# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES AND ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE<br><br>**Plaintiffs,**<br><br>v.<br><br>AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 14-35**<br><br><br><br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this action against the American Academy of Allergy, Asthma & Immunology ("AAAAI"); the American College of Allergy, Asthma & Immunology ("ACAAI"); Dallas Allergy and Asthma Center, P.A.; Family Allergy & Asthma LLC; the Joint Council of Allergy, Asthma & Immunology ("JCAAI"); Lyndon E. Mansfield M.D., P.A., a professional association; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; and David Weldon, MD (collectively, "Defendants").

## NATURE OF THE CASE

1.     This case is about a conspiracy among physicians who market themselves as "board-certified allergists," who are engaged in an anticompetitive campaign to restrict competition in the provision of allergy testing and allergen immunotherapy and all associated support services.  Today, thousands of physicians, including primary care physicians who are members of AAAPC, properly provide allergy testing and allergen immunotherapy to patients even though they are not board certified allergists.  Many primary care physicians in particular rely on plaintiff, UAS, an allergy support services company that has reduced the economic barrier to entry for these treating physicians by supplying them with necessary equipment, antigens, and trained technicians to provide adequate allergy treatments to patients.  Defendants have taken the position that board certified allergists, alone, may treat patients for their allergy symptoms.  Critically, the Defendants, which include the three major national associations of "board-certified allergists," along with several individual board members of those organizations and their business practices, have gone beyond mere rhetoric by engaging in a pattern of anticompetitive behavior in furtherance of their self-described "turf war."

2.     Defendants' conduct constitutes a conspiracy and agreement by the Defendant board certified allergist physicians, their businesses, and the trade organizations they lead, to drive competitors out of the market for allergy testing and allergen immunotherapy.  Defendants' agreement has included measures to attack their competitor physicians directly and to attack UAS, the services company that assists those competitors in entering and competing in the market.  In furtherance of their agreement, Defendants have attempted to orchestrate a group boycott of their competitor physicians and UAS through contacting physicians, insurance companies, managed care organizations, and others in an attempt to convince them not to do business with or pay these competitors, but to restrict the business of allergy testing and

immunotherapy to board-certified allergists, their businesses, and their staff. In addition to their boycott objectives, Defendants have sought to fix prices for allergy-related services in a way that disadvantages competitors in the marketplace.

3.      The result of Defendants' turf war has been to restrict competition in the market for allergy testing and allergen immunotherapy including the associated support services, damaging not only Plaintiffs, but the market as a whole, including the many millions of patients who need access to lower cost allergy testing and allergen immunotherapy.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

4.      This action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, and the common law of torts for civil conspiracy and tortious interference with both current contracts and prospective business relations.

5.      This Court has subject matter jurisdiction over UAS's claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a).

6.      The Court may exercise personal jurisdiction over Defendants Gross, Mansfield, Weldon, Dallas Allergy and Asthma Center, P.A., and Lyndon E. Mansfield M.D., P.A., a professional association, because they are located in Texas and have continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

7.      The Court may exercise personal jurisdiction over Defendants JCAAI, AAAAI, and ACAAI because they regularly conduct business in Texas, including with Texas-based physicians to whom they market and communicate directly through phone calls, writings, and over the internet, including via their respective websites. Additionally, they have purposefully

directed specific actions at Texas, including phone calls, emails, letters, and publications. This action arises from and specifically relates to those purposeful contacts with the State of Texas.

8.      Furthermore, the Court may exercise personal jurisdiction over all Defendants because they expressly aimed tortious conduct at the State of Texas knowing that the brunt of their intended injury would be felt by residents of Texas. Defendants have expressly aimed such torts individually by committing antitrust violations, as well as interfering with contracts and prospective business relationships in Texas with the intent to harm residents of Texas. They have done so through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas. For example, as part of their work for JCAAI, Drs. Aaronson and Sublett sent emails to Texas approving and authorizing the creation and distribution of anticompetitive letters throughout Texas. Those letters were intended to injure UAS, which is located in Texas, as well as the Texan physicians that it supports. The purpose of the Defendants' tortious actions was to prevent competition from physicians who are supported by UAS, and the benefit of those actions was meant to accrue to board-certified allergists' businesses, such as Family Allergy & Asthma, LLC, which belongs to Dr. Sublett.

9.      The Court may also exercise personal jurisdiction over all defendants because they expressly aimed their tortious conduct at the State of Texas in the form of a civil conspiracy that was directed at the State of Texas and was intended to harm residents of Texas. Defendants have conspired to orchestrate a group boycott of insurance companies, managed care organizations, and physicians located in Texas, have targeted AAAPC members and UAS in Texas, and have accomplished their conspiracy through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas.

10.     Defendants could reasonably expect to be held accountable by a Texas court for the anticompetitive actions taken in Texas that were the intended result of their conspiracy.  As such, the Court's exercise of personal jurisdiction over Defendants would not violate traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants inhabit or transact business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District, including, but not limited to, the conspirators' attempts to organize a group boycott of insurance companies, managed care organizations, and physicians located in this district to harm UAS, which is also located in this District.  In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because JCAAI, ACAAI, and AAAAI each transact business in the District, such as accrediting members of their organizations in the District and providing support services to those members in the District.

12.     Defendants' conduct, including their attempts to organize a group boycott against non-allergist physicians and their businesses and support staff, including AAAPC members and UAS, and their tortious interference with AAAPC members and UAS's contracts and prospective business relations all cross state lines.  Defendants' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

13.     AAAPC is a 503(C)(6) non-profit organization of physicians with its principal place of business in Washington, the District of Columbia.  AAAPC represents the interests of over 250 primary care physicians who practice allergy testing and allergen immunotherapy in Texas and nationwide.  AAAPC has standing to request declaratory and injunctive relief to

5

protect the interests of its members, who would have standing to sue individually, but are not necessary parties to this suit.

14.     United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.   UAS provides support services for physicians practicing allergy testing and allergen immunotherapy in Texas and nationwide.

