**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES** | § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. 14-35-OLG** |
| **v.** | § § § | |
| **AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD** | § § § § § § § § § § § § § § § § | |
| **Defendants.** | § | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND TEMPORARY RESTRAINING ORDER**

TO THE UNITED STATES DISTRICT COURT:

Plaintiffs, Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this Motion for Preliminary Injunction and Temporary Restraining Order against the American Academy of Allergy, Asthma & Immunology ("AAAAI"); the American College of Allergy, Asthma & Immunology ("ACAAI"); Dallas Allergy and Asthma Center, P.A.; Family Allergy & Asthma LLC; the Joint Council of Allergy, Asthma & Immunology ("JCAAI"); Lyndon E. Mansfield M.D. P.A., a professional association; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; and David Weldon, MD (collectively, "Defendants") and show the Court as follows:

Defendants, who are various board-certified allergists, their businesses, and the trade associations they lead, have conspired to push UAS and the primary care physicians represented by AAAPC out of the market for allergy testing and allergen immunotherapy by any means possible.  Defendants' most recent means is to contact insurance companies and health plans in an effort to convince those payors for these services not to pay Defendants' competitors or to adopt pricing and reimbursement policies to disadvantage those competitors while protecting the Defendants' inflated prices.  A Texas state court has previously enjoined such illegal group boycott and price fixing behavior, but it has nevertheless expanded to a nationwide level.

Defendants' actions, which have been planned and agreed to over the past few years, have intensified in recent days.  Since Plaintiffs filed their complaint on January 13, 2014, UAS and primary care physicians represented by AAAPC have received a noticeable rise in inquiries and efforts to cut off reimbursement by insurance companies and health plans in Texas and in many other states.  These third-party payors include those known to have been contacted by Defendants and consistently present the same misinformation used by Defendants to attack their competitors.  Because Defendants' anticompetitive activity threatens and is causing irreparable harm to Plaintiffs and consumers, including disruption of Plaintiffs' businesses, elimination of Plaintiffs as competitors, intrusion into the physician-patient relationship, increased prices, reduced patient choice, and disruption of patient care, immediate injunctive relief is necessary.

## STATEMENT OF FACTS

Defendants Drs. Gross, Mansfield, Sublett, and Weldon are physicians that, along with their businesses, employees, and staff, provide allergy testing and allergen immunotherapy to their patients, including all necessary support services. *See, e.g.*, Ex. A (Gross Depo.) at 14:14-15:25; Ex. B (Mansfield Depo.) at 35:15-36:1; 43:23-47:16; Ex. C (Sublett Depo.) at 7:4-8:14; Ex. D (Weldon Depo.) at 15:14-16:9.  These Defendants, along with Dr. Aaronson, lead the three

2

Defendant national trade associations of "board-certified allergists," a private certification granted to a physician by the American Board of Allergy and Immunology ("ABAI").  Ex. E (Aaronson Depo.) at 6:6-7:20; 19:8-24:17; 54:3-54:12.[1]  Defendants' competitors include other physicians and businesses that provide allergy testing and allergen immunotherapy, including board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), other specialists and primary care physicians, their businesses, employees, and staff, and any support services companies on which they rely.  Many of these classes of competitors have practiced allergy testing and allergen immunotherapy long before the creation of ABAI.  *See, e.g.*, Ex. D (Weldon Depo.) at 65:5-66:9; 180:10-181:13 & Ex. D-23.

Until recently, most primary care physicians could not enter the business of allergy testing and allergen immunotherapy, but only because of the large economic barrier to entry into the market.  Purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that had usually prevented these physicians and their businesses from providing allergy testing and allergen immunotherapy.  Ex. F ¶ 2.  UAS, an allergy support services company formed in 2009, enables primary care physicians and their businesses to overcome this economic barrier by providing them the necessary testing equipment, antigens, and technicians.  Since 2009, UAS has provided support services to more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states.  *Id.* ¶ 3.

Primary care physicians have traditionally been the largest source of referrals of patients to board-certified allergists and their businesses.  *See* Ex. B (Mansfield Depo.) at 39:12-40:9; Ex.

---

[1]    In 2012, Drs. Aaronson, Gross, Mansfield, Sublett, and Weldon each produced documents and gave deposition testimony while represented by counsel in response to third-party subpoenas issued by UAS in a prior state court litigation.  Excerpts from those deposition transcripts are attached to this motion as Exhibits A-E, and the relevant exhibits to those transcripts are attached and numbered as they were in the depositions.  Following those depositions, additional documents have been obtained, which are also attached, and Defendants have engaged in additional conduct, which should be the subject of further discovery.

