IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. 14-35** |
| v. | § § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; PSF, PLLC; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; DAVID WELDON, MD; ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS, JAMES WALLEN & PHADIA US INC.; ATLANTA ALLERGY & ASTHMA CLINIC, P.A.; STANLEY FINEMAN, MD | § § § § § § § § § § § § § § § § § § § § | **JURY TRIAL DEMANDED** |
| **Defendants.** | | |

## THIRD AMENDED COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United

Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this action

against the American Academy of Allergy, Asthma & Immunology ("AAAAI" or the

"Academy"); the American College of Allergy, Asthma & Immunology ("ACAAI" or the

"College"); Dallas Allergy and Asthma Center, P.A.; the Joint Council of Allergy, Asthma &

Immunology ("JCAAI" or the "Joint Council"); Lyndon E. Mansfield M.D., P.A., a professional

association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD;

James Sublett, MD; David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics,

Inc. ("AAN" or "AANMA"); Tonya Winders; Stanley Fineman, MD; Atlanta Allergy & Asthma Clinic, P.A. ("Atlanta Allergy"); James Wallen; and Phadia US Inc. ("Phadia") (collectively, "Defendants").

## NATURE OF THE CASE

1. This case concerns a conspiracy and agreement among the three national allergist trade associations, certain of their officers and board members, and those paid for and acting on their behalf or in coordination with them to restrict competition in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies (referred to herein as "allergy testing and allergen immunotherapy") in local areas throughout the United States. The three trade associations, AAAAI, ACAAI, and JCAAI, responded to pleas from their members to engage in a "turf war" to address the "encroachment" in the market by primary care physicians and UAS. In response, and in keeping with the "turf war" motif, these three independent associations of competitors agreed to form "RADAR," a joint venture of those organizations to recruit local allergists from every state, regional, and local allergist society in the nation to fight back against these competitors, and to provide a message board called "Basecamp" for those representatives to coordinate their anticompetitive activities.

2. Defendants, including not only these trade associations, but the leaders listed in this complaint and some RADAR members, actively engaged in their self-described "turf war" by contacting insurance companies, managed care organization health plans, and other third-party payors to convince them not to do business with or reimburse the allergy testing and allergen immunotherapy services of primary care physicians and UAS. Defendants also hired and paid organizations and their individuals to engage in this warfare on their behalf, including Defendant AAN, an organization formerly known as "Mothers of Asthmatics," under the guise that no one would challenge an organization with a now faux purpose of protecting children. Defendants

2

were further joined in agreement and in funds by Defendant Phadia, which lost sales of blood tests and medications as a direct result of primary care physicians performing allergy skin prick tests and preparing and administering allergen immunotherapy. Defendants engaged in this conduct despite, and in spite of, governmental organizations such as the Centers for Medicare and Medicaid Services and the Texas Medical Board, which otherwise pay for and authorize the services of these competitors. The purpose of Defendants' contacts with private third-party payors and encouragement of other members to engage in this behavior is to accomplish their anticompetitive objectives through persuasion, enticement, or coercion, and were economically motivated to protect Defendants' turf.

     3. The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers. By attempting to take away competitors' means to compete, namely reimbursement by third-party payors, Defendants have aimed to essentially deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy. Defendants' intended result is to protect their own profits and ensure that patients continue to pay their inflated prices, despite the need for additional supply in the market. Since this suit was filed, then unnamed members of the conspiracy, including AAN, Phadia, Winders, and Wallen only ramped up their anticompetitive activity with the hope that they could put Plaintiffs out of business before Plaintiffs could discover the depths of their participation in this conduct. Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, the Texas Free Enterprise and Antitrust Act, and Texas common law, the Court should put an end to this turf war and restore and protect competition.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

4.  This action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, and the common law of torts for civil conspiracy and tortious interference with both current contracts and prospective business relations.

5.  This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a). Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business. *See* 15 U.S.C. § 22.

6.  The Court may exercise personal jurisdiction over Defendants Gross, Mansfield, Weldon, Dallas Allergy and Asthma Center, P.A., and Lyndon E. Mansfield M.D., P.A., a professional association, and James Wallen because they are located in Texas and have continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

7.  The Court may exercise personal jurisdiction over Defendants JCAAI, AAAAI, ACAAI, AAN, and Phadia because they regularly conduct business in Texas, including with Texas-based physicians to whom they market and communicate directly through phone calls, writings, and over the internet, including via their respective websites. Additionally, they have purposefully directed specific actions at Texas, including phone calls, emails, letters, and publications. This action arises from and specifically relates to those purposeful contacts with the State of Texas.

8.  The Court may exercise personal jurisdiction over all Defendants, including Defendants Dr. Aaronson, Dr. Sublett, PSF, PLLC, AAN, Dr. Fineman, Atlanta Allergy, Phadia, and Tonya Winders because they expressly aimed tortious conduct at the State of Texas knowing

4

that the brunt of their intended injury would be felt by residents of Texas, and particularly by UAS, a San Antonio, Texas-based company. Defendants have expressly engaged in such tortious conduct individually by committing antitrust violations, as well as interfering with contracts and prospective business relationships in Texas with the intent to harm residents of Texas. They have done so through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas.

9. For example, on February 8, 2011, Dr. Aaronson, Dr. Sublett, and Dr. Fineman helped issue a letter to Regional, State, and Local Allergy Society Leaders announcing the formation of the Regional Advocacy Discussion and Response ("RADAR") initiative aimed at addressing the encroachment of non-allergists. *See* Exhibit E-4 to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order (Motion for Preliminary Injunction"), Dkt. No. 12-25. The letter, which was signed by Dr. Sublett, sought to recruit local representatives from every corner of the country, including Texas, to assist in carrying out RADAR's mission, the true intentions of which were to restrict access to the market for allergy testing and allergen immunotherapy. An AAAAI published report on "Ongoing Activities Relevant to the [RADAR] Initiative," admits that one of the means by which RADAR attempted to address the perceived encroachment by non-allergists, was to engage in "[o]ngoing communication with insurance companies" to represent the specialty "in discussions about appropriateness of care." *See* Exhibit G to Plaintiffs' Motion for Preliminary Injunction at 3, Dkt. No. 12-35. Those discussions have resulted in the refusal of insurance companies to reimburse claims submitted by primary care physicians residing in Texas who are supported by UAS. The encouragement of such actions by local representatives from every state in the country clearly demonstrates a nationwide pattern of anticompetitive conduct which has resulted in direct harm to entities located in Texas, including UAS and the practices of the Texas primary care physicians whom it supports.

10. Further, Dr. Sublett sent an email dated May 5, 2011 to the President of the Texas Allergy, Asthma & Immunology Society ("TAAIS"), Dr. Stuart Abramson, who was located in Texas, approving and authorizing the creation and distribution of anticompetitive letters aimed at primary care physicians, insurance companies, and managed care organizations throughout Texas. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order, Dkt. No. 12-46. The communication indicates that both Dr. Aaronson, JCAAI's acting Executive Director, and Dr. Gross, the organization's Executive Vice President, were also personally involved in approving these communications. Despite acting in their capacity as officers of JCAAI, Defendants' actions also benefitted themselves individually as physicians and their businesses engaged in the market for allergy testing and allergen immunotherapy, and thus were undertaken in more than any pure associational capacity. The fiduciary-shield defense protects against liability for officers of organizations just by being officers, but does not protect the individual Defendants from liability for their own tortious conduct, especially not from antitrust liability. The letters that Drs. Aaronson, Gross, and Sublett approved on behalf of JCAAI, were intended to injure UAS, as well as the Texas primary care physicians that it supports. As the referenced communication from TAAIS seeking approval for the letters asserts, they were revised to alter the "tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* at 2. However, regardless of the revisions, the intended target of the harm sought to be inflicted remains the same. Communications among the TAAIS leadership confirm that UAS was the intended target of the letters which Drs. Aaronson, Gross, and Sublett approved as described below. *See* Exhibit T to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-50 ("Because of "restraint of trade" issues, we cannot more directly attack [UAS], but the above approaches [including the draft letters] are within our legal rights."). The clear purpose of the Defendants' tortious conduct both with Texas and with others outside of

6

Texas as described below was to injure UAS and prevent competition from the physicians whom it supports. The benefit of those actions was meant to accrue to board-certified allergists' businesses, such as PSF, PLLC, which belongs to Dr. Sublett.

11. Dr. Sublett and Dr. Aaronson jointly participated in multiple JCAAI newsletters discussed below, which Dr. Sublett signed, and which were distributed to JCAAI members in Texas and support the basis for the claims in this Complaint. The October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," which was sent under Dr. Sublett's signature and originally drafted by Dr. Aaronson, mentions efforts to address the remote practice of allergy and specifically mentions "one such scheme featured in . . . a "Business Builder" article in *Medical Economics.*" Dr. Sublett testified under oath that the company featured in the referenced article was UAS. (September 7, 2012 Deposition Testimony of Dr. James Sublett, M.D. at 143:14-15). The newsletter, addressed to JCAAI's nationwide membership, including members in Texas, goes on to "recommend[] against engaging with any company that promotes [the remote practice of allergy]." Dr. Sublett also participated in RADAR, including its online message board "Basecamp," in which Dr. Sublett specifically sought information concerning UAS to target that company. Dr. Sublett, Dr. Aaronson, and Dr. Fineman also participated in the AAAAI Annual Meeting and the JCAAI meeting from February 22-26, 2013 in San Antonio, Texas, at which all three participated in discussions concerning the ongoing activities of RADAR and Defendants as described in this Complaint.

12. Dr. Fineman served as the President-Elect for the ACAAI from 2010-2011 and the President from 2011-2012. During his tenancy as President-Elect, Dr. Fineman drafted and participated in distributing multiple letters and publications, including attempts to paint ACAAI as setting the standard of care for allergy testing and allergen immunotherapy. Those communications were distributed to members in Texas, as well as third party payors, including

7

managed care organizations in Texas. For example, ACAAI sent a "position statement" regarding allergy testing and allergen immunotherapy to the managed care organization, El Paso First Health Plan located in El Paso, Texas. *See* Ex. A. El Paso First relied on the position paper to determine that the standard of care for allergy testing and allergen immunotherapy was limited to practice of board-certified allergists, and to deny claims of AAAPC members and primary care physicians in contract with UAS. Additionally during his tenancy as President-Elect of ACAAI, Dr. Fineman proposed and participated in drafting and sending a letter to the Texas Medical Board providing specific guidelines for immunotherapy. [Dkt. No. 135-23]. Dr. Fineman proposed a formal motion of ACAAI the ACAAI's letter be sent in support of the Texas Allergy & Asthma Society and its members in response to their pleas to combat UAS, and the ACAAI Executive Committee carried that motion and sent the letter in March 2011. Following the sending of this letter, Defendants Gross and Aaronson discussed with Dr. Fineman that the Texas Medical Board should target UAS and make their practices "a case they are investigating." Further, Defendant Gross and Dr. Fineman discussed how to disrupt UAS's business with primary care physicians, including Defendant Gross contacting the Chief of Internal Medicine at Presbyterian Hospital in Dallas to control Plaintiffs from a "corporate standpoint." [Dkt. No. 135-22].

13. Dr. Fineman also participated in Strike Force and RADAR, including its online message board "Basecamp." Through direct conversations with other Defendants, including those in Texas, and with his own colleagues at Atlanta Allergy, Dr. Fineman specifically sought information concerning UAS to target that company in Texas, Atlanta, and elsewhere. Dr. Fineman inquired with Defendants Aaronson and Sublett about whether they could collectively use a JCAAI press release "to support our case against the remote practice by United Allergy Labs?" Dr. Fineman and Atlanta Allergy also specifically targeted UAS through approaching

pediatric and primary care clinics in Georgia to convince them not to utilize or contract with UAS. *See* Ex. B. Defendants could reasonably expect to be held accountable by a Texas court for the anticompetitive injuries suffered in Texas that were the intended result of their conspiracy. As such, the Court's exercise of personal jurisdiction over Defendants would not violate traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants inhabit or transact business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District, including, but not limited to, the conspirators' attempts to organize a group boycott using insurance companies, managed care organizations, and physicians located in this district to harm UAS, which is also located in this District. In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because JCAAI, ACAAI, AAAAI, and AAN each transact business in the District, such as accrediting members of their organizations in the District and providing support services to those members in the District.

15. Defendants' conduct, including their attempts to organize a group boycott against non-allergist physicians and their businesses and support staff, including AAAPC members and UAS, and their tortious interference with AAAPC members and UAS's contracts and prospective business relations all cross state lines. Defendants' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

**PARTIES**

**Plaintiffs**

16.     AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia.  The AAAPC is an organization that fosters the ability of physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care.  Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  AAAPC seeks injunctive relief on its antitrust claims brought in a representational capacity on behalf of its members.  It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit.  AAAPC also seeks certain money damages in its own capacity because it has, itself, suffered actual damages due to the Defendants' tortious conduct through their interference with AAAPC's contracts and existing and prospective business relations.   AAAPC has appeared through undersigned counsel in this cause.

17.     United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.  UAS participates in the market for allergy testing and allergen immunotherapy through providing support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of board-certified allergists, including Defendant Dallas Allergy and Asthma Center, P.A. in the local market in Dallas; PSF, PLLC in the local market in Louisville; Lyndon Mansfield M.D., P.A. in the local market in El Paso, and Atlanta Allergy, in the local market in Atlanta, Georgia.  As a direct target of Defendants' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims.  UAS has appeared through undersigned counsel in this cause.

## Defendants

18.     The American Academy of Allergy, Asthma & Immunology is a Wisconsin non-profit organization of physicians with its principal place of business at 555 East Wells Street, Suite 1100, Milwaukee, WI 53202-3823 and has appeared through counsel in this cause.

19. The American College of Allergy, Asthma & Immunology is a Minnesota non-profit organization of physicians with its principal place of business at 85 West Algonquin Road, Suite 550, Arlington Heights, IL 60005 and has appeared through counsel in this cause.

20. Dallas Allergy and Asthma Center, P.A. is a Texas professional association owned and operated by Dr. Gary Gross with its principal place of business at 5499 Glen Lakes Dr., Ste. 100, Dallas, TX 75231 and has appeared through counsel in this cause.

21. PSF, PLLC d/b/a Family Allergy & Asthma LLC is a Kentucky limited liability company owned and operated by Dr. James Sublett, with its principal place of business at 9800 Shelbyville Road, Ste. 220, Louisville, KY 40223 and has appeared through counsel in this cause.

22. The Joint Council of Allergy, Asthma & Immunology is an Illinois non-profit organization of physicians with its principal place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067 and has appeared through counsel in this cause.

23. Lyndon E. Mansfield M.D., P.A., a professional association, is a Texas company owned and operated by Dr. Lyndon Mansfield, with its principal place of business at 2121 Wyoming Ave., El Paso, TX 79903 and has appeared through counsel in this cause.

24. Dr. Donald W. Aaronson is an individual residing in the state of Illinois and is the Executive Director of JCAAI, and has specially appeared through counsel in this cause.

25. Dr. Gary Gross is an individual residing in the state of Texas, is the Executive Vice President of JCAAI, and the owner of Dallas Allergy & Asthma Center, P.A., and has appeared through counsel in this cause.

26. Dr. Lyndon Mansfield is an individual residing in the state of Texas, is a member of the Board of Directors of JCAAI, and is the owner of Lyndon Mansfield, M.D., P.A., and has appeared through counsel in this cause.

27. Dr. James Sublett is an individual residing in the state of Kentucky and is the Immediate Past President and a member of the Board of Directors of JCAAI, the Vice President of ACAAI, the owner and founder of PSF, PLLC d/b/a Family Allergy & Asthma LLC, and has specially appeared through counsel in this cause.

28. Dr. David Weldon is an individual residing in the state of Texas and is a member of the board of regents of ACAAI and has appeared through counsel in this cause.

29. Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"), formerly known as Mothers of Asthmatics, is a Virginia corporation with its principal place of business at 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182. It can be served through its registered agent, Tonya Winders, 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

30. Tonya Winders is an individual residing in the state of Tennessee and is the Executive Director of AAN and a past officer of Phadia and may be served with process at her residence, 110 Countryside Drive, Hendersonville, TN 37075.

31. James Wallen is an individual residing in the state of Texas and is a representative of AAN, and may served with process at his residence, 28 Stillmeadow, Round Rock, Texas 78664.

32. Dr. Stanley Fineman is an individual residing in the state of Georgia, the Past President and current officer of ACAAI, and a current director of the board of AAN, and may be served with process at his residence, 4042 River Ridge Chase, Marietta, Georgia, 30067.

33. Atlanta Allergy & Asthma Clinic, P.A., a professional association ("Atlanta Allergy"), is a Georgia company owned and operated by Stanley Fineman, and may be served with process through its registered agent, Gregory P. Youra, 1180 Peachtree Suite, Suite 700, Atlanta, Georgia, 30309. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

34. Phadia US Inc. ("Phadia") is a Delaware corporation with its principle place of business at 4169 Commercial Drive, Portage, MI 49002, and may be served through its registered agent for service of process, Capitol Services, Inc., 1675 S State St., Suite B, Dover, Delaware, 19901. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

35. Defendants' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

36. Defendants Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are licensed physicians in their respective states and are in the business of providing allergy care to patients in their area and the places where their practices do business. Defendants operate their businesses either individually, or through professional associations or limited liability companies, which not only provide physician services for allergy care, but also provide support services necessary to provide the allergy care, including Defendants Dallas Allergy and Asthma Center, P.A.; PSF, PLLC; Lyndon Mansfield, M.D., P.A., and Atlanta Allergy & Asthma Clinic, P.A. Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are also members of some or all of the three national trade organizations composed of board-certified allergists, AAAAI, ACAAI, and JCAAI, and act on behalf of those organizations as either officers or board members.

37. The individual defendants market themselves within their sub-specialty as "board-certified allergists," which is a certification a physician obtains from the American Board of Allergy and Immunology ("ABAI"), a private organization established in 1971. The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine, and who participate in a three-year fellowship in an ABAI training program. Currently there are less than 3,000 board-certified allergists practicing nationwide. The number of fellowships and board-certified allergists is shrinking.

38. Defendant AAN is a "non-profit" organization originally named "Mothers of Asthmatics." Mothers of Asthmatics was formed in 1985 by Defendant Nancy Sander, a mother of an asthmatic child to advance the interests of asthmatic patients who suffer from lack of care to

treatment. Nancy Sander served as President of Mothers of Asthmatics until September 2013, when Tonya Winders took over the leadership of that organization, renaming it "Allergy and Asthma Network." Instead of advancing the cause of asthmatic children as the organization was originally formed to do, AAN now acts as a referral network for board-certified allergists who are members of ACAAI and in exchange for payment seeks to advance the market position of board-certified allergists affiliates.

39. Defendant Tonya Winders is the Executive Director of AAN and a former sales representative of Phadia, Inc., a company that employees many board-certified allergists as board members, including Defendant Mansfield. Phadia sells Immunocap tests, otherwise known as "ICAPs." ICAPs are a form of Radio Allergo Sorbent Tests ("RAST tests"), which are blood test that measure levels of Immunoglobulin E (IgE), the allergic antibody, in an effort to test for allergies. While ICAPs are used by board-certified allergists primarily to test for food allergies, Phadia promotes ICAPs to primary care physicians and encourages those physicians to use those tests on their patients who also may suffer from seasonal and perineal allergies, and encourages those physicians to refer those patients who test positive to board-certified allergists for treatment.

40. Despite not being certified by ABAI, many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of ABAI. As explained below, however, there is an important distinction between treating allergy-related symptoms and treating the underlying cause of allergies, the latter of which can only be accomplished through allergy testing and allergen immunotherapy.

15

41. While the number of physicians who receive ABAI accreditation is shrinking, board-certified allergists and their businesses are still the dominant players in the market for allergy testing and allergen immunotherapy. Almost every practicing board-certified allergist is in the business of allergy testing and allergen immunotherapy. Collectively, board-certified allergists as a group participate in more allergy testing and allergen immunotherapy than any other player in the market.

42. Board-certified allergists have the power to influence the market through their trade organizations. As the national organizations of board-certified allergists, AAAAI, ACAAI, and JCAAI, both individually and jointly are dominant players in the market for allergy testing and allergen immunotherapy. AAAAI, ACAAI, and JCAAI, which collectively represent virtually every board-certified allergist in the United States, publish and control the most respected medical journals related to allergy care, and distribute influential allergy practice guidelines that, if misunderstood or misused, can change the shape of the marketplace for allergy-related services.

43. The most common method of treating seasonal allergies includes the use of over-the-counter and prescription medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis. It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States.

44. Despite the temporary usefulness of over-the-counter and prescription allergy medications, these medications do nothing to desensitize or cure the patient, i.e., they fail to address the underlying cause of allergic rhinitis for seasonal and perennial allergies, instead masking the patient's condition by treating the symptoms. The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to

desensitize the patient to such allergens. Most physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test. Given travel cost and time considerations, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy. The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized. Allergy treatment services are offered in all major cities in the country and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another. While the market may be a local one, Defendants' actions are aimed at foreclosing an entire class of competitors and Defendants have attempted to impact localized markets in which they practice, and in which board-certified allergists practice, including for example, every localized market in Texas.

### THE MARKET FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

45. To compete in the market for allergy testing and allergen immunotherapy, firms rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees. The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, vials, needles, and other materials necessary to perform allergy testing and mixing of allergen immunotherapy. The firms must also be paid for the services performed, either by the patient directly, or by a "third-party payor" ("TPP"), such as a commercial insurance company, a managed care health plan, Medicare, or Medicaid. Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance

17

with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association.

46. During the testing of a patient, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test. If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician. The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the reaction, and the physician reviews the results. If a firm bills a third-party payor for a skin prick test, the firm does so under CPT Code 95004.

47.    If the physician determines that a patient is allergic to an allergen, the physician may recommend allergen immunotherapy to the patient. Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the allergen immunotherapy is typically mixed by the technician under the physician's supervision. The allergen immunotherapy is composed of antigens that are mixed with a diluent. The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose." If a firm bills a third-party payor for the mixing of allergen immunotherapy, the firm does so under CPT Code 95165.

48.    The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy shots." If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician. Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the

18

office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance that is associated with self-administered allergy shots. Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases. Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers.

49.     In 2003, AAAAI, ACAAI, and JCAAI collectively formed a "Joint Task Force" to act as authors and editors of "Practice Parameters," otherwise known as recommendations to their members. The first "Practice Parameters for Allergen Immunotherapy," published in 2003, recommended that board-certified allergists should no longer permit self-administration of allergy shots by patients, except in "exceptional cases in which allergen immunotherapy cannot be administered in a medical facility." Instead, the Practice Parameters recommended that allergy shots should be administered by the physician's technician in the physician's office. The Practice Parameters were the collective response of AAAAI, ACAAI, and JCAAI to the then-common practice of permitting self-administration of allergy shots by many board-certified allergists as well as non-board-certified allergists, including ENTs, board-certified family physicians, board-certified pediatricians, and other primary care physicians. The Joint Task Force recognized at the time that the trend towards patient self-administration would threaten the business of board-certified allergists, who most benefit from the high margins charged to patients and insurance companies for injections administered in the office, often between $20 and $30 per injection. Nevertheless, the "Practice Parameters" were only "recommendations" and explicitly stated that they did not intend to supplant the judgment of individual physicians. Despite the recommendation contained in the Practice Parameters, most physicians, including some board-

19

certified allergists and a majority of ENTs and primary care physicians in individual cases, permit self-administration of allergen immunotherapy for the appropriate patients.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

50. While the number of people who suffer from allergic rhinitis has grown along with the need for allergen immunotherapy, the number of board-certified allergists has declined. It is estimated that only 2-6% of the patients who would benefit from allergen immunotherapy actually receive this therapy. *See* Exhibit Z to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-57 at 15. Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas. This shortage has left rural and poor urban areas largely without access to allergy testing and allergen immunotherapy. In addition to location, cost is an issue as well. The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office.

51. In 2009, Plaintiff United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL." UAL's business model represented a response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services. While some board-certified family physicians, board-certified pediatricians, and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Notably, purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that usually prevents most primary care physicians from providing allergy testing and allergen immunotherapy. UAS helps physicians and their businesses overcome this economic barrier by contracting with those

20

businesses to assist those business's entry into the market. Since 2009, UAS has assisted more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy.

52. As part of the contractual relationship between UAS and physicians, practice groups, and hospitals, UAS is responsible for all of the non-physician services necessary to compete in the market for allergy testing and allergen immunotherapy, including the equipment, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry. UAS trains and provides technicians to assist physicians in the medical practice of allergy testing and allergen immunotherapy. Those technicians are located by UAS, and are required to meet more rigorous standards than the technicians typically relied on by the businesses of board-certified allergists, including engaging and passing a program concerning allergy testing and allergen immunotherapy administered by the University of the Incarnate Word School of Nursing. Physicians rely on the services of UAS employed technicians to personally provide allergy care to the patients that the physician determines may benefit from this treatment. This includes the physician supervising the provision of and reading the allergy test, consulting the patient on the potential for allergen immunotherapy in response to positive test, and supervising the mixing of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

53. Together, primary care physicians and UAS have provided a less expensive and more widely available alternative for consumers than the businesses of board-certified allergists in the market for allergy testing and allergen immunotherapy. The entry of at least 2,000 additional primary care physicians since 2009 in the local markets of 25 states, including Texas,[1] for allergy

---

[1] UAS currently contracts with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North

testing and allergen immunotherapy has begun to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but currently go untreated. Those primary care physicians who have entered the market offer a lower-cost option to patients, are more conveniently located to the patients, and have shorter wait times for an appointment and shorter wait times in the office. Those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or from incurring the expense of taking off work or school to travel to a medical facility for shot administration.

54. Third-party payors, especially commercial carriers, have also benefitted from this lower cost option of competitors. Lower reimbursement rates for primary care physicians as compared to specialists result in a significantly lower cost for allergy testing as billed under CPT Code 95004, the mixing of allergen immunotherapy as billed under CPT Code 95165, and a substantial reduction or elimination of costs billed for shot administration under CPT Codes 95115 and 95117. Additionally, the system as a whole has benefitted from the increased utilization of allergen immunotherapy, which studies have shown reduces the overall costs to patients and third-party payors in terms of expenses for medication, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by allergen immunotherapy.

55. Nevertheless, when board-certified allergists began discovering that primary care physicians in their local communities were practicing allergy testing and allergen immunotherapy (particularly in combination with UAS) instead of referring those patients to the businesses of board-certified allergists, many became upset at the entry of additional competitors. These

---

Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as TAAIS, began to complain to the leaders of those organizations about this increase in competition.

## MEDICAL BOARD COMPLAINTS

56. Defendants' first line of attack against the competition for allergy testing and allergen immunotherapy was to attack the non-allergist physicians directly. Defendant Gary Gross revealed to Defendants Aaronson, Sublett, and Fineman that if a primary care physician is concerned with the loss of his or her license, it may reduce any financial incentive to compete. Additionally, Gross suggested that they should find out if any primary care physicians had been dropped by UAS—as that information would be helpful to provide to medical boards and third party payors—or insurance companies.

57. To this end, Defendants conspired to file or cause others to file false medical board complaints against primary care physicians who work with companies like UAS, and then to influence the medical board's consideration of those complaints unjustly. The first of the complaints were filed by Dr. Michael Vaughn, an ACAAI member and a board-certified allergist in private practice in San Antonio, Texas. Dr. Vaughn discovered that these once referring family physicians were now competitors because UAS was providing those physicians with the necessary support services to provide patients with allergy testing and allergen immunotherapy. Dr. Vaughn filed the complaints with the Texas Medical Board ("TMB") in the summer and fall of 2010, alleging that certain physicians practicing in San Antonio, Texas were practicing allergy testing and allergen immunotherapy outside of their scope of practice, without proper training, and were inappropriately permitting patients to self-administer the allergy shots. After filing the complaints, Dr. Vaughn attended the November 16, 2010 Annual Meeting of ACAAI and on that date made a presentation to the ACAAI Board regarding the entry of additional competitors in the

23

San Antonio market for allergy testing and allergen immunotherapy. Dr. Vaughn reported this information to the ACAAI Board, which agreed to write a letter to the TMB discouraging the practice of physicians relying on allergy services companies like UAS to provide allergy testing and allergen immunotherapy. Following this presentation, the ACAAI Board agreed by consensus to send a letter of appreciation to Dr. Vaughn for his presentation.

58. After learning of Dr. Vaughn's complaints, Defendants encouraged all board-certified allergists to complain to the TMB if they discovered any primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS. In a December 2010 Texas Allergy, Asthma & Immunology Society ("TAAIS") newsletter, Dr. Weldon openly solicited board-certified allergists in Texas to report physicians who partner with companies like UAS to the TMB. That newsletter was a collaborative effort by the leadership of TAAIS and board members of ACAAI and JCAAI, including Dr. Weldon and Dr. Mansfield, respectively. The complaints to the TMB about primary care physicians practicing allergy testing and allergen immunotherapy included claims that those physicians were not qualified to provide such care, were providing substandard care by relying on support services from UAS, and were permitting patients to self-administer their allergy shots, which Defendants term "home immunotherapy."

59. In addition to encouraging complaints to the TMB, Defendants also attempted to influence the TMB's consideration of those complaints. On March 31, 2011, the ACAAI board sent a letter to the TMB regarding "specific practices of allergy by non-allergists." This letter was approved by the ACAAI Board on Dr. Fineman's motion during the March 23, 2011 ACAAI Executive Committee meeting. The TMB letter cited extensively from "Allergen immunotherapy: A practice parameter third update," misleadingly referring to this joint publication by JCAAI, ACAAI, and AAAAI as the "standard of care" despite disclaimers in that publication and the fact that there is no nationally accepted standard of care for allergen

24

immunotherapy. Due in part to the Defendants' conspiracy, the joint publications of JCAAI, ACAAI, and AAAAI continued to discourage patient self-administration of allergen immunotherapy, which Defendants had identified as a threat to their business model.

60. In addition to outside attempts to influence the complaints, certain Defendants, specifically Dr. Gross, Dr. Mansfield, and Dr. Weldon, attempted to use their positions as volunteer "expert reviewers" for the TMB to improperly influence the TMB's consideration of the complaints. Despite being made aware of the complaints by Dr. Vaughn and other colleagues and encouraging the filing of additional complaints, Dr. Gross, Dr. Mansfield, and Dr. Weldon failed to disclose this information and their conflict of interest to the TMB, a violation of their agreements with TMB and Texas State Law.

61. Despite Defendants' attempts to influence TMB, the TMB dismissed complaints against primary care physicians practicing allergy testing and allergen immunotherapy. The TMB's rulings specifically found that primary care physicians may practice allergy testing and allergen immunotherapy under Texas Medical Practices Act. The rulings also found that the physician's decisions to permit their patients to self-administer allergy shots does not violate the standard of care. After receiving these negative rulings, Defendants worked with other board-certified allergists in Texas in an attempt to alter future TMB decisions by volunteering as expert reviewers, included Defendants Dr. Gross, Dr. Mansfield, and Dr. Weldon, as well as their colleagues Dr. William McKenna, Dr. Wesley Stafford, and Dr. Theodore Freeman. Defendants and/or their co-conspirators also attempted to influence a TMB board member, Dr. Hari Reddy, also a JCAAI, ACAAI, and AAAAI member. Despite the actions of Defendants, the TMB never agreed with Defendants' recommendation that primary care physicians are not qualified to practice allergy testing and allergen immunotherapy or that self-administration of allergy shots is a violation of the standard of care.

25

62. Defendants' complaints and actions directed at the TMB are not the basis of the claims in this Complaint, but help explain Defendants' motivation to turn to illegal activity to accomplish the result they were unable to obtain through TMB complaints. As Dr. Weldon explained in an email to the leaders of TAAIS about losing the fight at the TMB level: "We need to survive our specialty. We need to capture the attention of our non-allergist colleagues. We need to get managed care to understand the differences provided by a ABAI BC allergist. If we don't, then we are dinosaurs waiting for the inevitable. Judging from the most recent response by the TMB in favor of the family practitioner who was practicing allergy, I would say we are fading fast." *See* Exhibit Y to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-55 at 2.

## CONSPIRACY TO RESTRICT COMPETITION IN THE MARKET FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

63. The evidence already in the record attached to Plaintiffs' Motion for Preliminary Injunction demonstrates the illegal activities that form the basis of this Complaint, specifically an agreement among the Defendants to restrain trade and restrict competition in the market for allergy testing and allergen immunotherapy in local areas throughout the United States and to tortiously interfere with AAAPC members and UAS's contracts and prospective business relations.

64. The agreement to restrict competition in the practice of allergy testing and allergen immunotherapy began after Defendants learned of UAS and the entry of primary care physicians into the market in areas within Texas. Defendants and other board-certified allergists in markets nationwide commonly referred to these competitors, specifically primary care physicians who practice with the support of UAS, as the "remote practice of allergy," "RPA," or "remote allergy." The term was originally adopted by board-certified allergists and their trade associations in reference to allergen immunotherapy that was remotely provided to competitor physicians by off-site mixing labs, but came to include the practice of primary care physicians who rely on a UAS

26

technician to assist in allergy testing and allergen immunotherapy. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. AAN, Phadia, and their representatives also adopted the term in their efforts in partnering with AAAAI, ACAAI, and JCAAI to boycott primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS and other allergy services companies.

65. To respond to this rise in competition of primary care physicians and allergy services companies, in 2009, ACAAI created its "Marketing the Allergist Campaign" as part of an initiative to ensure that allergy specialists did not lose market share to new entrants. Dr. Mansfield represented to the Board of Directors and Committee Chairs of TAAIS on May 1, 2009 that ACAAI's newly minted Marketing the Allergist Campaign was making a "strong effort" to respond to increasing frustrations "with losing business to other specialists." *See* Exhibit B-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-3.

66. By 2010, the conspiracy grew into a concerted effort to remove the economic incentive of their competitors to provide allergy testing and shots by attempting to cut off the main source of funding to these competitors, namely insurance companies and managed care health plans, otherwise known as third party payors. Without reimbursements from third party payors, the board-certified allergists' competitors would be unable to compete in the market for allergy testing and allergen immunotherapy. Leaders of TAAIS, including Dr. Mansfield and Dr. Weldon agreed that the organization should contact physicians and third-party payors in an effort to convince them not to do business with UAS. To that end, those board-certified allergists began drafting letters that would be disseminated on behalf of TAAIS to all physicians and third-party payors in Texas denouncing the practices of these competitors. *See e.g.* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38.

67. In the midst of drafting these letters, Defendants began contacting insurance companies directly. Original attempts began with phone calls to individual insurance companies following Defendants' agreement that they should convince insurance companies not to pay or to restrict reimbursement to their non-allergist competitors. In coordination with Dr. Mansfield and Dr. McKenna, and in accordance with Defendants' agreement, Dr. Victor Estrada, a then TAAIS Board Member and board-certified allergist in private practice in San Antonio, Texas spoke with a representative of Humana of Texas ("Humana"), a conversation he documented in an email to Dr. Mansfield and Dr. McKenna on June 5, 2010. *See* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38. According to Dr. Estrada, Humana was engaged in "red-flagging claims with certain codes coming in by primary care offices and are considering their options, such as, denying payment, considering charges as out of network, and even asking for their money back on previously paid claims." *Id.* at 2. Dr. Estrada expressed the hope that this would occur with all of the major carriers and "maybe some changes coming." *Id.* Dr. McKenna remarked on the "great news," and the three doctors continued to discuss a letter to insurance companies that would encourage them not to pay competitors who are not board-certified allergists. *Id.* at 1.

68. In September, 2010, Dr. Weldon engaged in a 45 minute conversation with an official at Blue Cross/Blue Shield of Texas ("BCBS Texas"), in which he told her to "suspect and to watch for abuse by primary care physicians" who practice "remote allergy" and that "she needed to have her organization look into" only allowing board-certified allergists to test and prescribe allergen immunotherapy. Dr. Weldon documented this conversation in an email to his fellow TAAIS board member and allergist colleague, Dr. William McKenna. *See* Exhibit K to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-39. In Dr. Weldon's email, he explained that: "If it all pans out, we may be in for what we wanted... [I]f something GOOD comes of this, then

28

perhaps all of this prescribing over the internet (remote practice) and inappropriate billing (and thus, making it economically unfeasible for competitors) will subside and we will again be able to look at ourselves as 'The Allergist' and not have to share that title with some nitwit technician in an ENT practice." *Id.* at 2 (emphasis added).

69. On September 25, 2010, the TAAIS Executive Director, Connie Mawer, circulated an Agenda and Reports for a September 28, 2010 conference call among the TAAIS Board Members and Committee Chairs, including their consideration of letters to be drafted and sent to insurance companies and primary care physicians throughout the State of Texas about their competitors. *See* Exhibit D-11 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-16. On September 26, 2010, Dr. Weldon responded in an email to the TAAIS Board and Committee Chairs regarding the need for letters to the market stating: "This is a turf war folks, like it or not, and it looks like we need to take a stand right now for our profession or else return to practicing primary care medicine (with a side of allergy, perhaps)." *Id* at 2.

70. The TAAIS Board, including Dr. Weldon, met on September 28, 2010 and according to the meeting minutes, "discussed a draft letter to PCPs [primary care physicians] developed by a small Ad Hoc Committee which informs [them] of 'allergy companies' popping up in Texas and marketing allergy skin testing and immunotherapy to [primary care] practices. This letter is currently under legal review." *See* Exhibit D-12 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-17. The Board also agreed to send voting delegates to the ACAAI November 2010 Annual Meeting in Phoenix, Arizona to present the letter concerning primary care physicians and "Texas scope of practice issues." Dr. McKenna also suggested "that the first draft letter could be revised to also be sent to third party payors." *Id.*

## AAAAI, ACAAI, AND JCAAI JOIN THE CONSPIRACY

29

71. On September 30, 2010, Dr. Weldon forwarded a draft of the TAAIS letter to primary care physicians via email to certain officers and members of the board of directors of AAAAI, ACAAI, and JCAAI, including Dr. Aaronson. *See* Exhibit D-9 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-14. Starting off his email, Dr. Weldon stated "Welcome to our world in Texas – this is what I've been beating my chest about for the past few years and for which we have been unable to counter. Call them charlatans or whatever — unlike the monsters under our beds of our youth, they DO exist." *Id.* Dr. Weldon's email expressed a desire to expand efforts in furtherance of their conspiracy and attempt to convince managed care organizations to stop paying, refuse to credential or accredit, or reduce reimbursement for their non-board-certified allergist competitors who are supported by UAS. He called for the leadership of the three national organizations "to partner with managed care to deter [the competition]." *Id.* The intentions behind his call to action were clear. He continued, "If we stop the economic incentive by showing that we 'do it better', then we may get the upper hand in this mess. Yet if we bury our minds in the academia of interleukins and hope that the competition will just 'go away,' then we will find ourselves out of a job." *Id.*

72. On November 12, 2010, the TAAIS delegates to the ACAAI Annual Meeting raised their concerns over the encroachment by non-board-certified allergists into the market for allergy testing and allergen immunotherapy to the ACAAI Board of Regents. A presentation was given "about the difficulties in San Antonio with the practice of allergy by non-allergists." *See* Exhibit C-3 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-6. The presentation, which is attached to the minutes of the ACAAI House of Delegates meeting specifically identifies UAS, then doing business as "United Allergy Labs (UAL)" which Dr. Vaughn stated "provides the PCP [primary care physician] with one of their 'trained' allergy testing technicians that work out of the PCP's [primary care physician's] office (but is a UAL employee)." *Id.* at 3. Following the

presentation, "[a] motion was made and passed to refer this problem to the Board of Regents for action. The JCAAI is already aware of the issue and has given advice to the Texas Allergy Society." *Id.* at 1.

73. The referenced advice of JCAAI to the Texas Allergy Society occurred at the November 2010 Annual Meeting, where Dr. Aaronson relayed to Dr. Weldon concerns of JCAAI's outside counsel about the TAAIS letter to primary care physicians, including that it was too targeted at a particular company. *See* Exhibit E-5 to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-26] at 3.

74. A week later, on November 19, 2010 Dr. Weldon sent an email to the Board of Directors of TAAIS to give them a report on the ACAAI House of Delegates Meeting. *See* Exhibit D-10 to Plaintiffs' Preliminary Injunction Motion, Dkt. 12-15. Dr. Weldon explained that he asked the ACAAI "to delay any recommendations until we have had the opportunity to ponder a definite plan of action." *Id.* Dr. Weldon expressed his opinion that the ACAAI "should bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy.'" *Id.* Dr. Weldon explained the reasoning behind doing so: "***Taking it one step further, if PCPs who practice allergy are not reimbursed because of questionable practices, and their patients are then having to absorb the costs of SLIT or watered-down SCIT given at home, then more than likely their allergy practices will fade.***" *Id.* (emphasis added). To accomplish this assault on the payment of competitors, Dr. Weldon explained that allergists could use the joint standards of AAAAI, ACAAI, and JCAAI to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing. If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause." *Id.* at 1-2. Dr. Weldon also revealed that he "talked with Lynn Mansfield at the meeting and he does not want 'the letter issue dropped – he

still feels it is a worthwhile effort to be pursued." *Id.* at 2. Dr. Weldon also suggested that the board-certified allergist organizations should encourage their membership to "flood journals with articles regarding safety issues and reports of adverse reactions." *Id.* Revealing the economic motivation for these actions, Dr. Weldon explained that "for those of us in private practice, we have a lot to lose if we do not take a stand and 'protect our turf'" *Id.* Dr. Weldon concluded his email by suggesting that the issues he raised were ones "that I feel we need to consider seriously and then dialogue over e-mails instead of taking up telephone time during quarterly board meetings." *Id.*

75. On November 19, 2010, Dr. Abramson, the then President of TAAIS, responded to Dr. Weldon's email by replying to him and the entire TAAIS Board stating "David, you are welcome to do whatever you like as an individual, as are others in TAAIS," with the rest of the sentence redacted by TAAIS as referencing their legal opinion. *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-18 at 3. By that time, TAAIS had received its legal review back from Jeff Henry, a lawyer in private practice in Austin, Texas, regarding the proposed letters to primary care physicians. Mr. Henry's "legal opinion" was to "'not send' due to liability and anti-trust [sic] issues." *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-40] at 1. Dr. Abramson went on to reject Dr. Weldon's request for a written record of their plan, stating "I feel strongly that we should have these discussions on conference calls, not e-mails." *Id.*

**ACAAI AND TAAIS AGREE TO WRITE LETTERS TO THIRD PARTY PAYORS**

76. On the morning of November 22, 2010, Dr. Weldon responded directly to just Dr. Abramson's email to him about the letter issue stating "If you wish to handle this specifically by phone conferences, then that is how we will handle it. However, I am currently on the Board of Regents for the ACAAI and I request that you please also consider our opinions on this matter." *See* Exhibit O to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-45] at 1. That same day,

Dr. Abramson responded to Dr. Weldon's email accepting Dr. Weldon's request, stating "We want to be on the same page with the ACAAI Board of Regents as well." *Id.* The email prompted Dr. Weldon to respond back, "It's too bad we can't find a lawyer that will have the same opinion as we do – the other 'allergists' do." *Id.*

77. On November 23, 2010, Dr. McKenna, the past-president of TAAIS, responded to all of the TAAIS Board of Directors concerning his disappointment "that our grand effort, to communicate to PCPs about the dastardly allergy marketing company techniques, is of course dead in the water." *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion [Dkt. 12-18] at 6. Dr. McKenna then proposed to the TAAIS Board "two actions." First, TAAIS would send "a communication to TAAIS membership of our attempted effort and result of due diligence," including the legal opinion of its private lawyer and the advice of JCAAI's lawyer Dr. Aaronson passed on to Dr. Weldon. *Id.* "Second, as was our intent at the outset, the next effort was to inform TPPs of the same issue and this still should be done." Dr. McKenna acknowledged that "some of you have expressed this also," and pledged to work with those Board members, namely "David Weldon, Lyndon [Mansfield], Victor [Estrada] and any others toward this next step." *Id.*

### AAAAI, ACAAI, AND JCAAI AGREE TO FORM "RADAR" FOR PURPOSES OF RESTRICTING COMPETITION

78. While the letters in Texas were still under discussion, the conspiracy continued to grow on the national stage. Following the TAAIS delegation's plea to the ACAAI House of Delegates about the entry into the market for allergy testing and allergen immunotherapy by primary care physicians relying on allergy services companies including UAS, all of the national allergy organizations responded. Specifically, as a result of that meeting, the leadership of AAAAI, ACAAI, and JCAAI agreed to a concerted effort and joint agreement to fight back against these new competitors. The organizations jointly agreed to form "RADAR," or the

33

"Regional Advocacy Discussion and Response" initiative, a joint task force aimed at addressing the encroachment of competitors on their turf of allergy testing and allergen immunotherapy. The purpose of this initiative was to recruit and train select local allergists in advocacy and other skills, such as persuading, enticing, or coercing third-party payors, so that the national associations could coordinate their efforts to restrict access to the market from the top down.

79. The forming of RADAR was a result of the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the ACAAI Annual Meeting, where those leaders "reviewed a plan to develop a more robust infrastructure to assist state/local AAI [allergy, asthma, and immunology] societies in addressing local issues." *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25. Subsequent to that meeting, "[i]n December 2009, the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly held a series of conference calls with state and local AAI society leaders to identify issues of concern to practicing allergists. Several common concerns were expressed by allergists around the country. Those included:.... Encroachment- Non-allergy providers representing themselves as trained A/I specialists... [and] Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.*

80. As a result of those conference calls with allergists around the country, in or around late December or early January 2011, three members of the AAAAI Board, Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks, met with the ACAAI House of Delegates. The AAAAI Board members' report from the meeting with ACAAI was documented in a January 5, 2011 email from the AAAAI President, Dr. Mark Ballow, to the three AAAAI representatives, copying the rest of the AAAAI Board. *See* Exhibit H to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-36]. Dr. Ballow stated "Thank you for sharing the outcome of the recent joint meeting between yourselves and the ACAAI House of Delegates. As you know, we have made a

34

concerted effort to collaborate with the College [ACAAI] and this is another good example of the possibilities for strengthening our relationship. We greatly appreciate the work that has gone into the Regional Advocacy Discussion and Response (RADAR) initiative." *Id.* at 1. Attached to the email was a document titled "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative January 2011." *Id.* at 3-5. Among the activities detailed was "Fiscal Realities, Ongoing efforts through national organizations" and "Ongoing communications with insurance companies about appropriate reimbursement for specialty care." *Id.* at 4. Other activities included addressing "Encroachment by non-allergists" explaining "Ongoing communication with insurance companies allows the specialty to be represented in discussions about appropriateness of care." *Id.* at 5. AAAAI's Winter Meeting took place a few days later on January 9, 2011 in Chicago, in which these topics were discussed. *Id.* at 1.

81. As a result of all of these meetings of the national and state allergy organizations, on February 8, 2011, AAAAI, ACAAI, and JCAAI issued a letter to Regional, State, and Local Allergy Society Leaders throughout the country seeking to recruit local representatives to carry out RADAR's mission. *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25. The letter was drafted on the joint letterhead of all three national associations, and executed by their joint leadership, including Dr. Sublett, as acting President of JCAAI. Among the issues to be addressed by the RADAR initiative were the two issues where these organizations agreed to contact insurance companies, specifically: "Encroachment- Non-allergy providers representing themselves as trained A/I specialists" and "Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.* The letter requested that each regional, state, and local society identify two individuals to serve as points of contact "to be trained to serve as conduits accessible by all three national organizations to channel information on issues impacting A/I patients and the physicians who serve them." *Id.*

35

## TAAIS JOINS RADAR AND TAKES ANTICOMPETITIVE ACTION

82. On February 12, 2011, Dr. Weldon sent an email to the TAAIS leadership calling for their involvement in the national RADAR initiative. *See* Exhibit Y to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-55. He wrote that "the initiative [was] going to demand the concerted attention of all organizations," in order to address "the survival of [their] specialty." *Id.* at 2. In a particularly impassioned plea, he stated that "it is OUR field that stands to disappear if we do not step up to the plate for it." *Id.* at 4. The President of TAAIS, Dr. Abramson, thanked Dr. Weldon for his "thoughtful comments," and promised to follow up "regarding planned actions, including . . . efforts with RADAR." *Id.* at 1.

83. In line with its pledge to be on the same page as the ACAAI Board and in participation with RADAR, the TAAIS leadership resumed their letter writing campaign and rewrote the letters to primary care physicians to be more "informational" in nature. *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-40. The minutes of the February 22, 2011 Executive Committee Conference Call indicate that such revisions were specifically made to address the earlier legal opinion advising TAAIS "not to send" due to "liability and anti-trust [sic] issues." *Id.* However, no attempt was made to change the letters to third-party payors to conform to the legal opinions TAAIS had previously received. The letters to third-party payors that existed at the time were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to those physicians' reliance on UAS for support services as the "remote practice" of allergy, which was represented to be "at best of poor quality and at worst… fraudulent." *See* Exhibit R to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-48. The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," and offered that board-certified

allergists should be relied on to review the claims of non-allergists, in an attempt for Defendants to gain control over the payment and prices of allergy testing and allergen immunotherapy. *Id.*

## DEFENDANTS INTIMIDATE ALLERGISTS AND PRIMARY CARE PROVIDERS ASSOCIATED WITH UAS

84. By this time, Defendants had already begun to resort to persuade, coerce, and intimidate to carry out their conspiracy to orchestrate a group boycott of UAS's services by board-certified allergists. For example, through their breach of confidence at the TMB, Defendant Dr. Weldon and his co-conspirators learned that Dr. Allen Kaplan, who is a former AAAAI president, was listed as a UAS Advisory Board member. On March 19, 2011, Dr. Weldon questioned Dr. Kaplan about his relationship with UAS. After discussing a course of action with Dr. Weldon, Dr. McKenna wrote to Dr. Kaplan in an email dated March 24, 2011. In that email, Dr. McKenna falsely claimed that he was investigating a claim of malpractice against UAS on behalf of the TMB. Dr. McKenna also mentioned his substantial credentials within the allergy community, referenced his awareness that Dr. Kaplan was listed as an advisor for UAS, and asked Dr. Kaplan if he could comment about a complaint made to the TMB. All this was in an attempt to intimidate Dr. Kaplan and to cause him to terminate his advisory relationship with UAS or risk being ostracized from the allergist community. After the email discussion between Dr. Kaplan and Dr. McKenna, as well as a verbal discussion between Dr. Kaplan and Dr. Weldon, Dr. Kaplan terminated his agreement with UAS. Updates about the investigation into Dr. Kaplan's cooperation with UAS made their way up the chain in the national allergist associations, eventually reaching the Executive Medical Director of ACAAI, Dr. Bob Lanier. Subsequently, allergists have continued to pressure their colleagues to avoid forming relationships with UAS.

85. Around the same time as the Defendants' intimidation of Dr. Kaplan, certain Defendants additionally intimidated providers either already in contract or in negotiations with

37

UAS. Representatives of Defendant Atlanta Allergy, including Defendant Fineman, met with one such provider, regarding the services of UAS and convinced them not to contract with UAS. Following this successful interference of a pediatric practice and clinic in Georgia, Atlanta Allergy began investigations to collect and retrieve materials of UAS in order to contact additional clinics and third party payors. Defendant Fineman even bragged to other allergists, including Defendant Sublett, that his company, Defendant Atlanta Allergy, was "successful in explaining to a local Peds group why they shouldn't institute this in the[i]r office."

## NATIONAL ORGANIZATIONS ENCOURAGE AND PARTICIPATE IN TAAIS'S ANTICOMPETITIVE CONDUCT

86. During this time, JCAAI's leaders also privately encouraged TAAIS in its letter writing campaign, but publicly maintained the opposite. In the March 16, 2011 JCAAI News You Can Use Newsletter, which was drafted by Dr. Aaronson and executed and sent under the signature of Dr. Sublett to JCAAI members across the nation, including Texas, JCAAI members were informed that "JCAAI's legal advisors [had] repeatedly warned . . . against actions which might be considered *restraint of trade* – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior." *See* Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7 (emphasis in original).

87. Nevertheless, in an April 4, 2011 email to the leaders of the Greater Houston Allergy and Immunology Society (GHAIS), Dr. Abramson, the then President of TAAIS, explained that "TAAIS has been aware of the 'scope of practice' issues surrounding various laboratories, including Smart Allergy and United Allergy Labs for more than several months." *See* Exhibit N to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42 at 1. As Dr. Abramson continued, "We have drafted 2 letters—one for PCP's and one for 3[rd] party payers." Further explaining, Dr.

Abramson stated "The Joint Council (JCAAI) is aware of our work in this area—there are significant medicolegal issues involved" referencing the JCAAI's prior newsletter. Dr. Abramson also revealed that "[a]t the AAAAI meeting, Bob Lanier, Executive Director for the ACAAI, complemented me on TAAIS efforts." As a result of this encouragement from the national organizations, Dr. Abramson explained "So, TAAIS has been a leader nationally in this effort, and we will continue to press forward with this effort."

88. In line with the private and secret encouragement of TAAIS, JCAAI approved the TAAIS letters. On or about May 4, 2011, then TAAIS President Dr. Abramson emailed Dr. Sublett to seek JCAAI's comments on TAAIS's letters to primary care physicians and third-party payors. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction [Dkt. 12-46] at 2. As Dr. Abramson explained in his email to Dr. Sublett, "As you are aware, there are several laboratory entities that are encroaching on the practice of allergy by advertising their services to physicians as a way of replacing referrals to allergists." *Id.* In reference to the prior JCAAI opinion Dr. Aaronson relayed to Dr. Weldon in November 2010, Dr. Abramson stated "Our initial letters had a tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* In response, Dr. Sublett relayed to Dr. Abramson the email and edits of Rebecca Burke, outside counsel for JCAAI. *Id.* at 1. Dr. Sublett then stated "I hope this helps. Good luck on your endeavors." *Id.* As a result of that communication, Dr. Abramson emailed the TAAIS Executive Committee reporting on the "Good news" and suggesting that the letters were ready to go out.

89. Despite having quietly approved the TAAIS letters to primary care physicians and insurance companies, JCAAI leadership attempted to cover up their involvement by publicly representing to its members in a June 8, 2011 newsletter drafted by Dr. Aaronson and Dr. Sublett that JCAAI had recommended that the letters "be withdrawn because [they] could raise antitrust

issues." *See* Exhibit E-10 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-27.

The public newsletter, signed by Dr. Sublett and distribute to JCAAI members, including

members in Texas, was met with confusion by TAAIS Board Members, who understood JCAAI

to have approved the letters. On June 9, 2011 Dr. Robert Mamlok expressed this confusion to

TAAIS Executive Director, Connie Mawer, who recalled in an email to Dr. Mamlok and Dr.

Abramson that the letter referenced "was approved by the JCAAI." *See* Exhibit E-11 to

Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-28.

90. By this time, ACAAI leadership had also given their seal of approval on the TAAIS

letters. *See* Exhibit N-Part 1 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42.

AAAAI also received and reviewed the letters on August 10, 2011 just before they were to be

released to the public. The letters were discussed in connection with an AAAAI Executive Board

Agenda item, item X or 10, specifically relating to UAS. *See* Exhibit No. Q to Plaintiffs'

Preliminary Injunction Motion, Dkt. No. 12-47.

91. At that time, the letters were set to go out to executives and representatives of

insurance companies and third-party payors in Texas, including representatives of Aetna, BCBS

Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health

Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans. *See* Exhibit S to

Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-49 at 8. To avoid revealing the true target

of the letters and thus antitrust scrutiny, Defendants and TAAIS planned to follow up the letters

with phone calls identifying UAS as the subject of the letters. *See* Exhibit T to Plaintiffs'

Preliminary Injunction Motion, Dkt. No. 12-50. The purpose of the phone calls instead of

identifying UAS in writing was "Because of 'restraint of trade issues'" Defendants "cannot more

directly attack UAL." *Id.* Dr. Abramson employed this same strategy previously suggested by

Defendants JCAAI, Dr. Aaronson, and Dr. Sublett, sending the letters to Tom Banning, the

Executive Director of the Texas Academy of Family Physicians on August 9, 2011, and following up that communication orally representing in a phone conversation that the letters pertained to physicians relying on the services of companies like UAS.

## STATE COURT INJUNCTION AGAINST TAAIS ACTION

92. On August 11, 2011, after discovering that the letters had been sent to Mr. Banning, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters to insurance companies. *See* Exhibit U to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-51. On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part of a settlement on February 1, 2013. *See* Exhibits V and W to Plaintiffs' Preliminary Injunction Motion, Dkt. Nos. 12-52 and 12-53. The Injunction prohibits TAAIS and the individual defendants, who included various TAAIS board members and board members of the national allergist associations, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants' competitors. For a period of time Defendants suspended some of their anticompetitive conduct, but later resumed that conduct on a national level.

## DEFENDANTS RESUME CONTACTING THIRD PARTY PAYORS

93. Despite the existence of temporary and permanent injunctions against their co-conspirators, Defendants ultimately intensified their efforts to orchestrate and carry out a group boycott against UAS and primary care physicians, including AAAPC members. The same day that Dr. Sublett and JCAAI approved the TAAIS letters, members of RADAR began participating in discussions on an online message board called "Basecamp." *See* Exhibit C-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-8. These discussions, which began on May 5, 2001 and continued through at least July 18, 2011, included coordination among these board-certified

41

allergists, who are normally competitors, in approaching insurance companies and convincing them not to pay or to limit payment to competitors who are not board-certified allergists. The message board specifically mentions UAS by name and contains further calls to action by Dr. Weldon. In a post he drafted on May 10, 2011, he writes "What we need is not rhetoric and 'ya-ya' but rather an aggressive attack on public senses without 'mentioning names.'" *Id.* at 6. Despite a RADAR member's admission that he was "acutely aware of how easily such a discussion might . . . run afoul of various anti-trust [sic] laws," the group pressed on, continuing to believe that the "AAAAI and ACAAI must join together to make this happen or [they would] continue to lose ground." *Id* at 8-9. As part of their effort to convince insurance companies and managed care organizations to stop doing business with or paying their competitors, Defendants, including some of the leaders of JCAAI, ACAAI, and AAAAI, implemented an idea previously suggested by Dr. Weldon and began to suggest to third-party payors that the publications of these organizations define the standard of care for the practice of allergy testing and allergen immunotherapy. Up until this point, those organizations and allergists as a whole declined to suggest their publications defined the "standard of care," namely because of legal concerns over the potential effect on many of their own members who did not follow the recommendations of those publications, such as the recommendation against permitting patients to self-administer allergy shots. *See* Exhibit D-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-12 at 2; Exhibit D-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-13 at 1.

### PHADIA, AAN, WINDERS & WALLEN JOIN THE CONSPIRACY

94. At the same time AAAAI, ACAAI, and JCAAI were forming RADAR, Phadia and AAN decided to enter into and support the conspiracy to restrict competition in the market for allergy testing and allergen immunotherapy. In or about March 2011, Phadia and Winders, acting on Phadia's behalf, began a strategy to combat the "remote practice of allergy" or "RPA."

Phadia, Inc. and its parent corporation, Thermo Fischer Scientific, manufacturer and sell a blood test to detect allergies, known as ImmunoCap or ICAP, a form of RAST or blood testing. Phadia markets those tests to physicians as an alternative to allergy skin prick testing, where physicians would draw the blood of their patients for analysis in a laboratory owned and operated by Phadia and ThermoScientific for a fee. The results from the ICAP testing, which generates more false positive results than skin prick testing, would then be used by Phadia to refer patients who tested positive to board-certified allergists for allergy skin prick testing and allergen immunotherapy. The emergence of allergy skin prick testing performed at primary care physicians' offices were seen as the cause in a reduction of orders of ICAPs and other RAST tests and medications sold by Phadia and a disruption in its referral of patients from primary care physician offices to board-certified allergists. The emergence of patients being treated with allergen immunotherapy also resulted in a reduction of allergy and asthma medication that Phadia sold.

95. Winders, at the time a market development team leader of Phadia, began to develop a strategy to reduce physicians' use of allergy skin prick tests that traded off with ICAPs by agreeing with board certified allergists, AAAAI, ACAAI, JCAAI, and a non-profit organization known at the time as "Mothers of Asthatics," now AANMA. In March 2011, Winders informed Sublett that she "look[ed] forward to battling these remote acce[s]s allergy providers with you." [Dkt. No. 135-12]. She requested a meeting to discuss her "clear strategy plan on this remote practice of a[l]lergy" with Sublett to begin fostering Phadia, AANMA, and Wallen's part in the conspiracy. Two months later, in May 2011, Sublett reached out to Aaronson and Gross regarding Winders' request for Sublett to serve on the Phadia advisory board. [Dkt. No. 135-10]. Sublett emphasized that Winders was "anxious to support efforts against United Allergy Labs and other similar operations," and that Winders had been in contact with AAN. On or about August 1, 2011, Winders met with Linda Cox, the President-elect of AAAAI. In that meeting Winders

and Cox agreed, on behalf of Phadia and AAAAI respectively, that their organizations should work together to approach and convince third-party payors to limit reimbursement of allergy testing and allergen immunotherapy to board certified allergists, including supporting Phadia's then ongoing strategy to combat UAS and primary care physicians in Texas.

96. On or about August 2, 2011 through August 4, 2011, Winders contacted numerous physicians in North Texas known to be in contract with UAS to convince those physicians to either terminate their agreements, or to reduce their performance under those agreements with UAS in favor of ICAPs sold by Phadia.

97. On August 3, 2011, Winders met with Dr. John Meiser, a representative of TAAIS, and they agreed that Phadia and TAAIS would support each other's strategy of combating UAS and primary care physicians by approaching third-party payors to convince them not to pay non-board certified allergists for allergy testing or allergen immunotherapy.

98. On or about August 17, 2011, Winders wrote to Sublett requesting an in-person meeting to discuss "exciting developments" in Phadia's strategy to address remote practice—as she had met with physicians and individuals in contract with UAS and Linda Cox for AAAAI's perspective. Winders specifically wanted JCAAI's feedback on the best way to restrict competition from UAS. [Dkt. No. 135-13].

99. On or about August 29, 2011, Winders met with Dr. Sublett, the then president of JCAAI, to discuss the increase in use of skin prick tests by primary care physicians in Texas and nationwide, the resulting loss of sales to Phadia, JCAAI's task force to combat the practice by primary care physicians and UAS, the then recent efforts by TAAIS to combat the practice, and the resulting lawsuit by UAS against TAAIS. Winders and Sublett agreed on behalf of Phadia and JCAAI respectively that they should join forces to combat the "remote practice of allergy"

44

through mutual support of all of these efforts. To facilitate the agreement, both Phadia and JCAAI relied on Mansfield, a board member of both Phadia and JCAAI.

100.    The motivation for Phadia to join Defendants' conspiracy concerned the loss of Phadia sales of ICAPs and other RAST tests to primary care physicians who had entered into contracts with UAS to conduct skin prick tests for allergies. In entering into an agreement in or around August 2011, Phadia and AAN specifically discussed Phadia's reduction in ICAP sales to over hundreds of primary care physicians, who had entered into a contract with UAS to provide allergy skin prick testing and allergen immunotherapy throughout markets in Texas. [Dkt. No. 134-21]. Those agreements between UAS and primary care physicians resulted in lost ICAP sales for Phadia in Dallas, San Antonio, McAllen, and Houston, resulting in a significant loss of revenue. Phadia determined that the loss of revenue for its ICAP sales was directly attributable to the rise of competition by primary care physicians and allergy services companies such as UAS in the market for allergy testing and allergen immunotherapy, to which Phadia referred to as the "remote practice of allergy" or "RPA." The significant decline in Phadia's business in Texas caused a loss of morale among Phadia representatives and Phadia also estimated that the rise in primary care physicians treating allergies with immunotherapy was also causing Phadia to lose a great deal of money related to a decline in necessary asthma medications as well.

101.    Also in or about August 2011, to combat the remote practice of allergy, Phadia began meeting with other board certified allergists in Texas in an effort to combat RPA. Phadia also began identifying customers of UAS in an effort to convince those customers to discontinue or reduce their business with UAS and return to selling ICAPs manufactured and sold by Phadia. Phadia also agreed with Sublett, Mansfield, JCAAI, ACAAI, AAAAI, and AAN that they should contact third-party payors to convince them not to do business with UAS or primary care

45

physicians for allergy testing or allergen immunotherapy by changing their policies to only reimburse board-certified allergists for those services.

102.    In the fall of 2011, Phadia also contacted third-party payors through its existing relationships with those payors to convince them to change their policy to restrict allergy skin testing and allergen immunotherapy to board-certified allergists or members of the American Academy of Otolaryngic Allergy ("AAOA"), an organization that represents otolaryngologist, frequently referred to as Ear, Nose, and Throat physicians or ENTs. The payors Phadia contacted in 2011 included Humana, United Healthcare, Blue Cross/Blue Shield of Texas, Texas Medicaid, and the managed care organizations that reimburse for Texas Medicaid. [Dkt. No. 134-21]. Phadia also planned to follow up with these same third-party payors for the same purpose in 2012, and other third-party payors including Aetna, Cigna, and Blue Cross entities in North Carolina, Pennsylvania, Georgia, South Carolina, Arizona, Missouri, Arkansas, Tennessee, Colorado, Kentucky, Utah, Illinois, Oklahoma, and Louisiana. When engaging in these contacts with third-party payors, Phadia distributed statements from its co-conspirators including AAAAI, ACAAI, JCAAI, and AAN supporting not only this restriction, but that primary care physicians should use ICAPs as the preferred method of testing for allergies instead. Phadia officers also directed its sales members in the field to disparage UAS to primary care physicians, including claiming that UAS was engaged in fraudulent billing.

103.    On or around September 2011, Alan Leahigh, Director of Corporate Council for AAN, contacted TAAIS, and other board-certified allergists in Texas, included Stuart Abramson, Bob Lanier, Defendant Mansfield, and Alnoor Malick, to request additional information about their fight against UAS and primary care physicians in Texas for a leadership summit to be held by AANMA, AAAAI, ACAAI, JCAAI, Phadia, and others on October 3, 2011 in Annapolis, Maryland. As a result of those contacts, Bob Lanier on behalf of ACAAI and Leahigh on behalf

46

of AAN discussed how AAN could act as a front for the conspiracy, which would shield Defendants because of AAN's prior history as a legitimate patient centered organization. In exchange, AAN could extract a large budget from Defendants to conduct the campaign against the "remote practice of allergy." In addition to contacting third-party payors, AAN and ACAAI discussed convincing extract companies to cut off supply to combat these competitors. Leading up to the leadership summit, AAN also discussed such a proposal with Defendant Fineman, the then president-elect of ACAAI, and Defendant Sublett, the then president-elect of JCAAI. Additionally, Nancy Sander, then President of AAN, contacted Dr. Fineman in October 2011 regarding AANMA's interest in combatting the remote practice of allergy by contacting third party payors. Since that time, October 2011, Dr. Fineman has become a Board member for AAN, has drafted and edited articles and publications to attack the "remote practice of allergy" for AAN and contacted third-party payors on their behalf.

104.    On or about October 3, 2011, AAN made a presentation to Defendants AAAAI, ACAAI, JCAAI, and Phadia explaining how AAN intended to carry out Defendants' agreement to combat the remote practice of allergy. In attendance at the meeting were all of the then-Presidents and Vice Presidents of AAAAI, ACAAI, and JCAAI, including Defendants Aaronson, Gross, Fineman, and Sublett, as well as representatives of Phadia and other industry organizations. AAN presented its strategic plan for combating the "remote practice of allergy," which included among other things, publishing a position statement and press release attacking the practices of primary care physicians and companies such as UAS, meeting with third-party payors and their trade associations to convince them not to pay these competitors, contacting primary care physicians to convince them not to do business with companies like UAS or engage in allergy testing or allergen immunotherapy, but to administer ICAPs and refer all allergy patients to board-certified allergists, and contacting governmental agencies and legislators to

47

defame these competitors. [Dkt. No. 134-9]. In exchange, AAAAI, ACAAI, JCAAI, Phadia, and others would agree to pay AAN a significant sum of money per month to conduct the campaign. *Id.*

105. As a result of that meeting, ACAAI, JCAAI, and Phadia agreed to pay AAN to serve as the front organization for Defendants' actions against primary care physicians, UAS, and any other physician or entity engaged in the "remote practice of allergy," by contacting third-party payors, industry players, governmental leaders, and agencies setting guidelines for industry standards to convince them to exclude primary care physicians and companies supporting those physicians, including UAS, from the market for allergy testing and allergen immunotherapy. Defendants also agreed that AAAAI and AAN would use their positions within the National Asthma Education, and Prevention Program ("NAEPP") to write into asthma guidelines of the National Heart, Lung, and Blood Institute language that could be used to exclude competitors. Following Defendants' meeting, AAN coordinated with Defendants Fineman and Sublett to facilitate the transfer of funds from Defendants to AAN and to assist in AAN's activities on behalf of Defendants.

106. To facilitate the conspiracy among AAAAI, ACAAI, and JCAAI members and Defendants' conspiracy with AAN and Phadia, Defendants Dr. Sublett and Dr. Aaronson authored a JCAAI "New News You Can Use" newsletter that was sent to all JCAAI Members on October 5, 2011 addressing at length the "remote practice of allergy" ("RPA") moving into JCAAI member communities. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. Dr. Sublett and Dr. Aaronson specifically targeted what they termed "the new version of RPA" which was "the imbedding of a 'certified allergy technician' in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy and treatments." *Id.* at 1. The business practices to which Defendants JCAAI,

Dr. Aaronson, and Dr. Sublett referred were those of UAS, which was featured in a "Business Builder" article in *Medical Economics* as pointed out in the newsletter. The newsletter documented what JCAAI had done to respond to this threat, including "the appointment of a task force on the RPA to develop proactive approaches and strategies," "monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing," and "working with the College & the Academy on marketing strategies and other responses." *Id.* The newsletter then stated to all JCAAI members that "We believe one approach you can take is to educate primary care physicians AND local carriers about the standard of care." *Id.* The newsletter directed that members should rely on a 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI. Members were encouraged to present these talks in their neighborhood being careful to keep their presentation "general in nature" and "not [to] mention any particular company." *Id.* at 2. Revealing the motivation to hurt UAS and primary care physicians economically, the newsletter stated that "This type of communication – brought to the carriers – could be very helpful, since they do not want to pay for ineffective treatments." *Id.* The newsletter then noted the ongoing lawsuit by UAS against the TAAIS and noted that as of yet, "This particular suit does not contain any anti-trust [sic] allegations." The newsletter then stated that "JCAAI recommends against engaging with any company that promotes RPA." *Id.*

107. Later in October, *Medical Economics* published another article regarding allergy testing and immunotherapy for non-board certified allergists. In response to the article, Defendant Fineman—with input from JCAAI and ACAAI leadership—wrote a letter to the editor for its publication to attack UAS (then known as UAL or United Allergy Labs). Further, Defendant Sublett emphasized to other Defendants, including Aaronson and Gross, that "this is our main focus, the commercial companies, including United Allergy Labs." Indeed, Sublett

49

revealed that to date—as of October 31, 2011, JCAAI had done the following things: given legal counsel and guidance to individual physicians and local societies regarding UAL, discussions with Defendant AAN related to "them taking a role as our lay voice," had individual discussions with managed care organizations related to the issue, and appointed a task force to develop short and long term strategies. *Ex.* C.

108.    Later, in November 2011, Winders, acting on behalf of Phadia and AAN, again requested to meet with Sublett to discuss her recent meetings with AAAAI's leadership and AAN's "plan of action." [Dkt. No. 135-14].   This plan of action included a "direct mail campaign to the medical directors of the top 100 commercial insurance payers" to request a utilization review for the 2, 84 participating physicians in AAAPC.   [Dkt. No. 135-15]. Additionally, AANMA conducted a direct mail campaign to the "top 100 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts" of UAS and AAAPC.

109.    The next month, on or about December 2011, Wallen contacted JCAAI's Director of Administration, Sue Grupe, regarding his interest in discussing remote practice of allergy. Wallen was and continues to be a business consultant in the field of allergy testing and immunotherapy, as he counsels businesses and doctors in how to strategically position themselves to combat the remote practice of allergy through contacts with third-party payors.  [Dkt. No. 135-17].

110.    After receiving funding from ACAAI, JCAAI, and Phadia, AAN carried out everything AAN promised Defendants they would do to combat the remote practice of allergy, including targeting AAAPC, its members and UAS.  For example, AAN and Phadia worked with members of AAAAI, ACAAI, JCAAI, and RADAR to identify and contact third-party payors in areas where competition was increasing from primary care physicians and UAS.  AAN sent letters

to medical directors of the top 100 third party payors in the nation, including third-party payors in Texas, seeking meetings to draft policies to exclude non-allergists from reimbursement. AAN, Phadia, Winders, and Wallen also suggested in their communications with third-party payors that those payors should take the list of all AAAPC members and audit each one for their allergy testing and allergen immunotherapy claims. In follow up to those letters, Defendants Winders and Wallen met with third-party payors in Texas and elsewhere in-person and on the phone to convince those third-party payors not to reimburse primary care physicians or UAS for allergy testing or allergen immunotherapy. As part of that strategy, AAN claimed that these competitors were acting outside the standard of care set by AAAAI, ACAAI, and JCAAI, relying on position statements those organizations drafted to attack the remote practice of allergy. AAN and Phadia also claimed in their communications with third-party payors in Texas and elsewhere that primary care physicians, AAAPC members, and UAS were engaged in billing fraud.

111. AAN, including Winders and Fineman, also drafted an article titled "Patients, Not Piggy Banks!" in which AAN falsely claims primary care physicians practicing allergy testing or allergen immunotherapy, or companies that participated in that care, were engaged in fraud. AAN posted the article on its website in the summer of 2013 attempting to create the impression that it was aimed at consumers, but AAN and the other Defendants circulated the article widely to third-party payors and primary care physicians in an effort to convince them not to do business with AAAPC members or UAS. On or about June 2013, once AAN became concerned that Defendants' antitrust activity may come to light and they may be investigated by the Federal Trade Commission, AAN began taking efforts to conceal Defendants' antitrust activities.

## HARM TO COMPETITION FROM DEFENDANTS' CONDUCT

112. As a result of the coordinated action and collaboration of members of RADAR and the encouragement of JCAAI, members of all three national organizations, AAAAI, ACAAI,

and JCAAI and representatives of AAN and Phadia began to contact physicians, third-party payors, and suppliers of allergy testing and allergen immunotherapy equipment and antigens about the business practices of primary care physicians and UAS in their participation in the market for allergy testing and allergen immunotherapy. These members, acting on behalf of Defendants, contacted insurance companies and managed care health plans through representatives of those organizations, including fraud investigators, provider relation representatives, and medical directors. Some of these third-party payors act on a national level, including Aetna, Cigna, Humana, and United ("national payors"). Other third-party payors act on a state level, including Blue Cross/Blue Shield entities and managed care health plans, who contract with particular states ("state payors"). Through use of RADAR, which is composed of every state and regional allergy society, AAN, Phadia, and through contacting national payors, Defendants have attempted to restrain competition in every local market in the nation. By contacting state payors, Defendants have sought the same result for all local markets in specific states. The result of this activity has constrained competition in all 25 states where Plaintiffs do business based on eliminated or reduced reimbursement by Humana, Aetna, and Cigna, as well as the local markets of Texas, Arkansas, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, North Carolina, Oklahoma, Pennsylvania, South Carolina, and West Virginia through denied or reduced reimbursement by state payors in those states.

113. Among other things, Defendants and these members and organizations attempted to persuade, entice, or coerce these representatives of third-party payors through use of materials distributed by AAN, AAAAI, ACAAI, and JCAAI, falsely suggesting that those organizations defined the standard of care for allergy testing and allergen immunotherapy and that primary care physicians were not adequately trained or qualified to perform allergy testing and allergen immunotherapy. These same actors also stated that primary care physicians' reliance on the

52

services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was "investigational" and should not be reimbursed. If a third-party payors expressed reluctance to stop doing business with primary care physicians or UAS, Defendants and Phadia, AAN, AAAAI, ACAAI, and JCAAI members and representatives suggested that those payors should reduce the amount paid to competitors for the mixing of immunotherapy under CPT Code 95165, but not reduce payment for shot administration in a board-certified allergists' office under CPT Codes 95115 and 95117. The goal of these suggested price changes was to disproportionately reduce payment to Defendants' competitors, who rely more on reimbursement of the mixing of immunotherapy under CPT Code 95165 and less on the reimbursement of shot administration under CPT Codes 95115 and CPT Codes 95117. Defendants further suggested to third-party payors that they should only pay primary care physicians for administering ICAPs, or RAST tests, which are billed under a different CPT code and sold by Phadia, instead of paying those physicians for allergy testing, i.e. skin prick tests under CPT Code 95004.

114. Some of the contacts with third-party payors were performed by Defendants themselves and other officers and directors of AANMA, AAAAI, ACAAI, JCAAI, and Phadia. For example, Dr. Allen Meadows, former ACAAI Speaker of the House of Delegates, reported to Dr. Weldon on October 9, 2011 that as instructed, he had been in contact with local insurance carriers regarding the remote practice of allergy. *See* Exhibit D-17 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-20. Further, Dr. Fineman contacted a Blue Cross Blue Shield medical director to convince that third-party payor not to pay competitors. [Dkt. No. 135-30].

115. Although not all allergists heeded AAN, AAAAI, ACAAI, JCAAI, or Phadia's encouragement to engage in the group boycott, either directly or through RADAR, to contact insurance companies, some did with differing degrees of success. Angry at the lawsuit against

their colleagues in Texas, Defendants continued contacting insurance companies, including fraud investigators, provider representatives, medical directors, and advisory board members over the phone and in person, rather than through letters, in furtherance of their preexisting agreement. One such insurance company contacted was BC/BS Texas in or around June 2011 by JCAAI and Dr. Aaronson, which had previously been contacted by Dr. Weldon. Following this contact, BC/BS Texas fraud investigators audited the medical records of numerous primary care physicians in Texas, including Dr. Bernice Gonzalez in San Antonio, Texas, and denied claims to many primary care physicians.

116.    Around the same time, AAAAI and JCAAI contacted Aetna claiming that primary care physicians and UAS were overbilling them for allergen immunotherapy and that Aetna should reduce the amount of units paid for allergen immunotherapy under CPT Code 95165. As a result of that contact, Aetna decided to reduce the amount it would permit to be billed to CPT Code 95165 to 90 units annually from 300 previously, a policy that also negatively impacted board-certified allergists. Following complaints, AAAAI and JCAAI's representatives, including Dr. Linda Cox, Dr. Aaronson, and Dr. Gross met with representatives of Aetna on July 25 and October 26, 2012, including an Aetna Senior Medical Director, Dr. Chris Jagmin, to propose raising the amount of units back to 120, which Aetna agreed to do for the first year of allergen immunotherapy. Subsequent to those two conversations, Dr. Gross engaged in a follow-up meeting with Dr. Jagmin in which he complained about Aetna's decision to continue to pay primary care physicians working with UAS, acting in the interests of himself, JCAAI, and Dallas Allergy & Asthma Center, P.A.

117.    Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, acting on behalf of Dr. Sublett, PSF, PLLC, and JCAAI, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky. *See* Exhibit F to

Plaintiffs' Preliminary Injunction Motion at ¶ 8, Dkt. No. 12-30. Similar to Dr. Gross's meeting with Aetna, Dr. Pollard attempted to persuade Anthem Blue Cross/Blue Shield of Kentucky representatives that they should not pay or do business with primary care physicians or UAS for allergy testing and allergen immunotherapy. As a result of follow up communications by Dr. Sublett, Anthem Blue Cross/Blue Shield of Kentucky has reduced the reimbursement it will pay primary care physicians practicing allergen immunotherapy by 60%.

118. More recently, representatives of AAN, AAAAI, ACAAI, JCAAI, and Phadia have met with managed health plans in Texas in an effort to convince them not to do business with primary care physicians or UAS in the market for allergy testing and allergen immunotherapy. Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients. A specialist certification is not required by the standard of care in Texas nor any other state in which Plaintiffs operate. Centers for Medicare and Medicaid Services pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state. Yet, Defendants suggest that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and are determined to shut primary care physicians and businesses like UAS out of the market. At Dr. Weldon's suggestion, these Defendants targeted managed care health plans because those plans are incentivized to deny claims. Specifically, managed health plans are paid annual on a per capita basis from the state health and human services commission, which requires them to pay all covered claims under federal and state Medicare and Medicaid regulations. If managed care organizations could reason that claims for services did not meet the standard of care, then that health plan could plausibly deny the claims and pocket the difference.

119. Defendants have had recent success targeting these organizations. For example, on or about February, 2013, an ACAAI representative contacted Superior HealthPlan

("Superior"), a Texas managed care organization. The representative supplied Superior's Chief Medical Officer, Dr. David Harmon, an "opinion" or position statement ACAAI stating that organization forbids "home immunotherapy" and thus Superior should not do business with nor reimburse the practices of primary care physicians who rely on UAS, who permit self-administration of allergy shots. Following this contact, Dr. Harmon contacted various primary care physicians who had billed Superior for allergy testing and allergen immunotherapy and stated Superior would no longer pay them for allergy testing and allergen immunotherapy based on the position of ACAAI. Subsequently, Superior began denying all claims submitted by the businesses of primary care physicians for allergy testing and allergen immunotherapy for more than 18 primary care providers doing business with UAS, some of whom are AAAPC members. In all more than 200 claims have been denied, totaling more than $500,000 in lost revenue to those providers and UAS from Superior alone.

120.    On August 1, 2013, Drs. Aaronson, Casale, Cox, Honsinger, and Webster, which includes the current Presidents of all three national allergist associations, JCAAI, AAAAI, and ACAAI, as well as the Executive Director and Executive Vice President of JCAAI, wrote another position statement entitled "Location Matters." *See* Exhibit X to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-54. "Location Matters," raises unfounded fears about the safety of self-administration of allergen immunotherapy, citing an increase in the risk of death. "Location Matters" is written in such a way as to conflate the standard of care with the non-binding practice parameters created by the allergist associations. While the publication of Location Matters or other journals is not in itself illegal, the use of these journals by board-certified allergists to claim privately to managed care organizations that they should not pay claims that do not meet these standards is anticompetitive.

56

121.     The very next day after Location Matters was published, on August 2, 2013, Superior announced a "credentialing policy" set to take effect on October 1, 2013 which limits reimbursements to physicians with the equivalent of a two-year specialist program, functionally precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy. *See* Exhibit F at ¶ 9 and F-2 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-32.  Superior's "credentialing" policy, where it would only pay for allergy testing or allergen immunotherapy if performed by a board-certified allergists, also encouraged primary care physicians to use ICAPs or RAST tests to test for allergies instead as suggested by Phadia.

122.     Around the same time Superior began denying claims, El Paso First Health Plan ("El Paso First"), another managed care organization that covers Texas Medicaid patients in El Paso, also began calling primary care physicians.  Specifically, the Chief Medical Officer of El Paso First called those physicians in an effort to coerce those physicians to no longer engage in allergy testing and allergen immunotherapy based on the positions of ACAAI.  El Paso First had previously been contacted by Dr. Mansfield regarding claims data for allergy testing and allergen immunotherapy and Dr. Mansfield, a director of JCAAI, ACAAI, and Phadia, is believed to be the contact with El Paso First.  As a result of those communications, numerous primary care physicians stopped engaging in allergy testing and allergen immunotherapy for El Paso First patients, and some were denied claims for previous services.

123.     Also around the same time period, Parkland Community Health Plan ("Parkland"), a third-party payor for managed care services based in Dallas, Texas, was contacted by a representative of JCAAI, Dr. Gross.  Dr. Gross and his business Dallas Allergy and Asthma Center represent the main competitor to the physicians in Parkland's network in Dallas who received these letters.  Following that communication, on October 1, 2013, Parkland's medical

director, Dr. Barry Lachman, wrote a letter to at least four primary care physicians announcing Parkland's new policy of not reimbursing services provided by primary care physicians or any physician in association with companies like UAS. *See* Ex. F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-33. In it, Dr. Lachman equated the standard of care with AAAAI practice parameters, just as Defendants intended in crafting their position statements. The primary reason given for Parkland's refusal to reimburse these physicians is that "AAAI [sic] states that physicians should have specialized training before providing these services." *Id.* The Parkland letter then explicitly attacks permitting certain patients to self-administer allergy shots using the same arguments and referencing the same articles that Defendants presented in "Location Matters." The letter concludes by threatening to exclude primary care physicians who continue to provide allergy care from the Parkland network, especially those in contract with UAS. *See* Exhibit F at ¶ 10 and F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-33. As a result of these letters, Dr. Osehotue Okojie and at least three other primary care physicians ceased participation in the market for allergy testing and allergen immunotherapy for patients associated with Parkland HealthPlan. *See* Ex. D.

124. Following the recent success with managed care organizations, Defendants began making headway with commercial carriers as well. In line with an earlier proposal by a member of RADAR, members of AAAAI began contacting "the Blues," otherwise known as the Blue Cross/Blue Shield of each state. *See* Exhibit C-7 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-8 at 1. As the RADAR post on Basecamp explained, if the Blues in one state restrict primary care physicians from allergy testing or allergen immunotherapy, "it would be great information to disseminate to others so that we can approach our local blues and try to change policy as well." *Id.*

58

125.    On December 10, 2013 following meetings with a board-certified allergist and AAAAI and AAN representatives, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014, stating "Immunotherapy self-administered in the home setting is considered investigational." This statement mirrors statements made to other third-party payors by Defendants and their representatives and could be interpreted to purportedly deny reimbursement to physicians that permit patients to self-inject allergy shots. *See* Exhibit F at ¶ 11 and F-4 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-34.

126.    More recently, representatives of AAAAI, ACAAI, JCAAI, AAN, and Phadia have approached other Blues to attempt to convince them to restrict the market for allergy testing and allergen immunotherapy by refusing to pay primary care physicians and those doing business with UAS. For example, Blue Cross/Blue Shield of Florida reported having considering changes to their policy following contacts with allergists. *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 12, Dkt. 12-30. Blue Cross/Blue Shield of Kansas more recently has been denying claims for any primary care physician in contract with UAS. *Id.*

127.    The level of activity has risen more recently, especially since this lawsuit was originally filed on January 13, 2014. As a result of not being named in the lawsuit, AAN and Phadia were encouraged by Defendants to continue engaging in their contacts with third-party payors in an effort to drive Plaintiffs out of business before they could succeed in prosecuting the lawsuit. As a result, on or about February 23, 2014 at the AAAAI Annual Meeting, Winders met with officers of Phadia, concerning methods to combat UAS on behalf of Defendants in light of this lawsuit.

128.    AAN representatives, including Defendant Winders and Wallen then carried out attacks on Plaintiffs in an effort to put them out of business and head off this lawsuit by increasing their direct mail and fax campaign to medical directors of third-party payors and to

primary care physicians practicing allergy testing or immunotherapy. The letters claimed that these competitors were engaged in substandard care and fraud and demanded that third-party payors investigate every AAAPC member and any physician in contract with UAS. These contacts had the desired effect during the early stages of this lawsuit, significantly reducing payment and revenue to AAAPC members and UAS. In or around March 2014, AAN also drafted another false, defamatory, and disparaging attack on the services of Plaintiffs, this one entitled "Deception in Allergy and Asthma Care: Recognize the Signs of Fraud." In this broadly distributed article to third-party payors and primary care physicians, AAN falsely claimed that primary care physicians and companies like UAS are engaged in fraud, and that primary care physicians should instead purchase RAST testing materials from Phadia and refer patients with a positive blood test to AANMA's network of board-certified allergists. AAN also paid Wallen in April 2014 to present to research "dirt" on Plaintiffs to use in contacts with third-party payors and physicians. [Dkt. No. 135-17; Dkt. 134-17a,b]. AAN and Phadia also continued to work together to find common sources of contact with third-party payors and others in an effort to put Plaintiffs out of business before they could discover AAN and Phadia's illegal activities.

129. For example, on January 22, 2014, Parkland demanded repayment of reimbursements which had previously been issued to primary care physicians. *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 12, Dkt. 12-30. Shortly thereafter, Coventry of Kansas suggested that after consultations with allergists, it may change its policies regarding reimbursement of primary care physicians or any physician that relies on the services of UAS. *Id.* Similarly, during this time frame, physicians called Plaintiffs to express concerns that other commercial carriers and health plans may no longer reimburse allergy testing and allergen immunotherapy performed by primary care physicians, including El Paso First, with some third-party payors threatening to seek their money back. *Id.* Shortly after AAN's follow up letter to

third-party payors in March 2014, Humana began demanding repayment of claims previously approved for services provided by primary care physicians in Kentucky in contract with UAS, the market dominated by Defendants Dr. Sublett and his business, PSF, PLLC. Commercial carriers such as the Blues and others are prone to coercion, persuasion or enticement because Defendant purport to represent violations of the standard of care, increased costs, and other claims, all of which are false.

130. In addition to approaching managed care organizations and commercial carriers, Defendants have approached suppliers—threatening to pull business from those suppliers if they contracted with UAS or AAAPC physicians or gave any grants or donations to AAAPC. An officer of Greer Labs, Inc., a supplier of skin prick testing equipment and antigens for allergen immunotherapy, informed AAAPC that Defendants threatened to cancel two large contracts if Greer works with AAAPC physicians or contributed at all to AAAPC. Defendants have contacted and threatened to cancel contracts and ongoing business relationships with Greer Labs, Inc. and Hollister-Stier Allergy, the two largest antigen suppliers in the market for allergy testing and immunotherapy in furtherance of these threats. And, due to the Defendants' conduct, AAAPC's membership numbers have suffered as well causing it direct economic harm

## PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS

131. Plaintiffs have been damaged, and will continue to be damaged, by actions taken by Defendants and their co-conspirators on a nationwide basis to boycott AAAPC members and UAS. The direct result of Defendants actions and the encouragement of AANMA, Phadia, AAAAI, ACAAI, JCAAI, and RADAR members to persuade, entice, and coerce insurance companies on behalf of those organizations has caused insurance companies and managed care organizations like Superior, Parkland, Humana, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Louisiana, Capital Blue Cross of Pennsylvania, Highmark of Pennsylvania,

and Blue Cross/Blue Shield of Kansas to avoid or stop reimbursing primary care physicians altogether; and managed care organizations including Texas Children's Health Plan and Community Health Choice to avoid certifying or approving primary care physicians for reimbursement; and other insurance companies like Aetna, Cigna, Blue Cross/Blue Shield of Texas, Blue Cross/Blue Shield of Florida, and Anthem Blue Cross/Blue Shield of Kentucky, to change and reduce the amounts they are willing to pay primary care physicians.

132.    As a direct result of Defendants' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Defendants. AAAPC and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing agreements and have also experienced difficulty in entering into business relationships with others because of the Defendants' anticompetitive public relations campaign.

133.    UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers. The result has been most noticeable in terms of lost revenue and corresponding lost profit for services that would have otherwise been provided to physicians. The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

134.    UAS has also been damaged by a direct boycott on the part of board-certified allergists and their trade organizations and co-conspirators, including AAN, AAAAI, ACAAI, and JCAAI and their partnership with Phadia. While UAS supports primary care physicians who compete with the allergists, there is no reason that an allergist could not employ UAS as well or at least assist and advise UAS. In addition to the interference with Dr. Kaplan's contract to advise

UAS, Defendants have also dissuaded or attacked board-certified allergists that could do business with UAS or any board-certified allergists that could advise or serve on the board of AAAPC.

135.    UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business.  Plaintiffs anticipate that UAS, AAAPC, and AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs' investigation into the extent of the damage they have suffered at the hands of Defendants is ongoing.  Also much of the additional damage that UAS, AAAPC, and AAAPC members have suffered is not easily calculable, such as damage to their goodwill and to the patient-physician relationship.

136.    AAAPC, for its part, has suffered significant damages.  These damages consist of lost revenue from members who are no longer active in AAAPC because Defendants' conduct illegally forced those physicians to stop offering immunotherapy services to patients.  These damages also consist of lost sponsorship revenue due to threats made by Defendants' to prospective sponsors of retribution that would occur if those companies sponsored or otherwise supported AAAPC.  Separately, these damages emanate from false exigencies precipitated by Defendants' illicit conduct, which have required AAAPC to divert resources away from supporting member physicians, towards combating the improper and inaccurate information campaigns lodged by Defendants with insurers, regulators, and legislators alike.

### COUNT ONE

### SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS

137.    Plaintiffs incorporate by reference paragraphs 1 through 136 as if fully alleged herein.

138.    At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition in the market for allergy testing and allergen immunotherapy

for seasonal and perennial allergies in local areas throughout the United States, including within the State of Texas and other states. Defendants actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing and allergen immunotherapy equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market. This group boycott and price fixing campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors on those associations' and organizations' behalf.

139.    The Defendants' actions are a *per se* violation of the Sherman Act. The Defendants include all three national allergy trade associations and represent virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing and allergen immunotherapy. Defendants have engaged in joint

collaborative action to destroy their legitimate competition by orchestrating a group boycott and encouraging price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

140. Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete with board-certified allergists in the relevant market. As the result of Defendants' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets in Texas and other states, leaving patients to choose between paying more for allergy

treatment or going without. Defendants actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits. Defendants actions are also not mere advocacy of the services of board-certified allergists, but are directed at eliminating competitors and thus restricting competition, to the ultimate harm of patient choice.

141. As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

142. UAS also seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

143. Plaintiffs also seek injunctive relief. The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO

### TEXAS FREE ENTERPRISE AND ANTITRUST ACT VIOLATION AGAINST ALL DEFENDANTS

144. Plaintiffs incorporate by reference paragraphs 1 through 143 as if fully alleged herein.

145. At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in local areas throughout the United States, including within the State of Texas and other states. Defendants actions include restricting participation in the market by non-board certified allergist physicians and their staff or contracting partners, including members of AAAPC and physicians supported by UAS. In furtherance of their conspiracy,

66

Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in an attempt to convince those persons and entities to refuse to do business with or pay for the services performed by AAAPC members and UAS, or to reduce payment for those services disproportionately to payment for services performed by Defendants and other businesses of board-certified allergists. This group boycott and price fixing campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors on those associations' and organizations' behalf.

146.    The result of that illegal *per se* boycott and price fixing has been to eliminate or restrict AAAPC members' and UAS's ability to market and provide their services in relevant geographic markets within Texas. For example, as explained above, certain Texas insurance companies and managed care organizations have either stopped reimbursements for allergy care by physicians who are supported and assisted by UAS or restricted or interrupted those reimbursements. As a result, UAS, Texas primary care physicians, Texas based members of AAAPC, and Texas allergy patients are all being denied the benefits of fair competition.

147.     The Defendants' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA"). The Defendants represent board-certified allergists, a dominant market group of horizontal competitors. They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny their competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and decreasing reimbursements to those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

148.     Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who partner with UAS. As the result of Defendants' conduct, consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians, leaving patients to choose between paying more for allergy treatment or going without.

149.    As a direct and proximate result of Defendants' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

150.    UAS seeks money damages from Defendants jointly and severally for these violations. Defendants' violations were willful and flagrant. UAS's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

151.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

152.    As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS AGAINST ALL DEFENDANTS

153.    Plaintiffs incorporate by reference paragraphs 1 through 152 as if fully alleged herein.

154.    In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with the existing agreements between AAAPC and its members and industry sponsors, as well as existing agreements between UAS and its many physicians and practice groups.  Defendants' conduct, which was neither justified nor privileged, was intended to cause insurance companies, managed care organizations, practice groups, and patients to cease their agreements or doing business with primary care physicians, and to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS.  Defendants' conduct constitutes willful and intentional acts of interference with those agreements and was done with malice.  Such conduct caused injury to AAAPC as an organization and to UAS by, among other things, reducing business under these agreements causing a reduction in revenue and

69

corresponding profits generated from these agreements and making it more difficult for AAAPC

and UAS to conduct their operations and business and by causing them to expend considerable

resources in order to ensure that agreements and business arrangements are not terminated as a

result of Defendants' actions.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS

155.    Plaintiffs incorporate by reference paragraphs 1 through 154 as if fully alleged

herein.

156.    In addition, or in the alternative, Defendants' conduct described herein constitutes

tortious interference with AAAPC's and UAS's existing and prospective business relations.

There was a reasonable probability that, absent Defendants' actions, AAAPC would maintained

existing relationships with and would have entered into additional relationships with third parties,

including primary care physicians and industry sponsors, and that UAS would have maintained

existing relationships with and entered into additional business relationships with third parties,

including other physicians and practice groups. Defendants intentionally interfered with these

relationships by attempting to prevent payment to AAAPC members and other physicians who are

not board-certified allergists who are assisted and supported by UAS, to scare them away from

membership in AAAPC as well as to prevent physicians and practice groups from maintaining

relationships with or entering into business with UAS. Defendants' conduct constitutes willful

and intentional acts of interference and was done with malice. Defendants' conduct was

independently tortious or unlawful for the reasons described herein, including for violating and

encouraging and participating others in violating the Sherman Act, the TFEAA, the Texas State

Court Injunction, making false, fraudulent, defamatory, and disparaging statements regarding

70

AAAPC, AAAPC members, and UAS, and their businesses, and participating in a breach of statutory and contractual duties of confidentiality owed to the Texas Medical Board and other governmental agencies. Defendants' interference proximately caused injury to AAAPC and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more difficult to conduct operations and causing AAAPC and UAS to expend considerable resources in order to further their business.

<div align="center">

**COUNT FIVE**

**CIVIL CONSPIRACY AGAINST ALL DEFENDANTS**

</div>

157.    Plaintiffs incorporate by reference paragraphs 1 through 156 as if fully alleged herein.

158.    In addition, or in the alternative, Defendants' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts and existing and prospective business relations. Defendants and others have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS. In furtherance of their conspiracy, Defendants and others have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants and their other co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to

<div align="center">71</div>

convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition. Defendants and their other co-conspirators have also taken actions to interfere with Plaintiffs' current contracts and prospective business relationships. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the marketplace. Defendants are all jointly and severally liable for the actions taken in furtherance of their conspiracy.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

159.     Plaintiffs incorporate by reference paragraphs 1 through 158 as if fully alleged herein.

160.     The actionable conduct of Defendants over the past few years has recently threatened and is starting to cause imminent and irreparable harm to AAAPC members and UAS. Starting around October 2013, the number of third party payors who report being contacted increased dramatically and at the urging of Defendants and their co-conspirators, actions to stop doing business with or reimburse these competitors started to grow. More recently, since the original filing of this Complaint, additional third party payors have expressed the same concerns raised by Defendants, threatening to remove primary care physicians and UAS from the market entirely, at the suggestion of Defendants.

161.     To preserve the status quo until trial in this cause, Plaintiffs hereby request the Court to preliminarily enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a preliminary injunction, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations

72

should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

162. Upon judgment in this cause, Plaintiffs further request the Court to enter a judgment permanently enjoining and restraining Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

## ATTORNEYS' FEES

163. Plaintiffs incorporate by reference paragraphs 1 through 162 as if fully alleged herein.

164. 15 USCA § 15 and TFEAA § 15.21 both provide for the recovery of attorney fees and costs of suit in private enforcement actions under the antitrust laws. Plaintiffs therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs they have incurred as a result of Defendants' conduct.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

# PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a.  Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

b.  Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

c.  Preliminarily and permanently enjoin Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

d.  Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing contracts.

e.  Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing and prospective business relationships.

f.  Adjudge and declare that Defendants unlawfully engaged in a civil conspiracy.

g.  Against all Defendants, jointly and severally, award UAS damages in an amount to be proved at trial, to be trebled with interest.

h.  Against all Defendants, jointly and severally, award AAAPC damages in an amount to be proved at trial, with interest.

i.  Against all Defendants, jointly and severally, award UAS and AAAPC exemplary damages in an amount to be proven at trial.

j.  Against all Defendants, jointly and severally, award Plaintiffs their attorney's fees and costs of this suit; and

k.  Award such other further relief as the Court deems just and proper.

DATED: January 30, 2015.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: /s/ Casey Low
     Casey Low
     Texas Bar No. 24041363
     111 Congress Ave., Suite 2300
     Austin, Texas 78701-4061
     Phone: (512) 542-2109
     Fax: (800) 404-3970
     casey.low@bgllp.com

     Richard C. Danysh
     Texas Bar No. 05377700
     300 Convent St., Suite 1500
     San Antonio, Texas 78205-3723
     Phone: (210) 299-3475
     Fax: (210) 299-0106
     richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS

75

# Exhibit A



## Efficacy and Safety of Immunotherapy

Immunotherapy, provided by qualified physicians, is an effective and safe treatment for asthma, allergic rhinitis and insect venom allergy.

### Effective treatment for asthma

A meta-analysis of 20 published prospective studies showed that allergen immunotherapy is effective in the treatment of asthma. (1) The American College of Allergy, Asthma & Immunology (ACAAI) recently compiled an annotated bibliography of 59 articles from the medical literature indicating the value of expert care and immunotherapy for asthma. (2) A meta-analysis of 23 published studies involving 935 asthmatic patients with documented allergy indicated that immunotherapy is effective in a selected population of allergic asthmatic patients. (3)

### Effective treatment for allergic rhinitis

An extensive review of immunotherapy for allergic rhinitis in children showed that the only treatment able to affect the natural cause of the disease is immunotherapy, and that immunotherapy may prevent the onset of asthma. (4) A meta-analysis of 18 published studies involving 789 patients concluded that immunotherapy is highly effective in the treatment of allergic rhinitis. (5)

### Effective treatment for insect venom allergy

Immunization with insect venom is an extremely effective treatment for preventing future systemic reactions to insect stings in individuals with previously demonstrated susceptibility.(6) A meta-analysis of nine published studies indicated that a course of immunotherapy is highly effective in the management of insect sting hypersensitivity. (7)

### Immunotherapy safety

A report from the Mayo Clinic on 79,593 immunotherapy injections over a 10-year period showed the incidence of adverse reactions to be less than two-tenths of 1 percent (0.137 percent). Most of the reactions were mild and responded to immediate medical treatment. There were no fatalities. (8)

More than 1 million injections were given without a fatality to 8,706 patients in allergy clinics at Roosevelt Hospital, New York City, between 1935 and 1955. (9)

### Comparative risks of immunotherapy

Nevertheless, rare occurrences of fatal anaphylactic episodes related to immunotherapy continue to be reported and studied. A total of 35 deaths following immunotherapy administration were reported for the years 1985 through 1993. It has been estimated that during that period there were 52.3 million immunotherapy procedures, making the incidence of fatality less than one per million (0.6692 per million).(10) Data recently compiled by the Allergen Products Manufacturers Association (APMA) estimated the incidence of fatalities to be about three per 190 million annual injections, or approximately one per 63 million injections.(11) Another study evaluating 13 international fatalities related to immunotherapy between 1992 and 1996 identified an elevated risk for patients with active asthma and being switched to high doses.(12)

For perspective, it is useful to compare these statistics with the incidence of fatalities related to other kinds of injections. Studies of fatal anaphylaxis reactions to injected penicillin have ranged from 0.4 fatalities per million injections (13), to 1 fatality per 7.5 million injections. (14)

Fatalities related to radiocontrast "dyes" used in intravascular radiologic studies in the early 1980s varied from 1 in 13,000 procedures (15) to 1 in 75,000 procedures. (16) A more recent study showed a substantial improvement to about 1 fatality in 169,000 procedures. (17)

## Guidelines for safe and effective immunotherapy

Any immunotherapy fatality, no matter how rare, is unacceptable. To promote immunotherapy safety, the American College of Allergy, Asthma & Immunology offers the following guidelines:

1. Immunotherapy should be prescribed only by an allergist-immunologist or other physician who is expertly trained in the therapy.

2. Immunotherapy should be administered under the supervision of an allergist-immunologist or other physician specifically trained in immunotherapy, the early signs and symptoms of anaphylaxis, and appropriate emergency procedures and medications. (18)

3. Patients must be suitably selected for immunotherapy.

4. Immunotherapy should be given only in facilities equipped to treat anaphylaxis.

5. The health status of the patient should be evaluated prior to every injection. Patients who are acutely ill, especially with asthma or respiratory difficulties, should not receive immunotherapy until their disease is stabilized.

6. Patients should always be asked about current medications prior to immunotherapy, to avoid interactions with beta blockers and other conflicting medications.

7. Patients must wait at the health care facility a minimum of 20 minutes after an allergen injection. The time period may be extended for high-risk patients. (19, 20)

## References

1. Abramson MJ, Puy RM, Weiner JM. Allergen immunotherapy effective in asthma? A meta-analysis of randomized controlled trials. Am J Respir Crit Care Med 1995; 151: 969-974.

2. Sullivan TJ, Selner JC, Patterson R, Portnoy J, Seligman M. Expert Care and Immunotherapy for Asthma. A review of published studies with emphasis on patient outcome and cost. ACAAI Monograph, Nov 1996, 1-25.

3. Ross RR. Effectiveness of immunotherapy in the management of asthma: A meta-analysis of the literature. May 1997. Data on file with American Academy of Allergy, Asthma & Immunology (AAAAI) and American College of Allergy, Asthma and Immunology (ACAAI) and submitted for publication.

4. Bousquet J, Demoly P. Specific immunotherapy for allergic rhinitis in children. Allergy Clin Immunol Inter 1996; 8:145-150.

5. Ross RR. Effectiveness of immunotherapy in management of allergic rhinitis: A meta-analysis of the literature. May 1997. Data on file with AAAAI and ACAAI and submitted for publication.

6. Valentine MD. Anaphylaxis and stinging insect hypersensitivity. JAMA 1992; 268:2830-2833.

7. Ross RR. Effectiveness of immunotherapy in the management of insect venom hypersensitivity: A meta-analysis of the literature. May 1997. Data on file with AAAAI and ACAAI and submitted for publication.

8. Valyaservi MA, Yocum MW, Gosselin VA, Hunt LW. Systemic reactions to immunotherapy at the Mayo Clinic. J Allergy Clin Immunol 1997; 99:S66.

9. Van Arsdel PP, Sherman WB. The risk of inducing constitutional reactions in allergic patients. J Allergy 1957; 28:251-261.

10. Turkeltaub P. Deaths associated with allergenic extracts. FDA Medical Bulletin 24, May 1994.

11. Data on file with the Allergen Products Manufacturers Association. April 1997 Communication.

12. Kordash T, Miller J. Allergenic extracts used in immunotherapy fatalities. J Allergy Clin Immunol 1997; 99:S67.

13. Orange RP, Donsky GJ. Anaphylaxis. In Middleton E, Reed CE, Ellis EF, editors. Allergy: principles and practice. St. Louis 1978, Mosby.

14. Idsoe O, Gruthe T, Wilcox RR, et al. Nature and extent of penicillin side-reactions with particular references to fatalities from anaphylactic shock. Bull WHO 1968; 38:159.

15. Shehadi WH. Death following intravascular administration of contrast media. Acta Radiol Diagn 1982; 26:457-61.

16. Hartman GW, Hattery RR, Witten DM, Williamson B. Mortality during excretory urography: Mayo Clinic Experience. AJR 1982; 139:919-922.

17. Katayama H, Yamaguchi K, Kozuka T, et al. Reactions to ionic and nonionic contrast media: A report from the Japanese Committee on the Safety of Contrast Media. Radiology 1990; 175:621-628.

18. Joint task force on practice parameters representing the American Academy of Allergy, Asthma & Immunology and the American College of Allergy, Asthma & Immunology. Nichlas RA, Bernstein IL, Blessing-Moore J, Fineman S, editors. J Allergy Clin Immunol 1996; 98:1-11.

19. Executive Committee, American Academy of Allergy, Asthma & Immunology. The waiting period after allergen skin testing and immunotherapy. J Allergy Clin Immunol 1990; 85:526-527.

20. Board of Directors, American Academy of Allergy, Asthma & Immunology. Position Statement. Guidelines to minimize the risk from systemic reactions caused by immunotherapy with allergenic extracts. J Allergy Clin Immunol 1994; 93:811-812

http://www.acaai.org/allergist/allergies/Treatment/allergy-immunotherapy-shots/Pages/are-allergy-shots-effective.aspx

# Exhibit B

Message
| | |
|---|---|
| **From:** | "Aaronson-MD, Donald" [/O=MICROSOFTONLINE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DFB5282A-4D5C-479C-A290-5180019B6D02] |
| **Sent:** | 5/19/2011 2:10:42 PM |
| **To:** | Abraham, Stanley [stanley.abraham@advocatehealth.com] |
| **Subject:** | RE: Dr. Senter - United Allergy Lab |
| **Attachments:** | image001.gif |

Sorry for the inconvience – I do not understand how this happened but please ignore this email

Donald W Aaronson MD JD MPH
Medical Director Patient Safety
Advocate Lutheran General Hospital
1775 Dempster Street
Park Ridge, Il 60068
donald.aaronson@advocatehealth.com
847-723-7620
cell 773-474-2040

**From:** Abraham, Stanley
**Sent:** Thursday, May 19, 2011 9:01 AM
**To:** Aaronson-MD, Donald
**Subject:** RE: Dr. Senter - United Allergy Lab

Dr. Aaronson – Please be advised that this message was sent to me by mistake.  Thank you.

_Stanley Abraham_
Information Systems
Advocate Health Care
Lutheran General Hospital
4th. Floor - East Pavilion
1775 Dempster Street
Park Ridge, Illinois 60068
PHONE: 847-723-2023
PAGER: 847-569-4604
FAX: 847-723-4352

www.advocatehealth.com

Please consider the environment before printing this e-mail

**From:** Aaronson-MD, Donald
**Sent:** Thursday, May 19, 2011 8:51 AM
**To:** 'Susan Grupe'; 'Donald Aaronson'; 'Gary Gross'

WDTX-JCAAI-015097

**Cc:** 'Burke, Rebecca'; sfineman@atlantaallergy.com; Abraham, Stanley
**Subject:** RE: Dr. Senter - United Allergy Lab

Becky, This looks like another we can send to OIG and check and see both Georgia and Texas to see if they violate local laws. I know they are active in Georgia since Stan Fineman has asked us to look further into this don

Donald W Aaronson MD JD MPH
Medical Director Patient Safety
Advocate Lutheran General Hospital
1775 Dempster Street
Park Ridge, Il 60068
donald.aaronson@advocatehealth.com
847-723-7620
cell 773-474-2040

**From:** Susan Grupe [mailto:grupes@jcaai.org]
**Sent:** Thursday, May 19, 2011 8:46 AM
**To:** Aaronson-MD, Donald; 'Donald Aaronson'; 'Gary Gross'
**Subject:** Dr. Senter - United Allergy Lab

The following is to review and comment as you see appropriate.

Sincerely,

*Sue*

Susan L. Grupe
Director of Administration

Joint Council of Allergy, Asthma & Immunology
50 N. Brockway St., #3-3
Palatine, IL 60067

V: 847-934-1918
F: 847-934-1820
E: grupes@jcaai.org
http://www.jcaai.org

**From:** Don Senter [mailto:dfsenter@verizon.net]
**Sent:** Wednesday, May 18, 2011 5:27 PM
**To:** info@jcaai.org
**Subject:** United Allergy Lab

Previously reported to Texas Allergy and Asthma organization. United Allergy Lab a San Antonio company is contracting with PCP's to place a staff person in their offices, where the person will do a cook book history via forms, do allergy skin tests, decide the treatment, mix the vaccine, then quote "dilute, dilute, then dilute some more". Vaccine will be administered in pcp's office by this Corp employee, then sent home to give at home.

WDTX-JCAAI-015098

TAAIS reports that a Dermatologist had United Allergy lab in his office, apparently terminated the relationship, then United took all records, patients, etc and went to another location.   United is being sued and is in discovery.

Manager at the Medical Edge group where I was practicing ½ day per week, paying them rent for the space advised as follows.

1.  A Texas Health Resources   (large hospital group Presybterian in Dallas area that owns more practices than Baylor)  had a primary clinic use United and they made lots of money, so the big hospital told all its PCP groups to look at this opportunity to make lots of money off of allergy patients.

My staff interviewed the LVN, age 23 who is the quote"allergist" for the group and she advised, that United does the test, the treatment, mixes the vaccine and gives the shots.  The doctor does not have to do anything.

Sounds like illegal practice of medicine, so unethical, my staff picked up all our equipment and we closed the part time office immediately.

One of the physicians in the group is aware United is unethical, but the others are interested in the money.

A copy of Practice Parameters for allergen immunotherapy was provided to the physician primarily involved with  the United Allergy Lab.

Large hospitals have no need for allergists unless we are willing to do drug testing and desensitization only.   Try to make a living doing that.   They are not interested in having allergists on their staff as it is contradictory to the hospital making more money.   ACO's will not have allergists.

It appears we have another group of enemies to pick over the bones of whats left of the allergy specialty.

Look up website of www.unitedallergylabs.com     Better yet, do a Google on united allergy labs and find out how many hits you will get, they are looking for personnel and already have regional directors.

Don Senter, M.D.

WDTX-JCAAI-015099

Message

| | |
|---|---|
| **From:** | "James Sublett" <jsublett@familyallergy.com> [jsublett@familyallergy.com] |
| **Sent:** | 3/10/2011 9:26:26 PM |
| **To:** | Fineman, Stanley [SFineman@atlantaallergy.com]; Donald Aaronson [doclaw@post.harvard.edu]; James Sublett [alerg@mindspring.com] |
| **Subject:** | Re: JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician |

I had emailed Don asking the same question.
JS

From: Stanley Fineman <sfineman@atlantaallergy.com>
Date: Thu, 10 Mar 2011 14:30:33 -0600
To: Donald Aaronson <doclaw@post.harvard.edu>, James Sublett <alerg@mindspring.com>
Subject: FW: JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician

Don & Jim,
Could we use this to support our case against the remote practice by United Allergy Labs?
SMF

From: jcaai.org.postmaster@readyportal.net [mailto:jcaai.org.postmaster@readyportal.net] **On Behalf Of**
admin@jcaai.org
**Sent:** Wednesday, March 09, 2011 5:37 PM
**To:** www-newnews@lists.jcaai.org
**Subject:** JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician

March 9, 2011

# Requirement for Physician Direct Supervision of Allergy Skin Testing

Dear JCAAI Member:

Medicare (CMS) has specific rules which govern physician supervision of various procedures. JCAAI was recently asked about the rules governing physician supervision of skin testing. The member who asked us about this had tried to find the answer on the Medicare website and was not successful. We asked JCAAI legal counsel and following is the information she found. For those of you who want to see it for yourself, click here.

Then select "physician fee schedule search;" click "accept;" select "payment policy indicators" from the first menu. Select either a single code or range of codes in the second menu, enter the code(s) you are interested in (e.g. 95004 for skin prick testing) in the "HCPCS code" box and select "all modifiers" in the box below. Click submit.

If you look to the right side of the page, you will see a column labeled "Phys Supv" and in that box you

WDTX-JCAAI-017015

will see the number "2." Each code has a required level of physician supervision which is denoted by a number. In this case the number is 2 - which is the level of supervision for allergy skin tests (95004, 95024, 95010, and 95015). Under Medicare rules, level 2 calls for "direct supervision". According to federal regulations "direct supervision" is defined as "In the office setting, (direct supervision) means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean the physician must be present in the room when the procedure is performed."

This means the physician has to be physically present in the office suite when testing is performed. And this is consistent with CPT 95004 and 95024 whose descriptors specifically state: "Percutaneous (or intracutaneous) tests with allergenic extract ... including test interpretation and report by physician."

When JCAAI was able to obtain physician work for 95004 and 95024, it was with the specific understanding that the physician work was to cover "test interpretation and report by physician". JCAAI agreed with CPT and the RUC that testing could not be properly done without the physician's physical presence - at least in the suite - so test results could be reviewed by that physician.

Remember to purchase a set of 2011 Coding Books!
( click link for details)

Please log onto the JCAAI website at http://www.jcaai.org to view all previous "New News You Can Use" articles.

You are subscribed to www-newnews. To unsubscribe, click http://www.jcaai.org/?ct=member&m_v=lusub&m_rt=WGList&m_rid=37731

If you have problems accessing the above link, visit the main site below.

This message is a service of JCAAI - Joint Council of Allergy Asthma and Immunology
http://www.jcaai.org

This email, and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

Message
_____

**From:** James Sublett [IMCEAEX-
_O=EXG5_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=JSUBLETT7790
5@familyallergy.com]

**Sent:** 3/18/2011 4:11:36 PM

**To:** Fineman, Stanley [SFineman@atlantaallergy.com]; Ned Delozier [ndelozier@pmecomm.com]; drbob3@earthlink.net; Dr. Ty
Prince [tprince@allergyasc.com]; David Tanner [DTanner@atlantaallergy.com]; Enrique Quintero [equintero@texallergy.com]

**Subjec** Re: UAL
**t:**
_____

```
I have an email from Bill abut this. Who is the former AAAAI president?
JS




On 3/18/11 11:01 AM, "Fineman, Stanley" <SFineman@atlantaallergy.com>
wrote:

>These guys are agressive and have already made an impact here in Atlanta.
>We know of referral PCPs who have started with United. The JCAAI has
>information about this in the agenda packet for the Sunday meeting. We'll
>try to find a 'kink' in they're armor, but at this stage education (&
>marketing) is the best recourse.On a local level with the help of our
>practice development team, we were successful in explaining to a local
>Peds group why they shouldn't institute this in they're office.
>This 'competitor' will be tougher that we thought.
>SMF
>
>_____From: Ned DeLozier
>[ndelozier@pmecomm.com]
>Sent: Friday, March 18, 2011 9:43 AM
>To: drbob3@earthlink.net; Dr. Ty Prince; Tanner, David; Fineman, Stanley;
>equintero@texallergy.com; jsublett@familyallergy.com
>Subject: Fwd: UAL
>
>Bill Dolen just sent me this.  Thought you may find it interesting.
>
>Another example of why the allergist must continue and increase education
>to providers and consumer about your importance.
>
>Ned
>
>Sent from my Verizon Wireless Phone
>
>----- Forwarded message -----
>From: "Bill Dolen" <bdolen@georgiahealth.edu>
>Date: Fri, Mar 18, 2011 9:18 am
>Subject: UAL
>To: "Ned DeLozier" <ndelozier@pmecomm.com>, "David Brown"
><dbrown@allergypartners.com>
>
>
>
>Begin forwarded message:
>
>From: Michael Shaffer <mas_05@comcast.net<mailto:mas_05@comcast.net>>
>Date: Mar 17, 2011 2:49 PM
>Subject: UAL
>To: xxx
>
>Hello Dr. xxx,
>
>I'm representing United Allergy Labs and wanted to schedule a time to
>formally introduce ourselves to you.  To tell a little about us, we are
>the largest purchaser of antigens and the largest provider of allergy
>testing and treatment in the United States.   We are currently operating
>in ten states with two more coming online in the next 6-8 weeks.
```

>
>We are a new and very powerful diagnostic and treatment tool for primary
>care providers.  Whereas before providers could only write a script for
>medications to mask symptoms or refer them out, we offer a completely
>different treatment option that allows providers to diagnose the problem
>correctly then decide the best treatment strategy.
>
>One prominent Atlanta pediatrician told me, 'It doesn't matter what th=y
>are allergic to as long as they are responding to medicine'.  Three year=
>ago that was true; now it does matter.  If a patient is allergic to
>something that can be removed from their environment easily, or avoided,
>then they could have their symptoms alleviated AND be taken off
>medications.  Our test is a great diagnostic tool for physicians.
>
>Once the provider knows conclusively what the problem is, and that it
>cannot be avoided, we offer another option not formerly available: a very
>safe protocol for immunotherapy that eliminates the expense associated
>with a specialist, is convenient and, most importantly, provides a
>permanent solution to a formerly chronic condition.  This would not have
>been a viable option four years ago because the protocols allergists
>employ are too dangerous (for self administering), inconvenient and cost
>a small fortune.  We've changed that.
>
>With the help of the former president of the academy (AAAAI), who is also
>our CMO, and the top scientists from Hollister-Stier and Greer we've
>developed an AAAAI compliant slow ramp protocol that is the safest in the
>industry.  Not one single case of anaphylactic reaction from a patient
>anywhere and we're the largest provider of immunotherapy in the country.
>When you consider we're safe, we are much more cost effective for the
>patient than prescription drugs or specialist, we're convenient and we=B9re
>good medicine the options start expanding.
>
>As a provider, you now have three options:
>
>1.      Patient responds well to medications so I will keep them on nasal
>steroids/antihistamines long term (and their attendant cost and long term
>affects)
>2.      Refer them out to an allergist where they encounter high co-pays
>and deductibles, get told what they're allergic to and get recommended
>treatment (avoidance, nasal steroid/antihistamine, or very high dosage
>immunotherapy)
>3.      Provide in house testing for the 48 most common environmental
>allergens and offer a treatment option that can give permanent relief
>without the co-pays or inconvenience of a specialist or a lifetime
>of medication.  Much safer, cheaper, and convenient - means better
>compliance and patient outcomes!
>
>I think most patients (and providers) will choose option 3 every time.
>
>When viewed from this perspective finances almost seem secondary, but to
>cover them briefly, the practice or group nets between 1100 and 1400 per
>patient opting for immunotherapy.  To put that in perspective, the
>average single provider practice partnering with us in TX is netting
>about 314K annually.  While I've noticed we do not scale linearly in
>large groups and practices (due to different degrees of provider adoption
>in larger systems) we do provide a very substantial revenue stream for
>medical groups and practices.
>
>I'd love to schedule a time to come in to more fully introduce our
>service line and explore a partnership.  Do you have anything available
>in the next couple of weeks?
>
>Best regards,
>Michael Shaffer
>Business Development
>United Allergy Labs
>Mas_05@comcast.net<mailto:Mas_05@comcast.net>
>770.823.7671
>
>

WDTX-JCAAI-045459

>[cid:image001.jpg@01CBE2FA.E0B76D90]Michael Shaffer
>Business Development
>770.823.7671 (m)
>678.880.7516 (f)
>
>THIS COMMUNICATION IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE AND MAY
>CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT
>THE INTENDED RECIPIENT OF THIS COMMUNICATION, YOU ARE HEREBY NOTIFIED
>THAT ANY DISSEMINATION OF THE INFORMATION CONTAINED HEREIN IS STRICTLY
>PROHIBITED AND THAT YOU ARE NOT AUTHORIZED TO READ, PRINT, RETAIN OR COPY
>ANY PART OF IT. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
>NOTIFY US IMMEDIATELY BY E-MAIL AND DELETE ALL COPIES OF THE MESSAGE AND
>ANY ATTACHMENTS. THANK YOU.
>
>
>
>
>ICD-9-CM codes (candidates for testing)
>
>473.0 Chronic Maxillary Sinusitis
>473.3 Chronic Sphenoidal Sinusitis
>477.0 Allergic Rhinitis to Pollen
>477.2 Allergic Rhinitis, due to Animal (cat, dog) Hair and Dander
>477.8 Allergic Rhinitis due to Other Allergen
>477.9 Allergic Rhinitis Cause Unspecified
>995.0 Anaphylactic Shock
>493.0 Extrinsic (i.e. Allergic) Asthma but we
>test only mild intermittent category of Asthma
>493.9 Unspecified Asthma but we test only
>mild intermittent category of Asthma
>493.82 Cough Variant Asthma
>493.81 Exercise induced Bronchospasm
>372.14 Chronic Allergic Conjunctivitis
>372.30 Unspecified Conjunctivitis
>691.8 Atopic Dermatitis (Eczema)
>692.9 Contact Dermatitis
>692.84 Dermatitis due to animal dander
>692.6 Dermatitis due to plants
>530.13 Eosinophilic Esophagitis
>478.19 Nasal Congestion
>472.2 Chronic Nasopharyngitis
>698.9 Pruritis (i.e. Itching)
>782.1 Rash
>786.05 Chronic Rhinitis
>477.9 Allergic Sinusitis
>473.0 Chronic Maxillary Sinusitis
>473.8 Chronic sinusitis Other
>708.0 Urticaria, Allergic
>708.1 Urticaria, Chronic
>708.9 Urticaria, Unspecified
>995.1 Angioedema
>472.2 Nasal Polyps
>786.07 Wheezing
>
>
>
>
>
>
>
>
>
>[cid:image001.jpg@01CBE4B2.97054E10]
>
>
>
>
>On February 1st, MCG became Georgia Health Sciences University. My email
>address has also changed to the format "@georgiahealth.edu". Please
>update your address book to reflect this change.
>
>The information contained in this e-mail communication and any

WDTX-JCAAI-045460

>attachments is intended only for the individual or entity named above and
>may contain information that is privileged or confidential. If you are
>not the intended recipient, you are hereby notified that you have
>received this communication in error and that any review, disclosure,
>dissemination, distribution or copying of it or its contents is strictly
>prohibited and unauthorized. If you have received this communication in
>error, please notify me immediately by replying to this message and
>deleting it from your files. Thank you.

```
<?xml version=.0" encoding=TF-8"?>
<!DOCTYPE plist PUBLIC "-//Apple//DTD PLIST 1.0//EN" "http://www.apple.com/DTDs/PropertyList-1.0.dtd">
<plist version=.0">
<dict>
        <key>date-sent</key>
        <real>1300464696</real>
        <key>flags</key>
        <integer>8590195713</integer>
        <key>original-mailbox</key>
        <string>ews://jsublett@mx01.faa.local/Sent%20Items</string>
        <key>remote-id</key>
        <string>AAMkADYzOTA3NGQzLTVjY2QtNGE1Mi1iMjFkLTY5MDhmMjIxNjBkMQBGAAAAAABncycH9bEmQJMqdJs0hBLjBwBtYy
yYSssjTofbRraBQ6K1AAAA9ewJAABtYyyYSssjTofbRraBQ6K1AAAA/IZAAAA=string>
        <key>subject</key>
        <string>Re: UAL</string>
</dict>
</plist>
```

WDTX-JCAAI-045461

# Exhibit C

Message

| | |
|---|---|
| **From:** | "Portnoy, Jay MD" <jportnoy@cmh.edu> [jportnoy@cmh.edu] |
| **Sent:** | 10/31/2011 2:48:10 PM |
| **To:** | James Sublett [jsublett@familyallergy.com]; David Brown [DBrown@allergypartners.com]; doctorlem@aol.com; rholzhauer@allergypartners.com |
| **CC:** | Donald Aaronson [doclaw@doclaw.org]; Gary Gross [ggross144@earthlink.net] |
| **Subject:** | RE: Medical Economics - August 25, 2011 - (33) |

Sounds great.

I personally plan to hire a surgery technician, take a weekend course on neuroanatomy and start doing brain surgery next week in my office.

What's to stop me?

Jay M Portnoy, MD
Chief, Section of Allergy, Asthma & Immunology
Children's Mercy Hospitals & Clinics
Kansas City, MO 64108
(816) 234-3097 (voice)
(816) 346-1301 (fa x)
(816) 853-3716 (cell)

**From:** James Sublett [mailto:jsublett@familyallergy.com]
**Sent:** Monday, October 31, 2011 9:29 AM
**To:** Portnoy, Jay MD; David Brown; 'doctorlem@aol.com'; 'rholzhauer@allergypartners.com'
**Cc:** Donald Aaronson; Gary Gross
**Subject:** Re: Medical Economics - August 25, 2011 - (33)

We have responded to this article. Stan Fineman, with input from the JCAAI & College leadership wrote a letter to the editor that has been accepted. This is our main focus, the commercial companies, including United Allergy Labs, that is mentioned in this article, with the model of embedding a "allergy technician" in PCP practices.
To date this is what has been done through the JCAAI:

1. We have turned a couple of specific situations that we thought were questionable billing practices to the OIG.
2. We have worked with individual physician and local societies, including Texas, who is being sued by UAL, giving them legal counsel and guidance.
3. We have kept the College and Academy leadership informed of developing activities by these companies.
4. We have had discussions with AANMA related to them taking a role as our lay voice.
5. In our lobbying efforts in DC, we have brought up the issue with congressman we visited.
6. We have had individual discussion with MCOs related to the issue.
7. We are working with the College's PR staff to develop messaging.
8. We have appointed this Task Force to, as outlined by David, to develop both short term and long term strategies.

JS

WDTX-JCAAI-016828

On 10/31/11 9:09 AM, "Portnoy, Jay MD" <jportnoy@cmh.edu> wrote:

Would allergy testing and treatment in an untrained PCP office count as remote practice? Follow the link below.

Jay M Portnoy, MD
Chief, Section of Allergy, Asthma & Immunology
Children's Mercy Hospitals & Clinics
Kansas City, MO 64108
(816) 234-3097 (voice)
(816) 346-1301 (fa x)
(816) 853-3716 (cell)

-----Original Message-----
From: Amado, Mercedes MD
Sent: Sunday, October 30, 2011 7:38 PM
To: AllergyFaculty; AllergyFellows; AllergyNPS; AllergyNurses
Subject: FW: Medical Economics - August 25, 2011 - (33)

Medical Economics article regarding increased revenue by allergy testing and allergy injections--for the non allergist


http://digital.healthcaregroup.advanstar.com/nxtbooks/advanstar/medec_20110825/index.php?startid=33#/28

Electronic mail from Children's Mercy Hospitals and Clinics. This communication is intended only for the use of the addressee. It may contain information that is privileged or confidential under applicable law. If you are not the intended recipient or the agent of the recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please immediately forward the message to Children's Mercy Hospital's Information Security Officer via return electronic mail at informationsecurityofficer@cmh.edu and expunge this communication without making any copies. Thank you for your cooperation.


This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

WDTX-JCAAI-016829

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

ACADEMY OF ALLERGY & ASTHMA §
IN PRIMARY CARE AND UNITED §
BIOLOGICS, LLC D/B/A UNITED §
ALLERGY SERVICES §
§
    Plaintiffs, §
§
v. §         CIVIL ACTION NO. 14-35-OLG
§
§
AMERICAN ACADEMY OF ALLERGY, §
ASTHMA & IMMUNOLOGY; §
AMERICAN COLLEGE OF ALLERGY, §
ASTHMA & IMMUNOLOGY; DALLAS §
ALLERGY AND ASTHMA CENTER, §
P.A.; FAMILY ALLERGY & ASTHMA §
LLC; JOINT COUNCIL OF ALLERGY, §
ASTHMA & IMMUNOLOGY; LYNDON §
E. MANSFIELD M.D., P.A., A §
PROFESSIONAL ASSOCIATION; §
DONALD AARONSON, MD; GARY §
GROSS, MD; LYNDON MANSFIELD, §
MD; JAMES SUBLETT, MD; AND §
DAVID WELDON, MD §
§
    Defendants. §

STATE OF TEXAS         §
                      §
COUNTY OF DALLAS    §

## DECLARATION OF OSEHOTUE OKOJIE, M.D.

1.     "My name is Osehotue Okojie, M.D. I am over twenty-one years of age, and I am

competent to make this Declaration. All matters stated herein are true and correct and within my

personal knowledge.

2.     I am a board-certified family physician in private practice in Dallas, Texas and the

owner of Allcare Family & Urgent Care. I am also a member of the Academy of Allergy &

Asthma in Primary Care. As part of my 10 years of experience as a family physician, I have

treated patients with all types of ailments, including allergies. Treating patients for seasonal and

1

perinneal allergies with allergy testing and immunotherapy falls within my scope of practice as a family physician, and I offer this care to the patients in my practice who would benefit from this care.

3.      As part of my practice, I contract with insurance carriers and health plans to serve their network as a family physician.  One of those networks is Parkland Community Health Plan, Inc. ("PCHP"), a managed care organization health plan whose members are Texas Medicaid patients.  As part of that contract, I have agreed to accept PCHP members and PCHP has agreed to reimburse me for covered services under Texas Medicaid that I perform for those members.  I have been performing allergy testing and immunotherapy for PCHP members and my other patients since approximately March or April 2012, after I had contracted with United Biologics, LLC to supply materials and a technician to assist in that care.  From that time until October 2013, I billed PCHP for allergy services and the claims were paid.

4.      Attached hereto as Exhibit A-1 is a true and correct copy of a letter dated October 1, 2013 that I received from PCHP.

5.      PCHP's letter came as a surprise and professional affront to me.  Prior to the letter, I had never been contacted by anyone, including PCHP, with any complaints about the allergy care of my patients.

6.      I take issue with several of the statements in the letter.  For example, the letter states that allergy skin testing and immunotherapy are "outside the scope of [my] primary care practice." As a board-certified family physician, and under CMS and Texas Medicaid guidelines, skin testing and immunotherapy are within the scope of my practice.

7.      The letter also states "you are using United Allergy Laboratories to provide some or all of these services" and implies that I am not performing the services myself.  I perform all of

2

the skin testing and immunotherapy, while United Allergy Services supplies equipment, antigens/serum and support personnel to assist me in my office with the skin prick test and the mixing and injections of antigens. The UAS technicians work under my supervision, and I read and confirm the test results and supervise the mixing and administration of antigens.

8.     The letter also states "skin testing and immunotherapy is a task that cannot be delegated," incorrectly assuming that I have delegated the skin test to a technician, when I perform the professional service as defined by CMS of ordering and reading the results of the skin test.

9.     PCHP's letter not only stated it would refuse to pay claims, but it also threatened to kick me out of the PCHP network. This put me in the position of having to either stop treating patients who were greatly benefiting from my allergy care or risk my continued participation in the network. On November 4, 2013, I received another letter from PCHP dated October 28, 2013 giving me until November 7, 2013 to submit a Corrective Action Plan. On November 5, 2013, I wrote a letter to PCHP informing that I had already stopped providing allergy testing and immunotherapy to PCHP patients as of October 4, 2013.

10.     The decision to stop immunotherapy for my PCHP patients has been disruptive to my practice and the care of these patients. I had to inform each of them that I could no longer treat them and that if they wanted to continue their treatment, they would need to see a board-certified allergist as directed by PCHP. Immunotherapy for seasonal allergies is a three-to-five year treatment. Many of my PCHP patients were in the middle of their immunotherapy. Some are now suffering allergy symptoms that are no longer being treated.

11.     Because all of these patients are Medicaid-dependent, they cannot afford to receive allergy testing and treatment if those services are not covered by PCHP. I have generally

3

referred my PCHP patients seeking allergy treatment back to PCHP so they can find a network allergist, but most patients of mine are comfortable coming to their PCP for this type of service and are not willing to go see other physicians. Also, finding and seeing a specialist is inconvenient and potentially more costly for many of my patients. Also, from my experience there are limited numbers of allergists that will actually see these patients and accept their PCHP insurance, even though they may be listed by PCHP as a network physician.

12.     Even though I had stopped practicing and billing for allergy testing and immunotherapy for PCHP patients, I received another letter from PCHP dated January 22, 2014 seeking repayment of $172,557.97 for allergy testing and immunotherapy that I had previously performed from March 2012 to November 2013. A true and correct copy of this letter is attached hereto as Exhibit A-2.

13.     If forced to repay $172,557.97, I could be forced to shut my doors.

14.     I declare under penalty of perjury that the foregoing is true and correct."

Dated: March 31, 2014

_____

Osehotue Okojie, M.D.

4


# Parkland
*Community Health Plan, Inc.*

October 1, 2013

Osehotue Okojie,
4101 Ross Avenue, Ste. 500
Dallas, TX 75204

Osehotue Okojie,,

It has come to our attention that you are performing allergy skin testing and immunotherapy in your primary care office. The American Academy of Allergy, Asthma and Immunology has developed standards for immunotherapy and skin testing. AAAI states that physicians should have specialized training before providing these services. PCHP has mechanisms for PCP's to be jointly certified as specialists. Since you have never applied as a specialist qualified to do skin testing or immunotherapy, skin testing and primary immunotherapy are considered by PCHP as outside the scope of your primacy care practice. Further, the volume of skin testing and hyposensitization indicates likely use of these modalities outside the accepted standard of practice because skin testing and immunotherapy are for patients with moderate to severe disease resistant to other care as delineated in the AAAAI standards, NAEPP for asthma and other professionally accepted guidelines. AAAAI indicates that the physician who determines the makeup of the allergy solution needs specific specialized knowledge that are beyond the scope of knowledge of a PCP.

We are also aware that you are using United Allergy Laboratoriesto provide some or all of these services. United Allergy Laboratories is not a credentialed and contracted provider for PCHP. Your contract with PCHP indicates that those you contract with or refer services to must be participating providers with PCHP. Using this provider puts you in violation of your contract, which could subject you to termination of your contract with PCHP.

Further, the model being used appears to provide three doses of immunotherapy in the office followed by immunotherapy at home. AAAAI standards including the reference attached specifically state safety standards for immunotherapy that are not consistent with this practice because there is a small but definite risk of anaphylaxis and death. Thus, home based immunotherapy poses a hazard and is not an acceptable practice for PCHP members. The AAAAI standards clearly indicate that home therapy should be done by exception with safety controls in place. Since this is a health and safety issue, you must stop immediately or risk suspension of participation from PCHP.

We have also been informed that you or United Allergy Laboratoriesto may be using allergy technicians for administering the skin tests and office based immunotherapy. There is no accepted national standard for an allergy technician. Texas does not have a process for recognition or certification for this type of health worker. It is our reading of the Texas Nurse Practice Act that skin testing and immunotherapy is a task that cannot be delegated.

For all of these reasons, effective 10/4/2013, we will no longer pay claims for immunotherapy or skin testing from your office or any other PCHP primary care provider.

EXHIBIT " A - 1 "




# Parkland
*Community Health Plan, Inc.*

You must submit to my attention a PCHP a corrective action plan that confirms that you will no longer provide the services described in this letter or use non-credentialed subcontractors for your PCHP patients, that you comply with PCHP standards of care and the steps that you have taken or will take to repair the contractual violations cited.

Specific contractual violations include Section 2.1 – allergy testing and initiation of immunotherapy is not within the scope of your practice by AAAAI standards;  Section 2.5 – by not applying to be credentialed to provide skin testing or initiation of immunotherapy as a specialist, you have violated the requirement to apply for appropriate credentials to perform these services; Section 5.1.1 – you are required to refer to participating providers and services and United Allergy Services is not a contracted and credentialed entity;

Section 9.5 – assignment of allergy skin testing and immunotherapy constitutes a violation of the requirement to have the written prior permission of PCHP for such assignment.

We value your participation as a Primary Care Provider in the PCHP network and look forward to hearing that you have addressed the issues raised in this letter.

Sincerely yours.

*Barry S Lachman MD, MPH*

Barry S. Lachman, MD, MPH
Medical Director – Parkland Community Health Plan
Clinical Professor of Pediatrics – University of Texas Southwestern Medical School

References
Hetal S. Amin, Gary M. Liss, David I. Bernstein, Evaluation of near-fatal reactions to allergen immunotherapy injections, Journal of Allergy and Clinical Immunology, Volume 117, Issue 1, January 2006, Pages 169-175

http://educationportal.com/articles/Allergy_Technician_Job_Description_and_Requirements_for_Be coming_an_Allergist_Assistant_or_Allergist_Technician.html

Allergen immunotherapy: A practice parameter third update, J ALLERGY CLIN IMMUNOL 127:S1-S55, 2011



151 Farmington Avenue, RWA4
Hartford, CT 06156-7626

**Tera Cooper**
**Investigator**
Special Investigations Unit
Phone/Fax: (972) 228-1572

January 22, 2014

Osehotue Okojie M.D.
4101 Ross Ave
Ste 500
Dallas, TX 75204

**Case #: 40054**

Dear Dr. Okojie:

We have completed a review of claims submitted by your office to Parkland Community Health Plan (PCHP) under Tax Identification Number 36-4648039 for claims processed from March 2012 to November 2013. Based on our review, we have identified overpayments in the amount of **$172,557.97.**

The overpayment is the result of charges submitted by your office for Current Procedural Terminology (CPT) codes 95004, 95117 and 95165.

95004 - Patch or application test(s) (specify number of tests)

95117 - Professional services for allergen immunotherapy not including provision of allergenic extracts; 2 or more injections

95165 - Professional services for the supervision of preparation and provision of antigens for allergen single or multiple antigens (specify number of doses)

As previously communicated, we were informed that you are using United Allergy Laboratories (UAL) to provide some or all of these services. United Allergy Laboratories is not a credentialed and contracted provider for PCHP. Your contract with PCHP indicates that you are to refer patients for services to participating providers with PCHP. Therefore, since UAL is not a credentialed and contracted provider, the services were not eligible for reimbursement; resulting in an overpayment of **$172,557.97.**

Second, the American Academy of Allergy, Asthma and Immunology has developed standards for immunotherapy and skin testing. AAAI states that physicians should have specialized training before providing these services. PCHP has mechanisms for PCP's to be jointly certified as specialists. You were credentialed and listed in our provider information as a PCP, not an allergist. Since you have never applied as a specialist qualified to do skin testing or immunotherapy, skin testing and primary immunotherapy are considered by PCHP as outside the scope of your agreement with PCHP.

**EXHIBIT " A-2 "**

Page 2
Osehotue Okojie M.D.
January 22, 2014

Further, the volume of skin testing and hyposensitization indicates likely use of these modalities outside the accepted standard of practice because skin testing and immunotherapy are for patients with moderate to severe disease resistant to other care as delineated in the AAAAI standards, NAEPP for asthma and other professionally accepted guidelines. AAAAI indicates that the *physician* who determines the makeup of the allergy solution needs specific specialized knowledge that are beyond the scope of knowledge of a PCP.

Additionally, the model being used appears to provide three doses of immunotherapy in the office followed by immunotherapy at home. AAAAI standards including the reference attached specifically state safety standards for immunotherapy that are not consistent with this practice because there is a small but definite risk of anaphylaxis and death. Thus, home based immunotherapy poses a hazard and is not an acceptable practice for PCHP members. The AAAAI standards clearly indicate that home therapy should be done by exception with safety controls in place.

Finally, we were also in informed that you and United Allergy Laboratories use allergy technicians for administering the skin tests and office based immunotherapy. There is no accepted national standard for an allergy technician. Texas does not have a process for recognition or certification for this type of health worker. It is our reading of the Texas Nurse Practice Act that skin testing and immunotherapy is a task that cannot be delegated.

It is our position that you are to provide services within the scope of your agreement with PCHP to PCHP members. Additionally, it is also your responsibility to provide services in accordance with the Texas Medicaid Program. As such, Parkland Community Health Plan is seeking the recovery of claims with adjudicated dates March 2012 to November 2013 as previously communicated.

Enclosed is a password protected CD containing a detailed patient report showing the specifics of the overpayments. Please call me at 972-228-1572 to obtain the password.

If you would like to have a discussion about these findings and the overpayments made to date or if you disagree with or dispute these findings, please notify us of your desire to have a discussion or provide us with the basis for your disagreement or dispute; including any documentation you would like us to review by February 07 , 2014.

You may resolve this overpayment by sending us payment of the full amount by February 14, 2014. Please send a bank check or money order for **$172,557.97** made payable to Parkland Community Health Plan to the following address:

Parkland Community Health Plan – SIU Overpayments
2777 Stemmons Freeway, Suite 1750
Dallas, TX 75207

Please include case #40054 on your check.

Page 3
Osehotue Okojie M.D.
January 22, 2014

If we have not heard from you by February 24, 2014 we will proceed according to the statue and the parties' contract. If you have any questions, please call me at 972-228-1572 or email me at cooperT1@aetna.com. Thank you for your cooperation.

Sincerely,

Tera Cooper
Investigator

References:

Hetal S. Amin, Gary M. Liss, David I. Bernstein, Evaluation of near-fatal reactions to allergen immunotherapy injections, Journal of Allergy and Clinical Immunology, Volume 117, Issue 1, January 2006, Pages 169-175

Page 4
Osehotue Okojie M.D.
January 22, 2014

http://educationportal.com/articles/Allergy_Technician_Job_Description_and_Requirements_for_Be
coming_an_Allergist_Assistant_or_Allergist_Technician.html

Allergen immunotherapy: A practice parameter third update, J ALLERGY CLIN IMMUNOL
127:S1-S55, 2011

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. 14-35 |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON ~~,~~ E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; PSF, PLLC; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; ~~AND~~ DAVID WELDON, MD; ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS, JAMES WALLEN & PHADIA US INC.; ATLANTA ALLERGY & ASTHMA CLINIC, P.A.; STANLEY FINEMAN, MD | § § § § § § § § § § § § § § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § § § § § § § § § § | |

## ~~SECOND~~ THIRD AMENDED COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this action against the American Academy of Allergy, Asthma & Immunology ("AAAAI" or the "Academy"); the American College of Allergy, Asthma & Immunology ("ACAAI" or the "College"); Dallas Allergy and Asthma Center, P.A.; the Joint Council of Allergy, Asthma & Immunology ("JCAAI"

or the "Joint Council"); Lyndon E. Mansfield M.D., P.A., a professional association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; ~~and~~ David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"); Tonya Winders; Stanley Fineman, MD; Atlanta Allergy & Asthma Clinic, P.A., ("Atlanta Allergy"); James Wallen; and Phadia US Inc. ("Phadia") (collectively, "Defendants").

## NATURE OF THE CASE

1.     This case concerns a conspiracy and agreement among the three national allergist trade associations ~~and~~, certain of their officers and board members, and those paid for and acting on their behalf or in coordination with them to restrict competition in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies (referred to herein as "allergy testing and allergen immunotherapy") in local areas throughout the United States.  The three trade associations, AAAAI, ACAAI, and JCAAI, responded to pleas from their members to engage in a "turf war" to address the "encroachment" in the market by primary care physicians and UAS.  In response, and in keeping with the "turf war" motif, these three independent associations of competitors agreed to form "RADAR," a joint venture of those organizations to recruit local allergists from every state, regional, and local allergist society in the nation to fight back against these competitors, and to provide a message board called "Basecamp" for those representatives to coordinate their anticompetitive activities.

2.     Defendants, including not only these trade associations, but the leaders listed in this complaint and some RADAR members, actively engaged in their self-described "turf war" by contacting insurance companies, managed care organization health plans, and other third-party payors to convince them not to do business with or reimburse the allergy testing and allergen immunotherapy services of primary care physicians and UAS.  Defendants also hired and paid organizations and their individuals to engage in this warfare on their behalf, including Defendant AAN, an organization formerly known as "Mothers of Asthmatics," under the guise that no one would challenge an organization with a now faux purpose of protecting children.  Defendants were further joined in agreement and in funds by Defendant Phadia, which lost sales of blood tests and

2

medications as a direct result of primary care physicians performing allergy skin prick tests and preparing and administering allergen immunotherapy. Defendants engaged in this conduct despite, and in spite of, governmental organizations such as the Centers for Medicare and Medicaid Services and the Texas Medical Board, which otherwise pay for and authorize the services of these competitors. The purpose of Defendants' contacts with private third-party payors and encouragement of other members to engage in this behavior is to accomplish their anticompetitive objectives through persuasion, enticement, or coercion, and were economically motivated to protect Defendants' turf.

3. The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers. By attempting to take away competitors' means to compete, namely reimbursement by third-party payors, Defendants have aimed to essentially deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy. Defendants' intended result is to protect their own profits and ensure that patients continue to pay their inflated prices, despite the need for additional supply in the market. Since this suit was filed, then unnamed members of the conspiracy, including AAN, Phadia, Winders, and Wallen only ramped up their anticompetitive activity with the hope that they could put Plaintiffs out of business before Plaintiffs could discover the depths of their participation in this conduct. Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, the Texas Free Enterprise and Antitrust Act, and Texas common law, the Court should put an end to this turf war and restore and protect competition.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

4.   This action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, and the common law of torts for civil conspiracy and tortious interference with both current contracts and prospective business relations.

5.   This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a). Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business. *See* 15 U.S.C. § 22.

6.   The Court may exercise personal jurisdiction over Defendants Gross, Mansfield, Weldon, Dallas Allergy and Asthma Center, P.A., and Lyndon E. Mansfield M.D., P.A., a professional association, and James Wallen because they are located in Texas and have continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

3

7.   The Court may exercise personal jurisdiction over Defendants JCAAI, AAAAI, and ACAAI, AAN, and Phadia because they regularly conduct business in Texas, including with Texas-based physicians to whom they market and communicate directly through phone calls, writings, and over the internet, including via their respective websites. Additionally, they have purposefully directed specific actions at Texas, including phone calls, emails, letters, and publications. This action arises from and specifically relates to those purposeful contacts with the State of Texas.

8.    The Court may exercise personal jurisdiction over all Defendants, including Defendants Dr. Aaronson, Dr. Sublett, ~~and~~ PSF, PLLC, AAN, Dr. Fineman, Atlanta Allergy, Phadia, and Tonya Winders because they expressly aimed tortious conduct at the State of Texas knowing that the brunt of their intended injury would be felt by residents of Texas, and particularly by UAS, a San Antonio, Texas-based company.   Defendants have expressly engaged in such tortious conduct individually by committing antitrust violations, as well as interfering with contracts and prospective business relationships in Texas with the intent to harm residents of Texas. They have done so through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas.

9.  For example, on February 8, 2011, Dr. Aaronson, Dr. Sublett, and Dr. ~~Sublett~~Fineman helped issue a letter to Regional, State, and Local Allergy Society Leaders announcing the formation of the Regional Advocacy Discussion and Response ("RADAR") initiative aimed at addressing the encroachment of non-allergists.   *See* Exhibit E-4 to Plaintiffs~~'~~' Motion for Preliminary Injunction and Temporary Restraining Order (Motion for Preliminary Injunction"), Dkt. No. 12-25.  The letter, which was signed by Dr. Sublett, sought to recruit local representatives from every corner of the country, including Texas, to assist in carrying out RADAR~~'~~'s mission, the true intentions of which were to restrict access to the market for allergy testing and allergen immunotherapy.  An AAAAI published report on "Ongoing Activities Relevant to the [RADAR] Initiative," admits that one of ~~4~~the means by which RADAR attempted to address the perceived encroachment by non-allergists, was to engage in "[o]ngoing communication with insurance companies" to represent the specialty "in discussions about appropriateness of care." *See* Exhibit G to Plaintiffs~~'~~' Motion for Preliminary Injunction at 3, Dkt. No. 12-35.  Those discussions have resulted in the refusal of insurance companies to reimburse claims submitted by primary care

physicians residing in Texas who are supported by UAS. The encouragement of such actions by local representatives from every state in the country clearly demonstrates a nationwide pattern of anticompetitive conduct which has resulted in direct harm to entities located in Texas, including UAS and the practices of the Texas primary care physicians whom it supports.

10. Further, Dr. Sublett sent an email dated May 5, 2011 to the President of the Texas Allergy, Asthma & Immunology Society ("TAAIS"), Dr. Stuart Abramson, who was located in Texas, approving and authorizing the creation and distribution of anticompetitive letters aimed at primary care physicians, insurance companies, and managed care organizations throughout Texas. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order, Dkt. No. 12-46. The communication indicates that both Dr. Aaronson, JCAAI's acting Executive Director, and Dr. Gross, the organization's Executive Vice President, were also personally involved in approving these communications. Despite acting in their capacity as officers of JCAAI, Defendants' actions also benefitted themselves individually as physicians and their businesses engaged in the market for allergy testing and allergen immunotherapy, and thus were undertaken in more than any pure associational capacity. The fiduciary-shield defense protects against liability for officers of organizations just by being officers, but does not protect the individual Defendants from liability for their own tortious conduct, especially not from antitrust liability. The letters that Drs. Aaronson, Gross, and Sublett approved on behalf of JCAAI, were intended to injure UAS, as well as the Texas primary care physicians that it supports. As the referenced communication from TAAIS seeking approval for the letters asserts, they were revised to alter the "tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* at 2. However, regardless of the revisions, the intended target of the harm sought to be inflicted remains the same. Communications among the TAAIS leadership confirm that UAS was the intended target of the letters which Drs. Aaronson, Gross, and Sublett approved as described below.

*See* Exhibit T to Plaintiffs'' Preliminary Injunction Motion, Dkt. No. 12-50 ("Because of "restraint of trade" issues, we cannot more directly attack [UAS], but the above approaches [including the draft letters] are within our legal rights."). The clear purpose of the Defendants'' tortious conduct both with Texas and with others outside of Texas as described below was to injure UAS and prevent competition from the physicians whom it supports. The benefit of those actions was meant to accrue to board-certified allergists'' businesses, such as PSF, PLLC, which belongs to Dr. Sublett.

11. Dr. Sublett and Dr. Aaronson jointly participated in multiple JCAAI newsletters discussed below, which Dr. Sublett signed, and which were distributed to JCAAI members in Texas and support the basis for the claims in this Complaint. The October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," which was sent under Dr. Sublett''s signature and originally drafted by Dr. Aaronson, mentions efforts to address the remote practice of allergy and specifically mentions "one such scheme featured in . . . a "Business Builder" article in *Medical Economics*." Dr. Sublett testified under oath that the company featured in the referenced article was UAS. ~~*See* Exhibit A~~ (September 7, 2012 Deposition Testimony of Dr. James Sublett, M.D. at 143:14-15). The newsletter, addressed to JCAAI''s nationwide membership, including members in Texas, goes on to "recommend[] against engaging with any company that promotes [the remote practice of allergy]." Dr. Sublett also participated in RADAR, including its online message board "Basecamp," in which Dr. Sublett specifically ~~s~~sought information concerning UAS to target that company. Dr. Sublett ~~and~~, Dr. Aaronson, and Dr. Fineman also participated in the AAAAI Annual Meeting and the JCAAI meeting from February 22-26, 2013 in San Antonio, Texas, at which ~~both~~all three participated in discussions concerning the ongoing activities of RADAR and Defendants as described in this Complaint.

12. Dr. Fineman served as the President-Elect for the ACAAI from 2010-2011 and the President from 2011-2012. During his tenancy as President-Elect, Dr. Fineman drafted and

participated in distributing multiple letters and publications, including attempts to paint ACAAI as setting the standard of care for allergy testing and allergen immunotherapy. Those communications were distributed to members in Texas, as well as third party payors, including managed care organizations in Texas. For example, ACAAI sent a "position statement" regarding allergy testing and allergen immunotherapy to the managed care organization, El Paso First Health Plan located in El Paso, Texas. *See* Ex. A. El Paso First relied on the position paper to determine that the standard of care for allergy testing and allergen immunotherapy was limited to practice of board-certified allergists, and to deny claims of AAAPC members and primary care physicians in contract with UAS. Additionally during his tenancy as President-Elect of ACAAI, Dr. Fineman proposed and participated in drafting and sending a letter to the Texas Medical Board providing specific guidelines for immunotherapy. [Dkt. No. 135-23]. Dr. Fineman proposed a formal motion of ACAAI the ACAAI's letter be sent in support of the Texas Allergy & Asthma Society and its members in response to their pleas to combat UAS, and the ACAAI Executive Committee carried that motion and sent the letter in March 2011. Following the sending of this letter, Defendants Gross and Aaronson discussed with Dr. Fineman that the Texas Medical Board should target UAS and make their practices "a case they are investigating." Further, Defendant Gross and Dr. Fineman discussed how to disrupt UAS's business with primary care physicians, including Defendant Gross contacting the Chief of Internal Medicine at Presbyterian Hospital in Dallas to control Plaintiffs from a "corporate standpoint." [Dkt. No. 135-22].

13. ~~12.~~ Dr. Fineman also participated in Strike Force and RADAR, including its online message board "Basecamp." Through direct conversations with other Defendants, including those in Texas, and with his own colleagues at Atlanta Allergy, Dr. Fineman specifically sought information concerning UAS to target that company in Texas, Atlanta, and elsewhere. Dr. Fineman inquired with Defendants Aaronson and Sublett about whether they could collectively use a JCAAI

press release "to support our case against the remote practice by United Allergy Labs?"  Dr.
Fineman and Atlanta Allergy also specifically targeted UAS through approaching pediatric and
primary care clinics in Georgia to convince them not to utilize or contract with UAS.  *See* Ex. B.
Defendants could reasonably expect to be held accountable by a Texas court for the anticompetitive
injuries suffered in Texas that were the intended result of their conspiracy.  As such, the Court's
exercise of personal jurisdiction over Defendants would not violate traditional notions of fair play
and substantial justice.

14. 13.Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants
inhabit or transact business in this District and a substantial part of the events or omissions giving
rise to these claims occurred in this District, including, but not limited to, the conspirators'
attempts to organize a group boycott using insurance companies, managed care organizations, and
physicians located in this district to harm UAS, which is also located in this District.  In addition,
venue is proper in this District pursuant to 15 U.S.C. § 22 because JCAAI, ACAAI, and AAAAI,
and AAN each transact business in the District, such as accrediting members of their organizations
in the District and providing support services to those members in the District.

15. 14.Defendants' conduct, including their attempts to organize a group boycott against
non- allergist physicians and their businesses and support staff, including AAAPC members and
UAS, and their tortious interference with AAAPC members and UAS's contracts and prospective
business relations all cross state lines.  Defendants' activities that are the subject of this Complaint
are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

16. 15. AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia. The AAAPC is an organization that fosters the ability of physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care. Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas within Texas and 24 other states. AAAPC's claims are limited to seeks injunctive relief, it on its antitrust claims brought in a representational capacity on behalf of its members. It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit. AAAPC also seeks certain money damages in its own capacity because it has, itself, suffered actual damages due to the Defendants' tortious conduct through their interference with AAAPC's contracts and existing and prospective business relations. AAAPC has appeared through undersigned counsel in this cause.

17. 16.  United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.  UAS participates in the market for allergy testing and allergen immunotherapy through providing support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of board- certified allergists, including Defendant Dallas Allergy and Asthma Center, P.A. in the local market in Dallas; PSF, PLLC in the local market in Louisville; and Lyndon Mansfield M.D., P.A. in the local market in El Paso., and Atlanta Allergy, in the local market in Atlanta, Georgia.  As a direct target of Defendants'' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims. UAS has appeared through undersigned counsel in this cause.

8

11

**Defendants**

18. ~~17.~~  The American Academy of Allergy, Asthma & Immunology is a Wisconsin non-profit organization of physicians with its principal place of business at 555 East Wells Street, Suite 1100, Milwaukee, WI 53202-3823 and has appeared through counsel in this cause.

19. ~~18.~~The American College of Allergy, Asthma & Immunology is a Minnesota non-profit organization of physicians with its principal place of business at 85 West Algonquin Road, Suite 550, Arlington Heights, IL 60005 and has appeared through counsel in this cause.

20. ~~19.~~Dallas Allergy and Asthma Center, P.A. is a Texas professional association owned and operated by Dr. Gary Gross with its principal place of business at 5499 Glen Lakes Dr., Ste. 100, Dallas, TX 75231 and has appeared through counsel in this cause.

21. ~~20.~~PSF, PLLC d/b/a Family Allergy & Asthma LLC is a Kentucky limited liability company owned and operated by Dr. James Sublett, with its principal place of business at 9800 Shelbyville Road, Ste. 220, Louisville, KY ~~40223. It can be served through its registered agent, Ivan J. Schell, 500 W. Jefferson Street, Ste. 2400, Louisville, KY 40202.~~40223 and has appeared through counsel in this cause.

22. ~~21.~~The Joint Council of Allergy, Asthma & Immunology is an Illinois non-profit organization of physicians with its principal place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067 and has appeared through counsel in this cause.

23. ~~22.~~Lyndon E. Mansfield M.D., P.A., a professional association, is a Texas company owned and operated by Dr. Lyndon Mansfield, with its principal place of business at 2121 Wyoming Ave., El Paso, TX 79903 and has appeared through counsel in this cause.

24. ~~23.~~Dr. Donald W. Aaronson is an individual residing in the state of Illinois and is the Executive Director of JCAAI, and has specially appeared through counsel in this cause.

9

25. 24. Dr. Gary Gross is an individual residing in the state of Texas, is the Executive Vice President of JCAAI, and the owner of Dallas Allergy & Asthma Center, P.A., and has appeared through counsel in this cause.

26. 25. Dr. Lyndon Mansfield is an individual residing in the state of Texas, is a member of the Board of Directors of JCAAI, and is the owner of Lyndon Mansfield, M.D., P.A., and has appeared through counsel in this cause.

27. 26. Dr. James Sublett is an individual residing in the state of Kentucky and is the Immediate Past President and a member of the Board of Directors of JCAAI, the Vice President of ACAAI, the owner and founder of PSF, PLLC d/b/a Family Allergy & Asthma LLC, and has specially appeared through counsel in this cause.

28. 27. Dr. David Weldon is an individual residing in the state of Texas and is a member of the board of regents of ACAAI and has appeared through counsel in this cause.

29. Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"), formerly known as Mothers of Asthmatics, is a Virginia corporation with its principal place of business at 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182. It can be served through its registered agent, Tonya Winders, 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

30. Tonya Winders is an individual residing in the state of Tennessee and is the Executive Director of AAN and a past officer of Phadia and may be served with process at her residence, 110 Countryside Drive, Hendersonville, TN 37075.

31. James Wallen is an individual residing in the state of Texas and is a representative of AAN, and may served with process at his residence, 28 Stillmeadow, Round Rock, Texas 78664.

32. Dr. Stanley Fineman is an individual residing in the state of Georgia, the Past President and current officer of ACAAI, and a current director of the board of AAN, and may be served with process at his residence, 4042 River Ridge Chase, Marietta, Georgia, 30067.

33. Atlanta Allergy & Asthma Clinic, P.A., a professional association ("Atlanta Allergy"), is a Georgia company owned and operated by Stanley Fineman, and may be served with process through its registered agent, Gregory P. Youra, 1180 Peachtree Suite, Suite 700, Atlanta, Georgia, 30309. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

34. Phadia US Inc. ("Phadia") is a Delaware corporation with its principle place of business at 4169 Commercial Drive, Portage, MI 49002, and may be served through its registered agent for service of process, Capitol Services, Inc., 1675 S State St., Suite B, Dover, Delaware, 19901. Service of process may also be made in any district where it transacts business. *See* 15 U.S.C. § 22.

35. 28. Defendants*'* acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

36. 29. Defendants Drs. Aaronson, Gross, Mansfield, Sublett, and Weldon, and Fineman are licensed physicians in their respective states and are in the business of providing allergy care to patients in their area and the places where their practices do business. Defendants operate their businesses either individually, or through professional associations or limited liability companies, which not only provide physician services for allergy care, but also provide support services necessary to provide the allergy care, including Defendants Dallas Allergy and Asthma Center,

14

P.A.; PSF, PLLC; and Lyndon Mansfield, M.D., P.A. , and Atlanta Allergy & Asthma Clinic, P.A.

Drs. Aaronson, Gross, Mansfield, Sublett, and Weldon, and Fineman are also members of some or

all of the three national trade organizations composed of

10 board-certified allergists, AAAAI, ACAAI, and JCAAI, and act on behalf of those
organizations as either officers or board members.

37. 30. The individual defendants market themselves within their sub-specialty as "board-

certified allergists," which is a certification a physician obtains from the American Board of

Allergy and Immunology ("ABAI"), a private organization established in 1971. The ABAI only

qualifies physicians who are already board-certified in either pediatrics or internal medicine, and

who participate in a three-year fellowship in an ABAI training program. Currently there are less

than 3,000 board-certified allergists practicing nationwide. The number of fellowships and board-

certified allergists is shrinking.

38. Defendant AAN is a "non-profit" organization originally named "Mothers of

Asthmatics." Mothers of Asthmatics was formed in 1985 by Defendant Nancy Sander, a mother of

an asthmatic child to advance the interests of asthmatic patients who suffer from lack of care to

treatment. Nancy Sander served as President of Mothers of Asthmatics until September 2013,

when Tonya Winders took over the leadership of that organization, renaming it "Allergy and

Asthma Network." Instead of advancing the cause of asthmatic children as the organization was

originally formed to do, AAN now acts as a referral network for board-certified allergists who are

members of ACAAI and in exchange for payment seeks to advance the market position of

board-certified allergists affiliates.

39. Defendant Tonya Winders is the Executive Director of AAN and a former sales

representative of Phadia, Inc., a company that employees many board-certified allergists as board

members, including Defendant Mansfield. Phadia sells Immunocap tests, otherwise known as

"ICAPs." ICAPs are a form of Radio Allergo Sorbent Tests ("RAST tests"), which are blood test

that measure levels of Immunoglobulin E (IgE), the allergic antibody, in an effort to test for allergies. While ICAPs are used by board-certified allergists primarily to test for food allergies, Phadia promotes ICAPs to primary care physicians and encourages those physicians to use those tests on their patients who also may suffer from seasonal and perineal allergies, and encourages those physicians to refer those patients who test positive to board-certified allergists for treatment.

40. 31. Despite not being certified by ABAI, many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of ABAI. As explained below, however, there is an important distinction between treating allergy-related symptoms and treating the underlying cause of allergies, the latter of which can only be accomplished through allergy testing and allergen immunotherapy.

41. 32. While the number of physicians who receive ABAI accreditation is shrinking, board-certified allergists and their businesses are still the dominant players in the market for allergy testing and allergen immunotherapy. Almost every practicing board-certified allergist is in the business of allergy testing and allergen immunotherapy. Collectively, board-certified allergists as a group participate in more allergy testing and allergen immunotherapy than any other player in the market.

11

42. 33. Board-certified allergists have the power to influence the market through their trade organizations. As the national organizations of board-certified allergists, AAAAI, ACAAI, and JCAAI, both individually and jointly are dominant players in the market for allergy testing and

allergen immunotherapy. AAAAI, ACAAI, and JCAAI, which collectively represent virtually every board-certified allergist in the United States, publish and control the most respected medical journals related to allergy care, and distribute influential allergy practice guidelines that, if misunderstood or misused, can change the shape of the marketplace for allergy-related services.

43. 34.The most common method of treating seasonal allergies includes the use of over-the-counter and prescription medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis. It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States.

44. 35.Despite the temporary usefulness of over-the-counter and prescription allergy medications, these medications do nothing to desensitize or cure the patient, i.e., they fail to address the underlying cause of allergic rhinitis for seasonal and perennial allergies, instead masking the patient's condition by treating the symptoms. The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens. Most physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test. Given travel cost and time considerations, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy. The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized. Allergy treatment services are offered in 12all major cities in the country and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another. While the market may be a local one, Defendants' actions are aimed at foreclosing an entire class of competitors and Defendants have attempted to impact localized markets in which

17

they practice, and in which board-certified allergists practice, including for example, every localized market in Texas.

### THE MARKET FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

45. 36. To compete in the market for allergy testing and allergen immunotherapy, firms rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees. The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, vials, needles, and other materials necessary to perform allergy testing and mixing of allergen immunotherapy. The firms must also be paid for the services performed, either by the patient directly, or by a "third- party payor" ("TPP"), such as a commercial insurance company, a managed care health plan, Medicare, or Medicaid. Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association.

46. 37. During the testing of a patient, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test. If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician. The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the 13 reaction, and the physician reviews the results. If a firm bills a third-party payor for a skin prick test, the firm does so under CPT Code 95004.

47. 38. If the physician determines that a patient is allergic to an allergen, the physician may recommend allergen immunotherapy to the patient. Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the

allergen immunotherapy is typically mixed by the technician under the physician's supervision. The allergen immunotherapy is composed of antigens that are mixed with a diluent. The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose." If a firm bills a third-party payor for the mixing of allergen immunotherapy, the firm does so under CPT Code 95165.

48. 39. The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy shots." If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician. Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance that is associated with self-administered allergy shots. Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases. Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers.

14

49. 40. In 1996, 2003, AAAAI, ACAAI, and JCAAI collectively formed a "Joint Task Force" to act as authors and editors of "Practice Parameters," otherwise known as recommendations to their members. The first "Practice Parameters for Allergen Immunotherapy," published in 1996, 2003, recommended that board-certified allergists should no longer permit

self-administration of allergy shots by patients, except in "exceptional cases in which allergen immunotherapy cannot be administered in a medical facility." Instead, the Practice Parameters recommended that allergy shots should be administered by the physician's technician in the physician's office. The Practice Parameters were the collective response of AAAAI, ACAAI, and JCAAI to the then-common practice of permitting self-administration of allergy shots by many board-certified allergists as well as non-board-certified allergists, including ENTs, board-certified family physicians, board- certified pediatricians, and other primary care physicians. The Joint Task Force recognized at the time that the trend towards patient self-administration would threaten the business of board- certified allergists, who most benefit from the high margins charged to patients and insurance companies for injections administered in the office, often between $20 and $30 per injection. Nevertheless, the "Practice Parameters" were only "recommendations" and explicitly stated that they did not intend to supplant the judgment of individual physicians. Despite the recommendation contained in the Practice Parameters, most physicians, including some board-certified allergists and a majority of ENTs and primary care physicians in individual cases, permit self-administration of allergen immunotherapy for the appropriate patients.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

50. 41. While the number of people who suffer from allergic rhinitis has grown along with the need for allergen immunotherapy, the number of board-certified allergists has declined. It is estimated that only 2-6% of the patients who would benefit from allergen immunotherapy actually receive this therapy. *See* Exhibit Z to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-57 at 15

15. Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas. This shortage has left rural and poor urban areas largely without access to allergy testing and allergen immunotherapy. In addition to location, cost is an issue as well.

The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office.

51. 42.In 2009, Plaintiff United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL." UAL's business model represented a response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services. While some board-certified family physicians, board-certified pediatricians, and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Notably, purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that usually prevents most primary care physicians from providing allergy testing and allergen immunotherapy. UAS helps physicians and their businesses overcome this economic barrier by contracting with those businesses to assist those business's entry into the market. Since 2009, UAS has assisted more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy.

52. 43.As part of the contractual relationship between UAS and physicians, practice groups, and hospitals, UAS is responsible for all of the non-physician services necessary to compete in the market for allergy testing and allergen immunotherapy, including the equipment, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry. UAS trains and provides technicians to assist physicians in the medical practice of allergy testing and allergen immunotherapy. Those technicians are located by UAS, and are required to meet more rigorous standards than the technicians typically relied on

by the businesses of board-certified allergists, including engaging and passing a program concerning allergy testing and allergen immunotherapy administered by the University of the Incarnate Word School of Nursing. Physicians rely on the services of UAS employed technicians to personally provide allergy care to the patients that the physician determines may benefit from this treatment. This includes the physician supervising the provision of and reading the allergy test, consulting the patient on the potential for allergen immunotherapy in response to positive test, and supervising the mixing of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

53. 44. Together, primary care physicians and UAS have provided a less expensive and more widely available alternative for consumers than the businesses of board-certified allergists in the market for allergy testing and allergen immunotherapy. The entry of at least 2,000 additional primary care physicians since 2009 in the local markets of 25 states, including Texas,[1] for allergy testing and allergen immunotherapy has begun to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but currently go untreated. Those patients primary care physicians who have entered the market offer a lower-cost option to patients, are more conveniently located to the patients, and have shorter wait times for an appointment and shorter wait times in the office. Those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or

---

[1] UAS currently contracts with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

---

[1] UAS currently contracts with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

17 from incurring the expense of taking off work or school to travel to a medical facility for shot administration.

54. 45.Third-party payors, especially commercial carriers, have also benefitted from this lower cost option of competitors. Lower reimbursement rates for primary care physicians as compared to specialists result in a significantly lower cost for allergy testing as billed under CPT Code 95004, the mixing of allergen immunotherapy as billed under CPT Code 95165, and a substantial reduction or elimination of costs billed for shot administration under CPT Codes 95115 and 95117. Additionally, the system as a whole has benefitted from the increased utilization of allergen immunotherapy, which studies have shown reduces the overall costs to patients and third-party payors in terms of expenses for medication, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by allergen immunotherapy.

55. 46.Nevertheless, when board-certified allergists began discovering that primary care physicians in their local communities were practicing allergy testing and allergen immunotherapy (particularly in combination with UAS) instead of referring those patients to the businesses of board-certified allergists, many became upset at the entry of additional competitors. These allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as TAAIS, began to complain to the leaders of those organizations about this increase in competition.

## MEDICAL BOARD COMPLAINTS

56. 47.Defendants'' first line of attack against the competition for allergy testing and allergen immunotherapy was to attack the non-allergist physicians directly. Defendant Gary Gross revealed to Defendants Aaronson, Sublett, and Fineman that if a primary care physician is concerned with the loss of his or her license, it may reduce any financial incentive to compete. Additionally, Gross suggested that they should find out if any primary care physicians had been

dropped by UAS—as that information would be helpful to provide to medical boards and third party payors—or insurance companies.

57. To this end, Defendants conspired to file or cause others to file false medical board complaints against primary care physicians who work with companies like UAS, and then to influence the medical board's 18consideration of those complaints unjustly. The first of the complaints were filed by Dr. Michael Vaughn, an ACAAI member and a board-certified allergist in private practice in San Antonio, Texas. Dr. Vaughn discovered that these once referring family physicians were now competitors because UAS was providing those physicians with the necessary support services to provide patients with allergy testing and allergen immunotherapy. Dr. Vaughn filed the complaints with the Texas Medical Board ("TMB") in the summer and fall of 2010, alleging that certain physicians practicing in San Antonio, Texas were practicing allergy testing and allergen immunotherapy outside of their scope of practice, without proper training, and were inappropriately permitting patients to self-administer the allergy shots. After filing the complaints, Dr. Vaughn attended the November 16, 2010 Annual Meeting of ACAAI and on that date made a presentation to the ACAAI Board regarding the entry of additional competitors in the San Antonio market for allergy testing and allergen immunotherapy. Dr. Vaughn reported this information to the ACAAI Board, which agreed to write a letter to the TMB discouraging the practice of physicians relying on allergy services companies like UAS to provide allergy testing and allergen immunotherapy. Following this presentation, the ACAAI Board agreed by consensus to send a letter of appreciation to Dr. Vaughn for his presentation.

48.After learning of Dr. Vaughn's complaints, Defendants encouraged all board-certified allergists to complain to the TMB if they discovered any primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS. In a December 2010 Texas Allergy, Asthma & Immunology Society ("TAAIS") newsletter, Dr. Weldon openly solicited board-certified allergists in Texas to report physicians who partner with companies like UAS to the TMB. That newsletter was a collaborative effort by the leadership of TAAIS and board members of ACAAI and JCAAI, including Dr. Weldon and Dr. Mansfield, respectively. The complaints to the TMB about primary care physicians practicing allergy testing and allergen 19immunotherapy included claims that those physicians were not qualified to provide such care,

were providing substandard care by relying on support services from UAS, and were permitting patients to self-administer their allergy shots, which Defendants term "home immunotherapy."

58. 49. In addition to encouraging complaints to the TMB, Defendants also attempted to influence the TMB's consideration of those complaints. On March 31, 2011, the ACAAI board sent a letter to the TMB regarding "specific practices of allergy by non-allergists." This letter was approved by the ACAAI Board on Dr. Fineman's motion during the March 23, 2011 ACAAI Executive Committee meeting. The TMB letter cited extensively from "Allergen immunotherapy: A practice parameter third update," misleadingly referring to this joint publication by JCAAI, ACAAI, and AAAAI as the "standard of care" despite disclaimers in that publication and the fact that there is no nationally accepted standard of care for allergen immunotherapy. Due in part to the Defendants' conspiracy, the joint publications of JCAAI, ACAAI, and AAAAI continued to discourage patient self-administration of allergen immunotherapy, which Defendants had identified as a threat to their business model.

59. 50. In addition to outside attempts to influence the complaints, certain Defendants, specifically Dr. Gross, Dr. Mansfield, and Dr. Weldon, attempted to use their positions as volunteer "expert reviewers" for the TMB to improperly influence the TMB's consideration of the complaints. Despite being made aware of the complaints by Dr. Vaughn and other colleagues and encouraging the filing of additional complaints, Dr. Gross, Dr. Mansfield, and Dr. Weldon failed to disclose this information and their conflict of interest to the TMB, a violation of their agreements with TMB and Texas State Law.

51. Despite Defendants' attempts to influence TMB, the TMB dismissed complaints against primary care physicians practicing allergy testing and allergen immunotherapy. The TMB' The TMB's rulings specifically found that primary care physicians may practice allergy testing and 20 allergen immunotherapy under Texas Medical Practices Act. The rulings also found that the physician's decisions to permit their patients to self-administer allergy shots does not violate the standard of care. After receiving these negative rulings, Defendants worked with other board-certified allergists in Texas in an attempt to alter future TMB decisions by volunteering as expert reviewers, included Defendants Dr. Gross, Dr. Mansfield, and Dr. Weldon, as well as their colleagues Dr. William McKenna, Dr. Wesley Stafford, and Dr. Theodore Freeman. Defendants and/or their co-conspirators also attempted to influence a TMB board member, Dr. Hari Reddy, also a JCAAI, ACAAI, and AAAAI member. Despite the actions of Defendants, the TMB never agreed with Defendants' recommendation that primary care physicians are not qualified to practice allergy testing and allergen immunotherapy or that self-administration of allergy shots is a violation of the standard of care.

60. 52. Defendants' complaints and actions directed at the TMB are not the basis of the claims in this Complaint, but help explain Defendants' motivation to turn to illegal activity to accomplish the result they were unable to obtain through TMB complaints. As Dr. Weldon explained in an email to the leaders of TAAIS about losing the fight at the TMB level: "We need to survive our specialty. We need to capture the attention of our non-allergist colleagues. We need to get managed care to understand the differences provided by a ABAI BC allergist. If we don't, then we are dinosaurs waiting for the inevitable. Judging from the most recent response by the TMB in favor of the family practitioner who was practicing allergy, I would say we are fading fast." *See* Exhibit Y to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-55 at 2.

## CONSPIRACY TO RESTRICT COMPETITION IN THE MARKET FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

61. 53. The evidence already in the record attached to Plaintiffs' Motion for Preliminary Injunction demonstrates the illegal activities that form the basis of this Complaint, specifically an agreement among the Defendants to restrain trade and restrict competition in the market for 21allergy testing and allergen immunotherapy in local areas throughout the United States and to tortiously interfere with AAAPC members and UAS's contracts and prospective business relations. The timeline attached hereto as Exhibit B tracks the timing of the agreement and when each of the parties joined the conspiracy.

62. 54. The agreement to restrict competition in the practice of allergy testing and allergen immunotherapy began after Defendants learned of UAS and the entry of primary care physicians into the market in areas within Texas. Defendants and other board-certified allergists in markets nationwide commonly referred to these competitors, specifically primary care physicians who practice with the support of UAS, as the "remote practice of allergy," "RPA," or "remote allergy." The term was originally adopted by board-certified allergists and their trade associations in reference to allergen immunotherapy that was remotely provided to competitor physicians by

off-site mixing labs, but came to include the practice of primary care physicians who rely on a UAS technician to assist in allergy testing and allergen immunotherapy. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. AAN, Phadia, and their representatives also adopted the term in their efforts in partnering with AAAAI, ACAAI, and JCAAI to boycott primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS and other allergy services companies.

63. 55. To respond to this rise in competition of primary care physicians and allergy services companies, in 2009, ACAAI created its "Marketing the Allergist Campaign" as part of an initiative to ensure that allergy specialists did not lose market share to new entrants. Dr. Mansfield represented to the Board of Directors and Committee Chairs of TAAIS on May 1, 2009 that ACAAI's newly minted Marketing the Allergist Campaign was making a "strong effort" to respond to increasing frustrations "with losing business to other specialists." *See* Exhibit B-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-3.

64. 56. By 2010, the conspiracy grew into a concerted effort to remove the economic incentive of their competitors to provide allergy testing and shots by attempting to cut off the main source of funding to these competitors, namely insurance companies and managed care health plans, otherwise known as third party payors. Without reimbursements from third party 22payors, the board-certified allergists' competitors would be unable to compete in the market for allergy testing and allergen immunotherapy. Leaders of TAAIS, including Dr. Mansfield and Dr. Weldon agreed that the organization should contact physicians and third-party payors in an effort to convince them not to do business with UAS. To that end, those board-certified allergists began drafting letters that would be disseminated on behalf of TAAIS to all physicians and third-party payors in Texas denouncing the practices of these competitors. *See e.g.* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38.

65. 57. In the midst of drafting these letters, Defendants began contacting insurance companies directly. Original attempts began with phone calls to individual insurance companies following Defendants' agreement that they should convince insurance companies not to pay or to restrict reimbursement to their non-allergist competitors. In coordination with Dr. Mansfield and Dr. McKenna, and in accordance with Defendants' agreement, Dr. Victor Estrada, a then TAAIS Board Member and board-certified allergist in private practice in San Antonio, Texas spoke with a representative of Humana of Texas ("Humana"), a conversation he documented in an email to Dr. Mansfield and Dr. McKenna on June 5, 2010. *See* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38. According to Dr. Estrada, Humana was engaged in "red- flagging claims with certain codes coming in by primary care offices and are considering their options, such as, denying payment, considering charges as out of network, and even asking for their money back on previously paid claims." *Id.* at 2. Dr. Estrada expressed the hope that this would occur with all of the major carriers and "maybe some changes coming." *Id.* Dr. McKenna remarked on the "great news," and the three doctors continued to discuss a letter to insurance companies that would encourage them not to pay competitors who are not board-certified allergists. *Id.* at 1.

23

66. 58. In September, 2010, Dr. Weldon engaged in a 45 minute conversation with an official at Blue Cross/Blue Shield of Texas ("BCBS Texas"), in which he told her to "suspect and to watch for abuse by primary care physicians" who practice "remote allergy" and that "she needed to have her organization look into" only allowing board-certified allergists to test and prescribe allergen immunotherapy. Dr. Weldon documented this conversation in an email to his fellow TAAIS board member and allergist colleague, Dr. William McKenna. *See* Exhibit K to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-39. In Dr. Weldon's email, he explained that: "If it all

pans out, we may be in for what we wanted… [I]f something GOOD comes of this, then perhaps all of this prescribing over the internet (remote practice) and inappropriate billing (and thus, making it economically unfeasible for competitors) will subside and we will again be able to look at ourselves as "The Allergist" and not have to share that title with some nitwit technician in an ENT practice." *Id.* at 2 (emphasis added).

67. 59. On September 25, 2010, the TAAIS Executive Director, Connie Mawer, circulated an Agenda and Reports for a September 28, 2010 conference call among the TAAIS Board Members and Committee Chairs, including their consideration of letters to be drafted and sent to insurance companies and primary care physicians throughout the State of Texas about their competitors. *See* Exhibit D-11 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-16. On September 26, 2010, Dr. Weldon responded in an email to the TAAIS Board and Committee Chairs regarding the need for letters to the market stating: "This is a turf war folks, like it or not, and it looks like we need to take a stand right now for our profession or else return to practicing primary care medicine (with a side of allergy, perhaps)." *Id* at 2.

68. 60. The TAAIS Board, including Dr. Weldon, met on September 28, 2010 and according to the meeting minutes, "discussed a draft letter to PCPs [primary care physicians] developed by a small Ad Hoc Committee which informs [them] of "allergy companies" popping up in Texas and 24marketing allergy skin testing and immunotherapy to [primary care] practices. This letter is currently under legal review." *See* Exhibit D-12 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-17. The Board also agreed to send voting delegates to the ACAAI November 2010 Annual Meeting in Phoenix, Arizona to present the letter concerning primary care physicians and "Texas scope of practice issues." Dr. McKenna also suggested "that the first draft letter could be revised to also be sent to third party payors." *Id.*

**AAAAI, ACAAI, AND JCAAI JOIN THE CONSPIRACY**

69. 61. On September 30, 2010, Dr. Weldon forwarded a draft of the TAAIS letter to primary care physicians via email to certain officers and members of the board of directors of AAAAI, ACAAI, and JCAAI, including Dr. Aaronson. *See* Exhibit D-9 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-14. Starting off his email, Dr. Weldon stated "Welcome to our world in Texas – this is what I've been beating my chest about for the past few years and for which we have been unable to counter. Call them charlatans or whatever — unlike the monsters under our beds of our youth, they DO exist." *Id.* Dr. Weldon's email expressed a desire to expand efforts in furtherance of their conspiracy and attempt to convince managed care organizations to stop paying, refuse to credential or accredit, or reduce reimbursement for their non-board-certified allergist competitors who are supported by UAS. He called for the leadership of the three national organizations "to partner with managed care to deter [the competition]." *Id.* The intentions behind his call to action were clear. He continued, "If we stop the economic incentive by showing that we 'do it better', then we may get the upper hand in this mess. Yet if we bury our minds in the academia of interleukins and hope that the competition will just 'go away,' then we will find ourselves out of a job." *Id.*

70. 62. On November 12, 2010, the TAAIS delegates to the ACAAI Annual Meeting raised their concerns over the encroachment by non-board-certified allergists into the market for allergy 25 testing and allergen immunotherapy to the ACAAI Board of Regents. A presentation was given "about the difficulties in San Antonio with the practice of allergy by non-allergists." *See* Exhibit C-3 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-6. The presentation, which is attached to the minutes of the ACAAI House of Delegates meeting specifically identifies UAS, then doing business as "United Allergy Labs (UAL)" which Dr. Vaughn stated "provides the PCP [primary care physician] with one of their 'trained' allergy testing technicians that work out of the

PCP's [primary care physician's] office (but is a UAL employee)." *Id.* at 3. Following the presentation, "[a] motion was made and passed to refer this problem to the Board of Regents for action. The JCAAI is already aware of the issue and has given advice to the Texas Allergy Society." *Id.* at 1.

71. 63. The referenced advice of JCAAI to the Texas Allergy Society occurred at the November 2010 Annual Meeting, where Dr. Aaronson relayed to Dr. Weldon concerns of JCAAI's outside counsel about the TAAIS letter to primary care physicians, including that it was too targeted at a particular company. *See* Exhibit E-5 to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-26] at 3.

72. 64. A week later, on November 19, 2010 Dr. Weldon sent an email to the Board of Directors of TAAIS to give them a report on the ACAAI House of Delegates Meeting. *See* Exhibit D-10 to Plaintiffs' Preliminary Injunction Motion, Dkt. 12-15. Dr. Weldon explained that he asked the ACAAI "to delay any recommendations until we have had the opportunity to ponder a definite plan of action." *Id.* Dr. Weldon expressed his opinion that the ACAAI "should bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy.'" *Id.* Dr. Weldon explained the reasoning behind doing so: "***Taking it one step further, if PCPs who practice allergy are not reimbursed because of questionable practices, and their patients are then having to absorb the costs of SLIT or watered-down SCIT given at home, then more than 26likely their allergy practices will fade.***" *Id.* (emphasis added). To accomplish this assault on the payment of competitors, Dr. Weldon explained that allergists could use the joint standards of AAAAI, ACAAI, and JCAAI to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing. If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause." *Id.* at 1-2. Dr. Weldon also revealed that he "talked

with Lynn Mansfield at the meeting and he does not want "the letter issue dropped – he still feels it

is a worthwhile effort to be pursued." *Id.* at 2. Dr. Weldon also suggested that the board-certified

allergist organizations should encourage their membership to "flood journals with articles

regarding safety issues and reports of adverse reactions." *Id.* Revealing the economic motivation

for these actions, Dr. Weldon explained that "for those of us in private practice, we have a lot to lose

if we do not take a stand and "protect our turf"." *Id.* Dr. Weldon concluded his email by

suggesting that the issues he raised were ones "that I feel we need to consider seriously and then

dialogue over e-mails instead of taking up telephone time during quarterly board meetings." *Id.*

73. 65. On November 19, 2010, Dr. Abramson, the then President of TAAIS, responded to

Dr. Weldon's email by replying to him and the entire TAAIS Board stating "David, you are

welcome to do whatever you like as an individual, as are others in TAAIS," with the rest of the

sentence redacted by TAAIS as referencing their legal opinion. *See* Exhibit D-13 to Plaintiffs'

Preliminary Injunction Motion, Dkt. No. 12-18 at 3. By that time, TAAIS had received its legal

review back from Jeff Henry, a lawyer in private practice in Austin, Texas, regarding the proposed

letters to primary care physicians. Mr. Henry's "legal opinion" was to ""not send" due to liability

and anti- trust [sic] issues." *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion [Dkt. No.

12-40] at

27

1. Dr. Abramson went on to reject Dr. Weldon's request for a written record of their plan, stating

"I feel strongly that we should have these discussions on conference calls, not e-mails." *Id.*

**ACAAI AND TAAIS AGREE TO WRITE LETTERS TO THIRD PARTY PAYORS**

74. 66. On the morning of November 22, 2010, Dr. Weldon responded directly to just Dr.

Abramson's email to him about the letter issue stating "If you wish to handle this specifically by

phone conferences, then that is how we will handle it. However, I am currently on the Board of Regents for the ACAAI and I request that you please also consider our opinions on this matter." *See* Exhibit O to Plaintiffs'' Preliminary Injunction Motion [Dkt. No. 12-45] at 1. That same day, Dr. Abramson responded to Dr. Weldon''s email accepting Dr. Weldon''s request, stating "We want to be on the same page with the ACAAI Board of Regents as well." *Id.* The email prompted Dr. Weldon to respond back, "It''s too bad we can''t find a lawyer that will have the same opinion as we do – the other ''allergists'' do." *Id.*

75. 67. On November 23, 2010, Dr. McKenna, the past-president of TAAIS, responded to all of the TAAIS Board of Directors concerning his disappointment "that our grand effort, to communicate to PCPs about the dastardly allergy marketing company techniques, is of course dead in the water." *See* Exhibit D-13 to Plaintiffs'' Preliminary Injunction Motion [Dkt. 12-18] at 6. 6. Dr. McKenna then proposed to the TAAIS Board "two actions." First, TAAIS would send "a communication to TAAIS membership of our attempted effort and result of due diligence," including the legal opinion of its private lawyer and the advice of JCAAI''s lawyer Dr. Aaronson passed on to Dr. Weldon. *Id.* "Second, as was our intent at the outset, the next effort was to inform TPPs of the same issue and this still should be done." Dr. McKenna acknowledged that "some of you have expressed this also," and pledged to work with those Board members, namely "David Weldon, Lyndon [Mansfield], Victor [Estrada] and any others toward this next step." *Id.*

28

## AAAAI, ACAAI, AND JCAAI AGREE TO FORM "RADAR" FOR PURPOSES OF RESTRICTING COMPETITION

76. 68. While the letters in Texas were still under discussion, the conspiracy continued to grow on the national stage. Following the TAAIS delegation''s plea to the ACAAI House of

Delegates about the entry into the market for allergy testing and allergen immunotherapy by primary care physicians relying on allergy services companies including UAS, all of the national allergy organizations responded. Specifically, as a result of that meeting, the leadership of AAAAI, ACAAI, and JCAAI agreed to a concerted effort and joint agreement to fight back against these new competitors. The organizations jointly agreed to form "RADAR," or the "Regional Advocacy Discussion and Response" initiative, a joint task force aimed at addressing the encroachment of competitors on their turf of allergy testing and allergen immunotherapy. The purpose of this initiative was to recruit and train select local allergists in advocacy and other skills, such as persuading, enticing, or coercing third-party payors, so that the national associations could coordinate their efforts to restrict access to the market from the top down.

77. 69. The forming of RADAR was a result of the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the ACAAI Annual Meeting, where those leaders "reviewed a plan to develop a more robust infrastructure to assist state/local AAI [allergy, asthma, and immunology] societies in addressing local issues." *See* Exhibit E-4 to Plaintiffs'_ Preliminary Injunction Motion, Dkt. No. 12-25. Subsequent to that meeting, "[i]n December 2009, the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly held a series of conference calls with state and local AAI society leaders to identify issues of concern to practicing allergists. Several common concerns were expressed by allergists around the country. Those included:.... Encroachment- Non-allergy providers representing

29 themselves as trained A/I specialists... [and] Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.*

78. 70. As a result of those conference calls with allergists around the country, in or around late December or early January 2011, three members of the AAAAI Board, Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks, met with the ACAAI House of Delegates. The AAAAI

Board members'' report from the meeting with ACAAI was documented in a January 5, 2011 email

from the AAAAI President, Dr. Mark Ballow, to the three AAAAI representatives, copying the rest

of the AAAAI Board. *See* Exhibit H to Plaintiffs'' Preliminary Injunction Motion [Dkt. No.

12-36]. Dr. Ballow stated "Thank you for sharing the outcome of the recent joint meeting between

yourselves and the ACAAI House of Delegates. As you know, we have made a concerted effort to

collaborate with the College [ACAAI] and this is another good example of the possibilities for

strengthening our relationship. We greatly appreciate the work that has gone into the Regional

Advocacy Discussion and Response (RADAR) initiative." *Id.* at 1. Attached to the email was a

document titled "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and

Response (RADAR) Initiative January 2011." *Id.* at 3-5. Among the activities detailed was "Fiscal

Realities, Ongoing efforts through national organizations" and "Ongoing communications with

insurance companies about appropriate reimbursement for specialty care." *Id.* at 4. Other activities

included addressing "Encroachment by non-allergists" explaining "Ongoing communication with

insurance companies allows the specialty to be represented in discussions about appropriateness of

care." *Id.* at 5. AAAAI''s Winter Meeting took place a few days later on January 9, 2011 in

Chicago, in which these topics were discussed. *Id.* at 1.

71. As a result of all of these meetings of the national and state allergy organizations, on February 8, 2011, AAAAI, ACAAI, and JCAAI issued a letter to Regional, State, and Local Allergy Society Leaders throughout the country seeking to recruit local representatives to carry 30out RADAR''s mission. *See* Exhibit E-4 to Plaintiffs'' Preliminary Injunction Motion, Dkt., No. 12-25. The letter was drafted on the joint letterhead of all three national associations, and executed by their joint leadership, including Dr. Sublett, as acting President of JCAAI. Among the issues to be addressed by the RADAR initiative were the two issues where these organizations agreed to contact insurance companies, specifically: "Encroachment- Non-allergy providers representing themselves as trained A/I specialists" and "Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.* The letter requested that each regional, state, and local society identify two individuals to serve as points of contact "to be trained to serve as conduits accessible by all three national organizations to channel information on issues impacting A/I patients and the physicians who serve them." *Id.*

### TAAIS JOINS RADAR AND TAKES ANTICOMPETITIVE ACTION

79. 72. On February 12, 2011, Dr. Weldon sent an email to the TAAIS leadership calling for

their involvement in the national RADAR initiative. *See* Exhibit Y to Plaintiffs'' Motion for

Preliminary Injunction, Dkt. No. 12-55. He wrote that "the initiative [was] going to demand the concerted attention of all organizations," in order to address "the survival of [their] specialty." *Id.* at 2. In a particularly impassioned plea, he stated that "it is OUR field that stands to disappear if we do not step up to the plate for it." *Id.* at 4. The President of TAAIS, Dr. Abramson, thanked Dr. Weldon for his "thoughtful comments," and promised to follow up "regarding planned actions, including . . . efforts with RADAR." *Id.* at 1.

80. ~~73.~~In line with its pledge to be on the same page as the ACAAI Board and in participation with RADAR, the TAAIS leadership resumed their letter writing campaign and rewrote the letters to primary care physicians to be more "informational" in nature. *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-40. The minutes of the February 22, 2011 Executive Committee Conference Call indicate that such revisions were specifically made to address the ~~31~~earlier legal opinion advising TAAIS "not to send" due to "liability and anti-trust [sic] issues." *Id.* However, no attempt was made to change the letters to third-party payors to conform to the legal opinions TAAIS had previously received. The letters to third-party payors that existed at the time were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to those physicians' reliance on UAS for support services as the "remote practice" of allergy, which was represented to be "at best of poor quality and at worst… fraudulent." *See* Exhibit R to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-48. The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," and offered that board-certified allergists should be relied on to review the claims of non-allergists, in an attempt for Defendants to gain control over the payment and prices of allergy testing and allergen immunotherapy. *Id.*

## DEFENDANTS INTIMIDATE ALLERGISTS AND PRIMARY CARE PROVIDERS ASSOCIATED WITH UAS

81. 74. By this time, Defendants had already begun to resort to persuade, coerce, and intimidate to carry out their conspiracy to orchestrate a group boycott of UAS's services by board-certified allergists. For example, through their breach of confidence at the TMB, Defendant Dr. Weldon and his co-conspirators learned that Dr. Allen Kaplan, who is a former AAAAI president, was listed as a UAS Advisory Board member. On March 19, 2011, Dr. Weldon questioned Dr. Kaplan about his relationship with UAS. After discussing a course of action with Dr. Weldon, Dr. McKenna wrote to Dr. Kaplan in an email dated March 24, 2011. In that email, Dr. McKenna falsely claimed that he was investigating a claim of malpractice against UAS on behalf of the TMB. Dr. McKenna also mentioned his substantial credentials within the allergy community, referenced his awareness that Dr. Kaplan was listed as an advisor for UAS, and asked Dr. Kaplan if he could comment about a complaint made to the TMB. All this was in an attempt to intimidate Dr. Kaplan and to cause him to terminate his advisory relationship with 32 UAS or risk being ostracized from the allergist community. After the email discussion between Dr. Kaplan and Dr. McKenna, as well as a verbal discussion between Dr. Kaplan and Dr. Weldon, Dr. Kaplan terminated his agreement with UAS. Updates about the investigation into Dr. Kaplan's cooperation with UAS made their way up the chain in the national allergist associations, eventually reaching the Executive Medical Director of ACAAI, Dr. Bob Lanier. Subsequently, allergists have continued to pressure their colleagues to avoid forming relationships with UAS.

82. Around the same time as the Defendants' intimidation of Dr. Kaplan, certain Defendants additionally intimidated providers either already in contract or in negotiations with UAS. Representatives of Defendant Atlanta Allergy, including Defendant Fineman, met with one such provider, regarding the services of UAS and convinced them not to contract with UAS. Following this successful interference of a pediatric practice and clinic in Georgia, Atlanta Allergy began investigations to collect and retrieve materials of UAS in order to contact additional clinics

37

and third party payors.  Defendant Fineman even bragged to other allergists, including Defendant Sublett, that his company, Defendant Atlanta Allergy, was "successful in explaining to a local Peds group why they shouldn't institute this in the[i]r office."

## NATIONAL ORGANIZATIONS ENCOURAGE AND PARTICIPATE IN TAAIS''S ANTICOMPETITIVE CONDUCT

83. 75.During this time, JCAAI''s leaders also privately encouraged TAAIS in its letter writing campaign, but publicly maintained the opposite.  In the March 16, 2011 JCAAI News You Can Use Newsletter, which was drafted by Dr. Aaronson and executed and sent under the signature of Dr. Sublett to JCAAI members across the nation, including Texas, JCAAI  members were informed that "JCAAI''s legal advisors [had] repeatedly warned . . . against actions which might be considered *restraint of trade* – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior." *See* Exhibit C-5 to Plaintiffs'' Preliminary Injunction Motion at 2, Dkt. No. 12-7 (emphasis in original).

84. 76.Nevertheless, in an April 4, 2011 email to the leaders of the Greater Houston Allergy and Immunology Society (GHAIS), Dr. Abramson, the then President of TAAIS, explained that "TAAIS has been aware of the ''scope of practice'' issues surrounding various laboratories, including Smart Allergy and United Allergy Labs for more than several months." *See* Exhibit N to Plaintiffs'' Preliminary Injunction Motion, Dkt. No. 12-42 at 1.  As Dr. Abramson continued, "We have drafted 2 letters—one for PCP''s and one for 3[rd] party payers."  Further explaining, Dr. Abramson stated "The Joint Council (JCAAI) is aware of our work in this area—there are

33 significant medicolegal issues involved" referencing the JCAAI''s prior newsletter. Dr. Abramson also revealed that "[a]t the AAAAI meeting, Bob Lanier, Executive Director for the ACAAI, complemented me on TAAIS efforts."  As a result of this encouragement from the national organizations, Dr. Abramson explained "So, TAAIS

has been a leader nationally in this effort, and we will continue to press forward with this effort."

85. 77. In line with the private and secret encouragement of TAAIS, JCAAI approved the TAAIS letters. On or about May 4, 2011, then TAAIS President Dr. Abramson emailed Dr. Sublett to seek JCAAI's comments on TAAIS's letters to primary care physicians and third-party payors. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction [Dkt. 12-46] at 2. As Dr. Abramson explained in his email to Dr. Sublett, "As you are aware, there are several laboratory entities that are encroaching on the practice of allergy by advertising their services to physicians as a way of replacing referrals to allergists." *Id.* In reference to the prior JCAAI opinion Dr. Aaronson relayed to Dr. Weldon in November 2010, Dr. Abramson stated "Our initial letters had a tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* In response, Dr. Sublett relayed to Dr. Abramson the email and edits of Rebecca Burke, outside counsel for JCAAI. *Id.* at 1. Dr. Sublett then stated "I hope this helps. Good luck on your endeavors." *Id.* As a result of that communication, Dr. Abramson emailed the TAAIS Executive Committee reporting on the "Good news" and suggesting that the letters were ready to go out.

86. 78. Despite having quietly approved the TAAIS letters to primary care physicians and insurance companies, JCAAI leadership attempted to cover up their involvement by publicly representing to its members in a June 8, 2011 newsletter drafted by Dr. Aaronson and Dr. Sublett that JCAAI had recommended that the letters "be withdrawn because [they] could raise antitrust issues." *See* Exhibit E-10 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-27.

34 The public newsletter, signed by Dr. Sublett and distribute to JCAAI members, including members in Texas, was met with confusion by TAAIS Board Members, who understood JCAAI to have approved the letters. On June 9, 2011 Dr. Robert Mamlok expressed this confusion to TAAIS Executive Director, Connie Mawer, who recalled in an email to Dr. Mamlok and Dr. Abramson that the letter referenced "was approved by the JCAAI." *See* Exhibit E-11 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-28.

87. 79. By this time, ACAAI leadership had also given their seal of approval on the TAAIS letters. *See* Exhibit N-Part 1 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42. AAAAI

also received and reviewed the letters on August 10, 2011 just before they were to be released to the public. The letters were discussed in connection with an AAAAI Executive Board Agenda item, item X or 10, specifically relating to UAS. *See* Exhibit No. Q to Plaintiffs'_ Preliminary Injunction Motion, Dkt. No. 12-47.

88. 80.At that time, the letters were set to go out to executives and representatives of insurance companies and third-party payors in Texas, including representatives of Aetna, BCBS Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans. *See* Exhibit S to Plaintiffs'_ Preliminary Injunction Motion, Dkt. No. 12-49 at 8. To avoid revealing the true target of the letters and thus antitrust scrutiny, Defendants and TAAIS planned to follow up the letters with phone calls identifying UAS as the subject of the letters. *See* Exhibit T to Plaintiffs'_ Preliminary Injunction Motion, Dkt. No. 12-50. The purpose of the phone calls instead of identifying UAS in writing was "Because of _"restraint of trade issues"_" Defendants "cannot more directly attack UAL." *Id.* Dr. Abramson employed this same strategy previously suggested by Defendants JCAAI, Dr. Aaronson, and Dr. Sublett, sending the letters to Tom Banning, the Executive Director of the Texas Academy of Family Physicians on August 9, 2011, and following 35up that communication orally representing in a phone conversation that the letters pertained to physicians relying on the services of companies like UAS.

## STATE COURT INJUNCTION AGAINST TAAIS ACTION

89. 81.On August 11, 2011, after discovering that the letters had been sent to Mr. Banning, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters to insurance companies. *See* Exhibit U to Plaintiffs'_Preliminary Injunction Motion, Dkt. No. 12-51. On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part

of a settlement on February 1, 2013. *See* Exhibits V and W to Plaintiffs'' Preliminary Injunction Motion, Dkt. Nos. 12-52 and 12-53. The Injunction prohibits TAAIS and the individual defendants, who included various TAAIS board members and board members of the national allergist associations, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants'' competitors. For a period of time Defendants suspended some of their anticompetitive conduct, but later resumed that conduct on a national level.

### DEFENDANTS RESUME CONTACTING THIRD PARTY PAYORS

90. 82. Despite the existence of temporary and permanent injunctions against their co-conspirators, Defendants ultimately intensified their efforts to orchestrate and carry out a group boycott against UAS and primary care physicians, including AAAPC members. The same day that Dr. Sublett and JCAAI approved the TAAIS letters, members of RADAR began participating in discussions on an online message board called "Basecamp." *See* Exhibit C-7 to Plaintiffs'' Preliminary Injunction Motion, Dkt. No. 12-8. These discussions, which began on May 5, 2001 and continued through at least July 18, 2011, included coordination among these board-certified allergists, who are normally competitors, in approaching insurance companies and convincing 36them not to pay or to limit payment to competitors who are not board-certified allergists. The message board specifically mentions UAS by name and contains further calls to action by Dr. Weldon. In a post he drafted on May 10, 2011, he writes "What we need is not rhetoric and ''ya-ya'' but rather an aggressive attack on public senses without ''mentioning names.''" *Id.* at 6. Despite a RADAR member''s admission that he was "acutely aware of how easily such a discussion might . . . run afoul of various anti-trust [sic] laws," the group pressed on, continuing to believe that the "AAAAI and ACAAI must join together to make this happen or [they would] continue to lose ground." *Id* at 8-9. As part of their effort to convince insurance companies and

41

managed care organizations to stop doing business with or paying their competitors, Defendants, including some of the leaders of JCAAI, ACAAI, and AAAAI, implemented an idea previously suggested by Dr. Weldon and began to suggest to third-party payors that the publications of these organizations define the standard of care for the practice of allergy testing and allergen immunotherapy.  Up until this point, those organizations and allergists as a whole declined to suggest their publications defined the "standard of care," namely because of legal concerns over the potential effect on many of their own members who did not follow the recommendations of those publications, such as the recommendation against permitting patients to self-administer allergy shots.  *See* Exhibit D-5 to Plaintiffs'' Preliminary Injunction Motion, Dkt. No. 12-12 at 2; Exhibit D-7 to Plaintiffs'' Preliminary Injunction Motion, Dkt. No. 12-13 at 1.

### PHADIA, AAN, WINDERS & WALLEN JOIN THE CONSPIRACY

91. At the same time AAAAI, ACAAI, and JCAAI were forming RADAR, Phadia and AAN decided to enter into and support the conspiracy to restrict competition in the market for allergy testing and allergen immunotherapy.  In or about March 2011, Phadia and Winders, acting on Phadia's behalf, began a strategy to combat the "remote practice of allergy" or "RPA."  Phadia, Inc. and its parent corporation, Thermo Fischer Scientific, manufacturer and sell a blood test to detect allergies, known as ImmunoCap or ICAP, a form of RAST or blood testing.  Phadia markets those tests to physicians as an alternative to allergy skin prick testing, where physicians would draw the blood of their patients for analysis in a laboratory owned and operated by Phadia and ThermoScientific for a fee.  The results from the ICAP testing, which generates more false positive results than skin prick testing, would then be used by Phadia to refer patients who tested positive to board-certified allergists for allergy skin prick testing and allergen immunotherapy.  The emergence of allergy skin prick testing performed at primary care physicians' offices were seen as the cause in a reduction of orders of ICAPs and other RAST tests and medications sold by Phadia

and a disruption in its referral of patients from primary care physician offices to board-certified allergists. The emergence of patients being treated with allergen immunotherapy also resulted in a reduction of allergy and asthma medication that Phadia sold.

92. Winders, at the time a market development team leader of Phadia, began to develop a strategy to reduce physicians' use of allergy skin prick tests that traded off with ICAPs by agreeing with board certified allergists, AAAAI, ACAAI, JCAAI, and a non-profit organization known at the time as "Mothers of Asthatics," now AANMA. In March 2011, Winders informed Sublett that she "look[ed] forward to battling these remote acce[s]s allergy providers with you." [Dkt. No. 135-12]. She requested a meeting to discuss her "clear strategy plan on this remote practice of a[l]lergy" with Sublett to begin fostering Phadia, AANMA, and Wallen's part in the conspiracy. Two months later, in May 2011, Sublett reached out to Aaronson and Gross regarding Winders' request for Sublett to serve on the Phadia advisory board. [Dkt. No. 135-10]. Sublett emphasized that Winders was "anxious to support efforts against United Allergy Labs and other similar operations," and that Winders had been in contact with AAN. On or about August 1, 2011, Winders met with Linda Cox, the President-elect of AAAAI. In that meeting Winders and Cox agreed, on behalf of Phadia and AAAAI respectively, that their organizations should work together to approach and convince third-party payors to limit reimbursement of allergy testing and allergen immunotherapy to board certified allergists, including supporting Phadia's then ongoing strategy to combat UAS and primary care physicians in Texas.

93. On or about August 2, 2011 through August 4, 2011, Winders contacted numerous physicians in North Texas known to be in contract with UAS to convince those physicians to either terminate their agreements, or to reduce their performance under those agreements with UAS in favor of ICAPs sold by Phadia.

94. On August 3, 2011, Winders met with Dr. John Meiser, a representative of TAAIS, and they agreed that Phadia and TAAIS would support each other's strategy of combating UAS and primary care physicians by approaching third-party payors to convince them not to pay non-board certified allergists for allergy testing or allergen immunotherapy.

95. On or about August 17, 2011, Winders wrote to Sublett requesting an in-person meeting to discuss "exciting developments" in Phadia's strategy to address remote practice—as she had met with physicians and individuals in contract with UAS and Linda Cox for AAAAI's perspective. Winders specifically wanted JCAAI's feedback on the best way to restrict competition from UAS. [Dkt. No. 135-13].

96. On or about August 29, 2011, Winders met with Dr. Sublett, the then president of JCAAI, to discuss the increase in use of skin prick tests by primary care physicians in Texas and nationwide, the resulting loss of sales to Phadia, JCAAI's task force to combat the practice by primary care physicians and UAS, the then recent efforts by TAAIS to combat the practice, and the resulting lawsuit by UAS against TAAIS. Winders and Sublett agreed on behalf of Phadia and JCAAI respectively that they should join forces to combat the "remote practice of allergy" through mutual support of all of these efforts. To facilitate the agreement, both Phadia and JCAAI relied on Mansfield, a board member of both Phadia and JCAAI.

97. The motivation for Phadia to join Defendants' conspiracy concerned the loss of Phadia sales of ICAPs and other RAST tests to primary care physicians who had entered into contracts with UAS to conduct skin prick tests for allergies. In entering into an agreement in or around August 2011, Phadia and AAN specifically discussed Phadia's reduction in ICAP sales to over hundreds of primary care physicians, who had entered into a contract with UAS to provide allergy skin prick testing and allergen immunotherapy throughout markets in Texas. [Dkt. No. 134-21]. Those agreements between UAS and primary care physicians resulted in lost ICAP sales for Phadia in

Dallas, San Antonio, McAllen, and Houston, resulting in a significant loss of revenue. Phadia determined that the loss of revenue for its ICAP sales was directly attributable to the rise of competition by primary care physicians and allergy services companies such as UAS in the market for allergy testing and allergen immunotherapy, to which Phadia referred to as the "remote practice of allergy" or "RPA." The significant decline in Phadia's business in Texas caused a loss of morale among Phadia representatives and Phadia also estimated that the rise in primary care physicians treating allergies with immunotherapy was also causing Phadia to lose a great deal of money related to a decline in necessary asthma medications as well.

98. Also in or about August 2011, to combat the remote practice of allergy, Phadia began meeting with other board certified allergists in Texas in an effort to combat RPA. Phadia also began identifying customers of UAS in an effort to convince those customers to discontinue or reduce their business with UAS and return to selling ICAPs manufactured and sold by Phadia. Phadia also agreed with Sublett, Mansfield, JCAAI, ACAAI, AAAAI, and AAN that they should contact third-party payors to convince them not to do business with UAS or primary care physicians for allergy testing or allergen immunotherapy by changing their policies to only reimburse board-certified allergists for those services.

99. In the fall of 2011, Phadia also contacted third-party payors through its existing relationships with those payors to convince them to change their policy to restrict allergy skin testing and allergen immunotherapy to board-certified allergists or members of the American Academy of Otolaryngic Allergy ("AAOA"), an organization that represents otolaryngologist, frequently referred to as Ear, Nose, and Throat physicians or ENTs. The payors Phadia contacted in 2011 included Humana, United Healthcare, Blue Cross/Blue Shield of Texas, Texas Medicaid, and the managed care organizations that reimburse for Texas Medicaid. [Dkt. No. 134-21]. Phadia also planned to follow up with these same third-party payors for the same purpose in 2012, and other

third-party payors including Aetna, Cigna, and Blue Cross entities in North Carolina, Pennsylvania, Georgia, South Carolina, Arizona, Missouri, Arkansas, Tennessee, Colorado, Kentucky, Utah, Illinois, Oklahoma, and Louisiana. When engaging in these contacts with third-party payors, Phadia distributed statements from its co-conspirators including AAAAI, ACAAI, JCAAI, and AAN supporting not only this restriction, but that primary care physicians should use ICAPs as the preferred method of testing for allergies instead. Phadia officers also directed its sales members in the field to disparage UAS to primary care physicians, including claiming that UAS was engaged in fraudulent billing.

100. On or around September 2011, Alan Leahigh, Director of Corporate Council for AAN, contacted TAAIS, and other board-certified allergists in Texas, included Stuart Abramson, Bob Lanier, Defendant Mansfield, and Alnoor Malick, to request additional information about their fight against UAS and primary care physicians in Texas for a leadership summit to be held by AANMA, AAAAI, ACAAI, JCAAI, Phadia, and others on October 3, 2011 in Annapolis, Maryland. As a result of those contacts, Bob Lanier on behalf of ACAAI and Leahigh on behalf of AAN discussed how AAN could act as a front for the conspiracy, which would shield Defendants because of AAN's prior history as a legitimate patient centered organization. In exchange, AAN could extract a large budget from Defendants to conduct the campaign against the "remote practice of allergy." In addition to contacting third-party payors, AAN and ACAAI discussed convincing extract companies to cut off supply to combat these competitors. Leading up to the leadership summit, AAN also discussed such a proposal with Defendant Fineman, the then president-elect of ACAAI, and Defendant Sublett, the then president-elect of JCAAI. Additionally, Nancy Sander, then President of AAN, contacted Dr. Fineman in October 2011 regarding AANMA's interest in combatting the remote practice of allergy by contacting third party payors. Since that time, October 2011, Dr. Fineman has become a Board member for AAN, has drafted and edited articles

46

and publications to attack the "remote practice of allergy" for AAN and contacted third-party payors on their behalf.

101.　On or about October 3, 2011, AAN made a presentation to Defendants AAAAI, ACAAI, JCAAI, and Phadia explaining how AAN intended to carry out Defendants' agreement to combat the remote practice of allergy. In attendance at the meeting were all of the then-Presidents and Vice Presidents of AAAAI, ACAAI, and JCAAI, including Defendants Aaronson, Gross, Fineman, and Sublett, as well as representatives of Phadia and other industry organizations. AAN presented its strategic plan for combating the "remote practice of allergy," which included among other things, publishing a position statement and press release attacking the practices of primary care physicians and companies such as UAS, meeting with third-party payors and their trade associations to convince them not to pay these competitors, contacting primary care physicians to convince them not to do business with companies like UAS or engage in allergy testing or allergen immunotherapy, but to administer ICAPs and refer all allergy patients to board-certified allergists, and contacting governmental agencies and legislators to defame these competitors. [Dkt. No. 134-9]. In exchange, AAAAI, ACAAI, JCAAI, Phadia, and others would agree to pay AAN a significant sum of money per month to conduct the campaign. *Id.*

102.　As a result of that meeting, ACAAI, JCAAI, and Phadia agreed to pay AAN to serve as the front organization for Defendants' actions against primary care physicians, UAS, and any other physician or entity engaged in the "remote practice of allergy," by contacting third-party payors, industry players, governmental leaders, and agencies setting guidelines for industry standards to convince them to exclude primary care physicians and companies supporting those physicians, including UAS, from the market for allergy testing and allergen immunotherapy. Defendants also agreed that AAAAI and AAN would use their positions within the National Asthma Education, and Prevention Program ("NAEPP") to write into asthma guidelines of the

National Heart, Lung, and Blood Institute language that could be used to exclude competitors. Following Defendants' meeting, AAN coordinated with Defendants Fineman and Sublett to facilitate the transfer of funds from Defendants to AAN and to assist in AAN's activities on behalf of Defendants.

103. 83.To that endfacilitate the conspiracy among AAAAI, ACAAI, and JCAAI members and Defendants' conspiracy with AAN and Phadia, Defendants Dr. Sublett and Dr. Aaronson authored a JCAAI "New News You Can Use" newsletter that was sent to all JCAAI Members on October 5, 2011 addressing at length the "remote practice of allergy" ("RPA") moving into JCAAI member communities. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. Dr. Sublett and Dr. Aaronson specifically targeted what they termed "the new version of RPA" which was "the imbedding of a "certified allergy technician" in a primary care physician's office, where they 37perform skin testing to inhalants and then begin allergen immunotherapy and treatments." *Id.* at

1. The business practices to which Defendants JCAAI, Dr. Aaronson, and Dr. Sublett referred were those of UAS, which was featured in a "Business Builder" article in *Medical Economics* as pointed out in the newsletter. The newsletter documented what JCAAI had done to respond to this threat, including "the appointment of a task force on the RPA to develop proactive approaches and strategies," "monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing," and "working with the College & the Academy on marketing strategies and other responses." *Id.* The newsletter then stated to all JCAAI members that "We believe one approach you can take is to educate primary care physicians AND local carriers about the standard of care." *Id.* The newsletter directed that members should rely on a 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI. Members were encouraged to present these talks in

their neighborhood being careful to keep their presentation "general in nature" and "not [to] mention any particular company." *Id.* at 2. Revealing the motivation to hurt UAS and primary care physicians economically, the newsletter stated that "This type of communication – brought to the carriers – could be very helpful, since they do not want to pay for ineffective treatments." *Id.* The newsletter then noted the ongoing lawsuit by UAS against the TAAIS and noted that as of yet, "This particular suit does not contain any anti-trust [sic] allegations." The newsletter then stated that "JCAAI recommends against engaging with any company that promotes RPA." *Id.*

104.    Later in October, *Medical Economics* published another article regarding allergy testing and immunotherapy for non-board certified allergists. In response to the article, Defendant Fineman—with input from JCAAI and ACAAI leadership—wrote a letter to the editor for its publication to attack UAS (then known as UAL or United Allergy Labs). Further, Defendant Sublett emphasized to other Defendants, including Aaronson and Gross, that "this is our main focus, the commercial companies, including United Allergy Labs." Indeed, Sublett revealed that to date—as of October 31, 2011, JCAAI had done the following things: given legal counsel and guidance to individual physicians and local societies regarding UAL, discussions with Defendant AAN related to "them taking a role as our lay voice," had individual discussions with managed care organizations related to the issue, and appointed a task force to develop short and long term strategies. *Ex.* C.

105.    Later, in November 2011, Winders, acting on behalf of Phadia and AAN, again requested to meet with Sublett to discuss her recent meetings with AAAAI's leadership and AAN's "plan of action." [Dkt. No. 135-14]. This plan of action included a "direct mail campaign to the medical directors of the top 100 commercial insurance payers" to request a utilization review for the 2, 84 participating physicians in AAAPC. [Dkt. No. 135-15]. Additionally, AANMA

conducted a direct mail campaign to the "top 100 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts" of UAS and AAAPC.

106.    The next month, on or about December 2011, Wallen contacted JCAAI's Director of Administration, Sue Grupe, regarding his interest in discussing remote practice of allergy. Wallen was and continues to be a business consultant in the field of allergy testing and immunotherapy, as he counsels businesses and doctors in how to strategically position themselves to combat the remote practice of allergy through contacts with third-party payors.  [Dkt. No. 135-17].

107.    After receiving funding from ACAAI, JCAAI, and Phadia, AAN carried out everything AAN promised Defendants they would do to combat the remote practice of allergy, including targeting AAAPC, its members and UAS.  For example, AAN and Phadia worked with members of AAAAI, ACAAI, JCAAI, and RADAR to identify and contact third-party payors in areas where competition was increasing from primary care physicians and UAS.  AAN sent letters to medical directors of the top 100 third party payors in the nation, including third-party payors in Texas, seeking meetings to draft policies to exclude non-allergists from reimbursement.  AAN, Phadia, Winders, and Wallen also suggested in their communications with third-party payors that those payors should take the list of all AAAPC members and audit each one for their allergy testing and allergen immunotherapy claims.  In follow up to those letters, Defendants Winders and Wallen met with third-party payors in Texas and elsewhere in-person and on the phone to convince those third-party payors not to reimburse primary care physicians or UAS for allergy testing or allergen immunotherapy.  As part of that strategy, AAN claimed that these competitors were acting outside the standard of care set by AAAAI, ACAAI, and JCAAI, relying on position statements those organizations drafted to attack the remote practice of allergy.  AAN and Phadia also claimed in their

communications with third-party payors in Texas and elsewhere that primary care physicians, AAAPC members, and UAS were engaged in billing fraud.

108.    AAN, including Winders and Fineman, also drafted an article titled "Patients, Not Piggy Banks!" in which AAN falsely claims primary care physicians practicing allergy testing or allergen immunotherapy, or companies that participated in that care, were engaged in fraud.  AAN posted the article on its website in the summer of 2013 attempting to create the impression that it was aimed at consumers, but AAN and the other Defendants circulated the article widely to third-party payors and primary care physicians in an effort to convince them not to do business with AAAPC members or UAS.  On or about June 2013, once AAN became concerned that Defendants' antitrust activity may come to light and they may be investigated by the Federal Trade Commission, AAN began taking efforts to conceal Defendants' antitrust activities.

## HARM TO COMPETITION FROM DEFENDANTS'' CONDUCT

109.    84.As a result of the coordinated action and collaboration of members of RADAR and the encouragement of JCAAI, members of all three national organizations, AAAAI, ACAAI, and JCAAI and representatives of AAN and Phadia began to contact physicians and insurance carriers in their communities, third-party payors. and suppliers of allergy testing and allergen immunotherapy equipment and antigens about the business practices of primary care physicians and UAS in their participation in the market for allergy 38testing and allergen immunotherapy. These members, acting on behalf of Defendants, contacted insurance companies and managed care health plans through representatives of those organizations, including fraud investigators, provider relation representatives, and medical directors.  Some of these third-party payors act on a national level, including Aetna, Cigna, Humana, and United ("national payors").  Other third-party payors act on a state level, including Blue Cross/Blue Shield entities and managed care health plans, who contract with particular states ("state payors").  Through use of RADAR, which is composed of

every state and regional allergy society, AAN, Phadia, and through contacting national payors, Defendants have attempted to restrain competition in every local market in the nation. By contacting state payors, Defendants have sought the same result for all local markets in specific states. The result of this activity has constrained competition in all 25 states where Plaintiffs do business based on eliminated or reduced reimbursement by Humana and, Aetna, and Cigna, as well as the local markets of Texas, Arkansas, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, North Carolina, Oklahoma, Pennsylvania, South Carolina, and West Virginia through denied or reduced reimbursement by state payors in those states.

85. Among other things, Defendants and these members and organizations attempted to persuade, entice, or coerce these representatives of third-party payors through use of materials distributed by AAN, AAAAI, ACAAI, and JCAAI, falsely suggesting that those organizations defined the standard of care for allergy testing and allergen immunotherapy and that primary care physicians were not adequately trained or qualified to perform allergy testing and allergen immunotherapy. These same actors also stated that primary care physicians' reliance on the services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was "investigational" and should not be reimbursed. If a third-party payors expressed reluctance to stop doing business with primary care physicians or UAS, 39Defendants and Phadia, AAN, AAAAI, ACAAI, and JCAAI members and representatives suggested that those payors should reduce the amount paid to competitors for the mixing of immunotherapy under CPT Code 95165, but not reduce payment for shot administration in a board-certified allergists' office under CPT Codes 95115 and 95117. The goal of these suggested price changes was to disproportionately reduce payment to Defendants' competitors, who rely more on reimbursement of the mixing of immunotherapy under CPT Code 95165 and less on the reimbursement of shot administration under CPT Codes 95115 and CPT Codes 95117. Defendants further suggested to third-party payors that they should only pay primary care physicians for administering ICAPs, or RAST tests, which are billed under a different CPT code and sold by Phadia, instead of paying those physicians for allergy testing, i.e. skin prick tests under CPT Code 95004.

110. 86.Some of the contacts with third-party payors were performed by Defendants themselves and other officers and directors of AANMA, AAAAI, ACAAI, and JCAAI, and Phadia. For example, Dr. Allen Meadows, former ACAAI Speaker of the House of Delegates, reported to Dr. Weldon on October 9, 2011 that as instructed, he had been in contact with local insurance carriers regarding the remote practice of allergy. *See* Exhibit D-17 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-20. Further, Dr. Fineman contacted a Blue Cross Blue Shield medical director to convince that third-party payor not to pay competitors. [Dkt. No. 135-30].

111.    87.Although not all ~~members~~allergists heeded  AAN, AAAAI, ACAAI, ~~and~~ JCAAI, or Phadia's encouragement to engage in the group boycott, either directly or through RADAR, to contact insurance companies, some did with differing degrees of success. Angry at the lawsuit against their colleagues in Texas, Defendants continued contacting insurance companies, including fraud investigators, provider representatives, medical directors, and advisory board members over the phone and in person, rather than through letters, in furtherance of their preexisting agreement.  One such insurance company contacted was BC/BS Texas in or around June ~~2011.~~2011 by JCAAI and Dr. Aaronson, which had previously been contacted by Dr. Weldon. Following this contact, BC/BS Texas fraud investigators audited the medical records of numerous primary care physicians in Texas, including Dr. Bernice Gonzalez in San Antonio, Texas, and denied claims to many primary care physicians.

~~40~~

112.    88.Around the same time, AAAAI and JCAAI contacted Aetna claiming that primary care physicians and UAS were overbilling them for allergen immunotherapy and that Aetna should reduce the amount of units paid for allergen immunotherapy under CPT Code 95165. As a result of that contact, Aetna decided to reduce the amount it would permit to be billed to CPT Code 95165 to 90 units annually from 300 previously, a policy that also negatively impacted board-certified allergists.  Following complaints, AAAAI and JCAAI's representatives, including Dr. Linda Cox, Dr. Aaronson, and Dr. Gross met with representatives of Aetna on July 25 and October 26, 2012, including an Aetna Senior Medical Director, Dr. Chris Jagmin, to propose raising the amount of units back to 120, which Aetna agreed to do for the first year of allergen immunotherapy.  Subsequent to those two conversations, Dr. Gross engaged in a follow-up meeting with Dr. Jagmin in which he complained about Aetna's decision to continue to pay primary care

physicians working with UAS, acting in the interests of himself, JCAAI, and Dallas Allergy & Asthma Center, P.A.

113.    89.Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, acting on behalf of Dr. Sublett, PSF, PLLC, and JCAAI, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky.  *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 8, Dkt. No. 12-30.  Similar to Dr. Gross's meeting with Aetna, Dr. Pollard attempted to persuade Anthem Blue Cross/Blue Shield of Kentucky representatives that they should not pay or do business with primary care physicians or UAS for allergy testing and allergen immunotherapy.  As a result of follow up communications by Dr. Sublett, Anthem Blue Cross/Blue Shield of Kentucky has reduced the reimbursement it will pay primary care physicians practicing allergen immunotherapy by 60%.

114.    90.More recently, representatives of AAN, AAAAI, ACAAI, and JCAAI, and Phadia have met with managed health plans in Texas in an effort to convince them not to do business with primary care physicians or UAS in the market for allergy testing and allergen immunotherapy.  Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients.  A specialist certification is not required by the standard of care in Texas nor any other 41state in which Plaintiffs operate.  Centers for Medicare and Medicaid Services pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state.  Yet, Defendants suggest that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and are determined to shut primary care physicians and businesses like UAS out of the market. At Dr. Weldon's suggestion, these Defendants targeted managed care health plans because those plans are incentivized to deny claims.  Specifically, managed health plans are paid annual on a per capita basis from the state health and human services commission, which requires them to pay all

covered claims under federal and state Medicare and Medicaid regulations. If managed care organizations could reason that claims for services did not meet the standard of care, then that health plan could plausibly deny the claims and pocket the difference.

115. 91.Defendants have had recent success targeting these organizations. For example, on or about February, 2013, an ACAAI representative contacted Superior HealthPlan ("Superior"), a Texas managed care organization. The representative supplied Superior's Chief Medical Officer, Dr. David Harmon, an "opinion" or position statement ACAAI stating that organization forbids "home immunotherapy" and thus Superior should not do business with nor reimburse the practices of primary care physicians who rely on UAS, who permit self-administration of allergy shots. Following this contact, Dr. Harmon contacted various primary care physicians who had billed Superior for allergy testing and allergen immunotherapy and stated Superior would no longer pay them for allergy testing and allergen immunotherapy based on the position of ACAAI. Subsequently, Superior began denying all claims submitted by the businesses of primary care physicians for allergy testing and allergen immunotherapy for more than 18 primary care providers doing business with UAS, some of whom are AAAPC members. In all more than 200

42 claims have been denied, totaling more than $500,000 in lost revenue to those providers and UAS from Superior alone.

116. 92.On August 1, 2013, Drs. Aaronson, Casale, Cox, Honsinger, and Webster, which includes the current Presidents of all three national allergist associations, JCAAI, AAAAI, and ACAAI, as well as the Executive Director and Executive Vice President of JCAAI, wrote another position statement entitled "Location Matters." *See* Exhibit X to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-54. "Location Matters," raises unfounded fears about the safety of self-administration of allergen immunotherapy, citing an increase in the risk of death. "Location Matters" is written in such a way as to conflate the standard of care with the non- binding practice

parameters created by the allergist associations.  While the publication of Location Matters or other journals is not in itself illegal, the use of these journals by board- certified allergists to claim privately to managed care organizations that they should not pay claims that do not meet these standards is anticompetitive.

__117.__   ~~93.~~The very next day after Location Matters was published, on August 2, 2013, Superior announced a "credentialing policy" set to take effect on October 1, 2013 which limits reimbursements to physicians with the equivalent of a two-year specialist program, functionally precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy.  *See* Exhibit F at ¶ 9 and F-2 to Plaintiffs'~~'~~ Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-32.  Superior's "credentialing" policy, where it would only pay for allergy testing or allergen immunotherapy if performed by a board-certified allergists, also encouraged primary care physicians to use ICAPs or RAST tests to test for allergies instead as suggested by Phadia.

__118.__   ~~94.~~Around the same time Superior began denying claims, El Paso First Health Plan ("El Paso First"), another managed care organization that covers Texas Medicaid patients in El Paso, also began calling primary care physicians.  Specifically, the Chief Medical Officer of El Paso First called those physicians in an effort to coerce those physicians to no longer engage in allergy testing and allergen immunotherapy based on the positions of ACAAI.  El Paso First had ~~43~~previously been contacted by Dr. Mansfield regarding claims data for allergy testing and allergen immunotherapy and Dr. Mansfield, a director of JCAAI ~~and ACAAI~~, ACAAI, and Phadia, is believed to be the contact with El Paso First.  As a result of those communications, numerous primary care physicians stopped engaging in allergy testing and allergen immunotherapy for El Paso First patients, and some were denied claims for previous services.

119.   95.Also around the same time period, Parkland Community Health Plan ("Parkland"), a third-party payor for managed care services based in Dallas, Texas, was contacted by a representative of JCAAI, Dr. Gross.  Dr. Gross and his business Dallas Allergy and Asthma Center represent the main competitor to the physicians in Parkland's network in Dallas who received these letters.  Following that communication, on October 1, 2013, Parkland's medical director, Dr. Barry Lachman, wrote a letter to at least four primary care physicians announcing Parkland's new policy of not reimbursing services provided by primary care physicians or any physician in association with companies like UAS.  *See* Ex. F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-33.  In it, Dr. Lachman equated the standard of care with AAAAI practice parameters, just as Defendants intended in crafting their position statements.  The primary reason given for Parkland's refusal to reimburse these physicians is that "AAAI [sic] states that physicians should have specialized training before providing these services."  *Id.*  The Parkland letter then explicitly attacks permitting certain patients to self-administer allergy shots using the same arguments and referencing the same articles that Defendants presented in "Location Matters."  The letter concludes by threatening to exclude primary care physicians who continue to provide allergy care from the Parkland network, especially those in contract with UAS.  *See* Exhibit F at ¶ 10 and F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-33.  As a result of these letters, Dr. Osehotue Okojie and at least three other primary care physicians ceased participation in the market for allergy testing and allergen immunotherapy 44for patients associated with Parkland HealthPlan.  *See* Ex. C (Declaration of Osehotue Okojie, M.D.).D.

120.   96.Following the recent success with managed care organizations, Defendants began making headway with commercial carriers as well.  In line with an earlier proposal by a member of RADAR, members of AAAAI began contacting "the Blues," otherwise known as the Blue Cross/Blue Shield of each state.  *See* Exhibit C-7 to Plaintiffs' Motion for Preliminary

Injunction, Dkt. No. 12-8 at 1. As the RADAR post on Basecamp explained, if the Blues in one state restrict primary care physicians from allergy testing or allergen immunotherapy, "it would be great information to disseminate to others so that we can approach our local blues and try to change policy as well." *Id.*

121. 97.On December 10, 2013 following meetings with a board-certified allergist and AAAAI and AAN representatives, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014, stating "Immunotherapy self-administered in the home setting is considered investigational." This statement mirrors statements made to other third-party payors by AAAAIDefendants and their representatives and could be interpreted to purportedly deny reimbursement to physicians that permit patients to self-inject allergy shots. *See* Exhibit F at ¶ 11 and F-4 to Plaintiffs*':* Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-34.

122. 98.More recently, representatives of AAAAI, ACAAI, or JCAAI, AAN, and Phadia have approached other Blues to attempt to convince them to restrict the market for allergy testing and allergen immunotherapy by refusing to pay primary care physicians and those doing business with UAS. For example, Blue Cross/Blue Shield of Florida reported having considering changes to their policy following contacts with allergistallergists. *See* Exhibit F to Plaintiffs*':* Preliminary Injunction Motion at ¶ 12, Dkt. 12-30. Blue Cross/Blue Shield of Kansas more recently has been denying claims for any primary care physician in contract with UAS. *Id.*

45

123. 99.The level of activity has risen more recently, especially since this lawsuit was originally filed on January 13, 2014. As a result of not being named in the lawsuit, AAN and Phadia were encouraged by Defendants to continue engaging in their contacts with third-party payors in an effort to drive Plaintiffs out of business before they could succeed in prosecuting the lawsuit. As a result, on or about February 23, 2014 at the AAAAI Annual Meeting, Winders met

with officers of Phadia, concerning methods to combat UAS on behalf of Defendants in light of this lawsuit.

124.    AAN representatives, including Defendant Winders and Wallen then carried out attacks on Plaintiffs in an effort to put them out of business and head off this lawsuit by increasing their direct mail and fax campaign to medical directors of third-party payors and to primary care physicians practicing allergy testing or immunotherapy.  The letters claimed that these competitors were engaged in substandard care and fraud and demanded that third-party payors investigate every AAAPC member and any physician in contract with UAS.  These contacts had the desired effect during the early stages of this lawsuit, significantly reducing payment and revenue to AAAPC members and UAS.  In or around March 2014, AAN also drafted another false, defamatory, and disparaging attack on the services of Plaintiffs, this one entitled "Deception in Allergy and Asthma Care: Recognize the Signs of Fraud."  In this broadly distributed article to third-party payors and primary care physicians, AAN falsely claimed that primary care physicians and companies like UAS are engaged in fraud, and that primary care physicians should instead purchase RAST testing materials from Phadia and refer patients with a positive blood test to AANMA's network of board-certified allergists.  AAN also paid Wallen in April 2014 to present to research "dirt" on Plaintiffs to use in contacts with third-party payors and physicians. [Dkt. No. 135-17; Dkt. 134-17a,b].  AAN and Phadia also continued to work together to find common sources of contact with third-party payors and others in an effort to put Plaintiffs out of business before they could discover AAN and Phadia's illegal activities.

125.    For example, on January 22, 2014, Parkland demanded repayment of reimbursements which had previously been issued to primary care physicians.  *See* Exhibit F to Plaintiffs': Preliminary Injunction Motion at ¶ 12, Dkt. 12-30. In the past few weeks  Shortly thereafter, Coventry of Kansas has suggested that after consultations with allergists, it may change

its policies regarding reimbursement of primary care physicians or any physician that relies on the services of UAS. *Id.* Similarly, during this time frame, physicians have called Plaintiffs to express concerns that other commercial carriers and health plans may no longer reimburse allergy testing and allergen immunotherapy performed by primary care physicians, including El Paso First, with some third-party payors threatening to seek their money back. *Id.* As recently as Shortly after AAN's follow up letter to third-party payors in March 2014, Plaintiffs have learned that Humana has demandedbegan demanding repayment of claims previously approved for services provided by primary care physicians in Kentucky in contract with UAS, the market dominated by Defendants Dr. Sublett and his business, PSF, PLLC. Commercial carriers such as the Blues and others are prone to coercion, persuasion or enticement because Defendant purport to represent violations of the standard of care, increased costs, and other claims, all of which are false.

126.    In addition to approaching managed care organizations and commercial carriers, Defendants have approached suppliers—threatening to pull business from those suppliers if they contracted with UAS or AAAPC physicians or gave any grants or donations to AAAPC. An officer of Greer Labs, Inc., a supplier of skin prick testing equipment and antigens for allergen immunotherapy, informed AAAPC that Defendants threatened to cancel two large contracts if Greer works with AAAPC physicians or contributed at all to AAAPC. Defendants have contacted and threatened to cancel contracts and ongoing business relationships with Greer Labs, Inc. and Hollister-Stier Allergy, the two largest antigen suppliers in the market for allergy testing and immunotherapy in furtherance of these threats.  And, due to the Defendants' conduct, AAAPC's membership numbers have suffered as well causing it direct economic harm

### PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS

127.    100.Plaintiffs have been damaged, and will continue to be damaged, by actions taken by Defendants and their co-conspirators on a nationwide basis to boycott AAAPC members

and UAS. The direct result of Defendants actions and the encouragement of AANMA, Phadia, AAAAI, ACAAI, JCAAI, and RADAR members to persuade, entice, and coerce insurance companies on behalf of those organizations has caused insurance companies and managed care organizations like Superior, Parkland, Humana, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Louisiana, Capital Blue Cross of Pennsylvania, Highmark of Pennsylvania, and Blue Cross/Blue Shield of Kansas to avoid or stop reimbursing primary care physicians altogether; and managed care organizations including Texas Children's Health Plan and Community Health Choice to

> ~~46~~ avoid certifying or approving primary care physicians for reimbursement; and other insurance companies like Aetna ~~and~~, Cigna, Blue Cross/Blue Shield of Texas, Blue Cross/Blue Shield of Florida, and Anthem Blue Cross/Blue Shield of Kentucky, to change and reduce the amounts they are willing to pay primary care physicians.

128.    ~~101.~~As a direct result of Defendants' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Defendants.  AAAPC ~~members~~ and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing agreements and have also experienced difficulty in entering into business relationships with others because of the Defendants' anticompetitive public relations campaign.

129.    ~~102.~~UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers.  The result has been most noticeable in terms of lost revenue and corresponding lost profit for services that would have otherwise been provided to physicians.  The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

130.   ~~103.~~UAS has also been damaged by a direct boycott on the part of board-certified allergists and their trade organizations and co-conspirators, including AAN, AAAAI, ACAAI, and JCAAI, and their partnership with Phadia.  While UAS supports primary care physicians who compete with the allergists, there is no reason that an allergist could not employ UAS as well or at least assist and advise UAS.  In addition to the interference with Dr. Kaplan''s contract to advise UAS, Defendants have also dissuaded or attacked board-certified allergists that could do business with UAS, or any board-certified allergists that could advise or serve on the board of AAAPC.

131.   ~~104.~~UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business.  Plaintiffs anticipate that UAS, AAAPC, and ~~47~~AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs'' investigation into the extent of the damage they have suffered at the hands of Defendants is ongoing.  Also much of the additional damage that UAS, AAAPC, and AAAPC members have suffered is not easily calculable, such as damage to their goodwill and to the patient-physician relationship.

132.   AAAPC, for its part, has suffered significant damages.  These damages consist of lost revenue from members who are no longer active in AAAPC because Defendants' conduct illegally forced those physicians to stop offering immunotherapy services to patients.  These damages also consist of lost sponsorship revenue due to threats made by Defendants' to prospective sponsors of retribution that would occur if those companies sponsored or otherwise supported AAAPC.  Separately, these damages emanate from false exigencies precipitated by Defendants' illicit conduct, which have required AAAPC to divert resources away from supporting member physicians, towards combating the improper and inaccurate information campaigns lodged by Defendants with insurers, regulators, and legislators alike.

## COUNT ONE

## SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS

133.    ~~105.~~Plaintiffs incorporate by reference paragraphs 1 through ~~104~~136 as if fully alleged herein.

134.    ~~106.~~At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in local areas throughout the United States, including within the State of Texas and other states.  Defendants actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS.  In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, <u>suppliers of allergy testing and allergen immunotherapy equipment,</u> and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants<u>'</u> competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to ~~48~~discourage competition in the market.  This group boycott and price fixing campaign has been at least partially successful and is the direct and ~~forseeable~~<u>foreseeable</u> result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, <u>to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to</u>

directly contact third-party payors, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors on those associations' and organizations' behalf.

135.   107. The Defendants' actions are a *per se* violation of the Sherman Act.   The Defendants include all three national allergy trade associations and represent virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing and allergen immunotherapy.   Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott and encouraging price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete.   Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide.   The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market.   By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.   There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

108. Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that 49 The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete with board-certified allergists in the relevant market. As the result of Defendants' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic

markets in Texas and other states, leaving patients to choose between paying more for allergy treatment or going without. Defendants actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits. Defendants actions are also not mere advocacy of the services of board-certified allergists, but are directed at eliminating competitors and thus restricting competition, to the ultimate harm of patient choice.

136. ~~109.~~As a direct and proximate result of Defendants~~'~~ past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

137. ~~110.~~UAS also seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

138. ~~111.~~Plaintiffs also seek injunctive relief. The violations set forth above are continuing and will continue unless injunctive relief is granted.

~~50~~

## COUNT TWO

### TEXAS FREE ENTERPRISE AND ANTITRUST ACT VIOLATION AGAINST ALL DEFENDANTS

139. ~~112.~~Plaintiffs incorporate by reference paragraphs 1 through ~~111~~143 as if fully alleged herein.

140. ~~113.~~At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in local areas throughout the United States, including within the State of Texas and other states. Defendants actions include restricting participation in the market by non-board certified allergist physicians and their staff or contracting partners, including members of AAAPC and physicians supported by UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict

competition by discouraging physicians who are not board-certified allergists from the practice of

allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by

targeting their businesses and contractual relations, including their use of UAS to become

competitors to board-certified allergists and their businesses. In furtherance of their conspiracies

and illegal agreements, Defendants have engaged in and encouraged contact with physicians,

insurance companies, managed care organizations, and third party payors in an attempt to convince

those persons and entities to refuse to do business with or pay for the services performed by

AAAPC members and UAS, or to reduce payment for those services disproportionately to payment

for services performed by Defendants and other businesses of board-certified allergists. This group

boycott and price fixing campaign has been at least partially successful and is the direct and

~~forseeable~~foreseeable result of Defendants agreements to contact third party payors, form

~~and~~RADAR, solicit

> 51 members to ~~RADAR~~join RADAR, to agree with Phadia and AAN to combat the
> "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party
> payors, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia
> representatives to contact third party payors on those associations'~~'~~ and organizations'
> behalf.
>
> 141.      ~~114.~~The result of that illegal *per se* boycott and price fixing has been to eliminate or

restrict AAAPC members'~~'~~ and UAS'~~'~~s ability to market and provide their services in relevant

geographic markets within Texas. For example, as explained above, certain Texas insurance

companies and managed care organizations have either stopped reimbursements for allergy care by

physicians who are supported and assisted by UAS or restricted or interrupted those

reimbursements. As a result, UAS, Texas primary care physicians, Texas based members of

AAAPC, and Texas allergy patients are all being denied the benefits of fair competition.

142.    115. The Defendants' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA"). The Defendants represent board-certified allergists, a dominant market group of horizontal competitors. They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny their competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and decreasing reimbursements to those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

52

143.    116. Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who partner with UAS. As the result of Defendants' conduct, consumers have been deprived of the competition

offered by AAAPC members, UAS-supported physicians, and other primary care physicians, leaving patients to choose between paying more for allergy treatment or going without.

144. ~~117.~~As a direct and proximate result of Defendants' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

145. ~~118.~~UAS seeks money damages from Defendants jointly and severally for these violations. Defendants' violations were willful and flagrant. UAS's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

146. ~~119.~~Plaintiffs also seek injunctive relief. The violations set forth above are continuing and will continue unless injunctive relief is granted.

147. ~~120.~~As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS ~~AND BUSINESS RELATIONS~~
### AGAINST ALL DEFENDANTS

148. ~~121.~~Plaintiffs incorporate by reference paragraphs 1 through ~~120~~152 as if fully alleged herein.

~~53~~

149. ~~122.~~In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with the existing agreements between AAAPC and its members and ~~insurance companies, managed care organizations, practice groups, and patients~~industry sponsors, as well as existing agreements between UAS and its many physicians and practice groups. Defendants' conduct, which was neither justified nor privileged, was intended to cause insurance companies, managed care organizations, practice groups, and patients to cease their agreements or doing business with primary care physicians, ~~including AAAPC members, as well~~

68

asand to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS. Defendants' conduct constitutes willful and intentional acts of interference with those agreements, and was done with malice. Such conduct caused injury to AAAPC membersas an organization and to UAS by, among other things, reducing business under these agreements causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for AAAPC members and UAS to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Defendants' actions.

## COUNT FOUR

## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS

150. 123.Plaintiffs incorporate by reference paragraphs 1 through 122154 as if fully alleged herein.

151. 124.In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with AAAPC members' and UAS's's and UAS's existing and prospective business relations. There was a reasonable probability that, absent Defendants' actions, AAAPC members' actions. AAAPC would maintained existing relationships with and would have entered into additional business relationships with insurance companies, managed care organizations, practice groups, and patientsrelationships with third parties, including primary care physicians and industry sponsors, and that UAS would have maintained existing relationships with and entered into additional

54 business relationships with third parties, including other physicians and practice groups. Defendants intentionally interfered with these relationships by attempting to prevent payment to AAAPC members and other physicians who are not board-certified allergists who are assisted and supported by UAS, to scare them away from membership in AAAPC as well as to prevent physicians and practice groups from maintaining

relationships with or entering into business with UAS. Defendants'' conduct constitutes willful and intentional acts of interference and was done with malice. Defendants' conduct was independently tortious or unlawful for the reasons described herein, including for violating and encouraging and participating others in violating the Sherman Act, the TFEAA, the Texas State Court Injunction, making false, fraudulent, defamatory, and disparaging statements regarding AAAPC, AAAPC members, and UAS, and their businesses, and participating in a breach of statutory and contractual duty duties of confidentiality owed to the Texas Medical Board, and other governmental agencies. Defendants'' interference proximately caused injury to AAAPC members and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more difficult to conduct operations and causing AAAPC members and UAS to expend considerable resources in order to further their business.

## COUNT FIVE

### CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

152. 125. Plaintiffs incorporate by reference paragraphs 1 through 124156 as if fully alleged herein.

153. 126. In addition, or in the alternative, Defendants'' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts' current contracts and existing and prospective business relations. Defendants and others have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS. In furtherance of their conspiracy, Defendants and others have agreed to engage in a 55coordinated campaign to restrict competition by discouraging physicians who are not board- certified allergists from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants and their other co-conspirators have engaged in and encouraged contact with physicians, insurance

companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition. Defendants and their other co-conspirators have also taken actions to interfere with Plaintiffs'' current contracts and prospective business relationships. As a direct result of the overt acts taken in furtherance of Defendants'' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the marketplace. Defendants are all jointly and severally liable for the actions taken in furtherance of their conspiracy.

### APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

154. ~~127.~~Plaintiffs incorporate by reference paragraphs 1 through ~~126~~158 as if fully alleged herein.

155. ~~128.~~The actionable conduct of Defendants over the past few years has recently threatened and is starting to cause imminent and irreparable harm to AAAPC members and UAS. Starting around October 2013, the number of third party payors who report being contacted increased dramatically and at the urging of Defendants and their co-conspirators, actions to stop doing business with or reimburse these competitors started to grow. More recently, since the original filing of this Complaint, additional third party payors have expressed the same concerns

~~56~~ raised by Defendants, threatening to remove primary care physicians and UAS from the market entirely, at the suggestion of Defendants.

156. ~~129.~~To preserve the status quo until trial in this cause, Plaintiffs hereby request the Court to preliminarily enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a preliminary injunction, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should

perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS''s businesses.

157. ~~130.~~Upon judgment in this cause, Plaintiffs further request the Court to enter a judgment permanently enjoining and restraining Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third- party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS''s businesses.

**ATTORNEYS' FEES**

~~57~~

158. ~~131.~~Plaintiffs incorporate by reference paragraphs 1 through ~~130~~162 as if fully alleged herein.

159. ~~132.~~15 USCA § 15 and TFEAA § 15.21 both provide for the recovery of attorney fees and costs of suit in private enforcement actions under the antitrust laws. Plaintiffs therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs they have incurred as a result of Defendants' conduct.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a. Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

b. Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

c. Preliminarily and permanently enjoin Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

d. Adjudge and declare that Defendants unlawfully interfered with Plaintiffs'' existing contracts ~~and business relations.~~

e. Adjudge and declare that Defendants unlawfully interfered with Plaintiffs'' existing and prospective business relationships.

f. Adjudge and declare that Defendants unlawfully engaged in a civil conspiracy.

g. Against all Defendants, jointly and severally, award UAS damages in an amount to be proved at trial, to be trebled with interest.

h. Against all Defendants, jointly and severally, award AAAPC damages in an amount to be proved at trial, with interest.

i. Against all Defendants, jointly and severally, award UAS and AAAPC exemplary damages in an amount to be proven at trial.

j. Against all Defendants, jointly and severally, award Plaintiffs their attorney''s fees and costs of this suit; and

k. Award such other further relief as the Court deems just and proper.

DATED: ~~June 14, 2014.~~ January 30, 2015.

58

Respectfully submitted,

BRACEWELL & GIULIANI LLP


By: /s/ Casey Low
     Casey Low~~Texas Bar No.~~
     Texas Bar No. 24041363
     111 Congress Ave., Suite 2300
     Austin, Texas 78701-4061
     Phone: (512) 542-2109
     Fax: (800) 404-3970
     casey.low@bgllp.com


     Richard C. Danysh ~~Texas Bar No.~~
     Texas Bar No. 05377700
     300 Convent St., Suite 1500
     San Antonio, Texas 78205-3723
     Phone: (210) 299-3475
     Fax: (210) 299-0106
     richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS

~~CERTIFICATE OF SERVICE~~

~~I hereby certify that on June 14, 2014, I electronically submitted a true and correct copy of the above with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case file system of the Court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).~~

~~Steven V. Walkowiak~~
~~GREENBERG TRAURIG, LLP~~
~~2200 Ross Avenue, Ste. 6200~~
~~Dallas, TX 75201~~
~~Walkowiaks@gtlaw.com~~
~~214-665-5928 Fax~~

~~Gregory J Casas Elizabeth R. Hadley GREENBERG TRAURIG, LLP 300 West 6th Street, Ste. 2050 Austin, TX 78701 casasg@gtlaw.com hadleye@gtlaw.com 512-320-7210 Fax~~

~~59~~

Paul J. Brown GREENBERG TRAURIG, LLP 1000 Louisiana Street, Suite 1700 Houston, TX 77002
brownpa@gtlaw.com 713-374-3505 Fax

**ATTORNEYS FOR AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY,**

Christopher M. Wilson GIBSON, DUNN & CRUTCHER LLP 2100 McKinney Avenue Dallas, TX 75201-6912
CWilson@gibsondunn.com
214-571-2940 Fax

Rachel S. Brass Veronica S Lewis GIBSON, DUNN & CRUTCHER LLP 555 Mission Street, Suite 3000 San Francisco, CA 94105-0921 RBrass@gibsondunn.com VLewis@gibsondunn.com
415-374-8429 Fax

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOTHERAPY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; AND DAVID WELDON, MD**

Ricardo G. Cedillo Mark W. Kiehne DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, TX 78212
rcedillo@lawdcm.com
mkiehne@lawdcm.com
210-822-1151 Fax

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; JAMES SUBLETT, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; DONALD AARONSON, MD; AND DAVID WELDON, MD**

60

Michael W. Oyler REED WEITKAMP SCHELL & VICE PLLC
500 W. Jefferson Street, Suite 2400
Louisville, KY 40202
moyler@rwsvlaw.com
502-562-2200 Fax

**ATTORNEYS FOR DEFENDANT JAMES SUBLETT, MD**

/s/ Casey Low
Casey Low

61

#4602516.1

Document comparison by Workshare Compare on Friday, January 30, 2015
3:27:04 PM

| Input: | |
|---|---|
| Document 1 ID | file://J:\085058_United Biologics\000001 Antitrust matter\Pleadings\2014-09-08 - Dkt. 117 - 2nd Amended Complaint.pdf |
| Description | 2014-09-08 - Dkt. 117 - 2nd Amended Complaint |
| Document 2 ID | PowerDocs://DM/4798282/8 |
| Description | DM-#4798282-v8-AAAPC_v_AAAAI_et_al_Third_Amended_Complaint |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 453 |
| Deletions | 540 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 993 |

# Exhibit 3

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | | |
|---|---|---|
| Academy of Allergy & Asthma in Primary Care, et al | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 5:14-35-OLG |
| American Academy of Allergy, Asthma & Immuniology, et al | ) | |
| *Defendant* | ) | (If the action is pending in another district, state where: ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Allergy & Asthma Network Mothers of Asthmatics, 8229 Boone Boulevard, Suite 260, Vienna, VA 22182

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: AAAPC and UAS request that you produce documents and things identified in "ATTACHMENT A" to the subpoena at 10:00 a.m. on August 15, 2014 at the offices of Bracewell & Giuliani LLP, (Attention Casey Low) 111 Congress Avenue, Suite 2300, Austin, Texas 78701 or a location and time to be mutually agreed upon.

| Place: Bracewell & Giuliani LLP 111 Congress Avenue, Suite 2300 Austin, Texas 78701 | Date and Time: 08/15/2014 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: ___07/16/2014___

CLERK OF COURT

OR

_____        /s/ Casey Low
*Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ___Academy of Allergy & Asthma in Primary Care and United Biologics, LLC___ , who issues or requests this subpoena, are:

Casey Low, Bracewell & Giuliani, LLP, 111 Congress Avenue, Suite 2300, Austin, Texas 78701  512-542-2109

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  5:14-35-OLG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT A

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, you are hereby subpoenaed to produce, on or before the date designated in the subpoena, the documents described herein.

### DEFINITIONS

1.  The term "You," "Your," or "AANMA" shall mean Allergy & Asthma Network Mothers of Asthmatics, and all predecessors, successors, subsidiaries, divisions, partnerships and affiliates thereof, any joint ventures to which it is party, and all present and former officers, directors, employees, agents, lobbyists, members, attorneys, and other persons acting on its behalf.

2.  The term "communication(s)" shall be interpreted in accordance with Western District of Texas Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

3.  The term "document(s)" shall be interpreted in accordance with Western District of Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the original.  Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

4.  The term "non-board-certified-allergist" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology.  Likewise, the term "board-certified-allergist" shall refer to those physicians who have obtained such certification or are eligible for the certification.

-4-

5.     "This Litigation" refers to the above-captioned case and the events giving rise thereto.

6.     The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

7.     The term "AAAPC" and/or "Plaintiff" shall mean the Academy of Allergy & Asthma in Primary Care, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

8.     The term "Individual Defendants" shall mean those individuals named in the above-captioned case, specifically Donald Aaronson, MD; Gary Gross, MD; Lyndon E. Mansfield, MD; James Sublett, MD; and David Weldon, MD.

9.     The term "TAAIS" shall mean the Texas Allergy, Asthma and Immunology Society, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

10.    The term "Allergy Companies" shall mean companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology. "Allergy Companies" includes, without limitation, UAS.

11.    The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.    The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.    The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting

#4624860

or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14. The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15. The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16. The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity.

17. The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter found at Docket No. 12-29.

18. References to specific individuals or physicians includes their respective current and former businesses, professional associations, partnerships, corporations, partners, affiliates, employees, agents, attorneys, and/or representatives.

19. References to specific public and private entities such as practice groups, governmental agencies, or insurance companies includes their current and former officers, directors, representatives, employees, agents, attorneys, parents, subsidiaries, and/or affiliates.

20. The term "produce" means to produce the responsive documents that are in Your possession, custody, or control, and includes those documents in Your constructive possession or in which you have a superior right to compel the production from any other person, for copying and inspection. Unless otherwise

stated, You should produce documents in response to each request from January 2011 to present.

21. The term "ESI" means electronically stored information including, but not limited to, information electronically, magnetically or optically stored as: (a) digital communications *(e.g.,* email, voice mail, instant messaging); (b) word processed documents *(e.g.,* Word or WordPerfect documents and drafts); (c) spreadsheets and tables *(e.g.,* Excel or Lotus 123 worksheets); (d) accounting application data (e.g., QuickBooks, Money, Peachtree data files); (c) image and facsimile files *(e.g.,* PDF, TIFF, JPG, GIF images); (f) sound recordings *(e.g.,* WAV and MP3 files); (g)video and animation *(e.g.,* AVI and MOV files); (h) databases *(e.g.,* Access, Oracle, SQL Server data, SAP); (i) electronic mail, contact and relationship management data *(e.g.,* Outlook, Maximizer, ACT!), including any deleted emails or any other emails resident on any servers or computers; (j) calendar and diary application data *(e.g.,* Outlook PST, Yahoo, blog tools); (k) online access data *(e.g.,* temporary internet files, history, cookies); (l) presentations *(e.g.,* PowerPoint, Corel Presentations); (m) network access and server activity logs; (n) project management application data; (o) computer-aided design/drawing files; and (q) back-up and archival files *(e.g.,* ZIP, GHO). ESI shall be produced (with metadata intact) in the format specified in the Instructions set forth below.

22. The term "metadata" means system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, dates of creation and last modification or access, number of attachments, and document type *(i.e.* email, attachment, etc.). Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail (including deleted emails), metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, Sent Date, Time Sent, CC, BCC and Body fields.

23. The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

24. The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

#4624860

25. The terms "related to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Western District of Texas Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

26. The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

27. The term "copy," or one of its derivatives, means and refers to any reproduction in any form whatsoever, including but not limited to transmissions over a network, printouts, or screenshots.

28. "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1. Any documents and communication related to Your relationship with the Defendants in the Litigation, including AAAAI, ACAAI, JCAAI, or any officer or director of those organizations or anyone acting or purporting to act on their behalf, including documents and communications concerning the Litigation.

2. Any documents or communications relating to any position statement of AAAAI, ACAAI, JCAAI, AAOA, ABIA, or AANMA concerning allergy testing or allergen immunotherapy including but not limited to any documents or communications concerning your participation in the drafting of any such position statement.

3. Any communications and documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

4. Any communications and documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL," Plaintiff AAAPC or any of its member physicians, or "Allergy Companies."

5. Any documents and communications related to communications with third-party payors concerning allergy testing or allergen immunotherapy performed by primary care physicians or non-board certified allergists, including Your efforts or the efforts of others to change the policy of any third-party payor regarding the practice of allergy testing or allergen immunotherapy by physicians who are not board certified allergists. This request includes documents and communications

-8-

with the following third-party payors and any and all persons known to be associated with each entity, but not limited to only this list: Aetna, Cigna, Humana, United Healthcare, Blue Cross Blue Shield of Texas, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Florida, Blue Cross Blue Shield of Georgia, Blue Cross Blue Shield of Louisiana, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of South Carolina, Blue Cross Blue Shield of Kentucky, Kaiser Permanente GA, Centene, Superior HealthPlan, El Paso First Health Plan, Parkland Community Health Plan, Texas Children's Community Health Plan, Community Health Choice, Texas Medicaid and Healthcare Partnership, Xerox, Accenture, Coventry Health Care of Georgia, Inc., Coventry of the Carolinas, Coventry of Kansas, and Coventry of Florida.

6.  Any documents and communications relating or referring to any actual or proposed reimbursement or payment policy of a third-party payor for claims by physicians under CPT Code 95004, CPT Code 95115, CPT Code 95117, and CPT Code 95165.

7.  Any documents and communications with any person acting or purporting to act on behalf of AAAAI, ACAAI, JCAAI, AOA, ABIA, AANMA, or the Individual Defendants, concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS, including documents or communications related to any position statement of those organizations.

8.  Any communications and documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

9.  Any communications and documents related to the February 2013 AAAAI Annual Meeting and February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

10. Any communications and documents related to the "Regional Advocacy Discussion and Response" initiative (RADAR), including communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

11. Any communications and documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, "remote practice," or UAS including all

-9-

meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

12.   Any communications and documents related to the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached hereto as Exhibit A, including but not limited to documents and communications concerning the "Business Builder" article in "Medical Economics," the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI, referenced in Exhibit A, and any communications with insurance companies.

13.   Any communications and documents concerning Allen Kaplan and his relationship with UAS.

14.   Any communications and documents related to communications with the Texas Medical Board, the Louisiana Medical Board, the Georgia Medical Board, or any other state medical board concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

15.   Any communications and documents related to communications with the United States House of Representatives and the United States Senate, or any other elected body or officials, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning primary care physicians practicing allergy testing or allergen immunotherapy or UAS, including any communications and documents regarding any advocacy or actions taken by you at the United States Congress on behalf of AANMA, including communications and documents related to the Allergy & Asthma Day Capitol Hill on May 7, 2014.

16.   Any communications and documents related to communications with the United States Department of Health and Human Services including its Office of Inspector General, or the United States Department of Justice, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

17.   Any communications and documents related to communications with Stanley Fineman, John Henley, Wesley Burks, or Andrew Murphy, concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

18.   Any communications and documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-

-10-

board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

19.    Any communications and documents related to communications with Hollister-Stier Laboratories, Phadia Laboratories, Thermo Scientific, Greer Laboratories, Inc., ALK or any other supplier of allergy testing or allergen immunotherapy equipment or services, including all persons, agents, or entities acting or purporting to act on those entities behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

20.    Any communications and documents related to communications with TAAIS, Stuart Abramson, M.D., Theodore Freeman, M.D., Wesley Stafford, M.D., William McKenna, M.D., Michael Vaughn, M.D., Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on their behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," remote practice of allergy," "remote allergy," or "RPA," or UAS.

21.    Any communications and documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

22.    Any communications and documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

23.    Any documents and communications related to the AANMA article entitled "Patients, Not Piggy Banks!," attached hereto as Exhibit B, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

24.    Any documents and communications related to the AANMA article entitled "Deceptive allergy testing and immunotherapy schemes," attached hereto as Exhibit C, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

25.    Any documents and communications related to Your communications with "presidents and president-elects of the allergy societies," any list serve or list of those persons, and all documents related thereto.

-11-

# EXHIBIT

# A



**EXHIBIT**

*A*



New News You Can Use JCAAI

October 5, 2011

## More on Remote Practice

Dear JCAAI Member:

JCAAI is hearing more and more every day from its members about the "remote practice of allergy" (RPA) moving into their communities. It is evident that this is a very important issue for the practicing allergists. We are starting to re-define "remote practice", since in the past we thought it referred to primary care physicians (PCPs) sending a vial of the patient's blood to a lab and receiving a vial of allergy extract back – for the PCP to provide allergen immunotherapy in *their* offices. While there probably is still some of that "remote practice" around, it has many new faces these days.

The new version of RPA is the imbedding of a "certified allergy technician" in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy treatments. There are a number of variations on this that have been recently reported to the JCAAI office; one such scheme was featured in as a "Business Builder" article in *Medical Economics*.

This is an entirely new approach to the RPA, in that these appear to be companies that have well thought-out business plans; appear to be well run (from a business standpoint); are well funded; and have done their homework on the allergy market.

They are using a business-to-business approach by going to the larger PCP practices and contracting with them directly. Contrary to the RPA companies' own publicity, they are not focusing on "underserved" areas, but on major metro markets where there are allergists in practice.

To date here's what the JCAAI has done:

- JCAAI leaders and JCAAI attorneys spent considerable time discussing options as far as what we can do and what we can advise our members to do when confronted with these remote practice-type issues.
- Our Board has approved the appointment of a task force on the RPA to develop proactive approaches and strategies.
- We are monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing.
- We are working with the College & the Academy on marketing strategies and other responses (e.g. a letter to the editor of *Medical Economics*) especially related to the RPA company's own marketing.

We believe one approach you can take is to educate primary care physicians AND local carriers about the allergy standard of care. To that end, the Immunotherapy

Committees of the College and the Academy have developed a slide set, "Pearls and Pitfalls of Allergy Diagnostic Testing." This is a 75 slide-set covering all kinds of allergy testing and how the results should be interpreted to arrive at the correct diagnosis and treatment. The slides and an accompanying article are directed to PCPs and carriers.

JCAAI encourages you to present these talks in your neighborhood, and leave behind the accompanying article; this will give Allergists a better chance to level the playing field. This contact with the PCP (and their patients) and/or carrier allows you to present the advantages of allergy care provided by a trained board-certified allergist who will supervise and interpret skin tests and help make therapeutic recommendations as to whether a patient *needs* allergen immunotherapy. We need to educate our local PCPs as to how we can aid them in enhancing the services they provide to their patients by achieving better results. We can help them understand that we can also provide immunotherapy for administration in the PCPs office, if they wish. You should discuss the dangers of misdiagnosis and administration of incorrect doses of immunotherapy with your PCP's. Your presentation needs to be general in nature and should not mention any particular company. This type of communication - brought to the carriers - could be very helpful, since they do not want to pay for ineffective treatments.

Allergists should be aware that these companies are very willing to defend their rights. JCAAI has recently learned of a lawsuit filed in Texas against the Texas Asthma, Allergy and Immunology Society alleging libel and defamation - among other things. This particular suit does not contain any anti-trust allegations.

JCAAI recommends against engaging with any company that promotes RPA. Your chances of convincing them that they might not be acting in the patient's best interest will probably fall on deaf ears and could give them reason to begin legal action against *you*. Do not disparage these companies; just talk about published standards of care and discuss what those standards are. Be careful not to insult them in any way and be very careful not to engage in any anti-competitive behavior. This means you *should not* engage in boycotts; suggest that others engage in boycotts; or take retaliatory action of any sort. JCAAI's recommendations and *suggestions* are made after careful review by our legal counsel.

JCAAI hopes this information is helpful when these remote practice issues arise.

Sincerely,

James Sublett, MD
JCAAI President

# EXHIBIT

# B

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

Follow us on Facebook    Follow us on Twitter            Subscribe to our RSS feed



## Allergy & Asthma Network
### Mothers of Asthmatics

Home | About AANMA | Publications | FAQs | Health Topics | Advocacy | Press Room | Membership | AANMA Store | Donate

All Articles | Basics | At Home | At School | Food Allergies | Medications | Blogs | Podcasts

## Patients, Not Piggy Banks!

Published April - 24 - 2013   share  share  share  share   share   share    Print This Post



Feeling more and more like the nation's healthcare piggy bank? Shaken, pinched and poked at every turn? No wonder! The Kaiser Foundation reports insurance premiums soared a whopping 131 percent in the last decade. Commercial insurance and government payers are shifting healthcare costs onto consumers faster than Farmer Deli can ring the dinner bell. And to some enterprising allergy and asthma businesses, that spells opportunity!

Don't go running wee, wee, wheezing all the way home! We've got work to do!

Bet your paycheck didn't increase $5,000 since 2008. However, medical costs for the average U.S. family of four have, according to Milliman Medical Index. Families tell Allergy & Asthma Network Mothers of Asthmatics (AANMA), "We're paying more but getting less."

## Doctors Optional

Allergy and asthma care account for $32 BILLION each year in direct and indirect costs in the U.S. More than $20 billion of that is for doctors' visits and prescription medications alone.

One belt-tightening idea offered by Food and Drug Administration (FDA) would "reduce routine asthma and anaphylaxis visits and free up prescribers to spend time with more seriously ill patients, reduce the burdens on an already overburdened healthcare system, and reduce healthcare costs."

It would "make certain asthma and anaphylaxis medications available under certain conditions of safe use without a prescription." They'd "require pharmacist intervention to ensure appropriate nonprescription use or healthcare kiosks to aid in the assessment, diagnosis and treatment" of your condition.

However, kiosks don't care. They, and the information you volunteer (read fine print before clicking "agree"), belong to the kiosk vendor for the purpose of merchandising in-store drugs, vitamins and paid physician referrals based on how you answer their leading questions. Kiosk vendors, stores and pharmacists are not liable for advice given or actions you take as a result.

Cold lard facts: Big box retailers are already moving forward as if FDA's proposal, which focuses on the most expensive chronic diseases, is a given! Such measures are short-sighted, leave patients at increased risk, and shift the financial burden to the backs of patients while insurance premiums keep going up! More OTC medications are not the answer.

The fleecing doesn't stop there.

## Sheep's Clothing

Increasingly, patients are unknowingly exposed to less than professional allergy testing immunotherapy practices and fraudulent billing schemes embedded in a growing number of primary care physician (PCP) practices throughout the United States.

How does it happen? Generally, allergy testing and immunotherapy services are marketed to PCPs as the answer to allergist shortages and patient non-compliance. In some cases, all the practice must do is provide an exam room for the "certified allergy technician" and refer patients to reap shared profits with the allergy testing



Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

### Milliman Medical Index (MMI)







company. In others, PCPs pay an up-front investment. Either way, projected annual revenues for PCPs are greater than six figures per year depending on the size of practice and number of patients tested.

Each day, thousands of PCPs nationwide shuffle their patients to these technicians for environmental allergy testing. Some are offered panels of food allergy testing, too. Patients then receive either allergy shots (subcutaneous immunotherapy-SCIT) or drops (sublingual immunotherapy-SLIT) to administer at home.

Meanwhile, patients have no idea this is not even close to the standard practice of an allergy evaluation. They have no clue there is no such medical accreditation as "allergy technician." They don't know the dangers of taking SCIT or SLIT at home!

If SCIT vials contain active antigen, you could have a life-threatening event at home. That is why insurance companies assign reimbursement codes for immunotherapy to be administered in a medical office where a life-saving crash cart and medical professionals are present.

SLIT, on the other hand, is still not FDA-approved in the United States and therefore clearly is not reimbursable! Every office that is billing your insurance company for SLIT is committing fraud whether your PCP knows it or not! If this is shocking to you, it's an education for many PCPs, too.

Regardless of healthcare wars waging out there, our insurance companies, Medicare and Medicaid set up rules so that we can see board-certified allergists and immunologists. Don't let anyone tell you differently!

Great PCPs won't allow substandard allergy care to creep into their practices. Others don't even know it is happening. Some work in large groups and are not aware of business contracts with outside vendors or how they work.

## Say NO to Rotten Pork

No one should be using our children or loved ones as healthcare piggy banks.

AANMA led the national charge for schoolchildren to now carry and use asthma inhalers and epinephrine auto-injectors, but it was your surge that ultimately made it possible.

With your help, AANMA stopped reimbursement fraud for nebulizer medications that were illegally mass manufactured under the guise of compounding!!

Now with **your** help, it's time to tell FDA "NO!" to asthma and anaphylaxis do-it-yourself diagnosis and treatment!

With **your** help, we can stop fraud and abuse of our families and protect our access to quality asthma and allergy care!

By Nancy Sander and Tonya Winders

Nancy Sander is president and founder of AANMA and Tonya Winders is chief operating officer.

### Related posts:

1. **Deceptive Allergy Practices**
2. **Shots to Drops?**
3. **FDA proposal threatens access to care for asthma and allergy patients**
4. **A Voice for Patients on Capitol Hill: 2011 Congressional Allergy & Asthma Caucus**

## Information
About AANMA
Publications
FAQs
Health Topics
Advocacy
Press Room
Membership
AANMA Store
Donate
AAT

## Categories
Basics
At Home
At School
Food Allergies
Medications
Blogs
Podcasts

## Archives
July 2014
June 2014
May 2014
April 2014
March 2014
February 2014
January 2014
December 2013
November 2013
October 2013
September 2013
August 2013

## Recent Posts
An ACE Advocate Says: 'Get Involved!'
Clearing the Air at Work: How to Identify Occupational Allergies or Asthma
Safe Travels
Women Breathe Free – A New Asthma Program For Women
Melting Away Allergies
AANMA Urges Congress to Ensure Patient Safety, Education
FDA Agenda Addresses OTC Medications
Allergy & Asthma Network Launches Free Prescription Assistance Program
Breathe Easy At Asthma Camp
Allergy and Asthma Day Capitol Hill

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

sitemeter

# EXHIBIT

# C

Deceptive Allergy Practices | Allergy and Asthma Network Mothers of Asthmatics

Follow us on Facebook    Follow us on Twitter                                    Subscribe to our RSS feed

**Allergy & Asthma Network**
Mothers of Asthmatics



EXHIBIT C

Certified Best Independent Charity

Search    Go

Home   About AANMA   Publications   FAQs   Health Topics   Advocacy   Press Room   Membership   AANMA Store   Donate

All Articles   Basics   At Home   At School   Food Allergies   Medications   Blogs   Podcasts

## Deceptive Allergy Practices

share   share   share   share   share   share   · Print This Page

### Deceptive allergy testing and immunotherapy schemes

Has a new allergy testing and immunotherapy scheme moved into your town?

Deceptive allergy testing and immunotherapy schemes sweeping country put patients at risk and fleece government and private insurance.

How does it happen? Read more here:

Allergy & Asthma Network Mothers of Asthmatics is hosting the 17th annual Allergy & Asthma Day Capitol Hill on May 7, 2014. We are asking Congress to put a stop to this practice and put asthma and anaphylaxis care back on track with patient-centered care.

## More news:

"Nashville Man Allegedly Impersonated a Doctor, Treated Over 1,000 Patients, and Wrongfully Disclosed Their Health Information"

Department of Health and Human Services, Office of the Inspector General Advisory Opinion

## GET INVOLVED – What you can do:

- If you or anyone you know run into this in your physician's office, report it to the OIG healthcare fraud line:  http://oig.hhs.gov/fraud/report-fraud/index.asp or 1-800-HHS-TIPS  (1-800-447-8477  ).
  Send a copy of your report to AANMA at advocacy@aanma.org.
- Join AANMA to support our advocacy efforts and keep up to date on issues that affect you and your family. You'll receive our award-winning newsletter and magazine straight to your mailbox, as well as e-mail alerts about ongoing issues.
- Share information on this issue with friends, family and medical care providers. Print out copies of these articles or send them links to this website.
- Bookmark AANMA's website, www.aanma.org, and this Advocacy page and check it often for updated information on this issue and on Allergy & Asthma Day Capitol Hill 2013.



Video Today  Popular

AIR POWER

Trac



FREE PRESCRIPTION ASSISTANCE PROGRAM

Compliments of:

Allergy & Asthma NETWORK

CLICK HERE

Join AANMA Today!

Join The AANMA Family Allergy & Asthma Decision Mapping Project

Anaphylaxis Community Experts (ACEs)

Nuevo en Español



**Allergy Asthma Today**

### Information

About AANMA

Publications

FAQs

Health Topics

Advocacy

Press Room

Membership

AANMA Store

Donate

AAT

### Categories

Basics

At Home

At School

Food Allergies

Medications

Blogs

Podcasts

### Archives

July 2014

June 2014

May 2014

April 2014

March 2014

February 2014

January 2014

December 2013

November 2013

October 2013

September 2013

August 2013

### Recent Posts

An ACE Advocate Says: 'Get Involved!'

Clearing the Air at Work: How to Identify Occupational Allergies or Asthma

Safe Travels

Women Breathe Free – A New Asthma Program For Women

Melting Away Allergies

AANMA Urges Congress to Ensure Patient Safety, Education

FDA Agenda Addresses OTC Medications

Allergy & Asthma Network Launches Free Prescription Assistance Program

Breathe Easy At Asthma Camp

Allergy and Asthma Day Capitol Hill

Donate and help the cause! - Join AANMA - Privacy - Contact - ■ RSS feed

# Exhibit 4

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Academy of Allergy & Asthma in Primary Care, et. al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   5:14-CV-35-OLG |
| American Academy of Allergy, Asthma & | ) | |
| Immunology, et. al. | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Stanley M. Fineman, MD, 1519 Johnson Ferry road, Suite 200, Marietta, GA  30062

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

SEE ATTACHMENT A

| Place: 171 17th Street NW<br>Suite 2100<br>Atlanta, GA  30363 | Date and Time:<br>09/10/2014 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographically and/or by videotape

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

AAAPC and UAS request that you produce documents and things identified in "ATTACHMENT A" to the subpoena at 10:00 a.m. on August 27, 2014 at the offices of Bracewell & Giuliani LLP, (Attention Casey Low)111 Congress Avenue, Suite 2300, Austin, Texas 78701 or a location and time to be mutually agreed upon.

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  08/08/2014

CLERK OF COURT

OR

_____         /s/  Casey Low
Signature of Clerk or Deputy Clerk              Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Academy of Allergy & Asthma in Primary Care and  United Biologics, LLC          , who issues or requests this subpoena, are:

Casey Low, Bracewell & Giuliani, LLP, 111 Congress Avenue, Suite 2300, Austin, Texas 78701 512-542-2109

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  5:14-CV-35-OLG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT A

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, you are hereby subpoenaed to produce, on or before the date designated in the subpoena, the documents described herein.

## DEFINITIONS

1.  The term "You," "Your," or "Dr. Fineman" shall mean Stanley Fineman, M.D., and anyone acting on Your behalf, including agents, employees, attorneys, advisers, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of You, whether directly or indirectly.

2.  The term "communication(s)" shall be interpreted in accordance with Western District of Texas Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

3.  The term "document(s)" shall be interpreted in accordance with Western District of Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

4.  The term "non-board-certified-allergist" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified-allergist" shall refer to those physicians who have obtained such certification or are eligible for the certification.

#4624857

5.    "This Litigation" refers to the above-captioned case and the events giving rise thereto.

6.    The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

7.    The term "AAAPC" and/or "Plaintiff" shall mean the Academy of Allergy & Asthma in Primary Care, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

8.    The term "Individual Defendants" shall mean those individuals named in the above-captioned case, specifically Donald Aaronson, MD; Gary Gross, MD; Lyndon E. Mansfield, MD; James Sublett, MD; and David Weldon, MD.

9.    The term "TAAIS" shall mean the Texas Allergy, Asthma and Immunology Society, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

10.   The term "Allergy Companies" shall mean companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology. "Allergy Companies" includes, without limitation, UAS.

11.   The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.   The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.   The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting

#4624857

or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14. The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15. The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16. The term "AANMA" shall mean Allergy & Asthma Network Mothers of Asthmatics, and all predecessors, successors, subsidiaries, divisions, partnerships and affiliates thereof, any joint ventures to which it is party, and all present and former officers, directors, employees, agents, attorneys and other persons acting on its behalf.

17. The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity. This includes the following third-party payors and any and all persons known to be associated with each entity, but not limited to only this list: Aetna, Cigna, Humana, United Healthcare, Blue Cross Blue Shield of Texas, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Florida, Blue Cross Blue Shield of Georgia, Blue Cross Blue Shield of Louisiana, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of South Carolina, Blue Cross Blue Shield of Kentucky, Kaiser Permanente GA, Centene, Superior HealthPlan, El Paso First Health Plan, Parkland Community Health Plan, Texas Children's Community Health Plan, Community Health Choice, Texas Medicaid and Healthcare Partnership, Xerox, Accenture, Coventry Health Care of Georgia, Inc., Coventry Healthcare of the Carolinas, Inc., Coventry of Kansas, and Coventry of Florida.

18. The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the

-6-

assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter attached hereto as Exhibit A.

19. References to specific individuals or physicians includes their respective current and former businesses, professional associations, partnerships, corporations, partners, affiliates, employees, agents, attorneys, and/or representatives.

20. References to specific public and private entities such as practice groups, governmental agencies, or insurance companies includes their current and former officers, directors, representatives, employees, agents, attorneys, parents, subsidiaries, and/or affiliates.

21. The term "produce" means to produce the responsive documents that are in Your possession, custody, or control, and includes those documents in Your constructive possession or in which you have a superior right to compel the production from any other person, for copying and inspection. Unless otherwise stated, You should produce documents in response to each request from January 2011 to present.

22. The term "ESI" means electronically stored information including, but not limited to, information electronically, magnetically or optically stored as: (a) digital communications *(e.g.,* email, voice mail, instant messaging); (b) word processed documents *(e.g.,* Word or WordPerfect documents and drafts); (c) spreadsheets and tables *(e.g.,* Excel or Lotus 123 worksheets); (d) accounting application data (e.g., QuickBooks, Money, Peachtree data files); (c) image and facsimile files *(e.g.,* PDF, TIFF, JPG, GIF images); (f) sound recordings *(e.g.,* WAV and MP3 files); (g)video and animation *(e.g.,* AVI and MOV files); (h) databases *(e.g.,* Access, Oracle, SQL Server data, SAP); (i) electronic mail, contact and relationship management data *(e.g.,* Outlook, Maximizer, ACT!), including any deleted emails or any other emails resident on any servers or computers; (j) calendar and diary application data *(e.g.,* Outlook PST, Yahoo, blog tools); (k) online access data *(e.g.,* temporary internet files, history, cookies); (l) presentations *(e.g.,* PowerPoint, Corel Presentations); (m) network access and server activity logs; (n) project management application data; (o) computer-aided design/drawing files; and (q) back-up and archival files *(e.g.,* ZIP, GHO). ESI shall be produced (with metadata intact) in the format specified in the Instructions set forth below.

23. The term "metadata" means system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, dates of creation and last modification or access, number of attachments, and document type *(i.e.* email, attachment, etc.). Application metadata is

#4624857

information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail (including deleted emails), metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, Sent Date, Time Sent, CC, BCC and Body fields.

24.     The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

25.     The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

26.     The terms "related to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Western District of Texas Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

27.     The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

28.     The term "copy," or one of its derivatives, means and refers to any reproduction in any form whatsoever, including but not limited to transmissions over a network, printouts, or screenshots.

29.     "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1.      Any documents and communication related to Your relationship with the Defendants in the Litigation, including AAAAI, ACAAI, JCAAI, or any officer or director of those organizations or anyone acting or purporting to act on their behalf, including documents and communications concerning the Litigation.

2.      Any documents or communications relating to any position statement of AAAAI, ACAAI, JCAAI, AAOA, ABIA, or AANMA concerning allergy testing or allergen immunotherapy including but not limited to any documents or communications concerning your participation in the drafting of any such position statement.

3.     Any communications and documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

4.     Any communications and documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL," Plaintiff AAAPC or any of its member physicians, or "Allergy Companies."

5.     Any documents and communications related to communications with third-party payors concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," "RPA," Plaintiff UAS, "home immunotherapy," "investigational" treatments or services, fraud, "pass through billing," or any other communication concerning the services of anyone other than You or Your business.

6.     Any documents and communications relating or referring to any actual or proposed reimbursement or payment policy of a third-party payor for claims by physicians under CPT Code 95004, CPT Code 95115, CPT Code 95117, and CPT Code 95165.

7.     Any documents related to Your communications with Aetna, Cigna, Humana, United Healthcare, Blue Cross/Blue Shield of Georgia, Kaiser Permanente GA, Georgia Medicaid, Coventry Healthcare of Georgia, Inc. or any other third party payor concerning allergy testing or allergen immunotherapy services or claims for reimbursement by non-board certified allergists or UAS, or any proposed changes to reimbursement policy related to such service or claims.

8.     Any documents and communications with any person acting or purporting to act on behalf of AAAAI, ACAAI, JCAAI, AAOA, ABIA, AANMA, or the Individual Defendants, concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS, including documents or communications related to any position statement of those organizations.

9.     Any communications and documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

10.    Any communications and documents related to the February 2013 AAAAI Annual Meeting and February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

-9-

11. Any communications and documents related to the "Regional Advocacy Discussion and Response" initiative (RADAR), including communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

12. Any communications and documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, "remote practice," or UAS including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

13. Any communications and documents related to the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached hereto as Exhibit A, including but not limited to documents and communications concerning the "Business Builder" article in "Medical Economics," the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI, referenced in Exhibit A, and any communications with insurance companies.

14. Any communications and documents concerning Allen Kaplan and his relationship with UAS.

15. Any communications and documents related to communications with the Texas Medical Board, the Louisiana Medical Board, the Georgia Medical Board, or any other state medical board concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

16. Any communications and documents related to communications with the United States House of Representatives and the United States Senate, or any other elected body or officials, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning primary care physicians practicing allergy testing or allergen immunotherapy or UAS, including any communications and documents regarding any advocacy or actions taken by you at the United States Congress on behalf of AANMA, including communications and documents related to the Allergy & Asthma Day Capitol Hill on May 7, 2014.

17. Any communications and documents related to communications with the United States Department of Health and Human Services including its Office of Inspector General, or the United States Department of Justice, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

#4624857

18.     Any communications and documents concerning any meeting between the ACAAI House of Delegates and anyone acting or purporting to act on behalf of AAAAI, JCAAI, ABIA, AAOA, or AANMA concerning the practice of allergy testing or allergen immunotherapy by physicians who are not board-certified allergists or the remote practice of allergy.

19.     Any communications and documents concerning all ACAAI board of director meetings from January 1, 2010 to the present, including all meeting minutes, notes, agenda items, actions, and any other document related to these meetings concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

20.     Any communications and documents related to communications with David Brown, M.D., Thomas Casale, M.D., James Tracy, M.D., John Henley, M.D., James Tracy, D.O., Wesley Burks, M.D., and/or Andrew Murphy, M.D. concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

21.     Any communications and documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

22.     Any communications and documents related to communications with Hollister-Stier Laboratories, Phadia Laboratories, Thermo Scientific, Greer Laboratories, Inc., ALK or any other supplier of allergy testing or allergen immunotherapy equipment or services, including all persons, agents, or entities acting or purporting to act on those entities behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

23.     Any communications and documents related to communications with TAAIS, Stuart Abramson, M.D., Theodore Freeman, M.D., Wesley Stafford, M.D., William McKenna, M.D., Michael Vaughn, M.D., Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on their behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," remote practice of allergy," "remote allergy," or "RPA," or UAS.

-11-

24. Any communications and documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

25. Any communications and documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

26. Any communications and documents related to the Annual Scientific Meeting in Baltimore on Nov. 7-11, 2013 concerning RADAR.

27. Any documents and communications related to the AANMA article entitled "Patients, Not Piggy Banks!," attached hereto as Exhibit B, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

28. Any documents and communications related to the AANMA article entitled "Deceptive allergy testing and immunotherapy schemes," attached hereto as Exhibit C, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

29. Any documents and communications related to AANMA's or Your communications with "presidents and president-elects of the allergy societies," any list serve or list of those persons, and all documents related thereto.

-12-

# EXHIBIT

# A



EXHIBIT

_A_



## More on Remote Practice

October 5, 2011

Dear JCAAI Member:

JCAAI is hearing more and more every day from its members about the "remote practice of allergy" (RPA) moving into their communities. It is evident that this is a very important issue for the practicing allergists. We are starting to re-define "remote practice", since in the past we thought it referred to primary care physicians (PCPs) sending a vial of the patient's blood to a lab and receiving a vial of allergy extract back – for the PCP to provide allergen immunotherapy in _their_ offices. While there probably is still some of that "remote practice" around, it has many new faces these days.

The new version of RPA is the imbedding of a "certified allergy technician" in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy treatments. There are a number of variations on this that have been recently reported to the JCAAI office; one such scheme was featured in as a "Business Builder" article in _Medical Economics_.

This is an entirely new approach to the RPA, in that these appear to be companies that have well thought-out business plans; appear to be well run (from a business standpoint); are well funded; and have done their homework on the allergy market.

They are using a business-to-business approach by going to the larger PCP practices and contracting with them directly. Contrary to the RPA companies' own publicity, they are not focusing on "underserved" areas, but on major metro markets where there are allergists in practice.

To date here's what the JCAAI has done:

- JCAAI leaders and JCAAI attorneys spent considerable time discussing options as far as what we can do and what we can advise our members to do when confronted with these remote practice-type issues.
- Our Board has approved the appointment of a task force on the RPA to develop proactive approaches and strategies.
- We are monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing.
- We are working with the College & the Academy on marketing strategies and other responses (e.g. a letter to the editor of _Medical Economics_) especially related to the RPA company's own marketing.

We believe one approach you can take is to educate primary care physicians AND local carriers about the allergy standard of care. To that end, the Immunotherapy

Committees of the College and the Academy have developed a slide set, "Pearls and Pitfalls of Allergy Diagnostic Testing." This is a 75 slide-set covering all kinds of allergy testing and how the results should be interpreted to arrive at the correct diagnosis and treatment. The slides and an accompanying article are directed to PCPs and carriers.

JCAAI encourages you to present these talks in your neighborhood, and leave behind the accompanying article; this will give Allergists a better chance to level the playing field. This contact with the PCP (and their patients) and/or carrier allows you to present the advantages of allergy care provided by a trained board-certified allergist who will supervise and interpret skin tests and help make therapeutic recommendations as to whether a patient *needs* allergen immunotherapy. We need to educate our local PCPs as to how we can aid them in enhancing the services they provide to their patients by achieving better results. We can help them understand that we can also provide immunotherapy for administration in the PCPs office, if they wish. You should discuss the dangers of misdiagnosis and administration of incorrect doses of immunotherapy with your PCP's.  Your presentation needs to be general in nature and should not mention any particular company. This type of communication - brought to the carriers - could be very helpful, since they do not want to pay for ineffective treatments.

Allergists should be aware that these companies are very willing to defend their rights. JCAAI has recently learned of a lawsuit filed in Texas against the Texas Asthma, Allergy and Immunology Society alleging libel and defamation - among other things. This particular suit does not contain any anti-trust allegations.

JCAAI recommends against engaging with any company that promotes RPA.  Your chances of convincing them that they might not be acting in the patient's best interest will probably fall on deaf ears and could give them reason to begin legal action against *you*. Do not disparage these companies; just talk about published standards of care and discuss what those standards are. Be careful not to insult them in any way and be very careful not to engage in any anti-competitive behavior. This means you *should not* engage in boycotts; suggest that others engage in boycotts; or take retaliatory action of any sort. JCAAI's *recommendations and suggestions are made after careful review by* our legal counsel.

JCAAI hopes this information is helpful when these remote practice issues arise.


Sincerely,

James Sublett, MD
JCAAI President

# EXHIBIT

# B

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

↑ Follow us on Facebook   Follow us on Twitter     Subscribe to our RSS feed



**Allergy & Asthma Network**
Mothers of Asthmatics

**EXHIBIT B**

Search   Go

Home   About AANMA   Publications   FAQs   Health Topics   Advocacy   Press Room   Membership   AANMA Store   Donate

All Articles   Basics   At Home   At School   Food Allergies   Medications   Blogs   Podcasts

# Patients, Not Piggy Banks!

Published April - 24 - 2013   ▪ share ▪ share ▪ share ▪ share   share ▪ share   Print This Post



Feeling more and more like the nation's healthcare piggy bank? Shaken, pinched and poked at every turn? No wonder! The Kaiser Foundation reports insurance premiums soared a whopping 131 percent in the last decade. Commercial insurance and government payers are shifting healthcare costs onto consumers faster than Farmer Dell can ring the dinner bell. And to some enterprising allergy and asthma businesses, that spells opportunity!

Don't go running wee, wee, wheezing all the way home! We've got work to do!

Bet your paycheck didn't increase $5,000 since 2008. However, medical costs for the average U.S. family of four have, according to Milliman Medical Index. Families tel: Allergy & Asthma Network Mothers of Asthmatics (AANMA), "We're paying more but getting less."

## Doctors Optional

..rgy and asthma care account for $32 BILLION each year in direct and indirect costs in the U.S. More than $20 billion of that is for doctors' visits and prescription medications alone.

One belt-tightening idea offered by Food and Drug Administration (FDA) would "reduce routine asthma and anaphylaxis visits and free up prescribers to spend time with more seriously ill patients, reduce the burdens on an already overburdened healthcare system, and reduce healthcare costs."

It would "make certain asthma and anaphylaxis medications available under certain conditions of safe use without a prescription." They'd "require pharmacist intervention to ensure appropriate nonprescription use or healthcare kiosks to aid in the assessment, diagnosis and treatment" of your condition.

However, kiosks don't care. They, and the information you volunteer (read fine print before clicking "agree"), belong to the kiosk vendor for the purpose of merchandising in-store drugs, vitamins and paid physician referrals based on how you answer their leading questions. Kiosk vendors, stores and pharmacists are not liable for advice given or actions you take as a result.

Cold lard facts: Big box retailers are already moving forward as if FDA's proposal, which focuses on the most expensive chronic diseases, is a given! Such measures are short-sighted, leave patients at increased risk, and shift the financial burden to the backs of patients while insurance premiums keep going up! More OTC medications are not the answer.

The fleecing doesn't stop there.

## Sheep's Clothing

Increasingly, patients are unknowingly exposed to less than professional allergy testing immunotherapy practices and fraudulent billing schemes embedded in a growing number of primary care physician (PCP) practices throughout the United States.

How does it happen? Generally, allergy testing and immunotherapy services are marketed to PCPs as the answer to allergist shortages and patient non-compliance. In some cases, all the practice must do is provide an exam room for the "certified allergy technician" and refer patients to reap shared profits with the allergy testing





**FREE PRESCRIPTION ASSISTANCE PROGRAM**

Compliments of:

Allergy & Asthma NETWORK

**CLICK HERE**

**Join AANMA Today!**

Join The AANMA Family Allergy & Asthma Decision Mapping Project



**Anaphylaxis Community Experts (ACEs)**

**Nuevo en Español**

Video Today   Popular

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

### Milliman Medical Index (MMI)



company. In others, PCPs pay an up-front investment. Either way, projected annual revenues for PCPs are greater than six figures per year depending on the size of practice and number of patients tested.

Each day, thousands of PCPs nationwide shuffle their patients to these technicians for environmental allergy testing. Some are offered panels of food allergy testing, too. Patients then receive either allergy shots (subcutaneous immunotherapy-SCIT) or drops (sublingual immunotherapy-SLIT) to administer at home.

Meanwhile, patients have no idea this is not even close to the standard practice of an allergy evaluation. They have no clue there is no such medical accreditation as "allergy technician." They don't know the dangers of taking SCIT or SLIT at home!

If SCIT vials contain active antigen, you could have a life-threatening event at home. That is why insurance companies assign reimbursement codes for immunotherapy to be administered in a medical office where a life-saving crash cart and medical professionals are present.

SLIT, on the other hand, is still not FDA-approved in the United States and therefore clearly is not reimbursable! Every office that is billing your insurance company for SLIT is committing fraud whether your PCP knows it or not! If this is shocking to you, it's an education for many PCPs, too.

Regardless of healthcare wars waging out there, our insurance companies, Medicare and Medicaid set up rules so that we can see board-certified allergists and immunologists. Don't let anyone tell you differently!

Great PCPs won't allow substandard allergy care to creep into their practices. Others don't even know it is happening. Some work in large groups and are not aware of business contracts with outside vendors or how they ⁀rk.

## Say NO to Rotten Pork

No one should be using our children or loved ones as healthcare piggy banks.

AANMA led the national charge for schoolchildren to now carry and use asthma inhalers and epinephrine auto-injectors, but it was your surge that ultimately made it possible.

With your help, AANMA stopped reimbursement fraud for nebulizer medications that were illegally mass manufactured under the guise of compounding!!

Now with **your** help, it's time to tell FDA "NO!" to asthma and anaphylaxis do-it-yourself diagnosis and treatment!

With **your** help, we can stop fraud and abuse of our families and protect our access to quality asthma and allergy care!

By Nancy Sander and Tonya Winders

Nancy Sander is president and founder of AANMA and Tonya Winders is chief operating officer.

**Related posts:**

1. **Deceptive Allergy Practices**
2. **Shots to Drops?**
3. **FDA proposal threatens access to care for asthma and allergy patients**
4. **A Voice for Patients on Capitol Hill: 2011 Congressional Allergy & Asthma Caucus**





### Information

About AANMA
Publications
FAQs
Health Topics
Advocacy
Press Room
Membership
AANMA Store
Donate
AAT

### Categories

Basics
At Home
At School
Food Allergies
Medications
Blogs
Podcasts

### Archives

July 2014
June 2014
May 2014
April 2014
March 2014
February 2014
January 2014
December 2013
November 2013
October 2013
September 2013
August 2013

### Recent Posts

An ACE Advocate Says: 'Get Involved!'

Clearing the Air at Work: How to Identify Occupational Allergies or Asthma

Safe Travels

Women Breathe Free – A New Asthma Program For Women

Melting Away Allergies

AANMA Urges Congress to Ensure Patient Safety, Education

FDA Agenda Addresses OTC Medications

Allergy & Asthma Network Launches Free Prescription Assistance Program

Breathe Easy At Asthma Camp

Allergy and Asthma Day Capitol Hill

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

Donate and help the cause! - Join AANMA - Privacy - Contact - ■ RSS Feed

# EXHIBIT

# C

Deceptive Allergy Practices | Allergy and Asthma Network Mothers of Asthmatics

Follow us on Facebook    Follow us on Twitter                                          Subscribe to our RSS feed

**Allergy & Asthma Network**
Mothers of Asthmatics

EXHIBIT
**C**

Search    Go

Home | About AANMA | Publications | FAQs | Health Topics | Advocacy | Press Room | Membership | AANMA Store | Donate

At Infancy | At Home | At School | Food Allergies | Medications | Blogs | Podcasts

## Deceptive Allergy Practices

share  share  share  share   share  share · Print This Page

### Deceptive allergy testing and immunotherapy schemes

Has a new allergy testing and immunotherapy scheme moved into your town?

Deceptive allergy testing and immunotherapy schemes sweeping country put patients at risk and fleece government and private insurance.

How does it happen? Read more here:

Allergy & Asthma Network Mothers of Asthmatics is hosting the 17th annual Allergy & Asthma Day Capitol Hill on May 7, 2014. We are asking Congress to put a stop to this practice and put asthma and anaphylaxis care back on track with patient-centered care.

## More news:

"Nashville Man Allegedly Impersonated a Doctor, Treated Over 1,000 Patients, and Wrongfully Disclosed Their Health Information"

Department of Health and Human Services, Office of the Inspector General Advisory Opinion

## GET INVOLVED – What you can do:

- If you or anyone you know run into this in your physician's office, report it to the OIG healthcare fraud line: http://oig.hhs.gov/fraud/report-fraud/index.asp or 1-800-HHS-TIPS (1-800-447-8477 ). Send a copy of your report to AANMA at advocacy@aanma.org.
- Join AANMA to support our advocacy efforts and keep up to date on issues that affect you and your family. You'll receive our award-winning newsletter and magazine straight to your mailbox, as well as e-mail alerts about ongoing issues.
- Share information on this issue with friends, family and medical care providers. Print out copies of these articles or send them links to this website.
- Bookmark AANMA's website, www.aanma.org, and this Advocacy page and check it often for updated information on this issue and on Allergy & Asthma Day Capitol Hill 2013.

Video Today    Popular





**FREE**
**PRESCRIPTION ASSISTANCE PROGRAM**

Compliments of:

Allergy & Asthma
N E T W O R K

**CLICK HERE**

**Join AANMA Today!**

Join The AANMA Family Allergy & Asthma Decision Mapping Project

**Anaphylaxis Community Experts (ACEs)**

**Nuevo en Español**

Deceptive Allergy Practices | Allergy and Asthma Network Mothers of Asthmatics



Allergy Asthma Today

## Information

About AANMA

Publications

FAQs

Health Topics

Advocacy

Press Room

Membership

AANMA Store

Donate

AAT

## Categories

Basics

At Home

At School

Food Allergies

Medications

Blogs

Podcasts

## Archives

July 2014

June 2014

May 2014

April 2014

March 2014

February 2014

January 2014

December 2013

November 2013

October 2013

September 2013

August 2013

## Recent Posts

An ACE Advocate Says: 'Get Involved!'

Clearing the Air at Work: How to Identify Occupational Allergies or Asthma

Safe Travels

Women Breathe Free – A New Asthma Program For Women

Melting Away Allergies

AANMA Urges Congress to Ensure Patient Safety, Education

FDA Agenda Addresses OTC Medications

Allergy & Asthma Network Launches Free Prescription Assistance Program

Breathe Easy At Asthma Camp

Allergy and Asthma Day Capitol Hill

# Exhibit 5

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Western District of Texas

| | |
|---|---|
| Academy of Allergy & Asthma in Primary Care, et al | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 5:14-35-OLG |
| American Academy of Allergy, Asthma & Immuniology, et al | ) |
| *Defendant* | ) (If the action is pending in another district, state where: ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Atlanta Allergy & Asthma Clinic, 1519 Johnson Ferry Road, Suite 200, Marietta, GA 30062

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: AAAPC and UAS request that you produce documents and things identified in "ATTACHMENT A" to the subpoena at 10:00 a.m. on August 15, 2014 at the offices of Bracewell & Giuliani LLP, (Attention Casey Low) 111 Congress Avenue, Suite 2300, Austin, Texas 78701 or a location and time to be mutually agreed upon.

| Place: Bracewell & Giuliani LLP 111 Congress Avenue, Suite 2300 Austin, Texas 78701 | Date and Time: 08/15/2014 10:00 am |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: 07/16/2014

| CLERK OF COURT | OR | |
|---|---|---|
| | | /s/ Casey Low |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Academy of Allergy & Asthma in Primary Care and United Biologics, LLC , who issues or requests this subpoena, are:

Casey Low, Bracewell & Giuliani, LLP, 111 Congress Avenue, Suite 2300, Austin, Texas 78701 512-542-2109

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:14-35-OLG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT A

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, you are hereby subpoenaed to produce, on or before the date designated in the subpoena, the documents described herein.

## DEFINITIONS

1.    The term "You," "Your," or "Atlanta Allergy" shall mean Atlanta Allergy & Asthma Clinic, and anyone acting on Your behalf, including all officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of You, whether directly or indirectly.

2.    The term "communication(s)" shall be interpreted in accordance with Western District of Texas Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

3.    The term "document(s)" shall be interpreted in accordance with Western District of Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

4.    The term "non-board-certified-allergist" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified-allergist" shall refer to those physicians who have obtained such certification or are eligible for the certification.

#4632589

5.  "This Litigation" refers to the above-captioned case and the events giving rise thereto.

6.  The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

7.  The term "AAAPC" and/or "Plaintiff" shall mean the Academy of Allergy & Asthma in Primary Care, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

8.  The term "Individual Defendants" shall mean those individuals named in the above-captioned case, specifically Donald Aaronson, MD; Gary Gross, MD; Lyndon E. Mansfield, MD; James Sublett, MD; and David Weldon, MD.

9.  The term "TAAIS" shall mean the Texas Allergy, Asthma and Immunology Society, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

10. The term "Allergy Companies" shall mean companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology. "Allergy Companies" includes, without limitation, UAS.

11. The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12. The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13. The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting

or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14.    The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15.    The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16.    The term "AANMA" shall mean Allergy & Asthma Network Mothers of Asthmatics, and all predecessors, successors, subsidiaries, divisions, partnerships and affiliates thereof, any joint ventures to which it is party, and all present and former officers, directors, employees, agents, attorneys and other persons acting on its behalf.

17.    The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity. This includes the following third-party payors and any and all persons known to be associated with each entity, but not limited to only this list: Aetna, Cigna, Humana, United Healthcare, Blue Cross Blue Shield of Texas, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Florida, Blue Cross Blue Shield of Georgia, Blue Cross Blue Shield of Louisiana, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of South Carolina, Blue Cross Blue Shield of Kentucky, Kaiser Permanente GA, Centene, Superior HealthPlan, El Paso First Health Plan, Parkland Community Health Plan, Texas Children's Community Health Plan, Community Health Choice, Texas Medicaid and Healthcare Partnership, Xerox, Accenture, Coventry Health Care of Georgia, Inc., Coventry Healthcare of the Carolinas, Inc., Coventry of Kansas, and Coventry of Florida.

18.    The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the

-4-

assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter attached hereto as Exhibit A.

19.  References to specific individuals or physicians includes their respective current and former businesses, professional associations, partnerships, corporations, partners, affiliates, employees, agents, attorneys, and/or representatives.

20.  References to specific public and private entities such as practice groups, governmental agencies, or insurance companies includes their current and former officers, directors, representatives, employees, agents, attorneys, parents, subsidiaries, and/or affiliates.

21.  The term "produce" means to produce the responsive documents that are in Your possession, custody, or control, and includes those documents in Your constructive possession or in which you have a superior right to compel the production from any other person, for copying and inspection. Unless otherwise stated, You should produce documents in response to each request from January 2011 to present.

22.  The term "ESI" means electronically stored information including, but not limited to, information electronically, magnetically or optically stored as: (a) digital communications *(e.g.,* email, voice mail, instant messaging); (b) word processed documents *(e.g.,* Word or WordPerfect documents and drafts); (c) spreadsheets and tables *(e.g.,* Excel or Lotus 123 worksheets); (d) accounting application data (e.g., QuickBooks, Money, Peachtree data files); (c) image and facsimile files *(e.g.,* PDF, TIFF, JPG, GIF images); (f) sound recordings *(e.g.,* WAV and MP3 files); (g)video and animation *(e.g.,* AVI and MOV files); (h) databases *(e.g.,* Access, Oracle, SQL Server data, SAP); (i) electronic mail, contact and relationship management data *(e.g.,* Outlook, Maximizer, ACT!), including any deleted emails or any other emails resident on any servers or computers; (j) calendar and diary application data *(e.g.,* Outlook PST, Yahoo, blog tools); (k) online access data *(e.g.,* temporary internet files, history, cookies); (l) presentations *(e.g.,* PowerPoint, Corel Presentations); (m) network access and server activity logs; (n) project management application data; (o) computer-aided design/drawing files; and (q) back-up and archival files *(e.g.,* ZIP, GHO). ESI shall be produced (with metadata intact) in the format specified in the Instructions set forth below.

23.  The term "metadata" means system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, dates of creation and last modification or access, number of attachments, and document type *(i.e.* email, attachment, etc.). Application metadata is

-5-

information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail (including deleted emails), metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, Sent Date, Time Sent, CC, BCC and Body fields.

24. The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

25. The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

26. The terms "related to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Western District of Texas Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

27. The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

28. The term "copy," or one of its derivatives, means and refers to any reproduction in any form whatsoever, including but not limited to transmissions over a network, printouts, or screenshots.

29. "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

### REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1. Any documents and communication related to Your relationship with the Defendants in the Litigation, including AAAAI, ACAAI, JCAAI, or any officer or director of those organizations or anyone acting or purporting to act on their behalf, including documents and communications concerning the Litigation.

2. Any documents or communications relating to any position statement of AAAAI, ACAAI, JCAAI, AAOA, ABIA, or AANMA concerning allergy testing or allergen immunotherapy including but not limited to any documents or communications concerning your participation in the drafting of any such position statement.

3.   Any communications and documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

4.   Any communications and documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL," Plaintiff AAAPC or any of its member physicians, or "Allergy Companies."

5.   Any documents and communications related to communications with third-party payors concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," "RPA," Plaintiff UAS, "home immunotherapy," "investigational" treatments or services, fraud, "pass through billing," or any other communication concerning the services of anyone other than You or Your business.

6.   Any documents and communications relating or referring to any actual or proposed reimbursement or payment policy of a third-party payor for claims by physicians under CPT Code 95004, CPT Code 95115, CPT Code 95117, and CPT Code 95165.

7.   Any documents related to Your communications with Aetna, Cigna, Humana, United Healthcare, Blue Cross/Blue Shield of Georgia, Kaiser Permanente GA, Georgia Medicaid, Coventry Healthcare of Georgia, Inc. or any other third party payor concerning allergy testing or allergen immunotherapy services or claims for reimbursement by non-board certified allergists or UAS, or any proposed changes to reimbursement policy related to such service or claims.

8.   Any documents and communications with any person acting or purporting to act on behalf of AAAAI, ACAAI, JCAAI, AAOA, ABIA, AANMA, or the Individual Defendants, concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS, including documents or communications related to any position statement of those organizations.

9.   Any communications and documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

10.  Any communications and documents related to the February 2013 AAAAI Annual Meeting and February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

11.    Any communications and documents related to the "Regional Advocacy Discussion and Response" initiative (RADAR), including communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

12.    Any communications and documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, "remote practice," or UAS including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

13.    Any communications and documents related to the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached hereto as Exhibit A, including but not limited to documents and communications concerning the "Business Builder" article in "Medical Economics," the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI, referenced in Exhibit A, and any communications with insurance companies.

14.    Any communications and documents concerning Allen Kaplan and his relationship with UAS.

15.    Any communications and documents related to communications with the Texas Medical Board, the Louisiana Medical Board, the Georgia Medical Board, or any other state medical board concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

16.    Any communications and documents related to communications with the United States Department of Health and Human Services including its Office of Inspector General, or the United States Department of Justice, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

17.    Any communications and documents concerning any meeting between the ACAAI House of Delegates and anyone acting or purporting to act on behalf of AAAAI, JCAAI, ABIA, AAOA, or AANMA concerning the practice of allergy testing or allergen immunotherapy by physicians who are not board-certified allergists or the remote practice of allergy.

18.    Any communications and documents concerning all ACAAI board of director meetings from January 1, 2010 to the present, including all meeting minutes, notes, agenda items, actions, and any other document related to these meetings

concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

19. Any communications and documents related to communications with David Brown, M.D., Thomas Casale, M.D., James Tracy, M.D., John Henley, M.D., James Tracy, D.O., Wesley Burks, M.D., and/or Andrew Murphy, M.D. concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

20. Any communications and documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

21. Any communications and documents related to communications with Hollister-Stier Laboratories, Phadia Laboratories, Thermo Scientific, Greer Laboratories, Inc., ALK or any other supplier of allergy testing or allergen immunotherapy equipment or services, including all persons, agents, or entities acting or purporting to act on those entities behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

22. Any communications and documents related to communications with TAAIS, Stuart Abramson, M.D., Theodore Freeman, M.D., Wesley Stafford, M.D., William McKenna, M.D., Michael Vaughn, M.D., Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on their behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," remote practice of allergy," "remote allergy," or "RPA," or UAS.

23. Any communications and documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

24. Any communications and documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

25.   Any communications and documents related to the Annual Scientific Meeting in Baltimore on Nov. 7-11, 2013 concerning RADAR.

26.   Any documents and communications related to the AANMA article entitled "Patients, Not Piggy Banks!," attached hereto as Exhibit B, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

27.   Any documents and communications related to the AANMA article entitled "Deceptive allergy testing and immunotherapy schemes," attached hereto as Exhibit C, including but not limited to any documents and communications related to allegations in the article and your participation in the drafting or dissemination of the article.

28.   Any documents and communications related to AANMA's or Your communications with "presidents and president-elects of the allergy societies," any list serve or list of those persons, and all documents related thereto.

-10-

# EXHIBIT
# A



**EXHIBIT**

_A_



New News You Can Use

JCAAI

October 5, 2011

## More on Remote Practice

Dear JCAAI Member:

JCAAI is hearing more and more every day from its members about the "remote practice of allergy" (RPA) moving into their communities. It is evident that this is a very important issue for the practicing allergists. We are starting to re-define "remote practice", since in the past we thought it referred to primary care physicians (PCPs) sending a vial of the patient's blood to a lab and receiving a vial of allergy extract back – for the PCP to provide allergen immunotherapy in *their* offices. While there probably is still some of that "remote practice" around, it has many new faces these days.

The new version of RPA is the imbedding of a "certified allergy technician" in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy treatments. There are a number of variations on this that have been recently reported to the JCAAI office; one such scheme was featured in as a "Business Builder" article in *Medical Economics*.

This is an entirely new approach to the RPA, in that these appear to be companies that have well thought-out business plans; appear to be well run (from a business standpoint); are well funded; and have done their homework on the allergy market.

They are using a business-to-business approach by going to the larger PCP practices and contracting with them directly. Contrary to the RPA companies' own publicity, they are not focusing on "underserved" areas, but on major metro markets where there are allergists in practice.

To date here's what the JCAAI has done:

- JCAAI leaders and JCAAI attorneys spent considerable time discussing options as far as what we can do and what we can advise our members to do when confronted with these remote practice-type issues.
- Our Board has approved the appointment of a task force on the RPA to develop proactive approaches and strategies.
- We are monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing.
- We are working with the College & the Academy on marketing strategies and other responses (e.g. a letter to the editor of *Medical Economics*) especially related to the RPA company's own marketing.

We believe one approach you can take is to educate primary care physicians AND local carriers about the allergy standard of care.  To that end, the Immunotherapy

Committees of the College and the Academy have developed a slide set, "Pearls and Pitfalls of Allergy Diagnostic Testing." This is a 75 slide-set covering all kinds of allergy testing and how the results should be interpreted to arrive at the correct diagnosis and treatment. The <u>slides</u> and an accompanying <u>article</u> are directed to PCPs and carriers.

JCAAI encourages you to present these talks in your neighborhood, and leave behind the accompanying article; this will give Allergists a better chance to level the playing field. This contact with the PCP (and their patients) and/or carrier allows you to present the advantages of allergy care provided by a trained board-certified allergist who will supervise and interpret skin tests and help make therapeutic recommendations as to whether a patient *needs* allergen immunotherapy. We need to educate our local PCPs as to how we can aid them in enhancing the services they provide to their patients by achieving better results. We can help them understand that we can also provide immunotherapy for administration in the PCPs office, if they wish. You should discuss the dangers of misdiagnosis and administration of incorrect doses of immunotherapy with your PCP's. Your presentation needs to be general in nature and should not mention any particular company. This type of communication - brought to the carriers - could be very helpful, since they do not want to pay for ineffective treatments.

Allergists should be aware that these companies are very willing to defend their rights. JCAAI has recently learned of a lawsuit filed in Texas against the Texas Asthma, Allergy and Immunology Society alleging libel and defamation - among other things. This particular suit does not contain any anti-trust allegations.

JCAAI recommends against engaging with any company that promotes RPA. Your chances of convincing them that they might not be acting in the patient's best interest will probably fall on deaf ears and could give them reason to begin legal action against *you*. Do not disparage these companies; just talk about published standards of care and discuss what those standards are. Be careful not to insult them in any way and be very careful not to engage in any anti-competitive behavior. This means you *should not* engage in boycotts; suggest that others engage in boycotts; or take retaliatory action of any sort. JCAAI's *recommendations and suggestions are made after careful review by* our legal counsel.

JCAAI hopes this information is helpful when these remote practice issues arise.

Sincerely,

James Sublett, MD
JCAAI President

# EXHIBIT

# B

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics



Allergy & Asthma Network
Mothers of Asthmatics

EXHIBIT

B

Search    Go

Home   About AANMA   Publications   FAQs   Health Topics   Advocacy   Press Room   Membership   AANMA Store   Donate
All Articles   Basics   At Home   At School   Food Allergies   Medications   Blogs   Podcasts

# Patients, Not Piggy Banks!

Published April - 24 - 2013    share   share   share   share   share   share    Print This Post



Feeling more and more like the nation's healthcare piggy bank? Shaken, pinched and poked at every turn? No wonder! The Kaiser Foundation reports insurance premiums soared a whopping 131 percent in the last decade. Commercial insurance and government payers are shifting healthcare costs onto consumers faster than Farmer Dell can ring the dinner bell. And to some enterprising allergy and asthma businesses, that spells opportunity!

Don't go running wee, wee, wheezing all the way home! We've got work to do!

Bet your paycheck didn't increase $5,000 since 2008. However, medical costs for the average U.S. family of four have, according to Milliman Medical Index. Families tell Allergy & Asthma Network Mothers of Asthmatics (AANMA), "We're paying more but getting less."

## Doctors Optional

Allergy and asthma care account for $32 BILLION each year in direct and indirect costs in the U.S. More than $20 billion of that is for doctors' visits and prescription medications alone.

One belt-tightening idea offered by Food and Drug Administration (FDA) would "reduce routine asthma and anaphylaxis visits and free up prescribers to spend time with more seriously ill patients, reduce the burdens on an already overburdened healthcare system, and reduce healthcare costs."

It would "make certain asthma and anaphylaxis medications available under certain conditions of safe use without a prescription." They'd "require pharmacist intervention to ensure appropriate nonprescription use or healthcare kiosks to aid in the assessment, diagnosis and treatment" of your condition.

However, kiosks don't care. They, and the information you volunteer (read fine print before clicking "agree"), belong to the kiosk vendor for the purpose of merchandising in-store drugs, vitamins and paid physician referrals based on how you answer their leading questions. Kiosk vendors, stores and pharmacists are not liable for advice given or actions you take as a result.

Cold lard facts: Big box retailers are already moving forward as if FDA's proposal, which focuses on the most expensive chronic diseases, is a given! Such measures are short-sighted, leave patients at increased risk, and shift the financial burden to the backs of patients while insurance premiums keep going up! More OTC medications are not the answer.

The fleecing doesn't stop there.

## Sheep's Clothing

Increasingly, patients are unknowingly exposed to less than professional allergy testing immunotherapy practices and fraudulent billing schemes embedded in a growing number of primary care physician (PCP) practices throughout the United States.

How does it happen? Generally, allergy testing and immunotherapy services are marketed to PCPs as the answer to allergist shortages and patient non-compliance. In some cases, all the practice must do is provide an exam room for the "certified allergy technician" and refer patients to reap shared profits with the allergy testing




Video Today   Popular

FREE PRESCRIPTION ASSISTANCE PROGRAM
Compliments of:
Allergy & Asthma NETWORK
CLICK HERE

Join AANMA Today!

Join The AANMA Family Allergy & Asthma Decision Mapping Project

Anaphylaxis Community Experts (ACEs)

Nuevo en Español

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

### Milliman Medical Index (MMI)



company.  In others, PCPs pay an up-front investment. Either way, projected annual revenues for PCPs are greater than six figures per year depending on the size of practice and number of patients tested.

Each day, thousands of PCPs nationwide shuffle their patients to these technicians for environmental allergy testing. Some are offered panels of food allergy testing, too. Patients then receive either allergy shots (subcutaneous immunotherapy-SCIT) or drops (sublingual immunotherapy-SLIT) to administer at home.

Meanwhile, patients have no idea this is not even close to the standard practice of an allergy evaluation. They have no clue there is no such medical accreditation as "allergy technician." They don't know the dangers of taking SCIT or SLIT at home!

If SCIT vials contain active antigen, you could have a life-threatening event at home. That is why insurance companies assign reimbursement codes for immunotherapy to be administered in a medical office where a life-saving crash cart and medical professionals are present.

SLIT, on the other hand, is still not FDA-approved in the United States and therefore clearly is not reimbursable! Every office that is billing your insurance company for SLIT is committing fraud whether your PCP knows it or not! If this is shocking to you, it's an education for many PCPs, too.

Regardless of healthcare wars waging out there, our insurance companies, Medicare and Medicaid set up rules so that we can see board-certified allergists and immunologists. Don't let anyone tell you differently!

Great PCPs won't allow substandard allergy care to creep into their practices. Others don't even know it is happening. Some work in large groups and are not aware of business contracts with outside vendors or how they work.

## Say NO to Rotten Pork

No one should be using our children or loved ones as healthcare piggy banks.

AANMA led the national charge for schoolchildren to now carry and use asthma inhalers and epinephrine auto-injectors, but it was your surge that ultimately made it possible.

With your help, AANMA stopped reimbursement fraud for nebulizer medications that were illegally mass manufactured under the guise of compounding!!

Now with **your** help, it's time to tell FDA "NO!" to asthma and anaphylaxis do-it-yourself diagnosis and treatment!

With **your** help, we can stop fraud and abuse of our families and protect our access to quality asthma and allergy care!

By Nancy Sander and Tonya Winders

Nancy Sander is president and founder of AANMA and Tonya Winders is chief operating officer.

**Related posts:**

1. **Deceptive Allergy Practices**
2. **Shots to Drops?**
3. **FDA proposal threatens access to care for asthma and allergy patients**
4. **A Voice for Patients on Capitol Hill: 2011 Congressional Allergy & Asthma Caucus**





### Information

About AANMA

Publications

FAQs

Health Topics

Advocacy

Press Room

Membership

AANMA Store

Donate

AAT

### Categories

Basics

At Home

At School

Food Allergies

Medications

Blogs

Podcasts

### Archives

July 2014

June 2014

May 2014

April 2014

March 2014

February 2014

January 2014

December 2013

November 2013

October 2013

September 2013

August 2013

### Recent Posts

An ACE Advocate Says: "Get Involved!"

Clearing the Air at Work: How to Identify Occupational Allergies or Asthma

Safe Travels

Women Breathe Free – A New Asthma Program For Women

Melting Away Allergies

AANMA Urges Congress to Ensure Patient Safety, Education

FDA Agenda Addresses OTC Medications

Allergy & Asthma Network Launches Free Prescription Assistance Program

Breathe Easy At Asthma Camp

Allergy and Asthma Day Capitol Hill

Patients, Not Piggy Banks! | Allergy and Asthma Network Mothers of Asthmatics

Donate and help the cause! · Join AANMA · Privacy · Contact · RSS Feed

sitemeter

# EXHIBIT

# C

Deceptive Allergy Practices | Allergy and Asthma Network Mothers of Asthmatics

**Allergy & Asthma Network**
Mothers of Asthmatics

**EXHIBIT**
**C**
_____

Search    Go

Home | About AANMA | Publications | FAQs | Health Topics | Advocacy | Press Room | Membership | AANMA Store | Donate
All Articles | Basics | At Home | At School | Food Allergies | Medications | Blog | Patients

## Deceptive Allergy Practices

share  share  share  share   share  share  · Print This Page

### Deceptive allergy testing and immunotherapy schemes

Has a new allergy testing and immunotherapy scheme moved into your town?

Deceptive allergy testing and immunotherapy schemes sweeping country put patients at risk and fleece government and private insurance.

How does it happen? Read more here:

Allergy & Asthma Network Mothers of Asthmatics is hosting the 17th annual Allergy & Asthma Day Capitol Hill on May 7, 2014. We are asking Congress to put a stop to this practice and put asthma and anaphylaxis care back on track with patient-centered care.

## More news:

"Nashville Man Allegedly Impersonated a Doctor, Treated Over 1,000 Patients, and Wrongfully Disclosed Their Health Information"

Department of Health and Human Services, Office of the Inspector General Advisory Opinion

## GET INVOLVED – What you can do:

- If you or anyone you know run into this in your physician's office, report it to the OIG healthcare fraud line:  http://oig.hhs.gov/fraud/report-fraud/index.asp or 1-800-HHS-TIPS  (1-800-447-8477  ).
  Send a copy of your report to AANMA at advocacy@aanma.org.
- Join AANMA to support our advocacy efforts and keep up to date on issues that affect you and your family. You'll receive our award-winning newsletter and magazine straight to your mailbox, as well as e-mail alerts about ongoing issues.
- Share information on this issue with friends, family and medical care providers. Print out copies of these articles or send them links to this website.
- Bookmark AANMA's website, www.aanma.org, and this Advocacy page and check it often for updated information on this issue and on Allergy & Asthma Day Capitol Hill 2013.



Video Today | Popular



**FREE PRESCRIPTION ASSISTANCE PROGRAM**

Compliments of:

Allergy & Asthma N E T W O R K

**CLICK HERE**

**Join AANMA Today!**

Join The AANMA Family Allergy & Asthma Decision Mapping Project

**Anaphylaxis Community Experts (ACEs)**


**Nuevo en Español**

Deceptive Allergy Practices | Allergy and Asthma Network Mothers of Asthmatics



### Information

About AANMA

Publications

FAQs

Health Topics

Advocacy

Press Room

Membership

AANMA Store

Donate

AAT

### Categories

Basics

At Home

At School

Food Allergies

Medications

Blogs

Podcasts

### Archives

July 2014

June 2014

May 2014

April 2014

March 2014

February 2014

January 2014

December 2013

November 2013

October 2013

September 2013

August 2013

### Recent Posts

An ACE Advocate Says: "Get Involved!"

Clearing the Air at Work: How to Identify Occupational Allergies or Asthma

Safe Travels

Women Breathe Free – A New Asthma Program For Women

Melting Away Allergies

AANMA Urges Congress to Ensure Patient Safety, Education

FDA Agenda Addresses OTC Medications

Allergy & Asthma Network Launches Free Prescription Assistance Program

Breathe Easy At Asthma Camp

Allergy and Asthma Day Capitol Hill

Donate and help the cause! - Join AANMA - Privacy - Contact - 🔲 RSS feed

# Exhibit 6

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | |
|---|---|
| Academy of Allergy & Asthma in Primary Care, et al | ) |
| _Plaintiff_ | ) |
| v. | ) |
| American Academy of Allergy, Asthma & Immuniology, et al | ) |
| _Defendant_ | ) |

Civil Action No.  5:14-35-OLG

(If the action is pending in another district, state where: _____ )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Phadia Laboratory Systems
C/O Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas  78701

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: AAAPC and UAS request that you produce documents and things identified in "ATTACHMENT A" to the subpoena at 10:00 a.m. on August 15, 2014 at the offices of Bracewell & Giuliani LLP, (Attention Casey Low) 111 Congress Avenue, Suite 2300, Austin, Texas 78701 or a location and time to be mutually agreed upon.

| Place:  Bracewell & Giuliani LLP 111 Congress Avenue, Suite 2300 Austin, Texas 78701 | Date and Time: 08/15/2014 10:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___07/16/2014___

CLERK OF COURT

OR

_____
Signature of Clerk or Deputy Clerk

/s/ Casey Low
_____
Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  Academy of Allergy & Asthma in Primary Care and  United Biologics, LLC _____, who issues or requests this subpoena, are:

Casey Low, Bracewell & Giuliani, LLP, 111 Congress Avenue, Suite 2300, Austin, Texas 78701  512-542-2109

Civil Action No.  5:14-35-OLG

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

◻ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

◻ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*

                                                    _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT A

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, you are hereby subpoenaed to produce, on or before the date designated in the subpoena, the documents described herein.

## DEFINITIONS

1.  The term "You," "Your," or "Phadia" shall mean Phadia Laboratory Systems, and all predecessors, successors, parents, subsidiaries, divisions, partnerships and affiliates thereof, any joint ventures to which it is party, and all present and former officers, directors, employees, agents, attorneys and other persons acting on its behalf.

2.  The term "communication(s)" shall be interpreted in accordance with Western District of Texas Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

3.  The term "document(s)" shall be interpreted in accordance with Western District of Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

4.  The term "non-board-certified-allergist" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified-allergist" shall refer to those physicians who have obtained such certification or are eligible for the certification.

#4624678

5.      "This Litigation" refers to the above-captioned case and the events giving rise thereto.

6.      The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

7.      The term "AAAPC" shall mean Plaintiff Academy of Allergy & Asthma in Primary Care, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

8.      The term "Individual Defendants" shall mean those individuals named in the above-captioned case, specifically Donald Aaronson, MD; Gary Gross, MD; Lyndon E. Mansfield, MD; James Sublett, MD; and David Weldon, MD.

9.      The term "TAAIS" shall mean the Texas Allergy, Asthma and Immunology Society, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

10.     The term "Allergy Companies" shall mean companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology. "Allergy Companies" includes, without limitation, UAS.

11.     The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.     The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.     The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting

or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14.     The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15.     The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16.     The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity.

17.     The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter found at Docket No. 12-29.

18.     References to specific individuals or physicians includes their respective current and former businesses, professional associations, partnerships, corporations, partners, affiliates, employees, agents, attorneys, and/or representatives.

19.     References to specific public and private entities such as practice groups, governmental agencies, or insurance companies includes their current and former officers, directors, representatives, employees, agents, attorneys, parents, subsidiaries, and/or affiliates.

20.     The term "produce" means to produce the responsive documents that are in Your possession, custody, or control, and includes those documents in Your constructive possession or in which you have a superior right to compel the production from any other person, for copying and inspection. Unless otherwise

stated, You should produce documents in response to each request from January 2011 to present.

21.    The term "ESI" means electronically stored information including, but not limited to, information electronically, magnetically or optically stored as: (a) digital communications *(e.g.,* email, voice mail, instant messaging); (b) word processed documents *(e.g.,* Word or WordPerfect documents and drafts); (c) spreadsheets and tables *(e.g.,* Excel or Lotus 123 worksheets); (d) accounting application data (e.g., QuickBooks, Money, Peachtree data files); (c) image and facsimile files *(e.g.,* PDF, TIFF, JPG, GIF images); (f) sound recordings *(e.g.,* WAV and MP3 files); (g)video and animation *(e.g.,* AVI and MOV files); (h) databases *(e.g.,* Access, Oracle, SQL Server data, SAP); (i) electronic mail, contact and relationship management data *(e.g.,* Outlook, Maximizer, ACT!), including any deleted emails or any other emails resident on any servers or computers; (j) calendar and diary application data *(e.g.,* Outlook PST, Yahoo, blog tools); (k) online access data *(e.g.,* temporary internet files, history, cookies); (l) presentations *(e.g.,* PowerPoint, Corel Presentations); (m) network access and server activity logs; (n) project management application data; (o) computer-aided design/drawing files; and (q) back-up and archival files *(e.g.,* ZIP, GHO). ESI shall be produced (with metadata intact) in the format specified in the Instructions set forth below.

22.    The term "metadata" means system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, dates of creation and last modification or access, number of attachments, and document type *(i.e.* email, attachment, etc.). Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail (including deleted emails), metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, Sent Date, Time Sent, CC, BCC and Body fields.

23.    The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

24.    The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

#4624678

25.     The terms "related to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Western District of Texas Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

26.     The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

27.     The term "copy," or one of its derivatives, means and refers to any reproduction in any form whatsoever, including but not limited to transmissions over a network, printouts, or screenshots.

28.     "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

1.      All documents and communications related to Your relationship with AAAAI, ACAAI, JCAAI, Lyndon E. Mansfield, M.D., P.A., a professional association, or the Individual Defendants.

2.      All documents and communications with any person acting or purporting to act on behalf of AAAAI, ACAAI, JCAAI, Lyndon E. Mansfield, M.D., P.A., a professional association, or the Individual Defendants relating to this Litigation, allergy testing and/or allergen immunotherapy, primary care physicians, AAAPC, or UAS.

3.      All documents and communications with any person acting or purporting to act on behalf of Superior HealthPlan relating to this Litigation, allergy testing and/or allergen immunotherapy, primary care physicians, AAAPC, or UAS.

4.      All documents and communications with any person acting or purporting to act on behalf of any third-party payor relating to this Litigation, allergy testing and/or allergen immunotherapy, primary care physicians, AAAPC, or UAS.

5.      All documents and communications related to the use of in vitro testing for allergy testing, including its use by You in primary care physicians' offices to refer patients to board-certified allergists.

6.      All documents and communications relating or referring to the "remote practice of allergy," "RPA," or "remote allergy."

7.     All documents and communications relating or referring to reimbursement or payment of claims to physicians practicing allergy or immunology who are not board-certified allergists.

8.     All documents and communications relating or referring to Allergy Companies.

9.     Any documents and communications relating or referring to "United Biologics," United Allergy Services," "UAS," "United Allergy Labs," and/or "UAL."

10.     Any documents sufficient to establish the membership of Phadia's Advisory Board for the past five years.

11.     Any documents and communications of the Phadia Advisory Board relating or referring to the "remote practice of allergy" or "remote allergy," "UAS," "Allergy Companies," primary care physicians, or "AAAPC."

12.     All documents and communications with any person acting or purporting to act on behalf of the Texas Medicaid & Healthcare Partnership (TMHP), Parkland Community Health Plan, El Paso First, and any other managed care organization in Texas relating to this Litigation, allergy testing and/or allergen immunotherapy, primary care physicians, AAAPC, or UAS.

#4624678

# Exhibit 7

| From: | Bernell, Ben |
|---|---|
| To: | Farrell, Ted; Low, Casey; Anthony.DiResta@hklaw.com |
| Cc: | Marcum, Liz; Hamm, Kira; Gartman, Cody |
| Subject: | RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division |
| Date: | Thursday, January 29, 2015 9:42:04 AM |

Ted/Tony,

Hope all's well.

I write concerning two issues.

First, we still haven't heard anything concerning the redacted/withheld documents set forth in paragraph 2 below. It's been about two weeks, please advise.

Second, we ask that you de-designate the following documents from your production:

- AAN0003651-52
- AAN0003906-08
- AAN0003909
- AAN0003898-99
- AAN0003900-01
- AAN0003656-3662
- AAN0006285
- AAN0006254

These documents (and indeed, all of the documents you produced) are currently marked "Confidential," but we do not believe they meet the designation criteria of section 3(b) of the Protective Order. However, they're your documents, and to the extent you do not de-designate them, we will either seek assistance from the Court to de-designate them by Motion or simply file them under seal. As to this second issue, please advise as soon as possible, as we anticipate using such documents in a filing tomorrow. If we don't hear back from you, we'll simply file them under seal.

Thanks,

Ben

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Friday, January 16, 2015 4:39 PM
**To:** Bernell, Ben; DiResta, Anthony E.; Low, Casey
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Ben,

Your renewed threat of sanctions is neither appreciated nor professional. If the concerns raised in your message are material please have Casey contact Tony directly as we may need to reschedule the deposition that is set for February 13th.

Please see my responses to your particular points below.

Best,

Ted

Ted/Tony,

With regard to the issue set forth in paragraph 1, we are simply asking whether or not you or your client have withheld letters that were actually sent. We are entitled to know this prior to a deposition. If you or your client did not withhold such documents (i.e., you are representing to us that the form letters were never finalized and sent), please let us know plainly, clearly, and in writing.

Response: Our production consists of responsive, non-privileged documents within the possession, custody or control of AAN that were identified based on the agreed upon search terms contained in my November 12, 2014 email. We have not withheld letters that were actually sent.

On the other hand, if for some reason you or your client has decided to withhold such documents, please let us know that plainly, clearly, and in writing and please also let us know your basis for any such withholding. Otherwise we will have no choice but to seek Court relief and will likely also seek sanctions. Your refusal to substantively address this issue in your email below is especially troubling in light of our now lengthy correspondence on this issue and the statements made in your email dated November 20 that should you uncover communications with third party payors, you would produce such documents or let us know why you would refuse such a refusal. We find it difficult to understand why drafts of such correspondence would be responsive, but final, as-sent correspondence (if any) would not be.

With regard to the issue set forth in paragraph 2, the documents redacted and/or that have been withheld as non-responsive include the following:

AAN0000001
AAN0000002
AAN0000006
AAN0000008
AAN0000015
AAN0000017
AAN0000023
AAN0003994 (AAN0003995 is blank and might be part of the same redaction; it is unclear to us)
AAN0003996 (AAN0003997 is blank and might be part of the same redaction; it is unclear to us)
AAN0003998 (AAN0003999-4001 are blank and might be part of the same redaction; it is unclear to us)
AAN0004002
AAN0004003
AAN0005658
AAN0005702
AAN0005740

Please let us know the basis for your redactions and withholdings of these documents such that we can evaluate whether your redaction/withholdings are proper and can seek Court relief, if necessary.

Response: We will review and respond accordingly.

With regard to the issues set forth in paragraph 3 and 4, please simply let us know whether your will gather the additional documents we requested below. These are your client's documents, so you obviously have more information than we do on this issue. But from our view, it appears that you might be refusing to gather any additional documents or email outside of those found from running the email search terms, a

th

concern we raised numerous time in our email chain below. Based on your November 20  email, we thought this issue had been resolved, but perhaps we were mistaken and you are indeed refusing to gather documents clearly responsive to the subpoena that may have fallen outside of the search terms.

<u>Response</u>: Our production consists of responsive, non-privileged documents within the possession, custody or control of AAN that were identified based on the agreed upon search terms contained in my November 12, 2014 email.  We will discuss your request with our client and respond accordingly.

With regard to the issue set forth in paragraph 5, we are missing complete metadata for all of the documents you provided. That is, no document appears to have been transmitted to us with complete metadata files. The files you provided were merely in PDF format, with no load file or other document that would contain the metadata for the documents produced. To the extent it is in you or your client's possession, please provide the metadata for all documents you produced or produce in the future.

<u>Response</u>: We will check with our technical team to see if such metadata is available.  Please be mindful that a good deal of the production comes from paper files, for which no metadata would be available.

Please let us know your stances on the above concerns as soon as possible. Thanks,

Ben

**Ted Farrell**
**Associate**
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC 20006-3817
D: +1 (202) 282-5383
F: +1 (202) 282-5100
Bio | VCard | Email | winston.com

WINSTON
& STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Friday, January 16, 2015 4:43 PM
**To:** Farrell, Ted; DiResta, Anthony E.; Low, Casey
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Ted/Tony,

With regard to the issue set forth in paragraph 1, we are simply asking whether or not you or your client have withheld letters that were actually sent. We are entitled to know this prior to a deposition. If you or your client did not withhold such documents (i.e., you are representing to us that the form letters were never finalized and sent), please let us know plainly, clearly, and in writing.

On the other hand, if for some reason you or your client has decided to withhold such documents, please let us know that plainly, clearly, and in writing and please also let us know your basis for any such withholding. Otherwise we will have no choice but to seek Court relief and will likely also seek sanctions. Your refusal to substantively address this issue in your email below is especially troubling in light of our now lengthy correspondence on this issue and the statements made in your email dated November 20

that should you uncover communications with third party payors, you would produce such documents or let us know why you would refuse such a refusal. We find it difficult to understand why drafts of such correspondence would be responsive, but final, as-sent correspondence (if any) would not be.

With regard to the issue set forth in paragraph 2, the documents redacted and/or that have been withheld as non-responsive include the following:

AAN0000001
AAN0000002
AAN0000006
AAN0000008
AAN0000015
AAN0000017
AAN0000023
AAN0003994 (AAN0003995 is blank and might be part of the same redaction; it is unclear to us)
AAN0003996 (AAN0003997 is blank and might be part of the same redaction; it is unclear to us)
AAN0003998 (AAN0003999-4001 are blank and might be part of the same redaction; it is unclear to us)
AAN0004002
AAN0004003
AAN0005658
AAN0005702
AAN0005740

Please let us know the basis for your redactions and withholdings of these documents such that we can evaluate whether your redaction/withholdings are proper and can seek Court relief, if necessary.

With regard to the issues set forth in paragraph 3 and 4, please simply let us know whether your will gather the additional documents we requested below. These are your client's documents, so you obviously have more information than we do on this issue. But from our view, it appears that you might be refusing to gather any additional documents or email outside of those found from running the email search terms, a concern we raised numerous time in our email chain below. Based on your November 20th email, we thought this issue had been resolved, but perhaps we were mistaken and you are indeed refusing to gather documents clearly responsive to the subpoena that may have fallen outside of the search terms.

With regard to the issue set forth in paragraph 5, we are missing complete metadata for all of the documents you provided. That is, no document appears to have been transmitted to us with complete metadata files. The files you provided were merely in PDF format, with no load file or other document that would contain the metadata for the documents produced. To the extent it is in you or your client's possession, please provide the metadata for all documents you produced or produce in the future.

Please let us know your stances on the above concerns as soon as possible. Thanks,

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Friday, January 16, 2015 1:58 PM
**To:** Bernell, Ben; DiResta, Anthony E.; Low, Casey
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Casey and Ben,

We have reviewed your message received yesterday afternoon and have provided detailed responses below.

As you know, AAN is a non-profit advocacy organization with very limited resources. We have made a good faith effort to comply with the subpoena, and have provided all responsive, non-privileged documents that were identified based on the agreed upon search terms memorialized in my November 12, 2014 email.

Please give me a call if you would like to discuss.

Best,

Ted

1. AAN's production appears to include a variety of "form" letters that appear to have been prepared to be sent to third party payor medical directors and/or primary care physicians. However, no actual, addressed-and-sent correspondence appears to have been produced.
    a. For example, AAN0005419 appears to be a form letter to medical directors specifically referencing AAAPC and billing code issues that go to the heart of this litigation, and AAN0005422, appears to have either been sent to primary care physicians and/or as a follow-up to some earlier correspondence (it is unclear whether the earlier correspondence referenced in AAN0005422 is AAN0005419 or any of the other, similar form letters produced).
    b. Your production has several versions of similar form correspondence (see AAN0004483, AAN0004494-95, AAN0005176, AAN0005384, etc.).
    c. For all such form letters, no actual, addressed-and-sent correspondence appears to have been produced.
    d. We request all versions of these letters as-sent and any documents referenced therein, and any documents or correspondence concerning the same, be produced immediately.

   **Winston Response**: Our production consists of responsive, non-privileged documents within the possession, custody or control of AAN that were identified based on the agreed upon search terms contained in my November 12, 2014 email. Your note above presupposes certain facts that are the proper subject of a deposition question.

2. Several documents appear to have improper redactions (see, e.g., AAN0000001-02) whereas others have been "withheld as non-responsive" (see, e.g., AAN0004002-03). Please provide an explanation for these redactions and withholdings as soon as possible.

   **Winston Response**: Could you please send a complete list of the documents that you believe "appear to have improper redactions." Once we have such a list we will be happy to review each of them and respond appropriately.

3. AN0002457-58 references an email Nancy Sander appears to have sent to an "Alan"

(presumably Alan Leahigh). This email was not produced, and we ask that it be produced as soon as possible.

**Winston Response**: Our production consists of responsive, non-privileged documents within the possession, custody or control of AAN that were identified based on the agreed upon search terms contained in my November 12, 2014 email.

4. There also appears to be wide variety of documents and/or communications discussed in or alluded to in the documents produced that have been withheld.
   a. For example, AAN0003653 details a "Remote Practice of Allergy" update that itself references an array of communications and likely communications that do not appear to have been produced.
      i. The pertinent, apparently unproduced documents are littered throughout AAN0003653 and include documents/communications concerning discussions as to "primary care education and letter of support to be secured by Oct 1" and "discussion regarding BCBS TN"; documents/communications concerning discussions as to Dr. Cox's interest "in RPA strategy and agree[ment that] payers are the key to stopping this behavior" and goal "to limit 95004 reimbursement to board certified allergists"; documents/communications concerning a variety of references to UAL (UAS's predecessor d/b/a title); documents/communications with Dr. John Meiser concerning his role "on the board of TX allergy society" and his "excite[ment] about RPA strategy"; documents/communications with Dr. Souza concerning his stance as "very pro allergist and opposed to PCP use and RPA," including a follow-up scheduled for September; documents/communications concerning four Medical Edge McKinney doctors "not adopting UAL program"; documents/communications a discussion of "fraudulent billing" and home immunotherapy.
   b. Instead of detailing a list such as that above for every document, we simply ask that you ask your client to gather and produce all documents related to the following documents you did produce:
      i. AAN0003653 (discussed above);
      ii. AAN0004456 (re: a Greer-related death);
      iii. AAN0004467 (re: a "media opportunity" concerning alleged fraud in allergy testing and immunotherapy);
      iv. AAN0004434 (re: a National Association of Attorney General fraud alert and evidence apparently provided to the US Attorney General's office in Houston, TX, among other things);
      v. AAN0004418 (re: our clients' CEO and CMO)

**Winston Response**: Our production consists of responsive, non-privileged documents within the possession, custody or control of AAN that were identified based on the agreed upon search terms contained in my November 12, 2014 email.

5. Finally, due to the nature of your production, it appears that the document metadata was lost, and we cannot identify the author, date of creation, etc. for a wide variety of documents (see, e.g., the AAN0003653 document discussed above). We thus ask that you produce these documents in an appropriate format that preserves the metadata

associated with the documents produced or otherwise provide the metadata for your production and any future supplementation.

**Winston Response**: Please provide a list of documents for which "it appears the document metadata was lost" and I will check with our technical team to see if such metadata is available. Please be mindful that a good deal of the production comes from paper files, for which no metadata would be available.

**Ted Farrell**

**Associate**

Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC 20006-3817

D: +1 (202) 282-5383

F: +1 (202) 282-5100

Bio | VCard | Email | winston.com

WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Thursday, January 15, 2015 4:29 PM
**To:** DiResta, Anthony E.; Low, Casey; Farrell, Ted
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Ted/Tony,

We have received and reviewed AAN's recent production and have a few follow-up questions/issues.

1.  AAN's production appears to include a variety of "form" letters that appear to have been prepared to be sent to third party payor medical directors and/or primary care physicians. However, no actual, addressed-and-sent correspondence appears to have been produced.
    a.  For example, AAN0005419 appears to be a form letter to medical directors specifically referencing AAAPC and billing code issues that go to the heart of this litigation, and AAN0005422, appears to have either been sent to primary care physicians and/or as a follow-up to some earlier correspondence (it is unclear whether the earlier correspondence referenced in AAN0005422 is AAN0005419 or any of the other, similar form letters produced).
    b.  Your production has several versions of similar form correspondence (see AAN0004483, AAN0004494-95, AAN0005176, AAN0005384, etc.).
    c.  For all such form letters, no actual, addressed-and-sent correspondence appears to have been produced.
    d.  We request all versions of these letters as-sent and any documents referenced therein, and any documents or correspondence concerning the same, be produced immediately.

2.  Several documents appear to have improper redactions (see, e.g., AAN0000001-02) whereas others have been "withheld as non-responsive" (see, e.g., AAN0004002-03). Please provide an explanation for these redactions and withholdings as soon as possible.

3.  AN0002457-58 references an email Nancy Sander appears to have sent to an "Alan" (presumably

Alan Leahigh). This email was not produced, and we ask that it be produced as soon as possible.

4.  There also appears to be wide variety of documents and/or communications discussed in or alluded to in the documents produced that have been withheld.

    a.  For example, AAN0003653 details a "Remote Practice of Allergy" update that itself references an array of communications and likely communications that do not appear to have been produced.

        i.  The pertinent, apparently unproduced documents are littered throughout AAN0003653 and include documents/communications concerning discussions as to "primary care education and letter of support to be secured by Oct 1" and "discussion regarding BCBS TN"; documents/communications concerning discussions as to Dr. Cox's interest "in RPA strategy and agree[ment that] payers are the key to stopping this behavior" and goal "to limit 95004 reimbursement to board certified allergists"; documents/communications concerning a variety of references to UAL (UAS's predecessor d/b/a title); documents/communications with Dr. John Meiser concerning his role "on the board of TX allergy society" and his "excite[ment] about RPA strategy"; documents/communications with Dr. Souza concerning his stance as "very pro allergist and opposed to PCP use and RPA," including a follow-up scheduled for September; documents/communications concerning four Medical Edge McKinney doctors "not adopting UAL program"; documents/communications a discussion of "fraudulent billing" and home immunotherapy.

    b.  Instead of detailing a list such as that above for every document, we simply ask that you ask your client to gather and produce all documents related to the following documents you did produce:

        i.  AAN0003653 (discussed above);

        ii.  AAN0004456 (re: a Greer-related death);

        iii.  AAN0004467 (re: a "media opportunity" concerning alleged fraud in allergy testing and immunotherapy);

        iv.  AAN0004434 (re: a National Association of Attorney General fraud alert and evidence apparently provided to the US Attorney General's office in Houston, TX, among other things);

        v.  AAN0004418 (re: our clients' CEO and CMO)

5.  Finally, due to the nature of your production, it appears that the document metadata was lost, and we cannot identify the author, date of creation, etc. for a wide variety of documents (see, e.g., the AAN0003653 document discussed above). We thus ask that you produce these documents in an appropriate format that preserves the metadata associated with the documents produced or otherwise provide the metadata for your production and any future supplementation.

Thanks,

Ben

---

**From:** DiResta, Anthony E. [mailto:ADiResta@winston.com]
**Sent:** Thursday, January 08, 2015 11:36 AM
**To:** Low, Casey; Bernell, Ben; Farrell, Ted
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

I will do my best to give you a call later today, but how is your schedule tomorrow

morning?  Sorry to sound so difficult; that is not my intent.
    Thanks.

    **Anthony E. DiResta**
    **Partner**
    Winston & Strawn LLP
    1700 K Street, N.W.
    Washington, DC 20006-3817

    D: +1 (202) 282-5782
    M: +1 (202) 415-2772
    **Experience and Accomplishments**

    Bio | VCard

    WINSTON
    &STRAWN
    LLP

---

**From:** Low, Casey [mailto:Casey.Low@bgllp.com]
**Sent:** Thursday, January 08, 2015 12:33 PM
**To:** DiResta, Anthony E.; Bernell, Ben; Farrell, Ted
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Tony,

Is there any way we can talk today or you gave me a sense of the difficulties?

Casey

---

**From:** DiResta, Anthony E. [mailto:ADiResta@winston.com]
**Sent:** Wednesday, January 07, 2015 5:38 PM
**To:** Bernell, Ben; Farrell, Ted; Low, Casey
**Cc:** Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

    Ben, thanks for sending; and I hope all of you had a terrific holiday season and a good new year celebration.
    Casey:  I'll be calling you directly in the next couple of days concerning the January 26 date, as some scheduling difficulties have arisen.
    Let's plan on touching base no later than Friday, as I clarify some matters.
    Thanks,
    Tony

    **Anthony E. DiResta**
    **Partner**
    Winston & Strawn LLP
    1700 K Street, N.W.
    Washington, DC 20006-3817

    D: +1 (202) 282-5782
    M: +1 (202) 415-2772
    **Experience and Accomplishments**

    Bio | VCard



**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Wednesday, January 07, 2015 6:34 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira; Gartman, Cody
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Ted, Tony,

Apologies for the delay.

Attached please find a formal subpoena for the AAN deposition on the 26th. As discussed, the topics in the 30(b)(6) notice mirror those set forth in the document subpoena, plus a topic for authentication. We also subpoenaed Mrs. Winders in her individual capacity under the presumption she will be your witness (or at least among your witnesses, if you have more than one). Of course, please also let us know if someone other than Mrs. Winders will be serving as a witness, and please let us know if you have any questions or concerns.

Otherwise we'll see you in a few weeks. Thanks,

Ben

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Thursday, December 04, 2014 1:04 PM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division

Ben,

We have the 26th of January marked on our calendar and are happy to host the 30(b)(6) deposition of AAN at our offices in Washington.

You can use our office address below for the deposition notice:

1700 K Street, NW
Washington, DC 20016

Thanks.

Ted

**Ted Farrell**
Associate
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383

F: +1 (202) 282-5100

winston.com

WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Thursday, December 04, 2014 12:31 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ted,

We've touched base with opposing counsel and 1/26 works. We presume you might prefer to host the
deposition at your offices, but we can host in our DC Office (near Washington Circle Park/ on K St NW) or
elsewhere if you'd like. Please let us know an address that works for your client and we'll generate a
formal notice. Thanks again,

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Tuesday, December 02, 2014 12:39 PM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ben,

The following dates would work for a 30(b)(6) deposition of the corporate representative for AAN:

January 26, 28, 29 or 30.

Please let us know if any of those dates work and we will get the date on the calendar.

Thanks.

Ted

**Ted Farrell**
**Associate**
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com

WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Monday, December 01, 2014 5:18 PM

**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

We can generate a more specific 30(b)(6) shortly, but the deposition topics will cover the document topics set forth on pdf pages 8-11 of the attached as well as questions about the documents produced and authenticity of the same.

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Monday, December 01, 2014 4:13 PM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

I hope that you and everyone on the Bracewell team had a good holiday.

We are in the process of trying to identify dates that would work.

In the meantime, could you please send us a list of the topics you plan to cover so we can make sure we can put forth a corporate representative able to testify on behalf of AAN for each topic.

Thanks.

Ted

**Ted Farrell**
Associate
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com

# WINSTON
# &STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Monday, December 01, 2014 4:31 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted/Tony,

Hope you had a nice Thanksgiving. Just following up to see when we might be able to schedule a deposition. Please advise once you've received feedback from your client. Thanks,

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Tuesday, November 25, 2014 11:19 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

We will get back to you with some proposed dates next week.

Enjoy the holiday.

Ted

**Ted Farrell**
**Associate**
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com

WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Monday, November 24, 2014 3:23 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted, Tony,

Thanks for the first batch of production, and we look forward to receiving addition email production soon.

With documents production in mind, we'd like to set up an AAN deposition either mid to late December or early January at the very latest. We will send 30(b)(6) topics after we nail down a date, but the 30(b)(6) topics will effectively mirror the topics set forth in the document subpoena (and we'll of course likely ask questions re: documents production and authenticity of the same).

Please let us know what dates work and who we can expect to depose. We presume it will be Tonya Winders, but will of course take you/your client's lead on that issue. Thanks,

Ben

**From:** Bernell, Ben
**Sent:** Thursday, November 20, 2014 10:03 AM
**To:** 'Farrell, Ted'; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira

**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Thanks for clarifying Ted, and apologies is any of my comments came of as untoward. Sometimes this job feels like chasing ghosts, if you know what I mean.

Ben

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Thursday, November 20, 2014 8:43 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

Your multiple insinuations that we are somehow acting improperly is unprofessional, unnecessary and worthy of memorializing. *See* B. Bernell email to T. Farrell and C. Low 11/13/2014 ("we can't agree to any party, including a third party 'carving around' certain documents they know are responsive, but that based on carefully crafted search terms, are not upon that for some reason they do not want to produce"); *see also* B. Bernell email to C. Low and T. Farrell 11/18/2014 ("your correspondence stretching back to September is giving us the strong impression that you're merely seeking to delay and avoid production of known relevant documents"); *see also* B. Bernell email to T. Farrell and C. Low 11/18/2014 ("just so I'm clear...(3) you aren't hiding/burying any documents").

Neither Tony nor I would make insinuations of the type you have made regarding our conduct about any attorney practicing at Bracewell & Giuliani.

Your client served a third party subpoena and we filed objections and responses. We had a meet and confer on October 3 where we offered to go through your subpoena request by request, but instead agreed that we would negotiate search terms. We have done so in good faith, and with the professionalism required by us as officers of the court.

On Tuesday I relayed the following to you:

> We will run the search terms outlined in my November 12, 2014 email and begin a rolling production of responsive non-privileged documents based on the review of such documents.

> Additionally, we expect to produce paper documents later this week.

*See* T. Farrell email to B. Bernell and C. Low 11/18/2014. This should clarify points 1 and 2 in your message below. As to question 3, leaving aside your insinuation about "hiding/burying documents" addressed above, we are not aware that our client has had any "communications with third party payors/insurance carriers". Should we uncover such a communication/communications as a part of our reasonable search, we will let you know the stance our client will take as to whether it will produce such a document, and you may then take action as you deem appropriate.

You should be seeing documents in a rolling production very soon.

Best,

Ted

**Ted Farrell**

**Associate**

Winston & Strawn LLP

T: +1 (202) 282-5000

D: +1 (202) 282-5383

F: +1 (202) 282-5100

winston.com

# WINSTON
# &STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Tuesday, November 18, 2014 12:37 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted/Tony,

From your email below and Tony's email earlier today, sounds like we're on the same page and production will begin soon and we can put this behind us. But just so I'm clear, (1) production of paper documents will begin soon, (2) production of documents from the search terms will come sometime shortly thereafter, and (3) you aren't hiding/burying any documents, and any additional documents of which your client is readably aware that are responsive will also be produced. As Casey mentioned below, concerning this third category, we're primarily interested in communications with third party payors/insurance carriers and want to ensure that these documents are produced (if any, of course).

Is the above correct?

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Tuesday, November 18, 2014 10:35 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

From the outset of this process it has been our goal to produce responsive, non-privileged documents, in a way that will satisfy reasonable, non-objectionable third party requests, while at the same time protecting our third party, non-profit entity client from an undue burden.

Following our October 3rd meet and confer, we received your initial proposed search terms on October 6th.

Since receiving your proposed search terms, we have negotiated fairly in the series of emails in the chain that you see below. Our "correspondence stretching back to September" has not been designed to "delay and avoid production of known, relevant documents". Instead, we have repeatedly tried to get a

commitment from you and your clients that the search terms we have negotiated with you over the last month will be deemed a sufficient response to the subpoena.

Our document collection and the search terms that we have negotiated with you in good faith comply with our obligation to perform a reasonable search.  We will run the search terms outlined in my November 12, 2014 email and begin a rolling production of responsive non-privileged documents based on the review of such documents.

Additionally, we expect to produce paper documents later this week.

Best,

Ted

**Ted Farrell**

**Associate**

Winston & Strawn LLP

T: +1 (202) 282-5000

D: +1 (202) 282-5383

F: +1 (202) 282-5100

winston.com

# WINSTON & STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Tuesday, November 18, 2014 11:14 AM
**To:** Low, Casey; Farrell, Ted
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

We still haven't heard back from you and your correspondence stretching back to September is giving us the strong the impression that you're merely seeking to delay and avoid production of known, relevant documents.

Please advise immediately.

If we do not come to an agreement this week, we will seek emergency relief from the Court and attorneys' fees.

Ben

**From:** Low, Casey
**Sent:** Friday, November 14, 2014 11:33 AM
**To:** Bernell, Ben; Farrell, Ted
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

I understand that Ben has been trying to reach you, but perhaps I can just cut to the chase. Are you suggesting that running the search terms will dispense with the subpoena's requirement to produce all hard copy documents, such as faxes and letters, that would not be captured by an electronic search term process? If so, that is problematic.

Otherwise, if you want an assurance that the existence of responsive electronic information may come out later that was not captured by the search terms will not support a sanctions motion or something like that, I'm happy to give you that assurance knowing your suggestion is not an attempt to avoid producing responsive information reasonably known to exist.

I certainly hope this issue is the latter, in which this is really a non-issue and we need to finally put this to bed as the time to respond to the subpoena is long overdue. If the true issue is that your client does not want to produce its faxes and letters to insurance carriers, then we need to discuss how to present that to the Court.

Casey

Casey Low | Partner | Bracewell & Giuliani LLP
111 Congress Avenue Suite 2300 | Austin, Texas | 78701-4061
T: 512.542.2109 | F: 800-404-3970
Casey.Low@bgllp.com | www.bgllp.com

CONFIDENTIALITY STATEMENT
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

---

**From:** Bernell, Ben
**Sent:** Wednesday, November 12, 2014 11:08 AM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

I just called and left a message in this regard. Although I'm attempting to set forth my thoughts here in writing, please give me a call back to discuss. I think we may be talking past each other a bit.

To be clear, I didn't mean to imply in any of my prior communications that we would seek some great number of documents that would not be found from running the search terms we agreed upon. All we've been asking for is that if there are documents of which you or your client are readably aware that are not hit upon by these terms, but that would otherwise be responsive to the subpoena, that they be produced.

We obviously don't have access to your documents and have simply been making best guesses as to what the search terms will bring up. And we appreciate you working with us and think the terms will result in a fairly responsive production without forcing AAN to have gone through a comprehensive, document-by-document, email-by-email review. We understood that to be the reason for your original request to use

search terms – to alleviate an email-by-email review, which can get out of hand pretty quickly.

With that said, you and your client have the ability to view your documents while we've discussed search terms. We do not. And although I don't think you have been doing so, we can't agree to any party, including a third party, "carving around" certain documents they know are responsive, but that based on carefully crafted the search terms, are not hit upon that for some reason they do not want to produce. That's why I can't assure you that the documents found from these search terms would necessarily be sufficient. I would hope they would be, but only you and your client knows your documents.

All this is to say, if there are a handful of documents you or your client knows are responsive to the subpoena, but that aren't necessarily responsive to the search terms, that they be produced. If you or your client is not aware of any such documents, then there shouldn't be a problem. The search terms are the end game. And if you or your client is aware of such documents, then you already know about them and there is no additional burden to producing them. So that's the end game.

We simply want to ensure that certain documents aren't intentionally being buried, and we would be troubled if you couldn't give us that assurance.

So, do we have an agreement – your client runs the terms and produces the non-privileged results, and if there are any additional documents of which they are readably aware that are responsive, that they also be produced? It's not a fishing expedition. We just want an assurance nothing is being buried. If we can get that, AAN can begin production and begin to put the document subpoena and related issues in the rear view mirror.

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Wednesday, November 12, 2014 10:27 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

In light of Tony's text on Friday, we have spoken to our client regarding our offer of search terms and the burdens this process is putting on the organization.

As we have continually stressed throughout this process, our client is a non-profit advocacy organization that is not a party to this litigation. Given this context, we have attempted to be as accommodating as possible. However, speaking practically and bluntly, we must have an end game in mind as we move forward.

As you know, we are willing to review documents captured by the following search terms:

- "Remote practice" OR "remote allergy" OR RPA;
- Strikeforce OR "strike force";
- RADAR;
- Allergy w/10 scheme! OR deceptive OR fraud;
- "United Allergy" or UAS OR UAL;
- Compan! w/10 technician!;
- (Aaronson w/100 (immunotherapy OR fraud OR passthrough OR "pass through");

- (Sublett w/100 (immunotherapy OR fraud OR passthrough OR "pass through");
- (Strauss w/100 (immunotherapy OR fraud OR passthrough OR "pass through"); and
- (Wallen w/100 (immunotherapy OR fraud OR passthrough OR "pass through")
- ("Primary care" OR PCP) w/10 (immunotherapy OR fraud OR passthrough OR "pass through")

These terms cover: (1) the practice at issue, (2) the named plaintiffs, (3) the named defendants, (4) the characterizations of your client's activities that you allege caused them injury and (5) the Internet message boards you claim were used to make representations about your client; and they contemplate the scope and spirit of Rule 26(b), and demonstrate utmost good faith in the conduct of third party discovery practice given the extremely limited resources of our client.

Yet, your statement in your November 7, 2014 email that you cannot "agree that the electronic documents found from a search of those terms will *necessarily* be the only documents AAN is required to produce" gives us pause. It leaves the door wide open to a future claim that AAN's search, review and responses are not enough to satisfy your needs and curiosity. Simply put, as a third party with severely limited economic resources and staffing, we cannot be subject to a fishing expedition.

Therefore, we ask for a clarification: Can you assure us that the responsive and nonprivileged documents produced by these search terms would be sufficient? If not, we will be required to consider other options on how to proceed.

Best,

Ted


**Ted Farrell**
**Associate**
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com


WINSTON
& STRAWN
LLP

From: Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
Sent: Friday, November 07, 2014 11:04 AM
To: Farrell, Ted; Low, Casey
Cc: DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
Subject: RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

We agree to AAN running those terms, and we imagine the results of the search will amount to the bulk of AAN's responsive production.

However, we can't agree that the electronic documents found from a search of those terms will *necessarily* be the only documents AAN is required to produce. The purpose of the search term exchange was to facilitate a convenient search for and production of electronic documents responsive to Plaintiffs' subpoena. We think that has been accomplished.

But if there are responsive documents of which your clients are aware (e.g., communications with third party payors, such as faxes, letters, emails, etc.) that might not happen to be turned up by the search terms, those documents should, of course, also be produced. To be clear, we don't expect or ask your clients to run the search terms and then also do a personal, "deep dive" into their electronic files. Search terms alleviate the electronic "deep dive" process, which as we all know can be sloppy, burdensome, and inconsistent. But the running of search terms do not allow a producing person or entity to fail to produce responsive documents of which they are aware.

We simply expect AAN to produce the results of the search terms (that are not privileged, of course) and any other responsive documents of which they are aware (such as communications with third party payors, such as faxes, letters, emails, etc.). Let us know if we have are in agreement and when we can expect production to begin. Thanks,

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Friday, November 07, 2014 9:40 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

In an effort to end the discussion of search terms, we are willing to review documents captured by the following search terms:

- "Remote practice" OR "remote allergy" OR RPA;
- Strikeforce OR "strike force";
- RADAR;
- Allergy w/10 scheme! OR deceptive OR fraud;
- "United Allergy" or UAS OR UAL;
- Compan! w/10 technician!;
- (Aaronson w/100 (immunotherapy OR fraud OR passthrough OR "pass through");
- (Sublett w/100 (immunotherapy OR fraud OR passthrough OR "pass through");
- (Strauss w/100 (immunotherapy OR fraud OR passthrough OR "pass through"); and
- (Wallen w/100 (immunotherapy OR fraud OR passthrough OR "pass through")
- ("Primary care" OR PCP) w/10 (immunotherapy OR fraud OR passthrough OR "pass through")

Please confirm the following:

1. Your clients and all of their attorneys in this litigation agree that a review of documents captured by the above search terms will be deemed by your clients and all of their attorneys in this litigation to be a sufficient and complete review in response to the third party subpoena served on AAN.

2. Neither your clients nor any of their attorneys in this litigation will seek to require AAN to search for, identify, review or produce any documents that are not captured by any of the search terms above.

Thanks,

Ted

**Ted Farrell**
**Associate**
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com

WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Friday, October 31, 2014 2:46 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Hamm, Kira
**Subject:** RE: Case No: 5:14-CV-0035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ted,

Thanks for speaking this afternoon.

First, I think we're close to closing out the term search discussion. We do believe, per my earlier emails and
as we mentioned on today's call, that the "primary care" terms should be run. With that said, we hope the
following term/limitation can close this out and present almost no additional burden:

("Primary care" OR PCP) w/10 (immunotherapy OR fraud OR passthrough OR "pass through")

Second, we wanted AAN's position as to whether it will produce communications (e.g., letters/faxes) to
third party payors such insurance companies like Blue Cross that might not otherwise be revealed through
the ESI term search. Based on the objections to our subpoena and follow-up correspondence, we're
unclear as to where we stand on this.

Hope to talk early next week. Happy Halloween and have a nice weekend. Thanks,

Ben

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Thursday, October 30, 2014 4:54 PM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-0035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ben,

We have reviewed your proposal and appreciate that you are "simply trying to get a universe
of pertinent documents without creating an undue burden for your client".

With that in mind we are offering to run the following search terms:

- "Remote practice" OR "remote allergy" OR RPA;
- Strikeforce OR "strike force";
- RADAR;
- Allergy w/10 scheme! OR deceptive OR fraud;
- "United Allergy" or UAS OR UAL;
- Compan! w/10 technician!;
- (Aaronson w/100 (immunotherapy OR fraud OR passthrough OR "pass through");
- (Sublett w/100 (immunotherapy OR fraud OR passthrough OR "pass through");
- (Strauss w/100 (immunotherapy OR fraud OR passthrough OR "pass through"); and
- (Wallen w/100 (immunotherapy OR fraud OR passthrough OR "pass through")

Running these terms will mean the burden and expense of review of thousands of documents for AAN.

This proposal is more than fair, will assuredly force AAN to pay for review of many documents that have nothing to do with your claims, and further run up the costs already incurred as you look for documents held by a third party, non-profit advocacy organization.

Please let us know if you are amenable to our proposal. Without finality on the scope of our search, we will not move forward.

Best,

Ted

**Ted Farrell**

**Associate**

Winston & Strawn LLP

T: +1 (202) 282-5000

D: +1 (202) 282-5383

F: +1 (202) 282-5100

winston.com



WINSTON
&STRAWN
LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bgllp.com]
**Sent:** Thursday, October 30, 2014 3:17 PM
**To:** Farrell, Ted; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Counsel,

I don't believe we've heard back from you re: the below. Please advise. Thanks,

Ben

**From:** Bernell, Ben
**Sent:** Tuesday, October 28, 2014 9:40 AM
**To:** 'Farrell, Ted'; Low, Casey
**Cc:** DiResta, Anthony E.'; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ted,

To follow up on our email below, and as it concerns running the term ["primary care" OR "primary care physician" OR PCP w/100 [allergy OR immunotherapy OR fraud OR passthrough OR "pass through"], we wanted to highlight that Request Number 23 specifically seeks documents and communications related to the AAN article entitled "Patients, Not Piggy Banks."

The article, attached as Exhibit B to the subpoena, contains statements such as "Increasingly, patients are unknowingly exposed to less than professional **allergy** testing **immunotherapy** practices and **fraudulent** billing schemes embedded in a growing number of **primary care physician** (PCP) practices throughout the United States." The bolded terms are intended to highlight and exemplify the reason for our request that you run "primary care" term and limiters we proposed. The article goes on to describe a variety of allergy business, without using their specific names, and much of that text would also be responsive to an electronic document search of the "primary care" term and limiters we proposed. We think UAS is one such business; hence the request.

Please let us know if you will add the three terms and limitations set forth in my email below. Again, if there is data to suggest that a search of these terms is overly burdensome, we will gladly discuss such data and limit the terms accordingly. Thanks,

Ben

**From:** Bernell, Ben
**Sent:** Monday, October 27, 2014 2:45 PM
**To:** 'Farrell, Ted'; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American
Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of
Texas, San Antonio Division - Dates for Meet and Co

Ted,

We understand your position, but you still have not provided us with any hit results, so we have no meaningful way of gauging your claims that these terms are overly burdensome or produce a large number of irrelevant hits. But with an eye towards limiting you production, we ask that you take a few limited additional sets of terms back to your client.

- ["primary care" OR "primary care physician" OR PCP **w/100 [allergy OR immunotherapy OR fraud OR passthrough OR "pass through"]**
- Strauss **w/100 [allergy OR immunotherapy OR fraud OR passthrough OR "pass through"]**
- Wallen **w/100 [allergy OR immunotherapy OR fraud OR passthrough OR "pass through"]**

We have explained these terms below, but to reiterate, from the documents we've seen, it appears that certain people have specifically sought to avoid referencing our company by name, and have instead used terms such as "primary care" OR "primary care physician" OR "PCP" when referencing our company and its primary care physician clients. The operative complaint is littered with the term primary care and similar shorthand. And by limiting such usage to being within 100 words of allergy, immunotherapy, fraud, passthrough, or pass through, such a search is surely relevant, and without any data to review, we don't see how it is overly burdensome.

Also, we presume many of Lemanske and Fineman's documents will be revealed by way of the search terms used and we will press the parties in our suit for additional documents. So, with an eye towards limiting the production, we ask that you run the terms beginning with Strauus and Wallen above. As noted below, these individuals have contacted one another and AAN and its principals re: claims that UAS's services and/or the "remote practice of allergy" is unsafe or otherwise implicates a deceptive and/or fraudulent scheme, which is why we're seeking emails and documents containing such terms. We think the limitations make clear the scope of our search and should not produce many irrelevant documents.

In addition to the six terms you've agreed to run, please let us know if you will run the three additional terms above. If you still believe these searches are overly burdensome, please provide some quantitative way by which we can evaluate any such claim.

I believe you understand our position – we are simply trying to get a universe of pertinent documents without creating an undue burden for your client. We think the proposed 9-term search accomplishes that. These terms are meant to be, and in our view clearly are, relevant. If you believe they are overly burdensome, just let us know how many unique hits they produce and we can discuss limitations accordingly. Thanks,

Ben

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Monday, October 27, 2014 8:31 AM
**To:** Bernell, Ben; Low, Casey
**Cc:** DiResta, Anthony E.; Marcum, Liz; Farrell, Ted
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ben,

We share your goal of minimizing AAN's burden while providing a largely representative universe of responsive and relevant documents.

It is with such a goal in mind that we offered to run your proffered search terms:

1. "Remote practice" OR "remote allergy" OR RPA;
2. Strikeforce OR "strike force";
3. RADAR;
4. Allergy w/10 scheme! OR deceptive OR fraud;
5. "United Allergy" or UAS OR UAL; and
6. Compan! w/10 technician!

After reviewing your message, we are additionally willing to run search terms that include Drs. Aaronson and Sublett, named defendants in this matter, fashioned per your suggested limitations.

We propose to add the following search terms:

- Aaronson AND (immunotherapy OR fraud OR passthrough OR "pass through")

- Sublett AND (immunotherapy OR fraud OR passthrough OR "pass through")

With the addition of these searches, we have now offered to produce documents based on 8 sets of search terms that cover the following subjects:

1.  **The Practices at Issue** - ("Remote practice" OR "remote allergy" OR RPA);

2.  **The Named Plaintiffs** - ("United Allergy" or UAS OR UAL);

3.  **The Named Defendants** - (Aaronson AND (immunotherapy OR fraud OR passthrough OR "pass through");

    (Sublett AND( immunotherapy OR fraud OR passthrough OR "pass through")

4.  **The Characterization of your Clients' Activities that you Allege Caused them Injury** -  (Allergy w/10 scheme! OR deceptive OR fraud); (Compan! w/10 technician!)

5.  **The Internet Message Boards which you Allege were Used to Make Communications about the Activities of your Client** -  (RADAR; Strikeforce OR "strike force")

Our offer is more than reasonable given the fact that we are a third party, not for profit advocacy organization.  The search, review and production of this information has already placed a tremendous burden on our client, and will continue to do so for some time.

Please let us know if you are amenable to our proposal.

Without an agreement as to the parameters of our search we do not have authorization from our client to move forward.

Best,

Ted

**Ted Farrell**
**Associate**
Winston & Strawn LLP
T: +1 (202) 282-5000
D: +1 (202) 282-5383
F: +1 (202) 282-5100
winston.com

WINSTON
& STRAWN
    LLP

**From:** Bernell, Ben [mailto:Ben.Bernell@bglip.com]
**Sent:** Wednesday, October 22, 2014 11:58 AM
**To:** Low, Casey; Farrell, Ted
**Cc:** DiResta, Anthony E.; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American

Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted/Anthony,

I write in response to the letter you emailed us yesterday afternoon a few hours after our sending the email below.

We appreciate AAN's willingness to at least run the 6 terms (1) "Remote practice" OR "remote allergy" OR RPA; (2) Strikeforce OR "strike force"; (3) RADAR; (4) Allergy w/10 scheme! OR deceptive OR fraud; (5) "United Allergy" or UAS OR UAL; and (6) Compan! w/10 technician!

However, in your letter, you mentioned that you felt that the remaining 10 terms were overbroad and not sufficiently tailored to lead to relevant materials. That was not at all our intent, and we want to work with you to narrow the terms such that we can come to an agreement as to the document search and production and minimize your client's burden while obtaining a largely representative universe of responsive and relevant documents. With that said, without a sense of how many hits/unique hits a particular term produces, we don't have a meaningful way of evaluating how burdensome a term actually is.

With that in mind, we would like to convene a meet and confer sometime this week to discuss your search and the preliminary results you found.

As we mentioned in our email below, if any particular term is reported as inordinately increasing the hit results, we think it will be helpful to be able to discuss, using concrete data, which terms produce the largest number of unique hits so that we can narrow that term appropriately.

For example, if the term ["primary care" OR "primary care physician" OR PCP] is producing thousands of unique hits, we will want to work with you to provide some limitations and/or modifications to focus the email results and weed out any normal, 'day-to-day' correspondence in which physicians or AAN representatives might reasonably be expected to reference primary care. An example limitation that comes to mind might be ["primary care" OR "primary care physician" OR PCP **w/100 [allergy OR immunotherapy OR fraud OR passthrough OR "pass through"]**. We imagine that a similar modifier/limitation might be able to be applied to a number of the terms you currently feel are overly broad such that the hit results of such search terms will be significantly narrowed.

Also, to quickly respond to some of the other comments in your letter:

- Discovery has revealed that third parties Lemanske, Fineman, Strauss, Wallen, and Allerta have contacted one another and AAN and its principals re: claims that UAS's services and/or the "remote practice of allergy" is unsafe or otherwise implicates a deceptive and/or fraudulent scheme, which is why we are seeking emails and documents containing such terms;
- We are, of course, seeking discovery from Defendants Dr. Aaronson and Dr. Sublett, but if their names result in overly broad hit results from your documents, we can certainly narrow the search terms consistent with the example provided above to reduce the hit count;
- Other terms such as NIH, NHLBI, and OIG are related to the claims made in the lawsuit that Defendants and potentially other persons have attempted to convince those organizations that UAS's services and/or the "remote practice of allergy" is unsafe or otherwise implicates a deceptive and/or fraudulent scheme

Thanks again for your willingness to work with us in regard to this matter, and we hope to come to an

agreement soon so that your client can run the search, produce documents, and return to its normal operations. Please let us know a good time to chat.

Ben

**From:** Bernell, Ben
**Sent:** Tuesday, October 21, 2014 3:12 PM
**To:** Low, Casey; Farrell, Ted
**Cc:** DiResta, Anthony E.; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted/Anthony,

I don't believe we've received any response to our correspondence below that followed our 10/3 meet and confer. Can you please advise re: the status of your document search?

Also, if when running these terms you feel that the responses are too numerous, can you please see whether you have the ability to run a hit report on these terms that reveals the total number of a hits a certain term produces, and more importantly, the unique number of hits a certain term produces (i.e., the number of documents/emails that a term produces that is not produced by way of searching for another term)? If any particular term is reported as inordinately increasing the hit results, we think it will be helpful to be able to discuss which terms produce the largest number of unique hits.

Thanks,

Ben

**From:** Low, Casey
**Sent:** Monday, October 06, 2014 2:52 PM
**To:** Farrell, Ted
**Cc:** DiResta, Anthony E.; Bernell, Ben; Marcum, Liz
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

Thank you for the call on Friday and the productive conversation regarding the subpoena to Allergy and Asthma Network. As we discussed, we have compiled a list of terms based on the requests in the subpoena and I have listed those below.

We look forward to working with you regarding the results. Please do not hesitate to contact us should you have any questions.

Casey

"Remote practice" OR "remote allergy" OR RPA
Strikeforce OR "strike force"
RADAR
"primary care" OR "primary care physician" OR PCP
Allergy w/10 scheme! OR deceptive OR fraud

NHLBI OR NIH

OIG

"United Allergy" or UAS OR UAL

Compan! w/10 technician!

Aaronson

Sublett

Lemanske

Fineman

Strauss

Wallen

Allerta

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Tuesday, September 30, 2014 11:32 AM
**To:** Low, Casey
**Cc:** DiResta, Anthony E.
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Casey,

How about 1 EDT on Friday October 3rd.

If that works please let me know and we will get it on the calendar.

Best,

Ted

### Ted Farrell
**Associate**

Winston & Strawn LLP

T: +1 (202) 282-5000

D: +1 (202) 282-5383

F: +1 (202) 282-5100

winston.com

# WINSTON & STRAWN
LLP

**From:** Low, Casey [mailto:Casey.Low@bgllp.com]
**Sent:** Tuesday, September 30, 2014 12:07 PM
**To:** Farrell, Ted
**Cc:** DiResta, Anthony E.
**Subject:** RE: Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San Antonio Division - Dates for Meet and Co

Ted,

I'm free any time but from 10:30-11:30 central on Thursday and anytime on Friday.

Casey

Casey Low | Partner | Bracewell & Giuliani LLP
111 Congress Avenue Suite 2300 | Austin, Texas | 78701-4061
T: 512.542.2109 | F: 800-404-3970
Casey.Low@bgllp.com | www.bgllp.com

CONFIDENTIALITY STATEMENT
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any
attachments.

---

**From:** Farrell, Ted [mailto:TFarrell@winston.com]
**Sent:** Thursday, September 18, 2014 11:18 AM
**To:** Low, Casey
**Cc:** DiResta, Anthony E.
**Subject:** Case No: 5:14-CV-00035; Academy of Allergy & Asthma in Primary Care, et al v. American Academy of
Asthma, Allergy & Immunology, et al., in the United States District Court for the Western District of Texas, San
Antonio Division - Dates for Meet and Confer

Casey,

Could you please let us know your availability for a meet and confer on either Thursday October 2nd or
Friday October 3rd.

Best,

Ted

**Ted Farrell**
**Associate**

Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC 20006-3817

D: +1 (202) 282-5383

F: +1 (202) 282-5100

Bio | VCard | Email | winston.com



WINSTON
&STRAWN
LLP

The contents of this message may be privileged and confidential. Therefore, if this message has been
received in error, please delete it without reading it. Your receipt of this message is not intended to
waive any applicable privilege. Please do not disseminate this message without the permission of
the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been
received in error, please delete it without reading it. Your receipt of this message is not intended to
waive any applicable privilege. Please do not disseminate this message without the permission of
the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been
received in error, please delete it without reading it. Your receipt of this message is not intended to

waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

Exhibit 10

Message

| | |
|---|---|
| **From:** | "James Sublett" <jsublett@familyallergy.com> [jsublett@familyallergy.com] |
| **Sent:** | 5/17/2011 1:43:24 PM |
| **To:** | Donald Aaronson [doclaw@post.harvard.edu]; Gary Gross [ggross144@earthlink.net] |
| **Subject:** | FW: Topic for Advisory Board |
| **Attachments:** | Remote Allergy letter.doc |

Gary and Don,

I have been asked to serve on the Phadia advisory board. They are trying to repair prior damage done in their relationship with allergists. Much of this was really promoted by labs like Quest to PCPs, but they, I'm sure reaped a benefit.

I have met with Tonya a few times and they are anxious to support efforts against the United Allergy Labs and other similar operations. As you can see, they have also been in contact with AANMA. I'm not sure how they intend to use the letter, but will clarify.

My questions:

1. Do you see any conflict of interest in me serving on their advisory board?
2. Any problem with me giving this type of update at the meeting?
3. Could we sign on to a modified letter or ask them to send it without us, but include AANMA.


JS

**From:** "Winders, Tonya" <tonya.winders@phadia.com>
**Date:** Mon, 16 May 2011 14:44:44 -0500
**To:** James Sublett <jsublett@familyallergy.com>
**Subject:** Topic for Advisory Board

Dear Dr. Sublett,

Thank you again for your participation in the Phadia Specialist Advisory Board! I am confident that this influential, well-versed group will significantly aid in the further development of strategy and provide valuable insight to shape our future.

I was hoping you would be willing to provide a 30-minute presentation on "Update on Joint Council of Allergy and Immunology----Critical Needs/Issues Affecting the Specialist Community & Opportunities for Collaboration with the College and the Academy" on Friday, June 10. 2011. I would like you to discuss the current needs and issues affecting the specialty including the remote practice of allergy, as well as how we may support the efforts of the ACAAI & AAAAI. I am also forwarding you the letter we have discussed to address the remote practice of allergy for your review and comments. AANMA has agreed to support this initiative.

Please let me know if you are willing to lead in this way by the end of business on Tuesday so that I may complete the agenda and distribute it to the board.

Thanks Again,
Tonya

Tonya A. Winders

WDTX-JCAAI-029920

Market Development Team Leader
Phadia US, Inc.
615-300-2569
www.pirllab.com
www.phadia.us

Phadia disclaimer: This e-mail and any attachment may contain information that is legally privileged,
confidential or exempt from disclosure. If you are not the intended recipient, please note
that any dissemination, distribution or copying of this e-mail and/or any of the attachments
is strictly prohibited. Anyone who receives this e-mail in error should notify the sender
immediately by telephone or return e-mail and delete it from his or her computer.

This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

WDTX-JCAAI-029921

# Exhibit 11

Message

| | |
|---|---|
| **From:** | "garyngross@gmail.com" <garyngross@gmail.com> [garyngross@gmail.com] |
| on behalf of | "Gary Gross" <ggross144@earthlink.net> [ggross144@earthlink.net] |
| **Sent:** | 8/21/2011 5:17:39 PM |
| **To:** | James Sublett [jsublett@familyallergy.com] |
| **CC:** | Donald Aaronson [doclaw@doclaw.org] |
| **Subject:** | Re: FW: Meijer Supercenter to Offer MyAllergyTest(R) |

agree. not much we can do. i spoke with one of the medial directors for a local part of a national insurance company about UAL. He said it is very hard to manage CPT codes and also difficult to restrict them to specialists. He realized there is abuse but is more concerned about surgicenters and so forth than allergy testing. i am not sure how to get their attention or how to demonstrate the poor care but sounds like Meijer is a direct to consumer version. would be nice to get some numbers on UAL's profits to show the insurance companies.

On Sun, Aug 21, 2011 at 5:09 AM, James Sublett <jsublett@familyallergy.com> wrote:

Don't think this is really anything we can do about this.

JS

**From:** "Winders, Tonya" <tonya.winders@phadia.com>
**Date:** Fri, 19 Aug 2011 11:39:44 -0500
**To:** Linda Cox <lindaswolfcox@msn.com>
**Cc:** James Sublett <jsublett@familyallergy.com>
**Subject:** RE: FW: Meijer Supercenter to Offer MyAllergyTest(R)

Jim & Linda,

Thank you for this additional insight. Are you all planning to similarly approach Meijers in light of this recent announcement?

This is yet another example of the remote practice of allergy which we believe must be addressed aggressively to preserve the integrity of the specialty and encourage appropriate utilization of available diagnostic tools. As you both know, Phadia is committed to addressing this at various levels with payers, physicians, practice managers, and trade organizations. We would like to work collectively and cooperatively with the allergist community to accelerate this strategy and ensure optimal coordination of care.

Thanks again for the information.

Tonya A. Winders

WDTX-JCAAI-031165

Market Development Team Leader

Phadia US Inc.

615-300-2569

www.pirllab.com

www.phadia.us

**From:** lindacox1955@gmail.com [mailto:lindacox1955@gmail.com] **On Behalf Of** Linda Cox
**Sent:** Thursday, August 18, 2011 9:35 PM
**To:** Winders, Tonya
**Subject:** Re: FW: Meijer Supercenter to Offer MyAllergyTest(R)

Jim and Tonya

This test has been around for awhile and was an active SETTaF 'agenda' item for some
time after someone (? Don Aaronson) brought it to our attention because COSTO was offering it for a short period of
time. Bob Krawicz, the ACAAI SETTaF staff liaison contacted COSTO and learned they. We actually had planned to study
it and compared the results to other assays We actually had a study outline drafted. But Bob Hamilton, a SETTaF
member did some research and found the test results to be valid -see the attached summary letter to SETTaF. The
project was abandoned

On Thu, Aug 18, 2011 at 7:10 PM, Winders, Tonya <tonya.winders@phadia.com> wrote:

Dr. Cox,

I wanted to share an email chain with Dr. Jim Sublett regarding the remote practice of allergy and a recent development
in the Midwest. Meijer Supercenter grocery stores has decided to offer a direct-to-patient allergy screen and the
hyperlink with details is below.

WDTX-JCAAI-031166

I look forward to meeting with you and Dr. Wallace in the near future to discuss how Phadia can help to fight against the many forces of the remote practice of allergy and help to preserve the integrity of the allergy specialty. Please let me know your availability in late September or early October to hold a dinner meeting.

Thanks,

Tonya A. Winders

Market Development Team Leader

Phadia US Inc.

615-300-2569

www.pirllab.com

www.phadia.us

**From:** "Winders, Tonya" <tonya.winders@phadia.com>
**Date:** Thu, 18 Aug 2011 07:31:57 -0500
**To:** James Sublett <jsublett@familyallergy.com>
**Subject:** Re: Meijer Supercenter to Offer MyAllergyTest®

We have been aware of the test and the direct access via online ordering; however, I just learned of the retail marketing agreement and thought you would be interested.

Have a good day!

Tonya A. Winders
Market Development Team Leader
Phadia US Inc.
615-300-2569
www.pirllab.com
www.phadia.us

WDTX-JCAAI-031167

From: James Sublett [mailto:jsublett@familyallergy.com]
**Sent**: Thursday, August 18, 2011 12:08 PM
**To**: Winders, Tonya
**Subject**: Re: Meijer Supercenter to Offer MyAllergyTest®


This has been around a while. The first time I've seen it in the retail market.


JS


**From**: "Winders, Tonya" <tonya.winders@phadia.com>
**Date**: Wed, 17 Aug 2011 23:25:10 -0500
**To**: James Sublett <jsublett@familyallergy.com>
**Subject**: Meijer Supercenter to Offer MyAllergyTest®


Have you heard about this? Double click on the underlined title below for the press release.


Meijer Supercenter to Offer MyAllergyTest®

Source: prweb.com

**ImmuneTech Partnership with Retail Chain Meijer Expands Innovative Allergy Diagnostic Test into Retail Market**


tonyawinders@bellsouth.net sent this using ShareThis.


Phadia disclaimer: This e-mail and
 any attachment may contain information that
 is legally privileged,
confidential or exempt from disclosure. If you
 are not the intended recipient, please note
that any dissemination, distribution or copying of
 this e-mail and/or any of the attachments
is strictly prohibited. Anyone who receives this e-mail in error should notify the sender
immediately by telephone or return e-mail and delete it from his or her computer.


This email, and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended

WDTX-JCAAI-031168

recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

```
Phadia disclaimer: This e-mail and any attachment may contain information that is legally
privileged,
confidential or exempt from disclosure. If you are not the intended recipient, please
note
that any dissemination, distribution or copying of this e-mail and/or any of the
attachments
is strictly prohibited. Anyone who receives this e-mail in error should notify the sender
immediately by telephone or return e-mail and delete it from his or her computer.
```

This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

--
Linda Cox, MD
5333 North Dixie Highway
Ft. Lauderdale, Fl. 33334
office 954-771-0928
cell: 561-306-4219

This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

WDTX-JCAAI-031169

# Exhibit 12

Message
<br>
| | |
|---|---|
| **From**: | tonyawinders@bellsouth.net [tonyawinders@bellsouth.net] |
| **Sent**: | 3/22/2011 8:06:11 PM |
| **To**: | James Sublett [jsublett@familyallergy.com] |
| **Subject**: | Re: APCG - Allergy Practice Consulting Group |

No problem! I know how hectic this is for you. Can we meet for lunch on Fri=ay of next week? I have a clear strategy plan on this remote practice of a=lergy that I would like to get your thoughts on?

Thanks,

Sent on the Sprint® Now Network from my BlackBerry®

-----Original Message-----
From: James Sublett <jsublett@familyallergy.com>
Date: Tue, 22 Mar 2011 10:54:39
To: Tonya Winders<tonyawinders@bellsouth.net>
Subject: Re: APCG - Allergy Practice Consulting Group

Sorry I didn't get by.

Jim Sublett MD
Sent from my iPad

On Mar 19, 2011, at 2:26 PM, "Tonya Winders" <tonyawinders@bellsouth.net> w=ote:

> http://www.allergypractice.com/about/team/default.php
>
> Dr Sublett,
>
> Hope you are enjoying AAAAI! I look forward to battling these remote acce=s allergy providers with you. Come see me at booth 215!
>
> Take care,
> Tonya
>
>
> Sent from my iPad

This email,and any files or attachments transmitted with it contains inform=tion that is confidential and proprietary. This information is intended on=y for the use of the individual(s) and entity(ies) to whom it is addressed= If you are the intended recipient, further disclosures are prohibited wit=out proper authorization. If you are not the intended recipient, any discl=sure, copying, printing, or use of this information is strictly prohibited=and possibly a violation of federal or state law. If you have received thi= information in error, please notify Family Allergy & Asthma immediately a= 502-429-8585 or via email to the sender.

```
<?xml version=.0" encoding=TF-8"?>
<!DOCTYPE plist PUBLIC "-//Apple//DTD PLIST 1.0//EN" "http://www.apple.com/DTDs/PropertyList-1.0.dtd">
<plist version=.0">
<dict>
        <key>date-sent</key>
        1300824371
        <key>flags</key>
        <integer>8590195713</integer>
        <key>original-mailbox</key>
        <string>ews://jsublett%40familyallergy.com@exg5.exghost.com/Inbox/JCAAI/Quackery</string>
        <key>remote-id</key>
        <string>AAMkADUyMjcwNjFlLTAxYWItNDUzZC1hNmRiLWJhMzE2NmM4OGU2MQBGAAAAAAA9IB1BwDnoQ4nXROZxdYOCBwBMNK
3HYTd1TZOx7AEIP+x7AAASXILTAABMNK3HYTd1TZOx7AEIP+x7AAEzdSmrAAA=string>
        <key>subject</key>
        <string>Re: APCG - Allergy Practice Consulting Group</string>
</dict>
</plist>
```

WDTX-JCAAI-042877

# Exhibit 13

Message

| | |
|---|---|
| **From:** | Winders, Tonya [tonya.winders@phadia.com] |
| **Sent:** | 8/17/2011 3:11:21 PM |
| **To:** | James Sublett [jsublett@familyallergy.com] |
| **Subject:** | FW: Jim sublett |

Dear Dr. Sublett,

I am writing to share exciting developments in our strategy to address the =emote practice of allergy in Texas and across the US.

I have spent the last several weeks meeting with physicians throughout Texa= to better understand why and how this process works. I have met with ind=viduals who are participating with United Allergy Labs based in Dallas, as=well as those who are participating with Allerta which is the new name for=APCG based in San Antonio. The largest physician group in the Dallas metro=lex is now mandating its 600+ physicians implement this program.

I would like the opportunity for us to speak live so I can share what we ha=e learned and our continued actions to stop this threat to the integrity o= the speciality of allergy and immunology.

This strategy includes a multifaceted approach which includes the PC physic=ans practicing allergy, payers, the physician practice management organiza=ions and the local allergists. I have discussed this strategy with Dr. Lin=a Cox and would like your feedback as well.

I will be attending the Southeastern Allergy meeting in September and notic=d you, too, are planning to attend. Are you available to meet beforehand o= could we schedule a dinner while there?

Thanks,

Tonya A. Winders
Market Development Team Leader
Phadia US Inc.
615-300-2569
www.pirllab.com
www.phadia.us


Sent from my iPad

Phadia disclaimer: This e-mail and any attachment may contain information t=at is legally privileged, confidential or exempt from disclosure. If you are not the intended recipie=t, please note that any dissemination, distribution or copying of this e-mail and/or any o= the attachments is strictly prohibited. Anyone who receives this e-mail in error should not=fy the sender immediately by telephone or return e-mail and delete it from his or her com=uter.
<?xml version=.0" encoding=TF-8"?>
<!DOCTYPE plist PUBLIC "-//Apple//DTD PLIST 1.0//EN" "http://www.apple.com/DTDs/PropertyList-1.0.dtd">
<plist version=.0">
<dict>
        <key>date-sent</key>
        1313593881
        <key>flags</key>
        <integer>8590195713</integer>
        <key>original-mailbox</key>
        <string>ews://jsublett%40familyallergy.com@exg5.exghost.com/Inbox/JCAAI/Remote%20Practice</string>
        <key>remote-id</key>
        <string>AAMkADUyMjcwNjFlLTAxYWItNDUzZC1hNmRiLWJhMzE2NmM4OGU2MQBGAAAAAAA9IB1BwDnoQ4nXROZxdY0CBwBMNK
3HYTd1TZOx7AEIP+x7AAWadCm3AABMNK3HYTd1TZOx7AEIP+x7AAWhplGsAAA=string>
        <key>subject</key>
        <string>FW: Jim sublett</string>
</dict>
</plist>

# Exhibit 14

Message

| | |
|---|---|
| **From:** | James Sublett [jsublett@familyallergy.com] |
| **Sent:** | 11/9/2011 10:44:15 AM |
| **To:** | Winders, Tonya [tonya.winders@thermofisher.com] |
| **Subject:** | Re: United Allergy welcomed by the Louisiana Academy of Family Physicians |

James L. Sublett MD, FACAAI
Manag=ng Partner
Family Allergy, Asthma, & Immunology
www.familyallergy.com
=irect: 502.500.8197

On Nov 8, 2011, at 7:03 PM, Winders, Tonya wrote:

Are you available to meet prior to the holidays to discuss my meetin=s with AAAAI leadership and AANMA's plan of action?
<=pan style="color: rgb(31, 73, 125); ">
From= James Sublett [mailt=:jsublett@familyallergy.com]
**Sent:** Tue=day, November 08, 2011 12:20 PM
**To:** Winders, Tonya
**Subject:** Re: United Allergy welcomed by the Louisiana=Academy of Family Physicians

Thanks. I had seen this.

Jim Sublett MD
Sent from my iPad

tonya.winders@thermofisher.com> wrote:

Interesting article for your review....<=:p>

## LAFP Welcomes New Partner – United Allergy Labs =o:p>

=ouisiana Academy of Family Physicians recently featured United Allergy Lab= in their e-newsletter to members.
United Allergy Labs (UAL) attended the=Annual Assembly & Exhibition for the first time in August. UAL special=zes in providing fully-staffed and operational allergy services inside phy=icians' offices. "We enjoyed meeting the LAFP physicians at the trades=ow and telling them about our allergy service line," says Russ Kendrick,=UAL regional sales manager. "The physicians were engaged and understood =ur business premise that assists them to offer allergy testing and immunot=erapy in their practice."

"At United Allergy Labs, we know that=every patient is different and responds differently to allergens," Kendr=ck says. "Our Certified Clinical Allergy Lab Specialists (CLS) manages t=e service under the physicians' supervision and tests for the 50 most ge=graphically specific airborne and mold allergens. Then the CLS custom-form=lates allergy immunotherapy for each patient identified by the physician.=94
The physician manages all medical decisions and supervises the funct=onal aspects of the lab. The benefits recognized by the practice include b=tter patient retention, increased new patient flow, better clinical care, =nd finally a completely new revenue stream.

WDTX-JCAAI-043638

"Unlike antihistamine=, nasal steroids and leukotriene modifiers, which only transiently suppres= allergic inflammation, allergy immunotherapy is the only disease modifyin= therapeutic modality which has been shown to induce allergen tolerance fo= more than a decade after the cessation of treatment," says Frederick Sc=affer, MD, board certified allergist and immunologist, Clinical Associate =rofessor at the Medical University of South Carolina, and UAL Chief Medica= Officer.

"This long-term allergen tolerance and suppression of a=lergic inflammation is due to the generation of allergen-specific regulato=y T cells (Treg). These Treg cells play a role in the suppression of aller=en-specific IgE production by B cells, the responses of T helper (Th1 and =h2) cells , and decreasing the inflammation mediated by mast cells, basoph=ls, and eosinophils. This suppression of allergic inflammation affects bot= early and late phase responses. In essence, long term allergy symptom sup=ression occurs with a related improvement in the patient's quality of li=e. Also, immunotherapy has been shown to decrease the development and onse= of new allergies, have a steroid-sparing effect for those with allergic a=thma, and decrease the risk of developing asthma in those with allergic rh=nitis," Schaffer says.


###


=ouisiana Academy of Family Physicians

Weekly e-Newsletter

September 6, 2011


Let's connect once you are back fro= ACAAI and have a few moments. I had interesting discussions with ACAAI &a=p; AAAAI leadership and would also like your thoughts on AANMA's proposa=.


Thanks.
-
*Tonya Winders*
Marke= Development Team Leader
ImmunoDiagnost=cs
Thermo Fisher Scientific=/o:p>
4169 Commercial Ave.
Portage, MI 49002
Phone: 269-492-19=0
Fax: 269-492-1950
=span style="font-size: 10pt; font-family: Arial, sans-serif; color: rgb(=1, 73, 125); ">Cell: 615-300-2569
E-mai=: tonya.winders@thermofishe=.com
www.thermoscientific.com/=hadia
-
&nb=p;
-
-
Thermo Fisher Scientific disclaimer: Disse=ination, distribution, or copying
of this e-mail or the information herein by anyone other than the inten=ed
recipient, or an employee o= agent of a system responsible for delivering
the message to the intended recipient, is prohibited. If y=u are not the
intended recipie=t, please inform the sender and delete all copies.
=/td>


This email,and any files or =ttachments transmitted with it contains information that is confidential a=d proprietary. This information is intended only for the use of the indivi=ual(s) and entity(ies) to whom it is addressed. If you are the intended re=ipient, further disclosures are prohibited without proper authorization. I= you are not the intended recipient, any disclosure, copying, printing, or=use of this information is strictly

WDTX-JCAAI-043639

prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

<=div>
=

WDTX-JCAAI-043640

# Exhibit 15

Dr. Sublett,

As we discussed, AANMA met with an experienced FTC attorney last week and we are planning to take a four-pronged approach to tackling the deception issue. The attached one-page document highlights the details of this approach.

Furthermore, we are conducting a direct mail campaign to the medical directors of the top 100 commercial insurance payers encouraging them to conduct a utilization review including the list of the 2,184 participating physicians in the AAAPC.

Finally, we are conducting a direct mail campaign to the top 1000 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts.

Please advise if you have additional questions or thoughts on this strategic approach.

Tonya Winders, MBA
COO
Allergy & Asthma Network Mothers of Asthmatics
8201 Greensboro Dr, Ste 300
McLean, VA 22102
Cell: (615)-300-2569
twinders@aanma.org

WDTX-JCAAI-047867

# Exhibit 16

Appointment

| | |
|---|---|
| **From:** | James Sublett [JSublett@familyallergy.com] |
| **To:** | James Sublett [JSublett@familyallergy.com]; Reinhardt, Robert W. [robert.w.reinhardt@thermofisher.com]; Esposito, David A. [david.esposito@thermofisher.com]; Matthews, Kathy J. [kathy.j.matthews@thermofisher.com] |

| | |
|---|---|
| **Subject:** | Meeting - Thermofisher |
| **Location:** | TBD |

| | |
|---|---|
| **Start:** | 6/27/2013 5:00:00 PM |
| **End:** | 6/27/2013 6:30:00 PM |
| **Show Time As:** | Busy |

| | |
|---|---|
| **Recurrence:** | (none) |

Dr Sublett,

Thanks for again following up; please hold Thurs 6/27; breakfast or lunch or AM anytime could work well for me.

Best regards,

Rob Reinhardt

From: James Sublett [mailto:JSublett@familyallergy.com]

Sent: Monday, May 20, 2013 7:14 PM

To: Matthews, Kathy J.

Cc: Reinhardt, Robert W.

Subject: Re: Remote Practice of Allergy

Sorry, but my travel schedule is very busy for the next month .

Here are some dates that could work:

June 24, 27

July 1

From: <Matthews>, "Kathy J."
<kathy.j.matthews@thermofisher.com<mailto:kathy.j.matthews@thermofisher.com>>

Date: Friday, May 17, 2013 4:41 PM

To: James Sublett <jsublett@familyallergy.com<mailto:jsublett@familyallergy.com>>

Cc: "Reinhardt, Robert W."
<robert.w.reinhardt@thermofisher.com<mailto:robert.w.reinhardt@thermofisher.com>>

Subject: RE: Remote Practice of Allergy

Hi Dr. Sublett:

I will be out of the office on vacation May 20-24. If you find some available time in your calendar to meet with Dr. Reinhardt in the next 2 weeks, please communication directly with him.

WDTX-JCAAI-042544
WDTX-JCAAI-042544

Thank you!

Regards,

Kathy

Kathy Matthews

Senior Administrative Specialist

US Travel Coordinator & Business Support

ImmunoDiagnostics

Thermo Fisher Scientific

Phadia US Inc

4169 Commercial Ave

Portage, MI 49002

269-492-1958 - Office

kathy.j.matthews@thermofisher.com<mailto:kathy.j.matthews@thermofisher.com>

www.thermoscientific.com/phadia<http://www.thermoscientific.com/phadia>

From: Matthews, Kathy J.

Sent: Thursday, May 16, 2013 10:06 AM

To: 'JSublett@familyallergy.com<mailto:'JSublett@familyallergy.com>'

Cc: Reinhardt, Robert W.

Subject: FW: Remote Practice of Allergy

Good morning Dr. Sublett:

If possible Dr. Reinhardt would like to meet in person with you before the end of May. Please let me know your availability for the next 2 weeks.  If your time allows, Dr. Reinhardt would like to invite you to meet over lunch.

Thank you!

Kathy

Kathy Matthews

Senior Administrative Specialist

US Travel Coordinator & Business Support

WDTX-JCAAI-042545
WDTX-JCAAI-042544

ImmunoDiagnostics

Thermo Fisher Scientific

Phadia US Inc

4169 Commercial Ave

Portage, MI 49002

269-492-1958 · Office

kathy.j.matthews@thermofisher.com<mailto:kathy.j.matthews@thermofisher.com>

www.thermoscientific.com/phadia<http://www.thermoscientific.com/phadia>

From: Reinhardt, Robert W.

Sent: Wednesday, May 15, 2013 10:44 AM

To: Matthews, Kathy J.

Subject: FW: Remote Practice of Allergy

From: James Sublett [mailto:JSublett@familyallergy.com]

Sent: Wednesday, May 15, 2013 10:42 AM

To: Reinhardt, Robert W.

Cc: Tim Feger

Subject: Re: Remote Practice of Allergy

I schedule my own appointments. Just have her email me.

JS

From: <Reinhardt>, "Robert W."
<robert.w.reinhardt@thermofisher.com<mailto:robert.w.reinhardt@thermofisher.com>>

Date: Wednesday, May 15, 2013 10:26 AM

To: James Sublett <jsublett@familyallergy.com<mailto:jsublett@familyallergy.com>>

Cc: Tim Feger <tfeger@familyallergy.com<mailto:tfeger@familyallergy.com>>

Subject: RE: Remote Practice of Allergy

Thanks for your very prompt reply.

Could you please share contact information for your administrative assistant?  Kathy Matthews can work
with him/her to coordinate our schedules.

Best,

Rob Reinhardt MD

From: James Sublett [mailto:JSublett@familyallergy.com]

Sent: Wednesday, May 15, 2013 10:11 AM

To: Reinhardt, Robert W.

Cc: Tim Feger

Subject: Re: Remote Practice of Allergy


I would be happy to meet at some point. Because of my positions with both the ACAAI (VP) and the JCAAI (Past-Pres) I will not be able to share much insight related to RPA.

Best regards,

James L. Sublett MD

Managing Partner

Family Allergy & Asthma

www.familyallergy.com<http://www.familyallergy.com>


502.500.8197 direct


[cid:image001.png@01CE55FC.8B806490]


From: <Reinhardt>, "Robert W."
<robert.w.reinhardt@thermofisher.com<mailto:robert.w.reinhardt@thermofisher.com>>

Date: Wednesday, May 15, 2013 9:56 AM

To: James Sublett <jsublett@familyallergy.com<mailto:jsublett@familyallergy.com>>

Cc: Tim Feger <tfeger@familyallergy.com<mailto:tfeger@familyallergy.com>>

Subject: Remote Practice of Allergy


Dear Dr Sublett,


By way of introduction, I am the Chief Medical Officer in the US for ImmunoDiagnostics at Thermo Fisher Scientific (formerly Phadia).  As you know, we are the makers of ImmunoCAP® specific IgE blood testing (we may have met several years ago at an Advisory Board meeting?)


We share a mutual concern regarding the remote practice of allergy, e.g. the United Allergy Services model.  I would welcome an opportunity to meet with you there to discuss this issue, at your convenience, perhaps for lunch?  Other topics might include the Joint Taskforce Practice Parameters (I do understand the JCAAI does not officially review these),and the broad availability of ImmunoCAP allergen component tests to support the improved assessment of certain allergic conditions.


Thank you for your consideration,

WDTX-JCAAI-042547
WDTX-JCAAI-042544

Respectfully,


Rob Reinhardt, MD


Chief Medical Officer US

ImmunoDiagnostics

Thermo Fisher Scientific

269.492.1967 · Office direct

269.998.1539 - Mobile

269.492.1997 - Fax

robert.w.reinhardt@thermofisher.com<mailto:robert.w.reinhardt@thermofisher.com>

www.thermoscientific.com/phadia<http://www.thermoscientific.com/phadia>


-->This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

-->This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

-->This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

# Exhibit 17

Message

| | |
|---|---|
| **From:** | "Susan Grupe" <grupes@jcaai.org> [grupes@jcaai.org] |
| **Sent:** | 12/27/2011 2:50:56 PM |
| **To:** | Donald Aaronson [doclaw@post.harvard.edu]; Aaronson-MD, Donald [donald.aaronson@advocatehealth.com]; Gary Gross [ggross144@earthlink.net] |
| **Subject:** | Mr. Wallen - Hello |

Please review email string – thank you!

Sincerely,

*Sue*

Susan L. Grupe
Director of Administration

Joint Council of Allergy, Asthma & Immunology
50 N. Brockway St., #3-3
Palatine, IL 60067

V: 847-934-1918
F: 847-934-1820
E: grupes@jcaai.org
http://www.jcaai.org

**From:** James Wallen [mailto:wallenjames@yahoo.com]
**Sent:** Monday, December 26, 2011 2:05 PM
**To:** Susan Grupe
**Subject:** Re: FW: Hello

Susan,
I hope the holidays are treating you well. I had replied to your email but am thinking it may have been blocked by your spam so I will re-send you my contact information. My cell is 512-348-3553 and home is 512-373-8465. Thank you and have a happy new year!!
Jim Wallen

--- On **Wed, 11/9/11, Susan Grupe <*grupes@jcaai.org*>** wrote:

From: Susan Grupe <grupes@jcaai.org>
Subject: FW: Hello
To: wallenjames@yahoo.com
Date: Wednesday, November 9, 2011, 1:14 PM

Mr. Wallen, would you reply with a telephone number where JCAAI leaders can reach you? Thank you.

Sincerely,


Susan L. Grupe

Director of Administration


Joint Council of Allergy, Asthma & Immunology

50 N. Brockway St., #3-3

Palatine, IL  60067


V: 847-934-1918

F: 847-934-1820

E: grupes@jcaai.org

http://www.jcaai.org


**From:** James Wallen [mailto:wallenjames@yahoo.com]
**Sent:** Tuesday, October 18, 2011 5:21 PM
**To:** grupes@jcaai.org
**Subject:** Hello

Good afternoon Susan,
I wanted to take a minute to introduce myself. My name is Jim Wallen and I have worked in the allergy industry for the last 13 years. I worked for ALK-Abello in the US for 12 years, most recently as the director of sales for 5 years. I left ALK for a position as the VP of business development for Allerta, a company operating in the remote practice of allergy field. This venture only lasted 3 weeks for numerous reasons and for the last 6 months, I have been consulting in the allergy world. I recently heard about the Joint Council's task force set up to deal with RPA and would love to have a discussion with this group. I am going to be in Boston around the upcoming college meeting and would be interested in getting a dialogue going. Please let me know if the membership night be interested.
Thank you and have a great day.
Sincerely,

Jim Wallen


This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

WDTX-JCAAI-015066

This email, and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

This message (including any attachments) is intended only for the use of the addressee(s) and contains information that is privileged and confidential. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient or an authorized representative of the intended recipient, the use, dissemination or reproduction of this communication is prohibited and may be a violation of federal or state law and regulations. If you have received this communication in error, please destroy all copies of the message and its attachments and notify the sender immediately. The company hereby claims all applicable privileges related to this information.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

WDTX-JCAAI-015067

# Exhibit 22

Message

| | |
|---|---|
| **From:** | "garyngross@gmail.com" <garyngross@gmail.com> [garyngross@gmail.com] |
| on behalf of | "Gary Gross" <ggross144@earthlink.net> [ggross144@earthlink.net] |
| **Sent:** | 5/19/2011 8:14:52 PM |
| **To:** | Aaronson-MD, Donald [donald.aaronson@advocatehealth.com] |
| **CC:** | Susan Grupe [grupes@jcaai.org]; Donald Aaronson [doclaw@post.harvard.edu]; Burke, Rebecca [Rebecca.Burke@ppsv.com]; sfineman@atlantaallergy.com |
| **Subject:** | Re: Dr. Senter - United Allergy Lab |

I have talked to the Texas Medical Board legal department and they now have United Allergy Lab as a case they are investigating. I have also written to the chief of internal medicine at Presbyterian hospital dallas to see who would be able to control this practice from a corporate standpoint. I agree that the OIG at the state or national level might be another avenue but I do not know them. gary

On Thu, May 19, 2011 at 8:50 AM, Aaronson-MD, Donald <donald.aaronson@advocatehealth.com> wrote:

Becky, This looks like another we can send to OIG and check and see both Georgia and Texas to see if they violate local laws. I know they are active in Georgia since Stan Fineman has asked us to look further into this  don

Donald W Aaronson MD JD MPH

Medical Director Patient Safety

Advocate Lutheran General Hospital

1775 Dempster Street

Park Ridge, Il 60068

donald.aaronson@advocatehealth.com

847-723-7620

cell 773-474-2040

**From:** Susan Grupe [mailto:grupes@jcaai.org]
**Sent:** Thursday, May 19, 2011 8:46 AM
**To:** Aaronson-MD, Donald; 'Donald Aaronson'; 'Gary Gross'
**Subject:** Dr. Senter - United Allergy Lab

The following is to review and comment as you see appropriate.

WDTX-JCAAI-029923

Sincerely,

*Sue*

Susan L. Grupe

Director of Administration

Joint Council of Allergy, Asthma & Immunology

50 N. Brockway St., #3-3

Palatine, IL  60067

V: 847-934-1918

F: 847-934-1820

E: grupes@jcaai.org

http://www.jcaai.org

**From:** Don Senter [mailto:dfsenter@verizon.net]
**Sent:** Wednesday, May 18, 2011 5:27 PM
**To:** info@jcaai.org
**Subject:** United Allergy Lab

Previously reported to Texas Allergy and Asthma organization.   United Allergy Lab a San Antonio company is contracting with PCP's to place a staff person in their offices, where the person will do a cook book history via forms, do allergy skin tests, decide the treatment, mix the vaccine, then quote "dilute, dilute, then dilute some more".   Vaccine will be administered in pcp's office by this Corp employee, then sent home to give at home.

TAAIS reports that a Dermatologist had United Allergy lab in his office, apparently terminated the relationship, then United took all records, patients, etc and went to another location.   United is being sued and is in discovery.

WDTX-JCAAI-029924

Manager at the Medical Edge group where I was practicing ½ day per week, paying them rent for the space advised as follows.

1.   A Texas Health Resources   (large hospital group Presybterian in Dallas area that owns more practices than Baylor)  had a primary clinic use United and they made lots of money, so the big hospital told all its PCP groups to look at this opportunity to make lots of money off of allergy patients.

My staff interviewed the LVN, age 23 who is the quote"allergist" for the group and she advised, that United does the test, the treatment, mixes the vaccine and gives the shots.  The doctor does not have to do anything.

Sounds like illegal practice of medicine, so unethical, my staff picked up all our equipment and we closed the part time office immediately.

One of the physicians in the group is aware United is unethical, but the others are interested in the money.

A copy of Practice Parameters for allergen immunotherapy was provided to the physician primarily involved with  the United Allergy Lab.

Large hospitals have no need for allergists unless we are willing to do drug testing and desensitization only.   Try to make a living doing that.   They are not interested in having allergists on their staff as it is contradictory to the hospital making more money.    ACO's will not have allergists.

It appears we have another group of enemies to pick over the bones of whats left of the allergy specialty.

Look up website of www.unitedallergylabs.com     Better yet, do a google on united allergy labs and find out how many hits you will get, they are looking for personnel and already have regional directors.

Don Senter, M.D.

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachments thereto, is strictly prohibited.

WDTX-JCAAI-029925

If you have received this e-mail in error, please respond to the individual sending the message and permanently delete the original and any copy of any e-mail and any printout thereof.

WDTX-JCAAI-029926

Exhibit 23

**House of Delegates**
**Report to the Board of Regents**
**Friday, November 12, 2010**

I.      **Welcome and Call to Order**

V.      **Spread of Allergy Labs**

Mike Vaughn, MD, made a presentation about the difficulties in San Antonio with the
practice of allergy by non-allergists. The details, as provided by Dr Vaughn, are enclosed
as Exhibit I. A motion was made and passed to refer this problem to the Board of
Regents for action. The JCAAI is already aware of the issue and has given advice to the
Texas Allergy Society.

WDTX-ACAAI-001509

**VII.**   **Adjournment**

The meeting adjourned at 5:46 pm.

Respectfully submitted
Mark Kalenian, MD
Recording Secretary

WDTX-ACAAI-001510

**Exhibit I**

**Requested Action from Mike Vaughn, MD on the Spread of Allergy Labs**

As per your request, I am providing you with a summary of the activities of companies in San Antonio Texas that are attempting to denigrate the community standards of "allergy" care in our community. "Allergy Practice Consultants Group" (APCG) is a company under the direction of a Chiropractor Patrick Strauss (www.allergypractice.com) who has created a company to perform the practice of skin testing and immunotherapy for Primary Care Physicians. It is my understanding that APCG provides a "trained" allergy testing technician to the PCP that works from their office. The PCP forwards the skin testing result to APCG where the immunotherapy (IT) is made and is then sent back to the PCP. The IT has been advocated as "safe" for "home" (ie. self -administration) and this IT is reported by APCG to be as effective as conventional IT. It is my presumption that they are preparing low dose IT for the PCPs that has never been proven to be either safe or effective, especially since it is not being prepared by a Board Certified Allergist.

"Smart Allergy Labs" (SAL), also reportedly provides allergy testing staff, supervises the staff, pays for all testing and pays for all billing and collections and makes their money in a fee splitting manner (www.smartallergylabs.com) . SAL then formulates IT without a physician directed clinical history. SAL provides the IT to the PCP for either home or in-office administration. It would appear that Smart Allergy Labs bills insurance or the patient for these services and provides a "kick-back" to the referring doctor.

United Allergy Labs (UAL) provides the PCP with one of their "trained" allergy testing technicians that work out of the PCP's office (but is a UAL employee). Their skin testing panel includes multiple allergens that have never been shown to cause nasal allergies or asthma in humans such as house fly, deer fly, moth, and Tobacco leaf, and these extracts are often included in their IT treatment kits. IT is then administered daily at "home" and multiple kits must be re-ordered several times per year. UAL is paid each time a kit is ordered from them (www.unitedallergylabs.com). One patient, who requested a second opinion from me after undergoing UAL skin testing by their PCP, suffered anaphylaxis during the skin testing process requiring in-office treatment with epinephrine and subsequent transfer to a local hospital ED.

All of these companies market to the PCPs by showing them the potential increased revenue they can generate in their practice and falsely assure safety and efficacy. All of these companies advocate IT treatment of all skin test or RAST positive patients regardless of their clinical histories. All of the above companies ignore the JCAAI recommendations for accurate skin testing interpretation as well as the JCAAI recommendation that "immunotherapy be formulated and administered only by physicians trained and experience in the use of IT. In addition, all of these companies ignore the JCAAI safety based recommendation that IT be administered only in a medically monitored environment capable of treating systemic allergic reactions expeditiously. The members of the San Antonio Allergy Asthma & Immunology Society (SAAAIS) have taken a stand against the practice of substandard allergy testing and immunotherapy by unanimously professing to follow the JCAAI practice parameters for allergy testing and immunotherapy as are available on the web site (www.jcaai.org). By unanimously adopting these evidenced based principles of practice, we have defined the local "community standards of care" among the "experts" in this field of medicine. In hopes of educating the unsuspecting and trusting population, who are being victimized by untrained physicians, these principles of "safe" allergy practice are clearly explained in layman's terms on the San Antonio Allergy Society web site (www.saaais.com).

WDTX-ACAAI-001511

In communications with the Texas Medical Board, I have learned that they have no jurisdiction over these commercial extract companies. I have seen several patients in my Allergy practice who have sought my "second opinion" concerning their need for immunotherapy. In each case, mis-diagnosis of allergic sensitivity had been objectively confirmed. In communicating these findings to the PCP performing the erroneous testing, and after pointing out the failure of the non-trained PCP to meet community standards, I have received a "Cease and Desist" letter from UAL. In this communication, I have been threatened with Civil legal actions, in which I could be sued for damages resulting from disparaging their reputation and disrupting the business agreements UAL has with its contracting PCP's. As a result, I am unable to freely communicate my clinical evaluation findings to these physicians; who share responsibility with me for medical care of these patients. I have written to the Texas Attorney General to report that as a result of UALs activities, uneducated and untrained physicians are injecting patients with unconventional allergen extracts and are attempting to treat non-existent allergies. The Texas Attorney General's office felt that this issue was one that was best addressed by the FDA. It was reported to me by an e-mail from the Attorney Generals Office that my letter had been forwarded to the FDA however, I have received no communications from them (after several months have passed). Please feel free to contact me concerning any specific medical cases you wish to review.

**Michael P. Vaughn PhD.MD. (mpvaughn@sbcglobal.net) / Office 210-499-0033 / 115 Gallery Circle, Ste. 200, San Antonio, Texas 78258**

WDTX-ACAAI-001512

**Board of Regents**
**American College of Allergy, Asthma and Immunology**
**November 16, 2010**
**Phoenix, Arizona**

Participants:   Dr. Dana V. Wallace and Drs. Sami L. Bahna, David I. Bernstein, Timothy J. Craig, Stanley M Fineman, Michael B. Foggs, Richard G. Gower,  Alnoor A. Malick, Kevin P. McGrath, J. Allen Meadows, Talal Nsouli, Rebecca Saff, James M. Seltzer, Russell A. Settipane, John M. Seyerle, Janna M. Tuck, Richard W. Weber and David R. Weldon.

EMD:   Dr. Bobby Q. Lanier

Guests:   Dr. Sarah Nelson, PhD, President, ACAAI Alliance.

Staff:   Rick Slawny, John Nocera, Mary Lou Callaghan, Linda Cullison, JoAnn Faber,  Robert Krawisz, Nancy Ryan and Melanie Thorsen.

Meeting was called to order by the President at 11:25 am.

III.   HOUSE OF DELEGATES

Non-Allergists   MOTION: (Drs. McGrath - Tuck) Request the ACAAI Committee on Immunotherapy
Practicing   and Diagnostics to provide specific guidelines for immunotherapy safety to be included
Allergy   in a letter forwarded to the Texas Medical Board on behalf of, and in support of, the
Texas Allergy Society concerning the practice of allergy by non-allergists -- CARRIED.

WDTX-ACAAI-001513

Page two
Board of Regents Meeting
Nov. 16, 2010


Dr. Vaughn
Letter

CONSENSUS: Send a letter of appreciation to Dr. Michael Vaughn of San Antonio, Texas, for bringing his concerns of allergy practices by non-allergists to the ACAAI House of Delegates.

WDTX-ACAAI-001514

Page three
Board of Regents
Nov. 16, 2010

VIII.   ADJOURNMENT
The meeting was adjourned at 1:00 pm. The next Board of Regents meeting will be June
4-5, 2011, at the Westin O'Hare Hotel in Rosemont, Illinois.

WDTX-ACAAI-001515

# HOUSE OF DELEGATES

Report to the Board of Regents

American College of Allergy, Asthma and Immunology

November 16, 2010

[Action Requested]

**House of Delegates Meeting**

The November 12 House of Delegates meeting was well attended. There was a quorum with delegates from 31 LSRs. In addition, 51 alternate delegates and guests were present. A full report will be sent by the recording Secretary, Mark Kalenian, MD

Grace-Marie Turner's presentation on the "Impact of Healthcare Reform on Allergists" was well received and a spirited debate occurred. Her presentation will be posted on the Web site.

Mike Vaughn, MD, made a presentation about the difficulties in San Antonio with the practice of allergy by non-allergists. The details, as provided by Dr Vaughn are enclosed as Exhibit I. A motion was made and passed to refer this problem to the Board of Regents for action.

**Options for the Board to consider on allergy practice by non-allergists (not mutually exclusive) to address this issue include the following:**

[Action Item]

1. **Refer the concerns to the Joint Council of Allergy, Asthma and Immunology (JCAAI).**

2. **Send a letter to Dr Vaughn thanking him for bringing his concerns to the HoD, and explaining what actions will be taken. Part of the goal of the marketing campaign was to differentiate allergists from other physicians.**

3. **Request a GAO investigation. As part of the new health care bill, any Congressman can request a GAO investigation of "false claims" in healthcare practices. The JCAAI has already requested Congressman Kagen to ask for an investigation of the nationwide "allergy relief care centers," using lasers to diagnose and treat allergy. The ACAAI could ask the Congressman to request a GAO investigation.**

4. **Write a letter to the Texas Board of Medical Examiners.**

5. **Do nothing.**

WDTX-ACAAI-001516

**Exhibit I**

**Requested Action from Mike Vaughn, MD on the Spread of Allergy Labs**

Dear Dr. Meadows,

As per your request, I am providing you with a summary of the activities of companies in San Antonio Texas that are attempting to denigrate the community standards of "allergy" care in our community. "Allergy Practice Consultants Group" (APCG) is a company under the direction of a Chiropractor Patrick Strauss (www.allergypractice.com) who has created a company to perform the practice of skin testing and immunotherapy for Primary Care Physicians. It is my understanding that APCG provides a "trained" allergy testing technician to the PCP that works from their office. The PCP forwards the skin testing result to APCG where the Immunotherapy (IT) is made and is then sent back to the PCP. The IT has been advocated as "safe" for "home" (ie. self -administration) and this IT is reported by APCG to be as effective as conventional IT. It is my presumption that they are preparing low dose IT for the PCPs that has never been proven to be either safe or effective, especially since it is not being prepared by a Board Certified Allergist.

"Smart Allergy Labs" (SAL), also reportedly provides allergy testing staff, supervises the staff, pays for all testing and pays for all billing and collections and makes their money in a fee splitting manner (www.smartallergylabs.com) . SAL then formulates IT without a physician directed clinical history. SAL provides the IT to the PCP for either home or in-office administration. It would appear that Smart Allergy Labs bills insurance or the patient for these services and provides a "kick-back" to the referring doctor.

United Allergy Labs (UAL) provides the PCP with one of their "trained" allergy testing technicians that work out of the PCP's office (but is a UAL employee). Their skin testing panel includes multiple allergens that have never been shown to cause nasal allergies or asthma in humans such as house fly, deer fly, moth, and Tobacco leaf, and these extracts are often included in their IT treatment kits. IT is then administered daily at "home" and multiple kits must be re-ordered several times per year. UAL is paid each time a kit is ordered from them (www.unitedallergylabs.com). One patient, who requested a second opinion from me after undergoing UAL skin testing by their PCP, suffered anaphylaxis during the skin testing process requiring in-office treatment with epinephrine and subsequent transfer to a local hospital ED.

All of these companies market to the PCPs by showing them the potential increased revenue they can generate in their practice and falsely assure safety and efficacy. All of these companies advocate IT treatment of all skin test or RAST positive patients regardless of their clinical histories. All of the above companies ignore the JCAAI recommendations for accurate skin testing interpretation as well as the JCAAI recommendation that "immunotherapy be formulated and administered only by physicians trained and experience in the use of IT. In addition, all of these companies ignore the JCAAI safety based recommendation that IT be administered only in a medically monitored environment capable of treating systemic allergic reactions expeditiously. The members of the San Antonio Allergy Asthma & Immunology Society (SAAAIS) have taken a stand against the practice of substandard allergy testing and immunotherapy by unanimously professing to follow the JCAAI practice parameters for allergy testing and immunotherapy as are available on the web site (www.jcaai.org). By unanimously adopting these evidenced based principles of practice, we have defined the local "community standards of care" among the "experts" in this field of medicine. In hopes of educating the unsuspecting and trusting population, who are being victimized by untrained physicians, these principles of "safe" allergy practice are clearly explained in layman's terms on the San Antonio Allergy Society web site (www.saaais.com).

WDTX-ACAAI-001517

In communications with the Texas Medical Board, I have learned that they have no jurisdiction over these commercial extract companies. I have seen several patients in my Allergy practice who have sought my "second opinion" concerning their need for immunotherapy. In each case, mis-diagnosis of allergic sensitivity had been objectively confirmed. In communicating these findings to the PCP performing the erroneous testing, and after pointing out the failure of the non-trained PCP to meet community standards, I have received a "Cease and Desist" letter from UAL. In this communication, I have been threatened with Civil legal actions, in which I could be sued for damages resulting from disparaging their reputation and disrupting the business agreements UAL has with its contracting PCP's. As a result, I am unable to freely communicate my clinical evaluation findings to these physicians; who share responsibility with me for medical care of these patients. I have written to the Texas Attorney General to report that as a result of UALs activities, uneducated and untrained physicians are injecting patients with unconventional allergen extracts and are attempting to treat non-existent allergies. The Texas Attorney General's office felt that this issue was one that was best addressed by the FDA. It was reported to me by an e-mail from the Attorney Generals Office that my letter had been forwarded to the FDA however, I have received no communications from them (after several months have passed). Please feel free to contact me concerning any specific medical cases you wish to review.

**Michael P. Vaughn PhD.MD.** (mpvaughn@sbcglobal.net) / Office 210-499-0033 / 115 Gallery Circle, Ste. 200, San Antonio, Texas 78258

WDTX-ACAAI-001518

**COMMITTEES** (CME Committee see "CME"; Managed Care Committee, see "Managed Care"; Public Relations/Public Education Committees, see "Public Relations"; also see Scientific Affairs)

Non-Allergists Practicing Allergy

MOTION: (Drs. McGrath-Tuck) Request the ACAAI Committee on Immunotherapy and Diagnostics to provide specific guidelines for immunotherapy safety to be included in a letter forwarded to the Texas Medical Board on behalf of, and in support of, the Texas Allergy Society concerning the practice of allergy by non-allergists – CARRIED.

Board of Regents (11/16/10)

WDTX-ACAAI-001519

**HOUSE OF DELEGATES**

Dr. Vaughn
Letter

<u>CONSENSUS</u>:  Send a letter of appreciation to Dr. Michael Vaughn of San
Antonio, Texas, for bringing his concerns of allergy practices by non-allergists to
the ACAAI House of Delegates.

Board of Regents (11/16/10)

WDTX-ACAAI-001520

**A**

**ACAAI Executive Committee**
**Telephone Conference Minutes**
**March 23, 2011**

Participants:   President Dana V. Wallace, MD and Drs. Sami L. Bahna, Stanley M. Fineman,
                Michael B. Foggs, Richard G. Gower, Talal Nsouli, and Russell A. Settipane.

EMD:            Bobby Q. Lanier, MD

Staff:          James Slawny, Rick Slawny and Mary Lou Callaghan.

                The Executive Committee meeting was called to order at 7:02 p.m. Central Time.

I.      APPROVAL OF THE MINUTES

Approval of the    MOTION: (Drs. Foggs – Settipane) Approve the minutes of the Executive Committee
2/23/11 Minutes    conference call of February 23, 2011 – CARRIED.

II.     CONSENT AGENDA

The following agenda items were considered and approved collectively by the
Executive Committee:

Texas Medical      MOTION: (Drs. Nsouli - Fineman) Forward to the Texas Medical Board on behalf of
Board Letter on    the Texas Allergy Society the letter developed by the ACAAI Committee on
IT Safety          Immunotherapy & Diagnostics which provides specific guidelines for immunotherapy
                   safety – CARRIED.

WDTX-ACAAI-001521

Page two
Executive Committee Conference Call
March 23, 2011

WDTX-ACAAI-001522

Page three
Executive Committee Conference Call
March 23, 2011

VII.   ADJOURNMENT

The meeting adjourned at 9:30 pm.  The next Executive Committee conference call is
scheduled for Wednesday Apr. 2oth at 7:00pm CT.

WDTX-ACAAI-001523

**15**

ACAAI Executive Committee
Telephone Conference Minutes
March 23, 2011

Participants:   President Dana V. Wallace, MD and Drs. Sami L. Bahna, Stanley M. Fineman,
Michael B. Foggs, Richard G. Gower, Talal Nsouli, and Russell A. Settipane.

EMD:   Bobby Q. Lanier, MD

Staff:   James Slawny, Rick Slawny and Mary Lou Callaghan.

The Executive Committee meeting was called to order at 7:02 p.m. Central Time.

**Actions**                                      **Follow-up**

I.   APPROVAL OF THE
MINUTES

Approval of the   MOTION: (Drs. Foggs – Settipane)
2/23/11 Minutes   Approve the minutes of the Executive
Committee conference call of February
23, 2011 – CARRIED.

II.   CONSENT AGENDA

The following agenda items were
considered and approved collectively by
the Executive Committee:

**Actions**                                    **Follow-up**

Texas Medical      <u>MOTION:</u> (Drs. Nsouli - Fineman)      **Mary Lou**
Board Letter on    Forward to the Texas Medical Board on      Sent 3/31/11
IT Safety          behalf of the Texas Allergy Society the
                   letter developed by the ACAAI
                   Committee on Immunotherapy &
                   Diagnostics which provides specific
                   guidelines for immunotherapy safety--
                   <u>CARRIED</u>.

WDTX-ACAAI-001525

VII.   ADJOURNMENT

The meeting adjourned at 9:30 pm. The
next Executive Committee conference call
is scheduled for Wednesday Apr. 2oth at
7:00pm CT.

WDTX-ACAAI-001526



**Committee on Immunotherapy and Diagnostics**
**Report to**
**ACAAI EXECUTIVE COMMITTEE**
**(March 2011)**

Recently the CACAAI Committee on Immunotherapy and Diagnostics has been given a few projects to work through as well as discussed projects and issues forwarded to it for consideration. The following two projects are now being forwarded to the ACAAI Executive Committee for further action.

     I.     Practice of Allergy by Non-Allergists.
Background:
During the Board of Regent's second meeting in November, 2010, the Board received a communication (a letter from Dr. Mike Vaughn re: spread of allergy labs) through the ACAAI House of Delegates concerning difficulties in San Antonio with the practice of allergy by non-allergists.

The Board of regents took the following action:
<u>MOTION:</u> Request the ACAAI Committee on Immunotherapy & Diagnostics to provide specific guidelines for immunotherapy safety to be included in a letter forwarded to the Texas Medical Board on behalf of, and in support of, the Texas Allergy Society concerning the practice of allergy by non-allergists -- <u>CARRIED</u>.

Attached (\_\_\_-\_\_) is the letter developed by the IT committee for Executive Committee consideration.

**RESOLVE, to forward the letter providing specific guidelines for immunotherapy safety developed by the ACAAI Immunotherapy & Diagnostics Committee to the Texas Medical Board on behalf of the Texas Allergy Society.**

Respectfully submitted,

Ira Finegold, MD
Chairman
ACAAI Committee on Immunotherapy & Diagnostics

WDTX-ACAAI-001528

# D-1

Texas Medical; Board
Mail Code 261
P.O. Box 2018
Austin, Texas 78768-2018


Dear Colleagues:

At the request of the Board of Regents of the American College of Allergy, Asthma and Immunology, this committee is commenting on specific practices of allergy by non-allergists.

This committee and national organization recognizes that it cannot regulate the practice of medicine by duly licensed physicians.  However, in the current practice of medicine in the United States, it can note that specialty societies have established guidelines for good medical practice in their specialty. One such highly respected document establishing expected standard of care is *Allergen Immunotherapy: A Practice Parameter Third Update, 2011.*[1]  This document has been approved by the American Academy of Allergy, Asthma and Immunology and the American College of Allergy, Asthma and Immunology, and the Joint Council of Allergy, Asthma and Immunology.

The following excerpts from this document make recommendations that provide safety and efficacy for treated patients. It is **particularly** relevant for individuals who practice allergy without the advanced training required by the American Board of Allergy and Immunology.

**Reducing the risk of anaphylaxis to immunotherapy injections**
**Summary Statement 45**: Allergen immunotherapy should be administered in a setting where procedures that can reduce the risk of anaphylaxis are in place and where the prompt recognition and treatment of anaphylaxis is ensured. The major risk of allergen immunotherapy is anaphylaxis, which in rare cases can be fatal, despite optimal management. Therefore allergen immunotherapy should be administered in a setting where anaphylaxis will be promptly recognized and treated by a physician, qualified physician extender (nurse practitioner or physician assistant), or both appropriately trained in emergency treatment.  Before allergen immunotherapy is chosen as a treatment, the physician should educate the patient about the benefits and risks of immunotherapy, as well as the methods for minimizing risks. The patient also should be told that despite appropriate precautions, reactions can occur without warning signs or symptoms. Informed consent should include a discussion of the potential immunotherapy-induced adverse reactions, and this discussion should be documented in the patient's medical record.

**Supervising medical personnel**
**Summary Statement 62**: Regardless of the location, allergen immunotherapy should be administered under the direct supervision of an appropriately trained physician, qualified physician extender (nurse practitioner or physician assistant), or both in a facility with the appropriate equipment, medications, and personnel to treat anaphylaxis. The physician and personnel administering immunotherapy should be aware of the technical aspects of this procedure and have available appropriately trained personnel, resuscitative

1

WDTX-ACAAI-001529

Page two
Texas Medical Board letter
March 2011

equipment/medicines, and storage facilities for allergen immunotherapy extract. Physicians and other health care professionals should be able to recognize early signs and symptoms of anaphylaxis and administer emergency medications as necessary. The physician and staff should be aware of situations that might place the patient at greater risk for systemic reactions (e.g., concomitant medications that can interfere with emergency treatment, such as beta-blockers; acute illness; and asthma exacerbations at the time of allergen immunotherapy extract injection). Appropriate adjustment of dose should be made, as clinically indicated. The physician whose office prepared the patient's allergen immunotherapy extract should provide adequately labeled allergen immunotherapy extract vials, detailed directions regarding the dosage schedule for build-up and maintenance, and instructions on adjustments that might be necessary under the following circumstances:

- when providing patients with new vials;
- during seasonal exposure to allergens that are in the patient's
- allergen immunotherapy extract to which the patient
- is very sensitive;
- if the patient has missed injections; and
- when reactions occur to the allergen immunotherapy extract.

Any systemic reaction to allergen immunotherapy should be treated immediately with epinephrine, and the physician whose office prepared the allergen immunotherapy extract should be informed. This might require a return to the allergist/immunologist's office for treatment and re-evaluation.

**Prescribing physician's office**
**Summary Statement 63:**
The preferred location for administration of allergen immunotherapy is in the office of the physician who prepared the patient's allergen immunotherapy extract. The preferred location of allergen immunotherapy administration is in the office of the physician who prepared the patient's allergen immunotherapy extract. The physician's office should have the expertise, personnel, and procedures in place for the safe and effective administration of immunotherapy. However, in many cases it might be necessary to administer the allergen immunotherapy extract in another physician's office. Allergen immunotherapy should be administered with the same care wherever it is administered. A physician or qualified physician extender (nurse practitioner or physician's assistant) should be present and immediately available and be prepared to treat anaphylaxis when immunotherapy injections are administered. Regular practice drills with the office staff for handling systemic reactions to immunotherapy reactions should be considered.

**Home administration.**
**Summary Statement 65:** In rare and exceptional cases when allergen immunotherapy cannot be administered in a medical facility and withholding this therapy would result in a serious detriment to the patient's health (e.g., VIT for a patient living in a remote area), careful consideration of potential benefits and risks of at-home administration of allergen immunotherapy should be made on an individual basis. If this approach is used, informed consent should be obtained from the patient, and the person administering the injection to the patient must be educated about how to administer immunotherapy and recognize and treat anaphylaxis. Allergen immunotherapy should be administered in a medical facility with trained staff and medical equipment capable of recognizing and treating anaphylaxis. Under rare circumstances, when the benefit of allergen immunotherapy clearly outweighs the risk of withholding immunotherapy (e.g., patients with a history of venom-induced anaphylaxis living in a remote region), at-home administration of allergen immunotherapy can be considered on an individual basis. In this instance there should be a

2

WDTX-ACAAI-001530

Page three
Texas Medical Board letter
March 2011

discussion with the patient, with careful consideration of the potential benefits and risks involved in home administration and alternatives. Informed consent should be obtained from the patient and appropriate family members after this discussion. Under these circumstances, another adult person should be trained to administer the injection and to treat anaphylaxis, should it occur. It should be noted, however, that the package insert approved by the FDA that accompanies all allergen extracts, including venom, implies that allergy injections should be administered in a clinical setting under the supervision of a physician. Intuitively, the risk from administering allergenic extracts outside a clinical setting would appear to be greater. Recognition and treatment of anaphylaxis might be delayed or less effective than in a clinical setting in which personnel, medications, supplies, and equipment are more optimal to promptly recognize and treat anaphylaxis. Home administration should only be considered in the rare circumstance when the benefit of immunotherapy clearly outweighs the risks. Frequent or routine prescription of home immunotherapy is not appropriate under any circumstances.

**Basis of allergen extract selection**
**Summary Statement 73:** The selection of the components of an allergen immunotherapy extract should be based on a careful history in correlation with positive allergy skin test results or serum specific IgE antibodies. The allergen immunotherapy extract should contain only clinically relevant allergens. In choosing the components for a clinically relevant allergen immunotherapy extract, the physician should be familiar with local and regional aerobiology and indoor and outdoor allergens, paying special attention to potential allergens in the patient's own environment. A careful history, noting environmental exposures and an understanding of the local and regional aerobiology of suspected allergens, such as pollen, mold/fungi, animal dander, dust mite, and cockroach, is required in the selection of the components for a clinically relevant allergen immunotherapy extract. Although the relationship between day-to-day outdoor pollen and fungi exposure and the development of clinical symptoms is not always clear, symptoms that occur during periods of increased exposure to allergens, in association with positive allergy skin test results or serum specific IgE antibodies, provide good evidence that such exposures are relevant. Because North America is botanically and ecologically diverse, it is not possible to devise a common list of appropriate allergen extracts for each practice location. Only clinically relevant allergens should be included in the allergen immunotherapy treatment.

**Allergen extract preparation**
**Summary Statement 77:** Allergen immunotherapy extract preparation should be performed by persons experienced and trained in handling allergenic products. A customized allergen immunotherapy extract should be prepared from a manufacturer's extract or extracts in accordance to the patient's clinical history and allergy test results and might contain single or multiple allergens. Allergen immunotherapy extracts carry the risk for anaphylaxis. Compounding personnel should be appropriately trained health professionals, including, but not limited to, registered nurses, licensed practical nurses, medical technicians, medical assistants, physician assistants, advanced practice nurses, and physicians. The compounding personnel should use the allergen extract preparation guidelines, the revised USP 797 pharmaceutical compounding guidelines, or both. The physician is responsible for providing general oversight and supervision of compounding, as well ensuring that the compounding personnel are appropriately trained in the allergen extract preparation guidelines.

WDTX-ACAAI-001531

Page 4
Texas Medical Board letter
March 2011

Careful consideration for the safety and efficacy of allergen immunotherapy as well as the appropriate selection of patients is very important to ensure the standard of care is being established.

Sincerely,

Ira Finegold, MD
Chairman,
*Submitted in collaboration, and on behalf, of the members of*
ACAAI Committee on Immunotherapy & Diagnostics

---

[1] Allergen immunotherapy: A practice parameter third update. Journal of Allergy and Clinical Immunology 2011 January.
Chief Editors: Linda Cox, MD, Harold Nelson, MD, and Richard Lockey, MD
Workgroup Contributors: Christopher Calabria, MD, Thomas Chacko, MD, Ira Finegold, MD, Michael Nelson, MD, PhD, and Richard Weber, MD
Task Force Reviewers: David I. Bernstein, MD, Joann Blessing-Moore, MD, David A. Khan, MD, David M. Lang, MD, Richard A. Nicklas, MD, John Oppenheimer, MD, Jay M. Portnoy, MD, Christopher Randolph, MD, Diane E. Schuller, MD, Sheldon L. Spector, MD, Stephen Tilles, MD, and Dana Wallace, MD.

WDTX-ACAAI-001532

# Exhibit 23a

# ACAAI
## American College of Allergy, Asthma & Immunology

*Follow the Leader Into the Future*

March 31, 2011

**President**
Dana V. Wallace, MD ('11)
Fort Lauderdale, FL

**President-Elect**
Stanley M. Fineman, MD, MBA ('11)
Marietta, GA

**Vice President**
Richard W. Weber, MD ('11)
Denver, CO

**Treasurer**
Michael B. Foggs, MD ('11)
Chicago, IL

**Past Presidents**
Sami L. Bahna, MD, DrPH ('12)
Shreveport, LA

Richard G. Gower ('11)
Spokane, WA

**Board of Regents**
David I. Bernstein, MD ('11)
Cincinnati, OH

Timothy J. Craig, DO ('11)
Hershey, PA

Alnoor A. Malick, MD ('13)
Pasadena, TX

Kevin P. McGrath, MD ('12)
Wethersfield, CT

J. Allen Meadows, MD ('11)
Montgomery, AL
Speaker, House of Delegates

Talal M. Nsouli, MD ('12)
Washington, DC

Rebecca R. Saff, MD ('11)
Boston, MA
Junior FIT Rep.

James M. Seltzer, MD ('12)
Worcester, MA

Russell A. Settipane, MD ('11)
Providence, RI

John R. Seyerle, MD ('11)
Columbus, OH
Senior FIT Rep.

Janna M. Tuck, MD ('13)
Cape Giradeau, MO

David R. Weldon, MD ('13)
College Station, TX

**Executive Medical Director**
Bobby Q. Lanier, MD

**Executive Director**
Richard J. Slawny

Texas Medical Board
Mail Code 261
P.O. Box 2018
Austin, Texas 78768-2018

Dear Colleagues:

At the request of the Board of Regents of the American College of Allergy, Asthma and Immunology, this committee is commenting on specific practices of allergy by non-allergists.

This committee and national organization recognizes that it cannot regulate the practice of medicine by duly licensed physicians. However, in the current practice of medicine in the United States, it can note that specialty societies have established guidelines for good medical practice in their specialty. One such highly respected document establishing expected standard of care is *Allergen Immunotherapy: A Practice Parameter Third Update, 2011*.[1] This document has been approved by the American Academy of Allergy, Asthma and Immunology and the American College of Allergy, Asthma and Immunology, and the Joint Council of Allergy, Asthma and Immunology.

The following excerpts from this document make recommendations that provide safety and efficacy for treated patients. It is **particularly** relevant for individuals who practice allergy without the advanced training required by the American Board of Allergy and Immunology.

### Reducing the risk of anaphylaxis to immunotherapy injections
**Summary Statement 45**: Allergen immunotherapy should be administered in a setting where procedures that can reduce the risk of anaphylaxis are in place and where the prompt recognition and treatment of anaphylaxis is ensured. The major risk of allergen immunotherapy is anaphylaxis, which in rare cases can be fatal, despite optimal management. Therefore allergen immunotherapy should be administered in a setting where anaphylaxis will be promptly recognized and treated by a physician, qualified physician extender (nurse practitioner or physician assistant), or both appropriately trained in emergency treatment. Before allergen immunotherapy is chosen as a treatment, the physician should educate the patient about the benefits and risks of immunotherapy, as well as the methods for minimizing risks. The patient also should be told that despite appropriate precautions, reactions can occur without warning signs or symptoms. Informed consent should include a discussion of the potential immunotherapy-induced adverse reactions, and this discussion should be documented in the patient's medical record.

### Supervising medical personnel
**Summary Statement 62**: Regardless of the location, allergen immunotherapy should be administered under the direct supervision of an appropriately trained physician, qualified physician extender (nurse practitioner or physician assistant), or both in a facility with the appropriate equipment, medications, and personnel to treat anaphylaxis. The physician

1

AAAC-00004176

Page two
Texas Medical Board letter
March 2011

and personnel administering immunotherapy should be aware of the technical aspects of this procedure and have available appropriately trained personnel, resuscitative equipment/medicines, and storage facilities for allergen immunotherapy extract. Physicians and other health care professionals should be able to recognize early signs and symptoms of anaphylaxis and administer emergency medications as necessary. The physician and staff should be aware of situations that might place the patient at greater risk for systemic reactions (e.g., concomitant medications that can interfere with emergency treatment, such as beta-blockers; acute illness; and asthma exacerbations at the time of allergen immunotherapy extract injection). Appropriate adjustment of dose should be made, as clinically indicated. The physician whose office prepared the patient's allergen immunotherapy extract should provide adequately labeled allergen immunotherapy extract vials, detailed directions regarding the dosage schedule for build-up and maintenance, and instructions on adjustments that might be necessary under the following circumstances:

- when providing patients with new vials;
- during seasonal exposure to allergens that are in the patient's
- allergen immunotherapy extract to which the patient
- is very sensitive;
- if the patient has missed injections; and
  and personnel administering immunotherapy should be aware of the technical aspects of this procedure and have available appropriately trained personnel, resuscitative
- when reactions occur to the allergen immunotherapy extract.

Any systemic reaction to allergen immunotherapy should be treated immediately with epinephrine, and the physician whose office prepared the allergen immunotherapy extract should be informed. This might require a return to the allergist/immunologist's office for treatment and re-evaluation.

**Prescribing physician's office**
**Summary Statement 63:**
The preferred location for administration of allergen immunotherapy is in the office of the physician who prepared the patient's allergen immunotherapy extract. The preferred location of allergen immunotherapy administration is in the office of the physician who prepared the patient's allergen immunotherapy extract. The physician's office should have the expertise, personnel, and procedures in place for the safe and effective administration of immunotherapy. However, in many cases it might be necessary to administer the allergen immunotherapy extract in another physician's office. Allergen immunotherapy should be administered with the same care wherever it is administered. A physician or qualified physician extender (nurse practitioner or physician's assistant) should be present and immediately available and be prepared to treat anaphylaxis when immunotherapy injections are administered. Regular practice drills with the office staff for handling systemic reactions to immunotherapy reactions should be considered.

**Home administration.**
**Summary Statement 65:** In rare and exceptional cases when allergen immunotherapy cannot be administered in a medical facility and withholding this therapy would result in a serious detriment to the patient's health (e.g., VIT for a patient living in a remote area), careful consideration of potential benefits and risks of at-home administration of allergen immunotherapy should be made on an individual basis. If this approach is used, informed consent should be obtained from the patient, and the person administering the injection to the patient must be educated about how to administer immunotherapy and recognize and treat anaphylaxis. Allergen immunotherapy should be administered in a medical facility with trained staff and medical equipment capable of recognizing and treating anaphylaxis. Under rare circumstances, when

2

AAAC-00004177

Page three
Texas Medical Board letter
March 2011

the benefit of allergen immunotherapy clearly outweighs the risk of withholding immunotherapy (e.g., patients with a history of venom-induced anaphylaxis living in a remote region), at-home administration of allergen immunotherapy can be considered on an individual basis. In this instance there should be a discussion with the patient, with careful consideration of the potential benefits and risks involved in home administration and alternatives. Informed consent should be obtained from the patient and appropriate family members after this discussion. Under these circumstances, another adult person should be trained to administer the injection and to treat anaphylaxis, should it occur. It should be noted, however, that the package insert approved by the FDA that accompanies all allergen extracts, including venom, implies that allergy injections should be administered in a clinical setting under the supervision of a physician. Intuitively, the risk from administering allergenic extracts outside a clinical setting would appear to be greater. Recognition and treatment of anaphylaxis might be delayed or less effective than in a clinical setting in which personnel, medications, supplies, and equipment are more optimal to promptly recognize and treat anaphylaxis. Home administration should only be considered in the rare circumstance when the benefit of immunotherapy clearly outweighs the risks. Frequent or routine prescription of home immunotherapy is not appropriate under any circumstances.

**Basis of allergen extract selection**
**Summary Statement 73:** The selection of the components of an allergen immunotherapy extract should be based on a careful history in correlation with positive allergy skin test results or serum specific IgE antibodies. The allergen immunotherapy extract should contain only clinically relevant allergens. In choosing the components for a clinically relevant allergen immunotherapy extract, the physician should be familiar with local and regional aerobiology and indoor and outdoor allergens, paying special attention to potential allergens in the patient's own environment. A careful history, noting environmental exposures and an understanding of the local and regional aerobiology of suspected allergens, such as pollen, mold/fungi, animal dander, dust mite, and cockroach, is required in the selection of the components for a clinically relevant allergen immunotherapy extract. Although the relationship between day-to-day outdoor pollen and fungi exposure and the development of clinical symptoms is not always clear, symptoms that occur during periods of increased exposure to allergens, in association with positive allergy skin test results or serum specific IgE antibodies, provide good evidence that such exposures are relevant. Because North America is botanically and ecologically diverse, it is not possible to devise a common list of appropriate allergen extracts for each practice location. Only clinically relevant allergens should be included in the allergen immunotherapy treatment.

**Allergen extract preparation**
**Summary Statement 77:** Allergen immunotherapy extract preparation should be performed by persons experienced and trained in handling allergenic products. A customized allergen immunotherapy extract should be prepared from a manufacturer's extract or extracts in accordance to the patient's clinical history and allergy test results and might contain single or multiple allergens. Allergen immunotherapy extracts carry the risk for anaphylaxis. Compounding personnel should be appropriately trained health professionals, including, but not limited to, registered nurses, licensed practical nurses, medical technicians, medical assistants, physician assistants, advanced practice nurses, and physicians. The compounding personnel should use the allergen extract preparation guidelines, the revised USP 797 pharmaceutical compounding guidelines, or both. The physician is responsible for providing general oversight and supervision of compounding, as well ensuring that the compounding personnel are appropriately trained in the allergen extract preparation guidelines.

3

AAAC-00004178

Page 4
Texas Medical Board letter
March 2011


Careful consideration for the safety and efficacy of allergen immunotherapy as well as the appropriate selection of patients is very important to ensure the standard of care is being established.



Sincerely,

*Ira Finegold, M.D.*

Ira Finegold, MD
Chairman,
*Submitted in collaboration, and on behalf, of the members of*
ACAAI Committee on Immunotherapy & Diagnostics



IF/mlc
Cc:      Dr. Dana V. Wallace, President
         Dr. Stanley M. Fineman, President-elect
         Dr. Bob Q. Lanier, Executive Medical Director
         Mr. Rick Slawny, Executive Director
         Ms. Mary L Callaghan, Director of Administration


---

[1] Allergen immunotherapy: A practice parameter third update. Journal of Allergy and Clinical Immunology 2011 January.
Chief Editors: Linda Cox, MD, Harold Nelson, MD, and Richard Lockey, MD
Workgroup Contributors: Christopher Calabria, MD, Thomas Chacko, MD, Ira Finegold, MD, Michael Nelson, MD, PhD, and Richard Weber, MD
Task Force Reviewers: David I. Bernstein, MD, Joann Blessing-Moore, MD, David A. Khan, MD, David M. Lang, MD, Richard A. Nicklas, MD, John Oppenheimer, MD, Jay M. Portnoy, MD, Christopher Randolph, MD, Diane E. Schuller, MD, Sheldon L. Spector, MD, Stephen Tilles, MD, and Dana Wallace, MD.

4

AAAC-00004179

# Exhibit 26

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES AND ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE, § § § § § | |
| Plaintiffs, § § | |
| v. § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; PSF, PLLC; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD § § § § § § § § § § § § § § § § § | Civil Action No. 5:14-CV-00035-OLG |
| Defendants. § | |

## DEFENDANT JCAAI'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and the Local Rules of the United States District Court for the Western District of Texas, the Joint Council of Allergy, Asthma & Immunology ("JCAAI"), by and through its undersigned attorneys, hereby supplement their response to Plaintiffs' Second Set of Requests for Production of Documents and Interrogatories. JCAAI is willing to meet and confer to discuss these objections and responses, should Plaintiffs' counsel desire to do so.

## **GENERAL OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTEROGATORIES**

JCAAI makes the following general responses and objections ("General Objections") to Plaintiffs' interrogatories ("Interrogatories") as set forth in Plaintiffs' Second Set of Requests for Production of Documents and Interrogatories to JCAAI dated June 6, 2014.

1. These responses are made solely for the purpose of the above-captioned action and are based on JCAAI's current knowledge. JCAAI will respond to the Interrogatories on the basis of the best information available to it at the time of gathering responsive information, subject to the objections described below. Further investigation may reveal additional information or documents that are responsive to the Interrogatories or that could lead to additions to, changes in, and/or variations from the responses herein. Without in any way obligating itself to do so, JCAAI reserves the right, where appropriate, to supplement, amend, correct, clarify, and/or modify the responses contained herein, pursuant to Federal Rule of Procedure 26(e), as further information becomes available. JCAAI also reserves the right to use or rely on, at any time, subsequently discovered information or information omitted from these responses and objections as a result of mistake, error, oversight, or inadvertence.

2. JCAAI's response to any particular Interrogatory is not an admission that it accepts or admits the existence of any fact set forth or assumed by the Interrogatory, or that the response constitutes, incorporates, or refers to admissible evidence. No response to any portion of any Interrogatory shall be deemed a waiver of any objection set forth herein that could be made to any such portion of the Interrogatory regarding relevancy of the information or its admissibility.

3. JCAAI objects to the Interrogatories to the extent that they seek to impose any obligations broader than, different from, or in addition to those imposed by the Federal Rules, the Local Rules, and any applicable order of this Court.

2

4.      JCAAI objects to the Interrogatories to the extent that they seek information not in the custody, possession, or control of JCAAI and/or purport to call for information that JCAAI no longer possesses, or that it was under no obligation to maintain.

5.      JCAAI objects to the Interrogatories to the extent that they seek information or documents that are neither relevant to the claims and defenses in the action nor reasonably calculated to lead to the discovery of admissible evidence.

6.      JCAAI objects to the Interrogatories to the extent that they are vague, ambiguous, overly broad, and/or unduly burdensome, including to the extent they seek "all" or "any" materials or information concerning the subject matters referenced therein, particularly under circumstances in which a subset of all such materials or information would be sufficient to disclose the pertinent information to Plaintiffs.

7.      JCAAI objects to each of the Interrogatories to the extent it seeks information that is also sought by other Interrogatories, or by other discovery requests, on the grounds that such Interrogatories are unnecessarily cumulative and duplicative.

8.      JCAAI objects to the Interrogatories to the extent that they purport to require information that is public, that is already in Plaintiffs' possession, custody, or control, or that is otherwise available from sources to which Plaintiffs have access.

9.      JCAAI objects to the Interrogatories to the extent that they purport to seek information in the possession, custody, or control of its members, affiliates, or other strangers to this litigation having corporate or other identities separate and apart from JCAAI and that therefore are not in JCAAI's possession, custody, or control.

10.     JCAAI objects to the Interrogatories to the extent that they seek information or documents (a) that were prepared in anticipation of or in connection with litigation, (b) that constitute, contain, or reflect work product, (c) that constitute, contain, or reflect attorney-client

3

communications, (d) that are subject to the protections of Federal Rule of Civil Procedure

26(b)(4)(B) and 26(b)(4)(C), or (e) that are otherwise protected from disclosure pursuant to the

attorney-client privilege, the work-product doctrine, the joint-defense or common-interest

doctrine, or any other applicable privilege, exemption, immunity, or protection against disclosure

arising under any applicable law or rule.   Any disclosure of privileged or protected information or

documents in response to the Interrogatories is inadvertent and is not intended to waive JCAAI's

rights to assert all applicable privileges, immunities, exemptions, or protections against disclosure

of such documents or information, and JCAAI insists that any such inadvertently disclosed

documents or information immediately be returned to JCAAI upon Plaintiffs' discovery of any

such inadvertent disclosure.

     11.    JCAAI objects to the Interrogatories to the extent that they seek information

protected from disclosure pursuant to federal and state privacy laws, including the Health

Insurance Portability and Accountability Act ("HIPAA").

     12.    JCAAI objects to the Interrogatories to the extent that they purport to require it to

create or generate documents that do not currently exist.

     13.    JCAAI objects to the Interrogatories to the extent that they call for information that

is more appropriately sought through another form of discovery, including a document request.

     14.    JCAAI objects to the definition of "You," "Your," "Yours," "Defendant," and

"Defendants" as overbroad, unduly burdensome, vague, and ambiguous.

     15.    JCAAI objects to the definition of the terms "remote practice," "remote practice of

allergy," and "RPA" as overbroad, vague, and ambiguous.   Additionally, JCAAI objects to the

definition of these terms as misleading and misrepresentative of usage of these terms in medical

and common parlance.

16.     JCAAI objects to the Interrogatories to the extent that they are overly broad, unduly burdensome, and/or oppressive.

17.     The Interrogatories propounded by Plaintiffs are construed by Defendants to count against Plaintiffs' total of 25 written interrogatories as set out in Federal Rule of Civil Procedure 33(a)(1).   Defendants reserve the right to object to future Interrogatories in excess of this limit.

18.     No incidental or implied concession or waiver as to any potential evidentiary objections is intended by the responses set forth below.   The fact that documents are referenced in JCAAI's responses is not intended to be, and shall not be construed as, a waiver of any objection as to the admissibility of same documents.   In furnishing the responses herein, JCAAI does not concede or admit the truth of any factual assertion or implication contained in any document referenced in these responses.

19.     JCAAI reserves the right to seek a Protective Order at any time limiting or quashing any Interrogatory, in whole or in part.

20.     The General Objections set forth above apply to each and every specific Response contained herein and are incorporated by reference into each of the specific Responses below as if fully set forth therein.   Objections set forth in any of the specific Responses below on any of the grounds also set forth in these General Objections are provided for emphasis and clarity only, and the absence of a Specific Objection on a particular ground should not be construed as an indication that JCAAI does not object to a particular Interrogatory on the basis of an applicable General Objection.

**SPECIFIC RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF INTEROGATORIES**

Subject to, in accordance with, and without waiving any of the foregoing General Objections, and as further specified in each of the specific objections set forth below, JCAAI responds and objects as follows:

**INTERROGATORY NO. 1:**

Identify all persons within Your organization, business, or with which You have a business or professional relationship, that You know is employed by or advises in any capacity any third-party payor regarding performance, payment, or reimbursement of allergy testing and allergen immunotherapy, including the name and location of the third-party payor, the capacity that person is employed by or advises the third-party payor, and the dates of employment or period of advising. The scope of this Interrogatory is limited to those persons who You know to have been employed by or advised a third-party payor at any time beginning January 2010 through the present.

**RESPONSE AND OBJECTION TO INTERROGATORY NO. 1:**

JCAAI incorporates by reference its General Objections as if fully set forth herein. In addition, JCAAI objects to this Interrogatory on the grounds that it is overbroad in that it seeks information related to relationships that JCAAI's members may have had in their individual capacity or on behalf of their private medical practices, information regarding individual member's medical practices is outside the scope of claims or defenses and duplicative of other discovery requests served in this litigation. JCAAI further objects to the terms "all," "any," "business or professional relationship," "know," "advises," and "within your organization" as unintelligible, overbroad, vague, and ambiguous. JCAAI also objects to this Interrogatory on the grounds that it is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. JCAAI further objects to this Interrogatory to the extent that it seeks information not in its custody, control, or possession such that individual members of JCAAI may have been employed or be employed by third-party payors as consultants outside the knowledge or control of JCAAI.

JCAAI understands this Interrogatory to request information regarding employment or advising relationships between its Executive Officers and members of its Board of Directors with

6

third-party payors.   Subject to that understanding and without waiving the forgoing Specific Objections or General Objections, JCAAI is unaware of any such relationships.

**INTERROGATORY NO. 2:**

Identify all communications You have engaged in with third-party payors, including without limitation any and all individuals known to be associated with those entities, related to the provision of allergy testing and allergen immunotherapy by any physician or business other than that operated by a board-certified allergist, including the businesses, practices, prices, billing, reimbursement, and services of non-board certified allergists and/or related support services by UAS. The scope of this Interrogatory is limited to those communications which have taken place during the time period from January 2010 through the present. This request includes communications of which you are aware engaged in by your members, agents, colleagues, and other individuals, including those persons in the definition for "You" as defined above, whether or not You assert that such communications were on Your behalf. Include in your response, with respect to each such communication:

    a)  the form of the communication;

    b)  the substance of both the communication and any related response;

    c)  the date on which the communication took place;

    d)  the identities of all persons involved in the communication including the identities of all persons involved in assessing whether to initiate such communication or in evaluating any response received;

    e)  the identification of all documents associated with the communication, any related response, and any assessments conducted regarding whether to initiate such communication or in evaluating any response received.

**RESPONSE AND OBJECTION TO INTERROGATORY NO. 2**

7

JCAAI incorporates by reference its General Objections as if fully set forth herein.   In addition, JCAAI objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. JCAAI further objects to the terms "all," "any," and "known to be associated" as unintelligible, overbroad, vague, and ambiguous.   JCAAI further objects to this Interrogatory to the extent that it seeks information protected from disclosure pursuant to federal and state privacy law including the Health Insurance Portability and Accountability Act ("HIPAA").   JCAAI further objects to this Interrogatory to the extent that it seeks information not in its custody, control, or possession such that JCAAI's members may have had communications with third-party payors outside its knowledge or control.   JCAAI further objects to this Interrogatory on the grounds that it seeks information more appropriately sought through a document request or otherwise represents a request duplicative of another discovery request.   JCAAI further objects to this Interrogatory and its subparts as compound in that it constitutes five Interrogatories.

Subject to and without waiving the forgoing Specific Objections or General Objections, JCAAI responds as follows: JCAAI will identify oral communications by members of JCAAI's Board of Directors or JCAAI's Executive Officers with third-party payors regarding the provision of allergy testing and allergen immunotherapy by any physician or business other than that operated by a board-certified allergist.   To the extent this interrogatory calls for a summary of documents, JCAAI refers plaintiffs to documents it has produced, or will produce, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

On or about May 21, 2012, Dr. Donald Aaronson, acting in his capacity as Executive Director of JCAAI, sent James Guy of Blue Cross/Blue Shield of Texas a letter responding to questions received from Mr. Guy on April 30 and May 1 of the same year regarding the scope of

8

services covered by CPT codes 95004, 95024, and 95165 and provision of allergen immunotherapy by non-board-certified allergists.

In approximately the fall of 2013, Dr. Lyndon Mansfield, then a member of JCAAI's Board of Directors, was contacted by Dr. Gilbert Handal of El Paso First Health Plan regarding the practice of allergy by non-specialists.

On or about June 17, 2014, Dr. David Brown, a member of JCAAI's Board of Directors, had a phone conversation with the Medical Director of United Healthcare of North Carolina. Dr. Brown had this conversation in his capacity as the President of Allergy Partners, P.A., in connection with that entity's consideration of a partnership with certain primary care physicians. Dr. Brown asked whether United Healthcare is currently planning on changing its policy with respect to primary care physicians or other non-board-certified allergists billing for allergen immunotherapy.

**FIRST SUPPLEMENTAL RESPONSE:**

In August, 2011, Dr. James Sublett had an in-person conversation with Dr. Tom James, the then-Medical Director of Humana. In that conversation, Dr. James asked Dr. Sublett for his views regarding whether companies providing remote practice of allergy had engaged in fraudulent billing practices. Dr. Sublett expressed his concern with billing by any physician that was not correlated with medical necessity or that involved unproven methods of treatment. This conversation occurred over a largely social breakfast meeting.

On October 3, 2011, Dr. James Sublett had an in-person conversation with Dr. Tom James, the then-Medical Director of Humana. In that conversation, they discussed, among social topics and general conversation regarding their respective businesses, issues surrounding remote practice of allergy, generally, and the changing nature of allergy care. This brief conversation occurred in the Baltimore airport when Dr. Sublett and Dr. James ran into one another by coincidence.

9

DATED: July 22, 2014

**GIBSON, DUNN & CRUTCHER LLP**

By _/s/ Rachel S. Brass_
Rachel S. Brass
  State Bar No. 219301 (California)
  RBrass@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, California 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

Veronica S. Lewis
  State Bar No. 24000092
  VLewis@gibsondunn.com
Christopher Wilson
  State Bar No. 24085660
  CWilson@gibsondunn.com
2100 McKinney Avenue
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

**ATTORNEYS FOR DEFENDANTS
AMERICAN COLLEGE OF ALLERGY,
ASTHMA & IMMUNOTHERAPY;
JOINT COUNCIL OF ALLERGY,
ASTHMA, AND IMMUNOLOGY;
DALLAS ALLERGY & ASTHMA
CENTER, P.A.; FAMILY ALLERGY &
ASTHMA LLC; LYNDON E.
MANSFIELD M.D., P.A., A
PROFESSIONAL ASSOCIATION;
DONALD AARONSON, M.D., GARY
GROSS, M.D.; JAMES SUBLETT, M.D.,
AND DAVID WELDON, M.D.**

10

**DAVIS, CEDILLO & MENDOZA, INC.**

By: */s/ Ricardo G. Cedillo*
Ricardo G. Cedillo
  State Bar No. 04043600
  rcedillo@lawdcm.com
Mark W. Kiehne
  State Bar No. 24032627
  mkiehne@lawdcm.com

McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, Texas 78212
Telephone: (210) 822-6666
Facsimile: (210) 822-1151

**ATTORNEYS FOR DEFENDANTS
AMERICAN COLLEGE OF ALLERGY
ASTHMA & IMMUNOLOGY; JOINT
COUNCIL OF ALLERGY ASTHMA &
IMMUNOLOGY; JAMES SUBLETT, M.D.;
GARY GROSS, M.D.; LYNDON
MANSFIELD, M.D.; DONALD
AARRONSON, M.D.; AND DAVID
WELDON, M.D.**

11

# Exhibit 27a

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § § | |
| Plaintiffs, | § § | Civil Action No. 5:14-CV-00035-OLG |
| v. | § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; PSF, PLLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD | § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES TO AAAAI

To:   Defendant American Academy of Allergy, Asthma & Immunology; through its counsel of record Greenberg Traurig, LLP, 300 West 6th Street, Ste. 2050, Austin, TX 78701.

Pursuant to Federal Rules of Civil Procedure 33 and 34, Local Civil Rules 26 and 33, Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively, "Plaintiffs") by and through their counsel of record, hereby propound the following interrogatory and requests for production of documents on Defendant the American Academy of Allergy, Asthma & Immunology ("AAAAI"), to be answered and responded to under oath within 30 days of service in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

## DEFINITIONS

1.     Plaintiffs hereby incorporate by reference as though fully set forth herein all Definitions and Rules of Construction set forth in Local Civil Rule 26(b).

2.     "You," "Your," and "Yours" as well as "Defendant" and "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

3.     The term "communication" shall be interpreted in accordance with Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

4.     The term "document" shall be interpreted in accordance with Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the

#4594964

original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

5.     The term "non-board certified allergist(s)" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified allergist(s)" shall refer to those physicians who have obtained such certification or are eligible for the certification.

6.     The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

7.     The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

8.     The terms "related to", "relating to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

9.     The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

10.     "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

#4594964

11.     The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.     The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.     The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14.     The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15.     The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other

-4-

person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16.    The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity.

17.    The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter found at Docket No. 12-29.

#4594964

# INSTRUCTIONS

The following instructions are applicable to these Interrogatories and Requests for Production unless otherwise specifically indicated:

1.      Each Request must be answered separately, fully, and specifically by each Defendant. Each response shall first set forth verbatim the Request to which it is responsive, followed by Defendants' response. If any objections are made in response, the reasons therefore shall be stated.

2.      When an answer to an Interrogatory is supplied on information and belief, so state, and describe in detail all sources of such information and belief. If you are unable to answer an Interrogatory, in whole or in part, either by actual knowledge or upon information and belief, so state, and confirm you have conducted a reasonable inquiry to obtain any relevant knowledge or information.

3.      All documents should be produced in accordance with Fed. R. Civ. P. 34(b)(2)(E), Local Civil Rule 26(b), and the Parties' agreement as described in the Joint Report on Rule 26 Discovery Plan found at Docket No. 78, as kept in the ordinary course and shall include electronically stored information including all associated metadata to be produced in an intelligible format or together with a description of the system from which it was derived sufficient to permit rendering the materials intelligible including in accordance with the Parties' "agreed format for production of electronically stored information" as stated in Docket No. 78-3. In producing documents, furnish all documents known or available to You regardless of whether such documents are possessed directly by You, or any of Your officers, directors, employees, agents, representatives, members, or attorneys, as well as any other document in Your custody or control.

#4594964

4.      Unless otherwise stated, each request covers the time period from January 1, 2010 to the present.  Each Request shall be deemed to be continuing in nature so as to require prompt supplementation if any further information called for herein is discovered, obtained, or created at any time hereafter in accordance with Federal Rule of Civil Procedure 26(e)(1)(A).

5.      Should any document be withheld or redacted based on some limitation of discovery (including a claim of privilege), please supply the following information:

A.      The identity of each document's author(s), writer(s), sender(s), or initiator(s);

B.      The identity of each document's recipient(s), addressee(s), or party(ies) for whom it was intended, including whether that recipient was copied or blind copied on the document or communication;

C.      The date of creation or transmittal indicated on each document, or an estimate of that date, indicated as such, if no date appears on the Document;

D.      The general subject matter as described on each document, or, if no such description appears, then some other description sufficient to identify the document; and

E.      The claimed ground(s) for limitation of discovery (e.g., "attorney-client privilege" or "attorney work product doctrine") and specific and precise reasons to support the claim.

#4594964

## INTERROGATORIES NOS. 1-2

INTERROGATORY NO. 1

Identify all persons within Your organization, business, or with which You have a business or professional relationship, that You know is employed by or advises in any capacity any third-party payor regarding performance, payment, or reimbursement of allergy testing and allergen immunotherapy, including the name and location of the third-party payor, the capacity that person is employed by or advises the third-party payor, and the dates of employment or period of advising. The scope of this Interrogatory is limited to those persons who You know to have been employed by or advised a third-party payor at any time beginning January 2010 through the present.

INTERROGATORY NO. 2

Identify all communications You have engaged in with third-party payors, including without limitation any and all individuals known to be associated with those entities, related to the provision of allergy testing and allergen immunotherapy by any physician or business other than that operated by a board-certified allergist, including the businesses, practices, prices, billing, reimbursement, and services of non-board certified allergists and/or related support services by UAS. The scope of this Interrogatory is limited to those communications which have taken place during the time period from January 2010 through the present. This request includes communications of which you are aware engaged in by your members, agents, colleagues, and other individuals, including those persons in the definition for "You" as defined above, whether or not You assert that such communications were on Your behalf. Include in your response, with respect to each such communication:

a) the form of the communication;

b) the substance of both the communication and any related response;

c) the date on which the communication took place;

d) the identities of all persons involved in the communication including the identities of all persons involved in assessing whether to initiate such communication or in evaluating any response received;

e) the identification of all documents associated with the communication, any related response, and any assessments conducted regarding whether to initiate such communication or in evaluating any response received.

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1: Any documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA."

REQUEST FOR PRODUCTION NO. 2: Any documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL" or Plaintiff AAAPC or any of its member physicians.

REQUEST FOR PRODUCTION NO. 3: Any documents concerning the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

REQUEST FOR PRODUCTION NO. 4: Any documents related to communications with third-party payors concerning allergy testing or allergen immunotherapy performed by primary care physicians or non-board certified allergists.

#4594964

REQUEST FOR PRODUCTION NO. 5: Any documents related to communications with third-party payors concerning UAS.

REQUEST FOR PRODUCTION NO. 6: Any documents related to communications with Aetna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS. This request specifically includes communications between Rebecca Burke and Dr. Chris Jagmin and all related documents including the communications with Aetna Defendants claimed were non-responsive to the Court ordered expedited discovery.

REQUEST FOR PRODUCTION NO. 7: Any documents related to communications with Cigna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 8: Any documents related to communications with Humana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 9: Any documents related to communications with United Healthcare including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 10: Any documents related to communications with Blue Cross/Blue Shield of Texas including any and all persons known to be associated with that

entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 11: Any documents related to communications with Blue Cross/Blue Shield of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 12: Any documents related to communications with Blue Cross/Blue Shield of Florida including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 13: Any documents related to communications with Blue Cross/Blue Shield of Louisiana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 14: Any documents related to communications with Blue Cross/Blue Shield of North Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 15: Any documents related to communications with Blue Cross/Blue Shield of South Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

#4594964

REQUEST FOR PRODUCTION NO. 16: Any documents related to communications with Blue Cross/Blue Shield of Kentucky including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 17: Any documents related to communications with Centene including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 18: Any documents related to communications with Superior HealthPlan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 19: Any documents related to communications with El Paso First Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 20: Any documents related to communications with Parkland Community Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 21: Any documents related to communications with Texas Children's Health Plan including any and all persons known to be associated with that entity, that

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 22: Any documents related to communications with Community Health Choice including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 23: Any documents related to communications with Texas Medicaid and Healthcare Partnership, Xerox, Accenture, or any other person or entity acting or purporting to be acting on behalf of those entities regarding allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 24: Any documents related to communications with Coventry of the Carolinas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 25: Any documents related to communications with Coventry of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 26: Any documents related to communications with Coventry of Florida including any and all persons known to be associated with that entity, that

#4594964

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 27: Any documents related to the February 2013 AAAAI Annual Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 28: Any documents related to the February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 29: Any documents concerning the "Regional Advocacy Discussion and Response" initiative (RADAR).

REQUEST FOR PRODUCTION NO. 30: Any documents sufficient to identify the complete membership of RADAR.

REQUEST FOR PRODUCTION NO. 31: Any documents concerning the vetting process for RADAR referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 32: Any documents concerning the communications and actions referenced in the February 8, 2011 letter attached as Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25.

REQUEST FOR PRODUCTION NO. 33: Any documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

REQUEST FOR PRODUCTION NO. 34: Any documents concerning communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

REQUEST FOR PRODUCTION NO. 35: Any documents concerning the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29, including without limitation all drafts of the newsletter and any communications related to the approval thereof by Defendant Dr. Sublett.

REQUEST FOR PRODUCTION NO. 36: Any documents concerning the "Business Builder" article in "Medical Economics" referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice." Attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29.

REQUEST FOR PRODUCTION NO. 37: Any documents concerning the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt No. 12-29.

REQUEST FOR PRODUCTION NO. 38: Any documents concerning requirements to become a member of AAAAI.

REQUEST FOR PRODUCTION NO. 39: Any documents sufficient to identify the membership of AAAAI.

REQUEST FOR PRODUCTION NO. 40: Any documents concerning Allen Kaplan and his relationship with UAS.

REQUEST FOR PRODUCTION NO. 41: Any documents concerning the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 42: Any documents concerning "JCAAI's legal advisors [had] repeatedly warned . . . against actions which might be considered restraint of trade – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior" as described the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 43: Any documents relating to the communications attached as Exhibit P to Plaintiffs' Motion for Preliminary Injunction Dkt. No. 12-46.

REQUEST FOR PRODUCTION NO. 44: Any documents concerning requirements to become a member of JCAAI.

REQUEST FOR PRODUCTION NO. 45: Any documents sufficient to identify the complete membership of JCAAI.

REQUEST FOR PRODUCTION NO. 46: Any documents concerning the eligibility requirements necessary to obtain certification from the ABAI.

REQUEST FOR PRODUCTION NO. 47: Any documents sufficient to identify the number of practicing board-certified allergists in the United States.

REQUEST FOR PRODUCTION NO. 48: Any documents sufficient to identify the number of practicing board-certified allergists in Texas.

REQUEST FOR PRODUCTION NO. 49: Any documents related to communications with the Texas Medical Board, the Louisiana Medical Board, or any other state medical board concerning primary care physicians practicing allergy testing or allergen immunotherapy or UAS.

REQUEST FOR PRODUCTION NO. 50: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning primary care physicians practicing allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 51: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning UAS.

REQUEST FOR PRODUCTION NO. 52: Any documents concerning the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly's communications with state and local AAI society leaders as described in Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25.

REQUEST FOR PRODUCTION NO. 53: Any documents concerning the meeting between Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks with the ACAAI House of Delegates referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 54: Any documents concerning the "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative

#4594964

January 2011" referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 55: Any documents concerning the January 2011 AAAAI Annual Meeting including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 56: Any documents concerning the AAAAI Executive Board Agenda referenced in Exhibit No. Q to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-47.

REQUEST FOR PRODUCTION NO. 57: Any documents concerning the joint letter between AAAAI and JCAAI regarding Medicaid rates referenced in AAAAI00019.

REQUEST FOR PRODUCTION NO. 58: Any documents concerning the patient database referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 59: Any documents concerning the ARTrust Board referenced in AAAAI00024.

REQUEST FOR PRODUCTION NO. 60: Any documents concerning all meetings of the AAAAI Executive Board, the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly, the AAAAI Task Force on the Future of Allergy/Immunology, the AAAAI Advocacy Committee, the JCAAI board of directors, the JCAAI task force for remote practice issues, and the JCAAI "strike force," from January 1, 2010 to the present, including all meeting minutes, notes, agenda items, membership identification,  actions, and any other document related to these meetings.

REQUEST FOR PRODUCTION NO. 61: Any documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

REQUEST FOR PRODUCTION NO. 62: Any documents concerning any joint meetings or communications with AAAAI, ACAAI, JCAAI, AAOA, or any other outside organization or association or anyone purporting to act on their behalf concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

REQUEST FOR PRODUCTION NO. 63: Any documents related to communications with the AAOA, including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 64: Any documents related to communications with the Allergy & Asthma Network Mothers of Asthmatics (AANMA), including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

-19-

REQUEST FOR PRODUCTION NO. 65: Any documents related to the letter from Thomas Casale to Aetna concerning Aetna's reimbursement of immunotherapy referenced in AAAAI00066.

REQUEST FOR PRODUCTION NO. 66: Any documents related to communications with John Henley concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 67: Any documents related to communications with Wesley Burks concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 68: Any documents related to communications with ACAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 69: Any documents related to communications with JCAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 70: Any documents related to communications with any AAAAI member, including all persons, agents, or entities acting or purporting to act on that member's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 71: Any documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 72: Any documents related to communications with Hollister-Stier Laboratories, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 73: Any documents related to communications with Greer Laboratories, Inc., including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 74: Any documents related to communications with ALK, including all persons, agents, or entities acting or purporting to act on that agency's behalf

concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 75: Any documents related to communications with Donald Aaronson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 76: Any documents related to communications with Gary Gross, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 77: Any documents related to communications with Lyndon Mansfield, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA;" or UAS.

REQUEST FOR PRODUCTION NO. 78: Any documents related to communications with James Sublett, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians,

-22-

non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 79: Any documents related to communications with David Weldon, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 80: Any documents related to communications with Stanley Fineman, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 81: Any documents related to communications with TAAIS, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 82: Any documents related to communications with Stuart Abramson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

-23-

REQUEST FOR PRODUCTION NO. 83: Any documents related to communications with Theodore Freeman, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 84: Any documents related to communications with Wesley Stafford, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 85: Any documents related to communications with William McKenna, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 86: Any documents related to communications with Michael Vaughn, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 87: Any documents related to communications with Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on his

#4594964

behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 88: Any documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 89: Any documents related to communications with anyone who participated in the Regional Advocacy Discussion and Response (RADAR) Team, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 90: Any documents related to communications to AAAAI members concerning this cause, including any directions or communications concerning the preservation or destruction of relevant documents.

REQUEST FOR PRODUCTION NO. 91: Any documents related to any position statement by AAAAI, ACAAI, or JCAAI concerning allergy testing or allergen immunotherapy including statements concerning the billing or reimbursement for these services, qualification of a physician to perform allergy testing and allergen immunotherapy services, home administration of allergen immunotherapy, reliance on a technician or an allergy services company, or any other position statement or document concerning the position of AAAAI concerning these issues.

REQUEST FOR PRODUCTION NO. 92: Any documents related to the AAAAI position statement referenced in AAAAI000055.

REQUEST FOR PRODUCTION NO. 93: Any documents related to any member who acts as a representative of a third-party payor concerning allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 94: Any documents related to communications with "Cliff" as referenced in WDTX-JCAAI-000590-91.

REQUEST FOR PRODUCTION NO. 95: Any documents related to Interrogatory No. 1.

REQUEST FOR PRODUCTION NO. 96: Any documents related to Interrogatory No. 2.

REQUEST FOR PRODUCTION NO. 97: Any documents identified in response to Interrogatory No. 2, subpart (e).

REQUEST FOR PRODUCTION NO. 98: Any documents concerning requirements to become a member of ACAAI.

REQUEST FOR PRODUCTION NO. 99: Any documents sufficient to identify the membership of ACAAI.

REQUEST FOR PRODUCTION NO. 100: Any documents related to Patrick Strauss, Allerta Corp., or AllergiSource, LLC including all communications with any associated individual or entity.

#4594964

REQUEST FOR PRODUCTION NO. 101: Any documents related to the Annual Scientific

Meeting in Baltimore on Nov. 7-11, 2013 concerning RADAR.

#4594964

Dated: June 6, 2014

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By:   /s/ Casey Low
      Casey Low
      Texas Bar No. 24041363
      111 Congress Ave., Suite 2300
      Austin, Texas 78701-4061
      Phone: (512) 542-2109
      Fax: (800) 404-3970
      casey.low@bgllp.com

      Richard C. Danysh
      Texas Bar No. 05377700
      300 Convent St., Suite 1500
      San Antonio, Texas 78205-3723
      Phone: (210) 299-3475
      Fax: (210) 299-0106
      richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS

-28-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents and Admissions has been electronically served on all counsel of record on this 6th day of June, 2014.

Steven V. Walkowiak
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Ste. 6200
Dallas, TX 75201
Walkowiaks@gtlaw.com
214-665-5928   Fax

Gregory J Casas
Elizabeth R. Hadley
GREENBERG TRAURIG, LLP
300 West 6th Street, Ste. 2050
Austin, TX 78701
casasg@gtlaw.com
hadleye@gtlaw.com
512-320-7210   Fax

Paul J. Brown
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
brownpa@gtlaw.com
713-374-3505 Fax

**ATTORNEYS FOR AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY,**

Christopher M. Wilson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, TX  75201-6912
CWilson@gibsondunn.com
214-571-2940 Fax

Rachel S. Brass
Veronica S Lewis
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
RBrass@gibsondunn.com
VLewis@gibsondunn.com
415-374-8429 Fax

#4594964

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOTHERAPY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; AND DAVID WELDON, MD**

Ricardo G. Cedillo
Mark W. Kiehne
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, TX 78212
rcedillo@lawdcm.com
mkiehne@lawdcm.com
210-822-1151 Fax

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; JAMES SUBLETT, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; DONALD AARONSON, MD; AND DAVID WELDON, MD**

Michael W. Oyler
REED WEITKAMP SCHELL & VICE PLLC
500 W. Jefferson Street, Suite 2400
Louisville, KY 40202
moyler@rwsvlaw.com
502-562-2200 Fax

**ATTORNEYS FOR DEFENDANT JAMES SUBLETT, MD**

/s/ Casey Low
Casey Low

#4594964

# Exhibit 27b

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | Civil Action No. 5:14-CV-00035-OLG |
| v. | § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; PSF, PLLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' SECOND SET OF
## REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES TO
## ACAAI

To:     Defendant American College of Allergy, Asthma & Immunology; through its counsel of record Gibson, Dunn & Crutcher LLP, 555 Mission Street, Suite 3000, San Francisco, CA 94105-0921.

Pursuant to Federal Rules of Civil Procedure 33 and 34, Local Civil Rules 26 and 33, Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively, "Plaintiffs") by and through their counsel of record, hereby propound the following interrogatory and requests for production of documents on Defendant the American College of Allergy, Asthma & Immunology ("ACAAI"), to be answered and responded to under oath within 30 days of service in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

**DEFINITIONS**

1.      Plaintiffs hereby incorporate by reference as though fully set forth herein all Definitions and Rules of Construction set forth in Local Civil Rule 26(b).

2.      "You," "Your," and "Yours" as well as "Defendant" and "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

3.      The term "communication" shall be interpreted in accordance with Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

4.      The term "document" shall be interpreted in accordance with Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the

-2-

original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

5.    The term "non-board certified allergist(s)" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified allergist(s)" shall refer to those physicians who have obtained such certification or are eligible for the certification.

6.    The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

7.    The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

8.    The terms "related to", "relating to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

9.    The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

10.    "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

#4586716

11.     The term "JCAAI" shall mean the Joint Council of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.     The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.     The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14.     The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15.     The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other

#4586716

person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16.     The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity.

17.     The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter found at Docket No. 12-29.

#4586716

## INSTRUCTIONS

The following instructions are applicable to these Interrogatories and Requests for Production unless otherwise specifically indicated:

1.     Each Request must be answered separately, fully, and specifically by each Defendant. Each response shall first set forth verbatim the Request to which it is responsive, followed by Defendants' response. If any objections are made in response, the reasons therefore shall be stated.

2.     When an answer to an Interrogatory is supplied on information and belief, so state, and describe in detail all sources of such information and belief. If you are unable to answer an Interrogatory, in whole or in part, either by actual knowledge or upon information and belief, so state, and confirm you have conducted a reasonable inquiry to obtain any relevant knowledge or information.

3.     All documents should be produced in accordance with Fed. R. Civ. P. 34(b)(2)(E), Local Civil Rule 26(b), and the Parties' agreement as described in the Joint Report on Rule 26 Discovery Plan found at Docket No. 78, as kept in the ordinary course and shall include electronically stored information including all associated metadata to be produced in an intelligible format or together with a description of the system from which it was derived sufficient to permit rendering the materials intelligible, including in accordance with the Parties' "agreed format for production of electronically stored information" as stated in Docket No. 78-3. In producing documents, furnish all documents known or available to You regardless of whether such documents are possessed directly by You, or any of Your officers, directors, employees, agents, representatives, members, or attorneys, as well as any other document in Your custody or control.

4.      Unless otherwise stated, each request covers the time period from January 1, 2010 to the present.  Each Request shall be deemed to be continuing in nature so as to require prompt supplementation if any further information called for herein is discovered, obtained, or created at any time hereafter in accordance with Federal Rule of Civil Procedure 26(e)(1)(A).

5.      Should any document be withheld or redacted based on some limitation of discovery (including a claim of privilege), please supply the following information:

A.      The identity of each document's author(s), writer(s), sender(s), or initiator(s);

B.      The identity of each document's recipient(s), addressee(s), or party(ies) for whom it was intended, including whether that recipient was copied or blind copied on the document or communication;

C.      The date of creation or transmittal indicated on each document, or an estimate of that date, indicated as such, if no date appears on the Document;

D.      The general subject matter as described on each document, or, if no such description appears, then some other description sufficient to identify the document; and

E.      The claimed ground(s) for limitation of discovery (e.g., "attorney-client privilege" or "attorney work product doctrine") and specific and precise reasons to support the claim.

#4586716

## INTERROGATORIES NOS. 1-2

INTERROGATORY NO. 1

Identify all persons within Your organization, business, or with which You have a business or professional relationship, that You know is employed by or advises in any capacity any third-party payor regarding performance, payment, or reimbursement of allergy testing and allergen immunotherapy, including the name and location of the third-party payor, the capacity that person is employed by or advises the third-party payor, and the dates of employment or period of advising. The scope of this Interrogatory is limited to those persons who You know to have been employed by or advised a third-party payor at any time beginning January 2010 through the present.

INTERROGATORY NO. 2

Identify all communications You have engaged in with third-party payors, including without limitation any and all individuals known to be associated with those entities, related to the provision of allergy testing and allergen immunotherapy by any physician or business other than that operated by a board-certified allergist, including the businesses, practices, prices, billing, reimbursement, and services of non-board certified allergists and/or related support services by UAS. The scope of this Interrogatory is limited to those communications which have taken place during the time period from January 2010 through the present. This request includes communications of which you are aware engaged in by your members, agents, colleagues, and other individuals, including those persons in the definition for "You" as defined above, whether or not You assert that such communications were on Your behalf. Include in your response, with respect to each such communication:

    a)   the form of the communication;

b) the substance of both the communication and any related response;

c) the date on which the communication took place;

d) the identities of all persons involved in the communication including the identities of all persons involved in assessing whether to initiate such communication or in evaluating any response received;

e) the identification of all documents associated with the communication, any related response, and any assessments conducted regarding whether to initiate such communication or in evaluating any response received.

## **REQUESTS FOR PRODUCTION**

REQUEST FOR PRODUCTION NO. 1: Any documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA."

REQUEST FOR PRODUCTION NO. 2: Any documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL" or Plaintiff AAAPC or any of its member physicians.

REQUEST FOR PRODUCTION NO. 3: Any documents concerning the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

REQUEST FOR PRODUCTION NO. 4: Any documents related to communications with third-party payors concerning allergy testing or allergen immunotherapy performed by primary care physicians or non-board certified allergists.

#4586716

REQUEST FOR PRODUCTION NO. 5: Any documents related to communications with third-party payors concerning UAS.

REQUEST FOR PRODUCTION NO. 6: Any documents related to communications with Aetna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS. This request specifically includes communications between Rebecca Burke and Dr. Chris Jagmin and all related documents including the communications with Aetna Defendants claimed were non-responsive to the Court ordered expedited discovery.

REQUEST FOR PRODUCTION NO. 7: Any documents related to communications with Cigna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 8: Any documents related to communications with Humana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 9: Any documents related to communications with United Healthcare including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 10: Any documents related to communications with Blue Cross/Blue Shield of Texas including any and all persons known to be associated with that

-10-

entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 11: Any documents related to communications with Blue Cross/Blue Shield of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 12: Any documents related to communications with Blue Cross/Blue Shield of Florida including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 13: Any documents related to communications with Blue Cross/Blue Shield of Louisiana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 14: Any documents related to communications with Blue Cross/Blue Shield of North Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 15: Any documents related to communications with Blue Cross/Blue Shield of South Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

#4586716

REQUEST FOR PRODUCTION NO. 16: Any documents related to communications with Blue Cross/Blue Shield of Kentucky including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 17: Any documents related to communications with Centene including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 18: Any documents related to communications with Superior HealthPlan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 19: Any documents related to communications with El Paso First Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 20: Any documents related to communications with Parkland Community Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 21: Any documents related to communications with Texas Children's Health Plan including any and all persons known to be associated with that entity, that

#4586716

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 22: Any documents related to communications with Community Health Choice including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 23: Any documents related to communications with Texas Medicaid and Healthcare Partnership, Xerox, Accenture, or any other person or entity acting or purporting to be acting on behalf of those entities regarding allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 24: Any documents related to communications with Coventry of the Carolinas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 25: Any documents related to communications with Coventry of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 26: Any documents related to communications with Coventry of Florida including any and all persons known to be associated with that entity, that

#4586716

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 27: Any documents related to the February 2013 AAAAI Annual Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 28: Any documents related to the February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 29: Any documents concerning the "Regional Advocacy Discussion and Response" initiative (RADAR).

REQUEST FOR PRODUCTION NO. 30: Any documents sufficient to identify the complete membership of RADAR.

REQUEST FOR PRODUCTION NO. 31: Any documents concerning the vetting process for RADAR referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 32: Any documents concerning the communications and actions referenced in the February 8, 2011 letter attached as Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25.

REQUEST FOR PRODUCTION NO. 33: Any documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

-14-

REQUEST FOR PRODUCTION NO. 34: Any documents concerning communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

REQUEST FOR PRODUCTION NO. 35: Any documents concerning the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29, including without limitation all drafts of the newsletter and any communications related to the approval thereof by Defendant Dr. Sublett.

REQUEST FOR PRODUCTION NO. 36: Any documents concerning the "Business Builder" article in "Medical Economics" referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt No. 12-29.

REQUEST FOR PRODUCTION NO. 37: Any documents concerning the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt No. 12-29.

REQUEST FOR PRODUCTION NO. 38: Any documents concerning requirements to become a member of AAAAI.

REQUEST FOR PRODUCTION NO. 39: Any documents sufficient to identify the membership of AAAAI.

REQUEST FOR PRODUCTION NO. 40: Any documents concerning Allen Kaplan and his relationship with UAS.

REQUEST FOR PRODUCTION NO. 41: Any documents concerning the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 42: Any documents concerning "JCAAI's legal advisors [had] repeatedly warned . . . against actions which might be considered restraint of trade – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior" as described the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 43: Any documents relating to the communications attached as Exhibit P to Plaintiffs' Motion for Preliminary Injunction Dkt. No. 12-46.

REQUEST FOR PRODUCTION NO. 44: Any documents concerning requirements to become a member of JCAAI.

REQUEST FOR PRODUCTION NO. 45: Any documents sufficient to identify the complete membership of JCAAI.

REQUEST FOR PRODUCTION NO. 46: Any documents concerning the eligibility requirements necessary to obtain certification from the ABAI.

REQUEST FOR PRODUCTION NO. 47: Any documents sufficient to identify the number of practicing board-certified allergists in the United States.

-16-

REQUEST FOR PRODUCTION NO. 48: Any documents sufficient to identify the number of practicing board-certified allergists in Texas.

REQUEST FOR PRODUCTION NO. 49: Any documents related to communications with the Texas Medical Board, the Louisiana Medical Board, or any other state medical board concerning primary care physicians practicing allergy testing or allergen immunotherapy or UAS.

REQUEST FOR PRODUCTION NO. 50: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning primary care physicians practicing allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 51: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning UAS.

REQUEST FOR PRODUCTION NO. 52: D Any documents ocuments concerning the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly's communications with state and local AAI society leaders as described in Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25.

REQUEST FOR PRODUCTION NO. 53: Any documents concerning the meeting between Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks with the ACAAI House of Delegates referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 54: Any documents concerning the "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative

#4586716

January 2011" referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 55: Any documents concerning the January 2011 AAAAI Annual Meeting including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 56: Any documents concerning the AAAAI Executive Board Agenda referenced in Exhibit No. Q to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-47.

REQUEST FOR PRODUCTION NO. 57: Any documents concerning the joint letter between AAAAI and JCAAI regarding Medicaid rates referenced in AAAAI00019.

REQUEST FOR PRODUCTION NO. 58: Any documents concerning the patient database referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 59: Any documents concerning the ARTrust Board referenced in AAAAI00024.

REQUEST FOR PRODUCTION NO. 60: Any documents concerning all JCAAI board of director meetings from January 1, 2010 to the present, including all meeting minutes, notes, agenda items, actions, and any other document related to these meetings.

REQUEST FOR PRODUCTION NO. 61: Any documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

-18-

REQUEST FOR PRODUCTION NO. 62: Any documents concerning any joint meetings or communications with AAAAI, ACAAI, JCAAI, AAOA, or any other outside organization or association or anyone purporting to act on their behalf concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

REQUEST FOR PRODUCTION NO. 63: Any documents related to communications with the AAOA, including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 64: Any documents related to communications with the Allergy & Asthma Network Mothers of Asthmatics (AANMA), including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 65: Any documents related to the letter from Thomas Casale to Aetna concerning Aetna's reimbursement of immunotherapy referenced in AAAAI00066.

REQUEST FOR PRODUCTION NO. 66: Any documents related to communications with John Henley concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

#4586716

REQUEST FOR PRODUCTION NO. 67: Any documents related to communications with Wesley Burks concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 68: Any documents related to communications with ACAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 69: Any documents related to communications with AAAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 70: Any documents related to communications with any JCAAI member, including all persons, agents, or entities acting or purporting to act on that member's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 71: Any documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen

#4586716

immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 72: Any documents related to communications with Hollister-Stier Laboratories, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 73: Any documents related to communications with Greer Laboratories, Inc., including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 74: Any documents related to communications with ALK, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 75: Any documents related to communications with Donald Aaronson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

-21-

REQUEST FOR PRODUCTION NO. 76: Any documents related to communications with Gary Gross, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 77: Any documents related to communications with Lyndon Mansfield, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA;" or UAS.

REQUEST FOR PRODUCTION NO. 78: Any documents related to communications with James Sublett, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 79: Any documents related to communications with David Weldon, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 80: Any documents related to communications with Stanley Fineman, M.D., including all persons, agents, or entities acting or purporting to act on

#4586716

his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 81: Any documents related to communications with TAAIS, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 82: Any documents related to communications with Stuart Abramson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 83: Any documents related to communications with Theodore Freeman, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 84: Any documents related to communications with Wesley Stafford, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care

physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 85: Any documents related to communications with William McKenna, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 86: Any documents related to communications with Michael Vaughn, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 87: Any documents related to communications with Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 88: Any documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

#4586716

REQUEST FOR PRODUCTION NO. 89: Any documents related to communications with anyone who participated in the Regional Advocacy Discussion and Response (RADAR) Team, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 90: Any documents related to any taskforce or committee concerning "remote practices issues," including all meeting minutes, communications, notes, actions, plans, and all other documents concerning that taskforce or committee.

REQUEST FOR PRODUCTION NO. 91: Any documents related to any position statement by AAAAI, ACAAI, or JCAAI concerning allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 92: Any documents related to the AAAAI position statement referenced in AAAAI000055.

REQUEST FOR PRODUCTION NO. 93: Any documents related to any member who acts as a representative of a third-party payor concerning allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 94: Any documents related to communications with "Cliff" as referenced in WDTX-JCAAI-000590-91.

REQUEST FOR PRODUCTION NO. 95: Any documents related to Interrogatory No. 1.

REQUEST FOR PRODUCTION NO. 96: Any documents related to Interrogatory No. 2.

REQUEST FOR PRODUCTION NO. 97: Any documents identified in response to Interrogatory No. 2, subpart (e).

REQUEST FOR PRODUCTION NO. 98: Any documents related to WDTX-JCAAIA-000007-000010 including the topics discussed on page WDTX-JCAAIA-000008 including the "NYCU email," the "task force on the RPA," the "marketing strategies and other responses…related to the RPA company's own marketing," and the "RADAR strategy."

REQUEST FOR PRODUCTION NO. 99: Any documents related to WDTX-JCAAIA-000075-000082 including the topics discussed on page WDTX-JCAAIA-000075-000076, including "submissions to the OIG or State AG," any "RADAR alert," any "friendly PCP," and all communications with David Weldon, Bill Dolen, or Michael Shaffer.

REQUEST FOR PRODUCTION NO. 100: Any documents related to WDTX-JCAAIA-000122-000125 including the JCAAI Board agenda and all related documents thereto discussed on page WDTX-JCAAIA-000122 and all notes, agenda items, or related documents to the 2/28/10 JCAAI Board of Directors meeting, the "market research from the College's Marketing Task Force" and all related documents thereto, the Texas Medical Board review and all related documents thereto, and the "industry allies" and all documents related thereto as discussed on page WDTX-JCAAIA-000123, and all communications with Susan Halstead or the practice for which she works as referenced on page WDTX-JCAAIA-000124.

REQUEST FOR PRODUCTION NO. 101: Any documents related to WDTX-JCAAIA-000147-000151 including all communications with "presidents and president-elects of the allergy societies," any list serve or list of those persons, and all documents related thereto.

REQUEST FOR PRODUCTION NO. 102: Any documents related to WDTX-JCAAIA-000154-000158 including the "Bridges to Excellence Program" and all documents related thereto.

REQUEST FOR PRODUCTION NO. 103: Any documents related to WDTX-JCAAIA-000172-000176 including all documents related to the 2008 AMA Practice Expense Survey, JCAAI sponsored surveys of its members regarding expenses and pricing, the "SETTaF Joint Task Force" lectures, and the course outline for "How to Lobby."

REQUEST FOR PRODUCTION NO. 104: Any documents related to WDTX-JCAAIA-000222-000225 including the referenced letter to Dr. Jeff Kang and all documents related thereto and all documents related to the conference call between JCAAI and Cigna including all notes, preparation materials, and prior and subsequent communications concerning the topics discussed in the call.

REQUEST FOR PRODUCTION NO. 105: Any documents related to any changes or proposed changes to the Texas Medicaid Provider Procedures Manual regarding allergy testing or immunotherapy including any communications with anyone associated with the manual.

REQUEST FOR PRODUCTION NO. 106: Any documents related to WDTX-JCAAIA-000280 including all documents related to the "contact with the major carrier in Texas" and any "editorial on medical necessity for immunotherapy" and the subsequent emails referenced in the document.

REQUEST FOR PRODUCTION NO. 107: Any documents related to WDTX-JCAAIA-000292-000293 including all documents related to any communications with James L. Guy concerning allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 108: Any documents related to WDTX-JCAAIS-00045 including all documents related to "Helping RSL Societies deal with various issues," "Info from NY to OIG," "Texas Allergy Society law suit," "Louisiana & Utah" and "marketing strategies and other responses."

REQUEST FOR PRODUCTION NO. 109: Any documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

REQUEST FOR PRODUCTION NO. 110: Any documents concerning requirements to become a member of ACAAI.

REQUEST FOR PRODUCTION NO. 111: Any documents sufficient to identify the membership of ACAAI.

REQUEST FOR PRODUCTION NO. 112: Any documents related to the Annual Scientific Meeting in Baltimore on Nov. 7-11, 2013 concerning RADAR.

#4586716

Dated: June 06, 2014

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: /s/ Casey Low
      Casey Low
      Texas Bar No. 24041363
      111 Congress Ave., Suite 2300
      Austin, Texas 78701-4061
      Phone: (512) 542-2109
      Fax: (800) 404-3970
      casey.low@bgllp.com

      Richard C. Danysh
      Texas Bar No. 05377700
      300 Convent St., Suite 1500
      San Antonio, Texas 78205-3723
      Phone: (210) 299-3475
      Fax: (210) 299-0106
      richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS

-29-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents and Admissions has been electronically served on all counsel of record on this 6th day of June, 2014.

Steven V. Walkowiak
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Ste. 6200
Dallas, TX 75201
Walkowiaks@gtlaw.com
214-665-5928   Fax

Gregory J Casas
Elizabeth R. Hadley
GREENBERG TRAURIG, LLP
300 West 6th Street, Ste. 2050
Austin, TX 78701
casasg@gtlaw.com
hadleye@gtlaw.com
512-320-7210   Fax

Paul J. Brown
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
brownpa@gtlaw.com
713-374-3505 Fax

**ATTORNEYS FOR AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY,**

Christopher M. Wilson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, TX  75201-6912
CWilson@gibsondunn.com
214-571-2940  Fax

Rachel S. Brass
Veronica S Lewis
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
RBrass@gibsondunn.com
VLewis@gibsondunn.com
415-374-8429 Fax

-30-

#4586716

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOTHERAPY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; AND DAVID WELDON, MD**

Ricardo G. Cedillo
Mark W. Kiehne
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, TX 78212
rcedillo@lawdcm.com
mkiehne@lawdcm.com
210-822-1151 Fax

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; JAMES SUBLETT, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; DONALD AARONSON, MD; AND DAVID WELDON, MD**

Michael W. Oyler
REED WEITKAMP SCHELL & VICE PLLC
500 W. Jefferson Street, Suite 2400
Louisville, KY 40202
moyler@rwsvlaw.com
502-562-2200 Fax

**ATTORNEYS FOR DEFENDANT JAMES SUBLETT, MD**

/s/ Casey Low_____
Casey Low

Exhibit 27c

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | Civil Action No. 5:14-CV-00035-OLG |
| v. | § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; PSF, PLLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; AND DAVID WELDON, MD | § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES TO JCAAI

To:    Defendant Joint Counsel of Allergy, Asthma & Immunology; through its counsel of record Gibson, Dunn & Crutcher LLP, 555 Mission Street, Suite 3000, San Francisco, CA 94105-0921.

Pursuant to Federal Rules of Civil Procedure 33 and 34, Local Civil Rules 26 and 33, Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively, "Plaintiffs") by and through their counsel of record, hereby propound the following interrogatory and requests for production of documents on Defendant the Joint Counsel of Allergy, Asthma & Immunology ("JCAAI"), to be answered and responded to under oath within 30 days of service in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

## DEFINITIONS

1.    Plaintiffs hereby incorporate by reference as though fully set forth herein all Definitions and Rules of Construction set forth in Local Civil Rule 26(b).

2.    "You," "Your," and "Yours" as well as "Defendant" and "JCAAI" shall mean the Joint Counsel of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

3.    The term "communication" shall be interpreted in accordance with Local Civil Rule 26(b)(1), and further shall be construed in its broadest sense to encompass any transmission or exchange of information, facts, data, inquiries, proposals or other matters; whether between individuals or between or among the members of any group, affiliation, or other entity; whether conducted face-to-face, by telephone, or by any means of written communication, whether electronic or otherwise.

4.    The term "document" shall be interpreted in accordance with Local Civil Rule 26(b)(2), and further shall be construed in its broadest sense to encompass any printed, typewritten, hand written, mechanically-produced, electronic or magnetic data or otherwise recorded matter of whatever character, including but without limitation: letters, correspondence, contracts, agreements, memoranda, emails, texts, telegrams, notes, newsletters, catalogues, brochures, diaries, reports, presentations, publications, minutes, agenda items, calendars, calendar entries, inter- or intra- office communications, statements, investigative reports, announcements, depositions, answers to interrogatories, pleadings, judgments, newspaper articles, photographs, tape recordings, webinars, motion pictures and any copies (electronic, photographic, carbon, etc.) of any such material if you do not have custody or control of the

original. Any comment or notation appearing on any document, and not part of the original text, is to be considered a separate "document."

5.    The term "non-board certified allergist(s)" shall refer to any physician conducting allergy testing or allergen immunotherapy who has not obtained certification from the American Board of Allergy and Immunology. Likewise, the term "board-certified allergist(s)" shall refer to those physicians who have obtained such certification or are eligible for the certification.

6.    The terms "and" and "or" as used herein are terms of inclusion and not exclusion, and shall be construed either disjunctively or conjunctively, whichever is appropriate to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

7.    The singular and plural forms of nouns and pronouns as well as the masculine and feminine forms thereof shall be construed interchangeably to bring within the scope of the discovery requested any information or documents which might otherwise be considered beyond their scope.

8.    The terms "related to", "relating to" or "regarding" shall be construed consistently with the definition provided for "concerning" in Local Civil Rule 26(b)(7), and further shall mean anything that constitutes, contains, evidences, embodies, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way relevant to that subject.

9.    The word "including" shall be construed to mean "including, but not limited to" to bring within the scope of the discovery sought all responses which might otherwise be construed to be outside its scope.

10.    "Any" refers to any and all documents, persons, or entities inclusively, not the option of responding as to some but not others.

11.     The term "AAAAI" shall mean the American Academy of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

12.     The term "ABAI" shall mean the American Board of Allergy & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

13.     The term "AAOA" shall mean the American Academy of Otolaryngic Allergy including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

14.     The term "ACAAI" shall mean the American College of Allergy, Asthma & Immunology including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, committee members, members, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

15.     The term "UAS" shall mean Plaintiff United Biologics, LLC d/b/a United Allergy Services formerly d/b/a United Allergy Labs or UAL, including its officers, directors, representatives, agents, employees, attorneys, advisers, partners, members, and/or any other

person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity, whether directly or indirectly.

16.     The term "third-party payor" shall mean any insurance provider, health plan, managed care organization, health maintenance organization and/or other commercial, private, semi-private, or public entity that pays or reimburses providers for health care services for its members or patients, including all persons related to or acting on behalf of that organization, including all parents, subsidiaries, affiliates, officers, directors, medical directors, provider relations directors, committee members, physicians, investigators, representatives, agents, advisers, employees, attorneys, partners, and/or any other person acting or purporting to act in concert or participation with, on behalf of, or at the direction of any such individual or entity.

17.     The terms "remote practice," "remote practice of allergy," or "RPA" shall mean the practice of allergy testing or allergen immunotherapy by a physician with the assistance of an allergy support service company, including UAS, including how that term is used by Defendants and board-certified allergists in the October 5, 2011 JCAAI New News You Can Use Newsletter found at Docket No. 12-29.

## **INSTRUCTIONS**

The following instructions are applicable to these Interrogatories and Requests for Production unless otherwise specifically indicated:

1.     Each Request must be answered separately, fully, and specifically by each Defendant. Each response shall first set forth verbatim the Request to which it is responsive, followed by Defendants' response. If any objections are made in response, the reasons therefore shall be stated.

2.     When an answer to an Interrogatory is supplied on information and belief, so state, and describe in detail all sources of such information and belief. If you are unable to answer an Interrogatory, in whole or in part, either by actual knowledge or upon information and belief, so state, and confirm you have conducted a reasonable inquiry to obtain any relevant knowledge or information.

3.     All documents should be produced in accordance with Fed. R. Civ. P. 34(b)(2)(E), Local Civil Rule 26(b), and the Parties' agreement as described in the Joint Report on Rule 26 Discovery Plan found at Docket No. 78, as kept in the ordinary course and shall include electronically stored information including all associated metadata to be produced in an intelligible format or together with a description of the system from which it was derived sufficient to permit rendering the materials intelligible, including in accordance with the Parties' "agreed format for production of electronically stored information" as stated in Docket No. 78-3. In producing documents, furnish all documents known or available to You regardless of whether such documents are possessed directly by You, or any of Your officers, directors, employees, agents, representatives, members, or attorneys, as well as any other document in Your custody or control.

4.      Unless otherwise stated, each request covers the time period from January 1, 2010 to the present.  Each Request shall be deemed to be continuing in nature so as to require prompt supplementation if any further information called for herein is discovered, obtained, or created at any time hereafter in accordance with Federal Rule of Civil Procedure 26(e)(1)(A).

5.      Should any document be withheld or redacted based on some limitation of discovery (including a claim of privilege), please supply the following information:

A.      The identity of each document's author(s), writer(s), sender(s), or initiator(s);

B.      The identity of each document's recipient(s), addressee(s), or party(ies) for whom it was intended, including whether that recipient was copied or blind copied on the document or communication;

C.      The date of creation or transmittal indicated on each document, or an estimate of that date, indicated as such, if no date appears on the Document;

D.      The general subject matter as described on each document, or, if no such description appears, then some other description sufficient to identify the document; and

E.      The claimed ground(s) for limitation of discovery (e.g., "attorney-client privilege" or "attorney work product doctrine") and specific and precise reasons to support the claim.

#4586711

## INTERROGATORIES NOS. 1-2

INTERROGATORY NO. 1

    Identify all persons within Your organization, business, or with which You have a business or professional relationship, that You know is employed by or advises in any capacity any third-party payor regarding performance, payment, or reimbursement of allergy testing and allergen immunotherapy, including the name and location of the third-party payor, the capacity that person is employed by or advises the third-party payor, and the dates of employment or period of advising. The scope of this Interrogatory is limited to those persons who You know to have been employed by or advised a third-party payor at any time beginning January 2010 through the present.

INTERROGATORY NO. 2

    Identify all communications You have engaged in with third-party payors, including without limitation any and all individuals known to be associated with those entities, related to the provision of allergy testing and allergen immunotherapy by any physician or business other than that operated by a board-certified allergist, including the businesses, practices, prices, billing, reimbursement, and services of non-board certified allergists and/or related support services by UAS. The scope of this Interrogatory is limited to those communications which have taken place during the time period from January 2010 through the present. This request includes communications of which you are aware engaged in by your members, agents, colleagues, and other individuals, including those persons in the definition for "You" as defined above, whether or not You assert that such communications were on Your behalf. Include in your response, with respect to each such communication:

    a)   the form of the communication;

-8-

b) the substance of both the communication and any related response;

c) the date on which the communication took place;

d) the identities of all persons involved in the communication including the identities of all persons involved in assessing whether to initiate such communication or in evaluating any response received;

e) the identification of all documents associated with the communication, any related response, and any assessments conducted regarding whether to initiate such communication or in evaluating any response received.

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1: Any documents concerning "remote practice," "remote practice of allergy," "remote allergy," or "RPA."

REQUEST FOR PRODUCTION NO. 2: Any documents concerning Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL" or Plaintiff AAAPC or any of its member physicians.

REQUEST FOR PRODUCTION NO. 3: Any documents concerning the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

REQUEST FOR PRODUCTION NO. 4: Any documents related to communications with third-party payors concerning allergy testing or allergen immunotherapy performed by primary care physicians or non-board certified allergists.

#4586711

REQUEST FOR PRODUCTION NO. 5: Any documents related to communications with third-party payors concerning UAS.

REQUEST FOR PRODUCTION NO. 6: Any documents related to communications with Aetna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS. This request specifically includes communications between Rebecca Burke and Dr. Chris Jagmin and all related documents including the communications with Aetna Defendants claimed were non-responsive to the Court ordered expedited discovery.

REQUEST FOR PRODUCTION NO. 7: Any documents related to communications with Cigna including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 8: Any documents related to communications with Humana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 9: Any documents related to communications with United Healthcare including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 10: Any documents related to communications with Blue Cross/Blue Shield of Texas including any and all persons known to be associated with that

#4586711

entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 11: Any documents related to communications with Blue Cross/Blue Shield of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 12: Any documents related to communications with Blue Cross/Blue Shield of Florida including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 13: Any documents related to communications with Blue Cross/Blue Shield of Louisiana including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 14: Any documents related to communications with Blue Cross/Blue Shield of North Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 15: Any documents related to communications with Blue Cross/Blue Shield of South Carolina including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

-11-

REQUEST FOR PRODUCTION NO. 16: Any documents related to communications with Blue Cross/Blue Shield of Kentucky including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 17: Any documents related to communications with Centene including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 18: Any documents related to communications with Superior HealthPlan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 19: Any documents related to communications with El Paso First Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 20: Any documents related to communications with Parkland Community Health Plan including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 21: Any documents related to communications with Texas Children's Health Plan including any and all persons known to be associated with that entity, that

#4586711

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 22: Any documents related to communications with Community Health Choice including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 23: Any documents related to communications with Texas Medicaid and Healthcare Partnership, Xerox, Accenture, or any other person or entity acting or purporting to be acting on behalf of those entities regarding allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 24: Any documents related to communications with Coventry of the Carolinas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 25: Any documents related to communications with Coventry of Kansas including any and all persons known to be associated with that entity, that relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 26: Any documents related to communications with Coventry of Florida including any and all persons known to be associated with that entity, that

#4586711

relates to the services, business, payment, or reimbursement of physicians who are not board-certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 27: Any documents related to the February 2013 AAAAI Annual Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 28: Any documents related to the February 2013 JCAAI Meeting in San Antonio, Texas, including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 29: Any documents concerning the "Regional Advocacy Discussion and Response" initiative (RADAR).

REQUEST FOR PRODUCTION NO. 30: Any documents sufficient to identify the complete membership of RADAR.

REQUEST FOR PRODUCTION NO. 31: Any documents concerning the vetting process for RADAR referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 32: Any documents concerning the communications and actions referenced in the February 8, 2011 letter attached as Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25.

REQUEST FOR PRODUCTION NO. 33: Any documents concerning the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the 2010 ACAAI Annual Meeting.

REQUEST FOR PRODUCTION NO. 34: Any documents concerning communications about RADAR and among members of RADAR, including all documents related to the online message board "Basecamp" including all messages ever posted to such message board, and all documents and communications in email, Facebook, Twitter, or any other message board.

REQUEST FOR PRODUCTION NO. 35: Any documents concerning the October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29, including without limitation all drafts of the newsletter and any communications related to the approval thereof by Defendant Dr. Sublett.

REQUEST FOR PRODUCTION NO. 36: Any documents concerning the "Business Builder" article in "Medical Economics" referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt No. 12-29.

REQUEST FOR PRODUCTION NO. 37: Any documents concerning the 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI referenced in the October 5, 2011 JCAAI Newsletter entitled "More on Remote Practice," attached as Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt No. 12-29.

REQUEST FOR PRODUCTION NO. 38: Any documents concerning requirements to become a member of AAAAI.

REQUEST FOR PRODUCTION NO. 39: Any documents sufficient to identify the membership of AAAAI.

#4586711

REQUEST FOR PRODUCTION NO. 40: Any documents concerning Allen Kaplan and his relationship with UAS.

REQUEST FOR PRODUCTION NO. 41: Any documents concerning the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 42: Any documents concerning "JCAAI's legal advisors [had] repeatedly warned . . . against actions which might be considered restraint of trade – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior" as described the JCAAI newsletter attached as Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7.

REQUEST FOR PRODUCTION NO. 43: Any documents relating to the communications attached as Exhibit P to Plaintiffs' Motion for Preliminary Injunction Dkt. No. 12-46.

REQUEST FOR PRODUCTION NO. 44: Any documents concerning requirements to become a member of JCAAI.

REQUEST FOR PRODUCTION NO. 45: Any documents sufficient to identify the complete membership of JCAAI.

REQUEST FOR PRODUCTION NO. 46: Any documents concerning the eligibility requirements necessary to obtain certification from the ABAI.

REQUEST FOR PRODUCTION NO. 47: Any documents sufficient to identify the number of practicing board-certified allergists in the United States.

REQUEST FOR PRODUCTION NO. 48: Any documents sufficient to identify the number of practicing board-certified allergists in Texas.

REQUEST FOR PRODUCTION NO. 49: Any documents related to communications with the Texas Medical Board, the Louisiana Medical Board, or any other state medical board concerning primary care physicians practicing allergy testing or allergen immunotherapy or UAS.

REQUEST FOR PRODUCTION NO. 50: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning primary care physicians practicing allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 51: Any documents related to communications with the United States Department of Health and Human Services, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning UAS.

REQUEST FOR PRODUCTION NO. 52: Any documents concerning the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly's communications with state and local AAI society leaders as described in Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25.

REQUEST FOR PRODUCTION NO. 53: Any documents concerning the meeting between Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks with the ACAAI House of Delegates referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 54: Any documents concerning the "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative

January 2011" referenced in Exhibit H to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-36.

REQUEST FOR PRODUCTION NO. 55: Any documents concerning the January 2011 AAAAI Annual Meeting including all meeting minutes, agenda items, materials, notes, and reports.

REQUEST FOR PRODUCTION NO. 56: Any documents concerning the AAAAI Executive Board Agenda referenced in Exhibit No. Q to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-47.

REQUEST FOR PRODUCTION NO. 57: Any documents concerning the joint letter between AAAAI and JCAAI regarding Medicaid rates referenced in AAAAI00019.

REQUEST FOR PRODUCTION NO. 58: Any documents concerning the patient database referenced in AAAAI00022.

REQUEST FOR PRODUCTION NO. 59: Any documents concerning the ARTrust Board referenced in AAAAI00024.

REQUEST FOR PRODUCTION NO. 60: Any documents concerning all JCAAI board of director meetings from January 1, 2010 to the present, including all meeting minutes, notes, agenda items, actions, and any other document related to these meetings.

REQUEST FOR PRODUCTION NO. 61: Any documents concerning meetings or communications of any committee, taskforce, or other entity including RADAR concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

REQUEST FOR PRODUCTION NO. 62: Any documents concerning any joint meetings or communications with AAAAI, ACAAI, JCAAI, AAOA, or any other outside organization or association or anyone purporting to act on their behalf concerning the practice of allergy testing or allergen immunotherapy by non-board certified allergists or primary care physicians, including all meeting minutes, notes, agenda items, communications actions, and any other document related to these meetings or communications.

REQUEST FOR PRODUCTION NO. 63: Any documents related to communications with the AAOA, including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 64: Any documents related to communications with the Allergy & Asthma Network Mothers of Asthmatics (AANMA), including all persons, agents, or entities acting or purporting to act on that entity's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians and/or non-board certified allergists or UAS.

REQUEST FOR PRODUCTION NO. 65: Any documents related to the letter from Thomas Casale to Aetna concerning Aetna's reimbursement of immunotherapy referenced in AAAAI00066.

REQUEST FOR PRODUCTION NO. 66: Any documents related to communications with John Henley concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

#4586711

REQUEST FOR PRODUCTION NO. 67: Any documents related to communications with Wesley Burks concerning allergy testing and/or allergen immunotherapy provided by primary care physicians; non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 68: Any documents related to communications with ACAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy by provided primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 69: Documents related to communications with AAAAI, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 70: Any documents related to communications with any JCAAI member, including all persons, agents, or entities acting or purporting to act on that member's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 71: Any documents related to communications with any non-board certified allergist or primary care physician including all persons, agents, or entities acting or purporting to act on that physician's behalf concerning allergy testing and/or allergen

-20-

immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 72: Any documents related to communications with Hollister-Stier Laboratories, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy by provided primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 73: Any documents related to communications with Greer Laboratories, Inc., including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 74: Any documents related to communications with ALK, including all persons, agents, or entities acting or purporting to act on that agency's behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 75: Any documents related to communications with Donald Aaronson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 76: Any documents related to communications with Gary Gross, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 77: Any documents related to communications with Lyndon Mansfield, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA;" or UAS.

REQUEST FOR PRODUCTION NO. 78: Any documents related to communications with James Sublett, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 79: Any documents related to communications with David Weldon, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 80: Any documents related to communications with Stanley Fineman, M.D., including all persons, agents, or entities acting or purporting to act on

-22-

his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 81: Any documents related to communications with TAAIS, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 82: Any documents related to communications with Stuart Abramson, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 83: Any documents related to communications with Theodore Freeman, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 84: Any documents related to communications with Wesley Stafford, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care

physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 85: Any documents related to communications with William McKenna, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 86: Any documents related to communications with Michael Vaughn, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 87: Any documents related to communications with Victor Estrada, M.D., including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 88: Any documents related to communications with Plaintiffs, including primary care physicians, non-board certified allergists, UAS, or any company, person, or entity engaged in "remote practice," "remote practice of allergy," "remote allergy," or "RPA," concerning allergy testing and/or allergen immunotherapy.

-24-

REQUEST FOR PRODUCTION NO. 89: Any documents related to communications with anyone who participated in the Regional Advocacy Discussion and Response (RADAR) Team, including all persons, agents, or entities acting or purporting to act on his behalf concerning allergy testing and/or allergen immunotherapy by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," or UAS.

REQUEST FOR PRODUCTION NO. 90: Any documents related to any taskforce or committee concerning "remote practices issues," including all meeting minutes, communications, notes, actions, plans, and all other documents concerning that taskforce or committee.

REQUEST FOR PRODUCTION NO. 91: Any documents related to any position statement by AAAAI, ACAAI, or JCAAI concerning allergy testing or allergen immunotherapy.

REQUEST FOR PRODUCTION NO. 92: Any documents related to the AAAAI position statement referenced in AAAAI000055.

REQUEST FOR PRODUCTION NO. 93: Any documents related to any member who acts as a representative of a third-party payor concerning allergy testing or allergen immunotherapy provided by primary care physicians or other non-board certified allergists, including without limitation any such physicians supported by UAS.

REQUEST FOR PRODUCTION NO. 94: Any documents related to communications with "Cliff" as referenced in WDTX-JCAAI-000590-91.

REQUEST FOR PRODUCTION NO. 95: Any documents related to Interrogatory No. 1.

REQUEST FOR PRODUCTION NO. 96: Any documents related to Interrogatory No. 2.

#4586711

REQUEST FOR PRODUCTION NO. 97: Any documents identified in response to Interrogatory No. 2, subpart (e).

REQUEST FOR PRODUCTION NO. 98: Any documents related to WDTX-JCAAIA-000007-000010 including the topics discussed on page WDTX-JCAAIA-000008 including the "NYCU email," the "task force on the RPA," the "marketing strategies and other responses...related to the RPA company's own marketing," and the "RADAR strategy."

REQUEST FOR PRODUCTION NO. 99: Any documents related to WDTX-JCAAIA-000075-000082 including the topics discussed on page WDTX-JCAAIA-000075-000076, including "submissions to the OIG or State AG," any "RADAR alert," any "friendly PCP," and all communications with David Weldon, Bill Dolen, or Michael Shaffer.

REQUEST FOR PRODUCTION NO. 100: Any documents related to WDTX-JCAAIA-000122-000125 including the JCAAI Board agenda and all related documents thereto discussed on page WDTX-JCAAIA-000122 and all notes, agenda items, or related documents to the 2/28/10 JCAAI Board of Directors meeting, the "market research from the College's Marketing Task Force" and all related documents thereto, the Texas Medical Board review and all related documents thereto, and the "industry allies" and all documents related thereto as discussed on page WDTX-JCAAIA-000123, and all communications with Susan Halstead or the practice for which she works as referenced on page WDTX-JCAAIA-000124.

REQUEST FOR PRODUCTION NO. 101: Any documents related to WDTX-JCAAIA-000147-000151 including all communications with "presidents and president-elects of the allergy societies," any list serve or list of those persons, and all documents related thereto.

-26-

REQUEST FOR PRODUCTION NO. 102: Any documents related to WDTX-JCAAIA-000154-000158 including the "Bridges to Excellence Program" and all documents related thereto.

REQUEST FOR PRODUCTION NO. 103: Any documents related to WDTX-JCAAIA-000172-000176 including all documents related to the 2008 AMA Practice Expense Survey, JCAAI sponsored surveys of its members regarding expenses and pricing, the "SETTaF Joint Task Force" lectures, and the course outline for "How to Lobby."

REQUEST FOR PRODUCTION NO. 104: Any documents related to WDTX-JCAAIA-000222-000225 including the referenced letter to Dr. Jeff Kang and all documents related thereto and all documents related to the conference call between JCAAI and Cigna including all notes, preparation materials, and prior and subsequent communications concerning the topics discussed in the call.

REQUEST FOR PRODUCTION NO. 105: Any documents related to any changes or proposed changes to the Texas Medicaid Provider Procedures Manual regarding allergy testing or immunotherapy including any communications with anyone associated with the manual.

REQUEST FOR PRODUCTION NO. 106: Any documents related to WDTX-JCAAIA-000280 including all documents related to the "contact with the major carrier in Texas" and any "editorial on medical necessity for immunotherapy" and the subsequent emails referenced in the document.

REQUEST FOR PRODUCTION NO. 107: Any documents related to WDTX-JCAAIA-000292-000293 including all documents related to any communications with James L. Guy concerning allergy testing or allergen immunotherapy.

#4586711

REQUEST FOR PRODUCTION NO. 108: Any documents related to WDTX-JCAAIS-00045 including all documents related to "Helping RSL Societies deal with various issues," "Info from NY to OIG," "Texas Allergy Society law suit," "Louisiana & Utah" and "marketing strategies and other responses."

REQUEST FOR PRODUCTION NO. 109: Any documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

REQUEST FOR PRODUCTION NO. 110: Any documents concerning requirements to become a member of ACAAI.

REQUEST FOR PRODUCTION NO. 111: Any documents sufficient to identify the membership of ACAAI.

REQUEST FOR PRODUCTION NO. 112: Any documents related to the Annual Scientific Meeting in Baltimore on Nov. 7-11, 2013 concerning RADAR.

#4586711

Dated: June 06, 2014

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By:  /s/ Casey Low
       Casey Low
       Texas Bar No. 24041363
       111 Congress Ave., Suite 2300
       Austin, Texas 78701-4061
       Phone: (512) 542-2109
       Fax: (800) 404-3970
       casey.low@bgllp.com

       Richard C. Danysh
       Texas Bar No. 05377700
       300 Convent St., Suite 1500
       San Antonio, Texas 78205-3723
       Phone: (210) 299-3475
       Fax: (210) 299-0106
       richard.danysh@bgllp.com

ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS

#4586711

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' Second Set of Interrogatories and Requests for Production of Documents and Admissions has been electronically served on all counsel of record on this 6th day of June, 2014.

Steven V. Walkowiak
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Ste. 6200
Dallas, TX 75201
Walkowiaks@gtlaw.com
214-665-5928  Fax

Gregory J Casas
Elizabeth R. Hadley
GREENBERG TRAURIG, LLP
300 West 6th Street, Ste. 2050
Austin, TX 78701
casasg@gtlaw.com
hadleye@gtlaw.com
512-320-7210   Fax

Paul J. Brown
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
brownpa@gtlaw.com
713-374-3505 Fax

## ATTORNEYS FOR AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY,

Christopher M. Wilson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, TX  75201-6912
CWilson@gibsondunn.com
214-571-2940  Fax

Rachel S. Brass
Veronica S Lewis
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
RBrass@gibsondunn.com
VLewis@gibsondunn.com
415-374-8429 Fax

-30-

#4586711

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOTHERAPY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; FAMILY ALLERGY & ASTHMA LLC; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; DONALD AARONSON, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; AND DAVID WELDON, MD**

Ricardo G. Cedillo
Mark W. Kiehne
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry Avenue
San Antonio, TX 78212
rcedillo@lawdcm.com
mkiehne@lawdcm.com
210-822-1151 Fax

**AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; JAMES SUBLETT, MD; GARY CROSS, MD; LYNDON MANSFIELD, MD; DONALD AARONSON, MD; AND DAVID WELDON, MD**

Michael W. Oyler
REED WEITKAMP SCHELL & VICE PLLC
500 W. Jefferson Street, Suite 2400
Louisville, KY 40202
moyler@rwsvlaw.com
502-562-2200 Fax

**ATTORNEYS FOR DEFENDANT JAMES SUBLETT, MD**

/s/ Casey Low
Casey Low

# Exhibit 28

Message

| | |
|---|---|
| **From:** | "James Sublett" <jsublett@familyallergy.com> [jsublett@familyallergy.com] |
| **Sent:** | 3/10/2011 9:26:26 PM |
| **To:** | Fineman, Stanley [SFineman@atlantaallergy.com]; Donald Aaronson [doclaw@post.harvard.edu]; James Sublett [alerg@mindspring.com] |
| **Subject:** | Re: JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician |

I had emailed Don asking the same question.
JS

**From:** Stanley Fineman <sfineman@atlantaallergy.com>
**Date:** Thu, 10 Mar 2011 14:30:33 -0600
**To:** Donald Aaronson <doclaw@post.harvard.edu>, James Sublett <alerg@mindspring.com>
**Subject:** FW: JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician

Don & Jim,
Could we use this to support our case against the remote practice by United Allergy Labs?
SMF

**From:** jcaai.org.postmaster@readyportal.net [mailto:jcaai.org.postmaster@readyportal.net] **On Behalf Of** admin@jcaai.org
**Sent:** Wednesday, March 09, 2011 5:37 PM
**To:** www-newnews@lists.jcaai.org
**Subject:** JCAAI - New News You Can Use - Requirement: Direct Supervision of Allergy Skin Tests by a Physician

March 9, 2011

## Requirement for Physician Direct Supervision of Allergy Skin Testing

Dear JCAAI Member:

Medicare (CMS) has specific rules which govern physician supervision of various procedures. JCAAI was recently asked about the rules governing physician supervision of skin testing. The member who asked us about this had tried to find the answer on the Medicare website and was not successful. We asked JCAAI legal counsel and following is the information she found. For those of you who want to see it for yourself, click here.

Then select "physician fee schedule search;" click "accept;" select "payment policy indicators" from the first menu. Select either a single code or range of codes in the second menu, enter the code(s) you are interested in (e.g. 95004 for skin prick testing) in the "HCPCS code" box and select "all modifiers" in the box below. Click submit.

If you look to the right side of the page, you will see a column labeled "Phys Supv" and in that box you

WDTX-JCAAI-017015

will see the number "2." Each code has a required level of physician supervision which is denoted by a number. In this case the number is 2 - which is the level of supervision for allergy skin tests (95004, 95024, 95010, and 95015). Under Medicare rules, level 2 calls for "direct supervision". According to federal regulations "direct supervision" is defined as "In the office setting, (direct supervision) means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean the physician must be present in the room when the procedure is performed."

This means the physician has to be physically present in the office suite when testing is performed. And this is consistent with CPT 95004 and 95024 whose descriptors specifically state: "Percutaneous (or intracutaneous) tests with allergenic extract ... including test interpretation and report by physician."

When JCAAI was able to obtain physician work for 95004 and 95024, it was with the specific understanding that the physician work was to cover "test interpretation and report by physician". JCAAI agreed with CPT and the RUC that testing could not be properly done without the physician's physical presence - at least in the suite - so test results could be reviewed by that physician.

Remember to purchase a set of 2011 Coding Books!
( click link for details)

Please log onto the JCAAI website at http://www.jcaai.org to view all previous "New News You Can Use" articles.

You are subscribed to www-newnews. To unsubscribe, click http://www.jcaai.org/?ct=member&m_v=lusub&m_rt=WGList&m_rid=37731

If you have problems accessing the above link, visit the main site below.

This message is a service of JCAAI - Joint Council of Allergy Asthma and Immunology
http://www.jcaai.org

This email,and any files or attachments transmitted with it contains information that is confidential and proprietary. This information is intended only for the use of the individual(s) and entity(ies) to whom it is addressed. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient, any disclosure, copying, printing, or use of this information is strictly prohibited and possibly a violation of federal or state law. If you have received this information in error, please notify Family Allergy & Asthma immediately at 502-429-8585 or via email to the sender.

WDTX-JCAAI-017016