IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; PSF, PLLC; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; DAVID WELDON, MD; ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS; JAMES WALLEN; PHADIA US INC.; ATLANTA ALLERGY & ASTHMA CLINIC, P.A.; STANLEY FINEMAN, MD; AND THERMO FISHER SCIENTIFIC INC. | § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 5:14-CV-35-OLG<br><br>JURY TRIAL DEMANDED |
| Defendants. | | |

## FOURTH AMENDED COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United

Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this action

against the American Academy of Allergy, Asthma & Immunology ("AAAAI" or the

"Academy"); the American College of Allergy, Asthma & Immunology ("ACAAI" or the

"College"); Dallas Allergy and Asthma Center, P.A.; the Joint Council of Allergy, Asthma &

Immunology ("JCAAI" or the "Joint Council"); Lyndon E. Mansfield M.D., P.A., a professional

association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"); Tonya Winders; Stanley Fineman, MD; Atlanta Allergy & Asthma Clinic, P.A. ("Atlanta Allergy"); James Wallen; Phadia US Inc.; and Thermo Fisher Scientific Inc. (Phadia US, Inc. and Thermo Fisher Scientific Inc. are collectively "Phadia") (all collectively, "Defendants").

## NATURE OF THE CASE

1.     This case concerns a conspiracy and agreement among the three national allergist trade associations, certain of their officers and board members, and those paid for and acting on their behalf or in coordination with them to restrict competition in the relevant markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies (referred to herein as the markets for "allergy testing and allergen immunotherapy") in local areas throughout the United States.   The three trade associations, AAAAI, ACAAI, and JCAAI, responded to pleas from their members to engage in a "turf war" to address the "encroachment" in the market by primary care physicians and UAS.   In response, and in keeping with the "turf war" motif, these three independent associations of competitors agreed to form "RADAR," a joint venture of those organizations to recruit local allergists from every state, regional, and local allergist society in the nation to fight back against these competitors, and to provide a message board called "Basecamp" for those representatives to coordinate their anticompetitive activities.

2.     Defendants, including not only these trade associations, but the leaders listed in this complaint and some RADAR members, actively engaged in their self-described "turf war" by contacting insurance companies, managed care organization health plans, and other third-party payors to convince them not to do business with or reimburse the allergy testing and allergen immunotherapy services of primary care physicians and UAS.   Defendants also hired

and paid organizations and their individuals to engage in this warfare on their behalf, including Defendant AAN, an organization formerly known as "Mothers of Asthmatics," under the guise that no one would challenge an organization with a now faux purpose of protecting children. Defendants were further joined in agreement and in funds by Defendant Phadia, which lost sales of blood tests and medications as a direct result of primary care physicians performing allergy skin prick tests and preparing and administering allergen immunotherapy. Phadia manufacturers more than 80% of the allergy blood tests sold in the United States and consequently has maintained for years a dominant position in the allergy testing market and the related market for allergen immunotherapy. In response to the competitive threat Plaintiffs posed to Phadia's market position, Phadia joined the conspiracy to put UAS out of business to serve its own economic interests. As part of the conspiracy, Phadia worked with the other Defendants to maintain and further monopolize the allergy testing and allergen immunotherapy markets. Indeed, Phadia and Thermo Fisher and its representatives, including Tonya Winders, believed that Phadia (subsequently Thermo Fisher) and AAN should lead the charge to exclude from the market UAS and its primary care physician clients who engage in skin prick allergy testing and allergen immunotherapy.

3. Defendants engaged in this conduct despite, and in spite of, governmental organizations such as the Centers for Medicare and Medicaid Services and the Texas Medical Board, which otherwise pay for and authorize the services of these competitors. The purpose of Defendants' contacts with private third-party payors and encouragement of other members to engage in this behavior is to accomplish their anticompetitive objectives through persuasion, enticement, or coercion, and were economically motivated to protect Defendants' turf.

4.     The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers. By attempting to take away competitors' means to compete, namely reimbursement by third-party payors, and by intimidating physicians by threatening them with claims of fraud or insurance company audits, Defendants have aimed to essentially deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy.   A direct consequence of this activity is that most consumers are forced to either pay Defendants' inflated prices for allergy testing or allergen immunotherapy, or consumers go without these services.   Defendants' intended result is to protect their own profits and ensure that patients continue to pay their inflated prices, despite the availability of competing cheaper alternatives and the need for additional supply in the market.   Since this suit was filed, then unnamed members of the conspiracy, including AAN, Phadia, Winders, and Wallen only ramped up their anticompetitive activity with the hope that they could put Plaintiffs out of business before Plaintiffs could discover the depths of their participation in this conduct.   Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, the Texas Free Enterprise and Antitrust Act, and Texas common law, the Court should put an end to this turf war and restore and protect competition.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

5.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, and the common law of torts for civil conspiracy and tortious interference with both current contracts and prospective business relations.

6.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a).  Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business.  *See* 15 U.S.C. § 22.

7.      The Court may exercise personal jurisdiction over Defendants Gross, Mansfield, Weldon, Dallas Allergy and Asthma Center, P.A., and Lyndon E. Mansfield M.D., P.A., a professional association, because they are located in Texas and have continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

8.      The Court may exercise personal jurisdiction over Defendants JCAAI, AAAAI, ACAAI, AAN, Phadia, and Thermo Fisher because they regularly conduct business in Texas, including with Texas-based physicians to whom they market and communicate directly through phone calls, writings, and over the internet, including via their respective websites.  Additionally, they have purposefully directed specific actions at Texas, including phone calls, emails, letters, and publications.  This action arises from and specifically relates to those purposeful contacts with the State of Texas.

9.      The Court may exercise personal jurisdiction over all Defendants, including Defendants Dr. Aaronson, Dr. Sublett, PSF, PLLC, AAN, Dr. Fineman, Atlanta Allergy, Phadia, Thermo Fisher, and Tonya Winders because they expressly aimed tortious conduct at the State of Texas knowing that the brunt of their intended injury would be felt by residents of Texas, and particularly by UAS, a San Antonio, Texas-based company.  Defendants have expressly engaged in such tortious conduct individually by committing antitrust violations, as well as interfering with contracts and prospective business relationships in Texas with the intent to harm residents

of Texas.  They have done so through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas.

10.     For example, on February 8, 2011, Dr. Aaronson, Dr. Sublett, and Dr. Fineman helped issue a letter to Regional, State, and Local Allergy Society Leaders announcing the formation of the Regional Advocacy Discussion and Response ("RADAR") initiative aimed at addressing the encroachment of non-allergists.  *See* Exhibit E-4 to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order (Motion for Preliminary Injunction"), Dkt. No. 12-25.   The letter, which was signed by Dr. Sublett, sought to recruit local representatives from every corner of the country, including Texas, to assist in carrying out RADAR's mission, the true intentions of which were to restrict access to the market for allergy testing and allergen immunotherapy.   An AAAAI published report on "Ongoing Activities Relevant to the [RADAR] Initiative," admits that one of the means by which RADAR attempted to address the perceived encroachment by non-allergists, was to engage in "[o]ngoing communication with insurance companies" to represent the specialty "in discussions about appropriateness of care."   *See* Exhibit G to Plaintiffs' Motion for Preliminary Injunction at 3, Dkt. No. 12-35.   Those discussions have resulted in the refusal of insurance companies to reimburse claims submitted by primary care physicians residing in Texas who are supported by UAS.   The encouragement of such actions by local representatives from every state in the country clearly demonstrates a nationwide pattern of anticompetitive conduct which has resulted in direct harm to entities located in Texas, including UAS and the practices of the Texas primary care physicians whom it supports.

11.     Further, Dr. Sublett sent an email dated May 5, 2011 to the President of the Texas Allergy, Asthma & Immunology Society ("TAAIS"), Dr. Stuart Abramson, who was located in Texas, approving and authorizing the creation and distribution of anticompetitive letters aimed at primary care physicians, insurance companies, and managed care organizations throughout Texas.  *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order, Dkt. No. 12-46.   The communication indicates that both Dr. Aaronson, JCAAI's acting Executive Director, and Dr. Gross, the organization's Executive Vice President, were also personally involved in approving these communications.   Despite acting in their capacity as officers of JCAAI, Defendants' actions also benefitted themselves individually as physicians and their businesses engaged in the market for allergy testing and allergen immunotherapy, and thus were undertaken in more than any pure associational capacity.   The fiduciary-shield defense protects against liability for officers of organizations just by being officers, but does not protect the individual Defendants from liability for their own tortious conduct, especially not from antitrust liability.   The letters that Drs. Aaronson, Gross, and Sublett approved on behalf of JCAAI, were intended to injure UAS, as well as the Texas primary care physicians that it supports.   As the referenced communication from TAAIS seeking approval for the letters asserts, they were revised to alter the "tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement."   *Id.* at 2.   However, regardless of the revisions, the intended target of the harm sought to be inflicted remains the same. Communications among the TAAIS leadership confirm that UAS was the intended target of the letters which Drs. Aaronson, Gross, and Sublett approved as described below.  *See* Exhibit T to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-50 ("Because of "restraint of trade" issues, we cannot more directly attack [UAS], but the above approaches [including the draft

letters] are within our legal rights."). The clear purpose of the Defendants' tortious conduct both with Texas and with others outside of Texas as described below was to injure UAS and prevent competition from the physicians whom it supports. The benefit of those actions was meant to accrue to board-certified allergists' businesses, such as PSF, PLLC, which belongs to Dr. Sublett.

12.     Dr. Sublett and Dr. Aaronson jointly participated in multiple JCAAI newsletters discussed below, which Dr. Sublett signed, and which were distributed to JCAAI members in Texas and support the basis for the claims in this Complaint. The October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," which was sent under Dr. Sublett's signature and originally drafted by Dr. Aaronson, mentions efforts to address the remote practice of allergy and specifically mentions "one such scheme featured in . . . a "Business Builder" article in *Medical Economics*." Dr. Sublett testified under oath that the company featured in the referenced article was UAS. (September 7, 2012 Deposition Testimony of Dr. James Sublett, M.D. at 143:14-15). The newsletter, addressed to JCAAI's nationwide membership, including members in Texas, goes on to "recommend[] against engaging with any company that promotes [the remote practice of allergy]." Dr. Sublett also participated in RADAR, including its online message board "Basecamp," in which Dr. Sublett specifically sought information concerning UAS to target that company. Dr. Sublett, Dr. Aaronson, and Dr. Fineman also participated in the AAAAI Annual Meeting and the JCAAI meeting from February 22-26, 2013 in San Antonio, Texas, at which all three participated in discussions concerning the ongoing activities of RADAR and Defendants as described in this Complaint.

13.     Dr. Fineman served as the President-Elect for the ACAAI from 2010-2011 and the President from 2011-2012. During his tenancy as President-Elect, Dr. Fineman drafted and participated in distributing multiple letters and publications, including attempts to paint ACAAI

as setting the standard of care for allergy testing and allergen immunotherapy. Those communications were distributed to members in Texas, as well as third party payors, including managed care organizations in Texas. For example, ACAAI sent a "position statement" regarding allergy testing and allergen immunotherapy to the managed care organization, El Paso First Health Plan located in El Paso, Texas. *See* Ex. A. El Paso First relied on the position paper to determine that the standard of care for allergy testing and allergen immunotherapy was limited to practice of board-certified allergists, and to deny claims of AAAPC members and primary care physicians in contract with UAS. Additionally during his tenancy as President-Elect of ACAAI, Dr. Fineman proposed and participated in drafting and sending a letter to the Texas Medical Board providing specific guidelines for immunotherapy. [Dkt. No. 135-17]. Dr. Fineman proposed a formal motion of ACAAI the ACAAI's letter be sent in support of the Texas Allergy & Asthma Society and its members in response to their pleas to combat UAS, and the ACAAI Executive Committee carried that motion and sent the letter in March 2011. Following the sending of this letter, Defendants Gross and Aaronson discussed with Dr. Fineman that the Texas Medical Board should target UAS and make their practices "a case they are investigating." Further, Defendant Gross and Dr. Fineman discussed how to disrupt UAS's business with primary care physicians, including Defendant Gross contacting the Chief of Internal Medicine at Presbyterian Hospital in Dallas to control Plaintiffs from a "corporate standpoint." [Dkt. No. 135-16].

14. Dr. Fineman also participated in Strike Force and RADAR, including its online message board "Basecamp." Through direct conversations with other Defendants, including those in Texas, and with his own colleagues at Atlanta Allergy, Dr. Fineman specifically sought information concerning UAS to target that company in Texas, Atlanta, and elsewhere. Dr.

Fineman inquired with Defendants Aaronson and Sublett about whether they could collectively use a JCAAI press release "to support our case against the remote practice by United Allergy Labs?"   Dr. Fineman and Atlanta Allergy also specifically targeted UAS through approaching pediatric and primary care clinics in Georgia to convince them not to utilize or contract with UAS.  *See* Ex. B.  Defendants could reasonably expect to be held accountable by a Texas court for the anticompetitive injuries suffered in Texas that were the intended result of their conspiracy.   As such, the Court's exercise of personal jurisdiction over Defendants would not violate traditional notions of fair play and substantial justice.

15.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants inhabit or transact business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District, including, but not limited to, the conspirators' attempts to organize a group boycott and restrict competition and output using insurance companies, managed care organizations, and physicians located in this district to harm UAS, which is also located in this District.  In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because JCAAI, ACAAI, AAAAI, and AAN each transact business in the District, such as accrediting members of their organizations in the District and providing support services to those members in the District.

16.   Defendants' conduct, including their attempts to organize a group boycott against and restrict competition and output from non-allergist physicians and their businesses and support staff, including AAAPC members and UAS; and their conspiracy to monopolize the market for allergy testing and allergen immunotherapy; and Defendants' tortious interference with AAAPC members and UAS's contracts and prospective business relations all cross state

lines.  Defendants' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

17.    AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia.  The AAAPC is an organization that fosters the ability of physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care.  Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  AAAPC seeks injunctive relief on its antitrust claims brought in a representational capacity on behalf of its members.  It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit.  AAAPC also seeks certain money damages in its own capacity because it has, itself, suffered actual damages due to the Defendants' tortious conduct through their interference with AAAPC's contracts and existing and prospective business relations.  AAAPC has appeared through undersigned counsel in this cause.

18.    United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.  UAS participates in the market for allergy testing and allergen immunotherapy through providing support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of

11

board-certified allergists, including Defendant Dallas Allergy and Asthma Center, P.A. in the local market in Dallas; PSF, PLLC in the local market in Louisville; Lyndon Mansfield M.D., P.A. in the local market in El Paso, and Atlanta Allergy, in the local market in Atlanta, Georgia. As a direct target of Defendants' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims. UAS has appeared through undersigned counsel in this cause.

## **Defendants**

19.     The American Academy of Allergy, Asthma & Immunology is a Wisconsin non-profit organization of physicians with its principal place of business at 555 East Wells Street, Suite 1100, Milwaukee, WI 53202-3823 and has appeared through counsel in this cause.

20.     The American College of Allergy, Asthma & Immunology is a Minnesota non-profit organization of physicians with its principal place of business at 85 West Algonquin Road, Suite 550, Arlington Heights, IL 60005 and has appeared through counsel in this cause.

21.     Dallas Allergy and Asthma Center, P.A. is a Texas professional association owned and operated by Dr. Gary Gross with its principal place of business at 5499 Glen Lakes Dr., Ste. 100, Dallas, TX 75231 and has appeared through counsel in this cause.

22.     PSF, PLLC d/b/a Family Allergy & Asthma LLC is a Kentucky limited liability company owned and operated by Dr. James Sublett, with its principal place of business at 9800 Shelbyville Road, Ste. 220, Louisville, KY 40223 and has appeared through counsel in this cause.

23.     The Joint Council of Allergy, Asthma & Immunology is an Illinois non-profit organization of physicians with its principal place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067 and has appeared through counsel in this cause.

24.     Lyndon E. Mansfield M.D., P.A., a professional association, is a Texas company owned and operated by Dr. Lyndon Mansfield, with its principal place of business at 2121 Wyoming Ave., El Paso, TX 79903 and has appeared through counsel in this cause.

25.     Dr. Donald W. Aaronson is an individual residing in the state of Illinois and is the Executive Director of JCAAI, and has specially appeared through counsel in this cause.

26.     Dr. Gary Gross is an individual residing in the state of Texas, is the Executive Vice President of JCAAI, and the owner of Dallas Allergy & Asthma Center, P.A., and has appeared through counsel in this cause.

27.     Dr. Lyndon Mansfield is an individual residing in the state of Texas, is a member of the Board of Directors of JCAAI, and is the owner of Lyndon Mansfield, M.D., P.A., and has appeared through counsel in this cause.

28.     Dr. James Sublett is an individual residing in the state of Kentucky and is the Immediate Past President and a member of the Board of Directors of JCAAI, the Vice President of ACAAI, the owner and founder of PSF, PLLC d/b/a Family Allergy & Asthma LLC, and has specially appeared through counsel in this cause.

29.     Dr. David Weldon is an individual residing in the state of Texas and is a member of the board of regents of ACAAI and has appeared through counsel in this cause.

30.     Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"), formerly known as Mothers of Asthmatics, is a Virginia corporation with its

principal place of business at 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182 and has appeared through counsel in this cause.

31.    Tonya Winders is an individual residing in the state of Tennessee and is the Executive Director of AAN and a past officer of Phadia and has appeared through counsel in this cause.

32.    James Wallen is an individual residing in the state of Texas and is a representative of AAN, and has appeared through counsel in this cause.

33.    Dr. Stanley Fineman is an individual residing in the state of Georgia, the Past President and current officer of ACAAI, and a current director of the board of AAN, and may be served with process at his residence, 4042 River Ridge Chase, Marietta, Georgia, 30067.

34.    Atlanta Allergy & Asthma Clinic, P.A., a professional association ("Atlanta Allergy"), is a Georgia company owned and operated by Stanley Fineman, and may be served with process through its registered agent, Gregory P. Youra, 1180 Peachtree Suite, Suite 700, Atlanta, Georgia, 30309.   Service of process may also be made in any district where it transacts business.  *See* 15 U.S.C. § 22.

35.    Phadia US Inc. ("Phadia") is a Delaware corporation with its principal place of business at 4169 Commercial Drive, Portage, MI 49002, and has appeared through counsel in this cause.

36.    Thermo Fisher Scientific Inc. ("Thermo Fisher") is a Delaware corporation with its principal place of business at 81 Wyman St., Waltham, MA 02451, and regularly conducts business in the State of Texas.   Thermo Fisher may be served through its registered agent for service of process, Capitol Services, Inc., Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, TX 78701-4411.   Thermo Fisher is the successor in interest to Phadia US,

Inc. through its purchase of that entity in August 2011, and is liable for the actions of its officers, directors, employees, and agents taken on its own behalf and on behalf of Phadia since that time. Service of process may also be made in any district where it transacts business.  See 15 U.S.C. § 22.

37.     Defendants' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

38.     Defendants Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are licensed physicians in their respective states and are in the business of providing allergy care to patients in their area and the places where their practices do business.  Defendants operate their businesses either individually, or through professional associations or limited liability companies, which not only provide physician services for allergy care, but also provide support services necessary to provide the allergy care, including Defendants Dallas Allergy and Asthma Center, P.A.; PSF, PLLC; Lyndon Mansfield, M.D., P.A., and Atlanta Allergy & Asthma Clinic, P.A.  Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are also members of some or all of the three national trade organizations composed of board-certified allergists, AAAAI, ACAAI, and JCAAI, and act on behalf of those organizations as either officers or board members.

39.     The individual defendants market themselves within their sub-specialty as "board-certified allergists," which is a certification a physician obtains from the American Board of Allergy and Immunology ("ABAI"), a private organization established in 1971.  The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine, and who participate in a three-year fellowship in an ABAI training program. Currently there are less

than 3,000 board-certified allergists practicing nationwide. The number of fellowships and board-certified allergists is shrinking.

40.     Defendant AAN is a "non-profit" organization originally named "Mothers of Asthmatics." Mothers of Asthmatics was formed in 1985 by Defendant Nancy Sander, a mother of an asthmatic child to advance the interests of asthmatic patients who suffer from lack of care to treatment. Nancy Sander served as President of Mothers of Asthmatics until September 2013, when Tonya Winders took over the leadership of that organization, renaming it "Allergy and Asthma Network." Instead of advancing the cause of asthmatic children as the organization was originally formed to do, AAN now acts as a referral network for board-certified allergists who are members of ACAAI and in exchange for payment seeks to advance the market position of board-certified allergists affiliates.

41.     Defendant Tonya Winders is the Executive Director of AAN and a former sales representative of Phadia, Inc., a company that employees many board-certified allergists as board members, including Defendant Mansfield. Phadia sells Immunocap tests, otherwise known as "ICAPs." ICAPs are a form of Radio Allergo Sorbent Tests ("RAST tests"), which are blood test that measure levels of Immunoglobulin E (IgE), the allergic antibody, in an effort to test for allergies. While ICAPs are used by board-certified allergists primarily to test for food allergies, Phadia promotes ICAPs to primary care physicians and encourages those physicians to use those tests on their patients who also may suffer from seasonal and perineal allergies, and encourages those physicians to refer those patients who test positive to board-certified allergists for treatment. In exchange for Phadia's promotion of referrals of patients needing allergen immunotherapy to allergists, AAN, ACAAI, and JCAAI agreed to recommend to insurance companies and physicians that primary care physicians should only use ICAPs as the exclusive

form of allergy testing.   The result is that primary care primary care physicians would be restricted to using the allergy blood test on which Phadia maintains a monopoly, and would not be permitted to provide allergen immunotherapy, which would be reserved to specialists.

42.   Despite not being certified by ABAI, many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of ABAI.   As explained below, however, there is an important distinction between treating allergy-related symptoms and treating the underlying cause of allergies, the latter of which can only be accomplished through allergy testing and allergen immunotherapy.

43.   While the number of physicians who receive ABAI accreditation is shrinking, board-certified allergists and their businesses are still the dominant players in the market for allergy testing and allergen immunotherapy.   Almost every practicing board-certified allergist is in the business of allergy testing and allergen immunotherapy.   Collectively, board-certified allergists as a group participate in more allergy testing and allergen immunotherapy than any other player in the market.

44.   Board-certified allergists have the power to influence the markets for allergy testing and allergen immunotherapy through their trade organizations.   As the national organizations of board-certified allergists, AAAAI, ACAAI, and JCAAI, both individually and jointly are dominant players in the markets for allergy testing and allergen immunotherapy. AAAAI, ACAAI, and JCAAI, which collectively represent virtually every board-certified allergist in the United States, publish and control the most respected medical journals related to

17

allergy care, and distribute influential allergy practice guidelines that, if misunderstood or misused, can change the shape of the marketplace for allergy-related services.

45.     Based on its significant market share, Phadia has market power, which gives it the ability to influence the markets for allergy testing and allergen immunotherapy both through its massive corporate reach and its decision to work with board certified allergists to achieve their mutual anticompetitive goals.   Phadia itself manufacturers and distributes more than 80% of allergy blood tests sold in the United States and boasts an expansive network of thousands of sales representatives that "call on" physicians nationwide to persuade them to order its ImmunoCap tests.  Furthermore, along with the board certified allergists and their national trade associations with which Phadia conspired, Defendants control over 80% of the market for allergy testing and more than 70% of the market for allergen immunotherapy in which Plaintiffs also compete with them, and an even larger market share in areas where Plaintiffs have been driven from the markets.   Phadia's and Defendants' overwhelming market share for their related services within the market has stood for more than ten years and was only recently threatened by market entrants such as UAS and its primary care physician clients starting in 2009.  In reaction to threats to this market share posed by Plaintiffs, Defendants, including Phadia agreed with each other to engage in the anticompetitive conduct discussed below to drive these competitors out of the market and erect additional market entry barriers, with the ultimate goal to further their attempt to monopolize and monopolization of the markets for allergy testing and allergen immunotherapy.   The result of Defendants' conduct has been the elimination of competition and the increase in market share by Defendants in the markets for allergy testing and allergen immunotherapy in the local geographic markets in the states of Arkansas, Arizona, Colorado, Florida, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, New Jersey,

New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

46.     The most common method of treating seasonal allergies includes the use of over-the-counter and prescription medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis.  It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States.

47.     Despite the temporary usefulness of over-the-counter and prescription allergy medications, these medications do nothing to desensitize or cure the patient, i.e., they fail to address the underlying cause of allergic rhinitis for seasonal and perennial allergies, instead masking the patient's condition by treating the symptoms.  The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens.  Physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test or an allergy blood test.  Given travel cost and time considerations, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy.  The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized.  Allergy treatment services are offered in all major cities in the country and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer

health care services, including allergy testing and allergen immunotherapy, close to their homes and workplaces. The most common method to determine the localized areas where patients travel for such services is use of metropolitan statistical areas, or "MSAs," and micropolitan statistical areas. MSAs and Micropolitan Statistical Areas are geographic areas defined by the U.S. Office of Management and Budget. While the market may be a local one, Defendants' actions are aimed at foreclosing an entire class of competitors and Defendants have attempted to impact localized markets in which they practice, and in which board-certified allergists practice, including for example, every localized market in Texas.

### THE PRODUCT MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

48.    To compete in the market for allergy testing and allergen immunotherapy, firms rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees. The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, vials, needles, and other materials necessary to perform allergy testing and mixing of allergen immunotherapy. The firms must also be paid for the services performed, either by the patient directly, or by a "third-party payor" ("TPP"), such as a commercial insurance company, a managed care health plan, Medicare, or Medicaid. Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association. Currently, there is no substitute for either allergy testing or allergen immunotherapy in effectively diagnosing or treating seasonal or perineal allergies.

20

49.     During the testing of a patient, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test.  If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician.  The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the reaction, and the physician reviews the results.  If a firm bills a third-party payor for a skin prick test, the firm does so under CPT Code 95004.  When the physician recommends an allergy blood test, the physician refers the patient to a laboratory that draws the patient's blood and applies an instrument, such as ImmunoCap, which is manufactured by Phadia.  The laboratories, most of which are owned by Quest Diagnostics or Clinical Pathology Labs ("CPL") bills third-party payors under CPT Code 86003.  Allergy testing, through either a skin test or a blood test, as described above, is a necessary prerequisite for a patient to be considered for allergen immunotherapy.

50.     If the physician determines that a patient is allergic to an allergen, the physician may recommend allergen immunotherapy to the patient.   Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the allergen immunotherapy is typically mixed by the technician under the physician's supervision.  The allergen immunotherapy is composed of antigens that are mixed with a diluent.  The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose."  If a firm bills a third-party payor for the mixing of allergen immunotherapy, the firm does so under CPT Code 95165.

51.    The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy shots."   If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician.   Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance that is associated with self-administered allergy shots.   Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases.   Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers.

52.    In 2003, AAAAI, ACAAI, and JCAAI collectively formed a "Joint Task Force" to act as authors and editors of "Practice Parameters," otherwise known as recommendations to their members.   The first "Practice Parameters for Allergen Immunotherapy," published in 2003, recommended that board-certified allergists should no longer permit self-administration of allergy shots by patients, except in "exceptional cases in which allergen immunotherapy cannot be administered in a medical facility."   Instead, the Practice Parameters recommended that allergy shots should be administered by the physician's technician in the physician's office.   The Practice Parameters were the collective response of AAAAI, ACAAI, and JCAAI to the then-common practice of permitting self-administration of allergy shots by many board-certified allergists as well as non-board-certified allergists, including ENTs, board-certified family

physicians, board-certified pediatricians, and other primary care physicians.   The Joint Task Force recognized at the time that the trend towards patient self-administration would threaten the business of board-certified allergists, who most benefit from the high margins charged to patients and insurance companies for injections administered in the office, often between $20 and $30 per injection.   Nevertheless, the "Practice Parameters" were only "recommendations" and explicitly stated that they did not intend to supplant the judgment of individual physicians.   Despite the recommendation contained in the Practice Parameters, most physicians, including some board-certified allergists and a majority of ENTs and primary care physicians in individual cases, permit self-administration of allergen immunotherapy for the appropriate patients.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

53.   While the number of people who suffer from allergic rhinitis has grown along with the need for allergen immunotherapy, the number of board-certified allergists has declined. It is estimated that only 2-6% of the patients who would benefit from allergen immunotherapy actually receive this therapy.   *See* Exhibit Z to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-57 at 15.   Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas.   This shortage has left rural and poor urban areas largely without access to allergy testing and allergen immunotherapy.   In addition to location, cost is an issue as well.   The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office.

54.   In 2009, Plaintiff United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL."   UAL's business model represented a response to the shortage of physicians who practiced allergy testing and allergen

23

immunotherapy despite the growing need for those services. While some board-certified family physicians, board-certified pediatricians, and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Notably, purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that usually prevents most primary care physicians from providing allergy testing and allergen immunotherapy. UAS helps physicians and their businesses overcome this economic barrier by contracting with those businesses to assist those business's entry into the market. Since 2009, UAS has assisted more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy.

55.     As part of the contractual relationship between UAS and physicians, practice groups, and hospitals, UAS is responsible for all of the non-physician services necessary to compete in the market for allergy testing and allergen immunotherapy, including the equipment, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry. UAS trains and provides technicians to assist physicians in the medical practice of allergy testing and allergen immunotherapy. Those technicians are located by UAS, and are required to meet more rigorous standards than the technicians typically relied on by the businesses of board-certified allergists, including engaging and passing a program concerning allergy testing and allergen immunotherapy administered by the University of the Incarnate Word School of Nursing. Physicians rely on the services of UAS employed technicians to personally provide allergy care to the patients that the physician determines may benefit from this treatment. This includes the physician supervising the

provision of and reading the allergy test, consulting the patient on the potential for allergen immunotherapy in response to positive test, and supervising the mixing of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

56.     Together, primary care physicians and UAS have provided a less expensive and more widely available alternative for consumers than the businesses of board-certified allergists and Phadia in the market for allergy testing and allergen immunotherapy.   The entry of at least 2,000 additional primary care physicians since 2009 in the relevant geographic markets of 25 states, including Texas,[1] for allergy testing and allergen immunotherapy has begun to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but currently go untreated.   Those primary care physicians who have entered the market offer a lower-cost option to patients, are more conveniently located to the patients, and have shorter wait times for an appointment and shorter wait times in the office.   Those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or from incurring the expense of taking off work or school to travel to a medical facility for shot administration.

57.     Third-party payors, especially commercial carriers, have also benefitted from this lower cost option of competitors.   Lower reimbursement rates for primary care physicians as compared to specialists result in a significantly lower cost for allergy testing as billed under CPT Code 95004, the mixing of allergen immunotherapy as billed under CPT Code 95165, and a substantial reduction or elimination of costs billed for shot administration under CPT Codes 95115 and 95117.   Additionally, the system as a whole has benefitted from the increased

---

[1]     UAS has contracted with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.   The   MSAs   applicable   to   those   states   can   be   found   at http://www.census.gov/population/metro/data/def.html.

utilization of allergen immunotherapy, which studies have shown reduces the overall costs to patients and third-party payors in terms of expenses for medication, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by allergen immunotherapy.

58.     Nevertheless, when board-certified allergists began discovering that primary care physicians in their local communities were practicing allergy testing and allergen immunotherapy (particularly in combination with UAS) instead of referring those patients to the businesses of board-certified allergists, many became upset at the entry of additional competitors.  These allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as TAAIS, began to complain to the leaders of those organizations about this increase in competition.

## MEDICAL BOARD COMPLAINTS

59.     Defendants' first line of attack against the competition for allergy testing and allergen immunotherapy was to attack the non-allergist physicians directly.  Defendant Gary Gross revealed to Defendants Aaronson, Sublett, and Fineman that if a primary care physician is concerned with the loss of his or her license, it may reduce any financial incentive to compete. Additionally, Gross suggested that they should find out if any primary care physicians had been dropped by UAS—as that information would be helpful to provide to medical boards and third party payors—or insurance companies.

60.     To this end, Defendants conspired to file or cause others to file false medical board complaints against primary care physicians who work with companies like UAS, and then to influence the medical board's consideration of those complaints unjustly.  The first of the complaints were filed by Dr. Michael Vaughn, an ACAAI member and a board-certified allergist

in private practice in San Antonio, Texas.   Dr. Vaughn discovered that these once referring family physicians were now competitors because UAS was providing those physicians with the necessary support services to provide patients with allergy testing and allergen immunotherapy. Dr. Vaughn filed the complaints with the Texas Medical Board ("TMB") in the summer and fall of 2010, alleging that certain physicians practicing in San Antonio, Texas were practicing allergy testing and allergen immunotherapy outside of their scope of practice, without proper training, and were inappropriately permitting patients to self-administer the allergy shots.   After filing the complaints, Dr. Vaughn attended the November 16, 2010 Annual Meeting of ACAAI and on that date made a presentation to the ACAAI Board regarding the entry of additional competitors in the San Antonio market for allergy testing and allergen immunotherapy.   Dr. Vaughn reported this information to the ACAAI Board, which agreed to write a letter to the TMB discouraging the practice of physicians relying on allergy services companies like UAS to provide allergy testing and allergen immunotherapy.   Following this presentation, the ACAAI Board agreed by consensus to send a letter of appreciation to Dr. Vaughn for his presentation.

61.     After learning of Dr. Vaughn's complaints, Defendants encouraged all board-certified allergists to complain to the TMB if they discovered any primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS.   In a December 2010 Texas Allergy, Asthma & Immunology Society ("TAAIS") newsletter, Dr. Weldon openly solicited board-certified allergists in Texas to report physicians who partner with companies like UAS to the TMB.   That newsletter was a collaborative effort by the leadership of TAAIS and board members of ACAAI and JCAAI, including Dr. Weldon and Dr. Mansfield, respectively.    The complaints to the TMB about primary care physicians practicing allergy testing and allergen immunotherapy included claims that those physicians were not qualified to

provide such care, were providing substandard care by relying on support services from UAS, and were permitting patients to self-administer their allergy shots, which Defendants term "home immunotherapy."

62.     In addition to encouraging complaints to the TMB, Defendants also attempted to influence the TMB's consideration of those complaints.  On March 31, 2011, the ACAAI board sent a letter to the TMB regarding "specific practices of allergy by non-allergists."  This letter was approved by the ACAAI Board on Dr. Fineman's motion during the March 23, 2011 ACAAI Executive Committee meeting.   The TMB letter cited extensively from "Allergen immunotherapy:    A practice parameter third update," misleadingly referring to this joint publication by JCAAI, ACAAI, and AAAAI as the "standard of care" despite disclaimers in that publication and the fact that there is no nationally accepted standard of care for allergen immunotherapy.   Due in part to the Defendants' conspiracy, the joint publications of JCAAI, ACAAI, and AAAAI continued to discourage patient self-administration of allergen immunotherapy, which Defendants had identified as a threat to their business model.

63.     In addition to outside attempts to influence the complaints, certain Defendants, specifically Dr. Gross, Dr. Mansfield, and Dr. Weldon, attempted to use their positions as volunteer "expert reviewers" for the TMB to improperly influence the TMB's consideration of the complaints.    Despite being made aware of the complaints by Dr. Vaughn and other colleagues and encouraging the filing of additional complaints, Dr. Gross, Dr. Mansfield, and Dr. Weldon failed to disclose this information and their conflict of interest to the TMB, a violation of their agreements with TMB and Texas State Law.

64.     Despite Defendants' attempts to influence TMB, the TMB dismissed complaints against primary care physicians practicing allergy testing and allergen immunotherapy.   The

TMB's rulings specifically found that primary care physicians may practice allergy testing and allergen immunotherapy under Texas Medical Practices Act.  The rulings also found that the physician's decisions to permit their patients to self-administer allergy shots does not violate the standard of care.  After receiving these negative rulings, Defendants worked with other board-certified allergists in Texas in an attempt to alter future TMB decisions by volunteering as expert reviewers, included Defendants Dr. Gross, Dr. Mansfield, and Dr. Weldon, as well as their colleagues Dr. William McKenna, Dr. Wesley Stafford, and Dr. Theodore Freeman.  Defendants and/or their co-conspirators also attempted to influence a TMB board member, Dr. Hari Reddy, also a JCAAI, ACAAI, and AAAAI member.  Despite the actions of Defendants, the TMB never agreed with Defendants' recommendation that primary care physicians are not qualified to practice allergy testing and allergen immunotherapy or that self-administration of allergy shots is a violation of the standard of care.

      65.    Defendants' complaints and actions directed at the TMB are not the basis of the claims in this Complaint, but help explain Defendants' motivation to turn to illegal activity to accomplish the result they were unable to obtain through TMB complaints.  As Dr. Weldon explained in an email to the leaders of TAAIS about losing the fight at the TMB level: "We need to survive our specialty. We need to capture the attention of our non-allergist colleagues. We need to get managed care to understand the differences provided by a ABAI BC allergist.  If we don't, then we are dinosaurs waiting for the inevitable. Judging from the most recent response by the TMB in favor of the family practitioner who was practicing allergy, I would say we are fading fast." *See* Exhibit Y to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-55 at 2.

## CONSPIRACY TO RESTRICT COMPETITION IN THE MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

66.     The evidence already in the record attached to Plaintiffs' Motion for Preliminary Injunction demonstrates the illegal activities that form the basis of this Complaint, specifically an agreement among the Defendants to restrain trade and restrict competition in the market for allergy testing and allergen immunotherapy in local areas throughout the United States and to tortiously interfere with AAAPC members and UAS's contracts and prospective business relations.

67.     The agreement to restrict competition in the practice of allergy testing and allergen immunotherapy began after Defendants learned of UAS and the entry of primary care physicians into the market in areas within Texas. Defendants and other board-certified allergists in markets nationwide commonly referred to these competitors, specifically primary care physicians who practice with the support of UAS, as the "remote practice of allergy," "RPA," or "remote allergy." The term was originally adopted by board-certified allergists and their trade associations in reference to allergen immunotherapy that was remotely provided to competitor physicians by off-site mixing labs, but came to include the practice of primary care physicians who rely on a UAS technician to assist in allergy testing and allergen immunotherapy. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. AAN, Phadia, and their representatives and co-conspirators also adopted the term in their efforts in partnering with AAAAI, ACAAI, and JCAAI in responding to this competitive threat.

68.     To respond to this rise in competition of primary care physicians and allergy services companies, in 2009, ACAAI created its "Marketing the Allergist Campaign" as part of an initiative to ensure that allergy specialists did not lose market share to new entrants. Dr. Mansfield represented to the Board of Directors and Committee Chairs of TAAIS on May 1,

2009 that ACAAI's newly minted Marketing the Allergist Campaign was making a "strong effort" to respond to increasing frustrations "with losing business to other specialists." *See* Exhibit B-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-3.

69.   By 2010, the conspiracy grew into a concerted effort to remove the economic incentive of their competitors to provide allergy testing and shots by attempting to cut off the main source of funding to these competitors, namely insurance companies and managed care health plans, otherwise known as third party payors.   Without reimbursements from third party payors, the board-certified allergists' competitors would be unable to compete in the market for allergy testing and allergen immunotherapy.   Leaders of TAAIS, including Dr. Mansfield and Dr. Weldon agreed that the organization should contact physicians and third-party payors in an effort to convince them not to do business with UAS.   To that end, those board-certified allergists began drafting letters that would be disseminated on behalf of TAAIS to all physicians and third-party payors in Texas denouncing the practices of these competitors. *See e.g.* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38.

70.   In the midst of drafting these letters, Defendants began contacting insurance companies directly.   Original attempts began with phone calls to individual insurance companies following Defendants' agreement that they should convince insurance companies not to pay or to restrict reimbursement to their non-allergist competitors.   In coordination with Dr. Mansfield and Dr. McKenna, and in accordance with Defendants' agreement, Dr. Victor Estrada, a then TAAIS Board Member and board-certified allergist in private practice in San Antonio, Texas spoke with a representative of Humana of Texas ("Humana"), a conversation he documented in an email to Dr. Mansfield and Dr. McKenna on June 5, 2010.   *See* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38.   According to Dr. Estrada, Humana was engaged in "red-

flagging claims with certain codes coming in by primary care offices and are considering their options, such as, denying payment, considering charges as out of network, and even asking for their money back on previously paid claims." *Id.* at 2. Dr. Estrada expressed the hope that this would occur with all of the major carriers and "maybe some changes coming." *Id.* Dr. McKenna remarked on the "great news," and the three doctors continued to discuss a letter to insurance companies that would encourage them not to pay competitors who are not board-certified allergists. *Id.* at 1.

71.     In September, 2010, Dr. Weldon engaged in a 45 minute conversation with an official at Blue Cross/Blue Shield of Texas ("BCBS Texas"), in which he told her to "suspect and to watch for abuse by primary care physicians" who practice "remote allergy" and that "she needed to have her organization look into" only allowing board-certified allergists to test and prescribe allergen immunotherapy. Dr. Weldon documented this conversation in an email to his fellow TAAIS board member and allergist colleague, Dr. William McKenna. *See* Exhibit K to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-39. In Dr. Weldon's email, he explained that: "If it all pans out, we may be in for what we wanted… [I]f something GOOD comes of this, then perhaps all of this prescribing over the internet (remote practice) and inappropriate billing (and thus, making it economically unfeasible for competitors) will subside and we will again be able to look at ourselves as 'The Allergist' and not have to share that title with some nitwit technician in an ENT practice." *Id.* at 2 (emphasis added).

72.     On September 25, 2010, the TAAIS Executive Director, Connie Mawer, circulated an Agenda and Reports for a September 28, 2010 conference call among the TAAIS Board Members and Committee Chairs, including their consideration of letters to be drafted and sent to insurance companies and primary care physicians throughout the State of Texas about

their competitors.  *See* Exhibit D-11 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-16.  On September 26, 2010, Dr. Weldon responded in an email to the TAAIS Board and Committee Chairs regarding the need for letters to the market stating: "This is a turf war folks, like it or not, and it looks like we need to take a stand right now for our profession or else return to practicing primary care medicine (with a side of allergy, perhaps)." *Id* at 2.

73.     The TAAIS Board, including Dr. Weldon, met on September 28, 2010 and according to the meeting minutes, "discussed a draft letter to PCPs [primary care physicians] developed by a small Ad Hoc Committee which informs [them] of 'allergy companies' popping up in Texas and marketing allergy skin testing and immunotherapy to [primary care] practices. This letter is currently under legal review."  *See* Exhibit D-12 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-17.  The Board also agreed to send voting delegates to the ACAAI November 2010 Annual Meeting in Phoenix, Arizona to present the letter concerning primary care physicians and "Texas scope of practice issues."  Dr. McKenna also suggested "that the first draft letter could be revised to also be sent to third party payors." *Id.*

## AAAAI, ACAAI, AND JCAAI JOIN THE CONSPIRACY

74.     On September 30, 2010, Dr. Weldon forwarded a draft of the TAAIS letter to primary care physicians via email to certain officers and members of the board of directors of AAAAI, ACAAI, and JCAAI, including Dr. Aaronson.  *See* Exhibit D-9 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-14.  Starting off his email, Dr. Weldon stated "Welcome to our world in Texas – this is what I've been beating my chest about for the past few years and for which we have been unable to counter.  Call them charlatans or whatever — unlike the monsters under our beds of our youth, they DO exist."  *Id.*  Dr. Weldon's email expressed a desire to expand efforts in furtherance of their conspiracy and attempt to convince managed care

organizations to stop paying, refuse to credential or accredit, or reduce reimbursement for their non-board-certified allergist competitors who are supported by UAS.   He called for the leadership of the three national organizations "to partner with managed care to deter [the competition]." *Id.* The intentions behind his call to action were clear. He continued, "If we stop the economic incentive by showing that we 'do it better', then we may get the upper hand in this mess.   Yet if we bury our minds in the academia of interleukins and hope that the competition will just 'go away,' then we will find ourselves out of a job." *Id.*

75.   On November 12, 2010, the TAAIS delegates to the ACAAI Annual Meeting raised their concerns over the encroachment by non-board-certified allergists into the market for allergy testing and allergen immunotherapy to the ACAAI Board of Regents.   A presentation was given "about the difficulties in San Antonio with the practice of allergy by non-allergists." *See* Exhibit C-3 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-6.   The presentation, which is attached to the minutes of the ACAAI House of Delegates meeting specifically identifies UAS, then doing business as "United Allergy Labs (UAL)" which Dr. Vaughn stated "provides the PCP [primary care physician] with one of their 'trained' allergy testing technicians that work out of the PCP's [primary care physician's] office (but is a UAL employee)." *Id.* at 3. Following the presentation, "[a] motion was made and passed to refer this problem to the Board of Regents for action.   The JCAAI is already aware of the issue and has given advice to the Texas Allergy Society." *Id.* at 1.

76.   The referenced advice of JCAAI to the Texas Allergy Society occurred at the November 2010 Annual Meeting, where Dr. Aaronson relayed to Dr. Weldon concerns of JCAAI's outside counsel about the TAAIS letter to primary care physicians, including that it was

too targeted at a particular company.   *See* Exhibit E-5 to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-26] at 3.

77.    A week later, on November 19, 2010 Dr. Weldon sent an email to the Board of Directors of TAAIS to give them a report on the ACAAI House of Delegates Meeting.   *See* Exhibit D-10 to Plaintiffs' Preliminary Injunction Motion, Dkt. 12-15.   Dr. Weldon explained that he asked the ACAAI "to delay any recommendations until we have had the opportunity to ponder a definite plan of action." *Id.*   Dr. Weldon expressed his opinion that the ACAAI "should bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy.'"   *Id.*   Dr. Weldon explained the reasoning behind doing so: "***Taking it one step further, if PCPs who practice allergy are not reimbursed because of questionable practices, and their patients are then having to absorb the costs of SLIT or watered-down SCIT given at home, then more than likely their allergy practices will fade.***" *Id.* (emphasis added).   To accomplish this assault on the payment of competitors, Dr. Weldon explained that allergists could use the joint standards of AAAAI, ACAAI, and JCAAI to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing.   If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause." *Id.* at 1-2.   Dr. Weldon also revealed that he "talked with Lynn Mansfield at the meeting and he does not want 'the letter issue dropped – he still feels it is a worthwhile effort to be pursued." *Id.* at 2.   Dr. Weldon also suggested that the board-certified allergist organizations should encourage their membership to "flood journals with articles regarding safety issues and reports of adverse reactions." *Id.*   Revealing the economic motivation for these actions, Dr. Weldon explained that "for those of us in private practice, we have a lot to lose if we do not take a stand and 'protect

our turf." *Id.* Dr. Weldon concluded his email by suggesting that the issues he raised were ones "that I feel we need to consider seriously and then dialogue over e-mails instead of taking up telephone time during quarterly board meetings." *Id.*

78.      On November 19, 2010, Dr. Abramson, the then President of TAAIS, responded to Dr. Weldon's email by replying to him and the entire TAAIS Board stating "David, you are welcome to do whatever you like as an individual, as are others in TAAIS," with the rest of the sentence redacted by TAAIS as referencing their legal opinion. *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-18 at 3. By that time, TAAIS had received its legal review back from Jeff Henry, a lawyer in private practice in Austin, Texas, regarding the proposed letters to primary care physicians. Mr. Henry's "legal opinion" was to "'not send' due to liability and anti-trust [sic] issues." *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-40] at 1. Dr. Abramson went on to reject Dr. Weldon's request for a written record of their plan, stating "I feel strongly that we should have these discussions on conference calls, not e-mails." *Id.*

## ACAAI AND TAAIS AGREE TO WRITE LETTERS TO THIRD PARTY PAYORS

79.      On the morning of November 22, 2010, Dr. Weldon responded directly to just Dr. Abramson's email to him about the letter issue stating "If you wish to handle this specifically by phone conferences, then that is how we will handle it. However, I am currently on the Board of Regents for the ACAAI and I request that you please also consider our opinions on this matter." *See* Exhibit O to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-45] at 1. That same day, Dr. Abramson responded to Dr. Weldon's email accepting Dr. Weldon's request, stating "We want to be on the same page with the ACAAI Board of Regents as well." *Id.* The email

prompted Dr. Weldon to respond back, "It's too bad we can't find a lawyer that will have the same opinion as we do – the other 'allergists' do." *Id.*

80.    On November 23, 2010, Dr. McKenna, the past-president of TAAIS, responded to all of the TAAIS Board of Directors concerning his disappointment "that our grand effort, to communicate to PCPs about the dastardly allergy marketing company techniques, is of course dead in the water." *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion [Dkt. 12-18] at 6. Dr. McKenna then proposed to the TAAIS Board "two actions." First, TAAIS would send "a communication to TAAIS membership of our attempted effort and result of due diligence," including the legal opinion of its private lawyer and the advice of JCAAI's lawyer Dr. Aaronson passed on to Dr. Weldon. *Id.* "Second, as was our intent at the outset, the next effort was to inform TPPs of the same issue and this still should be done." Dr. McKenna acknowledged that "some of you have expressed this also," and pledged to work with those Board members, namely "David Weldon, Lyndon [Mansfield], Victor [Estrada] and any others toward this next step." *Id.*

## AAAAI, ACAAI, AND JCAAI AGREE TO FORM "RADAR" FOR PURPOSES OF RESTRICTING COMPETITION

81.    While the letters in Texas were still under discussion, the conspiracy continued to grow on the national stage. Following the TAAIS delegation's plea to the ACAAI House of Delegates about the entry into the market for allergy testing and allergen immunotherapy by primary care physicians relying on allergy services companies including UAS, all of the national allergy organizations responded. Specifically, as a result of that meeting, the leadership of AAAAI, ACAAI, and JCAAI agreed to a concerted effort and joint agreement to fight back against these new competitors. The organizations jointly agreed to form "RADAR," or the "Regional Advocacy Discussion and Response" initiative, a joint task force aimed at addressing the encroachment of competitors on their turf of allergy testing and allergen immunotherapy.

37

The purpose of this initiative was to recruit and train select local allergists in advocacy and other skills, such as persuading, enticing, or coercing third-party payors, so that the national associations could coordinate their efforts to restrict access to the market from the top down.

82.     The forming of RADAR was a result of the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the ACAAI Annual Meeting, where those leaders "reviewed a plan to develop a more robust infrastructure to assist state/local AAI [allergy, asthma, and immunology] societies in addressing local issues." *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25.   Subsequent to that meeting, "[i]n December 2009, the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly held a series of conference calls with state and local AAI society leaders to identify issues of concern to practicing allergists.   Several common concerns were expressed by allergists around the country.   Those included:.... Encroachment- Non-allergy providers representing themselves as trained A/I specialists... [and] Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.*

83.     As a result of those conference calls with allergists around the country, in or around late December or early January 2011, three members of the AAAAI Board, Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks, met with the ACAAI House of Delegates.   The AAAAI Board members' report from the meeting with ACAAI was documented in a January 5, 2011 email from the AAAAI President, Dr. Mark Ballow, to the three AAAAI representatives, copying the rest of the AAAAI Board.   *See* Exhibit H to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-36].   Dr. Ballow stated "Thank you for sharing the outcome of the recent joint meeting between yourselves and the ACAAI House of Delegates.   As you know, we have made a concerted effort to collaborate with the College [ACAAI] and this is another good

example of the possibilities for strengthening our relationship.  We greatly appreciate the work that has gone into the Regional Advocacy Discussion and Response (RADAR) initiative." *Id.* at 1.   Attached to the email was a document titled "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative January 2011." *Id.* at 3-5. Among the activities detailed was "Fiscal Realities, Ongoing efforts through national organizations" and "Ongoing communications with insurance companies about appropriate reimbursement for specialty care." *Id.* at 4.   Other activities included addressing "Encroachment by non-allergists" explaining "Ongoing communication with insurance companies allows the specialty to be represented in discussions about appropriateness of care." *Id.* at 5.  AAAAI's Winter Meeting took place a few days later on January 9, 2011 in Chicago, in which these topics were discussed. *Id.* at 1.

84.    As a result of all of these meetings of the national and state allergy organizations, on February 8, 2011, AAAAI, ACAAI, and JCAAI issued a letter to Regional, State, and Local Allergy Society Leaders throughout the country seeking to recruit local representatives to carry out RADAR's mission.  *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25.   The letter was drafted on the joint letterhead of all three national associations, and executed by their joint leadership, including Dr. Sublett, as acting President of JCAAI.   Among the issues to be addressed by the RADAR initiative were the two issues where these organizations agreed to contact insurance companies, specifically: "Encroachment- Non-allergy providers representing themselves as trained A/I specialists" and "Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.*  The letter requested that each regional, state, and local society identify two individuals to serve as points of

contact "to be trained to serve as conduits accessible by all three national organizations to channel information on issues impacting A/I patients and the physicians who serve them." *Id.*

## TAAIS JOINS RADAR AND TAKES ANTICOMPETITIVE ACTION

85.     On February 12, 2011, Dr. Weldon sent an email to the TAAIS leadership calling for their involvement in the national RADAR initiative.   *See* Exhibit Y to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-55.   He wrote that "the initiative [was] going to demand the concerted attention of all organizations," in order to address "the survival of [their] specialty." *Id.* at 2.   In a particularly impassioned plea, he stated that "it is OUR field that stands to disappear if we do not step up to the plate for it." *Id.* at 4.   The President of TAAIS, Dr. Abramson, thanked Dr. Weldon for his "thoughtful comments," and promised to follow up "regarding planned actions, including . . . efforts with RADAR." *Id.* at 1.

86.     In line with its pledge to be on the same page as the ACAAI Board and in participation with RADAR, the TAAIS leadership resumed their letter writing campaign and rewrote the letters to primary care physicians to be more "informational" in nature.   *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-40.   The minutes of the February 22, 2011 Executive Committee Conference Call indicate that such revisions were specifically made to address the earlier legal opinion advising TAAIS "not to send" due to "liability and anti-trust [sic] issues." *Id.*   However, no attempt was made to change the letters to third-party payors to conform to the legal opinions TAAIS had previously received.   The letters to third-party payors that existed at the time were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to those physicians' reliance on UAS for support services as the "remote practice" of allergy, which was represented to be "at best of poor quality and at worst… fraudulent." *See* Exhibit R to Plaintiffs' Preliminary Injunction Motion, Dkt. No.

12-48.   The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," and offered that board-certified allergists should be relied on to review the claims of non-allergists, in an attempt for Defendants to gain control over the payment and prices of allergy testing and allergen immunotherapy. *Id.*

## DEFENDANTS INTIMIDATE ALLERGISTS AND PRIMARY CARE PROVIDERS ASSOCIATED WITH UAS

87.   By this time, Defendants had already begun to resort to persuade, coerce, and intimidate to carry out their conspiracy to orchestrate a group boycott of and restrict competition and output from UAS's services by board-certified allergists.  For example, through their breach of confidence at the TMB, Defendant Dr. Weldon and his co-conspirators learned that Dr. Allen Kaplan, who is a former AAAAI president, was listed as a UAS Advisory Board member.  On March 19, 2011, Dr. Weldon questioned Dr. Kaplan about his relationship with UAS.  After discussing a course of action with Dr. Weldon, Dr. McKenna wrote to Dr. Kaplan in an email dated March 24, 2011.  In that email, Dr. McKenna falsely claimed that he was investigating a claim of malpractice against UAS on behalf of the TMB.  Dr. McKenna also mentioned his substantial credentials within the allergy community, referenced his awareness that Dr. Kaplan was listed as an advisor for UAS, and asked Dr. Kaplan if he could comment about a complaint made to the TMB.  All this was in an attempt to intimidate Dr. Kaplan and to cause him to terminate his advisory relationship with UAS or risk being ostracized from the allergist community.  After the email discussion between Dr. Kaplan and Dr. McKenna, as well as a verbal discussion between Dr. Kaplan and Dr. Weldon, Dr. Kaplan terminated his agreement with UAS.  Updates about the investigation into Dr. Kaplan's cooperation with UAS made their way up the chain in the national allergist associations, eventually reaching the Executive Medical

Director of ACAAI, Dr. Bob Lanier.   Subsequently, allergists have continued to pressure their colleagues to avoid forming relationships with UAS.

88.    Around the same time as the Defendants' intimidation of Dr. Kaplan, certain Defendants additionally intimidated providers either already in contract or in negotiations with UAS.    Representatives of Defendant Atlanta Allergy, including Defendant Fineman, met with one such provider, regarding the services of UAS and convinced them not to contract with UAS. Following this successful interference of a pediatric practice and clinic in Georgia, Atlanta Allergy began investigations to collect and retrieve materials of UAS in order to contact additional clinics and third party payors.   Defendant Fineman even bragged to other allergists, including Defendant Sublett, that his company, Defendant Atlanta Allergy, was "successful in explaining to a local Peds group why they shouldn't institute this in the[i]r office."

## NATIONAL ORGANIZATIONS ENCOURAGE AND PARTICIPATE IN TAAIS'S ANTICOMPETITIVE CONDUCT

89.    During this time, JCAAI's leaders also privately encouraged TAAIS in its letter writing campaign, but publicly maintained the opposite.   In the March 16, 2011 JCAAI News You Can Use Newsletter, which was drafted by Dr. Aaronson and executed and sent under the signature of Dr. Sublett to JCAAI members across the nation, including Texas, JCAAI members were informed that "JCAAI's legal advisors [had] repeatedly warned . . . against actions which might be considered *restraint of trade* – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior."    *See* Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7 (emphasis in original).

90.    Nevertheless, in an April 4, 2011 email to the leaders of the Greater Houston Allergy and Immunology Society (GHAIS), Dr. Abramson, the then President of TAAIS,

explained that "TAAIS has been aware of the 'scope of practice' issues surrounding various laboratories, including Smart Allergy and United Allergy Labs for more than several months." *See* Exhibit N to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42 at 1. As Dr. Abramson continued, "We have drafted 2 letters—one for PCP's and one for 3rd party payers." Further explaining, Dr. Abramson stated "The Joint Council (JCAAI) is aware of our work in this area—there are significant medicolegal issues involved" referencing the JCAAI's prior newsletter. Dr. Abramson also revealed that "[a]t the AAAAI meeting, Bob Lanier, Executive Director for the ACAAI, complemented me on TAAIS efforts." As a result of this encouragement from the national organizations, Dr. Abramson explained "So, TAAIS has been a leader nationally in this effort, and we will continue to press forward with this effort."

91.     In line with the private and secret encouragement of TAAIS, JCAAI approved the TAAIS letters. On or about May 4, 2011, then TAAIS President Dr. Abramson emailed Dr. Sublett to seek JCAAI's comments on TAAIS's letters to primary care physicians and third-party payors. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction [Dkt. 12-46] at 2. As Dr. Abramson explained in his email to Dr. Sublett, "As you are aware, there are several laboratory entities that are encroaching on the practice of allergy by advertising their services to physicians as a way of replacing referrals to allergists." *Id.* In reference to the prior JCAAI opinion Dr. Aaronson relayed to Dr. Weldon in November 2010, Dr. Abramson stated "Our initial letters had a tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* In response, Dr. Sublett relayed to Dr. Abramson the email and edits of Rebecca Burke, outside counsel for JCAAI. *Id.* at 1. Dr. Sublett then stated "I hope this helps. Good luck on your endeavors." *Id.* As a result of that communication, Dr. Abramson

emailed the TAAIS Executive Committee reporting on the "Good news" and suggesting that the letters were ready to go out.

92.     Despite having quietly approved the TAAIS letters to primary care physicians and insurance companies, JCAAI leadership attempted to cover up their involvement by publicly representing to its members in a June 8, 2011 newsletter drafted by Dr. Aaronson and Dr. Sublett that JCAAI had recommended that the letters "be withdrawn because [they] could raise antitrust issues." *See* Exhibit E-10 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-27. The public newsletter, signed by Dr. Sublett and distribute to JCAAI members, including members in Texas, was met with confusion by TAAIS Board Members, who understood JCAAI to have approved the letters.  On June 9, 2011 Dr. Robert Mamlok expressed this confusion to TAAIS Executive Director, Connie Mawer, who recalled in an email to Dr. Mamlok and Dr. Abramson that the letter referenced "was approved by the JCAAI."  *See* Exhibit E-11 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-28.

93.     By this time, ACAAI leadership had also given their seal of approval on the TAAIS letters.  *See* Exhibit N-Part 1 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42.  AAAAI also received and reviewed the letters on August 10, 2011 just before they were to be released to the public.  The letters were discussed in connection with an AAAAI Executive Board Agenda item, item X or 10, specifically relating to UAS.  *See* Exhibit No. Q to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-47.

94.     At that time, the letters were set to go out to executives and representatives of insurance companies and third-party payors in Texas, including representatives of Aetna, BCBS Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans.  *See* Exhibit S to

Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-49 at 8. To avoid revealing the true target of the letters and thus subjecting themselves to antitrust scrutiny, Defendants and TAAIS planned to follow up the letters with phone calls identifying UAS as the subject of the letters. *See* Exhibit T to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-50. The purpose of the phone calls instead of identifying UAS in writing was "Because of 'restraint of trade issues'" Defendants "cannot more directly attack UAL." *Id.* Dr. Abramson employed this same strategy previously suggested by Defendants JCAAI, Dr. Aaronson, and Dr. Sublett, sending the letters to Tom Banning, the Executive Director of the Texas Academy of Family Physicians on August 9, 2011, and following up that communication orally representing in a phone conversation that the letters pertained to physicians relying on the services of companies like UAS.

## STATE COURT INJUNCTION AGAINST TAAIS ACTION

95.     On August 11, 2011, after discovering that the letters had been sent to Mr. Banning, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters to insurance companies. *See* Exhibit U to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-51. On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part of a settlement on February 1, 2013. *See* Exhibits V and W to Plaintiffs' Preliminary Injunction Motion, Dkt. Nos. 12-52 and 12-53. The Injunction prohibits TAAIS and the individual defendants, who included various TAAIS board members and board members of the national allergist associations, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants' competitors.     For a period of time Defendants suspended some of their anticompetitive conduct, but later resumed that conduct on a national level.

## DEFENDANTS RESUME CONTACTING THIRD PARTY PAYORS

96.    Despite the existence of temporary and permanent injunctions against their co-conspirators, Defendants ultimately intensified their efforts to orchestrate and carry out a group boycott against and restrict competition and output from UAS and primary care physicians, including AAAPC members.  The same day that Dr. Sublett and JCAAI approved the TAAIS letters, members of RADAR began participating in discussions on an online message board called "Basecamp."  *See* Exhibit C-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-8. These discussions, which began on May 5, 2011 and continued through at least July 18, 2011, included coordination among these board-certified allergists, who are normally competitors, in approaching insurance companies and convincing them not to pay or to limit payment to competitors who are not board-certified allergists.  The message board specifically mentions UAS by name and contains further calls to action by Dr. Weldon.  In a post he drafted on May 10, 2011, he writes "What we need is not rhetoric and 'ya-ya' but rather an aggressive attack on public senses without 'mentioning names.'"  *Id.* at 6.  Despite a RADAR member's admission that he was "acutely aware of how easily such a discussion might . . . run afoul of various anti-trust [sic] laws," the group pressed on, continuing to believe that the "AAAAI and ACAAI must join together to make this happen or [they would] continue to lose ground."  *Id* at 8-9.  As part of their effort to convince insurance companies and managed care organizations to stop doing business with or paying their competitors, Defendants, including some of the leaders of JCAAI, ACAAI, and AAAAI, implemented an idea previously suggested by Dr. Weldon and began to suggest to third-party payors that the publications of these organizations define the standard of care for the practice of allergy testing and allergen immunotherapy.  Up until this point, those organizations and allergists as a whole declined to suggest their publications defined the

"standard of care," namely because of legal concerns over the potential effect on many of their own members who did not follow the recommendations of those publications, such as the recommendation against permitting patients to self-administer allergy shots. *See* Exhibit D-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-12 at 2; Exhibit D-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-13 at 1.

## PHADIA, AAN, AND WINDERS JOIN THE CONSPIRACY

97.     At the same time AAAAI, ACAAI, and JCAAI were forming RADAR, Phadia and AAN decided to enter into and support the conspiracy to restrict competition in the market for allergy testing and allergen immunotherapy. In or about March 2011, Phadia and Winders, acting on Phadia's behalf, began a strategy to combat the "remote practice of allergy" or "RPA."

98.     Phadia, Inc. and its parent corporation, Thermo Fischer Scientific, manufacturer and sell a blood test to detect allergies, known as ImmunoCap or ICAP, a form of RAST or blood testing. Phadia markets those tests to physicians as an alternative to allergy skin prick testing, where physicians would draw the blood of their patients for analysis in a laboratory. The results from the ICAP testing, which generates more false positive results than skin prick testing, would then be used by Phadia to refer patients who tested positive to board-certified allergists for allergy skin prick testing and allergen immunotherapy. The emergence of allergy skin prick testing performed at primary care physicians' offices were seen as the cause in a reduction of orders of ICAPs and other RAST tests and medications sold by Phadia and a disruption in its referral of patients from primary care physician offices to board-certified allergists. The emergence of patients being treated with allergen immunotherapy also resulted in a reduction of allergy and asthma medication that Phadia sold.

99.     Winders, at the time a market development team leader of Phadia, began to develop a strategy to reduce physicians' use of allergy skin prick tests that traded off with ICAPs by agreeing with board certified allergists, AAAAI, ACAAI, JCAAI, and a non-profit organization known at the time as "Mothers of Asthatics," now AANMA.   In March 2011, Winders informed Sublett that she "look[ed] forward to battling these remote acce[s]s allergy providers with you." [Dkt. No. 135-10]. She requested a meeting to discuss her "clear strategy plan on this remote practice of a[l]lergy" with Sublett to begin fostering Phadia, AANMA, and Wallen's part in the conspiracy.   Two months later, in May 2011, Sublett reached out to Aaronson and Gross regarding Winders' request for Sublett to serve on the Phadia advisory board.   [Dkt. No. 135-8].  Sublett emphasized that Winders was "anxious to support efforts against United Allergy Labs and other similar operations," and that Winders had been in contact with AAN.   On or about August 1, 2011, Winders met with Linda Cox, the President-elect of AAAAI.   In that meeting Winders and Cox agreed, on behalf of Phadia and AAAAI respectively, that their organizations should work together to approach and convince third-party payors to limit reimbursement of allergy testing and allergen immunotherapy to board certified allergists, including supporting Phadia's then ongoing strategy to combat UAS and primary care physicians in Texas.

100.     On or about August 2, 2011 through August 4, 2011, Winders contacted numerous physicians in North Texas known to be in contract with UAS to convince those physicians to either terminate their agreements, or to reduce their performance under those agreements with UAS in favor of ICAPs sold by Phadia.

101.     On August 3, 2011, Winders met with Dr. John Meiser, a representative of TAAIS, and they agreed that Phadia and TAAIS would support each other's strategy of

combating UAS and primary care physicians by approaching third-party payors to convince them not to pay non-board certified allergists for allergy testing or allergen immunotherapy.

102.    On or about August 17, 2011, Winders wrote to Sublett requesting an in-person meeting to discuss "exciting developments" in Phadia's strategy to address remote practice—as she had met with physicians and individuals in contract with UAS and Linda Cox for AAAAI's perspective.    Winders specifically wanted JCAAI's feedback on the best way to restrict competition from UAS. [Dkt. No. 135-11].

103.    On or about August 29, 2011, Winders met with Dr. Sublett, the then president of JCAAI, to discuss the increase in use of skin prick tests by primary care physicians in Texas and nationwide, the resulting loss of sales to Phadia, JCAAI's task force to combat the practice by primary care physicians and UAS, the then recent efforts by TAAIS to combat the practice, and the resulting lawsuit by UAS against TAAIS.    Winders and Sublett agreed on behalf of Phadia and JCAAI respectively that they should join forces to combat the "remote practice of allergy" through mutual support of all of these efforts.    To facilitate the agreement, both Phadia and JCAAI relied on Mansfield, a board member of both Phadia and JCAAI.

104.    The motivation for Phadia to join Defendants' conspiracy concerned the loss of Phadia sales of ICAPs and other RAST tests to primary care physicians who had entered into contracts with UAS to conduct skin prick tests for allergies.    In entering into an agreement in or around August 2011, Phadia and AAN specifically discussed Phadia's reduction in ICAP sales to over hundreds of primary care physicians, who had entered into a contract with UAS to provide allergy skin prick testing and allergen immunotherapy throughout markets in Texas.    [Dkt. No. 134-8]. Those agreements between UAS and primary care physicians resulted in lost ICAP sales for Phadia in Dallas, San Antonio, McAllen, and Houston, resulting in a significant loss of

revenue.    Phadia determined that the loss of revenue for its ICAP sales was directly attributable to the rise of competition by primary care physicians and allergy services companies such as UAS in the markets for allergy testing and allergen immunotherapy, to which Phadia referred to as the "remote practice of allergy" or "RPA." The significant decline in Phadia's business in Texas caused a loss of morale among Phadia representatives and Phadia also estimated that the rise in primary care physicians treating allergies with immunotherapy was also causing Phadia to lose a great deal of money related to a decline in necessary asthma medications as well.

105.    Also in or about August 2011, to combat the remote practice of allergy, Phadia began meeting with other board certified allergists in Texas in an effort to combat RPA.    Phadia also began identifying customers of UAS in an effort to convince those customers to discontinue or reduce their business with UAS and return to selling ICAPs manufactured and sold by Phadia. Phadia also agreed with Sublett, Mansfield, JCAAI, ACAAI, AAAAI, and AAN that they should contact third-party payors to convince them not to do business with UAS or primary care physicians for allergy testing or allergen immunotherapy by changing their policies to only reimburse board-certified allergists for those services.

106.    In the fall of 2011, Phadia also contacted third-party payors through its existing relationships with those payors to convince them to change their policy to restrict allergy skin testing and allergen immunotherapy to board-certified allergists or members of the American Academy of Otolaryngic Allergy ("AAOA"), an organization that represents otolaryngologist, frequently referred to as Ear, Nose, and Throat physicians or ENTs.    The payors Phadia contacted in 2011 included Humana, United Healthcare, Blue Cross/Blue Shield of Texas, Texas Medicaid, and the managed care organizations that reimburse for Texas Medicaid.    [Dkt. No. 134-8]. Phadia also planned to follow up with these same third-party payors for the same purpose

in 2012, and other third-party payors including Aetna, Cigna, and Blue Cross entities in North Carolina, Pennsylvania, Georgia, South Carolina, Arizona, Missouri, Arkansas, Tennessee, Colorado, Kentucky, Utah, Illinois, Oklahoma, and Louisiana.   When engaging in these contacts with third-party payors, Phadia distributed statements from its co-conspirators including AAAAI, ACAAI, JCAAI, and AAN supporting not only this restriction, but that primary care physicians should use ICAPs as the preferred method of testing for allergies instead.   Phadia officers also directed its sales members in the field to disparage UAS to primary care physicians, including claiming that UAS was engaged in fraudulent billing.

107.    On or around September 2011, Alan Leahigh, Director of Corporate Council for AAN, contacted TAAIS, and other board-certified allergists in Texas, included Stuart Abramson, Bob Lanier, Defendant Mansfield, and Alnoor Malick, to request additional information about their fight against UAS and primary care physicians in Texas for a leadership summit to be held by AANMA, AAAAI, ACAAI, JCAAI, Phadia, and others on October 3, 2011 in Annapolis, Maryland.   As a result of those contacts, Bob Lanier on behalf of ACAAI and Leahigh on behalf of AAN discussed how AAN could act as a front for the conspiracy, which would shield Defendants because of AAN's prior history as a legitimate patient centered organization. In exchange, AAN could extract a large budget from Defendants to conduct the campaign against the "remote practice of allergy."   In addition to contacting third-party payors, AAN and ACAAI discussed convincing extract companies to cut off supply to combat these competitors.   Leading up to the leadership summit, AAN also discussed such a proposal with Defendant Fineman, the then president-elect of ACAAI, and Defendant Sublett, the then president-elect of JCAAI. Additionally, Nancy Sander, then President of AAN, contacted Dr. Fineman in October 2011 regarding AANMA's interest in combatting the remote practice of allergy by contacting third

party payors.   Since that time, October 2011, Dr. Fineman has become a Board member for AAN, has drafted and edited articles and publications to attack the "remote practice of allergy" for AAN and contacted third-party payors on their behalf.

108.   On or about October 3, 2011, AAN made a presentation to Defendants AAAAI, ACAAI, JCAAI, and Phadia explaining how AAN intended to carry out Defendants' agreement to combat the remote practice of allergy.   In attendance at the meeting were all of the then-Presidents and Vice Presidents of AAAAI, ACAAI, and JCAAI, including Defendants Aaronson, Gross, Fineman, and Sublett, as well as representatives of Phadia, including its President David Esposito, and representatives and officers of other industry organizations including Phadia's competitors.   AAN presented its strategic plan for combating the "remote practice of allergy," which included among other things, publishing a position statement and press release attacking the practices of primary care physicians and companies such as UAS, meeting with third-party payors and their trade associations to convince them not to pay these competitors, contacting primary care physicians to convince them not to do business with companies like UAS or engage in allergy testing or allergen immunotherapy, but to administer ICAPs and refer all allergy patients to board-certified allergists, and contacting governmental agencies and legislators to defame these competitors.   [Dkt. No. 134-2].  In exchange, AAAAI, ACAAI, JCAAI, Phadia, and others would agree to pay AAN a significant sum of money per month to conduct the campaign. *Id.*

109.   As a result of that meeting, ACAAI, JCAAI, and Phadia agreed to pay AAN to serve as the front organization for Defendants' actions against primary care physicians, UAS, and any other physician or entity engaged in the "remote practice of allergy," by contacting third-party payors, industry players, governmental leaders, and agencies setting guidelines for

industry standards to convince them to exclude primary care physicians and companies supporting those physicians, including UAS, from the market for allergy testing and allergen immunotherapy. Defendants also agreed that AAAAI and AAN would use their positions within the National Asthma Education, and Prevention Program ("NAEPP") to write into asthma guidelines of the National Heart, Lung, and Blood Institute language that could be used to exclude competitors. Following Defendants' meeting, AAN coordinated with Defendants Fineman and Sublett to facilitate the transfer of funds from Defendants to AAN and to assist in AAN's activities on behalf of Defendants.

110.  To facilitate the conspiracy among AAAAI, ACAAI, and JCAAI members and Defendants' conspiracy with AAN and Phadia, Defendants Dr. Sublett and Dr. Aaronson authored a JCAAI "New News You Can Use" newsletter that was sent to all JCAAI Members on October 5, 2011 addressing at length the "remote practice of allergy" ("RPA") moving into JCAAI member communities.   *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29.  Dr. Sublett and Dr. Aaronson specifically targeted what they termed "the new version of RPA" which was "the imbedding of a 'certified allergy technician' in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy and treatments."  *Id.* at 1.  The business practices to which Defendants JCAAI, Dr. Aaronson, and Dr. Sublett referred were those of UAS, which was featured in a "Business Builder" article in *Medical Economics* as pointed out in the newsletter.   The newsletter documented what JCAAI had done to respond to this threat, including "the appointment of a task force on the RPA to develop proactive approaches and strategies," "monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing," and "working with the College & the Academy on marketing strategies and other

responses." *Id.* The newsletter then stated to all JCAAI members that "We believe one approach you can take is to educate primary care physicians AND local carriers about the standard of care." *Id.* The newsletter directed that members should rely on a 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI. Members were encouraged to present these talks in their neighborhood being careful to keep their presentation "general in nature" and "not [to] mention any particular company." *Id.* at 2. Revealing the motivation to hurt UAS and primary care physicians economically, the newsletter stated that "This type of communication – brought to the carriers – could be very helpful, since they do not want to pay for ineffective treatments." *Id.* The newsletter then noted the ongoing lawsuit by UAS against the TAAIS and noted that as of yet, "This particular suit does not contain any anti-trust [sic] allegations." The newsletter then stated that "JCAAI recommends against engaging with any company that promotes RPA." *Id.*

111.   Later in October, *Medical Economics* published another article regarding allergy testing and immunotherapy for non-board certified allergists. In response to the article, Defendant Fineman—with input from JCAAI and ACAAI leadership—wrote a letter to the editor for its publication to attack UAS (then known as UAL or United Allergy Labs). Further, Defendant Sublett emphasized to other Defendants, including Aaronson and Gross, that "this is our main focus, the commercial companies, including United Allergy Labs." Indeed, Sublett revealed that to date—as of October 31, 2011, JCAAI had done the following things: given legal counsel and guidance to individual physicians and local societies regarding UAL, discussions with Defendant AAN related to "them taking a role as our lay voice," had individual discussions with managed care organizations related to the issue, and appointed a task force to develop short and long term strategies. *Ex.* C.

112.     Later, in November 2011, Winders, acting on behalf of Phadia and AAN, again requested to meet with Sublett to discuss her recent meetings with AAAAI's leadership and AAN's "plan of action." [Dkt. No. 135-12].     This plan of action included a "direct mail campaign to the medical directors of the top 100 commercial insurance payers" to request a utilization review for the 2,184 participating physicians in AAAPC.     [Dkt. No. 135-13]. Additionally, AANMA conducted a direct mail campaign to the "top 100 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts" of UAS and AAAPC.

113.     The next month, on or about December 2011, Wallen contacted JCAAI's Director of Administration, Sue Grupe, regarding his interest in discussing remote practice of allergy. Wallen was and continues to be a business consultant in the field of allergy testing and immunotherapy, as he counsels businesses and doctors in how to strategically position themselves to combat the remote practice of allergy through contacts with third-party payors. [Dkt. No. 135-15].

114.     Since Thermo Fisher's acquisition of Phadia in mid-2011, Phadia employees, who previously held themselves out to merely be Phadia representatives, have consistently held themselves out to be Thermo Fisher representatives.  For example, former Phadia clinical sales consultants, medical group consultants, and district managers introduced themselves to accounts or potential accounts as Thermo Fisher employees, emailed from new email addresses ending in "@thermofisher.com," and internally considered themselves to be Thermo Fisher employees after the acquisition. The bulk of the tortious Phadia communications discussed herein were sent by "@thermofisher" email addresses and from email accounts whose signature blocks identify the employee as an employee of Thermo Fisher.

115.    Further, Thermo Fisher employees have specifically confirmed that they intended to continue, and indeed, did continue to execute the strategy developed by Winders in 2011 while she was at Phadia. For example, in an email dated January 16, 2012 titled "RE: United Allergy", Tom Wajda, a Thermo Fisher District Sales Manager, confirmed that part of the company's strategy to combat UAS, which "we perceive [] as a competitor in the marketplace," was to "partner[] with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP." Phadia0056205-07. He then confirmed that he "communicated the Thermo Fisher Scientific (formerly Phadia) strategy" to others in prior emails and that he "works to execute [the strategy] on a daily basis with my district." *Id.*

### AAN Carries Out Defendants' Anticompetitive Plans

116.    After receiving funding from ACAAI, JCAAI, and Phadia, AAN carried out everything AAN promised Defendants they would do to combat the remote practice of allergy, including targeting AAAPC, its members and UAS.  For example, AAN and Phadia worked with members of AAAAI, ACAAI, JCAAI, and RADAR to identify and contact third-party payors in areas where competition was increasing from primary care physicians and UAS.  AAN sent letters to medical directors of the top 100 third party payors in the nation, including third-party payors in Texas, seeking meetings to draft policies to exclude non-allergists from reimbursement.   AAN, Phadia, Winders, and Wallen also suggested in their communications with third-party payors that those payors should take the list of all AAAPC members and audit each one for their allergy testing and allergen immunotherapy claims.  In follow up to those letters, Defendants Winders met with third-party payors in Texas and elsewhere in-person and on the phone to convince those third-party payors not to reimburse primary care physicians or UAS

for allergy testing or allergen immunotherapy. As part of that strategy, AAN claimed that these competitors were acting outside the standard of care set by AAAAI, ACAAI, and JCAAI, relying on position statements those organizations drafted to attack the remote practice of allergy. AAN and Phadia also claimed in their communications with third-party payors in Texas and elsewhere that primary care physicians, AAAPC members, and UAS were engaged in billing fraud.

117.    AAN, including Winders and Fineman, also drafted an article titled "Patients, Not Piggy Banks!" in which AAN falsely claims primary care physicians practicing allergy testing or allergen immunotherapy, or companies that participated in that care, were engaged in fraud. AAN posted the article on its website in the summer of 2013 attempting to create the impression that it was aimed at consumers, but AAN and the other Defendants circulated the article widely to third-party payors and primary care physicians in an effort to convince them not to do business with AAAPC members or UAS. On or about June 2013, once AAN became concerned that Defendants' antitrust activity may come to light and they may be investigated by the Federal Trade Commission, AAN began taking efforts to conceal Defendants' antitrust activities.

## Defendants' Acquisition and Misuse of the OIG Advisory Opinion

118.    At the same time AAAAI, ACAAI, and JCAAI were forming RADAR and when Phadia, AAN, and Winders began participating in the conspiracy (i.e., late 2010 or early 2011), Patrick Strauss contributed to the effort to drive UAS from the market.

119.    Strauss is a lawyer who formed an allergy services company in 2004 in the Rio Grande Valley. His company, Allerta, provided allergy shots by mail to nearby physicians engaged in the delivery of allergy care. UAS proved more successful than Allerta.

120.    Angry at the loss of business to UAS, Strauss devised a scheme to anonymously and falsely accuse UAS of operating a fraudulent business model. At the time, UAS was doing

business as United Allergy Labs, or UAL. Through the help of co-conspirators, including James Wallen (who later became an associate of Winders and an employee, consultant, and/or independent contractor of AAN), Strauss formed *Universal* Allergy Labs—a fake "UAL"— solely for the purpose of soliciting a negative advisory opinion from the Office of Inspector General of the United States Department of Health and Human Services ("OIG").

121.    Specifically, on or about February 11, 2011, Wallen, acting as an organizer, formed Universal Allergy Labs, LLC by filing a Certificate of Formation with the Texas Secretary of State naming himself as the initial manager.

122.    On or about March 28, 2011, Wallen filed a Certificate of Amendment transferring Universal Allergy Labs, LLC to Strauss, who would act as the company's sole manager and registered agent. On or about May 18, 2011, Strauss filed with the Texas Secretary of State another Certificate of Amendment, transferring Universal Allergy Labs to Alfredo G. Ledesma, stating that Ledesma was the company's sole manager and registered agent.

123.    On the very next day, May 19, 2011, Strauss and Ledesma caused their attorney Diane Carter of Brown McCarroll LLP to send a request via Federal Express to the OIG for an advisory opinion on the business model of the fake "UAL." The request purported to seek an advisory opinion from the OIG regarding whether a proposed arrangement described in the request "would constitute grounds for the imposition of sanctions under the exclusion authority at section 1128(b)(7) of the Social Security Act (the "Act") or the civil monetary provision at section 1128A(a)(7) of the Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal anti-kickback statute." The request was stated to be on behalf of Universal Allergy Labs, LLC, or "UAL," a Texas limited liability company, which would be operated by Ledesma.

124.    The OIG sent Ms. Carter several follow-up communications regarding the fake "UAL's" business plan.   At Strauss's and Carter's direction, Ledesma stated, under penalty of perjury, that he intended to engage in business as the fake "UAL," and that "UAL" would be operated by an individual with no healthcare experience whatsoever.   Carter emphasized in her communications with the OIG that her client's motive was to "exploit a business opportunity" and that the inexperienced head of "UAL" would have the final say regarding whether personnel "UAL" hired were adequately trained to perform healthcare related services.   In response to these statements to the OIG, the OIG issued Advisory Opinion No. 11-17 ("OIG Opinion") and expressed serious concerns about the proposed business.

125.    The request submitted by Strauss and the sham "UAL" falsely attested:   "With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided is true and correct, and constitutes a complete description of the facts regarding which an advisory opinion is sought, to the best of any knowledge and belief.   The arrangement described in [the] request for an advisory opinion is one that [the requestor] in good faith plans to undertake if the OIG issues a favorable advisory opinion."   This statement was false at the time it was made, as neither Strauss nor Ledesma, nor their sham company, "UAL," ever intended to undertake the arrangement described in the request.   Instead, Strauss and his sham company, "UAL," intended to procure a negative opinion from the OIG through false statements and deceit, and by presenting the real UAL's business in a false and misleading light.

126.    Throughout the process of submitting the request, several steps were taken by Strauss and his Universal Allergy Labs co-conspirators to ensure the OIG would issue a negative

advisory opinion, notwithstanding the requestor's certification that he sought a favorable opinion of the proposed business model.    For example, in the request itself, Strauss and his co-conspirators attempted to mimic the real UAL/UAS business model, including by attaching an outdated UAL contract, and by describing the request as one made by "UAL."   In addition, Strauss and Universal Allergy Labs and their co-conspirators represented that the fake "UAL," Universal Allergy Labs would be operated solely by Ledesma, who has no health care industry experience.    Defendants further stated that Ledesma wished to operate a business that would reward him despite lack of knowledge about applicable regulations and health care.

127.   Following submission of the request, Strauss, Universal Allergy Labs, and their co-conspirators intensified their efforts to elicit a negative opinion from the OIG.   On or about June 22, 2011, Strauss and "UAL" caused Carter to send through United States Certified Mail and Electronic Mail a response to a June 20, 2011 request by the OIG for more information.   In response to a request to "provide additional information regarding [the requestor's] experience in owning and/or operating a laboratory or any type of health care provider or supplier," Carter responded the requestor "has no experience in owning and/or operating a laboratory or any type of health care provider or supplier."

128.   On or about July 1, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to a June 28, 2011 request by the OIG for more information.   In response to a request to "explain how [the requestor] would operate the proposed arrangement with no experience," and "additional information regarding how [another individual] would be involved in the proposed arrangement," Carter responded the requestor "has general business experience; he has identified the proposed arrangement as a good business opportunity; and he recognizes that *exploiting the business opportunity* will require

investments in human resources and administrative infrastructure, which he will make if the proposed arrangement is allowed to proceed. In addition, the Requestor states that [the other individual] will not be involved in the proposed arrangement."

129.   On or about August 23, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to an August 19, 2011 request by the OIG for more information. In response to a request to "[w]hat specifically is meant by exploiting the business opportunity will require investments in human resources and administrative infrastructure," counsel for Strauss and Universal Allergy Labs responded the requestor states that "what is specifically meant by '*exploiting the business opportunity* will require investments in human resources and administrative infrastructure,' is that [the requestor] (as the sole owner, manager and officer of Requestor) would operate Requestor's proposed allergy lab business by identifying (through an interview process) and hiring, individuals whom [the requestor] believes have sufficient experience to provide, on Requestor's behalf, the services outlined in the proposed contract submitted to the OIG."

130.   On or about November 4, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to a November 2, 2011 request by the OIG for more information. In response to a request to certify additional information the OIG requested in response to their original request, Ledesma certified "that all information provided is true and correct, and constitutes a complete description of the facts regarding which an advisory opinion is sought, to the best of [his] knowledge and belief. The arrangement for which the advisory opinion is being sought is one that Requestor in good faith plans to undertake if the OIG issues a favorable advisory opinion." That certification was false as the requestor did not intend to operate the business submitted to the OIG. Instead, Strauss and

Wallen orchestrated for the fake UAL and Ledesma to submit the request in order to obtain a negative opinion from the OIG that Strauss, Wallen, and later, Phadia, Winders, and ANN could then use to disparage the real UAL/UAS, scare clinicians away from the real UAL/UAS, and promote sham qui tam actions against the real UAL/UAS and its primary care physician clients.

131.   Ultimately, on or about November 16, 2011, the OIG issued Advisory Opinion 11-17 expressing concern over the proposed business arrangement of Universal Allergy Labs, the fake UAL, and Ledesma.

132.   While Advisory Opinion 11-17 purports to express concern about a business that the requesting persons intentionally made to appear was the real UAL/UAS's business, the concern expressed in the opinion turn on facts that were not and are not true of the real UAL/UAS's business model.   For instance, among other things: (i) UAS is not operated by a single individual with no healthcare experience intent on "exploiting a business opportunity;" (ii) UAS does not decide which patients should be tested or treated; (iii) UAS does not receive referrals from physicians; (iv) UAS does not bill insurance carriers, including the federal government; and (v) UAS does not pay physicians for patients.   Nevertheless, because other similarities to UAS's business model are mentioned in the opinion, Strauss, Phadia, Winders, and AAN knew they could exploit the negative opinion elicited from the OIG.

133.   Strauss, Phadia, Winders, ANN, the JCAAI, and their co-conspirators took that opinion and spread it to physicians, physician practice groups, and hospitals who are or were considering doing business with the real UAL, claiming that "UAL" requested the opinion, was guilty of fraud for operating a business in violation of the opinion, and that anyone who does business with UAL would wind up wearing "orange jumpsuits."

134.   For example, following the publication of Advisory Opinion 11-17, Strauss instructed the employees of his companies Allerta to disseminate Advisory Opinion 11-17 to any physician or physician practice group that was in contract with or was considering whether to contract with United Allergy Labs, the real UAL.   Strauss told employees of Allerta that Advisory Opinion 11-17 concerned United Allergy Labs or the real UAL/UAS and that they should in turn tell this to physicians and physician practice groups.   Importantly, Defendant Strauss also told these employees of Allerta that their role in the distribution of this information should be kept "under the radar."

135.   Similarly, on November 30, 2011, JCAAI published a newsletter to its members discussing the OIG Opinion and suggesting that it was issued in response to a request from "a laboratory services management company that proposed to provide allergy testing and immunotherapy services within physician medical offices under an exclusive contract arrangement."   Phadia spread both the false OIG opinion and the JCAAI newsletter discussing the opinion to physicians, physician practice groups, and hospitals who are or were considering doing business with the real UAL in an attempt to dissuade them from doing business with UAS and its primary care physicians.

136.   From November 2011 until 2015, Phadia's and Thermo Fisher's clinical sales consultants and district managers (i.e., sales personnel) repeatedly disseminated and discussed the OIG opinion and articles of their co-conspirators discussing the opinion with physicians, physician practice groups, and hospitals who were in business with or were considering doing business with the real UAL/UAS. *See, e.g.*, Phadia0007035-37, Phadia0093432-34, Phadia0011890-91, Phadia0014102-03.   Phadia's clinical sales consultants were trained to create the impression that the OIG opinion applied to the real UAS's business arrangement, despite the

fact that it did not and was, in fact, fraudulently obtained to create just such an impression. Subsequent to mentioning the OIG opinion, Phadia and Thermo Fisher sales consultants would often inform current or potential UAS clients to consult their malpractice carriers. Phadia and Thermo Fisher representatives also shared these materials with representatives of third-party payors, including commercial health insurance companies and managed care organization health plans.

137.    Phadia and Thermo Fisher's employees and their co-conspirators knew and/or should have known the OIG did not apply to the real UAL/UAS and yet distributed and discussed the opinion with others in order to create the impression that it applied to the real UAL/UAS and thus falsely suggesting that entity was engaged in billing fraud. Indeed, James Wallen, one of the individuals who helped orchestrate the creation of the "fake" UAL and applied for and received the OIG opinion, was an associate of his co-conspirator and current co-Defendant Winders and subsequently became an employee, consultant, and/or independent contractor of his co-conspirator and current co-Defendant AAN which is headed by Winders). Further, Defendants circulated and discussed the OIG opinion and informed others that it applied to the real UAL/UAS despite the fact that the name of the party that requested the OIG opinion (i.e., the fake UAL) is redacted from the OIG opinion that issued, and the opinion carries with it the following express limitations: (1) "This advisory opinion is issued only to [name redacted], the requestor of this opinion. This advisory opinion has no application to, and cannot be relied upon by, any other individual or entity."; and (2) "This advisory opinion is limited in scope to the specific arrangement described in this letter and has no applicability to other arrangements, even those which appear similar in nature or scope."

138.   All of this activity was done in an effort to stifle the competition represented by UAS and its primary care clients and to monopolize the market for allergy testing and allergen immunotherapy.   Indeed, since at least August 2011, officers, employees and representatives of Phadia and Thermo Fisher have approached physicians, practice groups, and third-party payors to convince those individuals and entities not to do business with or reimburse Plaintiffs. Clinical sales consultants, medical group consultants, district managers, and clinical educators of Phadia and Thermo Fisher have contacted providers and payors regarding remote allergy, including Plaintiffs, with the intention to exclude them from the market for allergy testing and to conspire to monopolize the market for allergy testing.   They have done so by distributing materials, including the Office of Inspector General Opinion No. 11-17, AAAAI, ACAAI, and JCAAI materials, and AAN articles including "Patients Not Piggy Banks" and "Deception and Fraud in Primary Care" to falsely suggest that Plaintiffs are engaged in substandard care or billing fraud and that physicians and practice groups in contract with Plaintiffs will face both criminal and civil liability.

139.   Phadia and Thermo Fisher also refused to do business with UAS and coerced entities with which Phadia and Thermo Fisher had a close business relationship to also refuse to do business with UAS.   For example, as early as November 2011, UAS contacted Quest Diagnostics ("Quest") representatives in an effort to begin using Phadia's ICAP blood tests to test for seasonal and perineal allergies and food allergies.   Quest is a company that provides commercial clinical laboratory services and owns a dominant position in the market for supplying allergy blood tests in the United States and throughout the nation.

140.   Beginning in November 2011 and spanning at least into 2014, Phadia and Thermo Fisher, Quest's largest supplier of allergy blood tests, instructed and agreed with Quest to deny

UAS access to allergy blood tests and refused to do business with UAS because UAS represented a competitive threat in the market for allergy testing. *See, e.g.*, Phadia0029897-902. As a direct result of this directive, Quest complied and UAS was denied access to ICAPs as a result.

141.    Similarly, Phadia worked with Clinical Pathology Laboratories to reduce competition in the market. Clinical Pathology Laboratories ("CPL"), like Quest, is a company that provides commercial clinical laboratory services in the market for supplying allergy blood tests and administers the ICAP test for seasonal and perennial allergies. In a late 2011 to early 2012 email exchange, a CPL Regional Sales Manager informed Tom Wajda, a Thermo Fisher District Sales Manager, that "United Allergy is targeting our large practices that do Immunocap testing." Phadia0056205-07. The CPL representative went on to ask "What, if anything, is Phadia doing to help the CPL reps retain this allergy business." *Id.*

142.    In response, Wajda confirmed that the company was aware of UAS, "perceive them as a competitor in the marketplace," and were engaging in a strategy to, among other things, "partner[] with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP." *Id.* Wajda then confirmed that he "communicated the Thermo Fisher Scientific (formerly Phadia) strategy" to others in prior emails and that he "works to execute [the strategy] on a daily basis with my district." *Id.* Continuing into the present, CPL and Quest have still refused to do business with UAS at the urging and as part of the original agreement with Phadia.

## HARM TO COMPETITION FROM DEFENDANTS' CONDUCT

143.    As a result of the coordinated action and collaboration of members of RADAR and the encouragement of JCAAI, members of all three national organizations, AAAAI, ACAAI,

and JCAAI, and representatives of AAN and Phadia began to contact physicians, third-party payors, and suppliers of allergy testing and allergen immunotherapy equipment and antigens about the business practices of primary care physicians and UAS in their participation in the market for allergy testing and allergen immunotherapy.   These members, acting on behalf of Defendants, contacted insurance companies and managed care health plans through representatives of those organizations, including fraud investigators, provider relation representatives, and medical directors.   Some of these third-party payors act on a national level, including Aetna, Cigna, Humana, and United ("national payors").   Other third-party payors act on a state level, including Blue Cross/Blue Shield entities and managed care health plans, who contract with particular states ("state payors").   Through use of RADAR, which is composed of every state and regional allergy society, AAN, Phadia, and through contacting national payors, Defendants have attempted to restrain competition in every local market in the nation and with a specific intent to monopolize those markets.   By contacting state payors, Defendants have sought the same result for all local markets in specific states.   The result of this activity has constrained competition in all 25 states where Plaintiffs do business based on eliminated or reduced reimbursement by Humana, Aetna, and Cigna, as well as the local markets of Texas, Arkansas, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, North Carolina, Oklahoma, Pennsylvania, South Carolina, and West Virginia through denied or reduced reimbursement by state payors in those states.

144.   Among other things, Defendants and these members and organizations attempted to persuade, entice, or coerce these representatives of third-party payors through use of materials distributed by AAN, AAAAI, ACAAI, and JCAAI, falsely suggesting that those organizations defined the standard of care for allergy testing and allergen immunotherapy and that primary care

physicians were not adequately trained or qualified to perform allergy testing and allergen immunotherapy. These same actors also stated that primary care physicians' reliance on the services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was "investigational" and should not be reimbursed. If a third-party payors expressed reluctance to stop doing business with primary care physicians or UAS, Defendants and Phadia, AAN, AAAAI, ACAAI, and JCAAI members and representatives suggested that those payors should reduce the amount paid to competitors for allergy skin testing under CPT Code 95004 and the mixing of immunotherapy under CPT Code 95165, but not reduce payment for shot administration in a board-certified allergists' office under CPT Codes 95115 and 95117 or for allergy blood testing under CPT Code 86003. The goal of these suggested price changes was to disproportionately reduce payment to Defendants' competitors, who rely more on reimbursement of the mixing of immunotherapy under CPT Code 95165 and less on the reimbursement of shot administration under CPT Codes 95115 and CPT Codes 95117 or for allergy blood testing under CPT Code 86003. Defendants further suggested to third-party payors that they should only pay primary care physicians for administering ICAPs, or RAST tests, which are billed under CPT Code 86003 and sold by Phadia, instead of paying those physicians for allergy testing, i.e. skin prick tests under CPT Code 95004.

145. Some of the contacts with third-party payors were performed by Defendants themselves and other officers and directors of AANMA, AAAAI, ACAAI, JCAAI, and Phadia. For example, Dr. Allen Meadows, former ACAAI Speaker of the House of Delegates, reported to Dr. Weldon on October 9, 2011 that as instructed, he had been in contact with local insurance carriers regarding the remote practice of allergy. *See* Exhibit D-17 to Plaintiffs' Preliminary

Injunction Motion, Dkt. No. 12-20.   Further, Dr. Fineman contacted a Blue Cross Blue Shield medical director to convince that third-party payor not to pay competitors.   [Dkt. No. 137].

146.     Although not all allergists heeded AAN, AAAAI, ACAAI, JCAAI, or Phadia's encouragement to engage in the conspiracy, either directly or through RADAR, to contact insurance companies, some did with differing degrees of success.   Angry at the lawsuit against their colleagues in Texas, Defendants continued contacting insurance companies, including fraud investigators, provider representatives, medical directors, and advisory board members over the phone and in person, rather than through letters, in furtherance of their preexisting agreement. One such insurance company contacted was BC/BS Texas in or around June 2011 by JCAAI and Dr. Aaronson, which had previously been contacted by Dr. Weldon.   Following this contact, BC/BS Texas fraud investigators audited the medical records of numerous primary care physicians in Texas, including Dr. Bernice Gonzalez in San Antonio, Texas, and denied claims to many primary care physicians.

147.     Around the same time, AAAAI and JCAAI contacted Aetna claiming that primary care physicians and UAS were overbilling them for allergen immunotherapy and that Aetna should reduce the amount of units paid for allergen immunotherapy under CPT Code 95165. As a result of that contact, Aetna decided to reduce the amount it would permit to be billed to CPT Code 95165 to 90 units annually from 300 previously, a policy that also negatively impacted board-certified allergists.     Following complaints, AAAAI and JCAAI's representatives, including Dr. Linda Cox, Dr. Aaronson, and Dr. Gross met with representatives of Aetna on July 25 and October 26, 2012, including an Aetna Senior Medical Director, Dr. Chris Jagmin, to propose raising the amount of units back to 120, which Aetna agreed to do for the first year of allergen immunotherapy.   Subsequent to those two conversations, Dr. Gross engaged in a follow-

up meeting with Dr. Jagmin in which he complained about Aetna's decision to continue to pay primary care physicians working with UAS, acting in the interests of himself, JCAAI, and Dallas Allergy & Asthma Center, P.A.

148.    Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, acting on behalf of Dr. Sublett, PSF, PLLC, and JCAAI, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky.    *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 8, Dkt. No. 12-30.   Similar to Dr. Gross's meeting with Aetna, Dr. Pollard attempted to persuade Anthem Blue Cross/Blue Shield of Kentucky representatives that they should not pay or do business with primary care physicians or UAS for allergy testing and allergen immunotherapy.   As a result of follow up communications by Dr. Sublett, Anthem Blue Cross/Blue Shield of Kentucky has reduced the reimbursement it will pay primary care physicians practicing allergen immunotherapy by 60%.

149.    More recently, representatives of AAN, AAAAI, ACAAI, JCAAI, and Phadia have met with managed health plans in Texas in an effort to convince them not to do business with primary care physicians or UAS in the market for allergy testing and allergen immunotherapy.   Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients.   A specialist certification is not required by the standard of care in Texas nor any other state in which Plaintiffs operate.   Centers for Medicare and Medicaid Services pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state.   Yet, Defendants suggest that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and are determined to shut primary care physicians and businesses like UAS out of the market.   At Dr. Weldon's suggestion, these Defendants targeted managed care health plans

because those plans are incentivized to deny claims.  Specifically, managed health plans are paid annual on a per capita basis from the state health and human services commission, which requires them to pay all covered claims under federal and state Medicare and Medicaid regulations.  If managed care organizations could reason that claims for services did not meet the standard of care, then that health plan could plausibly deny the claims and pocket the difference.

150.   Defendants have had recent success targeting these organizations.  For example, on or about February, 2013, an ACAAI representative contacted Superior HealthPlan ("Superior"), a Texas managed care organization.  The representative supplied Superior's Chief Medical Officer, Dr. David Harmon, an "opinion" or position statement ACAAI stating that organization forbids "home immunotherapy" and thus Superior should not do business with nor reimburse the practices of primary care physicians who rely on UAS, who permit self-administration of allergy shots.  Around the same time, representatives of Phadia met with representatives of Texas Health and Human Services and Superior to convince those entities to restrict reimbursement of skin prick testing performed by primary care physicians in favor of blood testing, including sales of Phadia's ImmunoCaps.  Following this contact, Dr. Harmon contacted various primary care physicians who had billed Superior for allergy testing and allergen immunotherapy and stated Superior would no longer pay them for allergy skin testing and allergen immunotherapy based on the position of ACAAI.  Subsequently, Superior began denying all claims submitted by the businesses of primary care physicians for allergy skin testing and allergen immunotherapy for more than 18 primary care providers doing business with UAS, some of whom are AAAPC members.   In all more than 200 claims have been denied, totaling more than $500,000 in lost revenue to those providers and UAS from Superior alone.  Phadia representatives since utilized their success with Superior's policy change to approach physicians

and clinics to convince them not to do business with Plaintiffs. For example, one district manager encouraged his clinical sales consultants to use the policy change to regain lost business, noting that Thermo and Phadia had been waiting for that letter for three years.

151.   On August 1, 2013, Drs. Aaronson, Casale, Cox, Honsinger, and Webster, which includes the current Presidents of all three national allergist associations, JCAAI, AAAAI, and ACAAI, as well as the Executive Director and Executive Vice President of JCAAI, wrote another position statement entitled "Location Matters." *See* Exhibit X to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-54. "Location Matters," raises unfounded fears about the safety of self-administration of allergen immunotherapy, citing an increase in the risk of death. "Location Matters" is written in such a way as to conflate the standard of care with the non-binding practice parameters created by the allergist associations. While the publication of Location Matters or other journals is not in itself illegal, the use of these journals by board-certified allergists to claim privately to managed care organizations that they should not pay claims that do not meet these standards is anticompetitive.

152.   The very next day after Location Matters was published, on August 2, 2013, Superior announced a "credentialing policy" set to take effect on October 1, 2013 which limits reimbursements to physicians with the equivalent of a two-year specialist program, functionally precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy. *See* Exhibit F at ¶ 9 and F-2 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-32. Superior's "credentialing" policy, where it would only pay for allergy testing or allergen immunotherapy if performed by a board-certified allergists, also encouraged primary care physicians to use ICAPs or allergy blood tests to test for allergies instead as suggested by Phadia and Thermo Fisher representatives and AAN.

153.    Around the same time Superior began denying claims, El Paso First Health Plan ("El Paso First"), another managed care organization that covers Texas Medicaid patients in El Paso, also began calling primary care physicians.   Specifically, the Chief Medical Officer of El Paso First called those physicians in an effort to coerce those physicians to no longer engage in allergy testing and allergen immunotherapy based on the positions of ACAAI.  El Paso First had previously been contacted by Dr. Mansfield regarding claims data for allergy testing and allergen immunotherapy and Dr. Mansfield, a director of JCAAI, ACAAI, and Phadia, is believed to be the contact with El Paso First.   Dr. Mansfield serves on the Phadia Specialist Advisory Board, and Thermo Fisher and Phadia representatives, including marketing managers and clinical sales consultants, met with Dr. Mansfield to discuss their plans for his role as a member of the Board and in El Paso.  As a result of those communications, numerous primary care physicians stopped engaging in allergy testing and allergen immunotherapy for El Paso First patients, and some were denied claims for previous services.

154.    Also around the same time period, Parkland Community Health Plan ("Parkland"), a third-party payor for managed care services based in Dallas, Texas, was contacted by a representative of JCAAI, Dr. Gross.   Dr. Gross and his business Dallas Allergy and Asthma Center represent the main competitor to the physicians in Parkland's network in Dallas who received these letters.   Around the same time, representatives of Phadia and Thermo Fisher met with Dr. Lachman to implement a policy change to halt reimbursement of skin prick testing performed by primary care physicians in favor of blood testing.   Like other meetings with managed care organizations, Phadia and Thermo Fisher met with Dr. Lachman to convince Parkland to restrict primary care physicians to utilize only blood tests, leaving skin prick testing and allergen immunotherapy to board certified allergists only.

155. Following these communications, on October 1, 2013, Parkland's medical director, Dr. Barry Lachman, wrote a letter to at least four primary care physicians announcing Parkland's new policy of not reimbursing services provided by primary care physicians or any physician in association with companies like UAS. *See* Ex. F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-33. In it, Dr. Lachman equated the standard of care with AAAAI practice parameters, just as Defendants intended in crafting their position statements. The primary reason given for Parkland's refusal to reimburse these physicians is that "AAAI [sic] states that physicians should have specialized training before providing these services." *Id.* The Parkland letter then explicitly attacks permitting certain patients to self-administer allergy shots using the same arguments and referencing the same articles that Defendants presented in "Location Matters." The letter concludes by threatening to exclude primary care physicians who continue to provide allergy care from the Parkland network, especially those in contract with UAS. *See* Exhibit F at ¶ 10 and F-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-33. As a result of these letters, Dr. Osehotue Okojie and at least three other primary care physicians ceased participation in the market for allergy testing and allergen immunotherapy for patients associated with Parkland HealthPlan. *See* Ex. D. Since that time, Phadia and Thermo Fisher have utilized the letter with physicians and clinics to convince them not to do business with Plaintiffs: they convince physicians that no pre-authorization is needed for blood testing and that skin prick testing is reserved, and reimbursed only, for board certified allergists. Once the letter from Parkland was published, Phadia and Thermo Fisher representatives communicated internally that the end of remote allergy was near, thanks to the letter from Parkland. Defendants' success with managed care organizations means that any Medicaid patient in Texas is effectively restricted to only ImmunoCap testing manufactured by

Phadia. Few board certified allergists treat patients with Medicaid, and over 80% of allergy tests performed for the patients are utilized with Thermo Fisher and Phadia products.

156. Following the recent success with managed care organizations, Defendants began making headway with commercial carriers as well. In line with an earlier proposal by a member of RADAR, members of AAAAI began contacting "the Blues," otherwise known as the Blue Cross/Blue Shield of each state. *See* Exhibit C-7 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-8 at 1. As the RADAR post on Basecamp explained, if the Blues in one state restrict primary care physicians from allergy testing or allergen immunotherapy, "it would be great information to disseminate to others so that we can approach our local blues and try to change policy as well." *Id.*

157. On December 10, 2013 following meetings with a board-certified allergist and AAAAI and AAN representatives, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014, stating "Immunotherapy self-administered in the home setting is considered investigational." This statement mirrors statements made to other third-party payors by Defendants and their representatives and could be interpreted to purportedly deny reimbursement to physicians that permit patients to self-inject allergy shots. *See* Exhibit F at ¶ 11 and F-4 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-34.

158. More recently, representatives of AAAAI, ACAAI, JCAAI, AAN, Phadia, and Thermo Fisher have approached other Blues to attempt to convince them to restrict the market for allergy testing and allergen immunotherapy by refusing to pay primary care physicians and those doing business with UAS. For example, Blue Cross/Blue Shield of Florida reported having considering changes to their policy following contacts with allergists. *See* Exhibit F to Plaintiffs'

Preliminary Injunction Motion at ¶ 12, Dkt. 12-30.  Blue Cross/Blue Shield of Kansas more recently has been denying claims for any primary care physician in contract with UAS.  *Id.*

159.    The level of activity has risen more recently, especially since this lawsuit was originally filed on January 13, 2014.  As a result of not being named in the lawsuit, AAN and Phadia were encouraged by Defendants to continue engaging in their contacts with third-party payors in an effort to drive Plaintiffs out of business before they could succeed in prosecuting the lawsuit.  As a result, on or about February 23, 2014 at the AAAAI Annual Meeting, Winders met with officers of Phadia, concerning methods to combat UAS on behalf of Defendants in light of this lawsuit.

160.    AAN representatives, including Defendant Winders and Wallen then carried out attacks on Plaintiffs in an effort to put them out of business and head off this lawsuit by increasing their direct mail and fax campaign to medical directors of third-party payors and to primary care physicians practicing allergy testing or immunotherapy.  The letters claimed that these competitors were engaged in substandard care and fraud and demanded that third-party payors investigate every AAAPC member and any physician in contract with UAS.  These contacts had the desired effect during the early stages of this lawsuit, significantly reducing payment and revenue to AAAPC members and UAS.  In or around March 2014, AAN also drafted another false, defamatory, and disparaging attack on the services of Plaintiffs, this one entitled "Deception in Allergy and Asthma Care: Recognize the Signs of Fraud."  In this broadly distributed article to third-party payors and primary care physicians, AAN falsely claimed that primary care physicians and companies like UAS are engaged in fraud, and that primary care physicians should instead purchase RAST testing materials from Phadia and refer patients with a positive blood test to AANMA's network of board-certified allergists.  AAN also paid Wallen in

April 2014 to present to research "dirt" on Plaintiffs to use in contacts with third-party payors and physicians. [Dkt. No. 135-15; Dkt. 134-3, 4]. AAN and Phadia also continued to work together to find common sources of contact with third-party payors and others in an effort to put Plaintiffs out of business before they could discover AAN and Phadia's illegal activities.

161.    For example, on January 22, 2014, Parkland demanded repayment of reimbursements which had previously been issued to primary care physicians.  *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 12, Dkt. 12-30.  The Parkland letter included statements supplied to Parkland by Laurie Schroeder, a Clinical Sales Consultant for Thermo Fisher and Phadia, including the "Fraud and Deception in Allergy Care" article drafted by Winders and published by AAN.  Shortly thereafter, Coventry of Kansas suggested that after consultations with allergists, it may change its policies regarding reimbursement of primary care physicians or any physician that relies on the services of UAS.  *Id.*  Similarly, during this time frame, physicians called Plaintiffs to express concerns that other commercial carriers and health plans may no longer reimburse allergy testing and allergen immunotherapy performed by primary care physicians, including El Paso First, with some third-party payors threatening to seek their money back. *Id.*  Shortly after AAN's follow up letter to third-party payors in March 2014, Humana began demanding repayment of claims previously approved for services provided by primary care physicians in Kentucky in contract with UAS, the market dominated by Defendants Dr. Sublett and his business, PSF, PLLC.  Commercial carriers such as the Blues and others are prone to coercion, persuasion or enticement because Defendant purport to represent violations of the standard of care, increased costs, and other claims, all of which are false.

162.    More recently, Phadia and its representatives have attempted to monopolize the market for allergy testing through exclusive arrangements with health plans and other third-party

payors.  For example, in September 2014, Phadia agreed with Parkland that all allergy patients must be tested with an allergy-blood test and that no primary care physician in Parkland's network should conduct allergy skin testing.  Parkland, which is the largest hospital and Texas Medicaid provider in the Dallas area, is an essential facility in its area and thus an exclusive contract forecloses a significant portion of the market to competition.  The result of Parkland's agreement with Phadia is that over 90% of the Texas Medicaid patients in Parkland's network are tested using Phadia's ImmunoCap testing.  Since Parkland's adoption of that program, other Texas managed care organization health plans have considered following suit based on Phadia's and Parkland's urging, including El Paso First Health Plan, Superior HealthPlan, Texas Children's Hospital, and Community Health Choice, and leading to Defendants controlling more than 80% of the allergy testing and allergen immunotherapy markets in El Paso, Austin, and Houston.

163.    In addition to approaching managed care organizations and commercial carriers, Defendants have approached suppliers—threatening to pull business from those suppliers if they contracted with UAS or AAAPC physicians or gave any grants or donations to AAAPC.  An officer of Greer Labs, Inc., a supplier of skin prick testing equipment and antigens for allergen immunotherapy, informed AAAPC that Defendants threatened to cancel two large contracts if Greer works with AAAPC physicians or contributed at all to AAAPC.  Defendants have contacted and threatened to cancel contracts and ongoing business relationships with Greer Labs, Inc. and Hollister-Stier Allergy, the two largest antigen suppliers in the market for allergy testing and immunotherapy in furtherance of these threats.  And, due to the Defendants' conduct, AAAPC's membership numbers have suffered as well causing it direct economic harm.

164.    As a direct result of Defendants' conduct, AAAPC members and UAS have been required to withdraw from certain local markets, including but not limited to the following areas: Chicago-Joliet-Naperville, IL-IN-WI Metropolitan Statistical Area; Hagerstown-Martinsburg, MD-WV Metropolitan Statistical Area; Wheeling, WV Metropolitan Statistical Area; Gainesville, FL Metropolitan Statistical Area; Orlando–Kissimmee–Sanford, FL Metropolitan Statistical Area; Tampa–St. Petersburg–Clearwater, FL Metropolitan Statistical Area; Lakeland-Winter Haven, FL Metropolitan Statistical Area; Monroe, LA Metropolitan Statistical Area; Fort Polk South, LA Micropolitan Statistical Area; Lake Charles, LA Metropolitan Statistical Area; Kansas City, KS-MO Metropolitan Statistical Area; Wichita, KS Metropolitan Statistical Area; Louisville-Jefferson County, KY-IN Metropolitan Statistical Area; Lexington-Fayette, KY Metropolitan Statistical Area; Tucson, AZ Metropolitan Statistical Area; Phoenix-Mesa-Glendale, AZ Metropolitan Statistical Area; Yuma, AZ Metropolitan Statistical Area; Youngstown–Warren–Boardman, OH–PA Metropolitan Statistical Area; Canton–Massillon, OH Metropolitan area; Gaffney, SC Micropolitan Statistical Area; Greenville-Anderson-Mauldin, SC Metropolitan Statistical Area; and Columbia, SC Metropolitan Statistical Area.    As a result, Defendants no longer face any significant competition in these markets and have increased their market share in these markets above 70% for allergy testing and allergen immunotherapy, as well as in other markets in which Plaintiffs continue to operate but have been hindered. Defendants' conduct is still ongoing which is resulting defendants' further increased market share to Defendants and injury to Plaintiffs.    Phadia has also been able to charge super-competitive prices during the relevant time, often exceeding 150-250% of their competitors with negligible loss in market share.

165.    The result of Defendants' conduct has been to the detriment of payors and consumers.    As a result of driving the lower cost UAS and primary care physicians from the market and reducing supply, consumers in many markets must choose between paying the inflated price charged by Defendants for allergy testing or allergen immunotherapy, or going without those treatments.    For example, consumers who previously had available to them the cheaper and more convenient allergy skin test in their primary care physician's office must either pay for a more expensive allergy blood test, such as Phadia's ImmunoCap test, or a more expensive skin test performed by a board-certified allergist than if performed by their primary care physician.    Additionally, a smaller number of consumers have the less expensive allergen immunotherapy performed by a primary care physician available to them than the more costly allergen immunotherapy performed by a board-certified allergist.    Defendants' conduct also imposes additional costs on consumers in terms of longer travel times, in office waiting times, more expensive and less useful medications, additional office visits and emergency room visits, and lost work and school days from a decline in effective care.

## PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS

166.    Plaintiffs have been damaged, and will continue to be damaged, by actions taken by Defendants and their co-conspirators on a nationwide basis to boycott and restrict competition and output from AAAPC members and UAS and conspire to monopolize the market for allergy testing.    The direct result of Defendants actions and the encouragement of AANMA, Phadia, AAAAI, ACAAI, JCAAI, and RADAR members to persuade, entice, and coerce insurance companies on behalf of those organizations has caused insurance companies and managed care organizations like Superior, Parkland, Humana, Blue Cross/Blue Shield of Arkansas, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Louisiana, Capital Blue Cross of Pennsylvania, Highmark of Pennsylvania, and Blue Cross/Blue Shield of Kansas to avoid or stop

reimbursing primary care physicians altogether; and managed care organizations including Texas Children's Health Plan and Community Health Choice to avoid certifying or approving primary care physicians for reimbursement; and other insurance companies like Aetna, Cigna, Blue Cross/Blue Shield of Texas, Blue Cross/Blue Shield of Florida, and Anthem Blue Cross/Blue Shield of Kentucky, to change and reduce the amounts they are willing to pay primary care physicians.

167.    As a direct result of Defendants' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Defendants.   AAAPC and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing agreements and have also experienced difficulty in entering into business relationships with others because of the Defendants' anticompetitive public relations campaign.

168.    UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers.   The result has been most noticeable in terms of lost revenue and corresponding lost profit for services that would have otherwise been provided to physicians.   The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

169.    UAS has also been damaged by a direct boycott on the part of board-certified allergists and their trade organizations and co-conspirators, including AAN, AAAAI, ACAAI, and JCAAI and their partnership with Phadia.   While UAS supports primary care physicians who compete with the allergists, there is no reason that an allergist could not employ UAS as well or

at least assist and advise UAS. In addition to the interference with Dr. Kaplan's contract to advise UAS, Defendants have also dissuaded or attacked board-certified allergists that could do business with UAS or any board-certified allergists that could advise or serve on the board of AAAPC. Additionally, Phadia's agreements with its co-conspirators, Quest Diagnostics and CPL not to sell ImmunoCaps to UAS prevents UAS from engaging in blood testing and eliminates UAS's ability to compete with Defendants.

170. UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business. Plaintiffs anticipate that UAS, AAAPC, and AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs' investigation into the extent of the damage they have suffered at the hands of Defendants is ongoing. Also much of the additional damage that UAS, AAAPC, and AAAPC members have suffered is not easily calculable, such as damage to their goodwill and to the patient-physician relationship.

171. AAAPC, for its part, has suffered significant damages. These damages consist of lost revenue from members who are no longer active in AAAPC because Defendants' conduct illegally forced those physicians to stop offering immunotherapy services to patients. These damages also consist of lost sponsorship revenue due to threats made by Defendants' to prospective sponsors of retribution that would occur if those companies sponsored or otherwise supported AAAPC. Separately, these damages emanate from false exigencies precipitated by Defendants' illicit conduct, which have required AAAPC to divert resources away from supporting member physicians, towards combating the improper and inaccurate information campaigns lodged by Defendants with insurers, regulators, and legislators alike.

**COUNT ONE**

**SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS**

172.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if fully alleged herein.

173.    At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition and reduce supply in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in MSAs throughout the United States, including within the State of Texas and other states, including Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing and allergen immunotherapy equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to

discourage competition in the market. This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

174.   The Defendants' actions are a *per se* violation of the Sherman Act.   The Defendants include all three national allergy trade associations and represent virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing and allergen immunotherapy.   Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, seeking to restrict competition and supply, and encouraging and engaging in price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide.   The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market.   By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.

There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

175. Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete with board-certified allergists in the relevant market. As the result of Defendants' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets in Texas and other states, leaving patients to choose between paying more for allergy treatment or going without. Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits. Defendants' actions are also not mere advocacy of the services of board-certified allergists, but are directed at eliminating competitors and thus restricting competition, to the ultimate harm of patient choice.

176. As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

177.   UAS also seeks money damages from Defendants jointly and severally for these violations.   These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

178.   Plaintiffs also seek injunctive relief.   The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO

### SHERMAN ACT § 2 VIOLATION FOR MONOPOLIZATION,  ATTEMPTED MONOPOLIZATION,  AND CONSPIRACY TO MONOPOLIZE  AGAINST DEFENDANTS

179.   Plaintiffs incorporate by reference paragraphs 1 through 178 as if fully alleged herein.

180.   At all times relevant to the Complaint, Defendants and others have combined and conspired to attempt to eliminate competition, restrict output, and establish or maintain a monopoly in the markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies in MSAs throughout the United States, including within the State of Texas and other states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.   Defendants have over a 70% share in all local markets in which they compete, including the relevant geographic markets at issue in this case.   Defendants therefore have monopoly power in those markets.   Defendants' predatory and anticompetitive conduct was performed with the specific intent to monopolize the markets for allergy testing and allergen immunotherapy and a dangerous probability of achieving and/or maintaining monopoly power.

181.    Defendants' actions include seeking entry barriers and restriction on participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy skin testing and allergen immunotherapy with the foreseeable result of eliminating competition in the allergy testing and allergen immunotherapy markets by primary care physicians and UAS.   Defendants have conspired to these ends by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors.   In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market.   This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

182.    The Defendants include Phadia, an allergy blood test manufacturer with a greater than 80% share of allergy blood tests sold in MSAs throughout the United States, all three

national allergy trade associations, and represents virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing. Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, encouraging price fixing, and attempting to increase and maintain monopoly power in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy testing and care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy testing market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.

183.   The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition and output for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete in the relevant market. As the result of Defendants' conduct, payors and consumers have been deprived of the benefits of competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets, leaving patients to choose between paying more for

allergy treatment or going without.  Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits.  Defendants' actions are also not mere advocacy, but are directed at eliminating competitors, restricting competition, and achieving or maintaining a monopoly, to the ultimate harm of patient choice.

184.    Although Defendants acted in concert, Plaintiffs' Section 2 claims for attempted monopoly and monopolization are being asserted against Phadia and Thermo alone. Plaintiffs' claim for conspiracy to monopolize is being asserted against all Defendants.

185.    As a direct and proximate result of Defendants' past and continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

186.    UAS also seeks money damages from Defendants jointly and severally for these violations.   These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

187.    Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT THREE

### TEXAS FREE ENTERPRISE AND ANTITRUST ACT VIOLATIONS
### AGAINST ALL DEFENDANTS

188.    Plaintiffs incorporate by reference paragraphs 1 through 187 as if fully alleged herein.

189.    At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition and reduce supply in the market for allergy testing and

allergen immunotherapy for seasonal and perennial allergies in MSAs throughout the United States, including within the State of Texas and other states. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing and allergen immunotherapy equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market. This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

190. The result of that illegal *per se* boycott and price fixing has been to eliminate or restrict AAAPC members' and UAS's ability to market and provide their services in relevant

geographic markets within Texas. For example, as explained above, certain Texas insurance companies and managed care organizations have either stopped reimbursements for allergy care by physicians who are supported and assisted by UAS or restricted or interrupted those reimbursements. As a result, UAS, Texas primary care physicians, Texas based members of AAAPC, and Texas allergy patients are all being denied the benefits of fair competition.

191. The Defendants' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA"). The Defendants represent board-certified allergists, a dominant market group of horizontal competitors. Phadia also has a dominant position in the allergy testing market, as it controls over 80% of the allergy blood tests sold in MSAs throughout the United States. Together, Defendants control in excess of 70% of the allergy testing and allergen immunotherapy markets throughout Texas. They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny their competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and decreasing reimbursements to those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

192.   Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis.   The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who partner with UAS.   As the result of Defendants' conduct, consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians, leaving patients to choose between paying more for allergy treatment or going without.

193.   Additionally, at all times relevant to the Complaint, Defendants and others have combined and conspired to attempt to eliminate competition, restrict output, and establish or maintain a monopoly in the markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies in relevant geographic markets within Texas.   Defendants have over a 70% share in all local markets in which they compete, including the relevant geographic markets at issue in this case.   Defendants therefore have monopoly power in those markets.   Defendants' predatory and anticompetitive conduct was performed with the specific intent to monopolize the markets for allergy testing and allergen immunotherapy and a dangerous probability of achieving and/or maintaining monopoly power.

194.   Defendants' actions include seeking entry barriers and restriction on participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide

campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy skin testing and allergen immunotherapy with the foreseeable result of eliminating competition in the allergy testing and allergen immunotherapy markets by primary care physicians and UAS. Defendants have conspired to these ends by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market. This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

195. The Defendants include Phadia, an allergy blood test manufacturer with a greater than 80% share of allergy blood tests sold in MSAs throughout the United States and in MSAs in Texas, all three national allergy trade associations, and represents virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing. Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, encouraging price fixing, and

attempting to increase and maintain monopoly power in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy testing and care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy testing market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.

196.    The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition and output for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete in the relevant market. As the result of Defendants' conduct, payors and consumers have been deprived of the benefits of competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets, leaving patients to choose between paying more for allergy treatment or going without. Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits. Defendants' actions are also not

mere advocacy, but are directed at eliminating competitors, restricting competition, and achieving or maintaining a monopoly, to the ultimate harm of patient choice.

197.   Although Defendants acted in concert, Plaintiffs' claims for attempted monopoly and monopolization are being asserted against Phadia and Thermo alone. Plaintiffs' claim for conspiracy to monopolize is being asserted against all Defendants.

198.   As a direct and proximate result of Defendants' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

199.   UAS seeks money damages from Defendants jointly and severally for these violations. Defendants' violations were willful and flagrant. UAS's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

200.   Plaintiffs also seek injunctive relief.   The violations set forth above are continuing and will continue unless injunctive relief is granted.

201.   As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### AGAINST ALL DEFENDANTS

202.   Plaintiffs incorporate by reference paragraphs 1 through 201 as if fully alleged herein.

203.   In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with the existing agreements between AAAPC and its members and industry sponsors, as well as existing agreements between UAS and its many physicians and practice groups.   Defendants' conduct, which was neither justified nor privileged, was intended to cause insurance companies, managed care organizations, practice groups, and patients to cease

their agreements or doing business with primary care physicians, and to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS. Defendants' conduct constitutes willful and intentional acts of interference with those agreements and was done with malice. Such conduct caused injury to AAAPC as an organization and to UAS by, among other things, reducing business under these agreements causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for AAAPC and UAS to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Defendants' actions.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS

204.   Plaintiffs incorporate by reference paragraphs 1 through 203 as if fully alleged herein.

205.   In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with AAAPC's and UAS's existing and prospective business relations. There was a reasonable probability that, absent Defendants' actions, AAAPC would maintained existing relationships with and would have entered into additional relationships with third parties, including primary care physicians and industry sponsors, and that UAS would have maintained existing relationships with and entered into additional business relationships with third parties, including other physicians and practice groups. Defendants intentionally interfered with these relationships by attempting to prevent payment to AAAPC members and other physicians who are not board-certified allergists who are assisted and supported by UAS, to scare them away from membership in AAAPC as well as to prevent physicians and practice

groups from maintaining relationships with or entering into business with UAS. Defendants' conduct constitutes willful and intentional acts of interference and was done with malice. Defendants' conduct was independently tortious or unlawful for the reasons described herein, including for violating and encouraging and participating others in violating the Sherman Act, the TFEAA, the Texas State Court Injunction, making false, fraudulent, defamatory, and disparaging statements regarding AAAPC, AAAPC members, and UAS, and their businesses, and participating in a breach of statutory and contractual duties of confidentiality owed to the Texas Medical Board and other governmental agencies. Defendants' interference proximately caused injury to AAAPC and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more difficult to conduct operations and causing AAAPC and UAS to expend considerable resources in order to further their business.

## COUNT SIX

## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

206. Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully alleged herein.

207. In addition, or in the alternative, Defendants' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts and existing and prospective business relations. Defendants and others have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS. In furtherance of their conspiracy, Defendants and others have agreed to engage in a coordinated campaign to restrict competition by discouraging

physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists and their businesses.   In furtherance of their conspiracies and illegal agreements, Defendants and their other co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition and to attempt to maintain and further monopolize the markets for allergy testing and allergen immunotherapy.   Defendants and their other co-conspirators have also taken actions to interfere with Plaintiffs' current contracts and prospective business relationships.   As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the marketplace.   Defendants are all jointly and severally liable for the actions taken in furtherance of their conspiracy.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

208.   Plaintiffs incorporate by reference paragraphs 1 through 207 as if fully alleged herein.

209.   The actionable conduct of Defendants over the past few years has recently threatened and is starting to cause imminent and irreparable harm to AAAPC members and UAS. Starting around October 2013, the number of third party payors who report being contacted increased dramatically and at the urging of Defendants and their co-conspirators, actions to stop doing business with or reimburse these competitors started to grow.   More recently, since the original filing of this Complaint, additional third party payors have expressed the same concerns

raised by Defendants, threatening to remove primary care physicians and UAS from the market entirely, at the suggestion of Defendants.

210.    To preserve the status quo until trial in this cause, Plaintiffs hereby request the Court to preliminarily enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a preliminary injunction, from:  (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

211.    Upon judgment in this cause, Plaintiffs further request the Court to enter a judgment permanently enjoining and restraining Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

## ATTORNEYS' FEES

212.   Plaintiffs incorporate by reference paragraphs 1 through 211 as if fully alleged herein.

213.   15 USCA § 15 and TFEAA § 15.21 both provide for the recovery of attorney fees and costs of suit in private enforcement actions under the antitrust laws.  Plaintiffs therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs they have incurred as a result of Defendants' conduct.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

b.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

c.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

d.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(b) of the TFEAA, Tex. Bus & Comm. Code § 15.05(b).

e.   Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 and Sections 15.05(a) and (b) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a) & (b).

f.   Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing contracts.

g.   Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing and prospective business relationships.

h.   Adjudge and declare that Defendants unlawfully engaged in a civil conspiracy.

i.     Against all Defendants, jointly and severally, award UAS damages in an amount to be proved at trial, to be trebled with interest.

j.     Against all Defendants, jointly and severally, award AAAPC damages in an amount to be proved at trial, with interest.

k.     Against all Defendants, jointly and severally, award UAS and AAAPC exemplary damages in an amount to be proven at trial.

l.     Against all Defendants, jointly and severally, award Plaintiffs their attorney's fees and costs of this suit; and

m.    Award such other further relief as the Court deems just and proper.

DATED:  January 4, 2016.

Respectfully submitted,


**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:  /s/ Casey Low
  Casey Low
  Texas Bar No. 24041363
  Benjamin L. Bernell
  Texas Bar No: 24059451
  Liz Kozlow Marcum
  Texas Bar No: 24078801
  401 Congress Ave., Suite 1700
  Austin, Texas 78701-4061
  Phone: (512) 580-9600
  Fax:    (512) 580-9601
  casey.low@pillsburylaw.com
  liz.marcum@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS**

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN ACADEMY OF ALLERGY, ASTHMA & IMMUNOLOGY; AMERICAN COLLEGE OF ALLERGY, ASTHMA & IMMUNOLOGY; DALLAS ALLERGY AND ASTHMA CENTER, P.A.; JOINT COUNCIL OF ALLERGY, ASTHMA & IMMUNOLOGY; LYNDON E. MANSFIELD M.D., P.A., A PROFESSIONAL ASSOCIATION; PSF, PLLC; DONALD AARONSON, MD; GARY GROSS, MD; LYNDON MANSFIELD, MD; JAMES SUBLETT, MD; DAVID WELDON, MD; ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS,; JAMES WALLEN &; PHADIA US INC.; ATLANTA ALLERGY & ASTHMA CLINIC, P.A.; STANLEY FINEMAN, MD; AND THERMO FISHER SCIENTIFIC INC.<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.  5:14-CV-35-OLG<br><br>~~CIVIL ACTION NO. 14-35~~<br><br>JURY TRIAL DEMANDED |

## ~~THIRD~~FOURTH AMENDED COMPLAINT

Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United

Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively "Plaintiffs") file this action

against the American Academy of Allergy, Asthma & Immunology ("AAAAI" or the

"Academy"); the American College of Allergy, Asthma & Immunology ("ACAAI" or the

"College"); Dallas Allergy and Asthma Center, P.A.; the Joint Council of Allergy, Asthma &

Immunology ("JCAAI" or the "Joint Council"); Lyndon E. Mansfield M.D., P.A., a professional

association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"); Tonya Winders; Stanley Fineman, MD; Atlanta Allergy & Asthma Clinic, P.A. ("Atlanta Allergy"); James Wallen; and Phadia US Inc. (; and Thermo Fisher Scientific Inc. (Phadia US, Inc. and Thermo Fisher Scientific Inc. are collectively "Phadia") (all collectively, "Defendants").

## NATURE OF THE CASE

1.      This case concerns a conspiracy and agreement among the three national allergist trade associations, certain of their officers and board members, and those paid for and acting on their behalf or in coordination with them to restrict competition in the market relevant markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies (referred to herein as the markets for "allergy testing and allergen immunotherapy") in local areas throughout the United States.  The three trade associations, AAAAI, ACAAI, and JCAAI, responded to pleas from their members to engage in a "turf war" to address the "encroachment" in the market by primary care physicians and UAS.  In response, and in keeping with the "turf war" motif, these three independent associations of competitors agreed to form "RADAR," a joint venture of those organizations to recruit local allergists from every state, regional, and local allergist society in the nation to fight back against these competitors, and to provide a message board called "Basecamp" for those representatives to coordinate their anticompetitive activities.

2.      Defendants, including not only these trade associations, but the leaders listed in this complaint and some RADAR members, actively engaged in their self-described "turf war" by contacting insurance companies, managed care organization health plans, and other third-party payors to convince them not to do business with or reimburse the allergy testing and allergen immunotherapy services of primary care physicians and UAS.  Defendants also hired

2

and paid organizations and their individuals to engage in this warfare on their behalf, including Defendant AAN, an organization formerly known as "Mothers of Asthmatics," under the guise that no one would challenge an organization with a now faux purpose of protecting children. Defendants were further joined in agreement and in funds by Defendant Phadia, which lost sales of blood tests and medications as a direct result of primary care physicians performing allergy skin prick tests and preparing and administering allergen immunotherapy. Phadia manufacturers more than 80% of the allergy blood tests sold in the United States and consequently has maintained for years a dominant position in the allergy testing market and the related market for allergen immunotherapy. In response to the competitive threat Plaintiffs posed to Phadia's market position, Phadia joined the conspiracy to put UAS out of business to serve its own economic interests. As part of the conspiracy, Phadia worked with the other Defendants to maintain and further monopolize the allergy testing and allergen immunotherapy markets. Indeed, Phadia and Thermo Fisher and its representatives, including Tonya Winders, believed that Phadia (subsequently Thermo Fisher) and AAN should lead the charge to exclude from the market UAS and its primary care physician clients who engage in skin prick allergy testing and allergen immunotherapy.

    3.    Defendants engaged in this conduct despite, and in spite of, governmental organizations such as the Centers for Medicare and Medicaid Services and the Texas Medical Board, which otherwise pay for and authorize the services of these competitors. The purpose of Defendants' contacts with private third-party payors and encouragement of other members to engage in this behavior is to accomplish their anticompetitive objectives through persuasion, enticement, or coercion, and were economically motivated to protect Defendants' turf.

4.  3. The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers. By attempting to take away competitors' means to compete, namely reimbursement by third-party payors, and by intimidating physicians by threatening them with claims of fraud or insurance company audits, Defendants have aimed to essentially deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy. A direct consequence of this activity is that most consumers are forced to either pay Defendants' inflated prices for allergy testing or allergen immunotherapy, or consumers go without these services. Defendants' intended result is to protect their own profits and ensure that patients continue to pay their inflated prices, despite the availability of competing cheaper alternatives and the need for additional supply in the market. Since this suit was filed, then unnamed members of the conspiracy, including AAN, Phadia, Winders, and Wallen only ramped up their anticompetitive activity with the hope that they could put Plaintiffs out of business before Plaintiffs could discover the depths of their participation in this conduct. Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, the Texas Free Enterprise and Antitrust Act, and Texas common law, the Court should put an end to this turf war and restore and protect competition.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

5.  4. This action is brought under SectionSections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Comm. Code § 15.05, and the common law of torts for civil conspiracy and tortious interference with both current contracts and prospective business relations.

4

6.   5. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a).  Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business.  *See* 15 U.S.C. § 22.

7.   6. The Court may exercise personal jurisdiction over Defendants Gross, Mansfield, Weldon, Dallas Allergy and Asthma Center, P.A., and Lyndon E. Mansfield M.D., P.A., a professional association, and James Wallen because they are located in Texas and have continuous and systematic business contacts with Texas that are substantial, and because this action arises out of and is related to those purposeful contacts with Texas.

8.   7. The Court may exercise personal jurisdiction over Defendants JCAAI, AAAAI, ACAAI, AAN, and Phadia, and Thermo Fisher because they regularly conduct business in Texas, including with Texas-based physicians to whom they market and communicate directly through phone calls, writings, and over the internet, including via their respective websites. Additionally, they have purposefully directed specific actions at Texas, including phone calls, emails, letters, and publications.  This action arises from and specifically relates to those purposeful contacts with the State of Texas.

9.   8. The Court may exercise personal jurisdiction over all Defendants, including Defendants Dr. Aaronson, Dr. Sublett, PSF, PLLC, AAN, Dr. Fineman, Atlanta Allergy, Phadia, Thermo Fisher, and Tonya Winders because they expressly aimed tortious conduct at the State of Texas knowing that the brunt of their intended injury would be felt by residents of Texas, and particularly by UAS, a San Antonio, Texas-based company.  Defendants have expressly engaged in such tortious conduct individually by committing antitrust violations, as well as interfering with contracts and prospective business relationships in Texas with the intent to harm residents

5

of Texas. They have done so through communications directed to persons and entities located in Texas, with the aim of gaining extensive benefit, advantage, business, and profit from these contacts with Texas.

10.    9. For example, on February 8, 2011, Dr. Aaronson, Dr. Sublett, and Dr. Fineman helped issue a letter to Regional, State, and Local Allergy Society Leaders announcing the formation of the Regional Advocacy Discussion and Response ("RADAR") initiative aimed at addressing the encroachment of non-allergists. *See* Exhibit E-4 to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order (Motion for Preliminary Injunction"), Dkt. No. 12-25. The letter, which was signed by Dr. Sublett, sought to recruit local representatives from every corner of the country, including Texas, to assist in carrying out RADAR's mission, the true intentions of which were to restrict access to the market for allergy testing and allergen immunotherapy. An AAAAI published report on "Ongoing Activities Relevant to the [RADAR] Initiative," admits that one of the means by which RADAR attempted to address the perceived encroachment by non-allergists, was to engage in "[o]ngoing communication with insurance companies" to represent the specialty "in discussions about appropriateness of care." *See* Exhibit G to Plaintiffs' Motion for Preliminary Injunction at 3, Dkt. No. 12-35. Those discussions have resulted in the refusal of insurance companies to reimburse claims submitted by primary care physicians residing in Texas who are supported by UAS. The encouragement of such actions by local representatives from every state in the country clearly demonstrates a nationwide pattern of anticompetitive conduct which has resulted in direct harm to entities located in Texas, including UAS and the practices of the Texas primary care physicians whom it supports.

6

11.    10. Further, Dr. Sublett sent an email dated May 5, 2011 to the President of the Texas Allergy, Asthma & Immunology Society ("TAAIS"), Dr. Stuart Abramson, who was located in Texas, approving and authorizing the creation and distribution of anticompetitive letters aimed at primary care physicians, insurance companies, and managed care organizations throughout Texas. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order, Dkt. No. 12-46.    The communication indicates that both Dr. Aaronson, JCAAI's acting Executive Director, and Dr. Gross, the organization's Executive Vice President, were also personally involved in approving these communications.   Despite acting in their capacity as officers of JCAAI, Defendants' actions also benefitted themselves individually as physicians and their businesses engaged in the market for allergy testing and allergen immunotherapy, and thus were undertaken in more than any pure associational capacity.   The fiduciary-shield defense protects against liability for officers of organizations just by being officers, but does not protect the individual Defendants from liability for their own tortious conduct, especially not from antitrust liability.  The letters that Drs. Aaronson, Gross, and Sublett approved on behalf of JCAAI, were intended to injure UAS, as well as the Texas primary care physicians that it supports.  As the referenced communication from TAAIS seeking approval for the letters asserts, they were revised to alter the "tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* at 2.  However, regardless of the revisions, the intended target of the harm sought to be inflicted remains the same.  Communications among the TAAIS leadership confirm that UAS was the intended target of the letters which Drs. Aaronson, Gross, and Sublett approved as described below. *See* Exhibit T to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-50 ("Because of "restraint of trade" issues, we cannot more directly attack [UAS], but the above approaches [including the draft

7

letters] are within our legal rights."). The clear purpose of the Defendants' tortious conduct both with Texas and with others outside of Texas as described below was to injure UAS and prevent competition from the physicians whom it supports. The benefit of those actions was meant to accrue to board-certified allergists' businesses, such as PSF, PLLC, which belongs to Dr. Sublett.

12.   11. Dr. Sublett and Dr. Aaronson jointly participated in multiple JCAAI newsletters discussed below, which Dr. Sublett signed, and which were distributed to JCAAI members in Texas and support the basis for the claims in this Complaint. The October 5, 2011 issue of JCAAI Newsletter entitled "More on Remote Practice," which was sent under Dr. Sublett's signature and originally drafted by Dr. Aaronson, mentions efforts to address the remote practice of allergy and specifically mentions "one such scheme featured in . . . a "Business Builder" article in *Medical Economics*." Dr. Sublett testified under oath that the company featured in the referenced article was UAS. (September 7, 2012 Deposition Testimony of Dr. James Sublett, M.D. at 143:14-15). The newsletter, addressed to JCAAI's nationwide membership, including members in Texas, goes on to "recommend[] against engaging with any company that promotes [the remote practice of allergy]." Dr. Sublett also participated in RADAR, including its online message board "Basecamp," in which Dr. Sublett specifically sought information concerning UAS to target that company. Dr. Sublett, Dr. Aaronson, and Dr. Fineman also participated in the AAAAI Annual Meeting and the JCAAI meeting from February 22-26, 2013 in San Antonio, Texas, at which all three participated in discussions concerning the ongoing activities of RADAR and Defendants as described in this Complaint.

13.   12. Dr. Fineman served as the President-Elect for the ACAAI from 2010-2011 and the President from 2011-2012. During his tenancy as President-Elect, Dr. Fineman drafted and participated in distributing multiple letters and publications, including attempts to paint

8

ACAAI as setting the standard of care for allergy testing and allergen immunotherapy. Those communications were distributed to members in Texas, as well as third party payors, including managed care organizations in Texas. For example, ACAAI sent a "position statement" regarding allergy testing and allergen immunotherapy to the managed care organization, El Paso First Health Plan located in El Paso, Texas. *See* Ex. A. El Paso First relied on the position paper to determine that the standard of care for allergy testing and allergen immunotherapy was limited to practice of board-certified allergists, and to deny claims of AAAPC members and primary care physicians in contract with UAS. Additionally during his tenancy as President-Elect of ACAAI, Dr. Fineman proposed and participated in drafting and sending a letter to the Texas Medical Board providing specific guidelines for immunotherapy. [Dkt. No. 135-23̶17]. Dr. Fineman proposed a formal motion of ACAAI the ACAAI's letter be sent in support of the Texas Allergy & Asthma Society and its members in response to their pleas to combat UAS, and the ACAAI Executive Committee carried that motion and sent the letter in March 2011. Following the sending of this letter, Defendants Gross and Aaronson discussed with Dr. Fineman that the Texas Medical Board should target UAS and make their practices "a case they are investigating." Further, Defendant Gross and Dr. Fineman discussed how to disrupt UAS's business with primary care physicians, including Defendant Gross contacting the Chief of Internal Medicine at Presbyterian Hospital in Dallas to control Plaintiffs from a "corporate standpoint." [Dkt. No. 135-22̶16].

14. 13.̶ Dr. Fineman also participated in Strike Force and RADAR, including its online message board "Basecamp." Through direct conversations with other Defendants, including those in Texas, and with his own colleagues at Atlanta Allergy, Dr. Fineman specifically sought information concerning UAS to target that company in Texas, Atlanta, and

9

elsewhere.  Dr. Fineman inquired with Defendants Aaronson and Sublett about whether they could collectively use a JCAAI press release "to support our case against the remote practice by United Allergy Labs?" Dr. Fineman and Atlanta Allergy also specifically targeted UAS through approaching pediatric and primary care clinics in Georgia to convince them not to utilize or contract with UAS. *See* Ex. B. Defendants could reasonably expect to be held accountable by a Texas court for the anticompetitive injuries suffered in Texas that were the intended result of their conspiracy.  As such, the Court's exercise of personal jurisdiction over Defendants would not violate traditional notions of fair play and substantial justice.

15.  14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants inhabit or transact business in this District and a substantial part of the events or omissions giving rise to these claims occurred in this District, including, but not limited to, the conspirators' attempts to organize a group boycott and restrict competition and output using insurance companies, managed care organizations, and physicians located in this district to harm UAS, which is also located in this District.  In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because JCAAI, ACAAI, AAAAI, and AAN each transact business in the District, such as accrediting members of their organizations in the District and providing support services to those members in the District.

16.  15. Defendants' conduct, including their attempts to organize a group boycott against and restrict competition and output from non-allergist physicians and their businesses and support staff, including AAAPC members and UAS.; and their conspiracy to monopolize the market for allergy testing and allergen immunotherapy; and Defendants' tortious interference with AAAPC members and UAS's contracts and prospective business relations all cross state

lines.  Defendants' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

17.   16. AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia.  The AAAPC is an organization that fosters the ability of physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care.  Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  AAAPC seeks injunctive relief on its antitrust claims brought in a representational capacity on behalf of its members.  It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit. AAAPC also seeks certain money damages in its own capacity because it has, itself, suffered actual damages due to the Defendants' tortious conduct through their interference with AAAPC's contracts and existing and prospective business relations.  AAAPC has appeared through undersigned counsel in this cause.

18.   17. United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas, in the Western District of Texas.  UAS participates in the market for allergy testing and allergen immunotherapy through providing support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Texas and 24 other states.  As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of

11

board-certified allergists, including Defendant Dallas Allergy and Asthma Center, P.A. in the local market in Dallas; PSF, PLLC in the local market in Louisville; Lyndon Mansfield M.D., P.A. in the local market in El Paso, and Atlanta Allergy, in the local market in Atlanta, Georgia. As a direct target of Defendants' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims. UAS has appeared through undersigned counsel in this cause.

## **Defendants**

19.   18. The American Academy of Allergy, Asthma & Immunology is a Wisconsin non-profit organization of physicians with its principal place of business at 555 East Wells Street, Suite 1100, Milwaukee, WI 53202-3823 and has appeared through counsel in this cause.

20.   19. The American College of Allergy, Asthma & Immunology is a Minnesota non-profit organization of physicians with its principal place of business at 85 West Algonquin Road, Suite 550, Arlington Heights, IL 60005 and has appeared through counsel in this cause.

21.   20. Dallas Allergy and Asthma Center, P.A. is a Texas professional association owned and operated by Dr. Gary Gross with its principal place of business at 5499 Glen Lakes Dr., Ste. 100, Dallas, TX 75231 and has appeared through counsel in this cause.

22.   21. PSF, PLLC d/b/a Family Allergy & Asthma LLC is a Kentucky limited liability company owned and operated by Dr. James Sublett, with its principal place of business at 9800 Shelbyville Road, Ste. 220, Louisville, KY 40223 and has appeared through counsel in this cause.

23.   ~~22.~~ The Joint Council of Allergy, Asthma & Immunology is an Illinois non-profit organization of physicians with its principal place of business at 50 N. Brockway St., Suite 304, Palatine, IL 60067 and has appeared through counsel in this cause.

24.   ~~23.~~ Lyndon E. Mansfield M.D., P.A., a professional association, is a Texas company owned and operated by Dr. Lyndon Mansfield, with its principal place of business at 2121 Wyoming Ave., El Paso, TX 79903 and has appeared through counsel in this cause.

25.   ~~24.~~ Dr. Donald W. Aaronson is an individual residing in the state of Illinois and is the Executive Director of JCAAI, and has specially appeared through counsel in this cause.

26.   ~~25.~~ Dr. Gary Gross is an individual residing in the state of Texas, is the Executive Vice President of JCAAI, and the owner of Dallas Allergy & Asthma Center, P.A., and has appeared through counsel in this cause.

27.   ~~26.~~ Dr. Lyndon Mansfield is an individual residing in the state of Texas, is a member of the Board of Directors of JCAAI, and is the owner of Lyndon Mansfield, M.D., P.A., and has appeared through counsel in this cause.

28.   ~~27.~~ Dr. James Sublett is an individual residing in the state of Kentucky and is the Immediate Past President and a member of the Board of Directors of JCAAI, the Vice President of ACAAI, the owner and founder of PSF, PLLC d/b/a Family Allergy & Asthma LLC, and has specially appeared through counsel in this cause.

29.   ~~28.~~ Dr. David Weldon is an individual residing in the state of Texas and is a member of the board of regents of ACAAI and has appeared through counsel in this cause.

30.   ~~29.~~ Allergy and Asthma Network/Mothers of Asthmatics, Inc. ("AAN" or "AANMA"), formerly known as Mothers of Asthmatics, is a Virginia corporation with its principal place of business at 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182. ~~It can~~

4821-3151-7481.v1

be served through its registered agent, Tonya Winders, 8229 Boone Boulevard, Suite 260, Vienna, Virginia, 22182.  Service of process may also be made in any district where it transacts business.  *See* 15 U.S.C. § 22. and has appeared through counsel in this cause.

31.    30. Tonya Winders is an individual residing in the state of Tennessee and is the Executive Director of AAN and a past officer of Phadia and may be served with process at her residence, 110 Countryside Drive, Hendersonville, TN 37075has appeared through counsel in this cause.

32.    31. James Wallen is an individual residing in the state of Texas and is a representative of AAN, and may served with process at his residence, 28 Stillmeadow, Round Rock, Texas 78664has appeared through counsel in this cause.

33.    32. Dr. Stanley Fineman is an individual residing in the state of Georgia, the Past President and current officer of ACAAI, and a current director of the board of AAN, and may be served with process at his residence, 4042 River Ridge Chase, Marietta, Georgia, 30067.

34.    33. Atlanta Allergy & Asthma Clinic, P.A., a professional association ("Atlanta Allergy"), is a Georgia company owned and operated by Stanley Fineman, and may be served with process through its registered agent, Gregory P. Youra, 1180 Peachtree Suite, Suite 700, Atlanta, Georgia, 30309.  Service of process may also be made in any district where it transacts business.  *See* 15 U.S.C. § 22.

35.    34. Phadia US Inc. ("Phadia") is a Delaware corporation with its principleprincipal place of business at 4169 Commercial Drive, Portage, MI 49002, and has appeared through counsel in this cause.

36.    Thermo Fisher Scientific Inc. ("Thermo Fisher") is a Delaware corporation with its principal place of business at 81 Wyman St., Waltham, MA 02451, and regularly conducts

business in the State of Texas. Thermo Fisher may be served through its registered agent for service of process, Capitol Services, Inc., ~~1675 S State St., Suite B, Dover, Delaware, 19901~~Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, TX 78701-4411. Thermo Fisher is the successor in interest to Phadia US, Inc. through its purchase of that entity in August 2011, and is liable for the actions of its officers, directors, employees, and agents taken on its own behalf and on behalf of Phadia since that time. Service of process may also be made in any district where it transacts business. See 15 U.S.C. § 22.

37.    ~~35.~~ Defendants' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

### BACKGROUND

38.    ~~36.~~ Defendants Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are licensed physicians in their respective states and are in the business of providing allergy care to patients in their area and the places where their practices do business. Defendants operate their businesses either individually, or through professional associations or limited liability companies, which not only provide physician services for allergy care, but also provide support services necessary to provide the allergy care, including Defendants Dallas Allergy and Asthma Center, P.A.; PSF, PLLC; Lyndon Mansfield, M.D., P.A., and Atlanta Allergy & Asthma Clinic, P.A. Drs. Aaronson, Gross, Mansfield, Sublett, Weldon, and Fineman are also members of some or all of the three national trade organizations composed of board-certified allergists, AAAAI, ACAAI, and JCAAI, and act on behalf of those organizations as either officers or board members.

39.    ~~37.~~ The individual defendants market themselves within their sub-specialty as "board-certified allergists," which is a certification a physician obtains from the American Board

of Allergy and Immunology ("ABAI"), a private organization established in 1971. The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine, and who participate in a three-year fellowship in an ABAI training program. Currently there are less than 3,000 board-certified allergists practicing nationwide. The number of fellowships and board-certified allergists is shrinking.

40.    38. Defendant AAN is a "non-profit" organization originally named "Mothers of Asthmatics." Mothers of Asthmatics was formed in 1985 by Defendant Nancy Sander, a mother of an asthmatic child to advance the interests of asthmatic patients who suffer from lack of care to treatment. Nancy Sander served as President of Mothers of Asthmatics until September 2013, when Tonya Winders took over the leadership of that organization, renaming it "Allergy and Asthma Network." Instead of advancing the cause of asthmatic children as the organization was originally formed to do, AAN now acts as a referral network for board-certified allergists who are members of ACAAI and in exchange for payment seeks to advance the market position of board-certified allergists affiliates.

41.    39. Defendant Tonya Winders is the Executive Director of AAN and a former sales representative of Phadia, Inc., a company that employees many board-certified allergists as board members, including Defendant Mansfield. Phadia sells Immunocap tests, otherwise known as "ICAPs." ICAPs are a form of Radio Allergo Sorbent Tests ("RAST tests"), which are blood test that measure levels of Immunoglobulin E (IgE), the allergic antibody, in an effort to test for allergies. While ICAPs are used by board-certified allergists primarily to test for food allergies, Phadia promotes ICAPs to primary care physicians and encourages those physicians to use those tests on their patients who also may suffer from seasonal and perineal allergies, and encourages those physicians to refer those patients who test positive to board-certified allergists

16

for treatment.  In exchange for Phadia's promotion of referrals of patients needing allergen immunotherapy to allergists, AAN, ACAAI, and JCAAI agreed to recommend to insurance companies and physicians that primary care physicians should only use ICAPs as the exclusive form of allergy testing.  The result is that primary care primary care physicians would be restricted to using the allergy blood test on which Phadia maintains a monopoly, and would not be permitted to provide allergen immunotherapy, which would be reserved to specialists.

42.    40. Despite not being certified by ABAI, many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of ABAI.  As explained below, however, there is an important distinction between treating allergy-related symptoms and treating the underlying cause of allergies, the latter of which can only be accomplished through allergy testing and allergen immunotherapy.

43.    41. While the number of physicians who receive ABAI accreditation is shrinking, board-certified allergists and their businesses are still the dominant players in the market for allergy testing and allergen immunotherapy.  Almost every practicing board-certified allergist is in the business of allergy testing and allergen immunotherapy.  Collectively, board-certified allergists as a group participate in more allergy testing and allergen immunotherapy than any other player in the market.

44.    42. Board-certified allergists have the power to influence the marketmarkets for allergy testing and allergen immunotherapy through their trade organizations.  As the national organizations of board-certified allergists, AAAAI, ACAAI, and JCAAI, both individually and

17

jointly are dominant players in the ~~market~~markets for allergy testing and allergen immunotherapy.   AAAAI, ACAAI, and JCAAI, which collectively represent virtually every board-certified allergist in the United States, publish and control the most respected medical journals related to allergy care, and distribute influential allergy practice guidelines that, if misunderstood or misused, can change the shape of the marketplace for allergy-related services.

45.   Based on its significant market share, Phadia has market power, which gives it the ability to influence the markets for allergy testing and allergen immunotherapy both through its massive corporate reach and its decision to work with board certified allergists to achieve their mutual anticompetitive goals.   Phadia itself manufacturers and distributes more than 80% of allergy blood tests sold in the United States and boasts an expansive network of thousands of sales representatives that "call on" physicians nationwide to persuade them to order its ImmunoCap tests.   Furthermore, along with the board certified allergists and their national trade associations with which Phadia conspired, Defendants control over 80% of the market for allergy testing and more than 70% of the market for allergen immunotherapy in which Plaintiffs also compete with them, and an even larger market share in areas where Plaintiffs have been driven from the markets.   Phadia's and Defendants' overwhelming market share for their related services within the market has stood for more than ten years and was only recently threatened by market entrants such as UAS and its primary care physician clients starting in 2009.   In reaction to threats to this market share posed by Plaintiffs, Defendants, including Phadia agreed with each other to engage in the anticompetitive conduct discussed below to drive these competitors out of the market and erect additional market entry barriers, with the ultimate goal to further their attempt to monopolize and monopolization of the markets for allergy testing and allergen immunotherapy.   The result of Defendants' conduct has been the elimination of competition and

18

the increase in market share by Defendants in the markets for allergy testing and allergen immunotherapy in the local geographic markets in the states of Arkansas, Arizona, Colorado, Florida, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

46.   43. The most common method of treating seasonal allergies includes the use of over-the-counter and prescription medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis.  It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States.

47.   44. Despite the temporary usefulness of over-the-counter and prescription allergy medications, these medications do nothing to desensitize or cure the patient, i.e., they fail to address the underlying cause of allergic rhinitis for seasonal and perennial allergies, instead masking the patient's condition by treating the symptoms.  The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens.  Most physiciansPhysicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test or an allergy blood test.  Given travel cost and time considerations, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy.  The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized.  Allergy treatment services are offered in all major cities in the country and in some smaller cities as well.

19

Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health care services, including allergy testing and allergen immunotherapy, close to their homes and workplaces.  The most common method to determine the localized areas where patients travel for such services is use of metropolitan statistical areas, or "MSAs," and micropolitan statistical areas.  MSAs and Micropolitan Statistical Areas are geographic areas defined by the U.S. Office of Management and Budget.  While the market may be a local one, Defendants' actions are aimed at foreclosing an entire class of competitors and Defendants have attempted to impact localized markets in which they practice, and in which board-certified allergists practice, including for example, every localized market in Texas.

## THE MARKETPRODUCT MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

48.     45. To compete in the market for allergy testing and allergen immunotherapy, firms rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees.  The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, vials, needles, and other materials necessary to perform allergy testing and mixing of allergen immunotherapy.  The firms must also be paid for the services performed, either by the patient directly, or by a "third-party payor" ("TPP"), such as a commercial insurance company, a managed care health plan, Medicare, or Medicaid.  Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set

20

maintained by the American Medical Association.   Currently, there is no substitute for either allergy testing or allergen immunotherapy in effectively diagnosing or treating seasonal or perineal allergies.

49.     46. During the testing of a patient, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test.  If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician.  The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the reaction, and the physician reviews the results.  If a firm bills a third-party payor for a skin prick test, the firm does so under CPT Code 95004.  When the physician recommends an allergy blood test, the physician refers the patient to a laboratory that draws the patient's blood and applies an instrument, such as ImmunoCap, which is manufactured by Phadia.  The laboratories, most of which are owned by Quest Diagnostics or Clinical Pathology Labs ("CPL") bills third-party payors under CPT Code 86003.  Allergy testing, through either a skin test or a blood test, as described above, is a necessary prerequisite for a patient to be considered for allergen immunotherapy.

50.     47. If the physician determines that a patient is allergic to an allergen, the physician may recommend allergen immunotherapy to the patient.  Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the allergen immunotherapy is typically mixed by the technician under the physician's supervision.  The allergen immunotherapy is composed of antigens that are mixed with a diluent.  The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance

21

dose." If a firm bills a third-party payor for the mixing of allergen immunotherapy, the firm does so under CPT Code 95165.

51.   48. The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy shots." If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician. Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance that is associated with self-administered allergy shots. Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases. Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers.

52.   49. In 2003, AAAAI, ACAAI, and JCAAI collectively formed a "Joint Task Force" to act as authors and editors of "Practice Parameters," otherwise known as recommendations to their members. The first "Practice Parameters for Allergen Immunotherapy," published in 2003, recommended that board-certified allergists should no longer permit self-administration of allergy shots by patients, except in "exceptional cases in which allergen immunotherapy cannot be administered in a medical facility." Instead, the Practice Parameters recommended that allergy shots should be administered by the physician's technician in the physician's office. The Practice Parameters were the collective response of

22

AAAAI, ACAAI, and JCAAI to the then-common practice of permitting self-administration of allergy shots by many board-certified allergists as well as non-board-certified allergists, including ENTs, board-certified family physicians, board-certified pediatricians, and other primary care physicians.  The Joint Task Force recognized at the time that the trend towards patient self-administration would threaten the business of board-certified allergists, who most benefit from the high margins charged to patients and insurance companies for injections administered in the office, often between $20 and $30 per injection.  Nevertheless, the "Practice Parameters" were only "recommendations" and explicitly stated that they did not intend to supplant the judgment of individual physicians.  Despite the recommendation contained in the Practice Parameters, most physicians, including some board-certified allergists and a majority of ENTs and primary care physicians in individual cases, permit self-administration of allergen immunotherapy for the appropriate patients.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

53.    50. While the number of people who suffer from allergic rhinitis has grown along with the need for allergen immunotherapy, the number of board-certified allergists has declined. It is estimated that only 2-6% of the patients who would benefit from allergen immunotherapy actually receive this therapy.  *See* Exhibit Z to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-57 at 15.  Most specialists, including board-certified allergists, are typically located in large urban or wealthy suburban areas.  This shortage has left rural and poor urban areas largely without access to allergy testing and allergen immunotherapy.  In addition to location, cost is an issue as well.  The high cost of these treatments also decreases the ability of poor and rural patients to receive the necessary treatments, as does the requirement by most board-certified allergists that patients travel to and pay for shot administration in the office.

4821-3151-7481.v1

54. ~~51.~~ In 2009, Plaintiff United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL." UAL's business model represented a response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services. While some board-certified family physicians, board-certified pediatricians, and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Notably, purchasing and stocking the necessary allergy testing equipment and antigens for immunotherapy, as well as training and maintaining technicians to assist in administering tests and mixing immunotherapy, is an expense that usually prevents most primary care physicians from providing allergy testing and allergen immunotherapy. UAS helps physicians and their businesses overcome this economic barrier by contracting with those businesses to assist those business's entry into the market. Since 2009, UAS has assisted more than 2,000 providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy.

55. ~~52.~~ As part of the contractual relationship between UAS and physicians, practice groups, and hospitals, UAS is responsible for all of the non-physician services necessary to compete in the market for allergy testing and allergen immunotherapy, including the equipment, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry. UAS trains and provides technicians to assist physicians in the medical practice of allergy testing and allergen immunotherapy. Those technicians are located by UAS, and are required to meet more rigorous standards than the technicians typically relied on by the businesses of board-certified allergists, including engaging and passing a program concerning allergy testing and allergen immunotherapy administered by

24

4821-3151-7481.v1

the University of the Incarnate Word School of Nursing.  Physicians rely on the services of UAS employed technicians to personally provide allergy care to the patients that the physician determines may benefit from this treatment.  This includes the physician supervising the provision of and reading the allergy test, consulting the patient on the potential for allergen immunotherapy in response to positive test, and supervising the mixing of antigens for treatment through allergy shots for patients who are amenable and have consented to treatment.

56.   53. Together, primary care physicians and UAS have provided a less expensive and more widely available alternative for consumers than the businesses of board-certified allergists and Phadia in the market for allergy testing and allergen immunotherapy.  The entry of at least 2,000 additional primary care physicians since 2009 in the localrelevant geographic markets of 25 states, including Texas,[1] for allergy testing and allergen immunotherapy has begun to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but currently go untreated.  Those primary care physicians who have entered the market offer a lower-cost option to patients, are more conveniently located to the patients, and have shorter wait times for an appointment and shorter wait times in the office.  Those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or from incurring the expense of taking off work or school to travel to a medical facility for shot administration.

57.   54. Third-party payors, especially commercial carriers, have also benefitted from this lower cost option of competitors.  Lower reimbursement rates for primary care physicians as compared to specialists result in a significantly lower cost for allergy testing as billed under CPT

---

[1]  UAS currently contractshas contracted with physicians in 25 states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. The MSAs applicable to those states can be found at http://www.census.gov/population/metro/data/def.html.

Code 95004, the mixing of allergen immunotherapy as billed under CPT Code 95165, and a substantial reduction or elimination of costs billed for shot administration under CPT Codes 95115 and 95117.   Additionally, the system as a whole has benefitted from the increased utilization of allergen immunotherapy, which studies have shown reduces the overall costs to patients and third-party payors in terms of expenses for medication, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by allergen immunotherapy.

58.    55.-Nevertheless, when board-certified allergists began discovering that primary care physicians in their local communities were practicing allergy testing and allergen immunotherapy (particularly in combination with UAS) instead of referring those patients to the businesses of board-certified allergists, many became upset at the entry of additional competitors.  These allergists, which included members of JCAAI, AAAAI and ACAAI, as well as state trade organizations such as TAAIS, began to complain to the leaders of those organizations about this increase in competition.

## MEDICAL BOARD COMPLAINTS

59.    56.-Defendants' first line of attack against the competition for allergy testing and allergen immunotherapy was to attack the non-allergist physicians directly.  Defendant Gary Gross revealed to Defendants Aaronson, Sublett, and Fineman that if a primary care physician is concerned with the loss of his or her license, it may reduce any financial incentive to compete.  Additionally, Gross suggested that they should find out if any primary care physicians had been dropped by UAS—as that information would be helpful to provide to medical boards and third party payors—or insurance companies.

26

60.   57. To this end, Defendants conspired to file or cause others to file false medical board complaints against primary care physicians who work with companies like UAS, and then to influence the medical board's consideration of those complaints unjustly. The first of the complaints were filed by Dr. Michael Vaughn, an ACAAI member and a board-certified allergist in private practice in San Antonio, Texas. Dr. Vaughn discovered that these once referring family physicians were now competitors because UAS was providing those physicians with the necessary support services to provide patients with allergy testing and allergen immunotherapy. Dr. Vaughn filed the complaints with the Texas Medical Board ("TMB") in the summer and fall of 2010, alleging that certain physicians practicing in San Antonio, Texas were practicing allergy testing and allergen immunotherapy outside of their scope of practice, without proper training, and were inappropriately permitting patients to self-administer the allergy shots. After filing the complaints, Dr. Vaughn attended the November 16, 2010 Annual Meeting of ACAAI and on that date made a presentation to the ACAAI Board regarding the entry of additional competitors in the San Antonio market for allergy testing and allergen immunotherapy. Dr. Vaughn reported this information to the ACAAI Board, which agreed to write a letter to the TMB discouraging the practice of physicians relying on allergy services companies like UAS to provide allergy testing and allergen immunotherapy. Following this presentation, the ACAAI Board agreed by consensus to send a letter of appreciation to Dr. Vaughn for his presentation.

61.   58. After learning of Dr. Vaughn's complaints, Defendants encouraged all board-certified allergists to complain to the TMB if they discovered any primary care physicians practicing allergy testing and allergen immunotherapy with the assistance of UAS. In a December 2010 Texas Allergy, Asthma & Immunology Society ("TAAIS") newsletter, Dr. Weldon openly solicited board-certified allergists in Texas to report physicians who partner with

27

companies like UAS to the TMB. That newsletter was a collaborative effort by the leadership of TAAIS and board members of ACAAI and JCAAI, including Dr. Weldon and Dr. Mansfield, respectively. The complaints to the TMB about primary care physicians practicing allergy testing and allergen immunotherapy included claims that those physicians were not qualified to provide such care, were providing substandard care by relying on support services from UAS, and were permitting patients to self-administer their allergy shots, which Defendants term "home immunotherapy."

62. 59. In addition to encouraging complaints to the TMB, Defendants also attempted to influence the TMB's consideration of those complaints. On March 31, 2011, the ACAAI board sent a letter to the TMB regarding "specific practices of allergy by non-allergists." This letter was approved by the ACAAI Board on Dr. Fineman's motion during the March 23, 2011 ACAAI Executive Committee meeting. The TMB letter cited extensively from "Allergen immunotherapy: A practice parameter third update," misleadingly referring to this joint publication by JCAAI, ACAAI, and AAAAI as the "standard of care" despite disclaimers in that publication and the fact that there is no nationally accepted standard of care for allergen immunotherapy. Due in part to the Defendants' conspiracy, the joint publications of JCAAI, ACAAI, and AAAAI continued to discourage patient self-administration of allergen immunotherapy, which Defendants had identified as a threat to their business model.

63. 60. In addition to outside attempts to influence the complaints, certain Defendants, specifically Dr. Gross, Dr. Mansfield, and Dr. Weldon, attempted to use their positions as volunteer "expert reviewers" for the TMB to improperly influence the TMB's consideration of the complaints. Despite being made aware of the complaints by Dr. Vaughn and other colleagues and encouraging the filing of additional complaints, Dr. Gross, Dr.

4821-3151-7481.v1

Mansfield, and Dr. Weldon failed to disclose this information and their conflict of interest to the TMB, a violation of their agreements with TMB and Texas State Law.

64. 61.—Despite Defendants' attempts to influence TMB, the TMB dismissed complaints against primary care physicians practicing allergy testing and allergen immunotherapy. The TMB's rulings specifically found that primary care physicians may practice allergy testing and allergen immunotherapy under Texas Medical Practices Act. The rulings also found that the physician's decisions to permit their patients to self-administer allergy shots does not violate the standard of care. After receiving these negative rulings, Defendants worked with other board-certified allergists in Texas in an attempt to alter future TMB decisions by volunteering as expert reviewers, included Defendants Dr. Gross, Dr. Mansfield, and Dr. Weldon, as well as their colleagues Dr. William McKenna, Dr. Wesley Stafford, and Dr. Theodore Freeman. Defendants and/or their co-conspirators also attempted to influence a TMB board member, Dr. Hari Reddy, also a JCAAI, ACAAI, and AAAAI member. Despite the actions of Defendants, the TMB never agreed with Defendants' recommendation that primary care physicians are not qualified to practice allergy testing and allergen immunotherapy or that self-administration of allergy shots is a violation of the standard of care.

65. 62.—Defendants' complaints and actions directed at the TMB are not the basis of the claims in this Complaint, but help explain Defendants' motivation to turn to illegal activity to accomplish the result they were unable to obtain through TMB complaints. As Dr. Weldon explained in an email to the leaders of TAAIS about losing the fight at the TMB level: "We need to survive our specialty. We need to capture the attention of our non-allergist colleagues. We need to get managed care to understand the differences provided by a ABAI BC allergist. If we don't, then we are dinosaurs waiting for the inevitable. Judging from the most recent

4821-3151-7481.v1

response by the TMB in favor of the family practitioner who was practicing allergy, I would say we are fading fast." *See* Exhibit Y to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-55 at 2.

### CONSPIRACY TO RESTRICT COMPETITION IN THE ~~MARKET~~MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

66.   ~~63.~~ The evidence already in the record attached to Plaintiffs' Motion for Preliminary Injunction demonstrates the illegal activities that form the basis of this Complaint, specifically an agreement among the Defendants to restrain trade and restrict competition in the market for allergy testing and allergen immunotherapy in local areas throughout the United States and to tortiously interfere with AAAPC members and UAS's contracts and prospective business relations.

67.   ~~64.~~ The agreement to restrict competition in the practice of allergy testing and allergen immunotherapy began after Defendants learned of UAS and the entry of primary care physicians into the market in areas within Texas. Defendants and other board-certified allergists in markets nationwide commonly referred to these competitors, specifically primary care physicians who practice with the support of UAS, as the "remote practice of allergy," "RPA," or "remote allergy." The term was originally adopted by board-certified allergists and their trade associations in reference to allergen immunotherapy that was remotely provided to competitor physicians by off-site mixing labs, but came to include the practice of primary care physicians who rely on a UAS technician to assist in allergy testing and allergen immunotherapy. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-29. AAN, Phadia, and their representatives and co-conspirators also adopted the term in their efforts in partnering with AAAAI, ACAAI, and JCAAI ~~to boycott primary care physicians practicing allergy testing and~~

30

allergen immunotherapy with the assistance of UAS and other allergy services companies~~in responding to this competitive threat.~~

68. ~~65.~~ To respond to this rise in competition of primary care physicians and allergy services companies, in 2009, ACAAI created its "Marketing the Allergist Campaign" as part of an initiative to ensure that allergy specialists did not lose market share to new entrants. Dr. Mansfield represented to the Board of Directors and Committee Chairs of TAAIS on May 1, 2009 that ACAAI's newly minted Marketing the Allergist Campaign was making a "strong effort" to respond to increasing frustrations "with losing business to other specialists." *See* Exhibit B-3 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-3.

69. ~~66.~~ By 2010, the conspiracy grew into a concerted effort to remove the economic incentive of their competitors to provide allergy testing and shots by attempting to cut off the main source of funding to these competitors, namely insurance companies and managed care health plans, otherwise known as third party payors. Without reimbursements from third party payors, the board-certified allergists' competitors would be unable to compete in the market for allergy testing and allergen immunotherapy. Leaders of TAAIS, including Dr. Mansfield and Dr. Weldon agreed that the organization should contact physicians and third-party payors in an effort to convince them not to do business with UAS. To that end, those board-certified allergists began drafting letters that would be disseminated on behalf of TAAIS to all physicians and third-party payors in Texas denouncing the practices of these competitors. *See e.g.* Exhibit J to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-38.

70. ~~67.~~ In the midst of drafting these letters, Defendants began contacting insurance companies directly. Original attempts began with phone calls to individual insurance companies following Defendants' agreement that they should convince insurance companies not to pay or to

31

restrict reimbursement to their non-allergist competitors.  In coordination with Dr. Mansfield and

Dr. McKenna, and in accordance with Defendants' agreement, Dr. Victor Estrada, a then TAAIS

Board Member and board-certified allergist in private practice in San Antonio, Texas spoke with

a representative of Humana of Texas ("Humana"), a conversation he documented in an email to

Dr. Mansfield and Dr. McKenna on June 5, 2010.  *See* Exhibit J to Plaintiffs' Preliminary

Injunction Motion, Dkt. No. 12-38.  According to Dr. Estrada, Humana was engaged in "red-

flagging claims with certain codes coming in by primary care offices and are considering their

options, such as, denying payment, considering charges as out of network, and even asking for

their money back on previously paid claims." *Id.* at 2.  Dr. Estrada expressed the hope that this

would occur with all of the major carriers and "maybe some changes coming." *Id.*  Dr.

McKenna remarked on the "great news," and the three doctors continued to discuss a letter to

insurance companies that would encourage them not to pay competitors who are not board-

certified allergists. *Id.* at 1.

71. 68. In September, 2010, Dr. Weldon engaged in a 45 minute conversation with an

official at Blue Cross/Blue Shield of Texas ("BCBS Texas"), in which he told her to "suspect

and to watch for abuse by primary care physicians" who practice "remote allergy" and that "she

needed to have her organization look into" only allowing board-certified allergists to test and

prescribe allergen immunotherapy.  Dr. Weldon documented this conversation in an email to his

fellow TAAIS board member and allergist colleague, Dr. William McKenna.  *See* Exhibit K to

Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-39.  In Dr. Weldon's email, he explained

that: "If it all pans out, we may be in for what we wanted… [I]f something GOOD comes of this,

then perhaps all of this prescribing over the internet (remote practice) and inappropriate billing

(and thus, making it economically unfeasible for competitors) will subside and we will again be

32

able to look at ourselves as 'The Allergist' and not have to share that title with some nitwit technician in an ENT practice." *Id.* at 2 (emphasis added).

72. ~~69.~~ On September 25, 2010, the TAAIS Executive Director, Connie Mawer, circulated an Agenda and Reports for a September 28, 2010 conference call among the TAAIS Board Members and Committee Chairs, including their consideration of letters to be drafted and sent to insurance companies and primary care physicians throughout the State of Texas about their competitors. *See* Exhibit D-11 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-16. On September 26, 2010, Dr. Weldon responded in an email to the TAAIS Board and Committee Chairs regarding the need for letters to the market stating: "This is a turf war folks, like it or not, and it looks like we need to take a stand right now for our profession or else return to practicing primary care medicine (with a side of allergy, perhaps)." *Id* at 2.

73. ~~70.~~ The TAAIS Board, including Dr. Weldon, met on September 28, 2010 and according to the meeting minutes, "discussed a draft letter to PCPs [primary care physicians] developed by a small Ad Hoc Committee which informs [them] of 'allergy companies' popping up in Texas and marketing allergy skin testing and immunotherapy to [primary care] practices. This letter is currently under legal review." *See* Exhibit D-12 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-17. The Board also agreed to send voting delegates to the ACAAI November 2010 Annual Meeting in Phoenix, Arizona to present the letter concerning primary care physicians and "Texas scope of practice issues." Dr. McKenna also suggested "that the first draft letter could be revised to also be sent to third party payors." *Id.*

## AAAAI, ACAAI, AND JCAAI JOIN THE CONSPIRACY

74. ~~71.~~ On September 30, 2010, Dr. Weldon forwarded a draft of the TAAIS letter to primary care physicians via email to certain officers and members of the board of directors of

33

AAAAI, ACAAI, and JCAAI, including Dr. Aaronson.   *See* Exhibit D-9 to Plaintiffs'
Preliminary Injunction Motion, Dkt. No. 12-14.   Starting off his email, Dr. Weldon stated
"Welcome to our world in Texas – this is what I've been beating my chest about for the past few
years and for which we have been unable to counter.  Call them charlatans or whatever — unlike
the monsters under our beds of our youth, they DO exist."  *Id.*  Dr. Weldon's email expressed a
desire to expand efforts in furtherance of their conspiracy and attempt to convince managed care
organizations to stop paying, refuse to credential or accredit, or reduce reimbursement for their
non-board-certified allergist competitors who are supported by UAS.   He called for the
leadership of the three national organizations "to partner with managed care to deter [the
competition]."  *Id.*  The intentions behind his call to action were clear.  He continued, "If we stop
the economic incentive by showing that we 'do it better', then we may get the upper hand in this
mess.  Yet if we bury our minds in the academia of interleukins and hope that the competition
will just 'go away,' then we will find ourselves out of a job."  *Id.*

   75.   ~~72.~~ On November 12, 2010, the TAAIS delegates to the ACAAI Annual Meeting
raised their concerns over the encroachment by non-board-certified allergists into the market for
allergy testing and allergen immunotherapy to the ACAAI Board of Regents.   A presentation
was given "about the difficulties in San Antonio with the practice of allergy by non-allergists."
*See* Exhibit C-3 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-6.   The presentation,
which is attached to the minutes of the ACAAI House of Delegates meeting specifically
identifies UAS, then doing business as "United Allergy Labs (UAL)" which Dr. Vaughn stated
"provides the PCP [primary care physician] with one of their 'trained' allergy testing technicians
that work out of the PCP's [primary care physician's] office (but is a UAL employee)."  *Id.* at 3.
Following the presentation, "[a] motion was made and passed to refer this problem to the Board

34

of Regents for action. The JCAAI is already aware of the issue and has given advice to the Texas Allergy Society." *Id.* at 1.

76. ~~73.~~ The referenced advice of JCAAI to the Texas Allergy Society occurred at the November 2010 Annual Meeting, where Dr. Aaronson relayed to Dr. Weldon concerns of JCAAI's outside counsel about the TAAIS letter to primary care physicians, including that it was too targeted at a particular company. *See* Exhibit E-5 to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-26] at 3.

77. ~~74.~~ A week later, on November 19, 2010 Dr. Weldon sent an email to the Board of Directors of TAAIS to give them a report on the ACAAI House of Delegates Meeting. *See* Exhibit D-10 to Plaintiffs' Preliminary Injunction Motion, Dkt. 12-15. Dr. Weldon explained that he asked the ACAAI "to delay any recommendations until we have had the opportunity to ponder a definite plan of action." *Id.* Dr. Weldon expressed his opinion that the ACAAI "should bring back revisions of the position statements, especially regarding 'Remote Practice of Allergy.'" *Id.* Dr. Weldon explained the reasoning behind doing so: "***Taking it one step further, if PCPs who practice allergy are not reimbursed because of questionable practices, and their patients are then having to absorb the costs of SLIT or watered-down SCIT given at home, then more than likely their allergy practices will fade.***" *Id.* (emphasis added). To accomplish this assault on the payment of competitors, Dr. Weldon explained that allergists could use the joint standards of AAAAI, ACAAI, and JCAAI to "educate manage care organizations of this threat and of the current (and near future) practice parameters of immunotherapy and diagnostic allergy testing. If managed care believes that a 'standard of care' equates with current practice parameters, we may have a foothold in order to launch our cause." *Id.* at 1-2. Dr. Weldon also revealed that he "talked with Lynn Mansfield at the meeting and he

35

does not want 'the letter issue dropped – he still feels it is a worthwhile effort to be pursued." *Id.* at 2. Dr. Weldon also suggested that the board-certified allergist organizations should encourage their membership to "flood journals with articles regarding safety issues and reports of adverse reactions." *Id.* Revealing the economic motivation for these actions, Dr. Weldon explained that "for those of us in private practice, we have a lot to lose if we do not take a stand and 'protect our turf'" *Id.* Dr. Weldon concluded his email by suggesting that the issues he raised were ones "that I feel we need to consider seriously and then dialogue over e-mails instead of taking up telephone time during quarterly board meetings." *Id.*

78. ~~75.~~ On November 19, 2010, Dr. Abramson, the then President of TAAIS, responded to Dr. Weldon's email by replying to him and the entire TAAIS Board stating "David, you are welcome to do whatever you like as an individual, as are others in TAAIS," with the rest of the sentence redacted by TAAIS as referencing their legal opinion. *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-18 at 3. By that time, TAAIS had received its legal review back from Jeff Henry, a lawyer in private practice in Austin, Texas, regarding the proposed letters to primary care physicians. Mr. Henry's "legal opinion" was to "'not send' due to liability and anti-trust [sic] issues." *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-40] at 1. Dr. Abramson went on to reject Dr. Weldon's request for a written record of their plan, stating "I feel strongly that we should have these discussions on conference calls, not e-mails." *Id.*

## ACAAI AND TAAIS AGREE TO WRITE LETTERS TO THIRD PARTY PAYORS

79. ~~76.~~ On the morning of November 22, 2010, Dr. Weldon responded directly to just Dr. Abramson's email to him about the letter issue stating "If you wish to handle this specifically by phone conferences, then that is how we will handle it. However, I am currently on the Board

36

of Regents for the ACAAI and I request that you please also consider our opinions on this matter." *See* Exhibit O to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-45] at 1.  That same day, Dr. Abramson responded to Dr. Weldon's email accepting Dr. Weldon's request, stating "We want to be on the same page with the ACAAI Board of Regents as well." *Id.*  The email prompted Dr. Weldon to respond back, "It's too bad we can't find a lawyer that will have the same opinion as we do – the other 'allergists' do." *Id.*

80. ~~77.~~ On November 23, 2010, Dr. McKenna, the past-president of TAAIS, responded to all of the TAAIS Board of Directors concerning his disappointment "that our grand effort, to communicate to PCPs about the dastardly allergy marketing company techniques, is of course dead in the water." *See* Exhibit D-13 to Plaintiffs' Preliminary Injunction Motion [Dkt. 12-18] at 6.  Dr. McKenna then proposed to the TAAIS Board "two actions."  First, TAAIS would send "a communication to TAAIS membership of our attempted effort and result of due diligence," including the legal opinion of its private lawyer and the advice of JCAAI's lawyer Dr. Aaronson passed on to Dr. Weldon. *Id.*  "Second, as was our intent at the outset, the next effort was to inform TPPs of the same issue and this still should be done."  Dr. McKenna acknowledged that "some of you have expressed this also," and pledged to work with those Board members, namely "David Weldon, Lyndon [Mansfield], Victor [Estrada] and any others toward this next step." *Id.*

### AAAAI, ACAAI, AND JCAAI AGREE TO FORM "RADAR" FOR PURPOSES OF RESTRICTING COMPETITION

81. ~~78.~~ While the letters in Texas were still under discussion, the conspiracy continued to grow on the national stage.  Following the TAAIS delegation's plea to the ACAAI House of Delegates about the entry into the market for allergy testing and allergen immunotherapy by primary care physicians relying on allergy services companies including

UAS, all of the national allergy organizations responded.  Specifically, as a result of that meeting, the leadership of AAAAI, ACAAI, and JCAAI agreed to a concerted effort and joint agreement to fight back against these new competitors.  The organizations jointly agreed to form "RADAR," or the "Regional Advocacy Discussion and Response" initiative, a joint task force aimed at addressing the encroachment of competitors on their turf of allergy testing and allergen immunotherapy.  The purpose of this initiative was to recruit and train select local allergists in advocacy and other skills, such as persuading, enticing, or coercing third-party payors, so that the national associations could coordinate their efforts to restrict access to the market from the top down.

82.   ~~79.~~ The forming of RADAR was a result of the meeting of the leadership of the AAAAI RSLAAIS Assembly and the ACAAI House of Delegates at the ACAAI Annual Meeting, where those leaders "reviewed a plan to develop a more robust infrastructure to assist state/local AAI [allergy, asthma, and immunology] societies in addressing local issues." *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-25.  Subsequent to that meeting, "[i]n December 2009, the AAAAI Federation of Regional, State and Local AAI Societies (RSLAAIS) Assembly held a series of conference calls with state and local AAI society leaders to identify issues of concern to practicing allergists.  Several common concerns were expressed by allergists around the country.  Those included:…. Encroachment- Non-allergy providers representing themselves as trained A/I specialists… [and] Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.*

83.   ~~80.~~ As a result of those conference calls with allergists around the country, in or around late December or early January 2011, three members of the AAAAI Board, Dr. Daniel Steinberg, Dr. Jim Tracy, and Dr. Sharon Marks, met with the ACAAI House of Delegates.  The

AAAAI Board members' report from the meeting with ACAAI was documented in a January 5, 2011 email from the AAAAI President, Dr. Mark Ballow, to the three AAAAI representatives, copying the rest of the AAAAI Board.  *See* Exhibit H to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 12-36].  Dr. Ballow stated "Thank you for sharing the outcome of the recent joint meeting between yourselves and the ACAAI House of Delegates.  As you know, we have made a concerted effort to collaborate with the College [ACAAI] and this is another good example of the possibilities for strengthening our relationship.  We greatly appreciate the work that has gone into the Regional Advocacy Discussion and Response (RADAR) initiative." *Id.* at 1.  Attached to the email was a document titled "AAAAI Ongoing Activities Relevant to the Regional Advocacy Discussion and Response (RADAR) Initiative January 2011." *Id.* at 3-5. Among the activities detailed was "Fiscal Realities, Ongoing efforts through national organizations" and "Ongoing communications with insurance companies about appropriate reimbursement for specialty care." *Id.* at 4.  Other activities included addressing "Encroachment by non-allergists" explaining "Ongoing communication with insurance companies allows the specialty to be represented in discussions about appropriateness of care." *Id.* at 5.  AAAAI's Winter Meeting took place a few days later on January 9, 2011 in Chicago, in which these topics were discussed. *Id.* at 1.

84.  ~~81.~~ As a result of all of these meetings of the national and state allergy organizations, on February 8, 2011, AAAAI, ACAAI, and JCAAI issued a letter to Regional, State, and Local Allergy Society Leaders throughout the country seeking to recruit local representatives to carry out RADAR's mission.  *See* Exhibit E-4 to Plaintiffs' Preliminary Injunction Motion, Dkt., No. 12-25.  The letter was drafted on the joint letterhead of all three national associations, and executed by their joint leadership, including Dr. Sublett, as acting

39

President of JCAAI. Among the issues to be addressed by the RADAR initiative were the two issues where these organizations agreed to contact insurance companies, specifically: "Encroachment- Non-allergy providers representing themselves as trained A/I specialists" and "Changing healthcare environment- Tactics to position A/I specialists in the evolving healthcare model." *Id.* The letter requested that each regional, state, and local society identify two individuals to serve as points of contact "to be trained to serve as conduits accessible by all three national organizations to channel information on issues impacting A/I patients and the physicians who serve them." *Id.*

## TAAIS JOINS RADAR AND TAKES ANTICOMPETITIVE ACTION

85.   82. On February 12, 2011, Dr. Weldon sent an email to the TAAIS leadership calling for their involvement in the national RADAR initiative. *See* Exhibit Y to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-55. He wrote that "the initiative [was] going to demand the concerted attention of all organizations," in order to address "the survival of [their] specialty." *Id.* at 2. In a particularly impassioned plea, he stated that "it is OUR field that stands to disappear if we do not step up to the plate for it." *Id.* at 4. The President of TAAIS, Dr. Abramson, thanked Dr. Weldon for his "thoughtful comments," and promised to follow up "regarding planned actions, including . . . efforts with RADAR." *Id.* at 1.

86.   83. In line with its pledge to be on the same page as the ACAAI Board and in participation with RADAR, the TAAIS leadership resumed their letter writing campaign and rewrote the letters to primary care physicians to be more "informational" in nature. *See* Exhibit L to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-40. The minutes of the February 22, 2011 Executive Committee Conference Call indicate that such revisions were specifically made to address the earlier legal opinion advising TAAIS "not to send" due to "liability and anti-trust

40

[sic] issues." *Id.* However, no attempt was made to change the letters to third-party payors to conform to the legal opinions TAAIS had previously received. The letters to third-party payors that existed at the time were blunt, encouraging them to review and deny competitor physicians' claims for reimbursement, and referring to those physicians' reliance on UAS for support services as the "remote practice" of allergy, which was represented to be "at best of poor quality and at worst… fraudulent." *See* Exhibit R to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-48. The letters also suggested that insurance companies should "control" the practice of allergy testing and allergen immunotherapy by non-allergists by "economic means," and offered that board-certified allergists should be relied on to review the claims of non-allergists, in an attempt for Defendants to gain control over the payment and prices of allergy testing and allergen immunotherapy. *Id.*

## DEFENDANTS INTIMIDATE ALLERGISTS AND PRIMARY CARE PROVIDERS ASSOCIATED WITH UAS

<u>87.</u>   84. By this time, Defendants had already begun to resort to persuade, coerce, and intimidate to carry out their conspiracy to orchestrate a group boycott of <u>and restrict competition and output from</u> UAS's services by board-certified allergists. For example, through their breach of confidence at the TMB, Defendant Dr. Weldon and his co-conspirators learned that Dr. Allen Kaplan, who is a former AAAAI president, was listed as a UAS Advisory Board member. On March 19, 2011, Dr. Weldon questioned Dr. Kaplan about his relationship with UAS. After discussing a course of action with Dr. Weldon, Dr. McKenna wrote to Dr. Kaplan in an email dated March 24, 2011. In that email, Dr. McKenna falsely claimed that he was investigating a claim of malpractice against UAS on behalf of the TMB. Dr. McKenna also mentioned his substantial credentials within the allergy community, referenced his awareness that Dr. Kaplan was listed as an advisor for UAS, and asked Dr. Kaplan if he could comment about a complaint

41

made to the TMB. All this was in an attempt to intimidate Dr. Kaplan and to cause him to terminate his advisory relationship with UAS or risk being ostracized from the allergist community. After the email discussion between Dr. Kaplan and Dr. McKenna, as well as a verbal discussion between Dr. Kaplan and Dr. Weldon, Dr. Kaplan terminated his agreement with UAS. Updates about the investigation into Dr. Kaplan's cooperation with UAS made their way up the chain in the national allergist associations, eventually reaching the Executive Medical Director of ACAAI, Dr. Bob Lanier. Subsequently, allergists have continued to pressure their colleagues to avoid forming relationships with UAS.

88. 85. Around the same time as the Defendants' intimidation of Dr. Kaplan, certain Defendants additionally intimidated providers either already in contract or in negotiations with UAS. Representatives of Defendant Atlanta Allergy, including Defendant Fineman, met with one such provider, regarding the services of UAS and convinced them not to contract with UAS. Following this successful interference of a pediatric practice and clinic in Georgia, Atlanta Allergy began investigations to collect and retrieve materials of UAS in order to contact additional clinics and third party payors. Defendant Fineman even bragged to other allergists, including Defendant Sublett, that his company, Defendant Atlanta Allergy, was "successful in explaining to a local Peds group why they shouldn't institute this in the[i]r office."

## NATIONAL ORGANIZATIONS ENCOURAGE AND PARTICIPATE IN TAAIS'S ANTICOMPETITIVE CONDUCT

89. 86. During this time, JCAAI's leaders also privately encouraged TAAIS in its letter writing campaign, but publicly maintained the opposite. In the March 16, 2011 JCAAI News You Can Use Newsletter, which was drafted by Dr. Aaronson and executed and sent under the signature of Dr. Sublett to JCAAI members across the nation, including Texas, JCAAI members were informed that "JCAAI's legal advisors [had] repeatedly warned . . . against

42

actions which might be considered *restraint of trade* – such as writing letters to the primary care physicians or commercial companies (especially on local allergy society stationery) condemning such unscientific behavior." *See* Exhibit C-5 to Plaintiffs' Preliminary Injunction Motion at 2, Dkt. No. 12-7 (emphasis in original).

90. 87. Nevertheless, in an April 4, 2011 email to the leaders of the Greater Houston Allergy and Immunology Society (GHAIS), Dr. Abramson, the then President of TAAIS, explained that "TAAIS has been aware of the 'scope of practice' issues surrounding various laboratories, including Smart Allergy and United Allergy Labs for more than several months." *See* Exhibit N to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42 at 1. As Dr. Abramson continued, "We have drafted 2 letters—one for PCP's and one for 3rd party payers." Further explaining, Dr. Abramson stated "The Joint Council (JCAAI) is aware of our work in this area—there are significant medicolegal issues involved" referencing the JCAAI's prior newsletter. Dr. Abramson also revealed that "[a]t the AAAAI meeting, Bob Lanier, Executive Director for the ACAAI, complemented me on TAAIS efforts." As a result of this encouragement from the national organizations, Dr. Abramson explained "So, TAAIS has been a leader nationally in this effort, and we will continue to press forward with this effort."

91. 88. In line with the private and secret encouragement of TAAIS, JCAAI approved the TAAIS letters. On or about May 4, 2011, then TAAIS President Dr. Abramson emailed Dr. Sublett to seek JCAAI's comments on TAAIS's letters to primary care physicians and third-party payors. *See* Exhibit P to Plaintiffs' Motion for Preliminary Injunction [Dkt. 12-46] at 2. As Dr. Abramson explained in his email to Dr. Sublett, "As you are aware, there are several laboratory entities that are encroaching on the practice of allergy by advertising their services to physicians as a way of replacing referrals to allergists." *Id.* In reference to the prior JCAAI opinion Dr.

Aaronson relayed to Dr. Weldon in November 2010, Dr. Abramson stated "Our initial letters had a tone that was felt to be too targeted to a company and therefore could be construed as a restraint of trade statement." *Id.* In response, Dr. Sublett relayed to Dr. Abramson the email and edits of Rebecca Burke, outside counsel for JCAAI. *Id.* at 1. Dr. Sublett then stated "I hope this helps. Good luck on your endeavors." *Id.* As a result of that communication, Dr. Abramson emailed the TAAIS Executive Committee reporting on the "Good news" and suggesting that the letters were ready to go out.

92. 89. Despite having quietly approved the TAAIS letters to primary care physicians and insurance companies, JCAAI leadership attempted to cover up their involvement by publicly representing to its members in a June 8, 2011 newsletter drafted by Dr. Aaronson and Dr. Sublett that JCAAI had recommended that the letters "be withdrawn because [they] could raise antitrust issues." *See* Exhibit E-10 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-27. The public newsletter, signed by Dr. Sublett and distribute to JCAAI members, including members in Texas, was met with confusion by TAAIS Board Members, who understood JCAAI to have approved the letters. On June 9, 2011 Dr. Robert Mamlok expressed this confusion to TAAIS Executive Director, Connie Mawer, who recalled in an email to Dr. Mamlok and Dr. Abramson that the letter referenced "was approved by the JCAAI." *See* Exhibit E-11 to Plaintiffs' Motion for Preliminary Injunction at 1-2, Dkt. No. 12-28.

93. 90. By this time, ACAAI leadership had also given their seal of approval on the TAAIS letters. *See* Exhibit N-Part 1 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-42. AAAAI also received and reviewed the letters on August 10, 2011 just before they were to be released to the public. The letters were discussed in connection with an AAAAI Executive

44

Board Agenda item, item X or 10, specifically relating to UAS. *See* Exhibit No. Q to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-47.

94. ~~91.~~ At that time, the letters were set to go out to executives and representatives of insurance companies and third-party payors in Texas, including representatives of Aetna, BCBS Texas, Cigna, Texas Medicaid & Healthcare Partnership (TMHP), Trailblazers Health Enterprises, UniCare, United Healthcare, and Valley Baptist Health Plans. *See* Exhibit S to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-49 at 8. To avoid revealing the true target of the letters and thus <u>subjecting themselves to</u> antitrust scrutiny, Defendants and TAAIS planned to follow up the letters with phone calls identifying UAS as the subject of the letters. *See* Exhibit T to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-50. The purpose of the phone calls instead of identifying UAS in writing was "Because of 'restraint of trade issues'" Defendants "cannot more directly attack UAL." *Id.* Dr. Abramson employed this same strategy previously suggested by Defendants JCAAI, Dr. Aaronson, and Dr. Sublett, sending the letters to Tom Banning, the Executive Director of the Texas Academy of Family Physicians on August 9, 2011, and following up that communication orally representing in a phone conversation that the letters pertained to physicians relying on the services of companies like UAS.

## STATE COURT INJUNCTION AGAINST TAAIS ACTION

95. ~~92.~~ On August 11, 2011, after discovering that the letters had been sent to Mr. Banning, UAS filed suit and obtained a Temporary Restraining Order ("TRO") against further publication of the letters to insurance companies. *See* Exhibit U to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-51. On June 11, 2012, an agreed temporary injunction was entered to replace the TRO, and that temporary injunction stayed in place until an Agreed Permanent Injunction was issued as part of a settlement on February 1, 2013. *See* Exhibits V and

W to Plaintiffs' Preliminary Injunction Motion, Dkt. Nos. 12-52 and 12-53.  The Injunction prohibits TAAIS and the individual defendants, who included various TAAIS board members and board members of the national allergist associations, from participating in or encouraging efforts to convince insurance companies or physicians not to do business with or pay the defendants' competitors.   For a period of time Defendants suspended some of their anticompetitive conduct, but later resumed that conduct on a national level.

## DEFENDANTS RESUME CONTACTING THIRD PARTY PAYORS

96.  93. Despite the existence of temporary and permanent injunctions against their co-conspirators, Defendants ultimately intensified their efforts to orchestrate and carry out a group boycott against and restrict competition and output from UAS and primary care physicians, including AAAPC members.  The same day that Dr. Sublett and JCAAI approved the TAAIS letters, members of RADAR began participating in discussions on an online message board called "Basecamp."  *See* Exhibit C-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-8. These discussions, which began on May 5, 2001 2011 and continued through at least July 18, 2011, included coordination among these board-certified allergists, who are normally competitors, in approaching insurance companies and convincing them not to pay or to limit payment to competitors who are not board-certified allergists.  The message board specifically mentions UAS by name and contains further calls to action by Dr. Weldon.  In a post he drafted on May 10, 2011, he writes "What we need is not rhetoric and 'ya-ya' but rather an aggressive attack on public senses without 'mentioning names.'"  *Id.* at 6.  Despite a RADAR member's admission that he was "acutely aware of how easily such a discussion might . . . run afoul of various anti-trust [sic] laws," the group pressed on, continuing to believe that the "AAAAI and ACAAI must join together to make this happen or [they would] continue to lose ground."  *Id* at

8-9.  As part of their effort to convince insurance companies and managed care organizations to stop doing business with or paying their competitors, Defendants, including some of the leaders of JCAAI, ACAAI, and AAAAI, implemented an idea previously suggested by Dr. Weldon and began to suggest to third-party payors that the publications of these organizations define the standard of care for the practice of allergy testing and allergen immunotherapy.  Up until this point, those organizations and allergists as a whole declined to suggest their publications defined the "standard of care," namely because of legal concerns over the potential effect on many of their own members who did not follow the recommendations of those publications, such as the recommendation against permitting patients to self-administer allergy shots.  *See* Exhibit D-5 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-12 at 2; Exhibit D-7 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-13 at 1.

## PHADIA, AAN, <u>AND</u> WINDERS & WALLEN JOIN THE CONSPIRACY

<u>97.</u>    94.  At the same time AAAAI, ACAAI, and JCAAI were forming RADAR, Phadia and AAN decided to enter into and support the conspiracy to restrict competition in the market for allergy testing and allergen immunotherapy.  In or about March 2011, Phadia and Winders, acting on Phadia's behalf, began a strategy to combat the "remote practice of allergy" or "RPA."

<u>98.</u>    Phadia, Inc. and its parent corporation, Thermo Fischer Scientific, manufacturer and sell a blood test to detect allergies, known as ImmunoCap or ICAP, a form of RAST or blood testing.  Phadia markets those tests to physicians as an alternative to allergy skin prick testing, where physicians would draw the blood of their patients for analysis in a laboratory owned and operated by Phadia and ThermoScientific for a fee.  The results from the ICAP testing, which generates more false positive results than skin prick testing, would then be used by

4821-3151-7481.v1

Phadia to refer patients who tested positive to board-certified allergists for allergy skin prick testing and allergen immunotherapy. The emergence of allergy skin prick testing performed at primary care physicians' offices were seen as the cause in a reduction of orders of ICAPs and other RAST tests and medications sold by Phadia and a disruption in its referral of patients from primary care physician offices to board-certified allergists. The emergence of patients being treated with allergen immunotherapy also resulted in a reduction of allergy and asthma medication that Phadia sold.

99.   95. Winders, at the time a market development team leader of Phadia, began to develop a strategy to reduce physicians' use of allergy skin prick tests that traded off with ICAPs by agreeing with board certified allergists, AAAAI, ACAAI, JCAAI, and a non-profit organization known at the time as "Mothers of Asthatics," now AANMA. In March 2011, Winders informed Sublett that she "look[ed] forward to battling these remote acce[s]s allergy providers with you." [Dkt. No. 135-12 10]. She requested a meeting to discuss her "clear strategy plan on this remote practice of a[l]lergy" with Sublett to begin fostering Phadia, AANMA, and Wallen's part in the conspiracy. Two months later, in May 2011, Sublett reached out to Aaronson and Gross regarding Winders' request for Sublett to serve on the Phadia advisory board. [Dkt. No. 135-10 8]. Sublett emphasized that Winders was "anxious to support efforts against United Allergy Labs and other similar operations," and that Winders had been in contact with AAN. On or about August 1, 2011, Winders met with Linda Cox, the President-elect of AAAAI. In that meeting Winders and Cox agreed, on behalf of Phadia and AAAAI respectively, that their organizations should work together to approach and convince third-party payors to limit reimbursement of allergy testing and allergen immunotherapy to board certified allergists,

48

including supporting Phadia's then ongoing strategy to combat UAS and primary care physicians in Texas.

100.   96. On or about August 2, 2011 through August 4, 2011, Winders contacted numerous physicians in North Texas known to be in contract with UAS to convince those physicians to either terminate their agreements, or to reduce their performance under those agreements with UAS in favor of ICAPs sold by Phadia.

101.   97. On August 3, 2011, Winders met with Dr. John Meiser, a representative of TAAIS, and they agreed that Phadia and TAAIS would support each other's strategy of combating UAS and primary care physicians by approaching third-party payors to convince them not to pay non-board certified allergists for allergy testing or allergen immunotherapy.

102.   98. On or about August 17, 2011, Winders wrote to Sublett requesting an in-person meeting to discuss "exciting developments" in Phadia's strategy to address remote practice—as she had met with physicians and individuals in contract with UAS and Linda Cox for AAAAI's perspective. Winders specifically wanted JCAAI's feedback on the best way to restrict competition from UAS. [Dkt. No. 135-13 11].

103.   99. On or about August 29, 2011, Winders met with Dr. Sublett, the then president of JCAAI, to discuss the increase in use of skin prick tests by primary care physicians in Texas and nationwide, the resulting loss of sales to Phadia, JCAAI's task force to combat the practice by primary care physicians and UAS, the then recent efforts by TAAIS to combat the practice, and the resulting lawsuit by UAS against TAAIS. Winders and Sublett agreed on behalf of Phadia and JCAAI respectively that they should join forces to combat the "remote practice of allergy" through mutual support of all of these efforts. To facilitate the agreement, both Phadia and JCAAI relied on Mansfield, a board member of both Phadia and JCAAI.

49

104.   100. The motivation for Phadia to join Defendants' conspiracy concerned the loss of Phadia sales of ICAPs and other RAST tests to primary care physicians who had entered into contracts with UAS to conduct skin prick tests for allergies. In entering into an agreement in or around August 2011, Phadia and AAN specifically discussed Phadia's reduction in ICAP sales to over hundreds of primary care physicians, who had entered into a contract with UAS to provide allergy skin prick testing and allergen immunotherapy throughout markets in Texas. [Dkt. No. 134-21̶8]. Those agreements between UAS and primary care physicians resulted in lost ICAP sales for Phadia in Dallas, San Antonio, McAllen, and Houston, resulting in a significant loss of revenue. Phadia determined that the loss of revenue for its ICAP sales was directly attributable to the rise of competition by primary care physicians and allergy services companies such as UAS in the marketmarkets for allergy testing and allergen immunotherapy, to which Phadia referred to as the "remote practice of allergy" or "RPA." The significant decline in Phadia's business in Texas caused a loss of morale among Phadia representatives and Phadia also estimated that the rise in primary care physicians treating allergies with immunotherapy was also causing Phadia to lose a great deal of money related to a decline in necessary asthma medications as well.

105.   101. Also in or about August 2011, to combat the remote practice of allergy, Phadia began meeting with other board certified allergists in Texas in an effort to combat RPA. Phadia also began identifying customers of UAS in an effort to convince those customers to discontinue or reduce their business with UAS and return to selling ICAPs manufactured and sold by Phadia. Phadia also agreed with Sublett, Mansfield, JCAAI, ACAAI, AAAAI, and AAN that they should contact third-party payors to convince them not to do business with UAS or

4821-3151-7481.v1

primary care physicians for allergy testing or allergen immunotherapy by changing their policies to only reimburse board-certified allergists for those services.

106.  ~~102.~~ In the fall of 2011, Phadia also contacted third-party payors through its existing relationships with those payors to convince them to change their policy to restrict allergy skin testing and allergen immunotherapy to board-certified allergists or members of the American Academy of Otolaryngic Allergy ("AAOA"), an organization that represents otolaryngologist, frequently referred to as Ear, Nose, and Throat physicians or ENTs.  The payors Phadia contacted in 2011 included Humana, United Healthcare, Blue Cross/Blue Shield of Texas, Texas Medicaid, and the managed care organizations that reimburse for Texas Medicaid.  [Dkt. No. 134-2~~1~~8]. Phadia also planned to follow up with these same third-party payors for the same purpose in 2012, and other third-party payors including Aetna, Cigna, and Blue Cross entities in North Carolina, Pennsylvania, Georgia, South Carolina, Arizona, Missouri, Arkansas, Tennessee, Colorado, Kentucky, Utah, Illinois, Oklahoma, and Louisiana.  When engaging in these contacts with third-party payors, Phadia distributed statements from its co-conspirators including AAAAI, ACAAI, JCAAI, and AAN supporting not only this restriction, but that primary care physicians should use ICAPs as the preferred method of testing for allergies instead.  Phadia officers also directed its sales members in the field to disparage UAS to primary care physicians, including claiming that UAS was engaged in fraudulent billing.

107.  ~~103.~~ On or around September 2011, Alan Leahigh, Director of Corporate Council for AAN, contacted TAAIS, and other board-certified allergists in Texas, included Stuart Abramson, Bob Lanier, Defendant Mansfield, and Alnoor Malick, to request additional information about their fight against UAS and primary care physicians in Texas for a leadership summit to be held by AANMA, AAAAI, ACAAI, JCAAI, Phadia, and others on October 3,

2011 in Annapolis, Maryland.  As a result of those contacts, Bob Lanier on behalf of ACAAI and Leahigh on behalf of AAN discussed how AAN could act as a front for the conspiracy, which would shield Defendants because of AAN's prior history as a legitimate patient centered organization.  In exchange, AAN could extract a large budget from Defendants to conduct the campaign against the "remote practice of allergy."  In addition to contacting third-party payors, AAN and ACAAI discussed convincing extract companies to cut off supply to combat these competitors.  Leading up to the leadership summit, AAN also discussed such a proposal with Defendant Fineman, the then president-elect of ACAAI, and Defendant Sublett, the then president-elect of JCAAI.  Additionally, Nancy Sander, then President of AAN, contacted Dr. Fineman in October 2011 regarding AANMA's interest in combatting the remote practice of allergy by contacting third party payors.  Since that time, October 2011, Dr. Fineman has become a Board member for AAN, has drafted and edited articles and publications to attack the "remote practice of allergy" for AAN and contacted third-party payors on their behalf.

108.  ~~104.~~ On or about October 3, 2011, AAN made a presentation to Defendants AAAAI, ACAAI, JCAAI, and Phadia explaining how AAN intended to carry out Defendants' agreement to combat the remote practice of allergy.  In attendance at the meeting were all of the then-Presidents and Vice Presidents of AAAAI, ACAAI, and JCAAI, including Defendants Aaronson, Gross, Fineman, and Sublett, as well as representatives of Phadia ~~and~~, including its President David Esposito, and representatives and officers of other industry organizations including Phadia's competitors.  AAN presented its strategic plan for combating the "remote practice of allergy," which included among other things, publishing a position statement and press release attacking the practices of primary care physicians and companies such as UAS, meeting with third-party payors and their trade associations to convince them not to pay these

52

competitors, contacting primary care physicians to convince them not to do business with companies like UAS or engage in allergy testing or allergen immunotherapy, but to administer ICAPs and refer all allergy patients to board-certified allergists, and contacting governmental agencies and legislators to defame these competitors. [Dkt. No. 134-92]. In exchange, AAAAI, ACAAI, JCAAI, Phadia, and others would agree to pay AAN a significant sum of money per month to conduct the campaign. *Id.*

109. ~~105.~~ As a result of that meeting, ACAAI, JCAAI, and Phadia agreed to pay AAN to serve as the front organization for Defendants' actions against primary care physicians, UAS, and any other physician or entity engaged in the "remote practice of allergy," by contacting third-party payors, industry players, governmental leaders, and agencies setting guidelines for industry standards to convince them to exclude primary care physicians and companies supporting those physicians, including UAS, from the market for allergy testing and allergen immunotherapy. Defendants also agreed that AAAAI and AAN would use their positions within the National Asthma Education, and Prevention Program ("NAEPP") to write into asthma guidelines of the National Heart, Lung, and Blood Institute language that could be used to exclude competitors. Following Defendants' meeting, AAN coordinated with Defendants Fineman and Sublett to facilitate the transfer of funds from Defendants to AAN and to assist in AAN's activities on behalf of Defendants.

110. ~~106.~~ To facilitate the conspiracy among AAAAI, ACAAI, and JCAAI members and Defendants' conspiracy with AAN and Phadia, Defendants Dr. Sublett and Dr. Aaronson authored a JCAAI "New News You Can Use" newsletter that was sent to all JCAAI Members on October 5, 2011 addressing at length the "remote practice of allergy" ("RPA") moving into JCAAI member communities. *See* Exhibit E-13 to Plaintiffs' Preliminary Injunction Motion,

Dkt. No. 12-29. Dr. Sublett and Dr. Aaronson specifically targeted what they termed "the new version of RPA" which was "the imbedding of a 'certified allergy technician' in a primary care physician's office, where they perform skin testing to inhalants and then begin allergen immunotherapy and treatments." *Id.* at 1. The business practices to which Defendants JCAAI, Dr. Aaronson, and Dr. Sublett referred were those of UAS, which was featured in a "Business Builder" article in *Medical Economics* as pointed out in the newsletter. The newsletter documented what JCAAI had done to respond to this threat, including "the appointment of a task force on the RPA to develop proactive approaches and strategies," "monitoring the activity of these companies from the stand-point of the legality of their activities, especially related to billing," and "working with the College & the Academy on marketing strategies and other responses." *Id.* The newsletter then stated to all JCAAI members that "We believe one approach you can take is to educate primary care physicians AND local carriers about the standard of care." *Id.* The newsletter directed that members should rely on a 75 slide set directed at primary care physicians and insurance carriers jointly created by AAAAI and ACAAI. Members were encouraged to present these talks in their neighborhood being careful to keep their presentation "general in nature" and "not [to] mention any particular company." *Id.* at 2. Revealing the motivation to hurt UAS and primary care physicians economically, the newsletter stated that "This type of communication – brought to the carriers – could be very helpful, since they do not want to pay for ineffective treatments." *Id.* The newsletter then noted the ongoing lawsuit by UAS against the TAAIS and noted that as of yet, "This particular suit does not contain any anti-trust [sic] allegations." The newsletter then stated that "JCAAI recommends against engaging with any company that promotes RPA." *Id.*

54

111.   ~~107.~~ Later in October, *Medical Economics* published another article regarding allergy testing and immunotherapy for non-board certified allergists. In response to the article, Defendant Fineman—with input from JCAAI and ACAAI leadership—wrote a letter to the editor for its publication to attack UAS (then known as UAL or United Allergy Labs). Further, Defendant Sublett emphasized to other Defendants, including Aaronson and Gross, that "this is our main focus, the commercial companies, including United Allergy Labs." Indeed, Sublett revealed that to date—as of October 31, 2011, JCAAI had done the following things: given legal counsel and guidance to individual physicians and local societies regarding UAL, discussions with Defendant AAN related to "them taking a role as our lay voice," had individual discussions with managed care organizations related to the issue, and appointed a task force to develop short and long term strategies. *Ex.* C.

112.   ~~108.~~ Later, in November 2011, Winders, acting on behalf of Phadia and AAN, again requested to meet with Sublett to discuss her recent meetings with AAAAI's leadership and AAN's "plan of action." [Dkt. No. 135-~~14~~12]. This plan of action included a "direct mail campaign to the medical directors of the top 100 commercial insurance payers" to request a utilization review for the ~~2, 842~~2,184 participating physicians in AAAPC. [Dkt. No. 135-~~15~~13]. Additionally, AANMA conducted a direct mail campaign to the "top 100 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts" of UAS and AAAPC.

113.   ~~109.~~ The next month, on or about December 2011, Wallen contacted JCAAI's Director of Administration, Sue Grupe, regarding his interest in discussing remote practice of allergy. Wallen was and continues to be a business consultant in the field of allergy testing and immunotherapy, as he counsels businesses and doctors in how to strategically position

55

themselves to combat the remote practice of allergy through contacts with third-party payors. [Dkt. No. 135-~~17~~15].

114.   Since Thermo Fisher's acquisition of Phadia in mid-2011, Phadia employees, who previously held themselves out to merely be Phadia representatives, have consistently held themselves out to be Thermo Fisher representatives. For example, former Phadia clinical sales consultants, medical group consultants, and district managers introduced themselves to accounts or potential accounts as Thermo Fisher employees, emailed from new email addresses ending in "@thermofisher.com," and internally considered themselves to be Thermo Fisher employees after the acquisition. The bulk of the tortious Phadia communications discussed herein were sent by "@thermofisher" email addresses and from email accounts whose signature blocks identify the employee as an employee of Thermo Fisher.

115.   Further, Thermo Fisher employees have specifically confirmed that they intended to continue, and indeed, did continue to execute the strategy developed by Winders in 2011 while she was at Phadia. For example, in an email dated January 16, 2012 titled "RE: United Allergy", Tom Wajda, a Thermo Fisher District Sales Manager, confirmed that part of the company's strategy to combat UAS, which "we perceive [] as a competitor in the marketplace," was to "partner[] with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP." Phadia0056205-07. He then confirmed that he "communicated the Thermo Fisher Scientific (formerly Phadia) strategy" to others in prior emails and that he "works to execute [the strategy] on a daily basis with my district." *Id.*

**AAN Carries Out Defendants' Anticompetitive Plans**

4821-3151-7481.v1

116.   110. After receiving funding from ACAAI, JCAAI, and Phadia, AAN carried out everything AAN promised Defendants they would do to combat the remote practice of allergy, including targeting AAAPC, its members and UAS. For example, AAN and Phadia worked with members of AAAAI, ACAAI, JCAAI, and RADAR to identify and contact third-party payors in areas where competition was increasing from primary care physicians and UAS. AAN sent letters to medical directors of the top 100 third party payors in the nation, including third-party payors in Texas, seeking meetings to draft policies to exclude non-allergists from reimbursement. AAN, Phadia, Winders, and Wallen also suggested in their communications with third-party payors that those payors should take the list of all AAAPC members and audit each one for their allergy testing and allergen immunotherapy claims. In follow up to those letters, Defendants Winders and Wallen met with third-party payors in Texas and elsewhere in-person and on the phone to convince those third-party payors not to reimburse primary care physicians or UAS for allergy testing or allergen immunotherapy. As part of that strategy, AAN claimed that these competitors were acting outside the standard of care set by AAAAI, ACAAI, and JCAAI, relying on position statements those organizations drafted to attack the remote practice of allergy. AAN and Phadia also claimed in their communications with third-party payors in Texas and elsewhere that primary care physicians, AAAPC members, and UAS were engaged in billing fraud.

117.   111. AAN, including Winders and Fineman, also drafted an article titled "Patients, Not Piggy Banks!" in which AAN falsely claims primary care physicians practicing allergy testing or allergen immunotherapy, or companies that participated in that care, were engaged in fraud. AAN posted the article on its website in the summer of 2013 attempting to create the impression that it was aimed at consumers, but AAN and the other Defendants

57

circulated the article widely to third-party payors and primary care physicians in an effort to convince them not to do business with AAAPC members or UAS. On or about June 2013, once AAN became concerned that Defendants' antitrust activity may come to light and they may be investigated by the Federal Trade Commission, AAN began taking efforts to conceal Defendants' antitrust activities.

### Defendants' Acquisition and Misuse of the OIG Advisory Opinion

118.   At the same time AAAAI, ACAAI, and JCAAI were forming RADAR and when Phadia, AAN, and Winders began participating in the conspiracy (i.e., late 2010 or early 2011), Patrick Strauss contributed to the effort to drive UAS from the market.

119.   Strauss is a lawyer who formed an allergy services company in 2004 in the Rio Grande Valley. His company, Allerta, provided allergy shots by mail to nearby physicians engaged in the delivery of allergy care. UAS proved more successful than Allerta.

120.   Angry at the loss of business to UAS, Strauss devised a scheme to anonymously and falsely accuse UAS of operating a fraudulent business model. At the time, UAS was doing business as United Allergy Labs, or UAL. Through the help of co-conspirators, including James Wallen (who later became an associate of Winders and an employee, consultant, and/or independent contractor of AAN), Strauss formed *Universal* Allergy Labs—a fake "UAL"— soley for the purpose of soliciting a negative advisory opinion from the Office of Inspector General of the United States Department of Health and Human Services ("OIG").

121.   Specifically, on or about February 11, 2011, Wallen, acting as an organizer, formed Universal Allergy Labs, LLC by filing a Certificate of Formation with the Texas Secretary of State naming himself as the initial manager.

122.    On or about March 28, 2011, Wallen filed a Certificate of Amendment transferring Universal Allergy Labs, LLC to Strauss, who would act as the company's sole manager and registered agent.  On or about May 18, 2011, Strauss filed with the Texas Secretary of State another Certificate of Amendment, transferring Universal Allergy Labs to Alfredo G. Ledesma, stating that Ledesma was the company's sole manager and registered agent.

123.    On the very next day, May 19, 2011, Strauss and Ledesma caused their attorney Diane Carter of Brown McCarroll LLP to send a request via Federal Express to the OIG for an advisory opinion on the business model of the fake "UAL."  The request purported to seek an advisory opinion from the OIG regarding whether a proposed arrangement described in the request "would constitute grounds for the imposition of sanctions under the exclusion authority at section 1128(b)(7) of the Social Security Act (the "Act") or the civil monetary provision at section 1128A(a)(7) of the Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal anti-kickback statute."  The request was stated to be on behalf of Universal Allergy Labs, LLC, or "UAL," a Texas limited liability company, which would be operated by Ledesma.

124.    The OIG sent Ms. Carter several follow-up communications regarding the fake "UAL's" business plan.  At Strauss's and Carter's direction, Ledesma stated, under penalty of perjury, that he intended to engage in business as the fake "UAL," and that "UAL" would be operated by an individual with no healthcare experience whatsoever.  Carter emphasized in her communications with the OIG that her client's motive was to "exploit a business opportunity" and that the inexperienced head of "UAL" would have the final say regarding whether personnel "UAL" hired were adequately trained to perform healthcare related services.  In response to

59

these statements to the OIG, the OIG issued Advisory Opinion No. 11-17 ("OIG Opinion") and expressed serious concerns about the proposed business.

125.    The request submitted by Strauss and the sham "UAL" falsely attested: "With knowledge of the penalties for false statements provided by 18 U.S.C. § 1001 and with knowledge that this request for an advisory opinion is being submitted to the Department of Health and Human Services, I certify that all of the information provided is true and correct, and constitutes a complete description of the facts regarding which an advisory opinion is sought, to the best of any knowledge and belief. The arrangement described in [the] request for an advisory opinion is one that [the requestor] in good faith plans to undertake if the OIG issues a favorable advisory opinion." This statement was false at the time it was made, as neither Strauss nor Ledesma, nor their sham company, "UAL," ever intended to undertake the arrangement described in the request. Instead, Strauss and his sham company, "UAL," intended to procure a negative opinion from the OIG through false statements and deceit, and by presenting the real UAL's business in a false and misleading light.

126.    Throughout the process of submitting the request, several steps were taken by Strauss and his Universal Allergy Labs co-conspirators to ensure the OIG would issue a negative advisory opinion, notwithstanding the requestor's certification that he sought a favorable opinion of the proposed business model. For example, in the request itself, Strauss and his co-conspirators attempted to mimic the real UAL/UAS business model, including by attaching an outdated UAL contract, and by describing the request as one made by "UAL." In addition, Strauss and Universal Allergy Labs and their co-conspirators represented that the fake "UAL," Universal Allergy Labs would be operated solely by Ledesma, who has no health care industry

60

experience.  Defendants further stated that Ledesma wished to operate a business that would reward him despite lack of knowledge about applicable regulations and health care.

127.    Following submission of the request, Strauss, Universal Allergy Labs, and their co-conspirators intensified their efforts to elicit a negative opinion from the OIG.  On or about June 22, 2011, Strauss and "UAL" caused Carter to send through United States Certified Mail and Electronic Mail a response to a June 20, 2011 request by the OIG for more information.  In response to a request to "provide additional information regarding [the requestor's] experience in owning and/or operating a laboratory or any type of health care provider or supplier," Carter responded the requestor "has no experience in owning and/or operating a laboratory or any type of health care provider or supplier."

128.    On or about July 1, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to a June 28, 2011 request by the OIG for more information.  In response to a request to "explain how [the requestor] would operate the proposed arrangement with no experience," and "additional information regarding how [another individual] would be involved in the proposed arrangement," Carter responded the requestor "has general business experience; he has identified the proposed arrangement as a good business opportunity; and he recognizes that *exploiting the business opportunity* will require investments in human resources and administrative infrastructure, which he will make if the proposed arrangement is allowed to proceed.  In addition, the Requestor states that [the other individual] will not be involved in the proposed arrangement."

129.    On or about August 23, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to an August 19, 2011 request by the OIG for more information.  In response to a request to "[w]hat specifically is meant by

61

exploiting the business opportunity will require investments in human resources and administrative infrastructure," counsel for Strauss and Universal Allergy Labs responded the requestor states that "what is specifically meant by '*exploiting the business opportunity* will require investments in human resources and administrative infrastructure,' is that [the requestor] (as the sole owner, manager and officer of Requestor) would operate Requestor's proposed allergy lab business by identifying (through an interview process) and hiring, individuals whom [the requestor] believes have sufficient experience to provide, on Requestor's behalf, the services outlined in the proposed contract submitted to the OIG."

130.   On or about November 4, 2011, Strauss and Ledesma caused Carter to send through United States Certified Mail and Electronic Mail a response to a November 2, 2011 request by the OIG for more information.  In response to a request to certify additional information the OIG requested in response to their original request, Ledesma certified "that all information provided is true and correct, and constitutes a complete description of the facts regarding which an advisory opinion is sought, to the best of [his] knowledge and belief.  The arrangement for which the advisory opinion is being sought is one that Requestor in good faith plans to undertake if the OIG issues a favorable advisory opinion."  That certification was false as the requestor did not intend to operate the business submitted to the OIG.  Instead, Strauss and Wallen orchestrated for the fake UAL and Ledesma to submit the request in order to obtain a negative opinion from the OIG that Strauss, Wallen, and later, Phadia, Winders, and ANN could then use to disparage the real UAL/UAS, scare clinicians away from the real UAL/UAS, and promote sham qui tam actions against the real UAL/UAS and its primary care physician clients.

4821-3151-7481.v1

131.    Ultimately, on or about November 16, 2011, the OIG issued Advisory Opinion 11-17 expressing concern over the proposed business arrangement of Universal Allergy Labs, the fake UAL, and Ledesma.

132.    While Advisory Opinion 11-17 purports to express concern about a business that the requesting persons intentionally made to appear was the real UAL/UAS's business, the concern expressed in the opinion turn on facts that were not and are not true of the real UAL/UAS's business model.  For instance, among other things: (i) UAS is not operated by a single individual with no healthcare experience intent on "exploiting a business opportunity;" (ii) UAS does not decide which patients should be tested or treated; (iii) UAS does not receive referrals from physicians; (iv) UAS does not bill insurance carriers, including the federal government; and (v) UAS does not pay physicians for patients.  Nevertheless, because other similarities to UAS's business model are mentioned in the opinion, Strauss, Phadia, Winders, and AAN knew they could exploit the negative opinion elicited from the OIG.

133.    Strauss, Phadia, Winders, ANN, the JCAAI, and their co-conspirators took that opinion and spread it to physicians, physician practice groups, and hospitals who are or were considering doing business with the real UAL, claiming that "UAL" requested the opinion, was guilty of fraud for operating a business in violation of the opinion, and that anyone who does business with UAL would wind up wearing "orange jumpsuits."

134.    For example, following the publication of Advisory Opinion 11-17, Strauss instructed the employees of his companies Allerta to disseminate Advisory Opinion 11-17 to any physician or physician practice group that was in contract with or was considering whether to contract with United Allergy Labs, the real UAL.  Strauss told employees of Allerta that Advisory Opinion 11-17 concerned United Allergy Labs or the real UAL/UAS and that they

63

should in turn tell this to physicians and physician practice groups. Importantly, Defendant Strauss also told these employees of Allerta that their role in the distribution of this information should be kept "under the radar."

135.   Similarly, on November 30, 2011, JCAAI published a newsletter to its members discussing the OIG Opinion and suggesting that it was issued in response to a request from "a laboratory services management company that proposed to provide allergy testing and immunotherapy services within physician medical offices under an exclusive contract arrangement." Phadia spread both the false OIG opinion and the JCAAI newsletter discussing the opinion to physicians, physician practice groups, and hospitals who are or were considering doing business with the real UAL in an attempt to dissuade them from doing business with UAS and its primary care physicians.

136.   From November 2011 until 2015, Phadia's and Thermo Fisher's clinical sales consultants and district managers (i.e., sales personnel) repeatedly disseminated and discussed the OIG opinion and articles of their co-conspirators discussing the opinion with physicians, physician practice groups, and hospitals who were in business with or were considering doing business with the real UAL/UAS. *See, e.g.,* Phadia0007035-37, Phadia0093432-34, Phadia0011890-91, Phadia0014102-03. Phadia's clinical sales consultants were trained to create the impression that the OIG opinion applied to the real UAS's business arrangement, despite the fact that it did not and was, in fact, fraudulently obtained to create just such an impression. Subsequent to mentioning the OIG opinion, Phadia and Thermo Fisher sales consultants would often inform current or potential UAS clients to consult their malpractice carriers. Phadia and Thermo Fisher representatives also shared these materials with representatives of third-party

64

payors, including commercial health insurance companies and managed care organization health plans.

137.    Phadia and Thermo Fisher's employees and their co-conspirators knew and/or should have known the OIG did not apply to the real UAL/UAS and yet distributed and discussed the opinion with others in order to create the impression that it applied to the real UAL/UAS and thus falsely suggesting that entity was engaged in billing fraud. Indeed, James Wallen, one of the individuals who helped orchestrate the creation of the "fake" UAL and applied for and received the OIG opinion, was an associate of his co-conspirator and current co-Defendant Winders and subsequently became an employee, consultant, and/or independent contractor of his co-conspirator and current co-Defendant AAN which is headed by Winders). Further, Defendants circulated and discussed the OIG opinion and informed others that it applied to the real UAL/UAS despite the fact that the name of the party that requested the OIG opinion (i.e., the fake UAL) is redacted from the OIG opinion that issued, and the opinion carries with it the following express limitations: (1) "This advisory opinion is issued only to [name redacted], the requestor of this opinion. This advisory opinion has no application to, and cannot be relied upon by, any other individual or entity."; and (2) "This advisory opinion is limited in scope to the specific arrangement described in this letter and has no applicability to other arrangements, even those which appear similar in nature or scope."

138.    All of this activity was done in an effort to stifle the competition represented by UAS and its primary care clients and to monopolize the market for allergy testing and allergen immunotherapy. Indeed, since at least August 2011, officers, employees and representatives of Phadia and Thermo Fisher have approached physicians, practice groups, and third-party payors to convince those individuals and entities not to do business with or reimburse Plaintiffs.

65

Clinical sales consultants, medical group consultants, district managers, and clinical educators of Phadia and Thermo Fisher have contacted providers and payors regarding remote allergy, including Plaintiffs, with the intention to exclude them from the market for allergy testing and to conspire to monopolize the market for allergy testing. They have done so by distributing materials, including the Office of Inspector General Opinion No. 11-17, AAAAI, ACAAI, and JCAAI materials, and AAN articles including "Patients Not Piggy Banks" and "Deception and Fraud in Primary Care" to falsely suggest that Plaintiffs are engaged in substandard care or billing fraud and that physicians and practice groups in contract with Plaintiffs will face both criminal and civil liability.

139.    Phadia and Thermo Fisher also refused to do business with UAS and coerced entities with which Phadia and Thermo Fisher had a close business relationship to also refuse to do business with UAS. For example, as early as November 2011, UAS contacted Quest Diagnostics ("Quest") representatives in an effort to begin using Phadia's ICAP blood tests to test for seasonal and perineal allergies and food allergies. Quest is a company that provides commercial clinical laboratory services and owns a dominant position in the market for supplying allergy blood tests in the United States and throughout the nation.

140.    Beginning in November 2011 and spanning at least into 2014, Phadia and Thermo Fisher, Quest's largest supplier of allergy blood tests, instructed and agreed with Quest to deny UAS access to allergy blood tests and refused to do business with UAS because UAS represented a competitive threat in the market for allergy testing. *See, e.g.*, Phadia0029897-902. As a direct result of this directive, Quest complied and UAS was denied access to ICAPs as a result.

66

141.   Similarly, Phadia worked with Clinical Pathology Laboratories to reduce competition in the market. Clinical Pathology Laboratories ("CPL"), like Quest, is a company that provides commercial clinical laboratory services in the market for supplying allergy blood tests and administers the ICAP test for seasonal and perennial allergies. In a late 2011 to early 2012 email exchange, a CPL Regional Sales Manager informed Tom Wajda, a Thermo Fisher District Sales Manager, that "United Allergy is targeting our large practices that do Immunocap testing." Phadia0056205-07. The CPL representative went on to ask "What, if anything, is Phadia doing to help the CPL reps retain this allergy business." *Id.*

142.   In response, Wajda confirmed that the company was aware of UAS, "perceive them as a competitor in the marketplace," and were engaging in a strategy to, among other things, "partner[] with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP." *Id.* Wajda then confirmed that he "communicated the Thermo Fisher Scientific (formerly Phadia) strategy" to others in prior emails and that he "works to execute [the strategy] on a daily basis with my district." *Id.* Continuing into the present, CPL and Quest have still refused to do business with UAS at the urging and as part of the original agreement with Phadia.

## HARM TO COMPETITION FROM DEFENDANTS' CONDUCT

143.   112. As a result of the coordinated action and collaboration of members of RADAR and the encouragement of JCAAI, members of all three national organizations, AAAAI, ACAAI, and JCAAI, and representatives of AAN and Phadia began to contact physicians, third-party payors, and suppliers of allergy testing and allergen immunotherapy equipment and antigens about the business practices of primary care physicians and UAS in their participation in the market for allergy testing and allergen immunotherapy.  These members,

67

acting on behalf of Defendants, contacted insurance companies and managed care health plans through representatives of those organizations, including fraud investigators, provider relation representatives, and medical directors.  Some of these third-party payors act on a national level, including Aetna, Cigna, Humana, and United ("national payors").  Other third-party payors act on a state level, including Blue Cross/Blue Shield entities and managed care health plans, who contract with particular states ("state payors").  Through use of RADAR, which is composed of every state and regional allergy society, AAN, Phadia, and through contacting national payors, Defendants have attempted to restrain competition in every local market in the nation and with a specific intent to monopolize those markets.  By contacting state payors, Defendants have sought the same result for all local markets in specific states.  The result of this activity has constrained competition in all 25 states where Plaintiffs do business based on eliminated or reduced reimbursement by Humana, Aetna, and Cigna, as well as the local markets of Texas, Arkansas, Florida, Georgia, Illinois, Kansas, Kentucky, Louisiana, North Carolina, Oklahoma, Pennsylvania, South Carolina, and West Virginia through denied or reduced reimbursement by state payors in those states.

144.  113.  Among other things, Defendants and these members and organizations attempted to persuade, entice, or coerce these representatives of third-party payors through use of materials distributed by AAN, AAAAI, ACAAI, and JCAAI, falsely suggesting that those organizations defined the standard of care for allergy testing and allergen immunotherapy and that primary care physicians were not adequately trained or qualified to perform allergy testing and allergen immunotherapy.  These same actors also stated that primary care physicians' reliance on the services of UAS was inappropriate, that primary care physicians were engaged in billing fraud and "pass through billing," that the practice of "home immunotherapy" was

68

"investigational" and should not be reimbursed.  If a third-party payors expressed reluctance to stop doing business with primary care physicians or UAS, Defendants and Phadia, AAN, AAAAI, ACAAI, and JCAAI members and representatives suggested that those payors should reduce the amount paid to competitors for allergy skin testing under CPT Code 95004 and the mixing of immunotherapy under CPT Code 95165, but not reduce payment for shot administration in a board-certified allergists' office under CPT Codes 95115 and 95117 or for allergy blood testing under CPT Code 86003.  The goal of these suggested price changes was to disproportionately reduce payment to Defendants' competitors, who rely more on reimbursement of the mixing of immunotherapy under CPT Code 95165 and less on the reimbursement of shot administration under CPT Codes 95115 and CPT Codes 95117 or for allergy blood testing under CPT Code 86003.  Defendants further suggested to third-party payors that they should only pay primary care physicians for administering ICAPs, or RAST tests, which are billed under a different CPT codeCode 86003 and sold by Phadia, instead of paying those physicians for allergy testing, i.e. skin prick tests under CPT Code 95004.

145.   114. Some of the contacts with third-party payors were performed by Defendants themselves and other officers and directors of AANMA, AAAAI, ACAAI, JCAAI, and Phadia. For example, Dr. Allen Meadows, former ACAAI Speaker of the House of Delegates, reported to Dr. Weldon on October 9, 2011 that as instructed, he had been in contact with local insurance carriers regarding the remote practice of allergy.  *See* Exhibit D-17 to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-20.  Further, Dr. Fineman contacted a Blue Cross Blue Shield medical director to convince that third-party payor not to pay competitors.  [Dkt. No. 135-30137].

69

146.   ~~115.~~ Although not all allergists heeded AAN, AAAAI, ACAAI, JCAAI, or Phadia's encouragement to engage in the ~~group boycott~~conspiracy, either directly or through RADAR, to contact insurance companies, some did with differing degrees of success.  Angry at the lawsuit against their colleagues in Texas, Defendants continued contacting insurance companies, including fraud investigators, provider representatives, medical directors, and advisory board members over the phone and in person, rather than through letters, in furtherance of their preexisting agreement.  One such insurance company contacted was BC/BS Texas in or around June 2011 by JCAAI and Dr. Aaronson, which had previously been contacted by Dr. Weldon.  Following this contact, BC/BS Texas fraud investigators audited the medical records of numerous primary care physicians in Texas, including Dr. Bernice Gonzalez in San Antonio, Texas, and denied claims to many primary care physicians.

147.   ~~116.~~ Around the same time, AAAAI and JCAAI contacted Aetna claiming that primary care physicians and UAS were overbilling them for allergen immunotherapy and that Aetna should reduce the amount of units paid for allergen immunotherapy under CPT Code 95165. As a result of that contact, Aetna decided to reduce the amount it would permit to be billed to CPT Code 95165 to 90 units annually from 300 previously, a policy that also negatively impacted board-certified allergists.  Following complaints, AAAAI and JCAAI's representatives, including Dr. Linda Cox, Dr. Aaronson, and Dr. Gross met with representatives of Aetna on July 25 and October 26, 2012, including an Aetna Senior Medical Director, Dr. Chris Jagmin, to propose raising the amount of units back to 120, which Aetna agreed to do for the first year of allergen immunotherapy.  Subsequent to those two conversations, Dr. Gross engaged in a follow-up meeting with Dr. Jagmin in which he complained about Aetna's decision to continue to pay

4821-3151-7481.v1

primary care physicians working with UAS, acting in the interests of himself, JCAAI, and Dallas Allergy & Asthma Center, P.A.

148.   ~~117.~~ Around the same time, Dr. Sublett's business partner, Dr. Stephen J. Pollard, acting on behalf of Dr. Sublett, PSF, PLLC, and JCAAI, also approached and met with medical directors and representatives of Anthem Blue Cross/Blue Shield of Kentucky. *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 8, Dkt. No. 12-30. Similar to Dr. Gross's meeting with Aetna, Dr. Pollard attempted to persuade Anthem Blue Cross/Blue Shield of Kentucky representatives that they should not pay or do business with primary care physicians or UAS for allergy testing and allergen immunotherapy. As a result of follow up communications by Dr. Sublett, Anthem Blue Cross/Blue Shield of Kentucky has reduced the reimbursement it will pay primary care physicians practicing allergen immunotherapy by 60%.

149.   ~~118.~~ More recently, representatives of AAN, AAAAI, ACAAI, JCAAI, and Phadia have met with managed health plans in Texas in an effort to convince them not to do business with primary care physicians or UAS in the market for allergy testing and allergen immunotherapy. Nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients. A specialist certification is not required by the standard of care in Texas nor any other state in which Plaintiffs operate. Centers for Medicare and Medicaid Services pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state. Yet, Defendants suggest that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and are determined to shut primary care physicians and businesses like UAS out of the market. At Dr. Weldon's suggestion, these Defendants targeted managed care health plans because those plans are incentivized to deny claims. Specifically, managed health plans are paid

71

annual on a per capita basis from the state health and human services commission, which requires them to pay all covered claims under federal and state Medicare and Medicaid regulations.  If managed care organizations could reason that claims for services did not meet the standard of care, then that health plan could plausibly deny the claims and pocket the difference.

150.   119. Defendants have had recent success targeting these organizations.  For example, on or about February, 2013, an ACAAI representative contacted Superior HealthPlan ("Superior"), a Texas managed care organization.  The representative supplied Superior's Chief Medical Officer, Dr. David Harmon, an "opinion" or position statement ACAAI stating that organization forbids "home immunotherapy" and thus Superior should not do business with nor reimburse the practices of primary care physicians who rely on UAS, who permit self-administration of allergy shots.  Around the same time, representatives of Phadia met with representatives of Texas Health and Human Services and Superior to convince those entities to restrict reimbursement of skin prick testing performed by primary care physicians in favor of blood testing, including sales of Phadia's ImmunoCaps.  Following this contact, Dr. Harmon contacted various primary care physicians who had billed Superior for allergy testing and allergen immunotherapy and stated Superior would no longer pay them for allergy skin testing and allergen immunotherapy based on the position of ACAAI.  Subsequently, Superior began denying all claims submitted by the businesses of primary care physicians for allergy skin testing and allergen immunotherapy for more than 18 primary care providers doing business with UAS, some of whom are AAAPC members.   In all more than 200 claims have been denied, totaling more than $500,000 in lost revenue to those providers and UAS from Superior alone.  Phadia representatives since utilized their success with Superior's policy change to approach physicians and clinics to convince them not to do business with Plaintiffs.  For example, one district

4821-3151-7481.v1

manager encouraged his clinical sales consultants to use the policy change to regain lost business, noting that Thermo and Phadia had been waiting for that letter for three years.

151.   ~~120.~~ On August 1, 2013, Drs. Aaronson, Casale, Cox, Honsinger, and Webster, which includes the current Presidents of all three national allergist associations, JCAAI, AAAAI, and ACAAI, as well as the Executive Director and Executive Vice President of JCAAI, wrote another position statement entitled "Location Matters." *See* Exhibit X to Plaintiffs' Preliminary Injunction Motion, Dkt. No. 12-54. "Location Matters," raises unfounded fears about the safety of self-administration of allergen immunotherapy, citing an increase in the risk of death. "Location Matters" is written in such a way as to conflate the standard of care with the non-binding practice parameters created by the allergist associations.   While the publication of Location Matters or other journals is not in itself illegal, the use of these journals by board-certified allergists to claim privately to managed care organizations that they should not pay claims that do not meet these standards is anticompetitive.

152.   ~~121.~~ The very next day after Location Matters was published, on August 2, 2013, Superior announced a "credentialing policy" set to take effect on October 1, 2013 which limits reimbursements to physicians with the equivalent of a two-year specialist program, functionally precluding primary care physicians from receiving reimbursement for allergy testing and allergen immunotherapy.   *See* Exhibit F at ¶ 9 and F-2 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-32.   Superior's "credentialing" policy, where it would only pay for allergy testing or allergen immunotherapy if performed by a board-certified allergists, also encouraged primary care physicians to use ICAPs or ~~RAST~~ allergy blood tests to test for allergies instead as suggested by Phadia and Thermo Fisher representatives and AAN.

153.   ~~122.~~ Around the same time Superior began denying claims, El Paso First Health Plan ("El Paso First"), another managed care organization that covers Texas Medicaid patients in El Paso, also began calling primary care physicians.  Specifically, the Chief Medical Officer of El Paso First called those physicians in an effort to coerce those physicians to no longer engage in allergy testing and allergen immunotherapy based on the positions of ACAAI.  El Paso First had previously been contacted by Dr. Mansfield regarding claims data for allergy testing and allergen immunotherapy and Dr. Mansfield, a director of JCAAI, ACAAI, and Phadia, is believed to be the contact with El Paso First.  Dr. Mansfield serves on the Phadia Specialist Advisory Board, and Thermo Fisher and Phadia representatives, including marketing managers and clinical sales consultants, met with Dr. Mansfield to discuss their plans for his role as a member of the Board and in El Paso.  As a result of those communications, numerous primary care physicians stopped engaging in allergy testing and allergen immunotherapy for El Paso First patients, and some were denied claims for previous services.

154.   ~~123.~~ Also around the same time period, Parkland Community Health Plan ("Parkland"), a third-party payor for managed care services based in Dallas, Texas, was contacted by a representative of JCAAI, Dr. Gross.  Dr. Gross and his business Dallas Allergy and Asthma Center represent the main competitor to the physicians in Parkland's network in Dallas who received these letters.  Around the same time, representatives of Phadia and Thermo Fisher met with Dr. Lachman to implement a policy change to halt reimbursement of skin prick testing performed by primary care physicians in favor of blood testing.  Like other meetings with managed care organizations, Phadia and Thermo Fisher met with Dr. Lachman to convince Parkland to restrict primary care physicians to utilize only blood tests, leaving skin prick testing and allergen immunotherapy to board certified allergists only.

74

155.    Following ~~that  communication~~these  communications, on October 1,  2013,

Parkland's medical director, Dr. Barry Lachman, wrote a letter to at least four primary care

physicians announcing Parkland's new policy of not reimbursing services provided by primary

care physicians or any physician in association with companies like UAS.   *See* Ex. F-3 to

Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-33.   In it, Dr. Lachman equated the

standard of care with AAAAI practice parameters, just as Defendants intended in crafting their

position statements.     The primary reason given for Parkland's refusal to reimburse these

physicians is that "AAAI [sic] states that physicians should have specialized training before

providing these services."  *Id.*   The Parkland letter then explicitly attacks permitting certain

patients to self-administer allergy shots using the same arguments and referencing the same

articles that Defendants presented in "Location Matters."   The letter concludes by threatening to

exclude primary care physicians who continue to provide allergy care from the Parkland

network, especially those in contract with UAS.   *See* Exhibit F at ¶ 10 and F-3 to Plaintiffs'

Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-33.   As a result of these letters, Dr.

Osehotue Okojie and at least three other primary care physicians ceased participation in the

market for allergy testing and allergen immunotherapy for patients associated with Parkland

HealthPlan. *See* Ex. D.  Since that time, Phadia and Thermo Fisher have utilized the letter with

physicians and clinics to convince them not to do business with Plaintiffs: they convince

physicians that no pre-authorization is needed for blood testing and that skin prick testing is

reserved, and reimbursed only, for board certified allergists.  Once the letter from Parkland was

published, Phadia and Thermo Fisher representatives communicated internally that the end of

remote allergy was near, thanks to the letter from Parkland. Defendants' success with managed

care organizations means that any Medicaid patient in Texas is effectively restricted to only

ImmunoCap testing manufactured by Phadia.  Few board certified allergists treat patients with Medicaid, and over 80% of allergy tests performed for the patients are utilized with Thermo Fisher and Phadia products.

156.   124. Following the recent success with managed care organizations, Defendants began making headway with commercial carriers as well.  In line with an earlier proposal by a member of RADAR, members of AAAAI began contacting "the Blues," otherwise known as the Blue Cross/Blue Shield of each state.  *See* Exhibit C-7 to Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 12-8 at 1.  As the RADAR post on Basecamp explained, if the Blues in one state restrict primary care physicians from allergy testing or allergen immunotherapy, "it would be great information to disseminate to others so that we can approach our local blues and try to change policy as well." *Id.*

157.   125. On December 10, 2013 following meetings with a board-certified allergist and AAAAI and AAN representatives, Blue Cross/Blue Shield of North Carolina announced a change in its policy effective February 11, 2014, stating "Immunotherapy self-administered in the home setting is considered investigational."  This statement mirrors statements made to other third-party payors by Defendants and their representatives and could be interpreted to purportedly deny reimbursement to physicians that permit patients to self-inject allergy shots. *See* Exhibit F at ¶ 11 and F-4 to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 12-30 and 12-34.

158.   126. More recently, representatives of AAAAI, ACAAI, JCAAI, AAN, and Phadia, and Thermo Fisher have approached other Blues to attempt to convince them to restrict the market for allergy testing and allergen immunotherapy by refusing to pay primary care physicians and those doing business with UAS.  For example, Blue Cross/Blue Shield of Florida

76

reported having considering changes to their policy following contacts with allergists.  *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 12, Dkt. 12-30.  Blue Cross/Blue Shield of Kansas more recently has been denying claims for any primary care physician in contract with UAS. *Id.*

159.   ~~127.~~ The level of activity has risen more recently, especially since this lawsuit was originally filed on January 13, 2014.  As a result of not being named in the lawsuit, AAN and Phadia were encouraged by Defendants to continue engaging in their contacts with third-party payors in an effort to drive Plaintiffs out of business before they could succeed in prosecuting the lawsuit.  As a result, on or about February 23, 2014 at the AAAAI Annual Meeting, Winders met with officers of Phadia, concerning methods to combat UAS on behalf of Defendants in light of this lawsuit.

160.   ~~128.~~ AAN representatives, including Defendant Winders and Wallen then carried out attacks on Plaintiffs in an effort to put them out of business and head off this lawsuit by increasing their direct mail and fax campaign to medical directors of third-party payors and to primary care physicians practicing allergy testing or immunotherapy.  The letters claimed that these competitors were engaged in substandard care and fraud and demanded that third-party payors investigate every AAAPC member and any physician in contract with UAS.  These contacts had the desired effect during the early stages of this lawsuit, significantly reducing payment and revenue to AAAPC members and UAS.  In or around March 2014, AAN also drafted another false, defamatory, and disparaging attack on the services of Plaintiffs, this one entitled "Deception in Allergy and Asthma Care: Recognize the Signs of Fraud."  In this broadly distributed article to third-party payors and primary care physicians, AAN falsely claimed that primary care physicians and companies like UAS are engaged in fraud, and that primary care

physicians should instead purchase RAST testing materials from Phadia and refer patients with a positive blood test to AANMA's network of board-certified allergists. AAN also paid Wallen in April 2014 to present to research "dirt" on Plaintiffs to use in contacts with third-party payors and physicians. [Dkt. No. 135-~~17~~15; Dkt. 134-~~17~~a3,~~b~~ 4]. AAN and Phadia also continued to work together to find common sources of contact with third-party payors and others in an effort to put Plaintiffs out of business before they could discover AAN and Phadia's illegal activities.

161.   ~~129.~~ For example, on January 22, 2014, Parkland demanded repayment of reimbursements which had previously been issued to primary care physicians. *See* Exhibit F to Plaintiffs' Preliminary Injunction Motion at ¶ 12, Dkt. 12-30. <u>The Parkland letter included statements supplied to Parkland by Laurie Schroeder, a Clinical Sales Consultant for Thermo Fisher and Phadia, including the "Fraud and Deception in Allergy Care" article drafted by Winders and published by AAN.</u>  Shortly thereafter, Coventry of Kansas suggested that after consultations with allergists, it may change its policies regarding reimbursement of primary care physicians or any physician that relies on the services of UAS. *Id.* Similarly, during this time frame, physicians called Plaintiffs to express concerns that other commercial carriers and health plans may no longer reimburse allergy testing and allergen immunotherapy performed by primary care physicians, including El Paso First, with some third-party payors threatening to seek their money back. *Id.* Shortly after AAN's follow up letter to third-party payors in March 2014, Humana began demanding repayment of claims previously approved for services provided by primary care physicians in Kentucky in contract with UAS, the market dominated by Defendants Dr. Sublett and his business, PSF, PLLC. Commercial carriers such as the Blues and others are prone to coercion, persuasion or enticement because Defendant purport to represent violations of the standard of care, increased costs, and other claims, all of which are false.

162.    More recently, Phadia and its representatives have attempted to monopolize the market for allergy testing through exclusive arrangements with health plans and other third-party payors.  For example, in September 2014, Phadia agreed with Parkland that all allergy patients must be tested with an allergy-blood test and that no primary care physician in Parkland's network should conduct allergy skin testing.  Parkland, which is the largest hospital and Texas Medicaid provider in the Dallas area, is an essential facility in its area and thus an exclusive contract forecloses a significant portion of the market to competition.  The result of Parkland's agreement with Phadia is that over 90% of the Texas Medicaid patients in Parkland's network are tested using Phadia's ImmunoCap testing.  Since Parkland's adoption of that program, other Texas managed care organization health plans have considered following suit based on Phadia's and Parkland's urging, including El Paso First Health Plan, Superior HealthPlan, Texas Children's Hospital, and Community Health Choice, and leading to Defendants controlling more than 80% of the allergy testing and allergen immunotherapy markets in El Paso, Austin, and Houston.

163.    ~~130.~~ In addition to approaching managed care organizations and commercial carriers, Defendants have approached suppliers—threatening to pull business from those suppliers if they contracted with UAS or AAAPC physicians or gave any grants or donations to AAAPC.  An officer of Greer Labs, Inc., a supplier of skin prick testing equipment and antigens for allergen immunotherapy, informed AAAPC that Defendants threatened to cancel two large contracts if Greer works with AAAPC physicians or contributed at all to AAAPC.  Defendants have contacted and threatened to cancel contracts and ongoing business relationships with Greer Labs, Inc. and Hollister-Stier Allergy, the two largest antigen suppliers in the market for allergy

testing and immunotherapy in furtherance of these threats.  And, due to the Defendants' conduct, AAAPC's membership numbers have suffered as well causing it direct economic harm.

164. As a direct result of Defendants' conduct, AAAPC members and UAS have been required to withdraw from certain local markets, including but not limited to the following areas: Chicago-Joliet-Naperville, IL-IN-WI Metropolitan Statistical Area; Hagerstown-Martinsburg, MD-WV Metropolitan Statistical Area; Wheeling, WV Metropolitan Statistical Area; Gainesville, FL Metropolitan Statistical Area; Orlando–Kissimmee–Sanford, FL Metropolitan Statistical Area; Tampa–St. Petersburg–Clearwater, FL Metropolitan Statistical Area; Lakeland-Winter Haven, FL Metropolitan Statistical Area; Monroe, LA Metropolitan Statistical Area; Fort Polk South, LA Micropolitan Statistical Area; Lake Charles, LA Metropolitan Statistical Area; Kansas City, KS-MO Metropolitan Statistical Area; Wichita, KS Metropolitan Statistical Area; Louisville-Jefferson County, KY-IN Metropolitan Statistical Area; Lexington-Fayette, KY Metropolitan Statistical Area; Tucson, AZ Metropolitan Statistical Area; Phoenix-Mesa-Glendale, AZ Metropolitan Statistical Area; Yuma, AZ Metropolitan Statistical Area; Youngstown–Warren–Boardman, OH–PA Metropolitan Statistical Area; Canton–Massillon, OH Metropolitan area; Gaffney, SC Micropolitan Statistical Area; Greenville-Anderson-Mauldin, SC Metropolitan Statistical Area; and Columbia, SC Metropolitan Statistical Area.  As a result, Defendants no longer face any significant competition in these markets and have increased their market share in these markets above 70% for allergy testing and allergen immunotherapy, as well as in other markets in which Plaintiffs continue to operate but have been hindered. Defendants' conduct is still ongoing which is resulting defendants' further increased market share to Defendants and injury to Plaintiffs.  Phadia has also been able to charge super-

4821-3151 7481.v1

competitive prices during the relevant time, often exceeding 150-250% of their competitors with negligible loss in market share.

165.   The result of Defendants' conduct has been to the detriment of payors and consumers.  As a result of driving the lower cost UAS and primary care physicians from the market and reducing supply, consumers in many markets must choose between paying the inflated price charged by Defendants for allergy testing or allergen immunotherapy, or going without those treatments.  For example, consumers who previously had available to them the cheaper and more convenient allergy skin test in their primary care physician's office must either pay for a more expensive allergy blood test, such as Phadia's ImmunoCap test, or a more expensive skin test performed by a board-certified allergist than if performed by their primary care physician.  Additionally, a smaller number of consumers have the less expensive allergen immunotherapy performed by a primary care physician available to them than the more costly allergen immunotherapy performed by a board-certified allergist.  Defendants' conduct also imposes additional costs on consumers in terms of longer travel times, in office waiting times, more expensive and less useful medications, additional office visits and emergency room visits, and lost work and school days from a decline in effective care.

**PLAINTIFFS HAVE BEEN DAMAGED BY THE DEFENDANTS' ACTIONS**

166.   131. Plaintiffs have been damaged, and will continue to be damaged, by actions taken by Defendants and their co-conspirators on a nationwide basis to boycott and restrict competition and output from AAAPC members and UAS and conspire to monopolize the market for allergy testing.  The direct result of Defendants actions and the encouragement of AANMA, Phadia, AAAAI, ACAAI, JCAAI, and RADAR members to persuade, entice, and coerce insurance companies on behalf of those organizations has caused insurance companies and managed care organizations like Superior, Parkland, Humana, Blue Cross/Blue Shield of

81

Arkansas, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Louisiana, Capital Blue Cross of Pennsylvania, Highmark of Pennsylvania, and Blue Cross/Blue Shield of Kansas to avoid or stop reimbursing primary care physicians altogether; and managed care organizations including Texas Children's Health Plan and Community Health Choice to avoid certifying or approving primary care physicians for reimbursement; and other insurance companies like Aetna, Cigna, Blue Cross/Blue Shield of Texas, Blue Cross/Blue Shield of Florida, and Anthem Blue Cross/Blue Shield of Kentucky, to change and reduce the amounts they are willing to pay primary care physicians.

167.    132. As a direct result of Defendants' actions, AAAPC members and UAS have lost revenue and corresponding profits that they would have generated but for the actions of Defendants.  AAAPC and UAS have been forced to expend substantial resources to ensure that those they do business with do not terminate existing agreements and have also experienced difficulty in entering into business relationships with others because of the Defendants' anticompetitive public relations campaign.

168.    133. UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and consumers.  The result has been most noticeable in terms of lost revenue and corresponding lost profit for services that would have otherwise been provided to physicians. The lost revenue and profit is determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.

169.    134. UAS has also been damaged by a direct boycott on the part of board-certified allergists and their trade organizations and co-conspirators, including AAN, AAAAI, ACAAI,

and JCAAI and their partnership with Phadia. While UAS supports primary care physicians who compete with the allergists, there is no reason that an allergist could not employ UAS as well or at least assist and advise UAS. In addition to the interference with Dr. Kaplan's contract to advise UAS, Defendants have also dissuaded or attacked board-certified allergists that could do business with UAS or any board-certified allergists that could advise or serve on the board of AAAPC. Additionally, Phadia's agreements with its co-conspirators, Quest Diagnostics and CPL not to sell ImmunoCaps to UAS prevents UAS from engaging in blood testing and eliminates UAS's ability to compete with Defendants.

170. ~~135.~~ UAS and AAAPC members have experienced damages in terms of out-of-pocket expenses, lost profit, and loss in value of their business. Plaintiffs anticipate that UAS, AAAPC, and AAAPC members have experienced additional damages, but such damages are difficult to determine at this time because Plaintiffs' investigation into the extent of the damage they have suffered at the hands of Defendants is ongoing. Also much of the additional damage that UAS, AAAPC, and AAAPC members have suffered is not easily calculable, such as damage to their goodwill and to the patient-physician relationship.

171. ~~136.~~ AAAPC, for its part, has suffered significant damages. These damages consist of lost revenue from members who are no longer active in AAAPC because Defendants' conduct illegally forced those physicians to stop offering immunotherapy services to patients. These damages also consist of lost sponsorship revenue due to threats made by Defendants' to prospective sponsors of retribution that would occur if those companies sponsored or otherwise supported AAAPC. Separately, these damages emanate from false exigencies precipitated by Defendants' illicit conduct, which have required AAAPC to divert resources away from

83

supporting member physicians, towards combating the improper and inaccurate information campaigns lodged by Defendants with insurers, regulators, and legislators alike.

## COUNT ONE

## SHERMAN ACT § 1 VIOLATION AGAINST ALL DEFENDANTS

172.   137. Plaintiffs incorporate by reference paragraphs 1 through 136171 as if fully alleged herein.

173.   138. At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition and reduce supply in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies in local areasMSAs throughout the United States, including within the State of Texas and other states, including Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing and allergen immunotherapy equipment, and other third parties in an attempt to

84

persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market. This ~~group boycott and price fixing~~ campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

174. ~~139.~~ The Defendants' actions are a *per se* violation of the Sherman Act. The Defendants include all three national allergy trade associations and represent virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing and allergen immunotherapy. Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, seeking to restrict competition and supply, and encouraging and engaging in price fixing in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants

85

have similarly denied UAS elements access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

175. ~~140.~~ Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis.  The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete with board-certified allergists in the relevant market.  As the result of Defendants' conduct, some consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets in Texas and other states, leaving patients to choose between paying more for allergy treatment or going without.  Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits.  Defendants' actions are also not mere advocacy of the services of board-certified allergists, but are directed at eliminating competitors and thus restricting competition, to the ultimate harm of patient choice.

176. ~~141.~~ As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

4821-3151-7481.v1

177.   ~~142.~~ UAS also seeks money damages from Defendants jointly and severally for these violations.  These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

178.   ~~143.~~ Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT TWO

### SHERMAN ACT § 2 VIOLATION FOR MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, AND CONSPIRACY TO MONOPOLIZE AGAINST DEFENDANTS

179.   Plaintiffs incorporate by reference paragraphs 1 through 178 as if fully alleged herein.

180.   At all times relevant to the Complaint, Defendants and others have combined and conspired to attempt to eliminate competition, restrict output, and establish or maintain a monopoly in the markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies in MSAs throughout the United States, including within the State of Texas and other states, including Texas, Arkansas, Arizona, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.  Defendants have over a 70% share in all local markets in which they compete, including the relevant geographic markets at issue in this case.  Defendants therefore have monopoly power in those markets.  Defendants' predatory and anticompetitive conduct was performed with the specific intent to monopolize the markets for allergy testing and allergen immunotherapy and a dangerous probability of achieving and/or maintaining monopoly power.

4821-3151-7481.v1

181.    Defendants' actions include seeking entry barriers and restriction on participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy skin testing and allergen immunotherapy with the foreseeable result of eliminating competition in the allergy testing and allergen immunotherapy markets by primary care physicians and UAS.   Defendants have conspired to these ends by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors.   In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market.   This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

182.    The Defendants include Phadia, an allergy blood test manufacturer with a greater than 80% share of allergy blood tests sold in MSAs throughout the United States, all three

88

national allergy trade associations, and represents virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing. Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, encouraging price fixing, and attempting to increase and maintain monopoly power in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy testing and care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy testing market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.

183. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition and output for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete in the relevant market. As the result of Defendants' conduct, payors and consumers have been deprived of the benefits of competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets, leaving patients to choose between paying more for

4821 3151 7481 v1

allergy treatment or going without. Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits. Defendants' actions are also not mere advocacy, but are directed at eliminating competitors, restricting competition, and achieving or maintaining a monopoly, to the ultimate harm of patient choice.

184.    Although Defendants acted in concert, Plaintiffs' Section 2 claims for attempted monopoly and monopolization are being asserted against Phadia and Thermo alone. Plaintiffs' claim for conspiracy to monopolize is being asserted against all Defendants.

185.    As a direct and proximate result of Defendants' past and continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

186.    UAS also seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

187.    Plaintiffs also seek injunctive relief. The violations set forth above are continuing and will continue unless injunctive relief is granted.

## COUNT THREE

## TEXAS FREE ENTERPRISE AND ANTITRUST ACT ~~VIOLATION~~VIOLATIONS AGAINST ALL DEFENDANTS

188.    ~~144.~~ Plaintiffs incorporate by reference paragraphs 1 through ~~143~~187 as if fully alleged herein.

189.    ~~145.~~ At all times relevant to the Complaint, Defendants and others have combined and conspired to eliminate competition and reduce supply in the market for allergy testing and

90

allergen immunotherapy for seasonal and perennial allergies in ~~local areas~~MSAs throughout the United States, including within the State of Texas and other states. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members ~~of AAAPC~~ and ~~physicians supported by~~ UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy, by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors to board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, ~~and third party payors~~suppliers of allergy testing and allergen immunotherapy equipment, and other third parties in an attempt to ~~convince those persons and entities to refuse~~persuade, entice, or coerce them not to do business with ~~or pay for the services performed by~~Defendants' competitors, AAAPC members and UAS, or to ~~reduce payment for those services disproportionately to payment for services performed by Defendants and other businesses of board certified allergists. This group boycott and price fixing~~fix prices to competitively disadvantage these competitors to discourage competition in the market. This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN,

91

AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

190. ~~146.~~ The result of that illegal *per se* boycott and price fixing has been to eliminate or restrict AAAPC members' and UAS's ability to market and provide their services in relevant geographic markets within Texas. For example, as explained above, certain Texas insurance companies and managed care organizations have either stopped reimbursements for allergy care by physicians who are supported and assisted by UAS or restricted or interrupted those reimbursements. As a result, UAS, Texas primary care physicians, Texas based members of AAAPC, and Texas allergy patients are all being denied the benefits of fair competition.

191. ~~147.~~ The Defendants' actions are a *per se* violation of the Texas Free Enterprise and Antitrust Act ("TFEAA"). The Defendants represent board-certified allergists, a dominant market group of horizontal competitors. Phadia also has a dominant position in the allergy testing market, as it controls over 80% of the allergy blood tests sold in MSAs throughout the United States. Together, Defendants control in excess of 70% of the allergy testing and allergen immunotherapy markets throughout Texas. They have engaged in joint collaborative action to destroy their legitimate competition by encouraging a group boycott and fixing prices in an attempt to deny their competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy services market. By discouraging primary care physicians from working with UAS and decreasing reimbursements to

92

those who do, the Defendants have similarly denied UAS access to markets that are necessary for it to compete. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so the Defendants should not escape a *per se* designation.

192. ~~148.~~ Strictly in the alternative, the Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and the associated support services, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who partner with UAS. As the result of Defendants' conduct, consumers have been deprived of the competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians, leaving patients to choose between paying more for allergy treatment or going without.

193. Additionally, at all times relevant to the Complaint, Defendants and others have combined and conspired to attempt to eliminate competition, restrict output, and establish or maintain a monopoly in the markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies in relevant geographic markets within Texas. Defendants have over a 70% share in all local markets in which they compete, including the relevant geographic markets at issue in this case. Defendants therefore have monopoly power in those markets. Defendants' predatory and anticompetitive conduct was performed with the specific intent to monopolize the markets for allergy testing and allergen immunotherapy and a dangerous probability of achieving and/or maintaining monopoly power.

194.    Defendants' actions include seeking entry barriers and restriction on participation in the market for all physician and non-physician services provided by non-board certified allergist physicians and their staff or contracting partners, including AAAPC members and UAS. In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated nationwide campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy skin testing and allergen immunotherapy with the foreseeable result of eliminating competition in the allergy testing and allergen immunotherapy markets by primary care physicians and UAS. Defendants have conspired to these ends by targeting the physicians themselves, and by targeting their businesses and contractual relations, including their use of UAS to become competitors. In furtherance of their conspiracies and illegal agreements, Defendants have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, suppliers of allergy testing equipment, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Defendants' competitors, AAAPC members and UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the market. This campaign has been at least partially successful and is the direct and foreseeable result of Defendants agreements to contact third party payors, form RADAR, solicit members to join RADAR, to agree with Phadia and AAN to combat the "remote practice of allergy" or "RPA," to fund AAN, to directly contact third-party payors and physicians, and to encourage AAN, AAAAI, ACAAI, and JCAAI members and Phadia representatives to contact third party payors and physicians on those associations' and organizations' behalf.

195.    The Defendants include Phadia, an allergy blood test manufacturer with a greater than 80% share of allergy blood tests sold in MSAs throughout the United States and in MSAs in

Texas, all three national allergy trade associations, and represents virtually all board-certified allergists, a dominant group of horizontal competitors with substantial market power in the market for allergy testing. Defendants have engaged in joint collaborative action to destroy their legitimate competition by orchestrating a group boycott, encouraging price fixing, and attempting to increase and maintain monopoly power in an attempt to deny competitors access to customers and markets that are necessary to compete. Namely, the Defendants have interfered with primary care physicians' relationships with insurance companies, managed care organizations, and other third-party payors and thereby their ability to receive reimbursement for the allergy testing and care they provide. The Defendants have also discouraged primary care physicians from working with UAS, without whose services many of them will not be able to overcome the barriers to entering the allergy testing market. By discouraging primary care physicians from working with UAS and persuading, enticing, or coercing third-party payors to deny or decrease reimbursements to those who do, the Defendants have similarly denied UAS elements access to markets that are necessary for it to compete.

196.    The agreements that Defendants have entered, maintained, renewed and enforced with one another have had the purpose and effect of eliminating competition and output for the provision of allergy testing and allergen immunotherapy, especially in areas where third-party payors have begun to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS. Adequate reimbursements from third-party payors are essential for primary care physicians and UAS to effectively compete in the relevant market. As the result of Defendants' conduct, payors and consumers have been deprived of the benefits of competition offered by AAAPC members, UAS-supported physicians, and other primary care physicians in relevant geographic markets, leaving patients to choose between paying more for

95

allergy treatment or going without.  Defendants' actions and statements demonstrate that they are not exercising only altruistic concerns, but are motivated by the benefits of a restriction in competition, including protecting their turf and their profits.  Defendants' actions are also not mere advocacy, but are directed at eliminating competitors, restricting competition, and achieving or maintaining a monopoly, to the ultimate harm of patient choice.

197.    Although Defendants acted in concert, Plaintiffs' claims for attempted monopoly and monopolization are being asserted against Phadia and Thermo alone. Plaintiffs' claim for conspiracy to monopolize is being asserted against all Defendants.

198.    ~~149.~~ As a direct and proximate result of Defendants' past and continuing violations of the TFEAA, Plaintiffs have suffered injury and damages in an amount to be proved at trial.

199.    ~~150.~~ UAS seeks money damages from Defendants jointly and severally for these violations. Defendants' violations were willful and flagrant. UAS's actual damages should therefore be trebled under Section 15.21 of the TFEAA.

200.    ~~151.~~ Plaintiffs also seek injunctive relief.  The violations set forth above are continuing and will continue unless injunctive relief is granted.

201.    ~~152.~~ As required by Section 15.21(c) of the TFEAA, a copy of this Complaint shall be mailed to the Attorney General of Texas.

## COUNT ~~THREE~~FOUR

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
## AGAINST ALL DEFENDANTS

202.    ~~153.~~ Plaintiffs incorporate by reference paragraphs 1 through ~~152~~201 as if fully alleged herein.

96

203.   ~~154.~~ In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with the existing agreements between AAAPC and its members and industry sponsors, as well as existing agreements between UAS and its many physicians and practice groups.  Defendants' conduct, which was neither justified nor privileged, was intended to cause insurance companies, managed care organizations, practice groups, and patients to cease their agreements or doing business with primary care physicians, and to cause physicians and practice groups to cease or reduce their engagement under agreements with UAS.  Defendants' conduct constitutes willful and intentional acts of interference with those agreements and was done with malice.  Such conduct caused injury to AAAPC as an organization and to UAS by, among other things, reducing business under these agreements causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for AAAPC and UAS to conduct their operations and business and by causing them to expend considerable resources in order to ensure that agreements and business arrangements are not terminated as a result of Defendants' actions.

## COUNT ~~FOUR~~ FIVE

## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS AGAINST ALL DEFENDANTS

204.   ~~155.~~ Plaintiffs incorporate by reference paragraphs 1 through ~~154~~203 as if fully alleged herein.

205.   ~~156.~~ In addition, or in the alternative, Defendants' conduct described herein constitutes tortious interference with AAAPC's and UAS's existing and prospective business relations.  There was a reasonable probability that, absent Defendants' actions, AAAPC would maintained existing relationships with and would have entered into additional relationships with third parties, including primary care physicians and industry sponsors, and that UAS would have

maintained existing relationships with and entered into additional business relationships with third parties, including other physicians and practice groups. Defendants intentionally interfered with these relationships by attempting to prevent payment to AAAPC members and other physicians who are not board-certified allergists who are assisted and supported by UAS, to scare them away from membership in AAAPC as well as to prevent physicians and practice groups from maintaining relationships with or entering into business with UAS. Defendants' conduct constitutes willful and intentional acts of interference and was done with malice. Defendants' conduct was independently tortious or unlawful for the reasons described herein, including for violating and encouraging and participating others in violating the Sherman Act, the TFEAA, the Texas State Court Injunction, making false, fraudulent, defamatory, and disparaging statements regarding AAAPC, AAAPC members, and UAS, and their businesses, and participating in a breach of statutory and contractual duties of confidentiality owed to the Texas Medical Board and other governmental agencies. Defendants' interference proximately caused injury to AAAPC and UAS by, among other things, reducing revenue and corresponding profits from these business relationships and making it more difficult to conduct operations and causing AAAPC and UAS to expend considerable resources in order to further their business.

## COUNT FIVESIX

### CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

206.   157. Plaintiffs incorporate by reference paragraphs 1 through 156205 as if fully alleged herein.

207.   158. In addition, or in the alternative, Defendants' conduct described herein constitutes a civil conspiracy to violate the Sherman Act and the Texas Free Enterprise and Antitrust Act, as well as to tortiously interfere with Plaintiffs' current contracts and existing and

98

prospective business relations. Defendants and others have combined and conspired to eliminate competition for the provision of allergy testing and allergen immunotherapy and the associated support services in the form of physicians who are not board-certified allergists, including AAAPC members and those supported by UAS. In furtherance of their conspiracy, Defendants and others have agreed to engage in a coordinated campaign to restrict competition by discouraging physicians who are not board-certified allergists from the practice of allergy testing and allergen immunotherapy by targeting the physicians themselves and by targeting their businesses, including their use of UAS to become competitors with board-certified allergists and their businesses. In furtherance of their conspiracies and illegal agreements, Defendants and their other co-conspirators have engaged in and encouraged contact with physicians, insurance companies, managed care organizations, and third party payors in Texas and elsewhere in an attempt to convince those persons and entities to engage in a group boycott of the services of AAAPC members and UAS and to fix prices for these services to discourage competition and to attempt to maintain and further monopolize the markets for allergy testing and allergen immunotherapy. Defendants and their other co-conspirators have also taken actions to interfere with Plaintiffs' current contracts and prospective business relationships. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiffs have suffered considerable injury to their businesses and their ability to compete in the marketplace. Defendants are all jointly and severally liable for the actions taken in furtherance of their conspiracy.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

208. 159. Plaintiffs incorporate by reference paragraphs 1 through 158207 as if fully alleged herein.

209. 160. The actionable conduct of Defendants over the past few years has recently threatened and is starting to cause imminent and irreparable harm to AAAPC members and UAS.

Starting around October 2013, the number of third party payors who report being contacted increased dramatically and at the urging of Defendants and their co-conspirators, actions to stop doing business with or reimburse these competitors started to grow. More recently, since the original filing of this Complaint, additional third party payors have expressed the same concerns raised by Defendants, threatening to remove primary care physicians and UAS from the market entirely, at the suggestion of Defendants.

210.   161. To preserve the status quo until trial in this cause, Plaintiffs hereby request the Court to preliminarily enjoin and restrain Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a preliminary injunction, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting, discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

211.   162. Upon judgment in this cause, Plaintiffs further request the Court to enter a judgment permanently enjoining and restraining Defendants, and their agents, servants, employees and all persons acting under, and in concert with, or for them, from: (i) engaging in contacts or discussions with insurance companies, managed care organizations, or other third-party payors concerning who should perform allergy testing or allergen immunotherapy or whether or how much those organizations should reimburse for those services, (ii) contacting,

discussing, or disseminating materials to third-party payors, physicians, or others in the industry regarding the business practices or services of primary care physicians or UAS; or (iii) taking action or encouraging others to take action restrained above or otherwise to harm AAAPC's, AAAPC members', or UAS's businesses.

## ATTORNEYS' FEES

212. ~~163.~~ Plaintiffs incorporate by reference paragraphs 1 through ~~162~~211 as if fully alleged herein.

213. ~~164.~~ 15 USCA § 15 and TFEAA § 15.21 both provide for the recovery of attorney fees and costs of suit in private enforcement actions under the antitrust laws.  Plaintiffs therefore seek recovery of their attorneys' fees on this statutory basis as a remedy for the costs they have incurred as a result of Defendants' conduct.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

b.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

c.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(a) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a).

d.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Section 15.05(b) of the TFEAA, Tex. Bus & Comm. Code § 15.05(b).

e.   ~~c.~~ Preliminarily and permanently enjoin Defendants from violating ~~Section~~Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 -2 and

101

~~Section~~Sections 15.05(a)_and_(b) of the TFEAA, Tex. Bus & Comm. Code § 15.05(a)_&_(b).

f.    ~~d.~~ Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing contracts.

g.    ~~e.~~ Adjudge and declare that Defendants unlawfully interfered with Plaintiffs' existing and prospective business relationships.

h.    ~~f.~~ Adjudge and declare that Defendants unlawfully engaged in a civil conspiracy.

i.    ~~g.~~ Against all Defendants, jointly and severally, award UAS damages in an amount to be proved at trial, to be trebled with interest.

j.    ~~h.~~ Against all Defendants, jointly and severally, award AAAPC damages in an amount to be proved at trial, with interest.

k.    ~~i.~~ Against all Defendants, jointly and severally, award UAS and AAAPC exemplary damages in an amount to be proven at trial.

l.    ~~j.~~ Against all Defendants, jointly and severally, award Plaintiffs their attorney's fees and costs of this suit; and

m.    ~~k.~~ Award such other further relief as the Court deems just and proper.

DATED: ~~January 30, 2015~~January 4, 2016.

102

4821-3151-7481.v1

Respectfully submitted,


**PILLSBURY WINTHROP SHAW PITTMAN LLP**
~~BRACEWELL & GIULIANI LLP~~
By:   /s/ Casey Low

Casey Low
Texas Bar No. 24041363
Benjamin L. Bernell
Texas Bar No: 24059451
Liz Kozlow Marcum
Texas Bar No: 24078801
~~111~~401 Congress Ave., Suite ~~2300~~1700
Austin, Texas 78701-4061
Phone: (512) ~~542~~580-~~2109~~9600
Fax:     (~~800~~512) 404~~580~~-~~3970~~9601
~~casey.low@bgllp.com~~
casey.low@pillsburylaw.com
liz.marcum@pillsburylaw.com
~~Richard C. Danysh~~
~~Texas Bar No. 05377700~~
~~300 Convent St., Suite 1500~~
~~San Antonio, Texas 78205-3723~~
~~Phone: (210) 299-3475~~
~~Fax: (210) 299-0106~~
~~richard.danysh@bgllp.com~~

**ATTORNEYS FOR PLAINTIFFS**
**AAAPC & UAS**

# Exhibit 3

# FILED UNDER SEAL

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, LLC, d/b/a UNITED ALLERGY SERVICES, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIV. NO. 5:14-CV-00035-OLG |
| AMERICAN ACADEMY OF ALLERGY ASTHMA & IMMUNOLOGY, ET AL., | § § § | |
| Defendants. | § § | |

## DEFENDANT PHADIA US INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' REQUEST FOR PRODUCTION

TO:    Plaintiffs Academy of Allergy & Asthma in Primary Care and United Biologics, LLC d/b/a United Allergy Services, by and through their counsel of record, Casey Low, Bracewell & Giuliani, LLP, 111 Congress Ave., Suite 2300, Austin, Texas 78701-4061, and Richard C. Danysh, Bracewell & Giuliani, LLP, 300 Convent St., Suite 1500, San Antonio, Texas 78205-3723.

Pursuant to the Federal Rules of Civil Procedure, Defendant Phadia US Inc. ("Phadia"), serves its objections and responses to Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") (collectively, "Plaintiffs") Request for Production to Phadia.  Phadia reserves the right to supplement and amend these responses as may be required or permitted by the Federal Rules of Civil Procedure.

## **GENERAL OBJECTIONS**

The following general objections set forth herein are incorporated by reference as if fully set forth in, and fully applicable to, each specific response to each and every individual request and shall have the same force as if set forth in full in response to each and every individual request. Without waiving these general objections, Phadia may include specific objections on the same grounds in its written responses to the individual requests.

1.      Phadia objects to each of the requests to the extent it is (i) overly broad, (ii) seeks information that is not relevant to the subject matter of this case, and (iii) is not reasonably calculated to lead to the discovery of admissible evidence, including to the extent they seek "all" or "any" materials or information concerning the subject matters referenced therein, particularly under circumstances in which a subset of all such materials or information would be sufficient to disclose the pertinent information to Plaintiffs. To the extent that Phadia provides responsive information, it does not concede that such information is relevant to or admissible in this action.

2.      Phadia objects to each of the requests to the extent that it seeks information that is not in Phadia's immediate possession, custody, or control, or that cannot be obtained by means of a reasonably diligent, good faith effort on the grounds that it is (i) overly broad, (ii) unduly burdensome, and (iii) purports to impose obligations and duties on Phadia that exceed the scope of permissible discovery under the Federal Rules of Civil Procedure.

3.      Phadia objects to each of the requests to the extent that it seeks disclosure of information that is subject to any privilege, including without limitation, the attorney-client privilege, the work-product privilege, and the joint-defense or common-interest doctrine, on the basis that it exceeds the permissible scope of discovery under the Federal Rules of Civil Procedure. Phadia will make a reasonable effort to avoid the disclosure of information that reflects, contains, or constitutes privileged material or attorney work product. Phadia does not intend to waive, and hereby expressly preserves, any privilege, including the attorney-client and work-product privileges.

4.      Phadia objects to each of the requests to the extent that it seeks information that is also sought by other requests, or by other discovery requests, on the grounds that such requests are unnecessarily cumulative and duplicative.

5.      Phadia objects to each of the requests to the extent that it purports to require information that is public, that is already in Plaintiffs' possession, custody, or control or that is otherwise available from sources to which Plaintiffs have access.

6.      The objections and responses contained herein are subject to, and without waiver of, any right of Phadia to (i) object to other requests directed to the subject matter of the requests and this response; (ii) make additional supplementary objections to the requests; or (iii) revise, correct, supplement, or clarify the content of this response.

7.      Phadia objects to each of the requests on the basis that it purports to require, either expressly or by implication, complete, or final responses.  Discovery is ongoing and Phadia reserves the right to amend or supplement its responses.

8.      These general objections are referred to herein as "general objections" and are incorporated by reference into each of Phadia's specific objections and responses as set forth in full below.  The following responses are made subject to, and in reliance on, the general objections set forth above.

## SPECIFIC ANSWERS AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 1:**  Any documents and communications related to the Defendants in the Litigation including Your relationship with any of the Defendants or any communications concerning the Litigation.

**RESPONSE:**

Phadia objects to this request on the basis that it is overbroad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  The request seeks any and all documents and communications related to Defendants, without limitation.  Phadia further objects to this request on the grounds that it is duplicative and cumulative of documents already produced.  In response to Plaintiffs' Third Party Subpoena Request for Production ("Subpoena Request") No. 1, Phadia produced documents concerning the subject of the litigation that were related to Phadia's relationship with AAAAI, ACAAI, JCAAI, Lyndon E. Mansfield, M.D., Donald Aaronson, M.D., Gary Gross, M.D., James Sublett, M.D., and David Weldon, M.D.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with AANMA, Atlanta Allergy & Asthma Clinic, P.A., Dallas Allergy and Asthma Center, P.A., Stanley Fineman, M.D., Tonya Winders, and James Wallen discussing Plaintiffs or the remote practice of allergy; and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 2:**  Any documents and communications related to AAAAI, ACAAI, JCAAI, TAAIS, AANMA, AAOA, or ABAI and their position on reimbursement or payment of allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the basis that it is overbroad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  The request seeks any and all documents and communications related to reimbursement of allergy testing and/or allergen immunotherapy, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia further objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia.  Phadia further objects to this request to the extent it seeks the production of information that is not in Phadia's custody, control, or possession.  In addition, Phadia objects to this request on the grounds that it is duplicative and cumulative of documents already produced.  In response to Subpoena Request No. 2, Phadia produced documents that were related to AAAAI, ACAAI, and JCAAI and to allergy testing or allergen immunotherapy.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications between Phadia and TAAIS, AANMA, AAOA, or ABAI discussing their position on reimbursement or payment of allergy testing and/or

allergen immunotherapy, if any, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 3:**  Any documents and communications related to or referring to "remote practice," "remote practice of allergy," "remote allergy," "RPA," "remote allergy lab," "RAL," or "remote lab," or the practice of allergy testing and/or allergen immunotherapy by primary care physicians or non-board certified allergists.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia also objects to this request on the grounds that it is duplicative and cumulative of documents already produced in response to Subpoena Request No. 6.  Subject to and without waiver of the foregoing general and specific objections, Phadia will supplement its response to Subpoena Request No. 6 with non-privileged documents responsive to the enumerated search terms, to the extent they have not already been produced.

**REQUEST FOR PRODUCTION NO. 4:**  Any documents and communications related to or referring to "home immunotherapy," "investigational" treatments or services, "fraud," "fraudulent" or "pass through billing" for allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiving the forgoing specific and general objections, Phadia will produce non-privileged documents discussing "home immunotherapy," "investigational treatments or services," "pass through billing," "billing fraud," or deceptive billing practices in connection with Plaintiffs or their primary care physician clients and/or members related to Plaintiffs, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 5:**  Any documents and communications related to or referring to Plaintiff UAS including any name used to refer to Plaintiff UAS, including "United Allergy," "United Allergy Labs," or "UAL," Plaintiff AAAPC, or any of its member physicians, or "Allergy Companies."

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia objects to producing all documents and communications related to "Plaintiff AAAPC, or any of its member physicians" as placing an undue burden on Phadia to discern which physicians are or are not members of the AAAPC.  Phadia further objects to the extent that the term "member physicians" of AAAPC is vague, ambiguous, and calls for

information that is outside the knowledge of Phadia.  Phadia also objects to the term "Allergy Companies" as placing an undue burden on Phadia to discern all companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology.

Phadia further objects to this request on the grounds that it is duplicative and cumulative of documents already produced in response to Subpoena Requests Nos. 2, 3, 4, 11, and 12, and of documents already requested under Requests for Production Nos. 3, 10, 17, and 20.

**REQUEST FOR PRODUCTION NO. 6:**  Any documents and communications related to Your communications with any primary care physician or any other non-board-certified allergist concerning allergy testing or allergen immunotherapy, Plaintiffs, the remote practice of allergy, or OIG Advisory Opinion 11-17 attached hereto as Exhibit B.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks "any . . . communications . . . with any primary care physician or any other non-board-certified allergist concerning allergy testing."  Phadia is an allergy testing company with approximately 1,500 employees worldwide, many of whom communicate with physicians "concerning allergy testing" multiple times a day, every day. Phadia further objects to the term "non-board-certified allergist" as placing an undue burden on Phadia to discern which physicians have or have not obtained a certification from the American Board of Allergy and Immunology.  In addition, Phadia objects to this request as unnecessarily duplicative and cumulative of other discovery requests.  Phadia further objects to this request as vague and ambiguous because "Exhibit B" is not attached; however, Phadia interprets this request to refer to the November 2011 OIG Advisory Opinion available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-17.pdf.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with third parties reasonably believed to be primary care physicians or non-board-certified allergists discussing Plaintiffs or the OIG Advisory Opinion 11-17 linked above, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 7:**  Any documents related to communications with third-party payors concerning their policy for reimbursement of allergy testing and/or allergen immunotherapy, including but not limited to communications with Aetna, Cigna, Humana, United Healthcare, Blue Cross/Blue Shield of Arizona, Arkansas Blue/Cross Blue Shield, Anthem Blue Cross/Blue Shield of Colorado, Blue Cross/Blue Shield of Florida, Blue Cross/Blue Shield of Georgia, Blue Cross/Blue Shield of Illinois, Blue Cross/Blue Shield of Kansas, Anthem Blue Cross/Blue Shield of Kentucky, Blue Cross/Blue Shield of Louisiana, Anthem Blue Cross/Blue Shield of Missouri, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Oklahoma, Highmark Health, Capital Blue Cross/Blue Shield of Pennsylvania, Independence Blue Cross, Blue Cross Northeastern Pennsylvania, Blue

Cross/Blue Shield of South Carolina, Blue Cross/Blue Shield of Tennessee, Blue Cross/Blue Shield of Texas, Regence Blue Cross/Blue Shield of Utah, Oklahoma Health Care Authority, First Priority Life Insurance Company, Geisinger Health Plan, Coventry, Coventry Health America, Centene, Inc., Superior HealthPlan, Texas Children's Health Plan, Parkland Community Health Plan, El Paso First Health Plan, Texas Medicaid, Pennsylvania Medicaid, WellSpan Health, and South Central Preferred.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence, including insofar as it calls for the production of documents "related to" communications.  The request seeks any and all documents and communications related to multiple third party payors, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia.  Phadia further objects to this request to the extent that it seeks the production of information not in Phadia's custody, control, or possession.  In addition, Phadia objects to this request on the grounds that it is duplicative and cumulative of documents already produced in response to Subpoena Request Nos. 3, 4, 7, and 12.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with the above-listed payors discussing reimbursement for UAS's services, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 8:**  Any documents and communications related to AANMA, Tonya A. Winders, Nancy Sander, Stanley Fineman, M.D., James Wallen, or Patrick Strauss including AAN0005419-5421, attached as Exhibit B.

**RESPONSE:**

Phadia objects to this request as vague and ambiguous because "Exhibit B" is not attached.  Phadia also objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with AANMA, Tonya A. Winders, Nancy Sander, Stanley Fineman, M.D., James Wallen, and Patrick Strauss discussing Plaintiffs or the remote practice of allergy, and all non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 9:**  Any documents and communications related to David Brown, M.D., Wesley Burks, M.D., John Henley, M.D., James Tracy, D.O. and/or Andrew Murphy, M.D. concerning allergy testing and/or allergen immunotherapy provided by

primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," "RPA," "RAL," "Allergy Companies," AAAPC, or UAS.

**RESPONSE:**

Phadia objects to the term "non-board-certified allergists" as placing an undue burden on Phadia to discern which physicians have or have not obtained a certification from the American Board of Allergy and Immunology. Phadia further objects to the term "Allergy Companies" as placing an undue burden on Phadia to discern all companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 10:**   Any documents and communications related to Hollister-Stier Laboratories, Greer Laboratories, Inc., ALK Abello or any other supplier of allergy testing or allergen immunotherapy equipment or services, including all persons, agents, or entities acting or purporting to act on those entities behalf concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," "RPA," "RAL," "Allergy Companies," AAAPC, or UAS.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. The request seeks "any . . . communications . . . with any . . . supplier of allergy testing or allergen immunotherapy equipment or services . . . concerning allergy testing." Phadia is an allergy testing company with approximately 1,500 employees worldwide, many of whom communicate with suppliers of allergy testing equipment or services "concerning allergy testing" multiple times a day, every day. Phadia further objects to the term "non-board certified allergist" as placing an undue burden on Phadia to discern which physicians have or have not obtained a certification from the American Board of Allergy and Immunology. Phadia further objects to the term "Allergy Companies" as placing an undue burden on Phadia to discern all companies that provide allergy support services, including providing technicians and laboratory support, to physicians who practice allergy or immunology. Phadia also objects to the terms "any other supplier," "all," and "purporting to act" as vague and ambiguous.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents related to Hollister-Stier Laboratories, Greer Laboratories, Inc., ALK Abello, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 11:**   Any documents and communications related to Novitas Solutions, Inc. concerning allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Novitas Solutions, Inc. discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 12:**   Any documents and communications related to Gregory FCA concerning AANMA, Phadia, and allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia also objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia. In addition, Phadia objects to this request to the extent it seeks the production of information that is not in Phadia's custody, control, or possession.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents discussing Plaintiffs or the remote practice of allergy, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 13:**   Any documents and communications related to Medical Centers of North Texas concerning allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications concerning allergy testing and/or allergen immunotherapy, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Medical Centers of North Texas discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 14:**    Any documents and communications related to Texas Health Resources, including Texas Presbyterian Hospital and Medical Edge, concerning allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications concerning allergy testing and/or allergen immunotherapy, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Texas Health Resources, including Texas Presbyterian Hospital and Medical Edge, discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 15:**    Any documents and communications related to Hospital Corporation of American ("HCA"), including HCA Florida Hospitals, concerning allergy testing and/or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications concerning allergy testing and/or allergen immunotherapy, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia further objects to this request to the extent it calls for information unrelated to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Hospital Corporation of American ("HCA"), including HCA Florida Hospitals discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 16:**    Any communications and documents related to communications with James L. Guy, Stacy Jeffress, Robyn Goates, Roger Purnell, Bill

Reineberg, Dr. Barry Lachman, M.D., Gilbert Handal, M.D., William Glomb, M.D., David Palafox, M.D., David Harmon, M.D., Harold Farber, M.D., or Allan Chernov, M.D.

**RESPONSE:**

Phadia objects to this request on the basis that it is overbroad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. The request seeks any and all documents and communications related to multiple doctors, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with James L. Guy, Stacy Jeffress, Robyn Goates, Roger Purnell, Bill Reineberg, Dr. Barry Lachman, M.D., Gilbert Handal, M.D., William Glomb, M.D., David Palafox, M.D., David Harmon, M.D., Harold Farber, M.D., or Allan Chernov, M.D. discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 17:**  Any communications and documents related to the Texas Medical Board, the Louisiana Medical Board, the Georgia Medical Board, or any other state medical board concerning non-board certified allergists practicing allergy testing or allergen immunotherapy or UAS.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. Phadia also objects to the term "non-board-certified allergist" as placing an undue burden on Phadia to discern which physicians have or have not obtained a certification from the American Board of Allergy and Immunology. Phadia further objects to the term "any other" as unnecessarily overbroad.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Texas Medical Board, the Louisiana Medical Board, and the Georgia Medical Board discussing primary care physicians practicing allergy testing or immunotherapy or discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 18:**  Any communications and documents related to Patrick Strauss, Allerta Corp., or AllergiSource LLC including all communications with any associated individual or entity.

**RESPONSE:**

Phadia objects to this request on the basis that it is overbroad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence. The request seeks any and all documents and communications related to an individual, two entities, and all associated individuals and entities, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Patrick Strauss, Allerta Corp., and AllergiSource LLC discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 19:**   Any communications and documents related to AMW Consultants.

**RESPONSE:**

Phadia objects to this request on the basis that it is overbroad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. The request seeks any and all documents and communications related to an entity, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation. Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents that are reasonably related to the litigation.

**REQUEST FOR PRODUCTION NO. 20:**   Any documents related to communications with Jeffrey Rosch, MD, Rosch Visionary Systems, Inc., and Central Pennsylvania Allergy & Asthma Care concerning allergy testing and/or allergen immunotherapy provided by primary care physicians, non-board certified allergists, "remote practice," "remote practice of allergy," "remote allergy," or "RPA," "RAL," "Allergy Companies," AAAPC, or UAS.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence, including insofar as it calls for the production of documents "related to" communications. Phadia also objects to the term "non-board-certified allergist" as placing an undue burden on Phadia to discern which physicians have or have not obtained a certification from the American Board of Allergy and Immunology.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 21:**   Any documents and communications related the "red list" referenced in PHADIA-SUB0012902-12904.

12

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 22:**  Any documents and communications related to the Phadia Advisory Board and its members, including Allan Stillerman, MD, Jay Portnoy, MD, J.S. Eghrari-Sabet, MD, Maeve O'Connor MD, Lyndon Mansfield, MD, James Sublett, MD, and Paul Ehrlich including any contracts or agreements with Phadia or Thermo Fisher Scientific and any documents related to or reflecting payment or remuneration made to those individuals.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications related to Phadia's Advisory Board and its members, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia also objects to this request on the grounds that it is duplicative and cumulative of documents already produced.  In response to Subpoena Request No. 10, Phadia produced contracts between Phadia and the Advisory Board Members.

Subject to and without waiver of the foregoing general and specific objections, Phadia refers to documents bates labeled: PHADIA-SUB0000759, PHADIA-SUB0000766, PHADIA-SUB0000773, PHADIA-SUB0000783, PHADIA-SUB0000790, PHADIA-SUB0000797, PHADIA-SUB0000804, PHADIA-SUB0000811, PHADIA-SUB0000818, PHADIA-SUB0000825, PHADIA-SUB0000836, PHADIA-SUB0000843, PHADIA-SUB0000850, and PHADIA-SUB0000857.  Phadia will supplement this production with non-privileged written communications related to both Phadia's Advisory Board or its members and to Plaintiffs, and all non-privileged documents discussing such communications, to the extent not already produced, if any, that can be located through a reasonable search.  Phadia will also produce documents reflecting payments or remuneration made to members of the Phadia Advisory Board.

**REQUEST FOR PRODUCTION NO. 23:**  Any documents and communications related the "No-Fly list" referenced in PHADIA-SUB0016751-16752.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 24:** Any documents and communications related the "task grid" referenced in PHADIA-SUB0017303-17306.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 25:** Any documents and communications related the "webinar training for competitive intelligence on United Allergy" referenced in PHADIA-SUB0019588.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 26:** Any documents and communications related the AAAAI San Francisco meeting on March 18-22, 2011, including "Friends of Phadia" referenced in PHADIA-SUB0020224.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 27:** Any documents and communications related the "Shreveport Market Intel-April 13-14" referenced in PHADIA-SUB0020224.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 28:** Any documents and communications related the "Coordinating efforts and PR plans for 2011" referenced in PHADIA-SUB0020225.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 29:**   Any documents and communications related to Quest Diagnostics concerning allergy testing or allergen immunotherapy, including communications as referenced in PHADIA-SUB0020226.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.   This request seeks information about communications with Quest Diagnostics, regardless of whether they are related to Plaintiffs, Defendants or the claims or defenses at issue in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Quest Diagnostics discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 30:**   Any documents and communications related to Clinical Pathology Laboratories, Inc. concerning allergy testing or allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.   This request seeks information about communications with Clinical Pathology Laboratories, regardless of whether they are related to Plaintiffs, Defendants or the claims or defenses at issue in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Clinical Pathology Laboratories, Inc. discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 31:**   Any documents and communications related to "the Specialist Strategy," "the Phadia Advocate Development Strategy," and the "Comprehensive Market Access Strategy," as described in PHADIA-SUB0020228.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents.

**REQUEST FOR PRODUCTION NO. 32:**   Any documents related to communications with Jacqueline S. Eghrari-Sabet, M.D.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. The request seeks any and all documents and communications related to an individual, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.  Phadia also objects to this request on the grounds that it is duplicative and cumulative Request for Production No. 22.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Jacqueline S. Eghrari-Sabet, M.D. discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 33:**   Any documents and communications related to employment files, personnel files, sales performance reviews, termination proceedings or communications, evaluations, annual reviews, or other performance or employment-related communications of Tonya Winders, David Esposito, Laurie Schroeder, Tom Wajda, Joe Fraas, Matt Mannino, Dennis Flannelly, Brandon Massey, Steve Grabosky, Doug Burnett, Joseph Jones, and Kevin TenBrink.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  This request seeks employment files, personnel files, sales performance reviews, termination proceedings or communications, evaluations, annual reviews, or other performance or employment-related communications, regardless of whether they are related to the claims or defenses at issue in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents.

**REQUEST FOR PRODUCTION NO. 34:**   Any documents and communications related to Your litigation hold letter, or Your communications relating to preservation of documents and information relating to this litigation.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia also objects to the terms "any," "related to," and "relating to" as vague, ambiguous, and overbroad.  Phadia further objects to this request to the extent that it seeks the production of information protected from disclosure pursuant to the attorney-client

16

privilege, the work-product doctrine, the joint-defense or common-interest doctrine, or any other applicable privilege, exemption, immunity, or protection against disclosure arising under any applicable law or rule.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce documents sufficient to identify the individuals who received the litigation hold letter and a list of the document sets that those individuals were instructed to retain.

**REQUEST FOR PRODUCTION NO. 35:**  Any documents and communications related to the purchase and acquisition of Phadia U.S. Inc. by Thermo Fisher Scientific, including the evaluation of Phadia by Thermo Fisher Scientific and any communications and discussions regarding the potential for litigation against Plaintiffs or anyone practicing in allergy testing and allergen immunotherapy.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks information related to the acquisition of Phadia, regardless of whether such documents are related to the claims or defenses at issue in this litigation. Phadia further objects to the extent that it purports to require information that is public, that is already in Plaintiffs' possession, custody, or control, or that is otherwise available from sources to which Plaintiffs have access.

Subject to and without waiver of the foregoing general and specific objections, Phadia directs Plaintiffs to the Thermo Fisher Scientific, Inc. 10-K, filed on February 29, 2012, for information regarding the acquisition of Phadia. Phadia will produce non-privileged documents or communications related to the acquisition that relate to "the potential for litigation against Plaintiffs or anyone practicing in allergy testing and allergen immunotherapy," if any.

**REQUEST FOR PRODUCTION NO. 36:**  Any documents and communications sufficient to explain and define the relationship between Phadia and Thermo Fisher Scientific, including the relationship with ImmunoDiagnostics, ICAPs, Phadia Laboratory Systems, Phadia U.S. Inc., including any overlap with directors and officers of such entities.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents sufficient to explain and define the relationship between Phadia and Thermo Fisher Scientific, including the relationship with ImmunoDiagnostics, ICAPs, Phadia Laboratory Systems, and Phadia U.S. Inc., including any overlap with directors and officers of such entities.

**REQUEST FOR PRODUCTION NO. 37:**  Any documents and communications sufficient to demonstrate Phadia's market share of RAST or blood testing, including its market share for RAST or blood testing for seasonal and perennial allergies.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  In addition, Phadia objects to this request because it seeks documents containing highly confidential, proprietary and competitively sensitive information.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce documents and communications sufficient to demonstrate Phadia's market share of RAST or blood testing, including its market share for RAST or blood testing for seasonal and perennial allergies.

**REQUEST FOR PRODUCTION NO. 38:**  Any documents and communications related the promotion of ICAPs, ImmunoCaps, ImmunoDiagnostics, or other products of Phadia and Thermo Fisher Scientific by AAAAI, TAAIS, JCAAI, ABAI, AANMA, AAOA, or ACAAI.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seek information regarding communications related to all Phadia and Thermo Fisher Scientific products, regardless of whether they are at issue in this litigation.  Phadia also objects to this request because it seeks documents containing highly confidential, proprietary and competitively sensitive information.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with AAAAI, TAAIS, JCAAI, ABAI, AANMA, AAOA, or ACAAI discussing the promotion of ICAPs, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 39:**  Any documents and communications related to the introductory webinar of the Phadia Specialist Advisory Board, as referenced in PHADIA-SUB0005674.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 40:**  Any documents and communications related to the live meeting of the Phadia Specialist Advisory Board, as referenced in PHADIA-SUB0005674.

18

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 41:**   Any documents and communications between Tonya Winders and any of the Defendants, including Dr. Sublett.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications between Tonya Winders and the Defendants, with the exception of Phadia, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 42:**   Produce the spreadsheet referenced in PHADIA-SUB0013962 and any related documents or communications.

**RESPONSE:**

Phadia objects to this request on the grounds that the term "any related documents or communications" is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce the spreadsheet referenced in PHADIA-SUB0013962, e-mails preceding and proceeding PHADIA-SUB0013962 in the e-mail thread, and all versions and revisions to the spreadsheet referenced in PHADIA-SUB0013962.

**REQUEST FOR PRODUCTION NO. 43:**   Any documents and communications as referenced in PHADIA-SUB0003617-3621, including communications with Wee Tots, Wichita Falls, Dr. Levy, Dr. Parsley, Cooks Children, Health First, Medicine Associates, and THR/Medical Edge.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents and communications related to individuals and entities, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Wee Tots, Wichita Falls, Dr. Levy, Dr. Parsley, Cook Children's, Health First, Medicine Associates, and THR/Medical Edge discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 44:** Any documents and communications related to the Southeastern Allergy Society, including meetings, minutes, communications.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. The request seeks any and all documents and communications related to Southeastern Allergy Society, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation. Phadia also objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia. Phadia further objects to this request to the extent that it seeks the production of information that is not in Phadia's custody, control, or possession.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents that are reasonably related to the litigation.

**REQUEST FOR PRODUCTION NO. 45:** Any documents and communications related to Meijer and Costco and allergy testing.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. The request seeks any and all documents and communications related to Meijer and Costco, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation. Phadia further objects to this request to the extent that it seeks the production of information not in Phadia's custody, control, or possession.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with Meijer and Costco discussing allergy testing, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 46:** Any documents and communications related to Dr. Friedman including any documents referenced in PHADIA-SUB0012902-12904.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to

admissible evidence. The request seeks any and all documents and communications related to an individual, regardless of whether those documents reference or are related to Plaintiffs or to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications related to Dr. Friedman and his opinions and advocacy efforts regarding primary care providers performing allergy testing or allergen immunotherapy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 47:**   Any documents and communications related to payments made to any Defendants in this Litigation, including invoices, checks, payments, contracts, agreements, or any communication reflecting an exchange of money between You and AANMA, AAAAI, ACAAI, JCAAI, or Tonya Winders.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. Phadia objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia. Phadia further objects to this request to the extent that it seeks the production of information not in Phadia's custody, control, or possession.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce a list of payments made to AANMA, AAAAI, ACAAI, JCAAI, or Tonya Winders and will produce non-privileged written communications between Phadia and AANMA, AAAAI, ACAAI, JCAAI, or Tonya Winders regarding payments.

**REQUEST FOR PRODUCTION NO. 48:**   Any documents and communications related to the "JCAI Task Force on RPA Task Force," including as referenced in PHADIA-SUB0004786.

**RESPONSE:**

Phadia objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce responsive non-privileged documents.

**REQUEST FOR PRODUCTION NO. 49:**   Any documents and communications related to Your support for "Texas Allergy Society's litigation efforts," including as referenced in PHADIA-SUB0004786.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to

admissible evidence. Phadia further objects to the factual assumption that Phadia supported Texas Allergy Society's litigation efforts, and any response to this request does not concede that assumption.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with the Texas Allergy Society discussing Texas Allergy Society's litigation efforts, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 50:** Any documents and communications related to Your support for "Dr. Vaughn's litigation efforts," including as referenced in PHADIA-SUB0004786.

**RESPONSE:**

Phadia objects to the factual assumption that Phadia supported Dr. Vaughn's litigation efforts, and any response to this request does not concede that assumption. Subject to and without waiver of the foregoing general objections, Phadia will produce non-privileged written communications with Dr. Vaughn discussing Dr. Vaughn's litigation efforts, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 51:** Any documents and communications related to the statement "Report Fraud & Abuse to all aforementioned payors," including as referenced in PHADIA-SUB0004786.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce responsive non-privileged documents that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 52:** Any documents and communications related to the statement "Secure statement from AANMA & AAFA supporting ICAP as preferred tool for primary care testing," including as referenced in PHADIA-SUB0004786.

**RESPONSE:**

Subject to and without waiver of the foregoing general objections, Phadia will produce non-privileged written communications with AANMA and AAFA discussing ICAP as the preferred tool for the primary care setting, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 53:** Any documents and communications related to engaging "KOL's," or key opinion leaders, including as referenced in PHADIA-SUB0004787.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. The request seeks any and all documents and communications related to engaging key opinion leaders, regardless of whether those engagements are related to Plaintiffs or to the claims and defenses in this litigation.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications with KOLs discussing Plaintiffs or the remote practice of allergy, and non-privileged documents discussing such communications, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 54:** Any documents and communications related to the statement "Leverage relationships with professional organizations, lab partners, etc. to secure a policy change to reflect CPT 95000 series (SPT & SCIT) can only be reimbursed to board certified allergists or certified AAOA members," including as referenced in PHADIA-SUB0004787.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. Phadia also objects to this request to the extent it calls for information regarding protected communications subject to immunity under the *Noerr-Pennington* doctrine.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications discussing limiting reimbursement under the CPT 95000 series to board certified allergists or certified AAOA members, to the extent not already produced, that can be located through a reasonable search, if any.

**REQUEST FOR PRODUCTION NO. 55:** Any documents related to the effect of competition on Phadia's or the Defendants' sales, profits, standing, or revenue, including any effect caused by Plaintiffs, including any market impact analyses, studies, or communications.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. Phadia also objects to this request because it seeks documents containing highly confidential, proprietary and competitively sensitive information. In addition, Phadia objects to this request to the extent that it seeks the production of information not in Phadia's custody, control, or possession.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged written communications discussing any effect caused by Plaintiffs on Phadia's sales, profits, and revenue, as well as corresponding market impact analyses and studies, if any, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 56:**  Any documents related to Your position regarding the relevant market as it pertains to the claims in this Litigation, including the market for allergy testing and allergen immunotherapy, RAST or blood testing for allergies, or any other market definition, analysis, understanding or other position You may take regarding the relevant market.

**RESPONSE:**

Phadia objects to this request as premature in that it calls for information more appropriately addressed through expert discovery.  Phadia further objects to this request in that it calls for a legal conclusion regarding the "relevant market as it pertains to the claims in this Litigation."  In addition, Phadia objects to this request insofar as it assumes facts not in evidence in that Phadia, as a Defendant, does not have the burden to define a relevant market.

**REQUEST FOR PRODUCTION NO. 57:**  Any documents related to the costs and benefits of Your products, including studies, costs, and analyses of ICAPs, including any comparison of ICAPs to allergy skin testing.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  The request seeks any and all documents related to the costs and benefits of Phadia's products, regardless of whether the products are related to allergy testing.  Phadia is a company with approximately 1,500 employees worldwide, many of whom communicate internally and externally on a daily basis regarding the costs and benefits of Phadia products.  Phadia also objects to this request because it seeks documents containing highly confidential, proprietary and competitively sensitive information.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce documents sufficient to show the costs and benefits of ICAPs, including studies, costs, and analyses of ICAPs, including any comparison of ICAPs to allergy skin testing.

**REQUEST FOR PRODUCTION NO. 58:**  Any documents and communications related to any endorsement of Your products by any Defendant including AAAAI, ACAAI, JCAAI, AANMA, or any other allergy organization including AAOA, or national or state trade organizations.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence.  Phadia objects to this request to the extent it seeks documents more readily available from other parties or third parties or obtainable by means less burdensome to Phadia.  Phadia further objects to the terms "any other allergy organization" and "national or state trade organizations" as being vague, ambiguous, and overbroad.

Subject to and without waiver of the foregoing general and specific objections, Phadia will produce documents related to endorsements by AAAAI, ACAAI, JCAAI, AANMA, or

AAOA of Phadia's products, and non-privileged documents discussing such communications, if any, to the extent not already produced, that can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 59:** Any documents related to Your efforts to preserve, protect, or advance Your position in the market for allergy testing, allergen immunotherapy, or RAST, blood, or ICAP testing, including any documents related to market share, the effect of competition, UAS, and the effect of any coordination with Defendants.

**RESPONSE:**

Phadia objects to this request on the grounds that it is overbroad, unduly burdensome and seeks documents that are neither relevant to this action nor reasonably calculated to lead to admissible evidence. In addition, Phadia objects to this request because it seeks documents containing highly confidential, proprietary and competitively sensitive information. Phadia further objects to the terms "preserve, protect, or advance Your position" as unintelligible, overbroad, vague, and ambiguous. Phadia further objects to this request on the grounds that it is duplicative and cumulative of documents that have been and will be produced.

**REQUEST FOR PRODUCTION NO. 60:** Documents sufficient to demonstrate Your net worth.

**RESPONSE:**

Phadia objects to this request to the extent that it purports to require information that is public, that is already in Plaintiffs' possession, custody, or control, or that is otherwise available from sources to which Plaintiffs have access.

Subject to and without waiver of the foregoing general and specific objections, Phadia directs Plaintiffs to the Thermo Fisher Scientific, Inc. 10-K, filed on February 26, 2015, and amended by the Form 10-K/A, filed in March 5, 2015.

**REQUEST FOR PRODUCTION NO. 61:** Any documents and communications Phadia reviewed in preparing for their answers to interrogatories or any documents and communications related to Phadia's answers to their responses to interrogatories.

**RESPONSE:**

Phadia objects to this request to the extent that it seeks the production of information protected from disclosure pursuant to the attorney-client privilege or the work-product doctrine. Subject to and without waiver of the foregoing general and specific objections, Phadia will produce non-privileged responsive documents.

**REQUEST FOR PRODUCTION NO. 62:** Any documents and communications responsive to the third party subpoena issued by Plaintiffs on Phadia in this Litigation that Phadia has not already produced.

**RESPONSE:**

Subject to and without waiver of the foregoing general and specific objections and subject to and without waiver of the objections made in Phadia's Subpoena Response, Phadia will produce responsive non-privileged documents.

**Dated:  July 27, 2015**

**Respectfully submitted,**

**VINSON & ELKINS LLP**


*/s/ James A. Reeder, Jr.*
**James A. Reeder, Jr.**
Texas Bar No. 16695010
Federal Bar No. 12381
**Christopher V. Popov**
Texas Bar No. 24032960
Federal Bar No. 88136
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Telephone:  713-758-2202
Facsimile:  713-615-5033
E-mail: jreeder@velaw.com;
cpopov@velaw.com
**Liane Noble**
Texas Bar No. 24079059
Federal Bar No. 2329197
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Telephone: 512-542-8505
Facsimile: 512-236-3234
E-mail: lnoble@velaw.com

**ATTORNEYS FOR DEFENDANT
PHADIA US, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Phadia's Responses and Objections to Plaintiffs' Request for Production has been served on all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) on this 27th day of July, 2015.

/s/ Liane Noble
Liane Noble

**Ronald Casey Low**
**Elizabeth Kozlow Marcum**
**Patrick A. Caballero**
Bracewell & Giuliani LLP
111 Congress Ave., Suite 2300
Austin, TX 78701
512-542-2112
Fax: 800-404-3970
Email: liz.marcum@bgllp.com
patrick.caballero@bracewellgiuliani.com
casey.low@bgllp.com

**Richard C. Danysh**
Bracewell & Giuliani LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205
210-226-1166
Fax: 800-404-3970
Email: richard.danysh@bgllp.com

**Amy E. Parker**
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
713-221-1119
Fax: 713-221-1212
Email: amy.parker@bgllp.com

**ATTORNEYS FOR PLAINTIFFS**
**UNITED BIOLOGICS, LLC AND**
**ACADEMY OF ALLERGY & ASTHMA**
**IN PRIMARY CARE**

**Gregory J. Casas**
**Elizabeth Ross Hadley**
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, TX 78701
512-320-7238
Fax: 512-320-7210
Email: casasg@gtlaw.com
hadleye@gtlaw.com

**Paul J. Brown**
Greenberg Traurig, LLP
1000 Louisiana St., Ste. 1700
Houston, TX 77002
(713) 374-3500
Fax: (713) 374-3505
Email: brownpa@gtlaw.com

**Steven Vincent Walkowiak**
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
(214) 665-3683
Fax: (214) 665-5928
Email: WalkowiakS@gtlaw.com

**ATTORNEYS FOR AMERICAN**
**ACADEMY OF ALLERGY**
**ASTHMA & IMMUNOLOGY**

**E. Leon Carter**
**Courtney Barksdale Perez**
**Linda R. Stahl**
**Joshua J. Bennett**
Carter Scholer Arnett Hamada & Mockler, PLLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
214-550-8160
Fax: 214-550-8185
Email: lcarter@carterscholer.com
cperez@carterscholer.com
jbennett@carterscholer.com
lstahl@carterscholer.com

**ATTORNEYS FOR ALLERGY AND ASTHMA
NETWORK/MOTHERS OF ASTHMATICS, INC.
AND TONYA WINDERS**

29

# Exhibit 5

# BRACEWELL &GIULIANI

| | |
|---|---|
| **Texas** | Casey Low |
| **New York** | Partner |
| **Washington, DC** | |
| **Connecticut** | +1.512.542.2109 Office |
| **Seattle** | +1.800.404.3970 Fax |
| **Dubai** | |
| **London** | Casey.low@bgllp.com |

Bracewell & Giuliani LLP
111 Congress Avenue
Suite 2300
Austin, Texas
78701-4061

June 26, 2015

<u>VIA ELECTRONIC MAIL</u>

Ms. James A. Reeder, Jr.
1001 Fannin Street
Suite 2500
Houston, TX 77002

Re: **Case No: 5:14-CV-00035;** *Academy of Allergy & Asthma in Primary Care, et al v. American Academy of Asthma, Allergy & Immunology, et al.,* **in the United States District Court for the Western District of Texas, San Antonio Division: Phadia's Deficient Production and Related Issues.**

Dear Mr. Reeder:

This letter is an attempt to resolve certain issues we have encountered in reviewing your client Phadia US, Inc.'s production of documents. Although Phadia's production was in response to the attached previously served subpoena in this case, now that Phadia is a party, we expect that Phadia will comply with those prior requests as if they were requests for production. Please accept this letter as Plaintiffs' request that Phadia comply with its obligations as a producing party in this litigation. From our review thus far, we have encountered the following deficiencies:

First, we have encountered numerous documents that are missing attachments. For example, the following documents all reference attachments that are not in Phadia's prior production: PHADIA-SUB0000745, PHADIA-SUB0000870, PHADIA-SUB0001031, PHADIA-SUB0001313, PHADIA-SUB0004194, PHADIA-SUB0005534, PHADIA-SUB0007847, PHADIA-SUB0010799, PHADIA-SUB0011707, PHADIA-SUB0011890, PHADIA-SUB0012401, PHADIA-SUB0012982, PHADIA-SUB0013343, PHADIA-SUB0013554, and PHADIA-SUB0021998. We request that Phadia supply these and any other attachments missing from the production.

Second, Phadia has also produced certain electronic information in a medium that does not comply with the subpoena, and would not comply with the Rule 26 requirements in this case. At times, that production is illegible. Examples of those documents include: PHADIA-SUB0002540-2561, PHADIA-SUB0002694-2795, PHADIA-SUB0002989-3049, PHADIA-SUB0003884-3905, PHADIA-SUB0008464, PHADIA-SUB00100001. We

# BRACEWELL &GIULIANI

Mr. Reeder
June 26, 2015
Page 2

request that Phadia produce all ESI and metadata as defined by the subpoena regarding its production and that Phadia reproduce these documents in a legible format.

Third, Phadia has failed to produce documents responsive to the requests in the subpoena that are relevant to the claims against Phadia in this case. For example, completely missing from Phadia's production are communications with third-party payors including the following payors that are referenced in Phadia's prior production: Aetna, Cigna, Humana, United Healthcare, Blue Cross/Blue Shield of Arizona, Arkansas Blue/Cross Blue Shield, Anthem Blue Cross/Blue Shield of Colorado, Blue Cross/Blue Shield of Florida, Blue Cross/Blue Shield of Georgia, Blue Cross/Blue Shield of Illinois, Blue Cross/Blue Shield of Kansas, Anthem Blue Cross/Blue Shield of Kentucky, Blue Cross/Blue Shield of Louisiana, Anthem Blue Cross/Blue Shield of Missouri, Blue Cross/Blue Shield of North Carolina, Blue Cross/Blue Shield of Oklahoma, Highmark Health, Capital Blue Cross/Blue Shield of Pennsylvania, Independence Blue Cross, Blue Cross Northeastern Pennsylvania, Blue Cross/Blue Shield of South Carolina, Blue Cross/Blue Shield of Tennessee, Blue Cross/Blue Shield of Texas, Regence Blue Cross/Blue Shield of Utah, Oklahoma Health Care Authority, First Priority Life Insurance Company, Geisinger Health Plan, Coventry, Coventry Health America, Centene, Inc., Superior HealthPlan, Texas Children's Health Plan, Parkland Community Health Plan, El Paso First Health Plan, Texas Medicaid, Pennsylvania Medicaid, WellSpan Health, and South Central Preferred.

Additionally, Phadia redacted agreements with members of Phadia's Advisory Board that should have been produced in full with the appropriate designation, and Phadia appears to have withheld other information regarding communications with members of that board. Plaintiffs request that Phadia supplement its production with this and any other additional information that would be responsive to the requests in the subpoena as if they were requests made to Phadia as a party in this case.

Fourth, Phadia's pleadings and production to date appear to create ambiguity regarding the proper name and entity of Phadia as a defendant. "Phadia US, Inc." is the legal entity identified in Phadia's filings and on its website, and is the name you used in answering the Third Amended Complaint. "Phadia Laboratory Systems" is a name used by Phadia's predecessor counsel and in some of Phadia's documents, which also refer to the name "ImmunoDiagnostics" and sometimes equate Phadia with Thermo Fisher Scientific, Inc. For purposes of clarity with the parties in this litigation and the Court, please identify the proper name of Phadia as an entity.

Finally, and as we have previously discussed, Phadia has improperly designated documents as "Attorneys' Eyes Only" in a manner inconsistent with the Protective Order in this case. According to the Protective Order, the designation of "For Counsel Only" or

# BRACEWELL &GIULIANI

Mr. Reeder
June 26, 2015
Page 3

"Attorneys Eyes Only" shall be reserved for information that is believed to be unknown to the opposing party or parties, or any of the employees of a corporate party, such as product formula information, design information, non-public financial information, pricing information, customer identification data, and certain study methodologies. Phadia has marked the majority of its documents as "Attorneys' Eyes Only." I have attached for your convenience the documents marked "Attorneys' Eyes Only" that Plaintiffs dispute such a designation. *See* Exhibit A. I understand from our prior conversations that Phadia is reviewing these designations. Plaintiffs request that Phadia complete that review and inform Plaintiffs of any disputes, or otherwise seek Court relief within fourteen (14) days of this letter in accordance with the Protective Order.

As you are aware, Phadia has was served with its subpoena in August 2014, produced exceedingly deficient information in October and November 2014, and finally produced information responsive to its subpoena on March 31, 2015. We are aware that most of the time Phadia was deficient in its production, it was represented by other counsel. Nevertheless, we look forward to resolving the deficiencies in this letter given the lapse of time since Phadia was first requested to provide such information.

With that in mind, Plaintiffs look forward to receiving Phadia's supplemental information soon. Please do not hesitate to contact me should you have any questions.

Sincerely,

Casey Low

**Exhibit A**

| | |
|---|---|
| PHADIA-SUB0000001 | PHADIA-SUB0000024 |
| PHADIA-SUB0000057 | PHADIA-SUB0000084 |
| PHADIA-SUB0000085 | PHADIA-SUB0000126 |
| PHADIA-SUB0000127 | PHADIA-SUB0000127 |
| PHADIA-SUB0000182 | PHADIA-SUB0000183 |
| PHADIA-SUB0000184 | PHADIA-SUB0000226 |
| PHADIA-SUB0000227 | PHADIA-SUB0000258 |
| PHADIA-SUB0000265 | PHADIA-SUB0000265 |
| PHADIA-SUB0000267 | PHADIA-SUB0000268 |
| PHADIA-SUB0000269 | PHADIA-SUB0000270 |
| PHADIA-SUB0000271 | PHADIA-SUB0000317 |
| PHADIA-SUB0000318 | PHADIA-SUB0000360 |
| PHADIA-SUB0000361 | PHADIA-SUB0000403 |
| PHADIA-SUB0000423 | PHADIA-SUB0000426 |
| PHADIA-SUB0000427 | PHADIA-SUB0000493 |
| PHADIA-SUB0000494 | PHADIA-SUB0000536 |
| PHADIA-SUB0000537 | PHADIA-SUB0000541 |
| PHADIA-SUB0000542 | PHADIA-SUB0000544 |
| PHADIA-SUB0000545 | PHADIA-SUB0000546 |
| PHADIA-SUB0000547 | PHADIA-SUB0000559 |
| PHADIA-SUB0000560 | PHADIA-SUB0000561 |
| PHADIA-SUB0000564 | PHADIA-SUB0000574 |
| PHADIA-SUB0000745 | PHADIA-SUB0000745 |
| PHADIA-SUB0000746 | PHADIA-SUB0000758 |
| PHADIA-SUB0000759 | PHADIA-SUB0000765 |
| PHADIA-SUB0000766 | PHADIA-SUB0000772 |
| PHADIA-SUB0000773 | PHADIA-SUB0000782 |
| PHADIA-SUB0000783 | PHADIA-SUB0000789 |
| PHADIA-SUB0000790 | PHADIA-SUB0000796 |
| PHADIA-SUB0000797 | PHADIA-SUB0000803 |
| PHADIA-SUB0000804 | PHADIA-SUB0000810 |
| PHADIA-SUB0000811 | PHADIA-SUB0000817 |
| PHADIA-SUB0000818 | PHADIA-SUB0000824 |
| PHADIA-SUB0000825 | PHADIA-SUB0000835 |
| PHADIA-SUB0000836 | PHADIA-SUB0000842 |
| PHADIA-SUB0000843 | PHADIA-SUB0000849 |
| PHADIA-SUB0000850 | PHADIA-SUB0000856 |
| PHADIA-SUB0000857 | PHADIA-SUB0000863 |
| PHADIA-SUB0000864 | PHADIA-SUB0000865 |

| | |
|---|---|
| PHADIA-SUB0000866 | PHADIA-SUB0000869 |
| PHADIA-SUB0000909 | PHADIA-SUB0000955 |
| PHADIA-SUB0000976 | PHADIA-SUB0000988 |
| PHADIA-SUB0000989 | PHADIA-SUB0001017 |
| PHADIA-SUB0001018 | PHADIA-SUB0001019 |
| PHADIA-SUB0001020 | PHADIA-SUB0001023 |
| PHADIA-SUB0001024 | PHADIA-SUB0001030 |
| PHADIA-SUB0001031 | PHADIA-SUB0001032 |
| PHADIA-SUB0001119 | PHADIA-SUB0001247 |
| PHADIA-SUB0001249 | PHADIA-SUB0001251 |
| PHADIA-SUB0001256 | PHADIA-SUB0001257 |
| PHADIA-SUB0001258 | PHADIA-SUB0001262 |
| PHADIA-SUB0001263 | PHADIA-SUB0001296 |
| PHADIA-SUB0001297 | PHADIA-SUB0001310 |
| PHADIA-SUB0001311 | PHADIA-SUB0001312 |
| PHADIA-SUB0001313 | PHADIA-SUB0001314 |
| PHADIA-SUB0001315 | PHADIA-SUB0001315 |
| PHADIA-SUB0001316 | PHADIA-SUB0001317 |
| PHADIA-SUB0001318 | PHADIA-SUB0001322 |
| PHADIA-SUB0001323 | PHADIA-SUB0001324 |
| PHADIA-SUB0001344 | PHADIA-SUB0001372 |
| PHADIA-SUB0001386 | PHADIA-SUB0001410 |
| PHADIA-SUB0001411 | PHADIA-SUB0001411 |
| PHADIA-SUB0001412 | PHADIA-SUB0001455 |
| PHADIA-SUB0001456 | PHADIA-SUB0001458 |
| PHADIA-SUB0001459 | PHADIA-SUB0001460 |
| PHADIA-SUB0001461 | PHADIA-SUB0001465 |
| PHADIA-SUB0001534 | PHADIA-SUB0001578 |
| PHADIA-SUB0001592 | PHADIA-SUB0001593 |
| PHADIA-SUB0001594 | PHADIA-SUB0001606 |
| PHADIA-SUB0001607 | PHADIA-SUB0001650 |
| PHADIA-SUB0001651 | PHADIA-SUB0001679 |
| PHADIA-SUB0001680 | PHADIA-SUB0001722 |
| PHADIA-SUB0001723 | PHADIA-SUB0001765 |
| PHADIA-SUB0001785 | PHADIA-SUB0001831 |
| PHADIA-SUB0001838 | PHADIA-SUB0001840 |
| PHADIA-SUB0001841 | PHADIA-SUB0001842 |
| PHADIA-SUB0001843 | PHADIA-SUB0001844 |
| PHADIA-SUB0001853 | PHADIA-SUB0001857 |
| PHADIA-SUB0001858 | PHADIA-SUB0001861 |

PHADIA-SUB0001900      PHADIA-SUB0001902
PHADIA-SUB0001903      PHADIA-SUB0001904
PHADIA-SUB0001905      PHADIA-SUB0001907
PHADIA-SUB0001908      PHADIA-SUB0001908
PHADIA-SUB0001909      PHADIA-SUB0001924
PHADIA-SUB0001925      PHADIA-SUB0001969
PHADIA-SUB0001970      PHADIA-SUB0002048
PHADIA-SUB0002051      PHADIA-SUB0002079
PHADIA-SUB0002080      PHADIA-SUB0002093
PHADIA-SUB0002094      PHADIA-SUB0002150
PHADIA-SUB0002151      PHADIA-SUB0002211
PHADIA-SUB0002439      PHADIA-SUB0002456
PHADIA-SUB0002471      PHADIA-SUB0002499
PHADIA-SUB0002500      PHADIA-SUB0002506
PHADIA-SUB0002507      PHADIA-SUB0002535
PHADIA-SUB0002536      PHADIA-SUB0002538
PHADIA-SUB0002540      PHADIA-SUB0002561
PHADIA-SUB0002562      PHADIA-SUB0002564
PHADIA-SUB0002565      PHADIA-SUB0002611
PHADIA-SUB0002612      PHADIA-SUB0002617
PHADIA-SUB0002618      PHADIA-SUB0002660
PHADIA-SUB0002661      PHADIA-SUB0002693
PHADIA-SUB0002694      PHADIA-SUB0002795
PHADIA-SUB0002796      PHADIA-SUB0002808
PHADIA-SUB0002828      PHADIA-SUB0002874
PHADIA-SUB0002894      PHADIA-SUB0002895
PHADIA-SUB0002896      PHADIA-SUB0002924
PHADIA-SUB0002925      PHADIA-SUB0002928
PHADIA-SUB0002929      PHADIA-SUB0002935
PHADIA-SUB0002936      PHADIA-SUB0002937
PHADIA-SUB0002957      PHADIA-SUB0002959
PHADIA-SUB0002960      PHADIA-SUB0002963
PHADIA-SUB0002964      PHADIA-SUB0002965
PHADIA-SUB0002966      PHADIA-SUB0002966
PHADIA-SUB0002967      PHADIA-SUB0002967
PHADIA-SUB0002968      PHADIA-SUB0002988
PHADIA-SUB0003063      PHADIA-SUB0003109
PHADIA-SUB0003110      PHADIA-SUB0003152
PHADIA-SUB0003153      PHADIA-SUB0003185
PHADIA-SUB0003186      PHADIA-SUB0003230

| | |
|---|---|
| PHADIA-SUB0003231 | PHADIA-SUB0003232 |
| PHADIA-SUB0003233 | PHADIA-SUB0003245 |
| PHADIA-SUB0003246 | PHADIA-SUB0003302 |
| PHADIA-SUB0003303 | PHADIA-SUB0003308 |
| PHADIA-SUB0003309 | PHADIA-SUB0003332 |
| PHADIA-SUB0003560 | PHADIA-SUB0003562 |
| PHADIA-SUB0003563 | PHADIA-SUB0003566 |
| PHADIA-SUB0003611 | PHADIA-SUB0003611 |
| PHADIA-SUB0003614 | PHADIA-SUB0003614 |
| PHADIA-SUB0003617 | PHADIA-SUB0003621 |
| PHADIA-SUB0003622 | PHADIA-SUB0003626 |
| PHADIA-SUB0003627 | PHADIA-SUB0003629 |
| PHADIA-SUB0003630 | PHADIA-SUB0003632 |
| PHADIA-SUB0003633 | PHADIA-SUB0003634 |
| PHADIA-SUB0003635 | PHADIA-SUB0003640 |
| PHADIA-SUB0003641 | PHADIA-SUB0003643 |
| PHADIA-SUB0003644 | PHADIA-SUB0003644 |
| PHADIA-SUB0003645 | PHADIA-SUB0003645 |
| PHADIA-SUB0003648 | PHADIA-SUB0003649 |
| PHADIA-SUB0003650 | PHADIA-SUB0003650 |
| PHADIA-SUB0003669 | PHADIA-SUB0003672 |
| PHADIA-SUB0003673 | PHADIA-SUB0003696 |
| PHADIA-SUB0003697 | PHADIA-SUB0003720 |
| PHADIA-SUB0003743 | PHADIA-SUB0003785 |
| PHADIA-SUB0003786 | PHADIA-SUB0003828 |
| PHADIA-SUB0003829 | PHADIA-SUB0003861 |
| PHADIA-SUB0003884 | PHADIA-SUB0003905 |
| PHADIA-SUB0003906 | PHADIA-SUB0003906 |
| PHADIA-SUB0003907 | PHADIA-SUB0003919 |
| PHADIA-SUB0003920 | PHADIA-SUB0003941 |
| PHADIA-SUB0003942 | PHADIA-SUB0003988 |
| PHADIA-SUB0003989 | PHADIA-SUB0004001 |
| PHADIA-SUB0004002 | PHADIA-SUB0004044 |
| PHADIA-SUB0004047 | PHADIA-SUB0004093 |
| PHADIA-SUB0004094 | PHADIA-SUB0004164 |
| PHADIA-SUB0004165 | PHADIA-SUB0004193 |
| PHADIA-SUB0004194 | PHADIA-SUB0004194 |
| PHADIA-SUB0004195 | PHADIA-SUB0004214 |
| PHADIA-SUB0004215 | PHADIA-SUB0004219 |
| PHADIA-SUB0004220 | PHADIA-SUB0004224 |

| | |
|---|---|
| PHADIA-SUB0004225 | PHADIA-SUB0004227 |
| PHADIA-SUB0004228 | PHADIA-SUB0004229 |
| PHADIA-SUB0004230 | PHADIA-SUB0004232 |
| PHADIA-SUB0004233 | PHADIA-SUB0004233 |
| PHADIA-SUB0004234 | PHADIA-SUB0004268 |
| PHADIA-SUB0004425 | PHADIA-SUB0004466 |
| PHADIA-SUB0004467 | PHADIA-SUB0004469 |
| PHADIA-SUB0004470 | PHADIA-SUB0004471 |
| PHADIA-SUB0004472 | PHADIA-SUB0004484 |
| PHADIA-SUB0004485 | PHADIA-SUB0004486 |
| PHADIA-SUB0004574 | PHADIA-SUB0004575 |
| PHADIA-SUB0004576 | PHADIA-SUB0004580 |
| PHADIA-SUB0004581 | PHADIA-SUB0004582 |
| PHADIA-SUB0004583 | PHADIA-SUB0004625 |
| PHADIA-SUB0004626 | PHADIA-SUB0004628 |
| PHADIA-SUB0004629 | PHADIA-SUB0004630 |
| PHADIA-SUB0004631 | PHADIA-SUB0004633 |
| PHADIA-SUB0004634 | PHADIA-SUB0004635 |
| PHADIA-SUB0004636 | PHADIA-SUB0004639 |
| PHADIA-SUB0004640 | PHADIA-SUB0004641 |
| PHADIA-SUB0004642 | PHADIA-SUB0004643 |
| PHADIA-SUB0004676 | PHADIA-SUB0004678 |
| PHADIA-SUB0004760 | PHADIA-SUB0004761 |
| PHADIA-SUB0004762 | PHADIA-SUB0004770 |
| PHADIA-SUB0004771 | PHADIA-SUB0004771 |
| PHADIA-SUB0004772 | PHADIA-SUB0004772 |
| PHADIA-SUB0004773 | PHADIA-SUB0004779 |
| PHADIA-SUB0004780 | PHADIA-SUB0004780 |
| PHADIA-SUB0004781 | PHADIA-SUB0004781 |
| PHADIA-SUB0004782 | PHADIA-SUB0004783 |
| PHADIA-SUB0004784 | PHADIA-SUB0004787 |
| PHADIA-SUB0004788 | PHADIA-SUB0004788 |
| PHADIA-SUB0004789 | PHADIA-SUB0004789 |
| PHADIA-SUB0004790 | PHADIA-SUB0004790 |
| PHADIA-SUB0004791 | PHADIA-SUB0004793 |
| PHADIA-SUB0004794 | PHADIA-SUB0004796 |
| PHADIA-SUB0004797 | PHADIA-SUB0004843 |
| PHADIA-SUB0004879 | PHADIA-SUB0004885 |
| PHADIA-SUB0004886 | PHADIA-SUB0004889 |
| PHADIA-SUB0004913 | PHADIA-SUB0004929 |

| | |
|---|---|
| PHADIA-SUB0004930 | PHADIA-SUB0004958 |
| PHADIA-SUB0005014 | PHADIA-SUB0005042 |
| PHADIA-SUB0005043 | PHADIA-SUB0005046 |
| PHADIA-SUB0005047 | PHADIA-SUB0005075 |
| PHADIA-SUB0005076 | PHADIA-SUB0005078 |
| PHADIA-SUB0005079 | PHADIA-SUB0005081 |
| PHADIA-SUB0005082 | PHADIA-SUB0005083 |
| PHADIA-SUB0005084 | PHADIA-SUB0005087 |
| PHADIA-SUB0005088 | PHADIA-SUB0005090 |
| PHADIA-SUB0005091 | PHADIA-SUB0005093 |
| PHADIA-SUB0005094 | PHADIA-SUB0005096 |
| PHADIA-SUB0005191 | PHADIA-SUB0005225 |
| PHADIA-SUB0005230 | PHADIA-SUB0005230 |
| PHADIA-SUB0005231 | PHADIA-SUB0005274 |
| PHADIA-SUB0005275 | PHADIA-SUB0005321 |
| PHADIA-SUB0005322 | PHADIA-SUB0005355 |
| PHADIA-SUB0005356 | PHADIA-SUB0005357 |
| PHADIA-SUB0005358 | PHADIA-SUB0005386 |
| PHADIA-SUB0005387 | PHADIA-SUB0005488 |
| PHADIA-SUB0005489 | PHADIA-SUB0005491 |
| PHADIA-SUB0005492 | PHADIA-SUB0005529 |
| PHADIA-SUB0005530 | PHADIA-SUB0005531 |
| PHADIA-SUB0005532 | PHADIA-SUB0005533 |
| PHADIA-SUB0005534 | PHADIA-SUB0005535 |
| PHADIA-SUB0005536 | PHADIA-SUB0005582 |
| PHADIA-SUB0005583 | PHADIA-SUB0005585 |
| PHADIA-SUB0005586 | PHADIA-SUB0005588 |
| PHADIA-SUB0005589 | PHADIA-SUB0005611 |
| PHADIA-SUB0005612 | PHADIA-SUB0005635 |
| PHADIA-SUB0005694 | PHADIA-SUB0005717 |
| PHADIA-SUB0005718 | PHADIA-SUB0005719 |
| PHADIA-SUB0005720 | PHADIA-SUB0005732 |
| PHADIA-SUB0005733 | PHADIA-SUB0005734 |
| PHADIA-SUB0005735 | PHADIA-SUB0005738 |
| PHADIA-SUB0005739 | PHADIA-SUB0005740 |
| PHADIA-SUB0005741 | PHADIA-SUB0005743 |
| PHADIA-SUB0005744 | PHADIA-SUB0005747 |
| PHADIA-SUB0005748 | PHADIA-SUB0005763 |
| PHADIA-SUB0005764 | PHADIA-SUB0005766 |
| PHADIA-SUB0005767 | PHADIA-SUB0005769 |

| | |
|---|---|
| PHADIA-SUB0005770 | PHADIA-SUB0005771 |
| PHADIA-SUB0005773 | PHADIA-SUB0005774 |
| PHADIA-SUB0005775 | PHADIA-SUB0005776 |
| PHADIA-SUB0005782 | PHADIA-SUB0005824 |
| PHADIA-SUB0005825 | PHADIA-SUB0005867 |
| PHADIA-SUB0005882 | PHADIA-SUB0005885 |
| PHADIA-SUB0005886 | PHADIA-SUB0005918 |
| PHADIA-SUB0005919 | PHADIA-SUB0005965 |
| PHADIA-SUB0005966 | PHADIA-SUB0005969 |
| PHADIA-SUB0005970 | PHADIA-SUB0005973 |
| PHADIA-SUB0006031 | PHADIA-SUB0006091 |
| PHADIA-SUB0006092 | PHADIA-SUB0006103 |
| PHADIA-SUB0006106 | PHADIA-SUB0006108 |
| PHADIA-SUB0006113 | PHADIA-SUB0006119 |
| PHADIA-SUB0006120 | PHADIA-SUB0006121 |
| PHADIA-SUB0006122 | PHADIA-SUB0006125 |
| PHADIA-SUB0006126 | PHADIA-SUB0006128 |
| PHADIA-SUB0006129 | PHADIA-SUB0006145 |
| PHADIA-SUB0006146 | PHADIA-SUB0006147 |
| PHADIA-SUB0006151 | PHADIA-SUB0006154 |
| PHADIA-SUB0006155 | PHADIA-SUB0006156 |
| PHADIA-SUB0006157 | PHADIA-SUB0006194 |
| PHADIA-SUB0006195 | PHADIA-SUB0006241 |
| PHADIA-SUB0006256 | PHADIA-SUB0006316 |
| PHADIA-SUB0006317 | PHADIA-SUB0006380 |
| PHADIA-SUB0006381 | PHADIA-SUB0006427 |
| PHADIA-SUB0006428 | PHADIA-SUB0006471 |
| PHADIA-SUB0006472 | PHADIA-SUB0006514 |
| PHADIA-SUB0006780 | PHADIA-SUB0006808 |
| PHADIA-SUB0006809 | PHADIA-SUB0006855 |
| PHADIA-SUB0006856 | PHADIA-SUB0006858 |
| PHADIA-SUB0006859 | PHADIA-SUB0006860 |
| PHADIA-SUB0006869 | PHADIA-SUB0006892 |
| PHADIA-SUB0006971 | PHADIA-SUB0006975 |
| PHADIA-SUB0006976 | PHADIA-SUB0006982 |
| PHADIA-SUB0006991 | PHADIA-SUB0007003 |
| PHADIA-SUB0007004 | PHADIA-SUB0007005 |
| PHADIA-SUB0007006 | PHADIA-SUB0007007 |
| PHADIA-SUB0007008 | PHADIA-SUB0007009 |
| PHADIA-SUB0007044 | PHADIA-SUB0007044 |

| | |
|---|---|
| PHADIA-SUB0007079 | PHADIA-SUB0007120 |
| PHADIA-SUB0007162 | PHADIA-SUB0007163 |
| PHADIA-SUB0007168 | PHADIA-SUB0007214 |
| PHADIA-SUB0007215 | PHADIA-SUB0007220 |
| PHADIA-SUB0007221 | PHADIA-SUB0007225 |
| PHADIA-SUB0007245 | PHADIA-SUB0007258 |
| PHADIA-SUB0007259 | PHADIA-SUB0007282 |
| PHADIA-SUB0007283 | PHADIA-SUB0007284 |
| PHADIA-SUB0007285 | PHADIA-SUB0007286 |
| PHADIA-SUB0007306 | PHADIA-SUB0007352 |
| PHADIA-SUB0007359 | PHADIA-SUB0007360 |
| PHADIA-SUB0007361 | PHADIA-SUB0007362 |
| PHADIA-SUB0007363 | PHADIA-SUB0007405 |
| PHADIA-SUB0007406 | PHADIA-SUB0007421 |
| PHADIA-SUB0007441 | PHADIA-SUB0007442 |
| PHADIA-SUB0007443 | PHADIA-SUB0007444 |
| PHADIA-SUB0007445 | PHADIA-SUB0007445 |
| PHADIA-SUB0007446 | PHADIA-SUB0007447 |
| PHADIA-SUB0007448 | PHADIA-SUB0007452 |
| PHADIA-SUB0007453 | PHADIA-SUB0007455 |
| PHADIA-SUB0007456 | PHADIA-SUB0007483 |
| PHADIA-SUB0007484 | PHADIA-SUB0007497 |
| PHADIA-SUB0007565 | PHADIA-SUB0007593 |
| PHADIA-SUB0007594 | PHADIA-SUB0007614 |
| PHADIA-SUB0007615 | PHADIA-SUB0007657 |
| PHADIA-SUB0007658 | PHADIA-SUB0007700 |
| PHADIA-SUB0007701 | PHADIA-SUB0007701 |
| PHADIA-SUB0007703 | PHADIA-SUB0007705 |
| PHADIA-SUB0007808 | PHADIA-SUB0007828 |
| PHADIA-SUB0007829 | PHADIA-SUB0007831 |
| PHADIA-SUB0007832 | PHADIA-SUB0007835 |
| PHADIA-SUB0007836 | PHADIA-SUB0007839 |
| PHADIA-SUB0007840 | PHADIA-SUB0007846 |
| PHADIA-SUB0008077 | PHADIA-SUB0008078 |
| PHADIA-SUB0008115 | PHADIA-SUB0008157 |
| PHADIA-SUB0008162 | PHADIA-SUB0008163 |
| PHADIA-SUB0008164 | PHADIA-SUB0008184 |
| PHADIA-SUB0008185 | PHADIA-SUB0008213 |
| PHADIA-SUB0008233 | PHADIA-SUB0008234 |
| PHADIA-SUB0008235 | PHADIA-SUB0008236 |

| | |
|---|---|
| PHADIA-SUB0008237 | PHADIA-SUB0008250 |
| PHADIA-SUB0008251 | PHADIA-SUB0008254 |
| PHADIA-SUB0008257 | PHADIA-SUB0008266 |
| PHADIA-SUB0008286 | PHADIA-SUB0008314 |
| PHADIA-SUB0008315 | PHADIA-SUB0008323 |
| PHADIA-SUB0008397 | PHADIA-SUB0008399 |
| PHADIA-SUB0008404 | PHADIA-SUB0008408 |
| PHADIA-SUB0008409 | PHADIA-SUB0008412 |
| PHADIA-SUB0008464 | PHADIA-SUB0008485 |
| PHADIA-SUB0008486 | PHADIA-SUB0008486 |
| PHADIA-SUB0008487 | PHADIA-SUB0008499 |
| PHADIA-SUB0008500 | PHADIA-SUB0008540 |
| PHADIA-SUB0008542 | PHADIA-SUB0008550 |
| PHADIA-SUB0008551 | PHADIA-SUB0008554 |
| PHADIA-SUB0008574 | PHADIA-SUB0008602 |
| PHADIA-SUB0008603 | PHADIA-SUB0008605 |
| PHADIA-SUB0008608 | PHADIA-SUB0008631 |
| PHADIA-SUB0008632 | PHADIA-SUB0008666 |
| PHADIA-SUB0008667 | PHADIA-SUB0008669 |
| PHADIA-SUB0008670 | PHADIA-SUB0008672 |
| PHADIA-SUB0008676 | PHADIA-SUB0008677 |
| PHADIA-SUB0008678 | PHADIA-SUB0008680 |
| PHADIA-SUB0008681 | PHADIA-SUB0008723 |
| PHADIA-SUB0008724 | PHADIA-SUB0008727 |
| PHADIA-SUB0008728 | PHADIA-SUB0008731 |
| PHADIA-SUB0008732 | PHADIA-SUB0008734 |
| PHADIA-SUB0008769 | PHADIA-SUB0008782 |
| PHADIA-SUB0008817 | PHADIA-SUB0008859 |
| PHADIA-SUB0008861 | PHADIA-SUB0008917 |
| PHADIA-SUB0008918 | PHADIA-SUB0008949 |
| PHADIA-SUB0008950 | PHADIA-SUB0008973 |
| PHADIA-SUB0008974 | PHADIA-SUB0008978 |
| PHADIA-SUB0008979 | PHADIA-SUB0008980 |
| PHADIA-SUB0008981 | PHADIA-SUB0008993 |
| PHADIA-SUB0008994 | PHADIA-SUB0008995 |
| PHADIA-SUB0008996 | PHADIA-SUB0009042 |
| PHADIA-SUB0009122 | PHADIA-SUB0009138 |
| PHADIA-SUB0009140 | PHADIA-SUB0009159 |
| PHADIA-SUB0009160 | PHADIA-SUB0009161 |
| PHADIA-SUB0009162 | PHADIA-SUB0009165 |

| | |
|---|---|
| PHADIA-SUB0009166 | PHADIA-SUB0009168 |
| PHADIA-SUB0009169 | PHADIA-SUB0009170 |
| PHADIA-SUB0009171 | PHADIA-SUB0009172 |
| PHADIA-SUB0009400 | PHADIA-SUB0009402 |
| PHADIA-SUB0009422 | PHADIA-SUB0009468 |
| PHADIA-SUB0009469 | PHADIA-SUB0009472 |
| PHADIA-SUB0009476 | PHADIA-SUB0009517 |
| PHADIA-SUB0009546 | PHADIA-SUB0009588 |
| PHADIA-SUB0009589 | PHADIA-SUB0009647 |
| PHADIA-SUB0009671 | PHADIA-SUB0009687 |
| PHADIA-SUB0009688 | PHADIA-SUB0009696 |
| PHADIA-SUB0009697 | PHADIA-SUB0009731 |
| PHADIA-SUB0009751 | PHADIA-SUB0009774 |
| PHADIA-SUB0009775 | PHADIA-SUB0009790 |
| PHADIA-SUB0009810 | PHADIA-SUB0009812 |
| PHADIA-SUB0009832 | PHADIA-SUB0009833 |
| PHADIA-SUB0009834 | PHADIA-SUB0009837 |
| PHADIA-SUB0009838 | PHADIA-SUB0009866 |
| PHADIA-SUB0009927 | PHADIA-SUB0009970 |
| PHADIA-SUB0009971 | PHADIA-SUB0009975 |
| PHADIA-SUB0009978 | PHADIA-SUB0009979 |
| PHADIA-SUB0009980 | PHADIA-SUB0009981 |
| PHADIA-SUB0009982 | PHADIA-SUB0009986 |
| PHADIA-SUB0009987 | PHADIA-SUB0009989 |
| PHADIA-SUB0009990 | PHADIA-SUB0009990 |
| PHADIA-SUB0009991 | PHADIA-SUB0009994 |
| PHADIA-SUB0009995 | PHADIA-SUB0009997 |
| PHADIA-SUB0009998 | PHADIA-SUB0009999 |
| PHADIA-SUB0010000 | PHADIA-SUB0010000 |
| PHADIA-SUB0010001 | PHADIA-SUB0010022 |
| PHADIA-SUB0010024 | PHADIA-SUB0010036 |
| PHADIA-SUB0010037 | PHADIA-SUB0010038 |
| PHADIA-SUB0010039 | PHADIA-SUB0010040 |
| PHADIA-SUB0010041 | PHADIA-SUB0010059 |
| PHADIA-SUB0010060 | PHADIA-SUB0010106 |
| PHADIA-SUB0010107 | PHADIA-SUB0010144 |
| PHADIA-SUB0010145 | PHADIA-SUB0010187 |
| PHADIA-SUB0010207 | PHADIA-SUB0010241 |
| PHADIA-SUB0010469 | PHADIA-SUB0010507 |
| PHADIA-SUB0010512 | PHADIA-SUB0010553 |

| | |
|---|---|
| PHADIA-SUB0010799 | PHADIA-SUB0010803 |
| PHADIA-SUB0010804 | PHADIA-SUB0010832 |
| PHADIA-SUB0010833 | PHADIA-SUB0010875 |
| PHADIA-SUB0010876 | PHADIA-SUB0010895 |
| PHADIA-SUB0010896 | PHADIA-SUB0010899 |
| PHADIA-SUB0010900 | PHADIA-SUB0010902 |
| PHADIA-SUB0010903 | PHADIA-SUB0010915 |
| PHADIA-SUB0010916 | PHADIA-SUB0010976 |
| PHADIA-SUB0010977 | PHADIA-SUB0010992 |
| PHADIA-SUB0011012 | PHADIA-SUB0011014 |
| PHADIA-SUB0011015 | PHADIA-SUB0011016 |
| PHADIA-SUB0011017 | PHADIA-SUB0011040 |
| PHADIA-SUB0011041 | PHADIA-SUB0011083 |
| PHADIA-SUB0011084 | PHADIA-SUB0011114 |
| PHADIA-SUB0011134 | PHADIA-SUB0011194 |
| PHADIA-SUB0011195 | PHADIA-SUB0011214 |
| PHADIA-SUB0011234 | PHADIA-SUB0011235 |
| PHADIA-SUB0011236 | PHADIA-SUB0011242 |
| PHADIA-SUB0011243 | PHADIA-SUB0011245 |
| PHADIA-SUB0011285 | PHADIA-SUB0011328 |
| PHADIA-SUB0011332 | PHADIA-SUB0011336 |
| PHADIA-SUB0011338 | PHADIA-SUB0011350 |
| PHADIA-SUB0011436 | PHADIA-SUB0011464 |
| PHADIA-SUB0011509 | PHADIA-SUB0011517 |
| PHADIA-SUB0011536 | PHADIA-SUB0011558 |
| PHADIA-SUB0011559 | PHADIA-SUB0011605 |
| PHADIA-SUB0011645 | PHADIA-SUB0011647 |
| PHADIA-SUB0011648 | PHADIA-SUB0011649 |
| PHADIA-SUB0011650 | PHADIA-SUB0011652 |
| PHADIA-SUB0011653 | PHADIA-SUB0011655 |
| PHADIA-SUB0011656 | PHADIA-SUB0011659 |
| PHADIA-SUB0011662 | PHADIA-SUB0011663 |
| PHADIA-SUB0011664 | PHADIA-SUB0011672 |
| PHADIA-SUB0011707 | PHADIA-SUB0011709 |
| PHADIA-SUB0011731 | PHADIA-SUB0011792 |
| PHADIA-SUB0011793 | PHADIA-SUB0011795 |
| PHADIA-SUB0011796 | PHADIA-SUB0011797 |
| PHADIA-SUB0011798 | PHADIA-SUB0011826 |
| PHADIA-SUB0011832 | PHADIA-SUB0011836 |
| PHADIA-SUB0011837 | PHADIA-SUB0011841 |

| | |
|---|---|
| PHADIA-SUB0011842 | PHADIA-SUB0011870 |
| PHADIA-SUB0011871 | PHADIA-SUB0011873 |
| PHADIA-SUB0011874 | PHADIA-SUB0011875 |
| PHADIA-SUB0011876 | PHADIA-SUB0011877 |
| PHADIA-SUB0011878 | PHADIA-SUB0011882 |
| PHADIA-SUB0011883 | PHADIA-SUB0011885 |
| PHADIA-SUB0011886 | PHADIA-SUB0011889 |
| PHADIA-SUB0011892 | PHADIA-SUB0011895 |
| PHADIA-SUB0011896 | PHADIA-SUB0011899 |
| PHADIA-SUB0011919 | PHADIA-SUB0011997 |
| PHADIA-SUB0011998 | PHADIA-SUB0012044 |
| PHADIA-SUB0012066 | PHADIA-SUB0012094 |
| PHADIA-SUB0012134 | PHADIA-SUB0012166 |
| PHADIA-SUB0012188 | PHADIA-SUB0012234 |
| PHADIA-SUB0012235 | PHADIA-SUB0012237 |
| PHADIA-SUB0012238 | PHADIA-SUB0012239 |
| PHADIA-SUB0012240 | PHADIA-SUB0012341 |
| PHADIA-SUB0012342 | PHADIA-SUB0012354 |
| PHADIA-SUB0012356 | PHADIA-SUB0012358 |
| PHADIA-SUB0012359 | PHADIA-SUB0012400 |
| PHADIA-SUB0012401 | PHADIA-SUB0012401 |
| PHADIA-SUB0012402 | PHADIA-SUB0012444 |
| PHADIA-SUB0012447 | PHADIA-SUB0012475 |
| PHADIA-SUB0012500 | PHADIA-SUB0012508 |
| PHADIA-SUB0012528 | PHADIA-SUB0012556 |
| PHADIA-SUB0012579 | PHADIA-SUB0012620 |
| PHADIA-SUB0012621 | PHADIA-SUB0012663 |
| PHADIA-SUB0012735 | PHADIA-SUB0012758 |
| PHADIA-SUB0012759 | PHADIA-SUB0012774 |
| PHADIA-SUB0012775 | PHADIA-SUB0012853 |
| PHADIA-SUB0012897 | PHADIA-SUB0012901 |
| PHADIA-SUB0012905 | PHADIA-SUB0012933 |
| PHADIA-SUB0012934 | PHADIA-SUB0012936 |
| PHADIA-SUB0012956 | PHADIA-SUB0012957 |
| PHADIA-SUB0012978 | PHADIA-SUB0012981 |
| PHADIA-SUB0012982 | PHADIA-SUB0012982 |
| PHADIA-SUB0012983 | PHADIA-SUB0013003 |
| PHADIA-SUB0013004 | PHADIA-SUB0013004 |
| PHADIA-SUB0013035 | PHADIA-SUB0013079 |
| PHADIA-SUB0013121 | PHADIA-SUB0013133 |

PHADIA-SUB0013134    PHADIA-SUB0013156
PHADIA-SUB0013158    PHADIA-SUB0013186
PHADIA-SUB0013187    PHADIA-SUB0013215
PHADIA-SUB0013235    PHADIA-SUB0013240
PHADIA-SUB0013244    PHADIA-SUB0013276
PHADIA-SUB0013277    PHADIA-SUB0013280
PHADIA-SUB0013281    PHADIA-SUB0013309
PHADIA-SUB0013310    PHADIA-SUB0013312
PHADIA-SUB0013313    PHADIA-SUB0013314
PHADIA-SUB0013315    PHADIA-SUB0013330
PHADIA-SUB0013331    PHADIA-SUB0013333
PHADIA-SUB0013339    PHADIA-SUB0013342
PHADIA-SUB0013343    PHADIA-SUB0013343
PHADIA-SUB0013344    PHADIA-SUB0013347
PHADIA-SUB0013348    PHADIA-SUB0013349
PHADIA-SUB0013350    PHADIA-SUB0013351
PHADIA-SUB0013371    PHADIA-SUB0013373
PHADIA-SUB0013374    PHADIA-SUB0013397
PHADIA-SUB0013399    PHADIA-SUB0013411
PHADIA-SUB0013412    PHADIA-SUB0013413
PHADIA-SUB0013454    PHADIA-SUB0013462
PHADIA-SUB0013463    PHADIA-SUB0013465
PHADIA-SUB0013466    PHADIA-SUB0013526
PHADIA-SUB0013527    PHADIA-SUB0013529
PHADIA-SUB0013530    PHADIA-SUB0013553
PHADIA-SUB0013554    PHADIA-SUB0013556
PHADIA-SUB0013613    PHADIA-SUB0013615
PHADIA-SUB0013616    PHADIA-SUB0013618
PHADIA-SUB0013619    PHADIA-SUB0013631
PHADIA-SUB0013859    PHADIA-SUB0013882
PHADIA-SUB0013883    PHADIA-SUB0013891
PHADIA-SUB0013936    PHADIA-SUB0013941
PHADIA-SUB0013961    PHADIA-SUB0013961
PHADIA-SUB0013962    PHADIA-SUB0013962
PHADIA-SUB0013963    PHADIA-SUB0013964
PHADIA-SUB0013965    PHADIA-SUB0013967
PHADIA-SUB0013968    PHADIA-SUB0013972
PHADIA-SUB0014014    PHADIA-SUB0014048
PHADIA-SUB0014049    PHADIA-SUB0014077
PHADIA-SUB0014079    PHADIA-SUB0014101

| | |
|---|---|
| PHADIA-SUB0014102 | PHADIA-SUB0014103 |
| PHADIA-SUB0014104 | PHADIA-SUB0014146 |
| PHADIA-SUB0014413 | PHADIA-SUB0014413 |
| PHADIA-SUB0014417 | PHADIA-SUB0014420 |
| PHADIA-SUB0014421 | PHADIA-SUB0014444 |
| PHADIA-SUB0014445 | PHADIA-SUB0014447 |
| PHADIA-SUB0014448 | PHADIA-SUB0014454 |
| PHADIA-SUB0014455 | PHADIA-SUB0014483 |
| PHADIA-SUB0014503 | PHADIA-SUB0014504 |
| PHADIA-SUB0014507 | PHADIA-SUB0014550 |
| PHADIA-SUB0014551 | PHADIA-SUB0014591 |
| PHADIA-SUB0014593 | PHADIA-SUB0014594 |
| PHADIA-SUB0014650 | PHADIA-SUB0014710 |
| PHADIA-SUB0014957 | PHADIA-SUB0014969 |
| PHADIA-SUB0014970 | PHADIA-SUB0014974 |
| PHADIA-SUB0014975 | PHADIA-SUB0014979 |
| PHADIA-SUB0014980 | PHADIA-SUB0014983 |
| PHADIA-SUB0014984 | PHADIA-SUB0015027 |
| PHADIA-SUB0015051 | PHADIA-SUB0015053 |
| PHADIA-SUB0015054 | PHADIA-SUB0015056 |
| PHADIA-SUB0015057 | PHADIA-SUB0015057 |
| PHADIA-SUB0015113 | PHADIA-SUB0015116 |
| PHADIA-SUB0015117 | PHADIA-SUB0015117 |
| PHADIA-SUB0015173 | PHADIA-SUB0015195 |
| PHADIA-SUB0015196 | PHADIA-SUB0015239 |
| PHADIA-SUB0015503 | PHADIA-SUB0015547 |
| PHADIA-SUB0015567 | PHADIA-SUB0015579 |
| PHADIA-SUB0015580 | PHADIA-SUB0015580 |
| PHADIA-SUB0015581 | PHADIA-SUB0015627 |
| PHADIA-SUB0015628 | PHADIA-SUB0015674 |
| PHADIA-SUB0015680 | PHADIA-SUB0015681 |
| PHADIA-SUB0015682 | PHADIA-SUB0015728 |
| PHADIA-SUB0015731 | PHADIA-SUB0015754 |
| PHADIA-SUB0015774 | PHADIA-SUB0015775 |
| PHADIA-SUB0015776 | PHADIA-SUB0015778 |
| PHADIA-SUB0015779 | PHADIA-SUB0015780 |
| PHADIA-SUB0015781 | PHADIA-SUB0015781 |
| PHADIA-SUB0015782 | PHADIA-SUB0015783 |
| PHADIA-SUB0015786 | PHADIA-SUB0015790 |
| PHADIA-SUB0015792 | PHADIA-SUB0015804 |

| | |
|---|---|
| PHADIA-SUB0015805 | PHADIA-SUB0015806 |
| PHADIA-SUB0015812 | PHADIA-SUB0015858 |
| PHADIA-SUB0015861 | PHADIA-SUB0015889 |
| PHADIA-SUB0015896 | PHADIA-SUB0015938 |
| PHADIA-SUB0015939 | PHADIA-SUB0015981 |
| PHADIA-SUB0015982 | PHADIA-SUB0016015 |
| PHADIA-SUB0016016 | PHADIA-SUB0016072 |
| PHADIA-SUB0016073 | PHADIA-SUB0016107 |
| PHADIA-SUB0016108 | PHADIA-SUB0016128 |
| PHADIA-SUB0016129 | PHADIA-SUB0016160 |
| PHADIA-SUB0016202 | PHADIA-SUB0016230 |
| PHADIA-SUB0016250 | PHADIA-SUB0016266 |
| PHADIA-SUB0016267 | PHADIA-SUB0016279 |
| PHADIA-SUB0016280 | PHADIA-SUB0016280 |
| PHADIA-SUB0016302 | PHADIA-SUB0016307 |
| PHADIA-SUB0016308 | PHADIA-SUB0016312 |
| PHADIA-SUB0016347 | PHADIA-SUB0016375 |
| PHADIA-SUB0016376 | PHADIA-SUB0016404 |
| PHADIA-SUB0016405 | PHADIA-SUB0016406 |
| PHADIA-SUB0016407 | PHADIA-SUB0016408 |
| PHADIA-SUB0016447 | PHADIA-SUB0016491 |
| PHADIA-SUB0016492 | PHADIA-SUB0016511 |
| PHADIA-SUB0016512 | PHADIA-SUB0016550 |
| PHADIA-SUB0016554 | PHADIA-SUB0016585 |
| PHADIA-SUB0016605 | PHADIA-SUB0016639 |
| PHADIA-SUB0016640 | PHADIA-SUB0016659 |
| PHADIA-SUB0016663 | PHADIA-SUB0016686 |
| PHADIA-SUB0016730 | PHADIA-SUB0016730 |
| PHADIA-SUB0016731 | PHADIA-SUB0016731 |
| PHADIA-SUB0016751 | PHADIA-SUB0016752 |
| PHADIA-SUB0016753 | PHADIA-SUB0016797 |
| PHADIA-SUB0016798 | PHADIA-SUB0016842 |
| PHADIA-SUB0016843 | PHADIA-SUB0016849 |
| PHADIA-SUB0016869 | PHADIA-SUB0016915 |
| PHADIA-SUB0016916 | PHADIA-SUB0016959 |
| PHADIA-SUB0016979 | PHADIA-SUB0016980 |
| PHADIA-SUB0016981 | PHADIA-SUB0016997 |
| PHADIA-SUB0016998 | PHADIA-SUB0016998 |
| PHADIA-SUB0016999 | PHADIA-SUB0017002 |
| PHADIA-SUB0017003 | PHADIA-SUB0017007 |

| | |
|---|---|
| PHADIA-SUB0017008 | PHADIA-SUB0017011 |
| PHADIA-SUB0017050 | PHADIA-SUB0017050 |
| PHADIA-SUB0017089 | PHADIA-SUB0017135 |
| PHADIA-SUB0017216 | PHADIA-SUB0017232 |
| PHADIA-SUB0017235 | PHADIA-SUB0017237 |
| PHADIA-SUB0017251 | PHADIA-SUB0017279 |
| PHADIA-SUB0017280 | PHADIA-SUB0017282 |
| PHADIA-SUB0017283 | PHADIA-SUB0017284 |
| PHADIA-SUB0017289 | PHADIA-SUB0017292 |
| PHADIA-SUB0017293 | PHADIA-SUB0017297 |
| PHADIA-SUB0017301 | PHADIA-SUB0017302 |
| PHADIA-SUB0017303 | PHADIA-SUB0017306 |
| PHADIA-SUB0017307 | PHADIA-SUB0017308 |
| PHADIA-SUB0017309 | PHADIA-SUB0017310 |
| PHADIA-SUB0017311 | PHADIA-SUB0017313 |
| PHADIA-SUB0017361 | PHADIA-SUB0017362 |
| PHADIA-SUB0017363 | PHADIA-SUB0017373 |
| PHADIA-SUB0017413 | PHADIA-SUB0017454 |
| PHADIA-SUB0017477 | PHADIA-SUB0017500 |
| PHADIA-SUB0017501 | PHADIA-SUB0017503 |
| PHADIA-SUB0017504 | PHADIA-SUB0017506 |
| PHADIA-SUB0017507 | PHADIA-SUB0017508 |
| PHADIA-SUB0017509 | PHADIA-SUB0017517 |
| PHADIA-SUB0017518 | PHADIA-SUB0017519 |
| PHADIA-SUB0017521 | PHADIA-SUB0017529 |
| PHADIA-SUB0017530 | PHADIA-SUB0017533 |
| PHADIA-SUB0017537 | PHADIA-SUB0017572 |
| PHADIA-SUB0017573 | PHADIA-SUB0017601 |
| PHADIA-SUB0017640 | PHADIA-SUB0017640 |
| PHADIA-SUB0017641 | PHADIA-SUB0017660 |
| PHADIA-SUB0017661 | PHADIA-SUB0017662 |
| PHADIA-SUB0017663 | PHADIA-SUB0017666 |
| PHADIA-SUB0017667 | PHADIA-SUB0017668 |
| PHADIA-SUB0017669 | PHADIA-SUB0017670 |
| PHADIA-SUB0017671 | PHADIA-SUB0017672 |
| PHADIA-SUB0017673 | PHADIA-SUB0017673 |
| PHADIA-SUB0017674 | PHADIA-SUB0017693 |
| PHADIA-SUB0017694 | PHADIA-SUB0017722 |
| PHADIA-SUB0017723 | PHADIA-SUB0017724 |
| PHADIA-SUB0017725 | PHADIA-SUB0017745 |

PHADIA-SUB0017747     PHADIA-SUB0017749
PHADIA-SUB0017750     PHADIA-SUB0017762
PHADIA-SUB0017782     PHADIA-SUB0017824
PHADIA-SUB0017982     PHADIA-SUB0017983
PHADIA-SUB0018003     PHADIA-SUB0018031
PHADIA-SUB0018032     PHADIA-SUB0018074
PHADIA-SUB0018075     PHADIA-SUB0018076
PHADIA-SUB0018077     PHADIA-SUB0018078
PHADIA-SUB0018079     PHADIA-SUB0018081
PHADIA-SUB0018082     PHADIA-SUB0018084
PHADIA-SUB0018108     PHADIA-SUB0018109
PHADIA-SUB0018112     PHADIA-SUB0018113
PHADIA-SUB0018114     PHADIA-SUB0018115
PHADIA-SUB0018116     PHADIA-SUB0018118
PHADIA-SUB0018119     PHADIA-SUB0018120
PHADIA-SUB0018121     PHADIA-SUB0018121
PHADIA-SUB0018122     PHADIA-SUB0018142
PHADIA-SUB0018143     PHADIA-SUB0018145
PHADIA-SUB0018146     PHADIA-SUB0018179
PHADIA-SUB0018188     PHADIA-SUB0018191
PHADIA-SUB0018192     PHADIA-SUB0018205
PHADIA-SUB0018206     PHADIA-SUB0018240
PHADIA-SUB0018273     PHADIA-SUB0018292
PHADIA-SUB0018312     PHADIA-SUB0018312
PHADIA-SUB0018313     PHADIA-SUB0018359
PHADIA-SUB0018360     PHADIA-SUB0018361
PHADIA-SUB0018364     PHADIA-SUB0018376
PHADIA-SUB0018387     PHADIA-SUB0018389
PHADIA-SUB0018390     PHADIA-SUB0018392
PHADIA-SUB0018393     PHADIA-SUB0018494
PHADIA-SUB0018534     PHADIA-SUB0018535
PHADIA-SUB0018536     PHADIA-SUB0018552
PHADIA-SUB0018553     PHADIA-SUB0018557
PHADIA-SUB0018573     PHADIA-SUB0018575
PHADIA-SUB0018576     PHADIA-SUB0018579
PHADIA-SUB0018580     PHADIA-SUB0018580
PHADIA-SUB0018634     PHADIA-SUB0018636
PHADIA-SUB0018637     PHADIA-SUB0018639
PHADIA-SUB0018640     PHADIA-SUB0018667
PHADIA-SUB0018674     PHADIA-SUB0018717

| | |
|---|---|
| PHADIA-SUB0018718 | PHADIA-SUB0018746 |
| PHADIA-SUB0018747 | PHADIA-SUB0018762 |
| PHADIA-SUB0018763 | PHADIA-SUB0018806 |
| PHADIA-SUB0018807 | PHADIA-SUB0018807 |
| PHADIA-SUB0018808 | PHADIA-SUB0018808 |
| PHADIA-SUB0018809 | PHADIA-SUB0018811 |
| PHADIA-SUB0019061 | PHADIA-SUB0019062 |
| PHADIA-SUB0019090 | PHADIA-SUB0019092 |
| PHADIA-SUB0019093 | PHADIA-SUB0019096 |
| PHADIA-SUB0019097 | PHADIA-SUB0019099 |
| PHADIA-SUB0019100 | PHADIA-SUB0019102 |
| PHADIA-SUB0019103 | PHADIA-SUB0019105 |
| PHADIA-SUB0019106 | PHADIA-SUB0019109 |
| PHADIA-SUB0019110 | PHADIA-SUB0019111 |
| PHADIA-SUB0019112 | PHADIA-SUB0019113 |
| PHADIA-SUB0019114 | PHADIA-SUB0019116 |
| PHADIA-SUB0019117 | PHADIA-SUB0019163 |
| PHADIA-SUB0019202 | PHADIA-SUB0019204 |
| PHADIA-SUB0019206 | PHADIA-SUB0019212 |
| PHADIA-SUB0019221 | PHADIA-SUB0019263 |
| PHADIA-SUB0019267 | PHADIA-SUB0019273 |
| PHADIA-SUB0019278 | PHADIA-SUB0019279 |
| PHADIA-SUB0019280 | PHADIA-SUB0019292 |
| PHADIA-SUB0019293 | PHADIA-SUB0019326 |
| PHADIA-SUB0019355 | PHADIA-SUB0019367 |
| PHADIA-SUB0019368 | PHADIA-SUB0019370 |
| PHADIA-SUB0019371 | PHADIA-SUB0019435 |
| PHADIA-SUB0019436 | PHADIA-SUB0019464 |
| PHADIA-SUB0019465 | PHADIA-SUB0019493 |
| PHADIA-SUB0019494 | PHADIA-SUB0019554 |
| PHADIA-SUB0019555 | PHADIA-SUB0019558 |
| PHADIA-SUB0019559 | PHADIA-SUB0019560 |
| PHADIA-SUB0019561 | PHADIA-SUB0019564 |
| PHADIA-SUB0019565 | PHADIA-SUB0019569 |
| PHADIA-SUB0019570 | PHADIA-SUB0019571 |
| PHADIA-SUB0019572 | PHADIA-SUB0019573 |
| PHADIA-SUB0019574 | PHADIA-SUB0019575 |
| PHADIA-SUB0019576 | PHADIA-SUB0019580 |
| PHADIA-SUB0019584 | PHADIA-SUB0019586 |
| PHADIA-SUB0019587 | PHADIA-SUB0019587 |

| | |
|---|---|
| PHADIA-SUB0019588 | PHADIA-SUB0019588 |
| PHADIA-SUB0019659 | PHADIA-SUB0019719 |
| PHADIA-SUB0019752 | PHADIA-SUB0019754 |
| PHADIA-SUB0019786 | PHADIA-SUB0019819 |
| PHADIA-SUB0019838 | PHADIA-SUB0019840 |
| PHADIA-SUB0019841 | PHADIA-SUB0019869 |
| PHADIA-SUB0019909 | PHADIA-SUB0019910 |
| PHADIA-SUB0019911 | PHADIA-SUB0019953 |
| PHADIA-SUB0019954 | PHADIA-SUB0019957 |
| PHADIA-SUB0019960 | PHADIA-SUB0019961 |
| PHADIA-SUB0019962 | PHADIA-SUB0019964 |
| PHADIA-SUB0019965 | PHADIA-SUB0019966 |
| PHADIA-SUB0019967 | PHADIA-SUB0019968 |
| PHADIA-SUB0019969 | PHADIA-SUB0019969 |
| PHADIA-SUB0019970 | PHADIA-SUB0019972 |
| PHADIA-SUB0019975 | PHADIA-SUB0019977 |
| PHADIA-SUB0019978 | PHADIA-SUB0019981 |
| PHADIA-SUB0019982 | PHADIA-SUB0019985 |
| PHADIA-SUB0019986 | PHADIA-SUB0019987 |
| PHADIA-SUB0020003 | PHADIA-SUB0020003 |
| PHADIA-SUB0020004 | PHADIA-SUB0020004 |
| PHADIA-SUB0020005 | PHADIA-SUB0020006 |
| PHADIA-SUB0020037 | PHADIA-SUB0020065 |
| PHADIA-SUB0020080 | PHADIA-SUB0020082 |
| PHADIA-SUB0020083 | PHADIA-SUB0020114 |
| PHADIA-SUB0020115 | PHADIA-SUB0020150 |
| PHADIA-SUB0020151 | PHADIA-SUB0020174 |
| PHADIA-SUB0020175 | PHADIA-SUB0020218 |
| PHADIA-SUB0020219 | PHADIA-SUB0020231 |
| PHADIA-SUB0020233 | PHADIA-SUB0020236 |
| PHADIA-SUB0020237 | PHADIA-SUB0020239 |
| PHADIA-SUB0020240 | PHADIA-SUB0020282 |
| PHADIA-SUB0020283 | PHADIA-SUB0020286 |
| PHADIA-SUB0020294 | PHADIA-SUB0020298 |
| PHADIA-SUB0020299 | PHADIA-SUB0020300 |
| PHADIA-SUB0020549 | PHADIA-SUB0020609 |
| PHADIA-SUB0020642 | PHADIA-SUB0020670 |
| PHADIA-SUB0020671 | PHADIA-SUB0020713 |
| PHADIA-SUB0020733 | PHADIA-SUB0020741 |
| PHADIA-SUB0020795 | PHADIA-SUB0020814 |

| | |
|---|---|
| PHADIA-SUB0020815 | PHADIA-SUB0020843 |
| PHADIA-SUB0020844 | PHADIA-SUB0020862 |
| PHADIA-SUB0020863 | PHADIA-SUB0020906 |
| PHADIA-SUB0020909 | PHADIA-SUB0020937 |
| PHADIA-SUB0020938 | PHADIA-SUB0020958 |
| PHADIA-SUB0020959 | PHADIA-SUB0020961 |
| PHADIA-SUB0021014 | PHADIA-SUB0021017 |
| PHADIA-SUB0021018 | PHADIA-SUB0021084 |
| PHADIA-SUB0021085 | PHADIA-SUB0021085 |
| PHADIA-SUB0021086 | PHADIA-SUB0021087 |
| PHADIA-SUB0021143 | PHADIA-SUB0021143 |
| PHADIA-SUB0021174 | PHADIA-SUB0021218 |
| PHADIA-SUB0021521 | PHADIA-SUB0021549 |
| PHADIA-SUB0021569 | PHADIA-SUB0021581 |
| PHADIA-SUB0021635 | PHADIA-SUB0021663 |
| PHADIA-SUB0021909 | PHADIA-SUB0021932 |
| PHADIA-SUB0021933 | PHADIA-SUB0021975 |
| PHADIA-SUB0021976 | PHADIA-SUB0021977 |
| PHADIA-SUB0021978 | PHADIA-SUB0021978 |
| PHADIA-SUB0021981 | PHADIA-SUB0021983 |
| PHADIA-SUB0021997 | PHADIA-SUB0021997 |
| PHADIA-SUB0021998 | PHADIA-SUB0021999 |
| PHADIA-SUB0022000 | PHADIA-SUB0022000 |
| PHADIA-SUB0022001 | PHADIA-SUB0022001 |
| PHADIA-SUB0022002 | PHADIA-SUB0022030 |
| PHADIA-SUB0022034 | PHADIA-SUB0022052 |
| PHADIA-SUB0022053 | PHADIA-SUB0022095 |
| PHADIA-SUB0022096 | PHADIA-SUB0022102 |
| PHADIA-SUB0022103 | PHADIA-SUB0022149 |
| PHADIA-SUB0022150 | PHADIA-SUB0022177 |
| PHADIA-SUB0022218 | PHADIA-SUB0022220 |
| PHADIA-SUB0022221 | PHADIA-SUB0022222 |
| PHADIA-SUB0022223 | PHADIA-SUB0022224 |
| PHADIA-SUB0022228 | PHADIA-SUB0022246 |
| PHADIA-SUB0022247 | PHADIA-SUB0022270 |
| PHADIA-SUB0022271 | PHADIA-SUB0022303 |
| PHADIA-SUB0022304 | PHADIA-SUB0022307 |
| PHADIA-SUB0022308 | PHADIA-SUB0022310 |
| PHADIA-SUB0022311 | PHADIA-SUB0022311 |
| PHADIA-SUB0022315 | PHADIA-SUB0022315 |

# Exhibit 6

# Vinson&Elkins

Christopher V. Popov  cpopov@velaw.com
Tel +1.713.758.2636  Fax +1.713.615.5033

July 15, 2015

*Via E-mail*

Ronald Casey Low
Bracewell & Giuliani LLP
111 Congress Ave., Suite 2300
Austin, Texas 78701
Telephone: (512) 542-2109
Facsimile: (512) 542-2109
Email: casey.low@bgllp.com

Re:   Civil Cause No. 5:14-CV-35-OLG, *Academy of Allergy & Asthma in Primary Care and
United Biologics, LLC d/b/a United Allergy Services v. American Academy of Allergy Asthma
& Immunology, et al.*: Phadia's First Amended Response to Third-Party Subpoena

Casey:

Thank you for your June 26, 2015 letter regarding Phadia's production of documents.

First, consistent with the subpoena request, Phadia produced all attachments that were
responsive to the requests for production. Phadia did not produce attachments that were not
individually responsive to the requests for production, as doing so would not have been
reasonably calculated to lead to the discovery of admissible evidence. Additionally, the terms
"communications" and "document(s)"—as defined in the subpoena request—did not require
Phadia to produce entire families of documents including non-responsive attachments.

Second, with regard to PHADIA-SUB0002540-2561, PHADIA-SUB0002694-2795,
PHADIA-SUB0002989-3049,        PHADIA-SUB0003884-3905,        PHADIA-SUB0008464,
PHADIA-SUB00100001, Phadia has reproduced the identified six documents in native
format. We have included in the email attaching this letter a secure link that contains this
production. Phadia also provided the following metadata:

- FIRSTBATES
- LASTBATES
- BEGATTACH
- ENDATTACH

Vinson & Elkins LLP  Attorneys at Law
Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston  London
Moscow  New York  Palo Alto  Riyadh  San Francisco  Tokyo  Washington

1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Tel +1.713.758.2222  Fax +1.713.758.2346  www.velaw.com

V&E

- CUSTODIAN
- FROM
- TO
- CC
- BCC
- SUBJECT
- DATESENT
- TIMESENT
- LINK
- FILE_EXTEN
- AUTHOR
- DATECREATED
- TIME_CREATED
- FILE_SIZE
- PGCOUNT

Third, in response to the subpoena request to produce "[a]ll documents and communications with any person acting or purporting to act on behalf of any third-party payor relating to this Litigation, allergy testing and/or allergen immunotherapy, primary care physicians, AAAPC, or UAS," Phadia objected to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Phadia also objected to the undefined term "third-party payor" as overly broad. Nonetheless, Phadia searched for and produced all documents that were related to this litigation and included the term "third party payor" or "third-party payor." Phadia remains willing to work cooperatively to respond to subsequent discovery requests related to specific payors.

Additionally, Phadia complied with the subpoena request to produce "documents sufficient to establish the membership of Phadia's Advisory Board for the past five years." Phadia produced without redactions the consulting agreements that exist between the specialist advisory board members and Phadia during the relevant period.

Fourth, Phadia's pleadings and production did not create ambiguity regarding the proper name and entity of Phadia as a defendant. It was Plaintiffs, not Phadia, who addressed their subpoena request to "Phadia Laboratory Systems." Later, it was Plaintiffs, not Phadia, who sought to add Phadia US, Inc. as a new defendant in their Third Amended Complaint.



Lastly, in the spirit of compromise, Phadia has redesignated the attached list of documents from "Attorneys' Eyes Only to "Confidential." *See* Exhibit A. We have included in the email attaching this letter a secure link that contains this production with the new designations. Phadia remains willing to discuss the designation on any individual documents and to work cooperatively to resolve any areas of disagreement.

Sincerely,

Christopher V. Popov

# Exhibit A

Defendant Phadia US, Inc. hereby designates the following documents as Confidential pursuant the protective order in this case.

PHADIA-SUB0000001

PHADIA-SUB0000085

PHADIA-SUB0000269

PHADIA-SUB0000318

PHADIA-SUB0000361

PHADIA-SUB0000494

PHADIA-SUB0000759

PHADIA-SUB0000766

PHADIA-SUB0000773

PHADIA-SUB0000783

PHADIA-SUB0000790

PHADIA-SUB0000797

PHADIA-SUB0000804

PHADIA-SUB0000811

PHADIA-SUB0000818

PHADIA-SUB0000825

PHADIA-SUB0000836

PHADIA-SUB0000843

PHADIA-SUB0000850

PHADIA-SUB0000857

PHADIA-SUB0000909

PHADIA-SUB0000989

PHADIA-SUB0001024

PHADIA-SUB0001031

PHADIA-SUB0001311

PHADIA-SUB0001344

PHADIA-SUB0001412

PHADIA-SUB0001487

PHADIA-SUB0001607

PHADIA-SUB0001651

PHADIA-SUB0001680

PHADIA-SUB0001723

PHADIA-SUB0001785

PHADIA-SUB0001853

PHADIA-SUB0002051

PHADIA-SUB0002439

PHADIA-SUB0002471

PHADIA-SUB0002500

PHADIA-SUB0002507

PHADIA-SUB0002618

PHADIA-SUB0002828

PHADIA-SUB0002896

PHADIA-SUB0002936

PHADIA-SUB0002957

PHADIA-SUB0002960

PHADIA-SUB0002966

PHADIA-SUB0003309

PHADIA-SUB0003644

PHADIA-SUB0003648

PHADIA-SUB0003673

PHADIA-SUB0003697

PHADIA-SUB0003743

PHADIA-SUB0003786

PHADIA-SUB0003942

PHADIA-SUB0004002

PHADIA-SUB0004047

PHADIA-SUB0004165

PHADIA-SUB0004230

PHADIA-SUB0004425

PHADIA-SUB0004467

PHADIA-SUB0004485

PHADIA-SUB0004583

PHADIA-SUB0004626

PHADIA-SUB0004771

PHADIA-SUB0004797

PHADIA-SUB0004879

PHADIA-SUB0004913

PHADIA-SUB0004930

PHADIA-SUB0005014

PHADIA-SUB0005047

PHADIA-SUB0005231

PHADIA-SUB0005275

PHADIA-SUB0005358

PHADIA-SUB0005530

PHADIA-SUB0005532

PHADIA-SUB0005536

PHADIA-SUB0005583

PHADIA-SUB0005586

PHADIA-SUB0005612

PHADIA-SUB0005694

PHADIA-SUB0005775

PHADIA-SUB0005782

PHADIA-SUB0005825

PHADIA-SUB0005919

PHADIA-SUB0006113

PHADIA-SUB0006120

PHADIA-SUB0006129

PHADIA-SUB0006146

PHADIA-SUB0006155

PHADIA-SUB0006195

PHADIA-SUB0006428

PHADIA-SUB0006472

PHADIA-SUB0006780

PHADIA-SUB0006869

PHADIA-SUB0006976

PHADIA-SUB0007006

PHADIA-SUB0007168

PHADIA-SUB0007245

PHADIA-SUB0007259

PHADIA-SUB0007283

PHADIA-SUB0007285

PHADIA-SUB0007361

PHADIA-SUB0007363

PHADIA-SUB0007445

PHADIA-SUB0007448

PHADIA-SUB0007453

PHADIA-SUB0007484

PHADIA-SUB0007565

PHADIA-SUB0007615

PHADIA-SUB0007840

PHADIA-SUB0008077

PHADIA-SUB0008115

PHADIA-SUB0008185

PHADIA-SUB0008235

PHADIA-SUB0008237

PHADIA-SUB0008286

PHADIA-SUB0008608

PHADIA-SUB0008681

PHADIA-SUB0008817

PHADIA-SUB0008950

PHADIA-SUB0008994

PHADIA-SUB0009422

PHADIA-SUB0009476

PHADIA-SUB0009546

PHADIA-SUB0009671

PHADIA-SUB0009751

PHADIA-SUB0009832

PHADIA-SUB0009838

PHADIA-SUB0009927

PHADIA-SUB0009978

PHADIA-SUB0009991

PHADIA-SUB0009995

PHADIA-SUB0010000

PHADIA-SUB0010145

PHADIA-SUB0010512

PHADIA-SUB0010781

PHADIA-SUB0010804

PHADIA-SUB0010833

PHADIA-SUB0011017

PHADIA-SUB0011041

PHADIA-SUB0011236

PHADIA-SUB0011285

PHADIA-SUB0011436

PHADIA-SUB0011518

PHADIA-SUB0011645

PHADIA-SUB0011648

PHADIA-SUB0011798

PHADIA-SUB0011842

PHADIA-SUB0011874

Redesignated Documents                                           Page 6

PHADIA-SUB0012066

PHADIA-SUB0012402

PHADIA-SUB0012447

PHADIA-SUB0012528

PHADIA-SUB0012579

PHADIA-SUB0012621

PHADIA-SUB0012735

PHADIA-SUB0012905

PHADIA-SUB0013005

PHADIA-SUB0013158

PHADIA-SUB0013281

PHADIA-SUB0013310

PHADIA-SUB0013348

PHADIA-SUB0013374

PHADIA-SUB0013530

PHADIA-SUB0013859

PHADIA-SUB0013961

PHADIA-SUB0013962

PHADIA-SUB0013965

PHADIA-SUB0014049

PHADIA-SUB0014104

PHADIA-SUB0014421

PHADIA-SUB0014448

PHADIA-SUB0014455

PHADIA-SUB0014507

Redesignated Documents

PHADIA-SUB0014984

PHADIA-SUB0015051

PHADIA-SUB0015054

PHADIA-SUB0015196

PHADIA-SUB0015580

PHADIA-SUB0015628

PHADIA-SUB0015680

PHADIA-SUB0015731

PHADIA-SUB0015812

PHADIA-SUB0015861

PHADIA-SUB0015896

PHADIA-SUB0015939

PHADIA-SUB0016202

PHADIA-SUB0016250

PHADIA-SUB0016302

PHADIA-SUB0016308

PHADIA-SUB0016347

PHADIA-SUB0016376

PHADIA-SUB0016405

PHADIA-SUB0016663

PHADIA-SUB0016730

PHADIA-SUB0016731

PHADIA-SUB0016751

PHADIA-SUB0016843

PHADIA-SUB0016869

PHADIA-SUB0016916

PHADIA-SUB0016981

PHADIA-SUB0016999

PHADIA-SUB0017003

PHADIA-SUB0017008

PHADIA-SUB0017089

PHADIA-SUB0017216

PHADIA-SUB0017251

PHADIA-SUB0017311

PHADIA-SUB0017314

PHADIA-SUB0017394

PHADIA-SUB0017413

PHADIA-SUB0017455

PHADIA-SUB0017477

PHADIA-SUB0017501

PHADIA-SUB0017573

PHADIA-SUB0017669

PHADIA-SUB0017782

PHADIA-SUB0018003

PHADIA-SUB0018075

PHADIA-SUB0018077

PHADIA-SUB0018082

PHADIA-SUB0018112

PHADIA-SUB0018119

PHADIA-SUB0018121

PHADIA-SUB0018143

PHADIA-SUB0018313

PHADIA-SUB0018576

PHADIA-SUB0018580

PHADIA-SUB0018674

PHADIA-SUB0018718

PHADIA-SUB0018763

PHADIA-SUB0018807

PHADIA-SUB0018808

PHADIA-SUB0018809

PHADIA-SUB0019090

PHADIA-SUB0019093

PHADIA-SUB0019106

PHADIA-SUB0019110

PHADIA-SUB0019221

PHADIA-SUB0019278

PHADIA-SUB0019368

PHADIA-SUB0019436

PHADIA-SUB0019465

PHADIA-SUB0019570

PHADIA-SUB0019587

PHADIA-SUB0019820

PHADIA-SUB0019838

PHADIA-SUB0019841

PHADIA-SUB0019911

Redesignated Documents

Page 10

PHADIA-SUB0019962

PHADIA-SUB0019986

PHADIA-SUB0020151

PHADIA-SUB0020175

PHADIA-SUB0020240

PHADIA-SUB0020642

PHADIA-SUB0020671

PHADIA-SUB0020777

PHADIA-SUB0020815

PHADIA-SUB0020863

PHADIA-SUB0020909

PHADIA-SUB0021143

PHADIA-SUB0021521

PHADIA-SUB0021635

PHADIA-SUB0021891

PHADIA-SUB0021909

PHADIA-SUB0021933

PHADIA-SUB0021976

PHADIA-SUB0021981

PHADIA-SUB0021998

PHADIA-SUB0022000

PHADIA-SUB0022001

PHADIA-SUB0022002

PHADIA-SUB0022218

PHADIA-SUB0022221

Redesignated Documents                                                                     Page 11

PHADIA-SUB0022223

PHADIA-SUB0022247

PHADIA-SUB0022311

# Exhibit 7

# FILED UNDER SEAL

# Exhibit 8

# FILED UNDER SEAL

# Exhibit 9

# FILED UNDER SEAL

# Exhibit 10

| | |
|---|---|
| **From:** | Reeder, James |
| **To:** | Low, Casey |
| **Subject:** | Re: Thermo Fisher Scientific/Phadia Structure |
| **Date:** | Thursday, October 08, 2015 5:11:46 PM |

## Casey-

We are trying to track this down and will get you an answer by no later than the morning.

Best,

Jim

Sent from my iPhone

On Oct 8, 2015, at 3:35 PM, Low, Casey <casey.low@pillsburylaw.com> wrote:

Jim,

As we discussed on Tuesday, some issues have arisen concerning the legal structure of Defendant Phadia US, Inc. In the responses to the subpoena, Rule 26 disclosures, and follow up correspondence about the matter, it appears you reference Phadia US, Inc. as a subsidiary of Thermo Fisher Scientific, Inc. However, in Ms. Schroeder's deposition last week, she referenced having been an employee of Thermo Fisher Scientific upon that company's purchase of Phadia US, Inc.

In Tuesday and Wednesday's depositions of Defendant Phadia employees, Randy Miller and Patrick Galvin, respectively, both referenced Phadia as a division of Thermo Fisher Scientific that has been renamed the "Immunodiagnostics Division." If this is true, and as we discussed, it appears that Thermo Fisher Scientific, Inc. needs to be added as a party to the suit given the legal structure.

I know you mentioned on Tuesday that you would check into this question and get back to me about agreeing to add them as a party if that were necessary. Tomorrow, October 9, is our deadline to amend pleadings and add parties. Can you please get back to me sometime today or at the very latest first thing in the morning about this issue, including whether you would oppose Plaintiffs filing a Fourth Amended Complaint merely adding Thermo Fisher as a party?

Thank you in advance.

Casey

**Casey Low** | Partner
Pillsbury Winthrop Shaw Pittman LLP

221 West 6th Street, Suite 1110 | Austin, TX 78701-3443
t 512.375.4916 | f 512.375.4901
casey.low@pillsburylaw.com | website bio
<image001.png>



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Help Desk at Tel: 800-477-0770, Option 1, immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.



**James A. Reeder Jr.**
Partner

E   jreeder@velaw.com        Vinson & Elkins LLP
W   +1.713.758.2202          1001 Fannin Street
M   +1.713.201.2683          Suite 2500
                             Houston, TX 77002-6760

velaw | vcard

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

Thank You.

Exhibit 11

**From:** Wajda, Tom
**Sent:** Monday, January 16, 2012 11:34 PM
**To:** Bobby Garcia; 'Wajda, Tom'
**CC:** 'Ganong, Wayne'; 'Fitzpatrick, Mark J'; Dan A. Helminski; Danny Roznovsky; Mark A. Agientas
**Subject:** RE: United Allergy

Bobby,
I communicated the Thermo Fisher Scientific (formerly Phadia) strategy that I work to execute on a daily basis with my district in an e-mail that I sent to you on December 14th.  The core of the e-mail is included in the following excerpt:

*We are aware of United Allergy Labs and others companies like them.  At this time, we perceive them as a competitor in the marketplace, similar to other lab service providers. Joe Fraas, the District Sales Manager in South Texas, and I continue to work with our teams throughout Texas to proactively communicate our relationship with our lab partners and the many benefits of ImmunoCAP testing. We continue to invest in our model throughout the marketplace to retain business and drive growth in new accounts; our CPL ImmunoCAP business is up 42% YTD over prior year.  We are also partnering with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP where appropriate.  We would love to join with you and your team to ensure that we work collaboratively toward the same goals with key medical practices in our overlapping geographies.  Please let me know how you see that we can best optimize our efforts.*

If you would like to meet to discuss specific plans for targeted accounts, I am certainly open to this.  Please provide the date(s) and time(s) that you have in mind and I will let you know what works best for my calendar.  We can settle on a location once we secure a date/time.

Best Regards,

Tom

---

**From:** Bobby Garcia [mailto:bgarcia@cpllabs.com]
**Sent:** Tuesday, January 10, 2012 3:23 PM
**To:** Bobby Garcia; 'Wajda, Tom'
**CC:** 'Ganong, Wayne'; 'Fitzpatrick, Mark J'; Dan A. Helminski; Danny Roznovsky; Mark A. Agientas
**Subject:** RE: United Allergy

Tom,
Due to your lack of response to my previous email, is it safe to assume that Phadia currently has nothing to combat these revenue stream models within the allergy market? Or at the very least some strong dialogue that will potentially help retain this portion of our collaborative business.  I continue to hear of current CPL clients that are switching their allergy business to this type of testing.  I would like to be able to retain this business, however neither my reps nor I are aware of any information we can impart to these physicians that will help us retain this business.
Any assistance from you and your team would be greatly appreciated.
BG

---

**From:** Bobby Garcia
**Sent:** Wednesday, December 14, 2011 8:33 AM
**To:** 'Wajda, Tom'
**CC:** Ganong, Wayne; Fitzpatrick, Mark J; Dan A. Helminski; Danny Roznovsky; Mark A. Agientas
**Subject:** RE: United Allergy

Tom,

I appreciate your response however it does not really answer my question. 42% growth over last year is excellent, however that will not continue if we stare losing other practices such as a Dr. Sandknop and /or any other future opportunities. (Sales is, and always has been, what have you done for me lately)

I have researched some of the print materials, as well as, have been forwarded some from colleagues in reference to the business model from United Allergy and similar type companies.

Regardless, that the OIG has not made any official ruling as to this type business model (to my knowledge anyway) **we all need** to be, at the very least presenting these type articles in front of our customers so that they can make a better informed decision. I understand that this alone will not prevent a physician from engaging in this form of partnership with like companies, however we need to be the ones at least making them aware. We absolutely need to be proactive with our current clients, as well as, any future clients, until any future ruling (**if any**) is made in reference to this business model.
BG

---

**From:** Wajda, Tom [mailto:tom.wajda@thermofisher.com]
**Sent:** Wednesday, December 14, 2011 6:16 AM
**To:** Bobby Garcia
**Cc:** Ganong, Wayne; Fitzpatrick, Mark J
**Subject:** RE: United Allergy

Bobby,

Sorry for the brief delay in getting back to you. I appreciate you bringing United Allergy up as a topic of communication.

We are aware of United Allergy Labs and others companies like them. At this time, we perceive them as a competitor in the marketplace, similar to other lab service providers. Joe Fraas, the District Sales Manager in South Texas, and I continue to work with our teams throughout Texas to proactively communicate our relationship with our lab partners and the many benefits of ImmunoCAP testing. We continue to invest in our model throughout the marketplace to retain business and drive growth in new accounts; our CPL ImmunoCAP business is up 42% YTD over prior year. We are also partnering with local Allergists to make them aware of what is happening in the marketplace and for them to support the utilization of ImmunoCAP where appropriate. We would love to join with you and your team to ensure that we work collaboratively toward the same goals with key medical practices in our overlapping geographies. Please let me know how you see that we can best optimize our efforts.

Regards,

Tom

---

**From:** Bobby Garcia [mailto:bgarcia@cpllabs.com]
**Sent:** Monday, December 12, 2011 7:41 AM
**To:** Wajda, Tom
**Subject:** United Allergy

United Allergy is targeting our large practices that do Immunocap testing, such as Dr. Sandknop. I assume you have already been made aware of? What, if anything, is Phadia doing to help the CPL reps retain this allergy business, as well as, gain any other growth opportunities.
**Bobby Garcia**
Clinical Pathology Laboratories
Regional Sales Manager- North Texas
bgarcia@cpllabs.com
817.343.6099

---

This message contains privileged and confidential information intended only for the use of the addressee named

Thermo Fisher Scientific disclaimer: Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent of a system responsible for delivering the message to the intended recipient, is prohibited. If you are not the intended recipient, please inform the sender and delete all copies.

# Exhibit 12

# FILED UNDER SEAL

# Exhibit 13

# FILED UNDER SEAL

Exhibit 14



PiRL®

PHADIA IMMUNOLOGY
REFERENCE LABORATORY

**Center for Innovation**

# Going beyond traditional
# allergy and autoimmune testing

Operated by ImmunoDiagnostics part of Thermo Fisher Scientific, the worldwide leader in allergy diagnostics for more than 30 years, the Phadia Immunology Reference Laboratory (PiRL) offers a menu of cutting-edge assays to help clinicians extend the boundaries of innovative diagnostic testing technology.

## Your partner for exploration

As leaders in allergy and autoimmune diagnostics, we strive to provide clinicians and researchers in the fields of allergy and autoimmune research with innovative assays and component technology not available elsewhere.

## Leading-edge research

As your exclusive source for unique, premium, specific component/recombinant allergy tests, PiRL provides detection of cross-reacting allergens and precise identification of disease-eliciting allergens and disease-specific sensitization patterns. In addition, CLIA-certified PiRL evaluates new, state-of-the-art analytes prior to full commercial launch.

## A legacy of innovation

As the market leader of allergy blood tests with approximately 80% market share worldwide and 3 decades of innovation with specific antibody assays in autoimmune disease, ImmunoDiagnostics is dedicated to advancing diagnostics. With both our long history of supporting clinical trials and our microarray component technology instruments ranging from Phadia® 100 to Phadia® 5000, PiRL offers solutions for specific IgE blood testing, asthma, autoimmune testing, and molecular allergy.



**Thermo**
SCIENTIFIC

# Specialized testing for specialists

At PiRL, an initial clinical allergy assessment for the 21st century is now available with ISAC®. In addition to the ImmunoCAP® Specific IgE blood test and EliA® autoimmune assay, our molecular allergy tests help advance the understanding of allergy and autoimmune diseases.

## Trusted allergy and autoimmune diagnostics

### ImmunoCAP Specific IgE Blood Testing

As the most advanced specific IgE (sIgE) blood test available for allergy and asthma diagnostics, ImmunoCAP is the *de facto* reference standard that accurately measures and reports sIgE down to 0.1 $kU_A/L$.[1]

- Sensitization to 600 specific allergens
  - 100 complete food allergens
  - 22 complete food allergen mixes
- Customized assay design

### EliA Autoimmune Assays

With discrete single-well testing that eliminates the microtiter challenge, EliA measures autoantibodies and provides proven performance in a broad range of autoimmune diseases.

- Connective tissue disease
- Antiphospholipid syndrome
- Rheumatoid arthritis
- Celiac disease
- Autoimmune thyroid disease

## Innovative molecular allergy testing

### ImmunoCAP Allergen Components

As a highly refined specific allergen component test, ImmunoCAP Allergen Components can assess sensitization patterns at the molecular level.[1]

- Component resolved diagnostics (CRD) using only purified natural or recombinant allergen components
- Assessment of cross-reactivity patterns from widely divergent allergen sources
- Evaluation of risk of severe reactions at the individual component level

### Immuno Solid-phase Allergen Chip (ISAC)

As a miniaturized immunoassay, ImmunoCAP ISAC allows for multiplex measurement of sIgE antibodies to many allergen components using only 30 µl of serum or plasma (or a simple finger stick).

- Multiplex sIgE measurement to allergen components from over 50 common allergen sources in a single test
- 112 marker allergen components—specific, indicating cross-reactivity
- Semi-quantitative results based on fluorescence measurements

---

**Component testing is easy to order at www.PiRLlab.com.**
To order a full product catalog, please contact PiRL customer service at 800.346.4364, option 1, for more information.

**PiRL**

**PHADIA IMMUNOLOGY REFERENCE LABORATORY**

**Center for Innovation**

**References:**
1. Valenta R, et al. *Clin Exp Allergy.* 1999;29:896-904.

*Thermo Fisher Scientific*
4169 Commercial Avenue, Portage, MI 49002, 800.346.4364, www.thermofisherscientific.com/phadia

©2012 Thermo Fisher Scientific Inc. All rights reserved. All trademarks are the property of Thermo Fisher Scientific Inc., and its subsidiaries.
Legal Manufacturer: Phadia AB, Uppsala, Sweden.



**Thermo SCIENTIFIC**

# Exhibit 15

# FILED UNDER SEAL