# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA | § | |
| IN PRIMARY CARE and UNITED | § | |
| BIOLOGICS, LLC, d/b/a UNITED | § | |
| ALLERGY SERVICES, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIV. NO. 5:14-CV-00035-OLG |
| | § | |
| AMERICAN ACADEMY OF ALLERGY | § | |
| ASTHMA & IMMUNOLOGY, ET AL., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS PHADIA US INC. AND THERMO FISHER SCIENTIFIC INC.'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DONALD HOUSE**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.   HOUSE'S EXPERT OPINION TESTIMONY ................................................... 3

III.   ARGUMENT AND AUTHORITIES ................................................................ 4

A.   Expert Testimony Must Be Reliable and Aid the Jury in Its Determination .................... 4

B.   House's Chronology of Purported Facts Is Inadmissible. ............................................ 6

C.   House Should Be Precluded from Testifying That Defendants Engaged in a Conspiracy. ................................................................................................. 9

D.   House's Opinion That Defendants' Conduct Caused Plaintiffs to Suffer an Antitrust Injury Should Be Excluded. ............................................................. 13

   1.   House's opinion that Defendants' caused Plaintiffs to suffer an antitrust injury to their relationships with physicians is inadmissible. ................................. 13

   2.   House's opinion that Defendants' caused Plaintiffs to suffer an antitrust injury arising from third party payor reimbursement policy changes is inadmissible. ................................................................ 17

E.   House's Damages Calculations Are Unreliable and Inadmissible. ................................ 21

F.   House's Testimony Should Also Be Excluded under Federal Rule of Evidence 403. ...................................................................................................... 23

IV.   CONCLUSION AND PRAYER ...................................................................... 23

   CERTIFICATE OF SERVICE ....................................................................... 27

<u>TABLE OF AUTHORITIES</u>

## Cases

*Accident Ins. Co. v. Classic Bldg. Design, LLC,*
   No. 2:11CV33KS, 2012 WL 3913090 (S.D. Miss. Sept. 7, 2012) ............................................ 19

*American Tourmaline Fields v. International Paper Co.,*
   No. 3:96CV3363D, 1999 WL 242690 (N.D. Tex. Apr. 19, 1999) ........................................... 16

*AstraZeneca LP v. Tap Pharm. Prod., Inc.*
   444 F. Supp. 2d 278 (D. Del. 2006) ...................................................................................... 11

*City of Tuscaloosa v. Harcros Chems.,*
   158 F.3d 548 (11th Cir. 1998) ............................................................................................... 10

*Concord Boat Corp. v. Brunswick Corp.,*
   207 F.3d 1039 (8th Cir. 2000) ...................................................................................... 18, 19, 22

*Cooper v. Smith & Nephew, Inc.,*
   259 F.3d 194 (4th Cir. 2001) ................................................................................................... 6

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
   363 F.3d 761 (8th Cir. 2004) .................................................................................................. 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ......................................................................................................... passim

*El Aguila Food Products, Inc. v. Gruma Corp.,*
   301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) ...................... 22

*First United Fin. Corp. v. United States Fid. & Guar. Co.,*
   96 F.3d 135 (5th Cir. 1996) .................................................................................................... 11

*Fisher v. Halliburton,*
   Civ. Nos. H-05-1731, H-06-1971, H-06-1168, 2009 WL 5216949 (S.D. Tex. Dec. 21, 2009).... 11

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.,*
   546 F. Supp. 2d 155 (D.N.J. 2008) ........................................................................................ 20

*Gen. Elec. v. Joiner,*
   522 U.S. 136 (1997) ................................................................................................................. 6

*Guillory v. Domtar Indus.,*
   95 F.3d 1320 (5th Cir. 1996) .................................................................................................... 5

*Hathaway v. Bazany,*
   507 F.3d 312 (5th Cir. 2007) .................................................................................................. 16

*Heary Bros. Lightning Prot. Co., Inc. v. Lightning Prot. Inst.,*
   287 F. Supp. 2d 1038 (D. Ariz. 2003), *rev'd on other grounds*, 262 F. App'x. 815 (9th Cir. 2008) 19

*Highland Capital Mgmt., L.P. v. Schneider,*
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................................... 8

*In re Air Crash Disaster at New Orleans, La.,*
   795 F.2d 1230 (5th Cir. 1986) ...................................................................... 9

*In re Fosamax Products Liab. Litig.,*
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) ..................................................... 6, 12

*In re Prempro Prods. Liab. Litig.,*
   554 F. Supp. 2d 871 (E.D. Ark. 2008) ......................................................... 9

*In re Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................. 5, 8, 12

*In re Trasylol Prods. Liab. Litig.,*
   08-MD-01928, 2010 WL 4052141 (S.D. Fla. May 12, 2010) ...................... 12

*In re Viagra Products Liab. Litig.,*
   658 F. Supp. 2d 950 (D. Minn. 2009) ......................................................... 8

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.,*
   No. CIV 04-4213, 2011 WL 167259 (D. Minn. Jan. 14, 2011) ................... 20

*Jamsport & Entm't, LLC v. Paradama Productions., Inc.,*
   No. 02 C 2298, 2005 WL14917 (N.D. Ill. Jan. 3, 2005) .............................. 7

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.,*
   171 F.3d 1065 (6th Cir. 1999) ...................................................................... 5

*Knight v. Kirby Inland Marine, Inc.,*
   482 F.3d 347 (5th Cir. 2007) ....................................................................... 6

