IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA | § | |
| IN PRIMARY CARE and UNITED | § | |
| BIOLOGICS, LLC, d/b/a UNITED | § | |
| ALLERGY SERVICES, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIV. NO. 5:14-CV-00035-OLG |
| | § | |
| AMERICAN ACADEMY OF ALLERGY | § | |
| ASTHMA & IMMUNOLOGY, ET AL., | § | |
| | § | |
| Defendants. | § | |

DEFENDANTS PHADIA US INC. AND THERMO FISHER SCIENTIFIC INC.'S
MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

    A.    Skin Prick and Blood Testing Are Two Forms of Allergy Testing. ........................... 3

    B.    The UAS Business Model. ........................................................................................... 3

    C.    Phadia's Response to UAS. .......................................................................................... 4

    D.    Observing Dramatic Increases in Allergy Immunotherapy Claims Submitted by Primary Care Providers, Payors Reacted to UAS's Business Model. ................... 5

    E.    When UAS's Business Began to Unravel, UAS Turned to the Courts. ................... 7

ARGUMENT ............................................................................................................................ 8

I.    Summary Judgment Is Appropriate on Plaintiffs' Antitrust Claims Because the Theory of Liability Is Wrong as a Matter of Law and Because There Is No Evidence to Support Multiple Elements of the Claims ............................................... 8

    A.    Having Offered No Evidence of Harm to Competition, Plaintiffs Cannot Survive Summary Judgment on Any of Their Antitrust Claims. ........................... 9

        1.    There Is No Evidence of Increased Prices or Decreased Output. ............... 10

        2.    There Is No Evidence of Barriers to Entry. .................................................. 12

    B.    Plaintiffs' Monopolization and Attempt to Monopolize Claims Against Phadia Fail as a Matter of Law Because Phadia Has Not Engaged in Willful or Exclusionary Conduct within the Relevant Geographic Market. ...................... 14

        1.    Plaintiffs Fail to Overcome the Presumption That Phadia's Allegedly Disparaging Statements Had Only a *De Minimis* Effect on Competition. ...................................................................................................... 15

            (a)    Phadia's Statements Were Subject to Neutralization and Offset. ................................................................................................ 16

            (b)    Phadia's Statements Were Immaterial. .............................................. 18

            (c)    Phadia's Statements Were Not Clearly Likely to Induce Reasonable Reliance. .............................................................................. 18

        2.    There Is No Evidence that Phadia Engaged in Actionable Section 2 Conduct Related to Any Relevant Geographic Market. .............................. 19

    C.    Plaintiffs' Conspiracy Claims Fail as a Matter of Law Because Phadia's Conduct Does Not Establish an Illegal Group Boycott and There Is No Evidence That Phadia Conspired with the Other Defendants to Restrain Trade or Monopolize. ............................................................................................. 20

        1.    Phadia's Alleged Conduct Does Not Rise to the Level of an Illegal Group Boycott as a Matter of Law. .............................................................. 21

(a)     There Is No Evidence of a Group Boycott to Withhold Services to UAS. ...................................................21

(b)     Neither Phadia Nor Any Other Defendant Has Coerced Any Payor to Deny Necessary Services to UAS. ...............................22

2.     Not Only Does the Conduct Alleged Not Amount to a Group Boycott, but Plaintiffs Also Fail to Show Defendants Made an Agreement. ...................................................24

(a)     There Is No Direct Evidence of an Agreement. ..............................25

(b)     Plaintiffs Cannot Cobble Together Sufficient Circumstantial Evidence to Establish an Agreement. ................................27

II.     Summary Judgment Is Appropriate on Plaintiffs' Tortious Interference Claims Because There Is No Evidence of a Causal Link between Defendants' Alleged Conduct and Plaintiffs' Alleged Injury. ...................................................28

A.     Plaintiffs' Regression Model Cannot Show Causation. ............................................28

B.     Plaintiffs' Regression Model Cannot Distinguish between Legal Conduct and Conduct That Could Form the Basis of a Tortious Interference Claim. ..........29

C.     Any Claim for Tortious Interference Must Be Limited to Specifically Identified Providers. ...................................................30

CONCLUSION AND PRAYER...................................................30

## TABLE OF AUTHORITIES

### Cases

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
   776 F.3d 321 (5th Cir. 2015) ......................................................................... 15, 24

*Abraham v. Intermountain Health Care, Inc.*
   461 F.3d 1249 (10th Cir. 2006) ...................................................................... 23, 24

*ACS Investors, Inc. v. McLaughlin,*
   943 S.W.2d 426 (Tex. 1997) .................................................................................28

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,*
   323 F.3d 366 (6th Cir. 2003) ...............................................................................16

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
   108 F.3d 1147 (9th Cir. 1997) ........................................................... 13, 15, 16, 17

*Anago, Inc. v. Tecnol Med. Prods., Inc.,*
   976 F.2d 248 (5th Cir. 1992) .................................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990) ...............................................................................................9

*Bailey v. Allgas, Inc.,*
   284 F.3d 1237 (11th Cir. 2002) ...........................................................................13

*Bell Atl. Corp. v. AT&T Corp.,*
   339 F.3d 294 (5th Cir. 2003) ...............................................................................15

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................................................21

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ...............................................................................................1

*Brown v. City of Houston,*
   337 F.3d 539 (5th Cir. 2003) .................................................................................8

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ...............................................................................................8

*Coinmach Corp. v. Aspenwood Apartment Corp.,*
   417 S.W.3d 909 (Tex. 2013) ................................................................................28

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,*
   846 F.2d 284 (5th Cir. 1988) .................................................................................9

*County of Tuolumne v. Sonora Cmty. Hosp.,*
   236 F.3d 1148 (9th Cir. 2001) .............................................................................23

*David L. Aldridge Co. v. Microsoft Corp.,*

995 F. Supp. 728 (S.D. Tex. 1998) ................................................................... 16, 17, 18

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.,*
123 F.3d 301 (5th Cir. 1997) ...........................................................................10

*Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.,*
797 F.3d 1248 (11th Circuit 2015) .................................................................16

*Golden Bridge Tech., Inc. v. Motorola, Inc.,*
547 F.3d 266 (5th Cir. 2008) ...........................................................20, 25, 26, 27

*Hood v. Tenneco Tex. Life Ins. Co.,*
739 F.2d 1012 (5th Cir. 1984) .........................................................................14

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.,*
777 F.2d 306 (5th Cir. 1985) ...........................................................................11

*L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.,*
No. 3:07-cv-0341-B, 2008 WL 4391020 (N.D. Tex. Sept. 29, 2008) ...........16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) .................................................................................. 13, 27

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984) ........................................................................................25

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.,*
850 F.2d 904 (2d Cir. 1988) ............................................................................16

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
472 U.S. 284 (1985) .................................................................................. 21, 22

*Rebel Oil Co., Inc. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ...........................................................................10

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.,*
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ..............................................................19

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
28 F.3d 1379 (5th Cir. 1994) ...........................................................................10

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,*
435 S.W.2d 854 (Tex. 1968) ...........................................................................25

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
253 F.3d 215 (5th Cir. 2001) ...........................................................................22

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.,*
200 F.3d 307 (5th Cir. 2000) ...........................................................................25

*Sulmeyer v. Coca Cola Co.,*
515 F.2d 835 (5th Cir. 1975) ...........................................................................20

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.,*

496 F.3d 403 (5th Cir. 2007) ................................................................27

*United States v. Colgate & Co.*,
250 U.S. 300 (1919)........................................................................22

*Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*,
624 F.2d 476 (4th Cir. 1980) ........................................................24

*Yoder Bros. v. Cal.-Fla. Plant Corp.*,
537 F.2d 1347 (5th Cir. 1976) ................................................ 19, 20

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
331 F. Supp. 2d 513 (E.D. Tex. 2004) .......................................16

## Statutes

15 U.S.C. § 1 ................................................................................passim

15 U.S.C. § 2 ................................................................................passim

42 U.S.C. § 1320a-7b..........................................................................4

Tex. Bus. & Comm. Code § 15.05(a) .................................................8

Tex. Bus. & Comm. Code § 15.05(b) .................................................8

