IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, LLC, d/b/a UNITED ALLERGY SERVICES, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIV. NO. 5:14-CV-00035-OLG |
| AMERICAN ACADEMY OF ALLERGY ASTHMA & IMMUNOLOGY, ET AL., | § § § | |
| Defendants. | § | |

**DEFENDANTS PHADIA US INC. AND THERMO FISHER SCIENTIFIC INC.'S
RESPONSE TO PLAINTIFF UNITED ALLERGY SERVICES' MOTION FOR
<u>SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................... 1

STATEMENT OF FACTS ............................................................................................. 2

I.  Phadia Has Developed the Leading Blood Test for Allergies, Which Does Not Generate Revenue for Providers, But Offers Patients Reliable Results. ................... 2

II.  UAS Has Developed an Illegal Business Model Premised on "Selling" Patients Allergy Testing and Treatment and Paying a Kickback to Providers Based on a Percentage of the Revenue They Generate for UAS. ............................................... 3

III.  The OIG Issued an Opinion Condemning a Business Model with a Striking Resemblance to UAS's Percentage Kickback Model. ............................................. 6

IV.  UAS's Own Attorney Advises UAS to Amend Its Split Fee Contracts to Ensure Compliance with the Anti-Kickback Statute. ........................................................ 7

V.  Despite Its Attorney's Warning, UAS Siphons Business Away from Phadia by Continuing to Use Its Split Fee Contracts and Pay Kickbacks to Doctors Who Exclusively Use UAS's Services. ............................................................................ 8

VI.  During Discovery, Phadia Learned the Full Extent of UAS's Illegal Conduct, Including that UAS Continues to Use Split Fee Contracts Even After the OIG Issued Its Opinion. ................................................................................................ 8

ARGUMENT .................................................................................................................. 9

I.  Phadia Has Business Relationships with Providers Susceptible to Interference. ... 10

   A.  Phadia Has Sufficiently Direct Relationships with Providers. ..................... 10

   B.  Phadia Has Demonstrated a Reasonable Probability of Continued Business Relations with the Identified Providers. ....................................................... 12

II.  UAS Willfully Interfered with Phadia's Business Relations. ................................. 14

III.  UAS's Use of Illegal Split-Fee Referral Contracts and False Statements Constitute Independently Tortious or Unlawful Conduct. ...................................................... 16

   A.  UAS's Split-Fee Referral Contracts Violate the Federal Anti-Kickback Statute. ....................................................................................................... 17

      1.  It Is Irrelevant Whether Phadia Could Have Brought a Private Right of Action Based on UAS's Violation of the Anti-Kickback Statute. ............ 17

      2.  Whether UAS Violated the Anti-Kickback Statute Involves Fact Issues Fit for Jury Evaluation, Not Summary Judgment. ............................. 18

   B.  UAS Made False Statements Regarding the Safety and Price of Blood Testing and Misrepresented Its Protocol. ................................................... 21

IV.  The Statute of Limitations Does Not Bar Phadia's Counterclaim. ....................... 23

   A.  UAS Continues Its Tortious and Unlawful Conduct. ............................... 23

B.      The Discovery Rule Tolled the Limitations Period. ...................................24

C.      Assuming Phadia's Counterclaim Is Barred by the Statute of Limitations,
        the Counterclaim Is Revived by the Counterclaim Savings Clause. ........................26

## TABLE OF AUTHORITIES

**Cases**

*Amigo Broad., LP v. Spanish Broad. Sys., Inc.,*
    521 F.3d 472 (5th Cir. 2008) ........................................................................16

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.,*
    223 S.W.3d 616 (Tex. App.—Fort Worth 2007, pet. denied) ......................... 11, 13, 15

*Bradford v. Vento,*
    997 S.W.2d 713 (Tex. App.—Corpus Christi 1999), *rev'd in part on other grounds,*
    48 S.W.3d 749 (Tex. 2001)...........................................................................14

*Coinmach Corp. v. Aspenwood Apartment Corp.,*
    417 S.W.3d 909 (Tex. 2013) ..........................................................................9

*Computer Assocs. Int'l, Inc. v. Altai, Inc.,*
    918 S.W.2d 453 (Tex. 1996) .........................................................................26

*Gartrell v. Gaylor,*
    981 F.2d 254 (5th Cir. 1993) .........................................................................26

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.,*
    786 F.3d 400 (5th Cir. 2015) ..................................................................... 16, 18

*Hacienda Records, L.P. v. Ramos,*
    No. 2:14-cv-19, 2015 WL 6680597 (S.D. Tex. Nov. 2, 2015)............................ 28, 29

*Hanlester Network v. Shalala,*
    51 F.3d 1390 (9th Cir. 1995) .........................................................................21

*Harper v. Mac Haik Ford, Ltd.,*
    No. 01-09-01144-cv, 2010 WL 2650543 (Tex. App.—Houston [1st Dist.] July 1, 2010, no
    pet.). ..................................................................................................27

*Heil-Quaker Corp. v. Mischer Corp.,*
    863 S.W.2d 210 (Tex. App.—Houston [14th Dist.] 1993), *writ granted, judgm't vacated
    w.r.m.,* 877 S.W.2d 300 (Tex. 1994) ..............................................................10

*In re Apple Computer Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) .......................................................................24

*J.M.K. 6, Inc. v. Gregg & Gregg, P.C.,*
    192 S.W. 189 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ..............................29

*N. Cypress Med. Ctr. Operating Co. Ltd. v. Gallagher Ben. Servs., Inc.,*
  No. 4:11-CV-00685, 2012 WL 2870639 (S.D. Tex. July 11, 2012) ...............................................18

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,*
  791 F. Supp. 2d 33 (D.D.C. 2011)......................................................................................15

*Reed Migraine Centers of Texas, PLLC v. Chapman,*
  No. 3:14-cv-1204-N, 2015 WL 11120872 (N.D. Tex. Sept. 22, 2015)..................................... 12, 13

*Reliance Ambulance Serv. Inc. v. Mercy Hosp. of Laredo,*
  No. 04-02-00188, 2003 WL 21972724 (Tex. App.—San Antonio 2003, pet. denied) ................19

*Skytop Brewster Co. v. Skytop Int'l, Inc.,*
  No. H-93-0204, 1993 WL 721287 (S.D. Tex. Dec. 20, 1993)......................................................29

*Smith v. Royal Seating, Ltd.,*
  No. 03-09-00114-CV, 2009 WL 3682644 (Tex. App.—Austin, Nov. 6, 2009, no. pet.)..............11

*Verkin v. Melroy,*
  699 F.2d 729 (5th Cir. 1983) ........................................................................................ 14, 17

*Versata Software, Inc. v. Internet Brands, Inc.,*
  No. 2:08-cv-313-WCB, 2012 WL 588790 (E.D. Tex. Feb. 22, 2012) .................................... 27, 29

*Wal-Mart Stores, Inc. v. Sturges,*
  52. S.W.3d 711 (Tex. 2001)............................................................................................. 17, 19

*Wells v. Dotson,*
  261 S.W.3d 275 (Tex. App.—Tyler 2008, no pet.) ....................................................................28

**Statutes**

42 U.S.C. § 1320a-7b..................................................................................................................6

Tex. Civ. Prac. & Rem. Code § 16.069 ........................................................................ 23, 25, 26

