IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, LLC, d/b/a UNITED ALLERGY SERVICES, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIV. NO. 5:14-CV-00035-OLG |
| AMERICAN ACADEMY OF ALLERGY ASTHMA & IMMUNOLOGY, ET AL., | § § § | |
| Defendants. | § | |

DEFENDANTS PHADIA US INC. AND THERMO FISHER SCIENTIFIC INC.'S
<u>REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

I.      Plaintiffs' Failure to Establish Harm to Competition Requires that Judgment Be Entered Against Them on Their Sherman Act Claims. ........................................................... 1

    A.      Plaintiffs Do Not Have Any Evidence of Harm to Competition Given the Absence of Barriers to Entry. ....................................................................................... 2

    B.      Plaintiffs' Conclusory Allegations Regarding Patient Wait Times and "Difficulty in Finding a Physician" Fail to Establish Harm to Competition. ............ 5

II.     Plaintiffs Do Not Have Any Evidence That Phadia Maintained Alleged Market Dominance Through Anticompetitive Means. ..................................................................... 6

    A.      Plaintiffs Fail to Point to Any Anticompetitive Conduct That Contributed to Phadia's Alleged Market Dominance. .................................................................. 6

    B.      Phadia's Actions Constitute "Competition on the Merits." ................................... 7

    C.      Plaintiffs Fail to Link Phadia's Conduct and the Defined Geographic Market. .................................................................................................................... 8

III.    Defendants' Alleged Conduct Does Not Constitute an Illegal Restraint of Trade. .............. 8

    A.      Defendants' Alleged Conduct Does Not Rise to the Level of an Illegal Group Boycott as a Matter of Law. ........................................................................ 9

    B.      Plaintiffs' Price-Fixing Claims Are Actually Boycott Claims, and Are Similarly Not Actionable. ..................................................................................... 10

    C.      Defendants' Alleged Conduct Falls Far Short of Evincing Market Allocation Between Primary Care Providers and Allergists. ............................... 11

IV.     Plaintiffs Conspiracy Claims Also Fail Because There Is No Evidence of an Agreement Among Defendants. ......................................................................................... 11

V.      Plaintiffs' Failure to Establish Causation Requires That Judgment Be Entered Against Them on Their Tortious Interference Claims. ......................................................... 13

CONCLUSION AND PRAYER ...................................................................................................... 15

CERTIFICATE OF SERVICE ......................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Anago, Inc. v. Tecnol Med. Prods., Inc.*,
 976 F.2d 248 (5th Cir. 1992) ................................................................................................2

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)............................................................................................................11

*Brown v. City of Houston*,
 337 F.3d 539 (5th Cir. 2003) ...............................................................................................6

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
 479 U.S. 104 n.15 (1986) .....................................................................................................5

*Consol. Metal Prod., Inc. v. Am. Petroleum Inst.*,
 846 F.2d 284 (5th Cir. 1988) ...............................................................................................3

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
 547 F.3d 266 (5th Cir. 2008) .............................................................................................15

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*,
 777 F.2d 306 (5th Cir. 1985) ...........................................................................................3, 6

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)..................................................................................................4

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
 751 F.3d 368 (5th Cir. 2014) ...........................................................................................3, 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)............................................................................... 10, 13, 14

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
 641 F.3d 834 (7th Cir. 2011) ...............................................................................................1

*Norris v. Hearst Trust*,
 500 F.3d 454 (5th Cir. 2007) ...............................................................................................2

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
 998 F.2d 1224 (3d. Cir. 1993)............................................................................................13

*Taylor Publ'g Co. v. Jostens, Inc.*,
 216 F.3d 465 (5th Cir. 2000) ...........................................................................................7, 8

*United States v. Addyston Pipe & Steel Co.*,
 175 U.S. 211 (1899)............................................................................................................12

*United States v. Topco Assocs., Inc.*,
 405 U.S. 596 (1972)............................................................................................................12

*Yoder Bros., Inc. v. Call.-Fla. Plant Corp.*,
 537 F.2d 1347 (5th Cir. 1976) .............................................................................................9

