**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

FILED

SEP 2 9 2017

CLERK, U.S. DISTRICT COURT.
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE and UNITED BIOLOGICS, LLC d/b/a UNITED ALLERGY SERVICES, ) ) ) ) ) | |
| *Plaintiffs,* ) ) | |
| v. ) ) | Civil No. 5:14-CV-35-OLG |
| ALLERGY AND ASTHMA NETWORK/ MOTHERS OF ASTHMATICS, INC., TONYA WINDERS, PHADIA US, INC., and THERMO FISHER SCIENTIFIC, INC., ) ) ) ) ) | |
| *Defendants.* ) | |

## ORDER

This case is before the Court on the parties' motions for summary judgment and related evidentiary motions. Plaintiff United Biologics, LLC, d/b/a United Allergy Services (UAS) has moved for summary judgment on the counterclaim asserted by Defendants Phadia US, Inc. (Phadia) and Thermo Fisher Scientific (TFS) (docket no. 324); Plaintiffs UAS and the Academy of Allergy & Asthma in Primary Care (AAAPC) have moved for partial summary judgment on their claims under Section 1 of the Sherman Act (docket no. 325); Defendants Phadia and TFS have moved for summary judgment on Plaintiffs' antitrust and tortious interference claims (docket nos. 310, 326); and Defendants Allergy and Asthma Network/Mothers of Asthmatics, Inc. (AANMA) and Tonya Winders have moved for summary judgment on Plaintiffs' antitrust and tortious interference claims (docket no. 329).[1]

---

[1] Except where noted in this order, references to Phadia refer to both Phadia and its parent entity, TFS, and reference to AANMA refer to both AANMA and its director, Winders.

Phadia has moved to strike evidence submitted with Plaintiffs' response to Phadia's summary judgment motion (docket nos. 366, 396) and AANMA has moved to strike evidence submitted with Plaintiffs' motion for partial summary judgment on its claims under Section 1 of the Sherman Act (docket no. 338); to strike evidence submitted in support of Plaintiffs' response in opposition to AANMA's summary judgment motion (docket nos. 371, 400); to strike supplemental exhibits submitted with Plaintiffs' response in opposition to Defendants' motion to strike Plaintiffs' evidence in support of their partial summary judgment motion (docket no. 410); and for leave to file a sealed surreply to Plaintiffs' partial summary judgment motion (docket nos. 408, 409). Additionally, Plaintiffs have submitted objections to the evidence submitted in support of Defendants' summary judgment motions (docket no. 387).

The Court finds that UAS's Motion for Summary Judgment on the Counterclaims Asserted by Phadia and TFS (docket no. 324) should be GRANTED; AANMA's Motion to Strike Plaintiffs' Evidence in Support of their Motion for Partial Summary Judgment (docket no. 338) should be DENIED; AANMA's Motion to Strike Plaintiffs' Supplemental Exhibits to their Response to Defendants' motion to strike (docket no. 410) should be DENIED; AANMA's Motion for Leave to File a Surreply, or, Alternatively, to Strike Plaintiffs' New Evidence and Arguments Raised in Reply (docket no. 408) should be GRANTED as to the request for leave file a surreply and DENIED as to the request to strike evidence and arguments; Plaintiffs' Motion for Partial Summary Judgment Concerning *Per Se* Violation of Section 1 of the Sherman Act (docket no. 325) should be DENIED; Defendant AANMA's Motion to Strike Plaintiffs' Evidence In Support of Their Response to Defendants' Motion for Summary Judgment (docket nos. 371, 400) should be DENIED; Defendant AANMA's Motion for Summary Judgment (docket no. 329) should be DENIED; and Defendant Phadia's Motion for Summary Judgment (docket nos. 310, 326) should be DENIED.

## Background

At the outset of this case in January 2014, Plaintiffs UAS and AAAPC asserted several claims against a group of Defendants that included three allergist trade associations, the American Academy of Allergy, Asthma & Immunology (AAAAI), the American College of Allergy, Asthma & Immunology (ACAAI), and the Joint Council of Allergy, Asthma & Immunology (JCAAI); current and former officers of those trade associations, including JCAAI Executive Director Dr. Donald Aaronson, JCAAI Executive Vice President Dr. Gary Gross, JCAAI Board of Directors Member Dr. Lyndon Mansfield, JCAAI Board of Directors Member and Past President Dr. James Sublett, and ACAAI Board of Regents Member Dr. David Weldon; and the medical practices of some of those officers, including Dallas Allergy and Asthma Center, P.A., which is owned and operated by Gross, Family Allergy & Asthma LLC, which is owned and operated by Sublett, and Lyndon E. Mansfield M.D., P.A. Docket no. 1. In their Third Amended Complaint, filed in January 2015, Plaintiffs named additional Defendants including a patient advocacy organization, AANMA; a manufacturer of allergy blood testing equipment, Phadia; AANMA Executive Director and former Phadia officer Tonya Winders; AANMA representative Dr. Stanley Fineman; AANMA representative James Wallen; and Atlanta Allergy & Asthma Clinic, P.A., a Georgia company owned and operated by Fineman. Docket no. 159. Finally, in February 2016, Plaintiffs filed a Fourth Amended Complaint that added claims against Phadia's parent entity, TFS. Docket no. 235 at ¶ 36. In late 2015 and early 2016, Plaintiffs dismissed their claims against all Defendants except AANMA, Winders, Phadia, and TFS, against whom they assert federal and state antitrust claims, claims for tortious interference with both existing and prospective business relations, and civil conspiracy claims. Docket nos. 176; 190; 235 at ¶¶ 172-207; 244. Phadia and TFS have asserted a counterclaim against UAS for tortious interference with business relations. Docket no. 250 at ¶¶ 47-52.

UAS, which began operating in 2009, contends that its business model posed a competitive threat to board-certified allergists, their trade associations, and manufacturers of blood testing equipment such as Phadia. Plaintiffs contend that Defendants reacted to that threat by engaging in unlawful anticompetitive conduct designed to stifle competition in the local markets for allergy testing and immunotherapy in Arkansas, Arizona, Colorado, Florida, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia. Docket no. 235 at ¶¶ 45, 57 n.1.

UAS contends that, before it entered the marketplace, patients seeking allergy testing and treatment would typically be either administered an allergy test by their primary care physician or referred to a reference laboratory for allergy testing. Docket nos. 235 at ¶¶ 54; 325 at 6. Allergy testing in the primary care setting may be carried out using either a "skin prick test," in which the patient is injected with small amounts of allergens and their reaction is observed, or blood testing, in which the patient's blood is drawn and sent to a reference laboratory for testing. Docket nos. 326 at 12; 329 at 12; 235 at ¶¶ 49, 98. Phadia manufactures allergy blood tests, including the most popular allergy blood test, ImmunoCap, whereas UAS and its affiliated physicians rely upon skin prick testing, and Phadia and UAS dispute the relative merits of skin prick testing and blood testing. *See, e.g.*, docket nos. 235 at ¶ 98; 326 at 14; 385 at 9. The reference laboratories to whom primary care physicians might refer patients for allergy blood testing, such as LabCorp or Quest Diagnostics, use testing products including ImmunoCap. Docket nos. 235 at ¶ 49; 384 at 7. Under this arrangement, although reference laboratories are the direct purchasers of Phadia's products, Phadia directs much of its marketing to primary care physicians because their referrals of patients for allergy blood testing determines the demand for Phadia's products. Docket nos. 250 at 39; 325 at 6-7; 385 at 17. If the patients test positive, they

might be advised by their PCPs to simply avoid the environmental allergens to which they are sensitive, or directed to over-the-counter or prescription allergy medications, such as nasal steroids or anti-histamines, which can manage the symptoms of allergic rhinitis but cannot eliminate the underlying allergic sensitivity. Docket no. 329 at 12. PCPs could also refer patients to an allergist,[2] who can administer a treatment modality known as allergen immunotherapy, in which a serum is prepared and injected into the patient at regular intervals in order to expose them to their allergen in a controlled manner and, over time, reduce or eliminate their allergic sensitivity. Docket no. 235 at ¶¶ 46-47.

UAS's entry into the marketplace in 2009 disrupted this market arrangement, transforming PCPs from a referral source for allergists and allergy blood testing services and into a competitor of both. Docket no. 325 at 7. Under UAS's model, primary care physicians who contracted with UAS direct potential allergy patients to receive allergy skin prick testing and, if necessary, immunotherapy, from a technician supplied by UAS to operate within the physician's existing practice. Docket no. 384 at 7. The UAS-supplied technician is responsible for mixing the immunotherapy serum, instructing the patients on how to self-administer the injections at home, and, to the extent permitted by the patient's insurance, instructing the physician on billing the patient's insurance carrier for the full course of immunotherapy injections that the patient is instructed to self-administer over a six- to seven-month period. *Id.* at 7-8. According to UAS, this model helps physicians overcome the barriers to entry into the market for allergy testing and immunotherapy by providing "all of the non-physician services necessary to compete in the market . . . including the equipment, allergy testing kits, antigens for immunotherapy mixing, and other materials that UAS purchases from the established suppliers in the industry." Docket no.

---

[2] The term "allergist" is used by the parties in this case to refer to physicians who have received a certification from the American Board of Allergy and Immunology (ABAI). Docket no. 235 at ¶ 39.

235 at ¶ 54-55. Under UAS's contracts with the physicians, the physicians typically do not pay up front for the placement of the UAS-contracted technician within their practice, but are obligated to remit to UAS a portion of the amount the physician is expected to be paid by the patient or reimbursed by the patient's insurance provider. *Id.* at 7.

