1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3   UNITED BIOLOGIES, LLC,          )
    ACADEMY OF ALLERGY & ASTHMA )
4   IN PRIMARY CARE,               )
                                   )
5        Plaintiffs,               )
                                   )
6            vs.                   )   Docket No. SA-14-CV-35-RCL
                                   )
7   ALLERGY AND ASTHMA NETWORK/ )   San Antonio, Texas
    MOTHERS OF ASTHMATICS, INC.,)   March 9, 2018
8   AND TONYA WINDERS,             )
                                   )
9        Defendants.               )
    _____)

10                      TRANSCRIPT OF TRIAL
11        BEFORE THE HONORABLE ROYCE C. LAMBERTH
             SENIOR UNITED STATES DISTRICT JUDGE
12                      AND A JURY
                        VOLUME 5
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFFS:
15
        PILLSBURY WINTHROP SHAW PITTMAN
16      By:  Casey Low, Esquire
        By:  Elizabeth Marcum, Esquire
17      By:  Dillon Ferguson, Esquire
        By:  Benjamin Bernell, Esquire
18      401 Congress Avenue, Suite 1700
        Austin, TX  78701-3797
19
    FOR THE DEFENDANTS:
20
        CARTER SCHOLER ARNETT HAMADA & MOCKLER, PLLC
21      By:  E. Leon Carter, Esquire
        By:  Linda Stahl, Esquire
22      By:  Courtney Perez, Esquire
        By:  Joshua Bennett, Esquire
23      By:  Stacey Cho Hernandez, Esquire
        8150 N. Central Expressway, Suite 500
24      Dallas, TX  75206

25

```
 1        PRICHARD YOUNG, LLP
          By:  David Prichard, Esquire
 2        10101 Reunion Place Blvd., Suite 600
          San Antonio, TX  78216
 3
     COURT REPORTERS:
 4
          Chris Poage
 5        Gigi Simcox
          Karl H. Myers
 6        United States Court Reporters
          655 East Cesar E. Chavez Blvd.
 7        San Antonio, TX  78206
          Telephone:  (210) 244-5036
 8
     Proceedings reported by stenotype, transcript produced by
 9   computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Open court.)

 2              THE COURT:  Mr. Wallen can resume the stand.

 3              MS. PEREZ:  Your Honor, we need to update the juror

 4    notebooks of the witnesses who will be called today, and we

 5    have not done so because we were waiting on your ruling on Mr.

 6    McAnaney.  We didn't want to put him in there and then --

 7              THE COURT:  You can put him in.

 8              MS. PEREZ:  Okay.  So we will need just one minute

 9    to update those books so the jurors can have them with

10    Mr. Wallen's testimony.

11              THE COURT:  Okay.  Well, you can do it later because

12    the jury is coming.

13              MS. PEREZ:  Okay.  Yes, sir.

14              (Jury enters courtroom.)

15              THE COURT:  You may be seated.

16              Good morning, ladies and gentlemen.

17              Mr. Wallen can resume the stand.

18              I will remind you, you are still under oath.  Come

19    forward.

20                          *-*-*-*-*-*-*-*

21                        CROSS EXAMINATION

22    BY MS. PEREZ:

23    Q.  Good morning, Mr. Wallen.

24    A.  Good morning.

25    Q.  My name is Courtney Perez.  As you recall, we met in the
```

```
1   hallway, right?
2   A.  Yes.
3   Q.  And you and I have never spoken prior to when we met in
4   the hallway during this trial?
5   A.  Right.
6   Q.  We have never spoken on the phone?
7   A.  Correct.
8   Q.  Okay.  Mr. Wallen, you are here in response to a subpoena
9   today; is that correct?
10  A.  Right.
11  Q.  And it is a subpoena that UAS issued for you to testify at
12  this trial, right?
13  A.  Correct.
14  Q.  And you didn't volunteer to come here today, did you?
15  A.  Correct.
16  Q.  You didn't really want to be here today, did you?
17  A.  It's not a fun thing.
18  Q.  Not a fun thing.  Has anyone from UAS or Mr. Low's law
19  firm tried to contact you before your testimony today?
20  A.  We had a brief discussion.
21  Q.  You had a discussion with Mr. Low?
22  A.  Yes.
23  Q.  Mr. Wallen, you are a former defendant in this case,
24  correct?
25  A.  Correct.
```

```
1    Q.  And you are no longer a defendant in this case, right?
2    A.  Correct.
3    Q.  And are you here on a condition of you being dismissed
4    from this lawsuit to testify on behalf of UAS?
5    A.  Yes.
6    Q.  Now, you know that the Texas Allergy Society was sued,
7    right?
8    A.  I do.
9    Q.  And you learned that in your capacity as a consultant for
10   Mothers, correct?
11   A.  I believe it was in -- told me about the lawsuit.
12   Q.  During the 2014 time frame?
13   A.  Possibly.
14   Q.  Okay.  And, Mr. Wallen, when the Texas Allergy Society was
15   sued by UAS, you were nervous also about being sued, weren't
16   you?
17   A.  Yes.
18   Q.  And the Texas Allergy Society, they were also very
19   critical of the RPA industry, weren't they?
20   A.  Yes.
21   Q.  And the National Allergist Society, they were also
22   critical of UAS and the RPA industry, weren't they?
23   A.  Yes.  I think it was more the entire industry.
24   Q.  And UAS then sued all of the national allergist societies
25   who were vocally and publicly critical of them, correct?
```

1    A.  Correct.

2    Q.  And then UAS also sued Phadia, who was also vocally

3    critical about them and the RPA industry, correct?

4    A.  Correct.

5    Q.  And then UAS sued Mothers, who was vocally and publicly

6    critical about the RPA industry, correct?

7    A.  Correct.

8    Q.  And then UAS sued you individually, correct?

9    A.  Correct.

10   Q.  With the same $200 million they are seeking in this trial,

11   correct?

12   A.  I have no idea, but there was money involved.

13   Q.  And you yourself were also critical of UAS and what you

14   had learned in their practices in the RPA industry, correct?

15   A.  It was the entire industry of RPA.

16   Q.  And what you also learned when you investigated the entire

17   industry of RPA were some practices that were associated with

18   UAS; isn't that a fact?

19   A.  I don't know of any practices that I personally

20   investigated that had anything to do with UAS.

21   Q.  Well, you had conversations with Mr. Strauss about UAS's

22   practices, right?

23   A.  Correct.  But when I tried to verify that, I didn't find

24   any concrete information.

25   Q.  Now, I want you to think back to 2011, when you first

```
1    started looking into the RPA industry and talking to Mr.

2    Strauss about RPA and some of the things that he had learned

3    about UAS.  Okay?  And think back through today.

4             Is there anyone, any allergy society, any nonprofit,

5    any individual physician who you know of who is publicly

6    critical of UAS who has not been sued by UAS?

7    A.  That's a tough question to answer but I -- I can't think

8    of anyone.

9    Q.  You would agree with me, Mr. Wallen, that that's the price

10   of speaking out against UAS, isn't it?

11            MR. FERGUSON:  Your Honor, may we approach?

12            THE COURT:  Yes.

13            (Bench conference, as follows:)

14            MR. FERGUSON:  Your Honor, we have a motion in

15   limine about the litigious conduct of our client.  My

16   understanding is that has been granted.

17            THE COURT:  I will sustain that question there.

18   That is not -- that is a conclusion.

19            MS. PEREZ:  Yes, sir, Your Honor.

20            THE COURT:  The other questions are all right.

21            (End of bench conference.)

22   BY MS. PEREZ:

23   Q.  Mr. Wallen, you recall talking about, on direct

24   examination yesterday, about the OIG opinion at issue in this

25   case, correct?
```

```
1    A.  Correct.
2    Q.  And the OIG opinion that you talked about on direct, that
3    was signed by you, correct?
4    A.  The request?
5    Q.  I am sorry.  The request for the OIG opinion, thank you,
6    that was signed by you?
7    A.  Correct.
8    Q.  And you did so on instruction from your boss at the time?
9    A.  Correct.
10   Q.  You didn't actually draft the request for the OIG opinion,
11   did you?
12   A.  I did not.
13   Q.  And you didn't actually prepare it in terms of the
14   research and background and come up with that request
15   yourself, did you?
16   A.  I did not.
17   Q.  You did what your boss told you to do?
18   A.  I did.
19   Q.  And the entity that Patrick Strauss used to request that
20   OIG opinion, Universal Allergy Labs, Ms. Winders did not
21   instruct you to form that entity, did she?
22   A.  No.
23   Q.  And Mothers did not instruct you to form that entity?
24   A.  No.
25   Q.  Patrick Strauss is the one who requested that you form
```

```
 1    that entity, correct?

 2    A.   Correct.

 3    Q.   And as far as you know, Tonya Winders has never met or

 4    spoken with Patrick Strauss?

 5    A.   I can't confirm that they ever have spoken.

 6    Q.   And, Mr. Wallen, you don't recall ever having told Ms.

 7    Winders about the background of the OIG opinion, do you?

 8    A.   I don't.

 9    Q.   Ms. Winders also never requested that you elicit an

10    opinion from the OIG in connection with the remote practice of

11    allergy, did she?

12    A.   No.

13    Q.   And Mothers never requested that either?

14    A.   No.

15    Q.   And isn't it a fact that at the time you requested the OIG

16    opinion in 2011, you had never met Ms. Winders?

17    A.   Correct.

18    Q.   And, in fact, you didn't meet Ms. Winders until you

19    attended Allergy and Asthma Day on Capitol Hill sponsored by

20    Mothers, right?

21    A.   Correct.

22    Q.   And that was in 2013?

23    A.   Yes.

24    Q.   Two years after you requested the OIG opinion?

25    A.   Correct.
```

1  Q.  And you had never spoken with her before 2013 either, had

2  you?

3  A.  Correct.

4  Q.  And you didn't begin doing consulting work with Mothers

5  until 2014?

6  A.  Correct.

7  Q.  Three years after you requested the OIG opinion?

8  A.  Correct.

9  Q.  And so it is false, then, to suggest that Ms. Winders had

10  anything to do with that OIG opinion, isn't it?

11  A.  Correct.

12  Q.  And it is also false to suggest that Mothers had anything

13  to do with that OIG opinion, isn't it?

14  A.  Correct.

15  Q.  That being said, the OIG opinion itself is publicly

16  available, correct?

17  A.  Correct.

18  Q.  Anybody with access to the Internet can pull it up, except

19  for the jury, can pull it up and see the OIG opinion?

20  A.  Correct.

21  Q.  Okay.  And anyone -- in other words, there is nothing

22  secret about the OIG opinion?

23  A.  Correct.

24  Q.  And to your knowledge, the OIG opinion has never, the OIG

25  has never amended or corrected its conclusions in that opinion

1   ever?

2   A.  I know nothing about any corrections.

3   Q.  Well, that opinion, it advises against split fee

4   contracts, right?

5   A.  Yes.

6   Q.  In other words, percentage contracts, where a physician

7   gets a percentage and a vendor gets another percentage?

8   A.  Yes.

9   Q.  And you are also aware that UAS changed some of its

10  contractual structure after the OIG opinion was issued; you

11  are aware of that, right?

12  A.  I believe the entire industry went to a fee for service

13  instead of a fee splitting.

14  Q.  So would you be surprised to learn if UAS still kept that

15  split fee contract in place with some of its physicians?

16  A.  I guess I would be surprised.

17  Q.  And as you sit here today, you don't know whether Patrick

18  Strauss really had an intent to open up a competing RPA

19  company at the time he drafted that request to the OIG for

20  that opinion, correct?

21  A.  I'm sorry.  Can you restate that?

22  Q.  Sure.  As you sit here today, you can't tell the jury

23  whether or not Patrick Strauss actually intended to open up a

24  competing RPA company when he requested that opinion from the

25  OIG?

```
1    A.  At the time, he already did have a competing company.

2    What he had told me, and that's all I can go on, is that if

3    the OIG came back with a favorable opinion, then he would have

4    Universal Allergy Labs use, utilize that business model.

5    Q.  So that line that Mr. Ferguson pointed out yesterday where

6    it talked about good faith in submitting that request, do you

7    remember that?

8    A.  Yes.

9    Q.  You think Patrick Strauss had good faith when he submitted

10   that request, don't you?

11   A.  I know I did.

12   Q.  Now, you were not hired by Ms. Winders and Mothers to

13   investigate United Allergy Services specifically, were you?

14   A.  No.

15   Q.  You were not hired to put UAS out of business, were you?

16   A.  No.

17   Q.  May I have Plaintiff's 55, please.

18           MS. PEREZ:  I am sorry, Your Honor.  Hold on.  I

19   need to show it to the witness.

20           Can you pull up Plaintiff's 55?

21           I apologize, Your Honor.  I thought it was already

22   in evidence.

23   BY MS. PEREZ:

24   Q.  Let me know when you have it, Mr. Wallen.

25   A.  I do.  These are falling out, though.
```

1    Q.  Do you need some help?

2    A.  Possibly.

3    Q.  It will be up on the screen too in just a moment.

4    Mr. Wallen, do you recognize that document that is labeled

5    Plaintiff's Exhibit 55?

6    A.  I do.

7    Q.  And what is it?

8    A.  It looks like the initial consulting agreement between

9    AANMA and myself.

10   Q.  And does it have a date on the signature page?

11   A.  Yes.  It looks like May 21st of 2014.

12   Q.  And is this a true and correct copy of your consulting

13   agreement with Mothers?

14   A.  Yes.

15          MS. PEREZ:  Your Honor, we offer Plaintiff's 55,

16   which we will relabel Defendant's 485.

17          MR. FERGUSON:  No objection, Your Honor.

18          THE COURT:  Received.

19          MS. PEREZ:  Plaintiffs' 55, please.  Thank you,

20   Mr. Glass.

21   BY MS. PEREZ:

22   Q.  Okay.  The paragraph that says description of services, do

23   you see that?

24   A.  Yes.

25   Q.  And your services for Mothers were to begin May 15, 2014,

1    correct?

2    A.  Correct.

3    Q.  And it describes here in this paragraph what you were

4    hired by Mothers to do, right?

5    A.  Correct.

6    Q.  And it says you were hired to provide monthly consulting

7    to better understand and address trends in skin prick testing

8    and allergy immunotherapy.

9            Would you agree with that?

10   A.  Correct.

11   Q.  And that as part of that consulting agreement, Ms. Winders

12   asked you to give her your impression of the RPA industry in

13   general, right?

14   A.  Correct.

15   Q.  How immunotherapy is practiced, she wanted you to look

16   into that?

17   A.  Correct.

18   Q.  She wanted you to identify potentials for abuses in the

19   system?

20   A.  Correct.

21   Q.  And at this time, the 2014 time frame, there were over 100

22   entities in the RPA space?

23   A.  Correct.

24   Q.  And she did not ask you to point your investigation or

25   target any of your research at United Allergy Services, did

```
 1   she?
 2   A.  No, she did not.
 3   Q.  In fact, at any point, she didn't ask you to target any of
 4   your research at any specific RPA company, did she?
 5   A.  She did not.
 6   Q.  And she also asked you to provide your opinion as to how
 7   those abuses could be remedied in the industry for anyone who
 8   was practicing RPA, right?
 9   A.  Correct.
10   Q.  And she asked you to put together multiple documents that
11   would shine a light on the deficiencies in the RPA industry?
12   A.  As well as the way allergy is practiced by the
13   specialists, allergists and ENTs --
14   Q.  That's right.
15   A.  -- overall for the betterment of the patient.
16   Q.  That's right.  And it included not only primary physicians
17   but also allergists and ENTs?
18   A.  Correct.
19   Q.  And that is exactly what you did, isn't it, Mr. Wallen?
20   A.  It is.
21   Q.  You did, in fact, identify not just potential for abuse
22   but you uncovered actual abuses in the RPA industry?
23   A.  Suspected.
24   Q.  Suspected.  And you discovered what you suspected, at
25   least, of abuses by primary care physicians?
```

```
 1    A.  Are you referring to my trip to Houston?

 2    Q.  Yes, sir.

 3    A.  Yes.

 4    Q.  And you discovered abuses by those purporting to practice

 5    immunotherapy and allergy skin testing with little to no

 6    medical training?

 7    A.  Yes.

 8    Q.  And you discovered also abuses by those who were deceiving

 9    patients into believing they had medical experience and

10    credentials which they actually did not have?

11    A.  I don't believe I found evidence of that.

12    Q.  Did you find evidence of a person who was wearing a lab

13    coat purporting to be a physician but who -- and was

14    performing these allergy tests and ultimately wasn't a

15    physician?

16    A.  I believe that is one of the ones, one of the cases that

17    came before the courts, and I can't remember the name of the

18    case, but there was a case.

19    Q.  You also discovered abuses in Medicaid billing or what

20    appeared to be, at least, abuses in Medicaid billing for

21    immunotherapy?

22    A.  At the time, yes, I do believe, but, again, the

23    investigation didn't -- didn't come to a conclusion.

24    Q.  Your investigation of the Medicaid billing, you didn't

25    come to a conclusion?
```

Karl H. Myers, CSR, RMR, CRR

```
 1   A.  Correct.
 2   Q.  Okay.  But you suspected, based on what you were finding,
 3   that there were abuses in Medicaid billing, right?
 4   A.  Yes.
 5   Q.  Okay.  And let's talk a little bit about your background,
 6   while we are on the subject of Medicaid billing.  You worked
 7   for ALK, which is an allergen manufacturer, right?
 8   A.  Correct.
 9   Q.  And you worked for them for 11 or 12 years?
10   A.  Correct.
11   Q.  So as part of that, you sold the actual antigens or the
12   allergens that are distributed to whichever physicians are
13   giving immunotherapy shots, right?
14   A.  Yes.
15   Q.  And as part of that, you became familiar with the billing
16   codes?
17   A.  Correct.
18   Q.  That are associated with the mixing and compounding of
19   those allergens, right?
20   A.  Correct.
21   Q.  And you also became familiar with the billing codes for
22   administering the shots of the immunotherapy, right?
23   A.  Correct.
24   Q.  And you also then had a background into how you test for
25   allergies, which would then result in immunotherapy, right?
```

```
1    A.  Correct.

2    Q.  And you had that background as part of your training

3    because you were actually selling the allergens, right?

4    A.  Correct.

5    Q.  And tell the jury about your training that you had at ALK

6    to be educated enough to tell the doctors what it was you were

7    selling and how they were to use it in their practice.

8    A.  Well, we had scientific advisors that would come in and

9    train the sales force on the appropriate ways to skin test a

10   patient or blood test a patient and then create an

11   individualized patient prescription for each of the allergic

12   patients that went on immunotherapy.

13   Q.  And in doing so, did you also have training on what

14   billing codes are associated with the product that you were

15   selling?

16   A.  Yes.

17   Q.  And you also, in your years of experience, became familiar

18   with how the doctors used those codes?

19   A.  Correct.

20   Q.  And so at the time you were performing your analysis for

21   Ms. Winders on the use of those codes and Medicaid, you would

22   say, then, that you were qualified to be able to do that,

23   weren't you?

24   A.  I was -- I was qualified to look at anomalies.  Without

25   any medical training, I can't form an opinion as to whether it
```

1    was truly fraud --

2    Q.  Right.

3    A.  -- or not.

4    Q.  And you understand, I am not asking you about your medical

5    training, right?

6    A.  Correct.

7    Q.  And I am not asking you about how those medicines are used

8    clinically, right?

9    A.  Correct.

10   Q.  I am asking you just specifically about billing.

11   A.  Right.

12   Q.  And that's what you looked at, right?

13   A.  Correct.

14   Q.  Okay.  In your duties for Mothers, in your investigation

15   of the RPA industry, you also identified a 483 letter, didn't

16   you?

17   A.  I believe -- is that the one with Greer?

18   Q.  Yes, sir.

19   A.  Yes.

20   Q.  And a 483 letter is a warning letter from the FDA, right?

21   A.  Correct.

22   Q.  And Greer is another antigen manufacturer?

23   A.  Correct.

24   Q.  And the 483 letter you uncovered was actually related to

25   an immunotherapy death, wasn't it?

```
 1    A.  I believe it was.

 2    Q.  And in that process, you also uncovered a near death

 3    experience from an allergy shot administered by a patient's

 4    husband that punctured a blood vessel?

 5    A.  Correct.

 6    Q.  You also developed suggestions for how to stop the fraud

 7    and abuse in the RPA industry, correct?

 8    A.  Correct.

 9    Q.  You also developed some patient awareness tools that

10    Mothers could use that could be distributed to patients to

11    help stop some of the patient safety concerns you were

12    uncovering?

13    A.  Correct.

14    Q.  And an example of that is your contribution to the

15    Deception and Fraud in Allergy Care article, right?

16    A.  I am not familiar with exactly what that is.

17    Q.  Okay.  You are familiar with the article that was the

18    basis of this lawsuit, the Mothers article that was circulated

19    called Deception and Fraud in Allergy Care?

20    A.  Can we pull that up?

21    Q.  Sure.  If you can, there is another binder there.  It will

22    be Defendant's Exhibit 8.  It is going to be in one of the

23    black binders you have.

24    A.  Okay.

25    Q.  I will help you.  Do you have it there in front of you,
```

1    Mr. Wallen?

2    A.  I do.

3    Q.  I believe this is already in evidence, but we will go

4    through the process.  That is the article Deception and Fraud

5    in Allergy Care, correct?

