```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3  UNITED BIOLOGIES, LLC,        )
    ACADEMY OF ALLERGY & ASTHMA )
 4  IN PRIMARY CARE,             )
                                 )
 5       Plaintiffs,             )
                                 )
 6       vs.                     )   Docket No. SA-14-CV-35-RCL
                                 )
 7  ALLERGY AND ASTHMA NETWORK/ )    San Antonio, Texas
    MOTHERS OF ASTHMATICS, INC.,)    March 12, 2018
 8  AND TONYA WINDERS,           )
                                 )
 9       Defendants.             )
    _____)
10
                      TRANSCRIPT OF TRIAL
11            BEFORE THE HONORABLE ROYCE C. LAMBERTH
               SENIOR UNITED STATES DISTRICT JUDGE
12                      AND A JURY
                        VOLUME VI
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFFS:
15  PILLSBURY WINTHROP SHAW PITTMAN
    By:  Casey Low, Esquire
16  By:  Elizabeth Marcum, Esquire
    By:  Dillon Ferguson, Esquire
17  By:  Benjamin Bernell, Esquire
    401 Congress Avenue, Suite 1700
18  Austin, TX  78701-3797

19  FOR THE DEFENDANTS:
    CARTER SCHOLER ARNETT HAMADA & MOCKLER, PLLC
20  By:  E. Leon Carter, Esquire
    By:  Linda Stahl, Esquire
21  8150 N. Central Expressway, Suite 500
    Dallas, TX  75206
22
    PRICHARD YOUNG, LLP
23  By:  David Prichard, Esquire
    10101 Reunion Place Blvd., Suite 600
24  San Antonio, TX  78216

25
```

```
1    COURT REPORTERS:
     GIGI SIMCOX
2    CHRIS POAGE
     United States Court Reporters
3    655 East Cesar E. Chavez Blvd.
     San Antonio, TX  78206
4    Telephone:  (210) 244-5036

5    Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

960

1        (Open court)

2             THE COURT:  That's the ruling on the Schroeder

3    deposition.

4             I wanted to start and spend a couple minutes before I

5    bring the jury with an apology to counsel for the defendants

6    with that little outburst at the end on Friday.  That bothered

7    me over the weekend.  And I did want to say to all counsel,

8    the Court's frustration there was based on, I thought the

9    reason for the February 9th hearing was to make sure that

10   things went smoothly for the trial, and I was bothered when I

11   saw the volume of depositions and the volume of objections

12   then, and so on, on the Monday before the pretrial.

13            I had set the pretrial on the Friday before the

14   trial, which was somewhat unusual, but counsel had suggested

15   that was an adequate pretrial date.  And I then, on that

16   Monday when I saw the volume of depositions and that we were

17   talking about thousands of pages, I hadn't seen the

18   depositions, and I did have counsel on that Wednesday provide

19   me with the depositions and with the underlining of the

20   objections and cross-designations and so on.

21            I realized then the volume of what the Court was

22   being expected to do in a very short time.  And at the

23   pretrial then I was talking to counsel about will call and may

24   call and I went through that carefully with counsel for

25   plaintiff.

1           I did not realize until that discussion at the bench

2     on Friday afternoon that the defendants were really expected

3     to call everyone.  They had not designated, and I did not

4     realize they left the pretrial conference thinking that they

5     could call by deposition everyone whose deposition in the

6     thousands of pages they had submitted and the other side had

7     submitted, that they could call everyone in those depositions.

8           So I thought, mistakenly apparently, that the three

9     will call additional live witnesses they had was all we were

10    going to have and didn't know if they were going to designate

11    any additional will call depositions.  I was therefore

12    surprised when they talked about they were still planning to

13    call all of their will call depositions that they had not

14    designated at the pretrial.

15          In reflecting back on what happened at the pretrial,

16    I apparently misunderstood what was going on at the pretrial.

17    I had gone through carefully with the plaintiffs who was will

18    call and may call.  Apparently I did not make it clear to the

19    defendants that they had to designate at time of pretrial who

20    they were actually going to call by deposition and they have

21    the view that they could call anyone by deposition at trial

22    that they have designated.

23          I will, having not made that clear myself apparently,

24    go through each day the way I have with the plaintiffs, who

25    they expect to call in order and try to rule on those

1    objections so that it will be timely rulings, as I have tried

2    to do with the plaintiffs.

3         I will say to both sides, I really don't know what

4    was in mind of all counsel in designating thousands of pages

5    of depositions and delivering them to the Court at that late

6    date in a case that had been going four years, and with

7    hundreds of deposition objections, how the Court was going to

8    be expected to really keep up with this.  So it's a strange

9    case from the get-go, for me, that counsel really ended up

10   putting the Court in the posture that I'm in.  I'm not

11   complaining.  I just want y'all to understand the sense of

12   frustration that caused me to have that little outbreak, for

13   which I do apologize.

14        It's uncharacteristic of me to say some of the things

15   I said on Friday and I do sincerely apologize to counsel for

16   some of the things I said.  I'd take it all back, if I could,

17   but I can't.  But in any event, let's go on from there and

18   forget it happened and put it out of your minds.  I don't mean

19   any of that and I apologize.

20        Let's bring the jury.

21        All of you will be happy to know it bothered me over

22   the weekend.  I'm sure it bothered you as well.

23     (The jury entered the courtroom at 8:49 a.m.)

24        THE COURT:  Good morning, ladies and gentlemen.  You

25   may be seated.  I have a big surprise for you this morning,

1    another deposition.

2         The plaintiffs may proceed.

3         MR. LOW:  Good morning, may it please the Court.

4         Plaintiffs call Dr. Stanley Fineman by video

5    deposition.

6       (Video deposition was played.)

7         MR. LOW:  Your Honor, if I may clarify which exhibits

8    were referenced in that, so we can move them into evidence.

9         THE COURT:  All right.

10        MR. LOW:  Plaintiff's 227, Plaintiff's 229,

11   Plaintiff's 230, Plaintiff's 232, Plaintiff's 200, Plaintiff's

12   199, Plaintiff's 182, Plaintiff's 233, Plaintiff's 234,

13   Plaintiff's 235, Plaintiff's 237, Plaintiff's 241, Plaintiff's

14   242, Plaintiff's 522, Plaintiff's 219, Plaintiff's 217,

15   Plaintiff's 224, Plaintiff's 225, and Plaintiff's 200, and

16   plaintiffs would ask that the Court receive those into

17   evidence.

18        THE COURT:  They are received.

19      (Plaintiff's Exhibits 227, 229, 230, 232, 200, 199, 192,

20   233, 234, 235, 237, 241, 242, 522, 219, 217, 224, 225,

21   received into evidence.)

22        MR. LOW:  I think our next live witness is on his

23   way, so we're going to call one more deposition.  This is

24   going to be David Esposito, the corporate representative of

25   Phadia Thermo Fisher Scientific, Inc.

1          THE COURT:  Okay.

2      (Video deposition was played.)

3      (Video deposition was paused.)

4          THE COURT:  We're going to go ahead and take our

5  morning break.  This goes a little longer, so we'll take our

6  morning break now.

7      (The jury exited the courtroom at 10:20 a.m.)

8          MR. LOW:  There are two exhibits that weren't

9  technically on the list, but they are in a different form on

10  the list, and I didn't want to introduce them to be the same

11  thing that was on the video depo, and so we were going to

12  offer 606 and 607 when I'm done.  I'll show them to defense

13  counsel now.

14          THE COURT:  Okay.

15      (The jury entered the courtroom at 10:39 a.m.)

16          THE COURT:  All right.  You may be seated.  We'll

17  conclude this video deposition.

18          You may proceed.

19      (Video deposition was played.)

20          MR. LOW:  Your Honor, for the record, the exhibits

21  that aren't already in evidence are P238, Plaintiff's 606,

22  Plaintiff's 607, Plaintiff's 231, Plaintiff's 90, Plaintiff's

23  180, Plaintiff's 333, Plaintiff's 185, Plaintiff's 103,

24  Plaintiff's 335, Plaintiff's 336, Plaintiff's 119, Plaintiff's

25  338, Plaintiff's 210, Plaintiff's 208.  We would offer those

JEFFREY SNYDER - DIRECT

1  to the Court.

2       THE COURT:  Received.

3     (Plaintiff's Exhibits 238, 606, 607, 231, 90, 180, 333,

4  185, 103, 335, 336, 119, 338, 210, and 208 were received into

5  evidence.)

6       MR. LOW:  Your Honor, at this time we call Jeffrey

7  Snyder.

8     (WHEREUPON, JEFFREY SNYDER, having been duly sworn,

9  testified as follows:)

10                  DIRECT EXAMINATION

11  BY MR. LOW:

12  Q.  Please state your name for the record.

13  A.  Jeff Snyder.

14  Q.  Mr. Snyder, where do you live?

15  A.  Austin.

16  Q.  Do you have a family?

17  A.  No, not really.

18  Q.  And did you use to work at Thermo Fisher scientific?

19  A.  Yes.

20  Q.  From what years?

21  A.  So 2008 through the end of 2014.

22  Q.  If you could, just give me a little background before you

23  worked there in terms of educational after high school and any

24  other type of job.

25  A.  Right.  So I graduated from Westminster College in Fulton,

JEFFREY SNYDER - DIRECT

1    Missouri, then moved and worked overseas, came back to the
2    United States, ended up in the medical field, ended up working
3    for, at the time Thermo Fisher was Phadia, as a clinical sales
4    consultant for four years and then was promoted four years
5    after that to district sales manager for Austin.
6    Q.  And so it appears you were a clinical sales consultant
7    first for a period of time and then a district manager?
8    A.  That's correct.
9    Q.  And as a clinical sales consultant, was it typical in your
10   job responsibilities to meet with primary care physicians?
11   A.  Yes.
12   Q.  Okay.  And what was the purpose of meeting with those
13   physicians?
14   A.  To discuss disease states and to show them -- usually in
15   history a doctor will see a patient, they will look at the
16   symptoms, look at patient history, physical examination, and
17   then they would prescribe a, you know, for allergies or
18   asthma, they prescribe the medication.  So we talked to them
19   about, you know, diagnostics, as far as getting that more
20   accurate.
21   Q.  Was part of that purpose to encourage the physicians to
22   order ImmunoCap testing or blood testing for their patients?
23   A.  Sometimes yes.
24   Q.  And were you, as a clinical sales consultant, compensated
25   based about the amount of profiles that were sold?

JEFFREY SNYDER - DIRECT

1  A.  Yes.  I didn't do it for free.

2  Q.  Was that compensation directly tied to the amount of

3  ImmunoCap sales?

4  A.  Yes.

5  Q.  And then you became a district sales manager; correct?

6  A.  That's correct.

7  Q.  And what was that job, in terms -- different, how was it

8  different than being a clinical sales consultant?

9  A.  So my district had eight clinical sales consultants

10 underneath me.  And so, you know, putting them all together

11 and driving, you know, you know, driving that business.

12 Q.  So you are managing the sales people in the field in your

13 territory?

14 A.  Yes.

15 Q.  And where were you located?

16 A.  Austin.

17 Q.  Okay.  And what did your territory -- how big was it in

18 terms of geography?

19 A.  As far as people go?  Two in Austin.  Two in San Antonio.

20 One in the valley.  One in Corpus.  One in El Paso, and one in

21 Oklahoma City.

22 Q.  So it sounds like -- I'm sorry?

23 A.  No, I just kind of did the math in my head.

24 Q.  So it sounds like the sales people were located based on

25 the size of a city typically, like being assigned to a city?

JEFFREY SNYDER - DIRECT

1  A.  That's correct.

2  Q.  Now, I understand, we, the plaintiffs subpoenaed you in

3  this case; correct?

4  A.  Yes.

5  Q.  You happened to be within 100 miles of this court?

6  A.  Yes.

7  Q.  And you called me about that subpoena and asked what was

8  going on; right?

9  A.  Yeah.  I hadn't heard from you in so long, so...

10  Q.  And I told you I'm going to ask you questions about your

11  deposition?

12  A.  That's correct.

13  Q.  And I didn't tell you anything else, in terms of what you

14  should say or anything else?

15  A.  No, not at all.

16  Q.  And you are represented here by counsel today; is that

17  correct?

18  A.  Yeah, I have some.

19  Q.  Okay.  When you were a clinical sales consultant -- I'm

20  sorry.  When you were a district manager and a clinical sales

21  consultant, did you ever encounter United Allergy Services?

22  A.  Yes.

23  Q.  And you knew that entity to also be United Allergy Labs?

24  A.  Yes, UAL.

25  Q.  Do you recall when you first encountered United Allergy

JEFFREY SNYDER - DIRECT

1  Labs?

2  A.  When I first started as a clinical sales consultant, yes.

3  Q.  And when was that?

4  A.  2008.

5  Q.  And at some point --

6  A.  I think.  I mean, it's been so long.

7  Q.  Thereabouts?

8  A.  Right.

9  Q.  And at some point did you have -- did you perceive United

10 Allergy Labs to have an impact on your sales of the ImmunoCap

11 test?

12 A.  An impact on the health care industry, yes.

13 Q.  And that directly affected your compensation; correct?

14 A.  More or so yes.

15 Q.  At some point do you recall speaking with physicians about

16 whether or not United Allergy Labs or United Allergy Services

17 had a legal arrangement where they were legal?

18 A.  No.  You know, I don't recall.  I was -- several

19 physicians brought it up and it was, at that particular point

20 in time it was new to me.  So just understanding, you know,

21 like I think one office in Oklahoma City was, I would say

22 disgruntled, disenfranchised with UAL and I didn't know much

23 about it, so...

24 Q.  Okay.  I'm going to ask you some questions about some

25 exhibits and they are contained in binders.  I'm going to do

JEFFREY SNYDER - DIRECT

1    my best to keep you restrained to one binder, but if you could

2    please, sir, turn with me to the binder that contains 118.

3            MR. LOW:  And your Honor if I may approach?

4            THE COURT:  Yes.

5            THE WITNESS:  What binder are you talking about?  Oh.

6            18, you said?

7    BY MR. LOW:

8    Q.  118 sir.  Thank you.

9    A.  All right.

10   Q.  Do you recognize this document?

11   A.  It has my name on it.

12   Q.  Okay.  What is it?

13   A.  It's an email.

14   Q.  And who is it an email to?

15   A.  To Brandon Massey, Wayne, and Joe.

16   Q.  Are these people internal at Thermo Fisher?

17   A.  Two district sales managers and a regional manager.

18           MR. LOW:  Your Honor, I offer Exhibit 118.

19           MS. CHO-HERNANDEZ:  No objection.

20           THE COURT:  Received.

21       (Plaintiff's Exhibit 118 received into evidence.)

22   BY MR. LOW:

23   Q.  It's kind of hard to read on the screen.  We're going to

24   blow up the bottom, just the top of the bottom email to

25   confirm this is the email you authored; correct?

JEFFREY SNYDER – DIRECT

1  A.  Yes.

2  Q.  Now, it references something called NSM.  Do you know what

3  that is?

4  A.  National sales meeting.

5  Q.  Is that the national sales meeting within Phadia or Thermo

6  Fisher?

7  A.  Yes.

8  Q.  Who attends the national sales meeting?

9  A.  Everybody in the company.

10  Q.  And it appears that this is in the 2013 time frame;

11  correct?

12  A.  Yes.

13  Q.  Okay.  Do you recall when the national sales meeting was

14  back then?

15  A.  No.

16  Q.  Okay.

17  A.  I'm sure you know.

18  Q.  We'll go up to the next email.  I just want to orient in

19  terms of just within your responsibilities.  The next one is

20  from Laura Sanchez, who is she?

21  A.  She was a clinical sales consultant in El Paso.

22  Q.  Okay.  And it looks like she was reporting to you about

23  UAL; do you see that?

24  A.  Um-hum, yes.

25  Q.  At this time period did you have a knowledge of whether or

JEFFREY SNYDER - DIRECT

1   not UAL was harming the sales that your sales people were

2   trying to do in the field?

3   A.  I can't recall.

4   Q.  Okay.  Did you have any reason at that time to think that

5   UAL was operating either a fraudulent or illegal business?

6   A.  I can't recall that either at that particular point in

7   time.

8   Q.  Do you recall the president of Phadia or Thermo Fisher,

9   David Esposito, coming to Texas and speaking with you about

10  United Allergy?

11  A.  Yes.

12  Q.  And do you recall when that was?

13  A.  No.

14  Q.  If you'll turn with me to Exhibit 125.

15  A.  I mean --

16  Q.  Go ahead.

17  A.  I was just going to say, you are asking for specific

18  dates, and this is --

19  Q.  I understand.  That's why I'm showing it to help you.  No,

20  I understand.  125.

21  A.  Yes.

22  Q.  Okay.  Do you recognize this document?

23  A.  Yeah.

24  Q.  And what is it?

25  A.  I mean, it's an email.

JEFFREY SNYDER - DIRECT

1   Q.  And are you on it?

2   A.  Yes, I am.

3           MR. LOW:  Your Honor, I offer Plaintiff's Exhibit

4   125.

5           MS. CHO-HERNANDEZ:  No objection, your Honor.

6           THE COURT:  Received.

7       (Plaintiff's Exhibit 125 received into evidence.)

8   BY MR. LOW:

9   Q.  If we'll go to the top of the email, this appears to be an

10  email from the president of the Phadia division at Thermo

11  Fisher; correct?

12  A.  Yes.

13  Q.  And it includes you as well as who else, in general, just

14  titles?

15  A.  Ranita, the leadership team, Steve Grabowski [phonetic],

16  Fred Martin, CC'd Dwayne.  That's it.

17  Q.  And was this after the national sales meeting, most

18  likely?

19  A.  I don't know.

20  Q.  If you'll turn with me to Exhibit 135.

21  A.  Okay.

22  Q.  Do you recognize this exhibit?

23  A.  It's an email.

24  Q.  And who is it between?

25  A.  Myself and David Esposito.

JEFFREY SNYDER - DIRECT

1          MR. LOW:  Your Honor, we tender exhibit Plaintiff's

2   135.

3          MS. CHO-HERNANDEZ:  No objection.

4          THE COURT:  Received.

5      (Plaintiff's Exhibit 135 received into evidence.)

6   BY MR. LOW:

7   Q.  This appears to be in April 2013 when you are talking

8   about the field; correct?

9   A.  Yes.

10  Q.  He was asking you to keep up with him about United Allergy

11  Services; does that look right?

12  A.  Give me a second.

13  Q.  I'm sorry?

14  A.  Give me a second to read this.

15  Q.  Please take your time.

16  A.  Okay.  What was your question?

17  Q.  Was Mr. Esposito asking you to keep track of United

18  Allergy Services?

19  A.  No.  He just said he wanted to readdress some issues.

20  Q.  And you are speaking to him in a lower email about a

21  strategy?  I believe it's the bottom paragraph.

22  A.  Okay.  Yeah.

23  Q.  And at this time Phadia had -- was seeking an additional

24  strategy regarding United Allergy; is that correct?

25  A.  It was always been discussed, once it became apparent that

JEFFREY SNYDER - DIRECT

1   UAL was out there.

2   Q.  And what was the strategy?

3   A.  It was just, just some brainstorming ideas, nothing set in

4   stone, as I recall.

5   Q.  Back at the time you were at Phadia, you never really had

6   much interaction with Tonya Winders; is that right?

7   A.  No.

8   Q.  And you had interaction after she left; is that right?

9   A.  Yes.  One time.

10  Q.  And Mr. Esposito told you about Miss Winders being at

11  AANMA; correct?

12  A.  I don't recall that.

13  Q.  And what was the time you recall?

14  A.  At the AAAAI, I think.

15  Q.  What's the AAAAI?

16  A.  It's the Academy for Allergy Asthma and Immunology.  It's

17  a yearly, you know, big meeting here.  It was here in San

18  Antonio.

19  Q.  There was an AAAAI annual meeting in the summer of 2014;

20  does that sound right?

21  A.  Yes.

22  Q.  And you attended on behalf of Phadia; correct?

23  A.  I was one of the people, yes.

24  Q.  And you met with Miss Winders at that meeting?

25  A.  It wasn't a meeting.  It was just happenstance, hey.

JEFFREY SNYDER - DIRECT

1   Q.  You talked to her; correct?

2   A.  Yeah.

3   Q.  Do you recall what you discussed?

4   A.  The weather.

5   Q.  Anything else?

6   A.  I don't recall.  I'm sure you'll remind me, if --

7   Q.  We'll turn to Exhibit 151.

8   A.  You want to help me out here?  Okay.

9   Q.  Do you recognize this exhibit?

10  A.  It's an email.

11  Q.  Are you on it?

12  A.  I am.

13       MR. LOW:  Your Honor, I offer Plaintiff's Exhibit

14  151.

15       MS. CHO-HERNANDEZ:  No objection.

16       THE COURT:  Received.

17    (Plaintiff's Exhibit 151 received into evidence.)

18  BY MR. LOW:

19  Q.  So we get the full picture, let's go to the bottom email.

20  Can you confirm with me, Mr. Snyder, that's the original

21  email?

22  A.  Yes.

23  Q.  Okay.  And on the next page, there is a subject line; do

24  you see that?

25  A.  Okay.

JEFFREY SNYDER - DIRECT

1  Q.  What's it called?

2  A.  Deception in Allergy Care.

3  Q.  Correct.  Do you know what this email is discussing and

4  referring to, Deception in Allergy Care?

5  A.  Yeah, the deception of United Allergy Labs.

6  Q.  And what's the deception of United Allergy Labs?

7  A.  My personal opinion?

8  Q.  Yes.

9  A.  That their business practices can pretty much set back the

10 health care industry by decades.

11 Q.  And it set them back how?

12 A.  Offices that weren't really utilizing diagnostics for it

13 to diagnose, you know, asthma or allergy, allergic asthma or

14 allergic allergy, basically these offices were signing up

15 paying 10, $15,000, and now they are a full-fledged allergy,

16 you know, office, and they are utilizing not skin prick

17 testing, which is the gold standard, but scratch testing,

18 patch testing, and it was conducted not by somebody that is

19 trained, like a physician, but like a medical assistant, an

20 MA.

21 Q.  Who told you all of that?

22 A.  Through doctors, conversations with physicians.

23 Q.  You are saying you had conversations with physicians in

24 contracts with United Allergy?

25 A.  Yeah, there were some discussions.

JEFFREY SNYDER - DIRECT

1  Q.  And it's your sworn testimony here today they told you

2  they were doing patch testing; is that right?

3  A.  I think some of them have mentioned patch or scratch

4  testing.

5  Q.  You never actually saw any tests?

6  A.  I never -- I was not allowed into the rooms, when they

7  were doing the testing.

8  Q.  The middle email appears -- this email appears to be from

9  Brandon Massey, who was that individual?

10  A.  He was the district sales manager in Dallas.

11  Q.  And so he was about your level in a different part of

12  Texas; correct?

13  A.  That's correct.

14  Q.  And his email refers to the fact that Tonya Winders used

15  to work at Phadia and now she is the president of this

16  organization.  What's this organization?

17  A.  I'm just assuming the organization that she's a part of.

18  Q.  And what's that organization?

19  A.  Is it Mothers against Asthma?

20  Q.  AANMA, or Mothers of Asthmatics; does that sound right?

21  A.  Yeah.  I don't know the business name.

22  Q.  And there is a reference in his email about handing out

23  copies of documents; do you see that?

24  A.  I see:  "It would be nice to get a hold of some hard

25  copies."

JEFFREY SNYDER - DIRECT

1   Q.  Do you know what he's talking about?

2   A.  No, I don't.  You'll have to ask him.

3   Q.  Well, let's go to the top email.

4   A.  Okay.

5   Q.  You respond; correct?

6   A.  Um-hum.

7   Q.  I think earlier you testified that you thought you talked

8   about the weather with Miss Winders; is that right?

9   A.  Yes.

10  Q.  This says -- or can you just read that snippet, so I can

11  understand now that you're oriented -- let me just restate it

12  this way.  Do you recall, now seeing this email, that you

13  talked with Miss Winders about UAS specifically?

14  A.  I remember seeing this, when you presented it at my

15  deposition, yes.

16  Q.  Okay.  And does this refresh your recollection that you

17  and Miss Winders talked about UAS?

18  A.  Vaguely, but, yes.

19  Q.  And the fact that UAS would not go after them on a legal

20  basis for obvious PR reasons?

21  A.  Yeah.  Apparently I was wrong.

22  Q.  What's PR?

23  A.  So, public relation.

24  Q.  Is it a thought that no one is crazy enough to sue Mothers

25  of Asthmatics; is that basically what you said in your

JEFFREY SNYDER - DIRECT

1  deposition?

2  A.  I was wrong.

3  Q.  You also said:  "Tonya has had them in her sights for

4  several years and told Brandon and myself at the AAAAI last

5  year that she wasn't finished with them;"  Do you see that?

6  A.  I see that.

7  Q.  Do you know what she was referring to?

8  A.  No, but you can ask her.  There is a million things going

9  on at that meeting.  And it's not -- let me clarify.  It

10 wasn't like we were sitting in a closed room having a sit-down

11 meeting.

12     When you go to these conferences, it's a huge room, with

13 all these different vendors, different companies, and people

14 are walking by, there is a lot of people going on.  So it's

15 not like we were just sitting there going, hey, you know, get

16 close, let's have a meeting.

17 Q.  That's a fair point.  This is the annual meeting of the

18 academy, or the National Trade Association of Allergists;

19 right?

20 A.  Trade association would be a good --

21 Q.  And there are thousands of allergists there; right?

22 A.  I don't know thousands.

23 Q.  How many would you estimate?

24 A.  I don't know.  I mean, you'll have to go back and check

25 that one out.

JEFFREY SNYDER - DIRECT

1   Q.  And at the time Miss Winders is clearly not at Phadia,

2   she's at AANMA; is that right?

3   A.  That's correct.

4   Q.  And you are clearly working for Phadia?

5   A.  Yes.

6   Q.  Or Thermo Fisher?

7   A.  Yes.

8   Q.  The second page of this exhibit references what looks like

9   there was some sort of attachment; do you see that?

10  A.  Okay.

11  Q.  I know it's not attached to this document, but I want to

12  ask you about Exhibit P150.  Do you recognize this document?

13  A.  I mean, I'm reading it right now.

14  Q.  Okay.  And you are welcome to take your time to read it.

15  I'm just trying to establish that you are on it and what it

16  is.

17  A.  It's in front of me.

18  Q.  It's an email that you are on; correct?

19  A.  Yes.

20          MR. LOW:  Your Honor, I offer Plaintiff's 150.

21          MS. CHO-HERNANDEZ:  No objection.

22          THE COURT:  Received.

23      (Plaintiff's Exhibit 150 received into evidence.)

24  BY MR. LOW:

25  Q.  This appears to have the same title as the last email we

JEFFREY SNYDER - DIRECT

1  went over; right?

2  A.  Okay.

3  Q.  Okay.  If you'll turn with me to the second page of the

4  exhibit.  What does this appear to be, Mr. Snyder?

5  A.  An article.

6  Q.  By whom?

7  A.  Allergy Asthma Today.

8  Q.  And what's the title of the article?

9  A.  *Deception in Allergy Care*.

10 Q.  What does it say under that?

11 A.  Recognize the Signs of Fraud.

12 Q.  Do you have a belief on who published this article?

13 A.  No, I have no idea.

14 Q.  You don't know if AANMA published that?

15 A.  No, I have no idea.

16 Q.  We'll, turn back to the email of Mr. Massey, which seems

17 to be a similar email -- or I think it's the same email we

18 discussed in the last exhibit.  He seems to be referencing

19 that this was being handed out by Phadia representatives; were

20 you aware of that?

21 A.  No, I was not.

22 Q.  You said you saw that he was looking for hard copies;

23 right?

24 A.  Okay.

25 Q.  Did you agree with his, when you read it, his statement

JEFFREY SNYDER - DIRECT

1   that:  "Remote allergy seems to be a concern and strategies

2   around this business threat are ongoing?"

3   A.  Yes.  You are always strategizing.

4   Q.  Was part of the strategy to hand out articles such as

5   this?

6   A.  No, it was not.

7   Q.  Have you ever participated in handing out articles that

8   AANMA authored?

9   A.  No.

10  Q.  Are you aware of others at Phadia who did?

11  A.  No.

12  Q.  If you will turn with me to Exhibit P136, please.

13  A.  Okay.

14  Q.  Do you recognize this document, Mr. Snyder?

15  A.  It's a email.

16  Q.  And who is it from?

17  A.  From me.

18          MR. LOW:  Your Honor, I offer Plaintiff's 136.

19          MS. CHO-HERNANDEZ:  No objection.

20          THE COURT:  Received.

21      (Plaintiff's Exhibit 136 received into evidence.)

22  BY MR. LOW:

23  Q.  It appears the top email is from you, but it originates

24  from someone named Ahmed Al-Hafidh; is that right?

25  A.  Yes.

JEFFREY SNYDER - DIRECT

1  Q.  Who was he?

2  A.  He was a clinical sales consultant in Dallas.

3  Q.  Do you know what these links are referring to in his

4  email?

5  A.  No, I don't.  I don't recall, unless I can click on it

6  right now.

7  Q.  And unfortunately I don't have that capability, but have

8  you ever heard of an AANMA article called *Patients, not Piggy*

9  *Banks*?

10  A.  I don't recall.

11  Q.  You don't recall.  It appears that he's referencing AANMA

12  in this email; right?

13  A.  Yes.

14  Q.  You write back to this email:  "Perfect timing;" do you

15  recall why you wrote that?

16  A.  No, I do not recall.

17  Q.  You don't know what was going on, sitting here today, in

18  May of 2013?

19  A.  Not specifically.  We're talking five, six years ago.

20  Q.  I understand.

21  A.  It's hard for me to remember what happened yesterday.

22  Q.  When you were either a clinical sales consultant or a

23  district manager, did you also -- did you ever work with local

24  allergist, as it pertained --

25  A.  Yes.

JEFFREY SNYDER - DIRECT

1    Q.  —— to United Allergy Services?

2    A.  Not necessarily pertaining to United Allergy Services.  We

3    worked with local allergists for our business, for the most

4    part.

5    Q.  Did your CSCs work with local allergists, as it pertained

6    to physicians in their territories?

7    A.  Well, yes.

8    Q.  For example, Miss Sanchez worked with a local allergist in

9    El Paso in 2013; is that right?

10   A.  Okay.  Yes.

11   Q.  Do you recall that?

12   A.  No, but that's her responsibility, is to work with

13   allergists.

14   Q.  Is it her responsibility to work with local allergists to

15   combat United Allergy Services?

16   A.  No, it's not.

17   Q.  If you can please turn to Exhibit 137.

18   A.  Okay.

19   Q.  I may have set you up with the wrong name.  How about Ryan

20   Sadlier [phonetic]; do you know who he is?

21   A.  He wasn't a clinical sales consultant, or a district sales

22   manager.  I think he was —— I think he was an account manager

23   maybe.  I don't recall.  I think that's right.

24   Q.  Do you recognize Exhibit 137?

25   A.  Yeah.  It's an email.

JEFFREY SNYDER - DIRECT

1  Q.  And are you on it?

2  A.  Yes.

3          MR. LOW:  Your Honor, I offer Plaintiff's 137.

4          MS. CHO-HERNANDEZ:  No objection.

5          THE COURT:  Received.

6      (Plaintiff's Exhibit 137 received into evidence.)

7  BY MR. LOW:

8  Q.  The second email references a Dr. Mansfield; do you know

9  who that is?

10  A.  No, I do -- I couldn't pick him up out of a lineup.  The

11  name is very familiar.

12  Q.  It says from the joint council; do you know what that is?

13  A.  No, I do not.  I don't recall.

14  Q.  It mentions trying to find a patient to complain to the

15  IG; do you know anything about this?

16  A.  No, I do not, just from reading this, though.

17  Q.  And it appears to reference an article from AANMA, so this

18  would have been in May of 2013; do you recall that article?

19  A.  No, I do not.

20  Q.  Do you recall any patient ever coming forward about United

21  Allergy Services?

22  A.  No, I can't recall that.  Again, this is May of '14.

23  Q.  So in this -- and that's in 2013; correct?

24  A.  '13.  Sorry.  May 14th of 2013.

25  Q.  During this time do you recall a specific remote practice

JEFFREY SNYDER - DIRECT

1  of allergy being discussed with you?

2  A.  In what capacity?

3  Q.  As a district manager.

4  A.  From my reps?

5  Q.  With you from others in the company?

6  A.  Could you be more specific?

7  Q.  Sure.  I'm trying to save us some exhibits, but who is Joe

8  Fraas?

9  A.  Yeah, you want a generalization, though.  I mean --

10  Q.  I understand.  But if you don't recall, that's fine too.

11  Do you recall ever receiving a remote practice of allergy

12  strategy or something like it in 2013?

13  A.  An official strategy?

14  Q.  A document called that.  No?  Okay?

15  A.  It's a vague question.  I'm just trying to get you to be

16  more specific and ask me exactly what you are wanting to know.

17  Q.  Can you please, sir, turn with me to Plaintiff's 146.

18  A.  All right.

19  Q.  Do you recognize this document, Mr. Snyder?

20  A.  It is an email.

21  Q.  And are you on it?

22  A.  I am CC'd on it.

23         MR. LOW:  I'm moving for Exhibit 146 of plaintiffs to

24  be entered, your Honor.

25         MS. CHO-HERNANDEZ:  No objection.

JEFFREY SNYDER - DIRECT

