IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.  5:14-CV-35-OLG |
| ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.; TONYA WINDERS; PHADIA US INC.; & THERMO FISHER SCIENTIFIC INC. | § § § § § § | |
| Defendants. | | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR
JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL**

In responding to Plaintiffs' JMOL motion and for new trial, Defendants do not contest that they intended to interfere with UAS's relationships with its contracting physicians or AAAPC's relationships with its members. Defendants do not contest they agreed with Phadia and allergists organizations as part of those efforts so that the market for allergy testing and immunotherapy would be restricted to board-certified allergists. Defendants do not contest these facts because Winders herself admitted them at trial. Instead, Defendants raise numerous red herrings, as they did at trial. And even though the jury could not see through that confusion, the Court itself can in considering all of the evidence of the claims. Plaintiffs respectfully ask the Court to do so here.

## ARGUMENT

**1.  Plaintiffs Were Entitled to Submit their Civil Conspiracy Claim to the Jury.**

The first issue concerns Defendants' erroneous theory that Texas law required the early dismissal of a civil conspiracy claim premised on the conduct of a settling co-defendant. When presenting that argument at trial, Defendants did not contest that Plaintiffs had presented legally sufficient evidence that Phadia interfered with numerous contracts UAS had with physicians, or that Defendants supported those efforts. Instead, Defendants erroneously asserted that by releasing a defendant such as Phadia, Plaintiffs released Defendants from the derivative tort. But the Texas Supreme Court held otherwise long ago. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex. 1971). Defendants not only fail to address this authority in their response, they appear to agree. Resp. at p. 13 ("there is no argument that an alleged conspirator can never be liable for the acts of settling defendants, nor did [AANMA] argue that its own conduct has been released.").

Defendants now make new arguments that they failed to preserve in their motion at trial. *Allied Bank-W., N.A. v. Stein,* 996 F.2d 111, 115 (5th Cir. 1993). First, Defendants argue that Plaintiffs presented no evidence that Phadia tortiously interfered with UAS's contracts. Erroneously drawing inferences in their favor as the movant, instead of in Plaintiffs' favor,

Defendants characterize Phadia's conduct as "ordinary sales activity that on a few occasions include discussing the OIG Opinion and (on even fewer occasions) Mothers' articles" and "no knowingly false information was conveyed." Resp. at 14. Defendants' mischaracterization ignores the mountain of evidence that Phadia falsely suggested to physicians known to be in contract with UAS that the OIG Opinion applied to UAS, did so to "put these guys out of business," and circulated AANMA's articles suggesting UAS was engaged in fraud.[1] Phadia, which indisputably did not maintain contracts with these physicians, admitted through its witnesses that its behavior was not appropriate or justified.[2] *See* Mot. at pp. 5-6. Winders herself also admitted on behalf of Defendants that she knew of no basis to claim UAS engaged in fraud.[3] Legally sufficient evidence supported the ability of a reasonable jury to find that Phadia intentionally interfered with UAS's contracts with physicians, leading to terminations and reduced performance under those contracts.

Second, Defendants argue that they cannot be held liable for civil conspiracy because the jury did not find they themselves interfered with UAS's contracts. But if Defendants had to do the interfering to be liable for civil conspiracy, the tort of civil conspiracy would cease to exist. Texas law only requires legally sufficient evidence that Defendants had a meeting of the minds with Phadia that one of them would commit an illegal act—in this case Phadia would interfere with UAS's contracts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex. 1979). The record is replete with evidence that Defendants "planned, assisted, or encouraged [Phadia's] acts" from which the jury could find such a meeting of the minds. *See id.* at 925-26. The evidence

---

[1] P-101; P-50; P-51; P-52; P-53; P-102; P-106; P-107; P-119; P-134; P-254; P-257; P-258; P-259; P-260; P-265; P-266; P-267; P-268; P-269; P-336.

[2] Defendants now claim Phadia's conduct was justified, an affirmative defense. To have negated the civil conspiracy claim, Defendants would need to have conclusively proven that Phadia had a legal right to interfere with UAS's contracts. *See Souter v. Scott & White Mem'l Hosp.*, 105 F.3d 656 (5th Cir. 1996). This Defendants did not do.

[3] Dkt. No. 568 at pp. 459:7-462:4.

