UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

FILED
FEB 2 1 2019
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

UNITED BIOLOGICS, LLC )
d/b/a UNITED ALLERGY )
SERVICES et al., )
)
      Plaintiffs, )
)
v. ) Civil Case No. 5:14-35
)
ALLERGY & ASTHMA NETWORK/ )
MOTHERS OF ASTHMATICS, INC et al., )
)
      Defendants. )
)

## MEMORANDUM OPINION

United Biologics, LLC, doing business as United Allergy Services (UAS) is a corporation trying to break into the allergy testing and immunotherapy market. The Academy of Allergy & Asthma in Primary Care (AAAPC) is a trade association of primary care doctors interested in providing allergy testing and immunotherapy. Together they sued the Allergy & Asthma Network (AAN, an allergist advocacy organization), and Tonya Winders (AAN's executive director), bringing various antitrust and tort claims. But a jury rejected them all.

Now UAS and AAAPC renew their motion for judgment as a matter of law, raising issues they say entitle them to judgment notwithstanding the verdict or to a new trial. Yet two claimed errors were harmless, the Court properly analyzed their Sherman Act claim under the Rule of Reason, and the jury's verdict did not contradict the great weight of the evidence. So the Court will deny UAS and AAAPC's motion.

## I. Background

"Necessity is the mother of innovation." Or so thought UAS and AAAPC. Over forty million Americans suffer from airborne allergies, making it among the most common chronic diseases in the United States. The disease causes familiar symptoms: sneezing, coughing, itching, or a runny nose. And although the symptoms can be abated with over-the-counter medications like Benadryl or Zyrtec, the underlying allergy can only be treated through immunotherapy. Immunotherapy involves an initial test to identify the targeted allergen (either an allergist-administered skin test, or a diagnostic lab–administered blood test), followed by multiple bespoke allergist-administered injections weekly for several years as the patient gradually develops an immunity. Yet for the millions who could benefit from immunotherapy, the United States has only 3600 allergists to administer it. Combined with the treatment's frequency and duration, this dearth of allergists saddles rural patients with nearly insurmountable access burdens, requiring routine long-distance travel and making it impossible for them to hold a job or pursue an education. UAS teamed up with AAAPC to remedy this problem, imbedding allergy technicians and equipment in local primary care offices to empower family physicians to identify allergens and provide immunotherapy themselves. Some even trained patients to self-administer the injections at home. The plan succeeded: over 2000 physicians participated, providing immunotherapy to tens of thousands of new patients.

"Do not go gentle into that good night." Or so responded AAN and Winders. Convinced remote immunotherapy treatment endangered patients and defrauded insurers, AAN joined forces with Phadia (an allergy-testing equipment manufacturer), other allergist associations, and individual doctors to mount a campaign devoted to law reform and to dissuading insurers from reimbursing this treatment.

UAS and AAAPC took this "turf war" into court, alleging AAN, Phadia, and their allies flouted the Sherman Act, breached the Texas Free Enterprise and Antitrust Act, and committed the common law torts of civil conspiracy and tortious interference. 4th Am. Compl. ¶¶ 2, 172–207, ECF No. 235. Phadia, the diagnostic labs, the allergist associations, and the individual doctors ultimately settled. But AAN proceeded to trial, shielding itself with the affirmative defense from *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) (the *Noerr–Pennington* defense), allowing companies to lobby for government action with anticompetitive effects. A previous judge held UAS and AAAPC's Sherman Act claim should be analyzed under the more flexible Rule of Reason, not the stricter per se standard. Order 24-25, ECF No. 426.

After a two-week trial, the Court directed a verdict for AAN on UAS and AAAPC's civil conspiracy claim, holding AAN could not be liable for conspiring with Phadia to interfere with UAS's business arrangements. 3/20/18 Tr. 35:1-3. This Court further reaffirmed that UAS and AAAPC's Sherman Act claim should be analyzed under the Rule of Reason. *Id.* 10:1-2. And the jury returned a verdict for AAN on all other issues, finding AAN neither conspired with its allies to restrain trade nor tortiously interfered with UAS or AAAPC's business relations.

UAS and AAAPC now move for judgment as a matter of law, raising four issues. First, they argue the Court wrongfully directed a verdict on their civil conspiracy claim. Second, they challenge AAN's invocation of the *Noerr–Pennington* defense. Third, they argue the Court should have analyzed their Sherman Act claim under the per se standard, not the Rule of Reason. And fourth, they claim the jury rejected their tortious interference and Sherman Act claims against the great weight of the evidence.

