UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED BIOLOGICS, L.L.C. *and* **ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **ALLERGY AND ASTHMA NETWORK/MOTHERS OF ASTHMATICS, INC.** *and* **TONYA WINDERS**, <br><br> *Defendants.* | Case No. 5:14-cv-35-RCL |

## MEMORANDUM OPINION

In January 2014, the plaintiffs sued the defendants for alleged antitrust violations, tortious interference with existing and prospective business relations, and civil conspiracy. Complaint at ¶¶ 77–97, ECF No. 1. The case eventually went to trial in 2018, and the plaintiffs lost before a jury. Jury Verdict, ECF No. 563; Judgment, ECF No. 564. Shortly after, the defendants submitted their bill of costs. Bill of Costs ("BOC"), ECF No. 565. The plaintiffs then moved for a new trial or judgment notwithstanding the verdict. Mot., ECF No. 584. The Court denied those motions, and the plaintiffs appealed. Mem. Op., ECF No. 596; Order, ECF No. 597; Not. of Appeal, ECF No. 600. The Fifth Circuit affirmed and issued the mandate on August 12, 2020. ECF No. 648. Two days later, the defendants submitted an amended bill of costs to this Court. Amended BOC, ECF No. 649. The defendants seek to tax $141,395.63 of their litigation expenses as costs. *Id.* The plaintiffs timely objected. Objection, ECF No. 653. Thus, the Court now assesses the defendants' amended "proposed bill of costs . . . for final resolution." Local Rule CV-54. Having reviewed the

parties' briefing and supporting attachments, the Court will **GRANT IN PART** and **DENY IN PART** the defendants' amended bill of costs. Specifically, it holds that the defendants may tax only $79,080.38 of their expenses as costs.

## I.    BACKGROUND

The Court takes the following facts from their succinct restatement by the Fifth Circuit on appeal. United Biologics, L.L.C., which does business as United Allergy, "offers an alternative way to obtain allergy treatment." *United Biologics, L.L.C. v. Allergy and Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204, 206 (5th Cir. 2020). Traditionally, allergy-sufferers "seek treatment from a certified allergist[,] who administers immunotherapy." *Id.* But United Allergy sought to disrupt the traditional model. It contracted "directly with primary-care physicians," rather than certified allergists, to furnish immunotherapy services. *Id.* "In exchange for a fee, United Allergy would provide technicians and assist physicians with immunotherapy equipment and supplies." *Id.* In support of that business model, "United Allergy helped form and fund" co-plaintiff Academy of Allergy & Asthma in Primary Care, "a non-profit organization of physicians that 'represent[s] the interests of . . . primary care physicians that provide allergy and asthma care to their patients.'" *Id.*

Defendant Tonya Winders, by contrast, was aligned with the traditional model of allergy treatment. She was "first the market development team leader at Phadia"—a company that sells equipment for traditional allergy tests—"and later the president and CEO" of co-defendant Mothers of Asthmatics, "a patient advocacy organization." *Id.* "While at Phadia, Winders identified United Allergy as a market obstacle to traditional allergy businesses." *Id.* So Winders began exploring how to undermine United Allergy. As Winders's co-worker explained, they hoped to "compile a broad strategy to wipe these [companies] off the face of the earth." *Id.*

"By August 2011, Winders had formulated what she called '[her] plan for leading the charge to stop this market obstacle from negatively impacting [business] further." *Id.* The plan, in essence, involved Phadia directing its sales consultants to disseminate information to physicians that portrayed the "traditional" model in a positive light relative to companies like United Allergy. Phadia's "talking points" included the ideas that "(1) patients are safer when receiving traditional allergy and asthma care, (2) board-certified allergists receive extensive training to become board certified and prepared to address potential problems, and (3) the billing practices of remote allergy providers are concerning and could implicate providers if found to be illegal." *Id.*

In November, the U.S. Department of Health and Human Services's Office of the Inspector General (OIG) lent some credence to Phadia's claims. *Id.* It "issued an advisory opinion regarding a business model similar to United Allergy's and concluded that it 'could potentially generate prohibited remuneration under the anti-kickback statute.'" *Id.* (citing U.S. Dep't of Health & Hum. Servs., Re: OIG Advisory Opinion No. 11-17, at 1 (Nov. 23, 2011)). Phadia "shared the opinion internally as something that would 'help combat . . . these companies.'" *Id.* And "[i]t also shared the opinion with a company that was negotiating with United Allergy, the Hospital Corporation of America ["HCA"]." *Id.* Later, a "Phadia employee" remarked that he might have "prevented a clinic from signing on with [United Allergy]." *Id.* "Phadia also distributed publications authored by Mothers, and on one occasion, an insurance provider Phadia had contacted told non-certified physicians to cease remote allergy treatments. Mothers also campaigned against remote allergy practice, including by distributing articles . . . under Winders's direction." *Id.* at 206–07.

Then, "[b]eginning in 2013, United Allergy's business declined[.]" *Id.* at 207. "[I]t lost insurance reimbursements and ultimately substantially diminished its business. Academy, for its part, lost many of its members." *Id.* Believing Winders, Mothers of Asthmatics, and several other

entities responsible for those losses, the plaintiffs filed suit in 2014. *Id.* They eventually settled with all defendants other than Winders and Mothers of Asthmatics, who took their defenses to trial. *Id.*

At trial, the plaintiffs proceeded to lose on every claim they brought. *Id.* The Court "entered a directed verdict on the issue of civil conspiracy. The jury then unanimously found that neither Mothers nor Winders individually committed tortious interference." *Id.* The Court rendered its judgment for the defendants on March 27, 2018. Judgment, ECF No. 564. It also denied the plaintiffs' motions for a new trial or judgment notwithstanding the verdict. Order, ECF No. 597. The plaintiffs appealed the jury verdict and the resultant judgment for the defendants, along with the Court's denials of their motions for a new trial or judgment notwithstanding the verdict, in March 2019. Not. of Appeal, Min. Entry 3/25/2019.

On appeal, the Fifth Circuit affirmed this Court's judgment. *United Biologics, L.L.C.*, 819 F. App'x at 206. Because the plaintiffs did not appeal their loss on the antitrust claims, the Circuit focused on the issues of civil conspiracy and tortious interference. Though it held this Court's entry of a directed verdict on the issue of civil conspiracy technically improper,[1] *id.* at 208, it noted that the plaintiffs' claims still failed as a matter of law. *Id.* at 209–10. Texas's civil conspiracy tort requires proof of another, "underlying tort" that formed the basis of the conspiracy. *Id.* at 209. Yet the plaintiffs presented no "evidence that could support a finding in their favor on each element of either alleged underlying tort: (a) tortious interference with existing contracts, or (b) tortious interference with prospective business relations." *Id.* at 210.

---

[1] This Court entered a directed verdict for the defendants on the civil conspiracy issue after agreeing with them that civil conspiracy was legally impossible because Phadia, which allegedly committed the underlying torts, had already settled. 3/20/18 Tr. at 35:1-3, ECF No. 590. The Fifth Circuit disagreed with that conclusion but affirmed on the alternative ground that while Texas law still allowed the plaintiffs to make a civil conspiracy claim despite Phadia's settlement, the plaintiffs had presented legally insufficient evidence of any underlying tort. *United Biologics*, 819 F. App'x at 211.