## Defendants

15.     The American Academy of Allergy, Asthma & Immunology is a Wisconsin non-profit organization of physicians with its principal place of business at 555 East Wells Street, Suite 1100, Milwaukee, WI 53202-3823.   It can be served at that address, ATTN: Executive Director, Inc.

16.     The American College of Allergy, Asthma & Immunology is a Minnesota non-profit organization of physicians with its principal place of business at 85 West Algonquin Road, Suite 550, Arlington Heights, IL 60005.   It can be served at that address through its registered agent, Richard J. Slawny.

17.     Dallas Allergy and Asthma Center, P.A. is a Texas professional association owned and operated by Dr. Gary Gross with its principal place of business at 5499 Glen Lakes Dr., Ste. 100, Dallas, TX 75231.   It can be served at that address through its registered agent, Dr. Gary N. Gross.

18.     Family Allergy & Asthma LLC is a Kentucky limited liability company owned and operated by Dr. James Sublett, with its principal place of business at 9800 Shelbyville Road, Ste. 220, Louisville, KY 40223.   It can be served through its registered agent, Ivan J. Schell, 500 W. Jefferson Street, Ste. 2400, Louisville, KY 40202.

6

19.     The Joint Council of Allergy, Asthma & Immunology is an Illinois non-profit organization of physicians with its principal place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067. It can be served at that address through its registered agent, Dr. Donald W. Aaronson.

20.     Lyndon E. Mansfield M.D., P.A., a professional association, is a Texas company owned and operated by Dr. Lyndon Mansfield, with its principal place of business at 2121 Wyoming Ave., El Paso, TX 79903. It can be served at that address through its registered agent, Randee Mansfield.

21.     Dr. Donald W. Aaronson is an individual residing in the state of Illinois and is the Executive Director of JCAAI. He can be served at his place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067, as well as at his residence or any place he may be found.

22.     Dr. Gary Gross is an individual residing in the state of Texas and is the Executive Vice President of JCAAI. He can be served at his place of business at 5499 Glen Lakes Drive, Suite 100, Dallas, TX 75231-4383, as well as at his residence or any place he may be found.

23.     Dr. Lyndon Mansfield is an individual residing in the state of Texas and is a member of the Board of Directors of JCAAI. He can be served at his place of business at 2121 Wyoming Avenue, El Paso, TX 79903, as well as at his residence or any place he may be found.

24.     Dr. James Sublett is an individual residing in the state of Kentucky and is the Immediate Past President and a member of the Board of Directors of JCAAI, and the Vice President of ACAAI. He can be served at his place of business at 9800 Shelbyville Road #220, Louisville, KY 40223-2977, as well as at his residence or any place he may be found.

25.     Dr. David Weldon is an individual residing in the state of Texas and is a member of the board of regents of ACAAI.  He can be served at his place of business at 1600 University Drive East, College Station, TX 77840, as well as at his residence or any place he may be found.

26.     Defendants' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

27.     Defendants Drs. Aaronson, Gross, Mansfield, Sublett, and Weldon are licensed physicians in their respective states and are in the business of providing allergy care to patients in their area and the places where their businesses do business.  Defendants operate their businesses either individually, or through professional associations or limited liability companies, which not only provide physician services for allergy care, but also provide support services necessary to provide the allergy care. These individual defendants are also members of one or both of the two national trade organizations composed of board-certified allergists, AAAAI or ACAAI, and act on behalf of those organizations as either officers or board members.   Both of those organizations nominate members to the board of an umbrella trade organization, Defendant JCAAI, which employs Defendants Aaronson and Gross as officers.

28.     The individual defendants market themselves within their sub-specialty as "board-certified allergists," which is a certification a physician obtains from the American Board of Allergy and Immunology ("ABAI"), a private organization established in 1971. The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine, and who participate in a two-year fellowship in an ABAI training program. Currently there are approximately 5,000 board-certified allergists practicing nationwide. The number of fellowships and board-certified allergists is shrinking.

8

29.     Despite not being certified by ABAI, many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of ABAI.

30.     As mentioned, the number physicians who receive ABAI accreditation is shrinking. And, despite these shrinking numbers, board-certified allergists are still the dominant players in the market for allergy testing and allergen immunotherapy. Almost every practicing board-certified allergist offers allergy testing and allergen immunotherapy. Collectively, they administer more of such treatments than any other player in the market. Board-certified allergists have the power to influence the market through their trade organizations. Those organizations, which collectively represent virtually every board-certified allergist, publish and control the most respected medical journals related to allergy care, and distribute influential allergy practice guidelines that can change the shape of the marketplace for allergy-related services.

## TREATING ALLERGIES

31.     The most common method of treating seasonal allergies includes the use of over-the-counter and prescription medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis. It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States.

32.     Despite the usefulness of over-the-counter and prescription allergy medications, these medications do nothing to desensitize or cure the patient. Rather, they mask the patient's

condition by treating the symptoms. The only known potential cure or actual treatment of allergic rhinitis is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens.

33.     Most physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies. The most common form of testing for seasonal allergies is the application of a skin prick test, which reacts to the corresponding allergic material.  In any physician's office, the skin prick test is usually applied by a technician under the supervision of the physician, with the physician reading and interpreting the test results.

34.     Once a physician diagnoses the patient's allergies, the physician may then suggest allergen immunotherapy.  The most common form of allergen immunotherapy in the United States is subcutaneous shots of allergen immunotherapy, otherwise known as "SCIT" or "allergy shots."  Some physicians also prescribe allergen immunotherapy in the form of sublingual drops of allergen immunotherapy placed under the tongue, otherwise known as "SLIT," a practice more common in Europe.  Should the physician deem it appropriate to place the patient on allergen immunotherapy, the physician typically supervises the mixing of the allergen immunotherapy by a technician in that physician's office.  The allergen immunotherapy is composed of antigens that are mixed with a diluent.  The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose."