C (Sublett Depo.) at 30:14-31:16.   Consequently, board-certified allergists and their businesses began discovering a noticeable rise in competition for allergy testing and allergen immunotherapy in local communities when referrals from those physicians declined.   Ex. D (Weldon Depo.) at 65:5-67:20.   These allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as the Texas Association of Allergy, Asthma, and Immunology ("TAAIS"), began to complain to the leaders of those organizations about this increase in competition from primary care physicians and UAS.[2]   Ex. C (Sublett Depo.) at 50:5-51:7 & Exs. C-3, C-5 & C-10; Ex. D (Weldon Depo.) at 27:11-29:1; 63:4-64:12 & Ex. D- 2; Ex. E (Aaronson Depo.) at 126:17-127:10; Ex. D-13.

In response, Defendants and others discussed the economic threat to their business and "specialty" posed by the rise in these competitors.   Ex. C (Sublett Depo.) at 50:5-51:7; Ex. D (Weldon Depo.) 172:11-173:7; 180:10-181:13; 183:10-184:5 & Exs. D-19 & D-23; Ex. E (Aaronson Depo.) at 128:2-16 & Ex. E-13.   These discussions occurred in numerous board meetings of AAAAI, ACAAI, and JCAAI, as well as in phone calls and emails in which they refer to these new competitors as "quasi-allergy" entities, engaged in the "remote practice" of allergy and immunotherapy, or "remote allergy."   *See, e.g.*, Ex. B (Mansfield Depo.) at 61:20-62:21; 67:12-68:25; Ex. C (Sublett Depo.) at 50:5-20; Ex. D (Weldon Depo.) at 117:17-119:22; 126:19-129:4 & Exs. D-9, D-10, D-12, D-13, D-16, & D-19.   These discussions ultimately produced agreements to form various committees and task forces to involve their membership in an effort to orchestrate a boycott of these competitors.   *See* Ex. B (Mansfield Depo.) at 106:4-107:15 & Ex. B-3 (concerning ACAAI's "Marketing the Allergist Campaign");   Ex. C (Sublett

---

[2]      UAS originally did business as United Allergy Labs, or UAL, names Defendants often use in their emails when they discuss targeting UAS.   Additionally, many of the emails produced by Defendants and their co-conspirators have been redacted without the participation of Plaintiffs and often without explanation.

Depo.) at 51:8-25;  Ex. E (Aaronson Depo.) at 128:24-129:22 & Ex. E-13 (JCAAI task force for

"remote practice issues"); Ex. G (AAAAI "Task Force on the Future of Allergy/Immunology").

In implementing their boycott, Defendants recruited physicians at regional levels to carry

out their attacks.  In 2011, AAAAI, ACAAI, and JCAAI joined together to create the Regional

Advocacy Discussion and Response Initiative ("RADAR") to train select local allergists in

advocacy and other skills so that the allergist associations could coordinate their efforts from the

top down.  *See* Ex. D-17; Ex. E (Aaronson Depo.) at 87:1-88:21; 90:21-92:10 & Ex. E-4.

Among the issues addressed by the RADAR initiative were fighting back against

"encroachment" by non-allergists and targeting insurance companies, actions Defendants

discussed at regular meetings of AAAAI, ACAAI, and JCAAI.  *Id.*; Ex. H (TAAIS 1601).  From

at least May 4, 2011 to July 25, 2011, members of RADAR also participated in discussions on an

online message board called "Basecamp," where they discussed approaching insurance

companies and convincing them not to pay or to limit payment to competitors.  *See, e.g.*, Ex. C

(Sublett Depo.) at 115:14-116:1; Ex. C-7 ("We have approached health plans.").

More recently, Defendants have openly solicited the rank and file of JCAAI, ACAAI, and

AAAAI to join in their organized campaign against their new competitors.  *See, e.g.*, Ex. E -13

(encouraging JCAAI members to approach carriers).  On September 10, 2013, Drs. Aaronson

and Gross held an official JCAAI-sponsored webinar presentation that instructed approximately

1,000 allergists on strategies for combating the "remote practice" of allergy.  This presentation

was co-sponsored by AAAAI, which hosted the webinar, helped to advertise it, and offered it

free to AAAAI members.  Ex. I.