*Kumho Tire Co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999) ................................................................................. 4, 5

*Marlin v. Moody Nat'l Bank, N.A.,*
   248 F. App'x 534 (5th Cir. 2007) .............................................................. 12

*Marmo v. Tyson Fresh Meats, Inc.,*
   457 F.3d 748 (8th Cir. 2006) ..................................................................... 21

*Marx & Co. v. Diners' Club, Inc.,*
   550 F.2d 505 (2d Cir. 1977) ........................................................................ 8

*Matthews v. Ashland Chem., Inc.,*
   770 F.2d 1303 (5th Cir. 1985) .................................................................... 10

*Moore v. Ashland Chemical Inc.,*
   151 F.3d 269 (5th Cir. 1998) ................................................................... 4, 5

*Morgan v. United Parcel Serv. of Am., Inc.,*
   380 F.3d 459 (8th Cir. 2004) ..................................................................... 15

*Ohio v. Louis Trauth Dairy, Inc.,*
   925 F. Supp. 1247 (S.D. Ohio 1996) .......................................................... 10

*Schumacher v. Tyson Fresh Meats, Inc.,*
    No. Civ. 02-1027, 2006 WL 47504 (D.S.D. Jan. 5, 2006) .......................................................... 14

*Southard v. United Reg'l Health Care Sys., Inc.,*
    No. CIV.A.7:06-CV-0011-L, 2008 WL 5049299 (N.D. Tex. Nov. 26, 2008)............................ 10

*Taylor v. Evans,*
    No. 94 Civ. 8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997)..................................................... 9

*United States v. Vance,*
    No. 07–CR–351, 2011 WL 2633842 (N.D.Ill. July 5, 2011)....................................................... 8

*Vernon Walden, Inc. v. LIPOID GmbH,*
    No. CIV. 01-482, 2005 WL 3088333 (D.N.J. Nov. 17, 2005) .................................................. 23

*Williamson Oil Co. v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) .............................................................................................. 22

## Rules

FED. R. EVID. 403 ............................................................................................................. 3, 4, 23

FED. R. EVID. 702 ............................................................................................................. passim

FED. R. EVID. 702(b) ................................................................................................................. 5

FED. R. EVID. 702(b)-(d) ........................................................................................................... 5

FED. R. EVID. 702(c) ................................................................................................................. 5

FED. R. EVID. 702(d) ................................................................................................................. 6

Defendants Phadia US Inc. ("Phadia") and Thermo Fisher Scientific Inc. ("Thermo Fisher") (collectively "Phadia") file this Motion to Exclude the Expert Testimony of Donald House.

## I.     INTRODUCTION

Donald House, Ph.D. ("House"), an economist with RRC, Inc., is designated by Plaintiffs Academy of Allergy & Asthma in Primary Care ("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS") as an expert witness in this matter. House was asked by Plaintiffs' counsel to "██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████."[1]

House concludes, among other things, that Defendants' observed conduct "█████████

██████████████████" to "████████████████████████████████████████████

█████" and that "████████████████████████████████████████████████████

████████████████████████████."[2] He opines (without performing supporting economic analysis) that Defendants' conduct "████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████."[3] House also purports to calculate the alleged damages he claims result from Defendants' "███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[1] Expert Report of Donald R. House, Sr. updated May 2, 2016 ("House Report"), at 3 (***Sealed Exhibit 1***).
[2] House Report at 4.
[3] *Id.*

█████████████████████████████████████████████████

████."[4]

These opinions are inadmissible under Federal Rule of Evidence 702 and fall far short of the reliability standards for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. Exclusion of portions of House's opinion testimony is required for the following reasons:

- In nearly half of the pages of his 132 page original report, House does nothing more than to summarize Plaintiffs' factual story by interpreting and drawing inferences from selected evidence in an argumentative fashion characteristic of legal briefs. House applies no economic analyses at all in this portion of the report; on the contrary, he simply attempts to construct a narrative of what the Plaintiffs believe happened. This is advocacy, not expert analysis, and the jury is not assisted by House's interpretation of evidence that they can interpret for themselves.

- It is improper for House to opine that Defendants actually engaged in a conspiracy. As a matter of law, this opinion goes beyond the bounds of permissible economic expert testimony. It is also improper because his opinion that Defendants' efforts were coordinated is comprised largely of his speculations about the knowledge, intent or motivation of Defendants. It is well-settled that such state of mind testimony invades the province of the jury. In any event, House has no specialized expertise in determining what others may think, intend or know.

- House's opinion that Defendants' conduct caused UAS to suffer an antitrust injury by convincing physicians and third party payors not to do business with UAS is wholly unreliable. His econometric analyses cannot, as he admits, establish causation. His opinion that physicians reduced their business with UAS because of Phadia's alleged anticompetitive conduct is unsupported by sufficient facts or a reliable economic theory. His opinion that third party payors changed their reimbursement policies in response to Defendants' anticompetitive conduct requires the Court and jury to completely disregard all evidence concerning the reimbursement policy changes, including the sworn testimony of those third party payors.

- House's damages analyses, which purport to measure the damages flowing to UAS from Defendants' allegedly anticompetitive conduct, are completely unreliable and speculative. As House himself admits, even after multiple revisions correcting arithmetic errors in his calculations, his analyses cannot distinguish between business UAS lost because of (i) Defendants' lawful competitive conduct; (ii) Defendants' alleged anti-competitive conduct;

---

[4] *Id.* at 5.

or (iii) factors wholly unrelated to Defendants. As such, his damages calculations are not reliable measures of anything relevant to this case.