## Exhibits

| | |
|---|---|
| Exhibit 1 | Bexar County Court Records Search of *United Biologics, LLC* Lawsuits (July 26, 2016) ("***Ex. 1, UAS Bexar County Suits***") |
| Exhibit 2 | James Sublett Deposition Transcript (Mar. 31, 2016) (filed under seal) ("***Ex. 2, Sublett Tr.***") |
| Exhibit 3 | Jason Sigmon Deposition Transcript (Nov. 11, 2015) (filed under seal) ("***Ex. 3, Sigmon Tr.***") |
| Exhibit 4 | Joseph Bernardo Deposition Transcript (Apr. 13, 2016) (filed under seal) ("***Ex. 4, Bernardo Tr.***") |
| Exhibit 5 | Marketing Materials: "Does money really grow on trees?" (WDTX-UAS-242143) (filed under seal) ("***Ex. 5, WDTX-UAS-242143***") |
| Exhibit 6 | Michael DelVacchio Deposition Transcript (Jan. 12, 2016) (filed under seal) ("***Ex. 6, DelVacchio Tr.***") |
| Exhibit 7 | Tonya Winders Deposition Transcript (Jan. 14, 2016) (filed under seal) ("***Ex. 7, Winders Tr.***") |
| Exhibit 8 | Brandon Massey Deposition Transcript (Oct. 22, 2015) (filed under seal) ("***Ex. 8,*** |

*Massey Tr.*")

Exhibit 9        AANMA Invoices (PHADIA0006186) (filed under seal) ("***Ex. 9, PHADIA0006186***")

Exhibit 10       Brian Yang Deposition Transcript (Apr. 19, 2016) (filed under seal) ("***Ex. 10, Yang Tr.***")

Exhibit 11       Anthony Notarthomas Deposition Transcript (Mar. 8, 2016) (filed under seal) ("***Ex. 11, Notarthomas Tr.***")

Exhibit 12       Allan Chernov Deposition Transcript (Corporate Representative for Blue Cross Blue Shield of Texas) (July 14, 2016) (filed under seal) ("***Ex. 12, Chernov Tr.***")

Exhibit 13       David Palafox Deposition Transcript (Corporate Representative for El Paso First HealthPlan) (Aug. 19, 2015) (filed under seal) ("***Ex. 13, Palafox Tr.***")

Exhibit 14       Nicolas Hollis Deposition Transcript (Apr. 26, 2016) (filed under seal) ("***Ex. 14, Hollis First Tr.***")

Exhibit 15       Peter Kongstvedt Expert Report (June 8, 2016) (filed under seal) ("***Ex. 15, Kongstvedt Report***")

Exhibit 16       Email and attachments from UAS's Chief Medical Officer re: Revised immunotherapy protocol (WDTX-UAS-269759) (filed under seal) ("***Ex. 16, WDTX-UAS-269759***")

Exhibit 17       Email from Nicolas Hollis to Kevin Johnson re: Insurance Payer Log 7 (WDTX-UAS-247211) (Hollis Exhibit 1440) (filed under seal) ("***Ex. 17, WDTX-UAS-247211***")

Exhibit 18       Blue Cross Blue Shield of Florida Medical Policy (Effective Jan. 1, 2010) (FB_000001) ("***Ex. 18, FB_000001***")

Exhibit 19       Blue Cross Blue Shield of Florida Medical Policy (Effective Apr. 15, 2011) (FB_000042) ("***Ex. 19, FB_000042***")

Exhibit 20       UAS Payor Reimbursement Tracker-Midwest (WDTX-UAS-284157) (filed under seal) ("***Ex. 20, WDTX-UAS-284157***").

Exhibit 21       Email from Dwight Brower re: UAS (BCBS_LA000949) ("***Ex. 21, BCBS_LA000949***")

Exhibit 22       Barry Lachman Deposition Transcript (Corporate Representative for Parkland Community Health Plan) (Sept. 3, 2015) (filed under seal) ("***Ex. 22, Lachman Tr.***")

Exhibit 23       Michael Martin Deposition Transcript (Corporate Representative for Blue Cross

Blue Shield of Arkansas) (June 10, 2016) (filed under seal) ("***Ex. 23, Martin Tr.***")

Exhibit 24     Dwight Brower Deposition Transcript (Corporate Representative for Blue Cross Blue Shield of Louisiana) (June 7, 2016) (filed under seal) ("***Ex. 24, Brower Tr.***")

Exhibit 25     Robyne Goates Deposition Transcript (Corporate Representative for Blue Cross Blue Shield of Kansas) (June 10, 2016) (filed under seal) ("***Ex. 25, Goates Tr.***")

Exhibit 26     Molly O'Toole Deposition Transcript (Corporate Representative for Blue Cross Blue Shield of North Carolina) (June 29, 2016) (filed under seal) ("***Ex. 26, O'Toole Tr.***")

Exhibit 27     Barbara Muller Deposition Transcript (Corporate Representative for Wellmark Blue Cross Blue Shield) (June 22, 2016) (filed under seal) ("***Ex. 27, Muller Tr.***")

Exhibit 28     Sonya Canady Deposition Transcript (Corporate Representative for Highmark Blue Cross Blue Shield) (June 27, 2016) (filed under seal) ("***Ex. 28, Canady Tr.***")

Exhibit 29     William Glomb Deposition Transcript (July 13, 2016) (filed under seal) ("***Ex. 29, Glomb Tr.***")

Exhibit 30     Email and attachment from David Kennedy re: Late distribution of slides (WDTX-UAS-246156) (filed under seal) ("***Ex. 30, WDTX-UAS-246156***")

Exhibit 31     AAAPC Articles of Incorporation (WDTX-UAS-010332) (filed under seal) ("***Ex. 31, WDTX-UAS-010332***")

Exhibit 32     Email and attachments from Thomas Thill re: Marketing Follow up from Staff Meeting (WDTX-UAS-254269) (filed under seal) ("***Ex. 32, WDTX-UAS-254269***")

Exhibit 33     David Eisenstadt Expert Report (June 15, 2016) (filed under seal) ("***Ex. 33, Eisenstadt Report***")

Exhibit 34     Donald House Rebuttal Expert Report (July 19, 2016) (filed under seal) ("***Ex. 34, House Rebuttal***")

Exhibit 35     Letter from South Central Preferred's Medical Director (SCP000077) ("***Ex. 35, SCP000077***")

Exhibit 36     Nicolas Hollis Deposition Transcript (Apr. 28, 2016) (filed under seal) ("***Ex. 36, Hollis Second Tr.***")

Exhibit 37     Cody Mikeal Deposition Transcript (Corporate Representative for Greer Laboratories) (June 27, 2016) (filed under seal) ("***Ex. 37, Mikeal Tr.***")

Exhibit 38     Donald House Revised Expert Report (May 24, 2016) (filed under seal) ("***Ex. 38, House Report***")

Exhibit 39       Letitia Fecher Deposition Transcript (Apr. 1, 2016) (filed under seal) ("***Ex. 39, Fecher Tr.***")

Exhibit 40       Kevin McAnaney Deposition Transcript (June 29, 2016) (filed under seal) ("***Ex. 40, McAnaney Tr.***")

Exhibit 41       Email from Kurt Heiss re: OIG Opinion Letter Update (Heiss Exhibit 296) (WDTX-UAS-174536) (filed under seal) ("***Ex. 41, WDTX-UAS-174536***")

Exhibit 42       David Eisenstadt Deposition Transcript (June 23, 2016) (filed under seal) ("***Ex. 42, Eisenstadt Tr.***")

Exhibit 43       Defendant JCAAI's First Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories (Sublett Exhibit 1160) (filed under seal) ("***Ex. 43, JCAAI Resp.***")

Exhibit 44       Peter Boland Rebuttal Expert Report (July 1, 2016) (filed under seal) ("***Ex. 44, Boland Rebuttal***")

Exhibit 45       Donald House Deposition Transcript (May 25, 2016) (filed under seal) ("***Ex. 45, House Tr.***")

Exhibit 46       Steven Wiggins Deposition Transcript (June 17, 2016) (filed under seal) ("***Ex. 46, Wiggins Tr.***")

Defendants Phadia US Inc. and Thermo Fisher Scientific Inc. (collectively, "*Phadia*") hereby respectfully move for summary judgment on all claims asserted by Plaintiffs Academy of Allergy & Asthma in Primary Care ("*AAAPC*") and United Biologics, LLC d/b/a United Allergy Services ("*UAS*").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs' business has been a failure, and rather than trying to fix their failed business, Plaintiffs have resorted to the courts—suing over ninety customers in Bexar County alone, along with competitors and bystanders in Texas state court and in this court.[1] The basis of this action is antitrust law. But in bringing this action, Plaintiffs have ignored that antitrust laws protect competition—not individual competitors.[2] Not surprisingly, Plaintiffs have failed to expose any threatened harm to competition by Defendants' conduct, which is the *sine qua non* of any antitrust claim. Instead, Plaintiffs recast garden-variety (and insufficient) business tort allegations as antitrust claims and claim treble damages for the individual marketplace reactions of customers and third-party payors rejecting UAS's flawed business model. Each of Plaintiffs' claims fails as a matter of law.