**Other Authorities**

Restatement (Second) of Torts § 766B, comments a-c (1979) .........................................................10

**Exhibits**

Exhibit 1      Matthew Mannino Deposition Transcript (Feb. 2, 2016) (filed under seal) ("***Ex. 1, Mannino Tr.***")

Exhibit 2      Joseph Bernardo Deposition Transcript (Apr. 13, 2016) (filed under seal) ("***Ex. 2, Bernardo Tr.***")

Exhibit 3      Nicolas Hollis Deposition Transcript (Apr. 26, 2016) (filed under seal) ("***Ex. 3, Hollis First Tr.***")

Exhibit 4        Michael DelVacchio Deposition Transcript (Jan. 12, 2016) (filed under seal) (***"Ex. 4, DelVacchio Tr."***)

Exhibit 5        UAS Presentation (filed under seal) (***"Ex. 5, UIW000041"***)

Exhibit 6        John Thresher Deposition Transcript (Apr. 15, 2016) (filed under seal) (***"Ex. 6, Thresher Tr."***)

Exhibit 7        Office of Inspector General Advisory Opinion No. 11-17. (***"Ex. 7, OIG Opinion No. 11-17"***)

Exhibit 8        Kevin McAnaney Deposition Transcript (June 29, 2016) (filed under seal) (***"Ex. 8, McAnaney Tr."***)

Exhibit 9        Email from Chris Kraus re: Review Executive Summary (WDTX-UAS-278125) (filed under seal) (***"Ex. 9, WDTX-UAS-278125"***)

Exhibit 10       Email from Letitia Fecher re: Competitor Analysis (WDTX-UAS-236786) (filed under seal) (***"Ex. 10, WDTX-UAS-236786"***)

Exhibit 11       Email from Kurt Heiss re: UAL Competition (WDTX-UAS-234899) (filed under seal) (***"Ex. 11, WDTX-UAS-234899"***)

Exhibit 12       Chart of Clinics' UAS Implementation Dates and Corresponding Declines in ImmunoCAP Profiles Ordered Per Year (data compiled from WDTX-UAS-024367 & PHADIA0337175) (filed under seal) (***"Ex. 12, Clinic Declines Chart"***)

Exhibit 13       Thermo Fisher's Responses to Plaintiffs' Interrogatories (June 13, 2016) (filed under seal) (***"Ex. 13, Thermo Fisher's Responses to Plaintiffs' Interrogatories"***)

Exhibit 14       Email from Dr. Fred Schaffer re: Response Letter to ImmunoCAP Utilization (WDTX-UAS-013811) (filed under seal) (***"Ex. 14, WDTX-UAS-013811"***)

Exhibit 15       Fred Schaffer Deposition Transcript (Apr. 5, 2016) (filed under seal) (***"Ex. 15, Schaffer Tr."***)

Exhibit 16       Letter from Trey Bonner re: Decatur Pediatric Group, P.A. (Decatur0017) (***"Ex. 16, Decatur0017"***)

Exhibit 17       Wendy Weiss Rebuttal Expert Report (July 1, 2016) (filed under seal) (***"Ex. 17, Weiss Rebuttal"***)

Exhibit 18       Wendy Weiss Expert Report (May 2, 2016) (filed under seal) (***"Ex. 18, Weiss Report"***)

Exhibit 19       Fair Market Value Analysis Performed by Hill Schwartz Spilker Keller LLC (WDTX-UAS-285779) (filed under seal) (***"Ex. 19, WDTX-UAS-285779"***)

Exhibit 20     James Guy Deposition Transcript (Corporate Representative for Blue Cross Blue Shield Texas) (July 14, 2016) (filed under seal) ("***Ex. 20, Guy Tr.***")

Exhibit 21     Cyndi Porter Deposition Transcript (Corporate Representative for University of Incarnate Word) (Nov. 17, 2015) (filed under seal) ("***Ex. 21, Porter Tr.***")

Defendants Phadia US Inc. and Thermo Fisher Scientific Inc. (collectively, "*Phadia*") respectfully submit this response to Plaintiff United Allergy Services' ("*UAS*") Motion for Summary Judgment on Defendants' Counterclaim [Dkt. 324] (the "*Motion*" or "*UAS MSJ*").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

UAS unlawfully siphons business from Phadia by paying kickbacks to physicians who agree to exclusively contract with UAS, and by making false statements regarding the cost and safety of using Phadia's blood tests. Phadia's counterclaim aims to stop this tortious conduct—that is, to stop UAS from utilizing illegal split-fee contracts and employing disparaging statements to interfere with Phadia's long-standing business relationships with providers. Although Phadia has put forth ample evidence in support of every element of its counterclaim for tortious interference with prospective business relations, UAS asks this Court to disregard legal precedent, resolve a multitude of fact issues, and grant summary judgment on Phadia's counterclaim.

UAS's Motion for Summary Judgment [Dkt. 324], UAS asserts four challenges to Phadia's counterclaim—contending (1) Phadia does not have business relationships with primary care providers susceptible to interference; (2) UAS did not willfully interfere with Phadia's business relationships; (3) UAS's conduct was not independently tortious or unlawful; and (4) the statute of limitations bars Phadia's counterclaim. None of UAS's four arguments has merit.

First, Texas courts do not require a formal contract to satisfy the "business relationships" element. Phadia, through its sales representatives, maintains numerous ongoing business relationships with providers that are susceptible to influence, and on which a claim for tortious interference may be based under Texas law. Second, UAS willfully interfered with Phadia's relationships with providers by specifically tracking and targeting providers using blood testing. The evidence shows that UAS was aware all along that the vast majority of these targeted providers

were utilizing Phadia's products, given that Phadia is one of few providers in the limited pool of blood testing manufacturers. Third, Phadia has provided evidence that UAS used illegal split-fee referral contracts, in violation of the Federal Anti-Kickback Statute, and made false statements regarding its services and Phadia's products to capture business to the detriment of Phadia. Fourth, the statute of limitations has not run on Phadia's counterclaim. The discovery rule tolled the limitations period until Phadia engaged in discovery and learned of UAS's tortious conduct, and in any event, UAS is engaged in continuing tortious conduct, which actually continues to this day. Furthermore, even assuming Phadia's counterclaim was barred by the statute of limitations (and it is not), it would be revived under the counterclaim savings clause.

## STATEMENT OF FACTS

**I.**      **Phadia Has Developed the Leading Blood Test for Allergies, Which Does Not Generate Revenue for Providers, But Offers Patients Reliable Results.**

Phadia develops and markets blood test systems to diagnose allergy and autoimmune diseases, including the ImmunoCAP blood test, which is universally recognized as the "gold standard" in blood testing.[1] ImmunoCAP is an objective, quantitative, accurate, and reproducible allergy test, the use of which is supported in thousands of peer-review publications. ImmunoCAP has clinical and practical advantages over an alternative form of allergy testing—skin-prick testing ("**SPT**"). ImmunoCAP involves a simple blood draw from the patient, which is then analyzed in a

---

[1] Sublett Tr. [Dkt. 307-3] at 111:6-9 ("████████████████████████████████████████ ████████████████████"). *See also* Sigmon Tr. [Dkt. 307-4] at 235:12-236:13 (opining that based on medical literature and his experience using ImmunoCAP, the test is superior in terms of sensitivity and sensitivity).

laboratory.[2] Unlike SPT, ImmunoCAP can be used on patients, irrespective of age, skin conditions, medications, symptoms, and disease activity.[3]

Phadia markets its primary product, ImmunoCAP, to allergists and primary care providers (which place the vast majority of ImmunoCAP orders) in addition to the laboratories that are the direct purchasers of Phadia's products.[4] Phadia employs clinical sales consultants ("*CSCs*") to visit these clinicians to discuss the prevalence of allergies among the general patient population, the benefits of using ImmunoCAP to test for allergies, and to answer any questions that the primary care providers or allergists might have about ImmunoCAP or its benefits.[5] Phadia employs CSCs in major metropolitan markets across the United States.