*Exhibits*

| | |
|---|---|
| Exhibit 1 | Collection of "News & Articles" Compiled by United Allergy Services (WDTX-UAS-008350) ("***Ex. 1, WDTX-UAS-008350***") |
| Exhibit 2 | Remote Practice of Allergy Strategy: AANMA Strategic Plan (Winders Exhibit 655; AANMA002426) (filed under seal) ("***Ex. 2, Exhibit 655***") |
| Exhibit 3 | Email from Tonya Winders re: Remote Practice of Allergy Strategy (Winders Exhibit 642; PHADIA-SUB0012982) (filed under seal) ("***Ex. 3, Exhibit 642***") |
| Exhibit 4 | John Thresher Deposition Transcript (Apr. 15, 2016) (filed under seal) ("***Ex. 4, Thresher Tr.***") |
| Exhibit 5 | Nicolas Hollis Deposition Transcript (Apr. 26, 2016) (filed under seal) ("***Ex. 5, Hollis First Tr.***") |
| Exhibit 6 | Email from Kurt Heiss re: HCA (WDTX-UAS-174452) (filed under seal) ("***Ex. 6, WDTX-UAS-174452***") |
| Exhibit 7 | Email from Laurie Schroeder re: ModernHealthcare.com (PHADIA0085905) (filed under seal) ("***Ex. 7, PHADIA0085905***") |

*Record References*

| | |
|---|---|
| Mot. at __. | Defendants Phadia US Inc. and Thermo Fisher Scientific Inc.'s Motion for Summary Judgment [Dkt. 307] |
| Resp. at __. | Plaintiffs' Response to Defendants Phadia US Inc. and Thermo Fisher Scientific Inc.'s Motion for Summary Judgment [Dkt. 350] |

After using years of discovery to fish for a cause of action, Plaintiffs' Response to Phadia's Motion for Summary Judgment [Dkt. 350] demonstrates that Plaintiffs have uncovered nothing more than unconnected statements merely "calling into question the wisdom of doing business with [UAS]" that constitute procompetitive, commercial speech "outside the reach of antitrust laws."[1] Plaintiffs spend over half their Response attempting to obscure the summary judgment issues with a lengthy, one-sided narrative designed to paint Defendants in a poor light, but do nothing to address the legal infirmities of their claims, including that: (1) Plaintiffs have shown no harm to competition; (2) Plaintiffs have no evidence Phadia engaged in anticompetitive conduct connected to the relevant geographic markets alleged by Plaintiffs; (3) Phadia's conduct (whether labeled by Plaintiffs as a group boycott, price fixing, or market allocation) is not an illegal restraint of trade; (4) Plaintiffs' allegations cannot support a claim for conspiracy because the allegations are equally consistent with each Defendant acting independently; and (5) Plaintiffs have no evidence that Phadia engaged in tortious conduct that caused UAS to lose business.

Indeed, after having taken over fifty depositions and reviewing over one million pages of documents, Plaintiffs are no closer to exposing any threatened harm to competition by Defendants' conduct than they were at the preliminary injunction stage, when this Court found that the evidence was insufficient to show a likelihood of success on the merits. Dkt. 82 at 3. Phadia respectfully requests that the Court grant summary judgment and dismiss Plaintiffs' claims.

## I.     Plaintiffs' Failure to Establish Harm to Competition Requires that Judgment Be Entered Against Them on Their Sherman Act Claims.

Plaintiffs' antitrust claims require a showing that the conduct complained of resulted in harm to competition as evidenced by increased prices or decreased output in the relevant market.

---

[1] *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011).

*Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992). Plaintiffs' purported "evidence" of harm to competition consists solely of evidence that (1) UAS (as an alleged low-cost provider) has been eliminated from some geographic markets, and (2) consumers supposedly faced increased wait times and "███████████████████"

Even assuming these claims were true, they would not show harm to competition. Plaintiffs' arguments ignore the basic economic truth that competitors (including "low-cost" competitors) come and go from the market every day without harming the underlying competitive process that antitrust laws protect. This is precisely the nature of a competitive market. Yet Plaintiffs' sole "evidence" of harm to competition, rather than individual harm to UAS, is premised on conclusory allegations without the support of a single case in which this was sufficient to show antitrust harm. Consequently, all of Plaintiffs' antitrust claims fail as a matter of law.

**A.    Plaintiffs Do Not Have Any Evidence of Harm to Competition Given the Absence of Barriers to Entry.**

"[T]he antitrust laws . . . were enacted for the protection of competition not competitors." *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). Despite Plaintiffs' contention that "there is plenty" of evidence of harm to competition, this purported "evidence" consists of harm to "UAS contracts," the diminished "performance [of] UAS's contracting physicians," and reductions in AAAPC membership—none of which show harm to competition as a whole.[2] Resp. at 22.