Plaintiffs' claims arise from the steps that current and former Defendants took after UAS's entry into the marketplace. Plaintiffs allege that AAAAI, ACAAI, and JCAAI formed a joint enterprise, the Regional Advocacy Discussion and Response Initiative (RADAR), which operated in part through a message board called Basecamp, with the goals of recruiting allergists and discouraging third party payors from reimbursing for allergy testing and immunotherapy services provided by primary care physicians, a practice they referred to as the "Remote Practice of Allergy" (RPA). Docket nos. 235 at ¶ 67; 325 at 8. Plaintiffs allege that AANMA and Phadia joined in these efforts, entering into agreements, through Winders, to target both UAS and UAS-contracted physicians. *Id.* at 8-9. Plaintiffs allege that, under Winders's leadership, this group developed a strategy of coordinating to "combat the remote practice of allergy" and drive UAS out of business, primarily by discouraging third-party payors from reimbursing physicians for services provided in coordination with UAS and discouraging PCPs from initiating or continuing contractual relationships with UAS. Docket no. 325 at 9-12. Plaintiffs allege that Defendants pursued this goal of discouraging reimbursement by publicizing groundless concerns about the safety and efficacy of the treatment provided under the UAS model and the legality of UAS's reimbursement-sharing arrangement with physicians. *Id.*

For instance, Plaintiffs allege that, in August 2011, Winders contacted North Texas physicians who she believed had been in contact with UAS and attempted to persuade them to end or limit their involvement with UAS. Docket no. 235 at ¶ 100. Plaintiffs also allege that Phadia participated in the boycott effort, contacting third-party payors to convince them to

restrict reimbursement for allergy skin testing and immunotherapy to ABAI-certified allergists and members of the American Academy of Otolaryngic Allergy (AAOA). Docket no. 235 at ¶ 106 (citing docket no. 134-8). Plaintiffs allege that, in October 2011, ACAAI, JCAAI, and Phadia all agreed that AANMA, in exchange for substantial monthly payments from ACAAI, JCAAI, and Phadia, would act execute their concerted strategy to combat "RPA" by publishing a position statement and press release opposing the business model pursuant to which UAS operated, and physicians who partnered with entities using that model; contacting third-party payors and their trade associations to convince them not to do business with companies like UAS; and contacting governmental agencies and legislators "to defame these competitors." Docket no. 235 at ¶¶ 108-09. Plaintiffs allege that Winders, acting on behalf of both AANMA and Phadia, agreed to undertake direct-mail campaigns that would direct communications to "the medical directors of the top 100 commercial insurance payers" to "request a utilization review for the 2,184 participating physicians in AAAPC" and to the "'top 100 allergy and asthma primary care sites (based on rx data) encouraging them not to participate in these deceptive acts' of UAS and AAAPC." Docket no. 235 at ¶¶ 112 (quoting docket no. 135-13), 116. Plaintiffs allege that Phadia, AANMA, and Winders personnel contacted physicians who were considering or already doing business with UAS to publicize an Advisory Opinion issued on November 16, 2011, by the Office of the Inspector General of the United States Department of Health and Human Service (OIG). The OIG opinion appeared to raise doubts about the legality of UAS's business model, but it actually addressed the practices of a separate entity, which Plaintiffs allege had been created for the purpose of eliciting an unfavorable OIG opinion regarding an entity intended to be confused with UAS. Docket no. 235 at ¶¶ 118-42. Plaintiffs also allege that Phadia refused opportunities to do business with UAS and coerced other entities to do the same,

pressuring Quest Diagnostics and Clinical Pathology Laboratories to refuse UAS's efforts to begin using Phadia's ICAP blood tests through their laboratories. Docket no. 235 at 139-42.

Defendants do not dispute their involvement in an "advocacy campaign" whose goal was to counter the spread of RPA, but they contend that they were motivated not by a desire to drive UAS out of business, but by concerns about patient safety, the possibility that patients and insurers would be defrauded as a result of UAS's billing practices, and "UAS's flawed and wasteful business model." Docket no. 383 at 8. Defendants argue that their advocacy activities did not rise to the level of illegal anticompetitive behavior. Docket no. 384 at 6-11. Phadia and TFS also assert claims of their own, alleging that, in the course of UAS's outreach to primary care physicians, UAS representatives targeted physicians who had previously referred patients for allergy testing using Phadia-manufactured products and made inaccurate claims to those physicians regarding the relative merits of ImmunoCap and other Phadia products and the allergy testing and immunotherapy services that UAS could arrange to be administered within the physicians' practices. Docket no. 250 at 53-55.

UAS has moved for summary judgment against Phadia and TFS on their counterclaim against it. Docket no. 324. Plaintiffs have also moved for partial summary judgment against Defendants, arguing that their Sherman Act antitrust claims should considered under the *per se* rule rather than the "rule of reason." Docket no. 325. Defendants have moved for summary judgment on Plaintiffs' antitrust and tortious interference claims. Docket nos. 326, 329. The parties have filed other motions and objections to certain summary judgment evidence, arguing that certain evidentiary submissions should be stricken, and seeking leave to file a surreply. Docket nos. 338, 387, 366/396, 371/400, 408, 409, 410. The Court considers each motion in turn.

**Legal Standards and Analysis**

1. **UAS's Motion for Summary Judgment on the Counterclaims Asserted by Phadia and TFS (docket no. 324)**

Phadia has asserted a counterclaim against UAS for tortious interference with business relations, and seeks both declaratory and injunctive relief. Docket no. 250 at 53-55. Phadia alleges that UAS interfered with Phadia's business relationships with primary care physicians and physician groups by targeting physicians that referred a high volume of patients for testing using Phadia's ImmunoCAP protocol, making false statements to those physicians about ImmunoCAP and UAS's competing testing and immunotherapy protocol, and inducing those physicians to enter into split-fee contracts with UAS that violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (AKS). *Id.* at 53.

To prevail on their claim of tortious interference with prospective business relations, Phadia and TFS must establish that (1) there was a reasonable probability that they would have entered into a business relationship with a third party; (2) that UAS either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) that UAS's conduct was independently tortious or unlawful; (4) that the interference proximately caused Phadia and TFS injury; and (5) that Phadia and TFS suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Summary judgment is appropriate as to a claim or defense or part of a claim or defense if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant bears the burden of "demonstrat[ing] the

absence of a genuine issue of material fact," and once the movant has met this burden, the nonmovant must "go beyond the pleadings" and designate specific facts, supported by summary judgment evidence, showing that there is a genuine need for trial. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694 (1978); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

In its motion for summary judgment on the counterclaim, UAS argues that no evidence shows that Phadia or TFS had a business relationship with the physicians targeted by UAS marketing that could give rise to a tortious interference claim, docket no. 324 at 12-14; that no evidence shows willful interference because no evidence shows that UAS "acted with a conscious desire to prevent a business relationship from occurring between Phadia and the clinics[,]" *id.* at 9-10; that no evidence shows that its communications with physicians were independently tortious, and specifically that no evidence shows that UAS disparaged Phadia, TFS, or its ImmunoCAP product, that its split-fee contracts with physicians violated the AKS, or that an AKS violation could form the basis of a tortious interference claim, *id.* at 10-17; and that the counterclaim is barred by the statute of limitations because evidence not in dispute shows that Phadia became aware of the basis for its claims in fall 2011, *id.* at 17-18.

First, the Court considers whether Phadia's and TFS's relationships with the physicians and clinics to which UAS directed its marketing were sufficiently close to give rise to claims of tortious interference. The parties appear to agree regarding the factual circumstances of those relationships and the claimed tortious interference: Phadia dispatches Clinical Sales Consultants (CSCs) to primary care physicians, allergists, and other practitioners to "discuss the prevalence of allergies among the general patient population, the benefits of using ImmunoCAP to test for allergies, and to answer any questions that the primary care physicians or allergists might have about ImmunoCAP or its benefits." Docket nos. 250 at 39; 324 at 2, 7. However, although

Phadia markets its ImmunoCAP product to practitioners, it does not sell its products to them directly. Docket no. 250 at 39. Rather, Phadia's customers are reference laboratories to which practitioners may refer patients for allergy blood testing, and Phadia therefore markets its products to the practitioners not to make sales to them, but to encourage them to refer patients for reference laboratory testing using its products, particularly ImmunoCAP. Docket nos. 250 at 39; 324 at 2, 7; 385 at 8-9. Phadia alleges that, in some cases, practitioners "specifically identify ImmunoCAP on a prescription that they write for a patient[,]" but in other cases, "physicians simply refer patients to labs that they know utilize Phadia's ImmunoCAP for allergy blood testing." Docket no. 250 at 39. Phadia claims tortious interference based on UAS's marketing of its competing products and services to some of the same practitioners to which Phadia dispatched its CSCs. Phadia alleges that UAS's representatives misrepresented the respective qualities of ImmunoCAP and UAS's competing offerings, and induced some of those practitioners to enter into split-fee contracts with UAS, in which UAS provided allergy testing and immunotherapy services to practitioners at no up-front cost, but the practitioners paid UAS a portion[3] of the reimbursement they received from third-party payors for those services and treatments—a payment arrangement that Phadia alleges violates the AKS. Docket no. 250 at 40-51. However, the parties do not dispute that Phadia's claim does not allege interference with any contractual relationship between Phadia and a practitioner, nor do they dispute that a viable tortious interference claim does not require a written contractual relationship. Docket nos. 385 at 11; 392 at 4; *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 n.54 (Tex. App.—Fort Worth 2007, pet. denied) ("the types of business relations protected are business relations that

---

[3] Phadia alleges that, following doubts about the legality of UAS's percentage-based split-fee agreements with practitioners, UAS transitioned to "tiered fee" and "flat fee" contracts that avoided a percentage-based arrangement. According to Phadia, UAS's "tiered fee" and "flat fee" contracts still violate the AKS. Docket no. 250 at 50-52.

have not yet been reduced to a contract and continuing business or other customary relationships

not amounting to a formal contract" (citing Restatement (Second) of Torts § 766B cmts. a, c)).

Rather, relying upon the holding of the Northern District of Texas court in *Reed Migraine Centers of Texas, PLLC v. Chapman*, UAS argues that Phadia's status relative to the practitioners it markets to is, at most, a third-party beneficiary, and that tortious interference claims "are reserved for instances in which 'the prospective business relationships would have formed directly between the plaintiff and third parties.'" Docket no. 324 at 8 (quoting *Reed Migraine Centers of Texas, PLLC v. Chapman*, 3:14-CV-1204-N, 2015 WL 11120872, at *2 (N.D. Tex. Sept. 22, 2015)). In response, Phadia relies upon the holding of the state court of appeals in *Smith v. Royal Seating, Ltd.* for the proposition that a tortious interference claim can remain viable where "the defendant did not directly sell to the end user but instead sold products to a dealer who then sold to the end user." Docket no. 385 at 11 (citing *Smith v. Royal Seating, Ltd.*, 03-09-00114-CV, 2009 WL 3682644, at *4-*6 (Tex. App.—Austin Nov. 6, 2009, no pet.)).