6    A.  Correct.

7    Q.  And you have seen that article?  You recognize it?

8    A.  I do.

9          MS. PEREZ:  Your Honor, we offer Defendant's 8.

10          MR. FERGUSON:  No objection, Your Honor.

11          THE COURT:  Received.

12          MS. PEREZ:  Defendant's 8, please, Mr. Glass.  Thank

13    you.

14    BY MS. PEREZ:

15    Q.  Now, this is the article Deception and Fraud in Allergy

16    Care.  Do you recall seeing this when you were working at

17    Mothers?

18    A.  I do.

19    Q.  And this article was published in April of 2014?

20    A.  Correct.

21    Q.  And it was published leading up to the Allergy and Asthma

22    Day on Capitol Hill that then took place on May 5th, 2014,

23    correct?

24    A.  Correct.

25    Q.  And you had some contributions to this article, right?

```
1    A.  I don't remember --

2    Q.  Or some of the content, I should say?

3    A.  -- precisely what came from me.

4    Q.  Well, another example -- would you say this is an example

5    of some of the awareness and patient awareness tools that

6    Mothers provides?

7    A.  Yes.

8    Q.  You also -- you can close that one.  I am done with that

9    one, Mr. Wallen.  Another example of the patient awareness and

10   information tools that you helped to provide in your capacity

11   as a consultant was a wait 30 minutes poster, correct?

12   A.  Correct.

13   Q.  And that was a poster that was designed to be placed in

14   physician offices, right?

15   A.  Right.

16   Q.  Any physician's office, correct?

17   A.  Correct.

18   Q.  And it was a poster that said wait -- or:  Don't take

19   chances.  Wait 30 minutes.  Right?

20   A.  Correct.

21   Q.  And that was designed to tell patients to wait 30 minutes

22   at the doctor's office after getting an immunotherapy shot,

23   wasn't it?

24   A.  Correct.

25   Q.  And you did that because you know of the risk of
```

1    anaphylaxis, correct?

2    A.   The package insert on the extracts that I sold stated that

3    it should be given in a medical -- under medical supervision

4    with a 30-minute waiting period.

5    Q.   So the allergens that you sold that were used in

6    immunotherapy shots -- that are used in immunotherapy shots

7    have a packet insert that says:  This should be administered

8    in a doctor's office?

9    A.   Under medical supervision.

10             MR. FERGUSON:  Your Honor, he has no knowledge about

11    this medical experience.  He is not an expert.

12             THE COURT:  Overruled.

13    BY MS. PEREZ:

14    Q.   And the package insert also says:  Wait 30 minutes?

15    A.   That, I can't -- I can't be 100 percent sure of.  I think

16    each company's packaging differs.

17    Q.   Okay.  Well, it was Mothers' position that patients should

18    wait in the doctor's office 30 minutes after receiving an

19    immunotherapy shot, right?

20    A.   Correct.

21    Q.   And that is inconsistent with the idea of sending an

22    immunotherapy vial home with a patient for them to

23    self-administer at home, isn't it?

24    A.   Correct.

25    Q.   And it is against the warning label then -- and it is also

1    inconsistent, then, with the warning label that was in the

2    allergens from ALK?

3    A.  It is a package insert, correct.

4    Q.  You also presented at the Allergy and Asthma Day on

5    Capitol Hill in May of 2014?

6    A.  Correct.

7    Q.  And as a part of that, there are hundreds of volunteers

8    that come through to talk to congressional staffers about the

9    issues that Mothers is trying to raise awareness of, correct?

10   A.  Correct.

11   Q.  And as part of that, you prepared a PowerPoint

12   presentation?

13   A.  I was given a PowerPoint presentation.  I made some

14   modifications to it, correct.

15   Q.  And you were satisfied with it, then, after you made the

16   modifications?

17   A.  Yes.

18   Q.  And that is what you presented to the volunteers who were

19   going to go out and raise awareness on behalf of Mothers to

20   congressional staff members, right?

21   A.  Correct.

22   Q.  And in that PowerPoint, you showed a lot of examples of

23   what you uncovered in terms of the billing fraud and what you

24   were seeing on your trip to Houston?

25   A.  That was a part of it, yes.

```
 1    Q.  And you also included all of the public information, at

 2    least that you were aware of at the time, of the convictions

 3    and the investigat -- the federal government investigations

 4    that were going on of people in the RPA industry, right?

 5    A.  Correct.

 6    Q.  And was your intent in presenting at Allergy and Asthma

 7    Day on Capitol Hill as a consultant for Mothers was to raise

 8    awareness about the fraudulent things you had been

 9    discovering?

10    A.  Correct.

11    Q.  It wasn't to put UAS out of business?

12    A.  Correct.

13    Q.  Do you believe the public has a right to know about the

14    fraudulent and deceptive information you were uncovering?

15    A.  I do.

16    Q.  Do you believe that the public itself, not just allergy

17    patients, but the public itself has a right to know the

18    information you were uncovering?

19    A.  I do.

20    Q.  You also believe the insurance companies have a right to

21    know about the billing fraud that you at least suspected,

22    based on your research of these anomalies?

23    A.  I do.

24    Q.  Did you ever have an understanding that you were hired to

25    do anything else for Mothers other than what we have discussed
```

1   here today?

2   A.  No.

3   Q.  I want to clarify one other -- two other things.  You

4   never met with any insurance company on behalf of Mothers, did

5   you?

6   A.  No.

7   Q.  And you still believe that the RPA industry offers

8   outrageous financial incentives, don't you?

9   A.  I believe that the practice of allergen immunotherapy has

10  outrageous -- there is nothing unique about RPA that differs

11  from the allergists or the ENTs.

12  Q.  The allergy immunotherapy itself offers an incredible

13  financial incentive?

14  A.  Yes.

15  Q.  You have never had a consulting agreement with Phadia,

16  have you?

17  A.  No.

18  Q.  You have never had a consulting agreement with any of the

19  allergy associations?

20  A.  No.

21  Q.  And you have never received any compensation from Phadia

22  or any allergy trade association, correct?

23  A.  No.

24  Q.  And you have never received any compensation from Mothers,

25  other than what you were paid for the work that you did for

1    Mothers as a consultant, right?

2    A.  Correct.

3    Q.  Now, isn't it a fact that in 2011, three years before you

4    were a consulting -- a consultant for Mothers, you were

5    already uncovering suspected fraud and abuse in the RPA

6    industry?

7    A.  I had heard -- I heard rumors.  I didn't go out and

8    investigate it myself.

9    Q.  You hadn't personally investigated it?

10   A.  Correct.

11   Q.  But you had conversations with people who had told you

12   about the fraud and abuse that were going on?

13   A.  Correct.

14   Q.  And one of those people was Patrick Strauss we talked

15   about?

16   A.  Right.

17   Q.  And the abuses that you were hearing about, you actually

18   personally observed some of those practices by the time you

19   were working for Mothers in 2014?

20   A.  I don't believe I actually personally visited those

21   practices.

22   Q.  You visited some of the practices in Houston that you

23   discovered -- or you uncovered from your Medicaid analysis?

24   A.  Correct.  And should I go through a little bit of what

25   that uncovered?

```
 1    Q.  We will get there.
 2    A.  Okay.  I didn't find a single practice practicing allergy.
 3    Q.  So let me be clear.  Out of all of those practices that
 4    you discovered who were billing under these codes, when you
 5    went out to Houston and you looked and you visited those
 6    practices, not a single one of them was actually a medical
 7    practice?
 8    A.  No.  There were some that were medical practices, but they
 9    didn't match up with the names and they didn't practice
10    allergy.
11    Q.  Okay.
12          MS. PEREZ:  Your Honor, may I approach?  I have a
13    new exhibit that is not going to be in a binder.
14          THE COURT:  Yes.
15    BY MS. PEREZ:
16    Q.  Do you recognize what is labeled as Defendant's Exhibit
17    48 -- labeled 486?  It is 485, but it should be labeled 486.
18    We will get that changed.  Do you recognize that document?
19    A.  I do.
20    Q.  And it is an e-mail from you to Tonya Winders?
21    A.  Correct.
22    Q.  On April 25, 2014?
23    A.  Correct.
24    Q.  And there is an attachment to that e-mail, correct?
25    A.  Yes.
```

```
1    Q.  And you recognize the attachment to the e-mail?
2    A.  I do.
3             MS. PEREZ:  Your Honor, we offer Defendant's Exhibit
4    486.
5             MR. FERGUSON:  No objection, Your Honor.
6             THE COURT:  Received.
7             MS. PEREZ:  Mr. Glass, would you pull up 486,
8    please.
9    BY MS. PEREZ:
10   Q.  Now, this is your e-mail to Tonya Winders on April 25,
11   2014, and the subject of this e-mail is Houston CMS trip,
12   correct?
13   A.  Correct.
14   Q.  And you went to Houston as a follow-up to your Medicaid
15   billing analysis that you provided to Ms. Winders, correct?
16   A.  It is actually Medicare, not Medicaid.
17   Q.  Medicare.  Excuse me.  And so you went to Houston
18   following what you discovered as outliers?
19   A.  Correct.
20   Q.  Okay.  And you say:  Tonya, here is my report on the CMS
21   data dive and reconnaissance trip to Houston.  Let me know if
22   there is any other -- further follow-up that you would like me
23   to do.
24             So Ms. Winders actually asked that you go to Houston
25   and look at these practices and figure out what they were
```

Karl H. Myers, CSR, RMR, CRR

1    doing?

2    A.  Correct.

3    Q.  Let's turn the page.  Now, this is the CMS analysis that

4    you did from the publicly available information about use of

5    those billing codes, right?

6    A.  Correct.

7    Q.  And then you follow this up with information from your

8    personal visits to the practices that you identified from the

9    billing code analysis, right?

10   A.  Correct.

11          MS. PEREZ:  Let's go to the next page, please,

12   Mr. Glass.  The next page, please.

13   BY MS. PEREZ:

14   Q.  Katherine Blanchette, that was one of the doctors that you

15   identified with high utilization of the allergy skin testing

16   code, immunotherapy?

17   A.  Yes.  I believe -- it is very hard to read, but I am

18   fairly confident she was the number one provider in the

19   country.

20   Q.  The number one provider.  Okay.  So let's see what you

21   discovered.  The first thing you discovered is that the number

22   listed on her website was disconnected, right?

23   A.  Right.

24   Q.  And then you discover that when you entered the building,

25   the suite number that was associated with her address on file

1    with CMS, that didn't actually exist?

2    A.   Correct.

3    Q.   And you spoke to a woman, the property manager, I believe?

4    A.   Yes.

5    Q.   And she asked you, upon seeing you, "What government

6    agency are you from?"

7    A.   Correct.

8    Q.   She assumed you were from the government?

9    A.   That's how I interpreted what she said.

10   Q.   And you told her you weren't from a government agency?

11   A.   Correct.

12   Q.   And she proceeded to tell you there has never been a

13   Dr. Blanchette in this building?

14   A.   Correct.

15   Q.   And then you said:  An interesting sidenote was that there

16   were a dozen home health agencies listed in that same

17   building?

18   A.   Correct.

19   Q.   And you know that to be another industry fraught with

20   fraud and abuse?

21   A.   Correct.

22   Q.   Now, something else about Medicare dollars; those are

23   public tax dollars that funds the Medicare program?

24   A.   Correct.

25   Q.   So this was the number one biller that you discover

```
 1   through your analysis of the receipt, essentially, of tax
 2   dollars from the public?
 3   A.  For skin prick testing.
 4   Q.  For skin prick testing, yes, sir.  And you did find
 5   another address for Katherine Blanchette in Houston?
 6   A.  Yes.
 7   Q.  And it was an address that was in Oasis Medical Center and
 8   Oasis Home Health Hospice -- Home Health and Hospice?
 9   A.  Correct.
10             MR. FERGUSON:  Your Honor, relevance.
11             THE COURT:  Overruled.
12   BY MS. PEREZ:
13   Q.  And you asked to speak with a Dr. Katherine Blanchette at
14   that address, right?
15   A.  Correct.
16   Q.  And you were told that no one by that name had ever worked
17   there?
18   A.  Correct.
19   Q.  And then you found another number in Plano, but you didn't
20   actually go to Plano from Houston at that time?
21   A.  Correct.
22   Q.  Okay.  Let's turn to the next page.  Can you tell the jury
23   what the pictures on this page are, if you recall?  Number
24   2 was Daniel Tuft.
25             What does it mean by -- when you describe Daniel
```

1    Tuft as number 2?

2    A.  I believe he was the second -- the second highest

3    prescriber of percutaneous allergy testing.

4    Q.  Skin prick testing?

5    A.  Right.

6    Q.  For Medicare billing?

7    A.  Right.

8    Q.  And this is the address that he had of 12462 Shepherds

9    Ridge Drive on file with CMS?

10   A.  Correct.

11   Q.  And you discovered that this was a residence.  Is that the

12   residence that matched the address when you went to do your

13   investigation in Houston?

14   A.  Yes.

15   Q.  And Dr. Tuft actually had -- was listed as having an

16   affiliation with the Boston Medical Group?

17   A.  Yes.  I don't know if that was listed on the website or

18   whether that was something that I found through a Google

19   search.  But, yes, he was associated with that.

20   Q.  And you did try to contact that medical group?

21   A.  Yes.

22   Q.  And that medical group actually specialized in men's

23   sexual health?

24   A.  At the time I visited, that's what I was told, yes.

25   Q.  And when you asked them if they performed any kind of

1    allergy testing, they told you they had never done that?

2    A.  I don't know if they said they never did it.  They just

3    said they did not perform any kind of allergy testing and that

4    Dr. Tuft had retired the previous year.

5    Q.  Okay.  Number 3 at the bottom, do you see that, Stanton

6    Packard?

7    A.  Yes.

8    Q.  And you didn't visit his offices; it was too far from

9    Houston at the time?

10   A.  Correct.

11   Q.  And you visited number 4, Ronald Bryant?

12   A.  Correct.

13   Q.  And you write it was -- yes.  Is that the address that you

14   visited that was associated with Dr. Ronald Bryant?

15   A.  It is.

16   Q.  And you discovered that this practice actually provided

17   mostly nonmedical care services to homebound seniors?

18   A.  Correct.

19   Q.  Number 5, Harding Ross.  You discovered, with respect to

20   Harding Ross, that the suite did actually exist, but it was a

21   vacant building?

22   A.  Correct.

23   Q.  And maintenance had never actually heard of a Dr. Ross,

24   the number 5 top biller of allergy skin testing to Medicaid --

25   or I am sorry -- Medicare?

```
 1    A.  Correct.

 2    Q.  And when you did online research about Dr. Harding Ross,

 3    it reflected that he was a primary care physician and an

 4    otolaryngologist?

 5    A.  Correct.

 6    Q.  Number 6, Rao Nandety, his address didn't exist either; is

 7    that correct?

 8    A.  Not that I could find.  I asked.  I did ask around.

 9    Q.  And when you asked around, you saw a pharmacy and a

10    Hispanic medical clinic?

11    A.  Correct.

12    Q.  And no one there had ever heard of this person who is

13    listed as the number 6 biller of allergy skin testing for

14    Medicaid?

15    A.  Medicare, correct.

16    Q.  Medicare.  Thank you.  You did find another address for a

17    Dr. Rao Nandety?

18    A.  Yes.

19    Q.  And that was the Next Care Urgent Care Facility?

20    A.  Correct.

21    Q.  And no one at that address would tell you or confirm

22    whether or not he worked there; they wouldn't let you speak

23    with him, if he did?

24    A.  No.  They claimed due to privacy laws they couldn't even

25    tell me if he worked there or not.  It seems rather strange to
```

1   me.

2   Q.   Okay.  Number 7, Joseph Vadas.  And he was listed at Suite

3   Number 1575 at the 10375 Richmond Avenue suite, right?

4   A.   Right.

5   Q.   And that building didn't have a Suite 1575?

6   A.   Right.

7   Q.   And the doorman who you spoke with told you that he -- no

8   doctor had been in that building and he had been there for 14

9   years?

10  A.   Correct.

11  Q.   And he followed you to your car?

12  A.   That's what it looked like.  He -- after I left, he

13  followed me out to my car, and as I was pulling out, he was

14  standing behind the car.

15  Q.   And you thought that seemed shady?

16  A.   Strange.  Strange.

17  Q.   And he told you that a company called Prime Staff used to

18  be there and they staffed physicians?

19  A.   Correct.

20  Q.   And he thought that company was a little shady?

21  A.   Correct.

22  Q.   Let's turn to the last page, where you have your

23  conclusion.  What was your conclusion when you visited these

24  top billers of Medicare dollars for allergy skin testing?

25  A.   It was my conclusion at the time, because I couldn't make

```
 1    contact with any of the top billing physicians, with over
 2    2,400 skin tests -- patients skin tested, with an approximate
 3    value of 1.2 million is fraudulent.
 4             MS. PEREZ:  Thank you, Mr. Glass.
 5    BY MS. PEREZ:
 6    Q.  You also learned during your investigation that there were
 7    UAS customer physicians who were providing sublingual
 8    immunotherapy or SLIT; that's the drops under the tongue?
 9    A.  That's what I was told.
10    Q.  And you were also told that they were billing Medicaid and
11    insurance for skin prick testing for those sublingual drops?
12             MR. FERGUSON:  Objection, Your Honor.  Hearsay.
13             THE COURT:  Overruled.
14    BY MS. PEREZ:
15    Q.  Go ahead.
16    A.  Again, that's what I was told.
17    Q.  In other words, they were giving patients IT drops under
18    the tongue but billing Medicaid as though they had received
19    immunotherapy shots?
20    A.  Correct.
21    Q.  And SLIT, as we know, is not FDA approved?
22    A.  Correct.
23    Q.  And, therefore, it is not reimbursable?
24    A.  Correct.
25    Q.  And so it shouldn't be billed for at all?
```

```
 1    A.  Correct.  Billed to insurance.

 2    Q.  Billed to insurance and government payors, like Tricare,

 3    all of that?

 4    A.  Correct.

 5    Q.  You also learned that UAS had a quota in place for its

 6    techs for how many patients they could test or treat?

 7    A.  These are things that I had heard.

 8    Q.  You learned that?

 9    A.  When I tried to investigate, all of those offices would

10    not talk to me.

11    Q.  That's what you learned in connection with your

12    investigation; you just couldn't confirm it because they

13    wouldn't speak to you?

14    A.  The offices that I were told were doing that, I tried to

15    contact and they would not confirm or deny.  They wouldn't

16    speak to me at all.

17    Q.  Have you ever put out any false information about UAS into

18    the market?

19    A.  No.

20    Q.  As far as you know?  Information that you know was false,

21    did you ever put that out into the market?

22    A.  No.

23    Q.  Have you ever put out any false information, information

24    that you knew to be false about any RPA company?

25    A.  No.
```

```
 1              MS. PEREZ:  No further questions, Your Honor.
 2                        *-*-*-*-*-*-*-*
 3                      REDIRECT EXAMINATION
 4    BY MR. FERGUSON:
 5    Q.  Good morning, Mr. Wallen.
 6    A.  Good morning.
 7    Q.  Sir, do you have a binder, a binder that would have
 8    Document 438 in it?
 9              MR. FERGUSON:  Your Honor, may I assist the witness?
10              THE COURT:  Yes.
11    BY MR. FERGUSON:
12    Q.  Do you have that, sir?
13    A.  I do.
14    Q.  Have you seen Document 438 before?
15    A.  I don't actually remember seeing the actual advisory
16    opinion, if this is what -- if this is what it is.
17    Q.  I am sorry?
18    A.  If this is the advisory opinion.
19    Q.  Have you seen that advisory --
20    A.  The answer.
21    Q.  Have you seen Opinion 1117, the OIG Opinion 1117 before?
22    A.  No, I don't believe I have.  I always thought that the OIG
23    opinion was the request that I had sent out.
24    Q.  Have you seen an announcement of the issuance of the OIG
25    Opinion 1117?
```

```
 1    A.  I believe someone had e-mailed that it had come out, yes.

 2    Q.  Do you recall who e-mailed you that?

 3    A.  I really don't.  It was somebody in the industry.

 4    Q.  Do you recall if it was Ned DeLozier?

 5    A.  It could have been.

 6    Q.  Did you have a confidentiality agreement with Ned DeLozier

 7    in 2011?

 8    A.  I did.

 9    Q.  What did that respect?

10    A.  It was regarding his desire to set up kind of a hybrid

11    model, something inbetween RPA and board certified allergy.

12              MR. FERGUSON:  Your Honor, may I approach?

13              THE COURT:  Yes.

14    BY MR. FERGUSON:

15    Q.  Mr. Wallen, you hold Plaintiff's Exhibit No. 605.  Can you

16    identify that, please, sir?

17              MS. PEREZ:  Your Honor, may we approach before he

18    starts testifying about that?

19              THE COURT:  Yes.

20              (Bench conference, as follows:)

21              MS. PEREZ:  Your Honor, this document, it was not

22    produced in discovery.  It is a third-party document.  I am

23    not aware of any other business record or any other exception

24    to hearsay, and I also question its relevance at this point,

25    but --
```

 1              MR. FERGUSON:  It is --

 2              MS. PEREZ:  I have never seen this.

 3              MR. LOW:  It was produced by a third party, Ned

 4    DeLozier, and he can verify, this is Mr. Wallen's document.

 5              THE COURT:  What is it?

 6              MR. LOW:  It is his nondisclosure agreement.

 7              THE COURT:  What is the relevance?

 8              MR. LOW:  The relevance is that he met with Mr.

 9    DeLozier at the time that the OIG advisory opinion was being

10    requested and that's how Ms. Winders found out about the

11    opinion.