```
1          THE COURT:  Received.
2      (Plaintiff's Exhibit 146 received into evidence.)
3  BY MR. LOW:
4  Q.  If we can go to the top first.  This is in March 2013 when
5  you received this email; correct?
6  A.  That's correct.
7  Q.  And there is reference to Tonya's notes; do you know who
8  that is referencing?
9  A.  You'll have to ask Joe.
10 Q.  Who is Joe?
11 A.  He's the district sales manager, or was the district sales
12 manager out of Houston.
13 Q.  And who is Amy?
14 A.  Amy was marketing.
15 Q.  Okay.  And if we could go down to the bottom email.
16 A.  Okay.
17 Q.  Have you seen this?  You apparently saw this email in
18 2013; right?
19 A.  At some point I'm sure I did.
20 Q.  And it refers to a remote practice of allergy -- or, I'm
21 sorry.  Let me quote it correctly:  "A plan for leading the
22 charge to stop this market obstacle from negatively impacting
23 your territories further; did I read that correctly?
24 A.  Yes.
25 Q.  Are you familiar with that plan?
```

JEFFREY SNYDER - DIRECT

1  A.  No, I wasn't at that meeting.

2  Q.  Do you recall why this was being disseminated within

3  Thermo Fisher two years later?

4  A.  I don't know why.  I don't recall.

5  Q.  And are you sitting here today saying that you never had a

6  conversation within Thermo Fisher about a remote practice of

7  allergy strategy?

8  A.  I didn't say that.

9  Q.  Okay.  Is it possible you did in 2013?

10 A.  Yes.  Back to that, I asked you to be more specific.

11 Could have between me and a rep.  Could have been me and a

12 physician.  It could be me and my wife.

13 Q.  Okay.

14 A.  I mean --

15 Q.  Okay.  David Esposito came to visit you in Austin in 2013?

16 A.  That's correct.

17 Q.  And he was doing a deep dive on United Allergy services;

18 is that right?

19 A.  Into the analytics, yes.

20 Q.  And you were also discussing how you were combating United

21 Allergy in the field?

22 A.  We were talking about strategy.

23 Q.  And you were talking specifically about a remote practice

24 of allergy strategy; weren't you?

25 A.  Not to combat, but what we do to get our numbers back up.

JEFFREY SNYDER - DIRECT

1  Q.  And how would you get your numbers back up?

2  A.  You focus on where the business is.  Unless my reps had

3  100 percent of the physicians ordering ImmunoCap, then there

4  was business out there for them to go after.  There was

5  pediatricians, primary care, internal med offices that they

6  could go and discuss the utilization of diagnostics.

7  Q.  And did part of what you also discussed, the reps in your

8  field, is using AANMA articles in meetings with physicians?

9  A.  No.  I don't recall that.

10  Q.  Is it possible?

11  A.  It was never a directive from me.

12  Q.  Is part of what you discussed is reps in your field using

13  an OIG advisory opinion in reference to United Allergy?

14  A.  I don't remember that.  I remember that they were not --

15  if -- and I think I remember this from our deposition, and you

16  and I had a back and forth about the utilization of Google,

17  that if a physician brought up that article to us, which

18  wasn't that often, that you could steer them to Google it.

19  Q.  Was that okay for your representatives to do under your

20  territory, when you were district manager?

21  A.  Yeah.  It's public knowledge.

22  Q.  That was fine within Thermo Fisher from your vantage

23  point?

24  A.  It was okay to say, "You can Google OIG statement," yes.

25  It was just like -- it's similar to saying, "You can Google

JEFFREY SNYDER - DIRECT

1  the weather."  They are going to do it on their own.  We're

2  not going into the physician's computer and typing it in and

3  pulling it up.

4      You and I went back and forth about this during the

5  deposition, about -- because you're trying to redefine what is

6  is, and I told you that it's very okay for them to say, "Hey,

7  it's on their website, you can Google it up."

8  Q.  In reference United Allergy; that's okay?

9  A.  In reference to the OIG statement.

10 Q.  Why are you discussing with doctors an OIG statement in

11 the context of going to sell ImmunoCaps?  What's the point of

12 that?

13 A.  Well, you need to ask those physicians.  If those

14 physicians are going to ask a rep or me about the OIG

15 statement, it's clearly okay for me to say, "Hey, you can go

16 Google it;" right?  I feel a little badgered right now about

17 this.  And I think you and I went back and forth from the

18 deposition on this.

19 Q.  I'm sorry.  Sir, I'm not trying to badgering you.

20 A.  I just want to make sure we're having a clear

21 communication about this.  You know, if somebody came to me

22 and said, "What do you think the weather is going to be?"  Is

23 it okay for me to say:  "You can go Google it?"  Or:  "What do

24 you think about, you know, the Spurs and the Thunder?"  "I

25 don't know, go look it up."

JEFFREY SNYDER - DIRECT

1    Same thing.  If you walk into an office and they are like,

2  "Hey, what do you think about the OIG statement?"  "You can go

3  look it up."  "What is the OIG statement?"  "You can go look

4  it up."  We didn't proactively walk in there and say, "You

5  know, you need to go check this out."

6  Q.  And you said that wasn't part of a plan to combat United

7  Allergy; is that what you are saying?

8  A.  Was it a plan to go in there and lead with that?

9  Q.  At any point discuss it, was that ever part of a plan to

10 combat United Allergy?

11 A.  If a physician asked -- now, you are referring to me

12 personally; right?

13 Q.  The representatives under your --

14 A.  You're going to have to ask --

15 Q.  -- territory.

16 A.  -- those representatives specifically.  The direction from

17 me was:  "We don't lead with an OIG statement.  If they ask

18 about it, you can direct them towards that website."  It's

19 public knowledge.

20 Q.  If you could, sir, turn to Plaintiff's Exhibit 130.  Do

21 you recognize this document, Mr. Snyder?

22 A.  It's an email.

23 Q.  Are you on it?

24 A.  Yes.

25 Q.  You're the author; correct?

JEFFREY SNYDER - DIRECT

1  A.  That's correct.

2      MR. LOW:  Your Honor, I move Plaintiff's 130 into

3  evidence.

4      MS. CHO-HERNANDEZ:  No objection.

5      THE COURT:  Received.

6      (Plaintiff's Exhibit 130 received into evidence.)

7  BY MR. LOW:

8  Q.  This is also May of 2013; correct?

9  A.  Um-hum.

10  Q.  And there is a description of something called UAS/RAL; do

11  you see that?

12  A.  Yes.

13  Q.  And what are you referring to when you use those, that

14  acronym?

15  A.  United Allergy Service, remote allergy labs.

16  Q.  And under number one, you talk about the OIG statement;

17  you see?

18  A.  Um-hum.

19  Q.  And you talk about using -- you talk about stopping the

20  bleeding; do you see that?

21  A.  Um-hum.

22  Q.  Is it your testimony that reps in your area were not using

23  the OIG statement in connection with United Allergy?

24  A.  Like I said, under my direction they weren't supposed to

25  be.  You'll have to ask each individual rep whether they were.

JEFFREY SNYDER - DIRECT

1  I can't be with them 24 -- I couldn't be with them 24/7.

2  Q.  And you are reporting this to the president of the

3  company?

4  A.  Yes.  So the OIG statement, meaning that if a doctor asks

5  that, you know, you can lead them to that website.

6  Q.  There is also a reference there to a Dr. Jason Sigmon, who

7  is that?

8  A.  He's an ENT allergist out of Oklahoma City.

9  Q.  Does he have a sort of practice that you were working with

10 at that time?

11 A.  Yes.  He was one of the ENTs allergists that I called on.

12 Q.  And you are familiar with a company called Oasis Allergy?

13 A.  I'm very familiar.

14 Q.  And they sell allergy immunotherapy?

15 A.  That's correct, sublingual immunotherapy.

16 Q.  And it's sublingual, so it's drops?

17 A.  Yeah, underneath your tongue.

18 Q.  On your tongue.  And he ships it to physicians?

19 A.  That's correct.

20 Q.  In your territory?

21 A.  Across the country.  At the time he was.  I don't know if

22 he's still doing that.

23 Q.  Do you ever recall discussing that with Miss Winders?

24 A.  I don't know.  I don't recall it.  I'm sure that it could

25 have been discussed, or at least, you know, meet the,

JEFFREY SNYDER - DIRECT

1  connecting the two, the two had, you know, interesting things

2  to talk about.

3  Q.  I think that you mentioned that you only had one

4  discussion with Miss Winders that you could recall when you

5  were at Thermo Fisher; is that right?

6  A.  Face-to-face?

7  Q.  Okay.  Face-to-face.

8  A.  Again, you know, tell me.  You know, be specific with me.

9  Q.  Did you ever email with Miss Winders about --

10  A.  I don't think it was a constant.  I think there was a

11  couple.

12  Q.  Do you ever recall emailing with Miss Winders about

13  communicating with health insurance companies?

14  A.  I don't recall, but it's been a while.  I'm sure you

15  have --

16  Q.  Is it possible that occurred in 2013 or 2014?

17  A.  Possible.

18  Q.  Okay.  If you could, sir, turn with me to Exhibit 154.

19  A.  All right.

20  Q.  Do you recognize this document?

21  A.  Yes, it's an email.

22  Q.  And what is it?

23  A.  Contact information.

24  Q.  What are you doing --

25          MR. LOW:  First of all, I move for Exhibit 154 into

JEFFREY SNYDER - DIRECT

1   evidence.

2           MS. CHO-HERNANDEZ:  No objection.

3           THE COURT:  Received.

4       (Plaintiff's Exhibit 154 received into evidence.)

5   BY MR. LOW:

6   Q.  You're giving Miss Winders and Dr. Sigmon each other's

7   contact information?

8   A.  That's correct.

9   Q.  And you are doing it in the context of United Allergy

10  Services; is that right?

11  A.  That was one statement.  Yeah, part of it.

12  Q.  I think you said that, as you mentioned, she was with

13  Phadia and is the expert in UAS/RAL; do you see that?

14  A.  Yes.

15  Q.  What did you mean about that?

16  A.  That she knows the UAS/RAL business model.

17  Q.  And she's at AANMA now, at the time of this email?

18  A.  Okay.

19  Q.  And you are referencing Tonya; do you see that below

20  there?

21  A.  Yes.

22  Q.  Miss Winders, is that who you are directing?

23  A.  Yes.

24  Q.  And you mention about someone being "part of our fight for

25  quite some time;" do you see that?

JEFFREY SNYDER - DIRECT

1   A.   Right.

2   Q.   What did you mean by "our fight?"

3   A.   Our fight.  It could be a variety of things.  In generally

4   speaking, our fight in getting physicians to diagnose versus

5   empirically treat.  That's a fight.

6   Q.   Okay.  I'm asking, who is the O-U-R in that sentence?  Who

7   is "our?"  Who are you referencing?

8   A.   My district.

9   Q.   You are referencing Thermo Fisher?

10  A.   No.  I'm referencing my district, "our fight."

11  Q.   Are you referencing Miss Winders?

12  A.   I just put at the top Tonya.  I'm not referencing in our

13  fight.

14  Q.   And did you send up speaking with -- or rather, let me ask

15  you.  Are you aware that Dr. Sigmon and Miss Winders

16  collaborated as it related to Oklahoma Medicaid?

17  A.   I don't recall.

18  Q.   If you'll please turn to Exhibit 157, do you recognize

19  this document?

20  A.   Yes.

21  Q.   What is it?

22  A.   So this was in discussions with the Oklahoma Medicaid

23  prior authorization.

24  Q.   Um-hum.

25  A.   Do you want me to elaborate?

JEFFREY SNYDER - DIRECT

1  Q.  I'll follow up, so we can first get it in evidence.

2          MR. LOW:  Your Honor, I offer P157 into evidence.

3          MS. CHO-HERNANDEZ:  No objection.

4          THE COURT:  Received.

5      (Plaintiff's Exhibit 157 received into evidence.)

6  BY MR. LOW:

7  Q.  There is a discussion, it looks like in subject line you

8  are talking about Oklahoma Medicaid for prior authorization

9  for allergy testing; right?

10 A.  That's correct.

11 Q.  Okay.  And then attached to this is a -- what is this

12 attachment?

13 A.  This was a discussion about Oklahoma Medicaid prior

14 authorization.

15 Q.  And it appears -- was this originating from you; did you

16 write this time line?

17 A.  I sure did.

18 Q.  And there is references to ghost letters in it, do you

19 know what those are referencing?

20 A.  So -- oh, it was Brent, Bruce Quinn.  I forgot who they

21 were.  It was, I want to say they were lobbyists.

22 Q.  Are you referring to Foley Hoag?

23 A.  Yeah.  Yeah.  Yeah.  Yeah.  They were lobbyists that Ben

24 knew, but this has nothing to do with UAL or RAL.

25 Q.  I haven't gotten there yet.  I'm just asking you in

JEFFREY SNYDER - DIRECT

1  reference to the ghost letters.

2  A.  I just sparked in my brain.  I remember you and I having

3  this discuss about it, so...

4  Q.  Okay.  What did you mean by "ghost letter?"

5  A.  Well, when somebody else writes it.

6  Q.  And was it your idea to have Miss Winders send a ghost

7  letter on behalf of AANMA?

8  A.  No.  I don't see where that was suggesting Bruce Quinn and

9  Foley Hoag ghost write for DLO.

10  Q.  If you'll turn with me to the last page of the exhibit.

11  Blow that up.  First, there is a something that references

12  August of 2014; right?

13  A.  Yes.

14  Q.  August 13th.  I'm sorry.  And it references AANMA; do you

15  see that?

16  A.  Yes.

17  Q.  And it refers to Tonya Winders as being former MDM at

18  Phadia; what was that?

19  A.  Managed care development -- marking development manager.

20  Q.  Market development manager?

21  A.  Yeah.

22  Q.  And it talks about a proposed letter from AANMA; right?

23  A.  Okay.  Yes.

24  Q.  Are you testifying that there was not to be a letter from

25  AANMA on behalf of your position at Phadia?

1  A.  For UAL?  I mean, we're getting way out of context on what

2  this is actually all about.

3  Q.  I understand.  I just want to understand if AANMA wrote

4  letters to, or considered writing letters to Oklahoma

5  Medicaid?

6  A.  It could be.  I don't remember.

7         MS. CHO-HERNANDEZ:  Objection not relevant.

8         THE COURT:  Overruled.

9  BY MR. LOW:

10 Q.  Do you know if AANMA, you authored this, AANMA considered

11 writing letters on your behalf?

12 A.  So this time line was a series of teleconferences with

13 senior leadership team and everybody that was working to

14 figure out how we can work with the Oklahoma Health Care

15 Authority, because all of a sudden, due to lack of funding, or

16 whatever, they cut off any kind of diagnostic testing in a

17 primary care setting, whether that was United Allergy Labs,

18 whether that was ImmunoCap, whatever, and so basically they

19 set the health care industry back decades.

20    And so it was important we worked with DLO, which is

21 Diagnostic Laboratories of Oklahoma, which is a part of Quest,

22 to see how we could gather a meeting.  So that's what this

23 time line is all about.  This time line does not necessarily

24 have to do with United Allergy Services.

25 Q.  I'll follow up, just to make sure we have the proper

JEFFREY SNYDER - DIRECT

1  context.  You are saying around this time period, which was
2  August of 2014, Oklahoma Medicaid had a new policy that
3  restricted both skin and blood testing; right?
4  A.  On a primary care level.
5  Q.  Right.
6  A.  Right.
7  Q.  And at this time there is an effort to consider AANMA, and
8  specifically Miss Winders, sending a letter to Oklahoma
9  Medicaid about the blood testing?
10  A.  That was a discussion.  I was basically on this
11  teleconference.  I was the secretary taking notes.
12  Q.  You were just taking notes here, you not participating?
13  A.  I'm participating, but I'm the one who is supposed to type
14  out the time line and send it on to everybody else because
15  they wanted to see what the process was, as far as working
16  with the Oklahoma, you know, Medicaid situation, and so they
17  wanted to see as they brought in more people, including the
18  lobbyists, they wanted to see what the whole, you know, time
19  line was.  So it was my responsibility to put together this
20  time line.
21      That way people could go and read it and follow up on it.
22  And if they are brought in, you know, if they weren't up to
23  speed, if they just jumped right in in the middle of these
24  series of teleconferences, they could look at it and say,
25  okay, this is what was discussed.

JEFFREY SNYDER - DIRECT

1   Q.  If you'll look under future course of action, please, sir.

2   A.  Okay.

3   Q.  Again, there is a reference to a ghost letter.  I don't

4   know which one; do you?

5   A.  I know that DLO put together some different variations of

6   a letter to send to the Oklahoma Health Care Authority.

7   Q.  There is also a reference to a Tonya Winders' letter and

8   her findings; do you see that?

9   A.  Yes.

10  Q.  Do you know if that letter was sent?

11  A.  I don't know.  I don't recall.

12  Q.  Do you know the content of the letter?

13  A.  I don't recall that, no.

14  Q.  And you are saying this had nothing to do with United

15  Allergy Services?

16  A.  This had a lot -- this had everything to do with -- well,

17  I mean, it would affect United Allergy Services, just as much

18  as it would affect ImmunoCap.

19  Q.  Under the last, the second bullet under August 13th, 2014

20  references RAL/UAS.  Why are you referencing United Allergy

21  Services and remote allergy in this context?

22  A.  Because it was a conversation, or it was just part of the

23  conversation that, hey, you know, Dr. Sigmon, who is in

24  Oklahoma, who is very well-versed in Medicaid and the

25  situation and everything in the market in Oklahoma, just, hey,

JEFFREY SNYDER - DIRECT

1  I connected the two of them, so...

2  Q.  And you are saying that the letters had nothing to do with

3  United Allergy Services; is that your testimony?

4  A.  Not -- yeah.  Not to my recollection, but if you look at

5  this whole entire situation, the Oklahoma -- the Medicaid

6  stopped any kind of reimbursement on doing diagnostic testing,

7  allergy testing on primary care level.

8      That means they would not reimburse United Allergy Labs.

9  They would not reimburse DLO, you know, Quest, CPL, LabCorp on

10  a primary care setting.  I mean, that was the whole purpose of

11  the Oklahoma -- this whole deal, the Oklahoma Health Care

12  Authority discussion.

13  Q.  Are you saying that there would be a letter in support of

14  both blood and skin testing?

15  A.  I have no idea.  I didn't -- I'm not writing the letter.

16  Q.  If you'll turn with me to Plaintiff's 134, sir.

17  A.  All right.

18  Q.  Do you recognize this document?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's a PowerPoint presentation.

22  Q.  Did you draft it?

23  A.  I think so.  Part of it.  I wasn't the only one.

24      MR. LOW:  Your Honor, I move for admission of

25  Plaintiff's 134.

JEFFREY SNYDER - DIRECT

1    MS. CHO-HERNANDEZ:  No objection.

2    THE COURT:  Received.

3    (Plaintiff's Exhibit 134 received into evidence.)

4  BY MR. LOW:

5  Q.  I think we talked about a national sales meeting and

6  Phadia 2013; does that sound right?  Do you remember that

7  testimony?

8  A.  Yeah, there was a national sales meeting every year.

9  Q.  Do you remember preparing this document for that sales

10  meeting?

11  A.  This was not prepared for the national sales meeting.

12  Q.  What meeting was it prepared for?

13  A.  A meeting for the three district managers, the president,

14  and some analytics.

15  Q.  And then it was later shown at the national sales meeting;

16  wasn't it?

17  A.  No.  The national sales meeting is in January.  This is in

18  April.  Unless it was shown the year after, which I don't

19  recall that either.

20  Q.  Let's go to page 2.  I'm assuming you drafted all of this?

21  A.  I'm one of them.

22  Q.  Okay.  Who are the others?

23  A.  Brandon and Joe, the two other managers in Texas.

24  Q.  There is a reference under here to obstacles?

25  A.  That's correct.

JEFFREY SNYDER - DIRECT

1  Q.  And it references UAS specifically and a substantial loss

2  of accounts?

3  A.  Yes.

4  Q.  Did you consider United Allergy Services to be an

5  obstacle?

6  A.  I did.

7  Q.  And then the next thing it references is opportunities?

8  A.  Right.

9  Q.  And what's the first one?

10 A.  Dr. Sigmon, target accounts yet to sign with RAL/UAS.

11 Q.  Were you or was Thermo Fisher and Dr. Sigmon working

12 together to target accounts it had yet to sign with UAS?

13 A.  That's the course of our business.

14 Q.  So is that a yes?

15 A.  Yes.  So offices that weren't utilizing any kind of

16 allergy testing, that's what we were utilizing Dr. Sigmon for.

17 It had nothing to do with combating UAS or RAL.  It was

18 offices that if they haven't signed on with a remote allergy

19 lab company or a United Allergy Services, or whomever, there

20 is tons of them out there, we were to target them, just as my

21 direction of going after the business that wasn't -- you know,

22 that they hadn't already, you know, captured, or --

23 Q.  Are you saying that you didn't also target accounts that

24 were considering signing with United Allergy?

25 A.  Didn't say that.  This says:  "That had yet to sign with

JEFFREY SNYDER - DIRECT

1  remote allergy labs."

2  Q.  And this also says:  "OIG statement, create the

3  perception?"

4  A.  Um-hum.

5  Q.  You wrote that right?

6  A.  No.  I said that all three of us wrote this.

7  Q.  So you didn't write that?

8  A.  I don't recall writing that, no.

9  Q.  Do you know in reading this, either then or now, what the

10 perception you are referring to is?

11 A.  No, I don't recall.

12 Q.  Could it have been that you were referring to the

13 perception that the OIG advisory opinion applied to United

14 Allergy; could that be it?

15       MS. CHO-HERNANDEZ:  Objection.  Calls for

16 speculation.

17       THE COURT:  Overruled.

18       THE WITNESS:  You are speculating that.  I don't

19 recall.

20 BY MR. LOW:

21 Q.  Turn to the next page, sir.  Did you take this picture?

22 A.  I sure did.

23 Q.  It looks like you took it from a car?

24 A.  I did.

25 Q.  Of United Allergy Services building?

JEFFREY SNYDER - DIRECT

1   A.   Yeah.

2   Q.   Why?

3   A.   At the time when we were discussing -- what we were trying

4   to do is we were trying to get a meeting with the leadership

5   team and analytics to go over and drop our base numbers.  And

6   they didn't seriously take -- they didn't see United Allergy

7   Services, or UAL, or RAL, as a threat to our business.

8        Yet, as with any sales goals, you are assigned a base, and

9   our base still included accounts that had signed up with UAS,

10  UAL, RAL.  So I just thought, you know, it's big enough, you

11  can see it from the highway at that particular point in time,

12  I'm like, took a picture and sent it on in, or attached it to

13  our PowerPoint.

14  Q.   All right.  The next page is what?

15  A.   Me, Brandon, and Joe.

16  Q.   Are you in a western store, or what is this?

17  A.   Yeah, we are, in downtown Austin.

18  Q.   Why is your hand in your jacket?

19  A.   I don't know.  That's just how I always -- I kind of take

20  my pictures like this.

21  Q.   These are the other district managers in Texas?

22  A.   I'm sorry?

23  Q.   These are the other district managers in Texas?

24  A.   Yes, at the time.

25  Q.   I just want to make sure back on the slide that we were --

JEFFREY SNYDER - DIRECT

1  A.  Can we -- what were you inferring?

2  Q.  I just wanted to know why you took it.

3  A.  Yeah.  Well, if you go on my Facebook page, you can see I

4  take pictures with my family like this, it's just a habit,

5  so...

6  Q.  Go back to the slide we were talking about with obstacles

7  and opportunities.

8  A.  Okay.

9  Q.  I just want to make sure that I understand.  The

10 Dr. Sigmon you are referencing in this slide is the same

11 Dr. Sigmon you were testifying about earlier that you put in

12 touch with Tonya Winders; is that right?

13 A.  Yes, yet to sign with a remote allergy lab company.  Like

14 I said, there is there was dozens out there.  It wasn't just

15 UAS.

16 Q.  Did you ever see a decline in UAS in your region when you

17 were district manager?

18 A.  I did.

19 Q.  And do you know what that was attributed to?

20 A.  I do.

21 Q.  What was it?

22 A.  Lack of execution on -- well, it's not just UAS, but it's

23 remote allergy labs.  So what they would do is they would get

24 them to invest.  I think some of them -- it might have been

25 UAL, that the initial investment was maybe 10, 15,000, and

JEFFREY SNYDER - DIRECT

1  then they were to conduct the -- they were to conduct the

2  billing and United Allergy Services would take sixty percent

3  of the -- what's collected.

4      And so offices would sign up thinking that, you know, they

5  were going to make a lot of money, and it didn't turn out to

6  be what they thought it was.

7  Q.  Did they ever have anything to do with insurance company

8  audits or reimbursements?

9  A.  I wasn't part of that -- privy to that business.

10 Q.  If you could turn to me, sir, to Plaintiff's 143.

11 A.  143.  Oh, back here.  Okay.

12 Q.  Do you recognize this document, Mr. Snyder?

13 A.  Yeah.

14 Q.  What is it?

15 A.  Well, it's an email.

16 Q.  Okay.  Did you draft it?

17 A.  I did.

18      MR. LOW:  Your Honor, I move for Plaintiff's 143 into

19 evidence.

20      MS. CHO-HERNANDEZ:  No objection.

21      THE COURT:  Received.

22     (Plaintiff's Exhibit 143 received into evidence.).

23 BY MR. LOW:

24 Q.  This appears to be from you; right?

25 A.  Yes.

1010

JEFFREY SNYDER - DIRECT

1  Q.  And you are sending this to Miss Sanchez, who we discussed

2  earlier in El Paso?

3  A.  Yes, that's her field.

4  Q.  And you are copying your regional manager; is that right?

5  A.  That's correct.

6  Q.  And you are talking about Miss Sanchez' territory; right?

7  A.  That's correct.

8  Q.  And then you reference, in number 3, a Medicaid and

9  Superior letter.  Do you recall why you referenced that?

10  A.  I don't.  I don't.

11  Q.  You also reference in that same number something called

12  RAL accounts; do you recall what that meant?

13  A.  Remote allergy lab accounts.

14  Q.  Okay.  Did Thermo Fisher have remote allergy lab accounts?

15  A.  No.  We're talking about our accounts that have signed up

16  with remote allergy lab.

17  Q.  Like United Allergy?

18  A.  Similar to, yeah.

19  Q.  And then you talk about going to resell these accounts in

20  reference to the Medicaid Superior letter; do you see that?

21  A.  Yes.

22  Q.  What did you mean by that?

23  A.  If you'll give me a second.  Let me read this real quick.

24  Okay?

25  Q.  Okay.

JEFFREY SNYDER - DIRECT

1   A.   Okay.

2   Q.   What did you mean about it?

3   A.   So offices that had signed up with a remote allergy lab

4   company that had no longer utilized that business usually,

5   typically what they would do is they would just stray away

6   from diagnostic testing with allergies, period.  They were

7   burnt.  They were -- you know, I guess you could use the word

8   they were disenfranchised with diagnostics.

9        I don't really recall specifically what the Medicaid

10  Superior letter stated.  I think it stated that something

11  that, you know, with IGE testing they didn't need a five-day

12  prior auth, and whether that meant that you needed that with,

13  you know, other modes of diagnostics, I don't remember that.

14  Q.   And you don't know if that restricted primary care

15  physicians to just ordering allergy blood testing?

16  A.   Repeat that.

17  Q.   Was it your understanding that Superior was going to

18  restrict who could do allergy skin testing?

19  A.   Maybe they -- maybe I was under the impression.  I don't

20  recall this, but maybe I thought that Medicaid was going to do

21  prior auth for all testing.

22  Q.   Um-hum.  Okay.  You don't think it had a -- let me just

23  ask.  Did you perceive that Superior letter, whatever you were

24  discussing, would have a negative impact on United Allergy?

25  A.   I do not recall that.

JEFFREY SNYDER - DIRECT

1    Q.  If you'll turn with me to Exhibit 152, sir.

2    A.  All right.

3    Q.  Do you recognize this document?

4    A.  Yes.

5    Q.  And you authored it?

6    A.  Yes.

7            MR. LOW:  Your Honor, I offer Plaintiff's 152.

8            MS. CHO-HERNANDEZ:  No objection.

9            THE COURT:  Received.

10    (Plaintiff's Exhibit 152 received into evidence.)

11   BY MR. LOW:

12   Q.  You sent this also in August 30th of 2013; right?

13   A.  Yes.

14   Q.  Okay.  And you list a bunch of bullet points following

15   whatever 2H monthly highlights are.  What were you discussing

16   there?

17   A.  Just highlights of the second half.

18   Q.  Second half of 2013; correct?

19   A.  Or -- yeah.

20   Q.  And the second one is developed RAL/UAS, quote, "plan of

21   attack that has been implemented region wide?"

22   A.  That's correct.

23   Q.  And did you, in fact, do that?

24   A.  Developed a plan of attack?

25   Q.  Right.

JEFFREY SNYDER - DIRECT

1  A.  To gain our business?  Yes.

2  Q.  And did you implement it?

3  A.  Yeah.  Yes.

4  Q.  And --

5  A.  But it wasn't a plan of attack against UAL or RAL

6  specifically.  It was the, go after the business that hasn't

7  signed with them, make sure you shore up those accounts.  So

8  just because you -- because develop RAL/UAS plan of attack,

9  doesn't mean we're going after them specifically.

10  Q.  You are saying that "attack" does not modify UAL; is that

11  what you are saying?  You are not attacking UAL?

12  A.  We are going after the business that, like I said in a

13  previous email, that we were working with Dr. Sigmon on

14  accounts that had not signed up with an UAS/UAL remote allergy

15  lab.  That's our plan of attack.

16  Q.  Okay.  And that plan of attack didn't include use of the

17  OIG advisory opinion, for example?

18  A.  It wasn't supposed to.

19  Q.  And did it ever include insurance company audit letters?

20  A.  I don't know.  I won't work for -- I didn't work for an

21  insurance company.

22  Q.  And there is a reference to coordinating the utilization

23  of Dr. Sigmon, that's the same Dr. Sigmon we discussed

24  earlier; right?

25  A.  That's correct, in accounts that had not signed up for a

JEFFREY SNYDER - DIRECT

1  remote allergy lab company.

2  Q.  And later on about -- it's going to be about the

3  sixth bullet point up, there is a "worked with MDM, Ryan

4  Sadlier, on RAL/UAS strategy;" do you see that?

5  A.  Yes.

6  Q.  Where was there, in fact, a UAS/RAL strategy?

7  A.  We had a meeting in discussing what we do to bring our

8  business back up.  That's the reason why we had that district

9  meeting in Austin, was because, like I explained, when you

10  have a -- when you have a doctor's office, whether they are

11  utilizing 20, 30, ImmunoCaps a month, or they are utilizing

12  two ImmuniCaps a month, when they sign up with a remote

13  allergy lab company, such as UAL or UAS, that ImmunoCap

14  business shrinks to zero.

15      But, however, as in sales, as I think everybody

16  understands, we're still assigned a base to that.  So whatever

17  previously last year, within that base to that current time,

18  United Allergy Lab would come in, remote allergy lab company,

19  would come in and take that business.  But we're still tasked

20  for hitting that number.

21      So that's the reason why we had that meeting in Austin, is

22  to show analytics -- well, we already worked with analytics --

23  but to show the president of the company that, look, we need a

24  reprieve.  And I think it says that somewhere in my emails,

25  because I remember you and I having this discussion at --

JEFFREY SNYDER - DIRECT

1 during my deposition, and I explained the exact same concept.

2     We were looking -- the whole purpose of that meeting was

3 we needed a reprieve.  We needed for them to drop our base,

4 because in other parts of the country, other factors, not a

5 remote allergy lab, but let's say that a referenced lab out of

6 New York decided they didn't want to carry an ImmunoCap

7 instrument anymore.  Well, all of a sudden, they are not able

8 to order ImmunoCap, so the company was taking that volume out

9 of their base.

10     That's all we wanted, is because all of a sudden we were

11 just getting tasked with the same base but we were losing

12 business to remote allergy lab companies.  And once they sign

13 up for a remote allergy lab company, it wasn't like we can go

14 in there and go, "Hey, order ImmunoCap."  So that's kind of

15 the premise of all of this, is like how do you attack this?

16     You go in and you find the business elsewhere.  If a

17 company -- if a company -- if a doctor's office decided not to

18 use remote allergy lab, or whatever, most of the time they

19 didn't even want to do any kind of diagnostic testing, which

20 was disingenuous to the health care industry, very

21 disingenuous to the patient.

22     And so all of a sudden now, patients come in, watery eyes,

23 sneezing, coughing, those symptoms right there do not equate

24 to allergic rhinitis, allergic asthma.  That can equate to

25 nonallergic rhinitis or sinusitis.  All three of those disease

JEFFREY SNYDER - DIRECT

1  states have the same symptoms.  So what doctors would end up

2  doing was, they were just like, all right, I'm just going to

3  empirically treat you, treat by experiment.  So they were just

4  writing prescriptions.

5      So you have a patient that's not nonallergic rhinitis

6  that's prescribed a non-sedating antihistamine, by the nature

7  of a non-sedating antihistamine, that medication does not work

8  for a nonallergic patient.

9      So what do we do?  We go back in to those accounts that

10 remote allergy labs had in the past and we go, okay, look,

11 here's what we do for those patients.  You still can't

12 empirically treat your patients.  You've got to figure out if

13 they are, you know, nonallergic rhinitis, allergic rhinitis,

14 or it's sinusitis.

15 Q.  You said a lot there, so let me just compact it down real

16 quick.

17 A.  I'll repeat it.  Yeah.

18 Q.  Fair to say during this period of time in 2013 you saw a

19 loss of sales in your district to United Allergy Labs, United

20 Allergy Services; correct?

21 A.  That's correct.

22 Q.  And are there were certain things you did to react to that

23 and I think you talked at length about going to find new

24 accounts; right?

25 A.  That's correct, or going back to the accounts that no

JEFFREY SNYDER - DIRECT

1  longer used a remote allergy lab company.

2  Q.  Okay.  But you are saying it didn't include using

3  materials that attacked UAS; is that what you are saying?

4          MS. CHO-HERNANDEZ:  Objection, your Honor.

5  Q.  I'm just trying to understand?

6          MS. CHO-HERNANDEZ:  This is leading and this is

7  direct.

8          THE COURT:  Overruled.

9  BY MR. LOW:

10  Q.  Are you saying it didn't include materials intended to

11  attack UAS?

12  A.  Not by our direction.

13  Q.  For example --

14  A.  Not by my direction.

15  Q.  Okay.

16  A.  Now, like we discussed earlier, if you're into an office

17  and a doctor asked you about the OIG -- I'm sure you're going

18  to bring up the OIG statement -- then you can lead them to

19  Google it.

20  Q.  Did you ever share with clinics something called a white

21  paper written by Dr. Sigmon?

22  A.  Yes.

23  Q.  Did you ever do that in your talks about UAS?

24  A.  I don't recall that.  I recall him writing the white

25  paper.  The white paper didn't specifically -- it wasn't

JEFFREY SNYDER - DIRECT

1  just -- I don't think it was just about remote allergy labs.

2  I think it talked about the value of the negative, and I can

3  get into that.  It talks about, you know, total elevated IGE.

4  It talked about when you have a low IGE.

5  Q.  And you are aware that Dr. Sigmon is an allergist or an

6  ENT allergist; right?

7  A.  That's correct.

8  Q.  And he does sublingual immunotherapy; correct?

9  A.  That's correct.

10  Q.  And he did author a white paper; correct?  Are you aware?

11  A.  Yes.  It's a normal course that an ENT is going to write

12  their opinion.

13  Q.  And, in fact, he became a national speaker for Thermo

14  Fisher?

15  A.  That's correct.

16  Q.  And if you'll turn with me to Exhibit 148.

17         THE COURT:  We'll turn to that after lunch.  We'll

18  stop now and come back at 12:35.

19         Have a nice lunch.  Don't talk about the case.  Don't

20  Twitter or Tweet.  See you at 12:35.

21     (The jury exited the courtroom at 12:00 p.m.)

22     (Change in reporter.)

23

24

25