2

includes that while at AANMA, Winders: executed the "RPA Strategy" she previously drafted at Phadia;[4] solicited $450,000 from Phadia, including for supporting AANMA's letter campaign to insurance companies;[5] coordinated with Phadia leaders about joint efforts;[6] and coordinated with Phadia sales representatives about their visits with UAS contracted physicians, to name a few.[7]

Third, Defendants argue that Plaintiffs could not prove civil conspiracy because they could not present Phadia's underlying liability to the jury. Resp. at 15. But this new procedural twist flies in the face of controlling United States and Texas Supreme Court precedent that a jury may find a defendant conspiratorially liable for the acts of a previously settled tortfeasor. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 329-30 (1971); *McMillen*, 467 S.W.2d at 196.[8] And Plaintiffs' proposed instruction on civil conspiracy would have directed the jury to consider Phadia's conduct had it not been stricken.[9] Dkt. No. 523.

Finally, Defendants argue that the jury's answer to Question 9 concerning the *Noerr-Pennington* doctrine excused any liability for civil conspiracy with Phadia if a civil conspiracy question had been posed. But Defendants never explain how the jury could excuse a civil conspiracy claim they never considered in the first place. *See Barton's Disposal Serv., Inc. v. Tiger*

---

[4] Dkt. No. 568 at pp. 342:8-342:22; P-168; P-174; P-177; P-178; P-182; P-199; P606; P-233.

[5] P-208.

[6] P-216; P-217; P-220; P-222; P-223; Dkt. No. 569 at pp. 693:10-694:11.

[7] Dkt. No. 569 at pp. 693:10-694:11; P-271. Even if the law requires Defendants' overt acts, Plaintiffs presented legally sufficient evidence including drafting articles Phadia shared with physicians and offering to draft letters to insurance companies on Phadia's behalf. P-157.

[8] Because Plaintiffs introduced legally sufficient evidence of Phadia's tortious conduct, the jury could consider that evidence for conspiracy liability of a co-defendant. *See Tap Acquisition, Inc. v. Vianet Group PLC*, No. 3:14-CV-3601-B, 2016 WL 8674576, at *6 (N.D. Tex. Oct. 14, 2016); *Boynton v. Headwaters*, Inc., 243 Fed. Appx. 610 (Fed. Cir. 2007). Had Plaintiffs theory instead turned on liability for an unnamed third party, for which no evidence was offered, the result might be different, but that is not the situation here. *See West Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920-21 (Tex. App.—Dallas 2014, pet. denied).

[9] Plaintiffs proposed a verdict form requesting the jury find against parties including Phadia, to which Defendants objected. Charge Conf. at 10:23-11:4.  That Defendants now argue Plaintiffs were required to obtain a finding against Phadia specifically is surprising and contradictory.

*Corp.*, 886 F.2d 1430, 1436 (5th Cir. 1989). Moreover, Defendants cannot prove that their support of Phadia's efforts to put UAS out of business, through covert distribution of the OIG Opinion and other discussions with physicians, was government petitioning. Construing all inferences in favor of Plaintiffs, legally sufficient evidence exists from which a jury could reasonably find that Defendants agreed and supported Phadia's tortious inteference with UAS's contracts. *See Coffel v. Stryker Corp.*, 284 F.3d 625, 630–31 (5th Cir. 2002). A new trial is therefore necessary.

**2.  Defendants Were Not Merely Petitioning the Government.**

Defendants also fail to show how their other challenged conduct supported immunity under *Noerr-Pennington*. As pointed out in Plaintiffs' motion, Defendants' liability for tortious interference and antitrust violations was premised on Defendants' actions aimed at private actors to coerce physicians out of doing business with UAS and out of the market. That behavior included sending letters to over 100 private health insurance companies directing them to perform utilization reviews of AAAPC members, sending thousands of physicians articles suggesting that Plaintiffs were engaged in substandard care and fraud,[10] and suggesting in those same articles that allergy skin testing and immunotherapy should be limited to board-certified allergists.[11] Controlling authority holds that applying *Noerr-Pennington* immunity is error if the ***challenged conduct*** concerns actions aimed at private decision-makers rather than petitioning the government. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988).

Nevertheless, Defendants characterize their private conduct as "incidental" or "inextricably intertwined" with lobbying. But Plaintiffs' claims are not centered on Defendants convincing a

---

[10] P-218; Dkt. No. 568 at pp. 464:5-464:12; 464:21-470:9; 473:12-475:14.