## II. Analysis

UAS and AAAPC identify four issues entitling them either to judgment notwithstanding the verdict or to a new trial: that the Court improperly directed a verdict against them on their civil conspiracy claim; that the *Noerr–Pennington* defense should not have protected AAN; that the Court improperly analyzed their Sherman Act claim under the Rule of Reason; and that the jury rejected their tortious interference and Sherman Act claims despite the great weight of the evidence. But the Court need not consider the first two issues' merits, since any error was harmless. And UAS and AAAPC's latest attempt to invoke the per se standard falls flat: the alleged agreement was neither a market allocation scheme nor a horizontal boycott. That dooms their request for judgment notwithstanding the verdict on their Sherman Act claim, which assumed the per se standard applied. And their request for judgment notwithstanding the verdict on their tortious interference claim fares no better. The Court will deny the motion.

### A. UAS and AAAPC cannot undo the Court's directed verdict rejecting a civil conspiracy because any error was harmless.

UAS and AAAPC cannot obtain post-trial relief because even if their civil conspiracy claim should have gone to the jury, it would necessarily have failed. The jury found AAN did not commit the underlying tortious interference with UAS's business relations. And UAS and AAAPC did not ask the jury to decide whether Phadia or any other alleged coconspirator committed the underlying tort. Thus AAN's liability for conspiracy was legally impossible. So even if the directed verdict was improper, the error was harmless. *See* Fed. R. Civ. P. 61.

Under Texas common law, a defendant's liability for civil conspiracy requires a connection to some underlying tort. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Of course, all coconspirators need not be named in the suit. *See, e.g., Goldstein v. Mortenson*, 113

4

S.W.3d 769, 779 (Tex. App. 2003). But a jury must still find at least one coconspirator committed the underlying tort. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 751 (Tex. 2009). So here, under UAS and AAAPC's theory of AAN conspiring with Phadia to tortuously interfere with UAS's business relations, the jury would need to find either that AAN committed tortious interference with Phadia's help, or that Phadia committed tortious interference with AAN's help.

But the jury rejected the former, unanimously finding AAN did not tortuously interfere with UAS's business relations. And they never considered the latter, because UAS and AAAPC's civil conspiracy claim turned on AAN's own wrongdoing. So the jury's rejection of AAN's individual tortious conduct "necessarily disposes" of this derivative claim. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001).

In short, the jury's rejection of the underlying tortious interference doomed their civil conspiracy claim. Even assuming the claim should have gone to the jury, any error was harmless.

### B. Because the jury rejected UAS and AAAPC's Sherman Act claim, any error its consideration of the *Noerr–Pennington* defense caused was harmless.

UAS and AAAPC's second claimed error—that the *Noerr–Pennington* defense should not have shielded AAN—is similarly sisyphean. UAS and AAAPC's objection elides the obvious: AAN did not need the defense. Since the jury found no antitrust conspiracy, AAN does not need to duck behind *Noerr–Pennington*.

In *Noerr* and *Pennington*, the Supreme Court held "[c]oncerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). Subsequent holdings make clear the defense's affirmative character: only if a defendant can prove it

5

restrained trade indirectly by lobbying for valid governmental action will it defeat a plaintiff's valid antitrust claim. But conversely, if a plaintiff lacks a valid antitrust claim, the defendant has nothing to defeat. So too here, where the jury rejected UAS and AAAPC's antitrust claim.

Indeed, UAS and AAAPC know the jury would have applied *Noerr–Pennington* only because it did not follow the verdict form instructions. Since the jury answered "no" to whether AAN or Winders intentionally interfered with UAS's contracts or business relations (Question 5) the verdict form instructed them "not [to] answer" the *Noerr–Pennington* question (Question 9). *See* Special Verdict Form 3, 5, ECF No. 563. To be sure, the jury still answered it—signaling the defense would have applied—but only after it already rejected the underlying conspiracy. Because the jury had already rejected the conspiracy, the *Noerr–Pennington* question's mere presence on the verdict form did not prejudice UAS or AAAPC. But it does expose their current windmill-tilting.

Because the jury rejected UAS and AAAPC's antitrust claim, whether the *Noerr–Pennington* defense applied was of no moment. So even if the jury should not have considered the defense, any error would be harmless. *See* Fed. R. Civ. P. 61.

### C. The Court properly analyzed UAS and AAAPC's Sherman Act claim under the Rule of Reason because the alleged agreement was neither a horizontal market allocation scheme nor a horizontal boycott.

UAS and AAAPC challenge this Court's conclusion, and Chief Judge Garcia's independent conclusion before it, that their Sherman Act claim should be analyzed under the Rule of Reason, deeming it a trade-restraining conspiracy that per se violates the statute. To be sure, the Sherman Act's text prohibits "[e]very contract, combination . . . , or conspiracy[] in restraint of trade." 15 U.S.C. § 1. But the Supreme Court has long construed it to prohibit only

6

unreasonable restraints of trade. *See, e.g., Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911). To determine a trade-restraining agreement's reasonableness, courts generally apply the Rule of Reason, weighing the restraint's actual effect on market power and structure. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).