Indeed, the Circuit emphasized how weak were both theories of tortious interference. As for interference with an *existing* contract, it noted that the plaintiffs "point[ed] to no evidence that any contract was breached or that performance was impaired—only that membership and revenue declined because contracts with physicians ended in some fashion." *Id.* And "there was no evidence that their cessation was not proper according to their terms." *Id.* Any "causation evidence [was] ethereal at best." *Id.* "There was no evidence, either, that the physicians and groups were not acting within their rights when they reduced their business with United Allergy in favor of traditional providers." *Id.* "[T]he nature of United Allergy's relationship with Hospital Corporation of America," with which United Allergy was negotiating, was also "unclear." *Id.* "If they had a contract, there is no evidence that it was breached or impaired." *Id.* Ultimately, even if Phadia had played some role in United Allergy's decline, there was "no evidence that any interference was *tortious*." *Id.* As the Circuit observed, "competition alone is not tortious interference." *Id.*

The Circuit made similar observations about the plaintiffs' case on tortious interference with *prospective* business relations. It noted that the plaintiffs "have not identified what tort or illegal act Phadia or another defendant is supposed to have committed." *Id.* at 211. Even if Phadia had engaged in "sharp" practices, "the means were legitimate." *Id.* While the plaintiffs "claim[ed] that Phadia's statements about fraud and malpractice were 'unfounded,'" they "offere[ed] no evidence in support." *Id.* So the plaintiffs could not "support a claim of tortious interference with prospective business relations." *Id.* Both theories of tortious interference thus failed as a matter of law. *Id.*

Two days after the Fifth Circuit sent down its mandate, the defendants submitted their amended bill of costs to this Court. Amended BOC, ECF No. 649. Their revised version reduced some of their earlier costs requests, which the defendants hoped would "streamline[ ]" the award

process. Brief at 5 n.1, ECF No. 650. Though the Clerk of Court would ordinarily tax these costs,

the plaintiffs timely opposed the defendants' request. Objection, ECF No. 656. Thus, the Clerk

"forward[ed] the proposed bill of costs and the objection" to this Court "for final resolution." *See*

Local Rule CV-54.

Relying on the federal costs statute, 28 U.S.C. § 1920, the defendants seek to recover four

categories of costs. Amended BOC at 1, ECF No. 659. These include:

> (1) Fees for printed or electronically recorded transcripts necessarily
>     obtained for use in the case, for which the defendants seek $75,774.20;
> (2) Fees and disbursements for printing, for which they seek $9,920.88;
> (3) Fees for witnesses, for which they seek $1,039.12; and
> (4) Fees for exemplification and the costs of making copies of any materials
>     where the copies are necessarily obtained for use in the case, for which
>     they seek $54,661.43.

Those four categories of costs may be broken down further into the defendants' constituent

requests:

> (1) The $75,774.20 for "printed or electronic transcripts" includes:
>     a. Stenographic transcripts and videos of about thirty depositions
>        ($66,583.04); and
>     b. Trial transcripts used during and shortly after trial ($9,191.16)
> (2) The $9,920.88 for "printing" includes:
>     a. Expenses associated with five exhibit binders that the defendants
>        provided to the Court, the court reporter, the witness stand,
>        opposing counsel, and the defense table ($3,753.52), along with
>        other necessary copying and printing expenses ($6,167.36)
> (3) The $1,039.12 for "witnesses" includes:
>     a. Witness James Guy's witness fee, air fares, taxi fares, meals, and
>        parking fees ($1,039.12)
> (4) The $54,661.43 for "exemplification and the costs of making copies"
>     includes:
>     a. Fees charged by the defendants' trial technology consultant
>        ($20,670.00);
>     b. Expenses associated with trial graphics, like witness headshots
>        and demonstratives ($33,853.75); and
>     c. Costs incurred for creating TIFF conversions during discovery
>        ($137.68)

Brief at 9, 11, 12, ECF No. 650; Amended BOC at 2, ECF No. 649.

So in total, the defendants seek to tax $141,395.63 of their expenses as costs. Amended BOC at 1, ECF No. 649. The defendants argue that these costs were necessarily incurred to defend against the plaintiffs' claims and that case law supports awarding their full request. *See generally* Brief, ECF No. 650.

In response, the plaintiffs advance two distinct sets of arguments. One set comprises reasons that the plaintiffs say preclude the award of *any* costs to the defendants. Objection at 5–8, ECF No. 656. They argue, first, that they brought the suit in good faith; second, that the case presented "close and complex legal issues"; and third, that awarding costs would "chill future antitrust actions." *Id.* The other set comprises reasons—should the Court award costs to the defendants—that it should pare down the defendants' initial request. *Id.* at 8–18. Certain costs, the plaintiffs allege, are not allowed as a matter of law under the relevant statutes. *See, e.g., id.* at 14. And other costs, they say, even if theoretically permissible, were duplicative or unnecessarily incurred. *See, e.g., id.* at 10. The Court addresses these issues below, but first it will set out the legal standards governing its analysis.

## II.    LEGAL STANDARD

Both federal statutes and the Federal Rules of Civil Procedure (FRCP) directly address the parties' present costs dispute. FRCP 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." This provision represents "a strong presumption that the prevailing party will be awarded costs." *Pacheco v. Mineta*, 448 F.3d 783, 793 (5th Cir. 2006). And 28 U.S.C. § 1920, the costs statute, "embodies Congress['s] considered choice as to the kinds of expenses that a federal court may tax as costs against the losing party." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482

U.S. 437, 440 (1987). Section 1920 explains that a "judge or clerk of any court of the United States may tax as costs" the following:

    (1)  Fees of the clerk and marshal;

    (2)  Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

    (3)  Fees and disbursements for printing and witnesses;

    (4)  Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

    (5)  Docket fees under section 1923 of this title;

    (6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Regarding witness fees under § 1920, another federal statute, 28 U.S.C. § 1821, specifies how federal courts may tax costs for witnesses. "[A] witness in attendance at any court of the United States," § 1821(a)(1) says, "shall be paid the fees and allowances provided by this section." Those allowances include "an attendance fee of $40 per day for each day's attendance," *id.* at § 1821(b), travel expenses including parking and taxis, *id.* at § 1821(c)(3), and a "subsistence allowance . . . when an overnight stay is required at the place of attendance" because of its distance from the witness's residence. *Id.* at § 1821(d)(1). The Supreme Court has construed § 1821's mention of a "$40 per day" remuneration to constitute a hard cap for parties' expert witness fees,[2] at least "when not overridden by contract or explicit statutory authority."[3] *Crawford Fitting Co.*, 482 U.S. at 444; *see also Kansas v. Colorado*, 556 U.S. 98, 102 (2009) ("[D]istrict courts must adhere to the witness attendance fee limitations set forth in § 1821(b)[.]").

---

[2] Compensation for court-appointed witnesses, by contrast, is governed by 28 U.S.C. § 1920(6). *See* 28 U.S.C. § 1920(6).

[3] Federal courts may exceed this $40-per-day cap when the witness is court-appointed, rather than a party witness. *See Crawford Fitting Co.*, 482 U.S. at 442 ("There is no provision that sets a limit on the compensation for a court-appointed expert witness in the way that § 1821(b) sets a limit for litigants' witnesses.").

## III.   DISCUSSION

With those principles in mind, the Court now addresses the plaintiffs' various arguments against the defendants' amended bill of costs. Again, the plaintiffs present three arguments why the Court should decline to award the defendants costs altogether: that the suit (1) was brought in good faith, (2) presented "close and complex legal issues," and (3) that awarding costs "would chill future antitrust actions." Objection at 5–7, ECF No. 656. The plaintiffs then say that even if the Court awards the defendants *some* costs, the defendants' costs are too high. *Id.* at 8. Certain requests are supposedly duplicative and unnecessary, while others are not permissible "costs" under the relevant statutes. *Id.* at 8–18. The Court addresses these arguments in turn.

### 1.   *The Plaintiffs' Good Faith Is Not a Persuasive Reason to Deny the Defendants Costs*

The plaintiffs argue that the Court should decline to award the defendants costs because the "[p]laintiffs prosecuted this action in good faith" and "had no improper motive." *Id.* at 5. But as the Fifth Circuit has long recognized, "the losing party's good faith is alone insufficient to justify the denial of costs to the prevailing party." *Pacheco*, 448 F.3d at 795. Both cases the plaintiffs invoke regarding their "good faith" argument endorse this proposition and cite *Pacheco*. *Basler v. Barron*, for instance, notes that "bringing a case in good faith, alone, is not sufficient for the court to deny costs to the prevailing party." No. H-15-2254, 2017 WL 3394603, at *3 (S.D. Tex. Aug. 8, 2017) (citing *Pacheco*, 448 F.3d at 794)). And *Frischertz v. SmithKline Beecham Corp.*, too, remarks that "good faith alone does not overcome the presumption in favor of awarding the prevailing party costs[.]" No. 10-2125, 2013 WL 3894021, at *2 (E.D. La. July 26, 2013) (citing *Pacheco*, 448 F.3d at 794–95)). Rather, as both of these district-court cases recognize, and *Pacheco* itself holds, a showing of good faith is an essential *pre-condition* to the denial of costs. *Pacheco*, 448 F.3d at 794–95. But good faith alone cannot serve as an independently sufficient basis for that

denial. *Id.* Indeed, Rule 11 already obliges "all federal litigants . . . to bring suit in good faith." *Id.* at 795 (citing Rule 11). So if all that were required to rebut Rule 54(d)(1)'s "strong presumption" in favor of awarding costs was good faith, then "Rule 54(d)(1) would have little substance remaining." *Id.* at 793, 795.