35.     Whether administered in allergy shots or SLIT, physicians in the market differ on the location at which allergen immunotherapy should be administered.  Many physicians permit some of their patients to self-administer allergy shots or SLIT outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance that is associated with self-administered treatment.  Today a

10

majority of physicians who prescribe allergen immunotherapy for their patients permit patient self-administration in appropriate cases. Self-administration is a safe and effective alternative to having shots administered at the physician's office. It is also less expensive, because the patient and their insurer are not billed for shot administrations.

36.    Beginning in 1996, board-certified allergists agreed to advocate for restrictions on the practice of patient self-administration of allergen immunotherapy, a practice these physicians have termed "home immunotherapy." In a December 1996 article entitled "Practice Parameters for Allergen Immunotherapy," the editors of that publication first recommended that allergy shots should not be self-administered by patients, except in "exceptional cases in which allergen immunotherapy cannot be administered in a medical facility." Rather, the article posited, allergen immunotherapy should be administered by the physician's technician in the physician's office. The editors of that article, the "Joint Taskforce," represented leaders from the three national allergists organizations, AAAAI, ACAAI, and JCAAI. In this article, the Joint Taskforce was responding to a then-common practice by some board-certified allergists as well as non-board-certified allergists, including ENTs, board-certified family physicians, board-certified pediatricians, and other primary care physicians of permitting certain patients to self-inject their allergy shots. The Joint Taskforce recognized at the time that the trend towards patient self-administration would threaten the business of board-certified allergists, who most benefit from the high margins charged to patients and insurance companies, often between $20 and $30 per injection, for injections performed in the doctor's office.

**INCREASE IN COMPETITION**

37.    While the number of people who suffer from allergic rhinitis has grown along with the need for allergen immunotherapy, the number of board-certified allergists has declined. It is estimated that only 2-6% of the patients who would benefit from allergen immunotherapy

actually receive this therapy.  Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas.  This leaves rural and poor urban areas largely without access to allergy testing and allergen immunotherapy.  In addition to location, cost is an issue as well.  The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office.

38.     In 2009, Plaintiff UAS was formed.  UAS recognized the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services.  While some board-certified family physicians, board-certified pediatricians, and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Notably, purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that usually prevents most primary care physicians from providing allergy testing and allergen immunotherapy.  UAS helps physicians overcome this economic barrier by providing primary care physicians with the necessary testing equipment, antigens, and technicians.

39.     Since 2009, UAS has provided support services for more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states.  These support services are contract based, through which UAS provides contracting physicians and practice groups the necessary equipment, including allergy tests, and antigens for immunotherapy mixing, and other materials. Often, UAS will also provide a physician with trained technicians to assist the physician in testing and treating patients for seasonal allergies.   Physicians rely on these services to personally provide allergy care to the patients that the physician determines may benefit from this treatment.  This includes the physician supervising the provision of and reading the allergy

test, consulting the patient on the potential for allergen immunotherapy in response to a positive test, and supervising the mixing of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

40.    When board-certified allergists began discovering that primary care physicians in their local communities were practicing allergy testing and allergen immunotherapy instead of referring those patients to board-certified allergists, many became upset at the entry of additional competitors. These allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as the Texas Association of Allergy, Asthma, and Immunology ("TAAIS"), began to complain to the leaders of those organizations about this increase in competition.

## CONSPIRACY AND AGREEMENT TO ENGAGE IN ANTICOMPETITIVE BEHAVIOR

41.    In numerous board meetings of AAAAI, ACAAI, and JCAAI, as well as phone calls and emails, Defendants and others discussed the economic threat to their business and "specialty" posed by competitors providing allergy care, including primary care physicians and other non-specialist physicians who were supported by businesses like UAS. Defendants and other members of their organizations refer to these competitors as "quasi-allergy" entities, the "remote practice" of allergy and immunotherapy, or "remote allergy."

42.    In 2009, ACAAI created its "Marketing the Allergist Campaign" as part of an initiative to ensure that allergy specialists do not lose market share to new entrants. In a similar step, AAAAI created a "Task Force on the Future of Allergy/Immunology." In 2011, JCAAI also created a task force devoted to "remote practice issues." These and other national campaigns inspired regional organizations like TAAIS to develop their own marketing committees to fight against encroachment by competitors.

43.     Defendants also tried to recruit members of local organizations to collectively discuss and advocate against the practice of allergy by non-specialists.   In 2011, AAAAI, ACAAI, and JCAAI joined together to create the Regional Advocacy Discussion and Response Initiative ("RADAR").   The purpose of this initiative was to train select local allergists in advocacy and other skills so that the allergist associations could coordinate their efforts from the top down.   Among the issues to be addressed by the RADAR initiative were "Encroachment-Non-allergy providers representing themselves as trained A/I specialists" and "Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model."   At the 2011 AAAAI Winter Meeting, topics discussed in conjunction with the RADAR initiative included "Encroachment by non-allergists: ongoing communication with insurance companies allows the specialty to be represented in discussions about appropriateness of care."   From at least May 4, 2011 to July 25, 2011, members of RADAR also participated in discussions on an online message board called "Basecamp."   These discussions included coordination among these board-certified allergists, who are normally competitors, in approaching insurance companies and convincing them not to pay or to limit payment to competitors who are not board-certified allergists.

44.     More recently, Defendants have openly solicited the rank and file of JCAAI, ACAAI, and AAAAI to join in their organized campaign against competitors who are not board-certified allergists.   As recently as September 10, 2013, Drs. Aaronson and Gross held an official JCAAI-sponsored webinar presentation that instructed approximately 1,000 allergists on strategies for combating the "remote practice" of allergy.   This presentation was co-sponsored by AAAAI, which hosted the webinar, helped to advertise it, and offered it free to AAAAI members.