Communications among the Defendants made clear they intended to target competitors,

including primary care physicians and UAS, and restrict competition in the market for allergy

testing and allergen immunotherapy.  Ex. D (Weldon Depo.) at 126:19-129:4; 130:1-22; Exs. D-

9 & D-10.   For example, Defendant Dr. Weldon was particularly frank about this issue in an email to his colleagues, writing, "[c]all them charlatans or whatever — unlike the monsters under our beds of our youth, they DO exist."   Ex. D-9.   Focusing on the economics of these new competitors, Dr. Weldon explained "if we bury our minds in the academia of the interleukins and hope that the competition will just 'go away,' then we will find ourselves out of a job."   *Id.*   To stop the economic incentive of the competition, Defendants and their co-conspirators agreed to target the main source of payment of their competitors: third-party payors.   *See* Ex. D (Weldon Depo.) at 126:19-129:4; 133:11-136:9; 155:24-157:2; Ex. D-10.

**<u>GROUP BOYCOTT USING INSURANCE COMPANIES</u>**

Defendants' original attempts to target insurance companies began with phone calls.   In coordination with Dr. Mansfield and others, Dr. Victor Estrada, a board-certified allergist in San Antonio, spoke with a representative of Humana of Texas ("Humana"), a conversation he documented in an email on June 5, 2010.   *See* Ex. J (TAAIS 1971-72).   According to Dr. Estrada, Humana was engaged in "red-flagging claims with certain codes coming in by primary care offices and [were] considering their options, such as, denying payment, considering charges as out of network, and even asking for their money back on previously paid claims."   *Id.*   Dr. Estrada expressed the hope that this would occur with all of the major carriers and "maybe some changes coming."   *Id.*   On September 7, 2010, Dr. Weldon recounted over email with Defendants' other co-conspirators that he contacted an official at Blue Cross/Blue Shield of Texas ("BCBS Texas") and told her to "suspect and to watch for abuse by primary care physicians" who practice allergy testing and immunotherapy.   Ex. K (TCH 103-104).   Telling of Defendants' motivation, he stated, "If it all pans out, we may be in for what we wanted…"   *Id.*

During this time, various board-certified allergists, including Defendants Drs. Mansfield and Weldon, were engaged in drafting or commenting on letters to numerous primary care

physicians and insurance companies in Texas.  Ex. J.  The letters to primary care physicians were intended to convince those physicians not to contract with companies like UAS or engage in competition with board-certified allergists in allergy testing and allergen immunotherapy.  Ex. E-1 (JCAAI 7-9).  The letters to insurance companies were intended to encourage them to scrutinize claims and medical records submitted by primary care physicians supported by UAS and to ultimately refuse to pay those competitors.  *Id.* (JCAAI 10-12).

On September 30, 2010, Dr. Weldon forwarded a draft of a letter to primary care physicians to certain board members of AAAAI, ACAAI, and JCAAI, expressing his desire to stop the economic incentives of the competition.  *See* Ex. E (Aaronson Depo.) at 31:12-35:7; Ex. E-1 (JCAAI 6).  In response, Dr. Aaronson and Dr. Weldon had a conversation where Dr. Aaronson, who is also an attorney, relayed the antitrust concerns of JCAAI's lawyer concerning sending such a letter.  Ex. D (Weldon Depo.) at 143:23-144:17; 145:11-146:8 & Exs. D-10 (Estrada 98) & D-13 (RJM 61); Ex. E (Aaronson Depo.) at 39:19-40:2; 69:2-72:10 & Ex. E-5 (RJM 16).  Meanwhile, around the same time, TAAIS submitted a version of a letter to primary care physicians to its local attorney, Jeff Henry, in Austin, Texas, who later advised them to "not send" due to "liability and anti-trust [sic] issues."  Ex. E-5 (RJM 16); Ex. L (TAAIS 602).

In response, TAAIS followed the advice of its counsel, at least temporarily, and considered the letter issue "dead in the water."  Ex. D-13 (RJM 61).  That decision was reversed with the support of leaders of JCAAI, ACAAI, and AAAAI.  In a series of emails in November 2010, Dr. Weldon expressed that he and Dr. Mansfield did not "want 'the letter' issue dropped."  Ex. B-16; Ex. B (Mansfield Depo.) at 150:4-19; Ex. D-10.  Dr. Weldon also pointed out that he was "on the Board of Regents for the ACAAI" and requested that TAAIS "consider our opinions on this matter."  Ex. O (TCH-312).