- House's opinions should be excluded under Rule 403 of the Federal Rules of Evidence. To the extent his opinions are the proper subject of expert testimony, and are relevant and reliable at all, any probative value is substantially outweighed by the dangers of confusing the issues, misleading the jury, and unfair prejudice to Defendants.

House's opinions about anticompetitive conduct, causation, and damages are highly unreliable, speculative, and inadmissible. The Court should exclude these opinions from the evidence and testimony in this case.

## II.    HOUSE'S EXPERT OPINION TESTIMONY

House's opinions are set forth in his May 2, 2016 Report (as corrected) ("House Report"). He also submitted a July 1, 2016 Rebuttal Report (as corrected) ("House Rebuttal Report").[5] The specific portions of his report and opinions that Phadia seeks to exclude by this Motion include the following:

- The factual narrative set forth in pages 24-87 of the House Report;

- The conclusions that appear throughout the House Report and the House Rebuttal Report that Defendants engaged in a conspiracy;

- The opinion that "."[6]

- House's opinions regarding the amount of economic damages suffered and all related charts and calculations.

---

[5] The House Rebuttal Report is attached as ***Sealed Exhibit 2*** to this Motion.
[6] House Report at 4.

For the reasons discussed below, these opinions are unreliable and inadmissible and must be excluded from the evidence of this case.

## III.     ARGUMENT AND AUTHORITIES

### A.     Expert Testimony Must Be Reliable and Aid the Jury in Its Determination

The Court must act as gatekeeper to ensure that unreliable expert opinions are not presented to the jury. *See Daubert*, 509 U.S. 579 at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("*Daubert*'s general holding . . . applies . . . to testimony based on 'technical' and 'other specialized' knowledge."). Federal Rule of Evidence 702 requires that a testifying expert be qualified and that his or her testimony be reliable and relevant:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In addition to establishing the expert's qualifications and the reliability and relevance of the testimony, the trial judge must ensure that the probative value of proposed expert evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." *Daubert*, 509 U.S. at 595 (citing FED. R. EVID. 403). The party offering the expert has the burden of proving that the expert's testimony is admissible. *Daubert*, 509 U.S. at 592 n.10; *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Courts have held that even qualified experts may not testify about "lay matters which a jury is capable of understanding and deciding without the expert's help." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citations omitted) (examples of "expert" testimony on lay issues that courts have excluded include "factual narratives and interpretations of conduct or views as to the motivation of parties" (citations omitted)). Thus, experts cannot "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." *Id.*

Rule 702(b)-(d) address the reliability of an expert's opinion. Rule 702(b) requires that the expert's opinion be based on "a reliable foundation" of facts and data – and not on "speculation, conjecture, and possibility." *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072-73 (6th Cir. 1999); *see also Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (court property excluded expert's opinion because it was based upon incorrect, altered facts and speculation designed to bolster the defendant's position).

Rule 702(c) requires the district court to examine the general principles and methodology used by the expert "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also Moore,* 151 F.3d at 276 (holding that the proponent of the testimony must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable"). *Daubert* and its progeny instruct the district courts to evaluate the relevance and reliability of the methodology of proffered expert testimony based on a nonexclusive list of factors: (1) whether the expert's theory "can be (and has been) tested"; (2) whether the theory "has been subject to peer review and publication"; (3) "the known or potential rate of error"; (4) the "existence and

maintenance of standards controlling the technique's operation"; and (5) the "general acceptance" of the methodology in the scientific community. *Daubert*, 509 U.S. at 593-94.

Subpart (d) of Rule 702 requires district courts to determine whether the expert "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702(d). Thus, even if a particular method is generally viewed as reliable by both the relevant scientific community and the courts, it does not follow that every application of that methodology is reliable. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (noting that a "reliable differential diagnosis provides a valid foundation for an expert opinion," but that the differential diagnosis conducted by the expert at issue was not reliable). A district court is not required to admit expert testimony "that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Thus, "the reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)(citation omitted).

## B.   House's Chronology of Purported Facts Is Inadmissible.

Rule of Evidence 702 does not permit the expert to simply tell the jury what the facts are, or what conclusions to reach based on the factual evidence that the jury can interpret for itself. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009). Yet House spends more than half of his report telling the jury about what Plaintiffs believed happened in "the

conspiracy."[7]

House's prolix discussion of selected documents and deposition testimony in this portion of the report applies no economic analysis. On page 24 of his Report, in the introductory paragraph of this long exposition, House states that "█████████████████████████ ████████████████████████████."[8] The next 63 pages of his report are indeed a largely chronological account of Defendants' alleged conduct based on his discussion of and quotation from selected documents and deposition testimony.[9] In these pages, he performs no economic calculations or tests, applies no economic models or theories, but instead merely interprets the wording and speculates on the intent of documents in the way that anyone— including all the jurors—would be equally qualified to do.