**No antitrust harm.** Because Plaintiffs offer no evidence of harm to competition—a necessary prerequisite for claims under the Sherman Act—each of Plaintiffs' antitrust claims fails. Plaintiffs have neither shown direct evidence of anticompetitive effects, such as increased prices or decreased output, nor shown circumstantial evidence of harm to competition based on market or monopoly power in a relevant market in which significant barriers to entry make competitive harm possible. Having failed to make this threshold showing of harm to competition, Plaintiffs cannot

---

[1] Ex. 1, UAS Bexar County Suits.

[2] *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (holding that antitrust law is concerned "with the protection of competition, not competitors").

survive summary judgment on any of their antitrust claims.

**No disparaging statements sufficient for monopolization claims.** Because Plaintiffs cannot overcome the presumption that any statements regarding OIG Opinion No. 11-17 ("*OIG Opinion*") and UAS's business model had only a *de minimis* effect on competition, Plaintiffs' monopolization and attempted monopolization claims also fail. Assuming Phadia made disparaging statements regarding UAS, those statements do not rise to the level of willful or exclusionary conduct required for a monopolization violation. Furthermore, even if Phadia's alleged conduct was willful or exclusionary, Plaintiffs' monopolization claims would still fail because Plaintiffs offer no evidence that Phadia's alleged conduct is connected to the relevant geographic markets alleged by Plaintiffs' economic expert.

**No group boycott.** Defendants' conduct does not constitute an illegal group boycott as a matter of law; therefore, Phadia is entitled to summary judgment on Plaintiffs' conspiracy claims, which are premised on alleged group boycotts. Plaintiffs offer no evidence that Defendants either directly withheld services from UAS or coerced others to do so. Furthermore, Plaintiffs fail to exclude the possibility that each of the Defendants acted independently—and in fact, Plaintiffs' expert acknowledged that each Defendant has an independent interest in pursuing conduct allegedly part of the group boycotts.

**No causation.** Plaintiffs' tortious interference claims fail because Plaintiffs' only evidence of these claims—conclusory allegations and their expert's regression model—fall far short of providing sufficient evidence of causation to withstand summary judgment. As Plaintiffs' expert, Dr. House, concedes, his regression model cannot differentiate whether a change in providers' monthly billings is correlated with pro-competitive or tortious conduct by Defendants.

## STATEMENT OF FACTS

**A.    Skin Prick and Blood Testing Are Two Forms of Allergy Testing.**

Most patients are tested for allergies using either a skin prick test ("**SPT**") or a blood test. During a SPT, the patient is injected with small amounts of allergens, and the patient's reaction is observed. Dkt. 235, at ¶ 49. In contrast, during a blood test, the patient's blood is drawn then sent to a lab for analysis. *Id.* at ¶ 49. Regardless which test is used, the patient may be prescribed immunotherapy (e.g., allergy shots) based on the test results. *Id.* at ¶ 50.

Phadia develops and markets allergy blood test systems, including the ImmunoCAP blood test, which is universally recognized as the "gold standard" in blood testing.[3] Phadia sells its blood test systems to reference laboratories across the country.[4] Both allergists and primary care providers prescribe ImmunoCAP tests to their patients—though the vast majority of ImmunoCAP tests are prescribed by primary care providers.[5] Phadia does not participate in the allergy immunotherapy market.[6]

**B.    The UAS Business Model.**

UAS is one of many companies engaged in the remote practice of allergy ("**RPA**"). Although the specifics differ, RPA companies generally enter into contractual arrangements with providers which enable providers to offer allergy testing and immunotherapy within the primary care office setting.

---

[3] Ex. 2, Sublett Tr. at 111:6-9. *See also* Ex. 3, Sigmon Tr. at 235:12-236:13 (opining that based on medical literature and his experience using ImmunoCAP, the test is superior in terms of sensitivity and specificity).

[4] Ex. 4, Bernardo Tr. at 42:1-10.

[5] *Id.* at 38:6-21.

[6] *Id.* at 22:11-19.

The UAS version of RPA promises providers an additional revenue source at "no cost."[7] Under the contract, UAS supplies providers with a "certified allergy technician" to administer the allergy skin prick test and immunotherapy. In exchange, the provider either splits the reimbursement received from its allergy testing and immunotherapy claims with UAS (usually in a 60/40 split) or pays UAS a tiered or fixed fee.[8] In November 2011, the Office of Inspector General ("*OIG*") issued an advisory opinion that found that a similar 60/40 split-fee RPA business model was "inherently problematic" under the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

### C.       Phadia's Response to UAS.

In August 2011, Tonya Winders, Phadia's market development leader, visited Texas to gather information on RPA companies and help management determine whether a local adjustment to sales targets was warranted, in response to requests from sales representatives who had encountered UAS and other RPA companies in Texas.[9] She summarized her perception of the impact and brainstormed strategies of how to address this new market obstacle.[10]

Ms. Winders's primary job responsibilities were to promote Phadia's new products. While she was gathering information on RPA companies in Texas, Ms. Winders also met with both primary care providers to discuss the ImmunoCAP blood test and with allergists to discuss Phadia's advanced new molecular allergy products. As part of these efforts, Ms. Winders spoke with various key opinion leaders in the allergy field, including leaders of allergist trade associations,

---

[7] Ex. 5, WDTX-UAS-242143 ("███████████████████████████████████████████
███████████████████████████████████████").
[8] Ex. 6, DelVacchio Tr. at 150:4-9.
[9] Ex. 7, Winders Tr. at 99:21-101:9; Ex. 8, Massey Tr. at 99:6-22.
[10] Ex. 7, Winders Tr. at 112:24-113:3 ("██████████████████████████████████
███████████████████████████████████████████████████").

4

like Dr. James Sublett, Dr. Linda Cox, and Dr. Lyndon Mansfield.[11]

Phadia also discussed the benefits of its blood testing products with the non-profit advocacy organization, Allergy & Asthma Network/Mothers of Asthmatics ("**Mothers**"). Phadia has been a long-time supporter of Mothers' patient education efforts regarding allergy and asthma treatment.[12]

Another important aspect of Phadia's operations is educating and promoting the benefits of allergy blood testing to payors. These payor efforts focus on (1) revising policy language to reflect current medical evidence of the benefits of blood testing, and (2) increasing the number of allergy blood test units covered under policies to a level sufficient to achieve a comprehensive allergy test based on clinical evidence.[13] Phadia has also discussed "parity" efforts with payors, which aim to achieve equal numbers of reimbursable units between blood and skin prick testing—consistent with the National Institute of Health guidelines that state blood testing and skin prick testing are equivalent.[14]

### D. Observing Dramatic Increases in Allergy Immunotherapy Claims Submitted by Primary Care Providers, Payors Reacted to UAS's Business Model.

As UAS's business grew, payors began to observe a spike in the number of doses of immunotherapy submitted by certain primary care providers.[15] Payors investigated the reasons for

---

[11] *Id.* at 51:9-52:9, 113:4-16, 229:12-16.

[12] Ex. 9, PHADIA0006186 (Invoices for donations to Mothers' Capitol Hill Day, product advertisement in Mothers' magazine, purchase of inhaler posters, and grant donations beginning in June 2010).

[13] Ex. 10, Yang Tr. at 135:21-136:9; Ex. 11, Notarthomas Tr. at 13:11-16.

[14] Ex. 11, Notarthomas Tr. at 90:24-91:17.

[15] *See, e.g.*, Ex. 12, Chernov Tr. at 47:3-48:13 (stating that BCBS TX conducted a review of primary care providers that were in the 96th percentile or higher for claims compared to their peers and noticed many of these providers were billing for 300 units of immunotherapy); Ex. 13, Palafox Tr. at 183:25-184:5 (stating that El Paso First began receiving requests for "███████████████

the increase and, in many instances, found that UAS was the cause.[16]

The observed increase in claims was due significantly to UAS's business model, which UAS agreed is akin to a prepaid calling card in that the services are charged up front regardless of whether the services are actually utilized.[17] Under UAS's protocol, UAS instructs its providers to bill for an entire year of immunotherapy up front.[18] The fact that only a minority of patients (approximately 22%) are likely to actually receive allergy shots for the entire year is irrelevant under UAS's protocol—in other words, despite the fact that the majority of patients fail to complete the entire immunotherapy regimen, the protocol provides that a payor be charged for the entire year supply.[19]

To curb the drastic increases in claims, payors took a variety of approaches: limiting the number of immunotherapy doses paid for on a single claim,[20] limiting the annual number of immunotherapy doses,[21] denying claims for skin prick testing and immunotherapy if not submitted by an allergist or ENT,[22] and denying claims for UAS's services specifically.[23]

While payors have differed in their various policy changes, all payors have consistently

---

█████████████████").