Phadia monitors its sales and customer accounts by tracking the number of allergy test "profiles" ordered by primary care physicians, allergists, and other physician groups.[6] Phadia typically receives this data through the clinical labs that utilize ImmunoCAP for allergy blood testing.[7]

## II.   UAS Has Developed an Illegal Business Model Premised on "Selling" Patients Allergy Testing and Treatment and Paying a Kickback to Providers Based on a Percentage of the Revenue They Generate for UAS.

UAS is one of many companies engaged in the remote practice of allergy ("*RPA*"). Although the specifics differ among RPA companies, these companies generally enter into contractual arrangements with providers, which enable providers to offer allergy testing and immunotherapy within the primary care office setting. Beginning in 2009, UAS entered the allergy

---

[2] Plaintiffs' Fourth Amended Complaint [Dkt. 235] ¶ 49.
[3] Eisenstadt Report [Dkt. 307-31] at 6 (describing situations in which SPT is contraindicated).
[4] Bernardo Tr. [Dkt. 307-5] at 38:6-21.
[5] Ex. 1, Mannino Tr. at 32:3-25.
[6] Ex. 2, Bernardo Tr. at 162:5-22.
[7] *Id.*

testing and allergen immunotherapy market with its own RPA model and began to broadly market its services to primary care physicians and physician groups.

UAS agreed its model is akin to a prepaid calling card in that the services are charged up front regardless of whether the services are actually utilized.[8] Under UAS's business model, UAS instructs its providers to bill for an entire year of immunotherapy on day one.[9] Whether the patient actually receives allergy treatment for the entire year is irrelevant under UAS's model; despite the fact that only 22% of patients actually complete the entire immunotherapy regimen, a payor is still charged for the entire year supply in every instance.[10]

Under UAS's model, UAS hires and trains a "certified" allergy specialist/technician ("*CAT*") and installs the CAT in the office of a primary care physician to perform allergy SPT.[11] During SPT, the CAT injects the patient with small amounts of allergens and measures the patient's reaction.[12] Based on the results of the SPT, the patient may be prescribed immunotherapy in the form of allergy shots.[13] UAS's CATs may then train the patient to administer allergy shots himself and send the patient home with the immunotherapy serums that were created by the CATs after the patient's third in-office allergy shot injection.[14] UAS also provides billing and collection services to the provider, including specific instructions on how to bill government

---

[8] Hollis First Tr. [Dkt. 307-15] at 165:6-17.
[9] Kongstvedt Report [Dkt. 307-16] at 32-33 (highlighting six examples of UAS's billing recommendations that instruct providers to bill for 300 doses if there were no immunotherapy limitations or if limits existed then for the maximum number of covered doses).
[10] WDTX-UAS-269759 [Dkt. 307-17].
[11] Plaintiffs' Fourth Amended Complaint [Dkt. 235] ¶ 54.
[12] Plaintiffs' Fourth Amended Complaint [Dkt. 235] ¶ 49; Ex. 3, Hollis First. Tr. at 240:19-241:9.
[13] Plaintiffs' Fourth Amended Complaint [Dkt. 235] ¶ 50.
[14] Ex. 3, Hollis First. Tr. at 238:25-239:19.

healthcare providers for the provider's services.[15] UAS provided each of these services free of cost to the provider in exchange for a share of all reimbursement received by the physician for the SPT and allergen immunotherapy.

UAS pitched to providers that its split-fee contract would enable the providers to add an additional revenue source to their practices at "███████"[16] Under the split-fee contract, UAS agreed to supply providers with a CAT to administer the allergy skin prick test and "██" the patient on immunotherapy.[17] In exchange, the provider agreed to pay UAS 60% of the reimbursement received from its allergy testing and immunotherapy claims.[18]

Because UAS's model for revenue generation depends in part on percentage based fee-splitting with physician partners, UAS seeks physician partners who will maximize profits through testing a high number of patients and prescribing them immunotherapy.[19] UAS admits that it has terminated contract negotiations with physicians that it thought would be unprofitable and has unilaterally cancelled contracts with physician partners that did not test a sufficiently profitable volume of patients.[20]

---

[15] Ex. 4, DelVacchio Tr. at 138:10-12.
[16] WDTX-UAS-242123 [Dkt. 307-6] ("████████████████████████████████████
████████████████████████████████████████████████████").
[17] Ex. 5, UIW000041 ("██████████████████████████████████████████████
████████████").
[18] *See, e.g.*, Ex. 4, DelVacchio Tr. at 132:18-133:25.
[19] *Id.* at 279:10-13 ("███████████████████████████████████████████████
███████████████████").
[20] Ex. 6, Thresher Tr. at 112:24-114:3.

III.     **The OIG Issued an Opinion Condemning a Business Model with a Striking Resemblance to UAS's Percentage Kickback Model.**

UAS's split-fee model soon caught the attention of Patrick Strauss, the founder of another RPA company.[21] Strauss submitted an actual, prior UAS contract to the OIG and requested an advisory opinion on the legality of the model.[22] In November 2011, the OIG issued an advisory opinion that—while not explicitly requested by UAS—nonetheless held that the proposed split-fee business model of a UAS contract was "inherently problematic" under the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.[23] The OIG admonished that the remuneration under the proposed split-fee business model was not set in advance, but rather "determined in a manner that takes into account the volume or value of any business generated between the parties that is payable by a Federal health care program."[24] According to the OIG, "Percentage compensation arrangements are inherently problematic under the anti-kickback statute, because they relate to the volume and value of business generated between the parties, rather than the fair market value of the services provided."[25]

In reaction to the OIG opinion, UAS drafted a response letter to send to providers that highlighted the alleged differences between UAS's model and the model described in the OIG opinion.[26] After drafting this letter, however, UAS did not affirmatively send it out to all UAS-

---

[21] Fourth Amended Complaint [Dkt. 235] ¶ 119.
[22] *Id.* ¶ 123.
[23] Ex. 7, OIG Opinion No. 11-17.
[24] *Id.*
[25] *Id.*
[26] Fecher Tr. [Dkt. 307-36] at 125:15-126:5.

contracted providers.[27] Instead, UAS only mailed a hard-copy of the letter to providers that inquired about the applicability of the OIG opinion to the business model.[28]

## IV.   UAS's Own Attorney Advises UAS to Amend Its Split Fee Contracts to Ensure Compliance with the Anti-Kickback Statute.