---

[2] Indeed, Plaintiffs' diatribe against Defendants' purported conduct, which consists of efforts to "████████████" "████████████████" and "████████████████" underscores that the conduct of which Plaintiffs complain is precisely the type of spirited competition and commercial speech that antitrust laws are designed to protect. Resp. at 11, 14, 15. *See Consol. Metal Prod., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 297 (5th Cir. 1988) (holding "it is not enough to meet the plaintiff's burden under the rule of reason that the plaintiff was harmed because the defendant refused without justification to promote, approve, or buy the plaintiff's product" as "[i]t is a natural part of a competitive market that products, firms, and—sometimes—entire sectors of the economy fail").

Phadia pointed out in its Motion for Summary Judgment that "there are no documents in the record showing increased prices or decreased output, and Plaintiffs' experts failed to conduct any analysis of either."[3] Mot. at 11. Plaintiffs effectively concede this point—citing only hypothesized anticompetitive effects premised on the elimination of UAS from the market. Yet, as Plaintiffs themselves acknowledge, the elimination of UAS could only result in "lower output and higher prices" if there are barriers to entry, such that eliminating UAS would leave blood testing and skin-prick testing by allergists as the "only product[s] available." Resp. at 25. *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 377 (5th Cir. 2014) ("A restraint should not be deemed unlawful, even if it eliminates a competitor from the market, so long as sufficient competitors remain to ensure that competitive prices, quality, and service persist."). Despite acknowledging this well-established antitrust principle, Plaintiffs continue to rely on suppositions by Dr. House of increased costs and reduced output that depend on finding that barriers to entry prevent new remote allergy competitors from entering the market or existing competitors from expanding.[4] Resp. at 23-25. No such barriers exist.

In fact, UAS's experience belies any assertion of significant barriers to entry. UAS's founder, former CEO, and board member admitted that there are frequent new entrants to the

---

[3] While Phadia notes that Dr. Eisenstadt is the only expert that conducted an analysis of price and output, it is not Phadia's burden to show there is no harm to competition—it is Plaintiffs' burden to show there is harm. Even assuming Plaintiffs were correct that Dr. Eisenstadt's "███████ ████████████████████████████████████████████████████████" this does not absolve Plaintiffs of their burden—which they fail to meet—of showing evidence of increased costs or decreased output. *See Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 320 n.48 (5th Cir. 1985) (holding the plaintiff "has the burden of proving anticompetitive effect . . . and it has failed to carry it").

[4] While Plaintiffs cite *LePage's Inc. v. 3M*, for the proposition that an "████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████" Plaintiffs ignore the key fact from the case that the defendant's exclusionary conduct only harmed competition "because there was no ease of entry." 324 F.3d 141, 162 (3d Cir. 2003).

remote allergy market (i.e., "███████████████████████████") with the number of remote allergy companies growing from only one or two to twenty-five as of April 2016. Mot. at 13. Moreover, any barriers to entry must be low if UAS can expand, as it predicts, from sales of $95mm to $308mm in five years and from approximately 200 to 580 cities.[5]

Ignoring the calculations of their own expert and these admissions, Plaintiffs attempt to transform basic and modest costs of operations into "natural barriers to entry" that UAS allegedly helps providers overcome. Resp. at 25. But Plaintiffs' focus is misplaced. The "natural barriers to entry," which Plaintiffs identify as the cost of equipment and training a person to administer tests and immunotherapy, cost under $50,000 according to Plaintiffs, and can be recouped within only six months given the additional revenue of $10,000 to $15,000 per month from providing these services.[6] These are not the type of "high" barriers to entry that would preclude new competitors from entering the market. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 119 n.15 (1986) (holding that even the "'costs and delays' of building new plants, and the 'lack of [available] facilities and the cost [$20-40 million] associated with refurbishing old facilities" failed to show significant barriers to entry because if in fact defendants "succeeded in driving competitors out of the market," the equipment and labor force from the exiting competitors would be available for use by new competitors who could presumably enter without significant barriers to entry). Thus,

---

[5] *See* House Report [Dkt. 307-35] at 114, 117-18, 130 (showing but-for revenues of $95mm in 2013 to $308 mm in 2018). Additionally, Dr. House "assumed that UAS would have expanded by ten cities per month throughout the past and future damage period, beginning September 2013." Dr. House also stated that "[t]he measured loss rate is 2.42% per 12 months of time. This loss rate is applied to the number of existing cities plus the number of new cities every year in the damage calculations." The number of cities that UAS had a presence in as of August 2013 was 202 cities (Table 13). Based on this starting number and the growth/loss rates provided, UAS would have entered approximately 580 cities by 2018.
[6] Ex. 1, WDTX-UAS-008350.

conduct that eliminates a low-cost provider in a market with low barriers to entry cannot harm competition by increasing prices or reducing output; as a matter of law, it merely shows harm to a competitor.