Phadia's reliance on the *Smith* case is misplaced. In that case, the court reviewed a finding of interference where the plaintiff, Royal Seating, had alleged interference with an anticipated sale to a group of churches. However, the existence of a business relationship between Royal Seating and the churches was disputed on appeal because Royal Seating generally sold its merchandise to dealers rather than directly to end users such as the churches. *Smith*, 2009 WL 3682644, at *4. The Court concluded that the record supported the trial court's finding that "there was a reasonable probability that Royal Seating and the churches would have entered into a business relationship." *Id.* at *5. However, that conclusion was based on the existence of evidence that, in a departure from its usual practice, Royal Seating actually had intended to conduct business with the churches directly, rather than through a dealer. *Id.* (noting evidence that, *inter alia*, a Royal Seating employee "expected the sales to the churches to take

place from Royal Seating[,]" a representative of the churches "underst[ood] and . . . desire[d] that Royal Seating be the distributor on the transaction[,]" and that a check from the churches was identified as a "deposit" for the chairs and was made payable to Royal Seating.).

Thus, *Smith* does not stand for the proposition that a tortious interference claim may arise from an allegation that a defendant dissuaded referrals into transactions in which the plaintiff is not involved, but indirectly benefits, and Phadia has cited no authority that does. Rather, as in *Reed*, the Court concludes that Phadia's tortious interference claim is not viable because it has failed to produce evidence showing a reasonable probability that it would have entered into a business relationship with any of the physicians that it alleges UAS disparaged it to, or evidence showing that UAS had any contact with the reference laboratories with which it did conduct continuing business. *Reed*, 2015 WL 11120872, at *2 ("Reed asserts that Defendants interfered with prospective business relationships between its 'partner physicians' and potential patients. Reed has offered no authority, and the Court has not found any, suggesting that a third party beneficiary may maintain an action for tortious interference with prospective business relations."). Having failed to produce evidence showing that it had a business relationship with the practitioners who referred patients for ImmunoCAP testing that would be cognizable in a tortious interference claim, Phadia has also necessarily failed to show a reasonable probability of continued business relations with them. *See* docket no. 385 at 12-14. Having concluded that Phadia lacks evidence to satisfy these essential elements of its claim, the Court concludes that it is not necessary to consider the parties' arguments regarding the other elements of Phadia's counterclaim, and that UAS's motion for summary judgment on Phadia's counterclaim (docket no. 324) should be granted.

### 2. AANMA Motions to Strike and Seeking Leave to File a Surreply (docket nos. 338, 409, 410)

Before proceeding to Plaintiffs' partial summary judgment motion, the Court considers the various evidentiary and other motions related to that filing. Defendants AANMA and Winders have raised a number of objections to evidence submitted with Plaintiffs' motion and reply. AANMA argues that Plaintiffs have failed to produce evidence that would show that individual allergists or allergy trade organizations compete among themselves, that Phadia and allergists are competitors, or that Defendants reached an agreement to allocate markets among themselves. Docket no. 338 at 2-4. AAMNA also specifically objects to Plaintiffs' use of deposition testimony given by former defendant James Sublett in a separate state-court case (docket no. 325, exhibit 15), and deposition exhibits from separate state-court litigation (docket no. 325, exhibits 11, 12, 14). *Id.* at 4-5. AANMA also asserts hearsay objections to 41 documentary exhibits submitted with Plaintiffs' summary judgment motion (docket no. 325, exhibits 13, 17, 20, 22, 24, 32, 33, 41, 49, 50, 54, 55, 57, 60, 69, 81-86, 94, 96, 101, 102, 109-21). *Id.* at 5-6.

In their response to AANMA's objections to this evidence, Plaintiffs argue that it is within the Court's discretion to admit deposition testimony and exhibits from separate litigation, and responds to AANMA's hearsay objections to its documentary exhibits. Docket no. 397 at 2-5. After submitting their response, Plaintiffs separately filed supplemental exhibits: business records declarations from former defendants ACAAI, JCAAI, Atlanta Allergy & Asthma Clinic, P.A., and Donald Aaronson, M.D., which had been served upon all parties shortly before Plaintiffs' filed their response. Docket no. 407. Defendants AANMA and Winders then moved to strike those supplemental exhibits as untimely filed under Local Rule CV-7(e). Docket no. 410.

Defendants AANMA and Winders have also filed a motion seeking leave to file a surreply to Plaintiffs' reply in support of their partial summary judgment motion, which alternatively seeks that Plaintiffs' reply be stricken. Docket no. 408. In this motion, AANMA objects to several hundred pages of exhibits submitted with Plaintiffs' reply in support of their partial summary judgment motion. In response, Plaintiffs argue that most of the material in question is not newly submitted, but merely duplicates previously submitted material and is attached to its reply for convenience. As to five exhibits that were submitted for the first time with its reply (docket no. 403, exhibits 3, 4, 10, 16, 19), Plaintiffs argue that they relate only to a previously raised argument, that Phadia communicated with payors to coerce them into making reimbursement changes adverse to Plaintiffs, and notes that AANMA's summary judgment arguments do not relate to those five exhibits and that Phadia has not objected to their belated submission to the Court. Docket no. 412 at 3.

Fed. R. Civ. P. 32(a)(8) provides that "[a] deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." *See also Hub v. Sun Valley Co.*, 682 F.2d 776, 777-78 (9th Cir. 1982); *United States v. Bowen*, 411 F.2d 923, 927 (5th Cir. 1969). The Court is satisfied that, although this case does not involve the same parties as the earlier state court litigation in which the deposition of James Sublett was taken, the subject matter and interests of the parties in this case sufficiently align with the previous litigation such that use of the deposition should be permitted under Rule 32(a)(8), particularly given the liberal construction afforded to the rule's requirements of "the same subject matter" and "successors in interest[.]" *Hub*, 682 F.2d at 778. Fed. R. Civ. P. 56(c)(2) permits consideration at the summary judgment stage of evidence that can "be presented in a form that would be admissible in evidence" at trial. Given that UAS has

already produced a transcript of the deposition in which these materials were submitted as exhibits, the Court need not engage in speculation about hypothetical ways that they could be authenticated at trial. *Cf. Duplantis v. Shell Offshore*, Inc., 948 F.2d 187, 192 (5th Cir. 1991) (quoting Melissa L. Nelken, *One Step Forward, Two Steps Back: Summary Judgment After Celotex*, 40 Hastings L.J. 53, 85 (1988)); *see also Lee v. Offshore Logistical & Transp., LLC*, 16-31049, 2017 WL 2507740, at *1 (5th Cir. June 9, 2017). The Court therefore declines to strike these exhibits from the summary judgment record. For similar reasons, the Court declines to strike the numerous documentary exhibits against which AANMA has lodged hearsay objections. Many of the documents are either non-hearsay, because they are not offered to prove the truth of any matter asserted therein, or are e-mail correspondence exchanged among employees of current and former defendant entities in this case, and would therefore likely fall within the business records exception to the rule against hearsay, or other exceptions to the rule excluding hearsay. *See, e.g., In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, MDL 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012) (discussing circumstances in which e-mail correspondence is admissible as business record under Fed. R. Evid. 803(6)). In light of these likely bases for admissibility, the Court declines to strike this group of exhibits en masse, particularly in light of the mostly nonparticularized nature of the hearsay objections raised against them. *See, e.g., Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 853 (4th Cir. 1980) (citing Fed. R. Evid. 103(a)(1)). The Court concludes that AANMA's Motion to Strike Plaintiffs' Evidence in Support of Their Motion for Partial Summary Judgment (docket no. 338) should be denied.

The Court also declines to strike the belatedly submitted supplemental exhibits to Plaintiffs' opposition to AANMA's motion to strike, which appear at docket no. 407. Although they were not timely submitted under Local Rule CV-7(e), they were submitted days after they

became available to all parties, and AANMA has had an opportunity to respond to this new evidence, both in its motion to strike and in its proposed surreply to Plaintiff's partial summary judgment motion, which is premised in part on the submission of new evidence with Plaintiff's reply. *See generally Freeman v. County of Bexar*, 142 F.3d 848, 853 (5th Cir. 1998) (discussing factors that weigh on court's discretion to consider untimely submitted summary judgment evidence). The Court will grant AANMA's Motion for Leave to File a Surreply (docket no. 408), but declines its alternative request that the evidence submitted with Plaintiffs' reply in support of their partial summary judgment motion be stricken. The Court therefore denies AANMA's requests that the Court strike both as to the evidence belatedly submitted in support of Plaintiffs' response to AANMA's motion to strike (i.e., the evidence appearing in docket no. 407), and as to the evidence submitted with Plaintiff's reply in support of their partial summary judgment motion (i.e., the evidence appearing at docket nos. 403-1 through 403-4), and will consider both that evidence and AANMA's arguments in its surreply responding to that evidence in reviewing the parties' summary judgment motions.

### 3. Plaintiffs' Motion for Partial Summary Judgment Concerning *Per Se* Violation of Section 1 of the Sherman Act (docket no. 325)

Plaintiffs assert claims under Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1, which prohibits restrictive practices that impose an unreasonable restraint on competition. *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 343 & n.13 (1982) (quoting *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918)). To prevail on this claim, Plaintiffs must prove that the defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 372, 196 L. Ed. 2d 291 (2016). Plaintiffs allege that allergist trade associations and others "acting on their behalf or in coordination with them" coordinated to restrict competition in local

markets for allergy testing and allergen immunotherapy throughout the United States. Docket no. 235 at ¶¶ 1, 97-142, 172-78. In Plaintiffs' motion for partial summary judgment, they seek a determination that the group boycott they allege Defendants engaged in should be "conclusively presumed to be unreasonable and therefore illegal" without resort to the "rule of reason" under which the Court "must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *MM Steel*, 806 F.3d at 848 (discussing the *per se* and "rule of reason" approaches to assessing the reasonableness of restraints in the context of Section 1 claims). Plaintiffs argue that facts not in dispute establish that Defendants are competitors of each other and entered into an agreement to encourage a group boycott of Plaintiffs, with the objectives of fixing prices, allocating markets, and, ultimately, driving Plaintiffs from the marketplace—an arrangement that Plaintiff contends constitutes a *per se* horizontal restraint on competition. Docket no. 325 at 17-19.