12              MS. PEREZ:  I have never seen --

13              MR. LOW:  And also how he found out about the

14    opinion.

15              MS. PEREZ:  Well, what is the Bates label?  Because

16    this is not in our document database.  What is the Bates label

17    of the document you produced that you say Ned DeLozier

18    produced?

19              MR. LOW:  This should have been -- it's PME probe.

20              MS. PEREZ:  We don't have it, Your Honor.

21              THE COURT:  Objection sustained.

22              (End of bench conference.)

23              MS. PEREZ:  Your Honor, we need to approach again,

24    please.

25              THE COURT:  Yes.

```
 1              MS. PEREZ:  Thank you.
 2              (Bench conference, as follows:)
 3              MS. PEREZ:  I need to withdraw my objection on the
 4    basis that it was not produced.  It was in a separate database
 5    and my counsel found it at the table while we were up here,
 6    but there are other grounds.
 7              THE COURT:  What are the other grounds?
 8              MS. PEREZ:  My other grounds is relevance and
 9    hearsay.  It is not their business record.  I don't have a
10    business record --
11              THE COURT:  Can the witness identify this --
12              MR. LOW:  He signed it.
13              MR. FERGUSON:  He signed it.
14              THE COURT:  Okay.  Overruled.
15              (End of bench conference.)
16              THE COURT:  Did you ask him if he signed it?
17              MR. FERGUSON:  I haven't yet, Your Honor.
18              THE COURT:  Okay.
19    BY MR. FERGUSON:
20    Q.  Mr. Wallen, did you sign Exhibit, Plaintiff's Exhibit 605?
21    A.  I did.
22              THE COURT:  Received.
23              MR. FERGUSON:  We offer Plaintiff's Exhibit 605 into
24    evidence.
25              THE COURT:  Received.
```

1    BY MR. FERGUSON:

2    Q.  Mr. Wallen, this bears a date of June 27, 2011.  Were you

3    in consultation with Mr. Wallen shortly after that about the

4    OIG opinion?

5                    THE COURT:  Mr. DeLozier.

6                    MR. FERGUSON:  Mr. DeLozier.  I am sorry.

7                    THE WITNESS:  That is not what we talked about.  We

8    had talked about my helping him set up a hybrid model for his

9    partner physician to utilize.

10   BY MR. FERGUSON:

11   Q.  Did you ever discuss the fact that you had submitted a

12   request for an OIG opinion with Ned DeLozier?

13   A.  Yes, I believe I did.

14   Q.  What did you tell Mr. DeLozier?

15                   MS. PEREZ:  Objection, Your Honor.  Relevance.

16                   THE COURT:  Overruled.

17                   THE WITNESS:  Just that I had been requested to do

18   that by Patrick Strauss.

19   BY MR. FERGUSON:

20   Q.  And that you had done so, correct?

21   A.  Correct.

22   Q.  Do you know if Mr. DeLozier met with Ms. Winders in the

23   summer of 2011?

24   A.  In the summer of what?

25   Q.  2011, when you have a consulting agreement with --

```
 1              MS. PEREZ:  Objection.  Which consulting agreement
 2    was in effect?
 3              THE COURT:  This one.
 4              THE WITNESS:  I don't -- I don't remember.  I don't
 5    recall if they ever met during that time period.
 6              MR. FERGUSON:  Put up 178, please.
 7              MS. PEREZ:  Has this been offered?
 8              MR. LOW:  Yes.  It is in evidence.
 9              MR. FERGUSON:  2388.  Down in the right-hand, lower
10    right-hand corner.
11              MS. PEREZ:  Your Honor, may we approach and take the
12    exhibit down for the jury at this moment?  I know it is in
13    evidence, but I need to talk to you about this.
14              THE COURT:  All right.
15              (Bench conference, as follows:)
16              MS. PEREZ:  This e-mail chain is between --
17              THE COURT:  Wait a minute.
18              MS. PEREZ:  Oh, I am sorry.  The e-mail chain that
19    they are going to ask Mr. Wallen about is an e-mail between
20    Ned DeLozier and Tonya Winders that he is not on, and the time
21    to establish that Ned DeLozier met with Tonya Winders is with
22    Tonya Winders, not with this witness, who said he never met
23    Tonya Winders until 2013.  So we would object as to lack of
24    foundation, 602, and speculation, and it is prejudicial to
25    show the jury and insinuate that.
```

```
 1              MR. LOW:  Your Honor, Ms. Winders clearly met with
 2   Mr. DeLozier in the summer of 2011.  He said he didn't even
 3   know if she ever talked to him.  We should be able to at least
 4   impeach him with this.
 5              MS. PEREZ:  No.
 6              MR. LOW:  He worked for Ms. Winders and he should --
 7              THE COURT:  That is not impeachment.  The objection
 8   is sustained.  You can argue it.
 9              MR. LOW:  Okay.
10              (End of bench conference.)
11   BY MR. FERGUSON:
12   Q.  Mr. Wallen, you recall that Ms. Perez talked to you about
13   the fact that you had never met when she began her cross-
14   examination; do you recall that?
15   A.  I had never met --
16   Q.  -- Ms. Perez.
17   A.  Until this morning.
18   Q.  Yes.  Have you met any lawyers with her law firm?
19   A.  I don't believe I ever have.  I think they were at my
20   deposition.
21   Q.  Have you had any conversations with any lawyer in her law
22   firm?
23   A.  Outside of the deposition, no.
24   Q.  Did you say no?
25   A.  Outside of the deposition, no.
```

1    Q.  Have you talked with any of those lawyers with respect to

2    your testimony here today?

3    A.  No.

4    Q.  Ms. Perez asked you about a death that occurred in Canada

5    at an allergist's office.  Do you recall that?

6    A.  If that's the one from the 483.

7    Q.  That was -- was the 483 death in Canada, as best as you

8    understand it?

9    A.  I believe -- I believe it was, yes.

10   Q.  Do you know who was involved in that death?

11   A.  I don't.

12   Q.  Do you know if it was anyone involved in the remote

13   practice of allergy?

14   A.  I don't.

15   Q.  Did you investigate that death?

16   A.  I don't believe I did.  I tried to at the time and

17   didn't -- I don't believe I came up with any conclusions.

18   Q.  Do you know if Greer was involved in that patient death?

19   A.  I am fairly confident.  That's why I brought it to Tonya's

20   attention, because Greer's response to that was deficient, if

21   I am remembering correctly.  I can't be sure.  It was years

22   and years ago.

23   Q.  Do you know if it had anything to do with a mist-mixed

24   antigen?

25   A.  I honestly don't remember.  I don't recall.

1    Q.  Did you try to find information about the substandard

2    practices -- let me rephrase.  Did you try to find information

3    investigating the practices of UAS in connection with your

4    investigation?

5    A.  I investigated -- Tonya asked me to investigate any RPA

6    companies, so, yes, UAS was one of the ones.

7    Q.  When you indicated that you couldn't confirm any of the

8    information that you had, where had you obtained that

9    information?

10   A.  Patrick Strauss.

11   Q.  Was he the only source of the information that you had?

12   A.  Specifics, I believe he was.

13   Q.  When you described the SLIT discussions to Ms. Perez, do

14   you remember those SLIT discussions about the investigation?

15   A.  I remember Patrick saying that there were UAS customers

16   that were advised to bill SLIT as SCIT, yes, I do.

17   Q.  So you were attempting to investigate UAS customers?

18   A.  As a part of the overall industry investigation, correct.

19   Q.  Do you recall which offices would not respond to your

20   request for information?

21   A.  None of them.

22   Q.  When you say "none of them," you don't recall any of them;

23   is that right?

24   A.  There were not any offices that would -- that did respond

25   or would give me information.

```
 1    Q.  Do you recall the offices that wouldn't give you
 2    information?
 3    A.  None of them would give me information, so all of them
 4    would not give information.
 5    Q.  Do you recall the name of any of those offices that would
 6    not give you information?
 7    A.  Unfortunately, I don't.
 8    Q.  Do you recall how many there were?
 9    A.  A handful.
10    Q.  And you obtained information that sent you to those
11    locations from Patrick Strauss?
12    A.  Correct.
13    Q.  Did you discuss the OIG advisory opinion request with
14    people other than Patrick Strauss and Ned DeLozier?
15    A.  Request?
16    Q.  Request.
17    A.  I am sure I did over the years.
18    Q.  And one of those was Tonya Winders, correct?
19    A.  Correct.
20    Q.  I believe you testified that you had not been paid in
21    connection with your testimony here today; is that right?
22    A.  Correct.
23    Q.  And Ms. Perez asked you about your agreement with United
24    Allergy Services in the settlement of this lawsuit, correct?
25    A.  Correct.
```

```
 1    Q.  The settlement of this lawsuit between you and UAS
 2    includes an agreement that you will show up in this courtroom
 3    when served with a subpoena and testify to the truth as best
 4    you can, correct?
 5    A.  Correct.
 6    Q.  Was there any other agreement that you made with UAS?
 7    A.  No.
 8    Q.  Ms. Perez asked you about your training and she
 9    indicated -- I am sorry -- you indicated that you had received
10    some training with respect to allergy and immunotherapy,
11    correct?
12    A.  Correct.
13    Q.  What training did you receive?
14    A.  Oh, from our scientific team as to the mechanisms, what
15    happens to the body when you are injecting allergens to
16    desensitize the patient, how you would go about skin testing
17    and creating a formulary from the skin test, blood test.
18    Q.  And that was training given to you or were you in the room
19    when the training was given to others?
20    A.  Both.
21    Q.  Ms. Perez put up on the screen Defendant's Exhibit 486.
22    Would you bring that up, please?
23    A.  Is that the one that is called 485?
24    Q.  I am sorry.  It is the report that has your ever mail on
25    the top of it dated April the 25th, 2014?
```

1    A.  Correct.

2    Q.  Did this report have anything to do -- would you turn to

3    the second page of this report, please, sir.

4            Did this report have anything to do with the remote

5    practice of allergy?

6    A.  I have no way of knowing that.

7    Q.  Well, I understood your testimony to be that these were

8    people who billed for allergy, but you couldn't locate them

9    when you looked for them, correct?

10   A.  Correct.

11   Q.  Is that the remote practice of allergy?

12   A.  It depends on whose definition of remote practice of

13   allergy.

14   Q.  Let's use yours.  Is that the remote practice of allergy?

15   A.  All I know is that they were primary care physicians that

16   were billing outside of the norms, extreme, extreme outliers

17   that didn't follow up the typical -- I mean, if you go through

18   the thousands and thousands of physicians, it is so far of an

19   outlier that you would be in the top seven in the country for

20   percutaneous tests and not have any other follow-up from that.

21   But there is no -- there is nothing in here to say to me

22   whether it was the remote practice of allergy or just a

23   primary care physician operating on their own.

24   Q.  You couldn't locate these individuals, correct?

25   A.  Correct.

1    Q.  Do you know for a fact that they were primary care
2    physicians?
3    A.  The majority of them, according to Medicare and the
4    research I did, the majority of them, if not all of them, I
5    believe, were primary care.
6    Q.  Did you determine whether or not they had a medical
7    license?
8    A.  You need an MPI number to bill Medicare, so the MPI number
9    is listed on the --
10   Q.  Did you do anything other than look at the MPI number to
11   determine whether or not they were primary care physicians?
12   A.  There is the provider type, so I guess there is one --
13   there is one of them that was allergy immunology.  It is very
14   hard to read this, but one says for a general practice, one
15   says internal medicine, one says family practice, family
16   practice, internal medicine.  So out of -- out of those seven,
17   one of them looks like it was -- Daniel Tuft was an allergy
18   immunologist.
19   Q.  Was one of them deceased?
20   A.  If it was in my report, then possibly.  I don't recall.
21   This was years ago.
22   Q.  In your search, did you find any overbilling by a
23   physician working with United Allergy Services?
24   A.  No, I didn't.
25   Q.  Was Katherine Blanchette affiliated with United Allergy

1    Services?

2    A.  I have no idea.

3    Q.  Mr. Wallen, would you look at what has been marked as

4    Plaintiff's Exhibit 75.

5    A.  I have got something else.  I am sorry.

6            MR. FERGUSON:  May I assist the witness, Your Honor?

7            THE WITNESS:  This is D 75.

8    BY MR. FERGUSON:

9    Q.  Do you have P 75?

10    A.  Yes.

11    Q.  We talked about your e-mail yesterday that is from you to

12    Ms. Winders and then she responds in the same e-mail.  Do you

13    recall that?

14    A.  Correct.

15    Q.  I would like for you to look at entry number 2.  Entry

16    number 2, in the second sentence, says:  Several friends of

17    mine admitted that they thought AANMA was simply the marketing

18    arm of AAAAI.

19            MS. PEREZ:  Objection, Your Honor.  This is asked

20    and answered.

21            THE COURT:  Overruled.

22    BY MR. FERGUSON:

23    Q.  In the second sentence, you say:  Maybe they meant ACAAI,

24    but either way.

25            Do you recall what your friends told you?

```
 1    A.  They were very quick conversations, and that's pretty much
 2    it, and so because -- maybe it was because -- this is my
 3    opinion, but because they didn't have a relationship with the
 4    ENTs, I think they thought it was an allergist-only
 5    organization.
 6    Q.  That AANMA was an allergist-only organization?
 7    A.  Correct.
 8    Q.  As the marketing arm of AAAAI; is that right?
 9    A.  Correct.
10    Q.  Did they tell you anything else about why they would think
11    that?
12    A.  No.
13             MR. FERGUSON:  Would you pull up P 74, please.
14    BY MR. FERGUSON:
15    Q.  Would you look at P 74, please, sir.
16    A.  Yes.
17    Q.  What is P 74?
18    A.  It is an e-mail between myself and Dr. Rosch.
19    Q.  And it says --
20             MR. FERGUSON:  I am sorry.  Plaintiffs move for the
21    admission of P 74, Your Honor.
22             MS. PEREZ:  No objection, Your Honor.
23             THE COURT:  Received.
24    BY MR. FERGUSON:
25    Q.  Mr. Wallen, there is an attachment to this e-mail.  Do you
```

```
1    see that?
2    A.  I do.
3    Q.  Have you seen this before?
4    A.  I have.
5    Q.  What is the attachment?
6    A.  It is a letter regarding -- to the Federal Trade
7    Commission.
8    Q.  And did you write this letter?
9    A.  No.
10   Q.  Do you know who did?
11   A.  I don't.
12   Q.  What was the purpose of this letter?
13   A.  Can I read it?
14   Q.  Sure.
15        MS. PEREZ:  Objection, Your Honor.  He says he has
16   never read the letter.  How could he speak to its purpose?
17        THE COURT:  Sustained.  You have to lay a
18   foundation.
19   BY MR. FERGUSON:
20   Q.  Let's go back to the e-mail at the outset, please, sir.
21   A.  Yes.
22   Q.  What are you telling Mr. Rosch?
23   A.  That there is a Federal Trade Commission letter and that
24   there is an Attorney General alert that went out yesterday as
25   well as a consumer fraud alert.
```

1    Q.  And when you said to Dr. Rosch, "Attached is the
2    letter" --
3    A.  Correct.
4    Q.  -- was this a letter that was delivered at the AANMA
5    presentation that you made?
6    A.  I honestly don't believe -- I don't remember whether it
7    was delivered there or whether it was sent out post the
8    meeting.  I don't recall.
9    Q.  Do you recognize it as a letter that was either delivered
10   or sent out post the meeting of the Capitol Hill day?
11   A.  Yes.
12   Q.  And you indicate in the second sentence of the e-mail:
13   The 75 congressional visits went extremely well on Tuesday.
14   Do you see that?
15   A.  Correct.
16   Q.  What do you recall about that?
17   A.  Well, it is the Allergy and Asthma Capitol Hill day.  It
18   is a longstanding tradition for AANMA to go and discuss issues
19   that are facing allergy and asthmatic patients in Congress.
20   Q.  Was the letter that was attached to be signed by
21   congressional representatives?
22   A.  Yes.  It looks like it's -- it looks like it was, yes.
23            MR. FERGUSON:  Your Honor, we will offer P 74.
24            THE COURT:  She already agreed to its admission.
25   Who is the letter from and to?  Does that show?

```
 1            MR. FERGUSON:  It is from --
 2            THE COURT:  I am talking about, ask the witness.
 3    BY MR. FERGUSON:
 4    Q.  Mr. Wallen, who is the letter to?
 5    A.  Chairwoman Ramirez and Mary Engle, the associate director.
 6    Q.  And Chairwoman Ramirez is with the Federal Trade
 7    Commission, correct?
 8    A.  That is correct.
 9    Q.  And Ms. Engle is with the Federal Trade Commission,
10    correct?
11    A.  Correct.
12    Q.  And the letter was to be signed by whom?
13    A.  It looks like there is a space for a lawmaker's signature
14    or title in Congress.
15    Q.  And copies were to be sent to who?
16    A.  The Inspector General and the National Association of
17    Attorneys General.
18    Q.  Was this an effort to have the parties that were going to
19    visit with congressional representatives have representatives
20    sign and deliver this letter?
21    A.  I don't recall if that was one of the directives of the
22    day or not.
23    Q.  Do you recall what was to be done with this letter?
24    A.  I don't.
25    Q.  Do you know if any of the 75 congressional visits were in
```

```
 1    order to obtain a signature on this letter?
 2    A.  Unfortunately, I don't recall.
 3    Q.  Do you know if any of the letters were signed and
 4    delivered to the Federal Trade Commission?
 5    A.  I don't.  All I am saying is, here is the letter and an
 6    Attorney General alert went out as did a consumer fraud alert
 7    on the deception issue.  I actually don't -- I don't know
 8    whether these letters actually went out or not.
 9    Q.  Would you look with me at the second paragraph of the
10    letter in the first sentence.
11    A.  Yes.
12    Q.  It has in the third line the term "certified allergy
13    technician."  Do you see that?  In quotes.
14    A.  I do.
15    Q.  Do you know who that refers to?
16    A.  Pretty sure it is the people that are put into the offices
17    of the primary care physicians to kind of run the allergy
18    program.
19    Q.  Drop down a couple of paragraphs with me, if you will, to
20    the one that begins, "To date."  Do you see that?
21    A.  I do.
22    Q.  There is a description there of one death of a patient
23    that is directly attributable to these kinds of practices.  Do
24    you see that?
25    A.  I do.
```

```
1    Q.  Do you know what death that is referring to?

2    A.  I don't.

3    Q.  Do you have any idea as to the source of this letter?

4    A.  I don't know who wrote it.

5    Q.  Do you know who distributed it?

6    A.  I don't.

7    Q.  Do you know if it was distributed?

8    A.  I don't.

9    Q.  Do you know if it's the death that was referred to as the

10   Greer death that you described as 483?

11          MS. PEREZ:  Objection, Your Honor.  It was asked and

12   answered.  He said he didn't know.

13          THE COURT:  Sustained.

14   BY MR. FERGUSON:

15   Q.  Turning back to the e-mail, you say to Dr. Rosch:  We will

16   see if it gains any traction.

17          Can you tell me what you meant by that?

18   A.  Again, this is going back four years.  I am guessing I was

19   referring to the Attorney General alert and the consumer fraud

20   alert regarding the deception issue.

21   Q.  And the traction would be if the Attorney General alert or

22   the consumer fraud alert resulted in further investigation by

23   those entities?

24   A.  Increased awareness and investigations.

25          MR. FERGUSON:  Nothing further, Your Honor.
```

```
 1                THE COURT:  All right.

 2                MS. PEREZ:  Your Honor, will you allow me a brief

 3     recross on one --

 4                THE COURT:  You can proffer at the bench.

 5                (Bench conference, as follows:)

 6                MS. PEREZ:  One of the documents --

 7                THE COURT:  Wait.

 8                MS. PEREZ:  I'm sorry.  One of the documents wasn't

 9     offered on direct, and so I didn't go outside of that scope.

10     I would like to ask a couple of questions.  And another

11     document that was actually gone into on direct, and he asked

12     additional questions about, and I would like some follow-up on

13     that, if Your Honor would allow me just some leeway.

14                THE COURT:  Okay.

15                (End of bench conference.)

16                     *-*-*-*-*-*-*-*

17                     RECROSS EXAMINATION

18     BY MS. PEREZ:

19     Q.  Just a few more questions, Mr. Wallen, if you will indulge

20     me.

21                MS. PEREZ:  May I have Plaintiff's Exhibit 74,

22     please.

23     BY MS. PEREZ:

24     Q.  Dr. Wallen -- I am sorry.  Mr. Wallen, this e-mail that

25     you sent to Mr. Rosch, where you say, "75 congressional visits
```

1    went extremely well on Tuesday," do you see that statement?

2    A.  Correct.

3    Q.  That is referring to the Allergy and Asthma Day on Capitol

4    Hill that happened on May 5th, 2014?

5    A.  Yes.

6    Q.  And those are the 75 congressional visits where people on

7    behalf of Mothers are expressing their concerns to government

8    officials, correct?

9    A.  Correct.

10   Q.  And the activities that led up to the Allergy and Asthma

11   Day on Capitol Hill, in terms of the media blitz and

12   everything like that, would you say, would it be fair to say

13   that was also in connection with raising awareness to

14   government officials about what was going on in the RPA

15   industry?

16   A.  Yes.

17   Q.  And do you believe that the government officials have a

18   right to know about use of Medicare dollars in the allergy

19   testing and immunotherapy industry?

20   A.  Yes.

21            MS. PEREZ:  Plaintiff's Exhibit 75, please.  Thank

22   you.