```
 1      (Open court)
 2          THE COURT:  For the information of counsel, I was
 3     unaware at the time I signed the order on Schroeder this
 4     morning, obviously, of those filings over the weekend.  So I
 5     did not know about the withdrawal of those objections.
 6      I will say -- so I don't know if the plaintiffs are going
 7     to move for me to reconsider that order or not.  I will say
 8     that the reason I sustained the objections on Dr. Lachman was
 9     my own understanding in looking at it over the weekend was that
10     he was not ever a defendant, and Parkland was -- I assume he
11     was an internist and he's part of Parkland Community Health
12     Plan and I assume he was not ever a coconspirator.
13          COURT SECURITY OFFICER:  All rise.
14          THE COURT:  Hold the jury just a moment, would you.
15      I would have assumed he was not a coconspirator, not
16     alleged coconspirator, and the hearsay objections were all
17     proper.  That's why I sustained them.  So I don't think they
18     would be admissible.
19          MR. CARTER:  Should the witness be here for this?
20          THE COURT:  It doesn't matter because I'm just telling
21     you the basis of that ruling.  So I don't know what that all
22     would have to do.  But in light of the withdrawal of the
23     objections, which I didn't know about at the time of my ruling,
24     I just tell you what for what it's worth.  Because I see now
25     Sublett, I haven't issued the final ruling on that.  So we'll
```

JEFFREY SNYDER - DIRECT                          1020

 1   take that all up at the end of the day.

 2            MR. LOW:  Okay.

 3            THE COURT:  But I didn't know about that or the other

 4   matters at the time I ruled this morning.  Just to let you

 5   know.

 6        All right.  You can bring in the jury, and we'll finish

 7   this testimony.

 8        (Jury enters courtroom)

 9            THE COURT:  You may be seated.

10        Plaintiffs may proceed.

11        You were going to Plaintiff's 148, I guess?

12   BY MR. LOW:

13   Q.  Mr. Snyder, I only have one more exhibit to discuss.  It's

14   Plaintiff's 148.  I think you had it open.  Before I get there,

15   though, I just want to make sure, when did you leave Thermo

16   Fisher?

17   A.  Downsize in November of '14.

18   Q.  Okay.  You recognize Exhibit 148?

19   A.  Yeah.  Yes.

20   Q.  And what is it?

21   A.  It's an email.

22   Q.  And you're on it?

23   A.  Yes.

24            MR. LOW:  Your Honor, I offer Plaintiff's 148.

25            MS. CHO-HERNANDEZ:  No objection.

JEFFREY SNYDER - DIRECT                      1021