[11] Defendants assert their standard setting activity was limited to an internal email, but this is not true as reflected by the materials sent to hundreds of insurance companies and physicians.  *See* P-76; P-77 (stating skin testing "requires specialized training" and recommending "referral to board-certified allergist" if allergy testing or immunotherapy is required).

governmental body to rule in Defendants' favor.[12] As Winders admitted, the "key" to Defendants' plan to run Plaintiffs out of business was to target private insurance companies and to convince them to investigate physicians in contract with UAS.[13] And while Defendants also claim to have engaged in ineffective lobbying efforts, Defendants cannot use those efforts to immunize their private conduct "on the ground that they are intended to dramatize the plight of their industry and spur legislative action." *Allied Tube*, 486 U.S. at 503.

Finally, Defendants claim their efforts were just a public relations campaign of their government petitioning. But "[u]nlike the publicity campaign in *Noerr*, the activity at issue here did not take place in the open political arena," but in the secret confines of Defendants' communications with private parties. *See id.* at 506. Such activity included drafting a proposal AANMA kept "vague for legal reasons," sending such proposal to co-conspirators via FedEx with no cover letter, and sending letters to insurance companies and failing to keep a copy of responses.[14] When Defendants did speak publicly they were vague, including failing to name the actual companies they were maligning, mirroring internal discussions about not "naming names."[15]

### 3.  Plaintiffs are Entitled to Judgment as a Matter of Law or a New Trial on their Claims.

There were numerous undisputed facts at trial that Defendants not only did not contest, but admitted. Winders admitted that while at Phadia she drafted a plan with AANMA and the three trade associations of allergists, AAAAI, ACAAI, and JCAAI. Winders admitted she shared that

---

[12] *See Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1361 (5th Cir. 1983) (lawsuit and petitioning government); *Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F. Supp. 2d 538, 555 (N.D. Tex. 2007) (lobbying Congress); *Gaines v. Strayhorn*, 2007 WL 593584, at *8 (W.D. Tex. Feb. 21, 2007) (lobbying governmental agency); *Mercatus Group, LLC v. Lake Forst Hosp.*, 641 F.3d 834, 838–39 (7th Cir. 2011) (lobbying zoning board).

[13] P-175.

[14] P-190; P-199; P-200; P-205.

[15] P-205.  Defendants go to great lengths to defend their lobbying efforts, claiming they were not a sham. Considering those efforts are not the challenged conduct, that discussion is irrelevant.

plan with them. Winders admitted that after she arrived at AANMA she carried out parts of that plan including reporting fraud and abuse to certain insurance companies and sending 127 letters to prompt them to investigate AAAPC members she knew to be in contract with UAS. Winders admitted she did so because she wanted to cut off the means by which these physicians and UAS could compete with allergists, who at the time comprised the membership of AANMA. These admissions alone prove Plaintiffs' claims or at least represent the great weight of the evidence.

a.      *Plaintiffs Conclusively Proved Their Tortious Interference Claims.*

The evidence first demonstrates that AANMA and Winders intentionally interfered with AAAPC's relationships with its members, and UAS's contracts with physicians and practice groups, causing both damage. Winders admitted to sending 127 insurance companies letters in September 2013 making derogatory claims about AAAPC member physicians that she could not verify at trial and directing those insurance companies to www.aaapc.us to trigger utilization reviews.[16] The evidence establishes that certain insurance companies, such as United Healthcare and Wellmark, responded and engaged in invasive utilization reviews of physicians in late 2013 and early 2014, including Drs. Bullard and Gonzalez.[17] The undisputed evidence established that after the letters were sent, numerous AAAPC members terminated their relationships with AAAPC, reporting to Dr. Bullard concerns of insurance company scrutiny.[18] Meanwhile, UAS received similar reports from physicians who terminated their contracts or stopped testing.[19]

The response of United Healthcare alone demonstrates the effectiveness of Defendants' interference. United Healthcare's threats to recoup $50-60 million from UAS contracted

---

[16] Mot. at pp. 14-15; Tr. Trans. 743:15-747:5; Tr. Trans. 102:18-106:4.
[17] Tr. Trans. 743:15-747:5; Tr. Trans. 1205:11-1207:3.
[18] Tr. Trans. 747:7-747:10.
[19] Tr. Trans. 102:18-106:4; Tr. Trans 1113:8-1115:20.