But the law recognizes some agreements as always and inherently anticompetitive, invariably raising price and lacking any legitimate justification or competitive purpose. These per se Sherman Act violations include horizontal price fixing (agreements among competitors directly affecting price), horizontal bid rigging (agreements among prospective bidders on who will win a given bid), or horizontal market allocation schemes (agreements among competitors allocating specific customers, products, or territories). *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (price fixing); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (market allocation); *United States v. Rose*, 449 F.3d 627, 630 (5th Cir. 2006) (bid rigging).

The law further acknowledges a few other agreements which sometimes give rise to per se Sherman Act violations. For these agreements—including horizontal boycotts—the agreement's purpose and affect determines whether it per se violates the Act. A horizontal boycott occurs when competitors agree not to deal with another competitor or with third-parties who deal with a competitor. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). For a horizontal boycott to be a per se violation, the boycotting parties must hold a dominant position in the relevant market, the boycotting parties must control access to an element necessary for the boycotted entity to compete, and there must be no plausible pro-competitive argument. *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 414-15 (5th Cir. 2007).

UAS and AAAPC repeatedly tried to apply a per se standard to AAN's actions. They try again now, claiming AAN's concerted efforts with Phadia and individual allergists represent a horizontal market allocation scheme and a horizontal boycott.

But this rehashed argument fails for three reasons. First, the alleged conduct resembles neither a horizontal market allocation scheme nor a horizontal boycott. For one, AAN, Phadia, and individual allergists are not competitors. AAN advocates; Phadia supplies allergy testing equipment to laboratories; allergists offer allergy testing and immunotherapy services to patients. Moreover, the record does not indicate AAN, Phadia, or the individual allergists jointly refused to deal. Phadia continued providing equipment to labs servicing UAS-affiliated physicians; individual allergists neither withdrew from insurance networks nor refused to treat patients UAS-affiliated physicians referred.

Second, even assuming the agreement was a horizontal boycott, the Rule of Reason would still apply. Neither AAN, Phadia, nor the individual allergists control access to an element necessary for UAS or AAAPC to compete. To the extent UAS and AAAPC argue AAN and its allies discouraged primary care doctors from dealing with UAS by increasing the likelihood an insurance company would audit them, that argument fails from the start—AAN and its allies do not control who, when, or how an insurer audits primary care physicians.

Third, plausible pro-competitive arguments abound. At bottom, AAN and its allies joined forces to disseminate truthful information, albeit in a targeted and subjective way. But introducing truthful information into the marketplace generally aides competition. And specifically, the information here caused insurance companies to reduce how many UAS shots it covered (lowering patient cost) and UAS to increase its technician-training requirements (improving patient care).

In sum, the Court properly applied the Rule of Reason. The alleged agreement was neither a horizontal market allocation scheme nor a horizontal boycott. And even if it was a horizontal boycott, the Rule of Reason would apply since AAN and its allies do not control access to an element necessary for UAS or AAAPC to compete and since pro-competitive arguments abound.

### D. UAS and AAAPC have not shown the jury rejected their Sherman Act claim against the great weight of the evidence under the Rule of Reason.

UAS and AAAPC implicitly premise their motion for judgment notwithstanding the jury's rejection of their Sherman Act claim on applying the per se standard. Put differently, they do not claim the evidence "so strongly and overwhelmingly" establishes an unreasonable trade restraint under the Rule of Reason. *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012). Nor could they. The record shows procompetitive effects (including increasing consumer benefits and market efficiency) accompanied any UAS–market power reduction. Rejecting UAS and AAAPC's Sherman Act claim under the Rule of Reason does not contradict the evidence's great weight.

### E. UAS and AAAPC have not shown the jury rejected their tortious interference claim against the great weight of the evidence.

Similarly, UAS and AAAPC fail to show the jury rejected their tortious interference claim against the great weight of the evidence. Indeed, reviewing the trial record reveals how weak UAS and AAAPC's tortious interference case was. UAS and AAAPC could not find a single physician to testify he terminated a relationship with UAS or AAAPC due to AAN's conduct. Nor could they find a single insurer to say AAN caused a change in reimbursement policy, claims denial, or claim audits. UAS and AAAPC's theory—that AAN caused insurers to

9

conduct audits resulting in reductions to UAS's business and AAAPC's enrollment—was cobbled together from hearsay, a physician audited years before AAN's alleged conduct, and an expert witness who admitted he could not assess the actual harm to UAS or AAAPC, *see* 3/14/18 Tr. 1529:10–1531:25.

## III. Conclusion

The Court will deny UAS and AAAPC's post-trial motion for judgment as a matter of law or for a new trial. An accompanying order follows.

Date: February 21, 2019

Royce C. Lamberth
United States District Judge