That is why the Fifth Circuit requires the litigant opposing costs to show both good faith *and* an additional factor undercutting the costs award. *Id.* at 794–95; *see also Wade v. Peterson*, 419 F. App'x 354, 356 (5th Cir. 2011) ("[C]ourts may, but are nor required to[,] excuse a losing party from paying costs only if he brought suit in good faith *and* can demonstrate at least one of five factors set forth in *Pacheco*[.]"). As *Pacheco* recognized, following the Wright & Miller treatise, such additional factors might include:

      (1) The losing party's limited financial resources
      (2) Misconduct by the prevailing party
      (3) Close and difficult legal issues presented
      (4) Substantial benefit conferred to the public, and
      (5) The prevailing party's enormous financial resources.

*Pacheco*, 448 F.3d at 794 (citing 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2668 (1998)).

The plaintiffs advance no arguments about factors (1), (2), or (5). Rather, they focus on factors (3) and (4). Specifically, they assert that the case presented "close and complex legal issues" and that awarding costs would deter future, potentially socially beneficial antitrust actions. Objection at 6–8, ECF No. 656. The Court accepts for the sake of argument that the plaintiffs sued in good faith. But the Court now explains why, even so, the plaintiffs have not established the additional factors required to defeat the defendants' costs award altogether.

2.  *Though This Was a Complex Case, It Was Not a Close One*

Seeking to establish additional factors to defeat the costs award, the plaintiffs first argue that "[t]his case involved close and complex legal issues." *Id.* at 6. It "centered on a multi-faceted conspiracy and a factually complex mix of antitrust, conspiracy, and business tort claims," and it "required a large number of witnesses and produced hundreds of exhibits." *Id.* The defendants agree that the case was complex, but they dispute that it was close. Brief at 8, ECF No. 650. In their view, "the record showed unequivocally that Defendants' only 'crime' was speaking out against Plaintiffs' unsafe business practices, and that Plaintiffs *never* could prove that Defendants caused any of Plaintiffs' (self-inflicted) losses." *Id.* Thus, they say, "this case wasn't close." *Id.*

The Court agrees with the defendants. Having presided over the 2018 trial, the undersigned personally witnessed the defendants win the case hands-down. As the Fifth Circuit recognized on appeal, the plaintiffs' case was characterized not by its copious proof, but by its gaping holes. Again, the Circuit held that the plaintiffs presented "*no evidence* that could support a finding in their favor on each element of either alleged underlying tort[.]" *United Biologics, L.L.C.*, 819 F. App'x at 210 (emphasis added). The plaintiffs had "*no evidence* that any contract was breached or that performance was impaired—only that membership and revenue declined because contracts with physicians ended in some fashion." *Id.* (emphasis added). They had "*no evidence* that [the contracts'] cessation was not proper according to their terms"; the "causation evidence [was] ethereal at best." *Id.* (emphasis added). And they had "*no evidence* . . . that the physicians and groups were not acting within their rights when they reduced their business with United Allergy[.]" *Id.* (emphasis added). As for the supposed contract with HCA, even "[i]f they had a contract, there [was] *no evidence* that it was breached or impaired." *Id.* (emphasis added). Thus, there was "*no evidence* that any interference was tortious." *Id.* (emphasis added). The plaintiffs also did "not

11

identif[y] what tort or illegal act Phadia or another defendant [wa]s supposed to have committed." *Id.* at 211. The plaintiffs' claims about Phadia were "unfounded," and they had "*no evidence* in support." *Id.* (emphasis added). So after having watched the trial and then read an appellate opinion like that, the undersigned is now asked to conclude that, all along, the result was supposedly tottering on a knife's edge. But that was simply not the reality.

The plaintiffs respond by invoking a Sixth Circuit opinion from 1986, which said that "[t]he closeness of a case is judged not by whether one party clearly prevails over another, but by the refinement of perception required to recognize, sift through[,] and organize relevant evidence, and by the difficulty of discerning the law of the case." *Id.* (citing *White & White Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 732–33 (6th Cir. 1986)). That out-of-circuit musing, frankly, harks back "to the mystical aphorisms of the fortune cookie." *See Obergefell v. Hodges*, 576 U.S. 644, 719 n.22 (2015) (Scalia, J., dissenting). One party's thorough and decisive victory over the other is patently some of the *best* evidence that the case was not, in fact, close. Other concerns might be relevant, but to say that an overwhelming victory has no bearing on the closeness of a case is divorced from common sense. If one football team beats another by fifty points, was the game "close"? Anyway, even were the Court obliged to heed that nugget from the Sixth Circuit, it makes no difference here. The Court has once again refined, perceived, sifted, and discerned the plaintiffs' evidence (or lack thereof) and concludes once again that the plaintiffs did *not* present a "close" case realistically susceptible to a verdict in their favor. The Fifth Circuit presumably agrees, given its frigid reception of the plaintiffs' appellate arguments.

3. *The Plaintiffs' Claim That Awarding the Defendants Costs Would "Chill Future Antitrust Actions" Is Not a Persuasive Reason to Deny the Defendants' Costs*

The other factor the plaintiffs invoke, seeking to bolster their "good faith" argument, is that awarding costs to the defendants "would chill future antitrust actions." Objection at 7–8, ECF No. 656. "Future antitrust plaintiffs," they fear, "would be dissuaded from bringing complex and expensive antitrust actions based on the risk that they would also have to pay substantial litigation costs to prevailing defendants." *Id.* Thus, because of this "chilling effect," we all might miss out on the potential benefits of future antitrust actions. *Id.*

But the plaintiffs have failed to show why this suit, or suits like it, pose any utility to society. This suit was, if anything, a net negative. Sure, the antitrust system is intended to enhance consumer welfare and efficiency by promoting competition. *See* Richard A. Posner & Frank H. Easterbrook, *Antitrust: Cases, Economic Notes, and Other Materials* 154 (2d ed. 1981). And the Sherman and Clayton Acts' private rights of action and treble damages "increase the likelihood that a violator will be found out." Phillip Areeda, et al., *Antitrust Analysis* 58 (6th ed. 2004). But private enforcement of the antitrust laws can also engender several problems. Vis-à-vis public enforcement, private enforcement is more likely "to concern itself with local, episodic, or less-than-flagrant violations." *Id.* So the marginal cost of additional enforcement can sometimes exceed its marginal benefit. Weak antitrust cases force courts "to make increasingly speculative determinations about the amount and source of remote injuries." *Id.* at 60. Seeking exorbitant damages, plaintiffs "whose interests are not at the core of antitrust concerns" may seek "to punish [ ] defendant[s] whose transgression was minor or undertaken in good faith." *Id.* All the while, such suits incur the burden "of a lengthy trial on elusive issues." *Id.*

The plaintiffs' action here bore several of these unwelcome features. The plaintiffs advanced a weak, more-or-less unevidenced antitrust claim that the jury rejected. *See* Jury Verdict at 3, ECF No. 563. And even *had* the plaintiffs satisfied their basic evidentiary burden, the jury still would have found the action barred by the First Amendment. *See id.* at 5 (finding the plaintiffs' antitrust claim barred by the *Noerr-Pennington* doctrine). So critical pieces of the unfair-competition puzzle were absent from the case and possibly never existed. Perhaps the strongest evidence that the plaintiffs' antitrust theory was meritless was that after losing on it in this Court, the plaintiffs simply abandoned the issue on appeal.[4] Given the plaintiffs' quiet desertion of their antitrust theory, it seems improbable that they really believed it was even legally coherent, much less a potential boon to society. Indeed, as the defendants point out, the plaintiffs' weak, questionable antitrust claim is of precisely the sort we should *want* to deter. Brief at 8–9, ECF No. 650. So the plaintiffs' claim about a potential "chilling effect" on future antitrust actions is not a persuasive reason to deny the defendants' costs here, either.