45. In these various discussions among Defendants and other "board-certified allergists," Defendants agreed that certain actions should be taken to fight back against encroachment on their turf in providing allergy testing and allergen immunotherapy, either by attacking the competitor physicians themselves, or the companies that enable them to enter the market. The agreements discussed and reached among Defendants include, but are not limited to: (i) filing or causing others to file medical board complaints against non-allergist physicians practicing allergy testing and allergen immunotherapy; (ii) organizing a boycott of board-certified allergists who are considering doing business with UAS or working for UAS in advisory roles; (iii) contacting insurance companies, managed care organizations, and other third party payors in an effort to convince those organizations to completely boycott or refuse to credential, accredit, or approve for payment any allergy testing and allergen immunotherapy services provided by primary care physicians or any physician relying on the support services of UAS; (iv) contacting insurance companies, managed care organizations, and other third party payors in an effort to convince them to reduce and limit the amount they would pay for any allergy testing and allergen immunotherapy services not provided by a board-certified allergist and his or her staff or to adopt prices and payment policies that favored board-certified allergists; (v) taking actions to convince or intimidate primary care physicians and other physicians who are not board-certified allergists not to practice allergy and immunotherapy or engage companies such as UAS to support such services, but instead to refer all allergy patients to board-certified allergists and their staff, including Defendants.

46. Communications among the Defendants made clear that they intended to target competitor physicians and UAS, which was helping physicians treat allergy-related symptoms despite the absence of board certification. For example, Defendant Dr. Weldon was particularly frank about this issue in an email to his colleagues, writing, "[c]all them charlatans or whatever

— unlike the monsters under our beds of our youth, they DO exist." He continued, "If we stop

the economic incentive by showing that we 'do it better', then we may get the upper hand in this

mess. Yet if we bury our minds in the academia of interleukins and hope that the competition

will just 'go away,' then we will find ourselves out of a job."

## MEDICAL BOARD COMPLAINTS

47.    Defendants' first line of attack against the competition for allergy testing and

allergen immunotherapy was to attack the non-allergist physicians directly.    To this end,

Defendants conspired to file or cause others to file false medical board complaints against the

competition — primary care physicians who work with companies like UAS – and then to

influence the medical board's consideration of those complaints unjustly.  The agreement to file

and influence such complaints was first proposed and accepted at a November 16, 2010 meeting

of the ACAAI's board on the topic of the practice of allergy by non-allergists.  At that meeting,

Dr. Michael Vaughn, an ACAAI member and a board-certified allergist in private practice in San

Antonio, Texas, made a presentation to the ACAAI Board regarding the entry of competitor

physicians into the marketplace.  On information and belief, Dr. Vaughn had at that time recently

made complaints to the Texas Medical Board ("TMB") against at least one board-certified

family physician who stopped referring her patients to Dr. Vaughn, instead choosing to test and

treat her patients herself.  Dr. Vaughn discovered that the once referring family physician was

now a competitor because UAS was providing that physician with the necessary support services

to provide patients with allergy testing and allergen immunotherapy.  Dr. Vaughn reported this

information to the ACAAI Board, which agreed to write a letter to the TMB discouraging the

practice of physicians relying on allergy services companies like UAS to provide allergy testing

and allergen immunotherapy.  Following this presentation, the ACAAI Board (including Drs.

Stanley Fineman and Weldon), agreed by consensus to send a letter of appreciation to Dr. Vaughn for his presentation.

48.     Defendants continued to encourage Dr. Vaughn and other allergists to make numerous complaints to the TMB concerning primary care physicians practicing allergy testing and allergen immunotherapy. Defendant Weldon authored an article that appeared in the December 2010 edition of the TAAIS newsletter. In this article, Dr. Weldon openly solicited board-certified allergists in Texas to report physicians who partner with companies like UAS to the TMB. That newsletter was a collaborative effort by the leadership of TAAIS and board members of ACAAI and JCAAI, including Dr. Weldon and Dr. Mansfield, respectively. The complaints to the TMB about primary care physicians practicing allergy testing and allergen immunotherapy included claims that those physicians were not qualified to provide such care, were providing substandard care by relying on support services from UAS, and were permitting the frequent and routine administration of "home immunotherapy."

49.     Soon after Dr. Vaughn's presentation and the associated TAAIS newsletter, the national allergist associations took action to support the Texas allergists' actions at the TMB. On March 31, 2011, the ACAAI board sent a letter to the TMB regarding "specific practices of allergy by non-allergists." This letter was approved by the ACAAI Board on Dr. Fineman's motion during the March 23, 2011 ACAAI Executive Committee meeting. The TMB letter cited extensively from the "Allergen immunotherapy: A practice parameter third update," misleadingly referring to this joint publication by JCAAI, ACAAI, and AAAAI as the "standard of care" despite disclaimers in that publication and the fact that there is no nationally accepted standard of care for allergen immunotherapy. Due in part to the Defendants' conspiracy, the joint publications of JCAAI, ACAAI, and AAAAI continued to discourage patient self-

17

administration of allergen immunotherapy, which Defendants had identified as a threat to their business model.

50.     Despite Defendants' attempts to influence TMB complaints through letters, the TMB dismissed complaints against primary care physicians practicing allergy testing and allergen immunotherapy, specifically finding that the standard of care was met. After receiving these negative rulings, Defendants worked with other board-certified allergists in Texas in an attempt to alter future TMB decisions with the knowledge that the TMB only relied on a few allergy and immunotherapy "experts" to advise them whether to take action on complaints made about allergy care. The "experts" that the TMB relied upon included Defendants Dr. Gross, Dr. Mansfield, and Dr. Weldon, as well as their colleagues Dr. William McKenna, Dr. Wesley Stafford, and Dr. Theodore Freeman. Each of these "experts" was a JCAAI, ACAAI, or AAAAI member, and each was bound together by Defendants' agreement to drive non-board-certified allergists out of the market. Defendants and/or their co-conspirators also attempted to influence a TMB board member, Dr. Hari Reddy, also a JCAAI, ACAAI, and AAAAI member. Despite the actions of Defendants, their co-conspirator experts, and Dr. Reddy, the TMB never agreed with Defendants' recommendation that primary care physicians are not qualified to practice allergy testing and allergen immunotherapy or that self-administration of allergy shots is a violation of the standard of care.

51.     When Defendants' efforts to influence the TMB proved unsuccessful in eliminating the practice of allergy testing and allergen immunotherapy by primary care physicians, Defendants decided to use information they obtained from the TMB in order to orchestrate a group boycott of non-allergist physicians and UAS by various physicians and organizations.