The leadership of TAAIS resumed its work on letters to primary care physicians and insurance companies in February 2011 with the participation of ACAAI, AAAAI, and JCAAI.[3] The draft letters to insurance companies were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to the reliance on those physicians for support services by UAS as the "remote practice" of allergy represented to be "at best of poor quality and at worst… fraudulent."   Ex. R (TAAIS 528-30).   The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," including relying on board-certified allergists to review claims of non-allergists, so that Defendants could gain control over the payment and prices of allergy testing and allergen immunotherapy.  *Id.*  TAAIS planned to mail the letters to representatives of insurance companies and third-party payors in Texas, including Aetna, BCBS Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans. Ex. S (TAAIS 1935).  Defendants' co-conspirators then intended to follow up with phone calls, all part of a multifaceted conspiracy to target UAS.  *See* Ex. T (Meiser 41).

On August 11, 2011, after discovering the letters had been sent to the Executive Director of the Texas Academy of Family Physicians, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters.  Ex. U.  On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part of a settlement on February 1, 2013.  Exs. V (Temporary Injunction) & W (Agreed Permanent Injunction) ("State

---

[3]   *See* Ex. M (TAAIS632-33).  For example, ACAAI and its then executive director, Bob Lanier, encouraged TAAIS's president in the letter writing campaign and TAAIS's president emphasized his commitment to "be on the same page with the ACAAI board" throughout the drafting process.  Ex. N (TCH-381); Ex. O (TCH-312).  Additionally, JCAAI and its then-president, Dr. Sublett, and Executive Director, Dr. Aaronson, received and approved both letters.  Ex. P (TAAIS 1307-A).  AAAAI also received and reviewed the letters on August 11, 2011, just before they were to be released to the public.  Ex. Q (TAAIS 1830-34).

Court Injunction"). The State Court Injunction prohibits TAAIS and those in active concert and participation, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants' competitors. *Id.*

Despite the existence of injunctions against their co-conspirators, and contrary to the advice of their lawyers who "repeatedly warned" them not to engage in boycott behavior, Defendants and their co-conspirators merely made efforts to cover their tracks. *See* Ex. C-5 (JCAAI1-2) ("JCAAI's legal advisors have repeatedly warned us against actions which might be considered *restraint of trade* – such as writing letters to primary care physicians or commercial companies…."); Ex. C (Sublett Depo.) at 154:22-155:14; Ex. E (Aaronson Depo.) at 45:4-46:7, 97:16-98:7 & Ex. E-5 (RJM16). Defendants agreed to "refrain from discussing in emails" their plans to target competitors through insurance companies, to contact insurance companies locally through coordination with member physicians, and to distance themselves publicly from boycott activity even while participating in the activity behind the scenes. *See, e.g.*, Ex. C (Sublett Depo.) at 152:3-24 (suggesting JCAAI relies on local physician members); Ex. D-17; Ex. E-10 (suggesting JCAAI rejected state allergy society letter for "antitrust issues"); Ex. E-11 (expressing confusion because JCAAI had approved letter); Ex. E-13 (suggesting members contact carriers directly); Ex. O (TCH-312) ("I feel strongly that we should have these discussions on conference calls, not e-mails.").

Nevertheless, even Defendants engaged in direct contact with third-party payors. In the fall of 2012, Dr. Gross contacted and later met with representatives of Aetna in person, including an Aetna medical director, Dr. Chris Jagmin. *See* Exs. F ¶ 6; F-1. Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky for a similar purpose. *See* Ex. F ¶ 8. More recently, in October 2013, a board-certified allergist met with

9

representatives of Blue Cross/Blue Shield of North Carolina, including a medical director, Dr. Denis O'Connell, who later met with representatives of AAAAI.  *See id.* ¶ 11 & F-4.

### GROUP BOYCOTT USING MANAGED CARE ORGANIZATIONS

In addition to insurance companies, Defendants conspired and agreed as part of their boycott of AAAPC members and UAS to convince managed care health plans to stop paying, refuse to credential or accredit, or reduce reimbursement to these competitors.  The agreement originated in emails between Dr. Weldon and members of JCAAI, ACAAI, and AAAAI.  In a September 30, 2010 email, Dr. Weldon proposed that the board-certified allergists and their organizations needed to "partner with managed care to deter" their competitors.  Ex. D-9. Although managed care health plans are required by law to pay for all allergy testing and allergen immunotherapy by any licensed physician, he suggested that the allergists' organizations should falsely claim such services are outside a non-allergist's scope of practice.