House's recitation is not expert testimony under Rule 702. In *Jamsport & Entertainment, LLC v. Paradama Productions,* No. 02 C 2298, 2005 WL 14917 (N.D. Ill. Jan. 3, 2005), the court held that an expert's "discussion of the question of anticompetitive conduct [that] consist[ed], in large part, of his interpretation of correspondence and other evidence" was not "proper testimony by an expert in economics" because "[t]here is nothing in [his] expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them the intent of [the defendant] and others." *Id.* at *10. Just as Dr. House does here, the economist in *Jamsport* "simply examined materials produced in discovery and drew inferences from the record." *Id.* (citation omitted). Such testimony was held inadmissible under Rule of Evidence 702 because it was not the "application of 'scientific, technical, or other specialized knowledge

---

[7] House Report at 24.
[8] *Id.*
[9] *Id.* at 24-87.

[that] will assist the trier of fact." *Id.; see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510-11 (2d Cir. 1977) (rejecting proposed expert testimony because it was "based merely on his examination of documents and correspondence, which were equally before the judge and jury").

Courts have routinely rejected the use of experts as a shortcut to simply marshal and present the party's evidence in narrative form. In *Highland Capital Management., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005), the court noted that "[w]hile an expert must of course rely on facts or data in formulating an expert opinion . . . an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Id.* at 469; *see also Rezulin*, 309 F. Supp. 2d at 551 (rejecting portions of plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence").

Other courts have stressed that interpreting documents is a role for the jury, not an expert. In *In re Viagra Products Liability Litigation*, 658 F. Supp. 2d 950 (D. Minn. 2009), the expert devoted a significant portion of her opinion to summarizing the regulatory history of Viagra and "states her advocacy-based interpretation of documents in the record concerning regulatory activity related to Viagra." *Id.* at 967. The court held that because "there is no evidence that the jury could not be presented with these same documents and draw from them the relevant regulatory history of Viagra" the testimony was not helpful to the jury and was not admissible. *Id.; see also United States v. Vance*, No. 07–CR–351, 2011 WL 2633842, at *5 (N.D. Ill. July 5, 2011) (permitting an expert to provide summary testimony "based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself"); *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d

871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?") *aff'd in rel. part*, 586 F.3d 547 (8th Cir. 2009); *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report on the ground that the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing").

The Fifth Circuit has held that "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986). Pages 24-87 of House's report fail this standard. Thus, the Court should exclude House's slanted discussion of the evidence and leave it to the jury to determine what happened.

## C.   House Should Be Precluded from Testifying That Defendants Engaged in a Conspiracy.

Throughout his report, House concludes that Defendants' conduct was collusive.[10] In fact, the heading of the extensive recitation of alleged facts is titled "Conspiracy."[11]

House's opinion that the evidence indicates that a conspiracy existed in this case is inadmissible as a matter of law. While economists are permitted to testify that certain facts, i.e. economic conditions, are consistent with the hypothesis of a conspiracy, they may not testify that those facts establish a conspiracy. Whether the evidence supports the existence of a conspiracy is a legal conclusion that is an improper subject for expert testimony. *E.g., City of Tuscaloosa v. Harcros*

---

[10] *E.g.,* House Report at 39 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████"); *id.* at 62 (describing "Overt Acts in Furtherance of the Conspiracy"); *id.* at 77 ("████████████████████████████████████████████████████████████████████"); *id.* at 50-51 ("███████████████████████████████████████████████████████"); *id.* at 92 (describing a "conspiracy to monopolize").

[11] *Id.* at 24.

*Chems.*, 158 F.3d 548, 565 (11th Cir. 1998); *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1254 (S.D. Ohio 1996). Courts in this circuit have held that "experts cannot opine on the ultimate legal questions." *Southard v. United Reg'l Health Care Sys., Inc.*, No. 7:06-CV-0011-L, 2008 WL 5049299, at *5 (N.D. Tex. Nov. 26, 2008); *see Matthews v. Ashland Chem., Inc.*, 770 F.2d 1303, 1310 (5th Cir. 1985) ("It was within the trial court's discretion to disallow the question on the ground that it required the witness to state a conclusion of law . . . .").

In *City of Tuscloosa v. Harcros Chemicals*, the court upheld the district court's exclusion of expert "characterizations of documentary evidence as tending to show collusive behavior." *City of Tuscaloosa*, 158 F.3d at 567; *see also id.* at 567 n.27 (stating that testimony of another expert, an economist, also warranted exclusion to the extent that he testified as to "characterizations of pieces of documentary evidence as tending to show collusion"). Other courts have followed the standard laid down in *City of Tuscaloosa* to exclude legal conclusions as inadmissible expert testimony. In *Ohio v. Louis Trauth Dairy*, the court allowed the experts to testify, but held that they "may not express an opinion in the form of a legal conclusion regarding the existence of an illegal conspiracy." 925 F. Supp. at 1254. Instead, such experts were restricted to testifying as to "how their analyses are consistent with the other evidence of conspiracy." *Id.*

Similarly, experts cannot characterize certain behavior as evidence of collusion when such characterizations are beyond their competence. *City of Tuscaloosa*, 158 F.3d at 565. This prohibition is important here because House admits that his statistical regressions cannot distinguish between the effects of an antitrust conspiracy and perfectly lawful competition. Thus, House's conclusion that Defendants engaged in a conspiracy cannot be salvaged as econometric analyses. *See* Section III.D. *infra.* Instead, House's conspiracy opinion is based on his speculation

about Defendants' state of mind, including their intent and motivations.[12] For example, House testified that his "interpretation" of the "footprints of conduct" is that Phadia acted towards "a larger goal of eliminating a competitor."[13]