[16] *See, e.g.*, Ex. 12, Chernov Tr. at 47:3-48:13 (stating that BCBS TX investigated providers with "quite unusual" claims for immunotherapy and found the providers were contracted with UAS); Ex. 13, Palafox Tr. at 183:25-184:5, 188:12-24 (explaining that he "████████████████████████ ████████████████████████████████████████████████████████████████████" which were referred to El Paso First's compliance department).

[17] Ex. 14, Hollis First Tr. at 165:6-17.

[18] Ex. 15, Kongstvedt Report at 32-33 (highlighting six examples of UAS's billing recommendations that instruct providers to bill for 300 doses if there are no immunotherapy limitations or if limits exist then for the maximum number of covered doses).

[19] Ex. 16, WDTX-UAS-269759.

[20] Ex. 17, WDTX-UAS-247212 (BCBS TX).

[21] Ex. 18, FB_000001 & Ex. 19, FB_000042 (BCBS FL).

[22] Ex. 20, WDTX-UAS-284157 (Wellmark).

[23] Ex. 21, BCBS_LA000949 (BCBS LA).

maintained that Phadia played no role in their policy changes or in their decisions to deny claims.[24]

### E.    When UAS's Business Began to Unravel, UAS Turned to the Courts.

Faced with losses from its unsustainable business model, as well as from its own "self-inflicted wounds,"[25] UAS turned to litigation.[26]

First, UAS sued five Texas allergists and a Texas allergy trade association, alleging the same injury that UAS now alleges Phadia caused. UAS asserted a number of claims in this state-court action—all of which were premised on conduct that allegedly caused providers to cancel their UAS contracts and payors to change their allergy testing and immunotherapy policies. After the Texas defendants settled without admitting liability, UAS joined forces with its affiliated non-profit AAAPC,[27] and they brought the litigation efforts to the national stage.

And so, in January 2014, Plaintiffs sued three national allergy trade associations, five allergists that were affiliated with the trade associations, and three of the allergists' practices (collectively, "*Original Defendants*") alleging the same injury as in the Texas state-court action. Dkt. 1. UAS alleged antitrust violations and tortious interference claims—again, based on conduct

---

[24] Ex. 22, Lachman Tr. at 217:16-218:3 (Parkland); Ex. 13, Palafox Tr. at 172:22-176:4 (El Paso First); Ex. 23, Martin Tr. at 68:5-12 (BCBS AR); Ex. 24, Brower Tr. at 178:22-179:18 (BCBS LA); Ex. 25, Goates Tr. at 7:25-8:6 (BCBS KS); Ex. 26, O'Toole Tr. at 46:19-22, 47:18-23 (BCBS NC); Ex. 27, Muller Tr. at 5:2-7, 8:25-9:6 (Wellmark); Ex. 12, Chernov Tr. at 127:14-25 (BCBS TX); Ex. 28, Canady Tr. at 19:1-6, 26:18-24, 51:9-12 (Highmark); Ex. 29, Glomb Tr. at 127:20-128:1, 140:2-11 (Superior & TX Medicaid).

[25] These "self-inflicted wounds" included errors in sales and revenue forecasts, which led UAS to make "███████████████████████████" Ex. 14, Hollis First Tr. at 269:10-275:15.

[26] Ex. 30, WDTX-UAS-246156 ("████████████████████████████████████████████").

[27] UAS formed AAAPC, appointed UAS executives to AAAPC leadership positions, and added a provision within its contracts under which UAS-contracted providers would automatically become AAAPC members unless they affirmatively opted out. *See, e.g.*, Ex. 31, WDTX-UAS-010332 & Ex. 32, WDTX-UAS-254269.

that allegedly caused providers to cancel their contracts and payors to change their policies. *Id.*

A year later, Plaintiffs' Third Amended Complaint brought Phadia, Mothers, Tonya Winders, and three other individuals and entities (collectively, "***New Defendants***") into this lawsuit. Dkt. 135 & 158. Plaintiffs' Fourth Amended Complaint subsequently added Thermo Fisher Scientific, Inc. (Phadia's parent company). Dkt. 217 & 233. All the Original Defendants and three of the New Defendants have since settled without admitting liability.[28] Dkt. 165.

## ARGUMENT

Phadia is entitled to summary judgment on all of Plaintiffs' claims because "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiffs' "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat [Phadia's] motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Having failed "to make a showing sufficient to establish the existence of [multiple] element[s] essential to [their] case, and on which [they] will bear the burden of proof at trial," Plaintiffs cannot survive summary judgment on any of their claims. *Celotex Corp.*, 477 U.S. at 322.

I.  **Summary Judgment Is Appropriate on Plaintiffs' Antitrust Claims Because the Theory of Liability Is Wrong as a Matter of Law and Because There Is No Evidence to Support Multiple Elements of the Claims.**

Plaintiffs claim that Phadia violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and its Texas counterpart, Tex. Bus. & Comm. Code § 15.05(a), as well as Section 2 of the Sherman Act, 15 U.S.C. § 2, and its Texas counterpart, Tex. Bus. & Comm. Code § 15.05(b), by conspiring with

---

[28] *See* Ex. 2, Sublett Tr. at 144:2-147:11 (testifying the settlement decision was made based on the cost to litigate and the fact that the settlement terms in Dkt. 165 only barred the trade association from conducting activities that it already was not doing).

other Defendants to "boycott and restrict competition and output from AAAPC members and UAS and conspir[ing] to monopolize the market for allergy testing." Dkt. 235, at ¶ 166. Plaintiffs also allege Section 2 claims for monopolization and attempted monopolization against Phadia independently. *Id.* at ¶ 184. Phadia is entitled to summary judgment on all antitrust claims because Plaintiffs offer no evidence of harm to competition. Moreover, Phadia is entitled to summary judgment on the independent Section 2 claims because the disparagement allegations on which Plaintiffs rely fail to establish the willful or exclusionary conduct necessary for these monopolization claims and cannot be tied to any relevant geographic market. Finally, Plaintiffs' conspiracy claims fail because Plaintiffs cannot establish a recognizable group boycott or an agreement among Defendants as a matter of law.

### A.   Having Offered No Evidence of Harm to Competition, Plaintiffs Cannot Survive Summary Judgment on Any of Their Antitrust Claims.

Because antitrust laws only protect harm to competition as a whole in the relevant market—not harm to the individual competitors within that market—the Sherman Act provides recourse only for losses that stem "from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). To show harm to competition under Section 1 or Section 2, a plaintiff must make one of two showings.

First, a plaintiff may provide direct evidence of harm to competition, which is typically shown by evidence of "increased prices and decreased output." *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992). To prove a Section 1 violation under the rule of reason, a plaintiff "must show the defendant's conduct adversely affected competition"—that is, the defendant's actions constituted "a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284,

292-93 (5th Cir. 1988). Similarly, to prove the requisite harm to competition necessary for a Section 2 violation, a plaintiff may offer "direct evidence that [the defendant] could control prices in the market." *Roy B. Taylor Sales, Inc.*, 28 F.3d at 1388.

Second, and alternatively, a plaintiff may provide circumstantial evidence of harm to competition based on a defendant's market or monopoly power in a relevant market with barriers to entry. *See, e.g., Doctor's Hosp., Inc.*, 123 F.3d at 310-11 (finding no "threat to competition sufficient to violate Section 1" when the plaintiff failed to "establish that the defendants possessed market power"); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (holding that a plaintiff cannot establish a threat to competition under Section 2 by showing "substantial or even dominant market share alone" without showing "that new rivals are barred from entering the market and show[ing] that existing competitors lack the capacity to expand their output"). A plaintiff must provide evidence of barriers to entry in the relevant market to show that a defendant's market or monopoly power makes competitive harm possible. *See, e.g., Roy B. Taylor Sales, Inc.*, 28 F.3d at 1388 ("In the absence of barriers to entry such as a capital intensive industry or patents, a competitor waiting on the sidelines can deny those in the market the power to control prices—because current players cannot exclude competition.").