Additionally, UAS hired Kevin McAnaney, an attorney who previously worked with the OIG, to draft an opinion regarding the legality of UAS's business. Yet rather than opine on UAS's existing contracts, McAnaney opined regarding a "████████████████████████████████ ██████████"[29] McAnaney opined in his letter that UAS's business model (i.e., the newly proposed fixed fee model) did not contain the objectionable features described in the OIG opinion.[30]

In addition to opining regarding the legality of UAS's proposed fixed fee contracts, McAnaney also provided UAS with advice regarding its existing split-fee contracts. McAnaney informed UAS that the OIG opinion indicated that these split-fee agreements should be "█████ ████████████████████████████████████"[31] He recommended that UAS should consider amending these existing split-fee contracts going forward "███████████████ █████"[32] Despite this warning, UAS did not amend all of its existing split-fee contracts. In fact, to this day, UAS maintain numerous split-fee contracts with providers.[33]

---

[27] *Id.* at 292:5-14.
[28] *Id.* at 292:12-25.
[29] Ex. 8, McAnaney Tr. at 50:5-11.
[30] *Id.* at 52:7-18.
[31] *Id.* at 56:7-21.
[32] *Id.* at 60:10-20.
[33] Ex. 9, WDTX-UAS-278125.

**V.      Despite Its Attorney's Warning, UAS Siphons Business Away from Phadia by Continuing to Use Its Split Fee Contracts and Pay Kickbacks to Doctors Who Exclusively Use UAS's Services.**

UAS aggressively markets its services to primary care physicians and physician groups. In its marketing efforts, UAS has sought to leverage and take advantage of the significant resources that Phadia has invested in educating primary care providers on allergy testing. For example, in selecting which physician practices to target, UAS tracks which practices currently offer blood testing.[34] UAS specifically identifies those physicians that currently have business relationships with Phadia, i.e., the majority of practices that offer blood testing, and solicits and entices those providers to discontinue utilizing ImmunoCAP by offering them the prospect of additional revenue through a split-fee UAS contract.[35] With at least twenty providers, these efforts have been successful.[36]

Some physicians who had previously ordered ImmunoCAP blood tests have found appealing the potential for a significant revenue stream without up-front costs from UAS's split-fee contract. Phadia spreadsheets tracking the number of orders by various practices reveal that orders for ImmunoCAP typically plummet after a practice contracts with UAS.[37]

**VI.     During Discovery, Phadia Learned the Full Extent of UAS's Illegal Conduct, Including that UAS Continues to Use Split Fee Contracts Even After the OIG Issued Its Opinion.**

Although UAS's business practices have been harming Phadia for years, Phadia did not learn that UAS was engaging in illegal conduct damaging Phadia's business until discovery. Specifically, during the deposition of Michael DelVacchio on January 12, 2016, Phadia learned

---

[34] Ex. 10, WDTX-UAS-236786.

[35] Ex. 11, WDTX-UAS-234899 (email from Kurt Heiss stating that a provider offering blood testing is "███████"); Ex. 6, Thresher Tr. at 76:18-77:8 (testifying that he agreed that UAS saw an opportunity to sell to providers doing blood testing).

[36] Ex. 12, Clinic Declines Chart.

[37] *Id.*

that UAS was continuing to tortiously interfere with its business relationships by soliciting primary care physicians and practice groups with illegal split-fee referral contracts,[38] despite having claimed to have changed its business model after the OIG opinion was issued.[39] When Phadia learned of UAS's ongoing unlawful conduct, it brought the counterclaim at issue in this motion.

## ARGUMENT

Phadia has put forth ample evidence in support of its counterclaim for tortious interference with prospective business relations sufficient to defeat UAS's motion for summary judgment. "To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

In UAS's Motion for Summary Judgment, UAS challenges the first three elements—contending (1) Phadia does not have business relationships with primary care providers susceptible to interference; (2) "███████████████████

---

[38] Ex. 13, Thermo Fisher's Responses to Plaintiffs' Interrogatories ("████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████").

[39] *See* McAnaney Tr. at 47:20-24; 54:10-18; 183:7-11 (explaining that the opinion letter drafted by McAnaney for UAS and intended to be circulated to providers primarily addressed a *new* proposed contract that was to be implemented).

█████████████████████████████████████████" and (3) UAS's

conduct was not independently tortious or unlawful.[40]  UAS also contends the statute of

limitations bars Phadia's counterclaim.[41]  None of these arguments has merit; therefore, UAS's

motion for summary judgment should be denied.

**I.      Phadia Has Business Relationships with Providers Susceptible to Interference.**

UAS contends that "███████████████████████████████████████████████



██████████████████████████████████████" because (1) Phadia does not have direct

business relationships with primary care providers, and (2) "████████████████████████

████████████████████████████████████████████████████████████

██████████"[42]  Neither argument has merit.

**A.      Phadia Has Sufficiently Direct Relationships with Providers.**

Phadia has ongoing business relationships with providers susceptible to influence and on

which a claim for tortious interference with prospective business relations may be based.  Texas

courts have made clear that "[a] formal contractual relationship . . . is not always required" in a

claim for tortious interference with prospective business relations.  *See, e.g., Heil-Quaker Corp. v.

Mischer Corp.*, 863 S.W.2d 210, 214 (Tex. App.–Houston [14th Dist.] 1993) ("Tortious

interference with business or prospective contractual relations concerns business relations that

have not yet been reduced to a contract or to a continuing business relationship not amounting to

a formal contract."), *writ granted, judgm't vacated w.r.m.*, 877 S.W.2d 300 (Tex. 1994).  *See Astoria

Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 n.54 (Tex. App.–Fort Worth 2007, pet.

denied) (citing Restatement (Second) of Torts § 766B, comments a-c (1979), for the proposition

---

[40] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 5-16.
[41] *Id.* at 17-18.
[42] *Id.* at 7-9.

that "the types of business relations protected are business relations that have not yet been reduced to a contract and continuing business or other customary relationships not amounting to a formal contract"). Phadia has continuing business or customary relationships with providers, in which Phadia's CSCs regularly visit clinics to provide ongoing education around Phadia's products and to answer providers' questions.[43] While not embodied in a formal contract, Phadia nonetheless has "continuing business" or "customary relationships" with these providers that constitute protected business relationships. *See Astoria Indus. of Iowa*, 223 S.W.3d at 633 n.54.

Furthermore, the fact that a reference laboratory may serve as the direct purchaser from Phadia does not bar Phadia's counterclaim. *See Smith v. Royal Seating, Ltd.*, No. 03-09-00114-CV, 2009 WL 3682644, at *4-6 (Tex. App.—Austin, Nov. 6, 2009, no. pet.) (holding evidence was sufficient to find that the defendant and an end user "would have entered into a business relationship," despite the fact that the defendant did not directly sell to the end user but instead sold products to a dealer who then sold to the end user). UAS itself implicitly recognizes this fact. Its co-plaintiff AAAPC's claim for tortious interference with prospective business relations against Phadia (and other Defendants) is based on Defendants allegedly interfering with business relationships between AAAPC and providers, who do not contract directly with AAAPC.[44]

Additionally, UAS's reliance on *Reed Migraine Centers of Texas, PLLC v. Chapman* is not persuasive.[45] In *Reed Migraine Centers*, the defendants copied a unique medical procedure developed by the plaintiff and marketed it to patients, which allegedly interfered with patients using the plaintiff's providers for the procedure. No. 3:14-cv-1204-N, 2015 WL 11120872, at *1

---

[43] Ex. 1, Mannino Tr. at 32:3-25.
[44] Plaintiffs' Fourth Amended Complaint [Dkt. 235] ¶ 205.
[45] *See* Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 8-9.