Plaintiffs also offer conclusory allegations that Defendants have "thrown up" anticompetitive barriers to entry by coercing payors to boycott UAS and "███████████████ ████████████████████" Resp. at 25. Not only are Plaintiffs' allegations flatly inconsistent with Plaintiffs' own admissions, but unsubstantiated assertions regarding purported harm to "other unnamed 'market entrants'" are insufficient to show harm to competition. *See Marucci Sports, L.L.C.*, 751 F.3d at 376 (holding that when the "crux" of plaintiff's allegations was that defendants harmed the plaintiff "and other unnamed 'market entrants,'" the plaintiff failed to show harm to competition because the "predominate focus [was] on [plaintiff's] own injury" and "antitrust laws are designed to protect competition, not competitors"). *See also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) (holding a plaintiff cannot defeat a motion for summary judgment with "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation").

### B.  Plaintiffs' Conclusory Allegations Regarding Patient Wait Times and "Difficulty in Finding a Physician" Fail to Establish Harm to Competition.

Plaintiffs' only other supposed evidence of harm to competition is an alleged increase in "████████████████████████████████" and "████████████████████████" Resp. at 22. Both conclusory allegations relate to the elimination of UAS in particular markets, and neither result will persist if new entrants can easily enter the market. Moreover, neither allegation is translated by Plaintiffs into a market-wide increase in price or reduction in output which evinces harm to competition. Not surprisingly, Plaintiffs fail to cite a single case that has

found that either is sufficient to constitute harm to competition.

Having failed to proffer any evidence of harm to competition—an element which Plaintiffs have the burden of proving—Phadia is entitled to summary judgment on all of Plaintiffs' antitrust claims.[7] See *Jayco Sys., Inc.*, 777 F.2d at 320 n.48 (dismissing the plaintiff's Section 1 and 2 claims when the plaintiff "failed to carry" its "burden of proving anticompetitive effect").

## II.    Plaintiffs Do Not Have Any Evidence That Phadia Maintained Alleged Market Dominance Through Anticompetitive Means.

Plaintiffs base their monopolization and attempt to monopolize claims against Phadia on allegations that Phadia attempted to persuade "████████████████████████████ ██████████████████████" and advocated for payor policies that would increase coverage for blood testing as opposed to skin-prick testing. Resp. at 26-27. Even accepting these allegations as true, Plaintiffs fail to offer any evidence that Phadia's alleged conduct was anticompetitive or "something other than competition on the merits." See *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 481 (5th Cir. 2000). And furthermore, even if Plaintiffs were able to show that Phadia's conduct went beyond "competition on the merits," Plaintiffs concede there is no evidence that Phadia's conduct had any nexus to the relevant geographic markets alleged by Plaintiffs to be dominated by Phadia.

### A.    Plaintiffs Fail to Point to Any Anticompetitive Conduct That Contributed to Phadia's Alleged Market Dominance.

None of Phadia's alleged offenses directed at providers or payors satisfies the

---

[7] As explained in Phadia's Response to Plaintiffs' Motion for Partial Summary Judgment on *Per Se* Treatment [Dkt. 339], even assuming that Plaintiffs can prove Phadia conspired with payors and allergists, *per se* treatment of Plaintiffs' claims would be inappropriate because (1) Plaintiffs have not alleged that Phadia conspired with its direct, horizontal competitors, and (2) Plaintiffs have not shown that Phadia's alleged agreement involved patently anticompetitive conduct that would inevitably result in higher prices and reduced output.

anticompetitive conduct element for Section 2 claims. Phadia's marketing efforts encouraging providers to use blood testing rather than others' skin-prick tests, including the internal sales chatter regarding the OIG opinion on which Plaintiffs base their Section 2 claims, are precisely the type of competitive processes that antitrust laws are designed to protect and underscore the purpose of the *de minimis* presumption. Mot. at 15-19. While Plaintiffs contend that Phadia ignores evidence that these statements were "clearly likely to induce reasonable reliance" and not "subject to neutralization and offset," Plaintiffs fail to cite any of this "evidence"–and, in fact, Plaintiffs' own internal documents and witnesses establish the precise opposite.[8] Resp. at 28. Plaintiffs, therefore, have not overcome the legal presumption that the impact of any such contact was *de minimis*.