In their responses, Defendants argue for several reasons that summary judgment is inappropriate and that a *per se* analysis should not be applied. AANMA argues that Plaintiffs are not entitled to partial summary judgment because they have not shown the facts that would support application of the *per se* analysis using "the correct beyond-peradventure, light-most-favorable-to-the-nonmovant standard." Docket no. 384 at 12-14. AANMA also argues that Plaintiffs' claims of injury are too speculative to establish their antitrust standing, in part because the injury they allege is only an indirect consequence of the direct injury suffered by the primary victims of the alleged anticompetitive conduct: primary care physicians and patients. Docket no. 384 at 15-19 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 541-43 (1983)). AANMA also argues that the injuries Plaintiffs

allege, lost revenue and profits, do not establish their standing because Plaintiffs make no allegations of reduced output or predatory pricing. Docket no. 384 at 19-21. AANMA further argues that Plaintiffs have failed to produce evidence showing the existence of horizontal competition among the allergists or allergist trade associations that are current and former defendants in this case. *Id.* at 22-25. AANMA argues that the conduct Plaintiff alleges— "defendants' allegedly concerted effort to voice and act on their mutual disapproval of a risky and wasteful medical procedure"—is not a conduct that has been historically recognized as posing anticompetitive consequences, thus making application of the *per se* analysis inappropriate. *Id.* at 25-28. Finally, AANMA argues that, in the absence of a showing of conduct historically recognized to have anticompetitive consequences, Plaintiffs have not shown that application of the *per se* analysis is appropriate under the factors outlined in the *Tunica* case. *Id.* at 28-32 (citing *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414-15 (5th Cir. 2007) (applicability of *per se* rule requires analysis of "(1) whether the [Defendants] hold a dominant position in the relevant market; (2) whether the [Defendants] control access to an element necessary to enable [Plaintiffs] to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects.")).

Phadia argues that Plaintiffs have not shown the existence of an agreement qualifying for *per se* analysis because they have not alleged that Phadia participated in a horizontal conspiracy, but that Phadia conspired vertically with third-party payors and with the Defendant and former defendant allergists and allergy trade associations. Docket no. 383 at 6, 9-14. Phadia also argues that Plaintiffs have failed to show that the alleged agreement involved patently anticompetitive conduct or lacked any redeeming procompetitive characteristics. *Id.* at 14-19. Phadia also argues that the conduct Plaintiffs allege was not a boycott because Defendants only encouraged third-party payors to change reimbursement policies in a manner consistent with the payors' economic

interests. *Id.* at 19-21. Finally, Phadia argues that Plaintiffs have not alleged *per se* price fixing or market division claims because no horizontal competition exists among Defendants or between Defendants and payors. *Id.* at 21-24.

In their reply, Plaintiffs argue that Defendants inappropriately analyze portions of the alleged anticompetitive conspiracy in isolation from each other, and overlook controlling authority that "a group boycott is *per se* illegal if any part of the agreement is horizontal," even if it also includes vertical components, because "*per se* illegal group boycotts often involve enlisting or persuading vertical third parties to participate." Docket no. 403 at 5-11 (quoting *MM Steel*, 806 F.3d at 845). Plaintiffs further argue that *per se* analysis may be applied without resort to the *Tunica* factors because "the conspirators include competitors of the plaintiff" and that even if the *Tunica* factors are applied, the *per se* analysis would be triggered because "Defendants maintain a dominant position in the relevant market, seek to cut off access of necessary elements for Plaintiffs to compete, and are aimed at restricting output through eliminating which competitors can supply the market." *Id.* at 11-14 & 12 n.7. Finally, Plaintiffs argue that they have properly pleaded and produced evidence supporting their market division and price fixing claims. *Id.* at 14-19.

Under the "rule of reason," the reasonableness of a restraint on competition is assessed by considering "specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *MM Steel, LP*, 806 F.3d at 848 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). This wide-ranging and fact-intensive inquiry may be unnecessary, however, in cases where the likelihood of an agreement's "anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Id.* at 848 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 688-92

(1978) (discussing origins of "illegal *per se*" analysis). The Fifth Circuit has observed that,

generally, "[g]roup boycotts to foreclose an entrant from the market"—i.e., boycotts featuring

participants "either directly denying or persuading or coercing suppliers or customers to deny

relationships the competitors need in the competitive struggle"—may be conclusively presumed

to be unreasonable under the *per se* rule, without resort to the rule of reason. *MM Steel, LP*, 806

F.3d at 848.

However, as the Court has previously observed in this litigation, the form taken by an

allegedly anticompetitive combination is only determinative of the applicability of the *per se*

analysis to the extent that that form is indicative of anticompetitive effects and a lack of

redeeming competitive virtues. *See, e.g.*, docket no. 82 at 12-16 (noting that "[t]he Supreme

Court and Fifth Circuit have both noted that categories like '*per se*' and 'rule of reason' are less

fixed than they tend to appear."). Plaintiffs argue that *per se* treatment is required by the form

that the alleged restraint took—and that the Court should therefore disregard any evidence of the

procompetitive effects of the challenged conduct. *See, e.g.*, docket no. 403 at 10-11 (arguing that

"classic group boycott cases, such as this one, are routinely analyzed under the *per se* theory of

liability and all of [Defendants'] purported procompetitive justifications will go out the

window."). This argument inverts the required analysis, particularly since the Supreme Court has

hesitated to extend the *per se* analysis to restraints imposed by professional associations and to

scenarios in which "the economic impact of certain practices is not immediately obvious."[4]

---

[4] *See, e.g.*, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986) (reasoning that, although the challenged policy "resembles practices that have been labeled 'group boycotts'" because it "constitutes a concerted refusal to deal on particular terms with patients covered by group dental insurance[,]" the *per se* rule did not apply because of involvement of professional association and because economic impact was not obvious); *see also California Dental Ass'n v. FTC*, 526 U.S. 756, 773 n.10 (1999) ("It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to

At an earlier stage in this litigation, the Court declined to apply a *per se* analysis because it found Plaintiffs had not raised horizontal price-fixing allegations and because the professional associations who were then defendants asserted procompetitive and competition-neutral justifications for their challenged conduct. Docket no. 82 at 12 (gathering cases for the proposition that "the Supreme Court has been hesitant to impose antitrust liability on professional organizations without at least some investigation into asserted pro-competitive or competitive neutral justifications, unless the restraint directly controls prices."). At this stage, the Court notes that, although Plaintiffs have amended their complaint, and a wholly different group of Defendants are now before the Court, the same reasoning precludes application of the *per se* analysis. Now, as before, Plaintiffs' claims of price fixing are either better classified as boycott claims,[5] or they allege a vertical conspiracy between Defendants and third-party payors that would not in any event be suitable for *per se* review. *Compare* Docket nos. 82 at 8 (citing *United States v. Gen. Motors Corp.*, 384 U.S. 127, 148-49 (1966) and *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)); 235 at ¶¶ 173-76 (alleging price fixing based on claims that Defendants coerced physicians, insurance companies, managed care

---

apply to the professions antitrust concepts which originated in other areas." (quoting *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788-89, n. 17 (1975))); docket no. 82 at 12-13.

[5] To the extent that these allegations could be construed as horizontal price-fixing claims rather than boycott claims, the Court nonetheless declines to treat them as illegal *per se* in light of the factual disputes that persist regarding the plausible procompetitive purposes of Defendants' conduct. *Compare, e.g., New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000) (finding that agreement between two hospitals to jointly negotiate with health insurers regarding fees for certain services was illegal *per se* price fixing); and *California Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999) (in cases that do not present a "naked restraint on price and output[,]" "'considerable inquiry into market conditions' may be required before the application of any so-called 'per se' condemnation is justified." (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 n.26 (1984)); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010) (*per se* rules of illegality are inapplicable "[w]hen restraints on competition are essential if the product is to be available at all[.]" (internal quotation marks omitted)).

organizations, suppliers, and other third parties "not to do business with Defendants' competitors" and that Defendants' anticompetitive conduct has caused "third party-payors . . . to refuse or limit reimbursements to AAAPC members and physicians who are supported and assisted by UAS."). And, the Court notes that Defendants' pleadings of procompetitive and competition-neutral justifications for the challenged conduct have now been supplemented with evidentiary support.

Evidence in the record suggests that the concerns voiced about the emergence of UAS by Winders, AANMA, and other former defendants were twofold: they both feared infringement to their business and questioned the safety and efficacy of the testing and treatment provided by UAS, as well as the potential for reimbursement fraud.[6] *See, e.g.*, docket nos. 304-4 at 15-18 (AANMA e-mail regarding patient safety concerns); 329-2 at 75, 79, 87-88 (Winders's deposition testimony about allergists' competitive concerns), 258 (Sublett's deposition testimony about allergists' patient safety concerns), 372 (Mansfield's deposition testimony regarding allergists' patient safety concerns); 329-6 at 69-70 (JCAAI "News You Can Use" "More on Remote Practice" article), 71-72 (AANMA "Patients Not Piggy Banks" article), 74-75 (AANMA "Deception and Fraud in Allergy Care" article), 77-79 (AANMA "Allergy Testing and Immunotherapy Schemes Put Patients at Risk" article). The record also contains evidence indicating that some payors shared these concerns, and adjusted their reimbursement standards in ways adverse to UAS—decisions that, they testify, were not influenced by Defendants.[7] *See, e.g.*,

---

[6] As the Court has previously noted, evidence regarding Defendants' intent is not dispositive of "the essential [antitrust] inquiry": "whether or not the challenged restraint enhances competition[,]" but it "may inform this investigation[.]" Docket no. 82 at 14 n.12 (quoting *Cal. Dental*, 526 U.S. at 779-80 and citing *Bd. of Trade of Chicago*, 246 U.S. at 238 and *Levine v. Cent. Florida Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996)).