23   BY MS. PEREZ:

24   Q.  Mr. Ferguson has asked you a number of things about the

25   e-mail from September 22nd, 2014, the exchange between you and

1    Ms. Winders, and I would like to ask you a couple of more

2    questions about that.

3                MS. PEREZ:  Can we turn to the second page?

4    BY MS. PEREZ:

5    Q.  And this e-mail is about the conversations that you were

6    having with the AAOA, correct?

7    A.  Correct.

8    Q.  And that is the ENT association, right?

9    A.  A subset of the ENTs perform allergy, right.

10   Q.  And the ENTs have not been sued in connection with this

11   lawsuit, right?

12   A.  Not to the best of my knowledge.

13   Q.  Okay.  Let's go to item number 1.  I think you covered

14   item number 2.  Item number 1, you say it is very clear that

15   the ENTs do not want to discuss the lawsuit, RPA or anything

16   regarding any specialist or nonspecialist providing allergy

17   care.

18                Do you see that?

19   A.  Yes.

20   Q.  And what was Ms. Winders' response to your opinion about

21   the ENTs that you spoke with at the conference?

22   A.  She says that:  It is an interesting response and clearly

23   demonstrates they are afraid to speak out and have been

24   coached on a response.  This is not about one company but a

25   deceptive business practice that has clearly harmed patients

1    and the government payors.  Why do you think they are afraid?

2    Q.  Okay.  Let's skip to number 5.  And this is the comment

3    that Mr. Ferguson went over with you about Mothers being a

4    mouthpiece for the AAAAI or the allergist association,

5    correct?

6    A.  Correct.

7    Q.  And in this e-mail, you say that you explained to them

8    that AANMA has nothing against any one company and is fighting

9    for quality medical care for allergic patients.

10            You still believe that today, don't you?

11   A.  I do.

12   Q.  And what was Ms. Winders' response to the AAO's opinion

13   that Mothers was a mouthpiece for the allergist?  What was her

14   response to that?

15   A.  She said she would be happy to discuss the terminology,

16   specialists that includes the ENTs, and she actually asked me

17   to set up a meeting with Jami so that they could kind of meet

18   and discuss ways that they could assist each other.

19   Q.  Ways that the ENTs could become involved?

20   A.  Right.

21   Q.  Because allergy patients are treated by ENTs; isn't that

22   correct?

23   A.  Correct.

24   Q.  And then she says:  Allergy and Asthma Network has never

25   nor will make this an issue about one entity.  Our goal has

```
 1    been and will continue to be raising awareness about quality
 2    of care and deceptive business practices as reported to us by
 3    patients.  We would be remiss to not raise awareness and
 4    educate people on the potential risks associated with
 5    treatment by an untrained professional.
 6            You still believe that is Mothers and Ms. Winders'
 7    intent to this day, don't you, Mr. Wallen?
 8    A.  I do.
 9    Q.  Let's go to the front page of this e-mail, Plaintiff's
10    Exhibit 75.  We just discussed how Ms. Winders posed a
11    question to you in that e-mail:  Why do you think they are
12    afraid?  Meaning the ENTs.
13            Do you remember that, Mr. Wallen?
14    A.  I do.
15    Q.  And she responds to that -- or you respond to her question
16    posed to you, "Why do you think the ENTs are afraid?" in this
17    September 22nd, 2014 e-mail at 10:02 p.m., right?
18    A.  Right.
19    Q.  And what was your response to Ms. Winders' question?
20    A.  I think they are afraid because of the lawsuit and the
21    deep pockets involved.  And, yes, I am quite sure they were
22    well coached to not speak about it.  Again, this is the intent
23    of the lawsuit, in my opinion.  I am available Thursday
24    afternoon before 3:30 to touch base.
25    Q.  And it is still your opinion today that this is the intent
```

1    of UAS's lawsuit?

2    A.   Correct.

3    Q.   And as part of the settlement that you entered into, in

4    order to be dismissed with this lawsuit, you had to agree you

5    would never say anything negative about UAS again, didn't you?

6    A.   Correct.

7              MS. PEREZ:   No further questions, Your Honor.

8              THE COURT:   You can step down.

9              We will take our morning recess at this time.

10             (Brief recess.)

11             (Change of reporters.)

12             *-*-*-*-*-*-*-*

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Change of reporter)
 2        (Open court)
 3             THE COURT:  You have your witness here?
 4             MR. PRICHARD:  We do, Your Honor.
 5        (Jury enters courtroom)
 6             THE COURT:  All right.  You may be seated.
 7        Sometimes in a trial we take a witness out of order because
 8   of scheduling and other difficulties.  We are going to do that
 9   today.  We have a defense witness who, because of some timing
10   problems, won't be available next week.  And so we're going to
11   take her testimony now, although the plaintiff has not yet
12   rested.  This is a witness for the defendant that would
13   otherwise be called next week but won't be available next week
14   to testify.  So we're going to take this first defense witness
15   today; then we'll go back into the plaintiff's regular
16   presentation of their witnesses.
17        All right.  Mr. Prichard.
18             MR. PRICHARD:  Thank you, Your Honor.
19        Mothers and Tonya Winders would call Dr. Cyndi Porter.
20             THE COURTROOM DEPUTY:  Please raise your right hand to
21   be sworn.
22        (The oath was administered)
23             THE COURTROOM DEPUTY:  Thank you, ma'am.
24
25
```

```
 1              CYNDI PORTER, DEFENDANT'S WITNESS, SWORN
 2                         DIRECT EXAMINATION
 3   BY MR. PRICHARD:
 4   Q.  Good morning.
 5   A.  Good morning.
 6   Q.  Would you tell the ladies and gentlemen of the jury your
 7   full name, please, ma'am.
 8   A.  Yes.  My name is Dr. Cyndi Wilson Porter.
 9   Q.  Okay.  Dr. Porter, I think the jury has heard a little bit
10   about you.  Now we're going to hear directly from you.  And I
11   have told Mr. Ramos, who I think's going to be asking you some
12   questions, that I think we can do this in well under an hour
13   together.  All right?
14   A.  We'll try.
15   Q.  But couple of rules.  Just because we're going to try to
16   finish quickly doesn't mean we're going to speak quickly
17   because we have Mr. Poage who has to take everything down.  We
18   have all the jurors who have to hear you, and there are people
19   out in the gallery that need to hear.  So you need to keep your
20   voice up and speak slowly.  I think I know that you have a
21   career as a teacher and an educator.  So that shouldn't be a
22   problem.
23   A.  No.  I might hurt people with the microphone.
24   Q.  Yes.  Well, I have kind of the same problem.  So no one's
25   ever accused me of speaking too quietly.
```

1    If I ask you a question, Dr. Porter, that you don't

2  understand or you'd like me to rephrase it or repeat it, just

3  ask me to do that.  Will you do so?

4  A.  Yes.

5  Q.  Okay.  Where do you live, Dr. Porter?  What city?

6  A.  I live here in San Antonio.

7  Q.  And what do you do for a living?

8  A.  Well, I'm an adjunct teacher at the University of the

9  Incarnate Word.  And I'm also, for my day job, the vice

10  president for extended academic programs, which is the adult

11  evening and online programs, as well as continuing education.

12  Q.  Okay.  So you teach.  You're an adjunct teacher.  And I

13  think I know, because you gave your deposition earlier, you're

14  a chemistry teacher?

15  A.  Yes, I am.  That's what all my degrees are in.

16  Q.  And all of us that had to struggle with the periodic table,

17  you're the one up there instructing us or trying to instruct us

18  on the periodic table?

19  A.  That's right.  Greatest cheat sheet in the world.

20  Q.  Okay.  How long have you been a vice president at the

21  University of the Incarnate Word?

22  A.  I want to say April of 2008.  It was 2008.  So ten years.

23  Q.  Okay.  And as I understand it, your husband is also an

24  educator and an administrator at the U?

25  A.  Yes.  He's the dean for the School of Professional Studies,

1    which is our unit that has business -- primarily business-type

2    degrees.  And it's for the adults.

3    Q.  Okay.  So I've referred to you this morning as Dr. Porter.

4    Now, they've heard from family practice doctors.  They're going

5    to be hearing -- the jury's going to be hearing from allergist

6    MDs.  Are you an MD or a Ph.D.?

7    A.  I'm a Ph.D.  I'm the ones that flunk the doctors in organic

8    chemistry.

9    Q.  Okay.  And so you're basically -- you're an academic?

10   A.  Yes, I am.

11   Q.  All right.  Now, let's talk about your work at the UIW.

12   And if I refer to UIW, we're talking about Incarnate Word,

13   right?

14   A.  Correct.

15   Q.  Okay.  Vice president for adult education, online

16   education, and you also help our veterans and our active duty

17   folks?

18   A.  Right.  I'm the point of contact for the Department of

19   Defense for all active duty military, and I'm also responsible

20   for veterans education.

21   Q.  Let's get to it, Dr. Porter.  And you've got water up

22   there, and I've given you a few exhibits.  And you also

23   brought -- a little situation -- if anything occurs, feel free

24   to use that as well.  Okay?

25   A.  Thank you.

CYNDI PORTER - DIRECT                    872

1   Q.  All right.  As vice president for extended academic

2   programs, did you ever become acquainted with United Allergy

3   Services or UAS?

4   A.  Yes.

5   Q.  How did you become acquainted with that group in your role

6   at Incarnate Word?

7   A.  I was contacted by the president at that time, Dr. Louis

8   Agnese.  And he was having a meeting with the United Allergy

9   folks.  And he asked me to come to that meeting.  And my role

10  in the meeting was to listen, and if I felt that there were

11  some ways that we could work together to bring that.

12  Q.  Just give the ladies and gentlemen of the jury an idea of

13  kind of what was going on at the meeting.  What was UAS trying

14  to do in conjunction with UIW, if you recall?

15  A.  Oh, I recall.  What was actually taking place at the

16  meeting was really just brainstorming.  There were, at my

17  remembrance, potentially three or four of us from UIW, the

18  president of UIW, and I want to say four people from United

19  Allergy.  And it was very much a get-to-know-you kind of a

20  meeting.

21      The two principles -- the gentleman that was the president,

22  I think, of United Allergy Labs and Dr. Agnese -- knew each

23  other.  And so it was just simply a -- is there something we

24  can do together?  Just real exploratory.

25  Q.  Okay.  And the gentleman who was the president, was that a

1   gentleman with an Australian accent named Nick Hollis?  Do you
2   remember Mr. Hollis?
3   A.  Nick was there.  I remember that, yes.
4   Q.  Okay.  Do you remember a gentleman who was a chiropractor
5   named Dr. Strader?
6   A.  That's the person I'm talking about with Dr. Agnese.  They
7   knew each other well.
8   Q.  Okay.  And Mr. Strader's a chiropractor.  Did you know
9   that?
10  A.  No, I did not.
11  Q.  Okay.  And he was one of the founders of UAS.  Is that your
12  understanding?
13  A.  I think so, yes.
14  Q.  Okay.  Do you recall about when this was, Dr. Porter?
15  A.  Well, I know that the first meeting that I had outside of
16  this was in the range of 2010.  And at that point in time and
17  now much grass doesn't grow under my feet.  So I would say it's
18  probably in that timeframe.
19  Q.  Okay.  So roughly seven, eight years ago?
20  A.  Yes.
21  Q.  All right.  Did you come to meet some other folks,
22  management folks at UAS in the course of your dealing with
23  them?
24  A.  Yes.
25  Q.  All right.  And did you meet a young lady named Hope Solis

1  and a gentleman named Tim Crimmins?

2  A.  Yes.  I know both of those two individuals.

3  Q.  Okay.  And did they become -- Ms. Solis and Mr. Crimmins

4  become your points of contact with UAS?

5  A.  Yes.

6  Q.  All right.  And were you the point person with what we're

7  going to talk about?  The arrangement between UIW and UAS, were

8  you the point person at UIW for this relationship?

9  A.  Yes.

10  Q.  Are you still today?

11  A.  Yes.

12  Q.  Is there still a relationship even into 2018?

13  A.  Well, I wouldn't -- I guess I wouldn't call it a

14  relationship so much as we deliver some product for them, the

15  certificates.

16  Q.  We'll get to that.  But I'll call that a relationship

17  and --

18  A.  Okay.

19  Q.  Does it still exist today in 2018 as far as you know?

20  A.  Yes, it does.

21  Q.  Okay.  So when you got down to talking to Ms. Solis and

22  Mr. Crimmins about UIW and UAS working together, what kind of

23  came out of that?

24  A.  Well, we had -- we had a meeting where I took -- I was

25  present.  My dean for the School of Professional Studies, as

1    it's called now, was present.  I also had Julie Weber who was
2    my director of marketing and recruitment.  And we talked -- we
3    talked to them about two potential areas that we could work
4    together with.
5         The first area, which was obviously near and dear to my
6    heart, because I wouldn't have had my marketing and recruitment
7    person there, was that we could look at some kind of an
8    academic relationship where they could -- they could transfer
9    credit potentially into a degree program.  What we found at
10   that point was that the way that we would have to be able to do
11   that legitimately in an academic setting is for them to get ACE
12   credit for their training courses.
13   Q.  All right.  Now -- thank you.  What is ACE?
14   A.  It's the American Council of Education.
15   Q.  And what does ACE do that's different from what the UIW
16   does?
17   A.  When you're talking about credits, you have -- you have
18   credits that can be transferred in, and in some cases from,
19   say, military or from training programs.  And in order to
20   transfer those in, to meet academic requirements, they have to
21   have external certification.
22        And the external certification that is most commonly done
23   in academic institutions is for people to take a test, which is
24   called DANTES, or the other way is to take your training
25   program or your military programs to the American Council of

CYNDI PORTER - DIRECT                    876

1    Education and ask them to look at those courses and determine
2    if they are creditworthy.
3        All right.  They will send in a team of academics like me,
4    depending upon what it is they're trying to -- the area they're
5    trying to do.  And the academics will go in, and they will look
6    at a variety of different things.  They'll look at training
7    materials.  They'll look at minutes.  They'll look at clock
8    hours.  They'll look at all kinds of things to determine --
9        (Sneezing in the audience)
10           THE WITNESS:  God bless you -- yes or no, if it would
11   be an appropriate course to receive academic credit.  And if
12   so, how many credit hours?  It's expensive to do.
13   BY MR. PRICHARD:
14   Q.  Did you discuss that possibility, though, that academic
15   possibility with Ms. Solis and Mr. Crimmins and others at UIW?
16   A.  Yes.
17   Q.  And did that ever come about?
18   A.  No.
19   Q.  To this day has it ever come about?
20   A.  No.
21   Q.  All right.  Did there ever come a time, if you can recall,
22   Dr. Porter, that you were ever introduced to the medical
23   director for the company for UAS from South Carolina, an
24   allergist by the name of Dr. Fred Schaffer?  You ever meet
25   Dr. Schaffer in the last eight years?

1   A.  I do not think so.  The only other person I can remember is

2   a gentleman by the first name of Shane.

3   Q.  Okay.  So Fred Schaffer, Dr. Schaffer, the medical director

4   at UAS doesn't ring a bell, and you don't recall ever meeting

5   him, correct?

6   A.  I really don't.

7   Q.  All right.  Now, was there ever a discussion, back to

8   Ms. Solis and Mr. Crimmins, about what you describe as a

9   virtual portal?

10  A.  Absolutely, yes.

11  Q.  What is -- tell us, that don't have any idea, what a

12  virtual portal is.

13  A.  Okay.  I started the online program at the University of

14  the Incarnate Word.  And when we refer to virtual, you're

15  talking about taking coursework online.  All right.  At the

16  time we were talking, that was still my major responsibility.

17  I was the dean of the virtual university.

18      So what I talked to them about is a second -- a second

19  option would be for UIW to build a portal for them, where they

20  could -- they could actually take training courses within it.

21  If they wanted to have an academic wing, where they could

22  take -- if people wanted to take academic courses, they could

23  do that.  They could do a variety of different things in that

24  portal.  They elected not to do that.

25  Q.  Okay.  And so the jury has a reference about what we're

1    talking about, this is for training their technicians, correct?

2    A.  Correct.

3    Q.  All right.  This isn't about a management tool for their

4    management, their owners, their president.  This is about the

5    people that will be working in and around the patients.  Am I

6    right about that?

7    A.  Yes, you are.

8    Q.  Okay.  And was the virtual portal ever adopted?

9    A.  No.

10   Q.  Did that disappoint you?

11   A.  Of course.

12   Q.  Did Ms. Solis or Mr. Crimmins ever give you any reason why

13   the virtual portal was not acceptable to them?

14   A.  No.  They just weren't ready to move in the academic

15   direction.

16   Q.  All right.  Was there discussion with Ms. Solis and

17   Mr. Crimmins at UAS to somehow explore an arrangement with UIW

18   that could give their technicians that they were training some

19   kind of college credit through UIW?

20   A.  No.

21   Q.  All right.  If that had happened, is that a rigorous

22   process for them to get some academic and some credentialing

23   through the American College -- or the American council of

24   educators?

25   A.  Yes.  It would take at least a year.  And the money was

CYNDI PORTER - DIRECT                                    879

```
 1   significant.
 2   Q.  Okay.  What is "credentialing"?  What does that mean?
 3   A.  I'm not -- I'm not sure.  That word has been used -- has
 4   been used quite a bit.  When I use it, "credentialing," I'm
 5   talking about academic.  And that is that you go to ACE.  And
 6   ACE, in other words, assesses it and almost acts as an
 7   accreditor, if that makes sense.  I mean, they are the ones
 8   that say yea or nay, this is worth credit.  That could be
 9   called credentialing.
10   Q.  As far as you know, did the UAS training ever receive any
11   type of credentialing through the University of the Incarnate
12   Word?
13   A.  No.  They received a certificate of completion.
14   Q.  We'll get there.
15   A.  Okay.  So no.
16   Q.  Okay.  As far as credentialing, did UIW to this day offer
17   any credentialing to the program that we're going to be talking
18   about, that UAS employed?
19   A.  No.
20   Q.  All right.  As far as you know, did any other official
21   credentialing body, nationally, regionally or anywhere, as far
22   as you know, ever certify the UAS training program for its
23   technicians?
24   A.  Not that I know, no.
25   Q.  Did the UAS training program ever -- from 2010 when you
```

1   started until 2018, ever qualify for any college credit at UIW?

2   A.  No.

3   Q.  Did you -- were you provided by Mr. Crimmins and Ms. Solis

4   some of the training materials that they were going to employ

5   in training their techs?  And by them, I mean UAS.

6   A.  Yes.

7   Q.  Did they show them to you?

8   A.  Yes.  At that first meeting.

9   Q.  Okay.  Did you review them?

10  A.  I looked at them, yes.

11  Q.  Okay.  And did it become very apparent to you that what

12  they gave you would not stack up for academic credentialing?

13  A.  Correct.

14  Q.  So after -- how many discussions did you have with

15  Ms. Solis, Mr. Crimmins before they arrived at the relationship

16  that they did arrive with, with UIW?

17  A.  I would say probably two.

18  Q.  Okay.

19  A.  And maybe had a phone conversation after.  And that would

20  be it.

21  Q.  And tell the ladies and gentlemen of the jury what it is

22  that UAS opted to do.

23  A.  They do what's called a certificate of completion.  What

24  that means is that UAS -- or UAL, sorry -- has them go through

25  a series of training.  They have a group of things that they do

1    as a group before they're prepared to go out in the field and

2    do whatever they do for UAL.

3         And what a certificate of completion does is it simply says

4    that they have completed that training successfully.  Whatever

5    that training is, they completed it successfully.  It's an

6    ordinary thing to do in continuing education.  They do it in

7    community colleges.  So it just simply means, they would tell

8    us, this group of people have successfully done the training,

9    and we would give them the certificate of completion.

10   Q.  Okay.  Dr. Porter, I have two daughters.  They went to the

11   UIW, and they received a certificate of completion for Ken

12   Burmeister's Basketball Camp affiliated with the Silver Stars.

13   Is the University still partnering with the Silver Stars who

14   are about ready to leave town now?  Do you know?

15   A.  You know, I don't know.  I know they have but --

16   Q.  Okay.  And if they went all five days, what document would

17   my daughters get, and what document did they get?

18   A.  A certificate of -- a certificate of completion.

19   Q.  Okay.

20   A.  Same thing you get in tennis camp.

21   Q.  Okay.  They didn't get to certify that they were part of

22   the Silver Stars or part of the Lady Cardinals or anything like

23   that?

24   A.  No.

25   Q.  No Vickie Johnson, no Becky Hammon, nothing like that?

1    A.  No.

2    Q.  Okay.  As far as you know, did any faculty member at UIW

3    ever teach part of or a segment of the UAS training program?

4    A.  Absolutely not.

5    Q.  Do you know if any faculty member at UAS -- at UIW ever

6    helped write or prepare any part of their training program?

7    A.  Absolutely not.

8    Q.  As far as you know, was 100 percent of the coursework that

9    these techs took to get their certificate of completion taught

10   in-house by UAS people?

11   A.  Yes.

12   Q.  As far as you know, was that training program ever reviewed

13   by the American Council of Education or any licensing or

14   credentialing authority or medical review board whatsoever?

15   A.  No.

16   Q.  Does UIW ever, from 2010 to the present, certify UAS techs?

17   A.  They do not.

18   Q.  Does UIW even have a credentialing department?

19   A.  No.

20   Q.  All right.  Mr. Glass, if we could -- I'm going to ask you

21   to look at some documents with me, Dr. Porter.  And I have them

22   in a little folder there.  And it'll also come up on the

23   screen.  The first exhibit is Defendant's Exhibit 39, which has

24   previously been admitted.

25       Mr. Glass, could you put Defendant's Exhibit 39 up?  And

CYNDI PORTER - DIRECT                                883

1  that's a little hard to read.  Could you blow -- any chance you

2  can blow that up?

3      All right.  Now, you recognize defendant's exhibit as a

4  piece of information from United Allergy Services.  Do you see

5  that -- their logo up at the top?

6  A.  Yes.

7  Q.  And, of course, we see the pretty infamous tower and logo

8  of UIW.  That's pretty well known here in San Antonio and in

9  the southwest, isn't it?

10 A.  Yes, it is.

11 Q.  All right.  Is there anywhere in the agreements that you've

12 written or seen where UIW actually gave permission to UAS to

13 use your logo?

14 A.  No, we did not.

15 Q.  All right.  Now, read up here with me.  It says, "Our

16 technicians and CASs are USP-797 qualified and certified by the

17 University of the Incarnate Word."  You see that?

18 A.  Yes, I do.

19 Q.  Is that -- yes or no, Dr. Porter -- a true statement?

20 A.  No.

21 Q.  Why isn't it?

22 A.  We give them a certificate of completion.  We don't qualify

23 or certify.  We simply give them the certificate of completion

24 when they are successfully completed.

25 Q.  All right.  If you saw Mr. Strader or Mr. Hollis and you

CYNDI PORTER - DIRECT                                    884