```
 1              THE COURT:  Received.

 2         (Plaintiff's Exhibit No. 148 admitted)

 3    BY MR. LOW:

 4    Q.  If you could, sir, turn with me to the second page of the

 5    document.

 6         You are the author of this email, correct?

 7    A.  Yes.

 8    Q.  And who are you emailing?

 9    A.  So Patrick Galvin was a rep out of the Florida district,

10    where, the next person, Randy Miller, he was the district

11    manager.  Rebecca Rosenberger was, I think -- so the company

12    has mid-levels that do a deep dive to help discuss the medical

13    side of diagnostics.

14         And then, you got Brandon Massey who is the Dallas district

15    sales manager, Jennifer Murphy who was the regional manager and

16    then Larry Zemlick who is the marketing manager.

17    Q.  Okay.  I appreciate that.  And why are you emailing these

18    individuals?

19    A.  Can I take a second to read it?

20    Q.  Sure.

21         (Pause)

22    A.  Yeah.  So Pat is really kind of odd.  There was kind of two

23    situations going on, Texas and remote allergy lab issues, and

24    then all of the sudden, it was picking up pace in Florida and I

25    think Randy tasked Patrick with doing a deep dive into business
```

JEFFREY SNYDER - DIRECT                                    1022

1  models and what it looked like.  And it was kind of -- it's

2  just a repeat of everything that we've ever mentioned.  So,

3  yeah, I think it also discussed the Superior Medicaid letter.

4  Q.  Okay.  So you mentioned deep dive, and I think we

5  established before the timeline, that was back in 2013,

6  correct?

7  A.  Uh-huh.

8  Q.  When you met with the president of the company, David

9  Esposito, correct?

10 A.  Yes.

11 Q.  And you prepared some materials for him and then later on

12 for other people within the salesforce; is that right?

13 A.  Yes.

14 Q.  Okay.  And then --

15 A.  Well, that meeting.

16 Q.  Right.

17 A.  That PowerPoint, we were going -- I don't know what you're

18 inferring by that.  That PowerPoint meeting was to discuss the

19 drop in sales and how the base was still up there and how we

20 were trying to get them to lower our base.

21 Q.  And you specifically looked into sales that were lost to

22 United Allergy at that time?

23 A.  Right.  There's a list -- there's a list of accounts.

24 Dr. A, the year prior, ordered 215 ImmunoCAPs, and he went from

25 215 to zero or --

JEFFREY SNYDER - DIRECT                    1023

1    Q.  Okay.  And --

2    A.  Or Dr. B went from two in the entire year, all of the

3    sudden he went to zero, but all of the sudden he's become an

4    allergist.

5    Q.  And is the ones you were attributing Dr. A or Dr. B to the

6    loss --

7    A.  The combination of A plus B.

8    Q.  Okay.  And then later on -- so that was 2013.  Here in 2014

9    you're discussing a Superior Medicaid letter, correct?

10   A.  Right.

11   Q.  I think we went over it a little bit in a prior exhibit,

12   but something to do with their testing policy.  Does that sound

13   right?

14   A.  Yeah.  I mean, as you can see here, it's the best copy I

15   have.  I don't remember -- unless she -- unless it was -- I

16   don't think it was even a clear hard copy.  I think it was

17   passed along, passed along.  I don't even -- I can't even

18   recall exactly what that Superior Medicaid -- I can just make,

19   you know, a generalization over it.

20   Q.  And you're discussing that in the context of United Allergy

21   Services, correct?

22   A.  I don't -- I don't remember specifically what that -- what

23   that Superior -- I don't -- if it was a -- in context, to just

24   United Allergy Services, or if it was in context to diagnostic

25   testing as a whole.

JEFFREY SNYDER - DIRECT                    1024

```
 1        But also, I did want to point out that this Superior
 2   Medicaid letter was in Texas.
 3   Q.  What?
 4   A.  I think this -- this Superior Medicaid letter, I think, was
 5   in the state of Texas.
 6   Q.  Okay.  That's a fair -- I think I needed to ask you that
 7   question.  Superior Medicaid is a health insurance company in
 8   Texas, correct?
 9   A.  Right.  This is completely -- it's completely different
10   than what you brought up before about the Oklahoma Medicaid
11   situation.  So you can't put the two and two together because,
12   the more I sit here, I'm, like, I am sure that they don't
13   understand the two contexts.
14   Q.  Okay.  So that wouldn't make that much sense for Florida.
15   Is that what you're trying to say?
16   A.  Well, yeah.  I mean, if you look at it in the whole entire
17   context, they're, like, okay, if -- Texas and California
18   usually are the ones who take the first initial leap in the
19   health care industry, obviously, because of their size.  So
20   let's say that Texas -- one of the insurance companies decides
21   to cover something in pharmaceuticals, then usually you'll
22   see -- or health-wise, you'll see, you know, California do it.
23        So, you know, they can -- Medicaid, Texas Medicaid, decided
24   to -- or Superior, there's a lot of different companies
25   underneath the Medicaid umbrella.  So if they decided that all
```

JEFFREY SNYDER - DIRECT                                    1025

1   diagnostics -- all diagnostics do not need a five-day prior

2   off, then that kind of gives you an indication of what's going

3   to happen going forward in the future.

4   Q.  So are you saying that what Superior Medicaid decides may

5   be a good indication of what another state might have --

6   A.  Not necessarily.  It's just a benchmark.  But I definitely

7   wanted to make sure that they understood that the Oklahoma

8   Medicaid issue that had nothing to do with -- specifically with

9   UAL or RAL and this was completely different.  And this -- and

10  this -- I really don't recall what this letter was.

11  Q.  Okay.

12  A.  So --

13  Q.  I guess you're kind of going off on another subject.  But

14  you're saying that didn't have anything to do with UAL but

15  Superior does.  Is that fair?

16  A.  No.

17  Q.  Okay.  Anyway, you forward it on to -- I'm sorry.

18  A.  No, no, go ahead.  Let's move on.  I'm getting off on a --

19  Q.  You forward it on to these people, which includes Rebecca

20  Rosenberger, correct?

21  A.  Yes.

22  Q.  And she is a clinical educator?

23  A.  Clinical educator.  Thank you.

24  Q.  How many clinical educators are there in Thermo Fisher?

25  A.  I don't know.

JEFFREY SNYDER - DIRECT                    1026

1    Q.  Handful sound right?

2    A.  At the time?

3    Q.  Yeah.

4    A.  Yeah.  A handful.

5    Q.  She's not just in Texas, right?

6    A.  I don't know.

7    Q.  And if we --

8    A.  I don't think she's from Texas.

9    Q.  Okay.  So she's kind of company-wide.  Does that sound

10   right?  Or regional?

11   A.  No, they're regional.  I don't recall specifically.

12   Q.  Okay.  And if we can go up to her email.  Do you recall

13   getting this email from her?

14   A.  Okay.  I don't recall it.  But yeah, it's right there.

15   Q.  In the middle of her email she says, "I can definitely see

16   a concerted approach to combating these competitive threats."

17   A.  Okay.

18   Q.  "I greatly appreciate the followup and references you sent

19   today."

20       Did you have an impression on what competitive threats

21   she's addressing in her email?

22   A.  Specifically, no, you'll have to ask her.

23   Q.  Okay.  What's the subject of your email that she's

24   responding to?

25   A.  "UAS/RAL follow-up."

```
 1              MR. LOW:  I pass the witness.
 2                         CROSS-EXAMINATION
 3    BY MS. CHO-HERNANDEZ:
 4    Q.  Mr. Snyder, are you aware that Phadia was a defendant in
 5    this lawsuit?
 6    A.  I'm aware.
 7              MR. LOW:  Your Honor, may we approach?
 8              THE COURT:  Yes.
 9         (At the bench)
10              MR. LOW:  There's a limine on settlement, and I just
11    want to make sure that you're not --
12              MS. CHO HERNANDEZ:  (Inaudible).
13              MR. LOW:  I know.  I was just making sure you're not
14    going to go into that.
15              MS. CHO-HERNANDEZ:  I'm just going to ask him, does he
16    know who the defendants are.
17              MR. LOW:  Okay.  Perfect.  Yeah.  I figured that.  I
18    just wanted it to be clear.
19         (Open court)
20    BY MS. CHO-HERNANDEZ:
21    Q.  Mr. Snyder, are you also aware that Phadia is no longer a
22    defendant in the lawsuit?
23    A.  Vaguely.
24              MR. LOW:  Objection, Your Honor.  May we approach?
25              THE COURT:  Yes.
```

```
1        (At the bench)

2             MR. LOW:  Sounds a whole lot like:  They settled.  I

3    don't know what you're going after.

4             MS. CHO-HERNANDEZ:  My next question is, "You know the

5    defendants" (inaudible) --

6             COURT REPORTER:  I'm sorry.  I can't hear you.

7             MR. LOW:  I'm sorry.  That's not --

8             THE COURT:  Speak into this one.

9             MS. CHO-HERNANDEZ:  My next question was that, "You

10   know the defendants are Mothers and Tonya?"  Then I'm moving

11   on.

12            MR. LOW:  I mean, if that was the original question,

13   that's fine.  But asking about what the status of other

14   defendants are isn't proper because it confuses the jury on

15   whether or not they were dismissed because we didn't have a

16   case or whether they settled or anything else.

17            THE COURT:  Sustained.

18            MS. CHO-HERNANDEZ:  All right.

19       (Open court)

20   BY MS. CHO-HERNANDEZ:

21   Q.  Mr. Snyder, you've told the jury your background at Phadia?

22   A.  Yeah.

23   Q.  Did you have any experience in sales and marketing prior to

24   working at Phadia?