physicians nationwide reasonably deterred performance under their agreements with UAS.[20] Dr. Bullard, for example, testified how the threat of $400,000 in recoupments from United threatened to put his multi-specialty practice out of business and created fear of engaging in allergy testing and immunotherapy.[21] This undisputed evidence establishes that AANMA and Winders's efforts through the letters alone were effective, prompting some health insurance companies to perform utilization reviews that reduced contractual performance as Winders admitted she intended.[22]

Instead of contesting this evidence, Defendants instead solicited testimony from four other insurance companies that they did not change their policies. But how other insurance companies responded does not "affirmatively disprove" causation. Nor do suggestions that other insurance companies audited certain physicians at other points in time. The only evidence demonstrates that Defendants' letters to certain carriers such as United Healthcare were effective and numerous physicians terminated their relationship with AAAPC and UAS as a result. The jury verdict on the tortious interference claims was thus contrary to the great weight of the evidence.

###### b. *Plaintiffs' Conclusively Proved Their Sherman Act Claims Under Any Standard*

The undisputed evidence also demonstrates a violation of Section 1 of the Sherman Act. Defendants never denied that their actions were in coordination and part of a prior agreement with Phadia and allergists' trade associations. Faced with documentary evidence, Winders admitted it on numerous occasions in her testimony, including executing certain aspects of a plan she developed at Phadia. Winders admitted she created the plan in coordination with allergist such as Linda Cox and James Sublett in their capacity as leaders of AAAAI, ACAAI, and JCAAI.[23]

---

[20] Tr. Trans 1113:8-1115:20.
[21] Tr. Trans. 743:15-747:5.
[22] *See* Mot. at p. 3; Tr. Trans. 1113:8-1115:20.
[23] Dkt. No. 568 at pp. 410:7-411:11; 444:10-444:21; P-164; P-168; P-170; P-171; P-177; P-230 P-231; P-606.

Winders admitted the plan included taking efforts to "convince payors" including United Healthcare, "to limit [allergy skin testing and immunotherapy] to board-certified allergists" and "reporting fraud and abuse to the aforementioned payors."[24] And Winders admitted that such actions were "the key" to removing UAS and others as a "market obstacle."[25] And the undisputed evidence shows that Defendants' actions worked.[26] As a result, UAS withdrew from hundreds of markets around the country, reducing output for allergy testing and immunotherapy.[27]

If not conclusive, at least the great weight of the evidence demonstrates (1) Defendants agreed with one or more persons, (2) to restrict trade, (3) in the relevant market. *See MM Steel, L.P., v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015). Defendants' failure to even address these elements essentially concedes the claim. *See Dowling v. Harvey*, No. CV W-05-CA-314, 2006 WL 8436123, at *2 (W.D. Tex. Mar. 30, 2006).

**4.  Alternatively, the Court Should Order a New Trial with a *Per Se* Instruction.**

Defendants instead devote a majority of their response to attacking the alternative ground of a new trial based on a *per se* jury instruction. In this case, Winders admitted that the dominant source of allergy blood testing (Phadia) and the dominant source of allergy skin testing (allergists) agreed with Defendants to eliminate their common competitor, UAS. The evidence also shows the efforts were part of a larger agreement to divide the allergy testing and immunotherapy markets. In exchange for allergists agreeing to promote allergy blood testing at the primary care level to Phadia's benefit, Phadia agreed it would not enter the immunotherapy market.[28] The United States

---

[24] P-642; P-648.

[25] P-175.

[26] P-258; P-260; Dkt. 573 at pp. 1516:10-1526:5.

[27] *Id*.

[28] This agreement was recorded in an email between Phadia and allergist Maeve O'Connor as part of eliminating UAS. P-335 (agreeing that "UAL and companies like it are a mutual threat to our

Supreme Court has held that such horizontal agreements to divide the market and persuade customers are *per se* illegal. *See, e.g.*, *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990); *MM Steel*, 806 F.3d at 850. Defendants' arguments to the contrary are also unavailing.