In closing, the Court notes that someone who read the plaintiffs' opposition with no further context might think that federal courts regularly face agonizing decisions about whether to allow a prevailing party its costs. That's not the case. Rule 54(d)(1) plainly says that costs "should be allowed to the prevailing party." That language, the Fifth Circuit has made clear, establishes "a strong presumption that the prevailing party will be awarded costs"—a presumption displaced only if narrow circumstances happen to apply. *Pacheco*, 488 F.3d at 783. As a result, costs are rarely denied to prevailing parties. *See Baez v. U.S. Dep't of Justice*, 684 F.2d 999, 1004 (D.C. Cir. 1982). So having made clear that the defendants *are* entitled to costs, the Court now turns to the award's precise amount.

---

[4] *See* Brief of Appellees at 7, Case No. 19-50257, Doc. 00515211726, *United Biologics, L.L.C. v. Allergy and Asthma Network/Mothers of Asthmatics, Inc.* (5th Cir. Nov. 22, 2019).

4.   *The Defendants Are Entitled to Some, But Not All, of Their Requested Costs*

Having concluded that the defendants *are* entitled to their costs, the Court now considers the extent of the costs that it will award them. In so doing, the Court individually analyzes the seven constituent requests that make up the amended bill of costs: (1) fees for stenographic transcripts and videos of depositions; (2) fees for trial transcripts; (3) fees for the five exhibit binders and other copying and printing expenses; (5) James Guy's witness expenses; (6) fees for the trial-technology consultant; (7) fees for trial graphics (both witness headshots and demonstratives); and (8) fees for TIFF conversions. *See* Brief at 9–16, ECF No. 650; Amended BOC, ECF No. 649. The Court reviews each of those requests in turn.

*4.A The Defendants Are Entitled to Their Full Request ($66,583.04)*
*For Stenographic Transcripts and Videos of Depositions*

The Court will award the defendants their full request—$66,583.04—for stenographic transcripts and videos of depositions taken in preparation for the case. *Id.* Section 1920(2) authorizes the Court to award "fees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). As the Fifth Circuit has recognized, that language includes both written transcripts and videos of depositions. *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 807 F.3d 125, 130–31 (5th Cir. 2015). So the only remaining questions are, first, whether the transcripts were "necessarily obtained for use in the case" and, second, even if transcripts were necessary, whether obtaining both written transcripts *and* videos of the depositions was necessary.

Turning to the first question, the Court finds that the relevant transcripts were "necessarily obtained for use in the case." § 1920(2). As the Fifth Circuit has explained, transcripts "need not be introduced into evidence at trial in order to be 'necessarily obtained for use in the case' under

§ 1920; rather, the cost of a deposition or copy that is *reasonably expected* to be used for trial or trial preparation may be taxable." *GSDMIdea, L.L.C.*, 807 F.3d at 130 (citing *Fogelman v. ARAMCO*, 920 F.2d 278, 285–86 (5th Cir. 1991)) (internal quotation marks omitted) (emphasis added). The defendants' video depositions fit that description. As the defendants point out, "[m]ore than half of the 29 witnesses the parties called at trial appeared by video." Brief at 9, ECF No. 650. And even for the witnesses who testified live, the defendants could have *reasonably expected* to use their video depositions, "either to impeach th[o]se witnesses while they were on the stand or because they were outside subpoena range[.]" *Id.* at 9–10. Even where witnesses did not testify at trial, it was still "reasonably likely," *ex ante*, that they would "be called at trial." *Id.* at 10. For instance, though the plaintiffs did not call their chief medical officer, Dr. Frederick Schaffer, at trial, the defendants could have reasonably expected his testimony, and thus "were prepared to impeach him at trial with his video had he been called." *Id.* The plaintiffs also initially anticipated calling, but decided not to call at trial, several other witnesses. *Id.* So it was reasonable for the defendants to think that they would need the depositions for potential impeachment. Under Fifth Circuit precedent, expenses associated with those depositions may thus be taxed as costs.

That leaves the second question—whether it was also necessary for the defendants to obtain both written transcripts *and* videos of the relevant depositions. The plaintiffs strenuously object to the supposed double recovery, and their brief makes it seem as if a costs award for both written transcripts and videos of depositions is almost never allowed. Objection at 10–12, ECF No. 656. Really, authority varies widely on the propriety of recovery for both written transcripts and videos, and the Fifth Circuit has, so far, declined to resolve the issue. *See GSDMIdea City, L.L.C.*, 807 F.3d at 131. But as Judge Yeakel has noted, the phrase "'printed or electronically recorded transcripts' does not mean that costs may be taxed for only one of the two recited types of

transcripts." *Ushijima v. Samsung Elec. Co.*, No. A-12-CV-318-LY, 2015 WL 11251558, at *4 (W.D. Tex. July 30, 2015). To the contrary, it "permits costs to be taxed for both printed and electronically recorded transcripts so long as they are necessarily obtained for use in the case." *Id.* Following that logic, courts have allowed recovery for "deposition costs for a written transcript and video recording when considered appropriate trial preparation under the unique circumstances of the particular case." *Edwards v. 4JLJ, LLC*, No. 2:15-CV-299, 2019 WL 2344752, at *3 (S.D. Tex. June 3, 2019).

One factor that courts have found persuasive in permitting recovery for both written transcripts and videos of depositions is the case's complexity. Judge Yeakel permitted such an award where the case "involve[d] complex technical issues." *Ushijima*, 2015 WL 11251558, at *4. Judge Lake in the Southern District has done likewise where the "litigation [was] complex," and he noted that written and video records are not "wholly duplicative." *Baisden v. I'm Ready Prod., Inc.*, 793 F. Supp. 2d 970, 977 (S.D. Tex. 2011). While both capture verbal communication, videos also capture nonverbal communication. *Id.* at 977. Federal courts outside Texas, too, have awarded costs for both when the underlying case was complex. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, No. 4:06-cv-01654 SWW, 2010 WL 3655737, at *2 (E.D. Ark. 2010); *Merck Sharp & Dohme Pharm., SRL v. Teva Pharm. USA, Inc.*, No. 07-1596 (GEB), 2010 WL 1381413, at *4 (D.N.J. 2010).

This Court finds the "complexity" rationale persuasive. Because of the plaintiffs' convoluted claims, the defendants reasonably needed both written transcripts and videos to prepare their defense. The plaintiffs' own arguments support this conclusion. In their attempt to avoid paying costs altogether, the plaintiffs continually emphasize that this was a "complex" case. *See* Objection at 2, ECF No. 656 ("Plaintiffs' claims were complex[.]"); *id.* at 4 ("[T]he case involved

complex issues requiring protracted litigation which [sic] lasted over four years and culminated in a two and a half [sic] week trial generating hundreds of exhibits[.]"); *id.* at 6 ("Plaintiffs' case centered on a multi-faceted conspiracy and a factually complex mix of antitrust, conspiracy, and business tort claims."). The case cannot be so twistingly complex that the defendants deserve no costs and yet so blindingly simple that the defendants deserve no remuneration for the depositions. It's either complex or it's not. Here, the plaintiffs themselves admitted (indeed, hammered) how complex the case was. That's sufficient to permit the defendants an award for both the written transcripts and the videos of the depositions.

### 4.B The Defendants Are Entitled to Their Full Request ($9,191.16) For Daily Trial Transcripts

Next, the plaintiffs object to the defendants' requested reimbursement for the daily trial transcripts the defendants ordered. The crux of their argument is that these transcripts were not "necessary," i.e., "necessarily obtained for use in the case," under § 1920. Objection at 10, ECF No. 656. As the Fifth Circuit has explained, "[t]o award the cost of daily transcripts, the court must find that they were not 'obtained primarily for the convenience' of the parties but were 'necessarily obtained for use in th[e] case.'" *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.* ("*SGK*"), 713 F.2d 128, 133 (5th Cir. 1983). In deciding whether daily transcripts were reasonably necessary, courts consider the complexity of the issues and the length of the proceeding, whether the transcript would minimize disagreement over the testimony of the witnesses, whether portions of the transcript were actually used later in the proceeding, and whether proposed findings of fact were required. *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2677 (4th ed. 2014).