## GROUP BOYCOTT OF UAS'S SERVICES AMONG ALLERGISTS

52.     The Defendants conspired and agreed to orchestrate a group boycott of UAS's services by board-certified allergists through persuasion and intimidation. For example, through their breach of confidence at the TMB, Defendant Weldon and his co-conspirators learned that Dr. Allen Kaplan, who is a former AAAAI president, was listed as a UAS Advisory Board member. On March 19, 2011, Dr. Weldon questioned Dr. Kaplan about his relationship with UAS. After discussing a course of action with Dr. Weldon, Dr. McKenna wrote to Dr. Kaplan in a series of emails from March 24-25, 2011. In those emails, Dr. McKenna falsely claimed that he was investigating a claim of malpractice against UAS on behalf of the TMB. Dr. McKenna also mentioned his substantial credentials within the allergy community, referenced his awareness that Dr. Kaplan was listed as an advisor for UAS, and asked Dr. Kaplan if he could comment about a complaint made to the TMB. All this was in an attempt to intimidate Dr. Kaplan and to cause him to terminate his advisory relationship with UAS or risk being ostracized from the allergist community. After the email discussion between Dr. Kaplan and Dr. McKenna, as well as a verbal discussion between Dr. Kaplan and Dr. Weldon, Dr. Kaplan terminated his agreement with UAS. Updates about the investigation into Dr. Kaplan's cooperation with UAS made their way up the chain in the national allergist associations, eventually reaching the Executive Medical Director of ACAAI, Dr. Bob Lanier. Subsequently, allergists have continued to pressure their colleagues to avoid forming relationships with UAS.

## GROUP BOYCOTT OF NON-ALLERGIST AND UAS THROUGH CONTACT WITH INSURANCE COMPANIES

53.     Defendants conspired and agreed to remove or cut-off the economic incentive of their competitors to provide allergy testing and shots by attempting to cut off the main source of funding to these competitors, namely insurance companies. Without reimbursements from

19

insurance companies, the board-certified allergists' competitors would be unable to compete in the market for allergy testing and allergen immunotherapy and all associated support services.

54.     Defendants' original attempts to contact insurance companies began with phone calls to individual insurance companies following Defendants' agreement that they should convince insurance companies not to pay or to restrict reimbursement to their non-allergist competitors.   In coordination with Dr. Mansfield and Dr. McKenna, and in accordance with Defendants' agreement, Dr. Victor Estrada spoke with a representative of Humana of Texas ("Humana"), a conversation he documented in an email to Dr. Mansfield and Dr. McKenna on June 5, 2010.   According to Dr. Estrada, Humana was engaged in "red-flagging claims with certain codes coming in by primary care offices and are considering their options, such as, denying payment, considering charges as out of network, and even asking for their money back on previously paid claims."   Dr. Estrada expressed the hope that this would occur with all of the major carriers and "maybe some changes coming."   Dr. McKenna remarked on the "great news," and the three doctors continued to discuss a letter to insurance companies that would encourage them not to pay these doctors' competitors who are not board-certified allergists.

55.     On September 7, 2010, Dr. Weldon recounted over email his conversation with an official at Blue Cross/Blue Shield of Texas ("BCBS Texas") in which he told her to "suspect and to watch for abuse by primary care physicians" who practice "remote allergy."   In an email to his allergist colleagues discussing this advocacy, he continued, "If it all pans out, we may be in for what we wanted… [I]f something GOOD comes of this, then perhaps all of this prescribing over the internet (remote practice) and inappropriate billing (and thus, making it economically unfeasible for competitors) will subside and we will again be able to look at ourselves as 'The Allergist' and not have to share that title with some nitwit technician in an ENT practice."

56.     During this time, various board-certified allergists, including Defendants Mansfield and Weldon, were engaged in drafting or commenting on letters to numerous primary care physicians and insurance companies in Texas. The letters to primary care physicians were intended to convince those physicians not to contract with companies like UAS or engage in competition with board-certified allergists in supplying allergy testing and allergen immunotherapy to patients. The letters to insurance companies were intended to encourage those insurance companies to scrutinize claims and medical records submitted by primary care physicians and to ultimately refuse to pay those competitors.

57.     On September 30, 2010, Dr. Weldon forwarded a draft of a letter to primary care physicians to certain members of the board of directors of AAAAI, ACAAI, and JCAAI. Dr. Weldon expressed his desire to stop the economic incentives of the competition. In response to that email, Dr. Aaronson and Dr. Weldon had a conversation where Dr. Aaronson, who is also an attorney, relayed the antitrust concerns of sending such a letter. Meanwhile, around the same time, TAAIS submitted a version of a letter to primary care physicians to its local attorney, Jeff Henry, in Austin, Texas. In response to that submission, Mr. Henry advised TAAIS and its leadership to "not send" due to "liability and anti-trust [sic] issues."

58.     In response, TAAIS followed the advice of its counsel, at least temporarily, and considered the letter issue dead. That decision was reversed with the support of leaders of JCAAI, ACAAI, and AAAAI. In a series of emails in November 2010, Dr. Weldon expressed that he and Dr. Mansfield did not "want 'the letter' issue dropped." Dr. Weldon also pointed out that he was "on the Board of Regents for the ACAAI" and requested that TAAIS "consider our opinions on this matter."

59.     The leadership of TAAIS resumed its work on letters to primary care physicians and insurance companies in February 2011 at the encouragement of ACAAI, AAAAI, and

21

JCAAI. Aware of the potential antitrust liability involved, TAAIS and ACAAI, including Dr. Weldon, agreed that they would refrain from engaging in discussions of the letters in email, but would limit those discussions to phone calls. The TAAIS leadership then engaged in a process of rewriting the letters to primary care physicians to be more "informational" in nature. However, no attempt was made to change the letters to insurance companies to conform to the legal opinion TAAIS had previously received.

60.     The letters to insurance companies that existed at the time were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to the reliance on those physicians for support services by UAS as the "remote practice" of allergy represented to be "at best of poor quality and at worst... fraudulent." The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," and offered that board-certified allergists should be relied on to review the claims of non-allergists, in an attempt for Defendants to gain control over the payment and prices of allergy testing and allergen immunotherapy.