To that end, Dr. Weldon proposed a plan to "bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy'" as part of an initiative to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing."  Ex. D-10.  "If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause."  *Id.*  Dr. Weldon also suggested that the board-certified allergist organizations should "flood journals with articles regarding safety issues and reports of adverse reactions" and take other steps to "take a stand and 'protect our turf.'"  *Id.*

As part of that agreement, Defendants, including JCAAI, ACAAI, and AAAAI and their leaders and members now contact managed care organizations falsely claiming they define the standard of care for the practice of allergy testing and allergen immunotherapy, including those organizations' practice parameters and their thinly-veiled attacks against their competitors

published in the form of "position statements."  *See, e.g.*, Ex. D (Weldon Depo.) at 134:17-136:9; 191:7-192:9; Ex. X ("Location Matters").  The purpose of these publications and representations is to confuse managed care organizations concerning who should be paid for allergy testing and allergen immunotherapy and discourage third parties from doing business with physicians who are not board-certified allergists or are assisted by companies like UAS.  *See* Exs. D-5 (VB86); D-7 (Meiser 33); D-11 (RJM87).

## PRICE FIXING

In addition to engaging in a boycott of Plaintiffs, Defendants have also turned to price fixing behavior designed to disadvantage these competitors.  As explained above, Defendants have sought to convince third-party payors not to pay at all primary care physicians for allergy testing or allergen immunotherapy or those using the services of UAS, which itself is price fixing.  Additionally, in instances where payors resisted, Defendants have pushed for prices that limit the amount paid for immunotherapy prepared by these competitors as compared to board-certified allergists, and protecting the high shot fees that allergists charge.

For example, according to a February 13, 2013 JCAAI newsletter, JCAAI representatives engaged in "a number of discussions with a Senior Medical Director at Aetna" concerning raising reimbursement of immunotherapy prepared by board-certified allergists to 120 units annually as compared to the 90 units paid to everyone else for the same service.  *See* Ex. F-1. Defendants have also demanded that insurance companies and health plans require administration of allergy shots in a physician's office, a separate and additional charge to patients.  *See, e.g.*, Ex. X.  This demand protects the high margins of allergists, who have colluded not to permit patient self-administration, while disadvantaging competitors, who do not require or bill for this service, and patients, who incur additional out-of-pocket and time costs. Ex. Y (TAAIS 1646) (explaining the need for further concerted action to approach payors given

"the economics that face our field and our survival" including patients preferring "not have to pay co-pays for their shots or spend money on gas going to the allergist's office.").

## DEFENDANTS' THREATENED HARM IS REAL AND INCREASING

Although not required for injunctive relief, the threatened harm from Defendants' illegal agreements has proven to be real. Since contacted by Defendants and their co-conspirators:

- Humana of Texas has refused to reimburse allergy testing and allergen immunotherapy performed by primary care physicians or physicians supported by UAS;

- Both BCBS Texas and Aetna have significantly limited the amount they will pay physicians who are not board certified allergists for preparing allergen immunotherapy;

- Superior HealthPlan began denying all reimbursements to non-allergists for allergy testing and allergen immunotherapy, and later adopted a policy precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy;

- Parkland Community Healthplan abruptly cut off all reimbursements to primary care physicians who practice allergy testing and allergen immunotherapy, citing materials distributed by AAAAI and specifically attacking those physicians who rely on the services of UAS; and

- Relying on a position from AAAAI, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014 that could be interpreted to purportedly deny reimbursement to physicians that permit do not require patients to pay for allergy shots in the office.

*See* Ex. F at ¶¶ 6, 9-11; Exs. F-1; F-2; F-3; F-4.

The level of activity has risen more recently, especially since this lawsuit was filed. For example, in the past few weeks, Blue Cross/Blue Shield of Florida and Coventry of Kansas have both suggested that after consultations with allergists, they may change their policies regarding reimbursement of primary care physicians or any physician that relies on the services of UAS. *See* Ex. F ¶ 12. Similarly, during this time frame, physicians have called Plaintiffs to express concerns that other commercial carriers and health plans may no longer reimburse allergy testing and allergen immunotherapy performed by primary care physicians, including Blue Cross/Blue

Shield of Kansas, and El Paso First Health Plan, with some third-party payors threatening to seek their money back.  *Id.*

## ARGUMENT AND AUTHORITIES

"[A] court should issue a preliminary injunction if the movant shows (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Paulsson Geophysical Svcs, Inc. v. Sigmar*, 529 F.3d. 303, 309 (5th Cir. 2008).  Section 16 of the Clayton Act broadly empowers private litigants to seek injunctive relief "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  A private litigant need only show "threatened injury," not actual injury, to obtain injunctive relief.  *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 130 (1969).