This state of mind testimony is inadmissible. It is well-established that experts are not permitted to opine about what individuals or entities knew, believed, or intended. *AstraZeneca LP v. Tap Pharm. Prods., Inc.* 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify . . . regarding [the defendant's] intent, motive, state of mind, or evidence by which such state of mind may be inferred.") (citation omitted). Applying this principle, a trial court may strike expert testimony that evaluates a party's state of mind. *Fisher v. Halliburton*, Civ. Nos. H-05-1731, H-06-1971, H-06-1168, 2009 WL 5216949, at *3 (S.D. Tex. Dec. 21, 2009) (striking an expert's opinion that "[t]he evidence strongly suggests that [defendant's] management wanted to maximize its performance under the contract in order to maximize its profits"). This standard has been applied by the Fifth Circuit to affirm the exclusion of an expert opinion of dishonesty. *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996). The Court found such an opinion would go "beyond the scope of expertise" and such a conclusion "will not substitute for evidence of dishonesty." *Id.*

---

[12] House's speculations about the state of mind of Defendants appear throughout his report and deposition testimony. Deposition of Donald House, May 25, 2016 ("House Dep.") (***Sealed Exhibit 3***) at 285:20-286:6 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"). House Report at 26 ("████████████████████████████████████████████████████████████████████████████").

[13] House Dep. at 18:18-19:10.

Courts reject such state of mind testimony for two reasons. First, no expert is truly qualified to render such opinions. *Rezulin*, 309 F. Supp. 2d at 546 ("[T]he opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."). For example, the court in *In re Fosamax*, excluded a doctor's "conjecture" regarding "knowledge, motivations, intent, state of mind, or purposes" of the Defendant and its employees because the doctor's regulatory expertise "does not give her the ability to read minds." 645 F. Supp. 2d at 192. House's training as an economist does not mean that he can "read minds" any better than the expert in *In re Fosamax*, and his testimony should be rejected.

Second, courts exclude expert testimony about a party's state of mind because that "evaluation is within the province of the jury." *Fisher*, 2009 WL 5216949, at *2. The Fifth Circuit has held that "an expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind." *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007). Thus, because that testimony is not helpful to the trier of fact, it is inadmissible under Rule 702. *See In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 4052141, at *8 (S.D. Fla. May 12, 2010) (issues of knowledge, motive and intent are "classic jury questions").

House's attempt to characterize his conclusion that a conspiracy existed as an "economic" and not a "legal" opinion of conspiracy[14] is mere semantics and it does not salvage his opinion. Because he identified no difference between any economic and legal tests for determining whether the Defendants engaged in a conspiracy, and because he did not base his testimony on any

---

[14] House Dep. at 16:6-24.

"economic" theory but rather on his interpretation of intent from reading documents, the testimony that House intends to offer is, despite his protestations, an impermissible opinion about the ultimate legal issue, and should be excluded.

**D.  House's Opinion That Defendants' Conduct Caused Plaintiffs to Suffer an Antitrust Injury Should Be Excluded.**

House concludes that Plaintiffs were injured in two ways: (i) disparagement of Plaintiffs by Defendants (primarily Phadia) in communications with primary care physicians which caused the physicians to refrain from contracting with UAS or to reduce their usage of UAS's services; and (ii) a conspiracy by Defendants to cause insurance companies and other third party payors to change their reimbursement policies in ways that were allegedly detrimental to Plaintiffs.[15] House opines that these injuries were caused by Defendants because "████████████████████████████ ████████████████████████████" and because his regression analyses purportedly demonstrate a reduction in income to Plaintiffs during the relevant period.[16] As shown below, House's opinions regarding causation should be excluded from the evidence in this case.

**1.  House's opinion that Defendants' caused Plaintiffs to suffer an antitrust injury to their relationships with physicians is inadmissible.**

House opines that Defendants caused UAS to suffer a reduction in revenue from the physicians and clinics with whom it contracted, primarily through Phadia's alleged disparagement of UAS.[17] To test the supposed impact of Phadia's alleged product disparagement in direct contact with physicians and clinics, House constructed regression analyses examining whether UAS earned less revenue from physicians that House assumed were subjected to Phadia's alleged

---

[15] House Report at 4; 87-88.
[16] *Id.* at 4-5.
[17] *Id.* at 100-102.

disparagement, and those that he assumed likely were not. He posits that because his analyses showed a reduction in revenue from those physicians he assumed were privy to Phadia's alleged disparagement of UAS, Phadia's alleged disparagement caused UAS to suffer antitrust injury.[18]

However, House does not cite any evidence regarding which physicians Phadia actually contacted or any evidence regarding the nature of that contact.[19] Instead, he relied on a list of UAS-contracted physicians that was in Phadia's possession and assumed Phadia disparaged UAS to doctors on that list, and that Phadia did not disparage UAS to any doctors who were not on the list. He justifies his use of the list by simply assuming, without any supporting evidence, that the list would have been used to target existing UAS-contracted physicians:


[20]

This analysis does not come close to setting forth a reliable opinion about the necessary element of causation for several reasons. As House himself admits,[21] a regression analysis cannot, as a matter of law or economics, establish causation. *See Schumacher v. Tyson Fresh Meats, Inc.,* No. Civ. 02-1027, 2006 WL 47504, at *7 (D.S.D. Jan. 5, 2006) ("Even the best regression equation

---

[18] *Id.*

[19] As Defendants' expert witnesses discovered when they examined House's analyses, House did not actually perform the regression in the way he describes in his report. Due to methodological errors and other issues, House does not even correctly compare the revenues from physicians appearing on the list to those who do not appear on the list. Nevertheless, for purposes of this Motion, the regression is assumed to be as House describes it because the inherent unreliability of his approach is a sufficient basis to exclude it even if it otherwise had been done correctly.