In this case, there is neither (1) direct evidence of an anticompetitive effect, such as increased prices or decreased output, nor (2) evidence of barriers to entry; therefore, Defendants are entitled to summary judgment on Plaintiffs' antitrust claims under both Sections 1 and 2.

### 1.    There Is No Evidence of Increased Prices or Decreased Output.

Plaintiffs fail to allege—let alone provide any evidence—that the alleged conduct resulted in anticompetitive effects. Under the rule of reason standard which is applicable to this case, a

plaintiff "has the burden of proving anticompetitive effect." *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 320 n.48 (5th Cir. 1985). Given that there are no documents in the record showing increased prices or decreased output, and Plaintiffs' experts failed to conduct any analysis of either, Plaintiffs have not met their burden of showing direct anticompetitive effects.

In fact, the only evidence regarding prices and output in the relevant markets consists of two analyses by Defendants' expert Dr. Eisenstadt on price and output—both of which indicate there have been no anticompetitive effects in the market for allergy testing and immunotherapy.

First, to test whether there is any evidence of increased prices to consumers, Dr. Eisenstadt analyzed ImmunoCAP pricing in markets (1) that Phadia allegedly monopolized, and (2) where UAS was not located, and he found no evidence of an increase in price under either analysis.[29] Under Plaintiffs' antitrust theory, the price of ImmunoCAP should be higher in markets in which Phadia is alleged to have monopoly power and higher in markets in which UAS is not present. A "██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████"[30] Dr. Eisenstadt's regression analyses found no effect on prices based either on Phadia's alleged monopolization (i.e., Core Based Statistical Areas ("*CBSAs*")—generally small cities and towns—in which Dr. House contends Phadia's share is greater than 50 percent) or on UAS's presence in the market.[31]

Second, to test whether there is any evidence of a reduction in output, Dr. Eisenstadt

---

[29] Dr. Eisenstadt looked specifically at sales to physician-owned labs, since prices to reference labs are set on a national basis and not subject to price variations by geography. *See* Ex. 33, Eisenstadt Report at 40-44.

[30] *Id.* at 41.

[31] *Id.* at 42-44.

analyzed whether testing revenues were lower in various geographic markets in which UAS claims that Phadia had a dominant market share and found no evidence of a reduction in output.[32] Under Plaintiffs' antitrust theory that Defendants have restricted access to a more affordable allergy testing option, one would expect that allergy testing revenues, as a surrogate for market output after controlling for population size, would be lower in allegedly monopolized markets than in markets in which UAS operated.[33] Dr. Eisenstadt's analyses found there was "███████████ ██████████████████████████████████████████" markets," and "██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████"[34]

Dr. Eisenstadt's calculations are undisputed, as Plaintiffs' expert acknowledged that there is no evidence of increased prices or decreased output; however, Dr. House nonetheless claims that evidence of anticompetitive effects is not necessary because consumers will be harmed by the elimination of the low-cost provider.[35] This argument, however, is unconvincing in the absence of any evidence of barriers to entry, such as a "capital intensive industry or patents," which could prevent new competitors from entering the market or existing competitors from expanding. *Roy B. Taylor Sales, Inc.*, 28 F.3d at 1388.

### 2.    There Is No Evidence of Barriers to Entry.

Even assuming the evidence showed that UAS is a low-cost provider that has been driven from a specific market, Plaintiffs can provide no evidence of the requisite anticompetitive effect without showing that barriers to entry exist in the markets for allergy testing and immunotherapy

---

[32] *Id.* at 44-46.
[33] *Id.* at 41.
[34] *Id.* at 46.
[35] Ex. 34, House Rebuttal at 16.

services. Here, there is no evidence that if UAS was driven from the market, a new firm offering a similar RPA service could not immediately replace it. Without barriers to entry, the elimination of a low-cost provider cannot harm competition, as well-established antitrust principles create a presumption that other low-cost competitors will fill this void.[36] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 n.15 (1986) (noting that without "barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1256 (11th Cir. 2002) ("Where a market has low barriers to entry, sellers charging supracompetitive prices will soon attract new competitors.").

Plaintiffs offer no evidence of barriers to entry in the market for allergy testing and immunotherapy services. In fact, Plaintiffs admit that there are frequent new entrants—i.e., "███ ████████████████████████████████"—with the number of RPA competitors growing from one or two when UAS opened in 2009 to twenty to twenty-five today.[37] Similarly, one of UAS's antigen suppliers testified that it provides antigens to twenty to thirty other allergy services companies that are competitors to UAS and noted that "████████████████████████ ███"[38] This plethora of entry by similar companies is flatly inconsistent with any theory of market harm. *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997) (holding that the existence of competitors to the plaintiff within the

---

[36] Although Phadia assumes for the purposes of this motion that UAS is the low-cost provider, the evidence in the record reveals that UAS is *not* a low-cost provider. In fact, to the contrary, multiple payors conducted their own independent analyses and found UAS to be *more* costly than other testing options. *See, e.g.*, Ex. 24, Brower Tr. at 237:7-9 (stating that BCBS Louisiana found that the "████████████████████████████████████████████████"); Ex. 35, SCP000077 (Letter from South Central Preferred's Medical Director stating that the cost of UAS's "total care bundle appears to be over 2X that of [its] experience with local allergists").
[37] Ex. 36, Hollis Second Tr. at 540:20-541:9.
[38] Ex. 37, Mikeal Tr. at 35:3-4.

market "suggests that any barriers to entry may not be that significant").

Indeed, Plaintiffs' own damage theory is premised on the lack of barriers, as Plaintiffs claim that UAS would have easily expanded rapidly into hundreds of new markets had it not been for Defendants' conduct.[39] Implicit in this assertion is that few, if any, barriers to entry into those markets exist.

Given the absence of either direct evidence of anticompetitive effects or barriers to entry, Plaintiffs provide no evidence to satisfy the threshold showing of harm to competition, and therefore, Phadia is entitled to summary judgment on Plaintiffs' antitrust claims. *See Hood v. Tenneco Tex. Life Ins. Co.*, 739 F.2d 1012, 1019 (5th Cir. 1984) (affirming grant of Defendant's motion for summary judgment when the plaintiff "failed to provide adequate evidence of anticompetitive effect" and the evidence in the record indicated "ease of entry into the market").

**B.     Plaintiffs' Monopolization and Attempt to Monopolize Claims Against Phadia Fail as a Matter of Law Because Phadia Has Not Engaged in Willful or Exclusionary Conduct within the Relevant Geographic Market.**

Plaintiffs allege Phadia has monopolized or attempted to monopolize the allergy testing product market in 323 separate geographic markets, but the disparagement allegations on which Plaintiffs rely fail, as a matter of law, to establish the willful or exclusionary conduct necessary for these monopolization claims.[40] To establish a Section 2 claim for monopolization, Plaintiffs must prove that Phadia: "(1) possesses monopoly power in the relevant market, and (2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th

---

[39] Ex. 38, House Report at 112-121.
[40] *Id.* at 93.

Cir. 2015). To establish a Section 2 claim for attempt to monopolize, Plaintiffs must prove: (1) Phadia "engaged in predatory or exclusionary conduct," (2) Phadia "possessed the specific intent to monopolize," and (3) "there was a dangerous probability that [Phadia] would succeed in [t]his attempt." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

Plaintiffs allege that Phadia's willful or exclusionary conduct is its disparagement of UAS through "████████████████████████████████████████

████████████████████████████" and to "███████████████████████████

█████████████████"[41] however, even taking these allegations as true, Plaintiffs fail to allege sufficient facts to satisfy the willful or exclusionary conduct element of Section 2 claims.[42] And furthermore, even if Plaintiffs were able to satisfy this conduct element, there is no evidence that Phadia's conduct had any nexus to the relevant geographic markets alleged by Plaintiffs.

> **1.    Plaintiffs Fail to Overcome the Presumption That Phadia's Allegedly Disparaging Statements Had Only a *De Minimis* Effect on Competition.**

Marketing efforts by a party urging customers to buy its products rather than those of competitors are the essence of the competitive process that antitrust law protects. Thus, for Phadia's allegedly disparaging statements to rise to the level of unlawful "exclusionary conduct," Plaintiffs must "overcome a presumption that the effect on competition" of the statements was *de minimis. See Am. Prof'l Testing*, 108 F.3d at 1152. This presumption requires Plaintiffs to make a preliminary showing that the alleged statements have a "significantly more-than-temporary harmful effect[] on competition"—not merely a harmful effect on themselves. *Id.* at 1151.

---

[41] *Id.* at 8.
[42] Additionally, to the extent Plaintiffs allege that Defendants' conduct, which forms the basis of their Section 1 claim, involves disparaging statements, this conduct similarly fails to overcome the *de minimis* presumption test and is not actionable under Section 2.