(N.D. Tex. Sept. 22, 2015). The relevant interference was with the relationship between a "partner physician" and potential patient (i.e., because of the defendants' unlawful conduct, the patient may not go to see the provider). *Id*. at *2. The court held the plaintiff could not bring a tortious interference claim based on the defendants' conduct that allegedly interfered with the "partner physician" and potential patient relationship. *Id*. The plaintiff in *Reed Migraine Center* failed to "identify with sufficient particularity which client or group of clients would have formed relationships but for Defendants' interference." *Id*. Unlike in *Reed Migraine Centers*, Phadia's claim is based on an existing or probable business relationship between Phadia and treating providers to order ImmunoCAP tests and not on an attenuated relationship between "partner physicians" and unidentified potential patients. *Id*. Furthermore, unlike the plaintiff in *Reed Migraine Centers*, Phadia can point to a group of clients—physicians currently conducting blood testing or currently ordering the ImmunoCAP product from laboratories—with which UAS has interfered. A representative sample of those lost business relationships are listed in Exhibit 12 to this Response. *Reed Migraine Center* is therefore distinguishable and does not support finding that Phadia lacks sufficient business relationships with providers for a tortious interference claim.

### B. Phadia Has Demonstrated a Reasonable Probability of Continued Business Relations with the Identified Providers.

UAS theorizes that no material fact issue exists as to whether Phadia had a "reasonable probability that a contract would have been formed between Phadia and a clinic but for UAS's conduct."[46] But a claim for tortious interference with prospective business relations does not require that a plaintiff would have entered into a new prospective business relationship—a plaintiff's business relationship with an existing customer is equally sufficient. *See Astoria Indus. of*

---

[46] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 9.

*Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 (Tex. App.—Fort Worth 2007, pet. denied) (holding evidence that the defendant took some of the plaintiff's "business from a single, *existing* customer" constituted a relationship that "would support a tortious interference claim").

Substantial evidence indicates that the providers identified in Phadia's counterclaim—as well as many other providers—were likely to enter into or continue relationships with Phadia but for UAS's conduct, which at a minimum creates a fact issue for the jury. *See Verkin v. Melroy*, 699 F.2d 729, 732-33 (5th Cir. 1983) (explaining, in connection with the "reasonable probability" element, that "it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses") (citation omitted). This evidence includes: (1) evidence that the providers identified in Exhibit 12 to this Response had consistently ordered ImmunoCAP tests for their patients prior to UAS's interference;[47] (2) evidence that Phadia's ImmunoCAP is the "gold standard" for blood testing in the market;[48] (3) Phadia's considerable experience and ongoing efforts in educating providers on the value of testing;[49] and (4) the fact that Phadia is one of few manufacturers in the blood testing market.[50]

This evidence supports finding a reasonable probability, or at least creates a genuine issue of material fact, that Phadia would have entered into business relationships with the identified

---

[47] *See* Ex. 12, Clinic Declines Chart (containing a list of providers that drastically reduced their ImmunoCAP profile orders after contracting with UAS under either a split-fee or tiered contract).
[48] Sublett Tr. [Dkt. 307-3] at 111:6-9 ("                                                                                                

                                          "). *See also* Sigmon Tr. [Dkt. 307-4] at 235:12-236:13 (opining that based on medical literature and his experience using ImmunoCAP, the test is superior in terms of sensitivity and sensitivity).
[49] Ex. 1, Mannino Tr. at 32:3-25.
[50] Ex. 2, Bernardo Tr. at 27:24-28:4.

providers. *See, e.g.*, *Bradford v. Vento*, 997 S.W.2d 713, 732 (Tex. App.–Corpus Christi 1999) (holding evidence showed "a reasonable probability that contractual relations would have been entered into" given that the plaintiff had "considerable experience" in selling its product, a "large collection of merchandise, and an established and expanding customer base"), *rev'd in part on other grounds*, 48 S.W.3d 749 (Tex. 2001); *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632-34 (Tex. App.–Fort Worth 2007, pet. denied) (holding the plaintiff had a "reasonable probability" of continuing business with a single, existing customer based on evidence that the customer had previously purchased products from the plaintiff prior to the defendant's interference); *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs.*, Inc., 791 F. Supp. 2d 33, 57 (D.D.C. 2011) (holding the plaintiff produced sufficient evidence regarding reasonable business expectancy to create genuine issues of material fact by demonstrating that it "ha[d] a strong presence" in the relevant market").

Because considerable evidence in the record supports a finding of a reasonable probability that Phadia would have entered into business relations with providers absent UAS's conduct, UAS has failed to establish that no material fact issues exist or that it is entitled to summary judgment based on this first element of Phadia's tortious interference counterclaim.

## II.     UAS Willfully Interfered with Phadia's Business Relations.

Ignoring abundant evidence to the contrary, UAS also challenges Phadia's counterclaim by arguing that Phadia cannot "███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████"[51] In fact, evidence in the record establishes UAS aimed to prevent providers from using

---

[51] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 9.

ImmunoCAP, and unequivocally targeted providers utilizing blood testing.[52] Specifically, UAS tracked which providers were doing blood testing,[53] recognized the opportunity to sell UAS's services to these providers,[54] and actually carried out these plans to target these providers.[55] UAS knew these efforts to target providers using blood testing were "substantially certain" to interfere with Phadia's business relations, given there is a limited pool of blood testing manufacturers.[56] *See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 418 (5th Cir. 2015) (holding defendants "knew the interference was substantially certain to occur" based on evidence that defendants' conduct affected the contracting process and there were only a limited number of contractors, one of which was the plaintiff).

Furthermore, contrary to UAS's assertion, Phadia does not need to prove that UAS had "actual knowledge" of the prospective contract, but instead only needs to show UAS had "knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008). The sole case UAS cites for requiring proof of actual knowledge is *Verkin v. Melroy*, 699 F.2d 729 (5th Cir. 1983), which analyzed whether the plaintiff could show "malicious intent"–a requirement the Texas Supreme Court has now explicitly rejected as an

---

[52] Ex. 14, WDTX-UAS-013811 (letter listing alleged deficits of ImmunoCAP); Ex. 15, Schaffer Tr. at 342:12-346:10 (testifying that he could not definitively say whether or not the letter, which was targeted at ImmunoCAP, was sent to providers).

[53] Ex. 10, WDTX-UAS-236786 (UAS spreadsheet that kept track of who was doing blood testing).

[54] Ex. 11, WDTX-UAS-234899 (email from Kurt Heiss stating that a provider offering blood testing is "███████"); Ex. 6, Thresher Tr. at 76:18-77:8 (testifying that he agreed that UAS saw an opportunity to sell to providers doing blood testing).

[55] Ex. 6, Thresher Tr. at 25:21-27:1 (testifying that he recalled having conversations about blood testing and its potential to not be as accurate and that he shared the claims that blood testing has more false positives with providers on sales calls).