### B.    Phadia's Actions Constitute "Competition on the Merits."

Plaintiffs' purported evidence of Phadia's allegedly anticompetitive conduct directed at payors highlights that Phadia's payor communications involve "competition on the merits," which cannot form the basis of a monopoly claim. *See Taylor Publ'g Co.*, 216 F.3d at 481. Phadia's efforts to achieve parity between covered units for skin-prick and blood testing and to curb overutilization were the type of fact-based (premised on peer-reviewed literature) commercial persuasion that is the epitome of competition on the merits.[9] UAS remained "free to engage in similar persuasive efforts with the relevant" payors. *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 523 (5th Cir.

---

[8] Fecher Tr. [Dkt. 307-36] at 188:21-189:1 (acknowledging that she was unaware of any conduct by Phadia that caused UAS to lose an account). *See also* Mot. at 17-18 (describing UAS's neutralization efforts which included drafting a response letter and hiring Kevin McAnaney to prepare an opinion stating that UAS's model did not violate the anti-kickback statute).

[9] In fact, the unilateral and procompetitive nature of these comments is highlighted by the fact that Phadia's parity messaging was contrary to the interests of its supposed co-conspirators (i.e., allergists, who primarily offer skin-prick tests).

1999). It is not the Court's job to decide that UAS should be immune from critique; it is up to the payors to evaluate competitive information on both sides, which this Court has previously acknowledged when recognizing that Defendants have "legitimate procompetitive justifications for advocating that third-party payors adopt certain reimbursement policies." Dkt. 82 at 12.

### C.    Plaintiffs Fail to Link Phadia's Conduct and the Defined Geographic Market.

Plaintiffs effectively concede they have no evidence to connect any conduct by Phadia and their "defined relevant market" consisting of specific towns and small cities in which Phadia is claimed to have market dominance.[10] *See Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976). Instead, Plaintiffs broadly allege that Phadia used the OIG opinion to "███████████████████████████████████████" Resp. at 27. Having defined the relevant geographic market as individual towns and cities for purposes of alleging market dominance by Phadia, Plaintiffs cannot meet their burden of showing anticompetitive conduct supporting an alleged monopoly by broadly alleging that such conduct took place in some ambiguous and overbroad geography where Phadia has not been alleged to be dominant. Plaintiffs cannot have it both ways—i.e., by defining the market in a way such that they can manufacture market dominance in isolated small towns and cities, while alleging that the complained-of conduct took place generally.

## III.    Defendants' Alleged Conduct Does Not Constitute an Illegal Restraint of Trade.

Plaintiffs' conspiracy claims fail because Plaintiffs cannot establish an illegal restraint of trade—whether categorized as a group boycott, price fixing, or market allocation.

---

[10] Plaintiffs also seek to hide the weakness of their Section 2 claims by conflating Phadia's alleged share in the allergy blood testing market—which Plaintiffs do not allege to be the relevant antitrust product market—with Phadia's role in the allergy testing market at issue in this case, in which Phadia's national share of 22% (as calculated by Plaintiffs' expert) is far below any legally cognizable concept of dominance. *See* House Report [Dkt. 307-35] at 19.

### A. Defendants' Alleged Conduct Does Not Rise to the Level of an Illegal Group Boycott as a Matter of Law.

Rather than even try to address the cases cited by Phadia rejecting Plaintiffs' notion that mere commercial speech without coercion can support an antitrust claim, Plaintiffs make the blanket assertion that Defendants sought to exclude Plaintiffs from the marketplace by "persuading, coercing, and encouraging" payors to reduce or eliminate reimbursement. Mot. at 23-24; Resp. at 19-20. But Defendants' conduct cannot rise to the level of coercion without an element of economic inducement, and this element is noticeably lacking from Defendants' alleged conduct. *See Consol. Metal Prods.*, 846 F.2d at 296 (holding that "[a]bsent evidence of coercion, there is no reason to assume that buyers do not rely voluntarily on . . . [p]roduct information [which] is crucial to a competitive market").