[7] Viewed in the light most favorable to Defendants, this evidence suggests that Defendants' safety, efficacy, and efficiency concerns were shared by third-party payors, who

docket no. 392-2 at 292, 294, 295-96, 299 (Glomb's testimony regarding payor concerns about patient safety); 329-3 at 13-14, 35, 58 (Brower deposition testimony regarding payor efficacy and patient safety concerns), 101-02, 104, 148 (Lachman deposition testimony regarding payor efficacy, patient safety, and cost concerns), 170, 179, 193-94 (Martin deposition testimony regarding payor cost concerns). Plaintiffs argue that these concerns were merely pretexts intended to conceal Defendants' true goal of eliminating a competitive threat using improper means. The evidence in the record is sufficient to support such a claim—but it could also support a finding that Defendants' activities advanced procompetitive and competition-neutral objectives, such as increasing patient safety and discouraging a treatment model that, Defendants argue, is wasteful, costly, and of questionable safety and effectiveness. This evidence would permit a conclusion that Defendants' challenged conduct had procompetitive or competition-neutral motivations and effects. *See, e.g.*, *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 771-72, 771 n.9 (1999); *Diaz v. Farley*, 215 F.3d 1175, 1183-84 (10th Cir. 2000); *Bd. of Trade of Chicago*, 246 U.S. at 238 (distinguishing between restraints that "merely regulate[] and perhaps thereby promote[] competition" and those that "suppress or even destroy competition").

At this stage, the Court is not free to disregard evidence that creates a genuine dispute regarding material facts such as these, but is obligated to "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001). So viewed, summary judgment is not appropriate as to the issue of whether to apply the *per se* analysis, both because the challenged conduct was carried out by in part by professional associations and a patient advocacy

---

adjusted their reimbursement policies accordingly. This evidence may also be relevant to questions of market power and causation that are beyond the scope of this analysis of the applicability of the *per se* rule—such as whether Defendants exerted sufficient power within the market to effect changes in payor reimbursement policies, or whether the reimbursement policy changes were a result of Defendants' advocacy.

organization—a context in which the Supreme Court has expressed hesitation about applying the *per se* rule—and because, in light of the conflicting evidence, the economic impact of the challenged practices "is not immediately obvious." *Indiana Fed'n of Dentists*, 476 U.S. at 458-59. This factual dispute requires a more detailed inquiry into the "circumstance, details, and logic of the restraint[,]" which will permit the jury to determine whether the restraints advocated by Defendants are medically justified, or are merely a pretext by which Defendants seek to eliminate a competitive threat. Docket no. 82 at 14; *California Dental Ass'n*, 526 U.S. at 781; *Bd. of Trade of Chicago*, 246 U.S. at 238.

The Court therefore concludes that Plaintiffs' Motion for Partial Summary Judgment Concerning *Per Se* Violation of Section 1 of the Sherman Act (docket no. 325) should be denied.

### 4. Defendant AANMA's Motion for Summary Judgment (docket no. 329)

AANMA argues that summary judgment against Plaintiffs is appropriate because Plaintiffs lack standing to assert their Sherman Act claims, their Sherman Act claims are barred by the *Noerr-Pennington* doctrine, they have failed to properly define the relevant market, and because Plaintiffs lack evidence of either a restraint of trade or a conspiracy to monopolize. Docket no. 329 at 18. AANMA further argues that, because Plaintiffs' state-law claims of tortious interference and civil conspiracy are derivative of the Sherman Act claims, summary judgment against Plaintiffs is appropriate on those claims, as well.[8]

---

[8] AANMA has also filed a motion to strike evidence submitted with Plaintiffs' Response to AANMA's summary judgment motion (docket nos. 371, 400). Many of the evidentiary arguments raised in that motion closely resemble those submitted with AANMA's motion to strike evidence submitted with Plaintiffs' summary judgment motion and discussed above. *See supra* and docket no. 338. As above, the Court declines to exclude the 30 exhibits against which AANMA has blanketly lodged hearsay objections, since many of those exhibits are non-hearsay or, because they are e-mail correspondence exchanged among employees of current and former defendant entities, they likely fall within exceptions to the rule excluding hearsay. Likewise, the Court declines to exclude the deposition testimony given by David Weldon in related state district court litigation for the same reasons the Court declined to exclude the deposition

AANMA argues that Plaintiffs lack standing to assert their Sherman Act claims for two

reasons. First, AANMA argues, other parties have been more directly harmed by AANMA's

alleged anticompetitive conduct, and those parties—PCPs and allergy patients—therefore are the

proper plaintiffs to assert antitrust claims against AANMA, not UAS or AAAPC. Docket no. 329

at 19 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of*

*Carpenters*, 459 U.S. 519, 541 (1983) and *Norris v. Hearst Tr.*, 500 F.3d 454, 466 (5th Cir.

2007)). Second, AANMA argues, Plaintiffs' allegations of lost profits are insufficient to show

that they have suffered an "injury of the type the antitrust laws were intended to prevent and

[injury] that flows from that which makes the defendants' acts unlawful." Docket no. 329 at 22

(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); arguing that

"[a] producer's inability to charge higher prices as a result of an antitrust violation is not antitrust

injury as a matter of law . . . [and] [r]educed income resulting from an antitrust violation is also

not antitrust injury." (internal emphasis omitted)). In an earlier Order in this case, the Court,

confronted with similar arguments asserted by then-Defendants AAAAI, ACAAI, JCAAI and

others, docket nos. 26 at 4-9; 86 at 16-19, concluded that "AAAPC has associational standing to

---

testimony of James Sublett that was taken in the same litigation. *See supra*. The Court does not
agree with AANMA that portions of the declaration submitted by UAS CEO Thomas Thill
should be stricken as "sham affidavits," since Thill's declaration statements about states in which
UAS has experienced decreased sales "and/or" withdrawn entirely from, and his description of
the adverse reimbursement changes implemented by Superior Health Plan, docket no. 386-7 at
257 ¶¶ 4-5, do not clearly contradict his deposition testimony that UAS still operates in some of
those states and that, as of the deposition, he could not recall the changes made by Superior
Health Plan, docket no. 400 at 23-26. *Compare Kennett-Murray Corp. v. Bone*, 622 F.2d 887,
894 (5th Cir. 1980) ("Certainly, every discrepancy contained in an affidavit does not justify a
district court's refusal to give credence to such evidence."). Since the Court's summary judgment
analysis does not rely upon the statements found in paragraph 7 of Thill's declaration, the Court
declines to strike that paragraph at this juncture, and concludes that AANMA's motion (docket
nos. 371, 400) should be denied.

bring a Sherman Act claim on behalf of its members." Docket no. 116 at 19.[9] Similarly, at this

stage, the Court finds that Plaintiffs do not lack antitrust standing.

Since "[t]he antitrust laws . . . were enacted for the protection of competition not

competitors" a Plaintiff who asserts claims under Sections 1 or 2 of the Sherman Act must show

"not only injury to the plaintiff's business or property resulting from the alleged violation, but

also . . . antitrust injury and standing." *Norris*, 500 F.3d at 465 (internal quotation marks and

emphasis omitted). Antitrust injury is "injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The injury should

reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible

by the violation." *Id.* These requirements, however, do not mean that antitrust injury requires a

showing of market-wide injury to competition, although such a showing "is often a component

of substantive liability" without which the plaintiff cannot recover and the consideration of

standing is therefore ultimately superfluous. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All.,*

*Inc.*, 123 F.3d 301, 305-06 (5th Cir. 1997) ("antitrust injury for standing purposes should be

viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-

related perspective of the impact of a defendant's conduct on overall competition."). Exclusion

from the market is an injury that the antitrust laws were intended to prevent, and a competitor

who has been excluded from the market, "[i]rrespective of consumer injury . . . suffers a distinct

injury" and "has clear standing to challenge the conduct of rival(s) that is illegal precisely

---

[9] AANMA points out that, in its previous Orders, the Court did not explicitly address antitrust standing separately from Article III standing, and relied upon authority discussing Article III associational standing outside the antitrust context. Docket no. 399 at 5 & n.2. Nonetheless, essentially the same antitrust standing arguments were before the Court when it denied the then-Defendants' motions to dismiss and held that "AAAPC has associational standing to bring a Sherman Act claim on behalf of its members." Docket no. 116 at 19. The Court's implicit rejection of those arguments at that stage is consistent with its analysis here.

because it tends to exclude competitors from the market."[10] The Court therefore finds that

Plaintiffs have made a sufficient showing of an antitrust injury.

A plaintiff who has met the requirement of showing their antitrust injury still must show

that it is the "proper plaintiff" to assert claims arising from the anticompetitive acts alleged.

*Norris*, 500 F.3d at 465 (internal quotation marks omitted). Courts make this determination by

considering "such facts as (1) whether the plaintiff's injuries or their causal link to the defendant

are speculative, (2) whether other parties have been more directly harmed, and (3) whether

allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex

damage apportionment." *Id.* The Court finds that Plaintiffs, whose claimed antitrust injury is the

loss of profits they would have earned but for their exclusion from the market, docket no. 386 at

17 n.62, 22, are proper plaintiffs. Since Plaintiffs have produced evidence that Defendants'

allegedly unlawful conduct was directed against UAS and AAAPC-member physicians, there is

little to no attenuation between Defendants' allegedly anticompetitive conduct and Plaintiffs'

antitrust injuries.[11] Similarly, the antitrust injuries in this case, which are "neither derived from

---

[10] *Andrx Pharm., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 816 (D.C. Cir. 2001);
*Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003); *Angelico v. Lehigh Valley
Hosp., Inc.*, 184 F.3d 268, 275 & n.2 (3d Cir. 1999) ("This is not a case, however, in which we
grant standing to a competitor who was simply harmed by strong competition. Rather, [plaintiff]
has asserted facts indicating that he was harmed by a conspiracy with an illegal anticompetitive
intent."); *Lone Star Milk Producers, Inc. v. Dairy Farmers of Am., Inc.*, 5:00-CV-191, 2001 WL
1701532, at *8 (E.D. Tex. Jan. 22, 2001) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365
U.S. 320, 327-28 (1961)); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 431 (D.
Del. 2006) ("exclusion from the market is 'precisely the type of injury that the antitrust laws
were intended to prevent,' because it reflects an injury to competition." (quoting *Biovail Corp.
Intern. v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 772 (D.N.J. 1999))).