```
 1   saw this, would you ask him to rephrase it or do something
 2   different about this promotion?
 3   A.  Yes.
 4   Q.  All right.  Do you know what USP-797 even is?
 5   A.  No, I don't.
 6   Q.  As far as you know, did UIW ever qualify any of their
 7   technicians to be USP-797 qualified?
 8   A.  No.
 9   Q.  Thank you, Mr. Glass.
10       Could you -- Dr. Porter, would you look at your folder and
11   look at Exhibit D-40?
12   A.  I have it.
13   Q.  Do you recognize that document?
14   A.  Yes, I do.
15   Q.  What is that document?
16   A.  It's the certificate of completion.
17           MR. PRICHARD:  All right.  Your Honor, at this point
18   we would offer Defendant's Exhibit 40 into evidence.
19           MR. RAMOS:  No objection, Your Honor.
20           THE COURT:  Received.
21       (Defendant's Exhibit No. 40 admitted)
22   BY MR. PRICHARD:
23   Q.  And, Dr. Porter, I apologize.  These are very light up on
24   the screen.  But what are we looking at here?  Tell the ladies
25   and gentlemen of the jury what this document is.
```

CYNDI PORTER - DIRECT                                    885

1   A.  This is the certificate of completion that we generate once

2   we receive a list of people who have successfully completed

3   their course of training.  You'll notice it says, "Successfully

4   completed the required course of study and is therefore awarded

5   this certificate for" -- and this is the name, "certified

6   clinical allergy specialist," that they used at that time.

7   Q.  So it says "certified clinical allergy specialist," but

8   you've already told the jury that UIW's not certifying them?

9   A.  No.  That's the name that they gave us to be put on there.

10  Q.  Wait.  Let me make sure I understand.  UAS gave Incarnate

11  Word the name "certified"?

12  A.  Uh-huh.

13  Q.  Is that yes?

14  A.  Yes.  I'm sorry.  Yes.

15  Q.  That's okay.  Thank you.

16      So I've got a couple of questions about this document.  I

17  anticipate that at some point those folks that finish their

18  training at UAS, their name goes in there; is that right?

19  A.  Yes.  I asked that they redact that so that we don't

20  violate privacy for a student's name.  It falls right in the

21  yellow space.

22  Q.  Okay.  So would UIW -- I'm sorry -- put the recipient's

23  name in there, or would UAS do that?

24  A.  We would get an Excel spreadsheet, and the Excel

25  spreadsheet would tell us the name of the student.  It would

CYNDI PORTER - DIRECT                                    886

 1    give us the date that they completed, and it would tell us the
 2    specific name that they wanted on their certificate.
 3    Q.   Okay.  So let me make sure I understand.  In order for the
 4    folks at UAW -- or UAS to get one of these certificates, you,
 5    Cyndi Porter, you go to their training facility, and you make
 6    sure that they complete, and you're there while they're being
 7    trained, right?
 8    A.   No, no.
 9    Q.   Wait a minute.  Well, how do you know that they've even
10    finished the program?
11    A.   Because the folks in the department at United Allergy would
12    send me an Excel spreadsheet via email.
13    Q.   So you take their word for it?
14    A.   Yes.
15    Q.   You don't actually -- there's no chemistry professor, no
16    nursing prof, no doctor -- no teacher, professor goes over
17    there and makes sure that these folks actually complete the
18    weeklong session?
19    A.   No.  It's their training program.  And we trust them to
20    give us a list of successful completers, and we do the
21    certificates.
22    Q.   Okay.  So where on campus, on UIW, does this training take
23    place?
24    A.   It does not.  It takes place at United Allergy.
25    Q.   It doesn't even occur on campus?

CYNDI PORTER - DIRECT                                887

```
 1   A.  No.
 2   Q.  Now, I'm going to ask you -- thank you, Mr. Glass.
 3       Dr. Porter, if you would, would you look at Defendant's
 4   Exhibit 42?
 5   A.  Yes, sir.
 6   Q.  Do you recognize that document?
 7   A.  Yes.  It's an invoice.
 8   Q.  And what is -- and is it a front-and-back document?  Is
 9   there -- is there --
10   A.  No.  Well, this --
11   Q.  I mean, is there a -- is there something on the front and
12   the back?  That's what I'm asking.
13   A.  Oh, in the original document?  No.  It's simply an invoice
14   where we list the certificate names on the front.
15   Q.  Okay.  But Defendant's Exhibit 42 has an invoice on the
16   front and has another invoice on the back.  It was just
17   paginated that way?
18   A.  I just -- yeah.  I simply think if you look at the invoice
19   numbers on 42, it's invoice number 169.
20   Q.  Yes, ma'am.
21   A.  And if you turn it over, it's invoice number 198.  So I
22   think someone just photocopied front to back of two invoices,
23   is what it looks like to me.
24   Q.  Okay.  Do you recognize this document?
25   A.  Yes.  I created it.
```

1           MR. PRICHARD:  All right.  We'd offer Defendant's

2    Exhibit D-42, Your Honor.

3           MR. RAMOS:  No objection, Your Honor.

4           THE COURT:  Received.

5       (Defendant's Exhibit No. 42 admitted)

6    BY MR. PRICHARD:

7    Q.  Now, would you walk us through and tell us what D-42 is?

8    A.  Well, the important -- the important things would be the

9    invoice number, which is in the upper right-hand corner, and

10   the date that it was done.  Then it was sent to our contact for

11   billing, which is Nancy Underwood, which you can see there, and

12   then United Allergy Services' address and information.

13          And then if you look down in the center where you can see

14   the big table, the table would start out with when they

15   completed their training, which in this case was the week of

16   October 8th through the 12th, 2012 -- I was going to say 1912.

17   Excuse me.  And then underneath that, the list of the names of

18   the students that we created certificates for.  And it was at a

19   hundred dollars each.  So for this one we invoiced them for

20   $1,100.

21   Q.  So let me make sure I understand.  Who gave you the names

22   of the certificate holders?  Where did those names come from?

23   A.  UAS.

24   Q.  Did UIW ever meet any of these students?

25   A.  No.

1    Q.  And in order to get the certificate that we looked at

2    earlier, UAS would send over this list, and you would bill them

3    $100 for each certificate.  They would pay it, and then that

4    student would get that certificate of completion?

5    A.  Yes, sir.

6    Q.  Okay.  That's the total extent of UIW's involvement in this

7    process, correct?

8    A.  Yes, sir.

9    Q.  All right.  And then on the back -- I don't know,

10   Mr. Glass, if you can --

11       Do you see that, Dr. Porter, the back side?  It's invoice

12   number 198.

13   A.  Yes, sir.

14   Q.  So the front side was from October of 2012, and the back

15   side, which is also Trial Exhibit D-42, is from November of

16   2015, approximately three years later?

17   A.  Correct.

18   Q.  Looks like the format's pretty much the same.

19   A.  It is the same.

20   Q.  And, again, the names that came for the certificate

21   holders, they came to you or to your offices, and you're the

22   appropriate person at UIW for certificates to be issued, and

23   they compensated you at $100 per certificate?

24   A.  Yes, sir.

25   Q.  All right.  And they paid that?

1    A.  Yes.

2    Q.  All right.  Thank you, Mr. Glass.

3        Dr. Porter, I'm going to ask you to look at Defendant's

4    Exhibit 41.  Do you have that there in front of you?

5    A.  Yes, I do.

6    Q.  Do you recognize it?

7    A.  Yes.  This was -- this was one of my secretaries.  She's no

8    longer with me.  But she kept a running total of the invoices

9    that we sent out and the invoice number.  So this was simply

10   her way of keeping track.

11       So you'll notice, when you look at it, it starts with

12   invoice number 211.  All right.  So she knew the next time that

13   we sent one through, that it was going to be 212.  And she

14   would log that.  So this is Joy's log.

15   Q.  Okay.  So it's a compilation of some of these invoices over

16   a year or two period?

17   A.  Yes, sir.

18   Q.  Okay.  Now, so the jury fully understands, sometime ago you

19   gave a deposition; is that right?

20   A.  Yes, I did.

21   Q.  And you gave a deposition.  I believe Mr. Bernell was

22   present, and he asked you questions.  Ms. Stahl was present.

23   She asked you questions.  And you swore under oath like you

24   swore with Ms. Nowlin today, correct?

25   A.  Yes, I did.

CYNDI PORTER - DIRECT                                    891

```
 1   Q.  All right.  And some of these exhibits, if not all of them,
 2   were shown to you and discussed at that deposition?
 3   A.  Yes.
 4   Q.  So that's why you have some familiarity.  And also, you
 5   created some of them, correct?
 6   A.  Yes.  Yes.
 7   Q.  All right.  You and I met for the very first time out in
 8   the hall 20 minutes ago?
 9   A.  Yes.
10   Q.  All right.  I've never -- I haven't spoken to you on the
11   phone, have I?
12   A.  No.
13   Q.  And we provided a subpoena to Ms. Escamilla who is out
14   here, the general counsel at University of Incarnate Word, for
15   you to appear, right?
16   A.  I received a subpoena, yes.
17   Q.  Okay.  No one's paying you for your time?
18   A.  No.
19   Q.  That's why we're trying to hurry.  And you're going to be
20   gone next week.  And that's why Ms. Escamilla and you have
21   asked the Court to take you out of order; is that correct?
22   A.  Yes.  Next week is spring break.  Sorry.
23   Q.  Okay.  I hope you have a wonderful time, because the rest
24   of us in here aren't going anywhere, I think.
25   A.  Sorry.
```

```
 1   Q.  All right.  So looking at number D --
 2           MR. PRICHARD:  We'd offer Defendant's 41, Your Honor.
 3           MR. RAMOS:  No objection, Your Honor.
 4           THE COURT:  Received.
 5       (Defendant's Exhibit No. 41 admitted)
 6   BY MR. PRICHARD:
 7   Q.  Let's take a look at D-41 very briefly.  This is a little
 8   busy.  It's okay.  You all right?
 9   A.  No.  I didn't mean to cough into the microphone.
10           THE COURT:  Go ahead.  Can you kind of show us --
11       Mr. Glass, do you have a pointer?
12           TECHNOLOGY SPECIALIST:  Yes.
13   BY MR. PRICHARD:
14   Q.  I'm going to give you a dangerous tool.  You ever use a
15   laser pointer?
16   A.  Of course.  I'm a teacher.
17   Q.  May I approach, Your Honor?
18       Don't shoot it at me like some of those kids might.
19       So this looks kind of like a spreadsheet a little bit.  And
20   just kind of point us out the various categories.
21   A.  Well, when you look here, this was the date that she would
22   have invoiced.  This is the invoice number.
23       I'm not good at these, even though I do teach.
24       This was the date that was on the certificate.  This is the
25   amount we billed for that particular invoice.  This is when
```

1   they delivered the certificates.  And this would be when we

2   received the payment.

3   Q.  Okay.  And so let me ask you.  This covers 2013 -- a part

4   of 2013 and 2014?

5   A.  Correct.

6   Q.  So it didn't pick up the first, say, two-thirds of 2013 or

7   the latter part of 2014.  This is sort of a --

8   A.  Snapshot.

9   Q.  Thank you.  A snapshot, if you will, of the billings by UIW

10  to UAS for the certificates of completion?

11  A.  Yes.  This was done by my administrative assistant at the

12  time.  And this, we found later, after she left, was how she

13  kept track.

14  Q.  All right.  And tell the ladies and gentlemen of the jury

15  in that time period how much total -- is there a total amount

16  received at the end of that invoice by UIW?

17  A.  Yes.  It's 52,500.

18  Q.  Okay.  So for certificates only UAS paid UIW 52,500 for

19  that period of time?

20  A.  Yes.

21  Q.  Thank you.

22      Okay.  Thank you, Mr. Glass.

23      Now I'm going to ask you to look with me -- you mentioned a

24  gentleman by the name of Shane.  And I want you to look at

25  Trial Exhibit Number D-43.  Do you see that?

```
 1  A.  Yes, I do.
 2  Q.  Who is Shane Frazier?
 3  A.  Well, according to this, he's the national director of
 4  clinical operations for United Allergy Services.
 5  Q.  All right.  And according to this, you had a meeting, you
 6  personally met with Shane Frazier to have a discussion about
 7  another possible certification, correct?
 8  A.  Yes.
 9  Q.  All right.  And does this document discuss that meeting?
10  A.  Yes.
11          MR. PRICHARD:  All right.  We'd offer Defendant's 43,
12  Your Honor.
13          MR. RAMOS:  No objection.
14          THE COURT:  Received.
15      (Defendant's Exhibit No. 43 admitted)
16  BY MR. PRICHARD:
17  Q.  So now, we've moved ahead up to March of 2014.  So that's
18  about four years ago.  And do you remember this discussion with
19  Shane?
20  A.  Yes.  Hope Solis was also there.
21  Q.  Okay.  Tell us what the purpose of that meeting was,
22  Dr. Porter.
23  A.  He had come into town and was excited about potential other
24  opportunities that we could do.  So, again, it was a
25  brainstorming kind of a deal.  He was talking about maybe
```

CYNDI PORTER - DIRECT                                895

1    taking this into a national certification.  And, again, we

2    talked about ACE credits.

3    Q.  Okay.

4    A.  Yeah.

5    Q.  Did you talk about an organization called AAFA, or did he

6    mention the AAFA to you?

7    A.  He did.  And I can't tell you what it stands for.  I know

8    it was a national group.  And he was -- he was excited about a

9    potential to do some kind of an agreement.  But, again, we

10   talked, to do that we really needed to look at American Council

11   of Education credits.

12   Q.  Okay.  So there's no misunderstanding, UIW in March of 2014

13   still was not certifying this program, were they?

14   A.  Correct.  No, we were not.

15   Q.  All right.  So let's start with the -- with the sentence

16   that begins, "I will talk."  Do you see what I'm -- I think

17   it's the third sentence there.

18   A.  Yes, I see it.

19   Q.  "I will talk about this with Mike next week to discuss" AF

20   -- "AAFA endorsing and helping with our program to get

21   certified (partnering with UIW on the course content and

22   educational components)."  Did I read that correctly?

23   A.  That's what it says.

24   Q.  All right.  So even Mr. Frazier knew that this program was

25   not certified in March of 2014, correct?

 1    A.  Correct.

 2    Q.  All right.  But they were interested in seeing if

 3    there -- you know, the first time didn't work out with the

 4    portal or with ACE, but maybe revisiting it.  Is that what's

 5    going on?

 6    A.  Yes.

 7    Q.  Okay.  So that was in March.  Did you ever get any

 8    follow-up from Shane?

 9    A.  No.

10    Q.  Okay.  He sent you an email, though, didn't he, after that?

11    A.  Oh, he might have.  But we never went any further on moving

12    this program forward.

13    Q.  Well, didn't he send you programs or materials and, you

14    know, call you:  Dr. Porter, I want to -- I want to move this

15    along.  To this day has he ever done that?

16    A.  No.  My only remembrance was talking with Hope and her

17    saying that it didn't appear to be going anywhere.

18    Q.  Okay.  Is it fair to say that, in talking with Shane, that

19    you got excited and that y'all discussed a lot of neat stuff?

20    A.  That's what I do.  Yes, we were all very excited.

21    Q.  And nothing came about?

22    A.  No.

23    Q.  That disappointing to you?

24    A.  Yes.  But ideas are ideas.  And some of them work, and some

25    of them don't.

CYNDI PORTER - DIRECT                           897

1    Q.  Let's look at the first sentence from Shane.  It says, "We
2    met with Dr. Porter from UIW today to open discussion around a
3    national certification for our CAS training program."  And I
4    think we've talked about, before this, there was no national
5    certification that you knew about, right?
6    A.  Correct.
7    Q.  There was no national certification in March, as we sit
8    here, is there?
9    A.  Not that I know of, no.
10   Q.  There's no regional certification --
11   A.  Not --
12   Q.  -- that UAS has ever brought to your attention, is there?
13   A.  No.
14   Q.  And no -- there's been no indication to you, as the vice
15   president and point person for UIW -- there has been no
16   indication to you that they -- that this program has been
17   certified by any entity, body or organization whatsoever?
18   A.  No, sir.
19   Q.  Let's look at the last sentence there.  Mr. Glass, if you'd
20   highlight that, beginning, "I think the AAFA endorsement would
21   be a big feather in our cap in effort to become the only" --
22   and he bolds and underlines "only" -- "nationally certified
23   training program in our field."  You see that?  Did I read that
24   right?
25   A.  You did.

1    Q.  And at least to your knowledge, through UIW, that has not

2    happened?

3    A.  No.

4    Q.  If someone were to represent to others that a United

5    Allergy Services tech was nationally certified by UIW, would

6    that be true or false?

7    A.  False.

8    Q.  All right.  I have two last exhibits.  Take a look at

9    Exhibit 44 and 45.  And I believe both of these have previously

10   been admitted.  Not 44.  Okay.  Look at 44 and 45.  They're

11   very similar, correct?

12   A.  Yes.

13   Q.  One of them -- do you see a date on Number 44?

14   A.  The date of the exhibit?

15   Q.  It's underneath the "certified clinical allergy lab

16   specialist."  It's very small.  I'm sorry.  Can you read that?

17   A.  2012 --

18   Q.  Actually --

19   A.  -- July.

20   Q.  -- 2011, 07/15.

21   A.  I need glasses.  Okay.  I see it now.

22   Q.  Well, okay.  And then do you see Defendant's Exhibit 45 is

23   just about the same thing, correct?

24   A.  Yeah.  They look -- they look very similar.

25   Q.  And is there a revision date on there?