25   A.  Yes.
```

JEFFREY SNYDER - CROSS                    1029

1    Q.  Can you tell the jury about that?

2    A.  Yes.  So I graduated from college and went to work for

3    Mitsubishi Trading Company in Tokyo for two years.  Then I

4    headed up their -- for Mitsubishi Trading, their international

5    import division.

6        And then I went to go work for Pepsi Japan in operations.

7        And then after that, I went to work for a company in New

8    York City called Imperial Commodities, which is Berns &

9    Koppstein, importing food service items to sell to the Pizza

10   Huts, the Au Bon Pains, Einstein Bagels, so -- I'm sorry.  I

11   can go on and on, it seems like.  I've done a lot of things.

12   Q.  And are you currently working in sales and marketing today?

13   A.  Yes.  I'm in oncology sales.

14   Q.  In total, how many years of experience do you have in sales

15   and marketing?

16   A.  Really?  Let me think.  I left -- I left Pepsi Japan in

17   '97.  So probably -- or no.  Hang on.  '93, '97.  So from '97

18   on.

19   Q.  In your experience working in sales and marketing, is it

20   common for companies to gather information and investigate

21   their competitors?

22   A.  Without a doubt.

23   Q.  And do you think that is a common practice in sales and

24   marketing?

25   A.  Yes.

JEFFREY SNYDER - CROSS                                    1030

1    Q.  Do you think there's anything improper about that practice?

2    A.  No, I do not.

3    Q.  Isn't it important, Mr. Snyder, for a salesperson to

4    understand his or her competitors and the products of the -- or

5    services of competitors?

6    A.  Yeah, absolutely.

7    Q.  And isn't it also important for a salesperson to be able to

8    distinguish what he or she sells?

9    A.  Yes.

10   Q.  And while you were at Phadia as a clinical sales consultant

11   and a district sales manager, did you try to understand

12   Phadia's competitors?

13   A.  Absolutely.

14   Q.  And you tried to find ways to distinguish the products you

15   were selling on behalf of Phadia?

16   A.  That's what you do.

17   Q.  And that's not out of the ordinary in your experience in

18   sales and marketing?

19   A.  No, it's not.

20   Q.  In fact, that's what's expected of you as a salesperson?

21   A.  Yes.

22   Q.  What do you have to do in order to be able to distinguish

23   the product you're selling?

24   A.  So you have to -- you have to know the disease state.  And

25   particularly, you know, it's not just allergies.  You have to

JEFFREY SNYDER - CROSS                    1031

1   understand the respiratory system, upper and lower, and what

2   happens on a cellular level.

3       Then you have to understand -- we put it in a model.  The

4   who, the why, the what.  And so who we're testing, why we're

5   testing, why we're recommending testing, and then what

6   difference does it make.  And so, you know, just understanding,

7   you know, what it does -- you know, it's not an absolute, but

8   it's something that helps.  And why we're doing this.  It's for

9   the common good of, you know, the health care market, too.

10  Q.  So you have to know your product?

11  A.  Absolutely.

12  Q.  Did you also have to gather intel on what competitors were

13  offering?

14  A.  Yeah.  It usually came -- it came to us.  Doctors aren't

15  very forthcoming on what's going on.

16  Q.  And in your prior experience, did you collect information

17  regarding any sales that you lost?

18  A.  Yes.

19  Q.  And how do you go about doing that?

20  A.  As far as being a clinical sales consultant or from being a

21  district sales manager?

22  Q.  Let's start with clinical sales consultant.

23  A.  So you know your offices.  If all of the sudden -- I mean,

24  they're not going to call you and say, hey, I signed up with

25  this remote allergy lab.  What do you think?  They're going to

1    make their own business decision.  You're the second or -- you

2    know, second one to know -- you know, last one to, you know,

3    hear about it.  You walk in.  They're like, we've signed up

4    with a remote allergy lab company.

5        As a district sales manager, your expectations for the --

6    your team is for them to know their accounts.  So ideally you

7    would -- you would want them to know ahead of time if they were

8    discussing that possibility or discussing -- it's not just

9    remote allergy labs.  You can have different competitors.  So,

10   I mean, there's a whole -- the whole string of them.

11   Q.  So is it -- is it important for a salesperson to understand

12   what is causing him or her to lose sales?

13   A.  That's correct.

14   Q.  And is it normal for a salesperson to gather information in

15   order to figure out why I'm losing these sales?

16   A.  Right.  Yes.

17   Q.  Now, was Phadia in the business of allergy testing?

18   A.  Diagnostic testing.

19   Q.  And what product did Phadia manufacture?

20   A.  They manufactured the instruments to -- and the antigens

21   for allergy testing.

22   Q.  And do you understand when I say Phadia, I'm also talking

23   about Thermo Fisher?

24   A.  Yeah.  I prefer Phadia.

25   Q.  Who did you market this product to?

1   A.  Primary care, so pediatricians, your family practices, your

2   internal meds, ENTs and then some allergists.

3   Q.  And when you were working for Phadia, did you ever

4   encounter anyone that was not providing any kind of allergy

5   testing?

6   A.  Yes.

7   Q.  Was that one of the -- was one of the competitors to Phadia

8   not testing then?

9   A.  Big.  That's probably the biggest competitor, the apathy or

10  the lack of knowledge.

11  Q.  So back when you were working for Phadia, did you have to

12  invest time and effort in convincing these physicians there was

13  value in testing patients for allergies?

14  A.  Yeah.  So, typically, a physician that's not specializing

15  in allergies, they spend half a day in learning -- in med

16  school learning about allergies.  I don't know what it is

17  today.  This is how it was in the past, according to, you know,

18  several primary care providers.  And it was always -- it was

19  always directed towards -- they come in, watery eyes, sneezing,

20  coughing.  Let's write a prescription.

21      You want to put in a diagnostic factor into that.  That way

22  you can really drill down on what's the best medication, and

23  not just what's the best medication, but identifying what the

24  cause of it is.

25  Q.  And in your conversations with these physicians, did the

JEFFREY SNYDER - CROSS                    1034

1    topic of remote allergy come up?

2    A.  Yeah.  They would bring it up.

3    Q.  And I believe you testified earlier about certain

4    physicians being burnt after dealing with remote allergy?

5    A.  Yes.

6    Q.  Can you explain and recall what you heard?

7    A.  Yes.  There's -- as a clinical sales consultant, there's a

8    few in Oklahoma City.  I don't know what company they signed

9    up.  But one had invested quite a bit of money with the idea

10   that they would -- they would train one of their medical

11   assistants.  They would occupy one of their patient rooms.

12   They would conduct testing.  And then whether they were

13   responsible for the billing or -- I think so, and then -- but

14   the remote allergy lab company, the model was 60 percent of

15   that, what was reimbursed went back to the company, and then

16   the physicians got to keep 40 percent.

17   Q.  Did these physicians express any concerns about patient

18   safety?

19   A.  There's always a concern with patient safety when you're

20   utilizing in vivo versus in vitro.  And I can explain this.

21   In vivo is what happens in the body.  So if you -- skin testing

22   or patch testing or scratch testing, you're looking at what --

23   how the body reacts.  You can be hyperreactive.  So that's when

24   you go for allergy testing and they read everything to see.

25       In vitro testing is what happens in the blood.  So there's

1    no -- there's no risk of any kind of anaphylactic shock, which
2    you might have a patient that might be -- have an anaphylactic
3    reaction to one of the skin testing, to one of the antigens or
4    allergies -- allergens.
5    Q.  And so while you were a district sales manager, were you
6    getting reports from your clinical sales consultants about
7    remote allergy and the effect it was having?
8    A.  Yes.
9    Q.  And did you -- did you or your clinical sales consultants
10   then begin kind of investigating more what remote allergy was
11   and how they could continue to distinguish what Phadia could
12   offer to the physicians?
13   A.  Yes.
14   Q.  Did you share any of that information outside of your
15   clinical consultants?
16   A.  Yes.
17   Q.  And who did you share that information with?
18   A.  District managers.  Like I said, we tried to bring it to,
19   you know, the higher-ups in order to get a reprieve for our
20   numbers because it was, you know -- quickly, you know, our
21   numbers were quickly going down.  But it was kind of falling on
22   deaf ears.  And so it was very frustrating.  So, you know,
23   we're the ones who requested that meeting to talk about our
24   numbers.
25   Q.  So you shared some of that information with upper level

JEFFREY SNYDER - CROSS                                    1036

1  management?

2  A.  That's correct.

3  Q.  Why did you do that?

4  A.  Like I said, so the numbers in Texas, especially in my --

5  in my district -- it seemed to be a little bit more in my

6  district, but there's some in Houston as well.  But their

7  numbers were going down very quickly.  And so they understood

8  that they needed go out there and find the business.  You know,

9  it's not like you have a hundred percent of your doctors

10 utilizing diagnostic testing.  But -- so to bring it to the

11 company's attention, to say, look, we need some help on getting

12 some reprieve on these numbers.

13 Q.  Were you ever able to get that reprieve from upper level

14 management at Phadia?

15 A.  No.

16 Q.  Why not?

17 A.  In my opinion analytics didn't quite do what we asked them

18 to do for that meeting, and so it didn't seem like it was a

19 huge issue until after the fact so --

20 Q.  So did it seem like, to you, at least with regard to upper

21 level management, they did not perceive remote allergy as a

22 significant enough threat to justify lowering your sales

23 figures?

24 A.  That's correct.  Which, you know, like I explained earlier,

25 you know, if a lab -- a reference lab out of New York decided

JEFFREY SNYDER - CROSS                    1037

1    they weren't going to utilize the ImmunoCAP machine, but they

2    were going to go with a competition instrument -- we call it

3    instrument -- they would -- they would give them a reprieve on

4    their base, but they didn't -- they didn't say these numbers

5    were --

6    Q.  Now, do you recall testifying earlier today about the

7    remote allergy plan that you had developed at Phadia?

8    A.  The strategy or just an -- you know, the conversations

9    behind it?  Yes.

10   Q.  Yes, sir.  I believe you testified that it was

11   brainstorming, correct?

12   A.  Yes.

13   Q.  Was any of that plan developed in conjunction with Mothers

14   of Asthmatics?

15   A.  No.

16   Q.  Was any part of implementing that plan dependent upon the

17   actions of Mothers of Asthmatics?

18   A.  Yeah.  I don't -- I don't recall.  I don't think so.  It's

19   always good just to get -- the whole point was for us, Brandon

20   and Joe and I, to get a good, solid discussion centered around,

21   you know, what we could do.  And it always came back to, you

22   know, the business is out there.  You know, go with the offices

23   that have not signed up with a remote allergy lab company, or

24   go work on the ones that had already left remote allergy lab

25   companies.  They decided that the investment wasn't worth it.

JEFFREY SNYDER - CROSS                          1038