First, Defendants argue that Plaintiffs never pled market division—but the pled facts are clearly contained in the Fourth Amended Complaint. Dkt. No. 235 at ¶ 41.[29] This undisputed aspect of the agreement Defendants joined alone required a *per se* jury instruction that was not given. Dkt. No. 521 at pp 12-14. Second, Defendants argue that horizontal boycotts are not *per se* illegal unless plaintiffs demonstrate all three factors enunciated in *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414 (5th Cir. 2007). But the Fifth Circuit was explicit in *MM Steel* that the *Tunica* factors only apply when the plaintiff is not a competitor with at least one of the conspirators, as *Tunica* "potentially expanded *per se* liability." *MM Steel*, 806 F.3d at 850.[30]

Finally, Defendants try to claim a myriad of reasons for their admitted conduct they claim are related to "judgments about healthcare" that they claim prevents application of a *per se* standard. But 36 years ago the Supreme Court was "unpersuaded by the argument that we should not apply the per se rule in this case because the judiciary has little antitrust experience in the health care industry." *Arizona v. Maricopa Cty, Med. Soc.*, 457 U.S. 332, 349 (1982). The *per se*

---

business," and that "immunotherapy should be performed by a Specialist."). And Defendants helped carry out this agreement in their publications. P-76; P-77.

[29] "In exchange for Phadia's promotion of referrals of patients needing allergen immunotherapy to allergists, [AANMA], ACAAI and JCAAI agreed to recommend to insurance companies and physicians that primary care physicians should only use ICAPs as the exclusive form of allergy testing. The result is that primary care physicians would be restricted to using the allergy blood test on which Phadia maintains a monopoly, and would not be permitted to provide allergen immunotherapy, which would be reserved to specialists."

[30] Even if the *Tunica* factors applied, evidence of one would justify *per se* instruction although all are present: evidence showed Phadia holds a dominant position in the allergy testing market and allergists hold dominant position in immunotherapy. The evidence also showed insurance company and physician relationships are necessary for UAS to compete in the markets and Defendants were able to threaten those relationships. Finally, there was no evidence concerning "procompetitive effects" of Defendants' agreement, meaning higher output and lower costs.

rule of market division and horizontal group boycotts applies to all industries. *See id.* And even if there were some question, a *per se* instruction would still have been necessary upon the Court's own review of the evidence given the absence of procompetitive justifications.

Instead, all of Defendants' offered "strong pro-competitive effects" were simply red herrings. For example, Defendants' statement that they "demonstrated wide-spread, federally prosecuted fraud in the RPA industry" is the same tactic they attempted at trial trying to deceive the jury that a large stack of papers were supposedly filled with hundreds of cases of fraud. Defendants also elicited testimony of a former insurance company investigator that he thought Plaintiffs were engaged in fraud despite the authorities disagreeing, creating an impression Plaintiffs were still under an FBI investigation when Defendants knew they were not. Defendants also used scare tactics concerning the risk of death and smear campaigns based on an Incarnate Word "certification" that had nothing to do with the case. All of these red herrings aligned with Defendants' overall plan that they "can't sue us all" and doing so would be a "PR nightmare."

None of Defendants' "evidence" had anything to do with whether Defendants conduct was aimed at increasing output or decreasing prices, but had everything to do with an effort to prejudice the jury. And the jury seemed so prejudiced considering it deadlocked for several days and returned a verdict contrary to the great weight of the evidence. While Defendants may have been temporarily rewarded for these tactics, hopefully that reward will not prevail.  For these reasons, the Court should at least order a new trial if not entering judgment as a matter of law.

### Prayer

In consideration of the foregoing, Plaintiffs request that the Court enter judgment as a matter of law or alternatively order a new trial.

Dated:  May 31, 2018.

<div style="margin-left: 40%;">

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:   */s/ Casey Low*
   Casey Low
   Texas Bar No. 24041363
   Dillon J. Ferguson
   Texas Bar No. 06911700
   Ben Bernell
   Texas Bar No. 24059451
   Elizabeth K. Marcum
   Texas Bar No. 24078801
   401 Congress Ave., Suite 1700
   Austin, Texas 78701-4061
   Phone: (512) 580-9616
   Fax:    (512) 580-9601
   casey.low@pillsburylaw.com
   dillon.ferguson@pillsburylaw.com
   ben.bernell@pillsburylaw.com
   liz.marcum@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFFS
AAAPC & UAS**

</div>

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and the Local Rules, I hereby certify that all counsel of record who have appeared in this case were served on May 31, 2018 with a copy of the foregoing via the Court's CM/ECF electronic filing system.

<div style="margin-left: 40%;">

*/s/ Casey Low*
Casey Low

</div>

11