On balance, these factors support concluding that the defendants' daily trial transcripts were reasonably necessary. Everyone agrees—plaintiffs most of all—that this case presented

complex issues. *See, e.g.*, Objection at 6, ECF No. 656 ("[T]his case presented difficult and complex legal issues."). The trial lasted over two weeks and involved dozens of witnesses. It would be unreasonable to expect defense counsel to commit all the important aspects of this testimony to memory or to capture all its important aspects through handwritten notes. And the defendants actually used portions of these daily trial transcripts later in the proceeding. In their closing arguments, for instance, the defendants quoted trial testimony in their demonstratives. *See* Slides, ECF 650-1. The defendants also cited these transcripts several times to defeat the plaintiffs' motions for a new trial or judgment notwithstanding the verdict. *See generally* Response, ECF No. 591. Thus, the Court finds that these daily trial transcripts were not simply for the defendants' convenience but were necessarily obtained for trial.

### 4.C The Defendants Are Entitled to Only $2,639.52 For the Five Court-Required Binders of Defense Trial Exhibits and Other Printing and Copying Expenses

The defendants also seek to tax $9,920.88 of expenses they incurred while making copies of various documents before, during, and after the trial. Brief at 11, ECF No. 650. Of that $9,920.88-sum, $3,753.52, as the defendants explain, "resulted from (1) the cost of creating the five court-required binders of Defendants' trial exhibits (26,845 pages x $.08/page), which Defendants provided to the Court, the court reporter, the witness stand, opposing counsel, and Defendants' table; (2) the cost of producing one set of Plaintiffs' exhibits (6,149 x $.08/page) for use in the courtroom; and (3) the approximate cost of the binders and tab pages associated with each set of copies ($1,114)." *Id.* at 12. Another $6,167.36 of these expenses stemmed from "copies and color copies of documents needed for depositions, dispositive motions, and trial presentations." *Id.*

19

The plaintiffs object that the defendants cannot collect for mere "office supplies" like tabs and binders and that the defendants' documentation is not granular enough to discern whether the copy costs were really necessary. Objection at 14, ECF No. 656. On the "office supplies" point, the Court agrees. The Fifth Circuit has held that "incidental costs like shipping, binding, and tabbing are generally not taxable, as these costs are not listed in § 1920." *GSDMIdea City, L.L.C.*, 807 F.3d at 133. Because "these types of costs are nowhere enumerated in the statute," "the award of costs must be modified to delete" any award for "tabbing, binding, and other such costs." *Id.* The defendants' request for $1,114 in binders and tab pages will thus be denied.

As for the remaining $8,806.88 in copy costs, the defendants have only reasonably explained $2,639.52—what they incurred making copies for the five court-required binders and copying the plaintiffs' exhibits. Brief at 12, ECF No. 650. As for the other $6,167.36 in copy costs, the defendants conclusorily assert that these were incurred for "similar needs, such as copies and color copies of documents needed for depositions, dispositive motions, and trial presentations." *Id.* The defendants justify that sparse accounting with a line from the Fifth Circuit's *United Teacher* opinion that a party need not "precisely itemize its photocopying costs" so long as it submits an "appropriate declaration under penalty of perjury that the costs were correct and 'necessarily incurred in this action.'" *United Teacher Assoc. Inc. v Union Lab. Life Ins. Co.*, 414 F.3d 558, 574 (5th Cir. 2005).

The defendants read too much into *United Teacher*. While the Fifth Circuit may not demand "precise itemization," it does "require some demonstration that reproduction costs necessarily result[ed] from that litigation." *Oldham v. Thompson/Center Arms Co., Inc.*, No. 4:12-cv-2432, 2014 WL 1794861, at *3 (S.D. Tex. May 5, 2014) (citing *Fogelman*, 920 F.2d at 286); *see also Fogelman*, 920 F.2d at 286 ("[W]e do require some demonstration that reproduction costs

necessarily result from that litigation."). As Judge Ellison has explained, "while it is true that a party seeking to recover photocopying costs need not itemize, or describe with absolute specificity[,] each and every page copied, it is also true that the Fifth Circuit requires more than a simple blanket assertion of photocopying costs, which was the court's conclusion in *Fogelman*." *Oldham*, 2014 WL 1794861, at *3. Thus, "[t]he Court will not allow [ ] unexplained costs." *Id.* Though it finds the defendants' $2,639.52 in expenses for exhibit copies and copies *within* the binders necessarily incurred, the Court has no basis to make the same finding about the other $6,167.36 of purported copy costs. So, of their claimed "$9,920.88 for costs associated with copies and printing," Brief at 11, ECF No. 650, the defendants may collect only $2,639.52.

### 4.D The Defendants Are Entitled to Only $528.98 for James Guy's Witness Fees

The defendants also request an award for fees associated with witness James Guy; the request includes "[w]itness fees for James L. Guy to attend and testify in trial" ($538.46), air fare ($449.96), taxi fees ($62.02), meals ($11.68), and parking fees ($17), for a total request of $1,039.12. Cost Detail at 10, ECF 649-1. Confusingly, the defendants' same request also reflects that they have already received a $40 credit for Guy's "witness fees . . . to attend and testify in trial" and that his "witness fee [has] already been paid." *Id.* So the defendants' own request reveals that they have already been compensated the maximum amount the statute entitles them to recover for Guy's witness fee.

Indeed, 28 U.S.C. § 1821 specifies that "[a] witness shall be paid an attendance of $40 per day for each day's attendance," and the Supreme Court has construed this figure as a hard cap on parties' witness fees. *See Kansas v. Colorado*, 556 U.S. at 102. Section 1821, in other words, reflects "Congress['s] decision not to permit a prevailing party in the lower courts to recover its *actual* witness fee expenses[.]" (emphasis added). *Id.* Rather, "the recovery of witness fees under

§ 1920 is strictly limited by § 1821, which authorizes travel reimbursement and a $40 per diem." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 298 (2006). So because the defendants apparently have already received the statutorily set $40 remuneration, they are not entitled to another $538.46 for Guy's actual witness fee. The defendants also have not shown that Guy had to stay in San Antonio overnight, a prerequisite for awarding a "subsistence allowance for meals." § 1821(d)(1). (There is, for instance, no corresponding fee for hotel lodging, and the defendants' brief neglects to explain why Guy is entitled to meal expenses.) That leaves the fees for Guy's air fare ($449.96), taxis ($62.02), and parking ($17.00). Section 1821 explicitly allows recovery for "travel[ ] by common carrier," "taxicab fares," and "parking fees." The defendants are entitled to those sums, for a total award of $528.98.

### 4.E The Defendants Are Not Entitled To Recover Costs Incurred By Their Trial Technology Consultant

The defendants assert that they are entitled to "costs incurred for Defendants' audio/visual technician," at least for the "time [the technician] spent in trial." Brief at 12, ECF No. 650. They contend that the Court may award such A/V consulting fees under 28 U.S.C. § 1920(4), which permits taxing as costs "fees for exemplification[.]" *Id.*; *see also* § 1920(4). And the defendants note that other district courts have construed analogous consulting expenses as "exemplification" costs. Brief at 12, ECF No. 650. The plaintiffs respond that A/V consultant expenses "do not qualify as exemplification costs" under Fifth Circuit precedent. Objection at 14, ECF No. 656. They invoke the Fifth Circuit's decision in *Coats v. Penrod Drilling Corp.*, which held that fees incurred for a "video technician . . . are not included in § 1920 and therefore are not recoverable." *Id.* (citing 5 F.3d 877, 891 (5th Cir. 1993)).

The Court agrees with the plaintiffs.[5] Despite courts' occasional contortion of § 1920(4), no plausible reading of its provision for "fees for exemplification" permits recovery for expenses resulting from the time an A/V technician spends in trial. True, some courts have read the word "exemplification" extremely broadly "to include a wide variety of exhibits and demonstrative aids." *See, e.g.*, *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000). The Seventh Circuit, for example, endorsed that connotation not only by looking to a dictionary published long after § 1920's enactment, but also by selecting an incorrect definition relating to "illustration by example."[6] *Id.* (citing a 1993 dictionary). *Contra Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("As usual, our job is to interpret words consistent with their ordinary meaning at the time Congress enacted the statute.") (cleaned up). This reading transforms § 1920(4) from a tool to recover "relatively minor, incidental expenses" into a roving warrant to recover potentially millions of dollars expended on graphics and demonstratives. *Taniguchi v. Kan Pac. Saipan Ltd.*, 566 U.S. 560, 573 (2012). But this construction violates a basic tenet of the ordinary-meaning principle: that text must be read *in context*. *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 415 (2005) ("Statutory language has meaning only in context[.]"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012). And doing so refutes these courts' all-encompassing gloss on § 1920(4).