61.     As the letters were being finalized, ACAAI and its then executive director, Bob Lanier, complimented and encouraged TAAIS's president on the letter writing campaign. Throughout the drafting process, TAAIS's president emphasized his commitment to "be on the same page with the ACAAI board" by coordinating with Dr. Weldon, a member of that board. Additionally, JCAAI and its then-president, Dr. Sublett, and Executive Director, Dr. Aaronson, reviewed both letters and approved them on May 5, 2011. Yet not long after giving their approval, JCAAI, Dr. Sublett, and Dr. Aaronson attempted to cover up their involvement by claiming in a public newsletter on June 8, 2011 that JCAAI had recently rejected a similar letter

submitted on "state allergy society letterhead." AAAAI also received and reviewed the letters on August 11, 2011, just before they were to be released to the public.

62.     At that time, the letters were set to go out to executives and representatives of insurance companies and third party payors in Texas, including representatives of Aetna, BCBS Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans. A few weeks earlier, members of the TAAIS board received notice that UAS had contacted Tom Banning, the Executive Director of the Texas Academy of Family Physicians. In response, on August 9, 2011, Dr. Stuart Abramson sent Mr. Banning the letters intended for primary care physicians and insurance companies, orally representing in a phone conversation that the letters pertained to physicians relying on the services of companies like UAS. On August 11, 2011, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters to insurance companies. On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part of a settlement on February 1, 2013. The Injunction prohibits TAAIS and the individual defendants, who included various TAAIS board members and board members of the national allergist associations, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants' competitors.

63.     Despite the existence of temporary and permanent injunctions against their co-conspirators, Defendants intensified their efforts to approach insurance companies. Beginning in or around June 2012, Defendants again began contacting insurance companies, including fraud investigators, provider representatives, medical directors, and advisory board members over the phone and in person, rather than through letters in furtherance of their preexisting agreement. For example, beginning in the fall of 2012, Dr. Gross contacted and later met with

representatives of Aetna, including an Aetna medical director, Dr. Chris Jagmin, to advocate against reimbursing Plaintiffs, acting on behalf of himself, his business Dallas Allergy and Asthma Center, P.A., and JCAAI. Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, acting on behalf of Dr. Sublett, Family Allergy & Asthma, LLC, and JCAAI, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky. More recently, in or around October 2013, a board-certified allergist met with representatives of Blue Cross/Blue Shield of North Carolina, including a medical director, Dr. Denis O'Connell. In furtherance of the agreement between Defendants to convince insurance companies to eliminate or restrict payment to their competitors, Defendants Dr. Gross, Dr. Sublett, and other leaders of JCAAI, ACAAI, and AAAAI met with these and other insurance companies and discussed the practices of their competitor physicians and UAS, which supports them, and to advocate for boycotting Defendants' competitors.

64.     In absence of a payor's willingness to adopt a complete boycott of non-board certified allergist physicians, their businesses, and UAS, Defendants advocated that these payors fix prices in a manner that would disadvantage these competitors, such as eliminating or reducing the amount of reimbursement for immunotherapy charged by these competitors, while protecting reimbursement of board-certified allergists, including reimbursement for in-office administration of allergy shots, which favors the billing models of board-certified allergists. If the payors adopted policies that also harmed board-certified allergists, Defendants would collectively advocate to the payors for higher prices for board-certified allergists. For example, according to a February 13, 2013 JCAAI newsletter, JCAAI representatives engaged in "a number of discussions with a Senior Medical Director at Aetna" concerning raising reimbursement of board-certified allergists as compared to prices announced for the market.

65. Since being contacted by Defendants and other members of their conspiracy, Humana has refused to reimburse allergy testing and allergen immunotherapy performed by physicians supported by UAS. Meanwhile, on December 10, 2013, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014 that could be interpreted to purportedly deny reimbursement to physicians that permit patients to self-inject allergy shots. Other insurers have sought to limit the reimbursement of primary care physicians or to impose restrictions on their reimbursements as compared to the reimbursement of board-certified allergists. For example, both BCBS Texas and Aetna have limited the amount they will pay physicians who are not board certified allergists, but have not limited any payment for in-office administration of allergy shots, on which allergists make their largest margins, and which gives board-certified allergists a competitive advantage in pricing.

## GROUP BOYCOTT OF NON-ALLERGISTS AND UAS AMONG MANAGED CARE ORGANIZATIONS

66. In addition to insurance companies, Defendants conspired and agreed to convince managed care organizations to stop paying, refuse to credential or accredit, or reduce reimbursement for their non-board-certified allergist competitors who are supported by UAS. The agreement originated in emails between Dr. Weldon and members of JCAAI, ACAAI, and AAAAI. In a September 30, 2010 email, Dr. Weldon proposed that the board-certified allergists and their organizations needed to "partner with managed care to deter" their competitors. Subsequently, Dr. Weldon revealed a plan to "bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy'" as part of an initiative to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing. If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause." To that end, Dr. Weldon also suggested that the board-certified allergist organizations should

encourage their membership to "flood journals with articles regarding safety issues and reports of adverse reactions." These position statements are an essential part of the Defendants' attempt to "take a stand and 'protect our turf.'"

67.     As part of their effort to convince managed care organizations to stop doing business with or paying their competitors, Defendants, including JCAAI, ACAAI, and AAAAI and their leaders now advocate that the publications of these organizations define the standard of care for the practice of allergy testing and allergen immunotherapy, including those organizations' practice parameters and their thinly-veiled attacks against their competitors published in the form of "position statements." The purpose of these publications and representations is to confuse managed care organizations and their medical directors about the appropriate standard of care and discourage third parties from doing business with physicians who are not board-certified allergists who are assisted by companies like UAS.