Private litigants include competitors and other participants in the market threatened by a restriction on competition, like AAAPC members and UAS.  *See id.*; *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982); *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group, Inc*., 93 Fed.Appx. 1, 4-6 (5th Cir. 2004).  Those litigants are permitted to bring their claims themselves, or may seek injunctive or declaratory relief through an association like AAAPC, whose purpose includes advocating to prevent harm to its members.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd*., 627 F.3d 547, 551 (5th Cir. 2010).

### SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Given the timing of the injunction request, and the fact that there is an ongoing dispute, a "party is not required to prove his case in full at preliminary-injunction hearing."  *Id.*

Rather, the plaintiff must present a prima facie case based on the standards provided by the substantive law.  *See Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011).

### A.      Antitrust Claims.

At this stage, Plaintiffs have demonstrated overwhelming evidence in support of its claims against Defendants for Sherman Act and Texas Free Enterprise and Antitrust Act violations, much of which resulted in temporary and permanent injunctive relief in Texas state court for the same behavior.  Section 1 of the Sherman Act prohibits concerted action between entities that unreasonably restrain competition by stating:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "In order to state a claim under section 1 of the Sherman Act, a plaintiff must show that the defendants '(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market.'"  *Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007).[4]

Defendants' actions amount to a conspiracy and agreement by the Defendant board-certified allergist physicians, their businesses, and the trade organizations they lead, to intentionally injure primary care physicians and UAS in an effort to drive those competitors out of the market for allergy testing and allergen immunotherapy.  Defendants have agreed to target these competitors through at least two distinct anticompetitive tactics:  (1) engaging in and orchestrating a group boycott by contacting physicians, insurance companies, managed care organizations, and others in an attempt to convince them not to do business with or pay these competitors, but to restrict the business of allergy testing and immunotherapy to board certified allergists and their businesses, and (2) fixing prices for allergy-related services in a way that

---

[4]      The Texas Free Enterprise and Antitrust Act expressly provides that its provisions are to be construed in harmony with the federal antitrust statutes. Tex. Bus. & Comm. Code § 15.04.  For this reason, Defendants' conduct is a violation of that statute for the same reasons their conduct violates the Sherman Act.

disadvantages these competitors in the marketplace while protecting Defendants' high prices. Should Defendants' efforts succeed, there will be a further reduction in the provision of allergy services in both the national and local markets, as well as higher prices for allergy services than would otherwise prevail, to the ultimate detriment of Plaintiffs and the patients they serve.

These horizontal conspiracies aimed at harming competitors are *per se* illegal. *See Fed. Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 434-36 (1990) (explaining horizontal boycotts and price fixing are *per se* illegal because "[e]very such horizontal arrangement among competitors poses some threat to the free market" and reversing ruling requiring proof of market power); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 294 (1985) ("Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." ); *Tunica Web*, 496 F.3d at 413 (explaining *per se* analysis applies to boycotts of competitors). Defendants' actions are also *per se* illegal because they are inherently anticompetitive. Defendants as a group possess a dominant position in the relevant market, their actions are designed to cut off access to third-party reimbursement necessary to enable Plaintiffs to compete, and their effect of restricting others from offering allergy services are not pro-competitive. *See Tunica Web*, 496 F.3d at 413-14 (holding any of these attributes can merit *per se* analysis for refusal to deal with non-competitor).

Alternatively, a rule of reason analysis would produce the same result. Through aggressive marketing campaigns and efforts to restrict insurance payments to non-board certified competitors and support services, Defendants' horizontal agreement deliberately aims to suppress the number of physicians whom patients may turn for allergy testing and allergen immunotherapy. *See Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986);

*North Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008). The suppression of competition by additional providers does not improve diagnostic or treatment efficiency, decrease costs, improve choice of service, promote innovation in the field, or increase or enhance the geographical areas served. Instead, Defendants' actions impede all of these areas of institutional progress and enhanced competition. *See Ind. Fed'n of Dentists*, 476 U.S.at 459 (1986); *North Tex. Specialty Physicians*, 528 F.3d at 370. Under any analysis, Defendants' concerted activity has a net negative effect on competition in the market for allergy testing and allergen immunotherapy and therefore violates the antitrust laws.

### B.   Tortious Interference Claims.

There is a also substantial likelihood that Plaintiffs would recover against Defendants for tortiously interfering with Plaintiffs' existing contracts and business relationships. The elements of a claim for tortious interference with an existing contract are: "(1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss." *Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*, 514 F.Supp.2d 934, 938-39 (W.D. Tex. 2007).