[20] House Report at 100.

[21] House Dep. at 152:17-23 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

cannot prove causation."); *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 466 (8th Cir. 2004) ("A multiple regression analysis attempts to reveal relationships between explanatory variables and a dependent variable" but it "cannot prove causation."). At best, when performed correctly, it can demonstrate a correlation between two or more variables. *Schumacher*, 2006 WL 47504, at *7; *Morgan*, 380 F.3d at 466.

However, where, as here, the regression is based on wholly speculative inputs, the regression cannot reliably show a correlation between variables that are meaningful to this case. The most fundamental flaw of this analysis is that House did not, and could not, identify any evidence that the physicians he included in his regressions were, in fact, ever actually contacted by Phadia, much less that the contact involved anticompetitive conduct and that the physicians or clinics reduced their use of UAS services because of such conduct. In fact, House admitted that one cannot make the assumption that all direct contact with a UAS-contacted physician involved anticompetitive conduct, because House stated it was the job of the Phadia representatives to compete against UAS, and they could have done so in a permissible way:



---

House Dep. at 125:1-14.

As a consequence, even if he could identify which UAS-contracted physicians were contacted by Phadia at all, he could not show which of those physicians were subjected to allegedly anticompetitive tactics and, thus, his regression analyses cannot reliably show that such physicians reduced their use of UAS's services. Instead, his regression can only hope to show a difference between revenues from doctors who happen to appear on a list and those who do not appear on that list.

Without evidence of the nature or substance of Phadia's contacts with physicians, House's analysis lacks the factual grounding required to meet Rule 702's test for reliability. As the Fifth Circuit has held, the "existence of sufficient facts . . . is in all instances mandatory" because "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). Similarly, conjecture based on no facts is speculation and is not admissible. *Am. Tourmaline Fields v. Int'l Paper Co.*, No. 3:96CV3363D, 1999 WL 242690, at *2 (N.D. Tex. Apr. 19, 1999) ("Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be based on 'good grounds'" and must be "more than belief or unsupported speculation.") (citations omitted).

House concludes that Phadia caused Plaintiffs to suffer an antitrust injury based on nothing more than his opinion that Phadia had a motive to take business from Plaintiffs and the easy availability of contact information for certain UAS-contracted doctors. This is hardly a troubling or rare combination—all firms have an economic incentive to take business from their competitors and most would have gathered information on which potential customers use their competitor as part of their effort to compete. House cites no economic literature supporting this

notion that an antitrust injury can be inferred from the combination of an economic incentive and a good rolodex. This is not economics, it is pure guesswork and it should be precluded.

2. **House's opinion that Defendants' caused Plaintiffs to suffer an antitrust injury arising from third party payor reimbursement policy changes is inadmissible.**

The second part of House's causation opinion is that Defendants conspired together to cause third party payors, such as insurance companies, to change their reimbursement policies to the detriment of Plaintiffs and that those policy changes reduced UAS's revenues and harmed their ability to get new business. To support this opinion, House constructs a regression analysis that purports to show a decline in revenues

Here again, House's regression analysis is built atop a tower of highly speculative assumptions. This time, the successive necessary inferences are: (i) Defendants had contact with the third party payors; (ii) this contact was part of an antitrust conspiracy; (iii) this contact actually persuaded the third party payors to change their policies; and (iv) the resulting policy changes were detrimental to UAS.

House opines that the policy changes had to be the result of Defendants' conduct because no other market participant would be incentivized to make such changes:



House cites no evidence or study that would indicate that third party payors base their reimbursement policies on the desires of market participants such as the Defendants, and the notion that they have no independent incentives to change their own reimbursement policies is

---

[23] House Report at 87.

unreliable on its face. Even Plaintiffs' other expert, Peter Boland identifies many factors, such as concerns about substandard care or billing fraud,[24] clinical factors, market feedback, and other strategies, that influence reimbursement policy decisions.[25] House's conclusion that third party payors are passive institutions completely subject to the will of outside forces is not supported by facts, and it does not comport with reality.

Because House's analysis fails to properly credit and account for all of the factors that would drive third party payor reimbursement policies, his analysis is inadmissible. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (excluding expert testimony that assumed the plaintiff's lost growth was caused by defendants conspiracy and failed to take into account whether other factors, such as new competitors, played a role). House's analysis fails to "incorporate all aspects of the economic reality," and should not be admitted. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000).

Most importantly, House does not merely fail to cite evidence to support his opinion that Defendants' conduct drove third party payor decisions: he actively disregards extensive evidence in this case about the reasons third party payors changed their policies that directly contradicts House's theory that Defendants influenced the decision.[26] Without exception, the third party

---

[24] Deposition of Peter Boland, May 26, 2016 at 93:18-94:16 (***Sealed Exhibit 4***).

[25] *Id.* at 122:6-124:18.

[26] House Dep. at 300:10-301:10 ("

payors—via the sworn testimony provided by ten such entities—confirmed that Phadia had no influence over their decision making on any reimbursement policy changes.[27] Instead, the changes were based on the third party payors' independent judgment based on clinical factors analyzed pursuant to their internal processes.[28] House's assumption that no market participants other than Defendants could have influenced these decisions simply cannot overcome these uncontradicted facts.

"Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Guillory*, 95 F.3d at 1331; *see also Accident Ins. Co. v. Classic Bldg. Design, LLC*, No. 2:11CV33KS, 2012 WL 3913090 (S.D. Miss. Sept. 7, 2012) (collecting cases and noting that "courts routinely reject expert opinions based on incorrect factual bases."); *Heary Bros. Lightning Prot. Co., v. Lightning Prot. Inst.*, 287 F. Supp. 2d 1038, 1066 (D. Ariz. 2003), *rev'd on other grounds*, 262 F. App'x. 815 (9th Cir. 2008) (noting that because the evidence established a different number of market participants than that assumed by the expert, the expert's testimony was unreliable).

---

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████).

[27] Barry Lachman (Parkland Community Health Plan) Dep. at 217:16-218:3; David Palafox (El Paso First Health Plan) Dep. at 172:22-176:4; Michael Martin (Blue Cross Blue Shield of Arkansas) Dep. at 68:5-12; Dwight Brower (Blue Cross Blue Shield of Louisiana) Dep. at 178:22-179:18; Robyne Goates (Blue Cross Blue Shield of Kansas) Dep. at 7:25-8:6; Molly O'Toole (Blue Cross Blue Shield of North Carolina) Dep. at 46:19-22, 47:18-23; Barbara Muller (Wellmark Blue Cross Blue Shield) Dep. at 5:2-7, 8:25-9:6; Allan Chernov (Blue Cross Blue Shield of Texas) Dep. at 127:14-25; Sonya Canady (Highmark Blue Cross Blue Shield) Dep. at 19:1-6, 26:18-24, 51:9-12; William Glomb (Superior HealthPlan and Texas Medicaid) Dep. at 127:20-128:1, 140:2-11. These deposition excerpts are compiled and attached as **Sealed Exhibit 5**.

[28] *See* Sealed Exhibit 5.

The analysis in *Floorgraphics, Inc. v. News American Marketing In-Store Services., Inc.*, 546 F. Supp. 2d 155 (D.N.J. 2008) illustrates the fatal flaw in House's methodology. There, the court noted that "[t]he critical question in establishing causation in a business torts case is whether plaintiff can identify specific admissible evidence in support of its contentions that wrongful conduct by the defendant caused plaintiff to lose specific business that it previously had or that it sought and had a reasonable expectation of obtaining." *Id.* at 177-78. To attempt to satisfy that burden, plaintiff's expert witness designed a survey of customers and retailers, but "failed to show any specific or actual fact of a [business partner or customer] who can offer admissible testimony that the witness' company stopped doing business with Plaintiff or reduced the volume of its business with Plaintiff because of Defendants' conduct." *Id.* at 178. In fact, the court noted that the only person interviewed with a connection to the matter told the expert that "his opinion of Plaintiff was based on other completely independent factors than ones Plaintiff alleges." *Id.* The court rejected efforts to "introduce the testimony of Dr. McLaughlin as a substitute for the direct testimony of individuals who have first hand knowledge of the events at issue" and found his survey method to be unreliable. *Id.* at 179-80. Thus, the court excluded the expert testimony. *Id.* at 180. *See also Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. CIV 04-4213, 2011 WL 167259, at *5 (D. Minn. Jan. 14, 2011) (expert opinion was unreliable because it was based on how the expert speculated or inferred a customer would react to materials sent by defendant, but lacked actual evidence that a customer withdrew business because of defendant's actions).

Here, House did not even try to do a survey of the reasons third party payors changed their policies, or any other type of analysis, and he ignores their deposition testimony about those reasons. "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or

contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). House's causation opinions are all of these things and should be precluded.

### E.    House's Damages Calculations Are Unreliable and Inadmissible.

The unreliability of House's causation opinions discussed Part III.D. above also infects his damages analyses and renders those calculations inadmissible.

To estimate the Plaintiffs' alleged damages, House performs several calculations which can be divided into two broad categories. The first category of calculations purports to detail damages associated with Defendants' conduct toward physicians and clinics and purports to measure: (i) the losses of revenue suffered in offices/clinics where Phadia was aware of the contractual relationship with UAS, (ii) the deterioration in revenue experienced at Texas Health Physicians Group ("THPG") clinics after Defendants alleged interference with UAS's contractual relationship with THPG, and (iii) various leads and opportunities with Healthcare Corporation of America ("HCA") that failed to generate significant new business.[29] The second group of calculations purports to calculate damages associated with changes in the reimbursement policies of payors that were allegedly caused by Defendants' antitrust conspiracy.

All of these separate calculations however suffer from the same fundamental defect. House concedes that he made no effort to distinguish between revenue losses stemming from allegedly unlawful behavior prohibited by the antitrust laws and the standard, procompetitive, behavior that is encouraged by them. For example, if Phadia visited a UAS-contracted doctor and persuaded the doctor to use ImmunoCAP because of its benefits, and the doctor then reduced its use of UAS's services because of his preference for ImmunoCAP, that is procompetitive behavior. However, House would have the jury award those revenue losses to Plaintiffs. House admits he did no study

---

[29] House Report at 102-09.

to determine the actual cause of any physician terminations.[30] Similarly, if the third party payors made reimbursement policy changes based on clinical factors or other factors wholly unrelated to Defendants—as they testified under oath they all did—House's calculations would still award revenue declines allegedly associated with such policy changes to Plaintiffs.