To overcome the *de minimis* presumption, multiple circuits, as well as district courts within this circuit, require that a plaintiff show the statements were "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *See, e.g., Duty Free Ams.*, 797 F.3d at 1269 (11th Circuit); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 371 (6th Cir. 2003); *Am. Prof'l Testing*, 108 F.3d at 1152; *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988); *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-cv-0341-B, 2008 WL 4391020 (N.D. Tex. Sept. 29, 2008); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 530 (E.D. Tex. 2004); *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 749 (S.D. Tex. 1998). While the Fifth Circuit has not explicitly adopted this test, it "is relatively consistent with the Fifth[] Circuit['s] fundamental view of the nature of exclusionary conduct sufficient to support a Sherman Act claim," which distinguishes between "vigorously tout[ing] one's own product" and manipulating, bribing, or coercing a consumer. *L-3 Commc'ns Integrated Sys.*, 2008 WL 4391020, at *7.

Phadia is entitled to summary judgment on Plaintiffs' Section 2 claims because Phadia's allegedly disparaging statements were (1) readily susceptible to neutralization or offset, (2) not clearly material, and (3) not clearly likely to induce reasonable reliance.[43]

(a)    **Phadia's Statements Were Subject to Neutralization and Offset.**

UAS could have easily—and in fact has repeatedly—countered providers' concerns by

---

[43] Additionally, Phadia's statements were (1) not clearly false, (2) were allegedly made to educated providers and payors—not to buyers without knowledge of the subject matter, and (3) occurred intermittently and did not continue for prolonged periods.

providing responsive information when providers inquired about the applicability of the OIG opinion to UAS's business model. *See David L. Aldridge Co.*, 995 F. Supp. at 750 (holding the defendant's messages were subject to neutralization and offset when the plaintiff "could have countered these messages by giving information to users who called"). Indeed, UAS drafted a response letter mere days after the OIG opinion was published to deliver to providers who raised concerns with the OIG opinion.[44] Furthermore, UAS subsequently hired Kevin McAnaney, who formerly worked for the OIG, to prepare a written opinion that the UAS business model did not violate the anti-kickback statute to provide to providers who raised concerns about the OIG opinion.[45] The fact that UAS had the ability to prepare such neutralizing statements is the relevant inquiry for purpose of determining whether the disparaging statements are actionable. *See Am. Prof'l Testing Serv.*, 108 F.3d at 1152 ("The argument that its neutralization efforts were not completely successful is unavailing; the test refers to 'susceptible to neutralization' not 'successful in neutralization.'"). Furthermore, not only were providers' concerns susceptible to neutralization, but UAS's own documents indicate that its methods were generally successful in neutralizing providers' concerns—given that the majority of providers did not terminate their existing contracts or halt negotiations with UAS.[46]

Additionally, to neutralize and offset any potential effect from Phadia's allegedly disparaging statements, UAS could easily have affirmatively distributed its response letter to *all* UAS-contracted providers—as opposed to waiting for providers to raise concerns and then

---

[44] Ex. 39, Fecher Tr. at 125:15-126:5.
[45] However, McAnaney admits that the UAS business model described in his opinion letter was not the existing split-fee contract, but rather a proposed flat fee contract that UAS had not actually yet implemented in its business. Ex. 40, McAnaney Tr. at 29:7-17; 44:14-20.
[46] Ex. 41, WDTX-UAS-174536.

reacting.[47] Moreover, UAS could have submitted its own request to the OIG for an opinion regarding its business model. The fact that UAS "took no action, despite knowing" about providers' OIG concerns, "undercuts [any] argument that the messages were not susceptible to explanation or neutralization." *See David L. Aldridge Co.*, 995 F. Supp. at 751. Thus, assuming that the business model was lawful, UAS cannot overcome the presumption of *de minimis* effect because it cannot establish that Phadia's statements were not readily susceptible to neutralization or offset.

        **(b)**      **Phadia's Statements Were Immaterial.**

Plaintiffs' own damages model establishes that Phadia's statements were immaterial; Dr. House's model merely (1) shows reduced revenue but not termination of contracts, and (2) presumes that some providers would not react for months or years after the alleged conduct.[48] This damages model presumes that in response to being told that their business model potentially posed anti-kickback concerns, providers would only decrease their work under their contracts as opposed to terminating their contracts. Further, the model presumes this gradual decrease in work would occur over multiple years. Neither is the response a "clearly material" disparaging statement would provide. Plaintiffs' damages model thus impliedly acknowledges that providers viewed Phadia's statements as immaterial.

        **(c)**      **Phadia's Statements Were Not Clearly Likely to Induce Reasonable Reliance.**

The absence of record evidence that providers actually relied on Phadia's OIG statements in terminating their contracts also supports that Phadia's statements were not likely to induce reasonable reliance. *See Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 421-22 (S.D.N.Y. 2014) (holding that in evaluating whether a defendant's statements are likely to induce

---

[47] Ex. 39, Fecher Tr. at 292:9-14.
[48] Ex. 38, House Report at 101-02.

reasonable reliance, courts examine whether there is admissible evidence that consumers *actually* relied on the alleged misstatements). While Plaintiffs broadly claim that Phadia's conduct has resulted in "excessive terminations of UAS-contracted physicians,"[49] Plaintiffs have identified no specific evidence from any provider that it relied on Phadia's statements in deciding to terminate its contract.[50] The only evidence of providers' alleged reactions to Phadia's statements consists of *internal* Phadia communications regarding the perceived responses to its communications.

Having failed to show that Phadia's statements were not readily susceptible of neutralization or offset, clearly material, or clearly likely to induce reasonable reliance, Plaintiffs cannot overcome the presumption that Phadia's statements had only a *de minimis* effect on competition and do not constitute willful or exclusionary conduct.

### 2. There Is No Evidence that Phadia Engaged in Actionable Section 2 Conduct Related to Any Relevant Geographic Market.

Even if the willful or exclusionary conduct requirement of Section 2 was satisfied, Plaintiffs' claims would still fail because Plaintiffs offer no evidence that Phadia's alleged conduct relates to the relevant geographic markets in which Phadia is alleged to have market power.[51]

For both Section 2 monopolization and attempt to monopolize claims, the "offense must occur within a defined relevant market." *Yoder Bros. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976). Courts have made clear that "[m]onopoly power does not exist in a vacuum," and the "plaintiff bears the burden to show the defendant possesses monopoly power in the relevant market." *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 849 (5th Cir. 1975).

---

[49] *Id.* at 103.

[50] *See* Ex. 39, Fecher Tr. at 188:21-189:1 (acknowledging that she was unaware of any activity or conduct by Phadia that caused UAS to lose an account).

[51] Phadia's national testing market share of 22%, as calculated by Dr. House, is far below the level that could support any Section 2 claim. *See* Ex. 38, House Report at 19.

Assuming for the purposes of this motion that Dr. House's market definitions are correct, the relevant geographic market consists of 323 CBSAs—generally small cities and towns—in which Phadia allegedly possesses enough market power to make either Plaintiffs' monopolization claim or attempted monopolization claim viable.[52] However, even accepting Dr. House's market construction as correct, Plaintiffs offer no evidence to connect the alleged offenses to the "defined relevant market." *See Yoder Bros.*, 537 F.2d at 1368. Indeed, Plaintiffs fail to point to a single instance in any of the 323 CBSAs in which Phadia distributed the OIG opinion and disparaged UAS or to a single instance of disparagement that led to competitive harm in one of the relevant markets. It is insufficient for Plaintiffs to allege that Phadia generally harmed it within broad territories that happen to include, but are in no way specific to, "monopolized" markets. Furthermore, assuming that Plaintiffs could establish such a linkage, their claims would necessarily be limited to conduct and harm that occurred within the defined relevant market alone, not the broad national harm Plaintiffs' expert has proposed.

### C.   Plaintiffs' Conspiracy Claims Fail as a Matter of Law Because Phadia's Conduct Does Not Establish an Illegal Group Boycott and There Is No Evidence That Phadia Conspired with the Other Defendants to Restrain Trade or Monopolize.

Plaintiffs fail to establish Defendants "engaged in a conspiracy"—a necessary element of their Section 1 claim. *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (holding that to establish a violation of Section 1, a plaintiff must prove: "(1) the defendants engaged in a conspiracy; (2) that restrained trade; (3) in the relevant market"). "Regarding the conspiracy element, the Supreme Court recently observed that 'the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007)). Here, Plaintiffs variously allege

---

[52] Ex. 38, House Report at 16, 93.