[56] Ex. 2, Bernardo Tr. at 27:24-28:4 (testifying that Phadia's competitors in blood testing are Siemens and Hycor).

element of a claim for tortious interference with prospective business relations. *Wal-Mart Stores, Inc. v. Sturges*, 52. S.W.3d 711, 721-26 (Tex. 2001) (detailing the confusion associated with courts using the term "malicious" and adopting a new test for tortious interference with prospective business relations that omits this element).

### III. UAS's Use of Illegal Split-Fee Referral Contracts and False Statements Constitute Independently Tortious or Unlawful Conduct.

UAS additionally challenges Phadia's counterclaim for tortious interference by disputing that UAS committed independently tortious or unlawful conduct; however, UAS's Motion for Summary Judgment fails to show that its objections are valid or can be resolved without a jury trial. To the contrary, UAS's dissemination of false statements constitutes independently tortious conduct and UAS's use of illegal split-fee referral contracts violated (and continues to violate) the federal Anti-Kickback Statute. "[I]ndependently tortious" means "conduct that would violate some other recognized tort duty." *Sturges*, 52 S.W.3d at 713. Fraudulent misrepresentations can also satisfy the independent tort requirement. *Id.* at 726. Alternatively, a plaintiff may prove that the defendant engaged in an unlawful act, including a violation of a federal or state statute. *See id.* (holding "an action for interference with a prospective contractual or business relation provides a remedy for injurious conduct that other tort actions might not reach, . . . but only for conduct that is already recognized to be wrongful under the common law or by statute"); *Gil Ramirez Grp., LLC v. Houston Indep. Sch. Dist.*, No. 4:10-cv-4872, 2013 WL 3229682, at *12 (S.D. Tex. June 25, 2013) (holding claim was properly pled when unlawful act was violation of federal wire fraud statute); *N. Cypress Med. Ctr. Operating Co. Ltd. v. Gallagher Ben. Servs., Inc.*, No. 4:11-CV-00685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012) (finding claim properly plead when unlawful act was violation of Texas Insurance Code § 541.061(5)).

Phadia's violation of the Anti-Kickback Statute and fraudulent misrepresentations about its business model serve as two distinct means of satisfying the independent tort or unlawful conduct element for tortious interference. Substantial evidence proves that UAS (1) utilized illegal contracts to entice Phadia providers in violation of the federal Anti-Kickback Statute, and (2) disseminated false statements regarding blood testing and its own clinical protocol to Phadia providers, which, at a minimum, raises a fact issue on the independent tort or unlawful conduct element.

### A.   UAS's Split-Fee Referral Contracts Violate the Federal Anti-Kickback Statute.

UAS argues that Phadia cannot prove "independently tortious or unlawful" conduct based on UAS's violations of the Anti-Kickback Statute because (1) courts have rejected private rights of action under the Anti-Kickback Statute, and (2) there is "no doubt" that UAS's conduct does not violate the Anti-Kickback Statute. Not only is it irrelevant whether a private right of action exists under the Anti-Kickback Statute, but substantial evidence in the record creates far more than a doubt regarding whether UAS's conduct violates the Anti-Kickback Statute.

### 1.   It Is Irrelevant Whether Phadia Could Have Brought a Private Right of Action Based on UAS's Violation of the Anti-Kickback Statute.

Despite quoting from *Wal-Mart v. Sturges*, UAS glosses over the explicit pronouncement from the Texas Supreme Court that a plaintiff does not need to be able to prove that he or she could individually bring an independent tort claim for the alleged conduct. 52 S.W.3d at 726. The Texas Supreme Court has held that although a plaintiff must point to conduct "that is already recognized to be wrongful under the common law or by statute," the plaintiff does not need to "be able to prove an independent tort." *Id.* Illustrating this point, the Court explained, as an example, that a defendant's assault of someone other than the plaintiff could be the tortious conduct on which the plaintiff based his tortious interference claim, despite the fact that the plaintiff could

not have brought the assault claim against the defendant himself. *Id.* at 713. Notwithstanding this explanation, UAS contends it is entitled to summary judgment on Phadia's counterclaim—citing cases in which courts have rejected private rights of action under the Anti-Kickback Statute.[57]

Under the Texas Supreme Court's holding, Plaintiffs' cited cases regarding when a party can bring a private right of action for a violation of the Anti-Kickback Statute are entirely irrelevant. To the contrary, the key issue is whether Phadia has shown that a fact issue exists regarding whether UAS violated the Anti-Kickback Statute—regardless whether or not Phadia could bring an independent cause of action based on UAS's violation of the Anti-Kickback Statute. *See Reliance Ambulance Serv. Inc. v. Mercy Hosp. of Laredo*, No. 04-02-00188, 2003 WL 21972724, at *6 (Tex. App.—San Antonio 2003, pet. denied) (recognizing that the federal Anti-Kickback Statute does not given rise to a private right of action but holding "conduct allegedly violating the anti-kickback statute may form the basis for liability under some recognized common law cause of action, assuming all other elements of the cause of action are present").

> 2. **Whether UAS Violated the Anti-Kickback Statute Involves Fact Issues Fit for Jury Evaluation, Not Summary Judgment.**

As a preliminary matter, without even addressing UAS's individual arguments for why it has not violated the Anti-Kickback Statute, the fact that a multitude of other sources (e.g., various attorneys and the Office of Inspector General) have found that UAS's (or other similar entities') conduct raises anti-kickback concerns reveals that this inquiry, at a minimum, is not easily dispositive and is replete with fact issues.[58]

---

[57] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 12-13.

[58] Ex. 7, OIG Opinion 11-17 (holding that a 60/40 split-fee RPA business model, which was very similar to UAS's model, was "inherently problematic" under the federal Anti-Kickback Statute); Ex. 16, Decatur0017 (letter from a healthcare attorney who reviewed the UAS arrangement and concluded and advised UAS that "the compensation arrangement contained in the Agreement is

Additionally, UAS's arguments for why its conduct is not illegal are not only countered by abundant evidence in the record, but also require detailed factual interpretations and therefore should properly be decided by a jury—not on summary judgment. UAS constructs three arguments for why it has not violated the Anti-Kickback Statute: "███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████"[59] All arguments belie evidence in the record.

First, whether UAS's contracts state that providers will pay UAS for its services or vice versa is not dispositive regarding whether UAS's remuneration is lawful, and there are fact questions on this issue. As UAS itself acknowledges in its motion, Wendy Weiss, a former prosecutor with twenty years of government enforcement experience, disputes that the direction of payment controls whether payments to physicians are made in exchange for referrals.[60] Instead, determining whether the Anti-Kickback Statute is implicated by a particular arrangement requires a "step-by-step analysis" of the facts and circumstances of the transaction because in the analysis, substance prevails over form.[61] And contrary to UAS's contention, this argument, which is supported by evidence in the record, has not been "soundly rejected," by the court in *Hanlester*

---

in direct violation with the Federal Anti-Kickback Statute and [a fee splitting prohibition under Georgia state law])."
[59] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 13.
[60] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 13; Ex. 17, Weiss Rebuttal ¶¶ 19-20.
[61] Ex. 17, Weiss Rebuttal ¶¶ 19-20.

*Network v. Shalala*, 51 F.3d 1390 (9th Cir. 1995).[62] These sorts of conflicting witness testimony and detailed factual analyses do not permit deciding the issue on summary judgment.