Neither Phadia's communications with payors, nor with providers evince any threat of economic consequence for non-compliance. Plaintiffs contend Phadia circulated the OIG Opinion to providers and disparaged UAS; however, informing providers of the risks of contracting with UAS (and leaving providers free to judge for themselves the credibility of Phadia's interpretation) does not involve any economic threat. Similarly, with respect to payors, encouraging payors to enact reimbursement policies that were actually within the payors' economic self-interest does not come close to showing coercion because engaging in conduct that is consistent with one's self-interest negates the possibility that the conduct was coerced. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (holding conduct consistent with one's "independent interest" does not "support a finding of antitrust liability"). Here, there is no evidence that Phadia wielded any economic control over a payor (e.g., by threatening not to work with a payor if it refused to cease doing business with Plaintiffs), as Phadia does not even contract directly with

payors for reimbursement.

Furthermore, not a single document relied upon by Plaintiffs reflects anything but unilateral conduct on the part of a Defendant. In fact, the most that Plaintiffs allege in their Response is that Defendants "███████████████████████████████████████████

████████████" Resp. at 20. Even if each Defendant wanted to foreclose UAS from the market, individually "communicating" this desire to payors does not constitute the economic coercion required of a group boycott.[11] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."). Plaintiffs' group boycott claim doesn't make sense; it fails as a matter of law.

**B.    Plaintiffs' Price-Fixing Claims Are Actually Boycott Claims, and Are Similarly Not Actionable.**

Plaintiffs' price-fixing claims consist of rehashed allegations that are equivalent in all material respects to the claims this Court rejected in its Order on Plaintiffs' Motion for Preliminary Injunction. There this Court held that allegations that Defendants "'sought to convince third-party payors not to pay at all primary care physicians for allergy testing or allergen immunotherapy or those using the services of UAS'" did not constitute "a price-fixing claim, but instead [was] a boycott claim." Dkt. 82 at 8. And yet, despite this clear pronouncement, Plaintiffs again assert a price-fixing claim based on allegations that Defendants sought to persuade payors to change reimbursement policies in a manner that would benefit Defendants. Resp. at 19. Plaintiffs'

---

[11] Plaintiffs cite the report of Dr. House for an example in which a Defendant apparently unilaterally "scare[d]" a third-party payor into making a reimbursement change. But the testimonies from every payor reveal that changes reflect unilateral decisions considered to be in the payors' own self-interests. *See* Mot. at 6-7.

legally insufficient price-fixing claims should again be rejected.

### C. Defendants' Alleged Conduct Falls Far Short of Evincing Market Allocation Between Primary Care Providers and Allergists.

Plaintiffs' market allocation argument is baffling. Plaintiffs argue that Defendants agreed that primary care physicians would only do blood testing and refer their patients to allergists for skin-prick testing and immunotherapy. Resp. at 18-19. The problem with this theory is that it concerns an alleged allocation of services offered by primary care physicians—none of whom are part of the alleged conspiracy—rather than any reduction of services or turning away of customers involving Phadia's sales to its laboratory customers or the allergists' sales to patients seeking their services. Because Plaintiffs' market allocation arguments lack any element of a market allocation in which the parties agree to refrain from competing in some way, they should be dismissed. *See e.g.,* *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 618-19 (1972) (citing *United States v. Addyston Pipe & Steel Co.*, 175 U.S. 211 (1899) as the "fully authoritative exposition of antitrust law," in which the defendants collectively agreed to "assign[] to particular individual defendants" certain cities within the territory in which the defendants would sell their competing products at a fixed price).

Because Defendants cannot establish as a matter of law an illegal restraint of trade—whether labeled a group boycott, price fixing, or market allocation—Phadia is entitled to summary judgment on Plaintiffs' Section 1 and analogous claims.

### IV. Plaintiffs Conspiracy Claims Also Fail Because There Is No Evidence of an Agreement Among Defendants.

Plaintiffs' purported "direct evidence" that Defendants agreed to exclude Plaintiffs from the market is not actually direct evidence of a conspiracy to restrain trade or monopolize. The eight documents Plaintiffs cite as "direct evidence" reflect no more than: (1) proposed plans to engage in "dialogue" with others; (2) efforts to gain support for innocuous and protected activities;

(3) a shared opinion regarding the negative impact of UAS's business model; and (4) activities constituting a departure from future collaboration. Resp. at 17-18. It is impossible to look at these eight documents as explicitly reflecting a conspiracy—let alone piecing together a common scheme. *See Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (holding direct evidence of an agreement "explicitly refers to an understanding between the alleged conspirators" and does not require any additional inference to determine that an agreement took place).