[11] *See, e.g.*, *Andrx Pharm., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 816 (D.C. Cir.
2001) (finding proper plaintiff status where "[plaintiff's] alleged injury is not derived from or
measured by the injury to consumers; instead it is measured by the loss of profits it would have
otherwise made had it not been excluded from the market[;] . . . [it] does not seek damages for
profits it would have earned at higher, less competitive prices. . . . [but rather] [i]t seeks damages
to compensate for profits it would have earned by competing in the market."); *compare*

nor measured by injuries consumers may have suffered[,]" are distinct from the antitrust injuries recoverable by other potential plaintiffs, such as any supracompetitive prices paid by patients. *Biovail*, 256 F.3d at 817 (discussing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). The Court therefore finds that Plaintiffs have antitrust standing and are proper plaintiffs, and that summary judgment against them on this basis is not proper.

AANMA next argues that Plaintiffs' claims against it are precluded under the *Noerr-Pennington* doctrine, which immunizes from liability conduct designed to influence government action. Docket nos. 329 at 23-24 (citing *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989); 386 at 22. The same arguments were raised at an earlier stage of this litigation by then-Defendant AAAAI, and the Court rejected them in light of the allegations and evidence that Defendants "induced primary care physicians not to practice allergy care on their own or with the support of UAS" and "induced third-party payors to withhold payment to primary care physicians practicing allergy care and to withhold payment to UAS." Docket no. 116 at 15-16, 16 n.18 (noting that "[w]hile advocacy may be legal if conducted by an individual, private development of anti-competitive standards by an industry group and advocacy of those standards are actionable under the Sherman Act."; distinguishing *Schachar*, in which the defendant "did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment."). The Court likewise finds at this stage that summary judgment is not appropriate on this basis in light of the evidence showing that the Defendants' conduct was beyond the reach of the *Noerr-Pennington* exemption because the

---

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542 (1983) (finding lack of proper plaintiff status where claim of antitrust injury was "highly speculative" because "[t]here is . . . no allegation that any collective bargaining agreement was terminated as a result of the coercion, no allegation that the aggregate share of the contracting market controlled by union firms has diminished, no allegation that the number of employed union members has declined, and no allegation that the Union's revenues in the form of dues or initiation fees have decreased.").

restraint on trade, far from being an incidental effect of an effort to influence government action, was Defendants' intended goal, which they pursued through the development and advocacy of anti-competitive private standards, and advocacy directed at private payors, patients, and PCPs. *See, e.g.*, docket no. 116 at 15 n.18; 134-2 at 2; *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502, 505-06 (1988) (noting that, although the challenged conduct "certainly cannot be characterized as a sham[,]" the conduct was beyond the scope of the *Noerr-Pennington* exemption because "the context and nature of [the] activity make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves.").

AANMA next argues that it is entitled to summary judgment because Plaintiffs have failed to adequately define the relevant product and geographic markets. Docket nos. 329 at 25-27; 399 at 11-16 (citing *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002) and *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997)). Specifically, AANMA argues that Plaintiffs' definition of the product market fails to account for products that are "reasonable substitutes" for allergen immunotherapy, such as "over-the-counter and prescription allergy medications, such as nasal steroids and anti-histamines, which combat the symptoms of allergic rhinitis[,]" as well "the largest group of product-providers[,]" Otolaryngologists (also known as "Ear, Nose, and Throat" doctors, or ENTs). Docket no. 329 at 26-27 (internal emphasis and quotation marks omitted). AANMA also argues that Plaintiffs' expert defined the geographic markets, based on "Core Based Statistical Areas" (CBSAs) in a manner that fails to reflect the commercial realities of allergy testing and immunotherapy because his analysis is supported only by "conversations with UAS executives, . . . a study of travel patterns for patients of dentists[,]" and his own *ipse dixit*. Docket no. 329 at 27-28.

"Whether a relevant market has been identified is usually a question of fact" but "the issue may be determined as a matter of law" in some circumstances, such as where "the plaintiff

fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor[.]" *Apani*, 300 F.3d at 628.

The Court agrees with Plaintiffs that their analysis of the relevant market has sufficiently considered the "reasonable substitute" products identified by AANMA, and that they have presented sufficient evidence regarding the reasonable interchangeability and cross-elasticity of demand to permit a finding that the relevant product market does not include over-the-counter and prescription allergy medications. *See, e.g.*, docket no. 328-1 at 10-11 (distinguishing the uses and qualities of allergen immunotherapy and other methods of treating seasonal allergies, such as nasal steroids and anti-histamines); *Yoder Bros.*, 537 F.2d at 1366 ("if the differences in the two products' price, use, and qualities become too great, then they can no longer be said to be reasonably interchangeable."). The Court also agrees with Plaintiffs that their definition of the product market does not fail for insufficient consideration of the role of ENTs within the product market, since that claimed deficiency goes not to the interchangeability between allergen testing and immunotherapy with some other product, but to the respective market shares of the parties as providers of those products. Docket no. 329 at 27 (complaining that "Plaintiffs admit that ENTs are a source of allergy testing and immunotherapy[,] [y]et their expert never accounts for their presence in the market[.]").

For similar reasons, the Court finds that Plaintiffs' geographic market definition is grounded in the analysis of Plaintiffs' expert and supported by sufficient evidence to withstand summary judgment. While AANMA may argue against the analysis of Plaintiffs' expert regarding where consumers can practically go for services—by arguing, for instance, that material distinctions exist between the allergen immunotherapy patients at issue in this case and

the patients studied in the research relied upon by Dr. House—this is not a case in which the plaintiff made no showing on this subject. *Compare, e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002) (summary judgment where plaintiff's expert failed to make "a showing of where people could practicably go for" the services at issue); *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995) (summary judgment where plaintiff "relied on price differences between . . . stores in different towns" and "testimony from class members that most of their business came from in-town customers" but where "[t]he record is virtually silent . . . on the issue of where the consumer could 'practicably turn for alternative sources' of gas."); and docket nos. 328-1 at 17-18; 328-2 at 13-14, 15-16 (analysis concluding that "consumers of ambulatory services, such as allergy testing and immunotherapy, are willing to travel locally to obtain service" but are "unlikely to shop outside the bounds of" a CBSA). The Court therefore declines to grant summary judgment on the basis of Plaintiffs' definitions of the relevant markets.

AANMA next argues that it is entitled to summary judgment because Plaintiffs have failed to produce evidence showing that AANMA has sufficient market power to violate either Section 1 or 2 of the Sherman Act. AANMA argues that "i[t] is undisputed—and undisputable—that [it] possesses no market power" because AANMA does not manufacture or supply any allergy products or services and therefore has no share of the relevant markets. Docket nos. 329 at 31-32 & n.106; 329-2 at 34. "Market power is a necessary ingredient in every case under the Rule of Reason[,]" but the existence of market power cannot be reduced to a determination of a firm's market share. *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986). Firms that have a large market share may nonetheless lack market power because they lack "the ability to cut back the market's total output and so raise price[,]" such as where low

barriers to market entry ensure that outside competitors "are able to enter, expand, or import sufficiently quickly [to] . . . counteract a reduction in output by existing firms." *Ball Mem'l Hosp.*, 784 F.2d at 1335. Likewise, even firms that lack market share may exert market power when they—either alone or in coordination with other firms—exhibit the "ability to exclude other sources of supply." *Ball Mem'l Hosp.*, 784 F.2d at 1336 ("Indeed it is usually best to derive market share from ability to exclude other sources of supply."); *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001).

The Court agrees with Plaintiffs that they have produced sufficient evidence that AANMA, in coordination with its alleged co-conspirators, exerted market power. Plaintiffs point to evidence that "Phadia alone controls more than 50% of the allergy testing in 323 geographic markets" and that allergists—the majority of whom are members of AANMA's alleged co-conspirator organizations, AAAAI, ACAAI, and JCAAI—are the dominant providers of allergen immunotherapy and "collectively control at least 72% of the allergy testing market." Docket no. 328-1 at 7, 20. More pertinent, Plaintiffs have produced evidence that would enable a finding that AANMA and its alleged co-conspirators collaborated to drive UAS from the market and erect barriers to entry against other UAS-like firms, such as by coercing third-party payors into boycotting UAS and UAS- and AAAPC-affiliated physicians, and by advocating medically unjustified practice standards that excluded UAS and would have precluded the entry of other similar firms into the market. *See, e.g.*, Docket no. 304-2 at 222-35; *cf. California Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999) (ultimately, the "essential inquiry" is "whether or not the challenged restraint enhances competition."); *Spectators*, 253 F.3d at 225 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

Similarly, the Court declines to grant summary judgment on the basis of AANMA's argument that Plaintiffs have failed to produce evidence of a restraint of trade. AANMA argues

that AANMA's "introduction of information to the marketplace . . . is fundamentally procompetitive" and that the changes to insurance coverage that excluded UAS from reimbursement are beneficial to the market and to consumers. Docket no. 329 at 32-33. AANMA also argues that this "introduction of information" is incapable of violating the antitrust laws. *Id.* at 34 (discussing *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999)). As the Court has recognized above, however, the voluminous record in this case could support a finding either of procompetitive effects of Defendants' conduct—that Defendants and payors curtailed the proliferation of what they characterize as UAS's "flawed and wasteful business model[,]" docket no. 383 at 8—or of anticompetitive intent and effect. Resolving the parties' contrary claims about this evidence requires the resolution of questions of fact that makes summary judgment inappropriate, since it is the jury in this case who must "weigh[] all of the circumstances . . . [to] decid[e] whether" Defendants' conduct "impos[ed] an unreasonable restraint on competition." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 549 (5th Cir. 2009). The basis for Plaintiffs' claims against AANMA is not limited to "introduction of information" into the marketplace, but their alleged anticompetitive conduct—conduct which, in factually analogous cases, other courts have observed is a potential basis for antitrust liability. *See, e.g.*, *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435, 443 (E.D. Pa. 1996) (discussing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988)), *aff'd*, 107 F.3d 1026 (3d Cir. 1997); *compare Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989) (statement by ophthalmologist association that surgical procedure was "experimental" and should be "approach[ed] . . . with caution" did not violate Section 1 of the Sherman Act where the association, *inter alia*, "did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; [and] . . . did not

attempt to coordinate activities with" hospitals, insurers, state medical societies, licensing boards, or "any other persons who might be able to govern the performance of the surgery.").