```
 1    A.  Yes.  It's August 28, '13.
 2    Q.  Okay.  So 44 is approximately two years before 45, correct?
 3    A.  Correct.
 4         MR. PRICHARD:  And just for the record, we'd offer
 5    D-44 and D-45.
 6         MR. RAMOS:  No objection, Your Honor.
 7         THE COURT:  Received.
 8      (Defendant's Exhibit No. 44 and 45 admitted)
 9    BY MR. PRICHARD:
10    Q.  Okay.  I want to draw your attention -- let's take 44 first
11    to the first paragraph.  Up, very top, right?
12    A.  Correct.
13    Q.  And it says, "Through the guidance of UAL chief medical
14    officer and board certified allergist, Dr. Frederick
15    Schaffer" -- remember me asking you about Dr. Schaffer?
16    A.  Yes.
17    Q.  You never met him?  Never talked to him on the phone,
18    correct?
19    A.  Not that I know of.
20    Q.  "UAL" -- same as UAS, correct?  UAL/UAS?
21    A.  Yes.
22    Q.  -- "has built the only national certification in the
23    allergy testing and immunotherapy industry."  Did I read that
24    correct?
25    A.  That's what this says.
```

CYNDI PORTER - DIRECT                                    900

```
 1   Q.  As far as you know, is that true or false?
 2   A.  It's false.
 3   Q.  All right.
 4            MR. RAMOS:  May we approach the bench, Your Honor?
 5            THE COURT:  Yes.
 6        (At the bench)
 7            MR. RAMOS:  Maybe I was too slow at the trigger, but
 8   that was a draft.
 9            MR. LOW:  That's -- so he's putting in front of her
10   internal draft documents and giving the impression they'd been
11   publicly disseminated, and then asking her about them.  If
12   she's never seen these documents before, especially in the
13   public realm, her answering questions about them, whether or
14   not they're true or false, would mislead the jury to think that
15   we're disseminating them.
16            MR. RAMOS:  And we're not, and we haven't.
17            MR. PRICHARD:  They've already been admitted.  They
18   were discussed in her deposition.
19            MR. LOW:  She can't answer questions --
20            MR. PRICHARD:  They can do that on cross.
21            THE COURT:  These are drafts?
22            MR. PRICHARD:  I don't know that they're drafts.
23            MR. LOW:  Yes.  They're drafts.  They're internal
24   documents.  I can attest to that, Your Honor.  This is
25   internal.
```

```
 1              THE COURT:  If she has no knowledge of them, I'll
 2    sustain the objection.
 3         (Open court)
 4    BY MR. PRICHARD:
 5    Q.  Let me ask you this.  Did UAL partner with the University
 6    of the Incarnate Word, through their credentialing department,
 7    to verify our recruiting and training methods for our CLS, to
 8    ensure they meet the highest standards of training in this
 9    industry?  Is that a true or false statement?
10    A.  False.
11              MR. RAMOS:  I object.
12              THE COURT:  Overruled.
13    BY MR. PRICHARD:
14    Q.  That never happened, did it?
15    A.  No, it did not.
16    Q.  And if UAS was telling members of the public or wrote
17    documents that contained that language, that would not be
18    accurate, and that would be false, correct?
19    A.  Correct.
20    Q.  Thank you.
21              MR. PRICHARD:  I pass the witness.
22                        CROSS-EXAMINATION
23    BY MR. RAMOS:
24    Q.  Dr. Porter, good morning.  My name's Donato Ramos.  I'm an
25    attorney.  And my mother was also a schoolteacher for 40
```

1    somewhat years.

2    A.  Oh, wow.

3    Q.  First of all, there's a lot more to what UAS did than what

4    you've testified to, correct?

5    A.  No.  Not that I know of, no.

6    Q.  Okay.  Well, tell the jury, if someone -- forget UAS in

7    this case.  If someone wanted to have a similar program with

8    Incarnate Word, would you go to the president or department

9    head, and would they outline the steps that you need to do, the

10   protocol before UI -- excuse me -- Incarnate Word would either

11   sponsor, support, credential, certify?  They all kind of mean

12   the same thing, don't they?

13   A.  No.  In this case it's a certificate of completion, which

14   is -- in the industry simply means that you're asked to produce

15   a certificate that verifies that they have completed some

16   activity.

17   Q.  Okay.  We'll talk about the certificate now.  But am I

18   correct in saying that Incarnate Word sets a protocol and says:

19   You've got to do A, B, C, D and E before we will even consider

20   doing anything.  Is that correct?

21   A.  No, that's not correct.

22   Q.  Okay.  Have you -- and I'm sure -- what's the purpose of

23   the program at Incarnate Word?

24   A.  I don't understand your question.

25   Q.  Well, these type of programs, aren't you trying to help the

1  community in having people become more knowledgeable in a

2  particular area, without necessarily getting a degree, a

3  medical degree or a science degree?  What's the purpose of your

4  program?

5  A.  It depends on what part of my program you're talking about.

6  If you are -- if you are in the primary -- or the largest part

7  of my program, you are getting an associate degree, a

8  bachelor's degree, a master's degree or a doctor of business

9  administration.

10 Q.  Okay.  Let's talk about a nondegree program.  This was

11 never intended to be a degree program, was it?

12 A.  Initially they wanted to get academic credit for this and

13 have it be acceptable and transfer into an academic degree

14 program.  And that's when we talked about the American Council

15 of Education as a way to do that.  It was then decided that

16 they wanted a certificate of completion.

17 Q.  Okay.  When a decision was made to get the certificate of

18 completion, were certain instructions given to UAS, and in

19 particular to Nick Hollis, as to what UAS had to do to be able

20 to be accepted, as you might say, by Incarnate Word?

21 A.  No.

22 Q.  Okay.  Do you have any recollection of requiring of UAS a

23 particular curriculum and have Incarnate Word review that, the

24 curriculum for the course?

25 A.  The only time that we talked about that was when we

1  initially had the first meeting, and they wanted to get

2  academic credit.  We had a long discussion about the need for

3  the American Council of Education to come and review it before

4  we would be able to take anything for academic credit.

5  Q.  Okay.  Did UAS ever present to Incarnate Word a curriculum

6  and say:  This is what we intend to teach on day one and day

7  two, three, four and five?

8  A.  When I met with Tim and Hope, we talked about the

9  curriculum very briefly.  And I told them at that time that we

10  could not accept their curriculum for academic credit unless

11  they went to the American Council of Education, had it

12  reviewed, and the American Council for Education said:  This

13  course, this course and this course are worth three credit

14  hours in X, Y and Z.  They never did that.

15  Q.  But -- and I agree.  I don't think anyone's arguing that.

16  The point is, when we shied away from a degree program and we

17  said, we're just going to have this program, wasn't a

18  requirement of that -- of Incarnate Word that Incarnate Word be

19  given the actual curriculum?

20  A.  No, sir.

21  Q.  Okay.  So are you telling this jury that no one with

22  Incarnate Word reviewed any curriculum that was presented by

23  UAS?

24  A.  No.  It was a certificate of completion.

25  Q.  Okay.  But you're way ahead of me.  We haven't even

1    started.  Okay?  And all I want to make clear -- and I want you

2    to tell this jury whether or not UAS gave you a curriculum.

3    A.  As I told you initially, we sat down to talk about academic

4    credits.  At that time they gave me a curriculum book.  And I

5    told them, when I looked at what was in that book, that we

6    could not give academic credit for this information; that if

7    they wanted academic credit, they would have to contact the

8    American Council of Education and have a study visit where they

9    come out and they review it.  They send in faculty members.

10   And then they make a determination, just like they do for the

11   U.S. military programming.

12       All right.  Once they determined not to do that, then we

13   started talking about a certificate of completion.

14   Q.  Okay.  Do you require, as part of a nondegree -- I don't

15   want to talk about a degree because that's not what we're

16   talking about here.  In this case, besides getting a

17   curriculum, do you recall whether you asked UAS to prepare and

18   submit to Incarnate Word the proposed test questions?

19   A.  No.  We don't require that for a certificate of completion.

20   When we talked about anything that had to do with academic

21   credits initially, in that first meeting with Tim and Hope,

22   that was when I told them they would not get academic credit

23   for what they were showing me.

24   Q.  And I don't disagree -- nobody disagrees with that.  Did

25   you at any point after that first meeting, either by a

1    telephone call, through an email, ask UAS:  Hey, give us your

2    proposed curriculum and give us your proposed test questions so

3    that we may review them?

4    A.  No.  That was -- that was done when we talked with Tim and

5    Hope.  And it was quickly decided they were not going to go

6    that way.  And that's when we moved forward the way we did.

7    Q.  Do you know the extent of the training and education and

8    supervision that occurs within UAS before they get the

9    certificate?  Were you familiar with that?

10   A.  No.

11   Q.  You were not told that all of these people, that were

12   trying to become technicians, had to shadow someone for at

13   least three days, as a starter?

14   A.  Sir, that was in the first meeting, when I came in thinking

15   we were talking academic credit and was shown the information

16   they had.  And I told them in that first meeting that we could

17   not give them academic credit.  And I don't want to keep

18   repeating myself.  That was when we said certificate of

19   completion.  And a certificate of completion does not require

20   any further information other than UAS saying these people were

21   successful in their training.

22   Q.  But do you agree with me -- let's get away from the degree

23   because that was not what was happening here -- that UAS

24   explained to Incarnate Word:  First of all, we're going to have

25   three days of shadowing.  Do you know what "shadowing" is?

1    A.  Of course.

2    Q.  Okay.  Then, after that, we're going to have five days of

3    classes.  Do you recall that?

4    A.  No.  No, I don't.  It would have been in the initial

5    meeting.  It's not important to a certificate of completion,

6    which is what we do.

7    Q.  Okay.  But I'm not -- wouldn't it be of significance to

8    Incarnate Word to know the extent of the training and what's

9    being taught to these participants, or is that of no

10   significance?

11           MR. PRICHARD:  Pardon me, Your Honor.  We object.

12   We've been up and down this road now several times.  He's asked

13   the same question.

14           THE COURT:  Overruled.

15   BY MR. RAMOS:

16   Q.  Wouldn't that be of significance to Incarnate Word?

17   A.  It would be significance to the -- it would be of

18   significance to the American Council of Education.

19   Q.  Okay.

20   A.  Yes.

21   Q.  All right.  So it's no significance to Incarnate Word?

22   A.  Not for a certificate of completion, no.

23   Q.  Now, after the five days of in-class instruction, do you

24   know whether or not at that point in time an exam was

25   administered to those students?

1    A.  No, I don't.

2    Q.  Okay.  This is the first time that you hear that?

3    A.  It was in the -- when we talked initially, as I said, about

4    academic credit, we looked at the training materials.  And I

5    can't specifically remember a test.  I would imagine in any

6    kind of a training program you have tests.  Otherwise, it's not

7    a training program.  But after those initial conversations, it

8    became not important.  It was a certificate of completion.

9    Q.  Okay.

10   A.  And then that was on UAS to say, these ten people

11   completed -- they completed successfully, and they got the

12   certificate.

13   Q.  Do you know what the next step would be within the UAS

14   protocol before they got their certificate, besides passing the

15   exam after the five days of classroom work?  Do you know what

16   the next step was?

17   A.  No.

18   Q.  You never heard or you were never informed that after that,

19   irrespective of their passing the test, that they would need 90

20   days of actual experience in the field, being supervised?

21           MR. PRICHARD:  Excuse me, Your Honor.  Foundation with

22   this witness for that.  She's already said she doesn't know.

23           THE COURT:  She can answer the question if she knows.

24           MR. RAMOS:  Well, I was asking her about the exam.

25           THE WITNESS:  No.

 1   BY MR. RAMOS:
 2   Q.  Okay.  And you were never -- or you never learned that the
 3   certificate was not presented to any of these students until
 4   after they had done the three days shadowing, the five days in
 5   class, passed the exam and 90 days?  Doesn't that sound like a
 6   pretty extensive protocol to train?
 7           MR. PRICHARD:  Again, repetitive.
 8           THE COURT:  Overruled.
 9           THE WITNESS:  It sounds to me like they completed
10   their program, whatever that program was, and they qualified
11   for a certificate of completion.
12   BY MR. RAMOS:
13   Q.  Okay.  Now, I don't want to argue with you over -- can you
14   put Exhibit D-40 up, please?  It's the certificate.
15   A.  This name should be redacted.
16   Q.  All right.  Well, it was attached to your deposition.
17   A.  And I was -- I asked that it be redacted then, so it's not
18   a violation of privacy.  Thank you.
19   Q.  All right.  First of all, this paper, this certificate was
20   printed at whose instruction?
21   A.  United Allergy specialists sent us a list of students who
22   successfully completed their training, and then we produced the
23   certificate.  It was signed by us and then went to United
24   Allergy Labs, was hand delivered, then they signed and then
25   gave it to their students -- or their employees.  Excuse me.

CYNDI PORTER - CROSS                    910

1  Q.  Okay.  Who had it printed?

2  A.  It was printed in my offices.  So I guess I had it printed.

3  Q.  Under your supervision?

4  A.  Well, no.  It would be -- assistant of mine did it.

5  Q.  Okay.  And it's -- and it has in caps "certifies that."

6  A.  -- "student has successfully completed the required course

7  of study and is therefore awarded this certificate."

8  Q.  Okay.  But what I'm saying is the word "certifies that" are

9  emphasized in all caps.  You're a teacher?

10 A.  Yeah.  That's simply standard highlighting in the formula

11 that built that certificate.

12 Q.  Yes.  But it's not standard that you put "certifies that"

13 in all caps.

14 A.  Sure it is.  In any certificate like that, they're going to

15 have all kinds of different formatting.

16 Q.  Is there any reason why Incarnate Word would not have

17 called this certificate a certificate of attendance and just

18 put it at the very top?

19 A.  Well, attendance is different from completion.  Attendance

20 means you showed up for class.  Completion means you did what

21 you needed to do in order to be awarded a certificate of

22 completion.

23 Q.  Okay.  So the term "certified clinical allergy specialist,"

24 that was a title given by UAS based on the extensive teaching

25 that I've described to you?

1    A.  I don't know about the extensive teaching.  I know that

2    they successfully completed UAS's training program.

3    Q.  Okay.  But you're not here telling this jury that you're in

4    any way critical of the training that UAS gave to each -- and

5    has given to each of these individuals?

6    A.  I'm not critical.  I don't actually know everything about

7    their training.  I simply know that we have a partnership to

8    deliver a certificate of completion, which is what we do.

9    Q.  Does the word "completion" appear anywhere in that

10   certificate?

11   A.  "Has successfully completed."

12   Q.  Okay.  And what follows after that is also of significance?

13   A.  It's verbiage.

14   Q.  Okay.  Now, every one of these certificates has been signed

15   by a representative of Incarnate Word, correct?

16   A.  Yeah.  They've been signed by me.

17   Q.  You've signed all of these?

18   A.  I have.

19   Q.  Okay.  Has anyone come to you and say, by the way, this is

20   confusing, or anything --

21   A.  No.

22   Q.  -- regarding this certificate?

23       Okay.  All right.  Let's look at the exhibit, the other

24   exhibit.  I think -- let me -- I think it's 41 -- 39.  Do you

25   recall ever having any discussion with anyone from UAS saying:

1    By the way, the only place you can use the logo is on that

2    certificate?  Do you remember specifically if you discussed

3    that with anyone?

4    A.  No.  I didn't discuss it.

5    Q.  Okay.  And there is -- in any of your discussion there was

6    never a restriction that would say:  You know what?  We're

7    proud of what's happened, and we're proud to be tied in with

8    the Incarnate Word.  You've never told them:  You just can't do

9    that?

10   A.  No, I have not said that.  No.

11   Q.  And Incarnate Word tries to promote non-college education

12   in the community, does it not?

13   A.  We do.  It's a very small amount of what we do in

14   comparison.  What's obviously near and dear to all our hearts

15   is to make sure that every single person in the city and

16   through our online program gets an undergraduate degree at

17   least, a master's and for some folks a doctoral degree.

18   Q.  But Incarnate Word supports the idea of being educated even

19   if you don't get a degree?

20   A.  Absolutely.  Absolutely.

21   Q.  Such as in a program of this type?

22   A.  Yes.

23   Q.  Now, have you ever seen that particular document in the

24   public domain?

25   A.  No.  I first saw it in my deposition several years ago, I

 1    think.

 2    Q.  Okay.  Now, I know you're a teacher.  But doesn't -- as you

 3    read that, it says, "Our technicians and CASs are USP-797

 4    qualified."  All right.  Does the term "qualify" explain the

 5    USP-797?

 6        And then you have the word "and" after that.  In other

 7    words, they have two things.  One, they're USP-797 qualified.

 8    That's one classification.  And then "and certified by the

 9    University of Incarnate Word."  That's factual.

10    A.  I wouldn't know if that's factual because I don't know what

11    USP-797 is.  So I don't think that I, representing UIW, would

12    have qualified and certified something, I don't know what it

13    is.

14    Q.  Right.  But the word "qualified" relates to USP-797.  In

15    other words, USP-797 qualified.  You could put a period there.

16    In this case they put "and certified by the University of

17    Incarnate Word."  They're both consistent with each other.

18    A.  They may be, but I don't know what USP-797 is.

19    Q.  But if you knew that that person was qualified, they would

20    be consistent with each other?

21    A.  That may be.  But I'm representing the University of the

22    Incarnate Word.  And if I don't know what USP-797 is, I can't

23    qualify or certify it.  So I don't think that's a factual

24    statement.

25    Q.  How well did you get to know Hope Solis?

1  A.  Oh, she's a nice lady.  We had a conversation or two when I

2  would -- when I would drop off certificates.  She was probably

3  my longest-running contact with y'all.  So she's a very nice

4  lady.

5  Q.  Do you know the type of work that she's done most of her

6  life?

7  A.  Oh, I'm sure we had some conversations.  I know she was --

8  was she in the military?

9  Q.  Yes.

10  A.  So we had those kind of conversations.  They were -- they

11  were superficial when I would be coming into the office.  She

12  was a very nice lady.  I'm sure she still is.

13  Q.  Did you -- did you, in your discussions with her, learn

14  that she was a person within the Air Force that was responsible

15  for training relating to allergies and technicians and issues

16  of that type?

17  A.  Yeah.  I think we -- I think she said that to me.  We had

18  friendly conversations.

19  Q.  Okay.  You have no reason to deny her qualifications in her

20  job?

21  A.  Absolutely not.

22  Q.  Okay.  Did she share with you that Dr. Schaffer, as a

23  medical director, also assisted in preparing the protocol and

24  the instruction manuals for the course, the five-day course

25  that we talked about earlier?

1    A.  I don't remember that conversation.  I know that he was --

2    he was someone that Dr. Agnese, the president at the time, was

3    very well acquainted with.

4    Q.  I think these are not objected to, Exhibit 606 through 608.

5        (Discussion off the record)

6            MR. RAMOS:  May I approach, Your Honor?

7            THE COURT:  Yes.

8    BY MR. RAMOS:

9    Q.  Doctor, I'm going to show you what's been previously marked

10   as Exhibit 606, 607, and ask you to look at them and tell the

11   jury, please, whether you're familiar with those.

12   A.  It looks to me like it's part of a training program.

13   Q.  Okay.  Had you ever seen that before?

14   A.  I may have.

15   Q.  Okay.  And it -- does it appear to you to be a curriculum

16   for a course?

17   A.  It appears to be a course outline for a course.

18   Q.  Okay.  But you -- do you have any recollection that that

19   outline or literature, whatever you want to call it, was not

20   presented to Incarnate Word?

21   A.  Again, we're going to go back to our same conversation.  It

22   was -- it was presented to us at the initial meeting when they

23   wanted to get academic credit for it.  And we looked at it and

24   said, the only way we can give you academic credit is if you

25   submit to the American Council of Education, go through their

1    process and have them recommend credit.  And then we could --

2    we could take it in for academic credit.

3    Q.  Now, do you agree that reasonable people can disagree in

4    the use of a term?  For example, you're in the college arena.

5    I'm not.  Do you agree that credentialing, in my mind versus

6    yours, may be different, a layperson versus an educated person

7    like you?

8    A.  I mean, people can always disagree on the use of words.

9    So, you know, of course I would agree that words can be used

10   differently by different people.

11   Q.  And you, yourself, you're unsure of what credentialing

12   means, correct?

13   A.  No.  In my world credentialing is very clearly that

14   something is sufficient to be able to meet an accrediting

15   guideline or an American Council of Education's guideline to

16   signify academic credit.  I just can't -- I can't certify

17   something for credit just because I feel like it.  I mean,

18   there are days that I wish I could.  Many days.  But for the

19   most part, I can't do that.  I have to have some other outside

20   certification or accreditation.

21   Q.  Do you know whether or not the certificate that's given to

22   the different people that complete the program could be

23   clarified to make it, it's only an attendance certificate?

24   A.  No.  It's not an attendance, sir.  I'm sorry to interrupt

25   you.  Attendance means you came to class today.  Completion

CYNDI PORTER - CROSS                    917

1    means you worked really hard, and you finished what you did so

2    --

3    Q.  All right.

4    A.  A certificate of attendance is something you get with a

5    gold star in first grade.  So it's very important that

6    completion is pulled into this, because that means they've been

7    successful in whatever it is that they attempted to do.

8    Q.  It's like when I was in grammar school, we had what we

9    called attendance.

10   A.  That's right.

11   Q.  So what you're saying, the completion is comparable to our

12   attendance in school?

13   A.  No.  You attended school, but did you do your math

14   assignment correctly?  Did you do your art correctly?  Those

15   are -- those are real different things.  Attendance means you

16   were there breathing, and completion means you did your work.

17   Q.  Okay.  So this certificate, completion means that they did

18   the work under the UAS curriculum, be it the three days of the

19   shadowing, the five days of the school, then a test, and then

20   90 days after that.  You didn't know before today that the

21   certificates are presented after the 90 days?

22          MR. PRICHARD:  Repetitive and --

23          MR. RAMOS:  I'll withdraw it.  I'll withdraw it.

24       Thank you very much.

25          THE WITNESS:  Thank you.

```
 1              MR. RAMOS:  Have a very nice spring break.

 2              THE WITNESS:  Thank you.  I feel guilty.

 3              MR. PRICHARD:  Nothing further, Your Honor.  Ask that

 4    she be excused.

 5              THE COURT:  Have a nice break.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  We'll talk our luncheon recess at this

 8    time.  We'll come back at 12:40.  Don't talk about the case.

 9    Have a nice lunch.

10         (Lunch recess)

11         (Change of reporter)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Change in reporter.)

2    (The jury entered the courtroom at 12:43 p.m.)

3        THE COURT:  All right.  You may be seated.

4        We're back to the plaintiff's case now and the

5    plaintiff's next witness is a video.

6        So you may proceed.

7        MR. BERNELL:  Ben Bernell for the plaintiff, your

8    Honor.  For the record, we are playing Randy Miller by video

9    deposition.

10    (Video deposition was played.)

11        MR. BERNELL:  Ben Bernell for the plaintiff, your

12    Honor.  We will call our next witness, Kevin McAnaney.

13        MR. PRICHARD:  And, your Honor, if I might before the

14    witness takes the stand, we do have some objections.

15    (WHEREUPON, KEVIN MCANANEY, having been duly sworn,

16    testified as follows:)

17    (The following proceedings were held at the bench.)

18        MR. PRICHARD:  Your Honor, I don't think it takes a

19    weatherman to know which way the wind is blowing.

20        THE COURT:  I reviewed Judge Garcia's opinion last

21    night, and it seemed to me that I do think this is getting

22    beyond where we need to be.  At the same time, we're on the

23    fifth day of the plaintiff's case, and how much more evidence

24    are we going to put on, it's getting a little far afield, and

25    how they are going to wind up their case, so if they want to

1  go into this, they can go into it.

2          I think Judge Garcia was clear that he would allow

3  this, and the time to make the objection you were making

4  yesterday or the day before, whenever it was, was at the

5  pretrial.  I didn't hear any objection.  I noted that he said

6  that the defendant had not sought to prohibit the testimony in

7  all that he did.  There is no objection raised to the

8  testimony, and I think an explanation of what the OIG process

9  is, is something that would be helpful to the jury since they

10  have heard all of this discussion about the OIG.