```
 1   They lost their money, whatever, and, you know, that was a
 2   longer sales cycle.
 3   Q.  So the only folks that were involved in constructing or
 4   having discussions about this plan, was it restricted to Phadia
 5   individuals?
 6   A.  So with me, it was -- it was restricted to Phadia people
 7   from -- yeah, from my -- from all my recollection.
 8   Q.  Now, in the meetings you or your sales team had with
 9   primary care physicians, did Ms. Winders or anyone from Mothers
10   of Asthmatics ever join you in those meetings?
11   A.  Not to my knowledge, not in my -- no, they're not allowed
12   to ride with my -- people outside of the company are not
13   allowed to ride with my reps, or anybody.  That's a company
14   policy.  They're not allowed to get in the car.  You know,
15   insurance reasons.  It's not -- no.  That would be --
16   Q.  Can you think of any meetings with physicians that you had
17   or your sales consultants had that were secured by someone from
18   Mothers of Asthmatics?
19   A.  No.
20   Q.  Or same question for Tonya Winders?
21   A.  No.
22   Q.  And I have the same question for the Joint College.  Did
23   anyone from the Joint College ever join you or your sales teams
24   in meetings with primary care physicians?
25   A.  No, not unless they -- not unless -- no, no, no, not unless
```

JEFFREY SNYDER - CROSS                              1039

1   they were a paid speaker, but I don't think they're a part of

2   the Joint College.

3   Q.  Same question for the American Academy and American College

4   and -- anyone from those organizations ever join you or your --

5   A.  No.

6   Q.  -- sales teams in meeting with primary care physicians?

7   A.  No.

8   Q.  Okay.  Can you think of any meetings that you had with any

9   physicians that were secured by any of those groups?

10  A.  No.

11  Q.  I'd like to talk to you more about Ms. Winders.  And you

12  testified that you met with Ms. Winders at a AAAAI meeting; is

13  that correct?

14  A.  That's correct.

15  Q.  And what year was that?

16  A.  '12, '13, whenever that -- whenever that AAAAI was here in

17  San Antonio.

18  Q.  And --

19  A.  You know what?  It had to have been '12 or '13.  I'm just

20  trying to think back when I -- when I got hired.  I was fairly

21  new, as far as being a district sales manager.

22  Q.  Was Ms. Winders still at Phadia when you met with her at

23  the AAAAI?

24  A.  No.

25  Q.  Were there any officers of Phadia present in this

JEFFREY SNYDER - CROSS                          1040

1    conversation you had with Ms. Winders?

2    A.  Not that I recall, no.

3    Q.  About how long was that conversation with Ms. Winders?

4    A.  I don't know.  It was kind of surprising during the

5    deposition it was even brought up.

6    Q.  Did you discuss any kind of plan and approach to combating

7    the remote practice of allergy with Ms. Winders at the AAAAI?

8    A.  No.  There's so much stuff going on there.

9    Q.  And during this AAAAI conference, were there any meetings

10   to discuss methods to combat either United Allergy or the

11   remote practice of allergy?

12   A.  No.  You stand in front of a booth for eight hours, and

13   your feet hurt.

14   Q.  I can understand the feeling right now.

15       Was your remote practice of allergy plan -- and I know I

16   asked you earlier if it was developed in conjunction with

17   Mothers.  Was it developed in conjunction with Ms. Winders?

18   A.  No, not -- my plan wasn't.  The three district sales

19   managers, not to my -- not to my recollection, no.

20   Q.  And to be clear, my questions are directed at what you know

21   in your plan so --

22   A.  Right.  Exactly.

23   Q.  Are you aware of Phadia donating any money to Mothers in

24   exchange for Mothers publishing something on a particular

25   topic?

JEFFREY SNYDER - CROSS                1041

1    A.  No.

2    Q.  I'd like to direct your attention to Exhibit P-150.

3        Mr. Glass.

4        (Discussion off the record)

5            THE WITNESS:  There has to be a simpler method for

6    this.  Okay.

7    BY MS. CHO-HERNANDEZ:

8    Q.  Okay.  Do you have the exhibit in front of you, Mr. Snyder?

9    A.  No.  P-150?

10   Q.  Yes, sir.

11   A.  It's not matching up.

12   Q.  Oh, it's in the black binders -- in the white binders.  I'm

13   sorry.

14           MS. CHO-HERNANDEZ:  May I approach, Your Honor?

15           THE COURT:  Yes.

16           THE WITNESS:  I feel like a fool, fumbling through all

17   this.  All right.

18   BY MS. CHO-HERNANDEZ:

19   Q.  Do you have the exhibit in front of you?

20   A.  I do.

21   Q.  Now, prior to this email, had you ever heard of the Mothers

22   article attached called *Deception in Allergy Care*?

23   A.  No, I have not.

24   Q.  And do you know if this article is publicly available?

25   A.  I would assume it is.

JEFFREY SNYDER - CROSS                                    1042

1   Q.  And if you look at this email, it says, "It would also be

2   nice to get ahold of some hard copies.  So have your teams keep

3   an eye out, as these are floating around offices."

4       Do you see that?

5   A.  Yes.

6   Q.  Now, if Phadia and Mothers were working together to combat

7   remote allergy, why would you need to pick up hard copies of

8   Mothers' articles in physician offices?

9   A.  Fantastic question.

10  Q.  You wouldn't -- that wouldn't happen, would it?

11  A.  No.

12  Q.  Now, you said that you had a few communications with

13  Ms. Winders.  In these communications did she ever encourage

14  you to circulate publications Mothers had authored?

15  A.  No.

16  Q.  And can you take a look at Exhibit P-146?

17  A.  Okay.

18  Q.  Do you know why Ms. Winders' notes from 2011 were being

19  circulated within Phadia in 2013?

20  A.  I do not.

21  Q.  Was there any effort to speak with Ms. Winders to gain any

22  other input she had outside of her 2011 reports?

23  A.  I have no idea.

24          MR. LOW:  Objection, Your Honor.  Speculation.

25          THE COURT:  Overruled.

1   BY MS. CHO-HERNANDEZ:

2   Q.  You didn't reach out to Ms. Winders about this?

3   A.  No.

4   Q.  And can you pull up P-157?

5       Now, this is the exhibit about Oklahoma Medicaid.  Do you

6   recall your testimony about that, Mr. Snyder?

7   A.  Yes, I do.

8   Q.  And were you concerned with what was happening with

9   Oklahoma Medicaid in terms of requiring prior authorization?

10  A.  Yes.  So this has nothing to do with remote allergy labs,

11  United Allergy Services, nothing.  This has everything to do

12  with the funding on the state level.  Gosh, I don't know who

13  the governor was at the time she did it.  I think it was Mary

14  Fallin.  She didn't accept federal moneys.  So when they

15  started cutting, they went to -- they cut a variety of programs

16  within Medicaid.  And it was in diagnostic testing for allergy,

17  which is -- like I said earlier, is disingenuous to the

18  patients, especially the Medicaid patients who are, you know,

19  lower income demographics.  It's basically denying them an

20  opportunity to have the same type of testing that somebody with

21  commercial insurance would have.

22      And so it made no -- I mean, there was a lot of discussion

23  within Oklahoma with, you know, providers, midlevels, about --

24  centered around this.

25      And they did it without even consulting us.  And usually

JEFFREY SNYDER - CROSS                    1044

1    they have hearings where you can stand up there and discuss why

2    they should not make the cuts to this program.  And they went

3    ahead.  And it was -- I think that particular discussion, I

4    remember this because it affected us.  It was certain -- a lot

5    of time, and it basically covered all of mental health.

6         And at the very end, they're like, we're going to cut

7    diagnostic testing.  86003 at the very top, you will see that.

8    That's a -- that's a code.  So --

9    Q.  So this Oklahoma Medicaid policy requiring prior

10   authorization, did it apply to both skin prick testing and

11   blood testing?

12   A.  On a primary care level, yes.  You had to go to a -- and

13   here's where it gets even more convoluted.  In order to get a

14   diagnostic testing for allergies, you had to be -- you had to

15   go to a professional, like an allergist, an ENT who specialized

16   in that.  That was also disingenuous to the Medicaid patients

17   in the fact that if you get referred to a physician and you're

18   on Medicaid, they stagger you out six months; versus if you had

19   commercial insurance, they get you in right away.

20        So it was just -- it was just -- it wasn't right.  And that

21   was the whole point of -- we had to jump on this.  And

22   unfortunately, you know, we met just about this issue, about

23   86003.  Now, 86003 is the same CPT codes that UAL and remote

24   allergy labs use.  So it wasn't designated a diagnostic test of

25   ImmunoCAP or a skin test or a scratch test or a patch testing.

1    It was a diagnostic code of 86003.  And I think that's a

2    specific allergen.

3        So if you have a panel of specific allergens -- trees,

4    weeds, nuts, food, whatever -- those are specific allergens,

5    and that's an 86003.  So if you're testing 26 respiratory

6    allergens, that's billed out at 86003 times 26.

7    Q.  And so the jury understands, when you say 86003, that's

8    referencing blood testing?

9    A.  It's referencing the specific allergen.  You're not

10   referencing -- you're not referencing -- my understanding, it's

11   not just blood testing.  You're testing that specific allergen.

12   That specific allergen that you're testing on cedar pollen,

13   that we all experience now, whether it's done on a remote

14   allergy lab, a skin test, a patch testing or a blood test, you

15   bill that out as 86003, that's a tree.  86003, that's a nut.

16   86003, that's a weed.  The collective of that is times three or

17   however many on that panel.

18   Q.  And you drafted the document that's attached to this email?

19   A.  I did.  I was asked to put together a timeline.  As we've

20   discussed, it was made aware by a reference lab in Oklahoma

21   called Diagnostic Laboratory of Oklahoma -- they're a Quest

22   company.  They're the ones that made aware -- brought it to my

23   attention, and I didn't know.

24       And so when we started moving this up to the medical

25   director or whatever on what to do, more people got involved,

1    more of the senior leadership team, on how to -- do we go

2    straight -- straight to them?  Do we request a meeting?  Do we

3    work with DLO as to -- that way we wouldn't be construed as,

4    you know, we are a diagnostic company.  We do sell ImmunoCAP.

5        I had the conversation with their chief scientific officer

6    for the Oklahoma Health Care Authority.  And their conversation

7    was, do you construe this as affecting your sales?

8        And I said, no, I construe this as companies like DLO or

9    patients that go to a DLO or go to their primary care would

10   never get tested.  They're being banned from being tested.  And

11   you're focusing on low-income families.  And that's -- that's

12   discrimination.

13   Q.  Now, was the work you were doing with regard to the

14   Oklahoma Medicaid -- none of that involved not reimbursing skin

15   prick testing; is that correct?

16   A.  This was -- this was just -- this was trying to get them to

17   review their mind on doing a prior auth, which, by the way, the

18   prior auths never worked.  They had it rigged to where, even if

19   you put a cover sheet on there, even said that they would

20   automatically just shred it if it had a cover sheet on it.

21       So their prior auths that were sent in from the laboratory

22   companies that utilized our instrument, they would just -- like

23   I said, if you used a Diagnostic Laboratory or Clinical

24   Pathology Laboratory or LabCorp and they put their cover sheet

25   on it, the minute it came through the fax machine, if it wasn't

Case 5:14-cv-00035-RCL    Document 571    Filed 04/18/18    Page 90 of 141

JEFFREY SNYDER - CROSS                    1047

1  by -- if it had that cover sheet, they would shred it right
2  there.
3  Q.  And you mentioned you had a conversation with Oklahoma
4  Medicaid?
5  A.   Uh-huh, yeah.  And they were concerned.  First, they go,
6  well, you know, is this going to affect your -- affect your
7  business?
8      I said, that's not my concern.  My concern is that this is
9  going to affect the landscape of patients, especially lower
10 income demographic patients, from ever being tested.
11     Did we have something involved in that?  Well, yeah.  But
12 if you look at it -- if you look at it from, you know, a cost
13 perspective for the health care industry, when you're trying to
14 talk to doctors and you're saying, look, out of one -- one
15 dollar ever spent, two to three cents is really the diagnostic
16 cost.  And so, you, know we're -- here's the reason why you
17 should test.  It makes good sense.  You're getting a proper
18 referral.
19     So that's the reason why you want everybody across the
20 board, whether they have commercial insurance or Medicaid or
21 Medicare -- everybody to be covered for these diagnostic tests.
22 We're designating ImmunoCAP.  We're not singling out, you know,
23 not using any kind of remote allergy labs.  We're just stating,
24 hey, here it is.
25 Q.  You wanted to increase access to allergy care to patients?

JEFFREY SNYDER - CROSS                    1048

1    A.  Absolutely.

2    Q.  Do you think this policy change benefited the allergists?

3    A.  I'm sorry.  Repeat that one more time.

4    Q.  Do you think this policy change benefited the allergists?

5    A.  I have an opinion, yes.

6    Q.  What is your opinion?

7    A.  The chief scientific officer for the Oklahoma Health Care

8    Authority, her husband was a key opinion leader pediatrician

9    that was part -- that was good friends with some Oklahoma

10   asthma and allergy group.  Yeah, it definitely benefited them.

11   I mean, is it right?  No, it's not right.

12   Q.  So your work with regard to this policy change on behalf of

13   Phadia was contrary to the interest of board certified

14   allergists?

15   A.  Yes, yes.  And so going back to the original question --

16   sorry, I like to get off on a tangent because I'm passionate

17   about this -- my job was to put together this timeline so that

18   as people jumped into the teleconferences and they invited more

19   people, could be a variety of people outside of Phadia, you

20   know, then -- meaning outside, meaning, I think, DLO,

21   Diagnostic Laboratories of Oklahoma, might be interested in

22   what -- you know, how to partner up to work to combat this

23   86003, the prior authorization.

24   Q.  And you were asked some questions about the last page to

25   this exhibit.  It appears you thought that Ms. Winders and

JEFFREY SNYDER - CROSS                          1049

1    Dr. Sigmon should meet; is that correct?

2    A.  That's correct.

3    Q.  And why?

4    A.  They should -- you know, Dr. Sigmon was a key opinion

5    leader.  And he thought that it was -- through numerous

6    discussions about, you know, this Medicaid issue, you know, he

7    wanted to meet with her and, you know, not part of the Phadia

8    deal, to have a discussion.  And he says, as well as RAS and

9    United Allergy Services, that's between the two of them.  He

10   just wanted the connection.

11   Q.  Do you know if they ever met?

12   A.  I have no idea.  You can ask them that.

13   Q.  Did you ever set up a telephone conference for Dr. Sigmon,

14   Ms. Winders and Phadia?

15   A.  I don't think so.  I think I just connected them via email.

16   Q.  Did you have any conversations or communications in which

17   Dr. Sigmon and Winders were also included?

18   A.  Not that I recall.  You mean, like, after they would

19   have -- I don't even know if they had a discussion so --

20   Q.  And there's a reference in here to "Ghost letter sent to

21   DLO from Fred Martin."

22       Do you remember being asked that?

23   A.  Yeah.

24   Q.  Did that have anything to do with Mothers?

25   A.  No.

JEFFREY SNYDER - CROSS                    1050

1  Q.  Did Mothers participate in any of that ghost letter
2  mentioned?
3  A.  No.  And actually, the ghost writing -- the vernacular on
4  that wasn't even mine.  It was something from Ben Davol, and,
5  you know, prior to ever -- that movie *Ghost Writer*.  I didn't
6  realize what it was.  I didn't realize somebody else would be
7  writing it so --
8  Q.  Do you know if Ms. Winders ever told Dr. Sigmon that she's
9  not interested in supporting sublingual drops?
10  A.  I have no idea.
11  Q.  While you were at Phadia, did you engage in any efforts to
12  deal with remote allergy by affecting insurance company
13  reimbursement?
14  A.  No.  I don't have that kind of -- that's out of my --
15  that's above my pay grade.  I don't think any -- I don't
16  think -- yeah, you can't -- no.
17  Q.  So you didn't observe anyone at Phadia doing that?
18  A.  No.
19  Q.  Did you observe any coordinated effort between Mothers and
20  Phadia with respect to insurance company reimbursement?
21  A.  No.
22  Q.  And I want to go back to --
23  A.  Phadia's not that big.
24  Q.  Sorry?
25  A.  Phadia was not that big of a company.  I mean -- so no.

JEFFREY SNYDER - CROSS                    1051

1    Q.  And when you were selling products for Phadia --

2    A.  Uh-huh.

3    Q.  -- was patient safety something that mattered to you?  Was

4    it of concern?

5    A.  Yeah.  Yeah.  Yeah.  Absolutely.  More so when -- so you'll

6    see allergists utilize our testing for -- for food because

7    you're never going to -- you know, the prevalence of getting --

8    having an anaphylactic reaction from a -- from a food -- you

9    know, putting food on your skin from the skin test, there's

10   bigger risk.  So -- yes.

11   Q.  Did you distinguish Phadia's product from remote allergy

12   from a patient safety standpoint then?

13   A.  I separated ImmunoCAP from skin testing.

14   Q.  And how did you do that?

15   A.  Discussing the variety of benefits that ImmunoCAP has; that

16   you're not testing on the skin.  It's not in vivo.  It's in

17   vitro.  So there's less risk for anaphylactic reactions.

18   Q.  I'm going to move on to the OIG opinion.  You were asked

19   about that today.  Do you remember that?

20   A.  Yes.

21   Q.  Is the OIG a publicly available document as far as you

22   know?

23   A.  Yes, it is.

24   Q.  Do you know if Phadia did anything to cause that OIG

25   opinion to be issued?

JEFFREY SNYDER - CROSS                           1052

1    A.  No.

2    Q.  Phadia doesn't have control over the Office of Inspector

3    General?

4    A.  No.

5    Q.  Are you aware of any facts that suggest that Mothers of

6    Asthmatics or Tonya Winders procured or did anything for that

7    OIG opinion to come out?

8    A.  No, no.

9    Q.  Are you aware of any facts to suggest that board certified

10   allergists did anything to procure that OIG opinion?

11   A.  No.

12   Q.  I want to go -- this is the last exhibit.  It's P-136.  You

13   have it in front of you?

14   A.  Yes.

15   Q.  Do you see where it says, "AANMA is going to Congress to

16   stop fraud and abuse of patients and families with allergies

17   and asthma and support access to quality patient-centered

18   care."

19       Do you see that?

20   A.  Yes.

21   Q.  Mr. Snyder, are you familiar with Mothers of Asthmatics

22   being a patient -- patient-centered advocacy group?

23   A.  Yes.

24   Q.  And are you familiar with Mothers of Asthmatics being a

25   nonprofit?

JEFFREY SNYDER - REDIRECT                    1053

1   A.  Yes.

2   Q.  And do you understand that Mothers is dedicated to

3   eliminating death and suffering due to asthma and allergies?

4   A.  Yes.

5   Q.  Do you think it benefits patients to be well informed about

6   their allergy treatment?

7   A.  Without a doubt.

8   Q.  Are you at all surprised that Mothers spoke out against

9   remote allergy?

10  A.  No.

11  Q.  That's what you would expect a nonprofit like Mothers to

12  do?

13  A.  Yes.  Especially if it's not benefiting the patient.

14  Anything that's not benefiting the patient, so, I mean, that's

15  the whole purpose of this, right?

16          MS. CHO-HERNANDEZ:  Thank you.  I pass the witness.

17          MR. LOW:  I'll be brief, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MR. LOW:

20  Q.  Can we put that exhibit back up, Exhibit P-136, Roman?

21      You were just asked about this email where it refers to

22  what AANMA is going to do.

23  A.  Okay.  Yes.

24  Q.  And it says -- it says, in quotation marks, "to stop fraud

25  and abuse of patients and families with allergies and asthma."

1        Do you know why that's in quotation marks?

2   A.  I have no idea.  I did not --

3   Q.  Okay.

4   A.  I did not write this.

5   Q.  And you don't really know what AANMA was actually doing

6   then, did you?  I think you said you only had one meeting with

7   Tonya Winders?

8   A.  Face to face, yeah, I think.  Yeah, as far as exactly what

9   they were -- that's a higher level than I was, a lot more --

10  let's put it, a lot more complicated level.  I was fairly new,

11  trying to get a grasp on, you know, eight territories and, you

12  know, people coming at me from every direction so --

13  Q.  And you mentioned your pay grade.  So we're talking about a

14  time period where you're a district manager, right?

15  A.  Yeah.  So it's a figure of speech.  It's above -- it's -- I

16  don't make decisions like that.

17  Q.  Exactly.  And do you make decisions as a district manager

18  who you're going to put in touch with people like Tonya

19  Winders?

20  A.  It's -- it's within my scope, yeah.

21  Q.  Are you saying that David Esposito didn't direct you to put

22  Dr. Sigmon in touch with Tonya Winders?

23  A.  No.

24  Q.  That's not your testimony, is it?

25  A.  I don't recall that being my testimony, no.

1   Q.  No.  I mean, are you testifying, are you affirmatively

2   saying that's not what happened?

3   A.  I don't -- I don't recall that.  I'm the one who brought

4   Dr. Sigmon to Phadia, as far as, I think he would be, you know,

5   a good resource for helping us for offices that weren't

6   utilizing diagnostic testing.

7   Q.  Yes.  And your interaction was nil or none with Tonya

8   Winders when she was at the company, right?

9   A.  I don't -- this is kind of -- I mean, no offense, but I

10  don't remember Tonya that well.  I mean, you know, I was -- as

11  a clinical sales consultant, you're focused in your territory.

12  As a district sales manager, she wasn't -- she wasn't, you

13  know, the clinical educator for us.  I don't know what -- if

14  she was for other -- other districts so --

15  Q.  Is it fair to say that whether or not Phadia had strategy

16  plans and a specific strategy, such as a payor strategy, would

17  be above your pay grade?

18  A.  I would know.

19  Q.  You would know?

20  A.  I'm sure there'd be some discussions.  You know, what's

21  going on in your district?

22  Q.  Such as in your emails?

23  A.  What are you being --

24  Q.  Well, if you would know, then those would be in your

25  emails, right?

JEFFREY SNYDER - REDIRECT                    1056

1    A.  Not necessarily.

2    Q.  And you're saying that you don't remember actually having a

3    teleconference with Ms. Winders and Dr. Sigmon?

4    A.  I don't recall.  And I think we've had this discussion.  I

5    mean, we're talking about -- I mean, you subpoenaed me with an

6    old address I haven't been at for five years.  So that kind of

7    gives you a timeline of how long -- I mean, and I even did a

8    deposition -- what was that?  Three or four years ago?  Three

9    years ago?  Two years ago?  So I specifically don't recall

10   that.

11   Q.  Is it safe to say that the documents are going to be a

12   better reflection of what actually occurred?

13   A.  I mean, if you have it on email, I mean, then you have it

14   on email.

15   Q.  Or your -- whenever you detailed a timeline, for example,

16   that being the document?  That's --

17   A.  The timeline about what?

18   Q.  About your meetings with -- teleconference with Tonya

19   Winders and Dr. Sigmon.

20   A.  I don't know where you're going.

21        MS. CHO-HERNANDEZ:  Objection, asked and answered.

22        THE COURT:  Overruled.

23        THE WITNESS:  I don't know where you're going with

24   this.

25

JEFFREY SNYDER - REDIRECT                         1057

1    BY MR. LOW:

2    Q.  I'm not going anywhere.  I'm just asking you a question.

3    A.  Well, you're asking really vague questions.  If you can

4    drill it down so I can -- I can answer your question

5    specifically what you're wanting to know, then that would --

6    that'd be great.

7    Q.  Whether or not -- whether or not there was any plan or

8    agreement with -- on behalf of Phadia and someone else, that's

9    above your pay grade.  Is that fair?

10   A.  For me to make that decision.

11   Q.  Right.  You can't make that decision?

12   A.  No.  But I would be -- I'd probably be privy to

13   understanding if there was.  At least there's an inkling.

14   Phadia's not that big.  I mean, it's not, like, a huge, you

15   know, several -- you know, tens of thousands of people.  I

16   mean, people are -- it's pretty close.  Especially if it would

17   affect my -- the state of Texas, I'm sure that at least

18   somebody would know about it.

19   Q.  And it's fair to say that documents will speak to that as

20   well, right?

21   A.  If that's what you say.

22   Q.  And you said not that big.  There's hundreds of salespeople

23   at the Phadia division of Thermo Fisher, aren't there?

24   A.  Yeah.  But I'm comparing it against -- like, I work for

25   Syneos Health.  We have tens of thousands of salespeople; or a

1    pharmaceutical company that may have tens of thousands, if not

2    hundreds of thousands of people across the country -- across

3    the world.  So when I -- in reference, when you have a couple

4    of hundred people across the country, that's not big.

5    Q.  And you were asked some questions about what's common as a

6    salesperson in the industry, for example, right?

7    A.  Yes.

8    Q.  First of all, as a district manager, you don't make

9    decisions or would even necessarily know if Thermo Fisher gave

10   money to AANMA; is that right?

11   A.  No.

12   Q.  That's out of your -- that's not in your scope?

13   A.  Yeah.  Unless -- unless somebody told me about it, then I

14   wouldn't know that.

15   Q.  And if -- you know, who at Thermo Fisher and what their

16   intent is and whether or not they meet with an advocacy group

17   like AANMA, that's also beyond your scope, right?

18   A.  If it -- if it didn't relate to my district, then probably

19   wouldn't unless I heard it from somebody else.

20   Q.  And you said it's common to gather information -- I think

21   you went through what's common to do as a businessperson,

22   right?

23   A.  Yeah.  You do that with any job.

24   Q.  And it's common to promote your own product, like the

25   ImmunoCAP product, right?

JEFFREY SNYDER - REDIRECT                                    1059

1   A.   Absolutely.

2   Q.   Is it common to suggest that other people's products,

3   competitor products, are fraudulent?

4   A.   No.   You know what?   That's what separates decent

5   salespeople from really successful salespeople.   You focus

6   on -- you focus on your product.   If you walk in there and

7   start -- and start having a negative effect, you're giving a

8   commercial for somebody else's product.

9        That's the reason why I won ACE award three times in a

10  row -- ACE, Academy for Continual Excellence.   It's being one

11  of the best in the company.   Winning it once is hard; twice is

12  really difficult; and three times in a row.

13       And how I did that and how I conveyed that message to my

14  reps was focusing on the task at hand, your product, your --

15  the offices that aren't utilizing remote allergy labs or the

16  offices that used it in the past but no longer do it.   Focus on

17  the low-hanging fruit.   Focus on what you can do.

18  Q.   And I think I've read your email.   So I understand.   But I

19  think -- are you agreeing that it's uncommon to suggest a

20  competitor product is fraudulent?

21  A.   Are we talking about me?

22  Q.   Just, you were testifying about --

23  A.   You're talking about in general.   I'm trying -- I'm trying

24  to --

25  Q.   Well, you testified for about, you know, five minutes about

JEFFREY SNYDER - REDIRECT                    1060

```
 1  what's common as a businessperson.  And so I think --
 2  A.  For me, yes.
 3  Q.  -- it's fair for me -- so you were just testifying as to
 4  yourself, what you said?
 5  A.  Well, I can't answer for anybody else.
 6          MS. CHO-HERNANDEZ:  Objection, argumentative.
 7          MR. LOW:  I'll rephrase.
 8          THE WITNESS:  I mean, you're asking would I -- would I
 9  know that -- you know, Joe Frost does with his team as far
10  as -- or what, you know, Ahmed that we just looked at in P-136,
11  whether, you know, Ahmed -- how he conducts his sales.  I'm not
12  there.  That's not my concern.
13      My concern is -- is how I sold.  And, you know, everybody
14  has their own style of management, that -- I mean, or style of
15  selling, but how -- what I thought was the best way to conduct
16  it.
17  BY MR. LOW:
18  Q.  So you can only testify as to what you did within Phadia,
19  not the other common --
20  A.  Yeah.  We went through this in the deposition.  I can only
21  speak for me.
22  Q.  Okay.  And in your history as a salesperson, is it common
23  to coordinate with competitors?
24  A.  Coordinate between competitors?
25  Q.  With other competitors.
```

1   A.  I don't understand the question.  What do you mean

2   "coordinate with competitors?"  Like me meet with competitors?

3   No.

4   Q.  Right.  That's uncommon, right?

5   A.  Yeah.  You wouldn't -- why would I meet with competitors?

6   Q.  And is it uncommon to have advocacy groups send letters on

7   your behalf?  Is that uncommon as a salesperson?

8   A.  Nobody would send -- I don't understand.  Do you mean they

9   get into my computer and type out an email on my behalf?

10  Q.  Uh-huh.  No, I'm just saying.  Just asking them to do so,

11  that would be uncommon as a salesperson, right?

12          MS. CHO-HERNANDEZ:  Objection, lack of foundation.

13          THE COURT:  Overruled.

14  BY MR. LOW:

15  Q.  Would that be uncommon?

16  A.  Yeah.  I would think so.

17  Q.  I'm sorry?

18  A.  Yeah.  I mean, unless they -- unless they broke into my

19  house when I wasn't there and somebody got behind my computer

20  and logged into all the VPNs and all the passwords.  And, you

21  know, I can hardly remember my own password.  So good luck.

22  Q.  And, finally, I want to make clear, and I think you said

23  this in your deposition, the OIG advisory opinion itself was

24  not an approved marketing material for Phadia; is that right?

25          MS. CHO-HERNANDEZ:  Objection, asked and answered.

1          THE COURT:  Overruled.

2          THE WITNESS:  Do you want my opinion?  Overruled

3    doesn't mean -- overruled.  Sorry.  Approved doesn't mean --

4    apologize, Your Honor.

5       Approved doesn't necessarily mean it's illegal.  So -- but,

6    no, we were -- it's never -- you don't -- you don't go out

7    there and promote an OIG statement.  I mean, you don't -- that

8    wasn't -- it isn't something that we did.

9       The doctor -- like we've talked about earlier, and in my

10   deposition, as we discussed at great length, if a doctor came

11   to a salesperson, me, and said, hey, what's this OIG statement?

12   You can lead them to Google.  And I think you and I went back

13   and forth during my deposition about what Google is.  And

14   everybody knows how to Google something.  But as far as --

15   BY MR. LOW:

16   Q.  I was -- you understand that there are approved and

17   unapproved marketing --

18   A.  Well, you got to understand, was it in our Phadia ImmunoCAP

19   marketing piece that was signed off by the attorneys?

20   Q.  Right.

21   A.  No.  It's a public document.

22   Q.  Okay.  And was -- were you ever aware of any of the AANMA

23   articles being an approved marketing material of Phadia or

24   Thermo Fisher?

25   A.  No.

 1          MR. LOW:  Thank you, Your Honor.

 2          THE COURT:  You can step down.

 3      Next witness.

 4          MR. LOW:  Your Honor, for our next witness we call

 5  Anthony Notarthomas by video.

 6      (Playing video)

 7          THE COURT:  Let's pause there and take our afternoon

 8  recess.

 9      (Recess)

10      (Open court, jury in)

11          THE COURT:  All right.  You may be seated.

12      We'll resume the playing of the last deposition.

13      (Playing video)

14      (Video stopped)

15          MR. LOW:  Your Honor, for the record, the exhibits

16  were Plaintiff's 293, Plaintiff's 294, Plaintiff's 168,

17  Plaintiff's 295, Plaintiff's 170, Plaintiff's 296, Plaintiff's

18  297, Plaintiff's 298, Plaintiff's 186, Plaintiff's 300,

19  Plaintiff's 301, Plaintiff's 304, Plaintiff's 306, Plaintiff's

20  309, Plaintiff's 310, Plaintiff's 223, Plaintiff's 311,

21  Plaintiff's 77, Plaintiff's 98, Plaintiff's 608 and Plaintiff's

22  609.

23          THE COURT:  All right.  They're all received.

24      (Plaintiff's Exhibit Nos. 293, 294, 168, 295, 170, 296,

25  297, 298, 186, 300, 301, 304, 306, 309, 310, 223, 311, 77, 98,

NICOLAS HOLLIS - DIRECT                                1064