---

[5] The specific holding of *Coats*—that § 1920 does not permit taxation of video-technician expenses—was later overruled by statute in 2008. That year, Congress modified § 1920(2) to include awards for "electronically recorded transcripts," a phrase commonly understood to include video depositions. *See* 122 Stat. 4292; Pub. Law 110–406 (Oct. 13, 2008); *GSDMIdea City, L.L.C.*, 807 F.3d at 131. But *Coats* still represents a previous Fifth Circuit holding that video-technician expenses are not "exemplification" costs. When *Coats* was decided (and, indeed, since its enactment in 1948), § 1920 has allowed recovery for "exemplification" costs. So by holding that video-technicians were not included in the then-extant version of § 1920, the Fifth Circuit necessarily held that video-technician fees do not count as "exemplification" costs.

[6] Professor Garner has pointed out that those who deploy the term "exemplification" to mean "illustration" (as in a trial demonstrative) apparently think it "a highfalutin synonym of *example*." Bryan A. Garner, A DICTIONARY OF MODERN AMERICAN USAGE 273 (1998). But he, too, notes that the term means, "(in law)[,] an attested copy of a document with an official seal." *Id.*

Indeed, in the litigation context, the meaning of an "exemplification" has always been clear and specific: it refers to the official reproduction of a public record for use as evidence. As an evidence treatise popular around § 1920's enactment explained, litigants wishing to prove the contents of a public record could do so either by "production of the [original] records, without more, or by a copy." 1 SIMON GREENLEAF, A TREATISE ON THE LAW OF EVIDENCE § 501 (16th ed. 1899). If the litigant elected to proceed via copy, permissible types included "(1) exemplifications; (2) copies made by an authorized officer [so-called "office copies"]; [and] (3) sworn copies." *Id.* Exemplifications were said to be the most trustworthy, since they would issue only under the seals of the court that had produced the record or of the relevant state's secretary of state. *Id.*; *id.* at § 503 ("[C]opies of records and judicial proceedings, under seal, are deemed of higher credit than sworn copies, as having passed under a more exact critical [sic] examination."). But having obtained such a seal, an exemplification was itself "sufficient evidence" of the original's contents. *Id.* at § 501. By contrast, authenticating lesser copies required the testimony of an officer who had examined both the copy and the original to confirm that the copy was a faithful reproduction. *Id.* at § 508.

Case law before and leading up to § 1920's enactment in 1948 continued to reflect this understanding of "exemplification." Relying on the Greenleaf treatise, the Second Circuit explained in 1899 that "[r]ecords may be proved by exemplification (copies under seal), by office copies, and by sworn copies." *Nat'l Acc. Soc. v. Spiro*, 94 F. 750, 751 (2d Cir. 1899). It likewise noted that copies "under seal[ ] are deemed of higher credit than sworn copies." *Id.* Forty years later (and nine years before § 1920's enactment), the Ninth Circuit similarly wrote of a statute that "obviate[d] the necessity of proving the loss of the original or otherwise accounting for it by accepting at face value the exemplified copies of public records." *Shreve v. United States*, 103 F.2d 796, 809 (9th Cir. 1939). And a year after § 1920's enactment, the District Court for the

Western District of Pennsylvania noted in a case related to a prior proceeding in Missouri that because "[n]o exemplification of the court record was available and the petitioner had no documentary proof to support his oral representations," the court requested "a complete exemplification and certification of the records from the United States District Court for the Eastern District of Missouri." *Noll v. United* States, 83 F. Supp. 887, 889 (W.D. Pa. 1949). So courts writing before and contemporaneous with § 1920's enactment also understood "exemplification" to bear a concrete, specific meaning: an authenticated copy of a public record for use as evidence in a subsequent proceeding.

Dictionary definitions reinforce this point. Take the fourth edition of *Black's Law Dictionary*, published near the advent of § 1920. It defines an "exemplification" as "[a]n official transcript of a document from public records, made in form to be used as evidence, and authenticated as a true copy."[7] *Exemplification*, BLACK'S LAW DICTIONARY (4th ed. 1951). Likewise, a leading lay dictionary of the period, *Webster's New International*, reflects the correct contextual understanding of an "exemplification": "*Law.* An exemplified copy." *Webster's New International Dictionary* 892 (2d ed. 1959). It then explains that to "exemplify" a copy means "to make an attested copy or transcript of, under seal, as a record." *Id.* So these dictionaries, a leading evidence treatise, and contemporary courts had all converged on the same understanding of "exemplification."

More recent case law also undercuts the defendants' attempt to rebrand an A/V technician's expenses an "exemplification."[8] Other Texas district courts have concluded that "the costs

---

[7] The fourth edition of *Black's Law Dictionary*—specifically, its definition of "copy"—also succinctly captures the distinctions outlined in the Greenleaf treatise. *Copy*, BLACK'S LAW DICTIONARY (4th ed. 1951). As it explains under that entry, "*exemplifications* are copies verified by the great seal or by the seal of a court," while "*examined copies* are those which have been compared with the original or with an official record thereof," and "*office copies* are those made by officers intrusted [sic] with the originals and authorized for that purpose." *Id.*

[8] The Court notes that the defendants' own bill of costs puts "exemplification" in scare-quotes. *See* Bill of Costs at 12, ECF No. 649.

associated with an audio and visual technician's services used during trial" are not "taxable under § 1920[.]" *EVM Sys., LLC v. Rex Med., L.P.*, No. 6:13-cv-184, 2016 WL 3475318, at *2 (E.D. Tex. Feb. 5, 2016); *Summit 6 LLC v. Research in Motion Corp.*, No. 3:11-cv-367-O, 2013 WL 12124322, at *4 (N.D. Tex. Nov. 26, 2013) (holding that audiovisual expenses are "not properly taxable" as exemplification costs). Following these courts and the earlier cases, dictionaries, and treatises mentioned above, the Court holds that the defendants may not tax their A/V technician expenses as "exemplification" costs.

### 4.F The Defendants Are Not Entitled to $33,853.75 for Expenses Incurred for Graphics Created During and For Trial

The defendants also assert that they are entitled to $33,853.75 for "costs incurred for graphics created during and for trial." Brief at 12, ECF No. 650. These included both trial demonstratives and witness headshots compiled for several juror notebooks. *Id.* at 13. The defendants claim that these expenses, too, are "'exemplification' costs under § 1920" that may be taxed under Fifth Circuit precedent "when approved by the court prior to trial and if the materials generating such costs facilitated an efficient trial." *Id.* (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 335 (5th Cir. 1995)). The defendants then argue that they had "both express and implied authorization in the record for the trial graphics [they] commissioned and used," thus permitting taxation. Brief at 13, ECF No. 650. In turn, the plaintiffs respond that the defendants' graphics "were *not* approved in advance" and so may not be taxed as costs. Objection at 15–18, ECF No. 656.

The Court need not settle whether the trial graphics' creation was "approved in advance" because, regardless, their creation was not an "exemplification" that may be taxed under § 1920. Again, the defendants say that creating trial graphics *is* an "exemplification" cost, but that it may be taxed as such only with pretrial approval. Brief at 13, ECF No. 650. That's an odd argument. If

creating trial graphics really were an exemplification cost, then § 1920(4) would permit its taxation without advance approval. *See* § 1920(4) (omitting an advance-approval requirement). And if creating trial graphics really *isn't* an exemplification cost, then § 1920 doesn't permit its taxation at all, since none of § 1920's other categories comes close to encompassing remuneration for the labor expended creating trial graphics. So what the defendants' argument has to do with § 1920's plain text is opaque.