68.     For example, one such statement, entitled "Location Matters," was co-written by Drs. Aaronson, Casale, Cox, Honsinger, and Webster, which includes the current Presidents of all three national allergist associations, JCAAI, AAAAI, and ACAAI, as well as the executive director and executive vice president of JCAAI. "Location Matters" raises unfounded fears about the safety of self-administration of allergen immunotherapy, citing an increase in the risk of death. The allergists' safety concerns are nothing more than an attempt to protect their business model, which is predicated on the high margins that board-certified allergists charge for in-office administration of allergy shots. To this end, "Location Matters" is written in such a way as to conflate the standard of care with the non-binding practice parameters created by the allergist associations. Those practice parameters, in turn, support the allergists' model by recommending that every allergy injection be administered by a technician at a board-certified

allergist's office, so that the board-certified allergist and his or her business can continue to charge insurance companies, managed care organizations, and patients for the administration.

69.     Defendants' statements, representations, and contacts with managed care organizations have had their intended effect of restricting competition for the provision of allergy testing and allergen immunotherapy. In furtherance of Defendants' agreement to persuade third-party payors to stop paying non-allergists, in the fall 2012, two managed care organizations located in El Paso, Texas, Superior Health Plan ("Superior") and El Paso First Health Plan ("El Paso First"), were contacted by a representative of ACAAI, on information and belief, Dr. Mansfield. Around the same time period, Parkland Community Health Plan ("Parkland") was contacted by a representative of JCAAI, on information and belief Dr. Gross.

70.     Shortly after these contacts, Superior began denying all reimbursements to non-allergists for allergy testing and allergen immunotherapy, despite the fact that those services fall within the standard of care established by the Texas Medical Board. More recently, on August 2, 2013, Superior announced a "credentialing policy" that limits reimbursements to physicians with the equivalent of a two-year specialist program, functionally precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy. On October 1, 2013, the same day that Superior's plan was set to go into effect, Parkland abruptly cut off all reimbursements to primary care physicians who practice allergy testing and allergen immunotherapy, citing to materials distributed by AAAAI. On October 1, 2013, Parkland's medical director, Dr. Barry Lachman, wrote a letter to primary care physicians announcing Parkland's new policy of not reimbursing services provided by primary care physicians or any physician in association with companies like UAS. In it, Dr. Lachman equated the standard of care with AAAAI practice parameters, just as Defendants intended in crafting their position statements. The primary reason given for Parkland's refusal to reimburse these physicians is that

27

"AAAI [sic] states that physicians should have specialized training before providing these services."  The Parkland letter then explicitly attacks permitting certain patients to self-administer allergy shots using the same arguments and referencing the same articles that Defendants presented in "Location Matters."  It concludes by threatening to exclude primary care physicians who continue to provide allergy care from the Parkland network.

71.     Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients. A specialist certification is not required by the standard of care in Texas nor any other state in which Plaintiffs operate.  Yet, Defendants suggest that primary care physicians are incapable of providing quality allergy care to their patients and are determined to shut primary care physicians and businesses like UAS out of the market.

**PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS**

72.     Plaintiffs have been damaged by actions taken by insurance companies at the behest of Defendants and their co-conspirators.  Defendants' actions have caused insurance companies and managed care organizations like Superior, Parkland, Humana, and Blue Cross/Blue Shield of North Carolina to avoid or stop reimbursing primary care physicians altogether; and managed care organizations including Texas Children's Health Plan and Community Health Choice to avoid certifying or approving primary care physicians for reimbursement; and other insurance companies like Aetna and Blue Cross/Blue Shield of Texas to change and reduce the amounts they are willing to pay primary care physicians in accordance with price fixing advocated by Defendants.

73.     As a direct result of Defendants' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Defendants.  AAAPC members and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing agreements and have also

28

experienced difficulty in entering into business relationships with others because of the Defendants' anticompetitive public relations campaign.

74.     UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers.  The result has been most noticeable in terms of lost revenue and corresponding lost profit for support services that would have otherwise been provided to physicians.  The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

75.     UAS has also been damaged by a direct boycott on the part of board-certified allergists.  While UAS supports primary care physicians who compete with the allergists, there is no reason that an allergist could not employ UAS as well or at least assist and advise UAS.  In addition to the interference with Dr. Kaplan's contract to advise UAS, Defendants have also dissuaded or attacked board-certified allergists that could do business with UAS.

76.     UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business.  Plaintiffs anticipate that UAS and AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs' investigation into the extent of the damage they have suffered at the hands of Defendants is ongoing.  Also much of the additional damage that UAS and AAAPC members have suffered is not easily calculable, such as damage to their goodwill.

## COUNT ONE

### SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS

77.     Plaintiffs incorporate by reference paragraphs 1 through 76 as if fully alleged herein.

78.     At all times relevant to the Complaint, Defendants have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and associated support services provided by non-board certified allergist physicians and their staff or contracting partners, including members of AAAPC and physicians supported by UAS.   In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses.   In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition.   This campaign has been at least partially successful.

79.     The Defendants' actions are a *per se* violation of the Sherman Act.   The Defendants represent board-certified allergists, a dominant market group of horizontal competitors.   They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny competitors access to customers and markets that are necessary to compete.   Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care

organizations, and other third-party payors and thereby their ability to get reimbursed for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and denying or decreasing reimbursements to those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

80.     Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under the rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. As the result of Defendants' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in all relevant geographic markets in Texas and other states, leaving patients to choose between paying more for allergy treatment or going without.

81.     As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

82.     UAS also seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

83.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO

### TEXAS FREE ENTERPRISE AND ANTITRUST ACT VIOLATION
### AGAINST ALL DEFENDANTS

84.    Plaintiffs incorporate by reference paragraphs 1 through 83 as if fully alleged herein.

85.    At all times relevant to the Complaint, Defendants have combined and conspired to eliminate competition for the provision of allergy treatment in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS.   In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition. The result of that illegal *per se* boycott and price fixing has been to eliminate or restrict AAAPC members' and UAS's ability to market and provide their services in Texas.  For example, as explained above, certain Texas insurance companies and managed care organizations have either stopped reimbursements for allergy care by physicians who are supported and assisted by UAS or restricted or interrupted those

reimbursements. As a result, UAS, Texas primary care physicians, Texas based members of AAAPC, and Texas allergy patients are all being denied the benefits of fair competition.