AAAPC members maintain existing agreements with insurance companies, managed care organizations, practice groups and patients to provide care to patients and receive reimbursement for that care and UAS maintains existing agreements with physicians and practice groups regarding payment for its support services. *See* Ex. F ¶ 3. Defendants willfully interfered with these agreements through their contacts with insurance companies, managed care organizations, physicians and practice groups to cause these parties to cease or reduce their engagements under agreements with AAAPC members and UAS.

Plaintiffs also would recover for tortious interference with prospective business relationships, through showing: "(1) a reasonable probability that the plaintiff would have

entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Decorative Center of Houston, L.P. v. Direct Response*, 208 F.Supp.2d 719, 732 (S.D. Tex. 2002).

There is a reasonable probability that but for the Defendants' contact of insurance companies, managed care organizations, physicians, and practice groups to convince them not to do business with AAAPC members and UAS, they would have engaged in additional business. In addition to violating antitrust laws, Defendants actions are independently tortious and/or unlawful, because they involve: (1) violating a Texas State Court Injunction and encouraging others to do the same; (2) making false and fraudulent statements regarding the AAAPC members and UAS; (3) publishing disparaging communications about the business of AAAPC, its members, and the UAS; and (4) participating in a breach of statutory and contractual duty of confidentiality owed to the Texas Medical Board. *See, e.g.*, Ex. T (Meiser 41); Tex. Occ. Code Ann. §§ 152.0041; 164.007(c); 22 T.A.C. § 179.3.

### C.  Civil Conspiracy.

Finally, Defendants are also liable for a civil conspiracy, which includes: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 553 (5th Cir. 2012).  Defendants are not only jointly and severally liable for all of the claims above, but also for the acts of their co-conspirators and the persons and entities they have mobilized, including insurance companies, managed care organizations, and the TAAIS.

**PLAINTIFFS FACE A SUBSTANTIAL THREAT OF IRREPARABLE INJURY**

To show irreparable injury, a plaintiff "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Injury to goodwill and reputation in the market can be difficult to establish and therefore irreparable. *See, e.g., Allied Mktg Group, Inc. v. CDL Mktg, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); *Austin Bd. of Realtors v. e-Realty, Inc.*, 2000 WL 34239114, at *5 (W.D. Tex. 2000). Such irreparable harm occurs when patients may be lost to competitors, as those patients may never return. *See Humana*, 804 F.2d at 1394; *cf. Barron v. Vision Serv. Plan*, 575 F.Supp.2d 825, 836 (N.D. Ohio 2008). If the actions sought to be enjoined threatens to run the plaintiff out of the market, or business in general, irreparable harm certainly exists. *Humana*, 804 F.2d at 1394; *Life Source Enters., Inc. v. Shalala*, 2000 WL 33348793, at *5 (W.D. Tex. 2000); *Austin Bd. of Realtors*, 2000 WL 34239114, at *5.

Defendants' actions to run AAAPC members and UAS out of the market and interfere with their contracts and business relations cause and threaten irreparable harm in all of these ways. First, the actions harm the client relationships and goodwill of AAAPC members and UAS. If Defendants are permitted to continue implementing their coordinated campaign against Plaintiffs, Plaintiffs will lose existing patients, as well as relationships with insurers, managed care organizations, and others, with no way to calculate their damages and no way to repair the patient and business relationships that have suffered or the goodwill that has been lost. *See* Ex. Z ¶¶ 10, 13. If successful, Defendants' boycott could put UAS out of business. *See* Ex. F ¶ 15.

Second, Defendants' actions disrupt and intrude upon the physician-patient relationship. A patient's ability to obtain allergen immunotherapy is often dependent on the patient's ability to pay for such therapy, almost always through reimbursement by the patient's health plan or

insurance company.  *See* Ex. Z ¶ 6.  Similarly, AAAPC physicians cannot provide this necessary care to patients unless they receive reimbursement.  *Id.*  Defendants' attempts to run primary care physicians out of the business of allergy testing and allergen immunotherapy, including their attempts to negatively influence the reimbursement decisions of insurance companies and health plans, ultimately interferes with primary care physicians' relationships with their patients.  *Id.*

Third, Defendants' actions ultimately risk disruption and harm to patient care.  If physicians are no longer able to treat their patients for allergy testing and immunotherapy, those patients may possibly have to start their testing and treatment all over with a new physician, or discontinue their care altogether due to restricted access and higher costs.  *See* Ex. Z ¶ 11.  Even for the patients that can afford additional allergy testing or allergen immunotherapy from another physician, they will still be subjected to unnecessary medical risks.  *Id.* ¶ 12.

## THREATENED INJURY, IF THIS INJUNCTION IS DENIED, OUTWEIGHS HARM THAT WILL RESULT IF THE INJUNCTION IS GRANTED

Plaintiffs seek to enjoin Defendants from engaging in unlawful boycott and price fixing behavior, not from operating and marketing their medical practices or performing normal association functions.  Nevertheless, Defendants will likely claim they should be allowed to advocate for supposed "health" issues and any injunction would infringe their freedom of speech.  These arguments, which Defendants' co-conspirators tried and lost in the Texas State Court litigation, run contrary to clear Supreme Court jurisprudence.

In *Arizona v. Maricopa County Medical Society*, the Court held that the *per se* rule against price fixing permits injunctive relief against physicians regardless of their justification, as the Sherman Act "establishes one uniform rule applicable to all industries alike."  457 U.S. 332, 349-51 (1982).  In *Federal Trade Commission v. Superior Court Trial Lawyers Association*, the Court further held defenses based on "altruistic motives," free speech, and expression provide no additional protection against enjoining "a boycott conducted by business competitors who 'stand

to profit financially from a lessening of competition in the boycotted market.'"  493 U.S. at 427

(quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988)).

Defendants flatly refuse to agree to cease any activity.  Immediate injunctive relief is necessary

to preserve the status quo, while ensuring Defendants conduct their practices lawfully.

## PUBLIC INTEREST FAVORS THE INJUNCTION

Private enforcement of the antitrust laws through injunctive relief "serve[s] the public

interest in that 'they effectively pry open to competition a market that has been closed by

defendants' illegal restraints.'"  *Zenith Radio*, 395 U.S. at 133 (quoting *Salt Co. v. United States*,

332 U.S. 392, 401 (1947)).  The public interest is served by enjoining Defendants from

restricting competition for allergy care.  It is estimated that only 2-6% of the patients who would

benefit from allergen immunotherapy actually receive this therapy.  *See* Ex. Z-1.  Restricting

market competition will only serve to exacerbate these statistics, particularly in rural and poor

urban areas, by decreasing access and increasing costs of allergy care.  *See* Ex. Z ¶ 13.

## <u>PRAYER</u>

Plaintiffs request the Court to preliminarily enjoin Defendants, and their agents, servants,

employees and all persons acting under, and in concert with, or for them, from:  (i) engaging in

contacts or discussions with insurance companies, managed care organizations, or other third-

party payors concerning who should perform allergy testing or allergen immunotherapy or

whether or how much those organizations should reimburse for those services, (ii) contacting,

discussing, or disseminating materials to third-party payors, physicians, or others in the industry

regarding the business practices or services of primary care physicians or UAS; or (iii) taking

action or encouraging others to take action restrained above or otherwise to harm AAAPC

members' or UAS's businesses.  Plaintiffs are willing to post an appropriate bond.

DATED:  February 21, 2014.

Respectfully submitted,

BRACEWELL & GIULIANI LLP


By:  /s/ Casey Low _____
       Casey Low
       State Bar No. 24041363
       Richard C. Danysh
       State Bar No. 05377700
       Emily G. Ulman
       State Bar No. 24083997

       111 Congress Ave., Suite 2300
       Austin, Texas 78701-4061
       Phone: (512) 472-7800
       Fax: (800) 404-3970
       caseylow@bgllp.com

       ATTORNEYS FOR PLAINTIFFS
       AAAPC & UAS

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2014, I electronically submitted a true and correct copy of the above with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case file system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Steven V. Walkowiak
Greenberg Traurig
2200 Ross Avenue, Ste. 6200
Dallas Texas 75201
Walkowiaks@gtlaw.com
214-665-5928   Fax

Gregory J Casas
Greenberg Traurig
300 West 6th Street, Ste. 2050
Austin, TX 78701
casasg@gtlaw.com
512-320-7210   Fax

**ATTORNEYS FOR AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY**

Veronica S. Lewis
Christopher Wilson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, TX 75201
214-571-2900 Fax
vlewis@bigsondunn.com
cwilson@gibsondunn.com

**ATTORNEYS FOR DEFENDANTS AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOTHERAPY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD**

/s/ Casey Low
Casey Low