House simply made no effort to distinguish between the damages flowing from allegedly unlawful behavior and revenue declines related to lawful competition and unrelated factors. Courts have excluded expert testimony on this basis. For example, in *Concord Boat,* the expert's damages model failed to take into account certain market events that were not related to the alleged anticompetitive conduct, such as a recall of products and problems stemming from an earlier merger. 207 F.3d at 1056. Because the expert ignored these aspects of the market and did not separate lawful from unlawful conduct, his damages model was speculative and inadmissible. *Id.* at 1057.

Similarly, in *El Aguila Food Products, Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625–26 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005), the court rejected expert testimony that "did not rule out any of the externalities or distinguish between lawful or unlawful conduct on the part of [defendant]." *Id.* at 626. *See also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322-23 (11th Cir. 2003) ("Put differently, he did not differentiate between legal and illegal pricing behavior, and instead simply grouped both of these phenomena under the umbrella of illegal, collusive price fixing. This testimony could not have aided a finder of fact to determine whether appellees' behavior was or was not legal, and the district court properly excluded it."); *Vernon*

---

[30] House Dep. at 149:17-24 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

*Walden, Inc. v. LIPOID GmbH*, No. CIV. 01-482, 2005 WL 3088333, at *10-12 (D.N.J. Nov. 17, 2005) (rejecting an expert's damages calculations where it failed to take into account reasons for lost sales that were unrelated to the antitrust violations).

**F.      House's Testimony Should Also Be Excluded under Federal Rule of Evidence 403.**

To the extent these portions of House's opinions are reliable (which they are not), their relevance is greatly outweighed by the risks of unfair prejudice and, therefore, should be excluded under Federal Rule of Evidence 403. *Daubert* makes clear that the trial court, in its role as gatekeeper with regard to expert testimony, must be mindful of other applicable rules, and particularly Rule 403: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." 509 U.S. at 595 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Having House speculate about Defendants' conspiratorial intent, and guess about causation and damages from the witness stand is of no probative value, is highly prejudicial, and should be disallowed under Rule 403.

## IV.      CONCLUSION AND PRAYER

Although House is an economist, he does not conduct an adequate economic analysis to provide his opinions with the necessary reliability to testify here. Instead, his opinions are based on multiple unsupported inferences. The foundation for his opinions is his acceptance of Plaintiffs' version of the facts parroted by him in a long narrative telling the implausible story of a conspiracy. From there, he assumes that doctors' decisions about whether to do business with UAS, and third party payors decisions about allergy treatment and immunotherapy reimbursement, were caused by

this alleged conspiracy, even though the economic consequences of completely independent decisions and perfectly lawful competition would yield identical results. He posits no reliable reasons why the jury should assume with him that it is conspiracy, rather than competition.

WHEREFORE, Defendants respectfully request that the Court exclude these portions of the expert testimony of Dr. Donald House from the trial of this matter and for such other and further relief to which they may be justly entitled.

Dated: August 1, 2016        Respectfully submitted,

        VINSON & ELKINS LLP


*/s/ James A. Reeder, Jr.*
**James A. Reeder, Jr.**
Texas Bar No. 16695010
Federal Bar No. 12381
**Christopher V. Popov**
Texas Bar No. 24032960
Federal Bar No. 88136
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Telephone: 713-758-2202
Facsimile: 713-615-5033
E-mail: jreeder@velaw.com;
cpopov@velaw.com

**Liane Noble**
Texas Bar No. 24079059
Federal Bar No. 2329197
**Michelle Arishita**
Texas Bar No. 24092048
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Telephone: 512-542-8505
Facsimile: 512-236-3234
E-mail: lnoble@velaw.com;
marishita@velaw.com

**ATTORNEYS FOR DEFENDANTS PHADIA US INC. AND THERMO FISHER SCIENTIFIC INC.**

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that counsel for the Parties have met and conferred to resolve this matter by agreement, and Plaintiffs are opposed to the relief requested in this motion.

Dated: August 1, 2016                                      _/s/ Michelle K. Arishita_____
                                                          Michelle Arishita

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Motion to Exclude the Expert Testimony of Donald House, has been served on all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) on this 1st day of August, 2016.

*/s/ Michelle K. Arishita*
Michelle K. Arishita

**Ronald Casey Low**
**Elizabeth Kozlow Marcum**
**Ben Bernell**
Pillsbury Winthrop Shaw Pittman LLP
401 Congress Avenue, Suite 1700
Austin, Texas 78701-3443
512-375-4916
Fax: 512-375-4901
Email: casey.low@pillsburylaw.com
liz.marcum@pillsburylaw.com
ben.bernell@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS**
**UNITED BIOLOGICS, LLC AND**
**ACADEMY OF ALLERGY & ASTHMA**
**IN PRIMARY CARE**

**E. Leon Carter**
**Courtney Barksdale Perez**
**Linda R. Stahl**
**Joshua J. Bennett**
**Stacey Cho**
Carter Scholer Arnett Hamada &
Mockler, PLLC
8150 N. Central Expressway
Suite 500
Dallas, TX 75206
214-550-8160
Fax: 214-550-8185|
Email: lcarter@carterscholer.com
cperez@carterscholer.com
lstahl@carterscholer.com
jbennett@carterscholer.com
scho@carterscholer.com

**ATTORNEYS FOR ALLERGY**
**AND ASTHMA**
**NETWORK/MOTHERS OF**
**ASTHMATICS, INC. AND**
**TONYA WINDERS**

27