Defendants engaged in group boycotts with reference laboratories, antigen extract manufacturers and distributors, primary care providers, and third-party payors—all with the goal of harming UAS.[53] Plaintiffs cannot, however, show that Defendants' conduct constitutes an illegal group boycott or that this allegedly anticompetitive conduct stemmed from an agreement.

1. **Phadia's Alleged Conduct Does Not Rise to the Level of an Illegal Group Boycott as a Matter of Law.**

Group boycotts must involve some withholding of services—either by (1) "directly denying" services to a competitor or (2) "persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). As a matter of law, Defendants' conduct does not establish an illegal group boycott because Defendants have not (1) directly denied services to a competitor, or (2) persuaded or coerced others to deny necessary services to UAS.

(a) **There Is No Evidence of a Group Boycott to Withhold Services to UAS.**

Plaintiffs allege that Phadia refused to sell its ImmunoCAP instrument to UAS. But this cannot form the basis of a group boycott because (1) Phadia has a right to "freely . . . exercise [its] own independent discretion as to [the] parties with whom [it] will deal," *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); and, (2) Phadia and UAS are only indirect competitors.[54] There is no evidence of any other Defendant directly withholding services to UAS.

---

[53] *Id.* at 63-72.

[54] Phadia and UAS are not direct competitors because they do not sell competing products and do not sell to the same buyers. *See* Ex. 42, Eisenstadt Tr. at 254:13-255:11 ("███████████████████████████████████████████████████████████████████████████████████████████████████████").

(b)     **Neither Phadia Nor Any Other Defendant Has Coerced Any Payor to Deny Necessary Services to UAS.**

Plaintiffs next allege that some combination of Defendants coerced or persuaded payors, providers, reference laboratories, antigen manufacturers, and antigen distributors not to do business with UAS. Though for providers, reference laboratories, antigen manufacturers, and antigen distributors, there is simply no evidence of any group conduct, as all of these third-parties continue to do business with UAS. This leaves payors as the only possible third-party coerced or persuaded by Defendants to withhold services from Plaintiffs.[55] And as to payors, there is no evidence that any payor withheld or cut-off services to UAS—as opposed to merely changing reimbursement policies, for instance. *See Nw. Wholesale Stationers, Inc.*, 472 U.S. at 294 (citing as examples of the withholding of services as part of a group boycott, instances in which the defendants "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete").

Further, the fact that there is no evidence that a payor acted against its self-interest contradicts any theory that the behavior was coerced. As a matter of law, there can be no evidence of a defendant exerting sufficient persuasion or coercion to constitute a boycott if the conduct of the third-party complained of is actually within the third-party's economic self-interest—i.e.,

---

[55] Plaintiffs focus on language listing "persuasion" within the definition of a group boycott. *See* Ex. 34, House Rebuttal at 9-10. Courts, however, require far more than convincing rhetoric—recognizing "that an integral part of a boycott is often bringing pressure to bear ('persuading or coercing') on other participants." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001). The "persuasion" sufficient for group boycotts requires an element of economic inducement. *See, e.g., id.* (describing "persuasion" that consisted of one defendant offering advertising policy concessions to another defendant that were conditioned on agreeing to discontinue business with the plaintiff). Here, there is no evidence that any Defendant promised any payor any economic advantage or concession if the payor would cease doing business with Plaintiffs.

engaging in conduct that is consistent with one's self-interest negates the possibility that the conduct was coerced or the subject of persuasion. *See, e.g., County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1156-57 (9th Cir. 2001) (affirming summary judgment decision that a hospital and its governing board did not conspire with obstetricians to adopt a new medical policy that allegedly boycotted family practitioners in favor of obstetricians, where the plaintiffs' proof of the claimed conspiracy was equally consistent with the hospital's legitimate nonconspiratorial concerns with protecting quality patient care and curbing rising insurance costs). In this instance, there is no evidence that any payor took action with respect to UAS that was not in its own economic interest—i.e., the interest of reducing unnecessary costs.

Moreover, under analogous facts, other circuits have found that attempts to persuade a payor to change its policy in a way adverse to a plaintiff—even if successful—do not constitute a group boycott. For example, in *Abraham v. Intermountain Health Care, Inc.*, the Tenth Circuit upheld the district court's grant of summary judgment upon finding the plaintiffs had failed to establish the existence of a conspiracy—despite evidence that the defendant ophthalmologists had meetings with a managed health care company and encouraged the company to exclude optometrists from its panel of providers, which the company ultimately did. 461 F.3d 1249, 1256, 1258 (10th Cir. 2006). The court emphasized that defendants' "repeated discussions" and letter urging the managed health care company not to empanel optometrists were insufficient to "permit an inference of antitrust conspiracy," in the absence of evidence "to suggest that the ophthalmologists threatened a mass resignation, . . . conditioned their rates on the exclusion of optometrists, . . . or . . . in any way coerced [the health care company] to exclude optometrists." *Id.* at 1258, 1263.

Similarly, in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, the Fourth Circuit upheld the "district court's finding that there was no conspiracy" between the defendant medical specialty society and two insurance plans. 624 F.2d 476, 483 (4th Cir. 1980). Although the medical specialty society and one insurance plan were "particularly close," and the plan "adopted some of [the society]'s recommendations," including a policy that harmed the plaintiffs, this conduct was not illegal "absent some form of coercion." *Id*. at 478, 483.

Defendants' conduct related to payors is far less extensive than the conduct of the defendants in *Abraham* and *Virginia Academy of Clinical Psychologists*—and yet the *Abraham* and *Virginia Academy of Clinical Psychologists* courts still found the conduct in those cases to be insufficient to constitute a group boycott. Because Defendants' conduct does not establish a group boycott as a matter of law, Phadia is entitled to summary judgment on Plaintiffs' Section 1 and analogous claims.

> **2.    Not Only Does the Conduct Alleged Not Amount to a Group Boycott, but Plaintiffs Also Fail to Show Defendants Made an Agreement.**

In their Fourth Amended Complaint, Plaintiffs make conclusory allegations that "Defendants and others have combined and conspired to eliminate competition and reduce supply in the market for allergy testing and allergen immunotherapy for seasonal and perennial allergies" in a number of geographic markets across the United States; however, Plaintiffs fail to offer direct or circumstantial evidence of the alleged agreement.[56] Because Plaintiffs cannot prove the existence of an agreement among Defendants, Phadia is entitled to summary judgment on Plaintiffs' conspiracy claims.[57]

---

[56] Dkt. 235, at ¶ 173.

[57] For the same reason that Phadia is entitled to summary judgment on Plaintiffs' Section 1 claim because Plaintiffs failed to prove the existence of an agreement, Phadia is additionally entitled to

To prove the existence of an agreement, the plaintiff must present evidence that the defendants engaged in concerted action, defined as having a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Concerted action "may be shown by either direct or circumstantial evidence." *Golden Bridge Tech.*, 547 F.3d at 271.

(a)        <strong>There Is No Direct Evidence of an Agreement.</strong>

Direct evidence of an agreement "explicitly refers to an understanding between the alleged conspirators." *Golden Bridge Tech.*, 547 F.3d at 271. If any additional inference is required to determine that an agreement took place, then the evidence is not considered direct. *Id.*

Despite the breadth of the "factual" recitation section in Dr. House's report, the majority of the communications relied upon by Plaintiffs to establish an agreement are internal Defendant communications—not communications "between the alleged conspirators." Moreover, these internal discussions do not reveal the existence of any agreement.

Additionally, Defendants' external communications do not establish an "understanding between the alleged conspirators." *See Golden Bridge Tech.*, 547 F.3d at 271. Plaintiffs point to Defendants' communications "█████████████████████████████████████████████ ███████████████████████████████████████████████████████████" as proof

---

summary judgment on Plaintiffs' conspiracy to monopolize claim under Section 2 and on Plaintiffs' state-law civil conspiracy claim. *See Stewart Glass & Mirror*, 200 F.3d at 316 (granting summary judgment on conspiracy to monopolize claim under Section 2 when there was no evidence of an agreement under the Section 1 claim); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968) (holding that a civil conspiracy requires "a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy").

that "███████████████████████████████████"[58] This argument is flawed for multiple reasons. First, there is no evidence in these communications that Defendants coordinated in approaching and meeting with payors. Second, Phadia's unilateral communications with payors regarding parity between the number of reimbursable units for blood and skin prick testing put Phadia at odds with the commercial interests of allergists—a far cry from an agreement among alleged conspirators.[59] And third, Plaintiffs' allegedly "direct evidence" of a conspiracy based on payor changes is nothing more than a convoluted game of telephone among the payors themselves, not the Defendants—e.g., that Dr. Sublett spoke with Humana's medical director (notably after Humana had already changed its allergy reimbursement policy),[60] then BCBS Texas met with BCBS Louisiana and discussed Humana's plan, and then BCBS Louisiana implemented a policy change.[61] Plaintiffs' characterization of all of Defendants' communications invariably reveals this same type of bootstrapping of otherwise innocuous independent conduct that cannot constitute the requisite "understanding between the alleged conspirators"—without any inferences—needed to meet the direct evidence standard. *See Golden Bridge Tech.*, 547 F.3d at 271.[62]

---

[58] Ex. 34, House Rebuttal at 9.

[59] Ex. 11, Notarthomas Tr. at 89:14-91:17.

[60] *Compare* Ex. 43, JCAAI Resp. (listing two conversations between Dr. Sublett and Humana—one in August 2011 and one in October 2011), *with* Ex. 20, WDTX-UAS-284157 (listing Humana effective policy date of May 4, 2011). Furthermore, Dr. Sublett testified that Phadia did not have any role in his communications with Humana. *See* Ex. 2, Sublett Tr. at 207:23-208:13.

[61] Ex. 44, Boland Rebuttal at 4.

[62] Not only is this bootstrapping of independent conduct not direct evidence of an agreement, but it is also insufficient circumstantial evidence of an agreement. *See Golden Bridge Tech.*, 547 F.3d at 273 (holding evidence of each defendant's dislike for an entity and desire to remove it from the market was insufficient circumstantial evidence of an agreement when the defendants' independent conduct was "at least as consistent with permissible competition, and with independent action, as with unlawful conspiracy").

(b)     **Plaintiffs Cannot Cobble Together Sufficient Circumstantial Evidence to Establish an Agreement.**

Circumstantial evidence of a conspiracy in restraint of trade must be strong in order to survive summary judgment because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Tunica Web Advert.*, 496 F.3d at 409. To survive a motion for summary judgment, a plaintiff seeking damages from an alleged group boycott under Section 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. If the conduct of a defendant is "consistent with the defendant's independent interest," then the conduct does "not by itself support a finding of antitrust liability." *Id.* at 587.

In this case, Plaintiffs fail to exclude the possibility that each Defendant acted independently. In fact, Plaintiffs' expert acknowledged that each Defendant had an independent interest in taking positions unfavorable to UAS, such as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[63] And yet, despite Plaintiffs' own expert's acknowledgement that each Defendant had an independent interest in pursuing its conduct, Plaintiffs base their assertion of the existence of an agreement, as well as the majority of their damages model, on reimbursement changes by third-party payors that were consistent with Defendants' independent interests.[64] Such evidence fails to establish the existence of an agreement as a matter of law.

---

[63] Ex. 45, House Tr. at 121:16-122:4.
[64] Ex. 38, House Report at 128-131.

II.  **Summary Judgment Is Appropriate on Plaintiffs' Tortious Interference Claims Because There Is No Evidence of a Causal Link between Defendants' Alleged Conduct and Plaintiffs' Alleged Injury.**

To establish a claim for tortious interference with existing contracts or tortious interference with prospective business relations, a plaintiff is required to prove that the defendant's interference proximately caused the plaintiff's alleged injury.[65] In an attempt to show causation, Plaintiffs rely solely on their expert's regression model, which their expert himself admits only indicates correlation and not causation, and does not differentiate between pro-competitive and allegedly tortious conduct. Plaintiffs broadly assert that Phadia has interfered with every provider contained on a list, yet provide no evidence of a specific provider's existing or prospective contract with which Phadia interfered and caused harm.[66]

A.  **Plaintiffs' Regression Model Cannot Show Causation.**

Plaintiffs' tortious interference claims are based on their expert's regression analysis that purports to measure "economic damages" from "direct contacts" by Phadia to providers included in a "substantial listing of contracted physicians that was found in the possession of Phadia and presumably used to target existing UAS-contracted physicians."[67] Dr. House crafts a regression model in which he claims to analyze the "███████████████████████" among providers on that list and the "███████████████████████████████████████████

---

[65] *See, e.g.*, *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (holding a plaintiff alleging a claim for tortious interference with an existing contract must prove the defendant's "willful and intentional act proximately caused damage"); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (holding a plaintiff alleging a claim for tortious interference with prospective business relations must prove the defendant's "interference proximately caused the plaintiff injury").

[66] Not a single provider has stated that it ceased doing business with UAS as a result of Phadia's conduct. Moreover, there is not a single document in the record that provides such a causal link.

[67] Ex. 38, House Report at 99.

██████████████████████████████████[68] Despite no documents or testimony to corroborate that any of the providers on the list were actually contacted by Phadia, Plaintiffs rely on Dr. House's regression model to calculate their damages allegedly "████████████████████████████████████████████████████████"[69]

Moreover, Dr. House explicitly acknowledged that his regression analysis only shows a correlation between two variables—*not* causation or cause-and-effect.[70] In acknowledging that his regression model only shows correlation, he implicitly acknowledged that his model does not show whether a provider's presence on the substantial list—and having been presumably contacted by Phadia—resulted in that provider's decline in billings. And yet, despite recognizing that causation cannot be shown from his model, Dr. House nonetheless calculates Plaintiffs' purported damages from Phadia's alleged tortious interference based on this analysis.[71]

**B.   Plaintiffs' Regression Model Cannot Distinguish between Legal Conduct and Conduct That Could Form the Basis of a Tortious Interference Claim.**

In addition to failing to show causation, Plaintiffs' regression model is not able to differentiate between decreased billings, if any, that are correlated with anticompetitive conduct that could form the basis of a tortious interference claim and procompetitive conduct, such as Phadia providing product information to providers and lawfully convincing providers to use its products over those of UAS.[72] Because Dr. House's regression analysis depends solely on a

---

[68] *Id.* at 102 (emphasis added).

[69] *Id.*

[70] Ex. 45, House Tr. at 152:17-153:4.

[71] Ex. 38, House Report at 100-03.

[72] Ex. 45, House Tr. at 153:19-154:9; *see also*, Ex. 46, Wiggins Tr. at 63:14-20 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

provider's inclusion on the list—and not on any evidence of the actual contacts, if any, between Phadia and the providers on the list—there is no evidence that Phadia's alleged tortious conduct and Plaintiffs' injury. Because there is no evidence of causation, Phadia is entitled to summary judgment on Plaintiffs' tortious interference claims.

C.    **Any Claim for Tortious Interference Must Be Limited to Specifically Identified Providers.**

Finally, Plaintiffs appear to claim that Phadia interfered with every provider contained on the list of providers that was in the possession of Phadia. Plaintiffs use Dr. House's regression analysis to establish the use of the list.[73] Plaintiffs' claims, however, must be limited to only those specific providers for whom Plaintiffs can produce evidence of interference (as opposed to legitimate competitive conduct) and harm caused by such conduct (i.e., that the provider ceased its relationship with UAS as a result of the tortious interference). A global assertion of interference with every single provider based upon econometrics is insufficient.

## CONCLUSION AND PRAYER

For the above stated reasons, Phadia respectfully requests that its motion be granted and judgment be entered in Phadia's favor on each of Plaintiffs' claims.

_____ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

[73] Ex. 34, House Rebuttal at 17-21.

Dated: August 1, 2016

Respectfully submitted,

**VINSON & ELKINS LLP**

/s/ James A. Reeder, Jr.
**James A. Reeder, Jr.**
Texas Bar No. 16695010
Federal Bar No. 12381
**Christopher V. Popov**
Texas Bar No. 24032960
Federal Bar No. 88136
1001 Fannin Street, Suite 2500
Houston, Texas 77002-6760
Telephone:  713-758-2202
Facsimile:  713-615-5033
E-mail: jreeder@velaw.com;
cpopov@velaw.com

**Liane Noble**
Texas Bar No. 24079059
Federal Bar No. 2329197
**Michelle Arishita**
Texas Bar No. 24092048
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Telephone: 512-542-8505
Facsimile: 512-236-3234
E-mail: lnoble@velaw.com;
marishita@velaw.com

**ATTORNEYS FOR DEFENDANTS
PHADIA US INC. AND THERMO
FISHER SCIENTIFIC INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(d) and Local Rule CV-5(b)(2), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax on this 1st day of August, 2016.

*/s/ Michelle K. Arishita*
Michelle K. Arishita