Second, material fact issues also exist regarding whether the prices for UAS's services reflect fair market value. UAS contends that the prices for its services reflect fair market value because "undisputed evidence" demonstrates that all fees were "████████████████ █████████████████"[63] Evidence in the record is far from "undisputed" on this point. Indeed, a fair market value report performed by Hill Schwartz Spilker Keller LLC ("*HSSK*") at UAS's request indicated that UAS-contracted providers were receiving higher than the fair market value portion of the gross collections.[64] In other words, UAS's contention that each of its split-fee contracts—the vast majority of which happen to coincidentally land on a 60/40 split—represent the fair market value of the services UAS provides, is undermined by UAS's own HSSK valuation report.[65] Despite this advice, UAS kept the split fee contract in its business model and still uses these contracts today.[66]

Lastly, despite the emphasis UAS places on McAnaney's opinion as evidence that UAS did not willfully disregard the law, McAnaney's opinion is not dispositive on this point. McAnaney himself testified that when UAS consulted him, they "█████████████████████████████

---

[62] *Id*. ¶¶ 30-34 (explaining that UAS's reliance on *Hanlester* is inappropriate because the Anti-Kickback Statute requires deferral to the OIG's interpretation, and the arrangement in *Hanlester* was fundamentally different than UAS's arrangement in that (1) it did not depend on the volume of referrals, (2) required up-front investment, and (3) did not create a risk of overutilization).

[63] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 16.

[64] Ex. 17, Weiss Rebuttal ¶ 12; Ex. 18, Weiss Report ¶¶ 50-56; Ex. 19, WDTX-UAS-285779.

[65] Ex. 18, Weiss Report ¶¶ 53-55. Furthermore, UAS decided on its split-fee percentages *before* soliciting an analysis of the fair market value of its services. *See* Ex. 4, DelVacchio Tr. at 88:20-25.

[66] Ex. 9, WDTX-UAS-278125.

████████████████"[67] UAS gave McAnaney a proposed fixed fee contract—one that UAS had never used before—and asked him to write an opinion that this new contract did not violate the Anti-Kickback Statute. The UAS business model described in McAnaney's opinion—on which UAS alleges it relied—was therefore not the existing split-fee contract, but rather a proposed fixed fee contract that UAS had not yet actually implemented in its business.[68] Furthermore, regarding the existing split-fee contracts, McAnaney recommended that UAS amend these contracts on a going forward basis, yet UAS did not follow this recommendation.[69] This testimony hardly supports UAS's contention that it justifiably relied on McAnaney's opinion to confirm that "█

████████████████████████████████████████"[70]

Because UAS's arguments for why it has not violated the Anti-Kickback Statute require weighing conflicting opinions and examining a swath of competing evidence, these are precisely the types of judgment calls that a jury should be permitted to make; therefore, they are not proper for summary judgment.

**B.      UAS Made False Statements Regarding the Safety and Price of Blood Testing and Misrepresented Its Protocol.**

Not only did UAS utilize illegal contracts to entice Phadia's providers, but UAS also disseminated false information about blood testing and its own protocol in an effort to capture business to the detriment of Phadia. Substantial evidence of UAS's fraudulent representations creates—at a minimum—a fact issue on whether UAS engaged in independently tortious conduct.

UAS makes three arguments for why its conduct was not independently tortious or unlawful—claiming there is (1) no evidence UAS disseminated statements on ImmunoCAP's

---

[67] Ex. 8, McAnaney Tr. at 52:19-53:4.
[68] *Id.* at 29:7-17; 44:14-20.
[69] *Id.* at 59:15-61:2; 64:12-14.
[70] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 17.

alleged false positive rates, sensitivity, or ease of use; (2) no evidence UAS's representations concerning its training protocols were false; and (3) no evidence UAS's representations concerning its training protocols were material to a provider's decision whether or not to order Phadia blood tests.[71]

Evidence in the record contradicts every one of these arguments. First, contrary to UAS's assertion that "███████████████████████████████████" disparaging statements about ImmunoCAP's accuracy or sensitivity, UAS's own Vice President of Sales testified that he recalled having conversations with providers about blood testing not being as accurate as skin-prick testing and resulting in more false positives.[72] Second, testimony from multiple witnesses establishes that UAS made false representations regarding its services concerning the level of provider supervision and technician training.[73] Third, whether representations regarding UAS's training protocols were material to a provider's decision is inherently a fact-intensive inquiry that should be left to the jury. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (stating materiality is a "fact-specific issue[] which should ordinarily be left to the trier of fact"). Additionally, UAS ignores that its other misrepresentations regarding its services—in addition to those misrepresentations specifically about its technician training—may have been material to providers' decisions.

---

[71] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 10-12.

[72] Ex. 6, Thresher Tr. at 25:21-27:1.

[73] Ex. 20, Guy Tr. at 124:22-127:22 (testifying that UAS-contracted providers represented that they were training patients on how to administer their immunotherapy, were supervising the allergy testing, and were diagnosing the patients; however, interviews with patients revealed the providers were not involved and in many instances had never seen the patients); Ex. 21, Porter Tr. at 50:21-51:13 (testifying that the University of Incarnate Word ("*UIW*") does not have a credentialing department and has not had one in the 15 years the witness had been at UIW; however, UAS represented in its marketing materials that it partnered with UIW's credentialing department to verify the technician's recruiting and training methods).

The abundance of evidence indicating UAS made false statements creates, at the very least, a material issue of fact regarding whether UAS's statements were independently tortious.

## IV.   The Statute of Limitations Does Not Bar Phadia's Counterclaim.

UAS contends Phadia's counterclaim is barred by the statute of limitations because UAS's conduct allegedly all occurred between September 3, 2009 and May 31, 2011, and Phadia knew of the basis for its counterclaim prior to March 28, 2014 (i.e., two-years before Phadia filed its counterclaim).[74] Neither contention has merit.

First, UAS's tortious and unlawful conduct, on which Phadia's counterclaim is premised, was not isolated to 2009 to 2011. In fact, UAS continues to use contracts that violate the Anti-Kickback Statute to interfere with Phadia's business to this day. Second, the discovery rule tolled the limitations period until depositions were conducted within this case, which was when Phadia first learned the bases for its counterclaim; therefore, all of UAS's unlawful conduct is within the limitations period. And third, even assuming for the purposes of this response that the limitations period has run, Phadia's counterclaim was revived and is timely under Section 16.069 of the Texas Civil Practice and Remedies Code.

### A.   UAS Continues Its Tortious and Unlawful Conduct.

UAS's tortious and unlawful conduct, on which Phadia's counterclaim is based, has not only occurred within the two-year statute of limitations, but continues to this day. Although UAS may have discontinued implementing new split-fee referral contracts, UAS has maintained its

---

[74] Plaintiff UAS's Motion for Summary Judgment [Dkt. 324] at 17.

existing split-fee referral contracts.[75] In fact, over 25% of UAS's annual revenue as of October 2015 was attributable to split-fee contracts.[76]

Furthermore, UAS continues to utilize its equally problematic tiered fee contract. The fees used in UAS's tiered fee contracts were designed to approximate the percentage based split-fees that would otherwise have been paid under the split-fee referral contracts.[77] While the tiered fee contracts do not explicitly split the reimbursement from payors between UAS and providers based on percentages, the difference between these contracts and split-fee contracts is a change in form, but not substance. Both contracts achieve the same goal of incentivizing providers to refer patients to UAS, and both constitute unlawful relationships and their use constitutes tortious conduct.[78]

### B.  The Discovery Rule Tolled the Limitations Period.

Additionally, UAS is not entitled to summary judgment based on the statute of limitations because the discovery rule under Texas state law tolled the limitations period. *See Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993) (holding a federal court "applying the forum state's statute of limitations . . . should also give effect to any applicable tolling provisions"). The discovery rule protects a plaintiff from having a statute of limitations bar its claim when the plaintiff did not know the facts underlying its claim and could not reasonably have discovered them. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996). This is precisely the situation here. While Phadia was aware that its business had declined in certain areas as a result of UAS's conduct, Phadia was unaware that UAS was capturing business through unlawful conduct—i.e., by

---

[75] Ex. 6, Thresher Tr. at 164:9-165:6.
[76] Ex. 9, WDTX-UAS-278125.
[77] Ex. 8, McAnaney Tr. at 71:23-72:3 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").
[78] Ex. 18, Weiss Report ¶¶ 26-27.

falsely representing its products and using split-fee contracts.[79] These facts are not the type of information that would be readily discoverable to Phadia, given that UAS's contracts are confidential and its misrepresentations were not widely publicized to the general public, but rather made to targeted providers.

Because Phadia did not discover the nature of its injury until depositions and other discovery processes were conducted in this case, the discovery rule applies and tolled the limitations period. UAS, therefore, as the party moving for summary judgment, is required to prove that "no fact issue exists regarding when [Phadia] discovered, or should have discovered through reasonable diligence, the nature of [its] injury," in order to prevail on summary judgment. *See Harper v. Mac Haik Ford, Ltd.*, No. 01-09-01144-cv, 2010 WL 2650543, at *3 (Tex. App.— Houston [1st Dist.] July 1, 2010, no pet.). UAS has not come close to meeting this burden; therefore, the discovery rule applies, and UAS is not entitled to summary judgment based on the statute of limitations. *See Versata Software, Inc. v. Internet Brands, Inc.*, No. 2:08-cv-313-WCB, 2012 WL 588790, at *4 (E.D. Tex. Feb. 22, 2012) (holding the plaintiffs had not shown they were entitled to summary judgment as to the timeliness of the defendants' counterclaim when they failed to prove "that no reasonable jury could find that a reasonable person in the defendants'

---

[79] *See* Ex. 13, Thermo Fisher's Responses to Plaintiffs' Interrogatories ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Memorandum and Recommendation and Order on UAS's Motion to Strike Phadia's Counterclaim [Dkt. 274] at 6-7 (recognizing that it was not until after taking the deposition of UIW's corporate representative in November 2015 that Phadia was made aware that UAS was continuing to tortiously interfere with its business relationships).

position would have investigated" the plaintiffs' conduct and learned the basis of the counterclaim).

### C. Assuming Phadia's Counterclaim Is Barred by the Statute of Limitations, the Counterclaim Is Revived by the Counterclaim Savings Clause.

Alternatively, even assuming for the purposes of this response that the statute of limitations bars Phadia from bringing an independent claim for tortious interference with prospective business relations, Phadia's counterclaim is revived under the counterclaims saving clause, Section 16.069 of the Texas Civil Practice and Remedies Code. Section 16.069 states: "If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required." "To determine what constitutes a 'transaction,' [courts] employ the logical relationship test, which asks whether the essential facts on which the claims are based are significantly and logically relevant to both claims.'" *Hacienda Records, L.P. v. Ramos*, No. 2:14-cv-19, 2015 WL 6680597, at *3 (S.D. Tex. Nov. 2, 2015) (quoting *Wells v. Dotson*, 261 S.W.3d 275, 281 (Tex. App.—Tyler 2008, no pet.)). UAS's claims and Phadia's counterclaim stem from the same essential facts. Both UAS's and Phadia's tortious interference with prospective business relations claims center around the decision-making process of providers regarding what form of allergy testing and what testing brands to use.

This section covers counterclaims filed within thirty days of when the party's answer was due. Tex. Civ. Prac. & Rem. Code § 16.069. Both Phadia and Thermo Fisher filed their respective counterclaim at the same time as their answer to Plaintiffs' Fourth Amended Complaint;

therefore, their counterclaim plainly falls within the thirty day time period under the statute.[80] The fact that Phadia has previously filed an answer without a counterclaim in response to Plaintiffs' Third Amended Complaint is irrelevant. *See Skytop Brewster Co. v. Skytop Int'l, Inc.*, No. H-93-0204, 1993 WL 721287, at *1, *4 (S.D. Tex. Dec. 20, 1993) (holding counterclaim was revived under Section 16.069 when the defendant first filed this counterclaim with its second amended answer); *Versata Software, Inc.*, 2012 WL 588790, at *5 (holding counterclaim added to second amended answer was revived under Section 16.069, even though the original answer was filed nine months earlier).

Having met the requirements under Section 16.069, even assuming that the statute of limitations has run on Phadia's counterclaim, it is revived under this provision. *See Hacienda Records, L.P.*, 2015 WL 6680597, at *3 (quoting *J.M.K. 6, Inc. v. Gregg & Gregg, P.C.*, 192 S.W. 189, 199 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("Where the requirements of the statute are met, section 16.069 allows those who are already parties to the action to assert claims against one another that would otherwise be time-barred.").

## CONCLUSION AND PRAYER

For the above stated reasons, Phadia respectfully requests that UAS's Motion for Summary Judgment be denied.

---

[80] Defendants Thermo Fisher Scientific Inc. and Phadia US Inc.'s Answer to Plaintiffs' Fourth Amended Complaint and Counterclaim [Dkt. 248].

Dated: August 22, 2016                    Respectfully submitted,

                                          VINSON & ELKINS LLP


                                          /s/ James A. Reeder, Jr.
                                          **James A. Reeder, Jr.**
                                          Texas Bar No. 16695010
                                          Federal Bar No. 12381
                                          **Christopher V. Popov**
                                          Texas Bar No. 24032960
                                          Federal Bar No. 88136
                                          1001 Fannin Street, Suite 2500
                                          Houston, Texas 77002-6760
                                          Telephone: 713-758-2202
                                          Facsimile: 713-615-5033
                                          E-mail: jreeder@velaw.com;
                                          cpopov@velaw.com


                                          **Liane Noble**
                                          Texas Bar No. 24079059
                                          Federal Bar No. 2329197
                                          **Michelle Arishita**
                                          Texas Bar No. 24092048
                                          2801 Via Fortuna, Suite 100
                                          Austin, Texas 78746-7568
                                          Telephone: 512-542-8505
                                          Facsimile: 512-236-3234
                                          E-mail: lnoble@velaw.com;
                                          marishita@velaw.com


                                          **ATTORNEYS FOR DEFENDANTS
                                          PHADIA US INC. AND THERMO
                                          FISHER SCIENTIFIC INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(d) and Local Rule CV-5(b)(2), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax on this 22nd day of August, 2016.

_/s/ Michelle K. Arishita_
Michelle K. Arishita