Moreover, assigning the label "direct" to claimed evidence of concerted action does not have a talismanic effect, automatically permitting a plaintiff to bypass summary judgment. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) ("The Supreme Court did not draw a distinction between direct evidence on the one hand and circumstantial evidence on the other . . . it stated that in the absence of a plausible theory of conspiracy, a court must consider whether the plaintiff put forward 'sufficiently unambiguous' evidence that the defendants conspired.") (citing *Matsushita Elec. Indus.*, 475 U.S. at 597). In order to survive summary judgment on its Section 1 and Section 2 conspiracy claims, Plaintiffs, therefore, must allege a "plausible theory of conspiracy." And here, Plaintiffs have not, as their theory of a conspiracy simply does not make economic sense. As Phadia set forth in its Motion for Summary Judgment, and which Plaintiffs fail to address in their Response, Defendants each had an independent interest in taking positions unfavorable to UAS. Mot. at 27. Furthermore, third-party payors acted in their own self-interest in making reimbursement changes and conducting audits or investigations—showing that payors had no economic interest in joining the alleged conspiracy. Mot. at 22-24, 27.

Rather than address the fact that Defendants' conduct was equally consistent with

independent conduct as with conspiratorial conduct—a fact that alone warrants granting summary judgment on Plaintiffs' conspiracy claims—Plaintiffs attempt to manufacture evidence of a conspiracy from the bootstrapping of otherwise innocuous, isolated statements.[12] *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (holding antitrust liability could not be premised on conduct "consistent with the defendant's independent interest"). But the very evidence that Plaintiffs cite in support of finding a conspiratorial agreement reveals a *lack* of agreement among Defendants. For example, Plaintiffs focus on Phadia and Mothers each drafting a proposal for addressing the remote practice of allergy; however, the fact that each Defendant unilaterally developed a strategy—containing different proposed courses of conduct—reveals at best a non-actionable, "common dislike" for a competitor, which "is not the same as an explicit understanding to conspire."[13] Resp. at 17. *Golden Bridge Tech., Inc.*, 547 F.3d at 272.

## V.   Plaintiffs' Failure to Establish Causation Requires That Judgment Be Entered Against Them on Their Tortious Interference Claims.

Plaintiffs cannot globally manufacture a causal link between alleged tortious conduct by Phadia and interference with specific providers through their expert's regression model. Mot. at 28-30. While Dr. House's "██████████████████████████████████████████" if any,

---

[12] Plaintiffs cite to 69 documents allegedly supporting the existence of a conspiracy. Judging from their innocuous nature, Plaintiffs seem to hope the Court merely skims the content of each and assumes they have surpassed some volume threshold for support. A close review of all 69 documents reveals either (1) wholly unilateral conduct by each Defendant, (2) collaborative conduct on subjects that have nothing to do with Plaintiffs, or (3) brainstorming and proposals reflecting common opinions about Plaintiffs but as to which there is no evidence of implementation (and which because such proposals would be consistent with the unilateral self-interest of each Defendant, cannot by themselves support a finding of conspiracy).

[13] *Compare* Ex. 2, Exhibit 655 (Mothers' proposed strategy listing developing a position paper, encouraging action by consumer protection agencies, and utilizing broadcast media), *with* Ex. 3, Exhibit 642 (Phadia's proposed strategy listing reporting fraud and abuse to payors, providing Phadia salespersons with talking points, and considering an adjustment to sales goals).

among providers on a " ████████████████████ " the model fails to differentiate between legal conduct and conduct that could form the basis of a tortious interference claim. Resp. at 29-30. Plaintiffs admit that there is nothing wrong with a salesperson distinguishing its products from others' products; however, instances in which Phadia provided product information to providers and lawfully convinced providers on the UAS customer list to use its products over those of UAS will nevertheless result in a decline in revenue in Dr. House's regression model that is indistinguishable from a decline from some anticompetitive conduct.[14] And despite the fact that this legal, procompetitive conduct could not form the basis of a tortious interference claim, Dr. House's regression model includes this conduct as evidence of causation and damages.

Moreover, Plaintiffs respond to the argument that they cannot rely on a global assertion of interference with every provider on the UAS customer list based on econometrics, by contending that " ██████████████████ " also establishes causation. Resp. at 29. Yet this "overwhelming" evidence consists of nothing more than a handful of internal Phadia documents discussing the OIG Opinion and contact (which the record does not establish was tortious) with five clinics. Resp. at 29, n.152. Even assuming that Phadia tortiously interfered with UAS's existing or prospective contracts with this handful of clinics, this scant evidence does not support finding that every decrease in monthly billings of providers on the UAS customer list was caused by Phadia's alleged interference—and yet this is how Plaintiffs calculate their purported tortious interference damages. Having failed to identify any evidence of interference which actually caused harm with the providers on the UAS customer list, Plaintiffs cannot establish causation by broadly alleging purported interference without pointing to the specific contracts with which Phadia

---

[14] Ex. 4, Thresher Tr. at 62:20-63:3 ( ███████████████████████████████████ ██████████████████████████████████████████████████████████ ).

allegedly interfered. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987) (holding plaintiffs failed to "produce[] evidence supporting a claim for tortious interference" when the proffered evidence consisted of broad allegations of economic benefits from future contracts but plaintiffs failed to point to evidence of tortious interference "with any specific contract rights").

Plaintiffs only point to only one specific contract, Hospital Corporation of America ("*HCA*"), with which Phadia allegedly interfered and caused harm, based on an internal Phadia email from a low-level sales employee to his supervisor describing his purported sales success. Resp. at 30. But Plaintiffs ignore the abundance of evidence to the contrary, including an admission of their own witness and their own internal documents, from which no reasonable jury could conclude that Phadia's alleged use of the OIG opinion caused HCA to "███████████ ███████████████████████" In fact, UAS's corporate representative testified and the record corroborates that HCA did not "cancel all pending contracts" but rather opted to contract with UAS under a flat fee arrangement.[15] Additionally, an allegation that Phadia first alerted HCA to the OIG Opinion is implausible—as HCA and Phadia emails indicate that Phadia did not learn of the OIG Opinion until four days *after* HCA learned of it.[16] This single example of alleged interference does not come close to supporting Plaintiffs' tortious interference claim.

## CONCLUSION AND PRAYER

For the reasons stated in Phadia's Motion for Summary Judgment and the above stated reasons, Phadia respectfully requests that its Motion for Summary Judgment be granted and judgment be entered in Phadia's favor on each of Plaintiffs' claims.

---

[15] *See* WDTX-UAS-174536 [Dkt. 307-38]; Ex., 5, Hollis First Tr. at 332:22-333:6.
[16] *Compare* Ex. 6, WDTX-UAS-174452 (HCA learns of OIG Opinion on November 24, 2011), *with* Ex. 7, PHADIA0085905 (First mention of the OIG Opinion by Phadia on November 28, 2011).

Dated: August 31, 2016    Respectfully submitted,

            VINSON & ELKINS LLP

            */s/ James A. Reeder, Jr.*
            **James A. Reeder, Jr.**
            Texas Bar No. 16695010
            Federal Bar No. 12381
            **Christopher V. Popov**
            Texas Bar No. 24032960
            Federal Bar No. 88136
            1001 Fannin Street, Suite 2500
            Houston, Texas 77002-6760
            Telephone: 713-758-2202
            Facsimile: 713-615-5033
            E-mail: jreeder@velaw.com;
            cpopov@velaw.com

            **Liane Noble**
            Texas Bar No. 24079059
            Federal Bar No. 2329197
            **Michelle Arishita**
            Texas Bar No. 24092048
            2801 Via Fortuna, Suite 100
            Austin, Texas 78746-7568
            Telephone: 512-542-8505
            Facsimile: 512-236-3234
            E-mail: lnoble@velaw.com;
            marishita@velaw.com

            **ATTORNEYS FOR DEFENDANTS
PHADIA US INC. AND THERMO
FISHER SCIENTIFIC INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically in compliance with Local Rule CV-5(a). As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1). Pursuant to Fed. R. Civ. P. 5(a)-(d) and Local Rule CV-5(b)(2), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax on this 31st day of August, 2016.

*/s/ Michelle K. Arishita*
Michelle K. Arishita