AANMA further argues that Plaintiffs have failed to show that the alleged conspiracy caused a restraint of trade because they have not "introduce[d] evidence that tends to exclude the possibility that insurers acted independently." Docket no. 329 at 35-36 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). But this is not a case in which Plaintiffs contend that an antitrust conspiracy should be inferred from the bare fact of parallel behavior. Rather, Plaintiffs have produced evidence that tends to exclude the possibility of independent action and provides a "context" sufficient to show the existence of a Section 1 conspiracy by showing that payors' reimbursement changes were preceded by the coordinated effort of Defendants to drive UAS from the market, in part by soliciting those very reimbursement changes. *See, e.g.*, docket nos. 325-2 at 14, 39, 115, 253, 255; 325-3; 352-4; 352-5.

AANMA further argues that Plaintiffs have failed to produce evidence of specific intent to create a monopoly, which is necessary for their Section 2 monopolization claim. Docket no. 329 at 35-37. However, since the Court has already found that the record would permit a finding that AANMA engaged in anticompetitive practices, and the specific intent required under Section 2 "may be inferred by anticompetitive practices[,]"[12] the Court declines to grant summary judgment against Plaintiffs on their Section 2 claim on this basis.

---

[12] *Great W. Directories, Inc. v. Sw. Bell Tel. Co.*, 63 F.3d 1378, 1385 (5th Cir. 1995), *opinion withdrawn and superseded in part*, 74 F.3d 613 (5th Cir. 1996), *vacated pursuant to settlement* (Aug. 21, 1996); *see also, e.g., Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1130 (10th Cir. 2014); *California Computer Products, Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 736 (9th Cir. 1979) ("'Direct evidence' of specific intent to control prices or destroy competition . . . is not always necessary when the attempt claim is founded upon a substantial claim of restraint of trade i.e., a § 1 violation. In these circumstances the requisite specific intent may be inferred." (internal quotation marks omitted)).

AANMA argues that Plaintiffs have failed to produce evidence of price fixing. Docket no. 329 at 36. Plaintiffs have claimed that AANMA and its alleged co-conspirators "attempted to fix prices for allergy services . . . through limiting the amount of units that would be reimbursed for skin prick testing, . . . limiting skin prick testing to board certified allergists only, [and] 'imped[ing] the ordinary give and take of the market place, . . . substantially depriv[ing] the consumer of the ability to utilize and compare prices in selecting' services." Docket no. 325 at 24 (quoting *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000)); *see also* docket no. 235 at ¶¶ 173-75. The Court has declined to apply a *per se* analysis to Plaintiffs' price fixing allegations, noting that Plaintiffs had alleged a vertical price fixing claim since they alleged price-fixing between groups who are not competitors: allergists and third-party payors.[13] *See supra*; docket no. 82 at 8. AANMA now argues that the Court should summarily deny Plaintiffs' price-fixing claims because "there is no evidence that insurance companies set rates based on their entering an agreement with any of the defendants to do so" but there is "ample evidence . . . that the insurers acted independently." Docket no. 329 at 36. However, as discussed above, Plaintiffs have produced evidence that Defendants carried out a coordinated effort to lobby payors to change their reimbursement policies, and that evidence would permit a finding that, notwithstanding their subsequent claims to the contrary, the payors acted at the behest of Defendants. *Compare Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("program of buying surplus gasoline on the spot market in order to prevent prices from falling sharply was unlawful, even though there was no direct agreement on the actual prices to be

---

[13] The Court has also noted that Plaintiffs' claims that Defendants engaged in price fixing by "attempt[ing] to eliminate and restrict Plaintiffs from the market for allergy testing and allergen immunotherapy by persuading, coercing, and encouraging third party payors to reduce or eliminate reimbursement of primary care physicians in contract with UAS" are "better classified as boycott claims." *See supra*; *see also* docket no. 82 at 8.

maintained" (summarizing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)). This precludes summary judgment on Plaintiffs' price-fixing claims.

Since the Court has found that summary judgment as to Plaintiffs' Sherman Act claims is not appropriate, the Court also finds that summary judgment is not warranted as to Plaintiffs' state-law civil conspiracy claims. Docket no. 329 at 38-39. And, since Plaintiffs' tortious interference claims are premised on the alleged conduct of AANMA's alleged co-conspirator, Phadia—allegations analyzed in greater depth below—the Court declines at this juncture to grant summary judgment in favor of AANMA on those claims. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex. 1979) ("Once a conspiracy is proven, each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination." (internal quotation marks omitted)).

The Court therefore concludes that Defendant AANMA's Motion for Summary Judgment (docket no. 329) should be denied.

### 5. Defendant Phadia's Motion for Summary Judgment (docket no. 326)

Phadia has also moved for summary judgment on Plaintiffs' Sherman Act claims and state-law tortious interference claims.[14] Docket no. 326. Many of Phadia's summary judgment arguments echo those raised by AANMA, and are therefore denied in large part for the reasons explained above. For example, Phadia, like AANMA, argues that summary judgment against Plaintiffs' antitrust claims is appropriate because Plaintiffs have not produced evidence demonstrating an injury to the market rather than injury to their business. Docket no. 326 at 18. As above, the Court finds that summary judgment on this basis is not appropriate in light of Plaintiffs' evidence showing that Defendants collaborated with the intent of driving UAS from

---

[14] Phadia's motion to strike evidence filed in support of Plaintiffs' response to Phadia's summary judgment motion (docket nos. 366, 396) was addressed by the Court in an earlier Order. Docket no. 419 at 11-14.

the market, and because, "[i]rrespective of consumer injury," the target of such an effort "suffers

a distinct injury if it is prevented from selling its product" and "has clear standing to challenge

the conduct of rival(s) that is illegal precisely because it tends to exclude competitors from the

market." *Andrx Pharm., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 816 (D.C. Cir. 2001); *see*

*supra* note 10 and accompanying text. Additionally, in its response to Phadia's motion, Plaintiffs

note that they have also produced evidence that the removal of UAS caused market damages in

the form of increased costs and wait time for consumers seeking treatment, reduced output, and

increased difficulty in finding a physician. Docket nos. 390 at 30; 390-16 at 46, 128, 130-33,

134-39. Phadia contends that this evidence is immaterial absent an additional showing of barriers

to market entry by other UAS-like firms. Docket no. 391 at 6-9. However, the core of Plaintiffs'

claims, for which they have provided sufficient evidence to withstand summary judgment, is

that Defendants conspired to erect and maintain exactly such barriers, including by coercing

PCPs and payors not to do business with UAS or other similar firms. *See, e.g.*, docket no. 390-16

at 205-06. And although Phadia points to evidence that the number of firms providing allergy

testing and immunotherapy services in PCP practice settings increased from approximately two

in 2009 to twenty or twenty-five in 2016, and of UAS's intended expansion to new geographic

markets, docket no. 326-7 at 3, 7, this evidence does not compel summary judgment both

because Plaintiffs have provided contrary evidence and because Phadia's evidence encompasses

the time periods both before and during Defendants' alleged effort to drive UAS and UAS-like

firms from the market. *Compare Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119

n.15 (1986) ("a court should focus on whether significant entry barriers would exist after the

merged firm had eliminated some of its rivals, because at that point the remaining firms would

begin to charge supracompetitive prices, and the barriers that existed during competitive

conditions might well prove insignificant.").

Phadia next argues that Plaintiffs' Section 2 claims of monopolization and attempted

monopolization cannot survive summary judgment because Plaintiffs have failed to produce

evidence showing that Phadia engaged in willful or exclusionary conduct within the relevant

geographic markets. Docket no. 329 at 23 (citing *Abraham & Veneklasen Joint Venture v. Am.*

*Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015)). Phadia argues that Plaintiffs have

failed to show that the dissemination of the OIG opinion had more than a *de minimis* effect on

competition, and have failed to produce evidence establishing a link between Phadia's alleged

monopolistic conduct and any specific geographic market.[15] Docket no. 326 at 23-29. However,

Plaintiffs' allegations and evidence of monopolistic conduct is not limited to the dissemination of

the OIG opinion. Plaintiffs have produced evidence showing that Phadia undertook a coordinated

effort to disseminate damaging information to PCPs and payors regarding the patient safety,

fraudulent billing, and liability risks supposedly linked with UAS's business model. These

efforts included, but were not limited to, publicizing the OIG opinion, and Plaintiffs have

produced evidence indicating that at least some within Phadia viewed the information they

disseminated as both material and successful in inducing reliance. *See, e.g.*, docket no. 390-6 at

21-22. The requirements that disparaging statements be material, likely to induce reasonable

reliance, and not susceptible to neutralization or offset reflect a recognition that "most buyers

recognize disparagement as non-objective and highly biased." *Duty Free Americas, Inc. v. Estee*

---

[15] As Phadia acknowledges in its motion, the *de minimis* presumption has been applied in several circuits and by several district courts in Texas, but it has not been adopted by the Fifth Circuit. *See, e.g.*, *L-3 Communications Integrated Sys., L.P. v. Lockheed Martin Corp.*, CIVA 3 07-CV-0341-B, 2008 WL 4391020, at *7 (N.D. Tex. Sept. 29, 2008) (reasoning that six-factor *de minimis* test applied by several district courts in Texas "is relatively consistent with the Fifth's Circuit fundamental view of the nature of exclusionary conduct sufficient to support a Sherman Act claim"; that such conduct "is of the type that tends to impair the opportunities of rivals based on something other than competition on the merits[.]" (citing *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 481 (5th Cir. 2000))). Since the Court finds that this *de minimis* test would not require an award of summary judgment for Phadia, the Court need not determine whether it is binding in this case.

*Lauder Companies, Inc.*, 797 F.3d 1248, 1269 (11th Cir. 2015) (internal quotation marks omitted). In this case, however, Plaintiffs have produced evidence that Phadia's alleged co-conspirators recognized and sought to avoid this very problem by channeling much of their anti-RPA messaging through AANMA and leveraging AANMA's reputation as a patient advocate. *See, e.g.*, docket nos. 390-4 at 53-54; 390-5 at 41. Moreover, the exclusionary effects of this alleged campaign were not limited to UAS, but targeted any firm that posed a threat to Phadia's share of the allergy testing market by partnering with PCPs to provide allergy testing in a primary care setting—conduct which Plaintiffs have made a sufficient summary judgment showing was harmful not merely to Plaintiffs but to competition within the market. *Cf. Duty Free Americas, Inc.*, 797 F.3d at 1268 (*de minimis* presumption is applied because "false statements about a single competitor often do not meet the requisite standard of generating harm to competition . . . they do not give rise to a federal antitrust claim without factual allegations specifically addressing how these practices have harmed competition." (internal quotation marks omitted)). Ultimately, the Court finds that material questions of fact persist regarding whether the efforts of Phadia and its alleged co-conspirators raised genuine concerns about the safety, efficacy, and legality of UAS's business model, or "had recourse to methods beyond competition on the merits." *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 523 (5th Cir. 1999); *see also Taylor Pub. Co.*, 216 F.3d at 481 (test of exclusionary behavior is whether it "not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."). As discussed above, the Court has already found that Plaintiffs have made a sufficient showing regarding the relevant product and geographic markets, as well as sufficient evidence of injury to competition in the relevant markets, to survive summary judgment. Plaintiffs have also produced evidence regarding specific acts of anticompetitive conduct that Phadia carried out impacting particular

CBSAs. *See, e.g.*, docket no. 390-13 at 26, 60, 110. The Court is satisfied that this evidence is sufficient to permit a finding that the monopolistic conduct occurred "within a defined relevant market." *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976). The Court therefore concludes that summary judgment for Phadia is not warranted on Plaintiffs' Section 2 claims.

Phadia argues that summary judgment should be granted in Phadia's favor on Plaintiffs' conspiracy claims because Phadia's conduct did not rise to the level of an illegal group boycott and because there is no evidence that Phadia conspired to restrain trade or monopolize. Docket no. 326 at 29. Phadia first argues that there is no evidence that Defendants directly denied services to a competitor or persuaded or coerced suppliers or customers to "deny relationships the competitors need in the competitive struggle." Docket no. 326 at 30 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)). The Court has already observed that the record contains evidence that Defendants undertook a campaign of contacting payors to deter them from providing reimbursement to UAS and similar firms, and the record also contains evidence that Phadia specifically contacted payors, PCPs, and reference laboratories and urged them to deny reimbursement and refuse to do business with UAS. *See, e.g.*, docket nos. 390 at 25 n.104; 390-2 at 21; 390-14 at 80; 390-5 at 41; 390-9 at 32, 38, 69; 390-10 at 1, 12, 36-38, 48, 50, 73-82; 390-11 at 45, 52; 390-14 at 71-74. Phadia argues that evidence showing Defendants' efforts to persuade payors to deny reimbursement to UAS and UAS-affiliated physicians falls short of the "persuasion" that is actionable under a Section 1 group boycott claim. Docket no. 326 at 22 & n.55 (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001)). However, the Court does not agree that Plaintiffs' evidence falls short of this standard as a matter of law, given the evidence that Phadias' and its alleged co-conspirators' appeals to deny business to UAS included allegedly

misleading claims that UAS's business model was dangerous to patients, that its contracts with physicians violated federal law, that it engaged in fraudulent billing, and that it placed PCPs at risk of liability. Phadia also argues that Plaintiffs' group boycott claims fail as a matter of law because Plaintiffs lack evidence of an agreement among Defendants. Docket no. 326 at 33-35 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). As explained above, the Court has already found that Plaintiffs have produced evidence that "tends to exclude the possibility that insurers acted independently[,]" *Matsushita*, 475 U.S. at 588, since evidence shows that payors' reimbursement changes were preceded by the coordinated effort of Defendants to drive UAS from the market, in part by soliciting those very reimbursement changes, *see supra*, as well as evidence showing the coordination among current and former Defendants, including Phadia, to combat UAS both through payor contacts and other means. *See, e.g.*, docket no. 390-2 at 22, 390-4 at 43; 390-5 at 15, 20-21, 44-66, 102-04. The Court finds that this evidence is sufficient to permit a finding that Defendants acted pursuant to an agreement to eliminate what they viewed as a shared competitive threat.

Finally, Phadia argues that it is entitled to summary judgment on Plaintiffs' tortious interference claims because there is no evidence of a causal link between Defendants' alleged conduct and Plaintiffs' alleged injury. Docket no. 326 at 37-39. Phadia's argument focuses on the regression analysis prepared by Plaintiffs' expert Dr. Donald House, which analyzes the "average decrease in monthly billings" among providers who appeared on a list of UAS-contracted physicians obtained by Phadia and the "lost profits resulting from the average monthly decline in billings allegedly caused by contact from Phadia representatives." Docket no. 328-1 at 103. Phadia argues that Dr. House's analysis purports to show a correlation between a physician's presence on the list and decreased billings, but that it cannot show that Phadia actually contacted the physicians who appeared on the list, cannot show that any decrease in

billings was caused by any such contact, and cannot distinguish between decreased billings caused by conduct that would be actionable in a tortious interference claim and that which would not. Docket no. 326 at 37-39. Phadia therefore argues that Plaintiffs' tortious interference claims should be dismissed because Plaintiffs lack evidence of both causation and damages. Docket nos. 329 at 39; 391 at 13-15.

The Court does not agree. Under Texas law, a plaintiff may recover for tortious interference from a defendant who made "fraudulent statements about the plaintiff to a third person" *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 725 & n.73, 726 (Tex. 2001) (collecting cases in which tortious interference plaintiffs had recovered where the "defendant made false statements concerning the plaintiff's business"). In order to be fraudulent, "a statement must be material and false, the speaker must have known it was false or acted recklessly without regard to its falsity, the speaker must have intended that the statement be acted on, and hearer must have relied on it." *Wal-Mart*, 52 S.W.3d at 727. Plaintiffs have produced evidence that Phadia participated in an effort to drive UAS from the market, in part by communicating claims about UAS's business model to the PCPs who had or were considering entering into contractual arrangements with UAS. As part of this effort, Phadia trained its sales representatives to assert claims to physicians regarding the danger of legal and malpractice concerns, audits, claims denials, and recoupments and specifically to use the OIG opinion to "create the perception" that UAS's allocation of revenues between itself and PCPs violated federal law. The truth or falsity of these claims, as well as the question of whether Defendants' conduct violated state and federal antitrust laws, remains in dispute. Plaintiffs have produced evidence that a Phadia district manager, Tom Wajda, distributed a list of UAS accounts to his sales team, instructing them that the accounts listed "will be good targets for us to approach with your new strategy of Immunotherapy." Docket no. 390-9 at 32. Plaintiffs' evidence also includes

internal Phadia communications in which they discuss the success in dissuading physicians from contracting with UAS. *See, e.g.*, docket nos. 390-6 at 21; 390-8 at 1-21; 390-10 at 90-105; 390-11 at 1-57. In one case, a sales representative reports to Wajda that a physician who had considered contracting with UAS decided not to proceed based on information provided to them by Phadia that Plaintiffs allege to be fraudulent. Docket no. 390-8 at 1. In response to the sales representative's report that "[b]ased on the information that you provided me, I think I prevented a clinic from signing on with UA[S][,]" Wajda responds by congratulating the representative and encouraging his team to "put these guys out of business!" *Id.*

This evidence, coupled with Dr. House's analysis of the correlation between the presence of physicians on the UAS account list of "good targets" for Phadia's effort at neutralizing UAS as a competitive threat is not legally insufficient because, against this evidentiary background, a reasonable juror could find that Phadia's interference was the proximate cause of the injuries described in Dr. House's regression analysis. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (tortious interference claim requires showing that "the interference proximately caused the plaintiff injury"). The required showing of proximate cause "cannot be established by mere conjecture, guess, or speculation"; rather, to be sufficient, the evidence must "justify the conclusion that such injury was the natural and probable result" of the defendant's conduct. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)). Plaintiffs' evidence of causation goes beyond speculation or guess. Rather, it permits a finding that Plaintiffs' damages were the natural and probable result of the efforts undertaken by Phadia and its alleged co-conspirators to persuade physicians to limit or terminate business relationships

with UAS.[16] Indeed, such a finding would be consistent with the beliefs of the Phadia personnel who carried out that effort, who, in Plaintiffs' evidence, make clear that they believed the purpose and effect of their outreach to PCPs was to place UAS at a competitive disadvantage.

The Court therefore concludes that Defendant Phadia's Motion for Summary Judgment (docket no. 326) should be denied.

---

[16] *See, e.g., Kand Med., Inc. v. Freund Med. Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992) (in analysis of Ohio tortious interference claim based in Section 766 of the Restatement (Second) of Torts, agreeing with district court reasoning that causation element could be inferred from defendant's negotiations with manufacturer); *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 625 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011); *Chaves v. Johnson*, 335 S.E.2d 97, 104 (Va. 1985).

## Conclusion and Order

It is therefore ORDERED that:

UAS's Motion for Summary Judgment on the Counterclaims Asserted by Phadia and TFS (docket no. 324) is GRANTED;

AANMA's Motion to Strike Plaintiffs' Evidence in Support of their Motion for Partial Summary Judgment (docket no. 338) is DENIED;

AANMA's Motion to Strike Plaintiffs' Supplemental Exhibits to their Response to Defendants' motion to strike (docket no. 410) is DENIED;

AANMA's Motion for Leave to File a Surreply, or, Alternatively, to Strike Plaintiffs' New Evidence and Arguments Raised in Reply (docket no. 408) is GRANTED as to the request for leave file a surreply and DENIED as to the request to strike evidence and arguments;

Plaintiffs' Motion for Partial Summary Judgment Concerning *Per Se* Violation of Section 1 of the Sherman Act (docket no. 325) is DENIED;

Defendant AANMA's Motion to Strike Plaintiffs' Evidence In Support of Their Response to Defendants' Motion for Summary Judgment (docket nos. 371, 400) is DENIED;

Defendant AANMA's Motion for Summary Judgment (docket no. 329) is DENIED; and

Defendant Phadia's Motion for Summary Judgment (docket nos. 310, 326) is DENIED.

SIGNED this ____ 29 ____ day of September, 2017.

ORLANDO L. GARCIA
CHIEF UNITED STATES DISTRICT JUDGE