11          There is not any need for, and it's too extraneous,

12  to get into what AKS is and whether AKS was violating all of

13  that stuff.  Judge Garcia is right about that and I'll be

14  careful to try to sustain the objection to any of that,

15  whether or not legally they were doing something illegally

16  wrong is something that's not going to get decided in this

17  case, but I think the OIG process and what these OIG reports

18  are used for is probably useful since there's been all this

19  talk about the OIG report.

20          MR. PRICHARD:  That's fine, your Honor.  But for the

21  record, I do want to object to the relevance under 702 for

22  this witness.  I just want to remind the Court that when Judge

23  Garcia made his ruling Phadia and Thermo Fisher were still in

24  the case.

25          THE COURT:  I understand.

KEVIN MCANANEY - DIRECT

1        MR. PRICHARD:  And they have since settled out and he
2   was a witness on the counterclaim, Phadia and Thermo Fisher
3   counterclaim, which is no longer a part of this case, and
4   nowhere does he ever discuss anything about Mothers, and so we
5   just, you know --
6        THE COURT:  He's just going to talk about the OIG
7   process.
8        MR. PRICHARD:  If that's all we are talking about is
9   the process, the Court has my objection and I know it's
10  overruled.
11       THE COURT:  There was no objection to him being
12  called at all at the pretrial, so we're beyond that.
13       MR. PRICHARD:  Okay.
14    (The following proceedings were held in open court.)
15                    DIRECT EXAMINATION
16  BY MR. BERNELL:
17  Q.  Good afternoon, Mr. McAnaney.
18  A.  Good afternoon.
19  Q.  Can you please state your name for the record.
20  A.  Kevin McAnaney.
21  Q.  Mr. McAnaney, what do you do professionally?
22  A.  I'm an attorney.
23  Q.  And do you specialize in a specific subject matter?
24  A.  The Federal Health Care Fraud and Abuse Laws and
25  Regulations.

922

KEVIN MCANANEY - DIRECT

1  Q.  How many years of experience do you have in this subject
2  matter?
3  A.  Well, I've been dealing with it for -- since I became a
4  member of the bar, 40 years, probably 20 years where I focused
5  on it exclusively.
6  Q.  And do you focus more exclusively on the application of
7  federal fraud and abuse laws; is that accurate?
8  A.  Yes.
9  Q.  Can you please take us through your post-high school
10  education; if you can explain that to the jury.
11  A.  I went undergraduate to the University of North Carolina,
12  Chapel Hill, and then I went to law school at Columbia
13  University in New York City.
14  Q.  Did you graduate in 1977; is that --
15  A.  Yes, I graduated in 1977.
16  Q.  I know you've had a long career since law school.  Is it
17  fair to say between 1978 and 1997 that you worked at various
18  private law firms and the New York Governor's Office?
19  A.  Yes.
20  Q.  And did you focus primarily on health care regulatory and
21  litigation issues in those roles?
22  A.  I would say from about my second year in a law firm, my
23  second year out of law school, I focused significant amounts
24  on health care law.
25  Q.  So that brings us to 1997.  What happened in 1997, in your

KEVIN MCANANEY - DIRECT

1  career?

2  A.  Well, in 1997 I left the firm I was at at the time and

3  went to the Department of Health and Human Services, Office of

4  the Inspector General, their counsel's office.  They were

5  establishing a new branch, they called it, in counsel's office

6  to provide industry guidance as to how you complied with the

7  statutes.

8  Q.  When you say counsel's office, do you mean the counsel,

9  office of counsel to the inspector general?

10 A.  Yes.  The inspector general's offices are sort of -- there

11 is one basically at least for each cabinet agency, and they

12 are somewhat autonomous because their job is to basically

13 investigate fraud and abuse in the programs that are

14 administered by that agency.

15      In the case of the Health and Human Services, because they

16 supervise the Medicare and Medicaid program, that's -- their

17 office is significantly larger, and because they are

18 semi-autonomous, the OIG and Health and Human Services, they

19 have their separate -- a separate legal staff apart from the

20 general department's legal staff.

21 Q.  Were you a part of a specific guidance branch within that

22 office?

23 A.  Yeah.  In 1996 there was a major piece of health

24 legislation called HIPAA, the Health Insurance Portability and

25 Accountability Act, as part of that, which did a lot of

KEVIN MCANANEY - DIRECT

1  things.  It targeted a lot of increased funding to the

2  Department of Justice and the Inspector General's Office and

3  to CMS to investigate and address health care fraud and abuse

4  in the Medicare program.

5      As sort of part of that deal, Congress also, though,

6  required OIG to set up a process to issue binding advisory

7  opinions to the industry about if they wrote in about

8  compliance with those laws.

9  Q.  I have seen that referred to before as the industry

10  guidance branch; is that accurate?

11  A.  Yes.

12  Q.  And you were part of the industry guidance branch; is that

13  right?

14  A.  I was the first chief and I basically set it up.  I hired

15  the attorneys.  We developed regulations to implement this

16  advisory guidance, the advisory opinion process.

17  Q.  What were your responsibilities as the initial chief of

18  the industry guidance branch?

19  A.  Well, my initial task was to get the advisory opinion

20  process up and running.  It had been -- it was controversial

21  within the agency and within the justice department because

22  the advisory opinion process would give opinions on, among

23  other things, the federal antikickback statute, which is a

24  criminal statute that's enforceable by the justice department

25  criminal division.  And they don't -- they didn't want someone

KEVIN MCANANEY - DIRECT

1  else giving opinions on what is lawful and not.  Prosecutors

2  don't like that.

3  Q.  Did you play, personally, a role in issuing these advisory

4  opinions we're discussing?

5  A.  Well, yes.  As I said, we met repeatedly with the justice

6  department to establish the process and then I personally was

7  involved in all of the opinions that came out during the six

8  years I was in charge, and I would say I substantially wrote

9  most of them or at least structured them.

10  Q.  You said you were there for six years, so that's 1997 to

11  2003; is that right?

12  A.  Yes.  I left in -- I think May 2003.

13  Q.  Have you been in private practice since that time?

14  A.  Yes, I'm a sole practitioner.

15  Q.  Do you also teach law school courses regularly at the

16  University of Maryland on health care laws and health care

17  fraud and abuse laws?

18  A.  I was an adjunct professor beginning when I was in the

19  government and I taught at the University of Maryland Law

20  School, of course, in health care fraud laws for a dozen years

21  until I moved to New York about three or four years ago.

22  Q.  And do you also regularly speak at health care law

23  conferences on these subjects?

24  A.  Yes.  I speak probably at between three and six times a

25  year.  They are usually annual conferences on health care

926

KEVIN MCANANEY - DIRECT

1  fraud and abuse and compliance by the American Health Lawyers

2  Association, the American Bar Association, and the Health Care

3  Compliance Association, which is an association of all the

4  compliance officers in the health care field.

5  Q.  I don't know if you have it in front of you, but I would

6  like you to locate, if you can, plaintiff's trial exhibit 396.

7  It should be a white binder and I may be able to help you

8  there.

9        MR. BERNELL:  Your Honor, may I approach?

10        THE COURT:  Yes.

11        MR. BERNELL:  Thank you.

12        THE WITNESS:  396?

13        MR. BERNELL:  You got it.

14  BY MR. BERNELL:

15  Q.  Please let me know when you've located that.

16  A.  I have it in front of me.

17  Q.  Can you take a look through it.  Have you seen that

18  document before?

19  A.  Yes, I have.

20  Q.  What is Plaintiff's Exhibit 396?

21  A.  Well, it's my resume, or CV or -- generally, yes.

22  Q.  Does that accurately summarize your experience or parts of

23  your experience up to the time you created that document?

24  A.  Yes.  I mean, this is my educational and work experience.

25        MR. BERNELL:  At this time we would like to offer

KEVIN MCANANEY – DIRECT

1  into the record Plaintiff's 396.

2          MR. PRICHARD:  No objection, your Honor.

3          THE COURT:  Received.

4      (Plaintiff's Exhibit 396 received into evidence.)

5          MR. BERNELL:  Your Honor, at this time we would like

6  to, pursuant to Rule 702, tender Kevin McAnaney as a qualified

7  expert witness in the field of health care law, the workings

8  in the Officer of Inspector General, including the issuance of

9  advisory opinions.

10         THE COURT:  Do you want to voir dire on that?

11         MR. PRICHARD:  Well, I just want to make sure that

12 the Court's ruling stands that any opinions are in accordance

13 with the Court's previous rulings —

14         THE COURT:  Yes.

15         MR. PRICHARD:  — and that of Chief Judge Garcia's

16 rulings as well.

17         THE COURT:  Yes.

18         MR. PRICHARD:  Other than that, no objections.

19         THE COURT:  All right.  You may proceed.

20         MR. BERNELL:  Thank you, your Honor.

21 BY MR. BERNELL:

22 Q.  There has been quite a bit of reference over the past few

23 days, and in this video clip we just saw, to an OIG advisory

24 opinion, but I don't know if there's been a lot of discussion

25 about those opinions and what they mean, what they are.  So

KEVIN MCANANEY - DIRECT

1  can you please explain to the jury, what is an OIG advisory

2  opinion?

3  A.  Well, I mean, in layman's terms, if you have got a

4  favorable advisory opinion, it's a get-out-of-jail-free card.

5  But, I mean, the longer version is, what it is is, as I said,

6  the particular statute, the antikickback statute is very broad

7  and has, over the years, the industry has pushed back saying

8  it's so broad we don't know quite what it covers.  So there

9  have been a series of amendments and changes to tighten the

10 intense standard first.

11     So the law was passed about 1972 originally.  It was

12 amended in '77 to add a higher, intense standard.  In 1986

13 Congress gave the secretary of Health and Human Services the

14 authority to create what it called safe harbors, which were

15 regulations it said, if conduct fit in these -- met all these

16 hoops, it was exempt from the statute.

17     And then in 1996, as I said, the people had complained

18 that those safe harbors weren't really very useful, so the

19 advisory opinion process really set up the ability to create

20 basically an individual specific safe harbor, that if you

21 wrote in and the government, the OIG said -- gave a favorable

22 opinion, it basically said, we understand -- I mean, we've

23 reviewed the contact, that so long as you stick within the

24 parameters of what you've told us and stuff, that we will not

25 impose sanctions.  So it's basically -- it acts prospectively

KEVIN MCANANEY - DIRECT

1  to immunize that conduct from the statute.

2  BY MR. BERNELL:

3  Q.  We saw earlier that an individual named James Wallen

4  actually applied for an OIG advisory opinion that people have

5  been discussing in this case, and I want to put context around

6  that application process for the jury.

7      So I would like you to walk us through the process and

8  we'll go step by step and I think we should start with the

9  request first.  So what is the first step in the OIG process?

10 How does it all start?

11 A.  Well, I mean, it starts -- I mean sometimes when I was

12 there people would frequently start with a phone call and just

13 sort of run it by and say, is this something that you might

14 consider, and if we said -- I mean, there are a lot of things

15 we just say no off the bat, don't bother.

16     But then if you did want, we had put out regulations, as I

17 said, and we had put out some further guidance documents,

18 questionnaires, as to information we would want as part of the

19 request.  So who the requestor is, are they a health care

20 provider, do they -- if so, their provider numbers and who any

21 owners were of the organization.

22     If it dealt with a contract, we would want to, not

23 necessarily the exact contract, but at least a description of

24 all of the significant terms of the contract.  General, enough

25 information so we thought that we would have some ability to

KEVIN MCANANEY - DIRECT

1  at least understand the arrangement.

2  Q.  Roman, can we please see previously entered exhibit

3  plaintiff's 441.

4     You've seen this document before; haven't you?

5  A.  Yes, I have.

6  Q.  This is the request that was submitted that led to the OIG

7  opinion, 11-17 we've been discussing today?

8  A.  Yes.

9  Q.  And it was submitted by James Wallen?

10 A.  Yes, that's what I heard.

11 Q.  Roman, can we get page 5, please.

12    There was some discussion over the past few days about the

13 last two lines before this signature:  "The arrangement

14 described in this request, for an advisory opinion, is one

15 that UAL in good faith plans to undertake if the OIG issues a

16 favorable advisory opinion."  Did I read that correctly?

17 A.  Yes.

18 Q.  And the UAL discussed here, that is not United Allergy

19 Labs, now United Allergy Services; correct?

20 A.  That -- yes, that's what I understand from the testimony

21 of Mr. Wallen.

22 Q.  I want to know, why is that significant?

23 A.  Well, the significance, as, again, as I said, the justice

24 department was very concerned that basically that the agency

25 not be played, so I think that was it.  And they are not in --

KEVIN MCANANEY – DIRECT

1  we were not in a position to investigate what was being told

2  to us or what the arrangement is.

3    I mean, if you think of a typical criminal investigation,

4  they go out and they investigate and look at all the details.

5  So we were being asked basically to opine and to give immunity

6  based on a written submission to us that we had a limited

7  ability to verify.

8    So what was required was instead the submissions, all the

9  information that was given to us, they had to certify under

10  penalty of law that, in fact, it was truthful and accurate.

11  The particular sentence here that they would "in good faith

12  plan to undertake it," was because the government was very

13  clear that we were not going –– that they were not going to

14  act on hypotheticals, that it had to be an actual arrangement.

15    And that's what that was intended to address, was that

16  people were actually going to do it and not just on a fishing

17  expedition.

18  Q.  After the request is made what would happen from the

19  perspective of the inner workings of the Office of Inspector

20  General, your office?

21  A.  Well, the first thing we would do is we would review what

22  came in and decide, first, whether it was a nonstarter or not.

23  If it's one –– because, and certainly as time went on, you've

24  seen more and more requests, we knew ones that were kicked out

25  for one way or another and you tend to see a lot of the same

KEVIN MCANANEY - DIRECT

1  things again.  So as soon as we knew that we would contact the
2  requestor and tell them, you know, this is not -- you're not
3  going to get a favorable request, and we would allow them to
4  withdraw.
5      That was fairly important when we set up the process, to
6  allow people to withdraw without any decision, because we
7  wanted the process to work and we wanted people to actually
8  get useful information, if they could.
9      But given people don't want to submit things to the
10  government, if they are going to be told that they might be
11  subject to prosecution, or that that they just didn't want it,
12  and so we didn't think that if, in fact, it was -- once you
13  are in the process, you can't get out, that that would work.
14      So we said look, if you get it, it doesn't -- because it's
15  a very difficult bar to get a favorable advisory opinion
16  because the government is, as we said, you've basically got to
17  be, even if you had bad intent, we think that this arrangement
18  is so benign that it can't be a problem.
19      That's a very high bar, so we wanted people to be able to
20  withdraw if they did.  So we tried to tell them that as soon
21  as possible because it would also save them money.  So that's
22  the first -- well, that was the first.
23      The second thing we would do if they didn't is you would
24  draw up a summary of the opinion, the summary of the request
25  and the arrangement, who the parties were, and we would

KEVIN MCANANEY - DIRECT

1  circulate that to the OIG's office of investigations that are

2  private -- I mean, that their investigators that specialize in

3  health care fraud, the Federal Bureau of Investigation, the

4  justice department, and CMS, and that were to check, A, to see

5  if any of the people, the requestors were under investigation

6  themselves, or if whether the same or similar conduct was

7  under investigation.

8      And that was because, again, the justice department was

9  very concerned that we would say something in an advisory

10  opinion that would interfere or be detrimental to an ongoing

11  investigation they thought of criminal conduct.  So that's --

12  so that was the first screen.

13      I would say, when we finally, assuming something got to a

14  final opinion that we were going to go out, we would again

15  circulate that, but that would just go to CMS and to the

16  justice department.  And by the justice department, we would

17  send it to both the criminal division, which had the ultimate

18  say, and the civil division, because they have civil false

19  claims act cases.

20  Q.  You mentioned the ability to withdraw an opinion, and

21  we'll touch on that later.  I think that's very important.

22  But before we get there, that seems to be a later step, I want

23  to know that during the process, does the OIG occasionally or

24  typically request additional information from the requestor

25  itself?

KEVIN MCANANEY – DIRECT

1   A.  Almost always.  As I said, there is certain information

2   that we required.  When you get it in front of you, you

3   realize that you have other questions or other things or

4   perhaps things they said that might be ambiguous, or things

5   you thought that might give you pause, and to see whether or

6   not they might want to change that if it would still work,

7   because it might be easier it get a favorable opinion, change

8   aspects of the arrangement.

9       So, yes, there is typically a back and forth, several —— I

10  mean, it might be several exchanges, depending on exactly what

11  kind of an arrangement.  A fair number of the opinions ended

12  up being sort of cookie cutter, because, for example, we had

13  one on ambulance replenishing, and every fire department

14  wanted their own special opinion, so... that kind of thing.

15      But generally, there is a fair amount of back and forth.

16  Q.  I believe you said earlier that the OIG does not engage in

17  any fact finding?

18  A.  Yeah.  I mean, we were a bunch of lawyers sitting in an

19  office in Washington, D.C., and so we don't —— we didn't have

20  any —— most of the people we were dealing with tended to be

21  lawyers because they were representing the company seeking

22  advisory opinion, so, no.  And that was the point of having

23  the certifications have to be, have to be made because we're

24  relying on those.

25  Q.  Does the requestor, in providing information back to the

KEVIN MCANANEY - DIRECT

1  OIG upon request, have the ability to frame the request in any
2  way it chooses, whether it be positive or negative?
3  A.  Well, certainly.  It's their request.  I mean, they phrase
4  it and they tell us what the key features are and
5  characteristics of the arrangement.  I mean, we may ask them
6  follow-up questions, but I mean, so we depend on -- but they
7  ultimately tell us what they want to tell us.
8  Q.  And the ultimate opinion that is issued, it's issued with
9  the name redacted; isn't that right?
10 A.  Well, the actual opinion that goes to the requestor has
11 their name in it, and early on we would ask the requestor
12 whether they wanted their name on it or if they wanted it
13 deleted, because we would publish them on a website.  So
14 they've got -- but after about a year of that we decided that
15 we would just redact them all.  So they are all redacted, yes.
16 Q.  Are you familiar with the OIG opinion at issue in this
17 case, OIG 11-17?
18 A.  I am.
19 Q.  Were you familiar with that opinion prior to you being
20 engaged to provide your opinion for this trial?
21 A.  Yes.
22 Q.  Can you turn to plaintiff's trial exhibit 438?
23        MR. BERNELL:  May I approach, your Honor?
24        THE COURT:  Yes.
25        MR. BERNELL:  Beat me to it again.

KEVIN MCANANEY – DIRECT

1          THE WITNESS:  Being a lawyer, I'm used to binders.
2    BY MR. BERNELL:
3    Q.  Do you have it in front of you?
4    A.  Yes.
5          MR. BERNELL:  Your Honor, we'd like to move into
6    evidence, to the extent it hasn't been already, plaintiffs
7    trial's exhibit 438.
8          MR. PRICHARD:  Foundation, your Honor.
9          MR. BERNELL:  He just stated he was aware of today
10   factually.
11         MR. PRICHARD:  He saw it.  That doesn't mean it's a
12   proper foundation.
13         THE COURT:  Overruled.  It's received.
14      (Plaintiff's Exhibit 438 received into evidence.)
15   BY MR. BERNELL:
16   Q.  Roman, can you please put Exhibit 438 on the screen.
17   Could you please blow up the date, title, and redacted
18   information, please.  Thank you.
19      We were discussing the redacted nature of the OIG advisory
20   opinions as they are issued.  Is this a representative sample,
21   is this kind of what they all look?
22   A.  Yes.  This looks like it comes right off the website.
23   Q.  So you can't tell who requested it?  The public can't tell
24   that from an issued opinion; correct?
25   A.  That's correct.

KEVIN MCANANEY - DIRECT

1   Q.   So it can be attributed to anybody else in the industry;

2   is that right?

3   A.   Yeah.  I mean, it could be attributed to anybody.

4   Q.   You can take that down, we'll get back to it later.

5        Mr. McAnaney, we were discussing favorable and

6   nonfavorable advisory opinions and I want to put that in

7   context for the jury as well.  How easy is it to receive a

8   favorable advisory opinion?

9   A.   Well, as I said, it is difficult because it is a very high

10  bar, because if I go back, the justice department was very

11  concerned about the OIG's ability to address criminal

12  statutes.  And that's very rare.

13       And since this particular statute that they are opining

14  on, the kickback statute, one of the critical ingredients is

15  the intents of the party when they are doing their thing, and

16  we have no way -- we don't do investigation, intent is

17  incredibly hard to prove, that what we -- I mean, basically

18  tried to do, was we would, as I said, only approve

19  arrangements that we felt even if the person had really bad

20  intent that if the arrangement was carried out as described in

21  the request that there was a negligible risk of harm to the

22  Medicare program.  And I think -- so I mean, it's a very high

23  bar.

24  Q.   Fair to say that the government doesn't like to give

25  get-out-of-jail-free cards with much ease?

KEVIN MCANANEY - DIRECT

1  A.  They do not, and especially not on an intent-based

2  statute.

3  Q.  So that's a favorable opinion.  What is an unfavorable

4  opinion?

5  A.  Well, an unfavorable opinion says we -- you don't meet

6  that bar.  So you're not -- so you're just like anybody, any

7  other arrangement out there.  So what it says is, we've

8  reviewed it, and in light of it we don't think that it's --

9  that the risk is negligible, and so therefore we are not able

10 to give you a -- I mean, basically it would say we would

11 impose sanctions if you violated the law basically.  I mean,

12 it just leaves you where you would be if you hadn't asked the

13 opinion.

14 Q.  So it's basically just not a get-out-of-jail-free card?

15 A.  Right.

16       MR. PRICHARD:  Objection.  He's leading now.

17       THE COURT:  Sustained.

18 BY MR. BERNELL:

19 Q.  During your six years as the industry -- the chief --

20 during your six years as chief of the industry guidance

21 branch, approximately how many requests for opinions came

22 through your office?

23 A.  How many requests for opinions?  Well, as I said, a lot

24 were just telephone requests to begin with because people

25 didn't want to waste their time.  I think typically I would

KEVIN MCANANEY - DIRECT

 1  say I would probably think, we probably got probably a
 2  hundred, maybe a hundred, 120 requests, written requests a
 3  year, maybe not quite that.  Somewhere between 75 and 125
 4  probably.
 5  Q.  And how many of those would result in an unfavorable
 6  advisory opinion?
 7  A.  One or two, I think.
 8  Q.  So it's hard to get a --
 9  A.  On an annual basis.
10  Q.  So I understood it was hard to get a favorable advisory
11  opinion and you are not issuing a lot of unfavorable advisory
12  opinions, so why so few unfavorable advisory opinions?
13  A.  Well, because, as I said, people withdraw them if they are
14  not going to get a favorable because people would -- I mean,
15  they don't want something out there saying that they may
16  potentially violate the statute.
17  Q.  So there is an ability to withdraw.  How does the
18  requestor know that a negative or an unfavorable advisory
19  opinion is potentially going to be issued?
20  A.  Well, as I said, we would tell them.  We called them up
21  and told them as soon as we knew and they could withdraw right
22  up until we issued an opinion.  In fact, they had to pay us to
23  issue an opinion because we didn't issue an opinion unless we
24  got paid.  There was a fee.  Not that much, but -- and so if
25  you were told you got an unfavorable, if you didn't want it

KEVIN MCANANEY - DIRECT

1  you just didn't have to pay.

2  Q.  So to get an unfavorable advisory opinion about yourself

3  you would have to pay the government money?

4  A.  Yes.

5  Q.  If you are notified in advance that you are likely to get

6  an unfavorable opinion and you can withdraw it in advance,

7  why, in your expert opinion, would someone end up with an

8  unfavorable advisory opinion?

9  A.  Well, in my experience in the six years I was there, the

10 people that got unfavorable opinions, with one exception, were

11 people who were looking for a negative opinion.  Usually -- I

12 mean, always because of a -- to use it against a competitor.

13 Q.  Make sure I understand your testimony.  Is your expert

14 opinion that people solicit unfavorable advisory opinions to

15 attribute them to a competitor who did not request one?

16         MR. PRICHARD:  Now he's testifying, your Honor.

17         THE COURT:  Sustained.

18 BY MR. BERNELL:

19 Q.  With everything you just said, do you, in your expert

20 opinion, consider unfavorable advisory opinions reliable?  Do

21 you consider unfavorable advisory opinions to be reliable?

22 A.  Well, I don't think they give you much guidance because

23 they are -- they just say you potentially may violate the

24 statute, which is what the position of everybody in the

25 industry already, pretty much.  So they are not as valuable as

KEVIN MCANANEY - DIRECT

1  guidance as to what a favorable opinion is because that shows
2  you that the risk is so low at that, that we won't -- so that
3  gives you more -- it gives the industry more valuable insight
4  from a favorable than an unfavorable, where it just leaves you
5  back where you were.
6  Q.  In your experience, or based on your experience, and in
7  your expert opinion, and based on what you've said, why would
8  someone be able to use an unfavorable opinion for
9  anti-competitive purposes?
10         MR. PRICHARD:  Excuse me, your Honor.  That's way
11 outside the --
12         THE COURT:  Sustained.
13         MR. PRICHARD:  Thank you.
14 BY MR. BERNELL:
15 Q.  You said -- I don't recall the language you used.  You
16 said it was an unfavorable opinion was used to do something to
17 a competitor.  I didn't jot down what you said.
18         MR. PRICHARD:  Again, your Honor.
19         THE COURT:  Sustained.
20 BY MR. BERNELL:
21 Q.  That's probably better.  Can we get P438 up.  And can we
22 get page 6, please.  Can you highlight the three bullet points
23 right there.  Thank you, Roman.
24    Mr. McAnaney, I want to focus your attention on the first
25 bullet point.  "This advisory opinion is issued only to (name

KEVIN MCANANEY – DIRECT

1  redacted), the requestor of this opinion.  This advisory

2  opinion has no application to and cannot be relied upon any

3  other individual or entity."  What does this mean to you, in

4  your expert opinion?

5  A.  Well, the reason that we put in these limitations, and I

6  believe they are always the same in every advisory opinion, is

7  that, again, we were concerned that because this is a

8  get-out-of-jail-free for a criminal act, that it is very

9  specific only to that –– to the individual requesting it and

10 to the actual arrangement described in the opinion, and only

11 if it's followed everything that they said is in the opinion.

12         MR. PRICHARD:  Pardon me, your Honor.  I think if we

13 look at number two, they have just violated.  "This advisory

14 opinion may not be introduced into evidence in any matter

15 involving an entity or individual that is not a requestor of

16 this opinion."  We know Mr. Wallen, he's not a party to this.

17 So, we, again, we object.  This is inappropriate by virtue of

18 its own language.

19         MR. BERNELL:  Your Honor ––

20         THE COURT:  You could ask the witness what number two

21 means.

22 BY MR. BERNELL:

23 Q.  Mr. McAnaney, since you created this entire process, what

24 does the second bullet point mean?

25 A.  Well, it's what we thought we would try, but we always

KEVIN MCANANEY - DIRECT

1  thought that the federal judge would make that decision.

2  Q.  Roman, can we please flip the page.

3      THE COURT:  Good try.

4  BY MR. BERNELL:

5  Q.  Can we highlight the second bullet point.  Thank you.

6      The second bullet point states:  "This advisory opinion is

7  limited in scope to the specific arrangement described in this

8  letter and has no applicability to other arrangements, even

9  those which appear similar in nature or scope.

10      Why is that limitation in there?

11 A.  Well, again, it's that both the OIG and the justice

12 department were very concerned that this, given this, that it

13 would be misused by other parties, both to say their conduct

14 was lawful, or to say the conduct was unlawful.  So, I mean,

15 that's all it means.  This only applies to this specific

16 arrangement and has no bearing on any other arrangement.

17 Q.  Have you seen people attribute OIG advisory opinions to

18 parties who are not the requestor?

19 A.  I'm sorry.  Could you repeat the question?

20 Q.  Based on your experience have you seen people who have

21 attributed OIG advisory opinions to those other than the

22 requesting party?

23      MR. PRICHARD:  Again, this falls under Judge Garcia's

24 opinions and his rulings and is way outside the scope of what

25 of the process.

KEVIN MCANANEY - DIRECT

1        THE COURT:  Sustained.

2  BY MR. BERNELL:

3  Q.  Shortly after this opinion, 11-17, came out, did UAS

4  approach you to get your views on this?

5  A.  Yes.

6  Q.  Who did you speak with at UAS?

7        MR. PRICHARD:  Excuse me, your Honor.  Now we're

8  getting outside of process and we're getting into his

9  lawyering with the client.

10        MR. BERNELL:  Your Honor, may we approach?

11        THE COURT:  Yes.

12     (The following proceedings were held at the bench.)

13        MR. BERNELL:  This information is specifically

14  included in the portions that were allowed by Judge Garcia,

15  his view of this OIG opinion, and it's applicable to UAS.

16  It's the pertinent portion of his testimony, in large part.

17        THE COURT:  What are you talking about?

18        MR. BERNELL:  Judge Garcia specifically let 17 in,

19  did not strike that on downward, and allows for him to say

20  that he advised UAS was not binding, instructed him not to

21  talk in any detail about the statute, and I'm not going to ask

22  him any -- I don't want to get into a legal conversation.  I

23  just want to talk about what it states here and what Judge

24  Garcia already ruled is admissible.

25        THE COURT:  He's already said basically this --

KEVIN MCANANEY – DIRECT

1        MR. PRICHARD:  That's right.

2        THE COURT:  -- doesn't mean a thing.

3        MR. BERNELL:  I have established that he said that in

4    the context of his opinion, in the context of UAS.  He did say

5    it broadly.  I just want to make it more specific for the

6    jury.

7        THE COURT:  The objection is sustained.

8        MR. PRICHARD:  Thank you.

9      (The following proceedings were held in open court.)

10        MR. BERNELL:  We'll pass the witness.

11   BY MR. PRICHARD:

12   Q.  Mr. McAnaney, I've got a bad case of flying sticky notes

13   over here on my side, so bear with me.  I've got very few

14   questions for you.  I think Mr. Bernell established that you

15   were -- you are a private practice attorney living in New

16   York; correct?

17   A.  Actually I moved to New Jersey a month ago, so...

18   Q.  Good move, I guess.  Okay.

19   A.  So I now live in New Jersey.

20   Q.  So you practice in New Jersey?

21   A.  Yes.

22   Q.  Are you charging UAS for your time and testimony here

23   today?

24   A.  I am.

25   Q.  And at what rate are you charging these plaintiffs?

KEVIN MCANANEY - DIRECT

1   A.  $600 an hour.

2   Q.  Okay.  Now, I know we've had some bumps and starts along

3   the way, and you've been in the courtroom since when

4   Mr. McAnaney?

5   A.  I think Wednesday.

6   Q.  Okay.  So you were here -- today is Friday.  Were you here

7   Tuesday?

8   A.  I think I flew in Tuesday.

9   Q.  Flew in Tuesday.

10  A.  I don't remember.

11  Q.  Okay.  You've been here Wednesday, Thursday, and assuming,

12  and I make a promise to you we're going to be done with you

13  very shortly, you will have been here three days?

14  A.  Yes.

15  Q.  Do you charge for sitting in the back of the courtroom

16  listening?

17  A.  I do.

18  Q.  Okay.  So it would be fair to say that you roughly

19  incurred a fee of about $10,000 for your testimony here today;

20  right?

21  A.  I wouldn't calculate, but could be.

22  Q.  Now, so the Office of the Inspector General, that is a

23  United States government agency; correct?

24  A.  Yes.

25  Q.  All right.  So when you left private practice and you

KEVIN MCANANEY - DIRECT

1  became a chief or a member of the OIG, you went out of the

2  private sector and you joined the federal government; correct?

3  A.  Yes.

4  Q.  So this report, this advisory that we're talking about,

5  the OIG advisory report, that is a document that comes from

6  the United States Government; correct?

7  A.  Are you talking about the opinions?

8  Q.  Yes, sir.

9  A.  Yes.

10  Q.  Okay.  And those opinions, in whatever, either a positive

11  or a negative, if they are not withdrawn and they are

12  published, they are completely open to the public, except for

13  the jurors that can't go to the internet and get them; right?

14  A.  That's correct.

15  Q.  And so, if again, not this jury, but if anybody wanted to

16  go on and find that opinion from how many years ago now?

17  A.  Seven, six.

18  Q.  Could they find that on the website?

19  A.  They could.

20  Q.  Okay.  And I believe you told the folks here that the OIG

21  opinions are reviewed by a number of other entities; correct?

22  A.  That is correct.

23  Q.  They are reviewed by the Federal Bureau of Investigation,

24  the FBI?

25  A.  Not the opinions.  The opinions themselves are probably by

KEVIN MCANANEY - DIRECT

1   CMS, the Center for Medicare Services and DOJ and OIG.

2   Q.  Now, so everybody is with us, the DOJ, that's the

3   Department of Justice, main justice in Washington; correct?

4   A.  Yes.

5   Q.  That's Eric Holder, Loretta Lynch, Jeff Sessions, their

6   organizations?

7   A.  Yes.

8   Q.  They are the Attorney General that heads up the Department

9   of Justice; correct?

10  A.  That's correct.

11  Q.  The criminal division reviews it --

12  A.  Yes.

13  Q.  -- right?

14  A.  Yes.

15  Q.  Okay.  And they review it.  Do they review it before or

16  after that advisory -- or that opinion is issued?

17  A.  Before.

18  Q.  Okay.  So it's got to get clearance from the DOJ; right?

19  A.  Correct.

20  Q.  Okay.  And one of the things that the OIG is tasked with

21  is investigating fraud, waste, and abuse in the federal

22  programs administered by the Health and Human Services

23  Department; correct?

24  A.  Correct.

25  Q.  The OIG is supposed to be looking out for everybody's

KEVIN MCANANEY – DIRECT

1   pocketbook; right?

2   A.  Yes.

3   Q.  If an entity like, let's say, UAS, and they have got, I'll

4   tell you, outstanding lawyers -- okay? -- if they wanted to

5   validate its business model, could they submit a request to

6   the OIG?

7   A.  They could.

8   Q.  Someone like Mr. Bernell or Mr. Low, on behalf of -- if

9   they wanted to, they could -- any prohibition, is there any

10  prohibition to them asking about it?

11  A.  No.

12  Q.  Okay.  And really, there isn't any risk because if they

13  found out, again, if Mr. Low or Mr. Bernell found out about it

14  in advance before the opinion came out, they could withdraw

15  their request, as I understand your testimony; yes or no?

16  A.  Yes.

17  Q.  Okay.  And as far as you know, they have never made that

18  request; correct?

19  A.  Not to my knowledge.  I have no way to know.

20  Q.  Now, at the time that Mr. Wallen made the request for the

21  opinion, how long had you been out of the office of the OIG?

22  A.  Let me look.  Seven or eight years.

23         MR. PRICHARD:  Okay.  Mr. McAnaney, I appreciate your

24  time.  That's all the questions I have.

25         THE COURT:  We'll take our afternoon recess at this

KEVIN MCANANEY – DIRECT

1 time.  Don't talk about the case.  We'll see you back in a few

2 minutes.

3     (The jury exited the courtroom at 2:02 p.m.)

4          THE COURT:  Mr. McAnaney, come on up.

5          Counsel may approach too.

6     (Off the record discussion.)

7     (Change in reporter.)

```
1                    *-*-*-*-*-*-*-*

2              THE COURT:  Let me see counsel at the bench.

3              (Bench conference, as follows:)

4              THE COURT:  Juror number 3 approached me in the

5    hallway and said she wanted me to know that she didn't realize

6    that Incarnate Word might be involved in the case.  She had

7    gone to Incarnate Word and did not know Dr. Porter.

8              I said, "Do you think that would 1have any effect on

9    you on this trial?"  And she said, "No."  And I said, "No

10   problem."  So I just wanted to disclose.

11             MR. PRICHARD:  She said she might be involved in a

12   case?

13             MR. LOW:  No.  She didn't -- sorry.

14             THE COURT:  She did not know they might be involved

15   in this case.

16             MR. PRICHARD:  Okay.  I am sorry.  I misunderstood.

17             THE COURT:  And I just wanted to disclose it.  And I

18   said, "Do you think that would have any effect on your ability

19   to sit as a fair juror in this case?"  And she said,

20   "Absolutely not."

21             MR. PRICHARD:  Okay.

22             THE COURT:  I said, "Okay."  And I just wanted to

23   disclose that to counsel.

24             MR. PRICHARD:  Thank you, Your Honor.

25             MR. BERNELL:  If the Trinity guys hold that against
```

```
 1    her --

 2            THE COURT:  She did not know Dr. Porter.

 3            (End of bench conference.)

 4            THE COURT:  Who is next?

 5            MR. LOW:  Tom "Vi-da" or "Waj-da."

 6            MR. PRICHARD:  Pick one.

 7            MR. LOW:  I say it on the tape.

 8            (Jury enters courtroom.)

 9            COURTROOM SECURITY OFFICER:  Please be seated.

10            THE COURT:  Your next witness.

11            MR. LOW:  Good afternoon, Your Honor.  Casey Low for

12    the plaintiffs.  Plaintiffs call Tom Wajda by video

13    deposition.

14            (Video played.)

15            MR. LOW:  Your Honor, we have one last witness for

16    today.  It is Matt Mannino by video.

17            THE COURT:  All right.

18            (Video played.)

19            THE COURT:  That's it?

20            MR. LOW:  Yes, Your Honor.

21            THE COURT:  Okay.  We are going to give you an early

22    break today.  Don't talk about the case.  Don't let anyone

23    talk to you about the case.  Leave your notebooks in the jury

24    room.  Don't twitter or tweet and have a nice weekend.  I will

25    see you Monday at 8:30.
```

```
 1              COURTROOM SECURITY OFFICER:  All rise.

 2              (Jury leaves courtroom.)

 3              THE COURT:  I noted that that was juror number 2,

 4    not number 3 that I discussed at the bench.  I gave you the

 5    wrong juror number.

 6              Okay.  What is the Friday follies?

 7              MR. LOW:  I am sorry?

 8              THE COURT:  The Friday follies.

 9              MR. LOW:  What to expect for Monday; is that right,

10    Your Honor?

11              THE COURT:  Correct.

12              MR. LOW:  We will call by deposition Dr. Fineman.

13    We will call live Jeff Snyder.  I hope we can get him back

14    here, but I think that is true.  We will also call by

15    deposition Laurie Schroeder.  Which this may sound like a lot

16    of depositions.  We are going to cut the content a lot.

17    Mr. Notarthomas.  Mr. Esposito.  And then we will have two

18    more live witnesses, Nicholas Hollis and David Kennedy.

19              THE COURT:  Okay.  What is the playing time on the

20    depositions?

21              MR. LOW:  The play time for the depos?

22              THE COURT:  Yes.

23              MR. LOW:  I don't have it in front of me, but I was

24    mentioning -- like Esposito is two hours, and we are going to

25    cut that more than in half.
```

```
 1              THE COURT:  Okay.

 2              MR. LOW:  So we don't cover the same content that

 3    was just covered.

 4              THE COURT:  Okay.

 5              MR. LOW:  So I would imagine -- Fineman for sure

 6    will be an hour and 15 minutes, or just an hour, rather.

 7              THE COURT:  Okay.

 8              MR. LOW:  And then we will have, for Esposito, we

 9    will have less than an hour, and we will have less than an

10    hour for Laurie Schroeder.

11              THE COURT:  Okay.

12              MR. LOW:  And the same for Notarthomas.  So they may

13    not all get played tomorrow or Monday, but --

14              THE COURT:  Okay.  And then you may be able to rest

15    Tuesday?  Are we getting there, far enough or not?

16              MR. LOW:  That is our hope, but I think it depends

17    on how cross goes and how much we can cut this weekend on the

18    depos that we will get to work on.

19              THE COURT:  All right.  Now, I guess what I will do

20    is, since you haven't rested, I will talk ex parte off the

21    record at the bench with the defendants about what they are

22    expecting in their case, because I don't usually require

23    defendants to disclose before you rest what they are going to

24    do.  For my planning purposes, it would be helpful if I know

25    from the defendants what they are going to do.
```

```
 1                MR. LOW:  Okay.  Thank you.
 2                THE COURT:  Anything else you all want to raise?
 3                MR. LOW:  I am sorry?
 4                THE COURT:  Anything else you all need to raise?
 5                MR. LOW:  I need move into evidence the exhibits
 6     that were in the deposition today.
 7                THE COURT:  Okay.  Have you got the numbers assigned
 8     here?
 9                MR. LOW:  I do.
10                THE COURT:  And how is the jury going to figure out
11     these numbers?
12                MR. LOW:  That's what we were trying to do with our
13     list of exhibits; they reference the deposition number.  So I
14     hope we can keep them in line.  The exhibits were P --
15     Plaintiff's 50, 51, 52, 53.
16                THE COURT:  These are trial exhibit numbers?
17                MR. LOW:  These are trial exhibits, correct.
18     Plaintiff's 101, 102, 105, 106, 107 and 108.  And then
19     Plaintiff's 254, 257, 258, 259, 260, 265, 266, 267, 268, 269
20     and 271.  We move for those to be admitted into evidence, Your
21     Honor.
22                THE COURT:  All right.  They are all received.
23                MR. BENNETT:  We object, Your Honor, just to put our
24     objections in the record, to those exhibits on relevance
25     grounds.  They are not relevant to any antitrust or tortious
```

Karl H. Myers, CSR, RMR, CRR

```
 1    interference claim on record.  So consistent with our depo

 2    designation objections, we object on those grounds.

 3                  THE COURT:  All right.  That is overruled.

 4                  MR. LOW:  Thank you, Your Honor.  That's all I have,

 5    Your Honor.

 6                  THE COURT:  Okay.  All right.  Let me see

 7    defendant's counsel at the bench off the record.

 8                  (Bench conference off the record.)

 9                  (Proceedings recessed for the evening.)

10                  *-*-*-*-*-*-*-*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    *-*-*-*-*-*-*-*

2    UNITED STATES DISTRICT COURT )

3    WESTERN DISTRICT OF TEXAS    )

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that the transcript fees and format comply

7    with those prescribed by the Court and the Judicial Conference

8    of the United States.

9    Date signed:  March 8, 2018.

10
             /s/ Chris Poage
11           United States Court Reporter
             655 East Cesar E. Chavez Blvd.
12           San Antonio, TX 78206

13           /s/ Gigi Simcox
             United States Court Reporter
14           655 East Cesar E. Chavez Blvd.
             San Antonio, TX 78206

15
             /s/ Karl H. Myers
16           United States Court Reporter
             655 East Cesar E. Chavez Blvd.
17           San Antonio, TX 78206

18

19

20

21

22

23

24

25
```