```
 1   608 and 609 admitted)
 2           THE COURT:  Next witness.
 3           MR. LOW:  Yes, plaintiffs call Nicolas Hollis.
 4       (Witness enters courtroom)
 5           THE COURTROOM DEPUTY:  Please raise your right hand to
 6   be sworn.
 7           THE WITNESS:  Stand up?
 8           THE COURTROOM DEPUTY:  Yes.
 9       (The oath was administered)
10           THE COURTROOM DEPUTY:  Thank you.  You may be seated.
11            NICOLAS HOLLIS, PLAINTIFF'S WITNESS, SWORN
12                      DIRECT EXAMINATION
13   BY MR. LOW:
14   A.  Good afternoon.
15   Q.  Please state your name.
16   A.  My name is Nicolas Hollis.
17   Q.  Mr. Hollis, where do you live?
18   A.  I live in San Antonio, Texas.
19   Q.  And are you married?
20   A.  Yes.  I've been married for 32 years.
21   Q.  And do you have any children?
22   A.  I have three children.
23   Q.  And where did you grow up?
24   A.  I grew up in New Zealand and Australia.
25   Q.  Okay.  And did you -- can you give me your educational
```

1  background after high school?

2  A.  I went to Sydney University, and I did a degree in

3  economics.  I was also going to do a degree in law but decided

4  it wasn't for me.  Sorry.

5  Q.  Understood.

6      At some point did you move to the United States,

7  apparently?

8  A.  I moved to the United States in 1983.

9  Q.  Okay.  How did you end up in San Antonio?

10 A.  I met my wife in New York.  She was a Texan girl, and I

11 ended up in Texas.  I think that happens a lot.

12 Q.  And how long have you been in San Antonio?

13 A.  I've been in San Antonio now 25 years.

14 Q.  And can you tell me if you have a connection to United

15 Biologics, LLC or United Allergy Services, the plaintiff in

16 this case?

17 A.  Yes.  I was their -- the founder and CEO of United

18 Biologics from 2009 through 2014.

19 Q.  Before that, what businesses were you involved in?

20 A.  Well, immediately prior to United Biologics, I worked on

21 redeveloping the San Antonio River as a chairman of the River

22 Foundation.  So the additions that we made on the north side

23 and south side, I spent five years doing that.

24      Prior to that, I owned a cyber security company here in

25 town.  We used to employ a lot of the people coming out of the

1    Air Force, and we did a bunch of work with the federal

2    government.

3         Prior to that, I had what they call an angel group where we

4    organized a bunch of investors in San Antonio.  The mayor asked

5    me to see what we could do about funding the tech sector here

6    to create better quality jobs in San Antonio.  So I did that

7    for about two years.  That was also a nonprofit.

8         And then, prior to that, had a telecommunications company.

9    What we did was we put 800 numbers for the parents of kids who

10   were away at college.  This was before they had cellphones.  So

11   you could -- if your child was away at school, they could use

12   an 800 number to call you.

13        And then, obviously, prior to that, I was in New York in

14   the banking business.

15   Q.  This jury's already heard about the business of United

16   Allergy Services, but I'm going to ask you for, as it pertains

17   to that -- that business for a period of time.  Is that okay?

18   You were CEO until what -- when?

19   A.  I was CEO until about mid-2014.

20   Q.  Okay.  First of all, I'm going to ask you for a period of

21   time from March of 2011 to April 2015.  After you were CEO,

22   were you still affiliated with the company?

23   A.  After I stepped down as CEO?  Oh, yes.  I'm still a board

24   member of the company.

25   Q.  So you're currently on the UAS board?

```
 1   A.  I am.

 2   Q.  Okay.  And in March 2011 you were obviously a CEO, correct?

 3   A.  That's correct.

 4   Q.  The CEO.

 5        MR. CARTER:  Your Honor, I don't know what this

 6   graphic is.  It's not in evidence.

 7        MR. LOW:  It's just a demonstrative.  It's a

 8   demonstrative.  I'll establish it.

 9        THE COURT:  Okay.  Go ahead.

10   BY MR. LOW:

11   Q.  First, explain to me, if you can, just generally how United

12   Allergy Services grew from 2011 until present.

13   A.  Well -- until the present?

14   Q.  Correct.

15   A.  Well, we were growing very rapidly really from the founding

16   of the company in about 2009.  We had sort of stumbled, the

17   wrong turn, but we had a very intentional interest in allergy.

18   There seemed to be a big disconnect between the numbers of

19   allergists there were in the country and the numbers of people

20   with allergies.  Especially here in San Antonio.  I mean, it's

21   just -- half the people I know have allergies.  So we thought

22   this would be an excellent business.

23        So starting in 2009 through -- really through about 2014,

24   we had exceptional growth.  We had -- we had some bumps along

25   the way like every other growing business.  But come 2014, we
```

1    ran into headwinds that really have devastated the company.  I
2    believe today, even four years later, we're only doing about 60
3    percent of the revenue we were doing four years ago.  So
4    something very dramatic happened to our business in 2014 -- or
5    actually, 2013/2014.
6    Q.  We'll come back to that.
7        But let's first -- the company was founded here in
8    San Antonio, correct?
9    A.  It was founded here in San Antonio.
10   Q.  And it used to be just local doctors; is that right?
11   A.  We had local doctors.  We began with local doctors, as you
12   do.  This is the beginnings of any business, is the people you
13   know.  And then we expanded out across the country over a
14   period of time.
15   Q.  And expanded in which direction?
16   A.  Well, we really followed where the wind blows, in a sense
17   that the allergies blow across the -- sort of the bottom of
18   America and then go up the East Coast up to sort of through
19   New Jersey.  So we expanded along that sort of pathway where
20   the most allergies were prevalent and also in states where it
21   was practical for us to do business.
22   Q.  Okay.  And can you name some of the states as of March 2011
23   that United Allergy was in?
24   A.  Sure.  At that point I believe we were -- we had started in
25   Colorado.  I think we were in Arizona at the time.  We were in

1    Texas.  We were in Oklahoma.  We were in Louisiana.  We were in

2    South Carolina.  We were in North Carolina.  We were in

3    New Jersey.  I think that's about -- and maybe in Illinois as

4    well, from memory.  I'm sorry.

5    Q.  So, generally, for the most part, you were in the south and

6    the southeast?  Would that sound about right?

7    A.  The south and the east, I guess, would be the best way of

8    describing it.  We sort of hugged the coastline that way.

9    Q.  Would that include Georgia?

10   A.  It did include Georgia, yes.

11   Q.  Okay.  Sorry.  My penmanship is not the best.

12       And then did you continue to grow after that?

13   A.  We continued to move more into the sort of Midwest, sort of

14   north, up into -- up into Iowa, Nebraska and places such as

15   that and more into the Midwest and the plains states.  We

16   weren't in California.  We basically, as I said, were more in

17   the middle and up towards the East Coast.

18   Q.  Probably want to back up just to kind of get a sense.  But

19   when you started this business, did you end up working with any

20   board certified allergists?

21   A.  No.  We had a board certified allergist as our chief

22   medical officer.  But our early attempts -- in fact, all of our

23   attempts to meet with the allergists and their societies were

24   completely rebuffed.  We thought if we were going to be

25   addressing allergy with primary care physicians, it would be

1  useful to reach out to the people who had been doing this for a

2  long time and see if we can get some expertise from them and

3  some guidance.

4      However, they did not see it quite the same way.  In fact,

5  they rebuffed us instantly and refused to even respond to our

6  letters.

7  Q.  Maybe a little more clarity.  First, who was your board

8  certified allergist medical officer?

9  A.  He was our chief medical officer, a gentleman called

10  Dr. Frederick Schaffer.

11  Q.  And where is he located?

12  A.  He's located in Charleston, South Carolina.

13  Q.  Okay.  And who -- which allergists did you reach out to and

14  generally when?

15  A.  We had -- Dr. Schaffer is a board certified allergist, is a

16  member of all of the major allergy societies.  So he said he

17  would write letters on our behalf to introduce us to the

18  allergy societies and to the people who do all the science

19  there, to see what we could do about improving -- well, not so

20  much improving, but helping us grow as a business to make sure

21  that we do everything right.

22  Q.  And generally, what timeframe?  Would that have been around

23  2011?

24  A.  That would have been, I believe, late 2010, early 2011, in

25  that timeframe.  Dr. Schaffer joined us in, I think, early to

1    mid-2010.  So he felt it was important for us to be part of

2    the -- you know, what was going on in the professional practice

3    of allergy.

4    Q.  And these people he reached out to, can you name the

5    organizations?

6    A.  There's a lot of acronyms.  I don't know if you've heard

7    them all.  We have what we call the AAAAI, the JCAI and the

8    AACAI, which is -- they refer to, I think, as the Joint

9    Council, the College and AAAAI.  They're the three big -- well,

10   they're the three groups that represent the allergists in the

11   United States.

12   Q.  Prior to that time, so early on, did you ever have any

13   dealings with allergists?

14   A.  Prior to Dr. Schaffer?

15   Q.  Maybe I should ask it this way:  You said you had bumps in

16   the road early on.  What types of bumps besides business bumps

17   did you have?

18   A.  Well, almost immediately after us opening, there was a

19   particular allergist here in San Antonio, Texas, who decided

20   that he was single-handedly going to try and put us out of

21   business, and began reporting our physicians to the Texas

22   Medical Board and suggesting that what we were doing was

23   outside of the standard of care and dangerous.  So --

24         MR. CARTER:  Your Honor -- Your Honor, I'm going to

25   object to hearsay.  And can I take this witness on voir dire?

```
 1              THE COURT:  No.  The objection's overruled.
 2              MR. CARTER:  Okay.
 3              THE WITNESS:  So we ended up in a position where our
 4    physicians found themselves very early on defending themselves
 5    against allegations of the Texas Medical Board.
 6    BY MR. LOW:
 7    Q.  And you're aware of the actual materials that were sent
 8    back from the Texas Medical Board.  Have you seen them?
 9    A.  Yes.
10    Q.  And what was the result of those complaints?
11    A.  The result of all of those claims, that the Texas Medical
12    Board found that the primary care physicians were practicing
13    within their license and within the standard of care.
14    Q.  You expanded to other states.  Did you ever have issues
15    with any medical board anywhere finding substandard care?
16    A.  No, we did not.
17    Q.  Okay.  And then this graph that you have in front of you,
18    have you seen this before?
19    A.  This particular graph, yes, I think -- well, you shared it
20    with me earlier today.
21    Q.  And would you say it looks similar to the growth pattern of
22    the company?
23    A.  Yes.  It looks very similar to -- actually, I think it's a
24    very close description of how we grew and stopped growing.
25              MR. CARTER:  Your Honor, I'm going to object to the
```

1    graph because it's obviously a graph that Mr. Low created or

2    drafted, and not this witness.  He just saw it today.  So I'm

3    going to object to this graph coming into evidence.

4            THE COURT:  Overruled.

5    BY MR. LOW:

6    Q.  And it looks like the graph goes up and down.  So I'm going

7    to ask you about a little bit of these things.  Okay?

8    A.  Yes.  Certainly.

9    Q.  First of all, it looks like you're growing up until -- what

10   does that look like to you -- summer, August of 2011?

11   A.  August of 2011, yes.

12   Q.  Okay.  And growth pattern, I think you were describing

13   moving through the south and the southeast; is that right?

14   A.  That's correct.

15   Q.  Okay.  And what's the first event that you remember that

16   kind of slowed the growth of the company?

17   A.  As I said, if you look just there, by August of 2011, we

18   were sort of growing to the right, things are sort of moving

19   up, and then there's a big dropoff there.  That was a situation

20   where BlueCross BlueShield of Texas -- which then we were very

21   heavily concentrated in the state of Texas, we were expanding,

22   but the majority of the people were in Texas -- decided --

23   well, actually ended up doing some utilization audits and a

24   special investigation of some of our clinics and some other

25   clinics in the industry.  But, more importantly, stopped

NICOLAS HOLLIS - DIRECT                     1074

1  paying.  They stopped paying our doctors for --

2        MR. CARTER:  Your Honor, I hate to stop the witness,

3  but this is nonresponsive.  And this is beyond Rule 1006 of the

4  Rules of Evidence.  The information that this graph is based

5  upon is not in evidence, and so this is improper pursuant to

6  Rule 1006 of the Rules of Evidence.

7        THE COURT:  Overruled.  It's demonstrative.  It's not

8  in evidence.

9        MR. CARTER:  I understand.  I understand.

10        THE WITNESS:  Shall I continue?

11        THE COURT:  Yes.

12        MR. LOW:  Yes, please.

13        THE WITNESS:  Thank you.

14    Yeah, so we ended up in a situation where a very large

15  payor, BlueCross BlueShield -- I don't know if you have health

16  insurance, but that's one that a lot of people have in the

17  state of Texas -- stopped paying our doctors.

18     So we had to go up to Dallas and meet with the medical --

19  chief medical officer there.  And we ultimately came to a

20  successful resolution where they began paying again and we

21  moved forward.  But over that period of time, it was -- it was

22  pretty devastating in terms of our business.

23  BY MR. LOW:

24  Q.  And I can tell you're talking just a little quick for the

25  court reporter, so because I like to keep him happy, I'll

1  remind you to slow down just a bit.

2      And do you recall how much money was at issue with the

3  BlueCross Texas issue?

4  A.  My memory, the number that sticks in my mind was about $9

5  million, I think.

6  Q.  And $9 million in terms of what?  Claims paid?

7  A.  Where we had done the work, where the claims were filed

8  with the insurance company and the insurance company did not

9  pay those claims.

10  Q.  Okay.  And you say the claims were filed.  Who were the

11  claims filed by?

12  A.  The claims were filed by the -- our doctors.

13  Q.  Okay.  And you're in contract with these doctors, correct?

14  A.  That's correct.

15  Q.  Okay.  And so whenever BlueCross BlueShield upheld payment,

16  it was for $9 million of claims they had owed to the doctors?

17          MR. CARTER:  Objection, leading, Your Honor.

18  BY MR. LOW:

19  Q.  Is that right?

20          THE COURT:  Sustained.

21          MR. LOW:  Okay.  Let me back up.

22  BY MR. LOW:

23  Q.  At some point, you reference having resolved the issue.

24  How did that issue resolve with BlueCross Texas?

25  A.  As I said, we went to meet with the medical director, and

NICOLAS HOLLIS - DIRECT                    1076

1    they wanted to -- they wanted to map the medicine to the -- it

2    was -- I think it was every 60 days, they wanted to pay every

3    60 days for the medication as it was delivered to the patient.

4    Q.  You're mentioning payment by health insurance companies.  I

5    think it may be helpful to understand, how many health

6    insurance companies do your doctors deal with on a daily basis?

7    A.  I believe -- certainly when I was running the company, we

8    had as many -- I understand as many as 1,500 insurance

9    companies across the country were paying claims.

10   Q.  And do they all pay the same way?

11   A.  That is the one thing they don't do.  They all have their

12   own way of paying.  Some of the -- some of the claims are paid

13   immediately.  Some of the claims are paid over a period of

14   time.  Some have different volumes that they want on different

15   days.  It's all over the place as to how they pay the

16   physicians.

17   Q.  Okay.  I think you were here for opening but not any other

18   part of this trial, correct?

19   A.  No.  I just saw the opening.

20   Q.  Okay.  Are there some insurance companies that will pay for

21   the medicine all at once for a full year's worth?

22   A.  For -- yes, there are -- I would say the majority of the

23   insurance companies actually pay for the -- for the medicine

24   upfront.

25   Q.  Okay.  And are there others that pay over time, I guess?

1    A.   Yes.   There are a number that pay over time as well.

2    Q.   Okay.   The BlueCross BlueShield policy of, you mentioned

3    every two months or 60 days, was that common or unique?

4    A.   That was -- that was individually negotiated with them.   It

5    typically wasn't the way that the people were paying at the

6    time.   It was more -- again, typically they would -- they would

7    either pay upfront or they would pay -- in the case of, say,

8    Medicare, they would pay over a six-month period.

9    Q.   Okay.   And you were saying that the drop occurred around

10   that time.   I don't understand.   If they -- if they actually

11   ended up paying the claims, what was the big deal?

12   A.   Well, what happens, again, there were a combination of

13   things that -- what they call the utilization order and also a

14   special investigation.   When -- we don't quite know what

15   triggered BlueCross BlueShield to begin those audits.   We had

16   our suspicions, but what occurred was they began to go to all

17   of the physicians, and they would -- you know, they would come

18   in and say, hi, I'm from the fraud unit, or they would call the

19   physicians' patients and say that, your doctor's being

20   investigated for fraud.   And they would go to our largest

21   customers and they would send their teams in there and do these

22   audits that would take an indescribable amount of time and

23   effort for the doctors.

24       So during that time, a doctor is -- they just stop testing.

25   And if they're suspicious about their largest payor, they get

1   suspicious about, well, maybe another payor is going to stop

2   paying.  So what do they do for that period of time?  They stop

3   using our testing and they -- well, they stop working with the

4   company.  So your revenue drops precipitously until you can get

5   a resolution that the insurance company's happy with and the

6   doctors are happy with.  And then you have to say, okay, it's

7   all clear.  And then everybody slowly moves back to what they

8   were doing before.  It's just them being cautious, and I don't

9   blame them.

10  Q.  And did, in fact, everybody slowly move back?

11  A.  In the case -- at that particular time, yes, we ended up

12  maintaining most of our customers at that particular point in

13  time.  There were some, however, that just said, Look, this is

14  three or four percent of my revenue.  I'm not prepared to risk

15  losing my contract with BlueCross BlueShield or another major

16  carrier, and they just stopped doing business with us,

17  unfortunately.

18  Q.  It looks like after that time there's a trend up.  What was

19  happening with the company after August of 2011?

20  A.  Well, we were -- as I said, we were on the rebuild again.

21  This was a market -- you know, as we -- as we grew, we became

22  more, I guess more confident in what we were doing.  We were

23  doing, I think, a very good -- we had got a very good medical

24  board.  We had an excellent, you know, chief medical officer

25  there.  We felt confident about what we were doing.  And there

1    was tremendous amount of demand in the marketplace for primary

2    care physicians to be able to treat allergies.

3        So, as I said, that level of confidence, and we began to

4    grow.  We began to grow rapidly again.  We got -- the

5    physicians that were -- you know, that had been frightened felt

6    confident again, and we started moving forward and growing.

7    Q.  Okay.  Tell me some of the places at this stage that you

8    were growing into, not only just the states, but the types of

9    communities, in terms of size.

10   A.  Well, the beauty of working with a primary care physician

11   is there's a primary care physician in every community.  So we

12   ended up moving out to, like, places like west Texas because

13   there were gaps in the market.  There were places where you

14   have to drive 70, 80, 90 miles to get to an allergist, whereas

15   you had a primary care in your local town.

16       So we found a lot of the expansion that we were doing was

17   into sort of more rural and remote areas that weren't being

18   served by the marketplace at the moment.

19   Q.  At some point did you ever encounter something called the

20   OIG advisory opinion?

21   A.  Yes.

22   Q.  Now, what is that?  What's the OIG advisory opinion?

23   A.  Well, it's my understanding that an OIG advisory opinion is

24   an opinion sought by a company in order to see whether their

25   business model would pass muster with the government.  The

NICOLAS HOLLIS - DIRECT                1080

1  government has very specific rules about what they will pay and

2  what they won't pay.

3      It's my understanding -- well, it's my understanding that

4  somebody applied for an OIG opinion in a name of a company that

5  was supposed to look like us or looked very close to us.

6          MR. CARTER:  Your Honor, I'm going to object to this.

7  This is outside the scope of his question.  I think his

8  question was, what is his understanding of an OIG opinion, not

9  how this process happened in this case.

10          THE COURT:  Sustained.

11          MR. LOW:  Let me follow up, if I may.

12  BY MR. LOW:

13  Q.  Are you specifically familiar with OIG Advisory Opinion

14  11-17?

15  A.  Yes.

16  Q.  Okay.  Now, when did that come out?  Do you recall?

17  A.  That came out the day before Thanksgiving in 2011.

18  Q.  Thanksgiving's in November, correct?

19  A.  Oh, yes, sorry.  We don't celebrate Thanksgiving where I'm

20  from.

21  Q.  You say I didn't?

22  A.  No, no.  I said we don't.  It's not a date that rings in my

23  mind.  I've got good at it now that I'm living in America.

24          MR. LOW:  We'll take judicial notice -- or move for

25  judicial notice, Your Honor.  No.  I'm joking.

1  BY MR. LOW:

2  Q.  So after the OIG advisory opinion had come out, did you

3  find it?

4  A.  Yes.

5  Q.  When did you discover it?

6  A.  We discovered it as it came out because we had a public

7  relations firm that was looking for articles and anything that

8  pertained to the allergy business.  So it came up on the wire

9  and it was noticed immediately.

10 Q.  Okay.  And then what did you do when you -- when you saw

11 it?

12 A.  Well, the first thing we did was -- because it was -- we

13 sought counsel to see exactly what the nature of this OIG

14 opinion and what it meant to United Allergy Labs because it had

15 been sought by a company called Universal Allergy Labs, with

16 the acronym -- with the -- in parenthesis "UAL."  So obviously

17 we were very concerned.  So we reached out to an expert, and he

18 filled us in as to what an OIG opinion means, why it's sought

19 and what impact it has on us as a company.

20 Q.  Okay.  Were you concerned about your physician customers

21 seeing it?

22 A.  Well, we -- we were concerned about our physician -- well,

23 in a sense -- we were transparent.  In fact, what we did was,

24 is we alerted all of our customers and put -- and we created an

25 open hotline.  And I manned that hotline with our -- with our

```
 1    senior management team for, I think, three or four calls the

 2    following week.  Obviously, the Thanksgiving weekend, nothing

 3    went on.  But come Monday, we opened up a hotline, and we

 4    waited for our doctors to call in.

 5        One doctor called in, which we were surprised about.  So we

 6    filled them in on what we'd been told from our attorney.  And

 7    sort of that was it.  We put the phone down and assumed that

 8    that particular, you know, sort of thing had passed.

 9    Q.  So one call?

10    A.  One call.

11    Q.  And did that customer end their relationship?

12    A.  No, not at all.  They were just seeking clarity as to what

13    the OIG opinion meant.

14    Q.  Is there some time after that that you did receive calls,

15    and numerous calls, about the OIG advisory opinion?

16            MR. CARTER:  Objection, leading, Your Honor.

17            THE COURT:  Sustained.

18    BY MR. LOW:

19    Q.  Did that ever change in time, that you received just one

20    call as opposed to --

21    A.  Oh, yes.

22    Q.  Okay.

23    A.  I think, if my memory serves me correctly, it was somewhere

24    in about March of 2012.  As I said, it was very quiet until

25    that particular point in time.  There was very little feedback
```

1    from the OIG opinion.  And all of the sudden, it was like the

2    switchboard lit up.  There were people calling in from all over

3    the place.  Our physicians were concerned.  They were worried

4    that what they were doing was -- this particular treatment,

5    that it was illegal; and that there would be -- that they would

6    get into trouble.

7        The other thing that occurred is all of the sudden our

8    salesforce, you know, they had been speaking to doctors and

9    they were quite a long way into the contracting process.  And

10   the next thing you know, they wouldn't even get a call back.

11   And no one could understand why.

12       All of a sudden our sales fell off the face of the Earth.

13   And also, all of our physicians, again, got nervous, started

14   reducing their testing, started reducing seeing patients in the

15   allergy field.  And I think if you look at that graph, you'll

16   find that it just drops off a cliff in about February 2012.

17   Q.  To be fair, you first said March.  So I'm going to change

18   it to March.

19   A.  Yeah.  I'm sorry.  It's your graph.  It's not mine.

20   Q.  Well, I want to be consistent with your understanding or

21   your memory.

22   A.  Understood.

23   Q.  What did you do when you started receiving these calls in

24   that timeframe, in terms of how did you respond?

25   A.  Our response really was to go back to the opinion that we

NICOLAS HOLLIS - DIRECT                    1084

1    had received from our legal counsel who had expertise in that

2    area, Kevin McAnaney.  And it's my understanding -- well, it

3    was our understanding that he was someone who was very well

4    versed in the field.  So --

5            MR. CARTER:  Your Honor, I'm going to object to any

6    communication or conversation with Mr. McAnaney.

7            THE COURT:  Overruled.

8            THE WITNESS:  So that particular document that he

9    created for us, we would then share with our physicians and

10   have whatever -- and they could run through and they could make

11   their own judgment whether, in fact, this was something that

12   was, you know, going to be dangerous or deleterious to their

13   business.

14       We also -- you know, we encouraged them to speak to their

15   health care attorneys and have their health care attorneys look

16   over these particular documents to make -- that particular

17   document to make sure that they felt comfortable continuing to

18   do business with us.

19   BY MR. LOW:

20   Q.  And how was the response generally?  Did that make them all

21   comfortable, none comfortable, somewhere in between?

22   A.  I think the best thing to say is the graph speaks for

23   itself.  There were a number of people that were very

24   uncomfortable.  We did lose a number of customers in that.  We

25   lost some very large customers because of that.

1    We also had, as I said, the chilling effect of the doctors

2  not doing anything.  So I would say maybe about 75 to 80

3  percent -- again, this is just from memory -- we maintained

4  those customers and they went back to working with us.  But we

5  lost, I think, a good chunk of customers, but more importantly,

6  some very large and very important customers in that whole

7  process.

8  Q.  Okay.  And then it looks like after that point you're kind

9  of generally trending up.  Was there -- were there -- and some

10  up and some down.  What was occurring in that time in the

11  company?  Anything that comes to mind?

12  A.  I think if you look towards sort of 2013, that little

13  spike, the little thing that goes down again just before the

14  big peak, we started seeing letters from -- being circulated

15  about us being fraudulent and that our -- that there were --

16  what we were doing was bad medicine; it was dangerous; that we

17  were ripping patients off.  And they were being widely

18  circulated, and that also had an impact.

19    Again, you know, doctors have reputations.  They have

20  patients.  They have a place in the community.  And when people

21  start saying things like that, it matters to them.  They're not

22  just ignorant of this.  So when someone splashes mud on them,

23  they stop what they're doing, and then they spend some time to

24  wash it off.

25  Q.  If I could, do you recall if any of those letters were

1  published by AANMA?

2  A.  Both of those letters were published by AANMA.  One, I

3  think was called Patients, Not Piggybacks.  I think the other

4  one was something to do with fraud, and two separate letters

5  that went out to, I believe, their millions of customers, or

6  whatever they call them.

7  Q.  Let's look at the first one.  This is Exhibit Plaintiff's

8  76.  Is this the -- I think you said "Patients, Not

9  Piggybacks."  Did you -- or maybe it's the accent.  Did you say

10  --

11  A.  No, piggybanks.  Yes.  Sorry.

12  Q.  That's my hearing.

13     Is this the article you're referring to?

14  A.  Yes, it is.

15  Q.  Okay.  And it looks like it was published in April 2013,

16  correct?

17  A.  That's correct.

18  Q.  I want to ask you, when did you first see this article, if

19  you can remember?

20  A.  This article came to me through our chief medical officer.

21  He's sort of heavily steeped in that sort of circulation.  And,

22  you know, he's out there in the allergist community, and he saw

23  this article and gave it to me.

24  Q.  You recall about what timeframe that was?

25  A.  You're stretching my memory.  I'm sorry.

1  Q.  That's fine.

2      Do you recall if it's close to when it was published or

3  just very recently?

4  A.  Oh, no.  We saw it within -- you know, within a week or so

5  of when it was -- when it came out, supposedly, I think.  I

6  remember the timeframe being pretty quick.

7  Q.  Okay.  And how did you feel about the article?

8  A.  Well, very disappointed.  We felt that it mischaracterized

9  what we were trying to do.  But, more importantly, it maligned

10  our customers.  You know, primary care doctors, these people

11  work very, very hard.  As I said, they have reputations.

12  They're there on the front lines every day.  They see 30 and 40

13  patients a day.  They work extremely hard.

14      And here's an opportunity for them to do something a little

15  more expansive and help their patients.  And as soon as they

16  start doing it, they get maligned in articles like this.  And

17  we just felt it was -- it was pretty unfair.

18  Q.  And did you do anything as a response?

19  A.  Well, we made overtures to AANMA, or I think they referred

20  to themselves as Mothers at that particular point in time.

21      Around this article, there was also an industry day.  So we

22  had -- we had our -- a person who was working with us up in

23  Washington reach out -- it was a lobbyist actually -- reach out

24  to AANMA and say that we would like to represent primary care

25  and bring some of our physicians to congressional allergy day.

1   And we were completely rebuffed.  It was not a pleasant
2   good-bye.  No "thank you very much."
3       So both our comments about stop -- please stop sending
4   these letters and can we join in the -- and be part of the
5   congressional allergy day?  The answer was a definitive no.
6   Q.  Okay.  And you said you reached out through a lobbyist.
7   Who was that?
8   A.  That was a woman -- actually, that was a gentleman called
9   Corey Lewandowski, and I believe also a woman called Peggy
10  Binzer also made some approaches.  So we approached, I think,
11  on two different people.
12  Q.  And who is Peggy Binzer?
13  A.  Peggy Binzer is an attorney in Washington, D.C., that
14  assisted us with setting up the AAAPC.
15  Q.  And at the time that she reached out, is this -- were we
16  in -- obviously, it's after April 2013 based on what you were
17  saying, right?  Was she involved with AAAPC at that time?  Let
18  me back up.  I'm sorry.
19      Peggy Binzer, did she ever have any role at AAAPC?
20  A.  She was -- I think she actually -- she was a person who
21  was, I think, spearheading it at the time from the executive
22  director's perspective.
23  Q.  Okay.  So she was the executive director of AAAPC?
24  A.  Yes.  Yeah.
25  Q.  And at that time did you do anything else as it related to

1    AANMA in terms of reaching out or not or any other response

2    from you?

3              MR. CARTER:  Objection, leading, Your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  No.  As I said, we were pretty severely

6    rebuffed.  And based upon what we were -- we were hearing about

7    AANMA's view of us, we didn't really pursue this terribly much

8    further.

9    BY MR. LOW:

10   Q.  Okay.  And I'm going to write "piggy banks."  You know what

11   I mean by that, this article?

12   A.  Yes.

13   Q.  Okay.  Now, looks like after that drop, there's pretty --

14   is that a steep climb?  Let me just back up and ask this.

15       After that timeframe, then moving forward, how did the

16   company do?

17   A.  We were starting to do a lot better.  It had a lot to do

18   with the fact that, you know, all of these things that had gone

19   on in the past, we were pretty much on top of.  You know, we

20   knew how to answer the questions when our salespeople were

21   told, Well, what's this OIG opinion?  You know, it's got to be

22   about you, and all of the things that people were saying out in

23   the marketplace.  We ultimately got our physicians comfortable

24   that what they were doing was certainly legal; it was good

25   medicine; that it was safe.

NICOLAS HOLLIS - DIRECT                    1090

1      And I think around that time, we were actually publishing

2  our safety studies.  So we were then armed with safety studies.

3  We had an organization, the AAAPC, that was working with us

4  that was representing primary care.  So there was a lot of

5  validity to the company, and there was a lot of validity at

6  that point in time to the primary care physicians actually

7  doing allergy.  There was a level of comfort.

8      So things went right back to pretty much us going back to

9  the trajectory that we were on before, and we'd sort of sailed

10  past all of these waves that other people had created for us.

11  Q.  Okay.  And then did you keep expanding into additional

12  states at that time?

13  A.  I think what we were doing is actually infilling in the

14  states.  You know, we had -- you know, there are, I believe --

15  we did the math.  There was some 80,000 primary care physicians

16  that were -- we felt would work well with our particular

17  service.

18      So rather than just keep going into states and other states

19  and other states and expanding further and further, we felt

20  that we could -- we may as well just concentrate in the states

21  that we were in.  And we were -- we were -- you know, we were

22  in high-allergy states.  So there was no point just expanding

23  and expanding into different states.

24      So we started to do what we call infill, which is a lot

25  more practical.  That way we can have more staff, more people.

1    So if somebody needs a day off, we can always replace them, so

2    we're always there the whole time so --

3    Q.  At its height, how many states was United Allergy in, if

4    you could recall?

5    A.  I'd say almost 30 states.

6    Q.  Okay.  And do you recall a period in time where revenues

7    declined for the company?

8    A.  Well, we had the little blips created by various people

9    along the way.  But the real -- the real problem occurred in --

10   started occurring in the beginning of 2014, I'm going to say.

11   Again, your graphic is -- pretty much describes what happened

12   to our business at that particular point in time.

13   Q.  Do you know why, in terms of -- your revenue was declining?

14   What were you seeing on your side?

15   A.  Again, somebody had figured out a way to upset our doctors

16   again, to frighten them, to frighten them from taking allergy

17   patients, from -- frightening them from working with us.  And

18   that was a sustained effort.

19        MR. CARTER:  Your Honor, I object.  This is sheer

20   speculation.

21        THE COURT:  Well, let's try to get back to some

22   specific questions and facts.

23        MR. LOW:  Yeah.  Let me -- let me repose it.

24   BY MR. LOW:

25   Q.  And I think you said something early on.  But was there a

 1    period of time where the company experienced utilization

 2    reviews, that you can recall?

 3    A.  We had a utilization review around the BlueCross BlueShield

 4    timeframe.

 5    Q.  Right.  And did you ever have any additional --

 6            MR. CARTER:  I'm going to object to any utilization

 7    review.  They don't get -- they don't have any contracts with

 8    the insurance companies.

 9            MR. LOW:  Okay.  I'll clarify.

10            MR. CARTER:  They don't have any utilization reviews,

11    Your Honor.


13            THE COURT:  Let's start at 8:30 in the morning.

14            MR. LOW:  Okay.

15            THE COURT:  Don't talk about the case.  Don't let

16    anyone talk to you about the case.  Leave your notes here.

17    Don't twitter or tweet.  Have a nice afternoon.  I'll see you

18    at 8:30 tomorrow.

19        (Jury leaves courtroom)

20            THE COURT:  All right.  You want to tell me a little

21    more about the plans for tomorrow?

22            MR. LOW:  Yes, Your Honor.  And we still try -- intend

23    to close tomorrow.  We will finish with Mr. Hollis.  We will

24    also have a very short clip of Ms. Schroeder, Laurie Schroeder,

25    which Your Honor's already ruled on.

```
 1          THE COURT:  Okay.
 2          MR. LOW:  It's possible we play Sublett but probably
 3   unlikely given our limitation on time.  And then live -- we
 4   will have Kennedy live, Gonzalez live and House live.
 5          THE COURT:  Okay.
 6          MR. PRICHARD:  In that order?
 7          MR. LOW:  Actually, I'm not sure.  It may depend on
 8   when, for example, Dr. Gonzalez could be here.
 9          MR. PRICHARD:  That seems like more than a day to me,
10   realistically.
11          MR. LOW:  Well, that's probably why I won't play
12   Sublett.  But it probably depends on how much cross there is of
13   Mr. Hollis and whether or not it's within the scope.
14          MR. CARTER:  I will have a full cross, Your Honor,
15   unless I want to call him in my case-in-chief.
16          MR. PRICHARD:  My question -- my inquiry is -- I'm
17   trying to get ready for tomorrow.  You know, I hear you,
18   Mr. Low, about Dr. Gonzalez.  But I think you got a pretty good
19   idea of who you're going to call in what order.
20          MR. LOW:  Okay.  Well --
21          MR. PRICHARD:  I mean, I just -- so we don't have to
22   kill ourselves if somebody's not coming tomorrow --
23          MR. LOW:  Let me -- can I do this?  If we're going to
24   cut a live witness, it will be Kennedy.  So I think you can
25   safely assume Dr. Gonzalez and Dr. House are both taking the
```

1094

```
1    stand.
2            MR. PRICHARD:  So right now you're telling us that
3    Gonzalez will go before House?
4            MR. LOW:  That's my understanding.
5            MR. PRICHARD:  It's your intention to close with
6    House?
7            MR. LOW:  I need to go call her, but that's my
8    understanding.
9            MR. RAMOS:  It depends on her scheduling to a great
10   extent.
11           MS. PEREZ:  I'm sorry.  Are you saying you're not
12   calling -- you may not call Kennedy at all?
13       And the only reason I ask, Your Honor, is because we have
14   some affirmative deposition designations for him.  And we'd
15   like to play those if, in fact, they're not going to call him
16   live.  Our understanding was that they were --
17           THE COURT:  We're not getting to that tomorrow anyway.
18           MR. LOW:  Right.
19           MS. PEREZ:  Thank you, Your Honor.
20           MR. LOW:  And we'll try -- we're just trying to keep
21   with our projection for Your Honor so that --
22           MR. PRICHARD:  Just let us know.
23           MR. LOW:  Of course.  We just don't want to drag
24   this --
25           THE COURT:  I had not finally ruled on Sublett.  You
```

 1    may not call him anyway.  I did have a couple of questions on

 2    Sublett.  Was he designated as an expert?

 3              MR. LOW:  Not by us.

 4              MS. PEREZ:  He was designated as an expert by us, Your

 5    Honor.

 6              THE COURT:  I'm sorry?

 7              MS. PEREZ:  He was designated as an expert by us.

 8              THE COURT:  If you call him?

 9              MS. PEREZ:  We have some affirmative deposition

10    designation testimony for him.

11              THE COURT:  Okay.  That's what I wasn't sure in ruling

12    on some of those objections.  And then --

13              MR. LOW:  I apologize, Your Honor.  And that was that

14    issue.  It feels like it's been a month ago.  But when we were

15    arguing whether or not he was -- because he was designated

16    after his deposition, that's that whole argument.

17              THE COURT:  If they -- if they call him, that may

18    change what's designated anyway, I guess.

19              MR. LOW:  Right.  In terms of -- I think we both had

20    so many designations, I just figured --

21              THE COURT:  I know.

22              MR. LOW:  We can try and whittle down our cross

23    designations for them.  That way it's, you know, directly

24    responsive.

25              THE COURT:  Okay.  All right.  Well, I'll get to that

```
 1   later then.
 2              MR. LOW:  Okay.
 3              THE COURT:  I'm not going to try to finish ruling on
 4   Sublett then until I see what -- unless you're going to --
 5   you're not going to -- you've got enough to play of what I've
 6   already ruled on Sublett anyway.
 7              MR. LOW:  Right.  And so we won't, just to make it
 8   cleaner.
 9              THE COURT:  All right.  What else do I need to do
10   today?
11              MR. LOW:  I think that's all.
12              THE COURT:  Okay.  Then I need --
13              MR. PRICHARD:  Take your wife to dinner.
14              THE COURT:  No.  I need to talk to defendants then
15   about order.  I do appreciate what y'all filed ex parte about
16   your depositions.  I do need to talk to y'all ex parte.  And
17   after today, it won't be ex parte.  But for your order of depos
18   for me to start looking at, I need to talk to y'all.  And then
19   after they rest, I won't do it ex parte.  But for now, I'll do
20   it ex parte.
21              MR. LOW:  Thank you, Your Honor.
22              THE COURT:  Okay.
23         (At the bench off the record)
24         (Open court)
25              THE COURT:  Now, I actually had ruled on those Sublett
```

```
 1   objections that I did rule on -- the one day.  I hadn't ruled
 2   on the second day.  The one day.  I actually signed that Friday
 3   night before I left.  So I don't think it was processed until
 4   this morning.
 5       But I did not know about those Saturday withdrawals at the
 6   time of that ruling, for what that's worth.  So I don't know
 7   how that affects anything.
 8            MR. BENNETT:  We might not have withdrawn had we seen
 9   the order first.
10            MS. PEREZ:  We were trying to read the crystal ball
11   and cut down some of the work for the Court, Your Honor.
12            THE COURT:  It's too late.
13            MR. LOW:  And we would like to do the same.  For any
14   of their depo designations, we're going to try and do the same,
15   just because we understand you got -- there's way too much.
16            THE COURT:  Okay.
17            MR. LOW:  And so we'll go try and do that tonight or
18   tomorrow.
19            THE COURT:  Good.
20            MR. LOW:  And as far as what was cut, it's fine with
21   us.  I think we were cutting it anyways.
22            THE COURT:  Okay.  Good.
23            MR. LOW:  Thank you.
24            THE COURT:  I'll see y'all tomorrow.
25
```

1098

1  * * *

2      (Overnight recess)

3

4

5                          -oOo-

6      I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.  I

8  further certify that the transcript fees and format comply with

9  those prescribed by the Court and the Judicial Conference of

10  the United States.

11

12  Date:  3/12/2018        /s/ Gigi Simcox
                            United States Court Reporter
13                          655 East Cesar E. Chavez Blvd.
                            San Antonio, TX  78206
14
                            /s/ Chris Poage
15                          United States Court Reporter
                            655 East Cesar E. Chavez Blvd.
16                          San Antonio, TX  78206
                            Telephone:  (210) 244-5036
17

18

19

20

21

22

23

24

25

Chris Poage, RMR, CRR