The story only becomes clearer when looking to an old line of Fifth Circuit precedent the defendants invoke that purported to allow the taxation of certain expenses as "costs" even if the expenses fell outside § 1920's purview. Brief at 13, ECF No. 650. *Johns-Manville Corp. v. Cement Asbestos Products Co.*, decided in 1970, appears to have kicked off the trend. 428 F.2d 1381 (5th Cir. 1970). In a patent infringement case, the Cement Asbestos Products Company (CAPCO) sought to tax as costs "the costs of charts and physical exhibits" it had used in the proceeding. *Id.* at 1385. The Fifth Circuit responded that:

> *There is no statutory provision for the taxation of charts and exhibits as costs.* We think that the statutory omission is salutary. Under Rule 16, F.R.Civ.P., the court may authorize, prior to trial, the production of models and charts. This procedure avoids the possible abuse of incurring oppressive costs by one party, ex parte, which may be taxed to his adversary, and yet provides for full utilization of charts and exhibits necessary to the proper and efficient disposition of the case. No prior approval having been obtained from the Court by CAPCO to produce the models and charts in question, the costs must be disallowed.

*Id.* (emphasis added).

So the Fifth Circuit admitted that there was "*no statutory provision* for the taxation of charts and exhibits as costs."[9] *Id.* (emphasis added). Instead, it grounded this new approach in Rule 16, a

---

[9] Like a broken clock right twice a day, the court casually admitting that its novel procedure had no statutory basis meant that it mercifully declined to rely on the view that the charts were somehow "exemplifications."

rule about pretrial conferences that says nothing about cost-taxation for pre-approved demonstratives. *Id.* (citing Rule 16); *see also* Fed. R. Civ. P. 16. Apparently to promote what it regarded as sound policy, the Fifth Circuit created an ad hoc embellishment under which extra-statutory expenses may be taxed as "costs" if the trial court approves them in advance.

The Fifth Circuit reiterated this conclusion in a few subsequent opinions. In 1983's *Studiengesellschaft Kohle mbH v. Eastman Kodak Company* ("*SGK*"), the Circuit was asked to review the propriety of a district court's award of costs for "[c]harts, models[,] and photographs." *SGK*, 713 F.2d at 132. As the Circuit explained,

> The court assessed $1,067.97 against SGK for charts, models[,] and photographs. In *Johns-Manville Corp. v. Cement Asbestos Products Co.*, 428 F.2d 1381, 1385 (5th Cir. 1970), this court held that since *there is no statutory provision for the award of costs for charts, models[,] and photographs*, they may be taxed as costs only if there is a pretrial authorization by the trial court. The record does not show any prior approval; therefore, the district court should have disallowed this cost.

*Id.* at 132–33 (emphasis added).

So despite re-applying the "pretrial approval" rule, the Circuit noted once again that there is no actual statutory authority for this procedure. And on those shaky grounds, the Circuit in 1985 called it "*settled* that costs for charts, models[,] and photographs may be taxed as costs only if there is pretrial authorization by the trial court." *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 760 F.3d 613, 615 (5th Cir. 1985) (citing *SGK*, 713 F.2d at 133; *Johns-Manville Corp.*, 428 F.2d at 1385) (emphasis added); *see also La. Power & Light Co.*, 50 F.3d at 335 (relying on *Johns-Manville Corp.* and *SGK* for the proposition that parties may tax as costs expenses arising from trial exhibits if their creation received pretrial approval).

Yet the Fifth Circuit's view that courts may tax expenses not included in § 1920 as "costs" if such expenses are approved pretrial is at war with every recent Supreme Court case examining

§ 1920 and, ultimately, self-refuting. Take first the Supreme Court's 1987 decision in *Crawford Fitting Company v. J.T. Gibbons*, which itself was at the Supreme Court on certiorari to the Fifth Circuit. *Crawford Fitting*, 482 U.S. at 438–39. There, the Court emphatically rejected the petitioners' argument that "§ 1920 does not preclude taxation of costs [in that case, expert witness fees] above and beyond the items listed" in § 1920. *Id.* at 441. Instead, the Court explained, § 1920's six categories "embod[y] Congress['s] considered choice as to the kinds of expenses that a federal court may tax as costs against the losing party[.]" *Id.* at 440. Thus, the Court denied the expert-witness-fee request and "h[e]ld that absent explicit statutory or contractual authorization," courts may not tax as "costs" expenses not enumerated in 28 U.S.C. §§ 1821 and 1920. *Id.* at 445. The Court doubled down on that conclusion in its 1991 decision *West Virginia University Hospitals v. Casey*, 499 U.S. 83 (1991). The Court there rejected the notion that "fees for services rendered by experts" constitute "costs" under § 1920. *Id.* at 87. Invoking *Crawford Fitting*, the Court noted that *Crawford* had "held that [§ 1920's] provisions define the *full extent* of a federal court's power to shift litigation costs absent express statutory authority to go further." *Id.* (citing *Crawford Fitting*, 482 U.S. at 437) (emphasis added). The Court reiterated that point in its 2006 decision *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006). Citing *Crawford Fitting* once again, the *Murphy* Court noted that *Crawford* had "rejected an argument . . . that the term 'costs' . . . should be construed as an open-ended reference to prevailing [parties'] expenses." *Id.* (citing *Crawford Fitting*, 482 U.S. at 439). To the contrary, "Rule 54(d) *does not give* a district judge 'discretion to tax whatever costs may seem appropriate'; rather, the term 'costs' in Rule 54(d) is defined by the list set out in § 1920." *Id.* (emphasis added). And most recently in the 2019 decision *Rimini Street v. Oracle*, the Supreme Court again rejected the notion that lower courts may deploy § 1920 to tax as "costs" litigation expenses not actually

enumerated in § 1920's six categories. 139 S. Ct. 873 (2019). There, the Supreme Court unanimously reversed the Ninth Circuit's affirmance of a district court's taxation as "costs" various litigation expenses relating to "expert witnesses, e-discovery, and jury consulting." *Id.* at 875, 877. As the Supreme Court explained, its "precedents have consistently adhered" to the principle that courts may not "authoriz[e] an award of litigation expenses beyond the six categories listed in §§ 1821 and 1920, absent an explicit statutory instruction to that effect." *Id.* at 877–78. Indeed, absent that "explicit statutory instruction," "§§ 1821 and 1920 provide a *comprehensive schedule* of costs for proceedings in federal court." *Id.* at 878, 879 (emphasis added). So as the Supreme Court has said over and over, courts lacking explicit statutory or contractual authority from somewhere else *may not* tax as "costs" litigation expenses not encompassed in § 1920.

Given the obvious contradiction between these Supreme Court holdings and the Fifth Circuit's atextual tax-whatever-the-court-preapproved approach, that Fifth Circuit precedent has been abrogated. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 491 (2016) (noting that a federal district court is not obliged to follow a panel opinion where "there is a contrary decision by the U.S. Supreme Court."). The Fifth Circuit has twice admitted that its approach lacks any basis in the statute, and that's enough to invalidate it under the Supreme Court's recent and clear instructions about § 1920. Again, the six categories represent the "*full extent*" of and a "*comprehensive schedule*" of those fees that courts may tax as costs under § 1920. *See Casey*, 499 U.S. at 87; *Rimini St., Inc.*, 139 S. Ct. at 879 (emphases added). Section 1920 is not a rough suggestion that trial courts may fine-tune via pretrial approval of additional, extra-statutory expenses in individual cases. Could courts enlarge their own authority on such an ad hoc basis, Congress's attempt to strictly limit what federal courts may tax as "costs" would degenerate to no limit at all.

The only remaining question, then, is whether the trial graphics' creation expenses constitute an "exemplification," as the defendants say, under § 1920(4). (If that were the case, then, as with every other "cost" actually enumerated in § 1920, pretrial approval would be irrelevant.) But as the Court has already explained, an "exemplification" is an "[a]n official transcript of a document from public records, made in form to be used as evidence, and authenticated as a true copy." *Exemplification*, BLACK'S LAW DICTIONARY (4th ed. 1951). Trial graphics and juror headshots generated by private consultants and technicians for litigation purposes are not "public records" authenticated as "true cop[ies]" for use as evidence. So they are not "exemplifications." Thus, the defendants may not recover expenses associated with their creation.

### 4.G    The Defendants Are Entitled to Tax As Costs $137.68 of Expenses They Incurred Converting Scanned Documents to TIFF Format

Last, the defendants argue that they are entitled to recover $137.68 of expenses that they incurred while "convert[ing] more than 1,000 pages of documents to TIFF and render[ing] those documents discoverable." Brief at 15, ECF No. 650.[10] These TIFF conversions, they say, also constitute "exemplification costs" under § 1920(4), and thus are properly taxable. *Id.* at 12. The plaintiffs object that TIFF conversions are not "exemplification[s]" within the meaning of § 1920 and that the defendants never gained pretrial approval for those expenses. Objection at 14–18, ECF No. 656. Thus, the "Court should deny Defendants' costs for . . . TIFF document conversion." *Id.* at 14.

The Court agrees with the plaintiffs that the process of converting one file from its native format into TIFF does not constitute an "exemplification" within the original public meaning of that term as used in § 1920(4). The Court's earlier discussion of "exemplification" should make

---

[10] "TIFF," short for Tagged Image File Format, is a file-type "widely used" for e-discovery. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 925, 925 n.4 (9th Cir. 2015).

that conclusion obvious. But the Court disagrees with the plaintiffs that because TIFF conversions are not "exemplification" costs that they are not taxable under § 1920. To the contrary, § 1920(4) also allows taxation of "the costs of making copies of any materials where the copies are necessarily obtained for use in the case." So the real questions are whether TIFF conversions constitute the "making [of] copies of any materials"[11] and whether the TIFF conversions (i.e., the "copies") were necessarily obtained for use in the case.

Taking the second and simpler question first, the Court finds that the defendants' TIFF conversions were "necessarily obtained for use in the case." They were not extraneous expenses incurred simply for the defendants' convenience but were how the defendants conducted document discovery. Brief at 15, ECF No. 650. Because document discovery was plainly a necessary activity in this action, the defendants have satisfied that portion of § 1920(4).

Now for the first, more difficult question—whether TIFF conversions are "copies of any materials." In 2008, Congress amended § 1920(4) to allow taxation not just for "copies of papers," but for "copies of any materials." *See* 122 Stat. 4292; Pub. Law 110–406 (Oct. 13, 2008). So the relevant issues concern whether TIFF conversions involve "copies" of "materials." Dictionaries

---

[11] Because whether TIFF conversions fall within the text of § 1920(4) appears to be an outstanding issue in the Fifth Circuit, the Court presents its own interpretation of § 1920(4). *See GSDMIdea City, L.L.C.*, 807 F.3d at 131–32 ("Courts have not uniformly addressed which electronic discovery costs are recoverable under the most recent version of § 1920(4), including whether TIFF conversion and character recognition should be taxable. . . . We need not resolve that disagreement today[.]") Somewhat oddly, the Circuit also affirmed a district court's taxing of TIFF conversion expenses upon "find[ing] no abuse of discretion in the district court's award of conversion . . . costs." *Id.*; *see also U.S. ex rel. King v. Solvay Pharm. Inc.*, 871 F.3d 318, 336 (5th Cir. 2017) (concluding, based on *GSDMIdea City*, that a district court did not abuse its discretion in allowing taxation of TIFF conversion fees). But whether TIFF conversion is taxable at all under § 1920(4) is a pure question of statutory interpretation that merits review de novo, not for abuse of discretion. *See Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 254 (4th Cir. 2013) ("[W]hether a particular expense falls within the purview of § 1920, and thus may be taxed in the first place, is an issue of statutory construction, subject to de novo review.") (quoting *Synopsys, Inc. v. Ricoh Co. (In re Ricoh Co. Patent Litig.)*, 661 F.3d 1361, 1364 (Fed. Cir. 2011)).

The Court does note, however, that other Circuits have endorsed the view that TIFF conversion expenses may be taxed as costs under § 1920(4)'s provision for "copies of any materials." *See, e.g., Country Vintner of N.C.*, 718 F.3d at 261; *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 167 (3d Cir. 2012); *see also* Preston Register, Note, *How Much Do I Owe You For That Copy? Defining Awards Under 28 U.S.C. § 1920(4)*, 65 ALA. L. REV. 1087, 1096 (2014) (arguing that TIFF conversion is clearly analogous to "traditional discovery").

published around the 2008 amendment define a "copy" as "an imitation or reproduction of an original." *Copy*, BLACK'S LAW DICTIONARY (9th ed. 2009); *The American Heritage Dictionary of the English Language* 405 (5th ed. 2018) ("An imitation or reproduction of an original."). TIFF conversions, which have existed since 1986, appear to fall within that meaning. *See* James D. Murray & William vanRyper, *Graphics File Formats* 880 (2d ed. 1996). Converting a native file (an "original") into a new file format that "imitat[es]" or "reproduce[es]" the original's contents is a quintessential "copy." Sure, what comes out after the conversion is not an exact duplicate of the original; the file format differs. But one could easily envision the same scenario with a traditional copy machine. Imagine that someone with an old ribbon in her typewriter types out a faint message on standard white paper. She then places the message on a copy machine, put its "density" setting on high, and loads the copier with ivory résumé paper. What comes out of the copy machine is indisputably a "copy" of the original, even if the new "copy" happens to be slightly darker and on slightly heavier paper. It's still a "copy," even if the new "file format," so to speak—darker text and heavier paper—happens to differ from the original.

It may seem that a complication arises from this view of "copying." If that's what it means to "copy" something, why does the Court's definition of "copy" not swallow § 1920(3)'s allowance for parties' "[f]ees . . . for printing"? For instance, *printing* a TIFF document seems like reproducing an original—the TIFF file—in a new format—on paper. If that's the case, it seems like the Court's definition of "copy" must be overbroad, since it would render § 1920(3)'s "printing" provision surplusage. But "printing" in 1948 had a distinct and narrower definition than did (and does) "copying." Printing referred, specifically, to the mechanical transfer of an image from a printing surface onto another medium; typically, paper or cloth. *Print*, BLACK'S LAW DICTIONARY (4th ed. 1951). ("To stamp by direct pressure as from the face of types, places, or

33

blocks covered with ink or pigments[.]); *see also Printing, id.* ("The impress of letters or characters upon paper, or upon other substance;—implying a mechanical act."). This mechanical process creates an "original," the subsequent reproduction of which constitutes a "copy"—"an imitation or reproduction of an original." So using a computer to print a modern computer file really is "printing" under § 1920(3)—not copying. For modern printers also employ a printing surface to mechanically transfer an image via ink onto paper.[12]

It's also worth noting that today, just as in 1948, not everything that can be "copied" can be "printed." One can copy an original analog tape recording of a conversation, for instance, without the recorded conversation ever having been "printed" within the meaning of § 1920(3). Or, further outside the litigation context, one could copy a statue or piece of furniture without the statue or furniture ever having been "printed." So the Court's definition of "copying" under § 1920(4) does not engulf § 1920(3)'s definition of "printing."

A final issue concerns § 1920(4)'s reference to "copies *of any materials*[.]" Reproducing information in TIFF may be a "copy," but is it really the copying of "materials"? In some sense, perhaps not. "Material" can refer to tangible objects like paper. *New Oxford American Dictionary* 1078 (3d ed. 2010). But "material" also has a more general sense, as in "facts" or "information," irrespective of the medium in which they are fixed. *Id.* at 1079. (For instance, a professor might circulate the semester's readings in a digital computer file entitled "Class Materials.") It seems that Congress's 2008 amendment of § 1920(4) suggested the latter connotation. As mentioned, the pre-2008 statute used to allow taxation of fees only for "copies *of papers.*" *See* 122 Stat. 4292; Pub. Law 110–406 (Oct. 13, 2008) (emphasis added). But Congress broadened that language to

---

[12] But we could also imagine time-released ambiguities with § 1920(3)'s provision for "printing." Take, for instance, a "3D-printed" model used as a trial demonstrative. The model presumably involved "printing" costs, but whether those costs fall within the original public meaning of "printing" as used in § 1920(3) would be a difficult question.

allow taxing fees for copying "*any materials*." *Id.* (emphasis added). It thus abandoned the requirement that the information copied must have been fixed in a specific medium. What matters now is that information was reproduced—not the particular medium in which the reproduced information was originally fixed. So words "copied" from digital files may now be taxed just like words "copied" from a page. Thus, the defendants may tax the $137.68 of expenses they incurred converting native files to TIFF.

## IV.   CONCLUSION

For those reasons, the Court will **GRANT IN PART** and **DENY IN PART** the defendants' amended bill of costs. The defendants are entitled to tax $79,080.38 of their expenses as costs. A separate Order consistent with this Memorandum Opinion shall issue this date.

SIGNED this ___ day of May, 2021.

                                                         Royce C. Lamberth
                                    United States District Judge