86.     The Defendants' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA"). The Defendants represent board-certified allergists, a dominant market group of horizontal competitors. They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny their competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to get reimbursed for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and decreasing reimbursements to those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

87.     Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under the rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who partner with UAS. As the result of Defendants' conduct, consumers have been deprived of the competition offered by AAAPC

members, UAS-supported physicians, and other primary care physicians, leaving patients to choose between paying more for allergy treatment or going without.

88.     As a direct and proximate result of Defendants' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

89.     UAS seeks money damages from Defendants jointly and severally for these violations. Defendants' violations were willful and flagrant. UAS's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

90.     Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

91.     As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT THREE

## TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS AGAINST ALL DEFENDANTS

92.     Plaintiffs incorporate by reference paragraphs 1 through 91 as if fully alleged herein.

93.     In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with the existing agreements between AAAPC members and insurance companies, managed care organizations, practice groups, and patients, as well as existing agreements between UAS and its many physicians and practice groups.  Defendants' conduct, which was neither justified nor privileged, was intended to cause insurance companies, managed care organizations, practice groups, and patients to cease their agreements or doing business with primary care physicians, including AAAPC members, as well as to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS.  Defendants' conduct

34

constitutes willful and intentional acts of interference with those agreements. Such conduct caused injury to AAAPC members and UAS by, among other things, reducing revenue and corresponding profits generated from these agreements and making it more difficult for AAAPC members and UAS to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Defendants' actions.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS

94.     Plaintiffs incorporate by reference paragraphs 1 through 93 as if fully alleged herein.

95.     In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with AAAPC members' and UAS's prospective business relations. There was a reasonable probability that, absent Defendants' actions, AAAPC members would have entered into business relationships with insurance companies, managed care organizations, practice groups, and patients, and that UAS would have entered into business relationships with third parties, including other physicians and practice groups. Defendants intentionally interfered with these relationships by attempting to prevent payment to AAAPC members and other physicians who are not board-certified allergists who are assisted and supported by UAS, as well as to prevent physicians and practice groups from entering into business with UAS. Defendants' conduct was independently tortious or unlawful for the reasons described herein. Defendants' interference proximately caused injury to AAAPC members and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more

difficult to conduct operations and causing AAAPC members and UAS to expend considerable resources in order to further their business.

## COUNT FIVE

### CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

96.     Plaintiffs incorporate by reference paragraphs 1 through 95 as if fully alleged herein.

97.     In addition, or in the alternative, Defendants' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts and prospective business relations. Defendants and others have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS. In furtherance of their conspiracy, Defendants and others have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants and their other co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition. Defendants and their other co-conspirators have also taken actions to interfere with Plaintiffs' current contracts and prospective business relationships. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have

suffered considerable injury to their businesses and their ability to compete in the marketplace. Defendants are all jointly and severally liable for the actions taken in furtherance of their conspiracy.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

98.     Plaintiffs incorporate by reference paragraphs 1 through 97 as if fully alleged herein.

99.     To preserve the status quo until trial in this cause, Plaintiffs hereby request the Court to preliminarily enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a preliminary injunction, from:  (i) contacting insurance companies, managed care organizations, or other third-party payors about Plaintiffs and their services or business practices, (ii) publishing and disseminating or further publishing and disseminating statements attacking Plaintiffs or their services or business practices to third-party payors, members of the medical profession, or related entities; or (iii) interfering with Plaintiffs' business and contractual relationships, including taking action, in an effort to harm Plaintiffs' practices, services, methods, or businesses.

100.    Upon judgment in this cause, Plaintiffs further request the Court to enter a judgment permanently enjoining and restraining Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from: (i) contacting insurance companies, managed care organizations or other third-party payors about Plaintiffs and their services or business practices, (ii) publishing and disseminating or further publishing and disseminating statements attacking Plaintiffs or their services or business practices to third-party payors, members of the medical profession, or related entities; or (iii) interfering with Plaintiffs'

business and contractual relationships, including taking action, in an effort to harm Plaintiffs'
practices, services, methods, or businesses.

## ATTORNEYS' FEES

101.     Plaintiffs incorporate by reference paragraphs 1 through 100 as if fully
alleged herein.

102.     15 USCA § 15 and TFEAA § 15.21 both provide for the recovery of
attorney fees and costs of suit in private enforcement actions under the antitrust laws.  Plaintiffs
therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs
they have incurred as a result of Defendants' conduct.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of
right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a.     Adjudge and declare that Defendants have engaged in unlawful conduct in
violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

b.     Adjudge and declare that Defendants have engaged in unlawful conduct in
violation of Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

c.     Preliminarily and permanently enjoin Defendants from violating Section 1 of the
Sherman Act, 15 U.S.C. § 1 and Section 15.05(a) of the TFEAA, Tex. Bus &
Comm. Code § 15.05(a).

d.     Adjudge and declare that Defendants unlawfully interfered with Plaintiffs'
existing contracts.

e.     Adjudge and declare that Defendants unlawfully interfered with Plaintiffs'
prospective business relationships.

f.     Adjudge and declare that Defendants unlawfully engaged in a civil conspiracy.

g.     Against all Defendants, jointly and severally, award UAS damages in an amount
to be proved at trial, to be trebled with interest.

h.      Against all Defendants, jointly and severally, award Plaintiffs their attorney's fees and costs of this suit; and

i.      Award such other further relief as the Court deems just and proper.

DATED:  January 13, 2013.

Respectfully submitted,

BRACEWELL & GIULIANI LLP


By:   /s/ Casey Low
           Casey Low
           Texas Bar No. 24041363
           111 Congress Ave., Suite 2300
           Austin, Texas 78701-4061
           Phone: (512) 542-2109
           Fax: (800) 404-3970
           casey.low@bgllp.com

           Richard C. Danysh
           Texas Bar No. 05377700
           300 Convent St., Suite 1500
           San Antonio, Texas 78205-3723
           Phone: (210) 299-3475
           Fax: (210) 299-0106
           richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS